# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

DANESH NOSHIRVAN
an individual,

                                 CASE NO:
                                 2:23-cv-01218-JES-NPM

        Plaintiff,

                                 **JURY TRIAL DEMANDED**

vs.

JENNIFER COUTURE, an individual,
RALPH GARRAMONE M.D, an individual,
RALPH GARRAMONE M.D. P.A. d/b/a
GARRAMONE PLASTIC SURGERY.,
CENTRAL PARK OF SOUTHWEST
FLORIDA, LLC, WRAITH, LLC,
SULLIVAN STREET INVESTMENTS, LLC,
HAIRPIN TURN, LLC, OMG REALTY, LLC,
R G WEIGHT MANAGEMENT, LLC,
CENTRAL PARK SOUTH, LLC,
BRANTLEE, LLC, LEGACY OF MARIE
GARRAMONE, LLC, GARRAMONE
MARKETING, INC., 5681 DIVISION LLC,
THE LAW OFFICE OF PATRICK TRAINOR
ESQ, LLC d/b/a THE LAW OFFICE OF
PATRICK TRAINOR, PATRICK TRAINOR,
an individual, and
ANTI-DOXING LEAGUE INC.

        Defendant(s).

_____

## FIRST AMENDED COMPLAINT

_____

**COMES NOW** plaintiff, Danesh Noshirvan a/k/a "@ThatDaneshGuy" ("Noshirvan"), by and through his attorneys, sue defendants, Jennifer Couture ("**Couture**"), Ralph Garramone M.D ("**Garramone**"), Ralph Garramone M.D. P.A. D/B/A Garramone Plastic Surgery ("**Garramone Plastic Surgery**"), Central Park of Southwest Florida, LLC ("**Central Park**"),  Wraith, LLC ("**Wraith**"), Sullivan Street Investments, LLC ("**Sullivan St. Invest**."), Hairpin Turn, LLC ("**Hairpin**"), Omg Realty, LLC ("**OMG Realty**"), R G Weight Management, LLC ("**R G Weight**"), 5681 Division LLC ("**5681 Div**."), Garramone Marketing, Inc. ("**Garramone Marketing**"), Legacy Of Marie Garramone, LLC ("**Legacy**"), Central Park South, LLC ("**CPS**"), Brantlee, LLC ("**Brantlee**"), The Law Office of Patrick Trainor, Esq., LLC d/b/a The Law Office of Patrick Trainor ("**Trainor Law Firm**"), Patrick Trainor ("**Trainor**"), Anti-Doxing League Inc. ("**ADL**") collectively ("**Defendants**"), and alleges the following upon personal knowledge and belief, and investigation of counsel:

## I.  <u>NATURE OF THE ACTION</u>

1.  This is a civil conspiracy and agency action for defamation, tortious inference, misappropriation of likeness, and intentional infliction of emotional distress. Noshirvan is an online entertainer and journalist. His work often depicts bad actors behaving badly on camera and includes satire or political commentary.

Noshirvan advocates for accountability culture, which unfortunately in some cases, results in public cancellation. However, Noshirvan also helps the victims of the bad actors by shedding light on the bad actors' socially unacceptable actions. Noshirvan raises money to help the reported-on victims.

This case arises out of a series of events stemming from January 26, 2022. On January 26, 2022, Couture was video recorded committing crimes. Shortly thereafter, Noshirvan reported on Couture's story, and publicized her wrongdoing. As a result, online conversations, turned to false accusations, and the hiring of a social media terrorist under the guise of an "online image manager." Understandably, Garramone and Couture were angry about Couture's newly found publicity, but mistakenly blamed Noshirvan for the public outcry and ensuing online negative response to Couture's actions. Couture never accepted responsibility for her actions. At some point,  Defendants met or were brought together. This is when Defendants conspired to injure, harm, and destroy Noshirvan mentally, reputationally, and financially. Defendants' conspiracy started with their management of Noshirvan's online image  through rounds or a series of defamatory campaigns, swatting, false reports to Child Protective Services, libelous publication of flyers and billboards.

Defendants' conspiracy and overt acts were fueled by their need for vengeance or retribution. Defendants' malicious intent may be inferred by their expressed desire to cause Noshirvan to become homeless, deplatformed, have his child placed in foster care, and his wife forced to do immoral acts. In other words, mentally, emotionally, and financially wrecked. Defendants' series of campaigns were intentionally  designed to inflict severe emotional distress upon Noshirvan. Defendants' vindictiveness and follow through go beyond all bounds of decency and is not acceptable in a civilized community.

## II. <u>JURISDCTION</u>

2.     This Court has subject matter jurisdiction over this case pursuant to diversity jurisdiction prescribed by 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, and there is complete diversity between the parties.

3.     The Court has supplemental jurisdiction over Plaintiff's claims asserted against Trainor, the Trainor Law Firm, and ADL, in this action pursuant to 28 U.S.C. § 1367(a). Plaintiff's claims against Trainor, the Trainor Law Firm, and ADL, are part of the same case or controversy and arise out of the same nucleus of operative facts.

### III.   VENUE

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in all or a substantial part of the events or omissions giving rise to this claim occurred in this district.

5.      Venue is also proper in this Court pursuant to 28 U.S.C. § 1391 because Garramone and Couture are U.S. citizens domiciled in this District, Garramone Entities maintain a principal place of business in this District, and Trainor intentionally availed himself to Florida through §48.193(1)(a)1, Fla. Stat. Defendants have sufficient minimum contacts with the State of Florida. Further, substantial acts or events giving rise to Noshirvan's claims occurred in this District.

### IV.   <u>PARTIES</u>

**A. <u>Plaintiff, Danesh Noshirvan</u>**

6.      Noshirvan is an Iranian American social media personality publicly known by his commentary and opinions on politics, civil rights, and current social issues.

7.      Beyond simply being a media personality, Noshirvan is a citizen journalist who creates content geared towards helping disenfranchised minorities and people who the police refuse to help.

8.      Noshirvan reports news stories on social media platforms that do not initially make the cut for major media outlets. Noshirvan's reported news  often sheds light on racial prejudice, physical violence, criminal acts, abuse of government office, and other hot topic issues, which in turn, end up being reported by major media outlets.

9.      Noshirvan is an adult media personality and journalist who is *sui juris*.

10.     Noshirvan is a U.S. citizen domiciled in Mansfield,  Tioga County, Pennsylvania.

**B. <u>Defendant, Jennifer Couture</u>**

11.      Couture is an adult, who is upon information belief is *sui juris*.

12.     Couture is a U.S. citizen domiciled in Fort Myers, Lee County, Florida.

13.     Upon information and belief, Couture currently resides at 3706 Oxford Street, Fort Myers, Florida 33901.

14.     Couture is a co-owner of 3706 Oxford Street, Fort Myers, Florida 33901.

15.     Courture is Garramone's girlfriend and employee of Garramone Plastic Surgery**.**

16.    Upon information and belief, Couture is not a business owner.

## C.  Defendant, Garramone

17.    Garramone is an adult plastic surgeon, who upon information and belief  is *sui juris*.

18.    Garramone is a U.S. citizen domiciled in Fort Myers, Lee County, Florida.

19.    Garramone is primary owner of the following entities: Garramone Plastic Surgery, Central Park,  Wraith, Sullivan St. Invest.,  Hairpin, OMG Realty, Legacy,  Brantlee,  R  G  Weight,  Garramone  Marketing,  CPS,  and  5681  Div., collectively ("**Garramone Entities**").

