## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

DANESH NOSHIRVAN
an individual,

                              CASE NO:
                               2:23-cv-01218-JES-NPM

       Plaintiff,

                               **JURY TRIAL DEMANDED**

vs.

JENNIFER COUTURE, an individual,
RALPH GARRAMONE M.D, an individual,
RALPH GARRAMONE M.D. P.A. d/b/a
GARRAMONE PLASTIC SURGERY.,
CENTRAL PARK OF SOUTHWEST
FLORIDA, LLC, WRAITH, LLC,
SULLIVAN STREET INVESTMENTS, LLC,
HAIRPIN TURN, LLC, OMG REALTY, LLC,
R G WEIGHT MANAGEMENT, LLC,
CENTRAL PARK SOUTH, LLC,
BRANTLEE, LLC, LEGACY OF MARIE
GARRAMONE, LLC, GARRAMONE
MARKETING, INC., 5681 DIVISION LLC,
THE LAW OFFICE OF PATRICK TRAINOR
ESQ, LLC d/b/a THE LAW OFFICE OF
PATRICK TRAINOR, PATRICK TRAINOR,
an individual, and
ANTI-DOXING LEAGUE INC.

       Defendant(s).

_____

## SECOND AMENDED COMPLAINT

_____

**COMES NOW** plaintiff, Danesh Noshirvan a/k/a "@ThatDaneshGuy" (**"Noshirvan"**), by and through his attorneys, sue defendants, Jennifer Couture (**"Couture"**), Ralph Garramone M.D ("**Garramone**"), Ralph Garramone M.D. P.A. D/B/A Garramone Plastic Surgery (**"Garramone Plastic Surgery"**), Central Park of Southwest Florida, LLC (**"Central Park"**),  Wraith, LLC ("**Wraith**"), Sullivan Street Investments, LLC (**"Sullivan St. Invest**."), Hairpin Turn, LLC (**"Hairpin"**), Omg Realty, LLC (**"OMG Realty"**), R G Weight Management, LLC (**"R G Weight"**), 5681 Division LLC ("**5681 Div**."), Garramone Marketing, Inc. (**"Garramone  Marketing"**), Legacy Of Marie Garramone, LLC (**"Legacy"**), Central Park South, LLC (**"CPS"**), Brantlee, LLC (**"Brantlee"**), The Law Office of Patrick Trainor, Esq., LLC d/b/a The Law Office of Patrick Trainor ("**Trainor Law Firm**"), Patrick Trainor (**"Trainor"**), Anti-Doxing League Inc. ("**ADL**") collectively (**"Defendants"**), and alleges the following upon personal knowledge and belief, and investigation of counsel:

## I.  <u>NATURE OF THE ACTION</u>

1.  This is a civil conspiracy and agency action for defamation, tortious inference, misappropriation of likeness, and intentional infliction of emotional distress. Noshirvan is an online entertainer and journalist. His work often depicts bad actors behaving badly on camera and includes satire or political commentary.

Noshirvan advocates for accountability culture, which unfortunately in some cases, results in public cancellation. However, Noshirvan also helps the victims of the bad actors by shedding light on the bad actors' socially unacceptable actions. Noshirvan raises money to help the reported-on victims.

This case arises out of a series of events stemming from January 26, 2022. On January 26, 2022, Couture was video recorded committing crimes. Shortly thereafter, Noshirvan reported on Couture's story, and publicized her wrongdoing. As a result, online conversations, turned to false accusations, and the hiring of a social media terrorist under the guise of an "online image manager." Understandably, Garramone and Couture were angry about Couture's newly found publicity, but mistakenly blamed Noshirvan for the public outcry and ensuing online negative response to Couture's actions. Couture never accepted responsibility for her actions. At some point, Defendants met or were brought together. This is when Defendants conspired to injure, harm, and destroy Noshirvan mentally, reputationally, and financially. Defendants' conspiracy started with their management of Noshirvan's online image through rounds or a series of defamatory campaigns, swatting, false reports to Child Protective Services, libelous publication of flyers and billboards.

Defendants' conspiracy and overt acts were fueled by their need for vengeance or retribution. Defendants' malicious intent may be inferred by their expressed desire to cause Noshirvan to become homeless, deplatformed, have his child placed in foster care, and his wife forced to do immoral acts. In other words, mentally, emotionally, and financially wrecked. Defendants' series of campaigns were intentionally  designed to inflict severe emotional distress upon Noshirvan. Defendants' vindictiveness and follow through go beyond all bounds of decency and is not acceptable in a civilized community.

## II. JURISDCTION

2.      This Court has subject matter jurisdiction over this case pursuant to diversity jurisdiction prescribed by 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, and there is complete diversity between the parties.

3.      The Court has supplemental jurisdiction over Plaintiff's claims asserted against Trainor, the Trainor Law Firm, and ADL, in this action pursuant to 28 U.S.C. § 1367(a). Plaintiff's claims against Trainor, the Trainor Law Firm, and ADL, are part of the same case or controversy and arise out of the same nucleus of operative facts.

### III.   VENUE

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in all or a substantial part of the events or omissions giving rise to this claim occurred in this district.

5.      Venue is also proper in this Court pursuant to 28 U.S.C. § 1391 because Garramone and Couture are U.S. citizens domiciled in this District, Garramone Entities maintain a principal place of business in this District, and Trainor intentionally availed himself to Florida through §48.193(1)(a)1, Fla. Stat. Defendants have sufficient minimum contacts with the State of Florida. Further, substantial acts or events giving rise to Noshirvan's claims occurred in this District.

### IV.   <u>PARTIES</u>

#### A. <u>Plaintiff, Danesh Noshirvan</u>

6.      Noshirvan is an Iranian American social media personality publicly known by his commentary and opinions on politics, civil rights, and current social issues.

7.      Beyond simply being a media personality, Noshirvan is a citizen journalist who creates content geared towards helping disenfranchised minorities and people who the police refuse to help.

8.      Noshirvan reports news stories on social media platforms that do not initially make the cut for major media outlets. Noshirvan's reported news often sheds light on racial prejudice, physical violence, criminal acts, abuse of government office, and other hot topic issues, which in turn, end up being reported by major media outlets.

9.      Noshirvan is an adult media personality and journalist who is *sui juris*.

10.      Noshirvan is a U.S. citizen domiciled in Mansfield, Tioga County, Pennsylvania.

**B. <u>Defendant, Jennifer Couture</u>**

11.      Couture is an adult, who is upon information belief is *sui juris*.

12.      Couture is a U.S. citizen domiciled in Fort Myers, Lee County, Florida.

13.      Upon information and belief, Couture currently resides at 3706 Oxford Street, Fort Myers, Florida 33901.

14.      Couture is a co-owner of 3706 Oxford Street, Fort Myers, Florida 33901.

15.      Courture is Garramone's girlfriend and employee of Garramone Plastic Surgery**.**

16.     Upon information and belief, Couture is not a business owner.

## C.  Defendant, Garramone

17.     Garramone is an adult plastic surgeon, who upon information and belief is *sui juris*.

18.     Garramone is a U.S. citizen domiciled in Fort Myers, Lee County, Florida.

19.     Garramone is primary owner of the following entities: Garramone Plastic Surgery, Central Park, Wraith, Sullivan St. Invest., Hairpin, OMG Realty, Legacy, Brantlee, R G Weight, Garramone Marketing, CPS, and 5681 Div., collectively ("**Garramone Entities**").

20.     Garramone is the sole owner, shareholder, or member of all the Garramone Entities with the only exceptions being Hairpin, Brantlee, and OMG Realty, which are owned by Wraith – who is controlled by Garramone.

21.     The Garramone Entities all operate out of, or maintain their "principal place of business," at 12998 S. Cleveland Ave., Fort Myers, Florida.

22.     Garramone Plastic Surgery's surgery center is located 12998 S. Cleveland Ave., Fort Myers, Florida ("**Garramone Surgery Ctr.**").

23.     All Garramone Entities are closely held companies that are intimately

entangled or intertwined  as to simply be an extension of Garramone. The acts alleged in this Complaint by employees and agents were committed, controlled, or carried out as a result of Garramone's direction, instruction, or order – and in furtherance of the Couture/Garramone Conspiracy.

24.     Upon information and belief, Garramone currently resides at 3706 Oxford Street, Fort Myers, Florida 33901.

25.     Garramone is a co-owner of 3706 Oxford Street, Fort Myers, Florida 33901.

26.      Garramone through his company Central Park owns 6535 Winkler Rd., Fort Myers, Florida 33919.

27.     Garramone also owns 1215 Braman Ave., Fort Myers, Florida 33901.

**D. Garramone Entities**

28.     Garramone is the sole managing member of the following "LLC's": 5681 Div., R G. Weight, Central Park, Legacy, and Sullivan St.

29.     Garramone is a U.S. citizen domiciled in Fort Myers, Lee County, Florida.

30.     5681 Div., R G. Weight, OMG Realty, Hairpin, Central Park, Brantlee, Legacy, Sullivan St. are limited liability companies registered in Florida.

31.     5681 Div., R. G. Weight, OMG Realty, Hairpin, Central Park, Brantlee, Legacy, and Sullivan St. all maintain their principal place of business in Fort Myers, Florida at Garramone Surgery Ctr.

32.     CPS is a limited liability company registered in the State of Florida. CPS maintains its principal place of business located at 1215 Braman Ave., Fort Myers, Florida 33901. Garramone is the sole managing member of CPS. Garramone is a U.S. citizen domiciled in Fort Myers, Florida.

33.     Garramone Marketing is a for profit corporation incorporated in Florida. Garramone Marketing maintains its principal place of business in Fort Myers, Florida at Garramone Surgery Ctr. Garramone is the sole officer, director, or shareholder of Garramone Marketing.

34.     Garramone Plastic Surgery is a professional association organized and existing under the laws of the State of Florida. Garramone Plastic Surgery maintains its principal place of business in Fort Myers, Florida at Garramone Surgery Ctr. Garramone is the sole officer, director, or shareholder, of the professional association, and he U.S. citizen domiciled in Fort Myers, Lee County.

35.     Wraith is a limited liability company registered in Alaska. Wraith maintains its principal place of business at 1231 W. Northern Lights Blvd., #911,

Anchorage, Alaska 99503. Wraith  has two members, Ms. Elizabeth Santos and Garramone.

36.     Ms. Elizabeth Santos is U.S. citizen domiciled in Barnstead, New Hampshire and Garramone is a U.S. citizen domiciled in Fort Myers, Lee County.

37.     Wraith is the sole managing member of OMG Realty, Hairpin, Brantlee.

38.     Wraith is registered to do business in Florida.

**E.  Trainor**

39.      Trainor is a lawyer who first became  licensed in New Jersey on January 08, 2019, and is *sui juris*.

40.     Trainor is a U.S. citizen domiciled in Hasbrouck Heights Borough, Bergen County, New Jersey 07604.

**F.  Trainor Entities**

41.     The Law office of Patrick Trainor Esq., LLC is a domestic limited liability company registered in the State of New Jersey. Trainor is the sole member and owner of The Law office of Patrick Trainor Esq., LLC.  The Trainor Law Firm's place of business is located at 19 Union Ave., Suite 201 Rutherford, New Jersey 07070.

42.    The Anti-Doxing League, Inc. is a domestic non-profit corporation incorporated in the State of New Jersey. Trainor is the sole incorporator and trustee board member. The Anti-Doxing League, Inc. maintains its place of business at 19 Union Ave., Suite 201 Rutherford, New Jersey 07070.

43.     The Law office of Patrick Trainor Esq., LLC and The Anti-Doxing League, Inc.  are collectively  referred to as the "**Trainor Entities**."

44.    All Trainor Entities are closely held companies that are intimately entangled or intertwined  as to simply be an extension of Trainor. The acts alleged in this Complaint by Trainor Entities' employees and agents were committed, controlled, or carried out as a result of Trainor's direction, instruction, or order.

45.    Trainor and the Trainor Entities purposely availed themselves to Florida's jurisdiction by operating or having operated, active websites and social media accounts directed at contacting or recruiting persons residing or domiciled in Florida during the time frame alleged in the Complaint.

46.    Complete  diversity  jurisdiction  exists  because  no  Defendant  is  a domiciled  citizen  of  Pennsylvania  and  the  amount  in  controversy  exceeds $5,000,000.00 dollars.

## V.   <u>FACTUAL ALLEGATIONS</u>

### A. BACKGROUND

#### a.  The Parties and Known Co-Conspirators

##### i.    Couture behaving badly

47.    Couture constantly disregards the rights of people whom she deems beneath her "social status." Couture has on more than one occasion disregarded the rights of others who she deemed beneath her.[1]

48.    Upon information and belief, Couture was a client of Garramone Plastic Surgery, who then became Garramone's girlfriend and an employee of one or more of the Garramone Entities.

49.    During the height of the Covid-19 pandemic, employees who worked for Garramone Plastic Surgery were concerned about coming into the office for obvious health reasons. Upon information and belief,  Garramone with the help of Couture - fired those employees via social media - as depicted in the following picture:

---

[1] See Lee Cty. Case Numbers: 22-CO-005490 and 22-CO-005496.



50.     As a result of Couture and Garramone's insensitive action, members of Fort Myers and the social media community held animus feelings towards them for nearly two years prior to the January 26, 2022, altercation. Further, the public posting shows that their "relationship" was known prior to January 26, 2022.

51.     On January 26, 2022, Couture got into an altercation with a young woman in a Dunkin Donuts parking lot. That altercation was video recorded.[2]

52.     The altercation between Couture and the young woman escalated quickly, and what started out as a verbal argument soon became a one-sided violent and verbal attack solely maintained by Couture. (See fn. 3)

53.     During the altercation, Couture physically entered the young woman's motor vehicle through the driver side window and began to grab the young woman

---

[2] This is link to the video where Couture committed battery, burglary, and aggravated assault with a weapon on a young woman. https://www.youtube.com/watch?v=OdP9tP_5x8Q

sitting in the driver-side seat of the vehicle. Couture then attempted to steal the young woman's cellphone. Couture then verbally mocked the young woman. In response, the young woman verbally responded to Couture's extreme and outrageous actions. Couture in a  psychoneurotic state, entered her own motor vehicle, threw the vehicle in reverse, and attempted to crash into the young woman who exited her vehicle to video record Couture's license plate. (See Fn. 3)

54.    After the altercation, detective Ryan Justham,  of the Lee County Sheriff's Office executed an affidavit for arrest warrant.

