```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF FLORIDA
 2                    FORT MYERS DIVISION

 3              TRANSCRIPT OF MOTION HEARING

 4     ------------------------------------------------------

       DANESH NOSHIRVAN, an         )
 5     Individual,                  )
                                    )
 6              Plaintiff,          )
                                    )
 7          vs.                     )   2:23-cv-1218-JES-KCD
                                    )
 8                                  )
       JENNIFER COUTURE; RALPH      )
 9     GARRAMONE, M.D.; RALPH       )
       GARRAMONE, M.D. P.A.; CENTRAL)
10     PARK OF SOUTHWEST FLORIDA,   )
       LLC; WRAITH, LLC; SULLIVAN   )
11     STREET INVESTMENTS, LLC;     )
       HAIRPIN TURN, LLC; OMG       )
12     REALTY, LLC; R G WEIGHT      )
       MANAGEMENT, LLC; CENTRAL PARK)
13     SOUTH, LLC; BRANTLEE, LLC;   )
       LEGACY OF MARIE GARRAMONE,   )
14     LLC; GARRAMONE MARKETING,    )
       INC.; 5681 DIVISION, LLC; THE)
15     LAW OFFICE OF PATRICK        )
       TRAINOR, ESQ., LLC; PATRICK  )
16     TRAINOR; and ANTI-DOXING     )
       LEAGUE, INC.,                )
17                                  )
                Defendants.         )
18     ------------------------------------------------------

19

20

21

22          BEFORE THE HONORABLE KYLE C. DUDEK
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
23            FOR THE MIDDLE DISTRICT OF FLORIDA

24

25
```

1

2

3                    2110 First Street North
                    Fort Myers, Florida 33901
4                   10:13 AM, October 15, 2024

5

6                    Vonni R. Bray, RDR, CRR
                   Federal Official Court Reporter
7                   2110 First Street North
                    Fort Myers, Florida 33901
8                   vonni_bray@flmd.uscourts.gov
                         (239) 461-2033
9

10

11           Proceedings recorded by machine shorthand
      Transcript produced by computer-assisted transcription
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              APPEARANCES

2    FOR PLAINTIFF:

3    Mr. Nicholas A. Chiappetta
     Chiappetta Trial Lawyers
4    2101 Vista Parkway
     Suite 258
5    West Palm Beach, FL 33411

6

7    FOR DEFENDANT GARRAMONE PLASTIC SURGERY:

8    Mr. Julian Antony Jackson-Fannin
     Duane Morris LLP
9    201 S. Biscayne Boulevard
     Suite 3400
10   Miami, FL 33131

11

12   FOR DEFENDANTS CENTRAL PARK OF SOUTHWEST
                    FLORIDA, LLC, ET AL.:
13
     Mr. Patrick Trainor
14   Law Office of Patrick Trainor, Esq., LLC
     19 Union Avenue
15   Suite 201
     Rutherford, NJ 07070
16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              (Court called to order at 10:13 AM)

3              THE DEPUTY CLERK:  Calling Case 2:23-cv-1218,

4    Danesh Noshirvan versus Jennifer Couture; Ralph

5    Garramone M.D.; Ralph Garramone, M.D. P.A., et al.

6              THE COURT:  Good morning.  Who do I have for

7    the plaintiff?

8              MR. CHIPPETTA:  Good morning, Your Honor.

9    Nick Chiappetta on behalf of the plaintiff, Danesh

10   Noshirvan.

11             THE COURT:  And for defendants.

12             MR. TRAINOR:  Morning, Your Honor.  Patrick

13   Trainor, pro se.

14             MR. JACKSON-FANNIN:  Good morning, Your

15   Honor.  Julian Jackson-Fannin from Duane Morris on

16   behalf of Defendant Garramone Plastic Surgery.

17             THE COURT:  Okay.

18             Counsel, thank you for joining me today.  We

19   are here on two pending discovery motions.  The first

20   filed by the defendant, Garramone Plastic Surgery,

21   which can be found at Docket Entry 129.

22             And the second filed by the plaintiff, Danesh

23   Noshirvan, at Docket Entry 131.

24             Now, I plan to rule on the motions during

25   this hearing, so let me put some background information

1    on the record.

2            Before I do, Mr. Jackson-Fannin, was there

3    any resolution reached as to these pending motions?

4            MR. JACKSON-FANNIN:  Yes, Your Honor.  During

5    the counsels' conference prior to this hearing, there

6    was a resolution reached to resolve the plaintiff's

7    motion to compel in its entirety.  And we can certainly

8    articulate what that resolution was on the record,

9    because counsel wanted to make sure that to the extent

10   that there was a forthcoming order from the Court at

11   least identifying the parties' resolution of that

12   motion, that there were some deadlines that were agreed

13   to that the Court should be aware of.

14           THE COURT:  Okay.  And so the plaintiff's

15   motion, then, is at Docket Entry 131.

16           MR. JACKSON-FANNIN:  Correct, Your Honor.

17           THE COURT:  Okay.  And that is directed to

18   you, correct, Mr. Trainor?

19           MR. TRAINOR:  That is correct, Your Honor.

20           THE COURT:  All right.  And so for purposes

21   of the record, then, why don't you go ahead and tell me

22   what the resolution was so we can get those deadlines

23   on the record.

24           MR. JACKSON-FANNIN:  Your Honor, the

25   resolution of that motion is that -- that Mr. Trainor

 1  agreed to reproduce the documents that were the subject

 2  of the motion to compel, but via thumb drive, by this

 3  Friday, October 18, and to provide Mr. Chiappetta with

 4  an amended privilege log by October 25.

