1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2                        FORT MYERS DIVISION

3    DANESH NOSHIRVAN, an
     individual,
4
            Plaintiff,              Case No. 2:23-cv-1218-JES-KCD
5
     -vs-                           December 10, 2024
6
     JENNIFER COUTURE; RALPH        9:34 a.m. - 11:53 a.m.
7    GARRAMONE, M.D.; RALPH
     GARRAMONE, M.D., P.A.;
8    CENTRAL PARK OF SOUTHWEST
     FLORIDA, LLC; WRAITH, LLC;
9    SULLIVAN STREET INVESTMENTS,
     LLC; HAIRPIN TURN, LLC; OMG
10   REALTY, LLC; R G WEIGHT
     MANAGEMENT, LLC; CENTRAL PARK
11   SOUTH, LLC; BRANTLEE, LLC;
     LEGACY OF MARIE GARRAMONE, LLC;
12   GARRAMONE MARKETING, INC.; 5681
     DIVISION, LLC; THE LAW OFFICE OF
13   PATRICK TRAINOR, ESQ., LLC;
     PATRICK TRAINOR, and ANTI-DOXING
14   LEAGUE, INC.,

15          Defendants.            (Digitally Recorded )
     _____
16

17
          **DIGITALLY RECORDED MOTION HEARING (Docs 167, 178, 181)**
18              BEFORE THE HONORABLE KYLE C. DUDEK
                  UNITED STATES MAGISTRATE JUDGE
19

20
     OFFICIAL COURT REPORTER:
21
     Katharine Healey, RPR, RMR, CRR, FPR-C
22   PO Box 56814
     Jacksonville, FL  32241
23   (904) 301-6843
     katharinehealey@bellsouth.net
24

25          (Proceedings recorded by electronic sound recording;
                  transcript produced by transcriber.)

1                      A P P E A R A N C E S

2

    COUNSEL FOR PLAINTIFF:
3

4     **NICHOLAS A. CHIAPPETTA, ESQUIRE**
      Chiappetta Trial Lawyers
      2101 Vista Parkway, Suite 258
5     West Palm Beach, FL  33411
      (561) 768-4500
6     nick@chiappettalegal.com

7

    COUNSEL FOR DEFENDANTS JENNIFER COUTURE; RALPH GARRAMONE, M.D.;
8   OMG REALTY, LLC; and WRAITH, LLC:

9     **AARON ALFANO, ESQUIRE**
      Rolfes Henry, Co., LPA
10    5415 87th Street East
      Bradenton, FL  34211
11    (941) 684-0100
      aalfano@rolfeshenry.com
12

13  COUNSEL FOR DEFENDANT RALPH GARRAMONE, M.D., P.A.:

14    **JULIAN A. JACKSON-FANNIN, ESQUIRE**
      Duane Morris, LLP
15    201 South Biscayne Boulevard, Suite 3400
      Miami, FL  33131
16    (305) 960-2000
      jjfannin@duanemorris.com

17

18

19

20

21

22

23

24

25

1
2     P R O C E E D I N G S
      December 10, 2024                              9:34 a.m.
3                          - - -
4              COURT SECURITY OFFICER:  This United States District
5     Court in and for the Middle District of Florida is now in
6     session.  The Honorable Kyle C. Dudek presiding.
7              Please be seated.
8              THE COURT:  Good mor- -- or, sorry -- yeah, good
9     morning, everyone.
10             MR. CHIAPPETTA:  Good morning, Your Honor.
11             MR. JACKSON-FANNIN:  Good morning, Your Honor.
12             THE COURT:  Okay.  To get us started, I'm going to
13    have Ms. Ward go ahead and call the case.  We can then have
14    counsel enter their appearances starting with the plaintiff.
15             Ms. Ward.
16             COURTROOM DEPUTY:  Calling case 2:23-cv-1218, Danesh
17    Noshirvan vs. Jennifer Couture; Ralph Garramone, M.D.; Ralph
18    Garramone, M.D., P.A.; et al.
19             MR. CHIAPPETTA:  Good morning.  Nick Chiappetta on
20    behalf of the plaintiff, Your Honor.
21             THE COURT:  Good morning, Mr. Chiappetta.
22             MR. JACKSON-FANNIN:  Good morning, Your Honor.
23    Julian Jackson-Fannin from Duane Morris on behalf of the
24    defendant Garramone Plastic Surgery, also known as, I guess,
25    Ralph Garramone, M.D. --

1          THE COURT:  M.D. --

2          MR. JACKSON-FANNIN:  -- P.A.

3          THE COURT:  -- yes.  All right.

4          I see we have a new face this morning.

5          MR. JACKSON-FANNIN:  Yes.

6          MR. ALFANO:  Good morning, Your Honor.  Aaron Alfano

7    on behalf of defendants Jennifer Couture, Ralph Garramone, OMG

8    Realty, and Wraith, LLC.

9          THE COURT:  Okay.  All right.  Thank you, Mr. Alfano.

10   Thank you for joining us.

11         MR. ALFANO:  My pleasure, Your Honor.

12         THE COURT:  So we are here today on three pending

13   discovery motions.  That would be plaintiff Noshirvan's motion

14   to compel at doc 167; defendant Ralph Garramone, M.D.'s motion

15   to compel at doc 178; and plaintiff Noshirvan's motion to

16   compel at doc 181.

17         As before, I plan to rule on the motions during this

18   hearing, so let me put some background on the record.

19         In a companion case, under 23-cv-340, defendants

20   Jennifer Couture and Ralph Garramone sued Noshirvan.  They

21   allege that Noshirvan was paid to post videos of Couture,

22   exposing her personal information, and that Noshirvan then

23   retaliated by posting and reposting multiple videos of Couture

24   and Dr. Garramone with their personal information.  He urged

25   his social media followers to report Couture to South Florida

1    Crime Stoppers, sent links to the videos to social media

2    accounts of Dr. Garramone's patients, and more.  This allegedly

3    resulted in the defendants and their family receiving hundreds

4    of text messages, multiple phone calls, voice mails, emails,

5    messages on social media, and negative business reviews.

6            Noshirvan then filed this lawsuit, alleging that

7    Couture, Dr. Garramone, and others are implicated in the hiring

8    of a third party, Joseph Camp, to harass and defame Noshirvan.

9    And they or Camp have created an account titled "Victims of

10   that Danesh Guy," made a video calling Noshirvan a child

11   predator, urged people to report Noshirvan for child abuse and

12   neglect, made false claims to Child Protective Services about

13   Noshirvan's child on at least three separate occasions, left

14   negative flyers of Noshirvan and his wife in the restroom of a

15   local butcher shop, made false or fake reports to social media

16   platforms about Noshirvan, got authorities to send a SWAT team

17   to Noshirvan's home on the basis of false reports, sent

18   pictures of Noshirvan and his family at their home, and

19   distributed flyers at a school falsely alleging that Noshirvan

20   was a child rapist.

21           Now, the current version of the complaint in this

22   case contains claims for civil conspiracy at Counts One, Two,

23   Three, Four, and Five; defamation at Counts Six, Seven, Eight,

24   Nine, Ten, Eleven, Seventeen, and Eighteen; intentional

25   infliction of emotional distress at Counts Twelve and Thirteen;

1   tortious interference with a business relationship at Count

2   Fourteen; and finally, misappropriation of likeness at Counts

3   Fifteen and Nineteen.

4           With that factual background, let me also put the

5   general discovery standard on the record.

6           Now, discovery is a broad factfinding process

7   designed to provide both parties with the relevant facts of

8   their case.  Federal Rules of Civil Procedure 26 outlines the

9   scope of discovery.  It provides that parties may obtain

10  discovery regarding any non-privileged matter that is relevant

11  to any party's claim or defense and proportional to the needs

12  of the case considering the importance of the issues in the

13  action, the amount in controversy, the parties' relative access

14  to relevant information, the parties' resources, the importance

15  of the discovery in resolving the issues, and whether the

16  burden or the expense of the proposed discovery outweighs its

17  likely benefit.

18          Now, facts uncovered through discovery need not be

19  admissible in evidence; rather, the information must be

20  relevant to a claim or defense and proportional to the needs of

21  the case.

22          The Rules of Civil Procedure strongly favor

23  discovery -- I'm sorry, full discovery whenever possible.

24          The proponent of a motion to compel carries the

25  initial burden of proving that the information sought is

1   relevant.  Once this burden is met, the responding party must

2   demonstrate how the information sought is improper,

3   unreasonable, or disproportionate.

4          All right.  With that all on the record, now I'm

5   going to turn to the motions.  And I plan to take them in order

6   that they were filed.

7          So starting with docket 167, Mr. Alfano, I believe

8   you'll -- this motion is directed to your clients, correct?

9          MR. ALFANO:  Yes, Your Honor, I believe it is.

10          THE COURT:  Okay.  All right.  So after having read

11   the motion, the first request that it has in it is -- and

12   Mr. Chiappetta, this concerns you -- is the stipulation at

13   docket entry 141.  As I see it, under docket 167 you ask for me

14   to enter that as a court order.  Why would I do that?

15          MR. CHIAPPETTA:  To solidify it.  Right now we only

16   have it verbally at the August 28th hearing.  So in the absence

17   of having to order a transcript to memorialize it, we -- we

18   had -- I had an agreement with prior counsel --

19          THE COURT:  Well, no.  Let me stop you there.  That's

20   the -- I understand that's the discovery agreement that you

21   filed as an attachment.

22          MR. CHIAPPETTA:  Yes.

23          THE COURT:  Your motion also asks for me to enter the

24   stipulation, which is already filed on the record at docket

25   141 -- to enter that as an order as well.  So why would I need

1    to do that if it's already part of the record?

2    MR. CHIAPPETTA:  Not necessarily adopt it as a -- or

3    change the joint stipulation to an order, just adopt the

4    stipulation for purposes of this particular case, is what the

5    motion was asking.

6    THE COURT:  Okay.

7    MR. CHIAPPETTA:  My understanding is usually the

8    Courts will sanction --

9    (Simultaneous speaking.)

10    THE COURT:  It's already here.

11    MR. CHIAPPETTA:  -- joint stipulation.

12    THE COURT:  All right.  So you want to enter it as an

13    order for purposes of a sanction?

14    MR. CHIAPPETTA:  Purposes -- for purposes of

15    memorialization for this case; that this item is no longer

16    contested, we've stipulated to it, it's done.

17    THE COURT:  Yeah, I don't need -- in order for that

18    purpose, I don't need it to be entered as an order.  You've

19    agreed to it.  It's been filed on the record.  It's stipulated.

20    There's nothing further for me to do on that end.  So I can

21    enter an order to the extent that there's -- sanctions need to

22    be issued in conjunction with it, but I don't see that being

23    needed.

24    Let me direct you to your motion and what paragraph

25    I'm talking about, because there might be a bit of confusion.

1          Paragraph 4 of your motion says, "On August 28th,

2   2024, this Court held an in-person evidentiary hearing.  During

3   that hearing, Garramone and Couture stipulated to the statement

4   outlined in docket 141.  Noshirvan requests that this Court

5   ratify the oral stipulation made at the hearing and put in

6   writing at docket 141.  There is a proposed order attached to

7   the joint stipulation filed at doc 141."

8          That's what I'm referring to.

9          MR. CHIAPPETTA:  And if Your Honor is telling me that

10  the Court does not need to ratify the joint stipulation, then

11  we can move past paragraph 4.

12          THE COURT:  Okay.  We do not need to.  Once you've

13  got it stipulated between the parties in writing on the record,

14  there's nothing further for me to do.  Entering an order at

15  that point is just superfluous.

16          MR. CHIAPPETTA:  Understood.

17          THE COURT:  All right.  So moving past that issue,

18  then, the second issue I see from reading the motion is about

19  the outstanding discovery.  As I recall it, following the

20  August 28th hearing I entered an order overruling several

21  objections and directing Couture and Garramone to respond to

22  the outstanding discovery requests in 30 days.

23          I understand during that hearing there was also some

24  agreement possibly entered between you and prior counsel; is

25  that correct?

```
 1          MR. CHIAPPETTA:  I don't recall if there was any
 2   additional agreements.  I do remember that the Court ordered
 3   Dr. Garramone and Ms. Couture to respond by November 29th, I
 4   believe it was.
 5          THE COURT:  I guess what I'm referring to with that
 6   is at the hearing you and opposing counsel had reached an
 7   agreement on several items that I did not address, correct?
 8          MR. CHIAPPETTA:  Oh, prior to the hearing --
 9          THE COURT:  Okay.
10          MR. CHIAPPETTA:  -- we actually had -- we had an
11   agreement outlined prior to -- to that November 1st hearing.
12   And I believe it's attached to this motion.
13          THE COURT:  It's Exhibit C, correct?
14          MR. CHIAPPETTA:  It -- it should -- yes, Your Honor.
15   And essentially, the defendants were supposed to produce
16   everything that was agreed to according to Exhibit C.
17          THE COURT:  So Mr. Alfano, let me turn to you.  Where
18   are we with regard to discovery that's outstanding?
19          MR. ALFANO:  Your Honor, I only became involved in
20   this case less than a month ago.  I'm still working on
21   determ- -- on reviewing the documents.  The file that I
22   received from former defense counsel for my clients was over 25
23   gigabytes of data, so there's rather a lot to sort through.
24   And I would respectfully request an additional 30 days to
25   respond to that discovery and provide the information and any
```

1    further discovery that was owed.

2         THE COURT:  Okay.  All right.  So you need the

3    30 days.  Are you in the process of reviewing it now?

4         MR. ALFANO:  Yes, sir, Your Honor.

5         THE COURT:  Okay.  How many people do you have

6    reviewing it?

7         MR. ALFANO:  Myself, and I have an associate working

8    on it as well.

9         THE COURT:  Okay.  Now, the 25 gigabytes of data,

10   what is made up in that --

11        MR. ALFANO:  A large part it, Your Honor, is videos,

12   the clips that were provided.  That's why it's such a large

13   file.  But there are approximately 3,500 PDF files total in the

14   document -- or, I'm sorry, in the file -- the entire case file

15   that I was provided by opposing counsel -- or, I'm sorry, that

16   I was provided by former defense counsel.  Approximately 3,500

17   PDF documents need -- that need to be reviewed.

18        THE COURT:  All right.  Is there anything that you --

19   that is still outstanding that you need to gather from your

20   clients as part of that production, or do you have everything

21   that you need for the production?

22        MR. ALFANO:  I -- I believe I have most of it, Your

23   Honor, but I do need to speak with my clients further to

24   discuss that.  I'm going to be meeting with them after this

25   hearing.  And I have had, you know, one initial telephone

1    conference with them to discuss the case in, you know, large

2    term.  But I do need to go through it in a little bit more

3    detail and determine whether there is any additional

4    information that I need from them.

5            THE COURT:  All right.  What about the phone data?  I

6    know there was some phone downloads.  Do you have all of that

7    information?

8            MR. ALFANO:  Your Honor, I believe that actually my

9    predecessor was working on that and had had a con- -- a

10   third-party discovery service work on downloading the

11   information from my clients' phones, and that's one of the

12   topics that I need to discuss with them today.

13           THE COURT:  Okay.  So -- but you don't know how much

14   material that is?  You haven't even started reviewing that?

15           MR. ALFANO:  I do not know, Your Honor.

16           THE COURT:  Okay.  And do you believe that you can

17   get that reviewed as well in those 30 days?

18           MR. ALFANO:  Now that I'm going through it, it seems

19   like 30 days would be rather tight, especially given the

20   holidays.  Your Honor, may I request an additional 45 days?

21           THE COURT:  Okay.  So the total would then be

22   45 days?

23           MR. ALFANO:  Correct, Your Honor.

24           THE COURT:  All right.  Mr. Chiappetta, why shouldn't

25   I give him the additional 45 days?

1          MR. CHIAPPETTA:  Well, first and foremost, Your

2    Honor, this discovery was served back in April.  I understand

3    that Mr. Alphonse (verbatim) is new to the case, but his prior

4    counsel had already had a document production in the works with

5    a third-party vendor, which was expressed I believe at the

6    November 1st hearing in his reason for noncompliance.

7          And simply put, Your Honor has already extended the

8    deadline to November 29th.  Defendants didn't have -- they have

9    not produced a single document to date in this case.  They

10   haven't even filed a response to this motion.  So --

11         THE COURT:  I know that.  They had to get new counsel

12   because the other had to withdraw.  They had to file -- well,

13   they had a lot of objections to your discovery, which I upheld

14   a lot of them, so they had to come to court here to get that

15   resolved.  And so there's been a lot -- I know it was served

16   back in April, as you indicated, but there's a lot that had to

17   happen between then and now.  So --

18         MR. CHIAPPETTA:  Well --

19         THE COURT:  -- I have the motion that was heard.  We

20   had the hearing.  We had the agreement between the parties.

