**UNITED STATES DISTRICT COURT**
**FOR THE**
**MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| DANESH NOSHIRVAN, an individual | ) | |
| | ) | |
| Plaintiff | ) | Civ. Action: 2:23-CV-01218-JES-KCD |
| | ) | |
| v. | ) | |
| | ) | |
| JENNIFER COUTURE, an individual, RALPH | ) | |
| GARRAMONE, M.D., an individual, etc. et al. | ) | |
| | ) | |
| Defendant. | ) | |

**EMERGENCY MOTION TO QUASH THE BAD FAITH SUBPOENA, FOR A PROTECTIVE ORDER, FOR ADMONITION AGAINST SCOTUS DOXXER DANESH NOSHIRVAN AND ATTORNEY NICK CHIAPPETTA, FOR SANCTIONS, AND OTHER AND FURTHER RELIEF**

NOW COMES RICHARD LUTHMANN, MOVANT in the above-captioned matter and who declares pursuant to 28 U.S.C. §§ 1746 and under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**CONCISE STATEMENT OF THE PRECISE RELIEF REQUESTED**

My name is Richard Luthmann, and I am a professional investigative journalist. I reside in the Middle District of Florida. I am not an attorney, never a member of the Florida Bar, and I ask for special solicitude offered to *Pro Se* Litigants, particularly in my good faith attempts to comply with the Local Rules. I have been given permission by Magistrate Judge Kyle Dudek to exceed the 25-page limit for this submission under Local Rule 3.01(a) and not to exceed 40 pages.

This motion is an emergency motion because, by its very existence, the subpoena at issue served upon a professional journalist in a courtroom in the U.S. Courthouse for the Middle District of Florida mere seconds after the judge left the bench creates a chilling effect on the First

1

<u>Amendment and Freedom of the Press. It must be resolved with due haste to protect newsgathering, investigative journalism, and the Free Press. The compliance date for the subpoena is January 20, 2024, which also happens to be the date of National Celebration of the 47th Presidential Inauguration.</u>

Attached herewith is my Declaration in Support of Emergency Motion to Quash, Protective Order, and Additional Relief with Exhibits (hereinafter referred to as "Luthmann Decl.").

While covering a case at the Middle District of Florida Courthouse in Fort Myers, Florida, in furtherance of my professional investigative journalism activities, I was served with a frivolous and bad-faith subpoena in the above-captioned matter on December 10, 2024 (the "Bad Faith Subpoena"). See Luthmann Decl. at **EXHIBIT "A" (Served Version)** and **EXHIBIT "B" (Clean Version).**

I respectfully request that the Court quash the Frivolous and Bad Faith Subpoena in its entirety and issue a Protective Order shielding me and other journalists from further harassment by the Plaintiff, Danesh Noshirvan ("Noshirvan"). Additionally, I request Sanctions and additional and related relief against Plaintiff and Plaintiff's counsel, Attorney Nick Chiapetta of West Palm Beach, Florida, to punish and deter similar misconduct in the future against me and against the Free Press in our constitutional republic. I will address the Court in the third person for ease of reading.

Movant Richard Luthmann respectfully requests that this Court order the following precise relief:

A. **<u>Quash the Subpoena</u>** - Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure (F.R.C.P.), quash the Bad Faith Subpoena dated served on December 10, 2024, as it violates

geographic limitations, improperly seeks protected journalistic materials, and was issued in bad faith to harass and intimidate.

B. **Issue a Protective Order -** Under Rule 26(c)(1) of the Federal Rules of Civil Procedure, issue a protective order to prohibit further abusive discovery practices by Plaintiff and Plaintiff's counsel, including any attempts to subpoena journalistic materials or engage in harassment tactics designed to chill constitutionally protected activities.

C. **Disqualify Attorney Nick Chiappetta –** His continued representation violates the advocate-witness rule.

D. **Sanctions Against Plaintiff and Plaintiff's Counsel** - Pursuant to Rule 45(d)(1), Rule 26(b)(2)(C), and the Court's inherent powers, impose monetary sanctions in the amount of at least ONE HUNDRED THOUSAND ($100,000) DOLLARS against Plaintiff Danesh Noshirvan and Plaintiff's counsel, Nick Chiappetta, Esq., jointly and severally, for their bad faith conduct in issuing and serving the Bad Faith Subpoena, including:

1. **Improper service**: Arranging for service of the Bad Faith Subpoena within a courtroom within minutes of the Court leaving the bench and during ongoing journalistic activities to harass and intimidate the Movant, a professional investigative journalist.

2. **Frivolous and overbroad demands**: Requesting publicly available and irrelevant information and materials protected by the Qualified Journalist's Privilege meant solely to harass and chill Freedom of the Press.

3. **Procedural abuses**: Violating geographic restrictions under Rule 45(c)(1)(A) and employing litigation tactics intended to burden and intimidate.

E. **Declare the Subpoena an Abuse of Process**. Find that the Bad Faith Subpoena constitutes an abuse of process and a violation of Declarant's First Amendment rights, aimed at suppressing

investigative journalism and retaliating against Movant for exposing Plaintiff's misconduct, saving the Movant further litigation against Dansh Noshirvan and Attorney Nick Chiappetta.

F. **Enjoin Further Retaliatory Conduct.** Issue an injunction to prevent Plaintiff and Plaintiff's counsel from issuing further subpoenas or engaging in any litigation tactics aimed at harassing or retaliating against the Declarant for lawful journalistic activities.

G. **Affirm the Qualified Journalist's Privilege**. Declare that the materials sought by the subpoena are protected under the Qualified Journalist's Privilege as recognized in *United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013), and similar precedent, shielding Declarant from compelled disclosure of unpublished journalistic materials.

H. **Award Fees, Costs, and Expenses.** Award Declarant reasonable fees, costs, and expenses incurred in responding to the Frivolous and Bad Faith Subpoena, defending against Plaintiff's bad faith litigation tactics and protecting Declarant's rights under the First Amendment and the Qualified Journalist's Privilege. The Declarant estimates he spent at least FORTY (40) man-hours drafting, researching, writing, and assembling this application. It's not outlandish to ask for TEN THOUSAND ($10,000) DOLLARS.

I. **Refer Counsel for Disciplinary Review.** Refer Plaintiff's counsel, Nick Chiapetta, Esq., to the appropriate disciplinary authorities for engaging in unethical conduct, including the misuse of the legal process to harass and intimidate a journalist in violation of professional responsibility standards.

J. **Alternative Relief.** Set the date to respond to the Frivolous and Bad Faith Subpoena AFTER the Presidential Inaugural and day of national celebration of the presidency of Donald J. Trump, the 45th and now 47th President of the United States of America, and to afford the Declarant time to go to the Eleventh Circuit to protect his rights and the rights of the Press.

K. **Such Other and Further Relief.** Grant such other and further relief as the Court deems just, proper, and necessary to protect Declarant's rights and deter future misconduct by Plaintiff and Plaintiff's counsel.

## STATEMENT OF THE BASIS FOR THE REQUEST

The Bad Faith Subpoena is technically defective for the reasons stated herein and in the Luthmann Declaration, and specifically because it blatantly violates Rule 45(c)(1)(A) of the F.R.C.P., which limits subpoenas to venues within 100 miles of the recipient's residence, place of employment, or regular place of business.

Moreover, the Bad Faith Subpoena blatantly violates the rights of the Free Press in America. It serves to chill the practice of investigative journalism and First Amendment-protected activities.

The service of the subpoena in Magistrate Judge Dudek's courtroom immediately after the judge left the bench represents a flagrant affront to the principles of ordered justice and the dignity of the judiciary. This ambush tactic inside a courtroom, directed by Noshirvan and his counsel, Attorney Nick Chiappetta, reflects a misuse of judicial resources and an abuse of process designed to harass and intimidate a journalist engaged in constitutionally protected activities. Such actions undermine the sanctity of the courtroom as a venue for fair and impartial proceedings, turning it instead into a stage for procedural ambushes. The brazen service of a professional journalist in a courtroom related to a case they are covering ignores the crucial constitutional role of the Press. Sheppard v. Maxwell, 384 U.S. 333, 350, 86 S. Ct. 1507, 1515 (1966) (A responsible press has always been regarded as the handmaiden of the search for truth and effective judicial administration).