20.    Garramone is the sole owner, shareholder, or member of all the Garramone Entities with the only exceptions being Hairpin, Brantlee, and OMG Realty, which are owned by Wraith – who is controlled by Garramone.

21.    The Garramone Entities all operate out of, or maintain their "principal place of business," at 12998 S. Cleveland Ave., Fort Myers, Florida.

22.    Garramone Plastic Surgery's surgery center is located 12998 S. Cleveland Ave., Fort Myers, Florida ("**Garramone Surgery Ctr.**").

23.    All Garramone Entities are closely held companies that are intimately

entangled or intertwined  as to simply be an extension of Garramone. The acts alleged in this Complaint by employees and agents were committed, controlled, or carried out as a result of Garramone's direction, instruction, or order – and in furtherance of the Couture/Garramone Conspiracy.

24.     Upon information and belief, Garramone currently resides at 3706 Oxford Street, Fort Myers, Florida 33901.

25.     Garramone is a co-owner of 3706 Oxford Street, Fort Myers, Florida 33901.

26.      Garramone through his company Central Park owns 6535 Winkler Rd., Fort Myers, Florida 33919.

27.     Garramone also owns 1215 Braman Ave., Fort Myers, Florida 33901.

**D. Garramone Entities**

28.     Garramone is the sole managing member of the following "LLC's": 5681 Div., R G. Weight, Central Park, Legacy, and Sullivan St.

29.     Garramone is a U.S. citizen domiciled in Fort Myers, Lee County, Florida.

30.     5681 Div., R G. Weight, OMG Realty, Hairpin, Central Park, Brantlee, Legacy, Sullivan St. are limited liability companies registered in Florida.

31. 5681 Div., R. G. Weight, OMG Realty, Hairpin, Central Park, Brantlee, Legacy, and Sullivan St. all maintain their principal place of business in Fort Myers, Florida at Garramone Surgery Ctr.

32. CPS is a limited liability company registered in the State of Florida. CPS maintains its principal place of business located at 1215 Braman Ave., Fort Myers, Florida 33901. Garramone is the sole managing member of CPS. Garramone is a U.S. citizen domiciled in Fort Myers, Florida.

33. Garramone Marketing is a for profit corporation incorporated in Florida. Garramone Marketing maintains its principal place of business in Fort Myers, Florida at Garramone Surgery Ctr. Garramone is the sole officer, director, or shareholder of Garramone Marketing.

34. Garramone Plastic Surgery is a professional association organized and existing under the laws of the State of Florida. Garramone Plastic Surgery maintains its principal place of business in Fort Myers, Florida at Garramone Surgery Ctr. Garramone is the sole officer, director, or shareholder, of the professional association, and he U.S. citizen domiciled in Fort Myers, Lee County.

35. Wraith is a limited liability company registered in Alaska. Wraith maintains its principal place of business at 1231 W. Northern Lights Blvd., #911,

Anchorage, Alaska 99503. Wraith  has two members, Ms. Elizabeth Santos and Garramone.

36.    Ms. Elizabeth Santos is U.S. citizen domiciled in Barnstead, New Hampshire and Garramone is a U.S. citizen domiciled in Fort Myers, Lee County.

37.    Wraith is the sole managing member of OMG Realty, Hairpin, Brantlee.

38.    Wraith is registered to do business in Florida.

**E. Trainor**

39.     Trainor is a lawyer who first became  licensed in New Jersey on January 08, 2019, and is *sui juris*.

40.    Trainor is a U.S. citizen domiciled in Hasbrouck Heights Borough, Bergen County, New Jersey 07604.

**F. Trainor Entities**

41.    The Law office of Patrick Trainor Esq., LLC is a domestic limited liability company registered in the State of New Jersey. Trainor is the sole member and owner of The Law office of Patrick Trainor Esq., LLC.  The Trainor Law Firm's place of business is located at 19 Union Ave., Suite 201 Rutherford, New Jersey 07070.

42.    The Anti-Doxing League, Inc. is a domestic non-profit corporation incorporated in the State of New Jersey. Trainor is the sole incorporator and trustee board member. The Anti-Doxing League, Inc. maintains its place of business at 19 Union Ave., Suite 201 Rutherford, New Jersey 07070.

43.    The Law office of Patrick Trainor Esq., LLC and The Anti-Doxing League, Inc.  are collectively  referred to as the "**Trainor Entities**."

44.    All Trainor Entities are closely held companies that are intimately entangled or intertwined  as to simply be an extension of Trainor. The acts alleged in this Complaint by Trainor Entities' employees and agents were committed, controlled, or carried out as a result of Trainor's direction, instruction, or order.

45.    Trainor and the Trainor Entities purposely availed themselves to Florida's jurisdiction by operating or having operated, active websites and social media accounts directed at contacting or recruiting persons residing or domiciled in Florida during the time frame alleged in the Complaint.

46.    Complete diversity jurisdiction exists because no Defendant is a domiciled citizen of Pennsylvania and the amount in controversy exceeds $5,000,000.00 dollars.

## V.   <u>FACTUAL ALLEGATIONS</u>

### A. BACKGROUND

#### a.  The Parties and Known Co-Conspirators

##### i.   **Couture behaving badly**

47.    Couture constantly disregards the rights of people whom she deems beneath her "social status." Couture has on more than one occasion disregarded the rights of others who she deemed beneath her.[1]

48.    Upon information and belief, Couture was a client of Garramone Plastic Surgery, who then became Garramone's girlfriend and an employee of one or more of the Garramone Entities.

49.    During the height of the Covid-19 pandemic, employees who worked for Garramone Plastic Surgery were concerned about coming into the office for obvious health reasons. Upon information and belief,  Garramone with the help of Couture - fired those employees via social media - as depicted in the following picture:

---

[1] See Lee Cty. Case Numbers: 22-CO-005490 and 22-CO-005496.



50.     As a result of Couture and Garramone's insensitive action, members of Fort Myers and the social media community held animus feelings towards them for nearly two years prior to the January 26, 2022, altercation. Further, the public posting shows that their "relationship" was known prior to January 26, 2022.

51.     On January 26, 2022, Couture got into an altercation with a young woman in a Dunkin Donuts parking lot. That altercation was video recorded.[2]

52.     The altercation between Couture and the young woman escalated quickly, and what started out as a verbal argument soon became a one-sided violent and verbal attack solely maintained by Couture. (See fn. 3)

53.     During the altercation, Couture physically entered the young woman's motor vehicle through the driver side window and began to grab the young woman

_____

[2] This is link to the video where Couture committed battery, burglary, and aggravated assault with a weapon on a young woman. https://www.youtube.com/watch?v=OdP9tP_5x8Q

sitting in the driver-side seat of the vehicle. Couture then attempted to steal the young woman's cellphone. Couture then verbally mocked the young woman. In response, the young woman verbally responded to Couture's extreme and outrageous actions. Couture in a  psychoneurotic state, entered her own motor vehicle, threw the vehicle in reverse, and attempted to crash into the young woman who exited her vehicle to video record Couture's license plate. (See Fn. 3)

54.    After the altercation, detective Ryan Justham,  of the Lee County Sheriff's Office executed an affidavit for arrest warrant.