55.    Detective Ryan Justham specifically found that: (1) Couture entered the young woman's occupied vehicle with intent to commit  battery upon the young woman. (*Id*.); (2) Couture actions demonstrated an "intentional unlawful threat" "to do violence to the [young woman]" while having the apparent ability to do so. (*Id*.); and (3) that "Couture actually and intentionally grabbed the [young woman's] wrists against her will." (*Id*.)

56.    A felony arrest warrant was issued for Couture on or about February 16, 2022 -  under warrant number 22CF000256.

57.    On February 20, 2022, at 10:30 p.m., Couture was arrested for: (1) burglary of an occupied conveyance in violation of F.S. 810.02(3)(d); (2) battery in violation of  F.S. 784.03(1)(a)1.; and (3) aggravated assault with a deadly weapon

without intent to kill in violation of  F.S. 784.021(1)(a). Couture's Lee County mugshot following the arrest and a picture of the video recorded altercation is below:




58.     Upon information and belief, Couture made a plea deal with the prosecutor and only was required to plead guilty to first-degree trespass, second-degree assault, and first-degree battery.[3] All three charges were reduced to misdemeanors.

59.     As part of a plea agreement, the court withheld imposition of a sentence, and Couture was placed on twelve months of probation for Count 1 Trespass, six months of probation for Count 2 Assault and twelve months of probation for Count 3 Battery. Counts 1 and 2 ran concurrently with each other and consecutively to Count 3 for a total of two years of supervision.

---

[3] Couture had Lee Cty., Case Number 22-CF-000256 sealed as "confidential."

60.     During the probation period, Couture was ordered to have "no contact with her victim," attend "anger management," pay a "domestic violence surcharge," "restitution," and "submit to a Mental Health evaluation."

61.     Couture's criminal actions and mental health status are a matter of public concern as her actions endanger the health, safety, and welfare of the Lee County community.

62.     Publication of Couture's public criminal activities are protected by the U.S. Constitution and Florida State Constitution.

### i.     The felon, Joseph A. Camp, a "for-hire" Social Media Terrorist

63.     Joseph A. Camp ("Camp") is a 39-year-old convicted felon. Camp utilizes several pictures of his face on his social media accounts - pictures depicting him in various stages of his life. Here are a few:



64.    Camp goes by the following aliases or "handles" on the internet: "@CampJosephA," "@Joeycamp2020", "@daneshfiles", "reportingepik"[4], "yourdaddyjoey" "TheResearcher2020", "norshivan@yandex.com","Jojo," and "CEO at J Square Presents."

65.    Camp's publicly listed phone number is (720) 454-5240.[5] The photograph below was retrieved directly from Camp's verified Facebook account:



66.    Camp is a former student of the University of Central Missouri, who on April 12, 2013, plead guilty in the "Western District of Missouri" to "unlawful computer hacking scheme at UCM from March 2009 to March 2010."[6]

---

[4] https://www.washingtonpost.com/technology/2021/09/25/epik-hack-fallout/
[5] **N.B.** Camp's telephone number operates as a personal identifier in the pictures posted later in this Complaint.

67.     As part of the UCM computer hacking scheme, Camp conspired with another person to "gain unlawful and unauthorized access to the UCM computer network." Once their virus infected UCM's computers – databases containing faculty, staff, alumni, and student information, and money were stolen. Camp also utilized  remote access to a UCM administrator's computer to remotely turn on the webcam to watch and photograph the administrator. Camp was sentenced to three years in federal prison without parole and ordered to pay $61,500 in restitution for his role in the UCM computer hacking conspiracy.

68.     Camp is a "far-right internet troll and convicted hacker" "whose name was listed on domain registrations with Epik and who has claimed publicly to have done freelance work." (See Fn. 5)

69.     Camp's "freelance work" consists of  payment to Camp and in exchange  Camp will troll, harass, and defame, the "paid-for" target on social media. In short, Camp is a "for-hire" social media troll, harasser, maligner, and defamer, who freelances his service to the highest bidder.

70.     Camp's "for-hire" services goes well beyond social media trolling, doxing, and dissemination of public information. Camp services include real life

---

[6] https://www.justice.gov/usao-wdmo/pr/former-student-sentenced-computer-hacking-university-central-missouri

and in person harassment, defamation, swatting, intimidation, and at least, in one

instance, a bomb threat towards a target.

71.     Upon information and belief, Camp has ties to Lee County, Florida,

and in 2014 had an arrest warrant issued for making bomb threats to a person who

at the time was a Judge.[7] See pictures below:





72.     Camp routinely and intentionally makes false defamatory statements

on social media - both per se and by implication, about his target - to scare, silence,

or to destroy his "paid-for" target's reputation.

---

[7] The arrest warrant appears to have been revoked after the judge/complainant passed away.

73.    Camp intentionally tortiously  interferes with his "paid-for" target's known business and personal relationships.

74.    On several occasions, Camp has knowingly contacted his "paid-for" targets,  their families, friends, distant relatives, and other people close to the target.

75.    On several occasions, Camp has knowingly contacted his "paid-for" the target's place of employment, business, business partners or relationships, and government licensing office, via telephone or email  for the sole purpose of destroying the target-victim's reputation and inflicting severe emotional distress and mental anguish.[8]

76.    Upon information and belief, Camp was forced, or chose, to flee the United States in mid to late 2022 because of his "for-hire" services.

77.    Upon information and belief, Camp fled to Belize in or after July of 2022. Camp also expressly claims to change his identity and maintain multiple passports as pictured below:

---

[8] https://www.instagram.com/p/CyMbWcqiZhE/



78.    Camp self-professes, via social media, that he regularly moves between Yucatan peninsula countries in avoidance of some unstated "prosecution." The following pictures depict Camp's *GiveSendGo* campaign wherein he claims to be in "exile" for several reasons:

---

[9] In figure labeled Fn. 11,  Camp admits to having a second passport.



79.     Camp is best described as a "for-hire" social media terrorist.[10]  Camp is easily identifiable because, as Camp writes: "[b]ehind every troll I do, is my real name." Camp also alludes that he cannot be connected to an allegedly anonymous Yandex email accounts that send out malicious, mean, and threatening, emails:



80.     Camp expressly admitted to utilizing his real name in every internet or social media "troll" he does, "Yandex" domains, and claims ownership of the "Daneshfiles." Camp's statements above imply that he created the "Daneshfiles" and Norshirvan is his current "paid-for" target.

---

[10] Allegedly unreleased January 6th insurrection videos -posted by Joseph A. Camp on Rumble. https://rumble.com/c/JoeyCamp2020

81.     Camp also maintains multiple social media accounts on underground or alternative economy websites that pander to "supremacists," "proud boys," and nazi sympathizers. Upon information and belief, Camp met Trainor through these underground or alternative economy websites and social media applications.

### i. Trainor, the Trainor Law Firm, and the ADL

82.     Trainor obtained his New Jersey law license on January 08, 2019.

83.     On July 17, 2019, the Trainor Law Firm was formed in the State of New Jersey. The Trainor Law Firm received a certificate number: 0450400058.

84.     Upon information and belief, Trainor and the Trainor Law Firm marketed to, and represented, "supremacists," "proud boys," and nazi sympathizers.

85.     Upon information and belief, Trainor met Camp while marketing on underground or alternative economy websites and social media applications.

86.     On September 21, 2020, Trainor filed a RICO action in New Jersey federal court. *See D'ambly v. Exoo, 2:20-cv-12880*, (D.N.J.). In *D'ambly*, Trainor alleged his client was labeled as "fascist" or "supremacist" by defendant *Evoo*, who Trainor labeled an "anti-fascist" "Antifa leader." The *D'ambly* case was/is a reverse racial discrimination case.

87.     *D'ambly* is the first known instance where Camp interfered with an ongoing federal litigation. Upon information and belief, Trainor and Camp were

working together to force a settlement by means of extortion, intimidation, threat, and harassment. The plan involved Camp contacting several attorneys representing defendants in *D'ambly through telephone or electronic communications,* and threatening, harassing, intimidating, or extorting them in effort to get the defense lawyers to withdraw from the case. This is Camp's *modus operandi* - threaten, harass, intimidate, and extort, the perceived enemy until they retreat.

88.    After *D'ambly* was in suit and moving along,  Camp reached out to an individual to recruit that person to help find a new plaintiff in the New Jersey area – for Trainor's next case. During recruitment, the undisclosed person obtained recorded conversations and text messages implicating  Camp and Trainor as co-conspirators in the Couture/Garramone conspiracy. Those same recordings show that Camp and Trainor discussed private third-party conversations amongst themselves – in furtherance of the conspiracy. However, this undisclosed person never joined because Camp was informed by Trainor that this person "was under investigation." Here are text messages from Trainor and Camp to the undisclosed recruit:





[11] In these text message, Camp refers to "we", which implies a group of co-conspirators. Trainor states "these images you just sent and the voice message you just left look and sound like something a **snitch** would do. You know, nobody likes a **snitch… just don't** **snitch**."

Page 26 of 132

89.     In May of 2022, the ADL was formed by Trainor. Upon information and belief, the ADL created, or had others create social media profiles/accounts for the sole purpose of contacting bad actors who had been publicly outed as part of Noshirvan's investigative journalism and satire entertainment broadcasts.

90.     Additionally, Trainor through the ADL marketed to "supremacists," "proud boys," and nazi sympathizers through underground media outlets like "MurdertheMedia[12]," "Full Haus[13]," "Proud Boys MDC" and "Coach Finstock.[14]" For example:



---

[12] https://t.me/MurderTheMedia/16929
https://t.me/s/MurderTheMedia?q=patrick+trainor
https://t.me/MurderTheMedia/16985
https://t.me/MurderTheMedia/16986
https://t.me/MurderTheMedia/17022
https://t.me/MurderTheMedia/17023
https://t.me/MurderTheMedia/17024
[13] https://www.full-haus.com/index.php/2022/05/27/latest-show-support-the-adl/
https://t.me/prowhitefam2/1772
https://t.me/prowhitefam2/1786
[14] https://www.splcenter.org/hatewatch/2020/01/30/white-nationalist-state-department-official-still-active-hate-movement

91.     Upon information and belief, Trainor, the ADL, and Camp, utilize these underground nationalist platforms to gain access to digital nationalist networks to recruit co-conspirators to participate in the "Couture/Garramone conspiracy" against Noshirvan, an Iranian American, outlined in detail below.

### i.  Noshirvan  The Journalist And Satire Entertainer

92.     Noshirvan is an Iranian American who started making videos on Tiktok in 2020 - to provide for his family - because he lost his job due to the pandemic and government shutdown.

93.     Noshirvan is best portrayed as a new age shock jock, journalist, and social media entertainer. His news content focuses on bad actors behaving badly in public. Noshirvan entertains his audience with commentary, the consequences song, or other funny noises.

94.     Noshirvan adopted the phrase "accountability culture." Accountability culture is best described by Martin Luther King: "darkness cannot drive out darkness; only light can to that"  or  Marianne Williamson: "once the light of our awareness is cast on darkness, then darkness cannot hide, and it cannot remain." Put simply, Noshirvan's news reporting attempts to bring public awareness to social issues many disenfranchised American citizens face.

95.     Noshirvan does not advocate for online, or in person, harassment, or violence of any of the "bad actors" in  his news stories, nor has Noshirvan ever directed his viewers to   "go after" any of the "bad actors." Rather, in some instances, his followers/viewers do online research and provide public information about the bad actors – "tips." Those tips or research may be utilized in a follow-up news story. For example, in this case, Garramone's and Couture's relatives confirmed that Camp was residing at Garramone's property owned by Central Park at 6535 Winkler Rd, Fort Myers, FL 33919.

96.     Garramone's and Couture's relatives confirmed the link between Camp, Garramone and Couture – after the Couture/Garramone Conspiracy started taking place, i.e, credible threats of danger, defamation, harassment, and interference with Noshirvan's business relationships.

97.     Noshirvan quickly became a social media personality publicly  known for his ability to find and identify "bad actors,' and his commentary on politics, civil rights, and current social issues.

98.     Noshirvan is a citizen journalist who reports on issues geared towards helping disenfranchised minorities and people who the police refuse to help. He adds commentary and satire to entertain during his news reports -  similar to "Last Week Tonight's" host - John Oliver.

99.     Noshirvan's news reports only disclose identifiable public information about the bad actor who was behaving badly. And, in several instances, his disclosure of readily available public information identifying the wrongdoer has lead  to the wrongdoer's arrests by the authorities.[15]

100.   Noshirvan often reports news stories on his social media platforms that major media outlets overlook. Noshirvan's news reports have shed light on discrimination, prejudice, physical violence, various criminal acts, and abuse by government officials - some of which have been picked up by major media news outlets.

101.   Noshirvan covers each story he presents free of charge. Noshirvan has never collected money to publish a news story. Instead, Noshirvan uses his platform to raise money and awareness for the victims in his news stories, for charities, and other social, and political causes.

### i.  The  Making of the Couture/Garramone Conspiracy

102.   Upon information and belief, Garramone and Couture were angry about the public exposure they received from Noshirvan's reporting of Couture's criminal acts that occurred on January 26, 2022.

---

[15] https://www.tiktok.com/@thatdaneshguy/video/7285757284632775966?lang=en
https://www.tiktok.com/t/ZT8uRpUAy/
https://www.tiktok.com/t/ZT8u8ANNw/

103.   Upon information and belief, Camp connected with Garramone and Couture through social media applications sometime between February of 2022 through April of 2022. Camp then connected Garramone and Couture with Trainor, and the Trainor Law Firm.

104.   Upon information and belief, Trainor, the ADL, or Camp, created or had created, an account named "Victims of That Danesh Guy" on various platforms in May/June of 2022, for the purpose of contacting people who had been publicly outed as part of Noshirvan's investigative journalism and satire entertainment broadcasts.



105.   Upon information and belief, Trainor, the ADL, and Camp, utilize these social media platforms to recruit other wrongdoers who did not take accountability, but rather pretended to be a 'victim," - as co-conspirators to participate in the "Couture/Garramone conspiracy" against Noshirvan.