 5          THE COURT:  Okay.

 6          Mr. Chiappetta, is that consistent with your

 7  records as well?

 8          MR. CHIPPETTA:  It is, Your Honor.  Thank

 9  you.

10          THE COURT:  All right.  What I will do, is I

11  will -- following the hearing today, I will enter a

12  short order indicating it was resolved and that

13  Mr. Trainor agreed to produce the documents by thumb

14  drive by this Friday, and a privilege log will be

15  provided by October 25th.

16          Okay.  Well, with 131 out of the way, that

17  leaves the other motion to compel filed by

18  Dr. Garramone.

19          And let me ask Counsel, was any resolution

20  reached with regard to that motion in full or in part?

21          MR. JACKSON-FANNIN:  Well, Your Honor, there

22  was a partial resolution that was reached at least

23  before today as a matter of fact.  Because on -- I

24  think it was, I believe, a week after we filed the

25  motion, Mr. Chiappetta emailed me and informed me that

1  the plaintiff was withdrawing its objection -- his

2  objections to Request for Production Number 7, 8, and

3  18.

4        And, of course, we take the position, at

5  least what was my response to Mr. Chiappetta at that

6  point in time, that because he had forced us to

7  actually file the motion and later subsequently

8  withdraw, then we have to deal with Rule 37(a)(5)(A)

9  with the assessment of costs and fees in that

10  particular aspect.

11        Then there is a second portion of the motion

12  dealing with Rule 34 and the manner of the plaintiff's

13  production in that case.  And there has been some

14  discussion on that, because I recognize that the legal

15  basis that was forwarded to the Court in our motion

16  regarding the first part of -- I think it was Rule

17  34(e)(1).

18        THE COURT:  B(2).

19        MR. JACKSON-FANNIN:  B(2)(E)(1).  I think the

20  prevailing case law seems that it applies exclusively

21  to hard copy documents, although --

22        THE COURT:  Well, it's actually split.

23  There's some courts that have said that Subsection e(1)

24  addresses the organization of the production.  And then

25  e(2) specifically addresses the form of production when

1   there's ESI.  So there's some split of authority as to

2   how you treat that.  But go ahead.

3         MR. JACKSON-FANNIN:  Correct, Your Honor.  So

4   that was what we wished to discuss with Your Honor

5   today, about the manner of production and what we've

6   received and, you know, to really have a robust

7   discussion about that and whether or not the

8   plaintiff's production in at least the 1218 case

9   actually meets the requirements of Rule 34.

10        It's our position, of course, that it does

11  not.  Even if we were to look at the second romanette

12  that says that, "If a request does not specify a form

13  for producing electronically stored information, a

14  party must produce it in a form or forms in which it is

15  ordinarily maintained or in a reasonably usable form or

16  forms."

17        Well, Number 1, we don't believe that the

18  documents that we received, or at least the data that

19  we received, particularly as to the JPEGs and -- by way

20  of example, the plaintiff's tax returns were certainly

21  not produced to us as they were ordinarily maintained,

22  because we received just JPEGs of individual pages of

23  tax returns, and I'm sure that's not how it was

24  submitted at the IRS -- and/or in a reasonably usable

25  form or forms because there were many native files.

1          Of course, there were 16 different file types

2     that we received that are just inaccessible.  And there

3     were some native files and then some other files that

4     were produced, particularly with the JPEGs, that were

5     not OCR.  They're not word searchable.  They are images

6     of images or documents and things like that.

7          So we take issue with those and would

8     certainly need to discuss that with Your Honor today.

9          THE COURT:  All right.  So as I take it,

10    then, the Request Number 7, 8, and 18, the objections

11    have been withdrawn, rendering those issues moot; is

12    that correct, Mr. Chiappetta?

13          MR. CHIPPETTA:  That's my understanding, Your

14    Honor.

15          THE COURT:  Okay.  So those are mooted out

16    then.

17          That leaves two issues, that being Rule 34

18    and the form of production in this case by Noshirvan,

19    and then the second being the fees; correct, Counsel?

20          MR. JACKSON-FANNIN:  Correct, Your Honor.

21          THE COURT:  So let me start with the Rule 34

22    issue.  And I understand it's changed a little bit

23    since Dr. Garramone has filed their motion.

24          But I had some questions that I wanted to get

25    a better understanding of the production before I make

1    a decision, which is, Mr. Chiappetta, can you tell me,

2    how was the production organized when you sent it over

3    to opposing counsel?

4            MR. CHIPPETTA:  Organized in what fashion,

5    Your Honor?

6            THE COURT:  How was it provided?  Was it

7    digitally provided?  Was it paper copies?

8            MR. CHIPPETTA:  It was completely digital.

9            THE COURT:  And what medium was it given over

10   in the digital form?  Thumb drive?  CD?

11           MR. CHIPPETTA:  I believe they were

12   electronically uploaded either via email and sent over

13   or directly to the storage system that Duane Morris

14   uses.

15           THE COURT:  So it was essentially a

16   file-sharing program?

17           MR. CHIPPETTA:  Yes, Your Honor.

18           THE COURT:  Okay.  How much data was

19   uploaded?

20           MR. CHIPPETTA:  It had to be at least 12 and

21   a half gigabytes.  Possibly more.