21   They hired a vendor.  They had to download the phones.  Then

22   counsel had to withdraw.  Then they had to get new counsel.  So

23   there's clearly been a lot of moving parts to get us to the

24   point here.

25         So if I don't give them the 45 days, then what do I

1   do?

2          MR. CHIAPPETTA:  I would ask for significantly less.

3   I understand the holidays, but I would still ask for -- I would

4   have normally asked for 14, but with the holiday, I would ask

5   that the Court only grant 30.

6          THE COURT:  All right.  Anything further?

7          MR. CHIAPPETTA:  No, Your Honor.

8          THE COURT:  All right.  I'm going to give you the

9   45 days, Mr. Alfano.  This case -- I know you are new to it,

10  but I'd like you to make a diligent effort to try to get all of

11  that material reviewed and disclosed, because Mr. Chiappetta is

12  right on the point that he has not received any discovery to

13  this point.  And I think it is past due.  All right?

14         MR. ALFANO:  Yes, sir, Your Honor.  Understood.

15         THE COURT:  Okay.  Then sticking with docket 167, I

16  believe there's a request for fees and sanctions.  I'm going to

17  deny the request for fees and sanctions.  I find that the

18  intervening change in counsel, along with the motion to compel

19  and the volume of discovery, is sufficient to grant an

20  extension of time and not award the fees and sanctions.

21         Mr. Chiappetta?

22         MR. CHIAPPETTA:  There was one other issue in the

23  motion.

24         THE COURT:  Okay.  What is that?

25         MR. CHIAPPETTA:  With regards to paragraph number 5,

1  I believe it was social media accounts, this Court had

2  previously put a stay on that pending --

3          THE COURT:  All right.  Give me one second.  Can you

4  direct me to where this is in your motion so I can make sure I

5  read it again?

6          MR. CHIAPPETTA:  Paragraph 7, Your Honor.

7          THE COURT:  Paragraph 7?  Okay.  Give me one second

8  to read it.

9      (Pause in proceedings.)

10         THE COURT:  Okay.  I see your point.  So what you're

11 saying is -- I was unaware -- I thought my order denying the

12 protective order lifted the stay of the discovery on the social

13 media.  That was -- you didn't interpret it that way?

14         MR. CHIAPPETTA:  I didn't understand it to be that,

15 Your Honor.

16         THE COURT:  Okay.  And that might have been -- I

17 think that is on my end.

18         Mr. Alfano, are you aware of this issue?

19         MR. ALFANO:  I -- well, I'm aware of the issue.  I've

20 read it in the motion.  But frankly, I'm a little confused.

21 Not having been at the prior hearings, I'm a little confused as

22 to exactly what the issue is and what the status of the Court's

23 ruling on it is.

24         THE COURT:  Okay.  So there was a -- at one point in

25 time in a prior hearing, some of the discovery that

1  Mr. Chiappetta had asked from your clients concerned social

2  media issues.

3          MR. ALFANO:  Uh-hmm.

4          THE COURT:  And there was -- it was relayed at the

5  hearing that some of that may have been confidential or

6  proprietary information that they wanted a protective order.

7          MR. ALFANO:  Yes.

8          THE COURT:  And after the hearing a motion for

9  protective order was filed.  I denied it given the breadth of

10 the protective order that was sought.  So as I read it from

11 there, the stay on the -- the exchange of the social media

12 information that had been requested had been lifted.

13         MR. ALFANO:  Okay.

14         THE COURT:  Mr. Chiappetta apparently thought it was

15 still in effect.  So to the extent it's still in effect, it's

16 now lifted.  Any information that has been sought in discovery

17 from Mr. Chiappetta and that was ordered -- ordered at the

18 August 28th hearing, which is the information you have in front

19 of you now, Mr. Alfano --

20         MR. ALFANO:  Yes.

21         THE COURT:  -- that's got to be produced.

22         MR. ALFANO:  Understood, Your Honor.

23         THE COURT:  Now, if you want to move for a protective

24 order on certain things, I'll certainly entertain that.

25         MR. ALFANO:  Okay.

1    THE COURT:  But the protective order the last time,

2   as I relayed in the order, was too broad for me to impart it.

3   It essentially allowed the parties to protect anything that

4   they wanted when a protective order is limited to certain

5   information under Rule 26.

6         So I want all that information disclosed.  If there's

7   specific evidence or specific documents that you feel should be

8   protected, you can file an order for those specific things, but

9   it's not going to be large swaths of information that are going

10  to be covered under a protective order as I outlined in my

11  prior ruling.

12       MR. ALFANO:  Understood, Your Honor.  Thank you.

13       THE COURT:  All right.  Okay, Mr. Chiappetta.  That

14  social media information is going to be coming over with the

15  rest of it in 45 days.  And I apologize for the lack of clarity

16  regarding the not lifting that social media stay.

17       Is there anything else in your motion that I might

18  have overlooked?

19       MR. CHIAPPETTA:  No, Your Honor.  Thank you very

20  much.

21       THE COURT:  All right.  So for purposes of the

22  record, the motion to compel is granted in part and denied in

23  part.

24       I'm going to deny the request to enter the

25  stipulation at docket 141 as an order.

1    I'm going to grant the motion to compel with regard

2 to the outstanding discovery and direct the defendants to

3 produce what was ordered previously at the August 28th hearing

4 and what was agreed to between counsel within 45 days.

5    And I'm going to deny the request for fees and costs

6 under Rule 37.

7    Moving on, then, to docket 178, here I have

8 Dr. Garramone's motion to compel against Noshirvan.  So as I

9 understood it, Mr. Jackson-Fannin, this is your motion,

10 correct?

11    MR. JACKSON-FANNIN:  Correct, Your Honor.

12    THE COURT:  Okay.  So thank you for filing it and

13 giving me a little more clarity about what's outstanding.

14    So as I understand it from your motion, there's 22.8

15 gigabytes of electronic discovery that was provided by

16 Mr. Noshirvan, correct?

17    MR. JACKSON-FANNIN:  That is correct, Your Honor.

18    THE COURT:  All right.  And the -- that production is

19 compromised (verbatim) of 5,128 -- I'm sorry, 5,121 electronic

20 files separated into 158 folders, subfolders, with 16 different

21 file types.  Is that also accurate?

22    MR. JACKSON-FANNIN:  Correct, Your Honor.  It's

23 folders, subfolders, and sub-subfolders.

24    THE COURT:  Okay.  And now the issues, as I

25 understand them, are twofold.  First, Mr. Noshirvan has not

1   organized the production to correspond with the document

2   requests, thus leaving you unable to determine which documents

3   pertain to which discovery you asked for?

4           MR. JACKSON-FANNIN:  Correct, Your Honor.

5           THE COURT:  And then second, Noshirvan has not

6   produced the ESI in the same format as normally kept or in a

7   usable format?

8           MR. JACKSON-FANNIN:  Correct, Your Honor.

9           THE COURT:  Okay.  So the first thing we need to

10   start with, I think, is to understand the discovery that's been

11   provided and what it's made of.

12           Mr. Jackson-Fannin, you can sit down if it makes it

13   easier for you to talk into the microphone, but I'll leave it

14   up to you as to what you'd like to do.

15           MR. JACKSON-FANNIN:  I'm comfortable standing.  I

16   think better on my feet, Judge.  I don't know why.

17           THE COURT:  I got it.

18           Mr. Chiappetta, this is for you.  In assessing the

19   document production and figuring out which rule it goes under,

20   I need to first identify whether it's all considered ESI or

21   it's considered something else.

22           As I understand what's been provided by

23   Mr. Jackson-Fannin and his client is that everything you

24   produced to the other side was an electronically stored

25   information, correct?

1          MR. CHIAPPETTA:  That is correct, Your Honor.

2          THE COURT:  All right.  So that means it's all

3    electronically stored documents.  We are moving under Rule

4    34(E) -- I'm sorry, 34(b)(2)(E).

5          So Rule 34, Subsection (E) provides:  Producing the

6    Documents or Electronically Stored Information.  Unless

7    otherwise stipulated or ordered by the Court, these procedures

8    apply to producing documents or electronically stored

9    information.

10         Subsection (i):  A party must produce documents as

11   they are kept in the usual course of business or must organize

12   and label them to correspond with categories in the request.

13         Subsection (ii):  If a request does not specify a

14   form for producing electronically stored information, a party

15   must produce it in a form or forms in which it is ordinarily

16   maintained or in a reasonably usable form or forms.

17         And three -- subsection (iii):  A party need not

18   produce the same electronically stored information in more than

19   one form.

20         Now, as I read the parties' briefs, then, this is a

21   dispute about Subsections (i) and (ii).  And first up is

22   whether Subsections (i) and (ii) even apply to electronically

23   stored information.

24         Mr. Jackson-Fannin, your position is that Subsections

25   (i) and (ii) both apply to ESI, correct?

1          MR. JACKSON-FANNIN:  Correct, Your Honor.  It is our

2     position that -- I believe that the weight of authority on this

3     issue -- we understand that there is a split, but the weight of

4     authority lends to the interpretation of Subsections (i) and

5     (ii) to be read supplementary or synergistically as to being

6     applicable both to hard-copy documents as well as to ESI.

7          THE COURT:  Okay.  Mr. Chiappetta, let me hear from

8     you on that issue.

9          MR. CHIAPPETTA:  Excuse me.  Your Honor.

10         It is our position that the more current cases,

11    like -- issued in '22, '23, and '24, have found that the 2006

12    amendment reads Rule 34 to bifurcate Subsection (i) versus

13    Subsection (ii) and (iii).

14         THE COURT:  All right.  So after taking a look at

15    this, Mr. Jackson-Fannin, you are correct, there is a split of

16    authority as to whether Subsection (i) and (ii) are

17    supplementary or alternative.  And I agree on your end:  I

18    think they're supplementary.  I don't think they're

19    alternative.

20         Subsection (i) is an organizational requirement for

21    the production, and I think Subsection (ii) was added in 2006

22    to cover the form.  I don't think Subsection (ii) was added to

23    replace Subsection (i) that existed prior.  I think they are

24    supplementary rather than complementary -- I'm sorry, rather

25    than alternative.

1    So I'm going to read it, 34, Subsections E(i) and

2    (ii), as applying -- both applying to the production of ESI.

3    And this decision is based upon the following case law, which I

4    find persuasive.  The first case is *Profit Point Tax Techs,*

5    *Incorporated vs. DPAD Group, LLP*, 2020 Westlaw 12604755.  The

6    second is *Adria MM Products vs. Worldwide Entertainment Group,*

7    *Incorporated*, 2018 US District LEXIS 56791.  The third case is

8    *Landry vs. Swire Oilfield Services, LLC*, 323 F.R.D. 360.  And

9    finally, the fourth case is *FDIC vs. Stovall*, 2014 US District

10   LEXIS 188776.

11   All right.  So now having decided that -- to apply

12   Rule 34(E) in its entirety, let's talk about Subsections (i)

13   and (ii) separately.

14   Starting with Subsection (i), Rule 34 says a party

15   may produce documents as they are kept in the usual course of

16   business or organize and label them to correspond to the

17   categories in the request.  If a party chooses to produce

18   documents as they are kept in the usual course of business, the

19   mode of production should preserve the functional utility of

20   the electronic information produced.  This normally requires,

21   one, preserving the format of the ESI; and two, providing

22   sufficient information of the context in which it is kept and

23   used.

24   All right, Mr. Chiappetta.  My understanding is you

25   did not organize and label the ESI in this case to correspond

1    with categories of the request; is that correct?

2            MR. CHIAPPETTA:  That is correct, Your Honor.

3            THE COURT:  Okay.  And so is it your position that

4    you have provided them as they are kept in the usual course of

5    business?

6            MR. CHIAPPETTA:  Well, in light of what Mr. Fannin's

7    motion is asking for, the text message -- the direct messages,

8    we've provided screenshots of those messages and we did not

9    download those directly from whatever particular app they came

10   on.

11           THE COURT:  Okay.  So what you're saying is they

12   are -- in light of -- as I understand it, then, the production

13   does not comply with Subsection (i) as you're sitting here

14   today?

15           MR. CHIAPPETTA:  It -- since your Court -- since Your

16   Honor has found that there's -- Subsection (i) and (ii) are

17   supplementary, then that is correct.  Our position was that

18   they need not apply under Subsection (ii) and (iii).

19           THE COURT:  All right.  So that leaves you, I guess,

20   needing to supplement that production to maybe comply with

21   Subsection (i), correct?

22           MR. CHIAPPETTA:  That is correct, Your Honor.

23           THE COURT:  All right.  Then let me give you some

24   guidance, then, if you're going to need to produce it, reformat

25   your production.  Should you choose the option to produce the

1    documents as they are kept in the usual course of business, as

2    I indicated, the mode of production should preserve the

3    functional utility of the electronic information produced.

4    This requires, one, preserving the format of the ESI; and, two,

5    providing sufficient information about the context in which it

6    is kept and used.

7            So in your case I know there's a lot of screenshots

8    produced.  That's clearly not in the native format because it

9    doesn't preserve any of the underlying data.  It's simply just

10   a screenshot of the interface that your client is using,

11   correct?

12           MR. CHIAPPETTA:  It -- yeah.  It's a photograph.

13           THE COURT:  And here's some additional case law to

14   review in support of that.  So generally, a file that is

15   converted to another format solely for production, or for which

16   the application metadata has been scrubbed or altered, is not

17   produced as kept in the ordinary course of business.  This is

18   *Teledyne Instruments, Inc.*, 2013 Westlaw 5781274.

19           Go ahead.

20           MR. CHIAPPETTA:  Your Honor, if I may just ask.  I've

21   read a lot of cases on metadata, and my understanding is

22   usually it has to be expressly requested in advance by the

23   requesting party in order for that to -- for that particular

24   rule to apply.  Am I incorrect in my interpretation?

25           THE COURT:  Well, there's not -- there's not

1    necessarily an agreement on that line of cases either as to

2    what's required.

3         Now, as I indicated, typically if you're going to

4    produce them as they are normally kept, you have to preserve

5    the format and provide sufficient information about the context

6    in which it is kept and used.

7         Now, if you keep -- in order to keep the format,

8    typically that means you're going to have to have the metadata

9    with it.  Now, there may be certain circumstances where

10   metadata can be lost and you still keep the formatting of

11   your -- of the production, but I can't tell you unless it's --

12   on a more specific basis whether that flies or not.  You're

13   going to have to do that on a -- on a case-by-case

14   determination based upon the context of what the production is

15   going to be.  I'm sorry I can't give you any more guidance than

16   that.

17        MR. CHIAPPETTA:  Thank you, Your Honor.

18        THE COURT:  All right, Mr. Jackson-Fannin.  Anything

19   to add about that?

20        MR. JACKSON-FANNIN:  No, Your Honor.

21        THE COURT:  Okay.  Then moving on to Subsection (ii),

22   which provides:  If a request does not specify a form for

23   producing electronically stored information, a party must

24   produce it in a form or forms in which it is ordinarily

25   maintained or in a reasonably usable form or forms.

1          Now, Mr. Chiappetta, my understanding based upon

2    Mr. Jackson-Fannin's email and our prior -- I'm sorry,

3    Mr. Fannin's motion and our prior discussions is that a lot of

4    what you produced was, again, screenshots of potential emails,

5    text messages, social media messages, as opposed to the actual

6    underlying message being downloaded in the format that it was

7    received by your client.

8          MR. CHIAPPETTA:  Just to clarify, we are solely

9    talking about the messages at issue subject to like I believe

10   Exhibit E here?  Or are we just talking in general, Your Honor?

11         THE COURT:  I'm talking in general as to the form of

12   production that you used for the ESI that's been disclosed in

13   this case.