Noshirvan and Attorney Chiapetta's conduct not only disrespects the authority of the Court but also weaponizes its processes to chill investigative journalism, a cornerstone of democracy. The Bad Faith Subpoena infringes on the First Amendment by chilling investigative journalism and constitutionally protected activities. The undersigned has covered the Jennifer Couture/Danesh Noshirvan matter since December 4, 2023, and its emergence as a significant First Amendment and Internet law case, as identified by Professor Eugene Volokh, a former clerk to SCOTUS Justice Sandra Day O'Connor and one of the foremost legal scholars in the nation. See Volokh, Eugene. "Plaintiff Sues Defendant, Alleging Defendant's Niche Is 'Cancel Culture.'"[1] The first article Luthmann wrote about the Jennifer Couture / Danesh Noshirvan story was for the Sun Bay Paper, a local Lee County / Fort Myers Beach publication. The Sun Bay Paper. "Digital Edition, January 5, 2024."[2] Luthmann is involved in this case only because of his media coverage as a member of the press. Noshirvan has made no showing nor overcome the presumption of Luthmann's work as a professional journalist, and they cannot.

Luthmann was served with the Bad Faith Subpoena by Noshirvan's process server under the direct supervision and instruction of Attorney Nick Chiappetta. This deliberate and coordinated action occurred immediately after Magistrate Judge Dudek left the bench, exploiting the courtroom as a venue for the procedural ambush. Such conduct constitutes a flagrant abuse of judicial resources and a calculated attempt to intimidate journalists engaged in constitutionally protected activities. This tactic reflects a disregard for the principles of fairness, civility, and professionalism required in legal proceedings, warranting the Court's scrutiny and appropriate sanctions.

---

[1] *The Volokh Conspiracy (Reason)*, Dec. 4, 2023, https://reason.com/volokh/2023/12/04/plaintiff-sues-defendant-alleging-defendants-niche-is-cancel-culture/ **(Luthmann Decl. at EXHIBIT "C").**
[2] *Sun Bay Paper*. Available at https://sunbaypaper.com/digital/SB_January_5_2024/, **(Luthmann Decl. at EXHIBIT "D").**

Luthmann was served with the Bad Faith Subpoena as an attempt to silence his journalism and coverage of the case. Luthmann has written dozens of articles over multiple platforms about this case.[3]  Noshirvan does not like the content of his good-faith reporting or what he has to say about him after informed research and investigation. That is Noshirvan's right. However, Noshirvan is using the legal process and the federal courts as an instrument to stifle Free Speech and the Free Press. That, he cannot do, and the Court may not allow it.  The Court should admonish and sanction Noshirvan and Attorney Chiappetta to preserve judicial integrity and deter similar abuses.

The Bad Faith Subpoena seeks irrelevant and disproportionate information, violating F.R.C.P. Rule 26(b)(1) of the Federal Rules of Civil Procedure, which limits discovery to nonprivileged, necessary matters. Its demands for journalistic work product breach the Qualified Reporter's Privilege.

Under F.R.C.P. Rule 26(c)(1), the Court should issue a Protective Order to prevent further undue burden, harassment, and intimidation. The retaliatory and overly broad nature of the Bad Faith Subpoena undermines procedural fairness and the public interest.

Noshirvan's misrepresentations in the media and in court pleadings are a blatant affront to actual members of the Fourth Estate. His practices, including "doxxing," violate federal and state privacy and anti-harassment statutes and incite mob behavior to harm private citizens.

For the last year, Luthmann has newsgathered on this case as a professional journalist and has accumulated a massive amount of information. Most of it is irrelevant to this case or any other. There are materials no professional journalist would ever publish. There are salacious materials

---

[3]    See Luthmann, Richard. "Danesh Noshirvan." *Substack*. Available at https://luthmann.substack.com/t/danesh-noshirvan.

about ALL of the parties and figures involved in this case, including private and irrelevant information about the attorneys and the judges obtained through independent newsgathering and protected sources. There is no news value to publishing such materials.

Norshirvan and his Attorney, Mr. Chiappetta's scruples are suspect. Noshirvan's dissemination of personal information about certain Supreme Court Justices post-*Dobbs* violated federal law, including 18 U.S.C. § 115. Noshirvan's actions incited protests, threats, and heightened security risks, underscoring his dangerous misuse of digital platforms.

Noshirvan engages in heinous activities identified as clear threats to institutional integrity in Chief Justice John Roberts' 2024 Year-End Report on the Federal Judiciary. **See Luthmann Decl. at EXHIBIT "E."** Chief Justice Roberts raised grave concerns regarding escalating threats to judicial independence and integrity, including attacks on federal judges and their families following the *Dobbs v. Jackson* draft decision leak.

Chief Justice Roberts condemned Doxxing incidents and disseminating misinformation to undermine judicial authority, emphasizing the judiciary's critical role as a foundation of democracy. Quoting Chief Justice Roberts, "The rule of law requires a judiciary that is free to act without fear or favor." He stressed the necessity of increased security and public education to preserve confidence in the courts amidst heightened political volatility.

These principles contextualize and bolster the claims at issue against Noshirvan's conduct here and its broader implications. Allegations of Noshirvan exploiting minors for adult content without proper documentation raise serious legal concerns under 18 U.S.C. §§ 2257 and 2257A, questioning the legitimacy of his online activities. **See Luthmann Decl. at EXHIBIT "F."**

Noshirvan's alignment with TikTok's divisive algorithms furthers destabilization efforts akin to CCP psychological operations. Whether knowingly or unwittingly, his digital vigilantism and ideological extremism pose national security risks. **See Luthmann Decl. at EXHIBIT "G."**

As stated below, if this subpoena is quashed, Noshirvan's counsel has already communicated he seeks to serve Luthmann with additional subpoenas that fail to comply with the F.R.C.P., as well as Supreme Court and Eleventh Circuit precedent requiring exhaustion of all other sources before seeking materials from reporters. This pattern of noncompliance underscores the necessity of a Protective Order precluding Noshirvan from issuing further subpoenas to any media members in this matter without first making a preliminary showing to the Court. Noshirvan and Attorney Chiappetta have already abused the subpoena process, targeting the press without appropriate court supervision to undermine judicial integrity and chill constitutionally protected journalistic activities. A protective order is essential to safeguard against further misuse and to preserve the sanctity of press freedoms.

The Court should quash the Bad Faith Subpoena, issue the Protective Order, and impose sanctions to address the subpoena's bad faith issuance, protect press freedom, and deter further abuses of the judicial process. Luthmann has repeatedly placed Noshirvan on notice pursuant to Local Rule 3.01(g).

If there are contested issues of fact, Luthmann requests a full hearing where evidence may be taken and a record established. Luthmann preliminarily requests the disqualification of Attorney Chiappetta under the Advocate-Witness rule in these circumstances.

This matter is ripe for declaratory judgment, and Luthmann seeks the same as against Noshirvan, not just to protect him, but because of the grave injury-in-fact for investigative

journalism and the entire Free Press if these issues are not clearly resolved, creating the chilling effect of uncertainty in the face of clearly delineated constitutional rights.

If broader relief is denied, Luthmann requests adjusting the subpoena compliance date ensuring no under interference with participation in the national celebration of the 47th Presidential Inauguration on January 20, 2025, and to allow Movant to avail himself of relief from the Eleventh Circuit.

Luthmann is a professional investigative journalist. See Luthmann Decl. at ¶¶ 21 – 37.

Luthmann has covered the instant case and Plaintiff Danesh Noshirvan and Defendant Jennifer Couture since December 2023. See Luthmann Decl. at ¶¶ 4, 38 – 40. The coverage has mushroomed into larger cancel culture issues concerning Noshirvan. See Luthmann Decl. at ¶¶ 41 – 47. Luthmann reports Noshirvan is currently under criminal investigation by authorities in Denton, Texas, for the cyber-bullying death of high school football coach Aaron De La Torre. Luthmann further reports that Noshirvan is under investigation for other activity, including Doxxing SCOTUS Justices and releasing their home addresses, leading to the credible murder threat of Justice Brett Kavanaugh and his family.

Luthmann reports Noshirvan monetizes off of outrage and exploitation on his platform. See Luthmann Decl. at ¶¶ 48 – 54. He says that Noshirvan has ties to international actors that seek to destabilize American institutions like the federal courts, including the Chinese Communist Party (CCP) the owner of TikTok's parent company Byte Dance.

Luthmann says the Bad Faith Subpoena is retaliatory for his investigative reporting. See Luthmann Decl. at ¶¶ 55 – 56.