55.    Detective Ryan Justham specifically found that: (1) Couture entered the young woman's occupied vehicle with intent to commit  battery upon the young woman. (*Id*.); (2) Couture actions demonstrated an "intentional unlawful threat" "to do violence to the [young woman]" while having the apparent ability to do so. (*Id*.); and (3) that "Couture actually and intentionally grabbed the [young woman's] wrists against her will." (*Id*.)

56.    A felony arrest warrant was issued for Couture on or about February 16, 2022 -  under warrant number 22CF000256.

57.    On February 20, 2022, at 10:30 p.m., Couture was arrested for: (1) burglary of an occupied conveyance in violation of F.S. 810.02(3)(d); (2) battery in violation of  F.S. 784.03(1)(a)1.; and (3) aggravated assault with a deadly weapon

without intent to kill in violation of  F.S. 784.021(1)(a). Couture's Lee County mugshot following the arrest and a picture of the video recorded altercation is below:



58.   Upon information and belief, Couture made a plea deal with the prosecutor and only was required to plead guilty to first-degree trespass, second-degree assault, and first-degree battery.[3] All three charges were reduced to misdemeanors.

59.   As part of a plea agreement, the court withheld imposition of a sentence, and Couture was placed on twelve months of probation for Count 1 Trespass, six months of probation for Count 2 Assault and twelve months of probation for Count 3 Battery. Counts 1 and 2 ran concurrently with each other and consecutively to Count 3 for a total of two years of supervision.

---

[3] Couture had Lee Cty., Case Number 22-CF-000256 sealed as "confidential."

60.    During the probation period, Couture was ordered to have "no contact with her victim," attend "anger management," pay a "domestic violence surcharge," "restitution," and "submit to a Mental Health evaluation."

61.    Couture's criminal actions and mental health status are a matter of public concern as her actions endanger the health, safety, and welfare of the Lee County community.

62.    Publication of Couture's public criminal activities are protected by the U.S. Constitution and Florida State Constitution.

### i.    The felon, Joseph A. Camp, a "for-hire" Social Media Terrorist

63.    Joseph A. Camp ("Camp") is a 39-year-old convicted felon. Camp utilizes several pictures of his face on his social media accounts - pictures depicting him in various stages of his life. Here are a few:



64.     Camp goes by the following aliases or "handles" on the internet: "@CampJosephA," "@Joeycamp2020", "@daneshfiles", "reportingepik"[4], "yourdaddyjoey" "TheResearcher2020", "norshivan@yandex.com","Jojo," and "CEO at J Square Presents."

65.     Camp's publicly listed phone number is (720) 454-5240.[5] The photograph below was retrieved directly from Camp's verified Facebook account:



66.     Camp is a former student of the University of Central Missouri, who on April 12, 2013, plead guilty in the "Western District of Missouri" to "unlawful computer hacking scheme at UCM from March 2009 to March 2010."[6]

---

[4] https://www.washingtonpost.com/technology/2021/09/25/epik-hack-fallout/
[5] **N.B.** Camp's telephone number operates as a personal identifier in the pictures posted later in this Complaint.

67.    As part of the UCM computer hacking scheme, Camp conspired with another person to "gain unlawful and unauthorized access to the UCM computer network." Once their virus infected UCM's computers – databases containing faculty, staff, alumni, and student information, and money were stolen. Camp also utilized  remote access to a UCM administrator's computer to remotely turn on the webcam to watch and photograph the administrator. Camp was sentenced to three years in federal prison without parole and ordered to pay $61,500 in restitution for his role in the UCM computer hacking conspiracy.

68.    Camp is a "far-right internet troll and convicted hacker" "whose name was listed on domain registrations with Epik and who has claimed publicly to have done freelance work." (See Fn. 5)

69.    Camp's "freelance work" consists of  payment to Camp and in exchange  Camp will troll, harass, and defame, the "paid-for" target on social media. In short, Camp is a "for-hire" social media troll, harasser, maligner, and defamer, who freelances his service to the highest bidder.

70.    Camp's "for-hire" services goes well beyond social media trolling, doxing, and dissemination of public information. Camp services include real life

---

[6] https://www.justice.gov/usao-wdmo/pr/former-student-sentenced-computer-hacking-university-central-missouri

and in person harassment, defamation, swatting, intimidation, and at least, in one instance, a bomb threat towards a target.

71.     Upon information and belief, Camp has ties to Lee County, Florida, and in 2014 had an arrest warrant issued for making bomb threats to a person who at the time was a Judge.[7] See pictures below:





72.     Camp routinely and intentionally makes false defamatory statements on social media - both per se and by implication, about his target - to scare, silence, or to destroy his "paid-for" target's reputation.

---

[7] The arrest warrant appears to have been revoked after the judge/complainant passed away.

73.    Camp intentionally tortiously  interferes with his "paid-for" target's known business and personal relationships.

74.    On several occasions, Camp has knowingly contacted his "paid-for" targets,  their families, friends, distant relatives, and other people close to the target.

75.    On several occasions, Camp has knowingly contacted his "paid-for" the target's place of employment, business, business partners or relationships, and government licensing office, via telephone or email  for the sole purpose of destroying the target-victim's reputation and inflicting severe emotional distress and mental anguish.[8]

76.    Upon information and belief, Camp was forced, or chose, to flee the United States in mid to late 2022 because of his "for-hire" services.

77.    Upon information and belief, Camp fled to Belize in or after July of 2022. Camp also expressly claims to change his identity and maintain multiple passports as pictured below:

---

[8] https://www.instagram.com/p/CyMbWcqiZhE/



78.   Camp self-professes, via social media, that he regularly moves between Yucatan peninsula countries in avoidance of some unstated "prosecution." The following pictures depict Camp's *GiveSendGo* campaign wherein he claims to be in "exile" for several reasons:

---

[9] In figure labeled Fn. 11, Camp admits to having a second passport.



79.     Camp is best described as a "for-hire" social media terrorist.[10]  Camp is easily identifiable because, as Camp writes: "[b]ehind every troll I do, is my real name." Camp also alludes that he cannot be connected to an allegedly anonymous Yandex email accounts that send out malicious, mean, and threatening, emails:



80.     Camp expressly admitted to utilizing his real name in every internet or social media "troll" he does, "Yandex" domains, and claims ownership of the "Daneshfiles." Camp's statements above imply that he created the "Daneshfiles" and Norshirvan is his current "paid-for" target.

---

[10] Allegedly unreleased January 6th insurrection videos -posted by Joseph A. Camp on Rumble. https://rumble.com/c/JoeyCamp2020

81.    Camp also maintains multiple social media accounts on underground or alternative economy websites that pander to "supremacists," "proud boys," and nazi sympathizers. Upon information and belief, Camp met Trainor through these underground or alternative economy websites and social media applications.