106.   Couture and Garramone through Garramone Plastic Surgery's account joined  "Victims of That Danesh Guy" (on "Twitter" now "X") and "Victims of Danesh" (on "Instagram") sometime after  May of 2022. Garramone Plastic Surgery and Victims of That Danesh Guy follow each other, and Garramone Plastic Surgery follows Camp:



107.    Camp follows Garramone Plastic Surgery and Roof Korean 7. Roof Korean 7 is the profile pictured directly above Garramone Plastic Surgery. See photograph below and compare with ¶71, photograph 1 (Roof Korean 7).



108.    In May of 2022, Couture and Garramone allowed Camp to live at 6535 Winkler Rd, Fort Myers, FL 33919 ("**Central Park/Garramone Property**"). This is Garramone's property owned by Central Park.[16] Here are photographs of Camp physically on the Central Park /Garramone Property:

---

[16] 6535 Winkler Rd, Fort Myers, FL 33919 was originally painted in yellow when Garramone and Central Park purchased the property on November 15, 2021. See https://www.zillow.com/homedetails/6535-Winkler-Rd-Fort-Myers-FL-33919/295068155_zpid/? However, by May of 2022, Garramone and Central Park had painted the house white. See https://www.leepa.org/Display/DisplayParcel.aspx?FolioID=10208565&AllPhotos=true&SalesDetails=True#SalesDetails



109.   First, the door behind Camp contains an angled "wear and tear" mark directly above the door handle. The photograph of Central Park/Garramone Property without Camp has the exact same wear and tear pattern above the door handle. Secondly, the ornamental metal rods covering the glass in the door is the same in both pictures.

110.   In the pictures below, Camp, while on Central Park/Garramone Property, self-professes to be "visiting [his] boss's estate." The implication of this statement is that Garramone and Central Park are Camp's employers, Camp is Garramone and Central Park agent, or at a minimum, co-conspirators.



111.    In the picture on the left above, Camp is petting one of Central Park/Garramone's horses. The picture on the right above was taken prior to Garramone/Central Park's purchase of the property. The floor patterns in both pictures are the same. The shape of windows and ceiling fans are the same. The brass knobs, wood planks, and iron rods are the same. The wood ceiling is the same. The only difference is that the barn had been painted white to match the house.

112.    In May of 2022, Camp, while living at the Garramone/ Central Park's Property made a video defaming Noshirvan by calling him a "child predator,"

inciting public outrage through use of false statements, and directing the Couture/Garramone co-conspirators to contact Tioga County Department of Child Protective Services ("Child Protective Services"). In the picture below, Camp expressly directs co-conspirators to "report Noshirvan for child abuse and neglect."[17]






---

[17] A copy of the video will be provided to the Court via jump drive.



113.   Camp is pictured above sitting at the kitchen island in the Garramone/ Central Park Property. His camera is pointed at the ceiling to conceal his location. However, the bottom two pictures are the Garramone/ Central Park Property.[18] The air vent and smoke detector placement are the same. And the black painted door hinges are the same.

_____

[18] https://www.zillow.com/homedetails/6535-Winkler-Rd-Fort-Myers-FL-33919/295068155_zpid/?mmlb=g,14

114.   The Garramone/Central Park Property has an inground pool as pictured below:



115.   Around May 20, 2022, while Couture and Garramone were in Pennsylvania for a graduation ceremony, Camp broadcasted a video while sitting in the pool located at the Garramone/Central Park Property. The pool is readily identifiable because of its ornate roman edges and the surrounding iron fence.

116.   Camp's ties to Garramone and Couture were confirmed by several witnesses who personally know Garramone and Couture.

117.   Camp's ties to Garramone and Couture were confirmed by Garramone's and Couture's relatives.



118.   In photograph above of Camp's live stream video, Camp is being directed by Robert Colbert, owner of Shing TV, an alternative underground broadcasting platform. In this live stream video, Camp explains that he is working in concert with several other individuals with the sole purpose of destroying Noshirvan's reputation and placing him in financial ruin - essentially destroying Noshirvan's life. Camp further elaborates on the "Plan" or conspiracy: (1) having co-conspirators go through Noshirvan's trash; (2) hacking Noshirvan's digital accounts and possibly WIFI, (3) the different stages of the conspiracy (referred to as "rounds" the first round is advertising, the second round is labeling Noshirvan

as predator, etc.); (4) the financier and funding he has received to carry out his part of the conspiracy; (5) the distribution of thousands of defamatory flyers posted near Noshirvan's hometown in less than 24  hours; (6) the billboards containing Noshirvan's face and ThatDaneshGuy's likeness, that were placed in Noshirvan's hometown; (7)  the mass email sent to almost every business near Noshirvan's hometown containing or implying false statements, placing defamatory ads in Penny Savers; (8) published a television advertisement on FOX News; and (9) falsely alleging to be in Pennsylvania to cover for Couture and Garramone – who were actually in Pennsylvania on May 20, 2022.

119. On May 04, 2022, Camp was at Frenchy's Rockaway Grill in Clearwater, Florida for the Florida Governor's speech. Camp depicted below:[19]



_____

[19] See for date confirmation:
https://www.facebook.com/watch/live/?ref=watch_permalink&v=276292907956016

120.   Upon information and belief, on or about May 20, 2022, Garramone and Couture traveled from Fort Myers, Florida to Bucknell University for the graduation of Ralph R. Garramone, III – Garramone's child. Bucknell University is in Lewisburg, Pennsylvania – a 1 hour and 15-minute drive from Noshirvan's hometown. The picture depicts Bucknell University's May 22, 2022, graduation ceremony:



121.   Between May 20, 2022 and May 22, 2022, Garramone is filmed in a local butcher shop in Noshirvan's hometown. The same butcher shop the Couture/Garramone conspirators erroneously believed to be owned by Noshirvan's in-laws. Garramone is pictured below:



122.   Upon information and belief, Couture is pictured wearing a black wig in the picture on the right and standing next to Garramone. In the video, Couture and Garramone check out and leave together.[20]

123.   Camp falsely claimed on social media that he left defamatory flyers of Noshirvan and his wife in the restroom of this butcher shop.

---

[20] If this wigged woman is in fact Couture, then she would have likely violated her probation by traveling out of state to publish defamatory flyers of Noshirvan.



124.   Upon information and belief, Camp's false statement as addressed in ¶123 above, were made to protect Couture and Garramone from their actions of posting defamatory flyers in Noshirvan's hometown and in the mistaken local butcher shop.

125.   In the second photograph above, Camp states "we **recorded** every interaction in Pennsylvania." "We hit over a 1,000 community bulletin boards in 48 hours." Wait for round 3 of at least 50 punk." Noticeably, Camp in most of his social  media posts discussing the Couture/Garramone Conspiracy utilizes the term "we," which is indicative of a multi-person conspiracy – and possible illegal recordings. Camp's threats of danger are credible.

126.   Couture's and Garramone's relatives confirmed that during the graduation weekend Couture and Garramone went missing for several hours – and almost missed the entire graduation. Upon information and belief, Couture and Garramone placed the defamatory flyers in Noshirvan's hometown in furtherance of the Couture/Garramone Conspiracy - while Camp stayed at the Central Park/Garramone Property and broadcasted videos in furtherance of the conspiracy.

127.   In the video below, Camp again attempts to cover for Garramone and Couture by claiming to have been one of the co-conspirators to travel to Noshirvan's hometown and distribute the defamatory flyers. Camp further informs co-conspirators that his phone number is safe because Verizon refused to comply with a subpoena, and thereafter he moved the account to local carrier.



128.   On May 20, 2022, the following image was published in Noshirvan's hometown's Penny Saver:



129.   Around the same time the Penny Saver advertisement went live, a billboard appeared in Noshirvan's community. These advertisements contained both Noshirvan's face and an image of ThatDaneshGuy with the words "doxing is violent." These advertisements falsely imply that Noshirvan condones, advocates, or takes part in, "harmful or destructive physical force" directed at a person. Further, the advertisement improperly, and in contravention of law, utilizes ThatDaneshGuy's likeness for commercial purposes without consent.

130. Trainor and the Trainor Entities received money from unnamed donors (co-conspirators) – for the purpose of purchasing billboards – and purchased the billboard pictured above. Further, Trainor discussed the ADL with

Coach Finstock and admitted that the ADL will "dox the doxers" and "people funding the doxers" by "placing their face on a billboard." [21]

131.   Trainor or the Trainor Entities purchased or leased the billboards and caused Noshirvan's face and ThatDaneshGuy's likeness to be placed on several billboards. These actions were in furtherance of the Couture/Garramone Conspiracy.

132.   The defamatory flyers Defendants placed in, and around, Noshirvan's hometown falsely referred to Noshirvan has a "predator." In third picture below, Camp using the handle "daneshfiles" admits to buying commercials, billboards, and full-page advertisements containing a Trainor, or Trainor Entity, owned telephone number (732-723-4007), which was directed at defaming Noshirvan.[22] In the fourth picture below, Camp requested on social media for co-conspirators to send the defamatory flyers to news outlets.

---

[21] This is the public audio broadcast of that conversation. https://soundcloud.com/user-37760469/patrickdiscussesbizarroadlpurp (see 2:20 - 3:30 minutes in audio)
[22] This phone number was active as of December 15, 2023, and directed to Trainor and the Trainor Entities. An audio recording is included on the previously mentioned jump drive.



133.   Camp in furtherance of the conspiracy intentionally interfered with Noshirvan's business by submitting false or fake reports and complaints to known social media platforms for the purpose of deplatforming Noshirvan.

134.   Defendants caused a defamatory website about Noshirvan to be built and published. The website's domain is www.thatdaneshguy.com. However, at some point, the domain was redirected to Court Listener (*Couture v. Noshirvan* (2:23-cv-00340).

135.   Couture actively promoted the domain: www.thatdaneshguy.com, and promoted and published advertisements containing Noshirvan's face and ThatDaneshGuy's likeness in furtherance of the conspiracy. Furthermore, when the post below was taken, Couture's GPS on her cellphone indicated that she was in Pennsylvania.



136.   Rather than admit her wrongdoing on January 26, 2022, Couture doubled down and falsely accused Noshirvan of "stalking, sextortion, and blackmail" and then posted her claim of false allegations on social media. Couture continued her false narrative by alleging publicly that Noshirvan has a "sexual fantasy" about her, which is not true. Couture played the #metoo card to defame Noshirvan by implication and create a false narrative for her social media platform. Couture falsely accused Noshirvan as being a "revenge pornographer." Lastly, Couture bragged about tortiously interfering with social media platforms to have Noshirvan deplatformed and defunded. See Picture 3, above.

137.   Camp and other co-conspirators sent hundreds of threatening text messages to Noshirvan in furtherance of the conspiracy. The pictures below are representative of Camp's actions:



138.   In the first photograph in paragraph 137, Camp admits to paying Trainor "to go after [Noshirvan] and everyone [he] got information from." Camp's statements are indicative of malicious intent, malicious prosecution, or an abuse of process. Garramone, Couture, and Trainor's actions in case number 2:23-cv-00340-SPC-KCD confirm same by serving overly broad  irrelevant discovery aim

at obtaining personal information from anyone who provided information about the Couture/Garramone Conspiracy or donated to support Noshirvan's news media.

139.   In the second photograph in paragraph 137, Camp refers to Trainor as the "top RICO attorney in the nation." Camp further admits that telephone number (732-723-4007) on the Penny Saver and billboards belongs to Trainor or the Trainor Entities. The telephone number (732-723-4007) on the Penny Saver and billboards belongs to Trainor or the Trainor Law Firm.

140.   In the second photograph above, Camp states "we want you homeless, deplatformed, your kid in foster care, your wife f**k**g n****rs for crack and more." Camp's statements here, and throughout this Complaint, are indicative of Defendants malicious intentions regarding the Couture/Garramone Conspiracy.

141.   Camp published hundreds of social media posts in furtherance of the conspiracy. Most of which discuss steps taken towards the conspiracy's purpose – reputational and financial destruction, injury, and harm, of Noshirvan and his family. In furtherance of the Couture/Garramone Conspiracy, Defendants intentionally inflicted severe emotional distress on Noshirvan to effectuate the Couture/Garramone Conspiracy's purpose.



142.   In the second photograph above, Camp explains that the Couture/ Garramone Conspiracy is about "taking down [Noshirvan], online and teaching him a valuable lesson in matching vibes." Camp further explains "[d]oes it stop there? Nope, this is going to be ***a sustained operation*** that will continue until he is a broken human skeleton of the person he is. Until his kid is placed in foster care…." Defendants' conduct goes beyond all bounds of decency and ought to be regarded as odious and utterly intolerable in a civilized community.

143.   Defendants created a false narrative and spread defamatory statements throughout the internet and in real life. For example, Defendants consistently but

falsely allege that Noshirvan (1) is a "child groomer", (2) sexual "predator", (3) "pedophile", "cyberbully", "stalker", sextortionist", "blackmailer", and that he "rapes his own child" and "caused a 14-year-old to commit suicide." The implication of these statements incites hatred throughout the social media community. As a result of Defendants patently false statements, Noshirvan and his family, have suffered from mental anguish, emotional distress, pecuniary loss, harm to reputation, damaged business relationships, lost standing within his community, sustained personal and familial humiliation, and endured pain and suffering.

144.   Defendants intentionally targeted Noshirvan's wife and child to inflict extreme emotional distress upon Noshirvan.

145.   Defendants had Noshirvan and his family "swatted."[23] Defendants also sent Noshirvan pictures of himself and child at his home, implying Noshirvan's family were in danger. This picture is indicative of a credible threat of harm and was sent to Noshirvan within minutes of its depiction.

---

[23] Swatting is the action of making a false report of a serious emergency so that a SWAT team will go to a person's home, by someone who wants to frighten, upset, or cause problems for that person.



146.   Garramone himself, in his personal Twitter profile,  lead "the call to action" in furtherance of the Couture/Garramone Conspiracy. In the picture directly below, a co-conspirator   a/k/a "feudjunkie" states "FAFO" or "F**k around and find out." Garramone in response, makes a rally speech to gather. Specifically, Garramone states "[d]otting all of the i's and crossing off the t's now. It is time for all his (referring to Noshirvan) victims to gather."



147.   Defendants had knowledge of, and agreed to participate, in a concerted effort to destroy Noshirvan and his family financially, reputationally, and to defame, deplatform, and terrorize Noshirvan by attempting to detract his child from his custody - as payback for making the initial Couture video.