22           THE COURT:  Okay.  And what was -- what types

23   of files were included in the upload?  And by types of

24   files, I mean, since they are electronic, Word

25   documents?  JPEGs?  What did you have?

```
 1              MR. CHIPPETTA:  Well, I don't believe there
 2   would have been Word documents.  Maybe there was one.
 3   But the majority of the documents were -- well, would
 4   be some form of photographs, so whether it's JPEG or
 5   TIFF or something like that.  A lot of my client's
 6   production are simply photographs of screen images.  So
 7   that's the only way he has them.
 8              Setting that aside, there was some PDFs.  But
 9   they were all digitally-created PDFs.  There was
10   nothing like scanned-in paper document to PDF.
11              THE COURT:  All right.  When you uploaded it
12   to the file-sharing program, did you upload it using --
13   I'm sorry.  Let me back up a little bit.
14              When you uploaded it, was there any system
15   that you used, such as folders, subfolders to identify
16   the various documents?
17              MR. CHIPPETTA:  I believe that some of the
18   files may have been put in subfolders and then
19   ultimately put in, like, a ZIP file to compress it, and
20   then sent over.
21              THE COURT:  How many folders were included
22   with the production?
23              MR. CHIPPETTA:  I don't have an exact number.
24              THE COURT:  Were they labeled in any way?
25              MR. CHIPPETTA:  They would have been named.
```

```
 1              THE COURT:  What names did you use?  How did
 2   you demark them?
 3              MR. CHIPPETTA:  Some would have been marked,
 4   like, McGibney production or, like, this -- it would
 5   have had a name association with it.  So there would be
 6   some form of name recognition.
 7              Would it have been delineated by damages?
 8   No.
 9              Would it have been delineated by cause of
10   action?  No.
11              But it would have been associated with
12   either, like, the user or something that ties it that
13   way.  Like, tax returns would have been filed "tax
14   returns."
15              THE COURT:  Okay.  But you can't recall how
16   many folders were included with the production?
17              MR. CHIPPETTA:  Not off the top of my head.
18   Because there's the ZIP compressed folder.  Then
19   there's folders in there.  And then there's some loose
20   documents.  But then in those folders, there's also
21   folders.  So there's multiple layers.
22              THE COURT:  Is there any reason why you chose
23   that organizational path as opposed to something else?
24              MR. CHIPPETTA:  It's how it was provided to
25   me by the client.
```

1    THE COURT:  Okay.  You said there was quite a

2  few gigabytes of data provided.  Do you know how

3  many -- if you looked at it in a different -- what I'm

4  trying to understand is how much, the amount, of

5  production that you provided.  So if you were to look

6  at it as opposed to gigabytes and pages, if you were to

7  print them all out, how many pages approximately was

8  your production?

9    MR. CHIPPETTA:  It's tricky because the 12.5

10  gigabytes is only the initial production.  Then

11  Noshirvan has also produced documents he received in

12  the 340 case to Duane Morris, which was another 5

13  gigabytes of data.  So that puts it at 17 and a half.

14    Duane Morris has alleged that it's been

15  11,500 pages.  I believe it could possibly be more than

16  that just simply because some items are one single-page

17  documents, and other ones may have three or four --

18  multiple pages within one specific file type.  So it's

19  very hard to precisely state or quantify a number, Your

20  Honor.

21    THE COURT:  Okay.  But you have no reason to

22  doubt their 11,500 number that they have attributed to

23  it?

24    MR. CHIPPETTA:  It's probably pretty close,

25  if not more.

```
 1              THE COURT:  All right.  You indicated that
 2   you provided them in the medium that was given to you
 3   by your client; correct?
 4              MR. CHIPPETTA:  That is correct.
 5              THE COURT:  You didn't dictate that he
 6   provide it to you in any specific form; correct?
 7              MR. CHIPPETTA:  No.  I just asked my client
 8   to produce within certain parameters, and he sent me
 9   all digital documents.
10              THE COURT:  Okay.  All right.
11              Mr. Jackson-Fannin, let me hear from you,
12   because it seems like your firm has gone through the
13   data, at least at this juncture, and you're
14   representing it's 11,500 pages; correct?
15              MR. JACKSON-FANNIN:  Correct, at a minimum,
16   Your Honor.  I think with the supplemental productions,
17   again, it's more than that at this point.  But at the
18   time which we filed this motion, we had estimated it
19   at -- at least my practice support team estimated it to
20   be 11,500 pages -- imaged -- worth of data that we had
21   received.
22              THE COURT:  Can you maybe further enlighten
23   me on how the organizational structure of that
24   production was given to you?
25              MR. JACKSON-FANNIN:  So counsel was correct
```

1  in that the production, while voluminous, did have

2  loose documents.  There were files.  There were

3  subfolders in -- there were folders.  There were

4  individual files, folders, subfolders.  Those

5  subfolders had other files and sometimes reference

6  files that were in them.

7        Some of the naming nomenclature was clear

8  with respect -- prime example, tax returns; that did

9  have a folder.

10        And I must correct on the record that there

11  was a misrepresentation in the motion that we filed

12  that said we had not received the plaintiff's 2021 tax

13  return.  But upon closer inspection of going through

14  the documents, we did locate it.  It was there and

15  produced in PDF format; however, that PDF format had

16  its metadata stripped from it.  So that's a bit of an

17  issue.  And, of course, it had unexplained redactions

18  on it.  So the majority of the files that we received

19  were JPEGs, screenshot images.