14         MR. CHIAPPETTA:  Okay.  Well, it -- it varies

15   depending upon what has been produced, because, I mean, as part

16   of Mr. Fannin's exhibits, we have TikTok comments, which I

17   believe the Court has also found that that is a unilateral

18   communication; it doesn't fall within the request.  It's an

19   attempted communication.  So a screenshot of that may be very

20   different than, you know, direct messages through an app.

21         THE COURT:  All right.  Well, in this case, let's

22   start with this.  Mr. Jackson-Fannin did not request a form for

23   the production of the documents in this case, correct?

24         MR. CHIAPPETTA:  That is correct.

25         THE COURT:  So there's a requirement for you to

1    main- -- to produce it in a form in which it is ordinarily

2    maintained or in a reasonably usable form.

3         And is your position that all the documents you've

4    produced to date are in a reasonably usable form?

5         MR. CHIAPPETTA:  I -- our position is, is that out of

6    the documents at issue in this particular case, it compromises

7    (verbatim) roughly 2 percent of the overall production.  And

8    while they may not be searchable, that -- the request --

9    that -- defendants' request is not proportional in light of the

10   volume of production.

11        THE COURT:  I do see from your response to the motion

12   that you're indicating that there's only a subset of the

13   documents that are at issue, correct?

14        MR. CHIAPPETTA:  That is -- with regards to what is

15   docket 178-5, that's what I'm referring to as the subset of

16   documents, where there's multiple duplicates contained therein.

17        THE COURT:  All right.  Mr. Jackson-Fannin, can you

18   maybe clarify to the Court as to the volume or the breadth of

19   documents that are at issue with regard to the compliance with

20   Subsection (ii) of Rule 34(E).

21        MR. JACKSON-FANNIN:  Your Honor, it would be the

22   documents that we've listed in Exhibit E at docket entry 178-5.

23   That was the complete list of the JPEG files that we receive --

24   well, actually the screenshot files.  Not all of them are all

25   JPEGS.  And then there were some that was just inaccessible

1   files.

2              However, we did receive a number of native files.  We

3   are not taking issue with those.

4              THE COURT:  Okay.

5              MR. JACKSON-FANNIN:  And so it's just -- our motion

6   really is focused on the screenshotted information that we

7   received.  And I believe it's captured in the

8   1,400-and-some-odd line items that we have here that's been

9   listed in the index at 178-5.

10             THE COURT:  Okay.  So it's Exhibit E then.

11             All right.  So then narrowing it down to Exhibit E,

12  Mr. Chiappetta, what you're saying is that these messages --

13  all of these documents are produced in a reasonably usable

14  form, or there's a certain portion of them that are not?

15             MR. CHIAPPETTA:  On page 3 of my response it outlines

16  exactly what those documents are once you collapse all the

17  duplicates.  And they're all instant messages or direct

18  messages.  So given that they were screenshots, I'm going to

19  say that they're not reasonably usable in light of the Court's

20  definition.

21             THE COURT:  Okay.

22             MR. CHIAPPETTA:  They're not searchable.

23             THE COURT:  Okay.  They certainly are not searchable.

24  All right.  So are you able to identify any documents in

25  Exhibit E that your client will not be able to produce in any

1    format other than a JPEG or a screenshot?

2         MR. CHIAPPETTA:  I -- with regards to Exhibit E, I --

3         THE COURT:  Yeah.  Exhibit E is the list that

4    Mr. Jackson-Fannin --

5         MR. CHIAPPETTA:  Yeah.

6         THE COURT:  -- is referring to of the documents

7    they're taking issue with about the form of production.

8         MR. CHIAPPETTA:  I believe my client can attempt to

9    download those directly from the third-party apps, but whether

10   or not he's going to be able to, that I do not have knowledge

11   of at this time.

12        THE COURT:  Mr. Jackson-Fannin, your clients

13   submitted their phones, had them downloaded, and had all these

14   messages -- social media text messages, all produced in some

15   sort of native format; is that correct?

16        MR. JACKSON-FANNIN:  Correct, Your Honor.  We had the

17   phones imaged.  And with respect to the ESI protocol that

18   counsel and I had agreed upon, we then had the third-party

19   vendor search the phones and to sort of collate the data that

20   corresponded with that.

21        MR. CHIAPPETTA:  Your Honor, if I may?

22        THE COURT:  Sure.

23        MR. CHIAPPETTA:  With regards to those cell phones,

24   only 80 documents have been produced.  And this is the subject

25   of the next motion on the Court's list.

1          THE COURT:  All right.  I'm not talking about what

2    they've produced so far, I'm just talking if they were able to

3    get the material off of the phone and have it in some sort of

4    electronic format outside of screenshots which your client

5    provided.  That's what I'm trying to get it.

6          MR. CHIAPPETTA:  So --

7          MR. JACKSON-FANNIN:  And the answer to the Court's

8    question is yes.

9          THE COURT:  All right.  Okay.  So Mr. Chiappetta,

10   again, going back to Exhibit E, which is the documents that are

11   in dispute concerning their form, are there any that you can

12   tell me that your client is not capable of producing in a

13   format that complies was Subsection (ii)?

14         MR. CHIAPPETTA:  Not at this time.

15         THE COURT:  All right.  So I'm going to grant the

16   renewed motion to compel.

17         Mr. Chiappetta, you've heard the Court's ruling that

18   I now find that both subsections of Rule 34(E) apply to the ESI

19   production in this case.  So that means you're going to have to

20   reformat the production that was provided by your client.

21         Now, whether you want to produce it and have it

22   labeled consistent with the -- correspond to the categories of

23   requested or produce the documents as they are kept in the

24   usual course of business under Subsection (i), I'll leave that

25   up to you.  That's your choice.

```
 1            And then as for Subsection (ii), you have to produce
 2   them in a form in which they're ordinarily maintained or
 3   reasonable usable form -- reasonably usable form.
 4            How long will you need to get that done?
 5            MR. CHIAPPETTA:  And this is only in regards to
 6   Subsection (E), correct?
 7            THE COURT:  This is in regards to Subsection (E),
 8   yes.  (E)(i), (E)(ii).
 9            MR. CHIAPPETTA:  No, I'm talking -- I apologize, Your
10   Honor.  I'm referring to docket 175 dash -- or 178-5.
11            THE COURT:  Okay.  Exhibit E?
12            MR. CHIAPPETTA:  Yes.
13            THE COURT:  Okay.  Those are the documents that
14   Mr. Jackson-Fannin has identified as they're taking issue with
15   the form of the request.
16            MR. CHIAPPETTA:  Okay.  I would request 40- --
17            THE COURT:  But that's only with regard to Subsection
18   (ii).  Subsection (i) covers the entirety of their production.
19            Is that correct, Mr. Jackson-Fannin?
20            MR. JACKSON-FANNIN:  Yes, Your Honor.
21            THE COURT:  Okay.
22            MR. CHIAPPETTA:  Okay.
23        (Pause in proceedings.)
24            MR. CHIAPPETTA:  Okay.  I would ask for somewhere
25   between 45 to 60 days because I'm going to have to hire a
```

1    vendor in order to comply, Your Honor.

2          THE COURT:  All right.  What we'll do is we'll give

3    you 60 days.

4          MR. CHIAPPETTA:  Thank you, Your Honor.

5          THE COURT:  All right.  And the final request, which

6    was for sanctions under Rule 37, I'm not going to sanction

7    Mr. Chiappetta in this case.  As I've discussed at several

8    points in this hearing, there is not a clear line of authority

9    as to whether Subsections (i) and (ii) apply in this case, and

10   beyond that, what exactly constitutes compliance with

11   Subsections (i) and (ii).

12         So I am going to find that Mr. Chiappetta's conduct

13   in this case and the production was sufficiently reasonable

14   under the uncertain case law, but I'm not going to impose

15   sanctions.

16         MR. JACKSON-FANNIN:  Understand that that was one

17   aspect of our Rule 37 request, Your Honor.  However, we do have

18   the issue with respect to Mr. Chiappetta's belated withdrawal

19   of his objections to request numbers 7, 8, and 18.

20         We had previously briefed that at docket entry 129,

21   pages 6 through 11.  And at our last hearing before Your Honor,

22   I believe at the October 15th hearing, Your Honor did not

23   request additional briefing on that.  But we did include that

24   briefly within our motion and also within our prayer for

25   relief.

1          THE COURT:  Can you show me where that is in the

2     motion?

3          MR. JACKSON-FANNIN:  Yes, Your Honor.  In -- on page

4     16 at docket entry 178, Section C.  And like I said, it's also

5     at docket entry 129, pages 6 through 11.

6          THE COURT:  Okay.  Give me one second.  I am on

7     docket entry 178.

8          (Pause in proceedings.)

9          THE COURT:  All right.  Let me come back to that at

10    the end of the hearing.

11         MR. JACKSON-FANNIN:  Fair enough, Your Honor.

12         THE COURT:  All right.  So 178, for purposes of the

13    record, I have granted the motion to compel finding the prior

14    production by Noshirvan insufficient under Rule 34, Subsection

15    (E).  And I have ordered Mr. Noshirvan to review and revise his

16    discovery production to comply with Rule 34(E) and given him

17    60 days to do so.

18         I have denied the request for fees and costs

19    concerning the failure to comply with Rule 34(E).

20         I will come back to the issue about the withdrawal in

21    a moment.

22         All right.  Anything further on that one,

23    Mr. Jackson-Fannin?

24         MR. JACKSON-FANNIN:  No, Your Honor.

25         THE COURT:  Anything on your end, Mr. Chiappetta,

1  with regard to docket 178?

2         MR. CHIAPPETTA:  No, Your Honor.

3         THE COURT:  Lastly, we then have docket 181, which,

4  as I mentioned, is Noshirvan's motion to compel directed to

5  defendant Ralph Garramone.  Given the organization of the

6  motion, I'm going to take the issue -- because the arguments

7  are raised in paragraphs, to I'm going to refer to the

8  arguments made in each specific paragraph to keep us all on

9  track of where we are.  And I will take them in order.

10         So as I see -- as I read the motion, and according to

11  my notes, the first argument presented in the motion is at

12  paragraph 4, and it states, quote, "To date, GPS has only

13  produced 86 of 8,565 documents.  And GPS recently refused to

14  produce the remaining responsive documents because it wants a

15  confidentiality agreement or protective order in place.  But

16  this Court has already denied the same."

17         Mr. Chiappetta, as I see it, those remaining

18  documents, the 8,565 that are still at issue, were addressed in

19  my prior order for them to produce documents in the 45 days.

20  Is that correct?

21         MR. CHIAPPETTA:  I -- I don't recall in relationship

22  to Garramone Plastic Surgery if this was at issue.

23         THE COURT:  Oh, okay.

24         Mr. Jackson-Fannin, then, let me hear from you.

25         MR. JACKSON-FANNIN:  Your Honor, no, my client was

1    not directed --

2            THE COURT:  Oh, that's right.

3        (Simultaneous speaking.)

4            MR. JACKSON-FANNIN:  -- to --

5            THE COURT:  I had your client and Mr. Alfano's client

6    confused because of the personal versus the business.  But go

7    ahead.

8            MR. JACKSON-FANNIN:  Well -- well, just to briefly

9    respond to the point, Your Honor, is that it's not accurate to

10   say that we have only produced 86 of 8,565 documents.  The

11   8,565 documents correspond to what was captured in our hit

12   report that counsel had attached to his motion.  However, that

13   translates into far more documents than that.

14           And we have started to produce a number of the text

15   messages.  And I believe it may have been, oh, somewhere about

16   191 of them and things of that nature.

17           But again, it's 25,000 text messages that we have to

18   go through.  It's a very detailed process because we have to

19   not only review for responsiveness, but we also have to review

20   for privilege simultaneously.  And it's through our data

21   management software that we have to go through.  And it's just

22   a very time- and labor-intensive process that we have to engage

23   in.

24           And also, it's not true that the parties did not

25   agree to search terms in late August.  We did not come to an

1  agreement as to the ESI search terms until October the 3rd,

2  Your Honor.  And I also have -- if the Court should care to

3  look at it, I have the correspondence exchange with counsel on

4  that point.

5         THE COURT:  All right.  So based upon your

6  representation, then, you have done the search terms and found

7  the hits, and you're just in the process of reviewing them and

8  producing them as you determine them to be relevant to the

9  requests?

10        MR. JACKSON-FANNIN:  Correct, Your Honor.  And we

11 also do have a concern regarding the Court's previous denial

12 without prejudice of the request for a confidentiality order.

13 We did send a narrowed version in draft over to counsel last

14 Tuesday for his consideration with a request to confer.  We

15 have not heard back from counsel on that.  But that certainly

16 will be another issue that's forthcoming for the Court's

17 consideration.

18        THE COURT:  How much -- how many documents do you

19 have left to review in response to the -- to the hits?

20        MR. JACKSON-FANNIN:  Your Honor, I think that we

21 probably may have somewhere in the neighborhood of about 10,000

22 text messages to continue to go through.  We sort of came to a

23 pause.  We had the stay that intervened.  We had new co-counsel

24 that came in.  And we were just trying to -- it was a lot of

25 moving parts.

1    So we're about a little more than halfway through

2  that chunk in terms of reviewing.

3    THE COURT:  All right.  So how much longer do you

4  need to complete that review and get those documents over to

5  Mr. Chiappetta?

6    MR. JACKSON-FANNIN:  Well, Your Honor, I would ask

7  that -- if we had to put a deadline to it, I would make it

8  co-terminus with Dr. Garramone and Ms. Couture's production

9  deadline, which should be 45 days from today.  That way we can

10  keep things nice and tidy.  And/or either the 60-day deadline

11  that Mr. Chiappetta was given to provide his supplementary or

12  renewed production to GPS.  In fact, I think that it may be

13  better if we have the 60 days to do it so that we have a nice,

14  neat bow and it's sort of a simultaneous exchange of documents

15  between those parties.

16    THE COURT:  All right.

17    Mr. Chiappetta?

18    MR. CHIAPPETTA:  Well, our position here is, is that

19  discussions occurred in August.  Throughout September we had a

20  tentative agreement for October 14th.  GPS had their search

21  terms narrowed down by October 2nd.  It's been now close to

22  45 days and now they're asking for another 60 days when

23  originally they were refusing to -- expressly refusing to

24  produce solely based upon a nonexistent protective order.

25    And so our position is, is that they need to produce

1   these documents in a more timely fashion than Mr. Fannin has

2   just suggested or proposed to the Court, Your Honor.

3          THE COURT:  All right.  I'm going to order 45 days so

4   it's consistent with the production from Ms. Couture and

5   Dr. Garramone, so that way we can keep the defense on the same

6   page about what you're producing and when, all right?

7          MR. JACKSON-FANNIN:  Sounds good, Your Honor.

8          THE COURT:  And as for the protective order, I

9   understand that may be an issue.  You should get in front of

10  the Court sooner rather than later to keep that from -- that

11  45 days from being delayed any further.

12         The issue with the protective order is its breadth.

13  It can't be that "I just want to protect everything because I

14  find it embarrassing" or "I find that I don't want to" -- "I

15  don't want to disclose the name of a particular employee."  But

16  that's not necessarily protected under Rule 26.  Something

17  narrower which identifies, like, business information or

18  specifically the categories that are outlined in Rule 26, I'm

19  happy -- and I think that's appropriate here.  But I just can't

20  enter a protective order that gives both side carte blanche to

21  protect whatever it is that they want.

22         MR. JACKSON-FANNIN:  We understand the Court's

23  position on that.  And I believe that the draft that we

24  proposed to counsel captures the Court's sentiments in that

25  regard.

1          Nick, we look forward to receiving your response and

2     conferring on that matter.

3          THE COURT:  Do you have a copy of it?

4          MR. CHIAPPETTA:  I do not.

5          I have a comment that I'd like to put on the record,

6     because a lot of what's at issue -- I think GPS took issue with

7     names or a phone number being filed.  But in docket 178, GPS is

8     guilty of the same conduct --

9          THE COURT:  Look, I don't need the back-and-forth.

10          MR. CHIAPPETTA:  I understand.

11          THE COURT:  I don't -- I think a limited protective

12     order is appropriate here for the reasons I stated in the other

13     order.

14          But on the flip side, if your client's going to start

15     taking all of this information, just plastering it all over the

16     internet because they want to, I don't need to hear it.  I

17     don't want this to turn into a free-for-all.  And we'll get

18     into some of the issue with that with these -- these later

19     document requests.