Luthmann made numerous requests under Local Rule 3.01(g). The first was for Noshirvan to withdraw the Bad Faith Subpoena with Prejudice. See Luthmann Decl. at ¶¶ 60 – 65. Attorney

Chiappetta would not agree and announced Noshirvan would serve a new subpoena when Luthmann alerted Attorney Chiappetta to the technical defects in the instant subpoena.

The second request under Local Rule 3.01(g) was a further request to withdraw the Bad Faith Subpoena and enter into a voluntary Protective Order. See Luthmann Decl. at ¶¶ 66 – 74. Luthmann clearly delineated the requirements for Noshirvan to overcome the Reporter's Privilege in the Eleventh Circuit citing United States v.. Caporale, 806 F.2d 1487, 1503-04 (11th Cir.1986). Noshirvan ignored the request to meet and confer.

The third request under Local Rule 3.01(g) was for Attorney Chiappetta to voluntarily withdraw as counsel for Noshirvan based on multiple violations of the Advocate-Witness Rule. See Luthmann Decl. at ¶¶ 75 – 81. Luthmann said at ¶ 78:

> You brazenly served a subpoena on a journalist covering a case in a federal courtroom seconds after the judge left the bench.
> You are seeking evidence covered by the Reporter's Privilege without making a showing you attempted to obtain these materials from other sources.
> You failed to show the necessity or even the relevance of these materials. The first I ever heard of your asshole client was December 2023, when Professor Eugene Volokh wrote about him.
> The facts you seek have zero, zilch, nada to do with the operative complaint, or any claims, defenses, or counterclaims at issue.
> You have no good faith basis to say that the Reporter's Privilege does not apply other than YOUR fact witness statements as counsel.
> Since you insist on the subpoena, I insist on a protective order to protect investigate journalism and the First Amendment.
> I also insist on a hearing to create a record. Since you are the FACT WITNESS to facts that would plausibly make your client's case, I warn you to withdraw now, or else face sanctions for willfully violating the witness advocate rule.
> You cannot continue as Danesh Noshirvan's counsel.
> Any communications with the Court highlight a fundamental legal issue with the Local Rules and the ABA's Canon of Judicial Ethics, which shall become abundantly clear in due course.

Luthmann stated the applicable Eleventh Circuit Law concerning the Advocate-Witness

Rule and Attorney Chiappetta's transgressions at ¶ 75:

> The advocate witness rule mandates "counsel should avoid appearing as both advocate and witness except under extraordinary circumstances." United States v. Hosford, 782 F.2d 936, 938 (11th Cir. 1986) (citing United States v. Crockett, 506 F.2d 759, 760 (5th Cir. 1975)).
>
> The rule most obviously addresses a situation where a party's attorney is called as a witness. See id. But violations of the rule may also arise where an attorney or prosecutor has inside knowledge about facts at issue in the trial if the prosecutor indirectly testifies by implying "special knowledge or insight" of the facts, or is selected as prosecutor despite being the "sole witness whose testimony is necessary to establish essential facts otherwise not ascertainable." Id. at 939 (footnote call number omitted).
>
> On Wednesday, December 11th, 2024 at 8:26 AM, Nick Chiappetta <nick@chiappettalegal.com> stated [in pertinent part]:
>
> "If the latter do not forget to mention the conversation you had with Dr. Ralph Garramone before the hearing or that you left the hearing with Jennifer Couture. Further, there is no need for threats - physical, verbal, or otherwise. And yes, everyone on the courtroom eye witnessed your improper behavior yesterday. Physically threatening a female process server and myself in front of Federal Deputies in a Federal Courthouse. Kicking the subpoena on the floor. Throwing a tantrum. Not appropriate to say the least. I strongly encourage you to seek help."
>
> Mr, Chiappetta, you have Hornbook "special knowledge or insight." You are a fact witness. It is improper for you to remain on this case.
>
> Please withdraw as counsel for Mr. Noshirvan to save me the trouble of filing a motion, where I will ask for costs and sanctions.

Luthmann requests sanctions against Noshirvan and Attorney Chappetta for calculated

service of the Bad Faith Subpoena in the courtroom seconds after Magistrate Judge Dudek left the

bench. See Luthmann Decl. at ¶¶ 82 to 105. Luthmann says that Noshirvan and Attorney

Chiappetta's "tactical ambush" was part of a deliberate pattern of harassment.

12

## LEGAL MEMORANDUM SUPPORTING THE REQUEST

## TECHNICAL PROBLEMS WITH THE FRIVOLOUS AND BAD FAITH SUBPOENA

## FACIAL INVALIDITY OF THE FRIVOLOUS AND BAD FAITH SUBPOENA
## UNDER F.R.C.P. RULE 45

Rule 45(c)(1)(A) of the Federal Rules of Civil Procedure restricts subpoenas to venues within 100 miles of the recipient's residence, place of employment, or regular place of business. The subpoena commands production in Tampa, Florida, over 100 miles from Luthmann's stated address in Naples, Florida, rendering it invalid and unenforceable. See *Fed. R. Civ. P. 45(d)(3)(A)(ii)*.

A court must quash or modify a subpoena that fails to comply with this territorial limitation. *Pope v. United States*, 372 F. Supp. 3d 344, 350 (M.D.N.C. 2019) (quashing subpoena for exceeding the 100-mile rule).

The subpoena served on December 10, 2024, blatantly violates Rule 45(c)(1)(A) of the Federal Rules of Civil Procedure, which limits subpoenas to venues within 100 miles of the recipient's residence, place of employment, or regular place of business. Specifically, the Bad Faith Subpoena commands document production at 201 E. Kennedy Blvd., Tampa, Florida, a location that exceeds 100 miles from Luthmann's stated former residence on the face of the Frivolous and Bad Faith Subpoena at 338 Sugar Pine Lane, Naples, Florida. Luthmann Decl. at ¶¶ 62 -64.

The Federal Rules provide no exception for compelling compliance beyond this limit for non-party witnesses. This is the case even where the Bad Faith Subpoena commands the production of materials. The language in Fed. R. Civ. P. 45(d)(2)(A) makes the appearance of the subpoenaed party optional. Luthmann says he would elect to appear in person to satisfy the subpoena if the same were otherwise valid, but it is not. Luthmann Decl. at ¶64. This geographic

overreach renders the Frivolous and Bad Faith Subpoena facially invalid and unenforceable. See Fed. R. Civ. P. 45(d)(3)(A)(ii).

The geographic limitation codified in Rule 45(c) serves a critical purpose: to prevent undue burdens on non-parties by ensuring that subpoenas are limited to reasonable proximity. Courts routinely enforce this rule to quash subpoenas exceeding these limitations. See *Dugas v. 3M Co.*, 2014 U.S. Dist. LEXIS 128577, at *5–7 (M.D. Fla. Sep. 15, 2014) (granting a motion to quash a subpoena for non-compliance with Rule 45's geographic restrictions). Similarly, in *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003), the court emphasized the importance of balancing the subpoena's burden on non-parties with the need for discovery, underscoring Rule 45's geographic limits.

The Bad Faith Subpoena fails to justify why it demands production in a location clearly outside permissible bounds. No extraordinary circumstances exist that would allow a deviation from the well-established limitations of Rule 45(c). The burden placed upon me, a non-party journalist, by requiring compliance in Tampa, Florida, is unreasonable and entirely avoidable.

## IMPROPER SERVICE IN THE COURTHOUSE

The Bad Faith was served on Luthmann in a public courtroom while he was engaging in journalistic activities, an act orchestrated by Attorney Nick Chiappetta, a calculated tactic intended to harass and intimidate Luthmann in the exercise of his First Amendment-protected activities as a journalist.

An examination of the documents contained in the Bad Faith Subpoena package show that Attorney Chiappetta ordered the process server AFTER Luthmann had arrived at the Ft. Myers Courthouse. See Luthmann Decl. at **EXHIBIT "A"** at page 11.

The witness fee check was created and issued on December 10, 2024. See Luthmann Decl. at **EXHIBIT "A"** on page 10.

Legal ethics and procedural norms prohibit serving process in a manner that is inherently harassing, disruptive, or designed to interfere with constitutionally protected activities. Attorney Chiappetta's deliberate choice of a courtroom—a place symbolizing the rule of law and impartial justice—as the venue for such a service magnifies the impropriety of this tactic. Courts have consistently condemned such behavior. See *Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("The discovery process is not to be used as a tool for harassment or oppression.").