### i. Trainor, the Trainor Law Firm, and the ADL

82.    Trainor obtained his New Jersey law license on January 08, 2019.

83.    On July 17, 2019, the Trainor Law Firm was formed in the State of New Jersey. The Trainor Law Firm received a certificate number: 0450400058.

84.    Upon information and belief, Trainor and the Trainor Law Firm marketed to, and represented, "supremacists," "proud boys," and nazi sympathizers.

85.    Upon information and belief, Trainor met Camp while marketing on underground or alternative economy websites and social media applications.

86.    On September 21, 2020, Trainor filed a RICO action in New Jersey federal court. *See D'ambly v. Exoo, 2:20-cv-12880*, (D.N.J.). In *D'ambly*, Trainor alleged his client was labeled as "fascist" or "supremacist" by defendant *Evoo*, who Trainor labeled an "anti-fascist" "Antifa leader." The *D'ambly* case was/is a reverse racial discrimination case.

87.    *D'ambly* is the first known instance where Camp interfered with an ongoing federal litigation. Upon information and belief, Trainor and Camp were

working together to force a settlement by means of extortion, intimidation, threat, and harassment. The plan involved Camp contacting several attorneys representing defendants in *D'ambly through telephone or electronic communications,* and threatening, harassing, intimidating, or extorting them in effort to get the defense lawyers to withdraw from the case. This is Camp's *modus operandi* - threaten, harass, intimidate, and extort, the perceived enemy until they retreat.

88.     After *D'ambly* was in suit and moving along,  Camp reached out to an individual to recruit that person to help find a new plaintiff in the New Jersey area – for Trainor's next case. During recruitment, the undisclosed person obtained recorded conversations and text messages implicating  Camp and Trainor as co-conspirators in the Couture/Garramone conspiracy. Those same recordings show that Camp and Trainor discussed private third-party conversations amongst themselves – in furtherance of the conspiracy. However, this undisclosed person never joined because Camp was informed by Trainor that this person "was under investigation." Here are text messages from Trainor and Camp to the undisclosed recruit:





---

[11] In these text message, Camp refers to "we", which implies a group of co-conspirators. Trainor states "these images you just sent and the voice message you just left look and sound like something a **snitch** would do. You know, nobody likes a **snitch… just don't** *snitch*."

89.    In May of 2022, the ADL was formed by Trainor. Upon information and belief, the ADL created, or had others create social media profiles/accounts for the sole purpose of contacting bad actors who had been publicly outed as part of Noshirvan's investigative journalism and satire entertainment broadcasts.

90.    Additionally, Trainor through the ADL marketed to  "supremacists," "proud boys," and nazi sympathizers through underground media outlets like "MurdertheMedia[12]," "Full Haus[13]," "Proud Boys MDC" and "Coach Finstock.[14]" For example:



---

[12] https://t.me/MurderTheMedia/16929
https://t.me/s/MurderTheMedia?q=patrick+trainor
https://t.me/MurderTheMedia/16985
https://t.me/MurderTheMedia/16986
https://t.me/MurderTheMedia/17022
https://t.me/MurderTheMedia/17023
https://t.me/MurderTheMedia/17024
[13] https://www.full-haus.com/index.php/2022/05/27/latest-show-support-the-adl/
https://t.me/prowhitefam2/1772
https://t.me/prowhitefam2/1786
[14] https://www.splcenter.org/hatewatch/2020/01/30/white-nationalist-state-department-official-still-active-hate-movement

91.     Upon information and belief, Trainor, the ADL, and Camp, utilize these underground nationalist platforms to gain access to digital nationalist networks to recruit co-conspirators to participate in the "Couture/Garramone conspiracy" against Noshirvan, an Iranian American, outlined in detail below.

### i.  Noshirvan  The Journalist And Satire Entertainer

92.     Noshirvan is an Iranian American who started making videos on Tiktok in 2020 - to provide for his family - because he lost his job due to the pandemic and government shutdown.

93.     Noshirvan is best portrayed as a new age shock jock, journalist, and social media entertainer. His news content focuses on bad actors behaving badly in public. Noshirvan entertains his audience with commentary, the consequences song, or other funny noises.

94.     Noshirvan adopted the phrase "accountability culture." Accountability culture is best described by Martin Luther King: "darkness cannot drive out darkness; only light can to that"  or  Marianne Williamson: "once the light of our awareness is cast on darkness, then darkness cannot hide, and it cannot remain." Put simply, Noshirvan's news reporting attempts to bring public awareness to social issues many disenfranchised American citizens face.

95.    Noshirvan does not advocate for online, or in person, harassment, or violence of any of the "bad actors" in  his news stories, nor has Noshirvan ever directed his viewers to   "go after" any of the "bad actors." Rather, in some instances, his followers/viewers do online research and provide public information about the bad actors – "tips." Those tips or research may be utilized in a follow-up news story. For example, in this case, Garramone's and Couture's relatives confirmed that Camp was residing at Garramone's property owned by CPS at 6535 Winkler Rd, Fort Myers, FL 33919.

96.    Garramone's and Couture's relatives confirmed the link between Camp, Garramone and Couture – after the Couture/Garramone Conspiracy started taking place, i.e, credible threats of danger, defamation, harassment, and interference with Noshirvan's business relationships.

97.    Noshirvan quickly became a social media personality publicly  known for his ability to find and identify "bad actors,' and his commentary on politics, civil rights, and current social issues.

98.    Noshirvan is a citizen journalist who reports on issues geared towards helping disenfranchised minorities and people who the police refuse to help. He adds commentary and satire to entertain during his news reports -  similar to "Last Week Tonight's" host - John Oliver.

99.     Noshirvan's news reports only disclose identifiable public information about the bad actor who was behaving badly. And, in several instances, his disclosure of readily available public information identifying the wrongdoer has lead  to the wrongdoer's arrests by the authorities.[15]

100.   Noshirvan often reports news stories on his social media platforms that major media outlets overlook. Noshirvan's news reports have shed light on discrimination, prejudice, physical violence, various criminal acts, and abuse by government officials - some of which have been picked up by major media news outlets.

101.   Noshirvan covers each story he presents free of charge. Noshirvan has never collected money to publish a news story. Instead, Noshirvan uses his platform to raise money and awareness for the victims in his news stories, for charities, and other social, and political causes.

### i.   The  Making of the Couture/Garramone Conspiracy

102.   Upon information and belief, Garramone and Couture were angry about the public exposure they received from Noshirvan's reporting of Couture's criminal acts that occurred on January 26, 2022.

---

[15] https://www.tiktok.com/@thatdaneshguy/video/7285757284632775966?lang=en
https://www.tiktok.com/t/ZT8uRpUAy/
https://www.tiktok.com/t/ZT8u8ANNw/

103.  Upon information and belief, Camp connected with Garramone and Couture through social media applications sometime between February of 2022 through April of 2022. Camp then connected Garramone and Couture with Trainor, and the Trainor Law Firm.