148.   Camp is an employee, agent, and co-conspirator of Garramone and the Garramone Entities. See ¶¶105-117, supra.

149.   A substantial portion of the Couture/Garramone Conspiracy took place at the Garramone Surgery Center by employees, agents, and co-conspirators, of the Couture/Garramone Conspiracy – including Couture and Garramone.

150.   A substantial portion of the Couture/Garramone Conspiracy took place at the Garramone/ Central Park Property (Winkler Rd.) by employees, agents, and co-conspirators, of the Couture/Garramone Conspiracy – including Couture, Garramone and Camp. See ¶¶105-117, supra.

151.   Camp communicates to Garramone, Couture, Trainor, and other co-conspirators through social media applications like *Gab.com*. Defendants and unnamed co-conspirators make payments to Camp for his services through *GiveSendGo*. In the picture below, Camp stealthily communicates to Defendants that it is safe to continue paying him. For example,  Camp explains that Trainor can execute his affidavit, and Camp ***"will deny everything in a sworn affidavit."***

Camp goes on to explain that payments through *GiveSendGo* and *mailed letters* are allegedly untraceable. Camp prompts payments from other Defendants by classifying it as "operational expenses." Finally, Camp reassures the other Defendants that ***"no one is going to get into trouble."***



152.   On Tuesday, December 19, 2023, notice of intent to file a lawsuit was provided to all Defendants. Camp is not a named defendant and was not provided a copy. Despite this fact, on December 21, 2023, Camp had already received a copy and started posting publicly. The Pictures below depict Camp's Gab.com posts:



## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### CIVIL CONSPIRACY TO TORTIOUSLY
### INTERFERE WITH A PARENT-CHILD RELATIONSHIP
(as to  all Defendants)

[DISMISSED BY COURT ORDER. Dkt. 130]

### SECOND CAUSE OF ACTION

### CIVIL CONSPIRACY TO TORTIOUSLY
### INTERFERE WITH A BUSINESS RELATIONSHIP
(as to  all Defendants)

153.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one

hundred and fifty-two (152) above, as if fully stated herein, and further alleges as

follows:

154.   Noshirvan had monetized business relationships with "buymecoffee," "Twitter," "TikTok," "Patreon" and other social media platforms.

155.   Defendants along with unnamed conspirators, had direct knowledge of Noshirvan's monetized social media platforms, and agreed to participate in a campaign to deplatform Noshirvan for the purpose of financially ruining Noshirvan.

156.   Defendants through the Couture/Garramone Conspiracy intentionally and maliciously interfered with Noshirvan's business relationships with "buymecoffee," "Twitter," "TikTok," "Patreon" and other social media platforms.

157.   Defendants through the Couture/ Garramone Conspiracy intentionally and maliciously interfered with Noshirvan's business relationships by making fake or false reports of misconduct to the social media platform. Camp also sent harassing and threatening emails to Noshirvan's donors, which caused those donors to withdrawal support. As a result, Noshirvan lost lucrative business relationships, and future income, which caused detriment and harm.

158. Defendants' tortious interference with Noshirvan's business relationships is unjustifiable and was done solely to financially harm Noshirvan. See ¶¶141-144, above.

159.   Camp in furtherance of the Couture/Garramone Conspiracy harassed, threatened, extorted, and coerced Noshirvan's prior lawyer to withdraw as counsel. Camp abused process by harassing, threatening, extorting, and coercing Noshirvan's prior lawyer to help Trainor prevail against a *pro se* party. Camp's interference in a federal lawsuit and action towards the prior lawyer was malicious and done for an improper purpose. Defendants interference with Noshirvan's business relationship  was tortious.

160.   As a direct and proximate result of Defendants tortious interference, Noshirvan has incurred damages, including but not limited to mental anguish and emotional distress, lost earnings, other economic loss, and will continue to suffer damages in the future.

161.   Defendants acted maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

### THIRD CAUSE OF ACTION
### CIVIL CONSPIRACY TO DEFAME
### (as to  all Defendants)

162.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

163.   Defendants had direct knowledge of Couture/Garramone Conspiracy and agreed to participate in a defamatory campaign directed at Noshirvan for the purpose of ruining his reputation and destroying him financially.

164.   Defendants maliciously published or caused to be published, thousands of Flyers with Noshirvan's face printed on them along with the false statement: "have you seen this predator."

165.   Defendants maliciously published or caused to be published, false statements labeling Noshirvan as a "pedophile" "child groomer",  "stalker," "sextortionist," and "blackmailer."

166.   Defendants maliciously published or caused to be published, false statements stating that Noshirvan "rapes his own child" and "caused a 14-year-old to commit suicide."

167.   Defendants knew that the defamatory statements they published were not true but acted with reckless disregard for the truth.

168.   Defendants intentionally reported false child abuse to Child Protective Services on three occasions and then published statements regarding the false defamatory report on social media to harm Noshirvan's reputation.

169.   Defendants maliciously published, or caused to be published, a billboard with Noshirvan's face on it and the statement "doxing is violent." Defamation by implication.

170.   Defendants maliciously published, or caused to be published, fake flyers for a "swingers party," which contained Noshirvan and his wife's face and personal contact information. The pictures below depict Defendants act:



171.   In the second picture above, Camp questions Noshirvan's wife's virtue implicitly by falsely alleging they are "swingers",  and expressly by calling her a "wh**e" on social media.

172.   As a direct and proximate result of Defendants concerted effort to defame Noshirvan, Noshirvan suffered from mental anguish, emotional distress, reputational harm, and loss of income, future revenue, other damages.

173.   Defendants acted maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

## FOURTH CAUSE OF ACTION

### CIVIL CONSPIRACY TO
### INTENTIONALLY INFLICT EMOTIONAL DISTRESS
### (as to  all Defendants)

174.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

175.   Defendants had direct knowledge of Couture/Garramone Conspiracy and agreed to participate in an  online and in person campaign directed at Noshirvan for the purpose of ruining his reputation and destroying him financially.

176.   Defendants with malicious intent orchestrated an elaborate scheme to "tak[e] down [Noshirvan], online and teach[] him a valuable lesson in matching vibes." Defendants expressly admit that the  "sustained operation" "will continue

until [Noshirvan] is a broken human skeleton" of the person he was and his Child "is placed in foster care…." See ¶¶141-144.

177.   Defendants had Norshirvan and his family "swatted" and sent Noshirvan pictures of himself and child in his yard. Defendants claimed via social media to have placed their cameras illegally in public places near Noshirvan's hometown to watch him.

178.   As a result of Defendants harassment, threats, and defamatory campaign, false reports to Child Protective Services, and swatting, Noshirvan's wife and child were forced to temporarily move out of their home in fear for their safety.

179.   Defendants concerted actions when viewed in totality are extreme and outrageous and were done intentionally to cause Noshirvan emotional distress.

180.   Defendants' conduct goes beyond all bounds of decency and ought to be regarded as odious and utterly intolerable in a civilized community. Defendants' actions are atrocious.

181.   Noshirvan and family suffered severe emotional distress caused by Defendants' actions.

182.   As a direct and proximate result of Defendants concerted effort to intentionally cause Noshirvan severe emotional distress, Noshirvan suffered from

mental anguish, emotional distress, reputational harm, and loss of income, future revenue, other damages.

183. Defendants acted maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

## FIFTH CAUSE OF ACTION

### CIVIL CONSPIRACY TO MISAPPROPRIATE NOSHIRVAN'S LIKENESS FOR COMMERICAL
### (as to  all Defendants)

184. Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

185. Defendants had direct knowledge of Couture/Garramone Conspiracy and agreed to participate in an advertising campaign directed at Noshirvan for the purpose of ruining his reputation and destroying him financially.

186. Defendants maliciously printed, published, and displayed at least two distinct types of flyer advertisements containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent.  Upon information and

belief, Defendants printed, published, and caused to be displayed at least 10,000 flyers.

187.   Defendants maliciously printed, published, and displayed a billboard advertisement containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent.

188.   Defendants maliciously printed, displayed,  published or publicly disseminated commercials containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent and in furtherance of the conspiracy.

189.   Noshirvan is entitled to recover damages for injury, reasonable royalty, and punitive or exemplary damages.

190.   Defendants' publications were not bona fide news reports or of legitimate public interest. Defendants' publications were commercial advertisements.

191.   ThatDaneshGuy's likeness has commercial value, which Noshirvan developed legitimate public interest.

192.   As a direct and proximate result of Defendants concerted effort to participate in an advertising campaign utilizing Noshirvan's and ThatDaneshGuy's likes or image, Noshirvan suffered from mental anguish,

emotional distress, reputational harm, and loss of income, future revenue, other damages.

193.   Defendants acted maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

## SIXTH CAUSE OF ACTION

### DEFAMATION
### (as to Garramone Plastic Surgery, Couture, and Camp)

194.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

195.   Garramone Plastic Surgery employed Couture as its surgical center manager during all relevant time periods mentioned herein and to date. Couture received compensation in exchange for the work she provided to Garramone Plastic Surgery.

196.   Garramone Plastic Surgery employed, hired, or paid Camp to perform services on its behalf.

197.   Garramone Plastic Surgery paid Camp in bi-weekly increments to act as it representative, marketing, social media, and online reputation manager.

198. Garramone Plastic Surgery through its payments, actions, and knowledge, implicitly or expressly acknowledged Couture's and Camp's authority to act on its behalf.

199. Garramone Plastic Surgery expressly acknowledged in writing Camp's authority to act on its behalf.

200. Garramone Plastic Surgery expressly acknowledged Couture's authority to act on its behalf by placing Couture's picture on its website in the "meet the team" section."

201. Couture held herself out as an employee of Garramone Plastic Surgery.

202. Garramone Plastic Surgery hired Net Reputation online reputation management company.

203. Camp took over for Net Reputation as Garramone Plastic Surgery's marketing, social media, and online reputation manager in May/June of 2022.

204. Camp and Couture expressly or through their conduct accepted Garramone Plastic Surgery's appointment as its agent.

205. Garramone Plastic Surgery maintained control over Camp by virtue of the monetary compensation it paid to Camp on a bi-weekly basis.

206. Garramone Plastic Surgery maintained control over Couture by virtue of the monetary compensation it paid to her.

207.  Camp is an employee or agent of Garramone Plastic Surgery.

208.  Couture is an employee or agent of Garramone Plastic Surgery.

209.  Camp's actions were within the scope of employment with Garramone Plastic Surgery because Camp performed the acts mentioned throughout this Complaint while acting as a marketing, social media, and online reputation manager.

210.  Camp's actions were sufficiently outside the scope of employment because he acted within either his own, Couture's or Garramone's personal interest outside Garramone Plastic Surgery's business interest.

211.  Garramone Plastic Surgery and Garramone were aware of Camp's actions and ratified Camp's actions or conduct.

212.  Couture's actions were sufficiently outside the scope of employment because she acted within either her own or Dr. Garramone's personal interest outside Garramone Plastic Surgery's business interest.

213.  Couture's actions were within the scope of employment with Garramone Plastic Surgery because Couture performed the acts mentioned throughout this Complaint while acting as its manager.

214.  Garramone Plastic Surgery and Garramone were aware of Couture's actions and ratified Couture's actions or conduct.

215.   Garramone Plastic Surgery is responsible for Camp's (1) knowingly false publication of statements regarding Noshirvan allegedly being a "child predator" and inciting his followers to falsely report Noshirvan to CPS and the Mansfield State Troopers in bad faith, (2) mass emailing of defamatory statements, (3) publication of thousands of social media posts containing defamatory statements –  falsely labeling Noshirvan among other things as a "pedophile", "sexual predator", "child rapist", "sand n*gg*r", "F*gg*t" "revenge pornographer", "cyber bully child killer", "child groomer", (4) publication of a website containing the statements and depictions outlined above inter alia, (5) publication of doxing is violent photographs depicting Noshirvan's face (implying that Noshirvan is a dangerous doxer) all over the internet, (7) publication of false claims that Noshirvan and his wife are swingers,  and (8) claiming that Noshirvan (a) "rapes his own child", (b) "caused a 14-year-old to commit suicide," (c) "cause another minor to attempt suicide", (d) that Noshirvan sent a letter to Garramone and Couture that contained a white substance (implying a terrorist act)[24] and "victimizes others", (9) statements implying that Noshirvan was involved in

---

[24] Notably, the post mark on the depicted envelope was sent from Fort. Myers, Florida – not Pennsylvania.

"racketeering," "money laundering," "extortion," "sextortion," and "blackmail" inter alia.

216.   Garramone Plastic Surgery is responsible for Couture's (1) knowingly publication of false statements regarding Noshirvan via flyer in Mansfield, Pennsylvania, (2) promoting a website built by Camp to defame Noshirvan, (3) publishing doxing is violent photographs depicting Noshirvan's face (implying that Noshirvan is a dangerous doxer), (4) falsely accusing Noshirvan of "stalking," "sextortion," "blackmail" "harassment" "cyber stalker" "cyber bully" and being a "revenge pornographer" on social media, (5) creating a false narrative of social media to defame Noshirvan by implication, (6) falsely alleging that Noshirvan posted sexual images of her on the internet, and (7) attempting mass publication of her false narrative naming Noshirvan as the villain.

217.   As a direct and proximate result of Couture and Camp's concerted efforts to defame, Noshirvan suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

218.   Garramone Plastic Surgery is responsible for Camp and Couture's actions as alleged in this Complaint including acting maliciously, wantonly, or

with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

## SEVENTH CAUSE OF ACTION

## DEFAMATION

(as to Central Park and Camp)

219.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

220.   Central Park employed, hired, or compensated Camp to perform services on its behalf.

221.   Central Park provided  Camp living quarters and accommodations in exchange for his services for Garramone and Couture.

222.   Central Park through its payments in kind, actions, and knowledge, implicitly or expressly acknowledged Camp's authority to act on its behalf.

223.   Camp expressly or through his conduct (accepting and living at the Winkler property) accepted Central Park's appointment as its agent.

224.   Central Park maintained control over Camp by virtue of the in kind (living accommodations) compensation it provided to Camp.

225.   Camp is an employee or agent of Central Park.

226.   Camp's actions were within the scope of employment  with Central Park because Camp performed the acts mentioned throughout this Complaint at the Winkler Property during the course of his employment Central Park as a social media and online reputation manager.

227.   Camp's actions were sufficiently outside the scope of employment because he acted within either his own, Couture's or Garramone's personal interest outside Central Park's business interest.