20        THE COURT:  So now you're getting into the

21  form, and I'll turn to that shortly.  But right now I'm

22  trying to -- because I have not seen what the

23  production looks like.  I'm trying to conceptually

24  understand what has been produced to you

25  organizationally, how it was given, how you've reviewed

1    it, if it's possible for you to review it.  That sort

2    of information.

3         MR. JACKSON-FANNIN:  What we did, Your Honor,

4    is simply have our practice support team upload it into

5    our document management system, Relativity.  We had to

6    apply control numbers to everything, because it came

7    over with no numbering or anything else for us to

8    reference.  And we didn't receive an index or anything

9    with it.

10        So we had to put it into Relativity, give it

11   control numbers so that we could actively try and

12   review it, and at least have some sort of internal

13   organization to what we received, and tried, then, to

14   go back and review the documents that we can.

15        The majority of them, you can open them.  But

16   most of them -- some of them are OCR'd and some have --

17   you know, they're word searchable.  Others are not.

18        The majority are JPEGs.  And most of those

19   you can't search the words that are in them, which is a

20   bit problematic.  So the only thing we have been able

21   to do is to click on each one of them and go through

22   them.

23        The native files and videos and things of

24   that nature, we can look at them, some of them.  Not

25   all of them.  And I don't know whether that was just a

1    transfer issue, where maybe the file got corrupted or

2    something that we can't view it, whether or not we have

3    the right application to review it or whatnot.  But I

4    believe, in our motion, we described it as a hodgepodge

5    of various file types and things, and that's how we

6    received it.

7              But organization, it's very loose.  It's very

8    difficult to follow.  And we've just done our best by

9    simply putting it into our document management system

10   and applying control numbers to it so that we could at

11   least have some sort of internal reference.

12             THE COURT:  Okay.  All right.  I think I have

13   a good idea of what was produced and the organizational

14   structure of it.

15             The second part of your request also -- and

16   you've highlighted it here a couple times -- talks

17   about the form of some of the files that have been

18   produced to you.  So Rule 34, as I'm sure you're aware

19   under that Subsection E that we were talking about

20   earlier, says, "If your request does not specify a form

21   for producing electronically stored information, a

22   party must produce it in a form or forms in which it is

23   ordinarily maintained or in a reasonably usable form or

24   forms."

25             So my understanding of looking at the

1    document requests, that you indicated that there was no

2    request for a specific form of ESI; correct?

3              MR. JACKSON-FANNIN:  Correct.

4              THE COURT:  Okay.  And so what is wrong --

5    what is inadequate with him producing the JPEG non-text

6    searchable form that he has done?

7              MR. JACKSON-FANNIN:  Well, Your Honor, we

8    don't necessarily know whether or not this information

9    is complete, Number 1, because he's produced JPEG

10   images, or screenshot images, of text conversations

11   that he's had.  Those things are cut off at some

12   points.  We don't know what's continuing.  And it may

13   be manipulated.

14             And the example that I brought for the Court

15   today, again, is to look simply to the JPEG images of

16   Mr. Noshirvan's tax return.  He certainly didn't

17   provide individually-paged JPEG images to the IRS.  And

18   that's not how they were kept in the ordinary manner or

19   business or way.  But that's what he produced to us.

20             They have a litany of unexplained redactions

21   throughout any of them.  We don't know if any of the

22   information that's on there has been changed because,

23   clearly, the JPEG images themselves have been

24   manipulated.

25             And the representation that this is the only

1   manner that the plaintiff has, or at least that he only

2   has a cell phone, is contradicted by the depreciation

3   and amortization schedule that he presented on his 2023

4   tax returns, wherein he cites a video-editing laptop

5   along with a Galaxy phone.

6         So we have cause to believe, separate and

7   apart, that whether or not he's actually searched all

8   available devices.  But, certainly, we question the

9   information that we've received in the manner of the

10  JPEGs.  And that's the majority of what we have

11  received.

12        And I have a brief printout to show the Court

13  basically the printout and manner of how we received

14  these things.

15        May I approach?

16        THE COURT:  You may.  Thank you.

17        MR. JACKSON-FANNIN:  And as you can see, Your

18  Honor, the file names are rather generic.  It just

19  simply is listed that way with screenshot and numbers.

20  Then you have the media type, which is all JPEGs.  And

21  this is solely identified, by way of example, for the

22  tax returns.

23        They were in the folder.  In that folder you

24  can see that there's no organization to the tax returns

25  themselves, because you've got 2023, 2022, then back to

1    2023, back to 2022.  And all of the metadata was

2    stripped from them because all of them have an access

3    data of 1/1/1980.

4             So, again, because they were manipulated, we

5    question the veracity of the documents themselves and

6    the manner and form in which they were produced in this

7    JPEG format.  And that, of course, is 67 percent of the

8    plaintiff's production in this case -- and that's rough

9    math, Your Honor -- out of the 11,500 pages imaged.

10             So we have serious concerns and questions

11   about that.  And this doesn't even touch on the fact

12   that these particular documents are not word

13   searchable.

14             THE COURT:  But my question is, do they have

15   to be word searchable?  As I indicated in Rule 34, it

16   says, "If you don't specify a form, they must produce

17   it in a form or forms in which it is ordinarily

18   maintained or in a reasonably usable form or forms."

19             MR. JACKSON-FANNIN:  Correct.

20             THE COURT:  So if he decided to take

21   screenshots of these things, I understand it may not be

22   the most efficient way for you to review them, but is

23   that not a usable form?