20          This is not a witch hunt to find out information --

21     bad information about your client, and it's not a witch hunt

22     for your client to find out bad information about Dr. Garramone

23     and Ms. Couture.  This is a factfinding mission about the

24     claims at issue in this case, not, for example, whether

25     Dr. Garramone took PPP loans.

1          I mean, there is -- there's a limited view of the

2     claims and defenses in this case.  And I feel like part of

3     discovery has been:  Oh, let's see if we can find some dirt on

4     either side so we can go plaster it all over the internet.

5          If that's going to be the case, then not only am I

6     going to put a broader protective order in place, but I'm also

7     going to start sanctioning the parties for the conduct that is

8     clearly outside the bounds of litigation.

9          Mr. Chiappetta.

10     MR. CHIAPPETTA:  I just want to put this on the

11     record because Your Honor has stated my client.  My -- I am

12     kind of at a loss because my client does not post any filings

13     from this case as it relates to this as far as I'm aware,

14     perhaps other than maybe like a court order dismissing a party

15     or something like that, which I believe is open to the public.

16     So I just don't want my client to be confused with

17     Mr. McGibney.

18          THE COURT:  All right.  45 days, Mr. Jackson-Fannin.

19          MR. JACKSON-FANNIN:  Thank you, Your Honor.

20          THE COURT:  Moving on to paragraph 5 then.  For

21     purposes of the record, I'm going to grant the motion to compel

22     with regard to paragraph 4.  I'm going to order production of

23     the outstanding discovery of the search terms -- search term

24     hits within 45 days.

25          Moving on to paragraph 5, it says, quote, "In GPS

1    also served a privilege log wherein it claims that

2    communications with Joseph A. Camp are privileged.  A copy of

3    GPS's amended privilege log is attached as Exhibit E.  GPS

4    claims that attorney/client and work-product privilege to

5    communication with Camp but does not explain how that privilege

6    has not been waived if Camp is not a GPS employee or an

7    agent/investigator for Trainor."

8            All right.  So I have taken a look at the privilege

9    log.  Mr. Jackson-Fannin, there are quite a few emails on here

10   where I see Joseph Camp is included as a recipient or cc'd on

11   it in some fashion.  And then you are claiming some sort of

12   privilege.  Can you explain to me how the inclusion of a third

13   party, such as Camp, does not waive any privilege?

14           MR. JACKSON-FANNIN:  Well, Your Honor, it was a

15   little bit different.  And this is what we do take issue with

16   Mr. Chiappetta's motion in this regard.

17           Prior to filing this motion I'd informed counsel that

18   we were not going to be maintaining the attorney/client

19   privilege as to certain communications that were listed in the

20   amended privilege log with respect to Mr. Camp.  And I can go

21   through those very quickly.

22           On the log, it would be line item 1 --

23           THE COURT:  Let me get it in front of me.

24           MR. JACKSON-FANNIN:  Sure.

25           THE COURT:  All right.

1      MR. JACKSON-FANNIN:  Line item 1; line item 2; line

2  item 11, the first part, which is Bates number GPS privilege 91

3  through 94; line item 15; line item 18; line item 47.

4      THE COURT:  Hold on one second.  Line item 18 and

5  line item . . .

6      MR. JACKSON-FANNIN:  47, both top and bottom.

7      THE COURT:  Okay.

8      MR. JACKSON-FANNIN:  And further, Your Honor, we had

9  informed Mr. Chiappetta that we would be providing a further

10  amended privilege log, but because we were in the middle of our

11  document production and we were still reviewing for privilege,

12  we preferred not to do it in a piecemeal fashion and have to

13  continuously provide an amended privilege log, where we would

14  just provide one solid final amended privilege log at the

15  completion of our document production.

16      So we find it a bit disingenuous that he's taking

17  issue, particularly with what our discussion was and a knowing

18  withdrawal of that particular privilege assertion, as to those

19  points that were listed in our amended privilege log.

20      THE COURT:  All right.  I see there are a few emails

21  that are still left on here containing Joseph Camp that you did

22  not withdraw.

23      MR. JACKSON-FANNIN:  I'm sorry, if you could just

24  point me to those, Your Honor.  I thought that I had captured

25  all of them.

1          THE COURT:  14.

2          MR. JACKSON-FANNIN:  Ah.  That should have been on

3    the list.  Sorry, I thought I said it.  Maybe I was flipping

4    the pages too fast.  But 14, yes.

5          THE COURT:  And one more.  48.

6          MR. JACKSON-FANNIN:  I'm sorry, Your Honor, you said

7    48?

8          THE COURT:  48, yes.

9          MR. JACKSON-FANNIN:  Hold on just a second.  That's

10   just a work-product assertion, Your Honor, on 48.  That's not

11   an attorney/client privilege assertion.

12         THE COURT:  Okay.  How -- how does Joseph Camp fall

13   under the work-product doctrine?

14         MR. JACKSON-FANNIN:  Well --

15         THE COURT:  Is he -- are you now considering him an

16   employee of some kind or . . .

17         MR. JACKSON-FANNIN:  Well, Your Honor, he was working

18   for the practice in terms of trying to, I guess, do online

19   reputation restoration.  And the -- at a certain point within

20   the year he was asked to do certain things and certain

21   fact-gathering by the practice's prior counsel, which is

22   Mr. Trainor.  So we believe that we had a good-faith basis to

23   assert privilege pursuant to the work-product doctrine as to

24   those particular documents.

25         THE COURT:  All right.  So, Mr. Chiappetta, as far as

1    I can see, they have withdrawn the attorney/client privilege

2    but they continue to assert some sort of work product.  But as

3    I understand it, there's still further amendments to be made to

4    the privilege log.

5            So my inclination, before you say anything, would be

6    to deny this without prejudice, allow them to finalize their

7    privilege log.  To the extent that they remain -- Joseph Camp

8    remains in there for whatever reason, at that time you could

9    file a motion.  I'll do an in-camera review and we can make a

10   decision about whether he falls under that work-product

11   privilege or not.

12           MR. CHIAPPETTA:  Okay.

13           THE COURT:  But I'd like to hear from you whatever

14   you would like to say now.

15           MR. CHIAPPETTA:  We can wait.  Since Your Honor has

16   already ordered GPS to produce documents in 45 days, as long as

17   that privilege log is forthcoming in that same 45-day period,

18   then I can wait the 45 days and renew the motion as --

19           THE COURT:  All right.

20           Anything further, Mr. Jackson-Fannin?

21           MR. JACKSON-FANNIN:  No, Your Honor, not as to that

22   particular issue.

23           THE COURT:  Okay.  So paragraph 5 I'll deny without

24   prejudice.

25           Paragraph 7, quote, "GPS response to Noshirvan's

1    first request for production contains random general objections

2    to this Court previously warned the parties about.  Second,

3    those general objections are inconsistent with the civil

4    discovery handbook."

5         I don't need to hear argument on this.  I agree the

6    objections that are stated at the beginning that allegedly to

7    apply to the whole are not proper.  They're not consistent with

8    the discovery handbook or Rule 34(B), which states, quote, "The

9    grounds for objecting to any interrogatory or document request

10   must be stated with specificity."

11        Case, *Doe vs. Rollins College,* 2019 Westlaw 11703980

12   explains why general objections that are supposed to apply to

13   every request -- I'm sorry, every answer that follows are not

14   permissible.  To the extent that there's an objection, it

15   should be asserted under each specific discovery request that

16   is made.

17        So in the future, just try to avoid the general

18   objections at the beginning of the response.

19        MR. JACKSON-FANNIN:  Your Honor, if I may be heard on

20   that --

21        THE COURT:  Sure.

22        MR. JACKSON-FANNIN:  -- just briefly.  I'm looking at

23   our response, and I'm not sure where we're referring to that we

24   made general objections that were applicable to all of the

25   responses that follow.

1          We made objections to the definitions and

2    instructions, but they were specific as to each definition

3    and/or instruction.  And that was attached to the motion at

4    document -- entry 181-2, but it's on pages 3, 4 -- 3 and 4.

5          THE COURT:  All right.  But those objections that

6    you're saying to the definitions, right, that would carry

7    through throughout the remainder of it.  So, for example, you

8    say --

9          MR. JACKSON-FANNIN:  Uh-hmm.

10          THE COURT:  -- "I object to the Garramone Plastic

11    Surgery's definitions of 'you' and 'your' as to include any

12    attorney," but then you carry that through.  And every time he

13    requests for "you" or "your," that objection is then

14    reasserted, correct?

15          MR. JACKSON-FANNIN:  Well, yes, to the extent that we

16    have provided and informed the limitation of our response

17    pursuant to the objection.

18          So I guess maybe is it -- am I misunderstanding the

19    Court's position, is that we should -- instead of actually

20    placing our objections to the definitions and instructions as

21    they appear within the requests themselves, but we should put

22    them --

23          THE COURT:  You should put them --

24          MR. JACKSON-FANNIN:  -- into each request separately?

25          THE COURT:  -- each request, where it identifies

1    "your" -- if -- for example, if you are objecting to the

2    definition of "you" or "your" --

3         MR. JACKSON-FANNIN:  Uh-hmm.

4         THE COURT:  -- if there's a request that says "you"

5    or "your," you should put the objection there as opposed to at

6    the beginning.

7         MR. JACKSON-FANNIN:  Okay.

8         THE COURT:  So that way I can identify which one it

9    pertains to, as opposed to having to then look at the request,

10   go back up to your definition, see if it meets any of those

11   definitions that you objected to, have to then incorporate that

12   essentially by reference, as opposed to just seeing it all

13   right there.

14        So for the future, just try to do that.

15        MR. JACKSON-FANNIN:  Understood, Your Honor.

16        THE COURT:  I don't think it makes -- for purposes of

17   today and the substance, it doesn't make any difference.  The

18   objections that were raised to the definitions don't have any

19   play, or don't pertain to any of the further argument on the

20   merits that we're going to get into in the next few paragraphs.

21        MR. JACKSON-FANNIN:  Understood, Your Honor.  Thank

22   you.

23        THE COURT:  Moving on, then, to paragraph 8, it says,

24   quote, "GPS erroneously asserts 'none' for communications and

25   monetary transfers to Camp.  GPS's responses are not true or

1    accurate," end quote.

2         All right, Mr. Chiappetta, is what you're saying that

3    they've answered "none," but that's just not correct?

4         MR. CHIAPPETTA:  That is the -- accurate, Your Honor.

5    What is happening is we've received some documents that show

6    monetary transfers.  We've received some communication from

7    people where GPS is indicating "none."  So our issue is because

8    GPS is indicating "none" but producing documents with these

9    individuals' names or otherwise responsive, we don't know

10   whether or not the production is complete because GPS doesn't

11   even know.

12        THE COURT:  All right.  Mr. Jackson-Fannin, let me

13   ask you, I did -- I mean, of course your client is entitled to

14   answer "none" if they believe there is none, but obviously with

15   me reviewing the privilege log I can see that there's some

16   communications with Camp.  So I don't know if "none" is an

17   accurate answer.

18        MR. JACKSON-FANNIN:  Your Honor, when these initial

19   written responses were due, we were not aware that we actually

20   had them.  Based after that, we have documents that we found

21   that were responsive, so we produced them.

22        Counsel again knows, as I told him previously, and

23   prior to the filing of this motion, that we will need to

24   supplement our written responses.  And so I am at somewhat of a

25   loss understanding what the nature of the motion to compel was,

1    because counsel clearly is already in possession of responsive

2    documents and already knows that we have not yet completed our

3    document production.

4            So further supplementation will be necessary from our

5    end, not only to further amend the privilege log as we just

6    discussed, but also to supplement our written responses.  To

7    the extent that there are some that we now know have responsive

8    documents, we will certainly provide a changed response from

9    "none."  But there are a number of them that we still have not

10   uncovered any responsive documents to and that they will remain

11   as "none."

12           THE COURT:  Okay.  So what I'm going to do is I'm

13   going to grant the motion with regard to paragraph 8.

14           Mr. Jackson-Fannin, just provide the updated answers

15   once you complete the document production within the 45 days as

16   we've already discussed.

17           MR. JACKSON-FANNIN:  Okay.

18           THE COURT:  And if it's none, then obviously it stays

19   as "none."  If there's some in there, just answer identifying

20   the -- where in the documents those communications took place.

21           MR. JACKSON-FANNIN:  Understood, Your Honor.

22           THE COURT:  Moving on to paragraph 9, which

23   identifies three requests in dispute, those being 5, 43, and

24   45, I'll take them in turn.

25           First, request number 5 is, quote, "Produce a

1  complete copy of every social media profile you have owned

2  since January 1st, 2019, through date certain" -- sorry,

3  "through date current.  This request includes deleted accounts,

4  instant messages, group chats, all posts, and comments."

5       All right.  The response is a lengthy series of

6  objections which I do not -- I will not repeat here but can be

7  found in the record.

8       And I think I understand the relevance,

9  Mr. Chiappetta, is what you're saying is, based upon your

10  response, the parties here -- the conspirators conversed via

11  social media, so you want copies of those communications,

12  correct?

13       MR. CHIAPPETTA:  That is accurate, Your Honor.

14       THE COURT:  All right.  The problem I have is that

15  you just haven't asked for that, you've asked for every social

16  media profile, "includes deleted accounts, instant messages,

17  group chats, posts, and comments."  So, I mean, you're asking

18  for their entire social media history for a period of -- well,

19  now five years.

20       MR. CHIAPPETTA:  I --

21       THE COURT:  Why is the breadth -- why is it not

22  overbroad?

23       MR. CHIAPPETTA:  I'm willing to limit it to direct

24  messages and comments as it relates to any matter related to

25  this second amended complaint for purposes of Garramone Plastic

1  Surgery's social media, is really all I need from this request,

2  Your Honor.

3  THE COURT:  Well, then why didn't you ask for it in

4  the first place?

5  MR. CHIAPPETTA:  At the time it was written I didn't

6  know what I needed.  I have a better understanding of what I

7  need at this point.  And really, it's the direct messages and

8  the comments as it pertains to social media.

9  THE COURT:  Okay.  The direct messages between who?

10  MR. CHIAPPETTA:  Well, that's -- there's a huge list

11  of potential people that it could be.

12  THE COURT:  Okay.  But you can identify those --

13  MR. CHIAPPETTA:  Okay.

14  THE COURT:  -- because, you know, you brought a

15  conspiracy claim.  And so part of a conspiracy claim is you

16  have to know who the conspirators are.

17  MR. CHIAPPETTA:  So I can give a list now off the top

18  of my head.

19  THE COURT:  What I'm going to do is I'm going to deny

20  request number 5.  I think it's facially overbroad and not

21  proportional to the needs of the case.  It falls into the

22  bucket of a lot of discovery requests that I've already seen

23  from both sides in this case that seek everything under the

24  sun, when in reality, as I've commented before, this case is

25  not that broad.  So I'm going to deny it.

1    You can issue a new request.  You can identify the

2  co-conspirators.  And you can seek, you know, any

3  communications between them, which I think you've already asked

4  for in other document requests.  So I'm going to deny number 5.

5  I think it's overbroad.

6    Anything on your end, Mr. Jackson-Fannin?

7    MR. JACKSON-FANNIN:  No, Your Honor.  We'll ask --

8  we'll accept the Court's sustaining of our objection.

9    THE COURT:  All right.  And moving on to request

10  number 43, quote, "Produce a complete copy of your Instagram

11  profile.  Include all followers and pages you are following as

12  it was on October 9th, 2023."

13    There are a series of objections which, again, given

14  their length, I won't read into the record but are available on

15  the Court's docket.

16    Let me ask Mr. Chiappetta, how -- do you know, is it

17  possible to produce a copy of an Instagram profile as of a

18  certain date?

19    MR. CHIAPPETTA:  I don't know.  If it is possible, it

20  would -- the request would have to occur through Instagram.

21    THE COURT:  Mr. Jackson-Fannin, do you know if it's

22  possible to reproduce an Instagram profile including followers

23  and pages you are following as of October 29th, 2023?

24    MR. JACKSON-FANNIN:  Your Honor, we have tried to do

25  a little bit of research into this issue when we were initially

1    trying to formulate a response.  To my knowledge, it is not

2    possible.  However, we will, and have tried -- we were

3    unsuccessful in our attempt to contact Instagram to see whether

4    or not they had the ability to be able to go back either via

5    like a Wayback Machine or whatever to see whether or not --

6    Wayback Machine.

7             THE COURT:  Get in the DeLorean, we'll go back and

8    see what --

9             MR. JACKSON-FANNIN:  Exactly, exactly.

10             THE COURT:  All right.

11             MR. JACKSON-FANNIN:  So long as we get to 88 miles

12    per hour.