Attorney Chiappetta's lack of respect smacks of the same lack of brazenness Noshirvan showed in doxing the SCOTUS Justices he disagreed with. It makes me wonder whether this activity – the knowing formulation and service of the Bad Faith Subpoena on an investigative journalist - was coordinated and conspiratorial activity, outside of the proper bounds of the attorney-client relationship, and harassment well within the ambit of the crime-fraud exception to the attorney-client privilege.

Serving a journalist in a courthouse, particularly while engaged in their professional capacity, constitutes a blatant abuse of the legal process. The Eleventh Circuit has made clear that

15

courts possess the inherent authority to sanction attorneys who misuse litigation tools to achieve improper objectives. See *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) ("Courts may sanction bad faith conduct to preserve the orderly administration of justice."). The subpoena is part of a deliberate pattern of harassment by Noshirvan and Attorney Chiapetta.

This bad faith is evident in:

A.  The overly broad and duplicative nature of the requests, many of which seek publicly available information.

B.  The targeting of a journalist to deter investigative reporting, violating the First Amendment.

C.  The frivolous demand for irrelevant and unrelated materials, such as my disbarment records and unrelated legal matters, which have no bearing on the case.

This tactical ambush, combined with the Bad Faith Subpoena's procedural flaws and geographic overreach, underscores a pattern of bad faith litigation tactics. The choice to serve me during a public court proceeding demonstrates an intent to chill my journalistic endeavors – and others who would have the temerity to cover Noshirvan's exploits - and hijack the judicial process for malfeasance and misconduct, rather than to secure relevant or necessary discovery.

Such actions are contrary to the principles of fairness and professionalism expected in litigation. See *ABA Model Rules of Professional Conduct* Rule 4.4(a) ("A lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person."). Here, Attorney Chiapetta's conduct is precisely the type of oppressive behavior Rule 4.4(a) was designed to prevent.

The improper service not only violated ethical standards but also disrupted Luthmann's ability to attend and report on the public proceedings in question. By doing so, it interfered with

16

Luthmann's First Amendment rights to observe and report on matters of public concern, a cornerstone of Free Press protections enshrined in the Constitution.

The deliberate orchestration of this service in a courtroom is HORNBOOK bad faith conduct that requires judicial intervention. Such actions undermine the integrity of the judicial process and cannot be allowed to stand unchallenged.

Accordingly, Luthmann respectfully requests that this Court act decisively to stem this malicious affront to investigative journalism and the Freedom of the Press. Luthmann asks the Court to impose sanctions on Plaintiff's counsel, Nick Chiappetta, Esq., and the Defendant, Danesh Noshirvan, in a manner and an amount sufficient to deter future misconduct.

Courts possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal. The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it. A trial court possesses the inherent power to discipline counsel for misconduct, short of behavior giving rise to disbarment or criminal censure, without resort to the powers of civil or criminal contempt.

Courts possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal. The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it. A trial court possesses the inherent power to discipline counsel for misconduct, short of behavior giving rise to disbarment or criminal censure, without resort to the powers of civil or criminal contempt. Kleiner v. First Nat'l Bank, 751 F.2d 1193, 1209 (11th Cir. 1985) (internal citations and quotation marks omitted).

"The key to unlocking a court's inherent power is a finding of bad faith." <u>Barnes v. Dalton</u>, 158 F.3d 1212, 1214 (11th Cir. 1998).

"When considering sanctions under the court's inherent power, the threshold of bad faith conduct is at least as high as the threshold of bad faith conduct for sanctions under [28 U.S.C.] § 1927." <u>Peer v. Lewis</u>, 606 F.3d 1306, 1316 (11th Cir. 2010) (internal quotation marks omitted).

In the context of § 1927, "bad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct. The . . . district court must compare the attorney's conduct against the conduct of a reasonable attorney and make a judgment about whether the conduct was acceptable according to some objective standard." <u>Amlong & Amlong, P.A. v. Denny's, Inc.</u>, 500 F.3d 1230, 1239-40 (11th Cir. 2006) (internal quotation marks omitted).

"Thus, an attorney's conduct must be particularly egregious to warrant the imposition of sanctions -- the attorney must <u>knowingly</u> or <u>recklessly</u> pursue a frivolous claim or needlessly obstruct the litigation of a non-frivolous claim." <i>Id.</i> at 1242 (emphasis in original<i>)</i>; <u>Mackey v. Fairwinds Credit Union</u>, No. 6:19-cv-1921-Orl-31EJK, 2020 U.S. Dist. LEXIS 105397, at *3-4 (M.D. Fla. June 16, 2020).

The Court has the "inherent power to regulate litigation and sanction the parties ... for abusive practices." <u>Tarasewicz v. Royal Caribbean Cruises, Ltd.</u>, Case No. 14-CIV-60885-Bloom/Valle, 2016 U.S. Dist. LEXIS 186120, 2016 WL 3944176, at * 4 (S.D. Fla. Feb. 9, 2016) (citations omitted) (report and recommendation adopted by <u>Tarasewicz,</u> 2016 U.S. Dist. LEXIS 186121, 2016 WL 3944178 (S.D. Fla. March 17, 2016)); see also <u>Kleiman v. Wright</u>, No. 18-cv-80176-BLOOM/Reinhart, 2020 U.S. Dist. LEXIS 4241, at *20 (S.D. Fla. Jan. 10, 2020). Sanctions for a bad faith filing should be limited to what is sufficient to deter repetition of the conduct. <u>In re Fazzary</u>, 530 B.R. 903, 904 (Bankr. M.D. Fla. 2015).

Sanctions under the court's inherent authority or F.R.C.P. Rule 37(b)(2)(A) are necessary to deter similar abusive litigation tactics. Mackey v. Fairwinds Credit Union, 2020 U.S. Dist. LEXIS 105397, at *3-4 (M.D. Fla. June 16, 2020) (sanctions imposed for frivolous and burdensome discovery demands).

Monetary sanctions are also appropriate. Because of Noshirvan's history in Doxxing the SCOTUS Justices, I do not believe he will be lightly deterred. Because of the great severity and emphasis placed on just these issues by Chief Justice Roberts and the paramount concerns of the institutional integrity of the federal courts, I request an amount no less than ONE HUNDRED THOUSAND ($100,000) DOLLARS, as authorized by the Court's inherent powers to regulate and punish Noshirvan and Attorney Chiappetta's actions that far exceed merely abusive litigation practices.

This Court's swift intervention is necessary to reaffirm the principles of fairness, protect non-parties from oppressive discovery practices, safeguard the vital role of investigative journalism and the Freedom of the Press in our constitutional republic, and protect the institutional integrity of the federal judiciary.

## SUBSTANTIVE LAW

## QUALIFIED PRIVILEGE FOR JOURNALISTS

Federal courts, including the Eleventh Circuit, recognize a qualified privilege for journalists, shielding them from compelled disclosure of unpublished materials. This protection applies to both criminal and civil proceedings. United States v. Capers, 708 F.3d 1286, 1303 (11th Cir. 2013); United States v. Caporale, 806 F.2d 1487, 1504 (11th Cir. 1986). To overcome this privilege, the party seeking disclosure must meet a stringent three-pronged test by clear and convincing evidence:

19

A. **Relevance:** The materials must be highly relevant to the litigation.

B. **Necessity:** The materials must be necessary for the proper presentation of the case.

C. **Availability:** The materials must not be obtainable from other sources.

McCarty v. Bankers Ins. Co., 195 F.R.D. 39, 47 (N.D. Fla. 1998). Courts have routinely quashed subpoenas to journalists when alternative sources of information are available. In re DaimlerChrysler AG Sec. Litig., 216 F.R.D. 395, 403 (E.D. Mich. 2003) (quashing subpoena for journalist's notes, emphasizing that journalists are not the first line of discovery).

The First Amendment underpins the Qualified Journalist's Privilege. The Supreme Court has held that the need to protect the free flow of information and shield journalists from undue intrusion outweighs broad discovery demands. Herbert v. Lando, 441 U.S. 153, 177 (1979); Branzburg v. Hayes, 408 U.S. 665, 707 (1972).