104.  Upon information and belief, Trainor, the ADL, or Camp, created or had created, an account named "Victims of That Danesh Guy" on various platforms in May/June of 2022, for the purpose of contacting people who had been publicly outed as part of Noshirvan's investigative journalism and satire entertainment broadcasts.



105.   Upon information and belief, Trainor, the ADL, and Camp, utilize these social media platforms to recruit other wrongdoers who did not take accountability, but rather pretended to be a 'victim," - as co-conspirators to participate in the "Couture/Garramone conspiracy" against Noshirvan.

106.   Couture and Garramone through Garramone Plastic Surgery's account joined  "Victims of That Danesh Guy" (on "Twitter" now "X") and "Victims of Danesh" (on "Instagram") sometime after  May of 2022. Garramone Plastic Surgery and Victims of That Danesh Guy follow each other, and Garramone Plastic Surgery follows Camp:



107.   Camp follows Garramone Plastic Surgery and Roof Korean 7. Roof Korean 7 is the profile pictured directly above Garramone Plastic Surgery. See photograph below and compare with ¶71, photograph 1 (Roof Korean 7).



108.   In May of 2022, Couture and Garramone allowed Camp to live at 6535 Winkler Rd, Fort Myers, FL 33919 ("**CPS/Garramone Property**"). This is Garramone's property owned by CPS.[16]  Here are photographs of Camp physically on the CPS/Garramone Property:

---

[16] 6535 Winkler Rd, Fort Myers, FL 33919 was originally painted in yellow when Garramone and CPS purchased the property on November 15, 2021. See https://www.zillow.com/homedetails/6535-Winkler-Rd-Fort-Myers-FL-33919/295068155_zpid/? However,  by May of 2022, Garramone and CPS had painted the house white. See https://www.leepa.org/Display/DisplayParcel.aspx?FolioID=10208565&AllPhotos=true&SalesDetails=True#SalesDetails



109.   First, the door behind Camp contains an angled "wear and tear" mark directly above the door handle. The photograph of CPS/Garramone Property without Camp has the exact same wear and tear pattern above the door handle. Secondly, the ornamental metal rods covering the glass in the door is the same in both pictures.

110.   In the pictures below, Camp, while on CPS/Garramone Property, self-professes to be "visiting [his] boss's estate." The implication of this statement is that Garramone and CPS are Camp's employers, Camp is Garramone and CPS agent, or at a minimum, co-conspirators.



111.   In  the  picture  on  the  left  above,  Camp  is  petting  one  of CPS/Garamone's  horses.  The  picture  on  the  right  above  was  taken  prior  to Garramone/CPS's  purchase  of  the  property.  The  floor  patterns  in  both  pictures  are the  same.  The  shape  of  windows  and  ceiling  fans  are  the  same.  The  brass  knobs, wood  planks,  and  iron  rods  are  the  same.  The  wood  ceiling  is  the  same.  The  only difference  is  that  the  barn  had  been  painted  white  to  match  the  house.

112.   In  May  of  2022,  Camp,  while  living  at  the  Garramone/CPS  Property made  a  video  defaming  Noshirvan  by  calling  him  a  "child  predator,"  inciting public  outrage  through  use  of  false  statements,  and  directing  the

Couture/Garramone co-conspirators to contact Tioga County Department of Child Protective Services ("Child Protective Services"). In the picture below, Camp expressly directs co-conspirators to "report Noshirvan for child abuse and neglect."[17]






---

[17] A copy of the video will be provided to the Court via jump drive.



113.    Camp is pictured above sitting at the kitchen island in the Garramone/CPS Property. His camera is pointed at the ceiling to conceal his location. However, the bottom two pictures are the Garramone/CPS Property.[18] The air vent and smoke detector placement are the same. And the black painted door hinges are the same.

---

[18] https://www.zillow.com/homedetails/6535-Winkler-Rd-Fort-Myers-FL-33919/295068155_zpid/?mmlb=g,14

114.   The Garramone/CPS Property has an inground pool as pictured below:



115.   Around May 20, 2022, while Couture and Garramone were in Pennsylvania for a graduation ceremony, Camp broadcasted a video while sitting in the pool located at the Garramone/CPS Property. The pool is readily identifiable because of its ornate roman edges and the surrounding iron fence.

116.   Camp's ties to Garramone and Couture were confirmed by several witnesses who personally know Garramone and Couture.

117.   Camp's ties to Garramone and Couture were confirmed by Garramone's and Couture's relatives.



118.   In photograph above of Camp's live stream video, Camp is being directed by Robert Colbert, owner of Shing TV, an alternative underground broadcasting platform. In this live stream video, Camp explains that he is working in concert with several other individuals with the sole purpose of destroying Noshirvan's reputation and placing him in financial ruin -  essentially destroying Noshirvan's life. Camp further elaborates on the "Plan" or conspiracy: (1) having co-conspirators go through Noshirvan's trash; (2) hacking Noshirvan's digital accounts and possibly WIFI, (3) the different stages of the conspiracy (referred to as "rounds" the first round is advertising, the second round is labeling Noshirvan

as predator, etc.); (4) the financier and funding he has received to carry out his part of the conspiracy; (5) the distribution of thousands of defamatory flyers posted near Noshirvan's hometown in less than 24  hours; (6) the billboards containing Noshirvan's face and ThatDaneshGuy's likeness, that were placed in Noshirvan's hometown; (7)  the mass email sent to almost every business near Noshirvan's hometown containing or implying false statements, placing defamatory ads in Penny Savers; (8) published a television advertisement on FOX News; and (9) falsely alleging to be in Pennsylvania to cover for Couture and Garramone – who were actually in Pennsylvania on May 20, 2022.

119.  On May 04, 2022, Camp was at Frenchy's Rockaway Grill in Clearwater, Florida for the Florida Governor's speech. Camp depicted below:[19]



_____

[19] See for date confirmation:
https://www.facebook.com/watch/live/?ref=watch_permalink&v=276292907956016

120.   Upon information and belief, on or about May 20, 2022, Garramone and Couture traveled from Fort Myers, Florida to Bucknell University for the graduation of Ralph R. Garramone, III – Garramone's child. Bucknell University is in Lewisburg, Pennsylvania – a 1 hour and 15-minute drive from Noshirvan's hometown. The picture depicts Bucknell University's May 22, 2022, graduation ceremony:



121.   Between May 20, 2022 and May 22, 2022, Garramone is filmed in a local butcher shop in Noshirvan's hometown. The same butcher shop the Couture/Garramone conspirators erroneously believed to be owned by Noshirvan's in-laws. Garramone is pictured below:



122.    Upon information and belief, Couture is pictured wearing a black wig in the picture on the right and standing next to Garramone. In the video, Couture and Garramone check out and leave together.[20]

123.    Camp falsely claimed on social media that he left defamatory flyers of Noshirvan and his wife in the restroom of this butcher shop.

---

[20] If this wigged woman is in fact Couture, then she would have likely violated her probation by traveling out of state to publish defamatory flyers of Noshirvan.



124.   Upon information and belief, Camp's false statement as addressed in ¶123 above, were made to protect Couture and Garramone from their actions of posting defamatory flyers in Noshirvan's hometown and in the mistaken local butcher shop.