228.   Central Park was, at all relevant times, aware of Camps actions and ratified same.

229.   Central Park is responsible for Camp's (1) knowing publication of false statements regarding Noshirvan allegedly being a "child predator, groomer, rapist" and inciting his followers to falsely report Noshirvan to Child Protective Services and the Mansfield State Troopers in bad faith, (2) mass emailing of defamatory statements (as outlined in this Complaint) inter alia,  (3) publication of thousands of social media posts containing defamatory statements –  falsely labeling Noshirvan inter alia  as a "sexual predator", "pedophile", "predator", "child rapist", "sand n*gg*r", "F*gg*t" "revenge pornographer", "cyber bully child killer", "child groomer", (4) publication of a website containing the statements and depictions outline above inter alia, (5) publication of doxing is

violent photographs depicting Noshirvan's face (implying that Noshirvan is a dangerous doxer) throughout the interent, (7) publication of false claims that Noshirvan and his wife are swingers,  and (8) claiming that Noshirvan (a) "rapes his own child", (b) "caused a 14-year-old to commit suicide," (c) "cause another minor to attempt suicide", (d) that Noshirvan sent a letter to Garramone and Couture that contained a white substance (implying a terrorist act)  and "victimizes others", (9) statements implying that Noshirvan was involved in "racketeering," "money laundering," "extortion," "sextortion," and "blackmail"  inter alia.

230.   Central park knowingly assisted in Camp's wrongful acts by allowing Camp to utilize its Winkler ranch property to market and publish details of the defamatory campaign designed to injure Noshirvan.

231.   Central Park was aware of Camp's tortious activity through Garramone and knowingly provided substantial assistance.

232.   As a direct and proximate result of Camp's efforts, Noshirvan suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

233.   Central Park is responsible for Camp' actions as alleged in this

Complaint including acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, warranting the imposition of punitive damages as allowed by Florida law.

## EIGHTH CAUSE OF ACTION

## DEFAMATION

(as to Garramone and Camp)

234.    Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

235.    Garramone  employed, hired, or compensated Camp to perform services on his behalf.

236.    Garramone paid Camp in bi-weekly increments to act as his personal representative, marketing, social media, and online reputation manager.

237.    Garramone through his payments, actions, and knowledge, implicitly or expressly acknowledged Camp's authority to act on his behalf.

238.    Camp expressly or through his conduct accepted Garramone's appointment as his agent.

239.    Garramone maintained control over Camp by virtue of the Monetary compensation he provided to Camp.

240.   Camp is an employee or agent of Garramone and was given authority to act on Garramone's behalf.

241.   Camp's actions were within the scope of employment  with Garramone  because  Camp  performed  the  acts  mentioned  throughout  this Complaint   while  working  as  Garramone's  personal  social  media  and  online reputation manager.

242.   Camp's actions were sufficiently outside the scope of employment because  he  acted  within  his  own  or  Couture's  personal  interest  outside  of Garramone's interest.

243.   Garramone was, at all relevant times, aware of Camps actions and ratified same.

244.   Garramone is responsible for Camp's (1) intentional publication of false  statements  regarding  Noshirvan  allegedly  being  a  "child  predator"  and inciting his followers to falsely report Noshirvajn to Child Protective Services and the  Mansfield  State  Troopers  in  bad  faith,  (2)  mass  emailing  of  defamatory statements ( as mentioned throughout this Complaint) inter alia,  (3) publication of thousands  of  social  media  posts  containing  defamatory  statements  –   falsely labeling Noshirvan among other things as a "pedophile", "predator", "child rapist", "sand  n*gg*r",  "F*gg*t"  "revenge  pornographer",  "cyber  bully  child  killer",

"child groomer", (4) publication of a website containing the statements and depictions outline above inter alia, (5) publication of doxing is violent photographs depicting Noshirvan's face (implying that Noshirvan is a dangerous doxer) throughout the internet, (7) publication of false claims that Noshirvan and his wife are swingers,  and (8) claiming that Noshirvan (a) "rapes his own child", (b) "caused a 14-year-old to commit suicide," (c) "cause a another minor to attempt suicide", (d) Noshirvan sent a letter to Garramone and Couture that contained a white substance (implying a terrorist act)  and "victimizes others", (9) statements implying that Noshirvan was involved in "racketeering," "money laundering," "extortion," "sextortion," and "blackmail"  inter alia.

245.   Garramone knowingly assisted in Camp's wrongful acts by allowing Camp to utilize Central Park's Winkler ranch property to market and publish details of the defamatory campaign designed to injure Noshirvan.

246.   Garramone knowingly assisted in Camp's wrongful acts by providing certain means to Camp to carry out the defamatory campaign.

247.   Garramone  was aware of Camp's tortious activity through Couture or otherwise, and knowingly provided substantial assistance.

248.   As a direct and proximate result of Camp's efforts, Noshirvan

suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

249.   Garramone is responsible for Camp's actions as alleged in this Complaint including acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, warranting the imposition of punitive damages as allowed by Florida law.

## NINETH CAUSE OF ACTION

## DEFAMATION

(as to Couture and Camp)

250.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

251.   Couture  employed, hired, or compensated Camp to perform services on her behalf.

252.   Couture paid Camp to act as her personal representative, marketing, social media, and online reputation manager.

253.   Couture through her payments, actions, and knowledge, implicitly or

expressly acknowledged Camp's authority to act on her behalf.

254.   Camp expressly or through his conduct accepted Couture's appointment as his agent.

255.   Couture maintained control over Camp by virtue of the monetary compensation she provided to Camp.

256.   Camp is an employee or agent of Couture and was given authority to act on her behalf.

257.   Camp's actions were within the scope of employment  with Couture because Camp performed the acts mentioned in this Complaint  while working  as Couture's personal social media and online reputation manager.

258.   Camp's actions were sufficiently outside the scope of employment because  he  acted  within  his  own  or  Garramone's  personal  interest  outside  of Couture's interest.

259.   Couture was, at all relevant times, aware of Camps actions and ratified same.

260.   Couture is responsible for Camp's (1) intentional publication of false statements regarding Noshirvan allegedly being a "child predator" and inciting his followers  to  falsely  report  Noshirvan  to  Child  Protective  Services  and  the Mansfield State Troopers in bad faith, (2) mass emailing of defamatory statements

(mentioned throughout this Complaint) inter alia, (3) publication of thousands of social media posts containing defamatory statements – falsely labeling Noshirvan among other things as a "pedophile", "predator", "child rapist", "sand n*gg*r", "F*gg*t" "revenge pornographer", "cyber bully child killer", "child groomer", (4) publication of a website containing the statements and depictions outline above inter alia, (5) publication of doxing is violent photographs depicting Noshirvan's face (implying that Noshirvan is a dangerous doxer) throughout the internet, (7) publication of false claims that Noshirvan and his wife are swingers, and (8) claiming that Noshirvan (a) "rapes his own child", (b) "caused a 14-year-old to commit suicide," (c) "caused another minor to attempt suicide", (d) that Noshirvan sent a letter to Garramone and Couture that contained a white substance (implying a terrorist act) and "victimizes others", (9) statements implying that Noshirvan was involved in "racketeering," "money laundering," "extortion," "sextortion," and "blackmail" inter alia.

261.   Couture knowingly assisted in Camp's wrongful acts by participating with Camp to market and publish details of the defamatory campaign designed to injure Noshirvan.

262.   Couture was aware of Camp's tortious activity through her communications with Camp and knowingly provided substantial assistance.

263.   As a direct and proximate result of Camp's effort, Noshirvan suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

264.   Couture is responsible for Camp's actions as alleged in this Complaint including acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, warranting the imposition of punitive damages as allowed by Florida law.

## TENTH CAUSE OF ACTION

## DEFAMATION

### (as to Garramone Entities, Garramone, and Camp)

265.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

266.   Garramone  employed, hired, or compensated Camp to perform services on his behalf.

267.   Garramone paid Camp in bi-weekly increments to act as his personal representative, marketing, social media, and online reputation manager.

268.   Garramone through his payments, actions, and knowledge, implicitly or expressly acknowledged Camp's authority to act on his behalf.

269.   Camp expressly or through his conduct accepted Garramone's appointment as his agent.

270.   Garramone maintained control over Camp by virtue of the Monetary compensation he provided to Camp.

271.   Camp is an employee or agent of Garramone and Camp was authorized to act on Garramone's behalf.

272.   Camp's actions were within the scope of employment because Camp performed the acts mentioned throughout this Complaint while working as Garramone's personal social media and online reputation manager.

273.   Camp's actions were sufficiently outside the scope of employment because he acted within his own or Couture's personal interest outside of Garramone's interest.

274.   Garramone was, at all relevant times, aware of Camps actions and ratified same.

275.   Garramone is responsible for Camp's (1) intentional publication of false statements regarding Noshirvan allegedly being a "child predator" and inciting his followers to falsely report Noshirvan to Child Protective Services and

the Mansfield State Troopers in bad faith, (2) mass emailing of defamatory

statements (as mentioned throughout this Complaint) inter alia , (3) publication of

thousands of social media posts containing defamatory statements – falsely

labeling Noshirvan among other things as a "pedophile", "predator", "child rapist",

"sand n*gg*r", "F*gg*t" "revenge pornographer", "cyber bully child killer",

"child groomer", (4) publication of a website containing the statements and

depictions outline above, (5) publication of doxing is violent photographs depicting

Noshirvan's face (implying that Noshirvan is a dangerous doxer) throughout the

internet, (7) publication of false claims that Noshirvan and his wife are swingers,

and (8) claiming that Noshirvan (a) "rapes his own child", (b) "caused a 14-year-

old to commit suicide," (c) "cause another minor to attempt suicide", (d)

Noshirvan sent a letter to Garramone and Couture that contained a white substance

(implying a terrorist act) and "victimizes others", (9) statements implying that

Noshirvan was involved in "racketeering," "money laundering," "extortion,"

"sextortion," and "blackmail" inter alia.

276.   All Garramone Entities except for Wraith and CPS maintain their

principal place of business in Fort Myers, Florida at Garramone Surgery Ctr.

277.   All Garramone Entities are closely held companies that are intimately

entangled or intertwined as to simply be an extension of Garramone.

278.   The acts alleged in this Second Amended Complaint were committed by officers, employees, and agents of Garramone Entities, which were committed, controlled, or carried, out as a result of Garramone's sole discretion, by direction, instruction, or order.

279.   The acts alleged in this Second Amended Complaint were committed by officers, employees, and agents of Garramone Entities,  and were planned, coordinated, or carried out on location at Garramone Surgery Ctr.

280.   The acts alleged in this Second Amended Complaint were committed by officers, employees, and agents of Garramone Entities were committed for an improper purpose.

281.   Garramone Plastic Surgery and the Garramone Entities knowingly assisted in Camp's wrongful acts by allowing Camp access to Garramone Surgery Ctr. to plan and coordinate  the defamatory campaign designed to injure Noshirvan.

282.   Garramone Plastic Surgery  and the Garramone Entities were aware of Camp's tortious activity through Camp's communications -on and off – Garramone Surgery Ctr.,  and knowingly provided substantial assistance.

283.   As a result, of Garramone's improper use of the Garramone Entities,

Noshirvan suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

284.   Garramone and the Garramone Entities are responsible for Camp's and Couture's actions as alleged in this Complaint including acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, warranting the imposition of punitive damages as allowed by Florida law.

## ELEVENTH CAUSE OF ACTION

## DEFAMATION

## (as to OMG Realty, Central Park, Garramone, and Camp)

285.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

286.   Garramone  employed, hired, or compensated Camp to perform services on his behalf.

287.   Garramone paid Camp in bi-weekly increments to act as his personal representative, marketing, social media, and online reputation manager.

288.   Garramone through his payments, actions, and knowledge, implicitly or expressly acknowledged Camp's authority to act on his behalf.

289.   Camp expressly or through his conduct accepted Garramone's appointment as his agent.

290.   Garramone maintained control over Camp by virtue of the Monetary compensation he provided to Camp.

291.   Camp is an employee or agent of Garramone and Camp was authorized to act on Garramone's behalf.

292.   Camp's actions were within the scope of employment because Camp performed the acts mentioned throughout this Complaint while working as Garramone's personal social media and online reputation manager.

293.   Camp's actions were sufficiently outside the scope of employment because he acted within his own or Couture's personal interest outside of Garramone's interest.

294.   Garramone was, at all relevant times, aware of Camps actions and ratified same.

295.   Garramone is responsible for Camp's intentional publication of false statements regarding Noshirvan allegedly (1) being a "child predator" and inciting his followers to falsely report Noshirvajn to Child Protective Services and

the Mansfield State Troopers in bad faith, (2) mass emailing of defamatory statements (as mentioned throughout this Complaint) inter alia , (3) publication of thousands of social media posts containing defamatory statements – falsely labeling Noshirvan among other things as a "pedophile", "predator", "child rapist", "sand n*gg*r", "F*gg*t" "revenge pornographer", "cyber bully child killer", "child groomer", (4) publication of a website containing the statements and depictions outline above, (5) publication of doxing is violent photographs depicting Noshirvan's face (implying that Noshirvan is a dangerous doxer) throughout the internet, (7) publication of false claims that Noshirvan and his wife are swingers, and (8) claiming that Noshirvan (a) "rapes his own child", (b) "caused a 14-year-old to commit suicide," (c) "cause another minor to attempt suicide", (d) Noshirvan sent a letter to Garramone and Couture that contained a white substance (implying a terrorist act)  and "victimizes others", (9) statements implying that Noshirvan was involved in "racketeering," "money laundering," "extortion," "sextortion," and "blackmail"  inter alia.

296.   OMG Realty owns and maintain its principal place of business in Fort Myers, Florida at Garramone Surgery Ctr.

297.   OMG Realty is closely held company that is intimately entangled or intertwined with Garramone – and is extension of Garramone.

298.   Central park is closely held company that is intimately entangled or intertwined with Garramone – and is extension of Garramone.

299.   The acts alleged in this Second Amended Complaint were committed by officers, employees, and agents of OMG Realty, which were committed, controlled, or carried out as a result of Garramone's sole discretion, by direction, instruction, or order.

300.   The acts alleged in this Second Amended Complaint were committed by officers, employees, and agents of Central Park, which were committed, controlled, or carried out as a result of Garramone's sole discretion, by direction, instruction, or order.