24             MR. JACKSON-FANNIN:  My understanding of the

25   case law is that in order for it to really be a usable

1  form, it needs to be searchable.  And that's not the

2  case with respect to the entire production.  Some are

3  and some aren't.

4          THE COURT:  Where is that case law cited in

5  your motion?

6          MR. JACKSON-FANNIN:  Well, it wouldn't be

7  cited in the motion, Your Honor.  I think that would

8  probably be in some of the cases that Mr. Chiappetta's

9  opposition has cited.  Because, again, I recognize that

10 at least the legal basis in our affirmative motion did

11 not take into account the argument that counsel raised

12 in his opposition with respect to the application of

13 the second romanette in Rule 34.

14          But my review of those cases seem to suggest

15 that -- and, in fact, in order for it to be in a usable

16 form -- or at least the courts have said that they

17 found that when it was produced in a format that could

18 be viewed and then also was -- had word searchable,

19 they found that, in fact, it was in compliance with

20 Rule 34.

21          And, again, begging the Court's indulgence

22 real quick, and I can probably find a quote.

23          MR. CHIPPETTA:  If I may, it's on page 7.  It

24 says "metadata."  It doesn't say "searchable."

25          MR. JACKSON-FANNIN:  Well, again, Your Honor,

1    we question that because the metadata wasn't intact.

2              THE COURT:  All right.  So let me ask,

3    Mr. Jackson-Fannin, what would you have me order, I

4    guess, at the end of the day?  What is your ultimate

5    request?  Because in your motion to compel this issue

6    about the Rule 34, I don't want to say it's a throwaway

7    issue, but it's kind of tacked on at the end.  It

8    doesn't address a lot of the issues that Mr. Chiappetta

9    raised in response to it.  And so I'm trying to get a

10   grip on what exactly it is you're looking for.  What

11   would you have the Court order if you were to prevail

12   on this motion in full?

13             MR. JACKSON-FANNIN:  Well, Your Honor, if we

14   were to prevail on the motion in full, we would simply

15   want the actual documents as they are kept.  I mean, he

16   did not submit JPEGs to the IRS.  We don't know, with

17   the unexplained redactions that are in those

18   documents -- so we would ask for that information to be

19   produced to us.

20             Similarly, with respect to the text

21   communications or anything else like that, we certainly

22   want the actual communications.  Not simply pictures of

23   communications that we had there.

24             And we're not asking the plaintiff to do

25   anything that we are ourselves have not already done.

```
 1   We hired a third-party vendor called Cyber.  And we had
 2   Dr. Garramone's cell phone imaged.  We had the data
 3   downloaded, and we're now going through that.
 4        On the 4th of October, we finally came to an
 5   agreement with search terms, and we're now reviewing
 6   25,000 text messages so that we can produce them to the
 7   plaintiff.  So, again, the burden -- we're not asking
 8   him to do anything we haven't already undertaken.
 9        And to the extent that he needs to engage a
10   third-party vendor to get this information to actually
11   download the data, we certainly would ask and expect
12   that what's good for the goose is good for the gander.
13        THE COURT:  So the first prong of what you're
14   requesting is that the data that has been provided to
15   you be resubmitted in a more usable format,
16   specifically the native format as it exists on the
17   electronic advice?
18        MR. JACKSON-FANNIN:  Correct, Your Honor,
19   with metadata intact and all other information
20   associated that's with it.
21        THE COURT:  Okay.  And what else?
22        MR. JACKSON-FANNIN:  Well, to the extent
23   that, you know, the -- well, I mean, to the extent that
24   the plaintiff is saying that he only has his cell
25   phone, I think that we now know that he might need to
```

1   go back and look at that other device, particularly the

2   laptop, and give that information to us.

3           And insofar as there are messages and things

4   like that that he can't directly produce, then we would

5   ask that he simply have a third party download his data

6   from his phone so that it can be processed and sent to

7   us in a usable form.

8           THE COURT:  Okay.

9           MR. JACKSON-FANNIN:  And as it's kept in the

10  ordinary course.

11          THE COURT:  What about the organization?

12          MR. JACKSON-FANNIN:  The organization of it,

13  your Honor, I think -- because I made a suggestion to

14  counsel at the beginning part of this, and I think that

15  he may have taken it slightly wrong.

16          To the extent that we have produced native

17  documents and things in our document production --

18  granted our production was Bates numbered and

19  labeled -- so to the extent that there was a native

20  document which, of course, you can't Bates stamp, there

21  was a placeholder so you could identify what that file

22  was and things of that nature.  That way we had it.

23  Call it an index, if you will, of what has been

24  produced.

25          We certainly don't want to overburden the

1    plaintiff by trying to say that he has to list out the

2    file names or, you know, for each individual request.

3    But we certainly need some degree of organization so

4    that we can determine what is responsive and what isn't

5    responsive.  But the manner of the production now

6    simply precludes us from being able to do that.

7            So to the extent that the Court has its own

8    suggestions as to how the organization can be placed so

9    that we may better understand what is being delivered

10   to us, we're certainly open to the Court's suggestion

11   in that regard.  But we would ask that it be presented

12   to us at least with an index so that we can correspond

13   or at least be able to correlate what document or

14   information is responsive to a particular request, Your

15   Honor.

16           THE COURT:  So in other words, you could have

17   folder names that were attributed to a specific request

18   for production.

19           MR. JACKSON-FANNIN:  Yes, Your Honor.

20           THE COURT:  Okay.  So it's not necessarily an

21   index.  You just want some identifier that would show

22   you the material that's responsive to a specific

23   request.