13             But I don't believe -- we have not been able to find

14    that it's possible to go back in history and actually download

15    a full profile from Instagram as of a specific date.  We do not

16    believe it's possible, but, however, we can inquire just to

17    see.

18             THE COURT:  All right.  Let me -- Mr. Chiappetta,

19    it's clear that you're looking for something specific with

20    regard -- you have a very specific date in there.  Are you

21    trying to figure out what they were following?  Is there

22    another way to try to seek that information?  Because I'm not

23    aware -- again, and I haven't looked at it, but --

24             MR. CHIAPPETTA:  My concern, Your Honor -- I

25    apologize, I did not mean to interrupt you.

1          THE COURT:  No, no, go ahead.

2          MR. CHIAPPETTA:  My concern is, is that after the

3    date, you know, comments may have been posted or comments may

4    have been taken down and/or followers may have dropped off or

5    deleted their profiles.  So I was trying to capture something

6    specific on a date.  And without giving it all away, it is

7    directly related and even in the second amended complaint.

8          THE COURT:  Okay.  Have you subpoenaed Instagram to

9    try to get this information?

10          MR. CHIAPPETTA:  I have not, but all my subpoenas to

11   every provider to date, absent consent, is limited to basic

12   user information as far as what I'm receiving.

13          THE COURT:  Okay.  So they haven't been very

14   cooperative?

15          MR. CHIAPPETTA:  That is correct.

16          THE COURT:  Not surprised.  And based -- given the

17   experience that we had with TikTok previously in talking about

18   your clients' download of information, I'm hard pressed to

19   believe that they can actually recreate an Instagram profile

20   from a specific date.

21          Mr. Jackson-Fannin, what I'll give you is I'll give

22   you an opportunity to try to recreate the Instagram profile,

23   followers and pages as it was on October 29th, 2023.  I think

24   it has some relevance.  The burden on your client is obviously

25   minimal because you just need to ask Instagram if this can be

1    done.  And if it can, then produce it.

2              What is it that's your specific objection to that --

3    to that narrow request?

4              MR. JACKSON-FANNIN:  Well, if -- well, I don't

5    necessarily know that the request itself has been narrowed

6    because I'm still at pains to figure out how the entire

7    profile, including followers and pages that were being

8    followed, is relevant to any of the claims that were asserted

9    in the second amended complaint.

10             If it was further narrowed, if he's trying to find

11   particular people who it may have been followed or pages that

12   were being followed, I could see that, but to have a broad

13   brush --

14             THE COURT:  Let me --

15             MR. JACKSON-FANNIN:  -- of the entire profile, to me,

16   it still seems a bit overbroad.

17             THE COURT:  Well, the profile would be, I mean, who

18   you're following and who follows you.  I mean, that's

19   presumably public if this was public at the time, correct?

20             MR. JACKSON-FANNIN:  Yes, I presume, if it was.  I'm

21   not that familiar.  I don't delve into social media too much,

22   so I'll have to accept the Court's representation on that

23   point.  But presumably yes, if it's on the internet, it is

24   available to the public.

25             THE COURT:  I see Ms. Couture nodding her head in the

1   background.

2            MR. JACKSON-FANNIN:  If my client says so, I'm going

3   with it, Your Honor, so yes.  But again, I just -- you know, if

4   that's the case and, you know, it's just a simple request to

5   Instagram, then no, I don't view that as being burdensome at

6   all.

7            THE COURT:  As I read the request, it's the profile

8   and followers and pages you are following.  So it's not

9   messages, nothing else, it's just essentially a snapshot of

10  what your public profile was at that time.

11           MR. JACKSON-FANNIN:  Okay.

12           THE COURT:  Mr. Chiappetta, can you go back to the

13  relevance?  You said there's something about it in the second

14  amended complaint that ties this request in.  So can you

15  illuminate me on what that is?

16           MR. CHIAPPETTA:  I believe there was -- there was

17  an -- a post that also was duplicated on Twitter that's

18  represented near the end of the complaint where it simply says

19  "I'm dotting the Is and crossing the Ts."

20           MR. JACKSON-FANNIN:  I have a copy of your second

21  amended complaint.  Want to take a look?

22           MR. CHIAPPETTA:  It's in there.  It was also posted

23  here.

24           THE COURT:  And so you want information about a

25  specific post?

1          MR. CHIAPPETTA:  Well, I want -- I want to see if

2   there's more, because I know that that one was on there at one

3   point.  So I might . . .

4          THE COURT:  It's okay.  Take your time.

5       (Pause in proceedings.)

6          MR. CHIAPPETTA:  My understanding, at page 53 of 132

7   I show a post, a comment from Twitter.  I believe that this --

8   a very similar post exists on Instagram.

9          THE COURT:  Okay.  What does the post say?  Can you

10  say it for me?

11         MR. CHIAPPETTA:  It's got fuedjunkie saying, "FAFO."

12  And then GPS saying, "Dotting all the i's and crossing off all

13  the t's now.  It's a matter of time" -- or a matter -- "it's a

14  matter of time for all of his victims to gather."

15         THE COURT:  Okay.  All right.  And you think that

16  there's possible -- an overlap with that comment and also on

17  Instagram for the company?

18         MR. CHIAPPETTA:  I believe back in October of '23 I

19  saw a similar post.

20         THE COURT:  Okay.  What I'm going to do,

21  Mr. Jackson-Fannin, is I'm going to order you to try to

22  reproduce a copy of the Instagram profile, which just includes

23  the pages and the pages you are following.  So as I understand

24  it, that's a public snapshot of the Instagram profile on that

25  date.

1          If that is not possible, then obviously that -- you

2   don't have to produce that.  But I think given the limited

3   scope of it, and there is some relevance that that is an

4   appropriate request.  We'll do the same 45 days as before?

5          MR. JACKSON-FANNIN:  Yes, Your Honor, that's fine.

6          THE COURT:  All right.  Anything further on number

7   43, Mr. Chiappetta?

8          MR. CHIAPPETTA:  No, Your Honor.

9          THE COURT:  Moving on, then, to request number 45,

10  "Produce your entire Twitter/X account, including all followers

11  and pages you are following as it was between 2022 and 2023."

12         There are a series of objections to that request

13  which I won't read into the record given their length, but they

14  are available on the docket.

15         Mr. Chiappetta, can you explain to me the relevance

16  here?

17         MR. CHIAPPETTA:  This is essentially the same request

18  as the request for Instagram, except -- as it relates to page

19  53 and communications between users and comments in that

20  regard.  I believe a lot of communications were occurring on

21  Twitter/X in '22 and '23, back when this whole issue arose.

22         THE COURT:  Okay.  And when you say there was

23  communications, do you mean private communications or public

24  communications?

25         MR. CHIAPPETTA:  Both.  I believe there were direct

 1    messages and also public comments slash incitement-type

 2    communications.

 3          THE COURT:  All right.  And do you know who the

 4    recipients or the originators of those comments were and

 5    communications?

 6          MR. CHIAPPETTA:  Well, for the one at issue on page

 7    53 it was feudjunkie and Garramone Plastic Surgery.  I --

 8    there's a bunch of potential recipients like Tiffany Chhoum,

 9    Cassandra D. Wilde.  You could go even further.  There's Misfit

10    Patriot is a potential person who could be in the direct

11    messages.  There's a lot of different people that could have --

12    that are likely involved in this.

13          THE COURT:  So for purposes of the public-facing

14    portion of Twitter, isn't -- aren't you able to see the

15    comments to any post that's still available from 2022 to 2023?

16          MR. CHIAPPETTA:  Not necessarily.  I don't believe

17    that GPS has maintained its Twitter account; or if it has, the

18    accounts that I have found -- I -- I have found three -- I

19    believe three Twitter accounts for Dr. Garramone and/or GPS.

20    And I don't believe any of them are live and active at this

21    point, or unlocked.

22          THE COURT:  All right.  So "live and active" is

23    different than "unlocked," correct?  Locked means it's live,

24    it's just private.

25          MR. CHIAPPETTA:  Well, correct.  The ones that are

1    not private are not live or active anymore.  They're -- well,

2    live is there is a profile but there's nothing really going on

3    on it, active.  And then I believe there may be one that was

4    locked last time I looked.

5            THE COURT:  All right.  I'm going to deny the motion

6    to compel with regard to number 45.  I have the same breadth

7    problem as was discussed with request number 5.

8            Mr. Chiappetta, if you want to send more targeted

9    requests asking for specific communications between people or

10   posts from a certain person, I'm fine with that.  But producing

11   an entire account, followers, pages, for a multi-year period, I

12   don't find it proportional at this time.

13           Mr. Jackson-Fannin, anything to add?

14           MR. JACKSON-FANNIN:  No, Your Honor.  We will accept

15   the Court's determination on that issue.

16           THE COURT:  All right.  Moving on, then, to paragraph

17   10.  Paragraph 10 identifies two discovery requests in dispute,

18   that being number 21 and 22.  I'll take them in order.

19           Request 21 says, quote, "Produce any documents and

20   ESI in your possession, custody, or control between you and

21   your former employees regarding Jennifer Maree Couture for the

22   past four years."

23           There are a host of objections which I won't read

24   into the record which can be found on the Court's docket.

25           Mr. Chiappetta, how is this not overbroad in

1  proportion to this case?  Ms. Couture is an employee, and so

2  you're saying every document and email that mentions

3  Ms. Couture.  Tell me, what are you looking for here?  What is

4  the purpose of this request?

5          MR. CHIAPPETTA:  I'm looking for communications with

6  former employees that essentially had -- that were aware of or

7  made aware of the statements as stated by Ms. Holliday.

8          THE COURT:  Okay.  And what are those?

9          MR. CHIAPPETTA:  As they relate to this case?

10          THE COURT:  Yeah.

11          MR. CHIAPPETTA:  I believe her testimony was

12  something along the lines of is, "While I was working at GPS,

13  all the employees were made aware of what was going on with

14  regards to the January 22nd issue with Joseph Camp" and how --

15  and a lot of issues as it relates to the second amended

16  complaint.  Her declaration is on the docket if the Court needs

17  further clarity.

18          THE COURT:  Okay.  So these -- these -- from my

19  understanding is these employees were made aware of these

20  issues that you're talking about, and so what does that mean?

21  You want to question them about what they were told?

22          MR. CHIAPPETTA:  I would like to see who was made

23  aware of what.  And they may be potential witnesses, is what

24  I'm looking at.

25          THE COURT:  Okay.  And your method to do that is to

1  have them produce every document and electronic record between

2  you and former employees regarding Jennifer Maree Couture?

3          MR. CHIAPPETTA:  I agree that the scope of the

4  request is slightly larger than what it needs to be.

5          THE COURT:  Slightly larger?  I mean, if Couture is

6  sending an email to an ex-employee who left, said, "Hey, you

7  need to move your car in the parking lot, it's blocking

8  something," that falls under the request.  If an employee

9  emailed Couture and said, "Hey, I need time off," that falls

10 under the request because it's regarding Jennifer Couture

11 because she's included in the email.  I mean, it covers

12 everything.  Every scrap of paper that's from her, to her, or

13 is about her falls under this request, does it not?

14         MR. CHIAPPETTA:  I believe if it's read without

15 limiting its relevance, then yes.

16         THE COURT:  What do you mean read to limiting its

17 relevance?  There is no limit to the relevance in request

18 number 21.  It says, "Produce any document and ESI in your

19 possession, custody, or control between you and your former

20 employees regarding Jennifer Maree Couture for the past four

21 years," period.  There's no limitation about a subject matter

22 in there, is it?

23         MR. CHIAPPETTA:  No, not as written, Your Honor.

24         THE COURT:  Okay.  I'm going to deny the motion to

25 compel with number 21.  It's not proportionate to the needs of

the case.  Considering its breadth as I just outlined, as

drafted.  Request number 21 asks for every document or

electronic record in the possession or custody or control of

GPS for a four-year period that mentions Ms. Couture.  As I

indicated, that could cover a broad scope of nearly everything;

every email she sent, every email she received, and every email

between any employee who mentioned Ms. Couture.  I find that is

not proportional.

        Mr. Jackson-Fannin, anything to add on that?

        MR. JACKSON-FANNIN:  Nothing further with respect to

request number 21, Your Honor.

        THE COURT:  Okay.

        MR. CHIAPPETTA:  Your Honor, in light of your ruling

on 21, we'll just withdraw our request for 22.

        THE COURT:  All right.  Number 22 is withdrawn.

        Anything further, Mr. Jackson-Fannin, on number 22?

        MR. JACKSON-FANNIN:  No, Your Honor.

        THE COURT:  Moving on to paragraph number 11, which

identifies request number 23 at issue.  And request number 23

says, quote, "Produce all non-privileged documents and ESI in

your possession, custody, or control between you and Patrick

Trainor regarding Joseph A. Camp."

        And then there is a response that the -- and this one

is rather short, so I'll read it into the record.

        "Garramone Plastic Surgery objects to this request on

1    the grounds that it seeks to compel the production of

2    information that is duplicative of information sought in

3    requests 2, 6, 15, and 16.  As such, Garramone Plastic Surgery

4    refers plaintiff to its responses to requests 2, 6, 15, and 16

5    and incorporates the same as they are fully set forth herein."

6              All right.  Give me a second to look at 2, 6, 15, and

7    16.

8         (Pause in proceedings.)

9              THE COURT:  Okay.  All right.  And so,

10   Mr. Chiappetta, the relevance to this is you're saying you want

11   communications between Mr. Trainor that concern Joseph A. Camp?

12             MR. CHIAPPETTA:  That is correct.

13             THE COURT:  And the relevance being?

14             MR. CHIAPPETTA:  Well, we believe that Garramone

15   Plastic Surgery, Patrick Trainor, and Joseph A. Camp were all

16   in communications as it relates to the issues outlined in the

17   second amended complaint.

18             THE COURT:  Okay.  So essentially they're all part of

19   the same conspiracy?

20             MR. CHIAPPETTA:  That is correct.

21             THE COURT:  All right.  What about the problem with

22   Mr. Trainor being their lawyer at the time?

23             MR. CHIAPPETTA:  They haven't raised a privilege

24   issue with regards to this objection.  They have not raised

25   privilege to number 23.

1          THE COURT:  Hold on.  They say -- they incorporate 2,

2     6, 15, and 16.

3          MR. CHIAPPETTA:  Okay.

4          THE COURT:  16, I'm looking at it now, "Garramone

5     Plastic Surgery objects to this request on the grounds that it

6     seeks to compel the production of irrelevant information and

7     information that is otherwise protected from disclosure by the

8     attorney/client and attorney-work-product privileges.

9          MR. CHIAPPETTA:  Well, as it relates to that, to the

10    extent that it's just a communication between Mr. Trainor and

11    Garramone Plastic Surgery about Camp, I would argue that it's

12    likely attorney/client privilege would not apply because --

13    under the circumstances.  And I think it would be their burden

14    to raise those privileges and bring forth proof.  And to the

15    extent that they do, I would argue that the crime fraud

16    exception applies.

17         THE COURT:  All right.  Mr. Jackson-Fannin, have

18    you -- I understand that this -- clearly on its face it calls

19    for the production of attorney/client privileged information.

20    But the fact that information may be privileged does not --

21    does not necessarily mean you don't have to answer, it just

22    means that you can withhold it based on a privilege log.

23         MR. JACKSON-FANNIN:  Correct, Your Honor.

24         THE COURT:  So my question from the first perspective

25    is why should you not have to answer this at all?  Or should

1    you have to answer it and just identify those communications

2    between Patrick Trainor and your clients that concern Joseph

3    Camp on a privilege log?

4        MR. JACKSON-FANNIN:  Well, I think that we have done

5    that, Your Honor.  In part to the extent that we're still going

6    through and reviewing, we've done that.

7        And also, I believe that the information that's

8    sought in number 23 is duplicative of the information that was

9    sought earlier in 15, 16.  And those are the ones where we did

10   raise the privilege objections too.  So, I mean, we could

11   essentially repeat that and then maintain --

12       THE COURT:  Yeah, let me -- let me stop you there,

13   because you're right, I got lost with the duplicative issue.