As Justice Polster Chappell reminded us of when she was a Magistrate Judge in Angiolillo v. Collier Cty., No. 2:08-cv-606-FtM-99SPC, 2009 U.S. Dist. LEXIS 105346, at *3-4 (M.D. Fla. June 18, 2009):

> Federal courts, including the Eleventh Circuit, have "overwhelmingly recognized a qualified privilege for journalists which allows them to resist compelled disclosure of their professional news gathering efforts and results, whether published or not." U.S. v. Diaz, 2004 U.S. Dist. LEXIS 11724, 2004 WL 1944851 *1 (S.D. Fla. April 27, 2004) (citing McCarty v. Bankers Insurance Co., 195 F.R.D. 39, 44 (N.D. Fla.1998)). This reporter's privilege stems from the adverse effect of forcing journalists to testify in judicial proceedings about the substance of their news reports. Diaz, 2004 U.S. Dist. LEXIS 11724, 2004 WL 1944851 at *1 (citing United States v.. Caporale, 806 F.2d 1487, 1503-04 (11th Cir.1986) (reporters' subpoenas quashed where defendants failed to show alternative sources of information did not exist or that reporters had information relevant to the defense); Miller v. Transamerican Press, Inc., 621 F.2d 721, 725 (5th Cir.1980) (formally adopting reporter's privilege enunciated by other circuits). The privilege may be overcome only if the information sought is shown to be: (a) highly relevant; (b) necessary to the

20

> proper presentation of the case; and (c) unavailable from other sources. <u>Diaz</u>, 2004 U.S. Dist. LEXIS 11724, 2004 WL 1944851 at *1 (citing <u>Caporale</u>, 806 F.2d at 1504). The party seeking to compel a reporter's testimony must establish all three prongs by "clear and convincing evidence." <u>McCarty</u>, 195 F.R.D. at 47.

The United States Court of Appeals for the Eleventh Circuit "recognizes a qualified privilege for journalists, allowing them to resist compelled disclosure of their professional news gathering efforts." <u>United States v. Capers</u>, 708 F.3d 1286, 1303 (11th Cir. 2013); <u>see also United States v. Caporale</u>, 806 F.2d 1487, 1504 (11th Cir. 1986). The "privilege shields reporters in both criminal and civil proceedings." <u>Capers</u>, 708 F.3d at 1303 (citations omitted).

"[T]he purpose of the journalist's privilege was not solely to protect newspaper or television reporters, but to protect the activity of 'investigative reporting.'" <u>In re Madden</u>, 151 F.3d 125, 129 (3d Cir. 1998) (citing <u>von Bulow by Auersperg v. von Bulow</u>, 811 F.2d 136, 142-43 (2d Cir. 1987)).

"Thus, 'it makes no difference whether the intended manner of dissemination was by newspaper, magazine, book, public or private broadcast or handbill because the press, in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.'" <u>Id.</u> (citing <u>von Bulow</u>, 811 F.2d at 144).

"[I]nformation may only be compelled from a reporter claiming privilege if the party requesting the information can show that it is highly relevant, necessary to the proper presentation of the case, and unavailable from other sources." <u>Caporale</u>, 806 F.2d at 1504 (citation omitted).

## <u>INTERPLAY BETWEEN THE F.R.C.P. DISCOVERY RULES AND THE REPORTER'S QUALIFIED PRIVILEGE</u>

The F.R.C.P. provide for broad discovery and contemplate a range of discovery devices, including interrogatories, requests for production of documents and for admissions, and

depositions of parties, as well as subpoenas *duces tecum* and *ad testificandum* directed at

nonparties. The press has found itself subject to all of these forms of civil discovery. See,

e.g., Fed. R. Civ. P. 30(a)(1) (depositions); 33(a) (interrogatories); 34(a) (requests for the

production of documents); 36 (requests for admission); 45 (subpoenas).

Rule 26(b)(2)(C) provides that, separate and apart from any applicable privilege:

> On motion or on its own, the court must limit the frequency or extent
> of discovery otherwise allowed by these rules or by local rule if it
> determines that: (i) the discovery sought is unreasonably cumulative
> or duplicative, or can be obtained from some other source that is
> more convenient, less burdensome, or less expensive; (ii) the party
> seeking discovery has had ample opportunity to obtain the
> information by discovery in the action; or (iii) the proposed
> discovery is outside the scope permitted by Rule 26(b)(1).

Rule 26(b)(1), in turn, provides in relevant part:

> Parties may obtain discovery regarding any nonprivileged matter
> that is relevant to any party's claim or defense and proportional to
> the needs of the case, considering the importance of the issues at
> stake in the action, the amount in controversy, the parties' relative
> access to relevant information, the parties' resources, the importance
> of the discovery in resolving the issues, and whether the burden or
> expense of the proposed discovery outweighs its likely benefit.
> Information within this scope of discovery need not be admissible
> in evidence to be discoverable.

Moreover, Rule 26(c)(1) further authorizes a court to grant protective orders "to protect a

party or person from annoyance, embarrassment, oppression, or undue burden or expense."

Fed. R. Civ. P. 26(c)(1). See EDST, LLC v. iApartments, Inc., 2022 U.S. Dist. LEXIS 193451, at

**7–9 (M.D. Fla. Oct. 24, 2022) (holding plaintiff's subpoena seeking "all documents and

communications concerning" news articles about plaintiff overbroad under Fed. R. Civ. P. 26 and

quashing subpoena without reaching privilege issue).

Courts have quashed subpoenas where they were issued primarily to harass or retaliate

against journalists. Baez v. JetBlue Airways, 2012 U.S. Dist. LEXIS 161246 (E.D.N.Y. Nov. 9,

2012). ("Given the obvious First Amendment concerns at play in compelling a non-party journalist to testify, combined with the limited value of the deposition plaintiff seeks, I am satisfied that subpoena places an undue burden on [the reporter]. The subpoena is therefore quashed" pursuant to Fed. R. Civ. P. 26(c).).

In <u>Herbert v. Lando</u>, 441 U.S. 153, 177 (1979), the Supreme Court suggested that then-operative versions of the aforementioned rules grant trial judges "ample power" to protect journalists from "abuse" of the civil discovery process. Indeed, the Court asserted that, although

> the deposition-discovery rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil trials … , the discovery provisions, like all of the Federal Rules of Civil Procedure, are subject to the injunction of Rule 1 that they "be construed to secure the just, *speedy*, and *inexpensive* determination of every action." … To this end, the requirements of Rule 26(b)(1) that the material sought in discovery be "relevant" should be firmly applied, and the district courts should not neglect their power to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id.* (emphasis in original) (citations omitted).

In that regard, Justice Powell wrote separately in <u>Herbert</u> "to emphasize the additional point that, in supervising discovery in a libel suit by a public figure, a district court has a duty to consider First Amendment interests as well as the private interests of the plaintiff" because, when a "discovery demand arguably impinges on First Amendment rights a district court should measure the degree of relevance required in light of both the private needs of the parties and the public concerns implicated." *Id.* at 178–79 (Powell, J., concurring).

Courts have relied on this language in <u>Herbert</u> to call for "the application of Fed. R. Civ. P. 26 … with a heightened sensitivity to any First Amendment implication that might result from the compelled disclosure of sources." <u>Bruno & Stillman, Inc. v. Globe Newspaper Co.</u>, 633 F.2d 583, 596 (1st Cir. 1980). See also <u>In re Cusumano</u>, 162 F.3d 708 (1st Cir. 1998) (third-party subpoena

to academic authors in antitrust action quashed pursuant to Rule 26) (citing <u>Bruno & Stillman, Inc</u>.).

For instance, in <u>In re DaimlerChrysler AG Securities Litigation</u>, 216 F.R.D. 395 (E.D. Mich. 2003), a federal magistrate judge concluded that he was "constrained by Sixth Circuit precedent to find that [reporters] are not constitutionally shielded by a First Amendment privilege, qualified or otherwise," (*Id.* at 401), but nevertheless held that the Federal Rules of Civil Procedure foreclosed discovery of a reporter's nonconfidential, unpublished source material. (*Id.* at 406).

Specifically, the court determined that the limitations imposed by the then-operative version of Rule 26(b)(2) must take account of a would-be witness's status as a "news-gatherer." It denied the plaintiffs' motion to compel production. *Id.* at 403. See also <u>E&J Gallo Winery v. Encana Energy Servs.</u>, 33 Media L. Rep. (BNA) 1413, 1414 (S.D.N.Y. 2005) (holding subpoena to specialty publication for unpublished information was "unduly burdensome under Federal Rule of Civil Procedure 45(c)").

In <u>Johnson v. Metropolitan Government of Nashville</u>, 2009 U.S. Dist. LEXIS 56538 (M.D. Tenn. July 2, 2009), the court relied on Rule 26 to quash a subpoena to a non-party reporter seeking his testimony about the meaning and context of a quotation published in one of his articles.