125.   In the second photograph above, Camp states "we *recorded* every interaction in Pennsylvania." "We hit over a 1,000 community bulletin boards in 48 hours." Wait for round 3 of at least 50 punk." Noticeably, Camp in most of his social media posts discussing the Couture/Garramone Conspiracy utilizes the term "we," which is indicative of a multi-person conspiracy – and possible illegal recordings. Camp's threats of danger are credible.

126.   Couture's and Garramone's relatives confirmed that during the graduation weekend Couture and Garramone went missing for several hours – and almost missed the entire graduation. Upon information and belief, Couture and Garramone placed the defamatory flyers in Noshirvan's hometown in furtherance of the Couture/Garramone Conspiracy - while Camp stayed at the CPS/Garramone Property and broadcasted videos in furtherance of the conspiracy.

127.   In the video below, Camp again attempts to cover for Garramone and Couture by claiming to have been one of the co-conspirators to travel to Noshirvan's hometown and distribute the defamatory flyers. Camp further informs co-conspirators that his phone number is safe because Verizon refused to comply with a subpoena, and thereafter he moved the account to local carrier.



128.   On May 20, 2022, the following image was published in Noshirvan's hometown's Penny Saver:



129.   Around the same time the Penny Saver advertisement went live, a billboard appeared in Noshirvan's community. These advertisements contained both Noshirvan's face and an image of ThatDaneshGuy with the words "doxing is violent." These advertisements falsely imply that Noshirvan condones, advocates, or takes part in, "harmful or destructive physical force" directed at a person. Further, the advertisement improperly, and in contravention of law, utilizes ThatDaneshGuy's likeness for commercial purposes without consent.

130.   Trainor and the Trainor Entities received money from unnamed donors (co-conspirators) – for the purpose of purchasing billboards – and purchased the billboard pictured above. Further, Trainor discussed the ADL with

Coach Finstock and admitted that the ADL will "dox the doxers" and "people funding the doxers" by "placing their face on a billboard." [21]

131.   Trainor or the Trainor Entities purchased or leased the billboards and caused Noshirvan's face and ThatDaneshGuy's likeness to be placed on several billboards. These actions were in furtherance of the Couture/Garramone Conspiracy.

132.   The defamatory flyers Defendants placed in, and around, Noshirvan's hometown falsely referred to Noshirvan has a "predator." In third picture below, Camp using the handle "daneshfiles" admits to buying commercials, billboards, and full-page advertisements containing a Trainor, or Trainor Entity, owned telephone number (732-723-4007), which was directed at defaming Noshirvan.[22] In the fourth picture below, Camp requested on social media for co-conspirators to send the defamatory flyers to news outlets.

---

[21] This is the public audio broadcast of that conversation. https://soundcloud.com/user-37760469/patrickdiscussesbizarroadlpurp (see 2:20 - 3:30 minutes in audio)

[22] This phone number was active as of December 15, 2023, and directed to Trainor and the Trainor Entities. An audio recording is included on the previously mentioned jump drive.



133.  Camp in furtherance of the conspiracy intentionally interfered with Noshirvan's business by submitting false or fake reports and complaints to known social media platforms for the purpose of deplatforming Noshirvan.

134.  Defendants caused a defamatory website about Noshirvan to be built and published. The website's domain is www.thatdaneshguy.com. However, at some point, the domain was redirected to Court Listener (*Couture v. Noshirvan* (2:23-cv-00340).

135.  Couture actively promoted the domain: www.thatdaneshguy.com, and promoted and published advertisements containing Noshirvan's face and ThatDaneshGuy's likeness in furtherance of the conspiracy. Furthermore, when the post below was taken, Couture's GPS on her cellphone indicated that she was in Pennsylvania.



136.   Rather than admit her wrongdoing on January 26, 2022, Couture doubled down and falsely accused Noshirvan of "stalking, sextortion, and blackmail" and then posted her claim of false allegations on social media. Couture continued her false narrative by alleging publicly that Noshirvan has a "sexual fantasy" about her, which is not true. Couture played the #metoo card to defame Noshirvan by implication and create a false narrative for her social media platform. Couture falsely accused Noshirvan as being a "revenge pornographer." Lastly, Couture bragged about tortiously interfering with social media platforms to have Noshirvan deplatformed and defunded. See Picture 3, above.

137.   Camp and other co-conspirators sent hundreds of threatening text messages to Noshirvan in furtherance of the conspiracy. The pictures below are representative of Camp's actions:



138.   In the first photograph in paragraph 136, Camp admits to paying Trainor "to go after [Noshirvan] and everyone [he] got information from." Camp's statements are indicative of malicious intent, malicious prosecution, or an abuse of process. Garramone, Couture, and Trainor's actions in case number 2:23-cv-00340-SPC-KCD confirm same by serving overly broad  irrelevant discovery aim

at obtaining personal information from anyone who provided information about the Couture/Garramone Conspiracy or donated to support Noshirvan's news media.

139.   In the second photograph in paragraph 136, Camp refers to Trainor as the "top RICO attorney in the nation." Camp further admits that telephone number (732-723-4007) on the Penny Saver and billboards belongs to Trainor or the Trainor Entities. The telephone number (732-723-4007) on the Penny Saver and billboards belongs to Trainor or the Trainor Law Firm.

140.   In the second photograph above, Camp states "<u>we</u> want you homeless, deplatformed, your kid in foster care, your wife f\*\*k\*\*g n\*\*\*\*rs for crack and more." Camp's statements here, and throughout this Complaint, are indicative of Defendants malicious intentions regarding the Couture/Garramone Conspiracy.

141.   Camp published hundreds of social media posts in furtherance of the conspiracy. Most of which discuss steps taken towards the conspiracy's purpose – reputational and financial destruction, injury, and harm, of Noshirvan and his family. In furtherance of the Couture/Garramone Conspiracy, Defendants intentionally inflicted severe emotional distress on Noshirvan to effectuate the Couture/Garramone Conspiracy's purpose.



142.   In the second photograph above, Camp explains that the Couture/ Garramone Conspiracy is about "taking down [Noshirvan], online and teaching him a valuable lesson in matching vibes." Camp further explains "[d]oes it stop there? Nope, this is going to be ***a sustained operation*** that will continue until he is a broken human skeleton of the person he is. Until his kid is placed in foster care…." Defendants' conduct goes beyond all bounds of decency and ought to be regarded as odious and utterly intolerable in a civilized community.

143.   Defendants created a false narrative and spread defamatory statements throughout the internet and in real life. For example, Defendants consistently but

falsely allege that Noshirvan (1) is a "child groomer", (2) sexual "predator", (3) "pedophile", "cyberbully", "stalker", sextortionist", "blackmailer", and that he "rapes his own child" and "caused a 14-year-old to commit suicide." The implication of these statements incites hatred throughout the social media community. As a result of Defendants patently false statements, Noshirvan and his family, have suffered from mental anguish, emotional distress, pecuniary loss, harm to reputation, damaged business relationships, lost standing within his community, sustained personal and familial humiliation, and endured pain and suffering.

144.   Defendants intentionally targeted Noshirvan's wife and child to inflict extreme emotional distress upon Noshirvan.