301.   The acts alleged in this Second Amended Complaint that were committed by officers, employees, and agents of OMG Realty and Central Park, and were planned, coordinated, or carried out on location at Garramone Surgery Ctr.

302.   The acts alleged in this Second Amended Complaint were committed and  known by OMG Realty.  OMG Realty provided substantial assistance by allowing Garramone and Camp to utilize Garramone Surgery Ctr. to carry out those acts.

303.   The acts alleged in this Second Amended Complaint were committed and known by Central Park. Central Park provided substantial assistance by allowing Garramone and Camp to utilize the Winkler Property to carry out those acts.

304.   OMG Realty, Central Park, Garramone knowingly assisted in Camp's wrongful acts by allowing Camp access to Garramone Surgery Ctr. and the Winkler Property to plan and coordinate  the defamatory campaign designed to injure Noshirvan.

305.   OMG Realty, Central Park, Garramone were aware of Camp's tortious activity through Camp's communications -on and off – Garramone Surgery Ctr. and Winkler Property,  and knowingly provided substantial assistance.

306.   As a result, Garramone's, OMG Realty's, and Central Park's, aiding and abetting of Garramone's employee or agent Camp, Noshirvan suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

307.   Garramone, OMG Realty and Central Park are responsible for Camp's

actions as alleged in this Complaint include acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, warranting the imposition of punitive damages as allowed by Florida law.

## TWELFTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (as to Garramone Entities, Garramone, Couture, and Camp)

308. Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

309. Garramone employed, hired, or paid Camp to perform services on his behalf.

310. Garramone paid Camp in bi-weekly increments to act as his representative, marketing, social media, and online reputation manager.

311. Garramone through his payments, actions, and knowledge, implicitly or expressly acknowledged Camp's authority to act on his behalf.

312. Garramone authorized Camp to act on his behalf.

313. Camp expressly or through his conduct accepted Garramone appointment as his agent.

314. Garramone maintained control over Camp by virtue of the monetary compensation he paid to Camp.

315. Camp is an employee or agent of Garramone.

316. Camp's actions were within the scope of employment with Garramone.

317. Garramone was aware of Camp's actions and ratified same.

318. Camp, Garramone and Couture, with malicious intent orchestrated an elaborate scheme to "tak[e] down [Noshirvan], online and teach[] him a valuable lesson in matching vibes." Camp expressly admit that the "sustained operation" "will continue until [Noshirvan] is a broken human skeleton" of the person he was and his Child "is placed in foster care…." See ¶¶141-144.

319. Garramone, Couture, or Camp had or caused Noshirvan and his family swatted.

320. Camp sent Noshirvan pictures taken by Garramone, Couture, or other unknown third parties of Noshirvan and his minor child in his yard.

321. Camp claimed via social media to have placed cameras illegally in public places near Noshirvan's hometown to watch him.

322. Camp sent Noshirvan hundreds of malicious text message and emails. For example, those text messages and emails contained verbal and implied threats of immediate physical and sexual harm directed at Noshirvan's wife and minor child, racist and homophobic slurs directed at a minor child, harassing threats of

financial ruins, children being placed in foster care, sex and  extremely personal and private information, inter alia.

323. Camp sent Noshirvan multiple photographs in live time of Noshirvan in front of his home or pictures of his home with messages stating that "we are watching you" or "We are literally sitting across the street watching you cry" or "from a good distance away I can take photos [of you] crystal clear."

324.  Camp sent Noshirvan images and text messages that could only be interpreted as death threats.

325.  Garramone, Couture, or Camp maliciously caused made or caused false allegations of child abuse to be reported to Child Protective Services. Those false reports caused Noshirvan and his family to be investigated on multiple occasions. As a result, Noshirvan and his family became emotionally distressed at the thought of possibly losing custody of their child due to provably false allegations.

326. All Garramone Entities except for Wraith and CPS maintain their principal place of business in Fort Myers, Florida at Garramone Surgery Ctr.

327. All Garramone Entities are closely held companies that are intimately entangled or intertwined as to simply be an extension of Garramone.

328. The acts alleged in this Second Amended Complaint were committed

by officers, employees, and agents of Garramone Entities, which were committed, controlled, or carried, out as a result of Garramone's sole discretion, by direction, instruction, or order.

329.  The acts alleged in this Second Amended Complaint that were committed by officers, employees, and agents of Garramone Entities,  and were planned, coordinated, or carried out on location at Garramone Surgery Ctr.

330. The acts alleged in this Second Amended Complaint were committed by officers, employees, and agents of Garramone Entities were committed for an improper purpose.

331. As a result, of Garramone's improper use of the Garramone Entities, Noshirvan suffered from mental anguish, emotional distress, and other damages.

332. Garramone and the Garramone Entities are responsible for Camp's and Couture's actions as alleged in this Complaint including acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, warranting the imposition of punitive damages as allowed by Florida law.

333.  Camp gained access to one of Noshirvan's social media accounts and disseminated pictures of sexually explicit images of Noshirvan without consent in violation of Section 784.049, Florida Statutes.

334.   Camp's sent Noshirvan hundreds of text messages that ranged from threats of physical and sexual violence to racial, gender, and LGBTQ slurs and death.

335.   As a result of Garramone's, Couture's, and Camp's harassment (lasting roughly two years), cyberbullying, Camp's threats of physical and sexual harm, racist and homophobic slurs, false reports to Child Protective Services, swatting, public dissemination of sexually explicit photographs throughout the internet, and actual implied threats of physical harm, which included (a) photographs of Noshirvan being sent to him in live time with text message threats of implied physical violence, and (b) statements of real danger. For example, during a live stream, one of Camp's followers who lives in Pennsylvania offered to secure the area (referring to Noshirvan's home) by getting some "elastic capacity" out there (implying direct physical violence in context).

336.   Camp also doxed friends, family members, neighbors, employers, and licensing boards of those individual as applicable.

337.   Camp published private materials about Noshirvan obtained through a licensed private investigator. Materials Camp (a convicted felon) should not have had access to.

338.   Noshirvan's wife and child were forced to temporarily move out of their home in fear for their safety.

339. Garramone's, Couture's, and Camp's concerted actions when viewed in totality are extreme and outrageous and were done intentionally to cause Noshirvan and family emotional distress.

340. Garramone's, Couture's, and Camp's conduct goes beyond all bounds of decency and ought to be regarded as odious and utterly intolerable in a civilized community. Their actions are atrocious.

341. Noshirvan and family suffered severe emotional distress caused by Garramone's, Couture's, and Camp's actions.

342. Garramone, Couture, and Camp knew that Noshirvan would be particularly susceptible to their actions. Specifically, Garramone, Couture, and Camp knew of (1) Noshirvan's monetization of social media as his only financial means to provide for his family and they intentionally made false reports those platforms to destabilize Noshirvan financially, (2) Noshirvan was married with young children, so they intentionally targeted his wife and child, (3) Noshirvan ethnicity and intentionally made racial threats of physical violence and sexual harm to Noshirvan and family, (4) that Noshirvan was aware of Camp's ties to the KKK and proud boys, and utilized the real and present fear of those hate groups to target

Noshirvan's intermediate family, (5) Noshirvan was married with young children, so they hired an investigator who provided Camp with non-public highly sensitive private materials he would not normally have access to, in order to better harass, threaten, extort, or otherwise cyber bully Noshirvan, inter alia.

343. As a direct and proximate result of Garramone's, the Garramone Entites, Couture's, and Camp's concerted effort to intentionally cause Noshirvan severe emotional distress, Noshirvan suffered from mental harm, anguish, emotional distress, and other damages.

344. Garramone, Couture, and the Garramone Entities knowingly assisted in Camp's wrongful acts by allowing Camp to utilize to utilize corporate property (Garramone Surgery Ctr. and Winkler ranch) to plan, coordinate, market, or publish details of the defamatory campaign designed to injure Noshirvan.

345. Garramone Plastic Surgery lead the incitation of campaign to injure Camp. See Picture below ¶146.

346. Garramone and Couture traveled to Mansfield Pennsylvania and upon information and belief, took pictures of Noshirvan at his home. Those same pictures were sent to Camp and Camp immediately sent the pictures to Noshirvan to imply immediate or imminent harm or danger.

347. Garramone, Couture, and the Garramone Entities was aware of Camp's

psychological torture and illegally tortious activity as described above and knowingly provided substantial assistance.

348. As a direct and proximate result of Garramone's, Couture's, and Camp's concerted effort to intentionally cause Noshirvan severe emotional distress, Noshirvan suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

349. Garramone, Couture, and Camp acted maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law. The Garramone Entities are responsible for Garramone's, Couture's, and Camp's actions including acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

### THIRTEENTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(as to Garramone Plastic Surgery, Garramone, Couture, and Camp)**

350. Noshirvan re-adopts and re-alleges paragraphs one (1) through one

hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

351. Garramone Plastic Surgery employed, hired, or paid Camp to perform services on its behalf.

352. Garramone Plastic Surgery paid Camp in bi-weekly increments to act as it representative, marketing, social media, and online reputation manager.

353. Garramone Plastic Surgery through its payments, actions, and knowledge, implicitly or expressly acknowledged Camp's authority to act on its behalf.

354. Garramone Plastic Surgery expressly acknowledged  in writing Camp's authority to act on its behalf.

355. Garramone Plastic Surgery hired Net Reputation online reputation management company. Camp took over for Net Reputation as Garramone Plastic Surgery's marketing, social media, and online reputation manager in May/June of 2022.

356. Camp expressly or through his conduct accepted Garramone Plastic Surgery's appointment as its agent.

357. Garramone Plastic    Surgery maintained control over Camp by virtue of the monetary compensation it  paid to Camp on a bi-weekly basis.

358. Camp is an employee or agent of Garramone Plastic Surgery.

359. Camp's actions were within the scope of employment with Garramone Plastic Surgery or Garramone.

360. Garramone Plastic Surgery was aware of Garramone's, Couture's and Camp's actions and ratified same.

361. Garramone's, Couture's and Camp's actions were sufficiently outside the scope of employment because they acted within their own personal interest outside Garramone Plastic Surgery's business interest.

362. Garramone, Couture, and Camp with malicious intent orchestrated an elaborate scheme to "tak[e] down [Noshirvan], online and teach[] him a valuable lesson in matching vibes." Camp expressly admit that the "sustained operation" "will continue until [Noshirvan] is a broken human skeleton" of the person he was and his Child "is placed in foster care…." See ¶¶141-144.

363. Garramone, Couture, or Camp had Noshirvan and his family swatted.

364. Camp sent Noshirvan pictures taken by Garramone, Couture, or other unknown third parties, of Noshirvan and his minor child in his yard.

365. Camp claimed via social media to have placed cameras illegally in public places near Noshirvan's hometown to watch him.

366. Camp sent Noshirvan hundreds of malicious text message and emails. For example, those text messages and emails contained verbal and implied threats of immediate physical and sexual harm directed at Noshirvan's wife and minor child, racist and homophobic slurs directed at a minor child and Noshirvan, harassing threats of financial ruins, children being placed in foster care, sex and extremely personal and private information, inter alia.

367. Camp sent Noshirvan multiple photographs in live time of Noshirvan in front of his home or pictures of his home with messages stating that "we are watching you" or "We are literally sitting across the street watching you cry" or "from a good distance away I can take photos [of you] crystal clear."

368. Camp sent Noshirvan images and text messages that could only be interpreted as death threats.

369. Garramone, Couture, or Camp maliciously made, or caused to be made, false allegations of child abuse to be reported to Child Protective Services. Those false reports caused Noshirvan and his family to be investigated on multiple occasions. As a result, Noshirvan and his family became emotionally distressed at the thought of possibly losing custody of their child due to provably false allegations.  No good faith exception applies.

370. Camp gained access to one of Noshirvan's social media accounts and

disseminated pictures of sexually explicit images of Noshirvan without consent in violation of Section 784.049, Florida Statutes.

371. As a result of Garramone's, Couture's, and Camp's harassment (lasting roughly two years), cyberbullying, Camp's threats of physical and sexual harm, racist and homophobic slurs, false reports to Child Protective Services, swatting, public dissemination of sexually explicit photographs throughout the internet, and actual implied threats of physical harm, which included (a) photographs of Noshirvan being sent to him in live time with text message threats of implied physical violence, and (b) statements of real danger. For example, during a live stream, one of Camp's followers who lives in Pennsylvania offered to secure the area (referring to Noshirvan's home) by getting some "elastic capacity" out there (implying direct threats of physical harm).

372. Camp also doxed friends, family members, neighbors, employers, and licensing boards of those individuals as applicable.

373. Camp published private materials obtained through a licensed private investigator. Materials Camp (a convicted felon) should not have had access to.

374. Noshirvan's wife and child were forced to temporarily move out of their home in fear for their safety.

375. Garramone's, Couture's, and Camp's concerted actions when viewed in totality are extreme and outrageous and were done intentionally to cause Noshirvan and family emotional distress.

376. Garramone's, Couture's, and Camp's conduct goes beyond all bounds of decency and ought to be regarded as odious and utterly intolerable in a civilized community. Their actions are atrocious.

377. As a direct and proximate result of Garramone's, Couture's, and Camp's concerted effort to intentionally cause Noshirvan severe emotional distress, Noshirvan suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

378. Garramone, Couture, and Camp knew that Noshirvan would be particularly susceptible to their actions. Specifically, Garramone, Couture, and Camp knew of (1) Noshirvan's monetization of social media as his only financial means to provide for his family and they intentionally made false reports those platforms to destabilize Noshirvan financially, (2) Noshirvan was married with young children, so they intentionally targeted his wife and child, (3) Noshirvan ethnicity and intentionally made racial threats of physical violence and sexual harm

to Noshirvan and family, (4) that Noshirvan was aware of Camp's ties to the KKK and proud boys, and utilized the real and present fear of those hate groups to target Noshirvan's intermediate family, (5) Noshirvan was married with young children, so they hired an investigator who provided Camp with non-public highly sensitive private materials that he would not normally have access to, in order to better harass, threaten, extort, or otherwise cyberbully Noshirvan, inter alia.

379. Garramone, Couture, and the Garramone Plastic Surgery knowingly assisted in Camp's wrongful acts by allowing Camp to utilize to utilize corporate property (Garramone Surgery Ctr.) to plan, coordinate, publish details of psychological torture and campaign of other illegal activities designed to injure Noshirvan.