24           MR. JACKSON-FANNIN:  Correct, Your Honor.

25           THE COURT:  Okay.

 1              Mr. Chiappetta, let me turn back over to you.
 2   First, I want to talk about the form of the production,
 3   because it's been represented that a lot of the
 4   material that was produced by your client has been
 5   turned over in a -- what are -- I guess I'll just call
 6   them screenshots and other things that have no metadata
 7   that are not how they are ordinarily held by your
 8   client.
 9              So what can you tell me about the form of
10   production and why your client decided to do it that
11   way?
12              MR. CHIPPETTA:  Well, I have to step back a
13   second and say that I don't necessarily agree with
14   that, that's not how my client maintains it.  With
15   respect to the tax returns, I don't know why he didn't
16   produce a PDF as opposed to a screenshot image.  But
17   there are a lot of other images that go to social media
18   that pretty much the screenshot is the only way to
19   capture that image.  And that's a lot of what was
20   produced.
21              THE COURT:  So, for example, text messages, I
22   know there's a lot of messages in here, correct, that
23   have been exchanged by your client?
24              MR. CHIPPETTA:  With regards to certain
25   individuals, yes.

1          THE COURT:  Yeah.  How were those produced?

2          MR. CHIPPETTA:  Screenshots and video to show

3    a continuous stream.

4          THE COURT:  You would agree with me that

5    those documents are not housed by him in his phone via

6    screenshots; correct?  They are housed in a program

7    inside of his phone; correct?

8          MR. CHIPPETTA:  I would disagree, Your Honor.

9    I think they are accessible through the program on his

10   phone.  They are housed on a server at whatever the

11   app -- wherever the app holds that server.  So they are

12   possibly accessible, but they are not really housed by

13   him.

14         THE COURT:  Okay.  Well, he doesn't keep the

15   communications -- he keeps -- let me put it this way.

16         The communications in the app, or whatever

17   he's using, are kept inside of that app in some sort of

18   native format; correct?

19         MR. CHIPPETTA:  Subject to floating

20   electronic data that is a third-party server, yes.

21         THE COURT:  All right.  So what I'm trying to

22   get at is he provided screenshot of his communications

23   in response to the discovery requests; correct?

24         MR. CHIPPETTA:  Can you be more specific?

25   Because if we generalize it as providing screenshots --

1   for purposes of Mr. McGibney, yes, those communications

2   were provided via screenshot as opposed to, let's say,

3   obtaining the documents from Instagram.  But a lot of

4   times, there are other screenshots that aren't within

5   his app that were produced that are just simply

6   photographs.  So we need to be able to precisely

7   identify what we are targeting in order for me to be

8   able to respond, Your Honor.

9           THE COURT:  Okay.  I'm going to focus, then,

10   on the communications with McGibney just for purposes

11   of our discussion.  You would agree with me that he

12   doesn't keep his communications with McGibney stored as

13   screenshots on his phone.  He uses the native app where

14   they are housed; correct?

15           MR. CHIPPETTA:  That is correct.

16           THE COURT:  So my question, then, again, is,

17   focusing on McGibney specifically, why didn't he

18   provide communications in the native format by

19   downloading the data much like Mr. Garramone did?

20           MR. CHIPPETTA:  I can't go so far as to say

21   that what Dr. Garramone did or didn't do.  But I don't

22   have an answer to that question.

23           THE COURT:  Okay.  Were you involved with

24   your client in gathering these documents at all?  Or

25   did you just get them from him?

```
 1              MR. CHIPPETTA:  I have spoken to my client.
 2   I have talked to him, and we have went through it.  I
 3   have not hired a third-party vendor to obtain
 4   documents.
 5              THE COURT:  Okay.  Is there any reason why
 6   you haven't?
 7              MR. CHIPPETTA:  Is it required?
 8              THE COURT:  No, it's not required.  But
 9   what's required is for you to provide them in a form or
10   form that's usable.  And, for example, if your client
11   is providing screenshots that is omitting data that may
12   underlie the information -- or what the Court is more
13   concerned about is, for example, your tax returns have
14   a bunch of redactions in them.  Why were they redacted?
15   Did you provide a privilege log for the redactions?
16              So my concern is that you're providing them
17   in a form where you're omitting certain things and, in
18   other certain circumstances, they have been altered.
19   So that gives the Court concern about how -- the form
20   of the production here.
21              MR. CHIPPETTA:  I understand.  The
22   redactions, I believe, were specific to his wife and
23   child and to, like, personal identification
24   information, like social security number type
25   information.  As far as I'm aware.
```

1          You can correct me if I've misstated that,

2     because I don't have them in front of me.

3          THE COURT:  Okay.  But was there any

4     privilege log provided with the redactions?  Did you

5     tell them what the redactions were, why they were done?

6     Did you do them?  Did the client do them?

7          MR. CHIPPETTA:  The client did.  I did not.

8          THE COURT:  So therein lies the concern about

9     the form of production so far.

10          MR. CHIPPETTA:  That's related to one

11     document in regards to the tax returns.

12          As far as the screenshots go, they are a

13     usable format if they are just an image of what's being

14     occurred.  To the extent that Your Honor is saying that

15     there would be metadata associated with, I guess, an

16     Excel sheet downloaded from Instagram, I don't know

17     whether or not that would be accurate.

18          THE COURT:  So it's your position that all of

19     the information you provided to them is in a usable

20     form under Rule 34?