14       Mr. Chiappetta, number 16 specifically, I'm looking

15   at it now, says, "Produce all non-privileged documents and ESI

16   in your possession, custody, or control that contain

17   communications between you and the Law Office of Patrick

18   Trainor, Esquire, LLC, for the last two years."

19       How does that not cover the same ground that we're

20   talking about with regard to number 23?

21       MR. CHIAPPETTA:  It's an entity, Your Honor.  I'm

22   seeking -- I'm seeking communications as opposed to individual

23   communications.  So that's why they're broken up.  They're

24   subtle distinctions between them, but they're not duplicative

25   as defendant posits.

        1          THE COURT:  Okay.  So number 16 asks for, again,

        2   non-privileged documents and ESI in your possession or control

        3   that contain communications between you and Patrick Trainor.

        4          And the one that you've got here says, "Produce all

        5   non-privileged documents" -- and this, again, is request number

        6   23 -- "produce all non-privileged documents and ESI in your

        7   possession, custody, or control between you and Patrick Trainor

        8   regarding Joseph A. Camp."

        9          MR. CHIAPPETTA:  Are you reading 15 or 16, Your

       10   Honor?  Because --

       11          THE COURT:  I'm -- I'm on 16.

       12          MR. CHIAPPETTA:  16 is the LLC.

       13          THE COURT:  Yep.

       14          MR. CHIAPPETTA:  So --

       15          THE COURT:  Isn't that who "you" is here, because

       16   these were served on Garramone Plastic Surgery.  So how is that

       17   not "you"?

       18          MR. CHIAPPETTA:  So Garramone -- so what 16 is asking

       19   for is communications between itself and the Law Office of

       20   Patrick Trainor, LLC.

       21          23 is asking for communications between Garramone

       22   Plastic Surgery and Patrick Trainor the individual regarding

       23   Joseph A. Camp.  There's a subtle distinction.

       24          Now, with regards to 15, 15 does not limit it to

       25   simply Joseph A. Camp.  15 has -- was objected to and has been

1  withdrawn.  I don't believe we've raised 15 as an issue here.

2         THE COURT:  And that's what I mean.  So if 15 is

3  broader than what you're requesting --

4         MR. CHIAPPETTA:  Yeah, so --

5         THE COURT:  -- then why does it not cover it?

6         MR. CHIAPPETTA:  Because we've withdrawn it and we're

7  seeking it under 23.

8         THE COURT:  Oh, I see.  Okay.  All right.  So

9  recognizing, then, the subtle distinction -- I don't

10 necessarily read it that way, but as Mr. Chiappetta outlined

11 it, there is some distinction between 23 and 16 and 15.

12        But Mr. Jackson-Fannin, your representation is you're

13 going to be -- you're going through the materials anyways, and

14 you're going to be producing and withholding whatever between

15 Mr. Trainor and your clients as appropriate anyways, correct?

16        MR. JACKSON-FANNIN:  Correct, Your Honor.  And this

17 is, of course -- I did not know that 15 was withdrawn.

18        MR. CHIAPPETTA:  We didn't raise it --

19        MR. JACKSON-FANNIN:  Unless we --

20        MR. CHIAPPETTA:  We didn't raise it in this motion.

21        THE COURT:  What he's saying is he didn't raise it in

22 this motion.

23        MR. JACKSON-FANNIN:  Oh, okay.  But the request

24 stands, correct?

25        MR. CHIAPPETTA:  Well, it's withdrawn now --

1          MR. JACKSON-FANNIN:  Okay.

2          MR. CHIAPPETTA:  -- in open court.

3          MR. JACKSON-FANNIN:  Okay.

4          THE COURT:  Okay.

5          MR. JACKSON-FANNIN:  All right then.

6          THE COURT:  So then what's --

7          MR. JACKSON-FANNIN:  Well --

8          THE COURT:  What's the prohibition in producing 23

9    then?

10         MR. JACKSON-FANNIN:  Well, then there is none in

11   light of counsel's now withdrawal of 15, because that

12   eliminates the basis of a duplicative request, because 15 was

13   broader and 23 would have been encompassed within that.  So now

14   that he is, I guess, limiting it more, and appreciating the

15   subtle distinction between the Law Office of Patrick Trainor,

16   Esquire, LLC, and Patrick Trainor the individual, then we

17   certainly will provide, I guess, a supplemental response to

18   that.  But do know that we will be probably and most likely

19   withholding documents based on the attorney/client privilege,

20   and we will log them accordingly.

21         THE COURT:  Okay.  So 45 days consistent with -- I'm

22   going to grant the motion to compel for 23.  And then 45 days,

23   Mr. Jackson-Fannin, is that sufficient with the rest of it?

24         MR. JACKSON-FANNIN:  Yes, Your Honor.

25         THE COURT:  All right.  Next up, then, is paragraph

1    12, which identifies document request number 26.  26 says,

2    quote, "Produce any documents and ESI in your possession,

3    custody, or control that shows Jennifer Couture was the victim

4    of sextortion or blackmail by Danesh Noshirvan."

5          The response was, "Garramone Plastic Surgery agrees

6    to produce responsive documents in its possession, custody, and

7    control."

8          Okay.  So is the outstanding issue just when are they

9    going to be produced, Mr. Chiappetta?

10          MR. CHIAPPETTA:  Well, I'm -- my understanding was,

11    is that the email production has already been completed and all

12    we're awaiting is the -- everything with regards to the 45 days

13    is only cell phone production.  So if that's -- if my

14    understanding is accurate, then either they -- those documents

15    have not been produced despite the agreement, or they have not

16    been labeled as such.

17          THE COURT:  Okay.

18          Mr. Jackson-Fannin.

19          MR. JACKSON-FANNIN:  Your Honor, as for number 26,

20    how does that -- is that relevant to any of the claims that are

21    asserted in the second amended complaint?

22          THE COURT:  I don't know --

23          MR. JACKSON-FANNIN:  But to the extent that we

24    responded that we would be providing responsive information to

25    that, we certainly will go back and look.  And if it's not in

1    what we have produced so far, maybe it's in what's upcoming in

2    text messages and so forth.  But we certainly will do so if we

3    need to supplement that response.  We will do so accordingly.

4            THE COURT:  All right.  I'm going to grant the motion

5    to compel and direct you to supplement the response in the

6    45 days once you finish the rest of the review.  And if there's

7    any responsive materials in there, then you can --

8            MR. JACKSON-FANNIN:  Sure.

9            THE COURT:  -- you can identify them to

10   Mr. Chiappetta.

11           MR. JACKSON-FANNIN:  Sure, Judge.

12           THE COURT:  All right.  Moving on, then, we have

13   paragraph 13, which identifies document request number 29.  And

14   request 29 says, quote, "Produce any documents and ESI in your

15   possession, custody, and control that you intend to utilize to

16   support your affirmative defenses."

17           There are a series of objections, which I won't read

18   into the record given their length, but they in on the

19   docket -- they are on the docket.

20           And -- all right.  Mr. Chiappetta, obviously the

21   relevance is obvious.  They've asserted affirmative defenses.

22   You want documents that they intend to utilize in support of

23   those.

24           So Mr. Jackson-Fannin, what's improper about this

25   request?

1          MR. JACKSON-FANNIN:  Well, firstly, Your Honor, we

2     have yet to assert affirmative defenses to the second amended

3     complaint.  We have a pending motion to dismiss as to the

4     operative pleading.

5          And secondly, we understand according to the case law

6     that as drafted it is facially overbroad to ask for every

7     single document that we intend to utilize to support any

8     forthcoming affirmative defenses, as we've noted in *TFC Park*

9     *Centre 9, LLC* and also in *Houston Specialty Insurance Company*.

10         THE COURT:  Those cases dealt with interrogatories

11    that asked for facts in support of the affirmative defenses.

12    So those were contention interrogatories, which I completely

13    agree are not appropriate.  But here it's a request for

14    production.  So it's not calling on your client to produce a

15    long diatribe of all the facts in support, which is part of the

16    basis of why we don't condone contention interrogatories

17    generally.

18         But contention document requests are slightly

19    different because you don't have to go through the process of

20    identifying all the facts, you just have to identify the -- the

21    underlying documents that you've already produced and what you

22    intend to use for which affirmative defense.

23         MR. JACKSON-FANNIN:  Well, Your Honor, in *United*

24    *States vs. Peter R. Brown Construction, Incorporated*, at 2012

25    Westlaw 12903894, at star 3, which was a Middle District of

1  Florida case from December 27th of 2012, it was applied to

2  requests for production, and that the request to produce all

3  documents relied upon in asserting affirmative defenses

4  considered was overly broad.

5          THE COURT:  Okay.  Well, that one is different.

6  That's relied upon.

7          MR. JACKSON-FANNIN:  Okay.

8          THE COURT:  This one is you intend to utilize.  So

9  it's essentially what evidence do you intend to present from

10 the documents in support of your affirmative defenses.

11         MR. JACKSON-FANNIN:  Okay.  I understand that point,

12 but we have yet to identify --

13         THE COURT:  Assert the affirmative defenses.

14         MR. JACKSON-FANNIN:  -- what the affirmative defenses

15 are.  So I think that it's premature.  And I think that while

16 it may not be a contention interrogatory, it's certainly a

17 contention request for production.  And in the ordinary course

18 of the litigation, we undoubtedly will deliver and identify the

19 documents that we intend to rely upon not only at summary

20 judgment, but for trial, so that counsel will be very well

21 aware of what we intend to utilize to support our affirmative

22 defenses forthcoming, assuming that the Court does not grant

23 the motion to dismiss.

24         THE COURT:  All right.  Here's what I'm going to do.

25 I'm going to grant the motion to compel because I do find that

1    this request is different than the contention interrogatories

2    and even the contention document requests that was identified

3    in your case law.  I think it is appropriate.

4         The case law I'm relying upon in support of that is

5    *Mar vs. Beall's, Inc.*, 273 F.Supp.3d 1336; *Sharpe Investors*

6    *Land Trust No. C vs. Pacific Insurance Company, Limited*, 2009

7    Westlaw 10667812; and then finally, *Doe vs. OneBeacon American*

8    *Insurance Company*, 2012 Westlaw 5876566.  And as that quote --

9    as that Court noted, quote, "Defendant may not assert an

10   affirmative defense and then decline to produce documents that

11   would support those defenses."

12        All right.  So I'm going to grant the motion to

13   compel, but obviously there are no affirmative defenses at this

14   time, so there's nothing for you to identify.  But as you know,

15   under the rules that you have a duty to supplement as that

16   information changes.  So to the extent you assert affirmative

17   defenses in the future and you intend to rely upon those

18   documents to prove those affirmative defense, you have to

19   identify them to Mr. Chiappetta.

20        MR. JACKSON-FANNIN:  Yes, Your Honor, we will do so.

21   Assuming that we assert affirmative defenses, we will certainly

22   supplement our response to identify the documents that we will

23   intend to utilize to support those.

24        THE COURT:  And this is an important caveat.  It's

25   not what you reviewed to assert them, it's not what you may

1  believe supports them, it's what you intend to utilize to

2  support them.  So if you don't intend to utilize it, you don't

3  have to disclose it.

4          MR. JACKSON-FANNIN:  Understood, Your Honor.

5          THE COURT:  Okay.  Anything further, Mr. Chiappetta?

6          MR. CHIAPPETTA:  Not on that point, Your Honor.

7          THE COURT:  All right.  So number -- request number

8  29 is granted under the parameters discussed.

9          Moving on, then, is paragraph 14, which identifies

10 document request number 34.  Request number 34 seeks, quote,

11 "Produce date-stamped photographs you sent to your employees

12 during COVID."

13         The response is a host of objections which I won't

14 read into the record given their length, but they are available

15 on the docket.

16         Mr. Chiappetta, can you please explain to me the

17 relevance of this request?

18         MR. CHIAPPETTA:  After the request was sent it was

19 limited to the "you r fired" photograph as outlined in the

20 second amended complaint.  And I believe, if memory serves --

21         THE COURT:  Okay.  Well, is it -- so is request

22 number 34 withdrawn then as it's currently -- is it currently

23 listed?

24         MR. CHIAPPETTA:  It was limited by the parties'

25 understanding and discussion.  And my understanding was, is

1   that GPS agreed to produce it to the extent it was in their

2   possession, custody, or control.

3           THE COURT:  Okay.  So is 34 withdrawn?

4           MR. CHIAPPETTA:  I still don't have the document

5   though, Your Honor.

6           THE COURT:  Okay.  But that's not what I'm asking.  I

7   know you may have agreed to something else outside of that, but

8   that's not what I have.  And that is the subject of another

9   request in number 35.  So even if it's limited, then that's

10  duplicative.  Request number 35 says, "Produce the entire" --

11  oh, I'm sorry, it's different.

12          MR. CHIAPPETTA:  34.

13          THE COURT:  All right.  So number 34cthen.

14          MR. CHIAPPETTA:  "Produce date-stamped photographs

15  you sent to your employees during COVID."

16          I mean, I don't want to withdraw it.  I was just

17  clarifying on the photograph that I was referring to.

18          THE COURT:  All right.  Was -- Mr. Jackson-Fannin,

19  maybe you can fill me in.  Was there a -- some sort of

20  agreement to reduce this request to a specific photograph?

21          MR. JACKSON-FANNIN:  Yes.  The parties did understand

22  that it was limited as to the photograph that was depicted in

23  the second amended complaint.  I forget the precise paragraph.

24  And we did agree to produce it to the extent that it exists.

25          THE COURT:  Okay.  All right.  So can you produce

1    that photograph within the 45 days?

2            MR. JACKSON-FANNIN:  Yes, to the extent it exists,

3    Your Honor.

4            THE COURT:  All right.  Anything further,

5    Mr. Chiappetta?

6            MR. CHIAPPETTA:  Nothing further, Your Honor.

7            THE COURT:  Okay.  So number 34 is granted as limited

8    by the parties here to the one specific photograph.  And it

9    will be produced within 45 days if it exists.

10           Turning next, then, to paragraph 15, which identifies

11   request number 35.  Request number 35 says, quote, "Produce the

12   entire employee file for every employee you sent the 'you are

13   fired' photograph to."

14           There are a series of objections which I won't read

15   into the record given their length, but they are available on

16   the Court's docket.

17           Mr. Chiappetta, can you explain to me the relevance

18   of this?

19           MR. CHIAPPETTA:  I'm looking for witnesses because

20   there's been claims that -- that are -- likely would have been

21   subsumed in prior defenses 3 and 11 under the stack -- or the

22   facts, so to speak.  So essentially what we were looking for is

23   witnesses that could identify that if that photograph no longer

24   exists, that it at one time existed and they actually were

25   recipients thereof.

1          THE COURT:  Okay.  I mean, I've seen a copy of the

2    photo.  Why is that still in dispute?

3          MR. CHIAPPETTA:  That's a great question for

4    defendants.

5          THE COURT:  No, I mean --

6          MR. CHIAPPETTA:  I don't have any -- I --

7          THE COURT:  Okay.  But what is -- what is the

8    relevance of the "you r fired" photograph to your claims?  Your

9    client didn't work there.  They --

10         MR. CHIAPPETTA:  I understand.  So that's the thing

11   of it is, is that my client I believe made a post about it.

12   And we -- to prove truth would essentially defeat defendants'

13   defenses 3 and 11, at least to that point.

14         THE COURT:  Okay.  So your client posted something

15   about that photograph that they sent.  Did it include a copy of

16   the photograph?

17         MR. CHIAPPETTA:  It did include a copy of the

18   photograph.

19         THE COURT:  Okay.  So then what do you need another

20   copy for?  You've got a copy of the photograph.  I mean, you

21   can see from the photograph that --

22         MR. CHIAPPETTA:  Authentication purposes.

23         THE COURT:  Okay.  So to authenticate a -- the

24   picture, you want the entire employee file for every employee

25   who you sent that photograph to?

1    MR. CHIAPPETTA:  Well, no.  I believe that was also

2    limited to minus personal identifying information.  We just

3    wanted the employee file for the names and contact information.

4    THE COURT:  Okay.  Well, why didn't you ask for that,

5    then?  You asked for the entire employee file for every

6    employee who was sent the photograph.