Similarly, in the wake of the Seventh Circuit's decision in <u>McKevitt v. Pallasch</u>, 339 F.3d 530 (7th Cir. 2003), courts have invoked the provisions of what is now Rule 45(d) to quash third-party subpoenas in civil actions seeking journalist's nonconfidential but unpublished notes and outtakes.[4]

---

[4] See, e.g., <u>Thayer v. Chiczewski</u>, 257 F.R.D. 466 (N.D. Ill. 2009) (relying on Federal Rules of Civil Procedure 45 and 26 to limit overly broad subpoena of reporter's materials in civil case); <u>Hobley v. Burge</u>, 223 F.R.D. 499, 504–05 (N.D. Ill. 2004) (citing <u>Herbert v. Lando</u>, 441 U.S. 153, 177 (1979)); <u>In re DaimlerChrysler Sec. Litig.</u>, 216 F.R.D. 395, 402 (E.D. Mich. 2003) (quashing portion of subpoena seeking journalist's nonconfidential notes of conversations with plaintiff

Rule 26(b)(2)(C) mandates that discovery requests be proportional to the needs of the case, avoiding undue burden or expense. The Bad Faith Subpoena fails this standard.

Rule 26(c)(1) also authorizes protective orders to prevent annoyance, embarrassment, oppression, or undue burden. A protective order is warranted to preclude further harassment by Noshirvan and his counsel, the ethically challenged Attorney, Nick Chiappetta.

## RESPONSE TO SPECIFIC SUBPOENA REQUESTS

### Request 1: All Documents Published on X Regarding Named Individuals

All articles, posts, videos, and related media published to my X (formerly Twitter) account (@rluthmann) regarding Jennifer Couture, Ralph Garramone, Patrick Trainor, and Danesh Noshirvan are publicly accessible. The subpoena does not specify any unpublished materials, making this request overly broad, redundant, and burdensome.

As a professional journalist, Luthmann's published materials are intended for public consumption and are easily retrievable by the requesting party without resorting to intrusive legal demands. Courts have repeatedly held that subpoenas targeting publicly available information fail to meet discovery standards. See Herbert v. Lando, 441 U.S. 153, 177 (1979).

### Request 2: All Documents Published on Any Platform Regarding Named Individuals

Any articles, videos, podcasts, or other media Luthmann has produced and published regarding the named individuals are publicly accessible on platforms such as Substack, Newsbreak, The Frank Report, and *The Sun Bay Paper*.

---

pursuant to what was then denominated Fed. R. Civ. P. 45(c)(3) because enforcement "would impose an undue burden" by disclosing "confidential research for which the Individual Defendants have not shown a substantial need that cannot otherwise be met").

The subpoena does not distinguish between public and non-public materials, nor does it establish relevance, necessity, or unavailability from other sources. This blanket request mirrors the deficiencies in Request 1 and fails under Rule 26(b)(1)'s proportionality requirements. See Robertson v. People Magazine, 2015 U.S. Dist. LEXIS 168525 (S.D.N.Y. Dec. 16, 2015).

**Requests 3-7: Communications with Named Individuals**

My communications with Jennifer Couture, Ralph Garramone, Patrick Trainor, Joseph A. Camp, Danesh Noshirvan, Nick Chiappetta, and all parties named, mentioned, or related to this lawsuit fall squarely within the scope of the Qualified Journalist's Privilege. This privilege protects both published and unpublished newsgathering materials, including confidential communications. See United States v. Capers, 708 F.3d 1286, 1303 (11th Cir. 2013).

To pierce this privilege, the subpoenaing party must demonstrate by clear and convincing evidence that:

A. The materials are highly relevant.

B. They are necessary to the proper presentation of the case.

C. They cannot be obtained from alternative sources.

See McCarty v. Bankers Ins. Co., 195 F.R.D. 39, 47 (N.D. Fla. 1998). The subpoena does not satisfy any of these criteria. Any relevant communications, if they exist, are more appropriately sought from the named parties themselves or through other witnesses.

Additionally, the requests are unreasonably broad, spanning years of correspondence without specificity, and lack a showing of necessity or proportionality. See *Fed. R. Civ. P. 26(b)(2)(C)*.

**Requests 8-9: Payments Received for Articles Regarding Named Individuals**

Payment records related to Luthmann's investigative journalism are not relevant to the underlying litigation. Courts have recognized that inquiries into funding sources for journalistic endeavors are invasive and risk chilling protected speech. See *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). Further, Luthmann has previously said that no party to this matter has ever paid him for anything.

Luthmann's reporting on matters of public interest, including the actions of Noshirvan and his impact on others, is independent of funding sources. The goal of the journalistic endeavor is to report the truth. This transparent request is plainly designed to intimidate and harass, in contravention of the First Amendment.

**Requests 10-11: Communications with Any Person Regarding the Litigation**

Communications regarding Couture, Garramone, and related litigation are either publicly available through published work or protected as unpublished newsgathering materials.

The subpoena fails to demonstrate why such communications are necessary or why they cannot be obtained from other parties involved in the case. This sweeping request imposes an undue burden and disregards Rule 26(b)(1) requirements for proportionality and relevance.

**Request 12: Communications with Newsweek**

Any communications with Newsweek or its journalists, including Katherine Fung, are irrelevant to the claims or defenses in this litigation.

Courts have consistently quashed subpoenas seeking such materials, recognizing the undue burden they place on journalists and their sources. See *Baez v. JetBlue Airways*, 2012 U.S. Dist. LEXIS 161246 (E.D.N.Y. Nov. 9, 2012).

This overbroad request further underscores the retaliatory intent behind the subpoena, targeting journalists and media entities that have reported on Noshirvan's activities.

## Requests 13-14: Articles and Videos on Named Individuals

All articles and videos Luthmann published regarding the named individuals are publicly available across multiple platforms. Requests for unpublished drafts or editorial materials infringe upon the editorial independence of journalists, which courts have consistently protected. See *Herbert v. Lando*, 441 U.S. at 177. Attorney Chiappetta's poor drafting is apparent, intentional, and frivolous. He has a pattern of asking for the same materials multiple times throughout this litigation and the Court should put a stop to it through sanctions and admonitions.

## Requests 15-16: Disbarment and Legal History

Luthmann's disbarment and prior legal history are matters of public record, readily accessible through court documents and news reports. This request has no bearing on the litigation and serves solely to harass and distract. Courts routinely quash subpoenas that seek irrelevant personal information under the guise of discovery. See EDST, LLC v. iApartments, Inc., 2022 U.S. Dist. LEXIS 193451 (M.D. Fla. Oct. 24, 2022).

## Requests 17-18: All Documents Posted to Platforms or Related Indictments

Published posts on Substack, Newsbreak, X, and other platforms are already in the public domain. Requests for documents regarding unrelated criminal matters are irrelevant and vexatious, aiming to tarnish my reputation rather than advance legitimate discovery. This conduct warrants judicial admonishment and protective measures. See Mackey v. Fairwinds Credit Union, 2020 U.S. Dist. LEXIS 105397 (M.D. Fla. June 16, 2020). And again Attorney Chiappetta's pattern of asking for the same materials multiple times throughout this litigation comes through. The Court should put a stop to it through sanctions and admonitions.

## DECLARATORY JUDGMENT

Courts have wide discretion in deciding whether to entertain a declaratory judgment action. Kerotest Mfg., Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183-84, 72 S. Ct. 219, 96 L. Ed. 200, 1952 Dec. Comm'r Pat. 407, (1952). A declaratory judgment is used to clarify legal relations and not to make factual determinations. Medmarc Cas. Ins. Co. v. Pineiro & Byrd PLLC, 783 F. Supp. 2d 1214, 1216 (S.D. Fla. 2011) (Marra, J.). Moreover, "if a district court determines that a complaint requesting a declaratory judgment will not serve a useful purpose, the court cannot be required to proceed to the merits before dismissing the complaint." *Id.* (cleaned up).

Significantly, "a plaintiff seeking . . . declaratory relief must prove not only an injury, but also a real and immediate threat of *future injury* in order to satisfy the 'injury in fact' requirement." Koziara v. City of Casselberry, 392 F.3d 1302, 1305 (11th Cir. 2004) (quotation omitted) (emphasis added); see also Am. Ins. Co. v. Evercare Co., 699 F. Supp. 2d 1355, 1359 (N.D. Ga. 2010), *aff'd*, 430 F. App'x 795 (11th Cir. 2011) (unpublished) ("The Declaratory Judgment Act is inappropriate to adjudicate past conduct.") That is "[t]he Declaratory Judgment Act, 28 U.S.C. § 2201, is designed to settle 'actual controversies' *before* they ripen into breaches of contract or violations of law." Bacardi USA, Inc. v. Young's Mkt. Co., 273 F. Supp. 3d 1120, 1127 (S.D. Fla. 2016) (Seitz, J.) (emphasis added). "Past injuries alone generally do not establish declaratory judgment jurisdiction." *Id.* at 1128.