145.   Defendants had Noshirvan and his family "swatted."[23] Defendants also sent Noshirvan pictures of himself and child at his home, implying Noshirvan's family were in danger. This picture is indicative of a credible threat of harm and was sent to Noshirvan within minutes of its depiction.

---

[23] Swatting is the action of making a false report of a serious emergency so that a SWAT team will go to a person's home, by someone who wants to frighten, upset, or cause problems for that person.



146.   Garramone himself, in his personal Twitter profile,  lead "the call to action" in furtherance of the Couture/Garramone Conspiracy. In the picture directly below, a co-conspirator   a/k/a "feudjunkie" states "FAFO" or "F**k around and find out." Garramone in response, makes a rally speech to gather. Specifically, Garramone states "[d]otting all of the i's and crossing off the t's now. It is time for all his (referring to Noshirvan) victims to gather."



147. Defendants had knowledge of, and agreed to participate, in a concerted effort to destroy Noshirvan and his family financially, reputationally, and to defame, deplatform, and terrorize Noshirvan by attempting to detract his child from his custody - as payback for making the initial Couture video.

148. Camp is an employee, agent, and co-conspirator of Garramone and the Garramone Entities. See ¶¶105-117, supra.

149. A substantial portion of the Couture/Garramone Conspiracy took place at the Garramone Surgery Center by employees, agents, and co-conspirators, of the Couture/Garramone Conspiracy – including Couture and Garramone.

150.   A substantial portion of the Couture/Garramone Conspiracy took place at the Garramone/CPS Property (Winkler Rd.) by employees, agents, and co-conspirators, of the Couture/Garramone Conspiracy – including Couture, Garramone and Camp. See ¶¶105-117, supra.

151.   Camp communicates to Garramone, Couture, Trainor, and other co-conspirators through social media applications like *Gab.com*. Defendants and unnamed co-conspirators make payments to Camp for his services through *GiveSendGo*. In the picture below, Camp stealthily communicates to Defendants that it is safe to continue paying him. For example, Camp explains that Trainor can execute his affidavit, and Camp ***"will deny everything in a sworn affidavit."*** Camp goes on to explain that payments through *GiveSendGo* and *mailed letters* are allegedly untraceable. Camp prompts payments from other Defendants by classifying it as "operational expenses." Finally, Camp reassures the other Defendants that ***"no one is going to get into trouble."***



152.    On Tuesday, December 19, 2023, notice of intent to file a lawsuit was

provided to all Defendants. Camp is not a named defendant and was not provided a

copy. Despite this fact, on December 21, 2023, Camp had already received a copy

and started posting publicly. The Pictures below depict Camp's Gab.com posts:



## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### CIVIL CONSPIRACY TO TORTIOUSLY INTERFERENCE WITH A PARENT-CHILD RELATIONSHIP
(as to all Defendants)

153.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

154.   Noshirvan and his wife are the natural parents of their child. Noshirvan and his wife always had sole legal custody of their child.

155.   Defendants along with unnamed conspirators, had direct knowledge of, and agreed to participate in the Couture/Garramone Conspiracy.

156.   As part of the Couture/Garramone Conspiracy, Defendants and unnamed conspirators, agreed to, and tortiously interfered with Noshirvan's parental rights by intentionally making false claims of child abuse to Child Protective Services on three separate occasions. As a  result, Noshirvan and family underwent investigation by Child Protective Services on three separate occasions. Noshirvan and family were cleared of the false allegations and found to be fit parents.

157.   As part of the Couture/Garramone Conspiracy, Defendants, and unnamed conspirators, tortiously interfered with Noshirvan's parental rights by contacting or passing out flyers at a school that falsely allege  that Noshirvan was a child rapist.

158.   Defendants abused the process when they purposefully conspired with a stated goal  of getting  Noshirvan's "child placed in foster care" and followed through by making false reports – on three separate occasions. See ¶¶141-144.

159.   Defendants knew that their claims of child abuse and rape were patently false, but willfully made those allegations to improperly remove Noshirvan's child from his custody and cause Noshirvan harm.

160.   As a direct and proximate result of Defendants concerted effort to remove Noshirvan's child from him by improper means, Noshirvan suffered from mental anguish, emotional distress, reputational harm,  and other damages.

161.   Defendants acted maliciously, wantonly,  or  with  a  recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

## SECOND CAUSE OF ACTION

## CIVIL CONSPIRACY TO TORTIOUSLY
## INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (as to  all Defendants)

162.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

163.   Noshirvan had monetized business relationships with "buymecoffee," "Twitter," "TikTok," "Patreon" and other social media platforms.

164.   Defendants along with unnamed conspirators, had direct knowledge of Noshirvan's monetized social media platforms, and agreed to participate in a campaign to deplatform Noshirvan for the purpose of financially ruining Noshirvan.

165.   Defendants through the Couture/Garramone Conspiracy intentionally and maliciously interfered with Noshirvan's business relationships with "buymecoffee," "Twitter," "TikTok," "Patreon" and other social media platforms.

166.   Defendants through the Couture/ Garramone Conspiracy intentionally and maliciously interfered with Noshirvan's business relationships by making fake or false reports of misconduct to the social media platform. Camp also sent harassing and threatening emails to Noshirvan's donors, which caused those donors to withdrawal support. As a result, Noshirvan lost lucrative business relationships, and future income, which caused detriment and harm.

167. Defendants' tortious interference with Noshirvan's business relationships is unjustifiable and was done solely to financially harm  Noshirvan. See ¶¶141-144, above.

168.   Camp in furtherance of the Couture/Garramone Conspiracy harassed, threatened, extorted, and coerced Noshirvan's prior lawyer to withdraw as counsel. Camp abused process by harassing, threatening, extorting, and coercing Noshirvan's prior lawyer to help Trainor prevail against a *pro se* party. Camp's interference in a federal lawsuit and action towards the prior lawyer was malicious and done for an improper purpose. Defendants interference with Noshirvan's business relationship  was tortious.

169.   As a direct and proximate result of Defendants tortious interference, Noshirvan has incurred damages, including but not limited to mental anguish and emotional distress, lost earnings, other economic loss, and will continue to suffer damages in the future.

170.   Defendants acted maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

### THIRD CAUSE OF ACTION
### CIVIL CONSPIRACY TO DEFAME
### (as to  all Defendants)

171.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

172.   Defendants had direct knowledge of Couture/Garramone Conspiracy and agreed to participate in a defamatory campaign directed at Noshirvan for the purpose of ruining his reputation and destroying him financially.

173.   Defendants maliciously published or caused to be published, thousands of Flyers with Noshirvan's face printed on them along with the false statement: "have you seen this predator."

174.   Defendants maliciously published or caused to be published, false statements labeling Noshirvan as a "pedophile" "child groomer", "stalker," "sextortionist," and "blackmailer."

175.   Defendants maliciously published or caused to be published, false statements stating that Noshirvan "rapes his own child" and "caused a 14-year-old to commit suicide."

176.   Defendants knew that the defamatory statements they published were not true but acted with reckless disregard for the truth.