380. Garramone Plastic Surgery lead the incitation of campaign to injure Noshirvan. See Picture below ¶146.

381.  Garramone and Couture traveled to Mansfield Pennsylvania and upon information and belief, took pictures of Noshirvan at his home. Those same pictures were sent to Camp. Camp immediately sent the pictures to Noshirvan to imply immediate or imminent harm or danger.

382. Garramone, Couture, and the Garramone Plastic Surgery was aware of

Camp's tortious activity (as described above) and knowingly provided substantial assistance.

383. As a direct and proximate result of Garramone's, Couture's, and Camp's concerted effort to intentionally cause Noshirvan severe emotional distress, Noshirvan suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

384. Garramone, Couture, and Camp acted maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

385. Garramone, Couture, and Garramone Plastic Surgery are responsible for Garramone's, Couture's, and Camp's actions including acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

## FOURTEENTH CAUSE OF ACTION

## TORTURIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

**(as to Garramone Plastic Surgery, Garramone, Couture, Central Park, and Camp )**

386. Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

387. Noshirvan had monetized business relationships with "buymecoffee," "Twitter," "TikTok," "Patreon" and other social media platforms.

388. Garramone, Couture, Garramone Plastic Surgery, and Camp had direct knowledge of Noshirvan's monetized social media platforms.

389. Garramone Plastic Surgery employed, hired, or paid Camp to perform services on its behalf.

390. Garramone Plastic Surgery paid Camp in bi-weekly increments to act as it representative, marketing, social media, and online reputation manager.

391. Garramone employed, hired, or paid Camp to perform services on his behalf.

392. Garramone paid Camp in bi-weekly increments to act as his or Couture's personal representative, marketing, social media, and online reputation manager.

393. Couture employed, hired, or paid Camp to perform services on her

behalf.

394. Couture paid Camp in bi-weekly increments to act as her  personal representative, marketing, social media, and online reputation manager.

395. Garramone Plastic Surgery, Garramone, and Couture, through their payments, actions, and knowledge, implicitly or expressly acknowledged Camp's authority to act on their behalf.

396. Garramone Plastic Surgery  and Garramone expressly acknowledged in writing Camp's authority to act on their behalf.

397. Couture and Central Park through her actions acknowledged  Camp's authority to act on their behalf.

398. Central park employed, hired, or paid Camp to perform services on its behalf.

399. Central Park  paid Camp in kind (living accommodation) to act as a personal representative, marketing, social media, and online reputation manager.

400. Garramone Plastic Surgery, Garramone, and Couture, through their payments, actions, and knowledge, implicitly or expressly acknowledged Camp's authority to act on their behalf.

401. Camp took over for Net Reputation as Garramone Plastic Surgery's

marketing, social media, and online reputation manager in May/June of 2022. At that time, Camp also performed services for Garramone, Couture, and Central Park.

402. Camp expressly or through his conduct accepted Garramone Plastic Surgery's, Garramone's, Couture's and Central Park's appointment as their agent.

403. Garramone Plastic  Surgery,  Garramone, Couture, and Central Park. maintained control over Camp by virtue of the monetary compensation it  paid to Camp.

404. Camp is an employee or agent of Garramone Plastic Surgery, Garramone, Couture, and Central Park.

405. Camp's actions were within the scope of employment  with Garramone Plastic Surgery Garramone, Couture, and Central Park, because Camp performed the acts described in this Complaint while acting as a marketing, social media, and online reputation manager.

406. Camp's actions were sufficiently outside the scope of employment because he acted within his own, Couture's or Garramone's personal interest outside Garramone Plastic Surgery's and Central Park's  business interest.

407. Garramone Plastic Surgery, Garramone, Couture, and Central Park were aware of Camp's actions and ratified Camp's actions or conduct.

408. Camp, a paid employee or agent of Garramone, Couture, Garramone Plastic Surgery, and Central Park, started a campaign to deplatform Noshirvan for the purpose of removing all negative statements regarding Garramone, Couture, Garramone Plastic Surgery from the internet. In short, Camp was paid to scrub the internet clean of all the negative publicity documenting Couture's arrest and subsequent backlash.

409. Camp intentionally and maliciously interfered with Noshirvan's business relationships with "buymecoffee," "Twitter," "TikTok," "Patreon" and other social media platforms as part of his efforts to scrub the internet clean from all negative statements regarding Garramone, Couture, Garramone Plastic Surgery

410. Camp's stated goal to Garramone, Couture, and Garramone Plastic Surgery was to deplatform Noshirvan for the purpose of removing any negative connotation, comment, statement, or written item that mentioned Garramone, Couture, or Garramone Plastic Surgery.

411. Garramone Plastic Surgery, Couture, and Garramone, were aware of Camp's stated goal because they were included participants on an email chain where Camp's stated his goals.

412. Camp's, actions as ratified by Garramone Plastic Surgery, Garramone,

Central Park, and Couture, intentionally and maliciously interfered with Noshirvan's business relationships by making fake or false reports of misconduct to the social media platform.

413. Camp also sent harassing and threatening emails to Noshirvan's donors and subscribers, which caused those donors/subscribers to withdrawal support. As a result, Noshirvan lost lucrative business relationships, and future income, which caused detriment and harm.

414. Camp's, Garramone's, Couture's, and Garramone Plastic Surgery's tortious interference with Noshirvan's business relationships is unjustifiable and was done to better their internet reputation and intentionally financially harm Noshirvan. See ¶¶141-144, above.

415. Camp also harassed, threatened, extorted, and coerced Noshirvan's prior lawyer (Robson Powers) to withdraw as counsel. Specifically, Camp threatened Robson Powers wife with publication of her prior criminal history. As a result, Robson Powers was forced to withdrawal as Noshirvan's counsel. Camp's actions on behalf of Garramone, Couture, Central Park, and Garramone Plastic Surgery not only caused Noshirvan financial strain and mental anguish, but it also caused Noshirvan to remain unrepresented for an uncertain period of time.

416. Garramone, Couture, Central Park, and the Garramone Plastic Surgery

knowingly assisted in Camp's wrongful acts by allowing Camp to utilize corporate property (Garramone Surgery Ctr. and the Winkler ranch) to plan, coordinate, publish his campaign of tortious actions  designed to injure Noshirvan.

417. Garramone Plastic Surgery lead the incitation of campaign to injure Noshirvan. See Picture below ¶146.

418.  While on Central park's property, Camp lead the incitation of campaign to injure Noshirvan.

419. Garramone, Couture, Central Park, and the Garramone Plastic Surgery were aware of Camp's tortious activity as described above and knowingly provided substantial assistance.

420. As a direct and proximate result of tortious interference mentioned above, Noshirvan has incurred damages, including but not limited to mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

421. Garramone Plastic Surgery, Garramone, Couture, Central Park,  and Camp acted outlined throughout this Complaint maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, to warrant the imposition of punitive damages as allowed by Florida law.

## FIFTEENTH CAUSE OF ACTION

## MISAPPROPRIATION OF LIKENESS

### (Garramone, Couture, OMG Realty, and Central Park)

422. Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

423. Garramone  employed, hired, or compensated Camp to perform services on his behalf.

424. Garramone paid Camp in bi-weekly increments to act as his personal representative, marketing, social media, and online reputation manager.

425. Garramone through his payments, actions, and knowledge, implicitly or expressly acknowledged Camp's authority to act on his behalf.

426. Camp expressly or through his conduct accepted Garramone's appointment as his agent.

427. Garramone maintained control over Camp by virtue of the monetary compensation he provided to Camp.

428. Camp is an employee or agent of Garramone and Camp was authorized to act on Garramone's behalf.

429. Camp's actions were within the scope of employment because Camp

performed the acts mentioned throughout this Complaint while working as Garramone's personal social media and online reputation manager.

430. Camp's actions were sufficiently outside the scope of employment because he acted within his own or Couture's personal interest outside of Garramone's interest.

431. Garramone was, at all relevant times, aware of Camps actions and ratified same.

432. Garramone is responsible for Camp's digital publication of Noshirvan's likeness.

433.   OMG Realty is closely held company that is intimately entangled or intertwined with Garramone – and is extension of Garramone.

434.   Central park is closely held company that is intimately entangled or intertwined with Garramone – and is extension of Garramone.

435. The acts alleged in this Second Amended Complaint were committed by officers, employees, and agents of OMG Realty, which were committed, controlled, or carried out, as a result of Garramone's sole discretion, by direction, instruction, or order.

436.  The acts alleged in this Second Amended Complaint were committed

by officers, employees, and agents of Central Park, which were committed, controlled, or carried out, as a result of Garramone's sole discretion, by direction, instruction, or order.

437. The acts alleged in this Second Amended Complaint were committed were known by OMG Realty and OMG Realty provided substantial assistance by allowing Garramone and Camp to utilize Garramone Surgery Ctr. to carry out those acts.

438. The acts alleged in this Second Amended Complaint were committed were known by Central Park and Central Park provided substantial assistance by allowing Garramone and Camp to utilize the Winkler Property to carry out those acts.

439. Camp maliciously printed, published, or displayed at least two distinct types of flyer advertisements containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent.   Upon information and belief, Camp, published, disseminated and caused to be displayed hundreds of digital prints of Noshirvan's likeness without Noshirvan's consent.

440. Camp maliciously disseminated, published, and displayed digital photographs of a billboard advertisement containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent.

441. Camp maliciously disseminated, published, and displayed digital photographs of containing Noshirvan without Noshirvan's consent.

442. Garramone, Couture, OMG Realty, and Central Park knowingly assisted in Camp's wrongful acts by allowing Camp to utilize corporate property (Garramone Surgery Ctr. and the Winkler ranch) to market and publish Noshirvan's image and likeness.

443. Garramone and Couture traveled to Mansfield Pennsylvania and upon information and belief, distributed flyers containing Noshirvan's likeness and image throughout the town of Mansfield Pennsylvania. Pictures of those flyer were sent to Camp and Camp immediately posted or published those the pictures to his social media accounts.

444. Garramone, Couture, Central Park, and OMG Realty was aware of Camp's activity in violation of §540.08, Florida Statutes,  the acts described above knowingly provided substantial assistance.

445. Noshirvan is entitled to recover damages for injury, reasonable royalty, and punitive or exemplary damages.

446. The publications were not bona fide news reports or of legitimate public interest. The publications were commercial advertisements for Trainor, The Law Firm of Patrick Trainor, or the ADL, or anyone else.

447. That DaneshGuy's likeness has commercial value.

448. As a direct and proximate result of Camp's, Couture's and Garramone's dissemination of Noshirvan's and ThatDaneshGuy's likes or image, Noshirvan suffered from mental anguish, reputational harm, and loss of income, future revenue, other damages.

449. As a result, Garramone's, OMG Realty's, and Central Park's, aiding and abetting of Garramone's employee or agent Camp, Noshirvan suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

450. Garramone, OMG Realty and Central Park are responsible for Camp's actions as alleged in this Complaint include acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, warranting the imposition of punitive damages as allowed by Florida law.


**SIXTEENTH CAUSE OF ACTION**

**MISAPPROPRIATION OF LIKENESS**

**(Garramone Plastic Surgery, OMG Realty, and Couture)**

451. Noshirvan re-adopts and re-alleges paragraphs one (1) through one

hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

452. Garramone Plastic Surgery employed Couture as it surgery center manager.

453. Garramone Plastic Surgery paid Couture to act as its surgery center manager.

454. Garramone Plastic Surgery through its payments, actions, and knowledge, implicitly or expressly acknowledged Couture's authority to act on its behalf.

455. Couture expressly or through her conduct accepted Garramone Plastic Surgery's  appointment as its agent.

456. Garramone Plastic Surgery maintained control over Couture by virtue of the monetary compensation package provided to Couture.

457. Couture is an employee or agent of Garramone Plastic Surgery and Couture was authorized to act on its behalf.

458. Couture's actions were within the scope of employment because she performed the acts mentioned throughout this Complaint while working as Garramone's Plastic Surgery's manager.

459. Couture's actions were sufficiently outside the scope of employment

because she acted within his own personal interest outside of Garramone Plastic Surgery's interest.

460. Garramone Plastic Surgery was, at all relevant times, aware of Couture's actions and ratified same. Couture discussed her plans at work on a daily basis. Garramone Plastic Surgery's and OMG Realty's officer, Garramone, was also aware of Couture's plans and accompanied her Mansfield, Pennsylvania to distribute flyers.

461. Garramone Plastic Surgery is responsible for Couture's digital and physical publication of Noshirvan's likeness.

462.   OMG Realty is closely held company that is intimately entangled or intertwined with Garramone – and is extension of Garramone.

463. The acts alleged in this Second Amended Complaint were committed by officers, employees, and agents of OMG Realty, which were committed, controlled, or carried out, as a result of Garramone's sole discretion, by direction, instruction, or order.

464. The acts alleged in this Second Amended Complaint were committed by officers, employees, and agents of Garramone Plastic Surgery, which were carried out with knowledge by Garramone Plastic Surgery.

465. The acts alleged in this Second Amended Complaint that were

committed by officers, employees, and agents of OMG Realty and Garramone Plastic Surgery,  and were planned, coordinated, or carried out on location at Garramone Surgery Ctr.

466. The acts alleged in this Second Amended Complaint were committed were known by OMG Realty and OMG Realty provided substantial assistance by allowing Couture, Camp, and Garramone, to utilize Garramone Surgery Ctr. to carry out those acts.

467. The acts alleged in this Second Amended Complaint were committed and known by Garramone Plastic Surgery and Garramone Plastic Surgery provided substantial assistance by allowing Couture, Camp and Garramone, to utilize the Garramone Surgery Ctr. to carry out those acts.

468. Couture maliciously disseminated, published, or  displayed at least two distinct types of flyer advertisements containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent.  Upon information and belief, Couture published, disseminated, and caused to be displayed, digital prints of Noshirvan's likeness without Noshirvan's consent.

469. Couture's maliciously disseminated, published, and displayed digital photographs of the "Doxing is violent" advertisement containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent.

470. Couture maliciously disseminated, published, and displayed digital photographs of containing Noshirvan without Noshirvan's consent.

471. Couture's maliciously disseminated, published, and shamelessly promoted Camp's website www.thatdaneshguy.com, which contained several images of Noshirvan's likeness without consent.