21          MR. CHIPPETTA:  I believe under Rule

22     34(b)(2)(E)(ii), we had the option of providing it how

23     we wanted to because of the voluminous nature of it.

24     We provided it as my client keeps the majority of the

25     information.

```
 1              THE COURT:  Well, all right.  Here's what
 2    (E)(ii) says.  "If a request does not specify a form
 3    for producing electronically stored information," which
 4    applies here, "a party must produce it in a form or
 5    forms in which it is ordinarily maintained."
 6              We just talked about ordinarily maintaining
 7    it.  Your client doesn't ordinarily maintain all his
 8    communications with McGibney via screenshot.  He
 9    maintains them in the app.
10              Your client doesn't maintain the tax returns
11    as screenshots.  He maintains them as PDFs; right?
12              MR. CHIPPETTA:  I would agree in those two
13    instances that would be accurate.  But out of, let's
14    say, somewhere between 12 and a half and 17 gigabytes
15    of data that have been produced, that represents
16    probably less than a gigabyte of data.  So a lot of
17    what he did produce would have been ordinarily
18    maintained that way, as it pertains to a lot of my
19    client's claims, because they are screenshots of other
20    people's social media.
21              THE COURT:  Okay.  I can understand in those
22    circumstances.
23              But let's go back to what (E)(ii) says.  It
24    says, "A party must produce it in a form or forms in
25    which it is ordinarily maintained or in a reasonably
```

1  usable form or forms."  So you have two options:  You

2  either produce it as its maintained, how you keep it

3  and access it, or you produce it in a reasonably usable

4  form.

5      So what you're saying here is what your --

6  what does your client pick, then?  Does it vary

7  depending upon the document?

8      MR. CHIPPETTA:  Well, Your Honor, if I may,

9  with regards to the tax return, I'm not -- I believe

10 that it's -- it would fall under reasonably usable

11 because it's readable.

12     Setting that aside, with regards to

13 Instagram, there is no ordinarily maintained or

14 reasonably usable format, because it's in a cloud-based

15 storage floating with allowed access through an app.

16 So the only way to capture that would be to, A, take

17 screenshot so you see it how he sees it; or,

18 alternatively, request the data from Instagram and get

19 whatever you get from them.  And whether or not that

20 even comes in images or if it comes in the form of some

21 type of spreadsheets, that I don't know.

22     THE COURT:  Okay.

23     The problem I'm having with the motion and

24 how to address it is I don't have a full picture of how

25 many documents and what types of documents do you want

 1   him to produce in a different form.  So I know you've

 2   given me some examples here.

 3         But then there's still, as you indicated in

 4   the motion -- let me get to the precise number -- at

 5   least 11,500 total documents.  How many of those are in

 6   a format that are unusable to you or that you claim are

 7   improper?

 8         MR. JACKSON-FANNIN:  Your Honor, we would

 9   have to go back and get a precise number.  I don't have

10   that number for the Court today.  Because, again, we

11   were just speaking broadly and generally about it.  I

12   don't have a problem going back through and providing

13   that list and number to the Court.

14         THE COURT:  So what I'm going to do is I'm

15   going to deny the motion with regard to Rule 34 without

16   prejudice for you to brief it again.

17         MR. JACKSON-FANNIN:  Okay.

18         THE COURT:  And to identify the types of

19   documents that you claim are not in a usable form, why

20   they are not in a usable form, how Rule 34 applies here

21   given the ESI production, some of the things that

22   Mr. Chiappetta raised.

23         But I need more, on a granular detail, of

24   what you want ordered to be reproduced in a different

25   format.  Because it's hard for me to say what has been

1    produced and the manner in which he has it.

2              For example, if he's taken screenshots of

3    someone else's social media page, he doesn't have

4    access to that.  So that's in the ordinary course of

5    how he has it, which is he just views it on his phone.

6    That's all he's got.

7              MR. JACKSON-FANNIN:  I agree.

8              THE COURT:  But a message that he receives on

9    a platform, say it's Twitter or something else, that he

10   actually individually converses, I think that's how

11   it's kept in the ordinary course of business, so that's

12   a different story.

13             But I don't have the granular level of detail

14   where I can right now order him to produce this, you

15   don't have to produce that.  So I'm kind of at a loss

16   as to what I can do here.  I need more information from

17   you as to what documents you're contesting that need to

18   be produced in a different format in order to make a

19   ruling.

20             MR. JACKSON-FANNIN:  Absolutely, Your Honor.

21   And we understand the Court's position, and we're happy

22   to provide that.

23             THE COURT:  All right.  Then I'll deny it

24   without prejudice, allow you to refile it as soon as

25   you would like, specifically the Rule 34 issue,

1    addressing both the form and organization on a more

2    granular level as to what you need.

3         I think the organization I understand, which

4    is essentially, hey, we got all these electronic

5    documents.  They're in folders.  Some of them are

6    labeled where we can identify them.  Others are

7    unclear.  And you would like something that is more

8    directed as to each request; correct?

9         MR. JACKSON-FANNIN:  Correct, Your Honor.

10        THE COURT:  I think I got that.  So you can

11   add what you will or what you feel you need to that

12   issue.

13        But it's really more of the form question

14   that I'm having trouble with that I just can't issue a

15   blanket ruling on it right now, because I don't have

16   the granular level of detail I need.

17        MR. JACKSON-FANNIN:  Understood, Your Honor.

18        THE COURT:  All right.  So I'm going to deny

19   that portion without prejudice.  I will also deny the

20   request for fees without prejudice, to take that up

21   when I address the Rule 34 issue at the end.