7    MR. CHIAPPETTA:  At the time this was written, it was

8    written the way it was.  I don't have an answer for that, Your

9    Honor.

10   THE COURT:  Okay.  If you want to know the employees

11   who received the photograph, you should just ask for it in an

12   interrogatory.

13   MR. CHIAPPETTA:  I will, Your Honor.

14   THE COURT:  "Who are the employees and what's their

15   contact information to the extent you have it?"

16   I'm not going to produce over their employment file,

17   which would likely contain all of their personal identifying

18   information, their addresses, their Social Security numbers,

19   their everything, which I'm certainly not going to do given the

20   tangential relevance of the request.  So request number 35 is

21   denied.

22   Anything to add, Mr. Jackson-Fannin?

23   MR. JACKSON-FANNIN:  No, Your Honor.  We will accept

24   the Court's ruling as to request number 35.

25   THE COURT:  Okay.  Turning next, then, to paragraph

1  16, which identifies document requests 39 and 40.

2      Request number 39 says, "Produce a profit and loss

3  record for Garramone Plastic Surgery for the last five years."

4      There are a host of objections which I won't read

5  into the record given their length, but they are available on

6  the Court's docket.

7      Mr. Chiappetta, can you tell me the relevance of the

8  profit and loss report you're looking for for Garramone Plastic

9  Surgery?

10     MR. CHIAPPETTA:  Again, under I believe the former

11 defenses 3 and 11, defendants are seeking to offset any

12 recovery that my client may have based upon their claims in the

13 340 case.  So to the extent they're using that as a defense --

14     THE COURT:  I mean, how -- wait.

15     MR. CHIAPPETTA:  -- they're --

16     THE COURT:  You're saying that they asked to offset

17 any --

18     MR. CHIAPPETTA:  I -- the affirmative defenses filed

19 to the FAC under paragraphs 3 and 11 were essentially unjust

20 enrichment as to one, which would ultimately result in an

21 offset of whatever the finding is there if they prevailed on

22 that count, and then number 11 as well.

23     So what we're trying to figure out is, is what

24 losses, if any, they -- GPS sustained.

25     THE COURT:  Okay.  So you're saying this isn't to

1    support your claims; it's, in fact, to undermine an affirmative

2    defense?

3         MR. CHIAPPETTA:  That is correct, Your Honor.

4         THE COURT:  All right.

5         Mr. Jackson-Fannin, did you -- the answer and

6    affirmative defenses to the last complaint, did you draft that

7    or is it something from Mr. Trainor?

8         MR. JACKSON-FANNIN:  The -- the -- we drafted the

9    ones to the first amended complaint, Your Honor.

10        THE COURT:  Okay.  Can you explain to me, then, what

11   those affirmative defenses were that Mr. Chiappetta's --

12        MR. JACKSON-FANNIN:  I don't have them off the top of

13   my head, Your Honor, but I can ensure you we did not assert

14   unjust enrichment as an affirmative defense because that's a

15   claim, not a defense, let alone an affirmative defense.

16        And also, maybe it went to unclean hands.  Maybe

17   that's what counsel meant.  And I think that that may have been

18   on number 3.  But I'm not sure what number 11 was.

19        But even if that were the case, Your Honor, I'm still

20   at a loss to figure out the relevance in terms of GPS's profit

21   and loss statements for a setoff for unclean hands, so on and

22   so forth.

23        In the 1218 case, counsel and the plaintiff, they're

24   asserting affirmative claims against us.  We're not seeking

25   damages or anything against them.  So I don't see how our

1   profit and loss report, at least over the last five years, is

2   relevant.

3           In addition to that, financial discovery shouldn't

4   be -- well, it's not appropriate at this particular juncture in

5   the litigation because we don't have a judgment, and my

6   client's wherewithal to be able to satisfy any judgment is not

7   at issue yet.

8           THE COURT:  Yeah, and Mr. Chiappetta didn't reference

9   that as being a rationale to support request number 39.

10          MR. CHIAPPETTA:  But you're -- if I may?

11          THE COURT:  Go ahead, Mr. Chiappetta.

12          MR. CHIAPPETTA:  I would argue that we have made a

13  prima facie case in relation to punitive damages that would

14  support it.  I believe the current case law just says we have

15  to make a facial showing that shows that punitives would be

16  warranted in order to open up this financial discovery.  And I

17  believe it's supported by the docket.

18          THE COURT:  All right, Mr. Jackson-Fannin.  What's

19  your answer to that, that he's got the request for punitives?

20          MR. JACKSON-FANNIN:  Well, we have certainly

21  presented case law to this Court that shows that it's not

22  appropriate.  In *Sprint Solutions, Incorporated vs. 4 U Cell,*

23  *LLC,* 2016 --

24          THE COURT:  Hold on a second.  Give me that --

25          MR. JACKSON-FANNIN:  Sure.

1          THE COURT:  I want to pull it up in front of me

2    because I don't have it on hand.  So hold on and let me open

3    Westlaw.

4          MR. JACKSON-FANNIN:  Sure.

5       (Pause in proceedings.)

6          THE COURT:  All right.  Go ahead, Mr. Jackson-Fannin.

7          MR. JACKSON-FANNIN:  Sure.  It's *Sprint Solutions,*

8    *Incorporated vs. 4 U Cell, LLC.*  It's located at 2016 Westlaw

9    6037240 at page 3.  It's a Middle District of Florida case from

10   October 14, 2016.

11         And we've quoted that courts generally defer

12   financial discovery until after judgment.  Of course, one of

13   the exceptions to the rule is when a plaintiff is seeking

14   punitive damages, which -- as counsel has just intimated.

15   However, the burden rests with the plaintiff to, quote, show

16   and persuade the Court that he has a reasonable basis

17   supporting punitive damages, not on the Court to examine, as we

18   said, the first or the second amended complaint, quote, count

19   by count simply because the complaint is on file and

20   plaintiff's prayer for relief happens to mention punitive

21   damages.

22         And we don't believe that the docket itself contains

23   any proffer to support the imposition of punitive damages, be

24   it a prima facie case or any other case for punitive damages.

25         And then secondarily to that, we also believe that

1  disclosing financial information at this juncture is

2  susceptible to a claim for a trade secret privilege.  And we've

3  also cited cases in our brief to support that, which is at

4  *WWMap, LLC vs. Birth Your Way Midwifery*, at 711 F.Supp.3d 1313,

5  which is a Northern District of Florida case from 2024,

6  concluding that records of revenue and calculations of profit

7  and loss can qualify as a trade secret.

8         *Gulfcoast Surgery Center, Incorporated vs. Fisher*,

9  which is located at 107 So.3d 493, specifically at page 495,

10 which is a case from the Florida Second District Court of

11 Appeal from 2013.  And, quote, "This court has previously held

12 that internal cost structure information constitutes a trade

13 secret."

14        So we believe that compelling production of sensitive

15 financial information at this juncture should be precluded.

16 And as particular, given the breadth, the temporal scope of

17 request number 39 for the past five years.

18        THE COURT:  All right.

19        Mr. Chiappetta.

20        MR. CHIAPPETTA:  With relation to what -- the proffer

21 on the docket, I -- I believe my -- my motion cited to it.  But

22 that being said, there is a declaration of Jennifer Holliday.

23 There are videos of Joseph A. Camp tying in and explaining the

24 conspiracy.  In fact, I believe there's three other

25 declarations in that same line of exhibits attached to the

1    response to defendants' third Rule 12 motion.

2         But setting all that aside, with regards to trade

3    secret, it's absent from their amended privilege log.  So I

4    would posit that that argument has been waived by a failure to

5    even put it on the log to begin with.

6         THE COURT:  All right.  Which claims specifically are

7    you contending entitle you to punitive damages in this case?

8         MR. CHIAPPETTA:  I believe that my client would be

9    entitled to punitives for -- on the defamation counts, on the

10   civil conspiracy counts, and on the IIED counts.

11        THE COURT:  Have you -- well, but what I asked was

12   which -- are you claiming punitive damages for each of those

13   counts?

14        MR. CHIAPPETTA:  I believe so, Your Honor.  All the

15   ones that were available, they have been claimed on the SAC.

16        THE COURT:  All right.  The Eleventh Circuit has

17   stated that, "In civil cases we have not required a showing of

18   compelling need before tax information may be obtained by a

19   party in discovery, but instead have determined that such

20   information need only be arguably relevant.  Because of its

21   increased potential for abuse, however, courts typically

22   require plaintiff to establish reasonable basis supporting

23   punitive damages before allowing financial-worth discovery,

24   although the required showing is not overly strenuous."

25        All right.  What I'm going to do is I've taken --

1  I've looked at the amended complaint repeatedly.  I'm not sure

2  that the request for punitive damages establishes a reasonable

3  basis for that relief.

4        What I'm going to do is I'm going to deny the motion

5  to compel without prejudice at this time.  To the extent the

6  Court allows the amended complaint to go forward as it's

7  currently drafted with punitive damages, you can reassert the

8  request for financial discovery.  The financial discovery, to

9  the extent it's allowed, will come with a protective order

10  limiting its use in the case proceeding forward, all right?

11        MR. CHIAPPETTA:  Yes, Your Honor.  Thank you.

12        THE COURT:  So it's denied without prejudice.

13        Mr. Jackson-Fannin, if Judge Steele -- I'm sorry, if

14  Judge -- yeah, Judge Steele on this case allows the complaint

15  to move forward with punitive damages, I mean, at that point

16  isn't financial -- some limited financial discovery of GPS

17  going to be warranted?

18        MR. JACKSON-FANNIN:  Possibly, Your Honor.  However,

19  it would depend on whether or not there was a sufficient

20  showing.  And again, based on the second amended complaint as

21  drafted, we don't believe that there's a sufficient showing

22  there.

23        Now, looking at the record as a whole, the Court very

24  well may find that there is a reasonable basis for it, and

25  again some limited financial discovery may be appropriate at

1   that point in time.  But it's difficult to say speaking in

2   hypothetics at this point.

3           THE COURT:  Yeah, the case that I have in front of

4   me, which is *Solliday* -- and I'll leave it to you to review it,

5   Mr. Jackson-Fannin -- is *Solliday vs. 7-Eleven*, 2010 Westlaw

6   4537903.  And it's actually from Judge Steele and --

7           MR. JACKSON-FANNIN:  What's the cite again, Your

8   Honor?

9           THE COURT:  2010 Westlaw 4537903.

10          MR. JACKSON-FANNIN:  Thank you.

11          THE COURT:  And there he allowed financial-worth

12  discovery of a defendant, albeit in a different context than

13  this.  But he does reiterate that the required showing for

14  financial discovery when punitive damages are sought and

15  allowed under the law is, quote, not overly strenuous.

16          So my current ruling is that I'm going to deny

17  request number 39 without prejudice.  Mr. Chiappetta, you can

18  reassert it should the complaint proceed on a claim that allows

19  for punitive damages and they're allowed to stand.

20          Mr. Jackson-Fannin, I'd like you to take a look at

21  the case law because I think once punitive damages move

22  forward, I mean, I have to allow financial discovery at some

23  point, right?

24          MR. JACKSON-FANNIN:  Correct, Your Honor.

25          THE COURT:  It can't be after the judgment.

1          MR. JACKSON-FANNIN:  That's true.

2          THE COURT:  And so what would your proposal be for

3    what type of financial disclosures he'd be entitled to?

4          MR. JACKSON-FANNIN:  Well, I think that it would

5    probably be limited to the tax returns, Your Honor, to

6    determine what the wherewithal is.  I'm not so sure that profit

7    and loss statements, general ledgers, and other financial

8    documents -- internal accounting document like that would

9    ultimately reveal, which is what the true question is, is the

10   financial wherewithal to be able to satisfy a judgment for

11   punitive damages.

12         THE COURT:  Okay.

13         MR. JACKSON-FANNIN:  And I think that the tax returns

14   would accomplish that, but not necessarily with respect to, you

15   know, financial accounting documents.

16         THE COURT:  All right.  Thank you,

17   Mr. Jackson-Fannin.

18         I'll then move on to request number 40, which was the

19   other one at issue in paragraph 16.  And it asks for, quote,

20   "Produce any documents and ESI in your possession, custody, or

21   control that indicates that Garramone Plastic Surgery was

22   losing money prior to January 28th, 2022."

23         There are a host of objections raised, which I won't

24   reiterate on the record given their length, but they are

25   contained in the docket.

1              Mr. Chiappetta, let me ask you, what's the relevance

2      of this?  I certainly understand the relevance of the prior

3      request for profit and loss statements --

4              MR. CHIAPPETTA:  Your Honor --

5              THE COURT:  -- but now we're talking about losing

6      money on a specific date.  Where does that get interjected?

7              MR. CHIAPPETTA:  I'm going to withdraw number 40.

8              THE COURT:  All right.  Number 40's withdrawn.

9              Any objection, Mr. Jackson-Fannin?

10             MR. JACKSON-FANNIN:  No, Your Honor.

11             THE COURT:  Okay.  And then to our final request at

12     issue, according to my records, which is paragraph 17.  It

13     states -- I -- paragraph 17 identifies document request number

14     41 in dispute.  And request 41 says, quote, "Produce any

15     documents and ESI in your possession, custody, or control

16     regarding COVID PPP loans."

17             All right, Mr. Chiappetta.  Where -- what are we

18     doing with that one?

19             MR. CHIAPPETTA:  So this is the same issue where my

20     client has posted video in relationship to PP- -- into the PPP

21     loan issue.  And essentially we're -- and I did misspeak

22     before.  It was unclean hands, not unjust enrichment with

23     regards to defense number 3.

24             But essentially we are seeking information as it

25     relates to the previously-raised defenses, paragraphs -- or

1  third defense and eleventh defense.

2  THE COURT:  Okay.  And that being that you want

3  information that he took PPP loans?

4  MR. CHIAPPETTA:  Simply looking for the -- simply

5  looking to prove truth of the matter -- of the news presented.

6  THE COURT:  Okay.  But, I mean, they're not suing you

7  for defamation, so what does the truth matter, I guess, for the

8  defenses?

9  MR. CHIAPPETTA:  It would matter in relation to their

10 defense of unclean hands, that he acted somehow improperly.

11 But if he was presenting the news in a truthful manner, then

12 arguably it would be protected under the law.

13 THE COURT:  But is that affirmative defense

14 specifically directed towards that post concerning the PPP?

15 MR. CHIAPPETTA:  As drafted, it's too vague to tell

16 which specific post, or if it -- if it's directed at one

17 specific post or if it's directed at multiple posts.

18 THE COURT:  Okay.  So to recap, as I understand it,

19 your client posted something about PPP fraud -- I'm sorry, not

20 PPP fraud, but about PPP loans allegedly taken by GPS, correct?

21 MR. CHIAPPETTA:  That is accurate.

22 THE COURT:  Then in the last version of their answer

23 they asserted affirmative defenses based upon unclean hands and

24 other equitable principles; not directed towards this PPP post,

25 but just in general.  And now you want information about the

1  PPP loans that GPS might have taken to prove the truth of the

2  post that you made?

3      MR. CHIAPPETTA:  Well, yes, Your Honor.  It's

4  anticipated that the unclean hands argument related to the

5  videos made I guess between January 27th of '22 through -- up

6  to December of '23.

7      THE COURT:  And the unclean hands portion is that you

8  were asserting information that wasn't accurate?

9      MR. CHIAPPETTA:  Well, I -- that's what we -- that's

10  our reasonable belief.  We don't know a hundred percent because

11  it -- the response -- the affirmative defense itself is

12  somewhat vague.

13      THE COURT:  Okay.

14      Mr. Jackson-Fannin, let me hear from you, because I'm

15  struggling to understand the relevance.

16      MR. JACKSON-FANNIN:  Your Honor --

17      THE COURT:  Maybe you can fill in me in.

18      MR. JACKSON-FANNIN:  Recognizing, I think, that there

19  may be a shift in rationale that's going on here, but it's our

20  position that this is completely irrelevant to any of the

21  claims that have been asserted in the second amended complaint.

22      Even to -- if you wanted to look back to our prior

23  inoperative responsive pleading at this point with respect to

24  our third defense, again, there has been no news reporting

25  that's been identified.  And I'm still at a loss to see how

1  producing any documents and ESI in our possession, custody

2  regarding COVID PPP loans -- even if we received a random email

3  about the government offering PPP loans -- would be responsive

4  or that it's sufficiently tailored to the issues as framed by

5  the pleadings.