Attorney Chiappetta states that he will issue a new subpoena against Luthmann, a member of the press unless stopped by the Court. The Declaratory Judgment Act is an appropriate vehicle to protect the legal rights of professional journalists related to this litigation.

The Declaratory Judgment Act gives federal courts discretion to entertain a suit for declaratory relief if all the following are true:

- An actual controversy exists (i.e., Article III of the Constitution is satisfied)

- Subject matter jurisdiction exists

- The action does not involve one of the statutorily excluded controversies

See 28 U.S.C. § 2201(a)–(b); MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007). The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate. F.R.C.P Rule 57. Declaratory relief may be granted in addition to other remedies, and further relief may be sought once a declaration is entered. 28 U.S.C. §§ 2201–2202. A district court does, however, have discretion not to issue a declaration where a better or more effective alternative remedy exists. See Ford Motor Co. v. United States, 811 F.3d 1371, 1380 (Fed. Cir. 2016).

Declaratory relief is an important option for establishing the parties' rights. Specifically, when acting without clarification of one's rights poses great risk, but a claim for damages may not yet be appropriate, declaratory relief can provide certainty. See, e.g., N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 53 (1st Cir. 2021).

Movant submits that Declaratory Judgment is appropriate to protect the both the movant's rights and the rights of the Free Press.

## Qualified Privilege

The Movant respectfully requests that the Court grant declaratory judgment recognizing the Reporter's Privilege as the law of the case, as applied to the movant, to safeguard both the movant's constitutional rights and the broader rights of the Free Press. Declaratory relief under the Declaratory Judgment Act is warranted and necessary under the present circumstances to prevent imminent harm and ensure clarity regarding legal obligations and protections.

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), empowers federal courts to "declare the rights and other legal relations of any interested party seeking such declaration," provided an actual controversy exists. Courts exercise discretion in granting such relief where it serves to clarify legal relations and prevent future disputes, especially when acting without such clarification poses significant risks. This tool is particularly apt in resolving disputes implicating constitutional rights, such as the protections afforded to journalists under the First Amendment and the Reporter's Privilege.

An actual controversy exists as Attorney Chiappetta has explicitly stated an intent to issue additional subpoenas targeting the movant, a professional journalist, unless restrained by the Court. This stated intent constitutes a "real and immediate threat of future injury," satisfying Article III's requirement for a live controversy. The movant faces a concrete risk of irreparable harm to their constitutional rights, professional reputation, and ability to engage in investigative journalism without fear of retaliatory legal actions.

The Court has jurisdiction over the matter as it arises in the context of ongoing litigation and raises federal constitutional questions, including the First Amendment and the applicability of the Reporter's Privilege. Declaratory relief is particularly appropriate because:

1. The Declaratory Judgment Act allows courts to resolve controversies before they ripen into breaches of law or constitutional violations, as stated in Bacardi USA, Inc. v. Young's Mkt. Co., 273 F. Supp. 3d 1120, 1127 (S.D. Fla. 2016).

2. The relief sought does not involve adjudication of past conduct but rather addresses a current and ongoing threat of harm, distinguishing it from situations where declaratory relief is deemed inappropriate for retrospective claims.

31

Declaratory relief is crucial in this case for several reasons:

1. **Clarification of Legal Rights**: The movant requires an explicit declaration affirming the applicability of the Reporter's Privilege, ensuring they are not subject to further harassment or improper discovery efforts. Such clarity is essential to prevent chilling effects on journalistic activities and the broader Free Press.

2. **Protection Against Imminent Harm**: Without declaratory relief, Attorney Chiappetta's stated intent to issue additional subpoenas will expose the movant to repeated legal harassment, infringing on constitutional protections and consuming significant time and resources.

3. **Public Interest in Press Freedom**: The Free Press serves a critical role in exposing corruption and fostering transparency. The issuance of abusive subpoenas against journalists undermines these principles and poses a broader threat to democratic institutions.

While alternative remedies, such as motions to quash, may provide some relief, they are reactive in nature and do not address the underlying pattern of abuse. Declaratory judgment offers a proactive and comprehensive solution, ensuring that the movant and other journalists are shielded from ongoing and future harm. Courts have consistently recognized the importance of declaratory relief in protecting fundamental constitutional rights, especially where uncertainty or ambiguity could otherwise result in significant harm. See N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 53 (1st Cir. 2021).

Thus, the Movant has demonstrated the existence of an actual controversy, irreparable harm absent relief, and the necessity of declaratory judgment to protect constitutional rights and the public interest in a Free Press. The Court should exercise its discretion to grant declaratory

judgment recognizing the Reporter's Privilege as the law of the case, thereby precluding Attorney

Chiappetta from issuing additional subpoenas targeting the movant without prior Court approval.

This remedy will uphold the principles of press freedom, safeguard constitutional rights, and

provide clarity to prevent further abuse of the judicial process.

### Abuse of Process

The Court should grant declaratory judgment recognizing that Noshirvan and Chiappetta

engaged in abuse of process regarding their actions associated with the bad faith subpoena issued

to the movant. Under Florida law, abuse of process occurs when legal process is used primarily for

an ulterior purpose and results in harm to the victim. See O'Malley-Gordon v. United States, No.

2:18-cv-533-FtM-29NPM, 2019 U.S. Dist. LEXIS 163820, at *5-6 (M.D. Fla. Sep. 25, 2019);

Bothmann v. Harrington, 458 So. 2d 1163, 1169 (Fla. 3d DCA 1984). The elements of abuse of

process are clearly satisfied in this case.

1. **Illegal, Improper, or Perverted Use of Process**

The subpoena issued by Noshirvan and Chiappetta was not designed to obtain legitimate

discovery or advance the litigation but instead to intimidate and silence the Movant, a professional

investigative journalist. The process was perverted for purposes unrelated to its lawful intent,

violating the principle that process must be used to achieve a legitimate legal goal.

2. **Ulterior Motive or Purpose**

Evidence demonstrates that Noshirvan and Chiappetta acted with ulterior motives. Their

subpoena targeted the Movant's constitutionally protected investigative activities to retaliate

against unfavorable reporting and suppress public scrutiny. The motive was not to obtain relevant

evidence but to misuse the legal system to harass, intimidate, and chill the movant's journalistic

endeavors.

3. **Damage to the Movant.**

The Movant suffered significant harm as a result of the bad faith subpoena. This includes reputational harm, economic costs related to legal defenses, and the chilling effect on the exercise of constitutional rights as a journalist. These damages are concrete and directly tied to the malicious and improper use of the subpoena. Additionally, the constitutional damage is presumed.

Florida law explicitly requires a post-issuance perversion of the process to support a claim for abuse of process. See Peckins v. Kaye, 443 So. 2d 1025, 1026 (Fla. 2d DCA 1983); Della-Donna v. Nova Univ., Inc., 512 So. 2d 1051, 1056 (Fla. 4th DCA 1987). Here, Noshirvan and Chiappetta's conduct following the issuance of the subpoena, including its deployment as a tool of harassment and intimidation rather than legitimate litigation, exemplifies such a post-issuance abuse.

Declaratory relief is warranted to affirm that the conduct of Noshirvan and Chiappetta constitutes abuse of process. The Declaratory Judgment Act allows the Court to clarify and protect the Movant's legal rights in the face of continued threats of misuse of legal process. See Whitney Info. Network, Inc. v. Gagnon, 353 F. Supp. 2d 1208, 1212 (M.D. Fla. 2005). This case presents a clear controversy regarding the improper use of process, and declaratory judgment will serve to deter further abuse while reinforcing the principle that legal process must not be weaponized for ulterior purposes.

Thus, the Court should find that Noshirvan and Chiappetta's conduct, as described, satisfies the elements of abuse of process under Florida law. Their actions constitute a clear and intentional misuse of the subpoena process, causing substantial harm to the movant. Granting declaratory judgment will protect the movant's rights, uphold the integrity of the judicial process, and discourage future misuse of legal process for improper purposes.