177.   Defendants intentionally reported false child abuse to Child Protective Services on three occasions and then published statements regarding the false defamatory report on social media to harm Noshirvan's reputation.

178.   Defendants maliciously published, or caused to be published, a billboard with Noshirvan's face on it and the statement "doxing is violent." Defamation by implication.

179.   Defendants maliciously published, or caused to be published, fake flyers for a "swingers party," which contained Noshirvan and his wife's face and personal contact information. The pictures below depict Defendants act:



180. In the second picture above, Camp questions Noshirvan's wife's virtue implicitly by falsely alleging they are "swingers", and expressly by calling her a "wh\*\*e" on social media.

181. As a direct and proximate result of Defendants concerted effort to defame Noshirvan, Noshirvan suffered from mental anguish, emotional distress, reputational harm, and loss of income, future revenue, other damages.

182. Defendants acted maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

## FOURTH CAUSE OF ACTION

### CIVIL CONSPIRACY TO
### INTENTIONALLY INFLICT EMOTIONAL DISTRESS
### (as to  all Defendants)

183.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

184.   Defendants had direct knowledge of Couture/Garramone Conspiracy and agreed to participate in an  online and in person campaign directed at Noshirvan for the purpose of ruining his reputation and destroying him financially.

185.   Defendants with malicious intent orchestrated an elaborate scheme to "tak[e] down [Noshirvan], online and teach[] him a valuable lesson in matching vibes." Defendants expressly admit that the  "sustained operation"  "will continue until [Noshirvan] is a broken human skeleton" of the person he was and his  Child "is placed in foster care…." See ¶¶141-144.

186.   Defendants had Norshirvan and his family "swatted" and sent Noshirvan pictures of himself and child in his yard. Defendants claimed via social media to have placed their cameras illegally in public places near Noshirvan's hometown to watch him.

187.   As a result of Defendants harassment, threats, and defamatory campaign, false reports to Child Protective Services, and swatting, Noshirvan's wife and child were forced to temporarily move out of their home in fear for their safety.

188.   Defendants concerted actions when viewed in totality are extreme and outrageous and were done intentionally to cause Noshirvan emotional distress.

189.   Defendants' conduct goes beyond all bounds of decency and ought to be regarded as odious and utterly intolerable in a civilized community. Defendants' actions are atrocious.

190.   Noshirvan and family suffered severe emotional distress caused by Defendants' actions.

191.   As a direct and proximate result of Defendants concerted effort to intentionally cause Noshirvan severe emotional distress, Noshirvan suffered from mental anguish, emotional distress, reputational harm, and loss of income, future revenue, other damages.

192.   Defendants acted maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

**FIFTH CAUSE OF ACTION**

**CIVIL CONSPIRACY TO**
**MISAPPROPRIATE NOSHIRVAN'S LIKENESS FOR**
**COMMERICAL**
**(as to  all Defendants)**

193.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

194.   Defendants had direct knowledge of Couture/Garramone Conspiracy and agreed to participate in an advertising campaign directed at Noshirvan for the purpose of ruining his reputation and destroying him financially.

195.   Defendants maliciously printed, published, and displayed at least two distinct types of flyer advertisements containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent.  Upon information and belief, Defendants printed, published, and caused to be displayed at least 10,000 flyers.

196.   Defendants maliciously printed, published, and displayed a billboard advertisement containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent.

197.   Defendants maliciously printed, displayed, published or publicly disseminated commercials containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent and in furtherance of the conspiracy.

198.   Noshirvan is entitled to recover damages for injury, reasonable royalty, and punitive or exemplary damages.

199.   Defendants' publications were not bona fide news reports or of legitimate public interest. Defendants' publications were commercial advertisements.

200.   ThatDaneshGuy's likeness has commercial value, which Noshirvan developed legitimate public interest.

201.   As a direct and proximate result of Defendants concerted effort to participate in an advertising campaign utilizing Noshirvan's and ThatDaneshGuy's likes or image, Noshirvan suffered from mental anguish, emotional distress, reputational harm, and loss of income, future revenue, other damages.

202.   Defendants acted maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

## SIXTH CAUSE OF ACTION

### AGENCY
### (as to Garramone, Garramone Entities, and Camp)

203.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

204.   Garramone through his actions implicitly or expressly acknowledged Camp's authority to act on this behalf. Garramone admits that he "hired an online reputation management company." See 2:23-cv-00340-SPC-KCD, Dkt. 83, ¶40. Upon information and belief, that "online reputation management company" is owned by Camp. Defendants utilize semantics to gaslight or otherwise change the narrative.

205.   Camp expressly admits being an employee of Garramone and the Garramone Entities. See¶¶105-117. Camp expressly or through his conduct accepted Garramone or Garramone Entities appointment as agent.

206.   Garramone and Garramone Entities maintain control over Camp's. Camp is an employee or  agent of Garramone or Garramone entities. Garramone or Garramone Entities maintain control over  Camp because Camp is paid to provide his "for-hire services."

207.   Camp's actions were within the scope of employment   with Garramone and Garramone entities because Camp was hired to destroy Noshsirvan mentally, reputationally, and financially by "managing" Noshirvan's online reputation online. Noshirvan is Camp's "paid-for" target.

208.   Camp was acting within the scope of his employment with Garramone or Garramone Entities when he (1) falsely reported child abuse to Child Protective Services, (2) tortiously interfered with Noshivan's business relationships, (3) made libelous statements,(4)  published or caused to be published Noshirvan's likeness in commercial advertisements.

209.   As a direct and proximate result of Defendants concerted effort to intentionally cause Noshirvan severe emotional distress, Noshirvan suffered from mental anguish, emotional distress, reputational harm, and loss of income, future revenue, other damages.

210.   Garramone, and Garramone Entities are responsible under *respondeat superior* for Camp acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

## VII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, the plaintiff, Danesh Noshirvan, demands judgment against defendants, Couture, Garramone, Garramone Entities, Trainor, the Trainor Law Firm, and the ADL, for all injuries and damages suffered due to the Couture/ Garramone Conspiracy, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages and non-economic damages, in excess of 5 million dollars including but not limited to compensation for injury to reputation, mental anguish, emotional distress, shame, depression, anxiety, sleep disturbance, loss of enjoyment of life, lost income and earnings, lost business opportunities, humiliation, loss of online platforms, out of pocket expenses, other non-economic damages, costs, interest, and punitive damages, and for any such further relief as the Court deems appropriate.

## VIII.  <u>CONDITIONS PRECEDENT</u>

All condition precedents have been satisfied, excused, or waived.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated this 4th day of January, 2024.

Respectfully submitted,

/s/Nicholas A. Chiappetta
Nicholas A. Chiappetta, Esq.
Florida Bar No: 1006407
**Chiappetta Trial Lawyers**
*Attorneys for Plaintiff*
8401 Lake Worth Rd., Suite 130
Lake Worth, FL 33467
Direct: (561) 768-4500
Fax:     (561) 768-4600
Service@chiappettalegal.com
nick@chiappettalegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on 4th day of January, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to: all counsel of record.

*/s/ Nicholas A. Chiappetta*
Nicholas A. Chiappetta
Designated Lead Counsel