472. Noshirvan is entitled to recover damages for injury, reasonable royalty, and punitive or exemplary damages.

473. The publications were not bona fide news reports or of legitimate public interest. The publications were commercial advertisements for Trainor, The Law Firm of Patrick Trainor, or the ADL.

474. ThatDaneshGuy's likeness has commercial value.

475. Garramone Plastic Surgery, Couture, and OMG Realty knowingly assisted in Camp's and Couture's wrongful acts by allowing Camp and Couture to utilize to utilize corporate property (Garramone Surgery Ctr. and the Winkler ranch) to market and publish a campaign utilizing Noshirvan's image and likeness.

476. Garramone and Couture traveled to Mansfield Pennsylvania and upon information and belief, distributed flyers containing Noshirvan's likeness and image throughout the town of Mansfield Pennsylvania. Pictures of those flyer were

sent to Camp and Camp immediately posted or published those the pictures to his social media accounts.

477. Garramone Plastic Surgery, Couture, and OMG Realty was aware of Camp's activity in violation of §540.08, Florida Statutes,  the acts described above knowingly provided substantial assistance.

478. As a direct and proximate result of Camp's dissemination of Noshirvan's and ThatDaneshGuy's likes or image, Noshirvan suffered from mental anguish, reputational harm, and loss of income, future revenue, other damages.

479.  As a result, Garramone Plastic Surgery's and OMG Realty's, aiding and abetting Garramone's employee or agent Couture, Noshirvan suffered from mental anguish, reputational harm, mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

480. Garramone Plastic Surgery, OMG Realty, and Couture, are responsible for Couture's actions as alleged in this Complaint including acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, warranting the imposition of punitive damages as allowed by Florida law.

## SEVENTEENTH CAUSE OF ACTION

## DEFAMATION

## (as to Garramone Plastic Surgery and Camp)

481. Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

482. Garramone Plastic Surgery employed, hired, or compensated Camp to perform services on its behalf in April/May of 2022. The first known and documented payment to date occurred on May 05, 2022.

483. Garramone Plastic Surgery paid Camp in bi-weekly increments to act as its representative, marketing, social media, and online reputation manager.

484. Garramone Plastic Surgery through its payments, actions, and knowledge, implicitly or expressly acknowledged Camp's authority to act on his behalf.

485. Garramone Plastic Surgery knew or should have known that Camp was unfit to perform work as representative, marketing, social media, and online reputation manager.

486. Specifically, a simple Google search or background check would have placed Garramone Plastic Surgery on notice that Camp is a felon hacker who had

become known as a "super troll", cyber stalker,  cyber harasser, and internet terrorist prior to the year 2021.

487.   Camp  was/is  unfit  to  perform  work  as  representative,  marketing, social media, and online reputation manager.  Specifically, as alleged throughout this Complaint, Camp  went beyond managing Garramone Plastic Surgery's online reputation and created a campaign of misinformation and defamatory statements.

488.   Camp  maliciously  published,  disseminated,   or  caused  to  be published, digital Flyers and other images with Noshirvan's face printed on them along with the false statement: "have you seen this predator."

489. Camp maliciously published or caused to be published, false statements labeling Noshirvan as a "pedophile" "child groomer", "stalker," "sextortionist," and "blackmailer" among other things.

490. Camp maliciously published or caused to be published, false statements stating that Noshirvan "rapes his own child", "caused a 14-year-old to commit suicide", and "caused another minor to attempt suicide."

491. Camp knew that the defamatory statements he published were not true but acted with reckless disregard for the truth.

492. Camp intentionally lied to his followers in live stream publications by making false claims of child sexual abuse and requested that his followers report the false child abuse to Child Protective Services on three occasions.

493.   Camp then published those defamatory statements regarding the false child abuse allegations on social media to harm Noshirvan's reputation.

494. Camp maliciously published, disseminated, or caused to be published, a digital copies of a billboard and penny saver advertisements with Noshirvan's face on it and the statement "doxing is violent." Implying that Noshirvan is a violent doxer.

495. Camp maliciously published, or caused to be published, fake flyers for a "swingers party," which contained Noshirvan and his wife's face and personal contact information.

496.   Camp questioned Noshirvan's wife's virtue implicitly by falsely alleging they are "swingers", and expressly by calling her a "wh**e" on social media.

497. As a direct and proximate result of Camp's concerted effort to defame Noshirvan, Noshirvan suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, humiliation, loss

of enjoyment of life, lost income and earnings, lost business opportunities, future revenue, and other damages.

498. Garramone Plastic Surgery is responsible for Camp's actions as alleged in this Complaint including acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, warranting the imposition of punitive damages as allowed by Florida law.

## EIGHTEENTH CAUSE OF ACTION

## DEFAMATION

### (as to Garramone Plastic Surgery and Couture)

499. Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

500. Garramone Plastic Surgery employed, hired, or compensated Couture as it surgery center manager around the beginning of 2020.

501. Garramone Plastic Surgery paid Couture as an employee.

502. Garramone Plastic Surgery through its payments, actions, and knowledge, implicitly or expressly acknowledged Couture's authority to act on its behalf.

503. Garramone Plastic Surgery knew or should have known that Couture

was unfit to perform work as its surgery center manager after January 26, 2022.

504.   Specifically, Couture was involved in an altercation in a Dunkin Donuts parking lot and subsequently arrested and placed on probation. See ¶¶48-62, supra.

505.   Couture was/is unfit to perform work as surgery center manager. Specifically, as alleged throughout this Complaint, Couture  went beyond managing Garramone Plastic Surgery's surgery center.

506.   Couture was livid about all the negative attention she received after January 26, 2022, altercation. So much so, that she hired a copywriter to produce a 20-page script to alter the narrative and make her appear to be the victim – instead of the perpetrator. Noshirvan was villain in Couture's story.  Couture attempted multiple times to publish her story. Those attempts resulted in public dissemination of maliciously false statements about Noshirvan.

507.   Couture's behavior became an obsession; she constantly spoke about her revenge against Noshirvan at work. Over time, it was readily observable and apparent that Couture's focus (as communicated to Garramone Plastic Surgery employees), was to maintain daily discussions regarding the coordinated effort to injure Noshirvan's reputation. Garramone Plastic Surgery's work culture was very cliquey. Employees were required to agree that Couture was the victim of the

January 26, 2022, incident or be ostracized. Couture as manager of Garramone Plastic Surgery, maintained this open dialog and communicated freely with Garramone Plastic Surgery employees, in its office, about her plans to seek vengeance against Noshirvan. In one instance, Couture mentioned "publishing billboards with Noshirvan's likeness." Couture also mentioned "having something big planned" in reference to Noshirvan. All of Garramone Plastic Surgery's employees working in 2022 were aware of Couture's desire to harm, humiliate, and embarrass Noshirvan. The gossip between employees ran rampant and occurred on nearly a daily basis.

508.   Garramone Plastic Surgery employees observed Couture's actions and heard her statements regarding Noshirvan.

509.   Couture hired Camp to work for Garramone Plastic Surgery.

510.   Couture and Garramone Plastic Surgery's officer - Garramone - helped Camp obtain residency or citizenship in Belize. Thus, allowing Camp to evade prosecution for his actions.

511.   Couture and Garramone Plastic Surgery's officer Garramone went to Mansfield, Pennsylvania on or about May 20, 2022 to distribute defamatory flyers containing Noshirvan's face and likeness throughout Mansfield, Pennsylvania. During that trip, they stopped at Papa the Butcher's shop. Couture left defamatory

flyers in the women's restroom. Garramone and Couture, upon information and belief, left defamatory flyers throughout the town of Mansfield, Pennsylvania (as depicted supra).

512. Garramone Plastic Surgery knew or should have known that Garramone was unfit to be an officer after the May 20, 2022 trip to Mansfield, Pennsylvania.

513. Camp maliciously published, disseminated,  or caused to be published, digital Flyers with Noshirvan's face printed on them along with the false statement: "have you seen this predator."

514. Camp and Couture maliciously published or caused to be published, false statements labeling Noshirvan as a "pedophile" "child groomer", "stalker," "sextortionist," and "blackmailer" among other things.

515. Camp maliciously published or caused to be published, false statements stating that Noshirvan "rapes his own child", "caused a 14-year-old to commit suicide", and "caused another minor to attempt suicide."

516. Camp and Couture knew that the defamatory statements they published were not true but acted with reckless disregard for the truth.

517. Camp intentionally lied to his followers in live stream publications by making false claims of child sexual abuse and requested that his followers report the false child abuse to Child Protective Services on three occasions.

518.   Camp then published those defamatory statements regarding the false child abuse allegations on social media to harm Noshirvan's reputation.

519. Camp and Couture maliciously published, disseminated, or caused to be published, a digital copies of a billboard and penny saver advertisement with Noshirvan's face on it and the statement "doxing is violent." Implying that Noshirvan is a violent doxer.

520. Camp maliciously published, or caused to be published, fake digital flyers for a "swingers party," which contained Noshirvan and his wife's face and personal contact information.

521.   Couture and Garramone   maliciously published, or caused to be published, false paper flyers for a "swingers party," which contained Noshirvan and his wife's face and personal contact information.

522.   Camp questioned Noshirvan's wife's virtue implicitly by falsely alleging they are "swingers", and expressly by calling her a "wh**e" on social media.

523. As a direct and proximate result of Camp's concerted effort to defame Noshirvan, Noshirvan suffered from mental anguish, emotional distress, reputational harm, shame, depression, anxiety, sleep disturbance, loss of enjoyment

of life, lost income and earnings, lost business opportunities, humiliation, lost future revenue, other damages.

524. Garramone Plastic Surgery is responsible for Camp's, Couture's, and Garramone's actions as alleged in this Complaint including acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, warranting the imposition of punitive damages as allowed by Florida law.

**NINETEENTH CAUSE OF ACTION**

**MISAPPROPRIATION OF LIKENESS**

**(Trainor, Trainor Entities)**

525.   Noshirvan re-adopts and re-alleges paragraphs one (1) through one hundred and fifty-two (152) above, as if fully stated herein, and further alleges as follows:

526.   Garramone Plastic Surgery hired Trainor or the Trainor Entities.

527.   Garramone Plastic Surgery made monetary payments to Trainor or the Trainor Entities in exchange for Trainor or the Trainor Entities to act on its behalf.

528.   Garramone Plastic Surgery through its payments, actions, and knowledge, implicitly or expressly acknowledged Trainor's or the Trainor Entities' authority to act on its behalf.

529.   Trainor or the Trainor Entities expressly or through their conduct accepted Garramone Plastic Surgery's  appointment as its agent.

530.   Garramone Plastic Surgery maintained control over Trainor or the Trainor Entities by virtue of the monetary compensation package provided to them.

531.   Trainor or the Trainor Entities is an agent of Garramone Plastic Surgery and was authorized to act on its behalf.

532.   Trainor's or the Trainor Entities' actions were within the scope of its agency because the publication of penny saver advertisements and billboards were coordinated in conjunction with Trainor's representation of Garramone Plastic Surgery.

533.    Garramone Plastic Surgery was, at all relevant times, aware of Trainor's or the Trainor Entities' actions and ratified same.

534.   Garramone Plastic Surgery is responsible for Trainor's or the Trainor Entities' publication of Noshirvan's likeness.

535.   The acts alleged in this Second Amended Complaint were committed by officers, employees, or agents of Garramone Plastic Surgery, which were carried out with knowledge by Garramone Plastic Surgery.

536.   Trainor or the Trainor Entities maliciously disseminated, published, or displayed at least two distinct advertisements containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent.

537.   Trainor or the Trainor Entities maliciously disseminated, published, and shamelessly promoted the "Doxing is violent" advertisement containing Noshirvan's face and ThatDaneshGuy's likeness without Noshirvan's consent.

538.  Noshirvan is entitled to recover damages for injury, reasonable royalty, and punitive or exemplary damages.

539.   The publications were not bona fide news reports or of legitimate public interest. The publications were commercial advertisements for Trainor, The Law Firm of Patrick Trainor, or the ADL. Commercial advertisements sanctioned by Garramone Plastic Surgery and intended to harm Noshirvan.

540.   ThatDaneshGuy's likeness has commercial value.

541.   As a direct and proximate result of Trainor's or the Trainor Entities' dissemination of Noshirvan's and ThatDaneshGuy's likes or image, Noshirvan suffered from mental anguish, reputational harm, and loss of income, future revenue, and other damages. Noshirvan is entitled to a royalty and punitive damages.

542.   As a result, Garramone Plastic Surgery's aiding and abetting its agents Trainor or the Trainor Entities, Noshirvan suffered from mental anguish, reputational harm, and loss of income, future revenue, other damages.

543.   Garramone Plastic Surgery is responsible for Trainor's or the Trainor Entities' actions as alleged in this Complaint including acting maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, warranting the imposition of punitive damages as allowed by Florida law.

## VII.   PRAYER FOR RELIEF

WHEREFORE, the plaintiff, Danesh Noshirvan, demands judgment against defendants, Couture, Garramone, Central Park, OMG Realty, Garramone Plastic Surgery,  Garramone Entities, Trainor, the Trainor Law Firm, and the ADL, for all injuries and damages suffered due to the Couture/Garramone Conspiracy, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages and non-economic damages, in excess of 5 million dollars including but not limited to compensation for injury to reputation, mental anguish, emotional distress, shame, depression, anxiety, sleep disturbance, loss of enjoyment of life, lost income and earnings, lost business opportunities, humiliation, loss of online platforms, out of pocket expenses, other

non-economic damages, costs, interest, and punitive damages, and for any such further relief as the Court deems appropriate.

## VIII.  <u>CONDITIONS PRECEDENT</u>

All condition precedents have been satisfied, excused, or waived.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated this  23rd day of September, 2024.

Respectfully submitted,

<u>/s/Nicholas A. Chiappetta</u>
Nicholas A. Chiappetta, Esq.
Florida Bar No: 1006407
**Chiappetta Trial Lawyers**
*Attorneys for Plaintiff*
2101 Vista Parkway, Suite 258
West Palm Beach, Florida 33411
Direct: (561) 768-4500
Fax:    (561) 768-4600
Service@chiappettalegal.com
nick@chiappettalegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on 23rd day of September, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to: all counsel of record.

_/s/ Nicholas A. Chiappetta_
Nicholas A. Chiappetta
Designated Lead Counsel