22        MR. JACKSON-FANNIN:  That's fine with us as

23   well.

24        THE COURT:  All right.  I believe that

25   settles the last issue then.

```
 1              Is there anything else remaining in that
 2   motion?
 3              MR. JACKSON-FANNIN:  No, Your Honor.
 4              THE COURT:  Okay.  Mr. Chiappetta, anything
 5   remaining?
 6              MR. CHIPPETTA:  Nothing further, Your Honor.
 7              THE COURT:  Okay.
 8              So to recap, I'll stick with the 23-cv-1218:
 9   Mr. Chiappetta withdrew his objections to the requests
10   at issue, which were 7, 8, and 18, which rendered that
11   portion of the motion to compel moot.
12              The remaining issue -- two issues in the
13   motion to compel were, then, the Rule 34 question about
14   the form of production, which the Court is going to
15   deny without prejudice for further briefing; and the
16   issue of attorney's fees, which the Court is also going
17   to deny without prejudice, to be taken up when
18   Dr. Garramone refiles his motion on the Rule 34 issue.
19              Anything I am missing with regard to that
20   motion to compel?
21              MR. JACKSON-FANNIN:  Your Honor, just to
22   clarify, that the Court is not requesting additional
23   briefing on the attorneys fee issue?
24              THE COURT:  I don't need anything further on
25   the attorney's fee.
```

```
 1              MR. JACKSON-FANNIN:  Thank you, Your Honor.
 2              THE COURT:  Am I missing anything,
 3  Mr. Chiappetta?
 4              MR. CHIPPETTA:  No, Your Honor.  Thank you.
 5              THE COURT:  All right.  Then there is the
 6  motion to compel at Docket 131 concerning Mr. Trainor.
 7  The parties have reached an agreement on that.  And
 8  that is that Mr. Trainor will produce the responsive
 9  documents by this Friday that were included in the
10  thumb drive, and a privilege log will be provided to
11  Mr. Chiappetta by October 25th.
12              Is that consistent with your records,
13  Mr. Trainor?
14              MR. TRAINOR:  That is correct, sir.
15              THE COURT:  Am I missing anything,
16  Mr. Chiappetta?
17              MR. CHIPPETTA:  No, Your Honor.  Thank you.
18              THE COURT:  All right.  And then back to the
19  23-cv-340 case, the parties have reached an agreement
20  on that outstanding motion to compel.  And that is the
21  defendant has consented to the release or download of
22  the videos referring to Garramone Plastic Surgery,
23  Dr. Garramone, and/or Ms. Couture, and all data
24  associated with those videos, including comments,
25  likes, et cetera.
```

```
 1              Defendant has also consented to the release
 2   or download of his current followers and all data
 3   associated therewith.  That will be the order I enter.
 4              There will also be language indicating that
 5   it is an order under the Stored Communications Act to
 6   make it clear to -- what platform is it?  Twitter?
 7              MR. JACKSON-FANNIN:  TikTok.
 8              THE COURT:  I'm sorry, TikTok -- to the
 9   extent they need that language.
10              Is that consistent with your records,
11   Mr. Jackson-Fannin?
12              MR. JACKSON-FANNIN:  Yes, Your Honor, that is
13   consistent with my understanding.
14              THE COURT:  Mr. Chiappetta?
15              MR. CHIPPETTA:  Yes, Your Honor.
16              THE COURT:  Okay.  And I believe that
17   resolves all the issues we had to get through today.
18              Is there anything further, Mr. Chiappetta?
19              MR. CHIPPETTA:  Nothing further, Your Honor.
20              THE COURT:  Mr. Jackson-Fannin?
21              MR. TRAINOR:  Nothing further that's before
22   the Court, Your Honor.
23              However, I will remind the Court that we do
24   have the matter of the stipulated confidentiality
25   order -- or the motion for protective order that's
```

1    currently pending in the 1218 case.

2              THE COURT:  That's currently pending.

3    There's also the motion to consolidate these cases,

4    which I know Judge Steele or Judge Chappell has now.

5    Hopefully, we'll get a ruling on that soon.

6              And finally, Mr. Trainor, anything further

7    from you?

8              MR. TRAINOR:  No, sir, Your Honor.

9              THE COURT:  All right, Counsel.  Well,

10   everyone, thank you for your time.  I'll get those

11   orders issued today, and I will await the further

12   briefing on the Rule 34 and then give you a decision.

13             We are adjourned.

14             (Proceedings adjourned at 10:57 AM)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2             I, Vonni R. Bray, a Certified Diplomate and

 3    Realtime Reporter, certify that the foregoing transcript,

 4    consisting of 39 pages, is a true and correct record of

 5    the proceedings given at the time and place hereinbefore

 6    mentioned; that the proceedings were reported by me in

 7    machine shorthand and thereafter reduced to typewriting

 8    using computer-assisted transcription; that after being

 9    reduced to typewriting, a certified copy of this

10    transcript will be filed electronically with the Court.

11             I further certify that I am not attorney for,

12    nor employed by, nor related to any of the parties or

13    attorneys to this action, nor financially interested in

14    this action.

15             IN WITNESS WHEREOF, I have set my hand at Fort

16    Myers, Florida, this 18th day of October, 2024.

17

18

19                      s/ Vonni R. Bray, RDR, CRR
                        Vonni R. Bray, RDR, CRR
20                      United States Court Reporter

21

22

23

24

25
```