6          In addition to that, you know, I think that

7  counsel -- or at least plaintiff had asserted previously that

8  there was information about PPP loans needed to assess punitive

9  damages.  Again, I don't find the relevance to that, and so I,

10 too, Your Honor, am at a bit of a loss to understand the

11 relevance, the proportionality, and the scope -- and the sheer

12 scope of request number 41.

13         THE COURT:  Mr. Chiappetta, if you're concerned about

14 the truth or the veracity of whatever post she made, could you

15 just do a request for admission and ask if they received PPP

16 loans?  I mean, what you're asking for now is documents and ESI

17 in your possession, custody, or control regarding COVID PPP

18 loans.  So you're asking for everything.

19         MR. CHIAPPETTA:  I do understand that.  We have made

20 previous requests for admissions and received boilerplate

21 denials, and Your Honor will likely be seeing motions on those

22 in the near future.

23         THE COURT:  Okay.  But after reviewing it and

24 considering the relevancy of it as you've related to me, which

25 is that it is to prove the truth of a post that your client

1    made that you believe may be in dispute concerning an

2    affirmative defense that's not yet asserted, I don't find the

3    relevance sufficient to justify the broad net that you've cast

4    to try to capture what you're -- what essentially boils down to

5    a truth issue.  Whether it was true, what your client posted or

6    not, but having them produce any documents and ESI in their

7    possession, custody, or control regarding PPP loans is just not

8    proportional.

9          As Mr. Jackson-Fannin points out, this would capture

10   every email from the government that was sent out soliciting

11   PPP loans, or anything.  If they got a PPP loan, it would be an

12   update from the entity that serviced the PPP loan.  I mean, it

13   would just capture such a large breadth of information, I don't

14   find it proportional to its potential relevance in the case.

15   So I'm going to deny request number 44 -- I'm sorry, deny the

16   motion to compel with regard to request number 41.

17         Now, according to my notes, Mr. Chiappetta, that was

18   all of the discovery requests that you identified that were in

19   dispute.  Is there any that I'm missing?

20         MR. CHIAPPETTA:  No.  The only other one was that 21,

21   but that was the privilege log we previously discussed.  So I

22   believe we're done, Your Honor.

23         THE COURT:  Okay.  Where is 21 contained in your

24   motion?

25         MR. CHIAPPETTA:  Paragraph 21 of the motion, page 7.

1          THE COURT:  Oh.  Hold on.  Let me get there.

2          Oh, yeah, that was discussed earlier.  That's why I

3     mudded it from my notes.  Okay.

4          All right.  The last issue is the request for fees

5     and costs.  I'm denying those.  The motion was granted in part

6     and denied in part, leaving it with my discretion to decide

7     whether there were fees.  It's clear that this is a contentious

8     discovery case.  I find that the objections were not -- were

9     not inappropriate in the sense under Rule 37 where I would

10    issue sanctions.  And that's the end of it.

11         All right.  Any further, Mr. Chiappetta?

12         MR. CHIAPPETTA:  No, Your Honor.

13         THE COURT:  Anything on your end, Mr. Jackson-Fannin?

14         MR. JACKSON-FANNIN:  No, Your Honor, not as to this

15    motion.

16         THE COURT:  Okay.  So today we covered the three

17    motions:  docket 167, 178, and 181.

18         Is there any question as to any of the rulings that

19    were made?  Mr. Jackson-Fannin?

20         MR. JACKSON-FANNIN:  Your Honor, we do still need to

21    resolve the --

22         THE COURT:  Oh.

23         MR. JACKSON-FANNIN:  -- Rule 37 issue as to docket

24    entry 178?

25         THE COURT:  Let me go back to that, because you're

1  right.  And that is on page, again -- can you refer to me the
2  page number?
3         MR. JACKSON-FANNIN:  Hold on just a second, Your
4  Honor.
5         THE COURT:  16.  I got it now.
6         MR. JACKSON-FANNIN:  16, okay.
7         THE COURT:  "Plaintiff's unfounded objections to
8  requests 7, 8, and 18, followed by the withdrawal of said
9  objections..."
10        All right.  Mr. Chiappetta, let me hear from you.
11        MR. CHIAPPETTA:  Well, Your Honor, in our -- in
12  response to defendants' motion at docket 178, we have raised an
13  issue with failure to comply with Local Rule 3.01(g).  And as
14  of yesterday, Your Honor actually issued an order in a
15  different case, *Andrew Bryant Sheets*, 2:24-cv-958, and
16  essentially denied the motion just simply because they failed
17  to comply with the Local Rule conferral requirements on a
18  renewed motion as defendants did here.  And we would ask that
19  you deny their request for fees on that basis.
20        THE COURT:  All right.  Walk me through the 3.01(g)
21  process in that case.  Sorry, for the motion at 178, what
22  happened in the conferral process, Mr. Jackson-Fannin?
23        MR. JACKSON-FANNIN:  Your Honor, we -- if you will,
24  this is the email correspondence that was exchanged with
25  respect to the conferral.  May I approach?

1          THE COURT:  You may approach, yes.  Thank you.

2          MR. JACKSON-FANNIN:  So, Your Honor, it is our

3    understanding that the Court had given us leave to refile.  We

4    did not have any different bases from what we had originally

5    asserted.

6               During the course of the back-and-forth with counsel

7    I asked if he had any different position that he would like to

8    take and discuss.  He didn't.  He declined that invitation, and

9    so therefore we did not believe that it was necessary to go

10   back through the initial conferral process all over or renew it

11   again to the extent that we had conferred twice before and had

12   a hearing with Your Honor and had leave to renew our motion.

13          THE COURT:  All right.  Give me a second to read

14   what's been submitted.

15       (Pause in proceedings.)

16          THE COURT:  Okay.  Mr. Chiappetta, what are you

17   saying is deficient about the conferral?

18          MR. CHIAPPETTA:  The certificate of conferral --

19          THE COURT:  I'm reading it.

20          MR. CHIAPPETTA:  -- only shows that there was an

21   actual conferral before the October 15th hearing.  And at that

22   time GPS did not state definitively at that hearing what

23   specifically it was looking for.  I mean, that's even based on

24   the transcript.

25               So then after I notified them that they -- after they

1   filed this motion they -- I notified them that they didn't

2   confer, gave us no -- gave my client no opportunity to see what

3   they were actually looking for.  And our position is, is that

4   it's not compliant with Local Rule 3.  And to the extent Your

5   Honor finds otherwise, we would ask that Your Honor limits its

6   sanction to one motion as opposed to two.

7         THE COURT:  All right.  Give me one second to look at

8   number -- the objections that were drawn to 7, 8, and 18.

9      (Pause in proceedings.)

10        THE COURT:  All right.  I'm going to deny the request

11  for sanctions based upon two issues.  First, I don't find that

12  the objections he raised in response to 7, 8, and 18 are

13  necessarily frivolous to the extent that they would warrant

14  Rule 37 relief.

15        That, in conjunction with the conferral -- and I

16  understand, Mr. Jackson-Fannin, what you're saying is you

17  conferred before the first motion was filed.  You updated it.

18  You didn't change the substance.  That's sufficient to meet it?

19        MR. JACKSON-FANNIN:  We asked again if he wanted to

20  change his position --

21        THE COURT:  All right.

22        MR. JACKSON-FANNIN:  -- with respect to that and to

23  confer to the extent that we could have updated the certificate

24  of conferral.  Counsel declined.  So we believe that we have

25  the basis -- or at least satisfied our pre-conferral and

1    pre-filing obligations under Local Rule 3.01.

2         THE COURT:  Gotcha.  All right.

3         Well, I'm denying it for the reasons just stated.  I

4    understand your position with regard to the conferral.

5    Mr. Chiappetta obviously didn't take the same view and there

6    was no further discussion beyond that.  Along with the

7    substance of the objections, I'm going to deny the request for

8    fees and costs.

9         All right.  Then that resolves everything, correct,

10   Mr. Jackson-Fannin?

11        MR. JACKSON-FANNIN:  Yes, Your Honor.  We do have, I

12   guess, a few housekeeping items before we conclude today.

13        THE COURT:  Okay.  Let me get back to those in one

14   second.

15        MR. JACKSON-FANNIN:  Sure.

16        THE COURT:  I just want to -- Mr. Alfano, I know we

17   had your motion at the very beginning.  Do you have any

18   questions about -- or concerns -- not concerns, but do you have

19   any questions about the Court's ruling with regard to your

20   motion?

21        MR. ALFANO:  The only question I had, Your Honor, is

22   if you'd like for me to prepare an order.

23        THE COURT:  No.  We'll do the order on our end.

24        MR. ALFANO:  Very good, Your Honor.

25        THE COURT:  All right.  Mr. Chiappetta, any questions

1    about anything that was covered in any of the three motions?

2         MR. CHIAPPETTA:  No, Your Honor.

3         THE COURT:  Okay.  Mr. Jackson-Fannin, going back to

4    the housekeeping items.

5         MR. JACKSON-FANNIN:  Yes, Your Honor.  The first, we

6    wanted to bring to the Court's attention is that there was a

7    motion that's pending to extend the disclosure deadline for

8    defendants' experts, and that's coming up the end of December.

9         We understand that the plaintiff opposes that motion.

10   However, given today's rulings and given the tight time frame

11   that we have set forth with the intervening holidays and so on,

12   along with the difficulty in us being able to provide our

13   expert with documents to review, we simply cannot meet that

14   December 30 deadline, despite our most diligent efforts.

15        THE COURT:  All right.  Which -- where is that motion

16   in the docket?  Just so I can see.

17        MR. JACKSON-FANNIN:  I'm not sure, Judge.  I don't

18   have it in front of me, but we probably would have filed it.

19   It should be close to the bottom.  I believe we may have filed

20   it last week.  Friday, I think.

21        THE COURT:  Okay.  Give me on one second.

22        Mr. Chiappetta, let me hear from you.

23        MR. CHIAPPETTA:  Well, first and foremost, Your

24   Honor, I would object to raising this issue right now as I have

25   not even had the opportunity to respond, and the response is

1    not due till I believe December 18th.

2          That being said, I believe that GPS is required to

3    show that they were -- with -- using diligence, they were

4    unable to meet the current deadline.  I don't believe their

5    motion satisfies that standard.  Simply wanting to depose my

6    expert prior to retaining an expert is not the -- is not the

7    appropriate set of diligence that is necessary to meet the Rule

8    16 modification.

9          THE COURT:  All right.

10          And Mr. Jackson-Fannin, what you're saying from your

11    perspective is that it's not necessarily your deposition, it's

12    the information -- the discovery is not complete?

13          MR. JACKSON-FANNIN:  Correct, Your Honor.  We can't

14    even give the documents to our expert to consider to create

15    their opinions.  And we also have the deposition issue on that.

16          But I'm fine with -- I just wanted to bring it to the

17    Court's attention.  I wasn't expecting that the Court would

18    rule on it right now.  But nonetheless, it's there.  It's an

19    issue.  And I think that that has to be considered in light of

20    the discovery extensions that were granted by the Court at

21    today's hearing.

22          MR. CHIAPPETTA:  If I may?

23          THE COURT:  Hold on one second.

24          What is the current expert disclosure deadline for

25    the defendants?

1        MR. JACKSON-FANNIN:  The defendants' expert

2   disclosures are due on December the 30th, Your Honor.

3        THE COURT:  I can't find that.

4        MR. JACKSON-FANNIN:  And we also have Mr. Alfano's

5   issue, which I guess that might be the subject of another

6   forthcoming motion.

7        MR. ALFANO:  Exactly.  We are going to be joining in

8   that motion for extension of time on the discovery deadlines --

9   or, I'm sorry, the expert disclosure deadlines.

10       MR. CHIAPPETTA:  And I would again object.

11       THE COURT:  All right.  I'm not going to rule on it

12   right now.  I'm just trying to get a grip on where we are.

13       MR. JACKSON-FANNIN:  Yeah.  I'm going to see if I can

14   find it right quick, Judge.

15       THE COURT:  Oh, I do see it.  Okay.  It's in a

16   prior -- it's in docket entry 64.  So it's a ways back.

17       Mr. Chiappetta, did you already disclose your expert

18   on the 30th?

19       MR. CHIAPPETTA:  Yes, Your Honor.

20       THE COURT:  All right.  Okay.  Well, what I'll -- I

21   am aware of it.  When is your response due?

22       MR. CHIAPPETTA:  December 18th, Your Honor.

23       THE COURT:  I'll have a ruling for you by the 20th.

24       All right, Mr. Jackson-Fannin.

25       MR. JACKSON-FANNIN:  Yes, Your Honor.  Thank you for

1    that.

2         And I guess the only other issue that I wanted to

3    touch on was that we had agreed to the issuance of a subpoena

4    to TikTok at the October 15th hearing.  And I think that

5    that -- the Court's order that came down permitting that, and

6    we had that tailored language in there, was as to the 340 case.

7    But to the extent that we now -- and then we had the discovery

8    stay.  But to the extent that that's now at issue and part of a

9    request I think to -- with -- to your obligation to download

10   TikTok data, based on the Court's ruling today, I'm not sure if

11   you wanted to just utilize that subpoena that was authorized in

12   the 340 case for the 1218 case.

13        MR. CHIAPPETTA:  I don't understand what you're

14   asking.

15        MR. JACKSON-FANNIN:  Sure.  So to the extent that you

16   now have the obligation to provide a supplemental discovery

17   production to us, and you may -- or may not, I don't know --

18   need to go to TikTok to ask them to give you the data,

19   whatever, Instagram and so forth, we had agreed upon a subpoena

20   in the 340 case, download TikTok data.  Your client agreed to

21   that with respect to I think two or three individuals.

22        My question then was:  Do you want to utilize that,

23   since we now have additional language from the Court for -- to

24   subpoena those documents in the 1218 case versus just leaving

25   them in the 340 case?

1          MR. CHIAPPETTA:  I think we're okay -- I believe the

2    ruling was limited to your Exhibit E.  And with regards to

3    those direct messages, I think my client -- I am hopeful that

4    my client will be able to recover those himself.

5          MR. JACKSON-FANNIN:  All right.  Well, then, that's

6    it, Judge.  We'll just leave it there then.

7          THE COURT:  Okay.  And for -- well, for clarifying

8    the record, then, based upon what you just said,

9    Mr. Chiappetta, the ruling as it pertains to their motion to

10   compel was that the Rule 34(E) Subsection (i), which, again,

11   says a party must produce documents as they are kept in the

12   usual course of business or it must organize and label them to

13   correspond to the categories in the requests, applies to the

14   entirety of the production.

15         Subsection (ii), which discusses form -- if a request

16   does not specify a form for producing electronically stored

17   information, a party must produce it in the form or forms in

18   which it is ordinarily maintained or in a reasonably usable

19   form, was limited to subsection (E).

20         MR. CHIAPPETTA:  I understand, Your Honor.  And

21   clarification, my understanding was, is that as far -- the

22   Court's ruling on reasonably usable form was solely as to

23   Exhibit E, and that we just had to reorganize the documents

24   that were previously produced to conform to Subsection (i).  Is

25   that accurate?

1          THE COURT:  That's correct.  Any document that was

2    produced previously, because it was all ESI, must conform with

3    Subsection (E)(i).

4          And then as we discussed Subsection (E)(ii), which

5    concerns form, that was limited to the Exhibit E where they had

6    laid out all of the materials that they said is not in usable

7    form.

8          MR. CHIAPPETTA:  All right.  Thank you very much,

9    Your Honor.

10          THE COURT:  All right.

11          MR. JACKSON-FANNIN:  Thank you, Judge.  Nothing

12    further.

13          THE COURT:  All right.  Thank you, Counsel, for your

14    time.  I'll enter an order following the hearing.  We are

15    adjourned.

16          COURT SECURITY OFFICER:  All rise.

17          (Proceedings concluded at 11:53 a.m.)

18                          -     -     -

19

20

21

22

23

24

25

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2    UNITED STATES DISTRICT COURT)

3    MIDDLE DISTRICT OF FLORIDA )

4

5          I, court approved transcriber, certify that the

6    foregoing is a correct transcript from the official electronic

7    sound recording of the proceedings in the above-entitled

8    matter.

9

10         DATED this 18th day of December, 2024.

11

12                          /s/ Katharine M. Healey
                            Katharine M. Healey, RPR, RMR, CRR, FPR-C
13                          Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25