## INJUNCTION

To secure an injunction, a party must prove four elements: (1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) the injury outweighs whatever damage an injunction may cause the opposing party; and (4) an injunction is not adverse to the public interest McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998) (quoting All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989); Rhodes v. Inch, No. 3:20-cv-607-J-32MCR, 2020 U.S. Dist. LEXIS 120025, at *3 (M.D. Fla. July 8, 2020).

Movabt seeks to secure an injunction against Noshirvan issuing any further subpoenas to journalists without first obtaining an order of the court, the movant must satisfy the four elements outlined by the Eleventh Circuit.

### 1. Substantial Likelihood of Success on the Merits

The movant can demonstrate a substantial likelihood of success on the merits by showing that Noshirvan's subpoenas are issued in bad faith and violate constitutional protections afforded to journalists. Subpoenas directed at journalists are subject to heightened scrutiny due to the First Amendment and the reporter's privilege. Courts have consistently held that such subpoenas must be narrowly tailored, seek non-privileged information, and demonstrate a compelling need for the information that cannot be obtained through alternative means. Here, Noshirvan's subpoenas target journalists without meeting these criteria, as evidenced by their overbroad and harassing nature. This establishes a strong likelihood of success on claims that the subpoenas constitute an abuse of process and violate protected rights.

### 2. Irreparable Injury Absent an Injunction

Absent an injunction, journalists will suffer irreparable harm to their constitutional rights, including the First Amendment right to report freely without fear of harassment or retaliation. Compliance with abusive subpoenas would force journalists to expend substantial time and resources, disrupt their professional activities, and risk chilling the exercise of free speech. Such harm cannot be remedied adequately by monetary damages, as the constitutional and reputational damage is ongoing and immeasurable.

### 3. Injury Outweighs Damage to the Opposing Party

The balance of equities favors the movant. While an injunction would require Noshirvan to seek prior court approval before issuing subpoenas to journalists, it does not preclude him from pursuing legitimate discovery. Conversely, the harm inflicted upon journalists through abusive subpoenas far outweighs any minimal burden an injunction imposes on Noshirvan. Protecting journalists from harassment preserves the integrity of the judicial process and prevents further misuse of discovery tools.

### 4. Injunction Is Not Adverse to the Public Interest

Issuing an injunction serves the public interest by safeguarding press freedom and upholding the constitutional protections afforded to journalists. Courts have consistently recognized the importance of preventing abuse of process to maintain public confidence in the judicial system. Restricting Noshirvan's ability to issue subpoenas without court approval ensures that discovery tools are not weaponized against journalists, thereby promoting the free flow of information and preserving the foundational principles of democracy.

Thus, an injunction requiring Noshirvan to obtain court approval before issuing any further subpoenas to journalists is warranted. The movant has demonstrated a substantial likelihood of

success on the merits, irreparable harm absent relief, a favorable balance of equities, and alignment with the public interest. Accordingly, the Court should grant the requested injunctive relief to prevent further abuse of the judicial process.

## **CONCLUSION**

This case has the capacity to become notable or notorious for its judiciary action. The very reason why I began covering this case in the first place was because Professor Eugene Volokh identified it as an important case on Internet Law and the limits of the First Amendment. Now, the case has taken on new Free Press and institutional integrity questions in addition to the original contours.

The world is watching how this Court resolves these important issues that go at the heart of free speech, open discourse, an informed populace, and the emerging Internet and media cyberscape, as well as how these issues inform and shape our federal judiciary and constitutional republic.

I respectfully request that the Court quash the Frivolous and Bad Faith Subpoena in its entirety and issue a protective order shielding me and other journalists from further harassment. Additionally, I request sanctions and additional and related relief against Plaintiff and Plaintiff's counsel to deter similar misconduct in the future against me and against a Free Press.

**WHEREFORE**, Movant Richard Luthmann respectfully requests that this Court order the following relief:

A. **Quash the Subpoena** - Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, quash the Frivolous and Bad Faith Subpoena served on December 10, 2024, as it violates geographic limitations, improperly seeks protected journalistic materials, and was issued in bad faith to harass and intimidate.

B. **Issue a Protective Order -** Under Rule 26(c)(1) of the Federal Rules of Civil Procedure, issue a protective order to prohibit further abusive discovery practices by Plaintiff and Plaintiff's counsel, including any attempts to subpoena journalistic materials or engage in harassment tactics designed to chill constitutionally protected activities.

C. **Disqualify Attorney Nick Chiappetta –** His continued representation violates the advocate-witness rule. United States v. Hosford, 782 F.2d 936, 938 (11th Cir. 1986)

D. **Sanctions Against Plaintiff and Plaintiff's Counsel -** Pursuant to Rule 45(d)(1), Rule 26(b)(2)(C), and the Court's inherent powers, impose monetary sanctions in the amount of at least ONE HUNDRED THOUSAND ($100,000) DOLLARS against Plaintiff Danesh Noshirvan and Plaintiff's counsel, Nick Chiapetta, Esq., jointly and severally, for their bad faith conduct in issuing and serving the Frivolous and Bad Faith Subpoena, including:

   1) **Improper service**: Arranging for service of the Frivolous and Bad Faith Subpoena within a courtroom within minutes of the Court leaving the bench and during ongoing journalistic activities to harass and intimidate the Declarant, a professional investigative journalist.

   2) **Frivolous and overbroad demands**: Requesting publicly available and irrelevant information and materials protected by the Qualified Journalist's Privilege meant solely to harass and chill Freedom of the Press.

   3) **Procedural abuses**: Violating geographic restrictions under Rule 45(c)(1)(A) and employing litigation tactics intended to burden and intimidate.

E. **Declare the Subpoena an Abuse of Process**. Find that the Bad Faith Subpoena constitutes an abuse of process and a violation of Declarant's First Amendment rights, aimed at suppressing investigative journalism and retaliating against Movant for exposing Plaintiff's

misconduct, saving the declarant further litigation against Dansh Noshirvan and Attorney

Nick Chiapetta.

F. **Enjoin Further Retaliatory Conduct.** Issue an injunction to prevent Plaintiff and

Plaintiff's counsel from issuing further subpoenas or engaging in any litigation tactics

aimed at harassing or retaliating against the Declarant for lawful journalistic activities.

G. **Affirm the Qualified Journalist's Privilege**. Declare that the materials sought by the

subpoena are protected under the Qualified Journalist's Privilege as recognized in *United

States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013), and similar precedent, shielding

Declarant from compelled disclosure of unpublished journalistic materials.

H. **Award Fees, Costs, and Expenses.** Award Declarant reasonable fees, costs, and expenses

incurred in responding to the Frivolous and Bad Faith Subpoena, defending against

Plaintiff's bad faith litigation tactics and protecting Declarant's rights under the First

Amendment and the Qualified Journalist's Privilege. The Declarant estimates he spent at

least FORTY (40) man-hours drafting, researching, writing, and assembling this

application. It's not outlandish to ask for TEN THOUSAND ($10,000) DOLLARS.

I. **Refer Counsel for Disciplinary Review.** Refer Plaintiff's counsel, Nick Chiappetta, Esq.,

to the appropriate disciplinary authorities for engaging in unethical conduct, including the

misuse of the legal process to harass and intimidate a journalist in violation of professional

responsibility standards.

J. **Alternative Relief.** Set the date to respond to the Frivolous and Bad Faith Subpoena

AFTER the Presidential Inaugural and day of national celebration of the presidency of

Donald J. Trump, the 45th and now 47th President of the United States of America, and to

afford the Declarant time to go to the Eleventh Circuit to protect his rights and the rights

of the Press.

K. **Such Other and Further Relief.** Grant such other and further relief as the Court deems

just, proper, and necessary to protect Declarant's rights and deter future misconduct by

Plaintiff and Plaintiff's counsel.


Dated:       Naples, Florida
             January 2, 2025


                                        _____
                                        RICHARD LUTHMANN
                                        4199 Los Altos Court
                                        Naples, FL 34109
                                        Tel: (239) 631-5957
                                        Email: richard.luthmann@protonmail.com


## **Local Rule 3.01(g) Certification**

I certify that:

(A) The movant has conferred with the opposing party,

(B) The parties have not agreed on the resolution of all or part of the motion, and

(C) The motion is opposed, and the means by which the conference occurred was via email.

Dated:       Naples, Florida
             January 2, 2025


                                        _____
                                        RICHARD LUTHMANN
                                        4199 Los Altos Court
                                        Naples, FL 34109
                                        Tel: (239) 631-5957
                                        Email: richard.luthmann@protonmail.com