# EXHIBIT A

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Middle District of Florida

12-10.2024
L-20753
9-11:50 AM

| | |
|---|---|
| DANESH NOSHIRVAN, an individual, | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  2:23-cv-01218-JES-KCD |
| JENNIFER COUTURE, an individual, RALPH GARRAMONE M.D., an individual, etc., et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Richard A. Luthmann, 338 Sugar Pine Lane, Naples, FL 34108

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:    Please see attached schedule.

| Place: Veritext - Tampa (Riesdorph) 201 E. Kennedy Blvd., Suite 712 Tampa, FL 33602 | Date and Time: 01/20/2025 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  12/05/2024

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | /s/ Nicholas A. Chiappetta |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Plaintiff, Danesh Noshirvan                                        , who issues or requests this subpoena, are:
Chiappetta Trial Lawyers, Nicholas A. Chiappetta, Esq., 2101 Vista Parkway, Suite 258, West Palm Beach, FL 33411; (561) 768-4500; nick@chiappettalegal.com

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:23-cv-01218-JES-KCD

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*

❏ I served the subpoena by delivering a copy to the named person as follows:

on *(date)*                                    ; or

❏ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $                        for travel and $                        for services, for a total of $        0.00        .

I declare under penalty of perjury that this information is true.

Date:

*Server's signature*

*Printed name and title*

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  (A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  (A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  (A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  (D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Nick Chiappetta | Managing Partner
561-768-4500
nick@chiappettalegal.com
2101 Vista Parkway, Suite 258
West Palm Beach, Florida 33411

www.chiappettalegal.com
Product Defect | Injury | Defamation | Insurance



## SCHEDULE FOR SUBPOENA TO RICHARD LUTHMANN

### DEFINITIONS

The following definitions apply to this request for the production of documents.

1.     The term "Document" is used herein in the broadest possible sense permitted by the Federal Rules of Civil Procedure and means any written, graphic or other recorded (whether visible, electronically, magnetically or otherwise) matter of whatever nature, including computer files, discs, or any other means of preserving thought or expression, and all tangible things from which information can be processed, transcribed, copied or retrieved, whether originals, copies, drafts (including, without limitation, non-identical copies), stored in any medium from which information can be obtained either directly or, if necessary, after translation into a reasonably usable form. A document with handwritten, typewritten or other recorded notes, editing marks, etc., is not and shall not be deemed to be identical to one without such modifications, additions or deletions. The term "original" includes the file copy or copies of any document if there is no actual original or ribbon copy. "Document" shall include, without limitation, the following items: electronically stored information, images, letters, papers, correspondence, e-mail, facsimiles, memoranda, telegrams, reports, articles, telex and telecopier messages, records, affidavits, depositions, financial records, minutes, transcriptions, notes, books, instant messages, Facebook status updates, social media postings, internet postings, blog posts, text messages, voicemail messages, statements, contracts, pamphlets, diaries, bills, personal diaries and appointment books, computer diskettes, computer print-outs or other computer derived data, photographic material, all mechanic or electric sound recordings or transcripts thereof, pictures, audio or video tapes, drawings and all other records, transcribed, punched, taped, filmed or graphic matter, however produced or reproduced, and any tangible thing that, in whole or in part, records, illustrates or conveys information.

2.     "Communication" is used in the broadest possible sense permitted by the Federal Rules of Civil Procedure and means transmittal of information (including, without limitation, ideas, inquiries, or any other information) by any means

(including, without limitation, in the form of a document (as defined above), audio recording or otherwise).

3.    "Person" is used in the broadest possible sense permitted by the Federal Rules of Civil Procedure and shall include natural persons, public or private corporations, proprietorships, partnerships, governmental entities, associations, unions, organizations, groups, trusts and estates. Any reference herein to any "Person" shall be construed to include, if that "Person" is not a natural person, all present and former subsidiaries, affiliates, divisions, joint ventures, partners, officers, directors, board of directors (and committees thereof), employees, agents, and advisors, and any other person acting or purporting to act for, on behalf of, or in the name of such entity including, without limitation, business consultants, bankers, financial advisors, attorneys, accountants, and any other person of any description retained or employed by such entity for business or financial reasons of any kind.

4.    "Concerning", and "Regarding", in addition to their customary and usual meanings, shall mean "discussing," "evidencing," "relating to" "constituting," "referring to," "reflecting," "mentioning," "pertaining to, "containing an implicit reference to," "assessing," "characterizing," "recording," "describing," "touching upon," "repudiating," or "summarizing."

5.    The singular includes the plural and vice versa, except where the context may require otherwise; reference to any gender includes the other gender.

6.    "Each" shall also be construed to mean "every" and "every" shall also be construed to mean "each."

7.    "Any" shall also be construed to mean "any and all," or "all"; "all" shall also be construed to mean "any" or "any and all"; "including" shall mean "including, without limitation."

8.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a request all responses that might otherwise be construed to be outside of its scope.

9.    "You," and "Your," means Richard Luthmann, including any social media usernames that you have utilized such as @rluthmann, any aliases, e.g., "Richard LaFontaine" or "Richard LaRiviere", and any companies you may own, e.g., "Scrivener, LLC."

2

10.    The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" shall mean "including without limitation".

## INSTRUCTIONS

If you object to fully identifying a document, electronically stored information or oral communication because of a privilege, you must nevertheless provide the following information, unless divulging the information would disclose the privileged information:

(1)    the nature of the privilege claimed (including work product);

(2)    if the privilege is being asserted in connection with a claim or defense governed by state law, the state privilege rule being invoked;

(3)    the date of the document, electronically stored information or oral communication;

(4)    if a document: its type (*e.g.*, letter or memorandum) and, if electronically stored information, the software application used to create it (*e.g.*, MS Word or MS Excel Spreadsheet), and the custodian, location, and such other information sufficient to identify the material for a subpoena *duces tecum* or a production request, including where appropriate the author, the addressee, and, if not apparent, the relationship between the author and addressee;

(5)    if an oral communication: the place where it was made, the names of the persons present while it was made, and, if not apparent, the relationship of the persons present to the declarant; and

(6)    the general subject matter of the document, electronically stored information or oral communication.

## PLEASE PROVIDE THE FOLLOWING DOCUMENTATION:

1.  Produce all Documents regarding Jennifer Couture, Ralph Garramone, Patrick Trainor, or Danesh Noshirvan that you published to your X account - https://x.com/rluthmann or @rluthman. This request requires production of both native and non-native formats of all videos, posts, podcasts, and articles.

3

2. Produce every Document you published on any platform regarding Jennifer Couture, Ralph Garramone, Patrick Trainor, or Danesh Noshirvan. This request requires production of both native and non-native formats of all videos, posts, podcasts, and articles.

3. Produce every Communication between you and Jennifer Couture from January 26, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218.

4. Produce every Communication between you and Ralph Garramone, M.D. from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218.

5. Produce every Communication between you and Patrick Trainor from January 01, 2019 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218, any party thereto, or Joseph A. Camp.

6. Produce every Communication between you and Joseph A. Camp from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218. This request includes all of Joseph A. Camp's email addresses, aliases, businesses, and social media handles, e.g., @joeycamp2020, @CampJosephA, @Daneshfiles, etc.

7. Produce every Document sent or received in any Communication between you and Joseph A. Camp from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218. This request includes all of Joseph A. Camp's email addresses, aliases, businesses, and social media handles, e.g., @joeycamp2020, @CampJosephA, @Daneshfiles, etc. See https://www.newsbreak.com/richard-luthmann-1792610/3659332977133-legal-battle-tiktok-harassment-case-sparks-controversial-license-to-doxx ("We **spoke to Joey Camp**, who claims he is "enjoying the air in Mexico City.")

8. Produce all Documents concerning payments received by you from any Person who compensated or retained you to publish articles or stories regarding Jennifer Couture, Ralph Garramone, M.D., Patrick Trainor, Esq., or Danesh Noshirvan. See https://substack.com/home/post/p-150921957 ("We have been **retained** by a private party to investigate, newsgather, and publish on this story and related matters with the potential for a documentary on Social Media and Cancel Culture.")

9. Produce all Documents concerning any Person who retained you to publish articles or stories regarding Jennifer Couture, Ralph Garramone, M.D., Patrick Trainor, Esq., or Danesh Noshirvan. See https://substack.com/home/post/p-150921957 ("We have been retained by a private party to investigate, newsgather, and publish on this story and related matters with the potential for a documentary on Social Media and Cancel Culture.").

10. Produce every Document sent or received in any Communication between you and any Person from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218, the parties thereto, or Joseph A. Camp.

11. Produce every Communication between you and any Person from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218, the parties thereto, or Joseph A. Camp.

12. Produce every Communication you had with anyone from Newsweek.com, including Katherine Fung, from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218.

5

13. Produce every Communication you had with the Person or people who hired you to write articles or stories regarding Jennifer Couture, Ralph Garramone, Garramone Plastic Surgery or Danesh Noshirvan.

14. Produce every article and story you wrote and every video you published regarding Jennifer Couture, Ralph Garramone, Garramone Plastic Surgery or Danesh Noshirvan.

15. Produce Documents from the New York State Bar and New Jersey State Bar that state the reason for your disbarment, i.e., fraud, extortion, kidnapping, holding a client at gunpoint, conspiracy, etc.

16. Produce Documents from the USAO Eastern District of New York concerning E.D.N.Y. Docket No. 17-CR-664 (JBW). See https://www.justice.gov/usao-edny/pr/staten-island-attorney-richard-luthmann-sentenced-four-years-prison-fraud-and-extortion

17. Produce all Documents you posted to Substack, Muckrack, Instagram, Facebook, Threads, and Twitter/ X (ie., @rluthmann), Frank Report, The Sun Bay Paper, Newsbreak, Florida Gulf News, and This is for Real.

18. Produce Documents from your indictment for creating fake Facebook profiles and impersonating political leaders. See https://www.silive.com/crime/2019/09/with-mom-by-his-side-trial-by-combat-lawyer-richard-luthmann-sentenced-in-scrap-scheme.html



⑈220б90ӏ258⑈ ⑆092Е4ᴉᴉ2ᴉᴉ⑆ ⑈ᴓ8ᴓбЕ000⑈

Memo  Witness Fee Check

Western Alliance Bank

Dollars

Five and 00/100                                                    $5.00

PAY TO THE
ORDER OF  Richard A. Luthmann

Date  12/10/2024                                      Void after 90 days

This is an eCheck. The PAY TO THE
ORDER OF line designates the Payee.

0003б484

Proof Technology, Inc.
Service of Process
1800 Gaylord Street
Denver, CO 80206



Cut along this line  ✂

Check appears upside down intentionally

# How to use this check

**Need help?** Contact Proof Customer Support

| Step 1 | Step 2 | Step 3 |
|---|---|---|
| **Print the check** | **Validate it printed correctly** | **Deposit like normal** |

**Step 1**
**Print the check**

✓ **Any printer works**

✓ **Black or color ink**

✓ **Basic white paper**

**Step 2**
**Validate it printed correctly**

✓ **Correct if any bank numbers are:**
  Centered in white space
  Parallel to edge of the page
  Clearly printed in dark black ink

✗ **Reprint if bank numbers are:**
  Cut off, skewed, or off-center
  Smudged or wrinkled
  Too light to read

**Step 3**
**Deposit like normal**

1. **Cut on the dotted line above**
2. **Endorse the back**
3. **Deposit like normal:**
   In-person at a bank or credit union
   Using an ATM
   Via smartphone mobile deposit
   With an office check scanner

**Does your financial institution have questions about this check?**

- This check was printed from an authorized check record. It is not a Check 21 Image Replacement Document.
- To confirm this check was issued by the account holder and details (pay to, amount, routing/account number) remain unmodified.

# For your records

**Issued date:** 2024-12-10

**Check number:** 00039484

**From:** Proof Technology, Inc.

**Amount:** $5.00

**Payable to:** Richard A. Luthmann

**Delivery email:**

**Memo:** Witness Fee Check

**Delivery message:** Witness Fee Check



Serve Documents

# Richard A. Luthmann

Primary Address

2110 First St, Fort Myers, FL 33901

**Serve By**
1st attempt today, December 10th

**Speed**
Same Day

## Servee Information

| | |
|---|---|
| Type | Individual |
| Name | Richard A. Luthmann |
| Primary Address | Other - 2110 First St, Fort Myers, FL 33901 |
| Physical Description | None |
| Additional Notes | None |

## Job Information

| | |
|---|---|
| Job Number: | 760466 |
| Matter Number/Name | Noshirvan (1218) |
| Witness Fee | Calculate it for me |
| Subpoena | No |
| Related to an Eviction | No |
| Linked Job(s)? | No |

## Documents List

1. Subpoena

## Client Specifications

None                                   None

*Court Room 4E*
*magistrate Dudek*



# EXHIBIT B

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | |
|---|---|
| DANESH NOSHIRVAN, an individual, | ) |
| *Plaintiff* | ) |
| v. | ) |
| JENNIFER COUTURE, an individual, RALPH | ) |
| GARRAMONE M.D., an individual, etc., et al. | ) |
| *Defendant* | ) |

Civil Action No.  2:23-cv-01218-JES-KCD

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Richard A. Luthmann, 338 Sugar Pine Lane, Naples, FL 34108

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:          Please see attached schedule.

| Place: Veritext - Tampa (Riesdorph)<br>     201 E. Kennedy Blvd., Suite 712<br>     Tampa, FL 33602 | Date and Time:<br><br>          01/20/2025 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    12/05/2024

|          *CLERK OF COURT*  | OR | |
|---|---|---|
| | | /s/ Nicholas A. Chiappetta |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Plaintiff, Danesh Noshirvan                                                              , who issues or requests this subpoena, are:
Chiappetta Trial Lawyers, Nicholas A. Chiappetta, Esq., 2101 Vista Parkway, Suite 258, West Palm Beach, FL 33411; (561) 768-4500; nick@chiappettalegal.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  2:23-cv-01218-JES-KCD

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c)  Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
   **(i)** is a party or a party's officer; or
   **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   **(i)** fails to allow a reasonable time to comply;
   **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
   **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
   **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   **(i)** expressly make the claim; and
   **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Nick Chiappetta** | Managing Partner
561-768-4500
nick@chiappettalegal.com
2101 Vista Parkway, Suite 258
West Palm Beach, Florida 33411

www.chiappettalegal.com
Product Defect | Injury | Defamation | Insurance

## SCHEDULE FOR SUBPOENA TO RICHARD LUTHMANN

## DEFINITIONS

The following definitions apply to this request for the production of documents.

1.      The term "Document" is used herein in the broadest possible sense permitted by the Federal Rules of Civil Procedure and means any written, graphic or other recorded (whether visible, electronically, magnetically or otherwise) matter of whatever nature, including computer files, discs, or any other means of preserving thought or expression, and all tangible things from which information can be processed, transcribed, copied or retrieved, whether originals, copies, drafts (including, without limitation, non-identical copies), stored in any medium from which information can be obtained either directly or, if necessary, after translation into a reasonably usable form.  A document with handwritten, typewritten or other recorded notes, editing marks, etc., is not and shall not be deemed to be identical to one without such modifications, additions or deletions.  The term "original" includes the file copy or copies of any document if there is no actual original or ribbon copy.  "Document" shall include, without limitation, the following items:  electronically stored information, images, letters, papers, correspondence, e-mail, facsimiles, memoranda, telegrams, reports, articles, telex and telecopier messages, records, affidavits, depositions, financial records, minutes, transcriptions, notes, books, instant messages, Facebook status updates, social media postings, internet postings, blog posts, text messages, voicemail messages, statements, contracts, pamphlets, diaries, bills, personal diaries and appointment books, computer diskettes, computer print-outs or other computer derived data, photographic material, all mechanic or electric sound recordings or transcripts thereof, pictures, audio or video tapes, drawings and all other records, transcribed, punched, taped, filmed or graphic matter, however produced or reproduced, and any tangible thing that, in whole or in part, records, illustrates or conveys information.

2.      "Communication" is used in the broadest possible sense permitted by the Federal Rules of Civil Procedure and means transmittal of information (including, without limitation, ideas, inquiries, or any other information) by any means

(including, without limitation, in the form of a document (as defined above), audio recording or otherwise).

3.    "Person" is used in the broadest possible sense permitted by the Federal Rules of Civil Procedure and shall include natural persons, public or private corporations, proprietorships, partnerships, governmental entities, associations, unions, organizations, groups, trusts and estates. Any reference herein to any "Person" shall be construed to include, if that "Person" is not a natural person, all present and former subsidiaries, affiliates, divisions, joint ventures, partners, officers, directors, board of directors (and committees thereof), employees, agents, and advisors, and any other person acting or purporting to act for, on behalf of, or in the name of such entity including, without limitation, business consultants, bankers, financial advisors, attorneys, accountants, and any other person of any description retained or employed by such entity for business or financial reasons of any kind.

4.    "Concerning", and "Regarding", in addition to their customary and usual meanings, shall mean "discussing," "evidencing," "relating to" "constituting," "referring to," "reflecting," "mentioning," "pertaining to, "containing an implicit reference to," "assessing," "characterizing," "recording," "describing," "touching upon," "repudiating," or "summarizing."

5.    The singular includes the plural and vice versa, except where the context may require otherwise; reference to any gender includes the other gender.

6.    "Each" shall also be construed to mean "every" and "every" shall also be construed to mean "each."

7.    "Any" shall also be construed to mean "any and all," or "all"; "all" shall also be construed to mean "any" or "any and all"; "including" shall mean "including, without limitation."

8.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a request all responses that might otherwise be construed to be outside of its scope.

9.    "You," and "Your," means Richard Luthmann, including any social media usernames that you have utilized such as @rluthmann, any aliases, e.g., "Richard LaFontaine" or "Richard LaRiviere", and any companies you may own, e.g., "Scrivener, LLC."

10.     The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" shall mean "including without limitation".

## INSTRUCTIONS

If you object to fully identifying a document, electronically stored information or oral communication because of a privilege, you must nevertheless provide the following information, unless divulging the information would disclose the privileged information:

(1)     the nature of the privilege claimed (including work product);

(2)     if the privilege is being asserted in connection with a claim or defense governed by state law, the state privilege rule being invoked;

(3)     the date of the document, electronically stored information or oral communication;

(4)     if a document: its type (*e.g.*, letter or memorandum) and, if electronically stored information, the software application used to create it (*e.g.*, MS Word or MS Excel Spreadsheet), and the custodian, location, and such other information sufficient to identify the material for a subpoena *duces tecum* or a production request, including where appropriate the author, the addressee, and, if not apparent, the relationship between the author and addressee;

(5)     if an oral communication: the place where it was made, the names of the persons present while it was made, and, if not apparent, the relationship of the persons present to the declarant; and

(6)     the general subject matter of the document, electronically stored information or oral communication.

## PLEASE PROVIDE THE FOLLOWING DOCUMENTATION:

1. Produce all Documents regarding Jennifer Couture, Ralph Garramone, Patrick Trainor, or Danesh Noshirvan that you published to your X account - https://x.com/rluthmann or @rluthman. This request requires production of both native and non-native formats of all videos, posts, podcasts, and articles.

2. Produce every Document you published on any platform regarding Jennifer Couture, Ralph Garramone, Patrick Trainor, or Danesh Noshirvan. This request requires production of both native and non-native formats of all videos, posts, podcasts, and articles.

3. Produce every Communication between you and Jennifer Couture from January 26, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218.

4. Produce every Communication between you and Ralph Garramone, M.D. from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218.

5. Produce every Communication between you and Patrick Trainor from January 01, 2019 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218, any party thereto, or Joseph A. Camp.

6. Produce every Communication between you and Joseph A. Camp from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218. This request includes all of Joseph A. Camp's email addresses, aliases, businesses, and social media handles, e.g., @joeycamp2020, @CampJosephA, @Daneshfiles, etc.

7. Produce every Document sent or received in any Communication between you and Joseph A. Camp from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218. This request includes all of Joseph A. Camp's email addresses, aliases, businesses, and social media handles, e.g., @joeycamp2020, @CampJosephA, @Daneshfiles, etc. See https://www.newsbreak.com/richard-luthmann-1792610/3659332977133-legal-battle-tiktok-harassment-case-sparks-controversial-license-to-doxx ("We **spoke to Joey Camp**, who claims he is "enjoying the air in Mexico City.")

**4**

8. Produce all Documents concerning payments received by you from any Person who compensated or retained you to publish articles or stories regarding Jennifer Couture, Ralph Garramone, M.D., Patrick Trainor, Esq., or Danesh Noshirvan. See https://substack.com/home/post/p-150921957 ("We have been **retained** by a private party to investigate, newsgather, and publish on this story and related matters with the potential for a documentary on Social Media and Cancel Culture.")

9. Produce all Documents concerning any Person who retained you to publish articles or stories regarding Jennifer Couture, Ralph Garramone, M.D., Patrick Trainor, Esq., or Danesh Noshirvan. See https://substack.com/home/post/p-150921957 ("We have been retained by a private party to investigate, newsgather, and publish on this story and related matters with the potential for a documentary on Social Media and Cancel Culture.").

10. Produce every Document sent or received in any Communication between you and any Person from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218, the parties thereto, or Joseph A. Camp.

11. Produce every Communication between you and any Person from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218, the parties thereto, or Joseph A. Camp.

12. Produce every Communication you had with anyone from Newsweek.com, including Katherine Fung, from January 01, 2022 through December 04, 2024, regarding any matter concerning case 2:23-cv-0340 or 2:23-cv-1218.

13. Produce every Communication you had with the Person or people who hired you to write articles or stories regarding Jennifer Couture, Ralph Garramone, Garramone Plastic Surgery or Danesh Noshirvan.

14. Produce every article and story you wrote and every video you published regarding Jennifer Couture, Ralph Garramone, Garramone Plastic Surgery or Danesh Noshirvan.

15. Produce Documents from the New York State Bar and New Jersey State Bar that state the reason for your disbarment, i.e., fraud, extortion, kidnapping, holding a client at gunpoint, conspiracy, etc.

16. Produce Documents from the USAO Eastern District of New York concerning E.D.N.Y. Docket No. 17-CR-664 (JBW). See https://www.justice.gov/usao-edny/pr/staten-island-attorney-richard-luthmann-sentenced-four-years-prison-fraud-and-extortion

17. Produce all Documents you posted to Substack, Muckrack, Instagram, Facebook, Threads, and Twitter/ X (ie., @rluthmann), Frank Report, The Sun Bay Paper, Newsbreak, Florida Gulf News, and This is for Real.

18. Produce Documents from your indictment for creating fake Facebook profiles and impersonating political leaders. See https://www.silive.com/crime/2019/09/with-mom-by-his-side-trial-by-combat-lawyer-richard-luthmann-sentenced-in-scrap-scheme.html

# EXHIBIT C

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▾

FREE SPEECH

## Plaintiff Sues Defendant, Alleging Defendant's "Niche Is Cancel Culture"

EUGENE VOLOKH | 12.4.2023 9:07 AM

From *Couture v. Noshirvan*, decided Thursday by Judge Sheri Polster Chappell (M.D. Fla.):

> This case stems from a dozen TikTok videos…. [According to the Complaint,] Defendant Noshirvan is a TikTok creator. He makes money through TikTok gifts, tips, and subscription fees. His niche is cancel culture. Noshirvan finds a video of someone messing up. He then edits and reposts the video. In the edited video, Noshirvan overlays himself doxing the person depicted in the video—that is, he provides the person's name, contact information, employer, and other personal information. He targets the person as an antagonist, in need of accountability. Many of his millions of followers then harass the person. People pay Noshirvan for this doxing service.
>
> That's what happened here. Someone recorded Plaintiff Jennifer Couture during an argument. And someone then provided that video to Noshirvan and paid his fee. Noshirvan went to work. He edited the video and reposted his version targeting Couture. Many of his followers berated Couture by text and phone call. They found her family, the schools her children attended, and employers and contacted them. Over the next several months, Noshirvan posted twelve videos about Couture. He encouraged his followers to report Couture to Southwest Florida Crimestoppers. And he falsely reported to the Florida Department of Children and Families that Couture had harmed her child.
>
> Noshirvan did not target only Couture. He also targeted Garramone Plastic Surgery (her employer and family). Garramone similarly received calls, texts, emails, and negative online reviews. Garramone responded to a negative review by stating that it was not from a former or current patient. Noshirvan then accused Garramone of slander and questioned why Garramone took out a PPP loan. Noshirvan's videos forced Garramone to terminate contracts with surgeons who worried about reputational harm. Patients canceled scheduled procedures.

Garramone sued Noshirvan for, among other things, tortious interference with business relations; the court rejected these claims, but left open room for plaintiffs to amend their complaint:

> The elements of tortious interference are "(1) the existence of a business relationship … (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." A plaintiff may allege "tortious interference with present or prospective customers but no cause of action exists for tortious interference with a business's relationship to the community at large." …
>
> Garramone does not allege interference with a relationship to the community at large. Rather, Garramone alleges that, due to Noshirvan and his followers' harassment and false business reviews, it was "forced to prematurely terminate contracts with surgeons, who became fearful of reputational harm by being swept into [Noshirvan's] net, and many patients terminated scheduled procedure and ended their relationship." This allegation sufficiently identifies existing business relationships. This allegation, along with other allegations in the complaint, also suffices to allege Noshirvan actually interfered with Garramone's business relationships.
>
> But Garramone includes only conclusory allegations about Noshirvan's knowledge of the business relationships. Plaintiffs claim to have facts to support the knowledge element and request that the Court take judicial notice. The Court declines the invitation to take judicial notice of that information and dismisses the tortious interference claim … without prejudice….

The court thus allowed Garramone to file an amended complaint (due Dec. 15), and noted that, if the amended complaint adequately alleges tortious interference, it would also adequately allege civil conspiracy:

Advertisement

AD

> Garramone alleges Noshirvan and his followers agreed to engage in tortious interference and committed overt acts in furtherance of the conspiracy. For example, the amended complaint includes a screenshot of a conversation between Noshirvan and one of his followers. The follower asks, "so we are now working on reviews for his business right?" and Noshirvan responds "Yes." The amended complaint also includes screenshots of several fake reviews posted by Noshirvan's followers. These allegations are enough at this stage….

As to Couture's civil conspiracy claim, the court held it "needs more work":

> [Couture] does not sufficiently allege an underlying tort [that defendants were allegedly trying to commit against her]. Plaintiffs argue that Florida's "economic boycott exception" relieves them of the underlying-tort requirement. Under that exception, "if the plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual would not possess, then conspiracy itself becomes an independent tort." Whether this narrow exception applies here is unclear. And Plaintiffs have not sufficiently alleged this exception in the amended complaint.
>
> Moreover, the Court should not address the exception now…. Couture may be able to sufficiently allege other underlying torts. For instance, she alleges that Noshirvan participated in campaigns to "damage her business and professional reputation, and to tortiously interfere with the business relationship between Jennifer Couture and her clients." The amended complaint does not sufficiently develop how damage to Couture's reputation, perhaps a reference to defamation, or tortious interference serve as underlying torts supporting her conspiracy claim. Nor does Couture sufficiently allege agreement between Noshirvan and his followers or which overt acts were committed in furtherance of the conspiracy. The Court dismisses without prejudice Plaintiff Couture's conspiracy claim [which means that Couture could try to file an amended complaint making the requisite allegations -EV].

Plaintiffs also sued TikTok and ByteDance, TikTok's parent corporation, but the court threw out that claim under 47 U.S.C. § 230:

Nor do TikTok's monetization features transform it into a developer rather than publisher of Noshirvan's content. Viewing the amended complaint in the light most favorable to Plaintiffs, they allege (at best) that TikTok promotes Noshirvan's videos generally. Afterall, Noshirvan is an eligible creator, and TikTok makes money from his videos. But Plaintiffs cannot show that TikTok "contribut[ed] materially to the alleged illegality" of the videos at issue here. TikTok's monetization features turn on the popularity of a video, not its content. And "providing *neutral* tools to carry out what may be unlawful or illicit [content] does not amount to 'development'" of that content.

TikTok's knowledge of Noshirvan does not change this analysis…. At bottom, TikTok's role in the alleged wrongdoing was publishing Noshirvan's content. So <u>Section 230</u> bars Plaintiffs' claims. *See* <u>*McCall v. Zotos*</u> <u>(11th Cir. 2023)</u> ("Lawsuits seeking to hold a service provider like Amazon liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content—are barred.")….

Start your day with *Reason*. Get a daily brief of the most important stories and trends every weekday morning when you subscribe to *Reason Roundup*.

| Email Address | Submit |

---

**NEXT:** **#TheyLied Case Filed by Elected Official Over Allegations of Sexual Assault Can Go Forward**

---

<u>**EUGENE VOLOKH**</u> is the Thomas M. Siebel Senior Fellow at the Hoover Institution at Stanford, and the Gary T. Schwartz Distinguished Professor of Law Emeritus and Distinguished Research Professor at UCLA School of Law. Naturally, his posts here (like the opinions of the other bloggers) are his own, and not endorsed by any institution.

<u>FREE SPEECH</u>   <u>LIBEL</u>   <u>CANCEL CULTURE</u>

       MEDIA CONTACT & REPRINT REQUESTS

💬 Show Comments (16)

About

Browse Topics

Events

Staff

Jobs

Donate

Advertise

Subscribe

Contact

Media

Shop

Amazon

     

© 2024 Reason Foundation | Accessibility | Privacy Policy | Terms Of Use

# EXHIBIT D



The Sun Bay Paper .com

Digital Version

Right... All Along

production@sunbaypaper.com                    www.sunbaypaper.com

January 5, 2024                    Volume 9  Issue  8                    From Island to Bay, News on the  Level

# From Millions to Mere Thousands

In December 2023, Beach Talk Radio first reported a "Sweet-heart Deal" involving Fort Myers Beach property developer Terry Persaud and the Town Council, stirring significant interest and debate. This global settlement, seen as a pivotal development in Persaud's long-standing disputes with the town, has two distinct sides that merit attention.

Sun Bay Paper took the initiative to delve deeper into this story, sitting down with Terry Persaud to hear his perspective. Persaud, known for his ambitious Times Square property development, including the Sunset Beach Tropical Grill and The Playmore Tiki Bar and the adjoining parking lot, shared his viewpoint.

Attempts were made to gather insights from other players to ensure a comprehensive under-



like everything, the view has changed since IAN

standing of the situation. To present a balanced view, we contacted FMB Mayor Dan Allers and TPI Properties/Margaritaville Beach Resort representatives.

**Acquisition and Regulatory Challenges**

In 2014, Terry Persaud embarked on a significant property development project by acquiring

the Times Square property through Persaud Properties FL Investments LLC. This purchase, totaling $3.5 million, included a vision for an additional $1 million improvements.

However, Persaud's plans were quickly met with stringent regulatory challenges. The FMB Fire Department immediately required $500K worth of work to bring the property up to code. Persaud expressed frustration, stating, "I was caught between a rock and a hard place," highlighting the immediate conflict between his development plans and regulatory demands.

Compounding this issue was the "50% Rule" from the National Flood Insurance Program (NFIP), which restricts improvements on a property to no more than 50% of its market value unless it is fully compliant with Cont on pg 6

## Iran's War at Sea Targets Global Economy

As the world watches Israel battle Hamas, Iran's Yemen Houthi proxy army is using Tehran-provided missiles and drones to wage a shadow war on the global economy.

The headline topping TradeWindsNews.com's on marine insurance news update states: "War Risk rates set to explode as underwriters fear more Houthi attacks."



A Houthi attack on the Norwegian-flagged tanker "Strinda" spurred the report. As the Strinda transited the Bab al-Mandab strait (southern Red Sea) last month, an anti-ship cruise missile launched from Houthi territory in Yemen struck the ship and ignited a fire. Some media reports called it a Houthi cruise missile. No, Iran supplied the weapon. Perhaps a Houthi leader punched the button, but Iran calls the shots, literally and figuratively, since Iranian Al-Quds special forces officers' control offensive missile operations. Cont. pg 7

## Free Concert Series 2024 Hits Fort Myers Beach

The Fort Myers Beach Chamber of Commerce and the Town of Fort Myers Beach are excited to announce the dynamic 2024 free outdoor concert series launch at Bayside Park. Starting January 7, 2024, these Sunday concerts from 4 PM to 7 PM promise to be the highlight of the new year.

The series starts on January 7 with the vibrant sounds of Remedy, known for its captivating performances and engaging music. The following Sunday, January 14, will feature the equally impressive Simplyfi, bringing their unique blend of tunes to the beachside audience. These bands represent the best of local talent and are sure to draw crowds with their popular rhythms and melodies.

Peter Ennis of Snug Harbor Waterfront Restaurant, a principal sponsor, shares his excitement: "Old San Carlos is the place to be on Fort Myers Beach for the

Free Sunday Concert series. We're thrilled to be a part of this community event."

Concert-goers are encouraged to bring lawn chairs and leashed pets for a relaxing evening. However, outside food and beverages are not permitted. This restriction allows attendees to enjoy the local cuisine and support Fort Myers Beach businesses, enhancing the concert experience with shopping, dining, or even a mini staycation.

Alongside Snug Harbor Waterfront Restaurant, Wahoo Willie's Tiki Bar and Grill headlines the event, with Tri-Town Construction and Wicked Dolphin Rum Distillery sponsoring the stage.

The concert series is more than just an entertainment venue; it's a community celebration aimed at rejuvenating the spirit and economy of Fort Myers Beach.

Rich Luthmann

## The Jennifer Couture Case: Battle Over Online 'Doxxing'

Jennifer Couture, a Fort Myers, Florida resident, finds herself at the center of a significant legal challenge concerning online behavior and privacy boundaries. This case, unfolding in the Florida Federal Court, delves into the controversial practice of 'doxxing'—the act of publishing private information about an individual on the internet without their consent.



Jennifer Couture

**Background of the Case**

Jennifer Couture gained notoriety following a 2022 viral TikTok video, which captured her engaging in a physical altercation outside a Dunkin Donuts in Fort Myers. This footage, posted by TikTok influencer Daneesh Norvishan, known as @ThatDanesh-Guy, sparked widespread attention. Norvishan, who has a following of 1.7 million, specializes in content related to 'cancel culture' and has recently ventured into 'doxxing.' Cont. pg 2

# The Jennifer Couture Case:

Cont. from pg. 1

Following the incident, Couture was arrested and charged with multiple offenses, including assault with a deadly weapon. She later pleaded guilty and received a sentence of two years probation, mandatory anger management, and random drug and alcohol screening.

**The Legal Battle:
Couture vs. Norvishan**

The crux of the legal battle lies in Norvishan's action of 'doxxing' Couture. He released a series of videos featuring Couture's personal information, including her contact details and employer information. This led to harassment towards Couture, her family, and her employer, Garramone Plastic Surgery.
Responding to these actions, Couture and Garramone Plastic Surgery filed a lawsuit against Norvishan, TikTok, and its parent company, alleging civil harassment-based claims and cyber harassment.

**The Debate: Harassment vs. Citizen Journalism**

A key argument in the case is the distinction between harassment and citizen journalism. Norvishan's defense may hinge on 'citizen journalism,' a form of newsgathering recognized for capturing significant events. This argument draws parallels with notable instances like Darnella Frazier's Pulitzer Prize-winning recording of George Floyd's murder.

However, Couture's legal team emphasizes the personal and

professional harm caused by Norvishan's actions, challenging the notion that his activities fall under legitimate newsgathering.

The lawsuit also highlights the damage to Garramone Plastic Surgery's business, alleging slander and economic harm due to the negative attention and loss of clients following Norvishan's posts.

**Legal Questions and Challenges**

The case raises several vital legal questions, including:
The legality of 'doxxing' and its classification under existing statutes like cyberstalking or cyberharassment.
The balance between First Amendment protections (freedom of speech and the press) and the right to privacy.
The potential recourse for victims of doxxing under privacy torts and business torts.



**Court Proceedings and Decisions**

Presiding Judge Sheri Polster Chappell's assessment of the case has been meticulous. The court dismissed the claims against TikTok and its parent company, citing Section 230 of the Communications Decency Act, which protects



**Judge Sheri Polster Chappell**

online platforms from liability for user-generated content.

However, the claims against Norvishan remain under scrutiny. The court has allowed Couture and Garramone Plastic Surgery to amend their complaints, particularly addressing the requirements for conspiracy and tortious interference claims.

**Implications and Future of the Case**

The Couture vs. Norvishan case is a bellwether for Internet law, highlighting the challenges of addressing online behavior in the age of social media. The legal community and observers are keenly watching the evolution of this case, which may set precedents for handling similar issues in the future. The outcome could significantly influence the balance between protecting individuals from online harassment and upholding the legal frameworks governing digital platforms.

Richard Luthmann



**KUHN LAW FIRM, P.A.**

6720 Winkler Rd
Fort Myers, FL 33919

**CALL NOW:
(239) 333-4LAW**
(239) 333-4529
www.KuhnLegalGroup.com


BBB ACCREDITED BUSINESS | A+ rating

**ESTATE PLANNING PACKAGE**
**$750 Flat Fee Special**
**INCLUDES:** Preparation of a Couple's Will ($375 Flat Rate Singles), Power of Attorney, Living Will, Health Care Surrogate, & Pre-need Guardian. Costs included.

**Scott A. Kuhn
Attorney**



**FREE CONSULTATION ON ALL LEGAL MATTERS**
• Probate Administration & Litigation
• Trust Administration & Litigation
• Estate Planning • Guardianship
• Personal Injury • Elder Abuse • Medical Malpractice
• Real Estate • Insurance Law
• Medicaid Pre-planning & Crisis Planning

Email: support@kuhnlegal.com

January 5, 2024                    *The Sun Bay Paper*

## Worldcoin's Ambitious Eye-Scan ID System Faces Scrutiny and Privacy Concerns

Controversial biometric cryptocurrency project Worldcoin, founded by OpenAI CEO Sam Altman, is expanding its eye-scanning digital ID system. Despite concerns about privacy and potential exploitation of vulnerable groups, Worldcoin aims to extend its global digital ID system to social welfare users.

like Minecraft, Reddit, Telegram, Shopify, and Mercado Libre. This move follows upgrades with Discord, Talent Protocol, and Okta's Auth0.

Digital ID systems, like WorldCoin's, raise substantial privacy concerns due to the sensitive biometric data they collect, making identities immutable. Unlike



The project asserts its mission is to foster equal opportunities globally by contributing to the creation of the world's largest identity and financial network. It envisions a public infrastructure serving as "proof of personhood" for socially vulnerable individuals.

Worldcoin argues that the necessity of combating fraud in social benefit programs justifies the collection of biometric data, specifically iris scans. The platform cites an unsubstantiated claim on its website that India saved over half a billion dollars in social welfare and subsidies using a biometric anti-fraud system.

Despite concerns, Worldcoin insists its "decentralized proof of personhood," known as World ID, is a safe scheme and encourages its global implementation. The project vaguely references countering economic power concentration through anticipated advancements in AI.

In a bid to address security and privacy challenges, Worldcoin is integrating its eye-ball scanning protocol with popular platforms

traditional financial systems where creating a new wallet is possible, replacing a unique biometric identity, such as an iris scan, is challenging.

Worldcoin introduced World ID 2.0, emphasizing improved bot-human distinction in the digital realm. Tiago Sada, head of product for Tools for Humanity, highlights benefits such as Reddit moderators assigning unique permissions to World ID users to combat spam.

Sada also notes that Shopify merchants could use World ID for anti-fraud measures or promotions, showcasing the platform's potential. Despite limitations in the system, Sada believes it can help curb misuse of various platforms.

While Worldcoin expands its presence in Mexico and Singapore, challenges arise. The Kenyan government, citing privacy concerns, has banned Worldcoin from scanning its citizens' eyes, adding a hurdle to the project's global expansion.

And everyone..........  should be concerned!





Gavin's ACE Coupon

Expires 1-31-2024

$10 OFF

Purchase Of $50 Or More

$10 off $50 purchase of regularly priced items. Must present *Sun Bay* coupon. No copies or reproductions. Not to combine offers. Good at either Gavin's ACE.

Gavin's ACE
A Short Drive For Value and Selection

Curbside Pickup
- Visit acehardware.com
- Choose GAVIN'S ACE FORT MYERS
- Choose In Store or Curbside Pickup

TRAEGER   weber   Big Green Egg
The Ultimate Cooking Experience

Propane Tanks Filled
New Tanks
RVs Filled

All Star Selection Of Top Shelf Grills And Accessories

FREE ASSEMBLY & DELIVERY
ON GRILLS & ACCESSORIES TOTALING $399 AND UP

CRAFTSMAN   MAGNOLIA HOME BY JOANNA GAINES   Benjamin Moore
Milwaukee

Gavin's ACE Fort Myers
16025 San Carlos Blvd    239-466-7777

Gavin's ACE Cape Coral
290 Nicholas Pkwy NW    239-945-6223

Page 4     *The Sun Bay Paper*     January 5, 2024

# Letter to The Editor

To the Editor,

What a disapointment, the new Margaritaville Resort on FM Beach doesn't accept CASH, which tells me that are supporting the new digital currency agenda!

SAD... I won't be going there and recommend all locals and visitors who have a braincell to avoid any restaurant or business that doesn't accept CASH!

This push to a cashless society will be another way the Govt will be able to control us!

WAKE UP PEOPLE! NO CASH = BAD

Alexia Chappy

**Exec. Ed. note: I agree with you that a cashless society is bad, especially for any-one that is already financially burdened. Your letter inspired the article "Cash-less" on page 14, hopefully it will explain to non-believers the pitfalls of going to a completely digital currency, thanks for a great lead to an important current topic.**

To the Editor,

We picked up an edition of this paper in downtown Ft Myers the other evening. As I was reading the articles I was literally reading my own thoughts.

We are conservatives and have expressed your opinions to the T about how our government is being run and even about Michelle O being put in as a candidate.

Can we subscribe and get the paper in the mail?

Thank you for publishing this and getting it out there for others to read true journalism.

Dianna Hillebrand



# Correction:



Last week's sunset photo was submitted by Rod Smith, my apologies to Rod for mispelling his first name. (Ron)

## Quote of the Week

**"Once you realize you deserve a bright future, letting go of your dark past is the best choice you will ever make."**

**Roy T. Bennett.**

**Copyright** © SBP Media LLC and Sun Bay Paper
All rights reserved. This newspaper or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of the publisher.

# Editorial

**Fort Myers Beach Flips the Script?
From Legal Spats to a Charted Course**

The recent resolution of Terry Persaud's long-standing dispute with the Town Council marks more than the end of a contentious legal battle. It represents a watershed moment, an opportunity to "turn the page" and wholeheartedly commit to revitalizing Times Square, the Pier, and other vital tourist attractions in Fort Myers Beach, the most popular site in Lee County after the beaches.

We universally recognize that tourism is the lifeblood of the FMB economy. Persaud's confrontation, stemming from concerns about the dynamics between local businesses and larger entities, mirrors a more significant issue. He perceived an uneven playing field between different developers, echoing a sentiment prevalent among smaller business owners in the community. Persaud's insistence on equitable treatment and opportunities for all businesses, regardless of size or influence, is a call for fairness that resonates deeply in a tourist-driven economy.

Persaud's journey has been marked by challenges and breakthroughs, from the acquisition of the Times Square property in 2014 to the recent settlement. Confronted with stringent regulatory demands and the limiting "50% Rule" from the National Flood Insurance Program, Persaud's story is a testament to the resilience of small businesses in the face of significant obstacles.

The recent reduction in fines isn't the "sweetheart deal" some say is. The town could have ended up owing Persaud money if he showed that most fines were unsubstantiated. Persaud claimed the Town couldn't produce an accounting.

Hopefully, this resolution signals a potential shift in the town's stance towards his and similar development projects. For the last decade, FMB taxpayers have been hemorrhaging legal fees against serious developer lawsuits like Persaud's and James Jamieson's. The win rate has been about 50% for the town but 100% for the lawyers.

This pivotal moment goes beyond settling fines and compliance issues. It's a chance to engage in a broader conversation about the future of development in FMB. What is the role of small businesses, especially in a tourist-centric economy, and the importance of fair treatment in light of larger projects in the town's recovery and growth post-Hurricane Ian? As FMB rebuilds, ensuring a balance of interests and a commitment to transparent governance is essential.

Our current reconstruction effort offers an opportunity to reinforce the community's economic foundation. Supporting small businesses is crucial in creating a diverse and robust tourist economy. Equal treatment of all companies, regardless of scale, is vital in attracting tourism dollars and fostering a vibrant, inclusive community.

Persaud's dispute and resolution can serve as a springboard for positive change. Acknowledging the challenges small businesses face and addressing issues of unequal treatment can set FMB on a path of collaborative and fair rebuilding. The focus should be on creating a destination that appeals to a wide range of tourists, where local businesses can thrive alongside larger enterprises.

Times Square's reemergence is symbolic of the community's resilience. But it is an opportunity to not only rebuild but also to reimagine a top tourist destination. Collaboration between the town, developers, and local businesses will ensure that the redevelopment benefits the entire community and aligns with the town's unique character and needs.

The town must embrace sustainable and inclusive development strategies catering to the broad spectrum of tourists. This involves creating accessible spaces, supporting local artisans and entrepreneurs, and ensuring a transparent and inclusive development process.

Let's work together to rebirth a town that is a premier tourist destination and a model of community spirit and resilience. This is our moment to turn the page and chart a new course for a prosperous and inclusive future for Fort Myers Beach and the broader Lee County community.

Richard Luthman
Editor in Chief

January 5, 2024 — *The Sun Bay Paper* — Page 5

# The Right Side

## JOE MUST GO... HE CROSSED THE TREASON LINE ONCE TOO OFTEN... HE IS GOING TO SHUT DOWN OUR GRID!

Obiden has done it! He announced he will effectively put an end to using US power plants that produce/release methane gas



water...feed thousands with one fish and one loaf of bread, and personally speak to Jesus and have him stabilize our climate change...

those locations. If they do, they will be responsible for the deaths that will follow! You know-it-all journalists... "Keep your mouths

and carbon dioxide into the atmosphere! That is a liar's way of stating he will ELIMINATE all "60%" of fossil fuel power plants ...SOON...without any replacements. Those are Obiden's words. That goes to show you how ignorant Biden is! He knows nothing, and his "advisors" know less about the grids and fossil fuel plants. They currently supply over 80% of your grid's power...not 60%! So, there won't just be "brown outs" and periods of no electricity whatsoever...it will be permanent! Coal plants cannot be fired back up once they go cold! They will be gone, as will millions more jobs, and all the low cost and clean power plants that are essential to your survival... read on! Some moron who knows nothing about our power grid, coal and other fossil fuel plants and most important...what will follow... is shutting down your grid!

Why? To stop climate change! He will then walk on

because the fact is only Jesus or his father, God, can do that!

According to the NY Post, 12/23/23, Biden said he will close all fossil fuel plants. He said that in words that he, himself, doesn't realize what he is saying! I say that because I do know what will happen and the devastating impact he will cause with fighting words and fighting threats to deny us the unalienable God given rights to Life, Liberty, and the pursuit of Happiness. That's in the Bill of Rights as well as the Constitution!

Well, all three grids are unified, tied together by computers that automatically fill in when a plant goes off grid. Shutting down just a few critical locations could cause permanent damage to overheated transformers, transfer stations and other electric switches... devices. I hope none of those who know those locations, including newspaper "journalists", would even think about divulging

shut" because it will be the death of our grids, and ultimately your own families...just as bad as an EMP attack by China or Russia. If these scoundrels do shut down the grid, China and Russia WILL attack with EMPs to seal our fate. The US will be defenseless if this moron gets away with it and Congress doesn't STOP him dead in his tracks! Enforce all the laws that require removal of a president who is nuts and turning on his country...! When the FBI takes down Biden for Treason, don't forget who directed him to cut off the grid...Hussein Obama, and I hope he resists arrest!

No electricity means no refrigeration for life-saving drugs like insulin, Repatha and other refrigeration required drugs that save millions of Americans....no heat, no drinking water (powered by electric pumps), no gasoline, no natural gas which is pumped to your house by electric pumps,

no propane (made with electric pumps), shall I go on? Anybody who tells you that we can "get by" without fossil fuel is somebody who knows nothing...you, me, our country cannot work, move, make anything, without fossil fuels. Keep in mind that only about 15% of your/our electricity is made with other than fossil fuel...that's an undeniable fact...so what's left? The rest comes from fossil fuels!

It sounds to me like Obiden and his co-conspirator Obama, may have worked out deals with Russia and China to remove the teeth from our military strike capability, my opinion! Now you see what I've been saying? Why do you think they filled the Military with sexually confused Soldier-ettes and Leader-ettes and intentionally reduced our fighting, scratching, and bighting "force"!??

The Right Side began issuing that alert softly... going back to when the scoundrel Hussein Obama was elected president in 2008, up to present! No more SOFT... we are telling it as it is! The fact is I have addressed that issue in my new Sun Bay Paper many times already! It's the reason I bought this paper, and started my website to alert you, the public, of a disaster that is coming! It's called TREASON!

Don't think this is new... you just didn't listen... Hussein started to shut down coal plants, stopped drilling for oil, closed the largest oil find in the world, Green River Colorado. ...and the Keystone Pipeline, and started closing natural gas plants, in his first term of destruction!! He said it was for ENVIRONMENTAL reasons... Global Warming and such...that's pure BULL! Obama weaponized the EPA, with ridiculous executive orders, and lies! He also closed or tried to close,

**Cont. pg 6**

---

## The Sun Bay Paper

PHONE: (239) 267-4000

MAIL (Correspondence & General Inquiries):
16970 San Carlos Blvd., Ste 160, Fort Myers, Fl 33908

MAIL (Billing & Payments): PO Box 471, Sanborn, NY 14132

E-MAIL: production@sunbaypaper.com

WEBSITE & DIGITAL VERSION: www.sunbaypaper.com

PRODUCER: J. GARY DILAURA
EDITOR IN CHIEF: RICHARD LUTHMANN
EXEC. EDITOR: BOBBY MIMMO

The information contained in this publication is for educational, general information, and entertainment purposes only and is never intended to constitute medical, financial or legal advice or to replace the personalized care of a primary care practitioner, financial or legal expert.



BESIDES the EMAILS, RECORDED CALLS, WHATSAPP MESSAGES, TEXT MESSAGES, BANK RECORDS, and WHISTLE BLOWER TESTIMONY, THERE'S ABSOLUTELY ZERO EVIDENCE MY FATHER was FINANCIALLY INVOLVED in MY BUSINESS DEALINGS.

HUNTER BIDEN

# The Right Side

<span>Cont. from pg 5</span>

the Cheyenne Mountain NORAD Center and it was reopened when Trump realized that if we ever hit by an EMP attack, we will lose all communications with most of our military, so the NORAD complex was updated and repurposed to be able to contact our fleet no matter what happens. I hope our Trident Sub Fleet has orders that if we are hit by ANY EMP Strike to make China and Russia disappear, as no matter who hits us with an EMP, Russia and China will ...finish us off, my opinion!

I hope I have your attention. There has never been a Global Warming threat...NEVER...did ANY of those predictions, threats, that the Gore-ites put out there, come true? No and they never will.

The same is true about climate, climate change, CO2, methane gas.... it's all Bullshit to scare you into allowing them to take over America by force, violence and intimidation...all while they burn more fossil fuel flying to fossil fuel summits to stop you from using God's gift to us, FOSSIL FUEL.

God intended Life, Liberty, and the pursuit of Happiness for all of us...not just Gore, Obama, Obiden, Kerry and on and on! They burn more fossil fuel than small cities with their mansions and 747 private jets.

Do you really believe that any of these scoundrels will stop using natural gas, oil, diesel fuel, electricity produced by fossil fuels including the fireplaces in those mansions? Listen...there is no other way, no other fuel that ANYBODY has, reliable enough to power a single light bulb reliably and indefinitely...except fossil fuel Even our nuclear power plants have backup ELECTRIC generators, from other fossil fuel sources to pump cooling water to the reactor room, just in case the plant is flooded by a huge wave...like the Japan tsunami. Their backup diesel generators were on the ground floor...flooded. Our diesel backup generators are not on the ground floor! I am not just talking "through my hat"; I know what I am telling you to be very real. The earth has been the victim of climate change for 4-5 billion years...use your head! What can we do to have any effect on the climate...? The sun controls almost 100% of what happens to planet Earth...not CO2 or green gases, or Governor Cuomo's "cow farts" ...for real...he wanted to do something about cow methane!

J Gary DiLaura, FBI RET
**therightsidejgarydilaura.com**



# From Millions to Mere Thousands

<span>Cont from pg 1</span>

current flood regulations. For Persaud, this rule presented a unique dilemma. Although he purchased the property for $3.5 million, the existing structures were valued at only $800K. This valuation meant his budget for improvements was effectively capped at $1.2 million. The Fire Department's mandated improvements cost $100K more than the amount required to make the site operational.

Faced with these constraints, Persaud sought relief from the Town Council in October 2014, but his appeals were met with no reassessment or relief. This denial set the stage for a prolonged battle between Persaud and the town authorities.

### Legal Struggles and Permitting Issues

Persaud received relief from Lee County, which reduced the scope of needed work. The primary issue Persaud faced was obtaining the necessary permits for development. He initially secured a DEP Field Permit to begin work in February 2015. However, this progress was abruptly halted when the Town issued a "Stop Work Order" in May 2015, demanding a more comprehensive "Full" DEP Permit. Reflecting on this setback, Persaud stated, "The Full Permit takes much longer. I lost another four months." This requirement significantly delayed his plans, as the Full Permit process was considerably more time-consuming than the Field Permit.

Moreover, Persaud had a legal battle concerning revoking his liquor license for beach service. The Town's decision, based on a code that labeled his property as "abandoned," was firmly contested by Persaud. He argued that his property was not abandoned but "Under Construction." This dispute escalated into a lawsuit against the Town, which initially did not rule in his favor. However, in a turn of events, Persaud stated, "Initially, we lost in Lee County in 2018. But the Second Circuit District Court of Appeals reversed the decision in 2019," marking a significant victory for him in asserting his property rights.

### Allegations of Discriminatory Treatment and Fines

Persaud's challenges escalated into allegations of discriminatory treatment and unfair imposition of fines by Fort Myers Beach authorities. These issues, emerging alongside the permitting and legal struggles, added another layer of complexity.

Persaud alleged he faced significant financial penalties, which he argued were imposed in a retaliatory and discriminatory manner. Persaud's frustration with the town's approach was evident in his statement, "I was receiving fines of $250 to $500 per day based on the dumpster, parking charges, and beach chair and umbrella rentals."

Many of the imposed fines are related to the parking lot. Persaud claimed that the requirements imposed on him were more stringent than those for other property owners. "The parking lot has been there since the 1970s. All they need is a Use Permit per the Town Code for any other restaurant. For me, they required a Full Order, which is much more time-consuming and expensive and would have reduced the lot capacity by 30 percent," Persaud explained, highlighting the discrepancies in treatment.

Persaud sued the town for lost revenue, claiming that the town's actions amounted to discrimination and a violation of his equal protection rights. However, this case was ultimately dismissed by U.S. District Court Judge John Badalamenti in February 2023.

### Recent Developments: A Sweetheart Deal?

In December, the Town Council offered Persaud what has been termed a "sweetheart deal," substantially reducing the fines he was required to pay. Initially facing a staggering $2.7 million in penalties, the Council proposed to lower this amount to $250,000. A "good faith" bond of $500,000 was included in the deal, which Persaud would be eligible to release if he maintained compliance with the town's regulations for one year.

Persaud said he told the town attorney the original fines, if pressed, would face court challenges. "They would be challenged, and they don't have the backup" the developer stated, suggesting potential issues with the legality or enforceability of the penalties.

Expressing his dissatisfaction with the prolonged dispute and the nature of the agreement, Persaud said, "This has been going on way too long. I have gone above and beyond to create an agreement I don't agree with."

This sentiment was met with concern from Mayor Dan Allers, who responded, "That was a little concerning. You've done this before. For 4-5 years, we've been dealing with this. It's been a matter of compliance. It's the simple things that you agreed to do."

As part of the agreement, Persaud must remove a large tree stump from the property, a point of contention for years. The Council mandated a strict timeline for this task, giving him 60 days to apply for the permit and 30 days following receipt to remove the stump.

### Code Compliance and Property Inspections

Persaud's battle with the town over the use of his property was central to the compliance issue. Initially, Persaud faced allegations from the town for renting beach chairs behind his restaurant and operating an "unauthorized" parking lot adjacent to the Sunset Grill Restaurant. Town employees were even sent in "undercover" to rent beach chairs and pay for parking, a move aimed at proving his violations. Persaud objects to the legality of this practice. "Town employees are not authorized to do undercover investigations. That is a job for law enforcement, and all fines based on that practice were invalid," he said.

Addressing these concerns, Fort Myers Beach Operations Manager Frankie Kropacek confirmed a positive change in Persaud's compliance status. Kropacek stated, "Persaud is now 100 percent in compliance."

Furthermore, the town revised its stance on the legality of Persaud's parking lot. Previously declared illegal and restricted only for restaurant customer parking, the lot has since been opened to the general public. This change aligns with the varied usage of the lot, which has historically catered to the beach-going public with seasonal rate changes.

As part of the settlement agreement with the town, Persaud's properties will undergo regular inspections to ensure continued compliance. If Persaud fails to adhere to the regulations, he will be issued a courtesy warning notice to rectify the violation. <span>Cont on pg 11</span>

January 5, 2024 — *The Sun Bay Paper* — Page 7

# Iran's War at Sea Targets Global Economy

Cont. from pg. 1

The Strinda's crew — all citizens of India — fought the fire. A French Navy frigate shot down a suicide drone that was "menacing" the Strinda. A U.S. Navy destroyer showed up to render aid.

Meantime the Houthis engaged the world on the propaganda front. Houthi spokesmen claimed the Strinda was carrying crude oil to Israel. They reiterated a statement that henceforth Houthi fighters will attack any vessel they believe is heading for Israel, no matter the ownership and nationality.

Commercial maritime sources reported the Strinda was carrying palm oil from Indonesia to Italy, possibly by way of Malta.

The Houthis have attacked other vessels they claimed were going to Israel and facts proved the Houthi information was either dated or wrong.

The Houthi attack on the Strinda represents a major escalation in Iran's proxy war with Israel. The U.N.'s International Maritime Organization (IMO) also expressed "grave concern" for the safety of international shipping.

Some other obvious facts: The Strinda Incident involved three NATO nations, Norway, France and the U.S. Since Indian citizens crewed the ship, India, which is on the verge of becoming the world's most populous nation, was also involved.

A Norwegian government official, Eivind Vad Petersson, told media that Norway is working closely with the U.S., France and Great Britain "both politically and militarily — to ensure free and safe navigation at sea." Note he mentioned military cooperation, perhaps an international naval task force.

Safe transit in the Red Sea matters. The Red Sea connects the Suez Canal to the Indian Ocean. Annually around 19,000 commercial ships transit the waterway.

That's a lot of money. Iran knows it. So does the Joint War Committee.

The JWC has members from Lloyd's of London insurance and The International Underwriting Association of London (IUA). They represent organizations that underwrite "marine hull war business insurance" worldwide.



The "USS Carney" guided-missile destroyer defeats a combination of Houthi missiles and suicide drones in the Red Sea

The JWC evaluates the risks faced by ships carrying cargo. Higher risk raises the insurance cost. It is a detailed business involving products carried, geography traversed, crew training, shipper safety records, specific ships, specific cargoes and very complex politics.

The JWC determines Listed Areas — areas where ship owners must notify underwriters their ships will traverse.

War is ultra-risky. The Strinda Incident means the "war risk" insurance premium for vessels transiting the Red Sea and the shipping lanes within missile range of Yemen will rise. That means the price of their goods spikes.

Many vessels already avoid Suez and sail around Africa's Cape of Good Hope. That takes more fuel and transit time — which costs more money — but avoids war risk.

To the delight of Tehran's ayatollahs, its Houthi proxy sea

war inflicts economic damage on its Western enemies, including the U.S.

But that damage is slow -- felt over time. To many Americans the Red Sea remains safely distant. Houthi missiles hitting freighters and U.S. Navy ships shooting down Iranian suicide drones -- that's stunning televised imagery but it occurs in faraway places.

But this is one way Iran and China wage incremental war on the America's economy and will to fight.

The cynical argue only Pearl Harbors and 9/11s drive Americans to take effective collective action. Battleships burning, toppled skyscrapers, dreadful loss of American life. After those shocks glazed eyes see galvanizing threat.

The U.S. Navy and Air Force are powerful forces protecting North America. Unfortunately, they have global commitments.

The U.S. Coast Guard (USCG) -- a great institution -- is tasked with defending America's sea borders. But the USCG is overworked and under-resourced -- meaning it doesn't have the ships and aircraft to adequately patrol America's seacoasts, much less protect them.

We know U.S. seaports are vulnerable to terrorist/saboteur attack. An enemy nuclear weapon hidden in a hold was a Cold War fear. But here's a hard fact: U.S. coasts are vulnerable to proxy attack using 21st-century unmanned air and sea vehicles launched a hundred miles offshore.

The U.S. has 12,480 miles of coastline -- equivalent to about half the Earth's circumference at the Equator. Twenty-three U.S. states have ocean coastlines. Alaska (No. 1) has the longest: 6,640 miles. Florida (No. 2): 1,350.

America's Exclusive Economic Zone (EEZ) extends out 200 nautical miles. The seabed is immensely valuable -- minerals, food. Oil and gas platforms off the shores of Louisiana (No. 5), Texas (No. 6) and other Gulf states provide nearly 20% of America's daily energy requirements.

In 1942 these platforms did not exist, otherwise they would have been easy targets for Nazi U-boats. Today they are easy targets for Russian and Chinese subs or for terrorist/proxy forces.

Austin Bay

---

### The History of Christmas

In 497BC after building a temple to Saturn, god of the harvest, the Romans began celebrating Saturnalia. As time went by traditions of gift giving, role playing, excessive eating and drinking became part of the harvest festival.

The week long festival ending on December 25th, the birthday of the Roman diety Sol Invictus, In 392AD, after the christianity became the official religion of Rome, all Pagan festivals were forbidden; including the Olympics in Greece, as it was in honor of Zeus.

Being such a big party at the darkest time of the year, Saturnalia was well loved and the Romans refused to stop celebrating. The church then decreed that Jesus was born on December 25th and that the celebration was about him. The Romans accepted that and the festival is still celebrated, though rebranded as Christmas. The party was there 5 centuries before Christ..

sent in by Nico Chaménos



# FIRST PRIORITY
RESTORATION

"Moving You Forward When Disaster Sets You Back"

Call Troy L. Conner
1-614-989-1263

STORM/DISASTER
WATER DAMAGE
FIRE DAMAGE
CONSTRUCTION
MOLD
ROOF DAMAGE

Got mold? We can help.

Whether your business or home, we are trained to safely remediate toxic mold and service all your restoration needs.

DISCOUNT CODE: Mention "SUNBAY"

4300 Ford Street Unit 109 Fort Myers, FL 33916

Page 8                                    *The Sun Bay Paper*                                    January 5, 2024

# USE YOUR BOAT CHART!

You should have a waterproof paper chart on your boat, even if you have a GPS system.



Nautical charts are the maps of our waterways and are a vital navigational tool! Electronics can fail, and a Paper chart can help you plan a trip in advance. You can set up your way points and turns and know the depth of the water all planned at home. The tide chart of the Area is also vital, as the tidal change affects the depth of the water. The tide swing in our area is about 3 feet and this can make a difference when traveling in unfamiliar waterways!

The local chart of our area is NOAA-11426 (Estero Bay to Lemon Bay, including Charlotte

Harbor and the continuation of the Peace River). Charts aid us in traveling safely by drawing course lines on our chart and using TVM-DC to compute a compass course to follow. TVMDC stands for True course plus or minus Variation on your chart, which equals Magnetic course plus or minus your boat Deviation to your compass equals the Compass course you should follow on your journey. Charts list all the channels, numbered buoys, numbers on markers, depth of water at medium-low tide, landmarks, and much more valuable information for Mariners.

Look for the latest date on the chart and use the "Local Notice to Mariners" in your area to update your chart. It is available by applying for it at www.navcen.uscg.mil, and it will be emailed to you weekly. Charts are available at Marinas, Boating stores, and online.

**TAX TIME !!!**

Just a quick reminder that if you have a Mortgage (Loan) on your boat and it has a Head(Bathroom), Galley (Stove and Refrigerator) and Berth, you may be able to deduct the interest charged on the loan. Check with your Tax Advisor for details.

Questions or comments---
E-mail me at: vilshp@aol.com

Frank M. Ferraiuolo

# Beautiful Things, Extravagant Lifestyle

"Hunter Biden lashes out at GOP," a recent USA Today's front-page headline.

The real news was in the subhead: "Flouting subpoena, he may face contempt vote."

Yes, the president's son refused to testify under House subpoena -- he said he didn't want to testify behind closed doors, but that's not his call -- as he nonetheless felt free to give a tongue lashing to House Republicans.

During the press conference, Biden took no questions from the press.

Hunter Biden admitted that he had addiction issues, which he disclosed in painful detail in his memoir, "Beautiful Things." Then he suggested he was a victim of the "MAGA Republicans."

There's a pattern here.

Talking heads often frame the House GOP's look into Hunter Biden's curious income by maintaining Republicans have failed to link the son's huge paydays to President Joe Biden's record.

They're blind to the fact that, legal or not, when the son of a then-vice president and later presidential hopeful rakes in some $7 million from 2016 through October 2020, much of it from foreign interests, it makes Team Biden appear as if it is for sale.

That's not just a GOP talking point. During the 2016 campaign, The New York Times reported that Hunter Biden "lacked any experience in Ukraine and just months earlier had been discharged from the Navy Reserve for testing positive for cocaine" in 2014 -- yet somehow found himself on the payroll of Ukraine energy company Burisma, while his father was supposed to be fighting corruption, in Ukraine.

While Hunter Biden wants

to focus on the House investigation, I can't forget Special Counsel David Weiss' Dec. 7 indictment of Hunter Biden on nine federal tax fraud charges.

The president's son pleaded not guilty.

According to the indictment, the 53-year-old Georgetown and Yale Law School graduate failed to pay his taxes as he splurged on an "extravagant lifestyle." To wit: "drugs, escorts and girlfriends, luxury hotels and rental properties, exotic cars, clothing, and other items of a personal nature, in short, everything but his taxes."

The document claims Hunter Biden spent $10,000 on membership in a sex club, identified $1,500 for an exotic dancer as a business expense, and told a personal assistant to pay his boat loan payment, not his taxes.

Weiss noted that in the year 2020, after Hunter Biden "had regained his sobriety" and was paid more than $1.2 million, the younger Biden still did not pay off his tax liabilities.

If I recall correctly, his father ran for president in 2020.

Apparently the son thought he could short the U.S. treasury, and get away with it.

Debra J. Saunders

Bring new customers to your door, advertise!

*The Sun Bay Paper*





"Opening Doors to Luxury Living in Southwest Florida"

Claire Bisignano Chesnoff, REALTOR®
ABR, AHWD, ASP, IAHSP, CLHMS, CRS, GREEN, GRI, SRES

Certified Luxury Home Marketing Specialist
International Accredited Home Staging Professional

Direct: 239-238-6928 call/text
claire@clairechesnoff.com
clairechesnoff.com

COLDWELL BANKER REALTY

# 6 Things You Will Regret Throwing Out

Decluttering and reorganizing any space starts with the most difficult step: deciding what to keep and what to discard. Some items are easy to part with, but others much more difficult, especially if you don't have a use for them. There are several vintage family heirlooms that I hastily sent off to a new home with distant cousins that I regret to this day.

When simplifying your space, consider the value of each item and think about potential future uses. You can always store them, and if you change your mind, discard them later.

**NO. 1: BIG BABY ITEMS**

If you're not absolutely sure you won't have another baby, keep the crib, stroller and other big baby stuff.

Getting rid of them might be costly if you end up needing them for another child. Check the condition of each item you want to keep; a five-year-old stroller is fine if it's still in good shape. Also, check recent recalls on baby items to make sure what you're holding onto is safe and not on the recall list.

**NO. 2: VINTAGE CLOTHING AND FURNITURE**

Here, I'm speaking not

retro things you bought at the thrift store but rather vintage items you inherited -- anything from old dinnerware to high-quality clothing to furniture pieces. It'll never be out of style forever. And if you absolutely do have room to store,



Never throw out old photos, even if you have a digital version of them!

take them to a consignment store for evaluation. Making sure they are re-homed rather than sent to the landfill will give you peace of mind.

**NO. 3: AWARDS AND MEDALS**

Medals, trophies, certificates and other awards mark a significant achievement in your life or perhaps your childrens'. They may seem like clutter right now, but they're also irreplaceable.

Someday, you will regret getting rid of them.

These are not items that should you change your mind, you can just run into Walmart and pick up another. If you can't decide about tossing out your athletic

medals or other irreplaceable personal mementos, pack them away in a safe place. Then revisit them in a few months. If you're still wanting to trash them, you'll easily be able to do that without regret.

**NO. 4: PHOTOS**

Hold on to your photos. Even if you're going to scan them into a digital format, keep physical copies of your favorites. Photos don't have to cause clutter. You can

put them in a memory box and then store the box in a closet, on a shelf or in another out-of-the-way spot.

**NO. 5: ELECTRONIC CABLES, ADAPTERS**

There are functional items you should keep -- electronic cables, adapters and cords. Take the time to label and then organize by type and use. Separate headsets from phone chargers: USB-A from USB-C, etc. The point is to store these items in a way that everyone in the house knows exactly what you have, and can actually find it.

**NO. 6: APPLIANCE ACCESSORIES**

I'm referring to the extra shelves that came with the refrigerator or the attachments for the vacuum cleaner. If you own a specific appliance, it's a good idea to keep all its parts -- especially the power supply, which easily becomes disassociated with its appliance if it's something you use only occasionally. Even if you're not using them right now, you might need these things in the future. Getting rid of a part for your dishwasher or vacuum cleaner could be a big hassle and possibly prevent you from selling or donating it later.

Mary Hunt

# 2023 Rearview Awards

As the days begin to lengthen and 2023 is one for the history books, the time for the annual Rearview Awards is upon us.

Books of the year: Drew Thomas Allen's: "America's Last Stand: Will You Vote to Save or Destroy America in 2024." Allen pulls no punches and cuts through the partisan and bureaucratic chaos that plagues American politics. If you love America, this book is a tour de force and a must read as we enter into a presidential election year.

"How Covid Enabled the Expansion and Abuse of State Power" by Ramesh Thakur is the most documented takedown of the COVID lockdown published.

Nonagenarian Thomas Sowell's "Social Justice Fallacies" breaks down the consequences of pursing equality at the expense of merit that is fundamental to the social justice agenda.

Sign of the times: Maxim magazine named a biological male to their "Hottest 100 Women" list, while a transgender professor will teach a course on Taylor Swift at Harvard.

The alarm has been sounded: The recent congressional testimony of the three college presidents should be a first-degree

wake-up call for academia.  How much more shame must universities endure before something is done?

Ms. Bitter, USA: Megan Rapinoe calls playing for U.S. Team "Worst Job In The World" as she kneels for the National Anthem. Note to Rapinoe: It wasn't a job but a privilege that paid well.

Racist medal: Boston's Mayor Michelle Wu. Wu invited only city council members of color that excluded whites to her year-end "holiday party."  Racial equity is becoming what it was bound to become – the return of racial segregation.

Metaphors of the Year: The White House Christmas tree toppling over was followed by Jill Biden's Christmas video that resembled The Nutcracker on crack.

Endorsement: One financial analyst recommends we buy canned food and ammunition.

You know one and they vote: An ABC News/Ipsos poll says more than 75 % believe the country is headed in the wrong direction. Only 25% believe the opposite and admittedly you know at least one of them.

Time travel: After Paul McCartney released the Beatles' final song: "Now and Then" the next day

the Rolling Stones' latest album topped the charts. When we turned the clocks back in November just how far back have we gone?

Things that make you go hmm: It took the American Republic until 2007 to accumulate the amount of debt we have run up the last four years.

Most flamboyant opening: The Las Vegas Golden Knights raised their 2023 NHL Stanley Cup banner to commence their season using a giant slot machine. With Vegas now a first stop destination of the professional sports' leagues, the odds for the next great sports' gambling scandal has increased exponentially.

No pads or helmet needed: By 2027, NFL commissioner Roger Goodell's career earnings will be more than double what any player has ever made in the history of the NFL.

Snake bit: The New York Jets' Aaron Rodgers Era ended after just four plays when Rodgers ruptured his left Achilles tendon. Rodgers is still collecting his $31million salary.  Only Judge Judy gets paid more to sit on the bench.

Most notorious envoy: Dylan Mulvaney rivals the late Lion of the Senate Ted Kennedy as alcohol's most infamous spokesman.

Charlatan cup: The Democrats ridiculed Sen. John Kennedy for reading pornographic material in a Senate hearing. Yet, they are the same books Democrats want in public schools.

Best signage: Peddling on two wheels a bed and breakfast caught my attention: "We Do Not Provide Wi-Fi – So Pretend Like It's 1980."

Worst Trade: The Biden administration's release of billions dollars in sanctioned Iranian funds for the release of five wrongfully held U.S. hostages. Such diplomacy only emboldens our enemies to kidnap more Americans.

A drive for the ages: Southern Columbia drives its way to seven-straight state Class 2A titles with a 21-20 win over Westinghouse going 99-yards on the team's final drive of the season for the program's 14th Pennsylvania state football title – the most in state history.

There is so much more to grouse about, but space and ink are limited.  However, don't fret.  In order to keep this New Year's party going, part two is next week.

Best wishes in 2024.

Greg Maresca

# Environmental

In 1971, President Nixon created the EPA by executive order and directed the FBI to have agents with science backgrounds establish whatever is necessary to create a criminal agenda for investigations with the EPA until EPA Agents could be trained and or hired. My trade was metallurgy with chemistry and was assigned the Western District of NY...all 17 counties! I attended all the EPA training sessions regarding environmental crimes like the Clean Air and Clean Water Acts that became Laws enacted as part of the big eight laws Congress passed. I established the Environment Crimes program in the Western District of NY, all counties, and at least 100 different law enforcement agencies, prosecutor jurisdictions plus chemistry labs, all in WDNY!

Western NY had the cleanest coal plant in the US, the Somerset. I never observed black smoke in the air during the many drive-bys, but Obama closed it and an oil-fired plant that was small, the Huntly plant which was...old ...but performed a necessary service... until Hussein was elected. All of a sudden, a guy who never took a science course in a college that anybody could recall...including his roommate...now knows "what's best for us" ...that's what Socialism is...at its worst! Remember his Health Care disaster where he had to hire a college professor to lie to us to get the bill signed?! Remember the "End justify the means" ...that's NOT freedom America, for Christ's sake wake up!!

This moron, Joe Biden made climate change the number one danger America faces...today! That, in and of itself should have been enough to make you wonder... "Is Biden nuts" ...along with his inability to walk up stairs, not fall off the stage, or trip over a box, or put two sentences together so they make sense...you need a "re-boot"! if you couldn't figure that out ...by now!! Do you believe how low his ability to reason must be to believe that? How about the non-scientific advisors who are leading him around by the nose or ...he's as crooked about climate change as he is about his political career, my opinion! I'll bet his mental capacity is so diminished, he doesn't know what climate is, has no idea what climate change is, where his "advisors" obtained their info... because the Planet Earth has had "Climate Change" since its conception...4-5 billion years ago...so what's changed and how?! By the way, we are still in an Ice Age that started some 10-12,000 years ago!? Surprised...aren't you...so was I!

I know where these geniuses get their "scientific" information...it's the UN Intergovernmental Panel on Climate Change (UN IPCC). Remember how Hillary hired Fusion GPS to create the phony Dossier, that the FBI used as Probable Cause (and she actually paid for that dossier) to apply for and get a wiretap on Carter Page. That started the whole scam on Russia –Trump collusion...all phony, made up by Fusion GPS and others, and FBI Comey said was "Salacious and Unverified" ...AND he still used it for the wiretap warrant, two months AFTER he says he knew it was phony?!?! Well... look at the UN IPCC as providing the same service to the left that Fusion GPS provided to Hillary..." tell us what you want the Earth's temperature to be, and we'll prove it...you lie to it, and we'll (IPCC) swear to it. My opinion...possibly very close!

There is no scientific evidence that climate change is any more a threat than a seagull crapping on a sailor's hat while at sea...in a submarine! Besides that, even if there is severe change in the climate coming...only God and the UN IPCC can "predict" that?! AND, in my opinion, nobody on Earth has found a way to speak with God, and the UN IPCC has never been correct about anything, a FACT!

In 2015, after NASA drilled thousands of test holes in Antarctica, they reported the Antarctic land ice mass is thicker, colder, and bigger than it was 10,000 years ago and the UN IPCC model studies of 18 years on Global Warming are useless...prove absolutely NOTHING. Yet Al Gore made insane predictions based upon those 18 years of IPCC studies and announced all those ridiculous things he shared you with... Global Warming must be stopped, glaciers will melt by 2015, (well it's 2023, IPCC... WTF)! The IPCC study was more accurate predicting how many UFOs would appear in our sky, than if there is Global warning!

In 2015, after NASA all but destroyed IPCC's credibility, the IPCC admitted that the books on Global Warming were "inaccurate" (to say the least) ...and several "scientists" resigned. By the way...there were no scientists in the IPCC according to Weather Channel creator, John Coleman. Mr. Coleman, a scientist himself, compared the 18-year IPCC Model that predicted temperatures to the actual temperatures and there was no correlation whatsoever...NASA declared the IPCC Model and study "useless"! The millions that

the UN spent on the Global Warming model were a waste...nothing more! That includes Global Warming, the glaciers melting, Manhattan flooding and the Polar Bears dying...none were accurate!

Now these morons are doing the same thing, with climate change...weaponizing it! They are going to try to force us into a Socialist, eventually Islamic, nation ruled by Hussein Obama...my opinion!

### That's Treason!

If they cut communications, cut the internet, cut the power, LIKE THIS "president" Biden said he WILL do (the electricity he says he will cut, drives all that I just mentioned...soon) ...he MUST BE STOPPED! We will be in trouble!

So Congress, Republicans AND Democrats, listen and listen well...you absolutely MUST prepare for the inevitable and prepare Court Orders for Injunctive Relief to Federal Districts to restore anything these Traitors do to force us to submit to their Socialist Agenda...it's also Treason if they cut our Rights to Life, Liberty, and the pursuit of Happiness, AND aid our enemies ...at the same time!! This country CANNOT survive WITHOUT fossil fuel! What he is planning is to intentionally weaken the US and make us susceptible to our enemies. He is disarming America, what powers our Military...fossil fuel!?

YOU and I cannot survive without fossil fuel...this is not a game. This imbecile is doing what Obama tells him to do, my opinion, and Biden's words are through Obama's old staff. AND Impeachment cannot come fast enough along with enactment of the 25th Amendment. Biden has lost all sense of reason if he attempts to do what Obama is directing him to do! Cutting off electric power is an act of Treason and whoever assists is guilty of the same crime as if they flipped the grid switch OFF themselves...the penalty is death!

To deny us what God gave us to survive, from the beginning of man, is fossil fuel. No Government can take that away thereby denying you and me from Life, Liberty, and the pursuit of Happiness, provided by the Constitution of the US, ERA, and the Bill of Rights. The Government, EVEN with their "Bull" argument, cannot change the climate of Earth!

CONGRESS MUST STOP THE TAG TEAM OF Obiden/ Obama before they do irreparable damage. Trump can fix what they have done so far...nobody can fix

what he/they say they are going to do...fossil fuel is the blood that keeps America alive...kill it and you kill America, you, your kids, family and everything we know... smarten up before it's too late.

You must contact all Major Grid Operators and DIRECT them to disregard any orders from anybody, Department, Agency, elected officials, including this President, to stop production of any electric plants without first appearing before Congress! This action is necessary as President Obama reduced your capacity from approximately 120% by about 45% by closing coal and other natural gas plants thus endangering and reducing our grid to about 85% of the full capacity necessary to operate without any cushion!

To simplify what I am stating...THE ONLY RELIABLE MEANS OF PRODUCING ELECTRIC POWER, SUITABLE TO POWER A COUNTRY WITHOUT RELEASING "ANY GASES" OF SOME SORT, HARMFUL OR NOT, IS HYDRO POWER!

THE NEXT BEST CHOICES ARE FOSSIL FUEL AND THEN NUCLEAR!

SUN AND WIND ARE NOT VIABLE TO POWER A CITY!

FOSSIL FUEL IS THE LEAST EXPENSIVE, THE SAFEST, THE MOST RELIABLE, MOST PLENTIFUL, GOD GIVEN, THE LEAST INTRUSIVE TO LIFE, AND RELEASES GASES THAT ARE ENHANCING LIFE INCLUDING $CO_2$, METHANE AND OTHER GASES...WE HAVE NO OTHER CHOICE, EXCEPT DOING WITHOUT ELECTRICITY!

MAKE YOUR CHOICE... BUT FIRST SPEND A WEEK CAMPING IN A CABIN WITH NO POWER...NO FIREWOOD, NO FOSSIL FUEL OR SUN OR WIND ...NO POWER...DO IT IN THE WINTER! THAT'S WHAT OBIDEN AND OBAMA WANT ...SINCE "GLOBAL WARMING" DIDN'T WORK, THE DANGER IS NOW "CONTROL" OVER "CLIMATE CHANGE" ...THEY CANNOT CONTROL THE CLIMATE...SO THEY ARE GOING TO CONTROL YOU...IF YOU ALLOW THEM!!! THEY HAVE WEAPONIZED THE CLIMATE AS THEY DID GLOBAL WARMING!!!

By J Gary DiLaura FBI Ret, EPA/ FBI Environmental Investigator, Metallurgist-Material Science Bachelor of Science Degree

January 5, 2024 — *The Sun Bay Paper* — Page 11

# Sunset Photo Contest

Photos taken in the highest resolution will look sharper, so they will have a better chance of winning. If you are using your phone, use the highest resolution available!

We have received many GREAT pictures that we can not use due to low resolution!

Winners will be awarded Bragging Rights, knowing they were selected amongst all the entries sent in, if you didn't win this week, we will keep your photo on file for future consideration or you are welcome to take another! With more entries, chances of winning improve.

**Simple contest rules:**
1) Photo must be taken in Florida
2) Submitted photos can be landscape or portrait and should include: location where the photo was taken from. Please include your full name & phone # in your email.
3) You can only submit photos you yourself have taken and have full rights to, it must be previously unpublished & by submitting any photo, you are giving Sun Bay Paper full rights to publish in print and on the internet.

AND PLEASE Do not shrink photos
send to:
bobby@sunbaypaper.com

This week's photo was sent to us by :

## Barry Day

Taken in Downtown Fort Myers from Calousa Harbour Apartment Building



---

# From Millions to Mere Thousands

Cont from pg 6

Failure to address these violations would escalate the matter to the town's Magistrate for a ruling. Persaud risks forfeiting the $500,000 bond included in his settlement agreement in such a scenario.

**Future Outlook**

The resolution of Persaud's protracted disputes with the Town Council not only marks an end to his legal and regulatory battles but also sheds light on broader concerns.

Persaud expressed concerns about the dynamics between local businesses and larger entities. He specifically mentioned Tom Torgeson and TPI, suggesting a perceived imbalance in the treatment of different developers. Persaud boldly asserted, "Our location on the beach is the best. The Town can't play favorites. There is a divided loyalty to Tom Turgeson and TPI."

Invoking Margaritaville, Persaud alleged inconsistencies in code enforcement. He charged, "Margaritaville is not 'up to code,' but their violations are being ignored."

Is there a double standard in how regulations are applied within Fort Myers Beach, favoring more prominent developers at the expense of smaller ones? Persaud believes so and wants equitable treatment and opportunities for all businesses, regardless of their size or influence.

In response to Persaud's claims, attempts were made to contact FMB Mayor Dan Allers and representatives of TPI/Margaritaville for further comment. However, as of press time, only Margaritaville/TPI has responded to our inquiry with "no comment."

The final deal has not been inked as of press time. Hopefully, the conclusion of Persaud's acrimony with FMB officials is more than just a settlement of fines and compliance issues. The entire town could use this moment to have conversation about the broader context of development, the role of small businesses, and the need for equitable treatment in the face of larger projects, particularly in the aftermath of Ian. As Fort Myers Beach recovers and evolves, balancing different interests and the commitment to fair and transparent governance will be crucial.

Richard Luthmann



*Diana's*
**BEAUTY** CENTER
Established 1985
16521 San Carlos Blvd # A
Fort Myers, FL 33908
**Woman & Mens**
Custom Haircuts
◆ Color ◆ Highlights ◆
& More
# 239-466-8121
All Major Credit Cards Accepted
COMING SOON
NAILS
by
JENNIFER
*Attention Stylists*
**Booth Rental**
**Available**

# Comic Strip Page

**B.C.**   BY: Mason Mastroianni, Mick Mastroianni and Johnny HartHart






**Andy Capp**   BY: Reg Smythe















**Shrimp & Grits**   BY:: Andy Marlette














**Daddy's Home**   BY: Anthony Rubino Jr. and Gary Markstein















# FUNNY BONES



## WHY OLD MEN DON'T GET HIRED

At Job interview:
HR Manager: "What is your greatest weakness?"

Old man: "Honesty."

HR Manager: "I don't think honesty is a weakness."

Old Man: "I don't really give a sh!t what you think."

---

## Miracle?

Sister Mary Ann, who worked for a home health agency, was making her rounds. She was visiting homebound patients when she ran out of gas. As luck would have it, a gas station was just a block away. She walked to the station to borrow a gas can and buy some gas.

The attendant told her that the only gas can he owned had been loaned out, but she could wait until it was returned.

Since Sister Mary Ann was on the way to see a patient, she decided not to wait and walked back to her car. She looked for something in her car that she could fill with gas and spotted the bedpan she was taking to the patient.

Always resourceful, Sister Mary Ann carried the bedpan to the station, filled it with gasoline, and carried the full bedpan back to her car.

As she was pouring the gas into her tank, two Baptists watched from across the street. One of them turned to the other and said, "If it starts, I'm becoming Catholic."

---

## Funny Guy

Two elderly gentlemen from a retirement center were sitting on a bench under a tree when one turns to the other and says: "John, I'm 83 years old now and I'm just full of aches and pains. I know you're about my age. How do you feel?"

John says, "I feel just like a newborn baby."

"Really!? Like a newborn baby!?"

"Yep. No hair, no teeth, and I think I just pooped my pants."

---

## All Natural

While shopping in a food store, two nuns happened to pass by the beer, wine, and liquor section.

One asked the other if she would like a beer. The second nun answered that, indeed, it would be very nice to have one, but that she would feel uncomfortable purchasing it.

The first nun replied that she would handle it without a problem. She picked up a six-pack and took it to the cashier.

The cashier was surprised, so the nun said, "This is for washing our hair."

Without blinking an eye, the cashier reached under the counter and put a package of pretzel sticks in the bag with the beer. "The curlers are on me."



**Beach People** — cartoon art by J. D Burdge

Every time I get a headache I take 2 Ibuprofen and keep away from my children...

Just like the bottle says.

## Dont Mess w Old People!

An old gent had an appointment to see a urologist who shared an office with several other doctors. The waiting room was filled with patients. He approached the receptionist desk. The receptionist was a large imposing woman who looked like a wrestler. He gave her his name.

In a very loud voice the woman said, "Yes, I see your name here. You want to see the doctor about impotence, right?"

All of the patients in the waiting room snapped their head around to look at the very embarrassed man.

He recovered quickly though, and in an equally loud voice replied, "No, I've come to inquire about a sex change operation and I'd like the same doctor that did yours!"

---

## Butterfly Effect?

A man was watching TV and enjoying a beer. "Don't go," he yelled at the screen. "Do not enter that building. Walk away. Argh, you stupid man!"

His wife called from the kitchen, "What on earth are you watching?"

"Our wedding video."

---

## Deep Thinking

I mowed the lawn today, and after doing so I sat down and had a cold beer. The day was really quite beautiful, and the drink facilitated some deep thinking on various topics. Finally I thought about an age old question:

Is giving birth more painful than getting kicked in the nuts? Women always maintain that giving birth is way more painful than a guy getting kicked in the nuts.

Well, after another beer, and some heavy deductive thinking, I have come up with the answer to that question....
Getting kicked in the nuts is more painful than having a baby; and here is the reason for my conclusion.

A year or so after giving birth, a woman will often say, "It might be nice to have another child."
On the other hand, you never hear a guy say, "You know, I think I would like another kick in the nuts."
I rest my case.... Time for another beer.

*The Sun Bay Paper*

January 5, 2024

# Cashless

*We received a letter to the editor stating her concerns that a business on Fort Myers Beach being cashless, she has good reason to have them, here's why...*

A cashless society is a tool of transnationalist tyranny. Everyday cash transactions are anonymous.

To operate seamlessly in such a society, a central computer system is essential, containing a repository of all your personal data. This system would meticulously monitor your "credits" and execute debits from your account.

I don't do anything illegal". Perhaps not, but what about your health? What about tracking your habits? Do you eat out a lot? Do you purchase alcohol on a regular basis? What if all your dietary habits were right there for the insurance companies to see? What if they decided to charge you extra because you had an extra glass of wine every night, or a eating too much pizza? Just one example of a slippery slope.

The potential for abuse emerges when considering freedom of speech against the government or a political figure. The bank can simply

E-books seem like a great solution for those of us who prefer spending $5.99 for a book is a small price for a few hours of entertainment. It is perfectly reasonable, and we don't want the fuss of a physical copy.

But where does that leave a little girl who has no money and just wants to read? It leaves her out in the metaphorical cold. She can't afford an e-book reader, she doesn't have an Amazon Prime account or a way to pay for an e-book. If we went 100% e-books, that little girl would never have read The Lord of the Rings or I, Robot. She would never have fostered

for emergencies, you can do that. In a world where all transactions are electronic, this option disappears. The transition to a fully electronic monetary system implies comprehensive tracking of every purchase. The concern here extends beyond Uncle Sam monitoring commonplace transactions; it encompasses a profound intrusion into personal privacy.

Under an all-electronic currency system, the ability to discreetly handle financial matters becomes virtually nonexistent. Whether it's purchasing a television, acquiring a book on politics, buying ammunition, securing



Signs like these should be read as "DO NOT ENTER"

The problem? The system has to approve your transaction. You piss off the company/government and they freeze your account. No food, no medical, no fuel…

You would only be able to buy what they let you buy, IF they let you. Remember what Canada did to the peaceful protesting truckers?

The biggest fear is that with electronic cash only, Uncle Sam can watch and track everything you do. The second fear is that if there is an attack on the U.S. that knocks out the power grid, people will not have access to money. Banks can use emergency power to print account information to be able to distribute cash, but if there is no cash and no power, we are done.

Supporters of a cashless society argue for the convenience it offers, but what you are talking about is giving up control of almost every aspect of your life. Instead of having a currency that can be freely traded for goods and services, you would be forced to have some sort of bank account that meticulously tracks and governs every transaction.

Now I know a lot of people would respond, "I don't care because

close your account or deny your transactions. Of course, it will "officially" be a clerical error that only takes a few weeks to fix. In the meantime, you can't pay for food or your water or heating bill. You could become homeless and would have no recourse because you have no control over your money.

In a completely monitored cashless system, every transaction, no matter how minor, would be recorded. The kid next door couldn't mow your lawn or shovel your driveway. We couldn't sell anything to each other. The absence of cash eliminates a crucial medium for private negotiations and transactions, we'd have nothing left but bartering.

It's also crucial to consider the impact on all segments of society, not just the affluent or middle class. Here's an example.

I recently read a story online about a little girl; she grew up poor. Very poor. Like, "eating out of the garbage" poor. Paperback books were one of her only entertainments; she would save coins she found on the ground, in order to buy used books, the library where she lived at the time was hard to reach and distinctly lacking.

a love for fantasy or science fiction.

Today that little girl is a Hugo Award winning, bestselling author. Our world is better because that little girl could pick up coins off the sidewalk and buy cheap used books.

It's not just about poor people being able to get loose change. A cashless society means so much more.

It means that someone without a smartphone can't park at the downtown parking lots and shops. (this actually is already a problem)

It means an abuse victim can't secretly save up cash so they can escape from a spouse who controls the bank accounts.

It means a ten-year-old can't go down to the 7–11 and buy a ice cream, without asking a grownup first.

It means the police can easily track the guy who wrote a book about the kid they murdered in his neighborhood.

It means the government could prevent you from buying gas if they thought you had already used enough during any set period or prevent you from buying ice cream because you are overweight.

Right now, if you want to keep a few grand in cash in your house

medications, or any other transaction, each one is subjected to scrutiny. The apprehension arises from the loss of financial autonomy and the potential for excessive oversight.

The current flexibility to respond to economic uncertainties, such as concerns about the stock market, includes the option to convert investments to cash and safeguard that wealth in unconventional ways, like burying money in the backyard. The ability to convert dollar bills to tangible assets such as gold or silver provides a level of financial diversification and security.

However, in an exclusively electronic currency scenario, this diversification strategy would be rendered impossible.

In essence, the shift to an all-electronic currency landscape carries significant implications for individual privacy, financial autonomy, and security. It prompts a reevaluation of the balance between convenience and the preservation of personal freedoms in financial transactions.

Not supporting businesses that don't accept cash is one way we can fight this individually.

January 5, 2024 — The Sun Bay Paper — Page 15

this issue's puzzle is called 'SHIP MATES? '    Last weeks solution on page 17

**DOWN**

1 "The Masked Ball" composer
2 Plants in a Fugard title
3 Latin for lips
4 Run, as a machine
5 Neighbor of Leb.
6 Covered with bristles
7 Limber
8 To gild, of old
9 Go faster: abbr.
10 Poker house take
11 "Lifeboat" actor
12 Mistake
13 Positive thinker
18 Suffice
23 _ room
25 Rugged
26 Love potion number
30 Savored
31 Wrath
32 Drink moderately
33 Doyenne of etiquette
34 Printemps follower
36 Little piggy
37 Finale
40 Pledge
41 Of spaces between leaf veins
46 Intimation
48 Musicianship
49 Fell slowly
50 High-pitched
51 Twenty
52 Made of a certain cereal
54 Desires
55 She was a lady
56 Lawn tool
57 Oblique glances
59 Certain hairdo
64 Disencumber
65 Joplin opus

**ACROSS**

1 Dame Ninette de_ of ballet fame
7 Ananias, for one
11 March count
14 Slipby
15 Ancient Peruvian
16 "Maid of Athens, _ we part"
17 Orig,"Unsolved Mysteries" host
19 The Blue Eagle letters
20 Earl _ Biggers
21 Honolulu's island
22 A Flynn
24 Russian born American violinist
27 1847 novel "Jane
28 Type of surgeon
29 Eighth letter
31 "_ little silhouetto of a man" (3 wds.)
34 Sicilian volcano
35 Native American
38 Margin
39 Facial ornaments
42 Chaney
43 Center lead-in
44 Paris railroad station
45 Like some kitchen floors
47 Philippine island
49 Anna who was Nana
51 Versatile bean
53 "Show Boat" actor/ singer
58 "It Happened One Night" director
60 Rural road
61 Put aboard
62 See 35 Across
63 English composer: 1879-1941
66 Thing, in law
67 "Norma Rae" director Martin
68 "Tigerlilies" author Sidney
69 Tolkien creature
70 Keats specialties
71 Easter _, hen breeds



-Pizzas-
-Flatbreads-
-Sandwiches-
-Salads-
-Entrees-
-Desserts-
-Margaritas-
-Shots-
-Martinis-
-Seltzers-

WAHOO WILLIES
TIKI BAR & GRILL
FORT MYERS BEACH, FL

239-233-8081
WahooWillies.com

ENJOY Great Food and even better time! Great Drinks Delicious Bites

We Proudly serve Certified Angus Beef AND STRIVE TO HAVE THE FRESHEST FISH AVAILABLE FOR OUR GUESTS ENJOYMENT

"Beach Talk Radio" live podcast every Saturday @ 11am.

645 Old San Carlos Blvd. Fort Myers Beach, FL



WATERFRONT
SNUG HARBOR
FORT MYERS BEACH
RESTAURANT

Locals Day Every Wednesday, Live Music 3-6 PM 2ND Drink Free w/Snug shirt

The Place To Be For Sunday Concerts 4-7PM

OVER THE WATER DINING
DAILY LUNCH & DINNER SPECIALS
FRESH LOCAL SEAFOOD

A Delicious Variety Of Food From Starters, Soups, Salads, Burgers, Wraps, Steaks & Seafood

239-463-4343

Home OF Tiki Cruises

645 Old San Carlos Blvd.
Visit our website:
SNUGHARBOR.RESTAURANT

Page 16        *The Sun Bay Paper*        January 5, 2024

# The Travel Outlook for 2024

If you're thinking of taking time off next year to explore a place close to home, you'll be one of many people considering the same thing. On the other hand, if Europe is your dream destination, it's not too early to begin planning and making reservations.

These are the trends identified by travel experts looking ahead to what might happen in 2024. In general, they predict a continued upsurge in vacation trips, expansion of some popular types of travel, and increased focus on tourism that can extend experiences and enjoyment beyond the usual.



The resurgence of domestic pleasure trips that began as the pandemic waned is expected to continue next year. Folks who learned that attractions not far from where they live have much to offer will spur a continued rise in domestic travel. This coincides with a rise in "microcations," short trips that don't require a lot of planning or time off. These mini-journeys can provide introductions to local destinations that were unknown or overlooked in the past.

According to the U.S. Travel Association, domestic leisure travel has been "normalizing" during 2023 and is likely to return to pre-pandemic levels next year. Of course, international travel will retain its allure, and the number of people ready to embark on trips to other countries continues to rebound. As a result, those in the know suggest that it's not too early to begin taking steps to lock in reservations.

Cristiano Cabutti, manager of a Marriott resort in Venice, Italy, has reported that one result of "pent-up travel demand and the concept of making up for lost time" is that the property already is receiving reservation requests for next spring. Dino Triantafillou of the Italian Journeys tour company suggests that clients book trips at least six months in advance and

preferably even earlier "to get what they want at the right price."

According to the annual traffic report of the Airports Council International, based on information gathered from more than 2,600 airports around the world, 2024 is positioned to be a milestone year for global passenger traffic. All regions are expected to reach pre-pandemic levels next year, and the Caribbean Islands are predicted to be among the first to achieve that goal.

At the same time the volume of travel recovers to previous levels, there likely will be some changes in what many people are seeking from their sojourns. According to Hannah Free, travel and tourism analyst at the information research company GlobalData, "Consumers are now more likely to pursue authentic experiences, demand personalized travel offerings, blend business and leisure travel, and be more conscious of their overall environmental impact."

One trend is an increase in experiential and transformative trips. More people are expected to seek an immersion in the customs and culture of places they visit. Others will look for close interactions with unspoiled nature or opportunities for self-reflection.

An increasing number of people also are paying attention to the effect their travel will have on the environment. Sustainable tourism is transitioning from a niche market to a mainstream goal. This translates to assurances that a trip will not contribute to the degradation of a destination -- including protection of both its natural and cultural heritage -- and will support the local economy.

Those who seek to combine a trip with efforts to improve the lives of others are expected to support an increase in volunteer tourism. Opportunities cover a wide range of activities, from helping to build and repair houses to assisting overworked healthcare providers

and from teaching English as a second language to school children to picking up trash at tourist sites.

The worldwide pandemic has influenced the way people will travel as it wanes, if not disappears. One result has been heightened awareness about health and wellness. That translates to vacations that offer holistic benefits and enhance physical and mental well-being. This might include yoga and meditation, spas that offer therapeutic treatments and outdoor adventures that promote physical fitness.

Also, as family and friends look forward to reconnecting after being parted by health restrictions, multigenerational and group travel are expected to increase in popularity. These trips provide opportunities for sharing experiences and personal bonding, along with some practical advantages.

Going with members of your family or another group can be cost-effective because expenses such as accommodations and land transportation are shared. Discounts may be available for tours, excursions and entrance to attractions. An added bonus is the security of being with others in case of an unexpected situation or emergency.

Also predicted to grow during 2024 are "workations." These are trips that combine the appeals of a traditional vacation with the benefit of being able to work remotely from anywhere in the world. As people are less tied to toiling in a traditional office environment, more are expected to take advantage of the ability to work elsewhere, enabling them to stick to their job at the same time that they enjoy learning about different places and the people who inhabit them. A growing number of accommodations is catering to these "digital nomads" by offering comfortable workspace, high-speed Wi-Fi connection and other amenities that blur the distinction between employment and enjoyment.

Victor Block



**KUHN LAW FIRM, P.A.**
6720 Winkler Rd • Fort Myers, FL 33919

BBB   A+ rating

## Seeking Clarity on Nursing Home Costs? We're Here to Help.

Scott A. Kuhn
Attorney

• Protect your assets. Consider your legacy. Let's discuss your options.

• Complimentary Initial Consultation. Gain clarity on your financial path.

CALL NOW:
**(239) 544-4LAW**
(239) 544-4529
www.KuhnLegalGroup.com

**FREE CONSULTATION ON ALL LEGAL MATTERS**
• Probate Administration & Litigation
• Trust Administration & Litigation
• Estate Planning • Guardianship
• Elder Abuse • Personal Injury • Medical Malpractice
• Real Estate • Insurance Law
• Medicaid Pre-planning & Crisis Planning

January 5, 2024                     The Sun Bay Paper                                Page 17

# Systemic Inflation – America's Biggest Financial Problem

Inflation solutions typically involve official bickering about spending and tax policies. Here I'll discuss more subtle factors such as informal government processes, bad governance habits, or unintended consequences of policies. Those are labeled systemic inflation because they drive inflation automatically. And there's an interesting



solution being suggested for our biggest barrier to spending control.

First, our undisciplined budgeting process, a huge systemic problem, doesn't lend itself to the careful analysis of spending and borrowing decisions. These problems don't get our legislators' attention until spending authorizations are depleted or we're bumping up against our debt ceiling. Only emergencies attract attention.

We go through an endless stream of emergency budget and debt ceiling debates strung together with omnibus spending bills and continuing resolutions. There's dangerously little old fashioned "scrutinizing" going on.

A related process, "baseline budgeting," was intended as a tool only. It's a projection of receipts, expenditures, deficit or surplus that would result from making no changes in law or policy. When

baseline budgeting dominates the process rather than just being informational, serious budget analysis doesn't happen. There's a built-in inflationary bias when we simply do the same thing, but with inflationary adjustments.

When baseline budgeting is controlling our financial planning, we hear claims that budgets have been reduced, even after increased deficits have been announced. It's seems like a pretend world.

A cynic might complain that under baseline budgeting, "balanced is bad, reduced is a code word for increased, less means more, down means up; and 'draconian spending cuts' somehow result in borrowing increases. It's an upside down world." Our financial management should return to "regular order" by thoroughly analyzing all 12 spending budgets.

Before I discuss what I consider our biggest example of a systemic financial problem, I'll just mention there are many other examples of systemic causes of inflation such as cramdown energy policies, overwrought federal regulations, and the trendy Modern Monetary Theory which preaches deficits and debt are of little concern. It's easy to add to that list.

I consider our entitlement programs to be the biggest example of systemic inflation. This includes Social Security, Medicare, Medicaid, as well as several others. They comprise 70% of total federal expenditures and are apparently politically untouchable. As a result, legislators are forced to hunt for spending reductions by nibbling inconsequentially at discretionary spending budgets which make up a mere 30% of total spending.

However, I'm convinced we have a potential ally in changing the nature of this problem and funding entitlements from "normal operations," without straining the system. I'm endorsing an idea that has been bantered about by many pundits, including Dan North, Senior Economist at Allianz Trade North America, who really got my attention.

Let's acknowledge that entitlement programs are, as of now at least, politically impossible to be reduced in any significant amount. Let's also have as a goal of maintaining current individual benefit levels.

The U.S. is experiencing a dramatically aging workforce resulting in an urgent demand for more skilled workers and entrepreneurs. While we have established limits on the number of skilled legal immigrants, we're being overrun by illegal, largely unskilled illegal immigrants, a major drag on our economy.

It's simply common sense to dramatically reverse those immigration statistics. Let's legislatively increase legal immigration of skilled workers and professionals to strengthen the economy, expand employment levels, and fund stabilized entitlement programs. Let's also establish measures to stem the uncontrolled border crossings.

We have no choice but to establish "old fashioned" border security with barriers and entry points. This would require finishing a physical barrier along with expanding technological and human surveillance. In November, Republican senators introduced legislation that would emphasize attracting skilled legal workers immigrants the U.S. Let's get that done and follow that up with make sure we take back physical control of our borders.

Common sense can go a long way to solving our systemic problems!

Visit my website at
myslantonthings.com



Steve Bakke

Last issue's puzzle solution to '**BAR NONE**"

| A | L | A | M | O |   | E | R | I | E |   |   | B | S | F |
| R | O | V | E | S |   | P | I | T | A |   | B | E | T | E |
| A | L | E | R | T |   | A | P | E | R |   | A | G | I | N |
| B | A | R | L | E | Y | C | O | R | N |   | R | I | N | D |
|   |   |   | N | E | T | S |   | E | V | E | N | T | S |   |
| L | A | M | B | D | A |   | T | O | R | A | H |   |   |   |
| A | R | E | A |   | S | P | E | D |   | L | E | A | V | E |
| I | N | G | R | A | T | E |   | I | D | E | A | T | E | D |
| R | E | A | C | T |   | R | E | N | E |   | D | I | R | E |
|   |   |   | A | T | R | I | A |   | L | E | S | S | O | R |
| E | T | E | R | N | E |   | R | A | L | E |   |   |   |   |
| L | A | L | O |   | B | A | R | B | A | R | O | S | S | A |
| A | B | E | L |   | E | L | I | A |   | I | O | N | I | C |
| T | O | N | E |   | L | I | N | T |   | E | L | I | T | E |
| E | R | A |   | S | A | G | E |   | R | A | T | E | S |   |



WANTED

HIGHWAYMEN ART
BUCKNER    NEWTON    WALKER
BUTLER    HAIR    BACKUS

CALL OR TEXT WALTER
863.517.1986



# The Oyster Ed

### pearls from the muck

*Journalism, a Reckoning*

You know journalism is flailing when Economist columnist James Bennet writes a piece that pretty much blew up his old home. The headline: "When the New York Times lost its way."

In 2020 when he was the Gray Lady's editorial-page editor, Bennet became a victim of one of his profession's too frequent witch hunts. He did his job that way it is supposed to be done and that cost him his precious perch.

After the death of George Floyd at the hands of Minneapolis police, protests turned violent, downtowns burned, police stations were torched and minority-owned businesses were gutted. The New York Times editorialized against police misconduct and ran columns to the same effect. But then, in a nod to the notion of balance, Bennet's shop ran one pro-law enforcement opinion piece, written by Sen. Tom Cotton, R-Ark., that called for employing U.S. troops to stop the rioting.

That lone contrary viewpoint in a sea of groupthink sank Bennet.

At first, New York Times board chairman A.G. Sulzberger supported Bennet's decision to run the outlier opinion.

In the newsroom, alas, there were bursts of outrage and hysteria. A mob mentality prevailed. Co-workers chastised the decision on social media. The newspaper guild protested that running the piece presented "a clear threat to the health and safety of the jour-

nalists we represent." Sulzberger caved to calls for Bennet's head and canned him.

Everything wrong in journalism had a cameo appearance in this movie. Reporters and editors who gave lip service to diversity were blind to their readiness to muzzle contrary opinions.



It didn't matter that most Americans agreed with Cotton. Woke journalists had nothing but scorn for the reading public, and the reading public lost faith in the country's self-styled paper of record.

And there was so much more to the picture, as Cotton wrote for the Times. "Outnumbered police officers, encumbered by feckless politicians, bore the brunt of the violence. In New York State, rioters ran over officers with cars on at least three occasions. In Las Vegas, an officer is in 'grave' condition after being shot in the head by a rioter."

Over the years, Bennet observed, The New York Times stopped seeing its prime mission as informing the public. Many in to-

day's news crews see a mandate to tell readers what they should think. Police bad. Social justice good. Republicans bad. Progressives good. Black and white. No gray.

In the modern news orbit, there is little humility, no place for surprise, no thirst to uncover the unknown. When controversy erupts, stories follow a prescribed path.

Bennet summed up the situation well when he wrote, "The Times's problem has metastasized from liberal bias to illiberal bias, from an inclination to favor one side of the national debate to an impulse to shut debate down altogether."

There you have it. A profession that demands diversity, except in thought. Hysterical claims, such as that criticizing riots endangers newsroom staff. (Fun fact: The Cotton piece ran and not one New York Times scribe was hurt as a result.)

As he looked at journalism today, Bennet recalled his early days in the business, when seasoned editors steered him in

directions where "in humbling ignorance," he was put in situations where he had to approach stories from a fresh perspective.

Today that dynamic is upside-down.

It's been building for some time. In 2020 during the heat of COVID shutdowns, former Times columnist Ben Smith (now Semafor editor-in-chief) wrote of media big shots who lost their jobs after weak complaints from underlings.

Smith's focus was on the economic divide -- as many well-paid news execs spent the pandemic lockdown outside the city, while young staffers stayed in their cramped walkups.

This line got my attention: "The ousters were driven, in many cases, by employees who believe the companies' internal cultures don't mirror the progressive and anti-racist values they sell."

Editors fear interns. The kids are running the candy store. It's a reason so many Americans don't trust the news media. When an editorial page editor loses his job for running one piece that very much was in sync with public opinion, "without fear or favor," the Times' de facto motto, morphs into fear and favor.

Perhaps the saddest trend is the lack of courage, with groupthink zealously enforced by people who should be champions of independent thought but prefer to act as enforcers of dubious trends.

Bottom line: We should not feel safe in journalism. That's not the mission.

Debra J. Saunders

## Tide Chart

*Sponsored By...*

| | | High Tide | | Low Tide | |
|---|---|---|---|---|---|
| Fri, Jan 5 | Tide Set One | 09:19 AM | 1.12 ft | 02:48 AM | 0.13 ft |
| | Tide Set Two | 07:34 PM | 2.17 ft | 01:06 PM | 0.89 ft |
| Sat, Jan 6 | Tide Set One | 11:24 AM | 1.15 ft | 03:51 AM | -0.23 ft |
| | Tide Set Two | 08:12 PM | 2.33 ft | 01:34 PM | 1.12 ft |
| Sun, Jan 7 | Tide Set One | 08:55 PM | 2.49 ft | 04:46 AM | -0.52 ft |
| | Tide Set Two | | | | |
| Mon, Jan 8 | Tide Set One | 09:43 PM | 2.62 ft | 05:37 AM | -0.79 ft |
| | Tide Set Two | | | | |
| Tue, Jan 9 | Tide Set One | 10:34 PM | 2.79 ft | 06:26 AM | -1.02 ft |
| | Tide Set Two | | | | |
| Wed, Jan 10 | Tide Set One | 11:26 PM | 2.92 ft | 07:13 AM | -1.18 ft |
| | Tide Set Two | | | | |
| Thu, Jan 11 | Tide Set One | 03:59 PM | 1.28 ft | 07:58 AM | -1.25 ft |
| | Tide Set Two | | | 05:22 PM | 1.28 ft |

**Do you Like our Paper? You can sponsor our Tide Chart**

**YOUR NAME HERE**

**Sponsor our Tide Chart and show everyone that you are an informed American and you support Conservative Values**

January 5, 2024                     *The Sun Bay Paper*

# CONNECTING YOUR PHONE TO A RENTAL CAR?

Upon acquiring a rental car and being in possession of a smartphone, it's customary for individuals to explore the connectivity options with the car's infotainment and navigation system. In contemporary vehicles, drivers can seamlessly link their mobile devic-



es, facilitating hands-free calling, music playback, and, in certain instances, even screen mirroring. This connectivity is typically achieved through a physical USB connection or the establishment of a Bluetooth pairing.

You may assume that when connecting your phone to a rental car, there should be little to no risk to your personal information or privacy. However, after 'hacking' into an infotainment system experts discovered:

**Unique identifiers for previously connected phones, detailed log of phone calls; text messages; photos; and entire contact lists including other people's names, address, and emails.**

While the convenience of connecting your phone to a rental car is undeniable, it introduces potential risks to your personal information and privacy. The substantial amount of data retained by vehicle infotainment systems was recently brought to attention. This includes the storage of unique identifiers for previously connected phones, a comprehensive log of phone calls, text messages, stored photos, and the entirety of contact lists.

Despite the absence of prominent reports on data breaches involving rental cars, the possibility of personal information collection exists. This could occur through the rental car company, the auto manufacturer, another renter, or an unauthorized third party.

A common oversight when returning a rental car is leaving phones paired, inadvertently leaving personal data behind. Notably, many car rental companies lack explicit policies addressing the removal of personal data, placing the onus on the driver. AVIS, for instance, explicitly states in its

privacy statement that they are not accountable for any data left in the vehicle.

The last vehicle I rented from Hertz had 2 previous phones still in the memory, I deleted them, but other drivers may have other intentions.

To fortify the protection of your personal data while utilizing a rental car, consider adopting the following precautionary measures:

**Control Access to Your Contacts:**
When initiating the connection between your phone and the infotainment system, explore options to restrict access to your contact list through your phone's operating system. Unfortunately, this won't allow the car's system to tell you who is calling.

**Consistently Unpair Your Device:**
Establish a routine of unpairing your device from the car's Bluetooth settings when returning the rental. This practice may contribute to the potential removal of collected information.

**Prefer Apple/Android Car Apps:**
Most phones already have maps and navigation systems so you can choose to use your phone. Bring along a phone holder that attaches to the vent of the vehicle to make this option safe.

**Caution in Connectivity:**
While somewhat impractical, limiting the frequency of connecting your phone to the car altogether represents an extreme yet effective measure to minimize exposure to personal data leakage.

For those who remain concerned about privacy, even after adopting the measures, consider embracing more unconventional steps, not connecting to the rental at all, charging your phone via a 12-volt USB converter, utilizing audio connectors for playback, or resorting to a speakerphone or dedicated hands-free headset for communication.

Al Dipasquale



*Cibo*

**(239)454-3700**

**Fine Italian Dining
Casual Attire**

**cibofortmyers.com**

OPEN 7 DAYS A WEEK
SUN. - THURS. 4PM - 9PM
FRI. & SAT. 4PM - 10PM

*Reservations Recommended*

HAPPY HOUR 4PM - Close
EVERYDAY!!! ONLY AT
THE BAR SEATS

Serving all the Italian classics
you've come to expect
and additional delights from Chef Sean

12901 McGregor Blvd Fort Myers, FL

# Local Dentist Helps Uninsured Adults



Dr. Andrew Frey, Dental Assistants Alex and Ali and Dental Hygienist Stacey provide comprehensive dental care exclusively to Uninsured Adults in the Fort Myers area.

Our facility is very modern but still modest while using the latest technology and treatment modalities. We focus on the technology that delivers the highest quality care without all the glitz and gadgetry that increase costs. This allows us to offer lower fees to serve the people in our community. Dr. Frey grew upw in Michigan and graduated from the University of Michigan School of Dentistry, which has been ranked as the top dental school in the United States for the past four years, according to the QS World University Rankings. Dr. Frey comes from a family legacy of dental providers and has moved to Southwest Florida with his wife Valerie, currently a middle school teacher.

After watching the dental profession change, we felt it had to be done a different way (A Non Insured Way). Patients often remark they find our office to be a breath of fresh air in an age where profit and greed driven corporations and insurance agencies are invading every aspect of our lives including our healthcare. Here at Independent Dental Care, we treat all patients like we would our own family and friends.

Dental insurance itself is a huge clerical expense for a dental office. If we worked with insurance companies we would have to hire more people just to process and reprocess claims as the insurance companies decide the best treatment for the patient. Dr. Frey said in his opinion the entire concept of dental insurance has led to today's inflated dental fees and a climate that encourages treatment based on fees rather than needs. The insurance system is a breeding ground for greed, fraud and prejudice.

We see a number of new patients each week, yet have always been able to get people in for the emergency care they may need

"We explain to our patients that we don't cut corners on treatment, care or materials", said Dental Assistant Alex. "We pride ourselves in treating people, not just their teeth. We love dentistry and feel great about providing excellent care driven by our desire to help others."

Many of our patients are seniors or those with a very limited healthcare policy that gives them only a few benefits and then charges more for their other needs.

We offer no gimmicks just to get you in the office. We offer only modern quality dental treatment at an affordable cost.



## Thank You For Voting For Us As

# Best Dental Clinic!

Dr. Andrew Frey, D.D.S. - License Number 22529
(239) 437-8900
9131 College Parkway 150
Fort Myers, FL 33919

---

**$99**

**Adult Exam, X-Rays & Basic Cleaning**

*(D0150, D0330, D1110)*

Excludes gum disease & patients with insurance
-New Patients Only-
Must present coupon. Not valid with other offers.
Expires 1/31/24

**$899**

**Porcelain Crown**

*(D2750)*

-New Patients Only-
Must present coupon. Not valid with other offers.
Expires 1/31/24

**$74**

**Emergency Exam & X-Ray & Basic Cleaning**

*(D0140, D0220)*

-New Patients Only-
Must present coupon. Not valid with other offers.
Expires 1/31/24

PAID ADVERTISEMENT

# EXHIBIT E



Richard A. Luthmann
4199 Los Altos Court
Naples, FL 34109
Tel: (239) 631-5957
richard.luthmann@protonmail.com
Luthmann.Substack.com

January 2, 2024

**<u>Via Overnight Mail, U.S. Mail, and Email</u>**

Nick Chiappetta, Esq.
Chiappetta Trial Lawyers
2101 Vista Parkway, Suite 258
West Palm Beach, FL 33411
Email: nick@chiappettalegal.com

Danesh Noshirvan
2411 Charleston Road
Mansfield, PA 16933
Email: daneshnoshirvan@gmail.com

> **Re:    Formal Demand for Retraction, Apology, and Damages for Defamation and Defamation _Per Se_**

Dear Mr. Chiappetta and Mr. Noshirvan:

This letter serves as formal notice regarding egregious and defamatory statements made by Mr. Danesh Noshirvan on TikTok on January 1, 2025, among other platforms. These false statements defame me both personally and professionally, rising to the level of defamation **_per se_** under Florida law.

1

## Specific Defamatory Statements

In the January 1, 2025, TikTok video, Mr. Noshirvan made the following false and defamatory statements:

1. "[Richard Luthmann]…has been involved in a crime where he lured someone to a private room so that that person could be held at gunpoint…so he could have money taken from him. This guy is insane."

2. "[Richard Luthmann is] their new for-hire troll…coming after my children, coming after my family and…targeting and harassing me."

3. "[Richard Luthmann] was hired by Jennifer Couture, Ralph Garramone, and Garramone Plastic Surgery to engage in stalking and harassment."

4. "Get ready for prison, buddy."

These statements are unequivocally false. Additionally, your claim that I am compensated by Ms. Couture, Dr. Garramone, or their business not only constitutes defamation but also strikes at the heart of protected journalistic activities, accusing me of criminal conduct and ethical violations that frustrate my ability to practice investigative journalism and the ability of other journalists to do the same. Price v. Time, Inc., 416 F.3d 1327, 1345 (11th Cir. 2005); Zerilli v. Smith, 211 U.S. App. D.C. 116, 656 F.2d 705 (1981)

## Legal Standards for Defamation Under Florida Law

Defamation requires the publication of a false statement to a third party that damages the plaintiff's reputation (Clowdus v. Am. Airlines, Inc., No. 22-14053, 2023 U.S. App. LEXIS 20232, at *8 (11th Cir. Aug. 7, 2023). Defamation *per se* applies to statements falsely imputing criminal behavior, professional misconduct, or actions inherently damaging to reputation (Wolfson v. Kirk, 273 So. 2d 774, 776 (Fla. Dist. Ct. App. 1973)). Mr. Noshirvan's statements clearly satisfy these elements:

1. They falsely impute criminal conduct and serious professional ethical violations.

2. They were published to an audience of millions on TikTok.

2

3. They are not protected as opinions under the First Amendment (Turner v. Wells, 879 F.3d 1254, 1262 (11th Cir. 2018)).

## Mr. Noshirvan's Escalating Danger to Society

Mr. Noshirvan's pattern of conduct extends beyond defamatory statements. His actions align with those of a destabilizing agent operating against the public good, including:

1. Doxxing and Harassment Campaigns: Noshirvan has a history of weaponizing his TikTok platform to target individuals and families, including doxxing U.S. Supreme Court justices following the Dobbs decision overturning Roe v. Wade. After Noshirvan published the home addresses of the SCOTUS Justices and acted further in violation of 18 U.S.C. § 115, Justice Kavanaugh received a credible death threat at his home. Noshirvan is also currently under investigation related to the harassment-related suicide of Denton, Texas, football coach Aaron De La Torre, who Noshirvan previously targeted. His actions have prompted numerous state and federal investigations, including his potential role as an instrument of foreign interference.

2. Threats to Judicial Integrity: Publicly distorting courtroom proceedings and falsely claiming I was distressed upon being improperly served with a subpoena undermines the sanctity of the judiciary and aligns with Chief Justice John Roberts' warnings about increasing threats to judicial independence.

3. Global Connections to Dangerous Actors: Evidence suggests that Mr. Noshirvan's actions mirror foreign influence operations, such as those deployed by the Chinese Communist Party (CCP), raising concerns about his intent and affiliations.

These actions exacerbate the defamatory harm caused by his statements and threaten the institutional integrity of the judiciary. Chief Justice John Roberts' 2024 Year-End Report explicitly warned about the dangers of misinformation and the growing threats of violence against the judiciary.

3

Mr. Noshirvan and his wife Hannah are also mentally ill, suffering from severe PTSD. They have represented as much to the U.S. Court for the Middle District of Florida in relation to the pending *Noshirvan v. Couture et al.* matter. Their claims that I or anyone is "coming after my children, coming after my family and…targeting and harassing me" ignores two important facts. First, Mr. Noshirvan appears to have perjured himself to the federal court.

Second, and most importantly, the best interests of the Noshirvan children is a serious moral, ethical, and legal question, and Mr. Noshirvan and Hannah Noshirvan have now made this issue one of public concern by their own actions.

## **Demands**

To resolve this matter without litigation, I demand the following actions by January 15, 2025:

1. A full public retraction of all defamatory statements on TikTok and other platforms.

2. A formal written apology, published on TikTok and provided to me directly.

3. Payment of $100,000 in liquidated damages for reputational harm, emotional distress, and other damages caused by the defamatory statements.

Failure to comply with these demands will result in the initiation of legal action against Mr. Noshirvan and potentially Mr. Chiappetta, whose facilitation and enabling of these acts may invoke the crime-fraud exception to attorney-client privilege.

## **[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## Conclusion

This letter is a final opportunity to mitigate the significant harm caused by Mr. Noshirvan's defamatory conduct. Your failure to act will compel me to seek judicial remedies, including monetary damages, injunctive relief, and punitive damages.

This correspondence is not a waiver of any rights or remedies, all of which are expressly reserved.

Regards,

Richard A. Luthmann

CC:      File
Interested Litigation Parties in *Noshirvan v. Couture et al.*
The Fourth Estate
Denton, Texas, investigators
Additional authorities (names withheld to maintain the integrity of ongoing investigations)

ENCL:    Chief Justice John Roberts, 2024 Year End Report on the Federal Judiciary

5



*J. Waties Waring Judicial Center, Charleston, South Carolina*

# 2024 Year End Report on the Federal Judiciary

In December 1761, a little more than one year into what would be a fifty-nine year reign, King George III decreed that from that date forward, colonial judges were to serve "at the pleasure of the Crown." This royal edict departed from the long-standing practice in England, enshrined by Parliament in the 1701 Act of Settlement, of allowing judges to retain their offices "during good behavior."

The King's order was not well received. To the colonists, stripping lifetime appointments from judicial officers marked yet another instance in which British subjects living on the west side of the Atlantic Ocean were treated as second class. George III compounded the insult about a decade later, in 1772, when he established a salary set by the Crown for superior court judges in Massachusetts, preventing

them from accepting the then-prevailing local government wages for their services. A prominent Boston lawyer by the name of John Adams protested that the King's actions made colonial judges "entirely dependent on the Crown for Bread [as] well as office."[1]

Despite widespread disapproval in the colonies over this interference with the independence of their judges, the King held his ground. Accordingly, the ninth of twenty-seven grievances enumerated in the Declaration of Independence charged that George III "has made Judges dependent on his Will alone for the tenure of their offices, and the amount and payment of their salaries."

After securing independence, the fledgling United States did not immediately set about creating a national judiciary. Indeed, among the many defects of the Articles of Confederation, the absence of any mention of a judicial branch—or judges at all—seems particularly glaring.

The Constitutional Convention of 1787 remedied that oversight. In a tidy rebuttal to the King, Article III, Section 1 of the Constitution of the United States states that "The Judges, both of the supreme and inferior courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office."

You might have expected the man who soon would become the first Chief Justice of the United States, John Jay, to have authored the portions of the Federalist Papers devoted to the judicial branch. But, as I explained in my 2019 Year End Report, Jay spent the winter of 1788 recovering from a severe head injury sustained while trying to protect a group of medical students from an angry mob who thought, erroneously, that the students were stealing cadavers from graves to practice surgery. As Jay rested to heal the "two large holes in his forehead," the task of championing judicial independence fell to Alexander Hamilton.

Quoting the French political philosopher Montesquieu, Hamilton endorsed in Federalist No. 78 the principle that "there is no liberty, if the power of judging be not separated from the legislative and executive powers."[2] Hamilton anticipated that the relatively weak judicial



*Stipple engraving of Alexander Hamilton, c. 1834*

---

[1] J. Adams, *Diary and Autobiography of John Adams*, Vol. 1, 1961.

[2] Federalist No. 78.

branch—possessing neither the sword nor the purse—would require "all possible care . . . to defend itself" against the attacks of the other branches.[3] To that end, "permanent tenure of judicial offices" would free judges to perform their essential role as "the bulwarks of a limited Constitution against legislative encroachments."[4] In Federalist No. 79, Hamilton argued for judicial compensation that could not be diminished—noting that "power over a man's subsistence amounts to a power over his will."[5] Hamilton's masterful defense of judicial independence also went on to presage Chief Justice Marshall's foundational decision in *Marbury v. Madison*, recognizing the duty of the courts "to declare all acts contrary to the manifest tenor of the Constitution void."[6]

The independent federal judiciary established in Article III and preserved for the past 235 years remains, in the words of my predecessor, one of the "crown jewels of our system of government."[7] Indeed, it is no exaggeration to conclude, as Chief Justice Rehnquist did, that "the creation of an independent constitutional court, with the authority to declare unconstitutional laws passed by state or federal legislatures, is probably the most significant contribution the United States has made to the art of government."[8] Before the American

founding, no other country had found a way to ensure that the people *and* their government respect the law. One reason judicial review has endured and served us well lies in yet another insight from Chief Justice Rehnquist, articulated in his 2004 Year End Report: "The Constitution protects judicial independence not to benefit judges, but to promote the rule of law."[9] Or, as Justice Kennedy put it, "Judicial independence is not conferred so judges can do



*Chief Justice William H. Rehnquist, 1993*

---

[3] Ibid.

[4] Ibid.

[5] Federalist No. 79.

[6] Federalist No. 78.

[7] W. H. Rehnquist, Remarks of the Chief Justice at the Washington College of Law Centennial Celebration, American University, April 9, 1996.

[8] W. H. Rehnquist, Judicial Independence, 38 U. Rich. L. Rev. 579-80 (Mar. 1, 2004).

[9] W. H. Rehnquist, 2004 Year End Report on the Federal Judiciary.

as they please. Judicial independence is conferred so judges can do as they must."[10]

In that same 2004 Report, which would prove to be his last, Chief Justice Rehnquist observed that "[c]riticism of judges has dramatically increased in recent years, exacerbating in some respects the strained relationship between the Congress and the federal Judiciary."[11] That statement is just as true, if not more so, today.

In truth, some tension between the branches of the government is inevitable and criticism of judicial interpretations of the people's laws is as old as the Republic itself. In Hamilton's and Jefferson's time, the debate was framed by pitting those who believed that the government's powers extended only to those specifically enumerated in the document against those who found in it more expansive powers. Today we often use terms like originalism and pragmatism to describe these differences of opinion. The political branches sometimes inquire into judicial philosophy when considering nominees for the federal courts. But the oath—and the duties that follow—are the same regardless of the President who nominated and the Senate that confirmed every new Article III judge.

Judicial review makes tensions between the branches unavoidable. Judicial officers resolve crucial matters involving life, liberty, and property. At times, as Hamilton recognized, an independent judiciary must uphold the Constitution against the shifting tides of public opinion, as "no man can be sure that he may not to-morrow be the victim of a spirit of injustice, by which he may be a gainer to-day."[12] It should be no surprise that judicial rulings can provoke strong and passionate reactions. And those expressions of public sentiment—whether criticism or praise—are not threats to judicial independence.

To the contrary, public engagement with the work of the courts results in a better-informed polity and a more robust democracy. Indeed, when working in panels, judges themselves join from time to time the ranks of critics through concurring and dissenting opinions. Two district judges independently looking at the same legal issue can also come to different conclusions, leaving it to higher courts to resolve the split of authority. And room for disagreement is almost endless when it comes to the vast swath of trial court work that involves the application of variable legal tests to unique fact patterns in individual cases. In last year's Year End Report, I opined that the application of discretion in these situations explains why machines will never fully replace human judges. But it also creates fertile ground for debate and criticism.

At the end of the day, judges perform a critical function in our democracy. Since the beginning of the Republic, the rulings of judges have shaped the Nation's development and checked the excesses of the other branches.

---

[10] A. M. Kennedy, Testimony in Senate Judiciary Committee Hearing on Judicial Independence, 2007.

[11] W. H. Rehnquist, 2004 Year End Report on the Federal Judiciary.

[12] Federalist No. 78.

Of course, the courts are no more infallible than any other branch. In hindsight, some judicial decisions were wrong, sometimes egregiously wrong. And it was right of critics to say so. In a democracy—especially in one like ours, with robust First Amendment protections—criticism comes with the territory. It can be healthy. As Chief Justice Rehnquist wrote, "[a] natural consequence of life tenure should be the ability to benefit from informed criticism from legislators, the bar, academy, and the public."[13]

Unfortunately, not all actors engage in "informed criticism" or anything remotely resembling it. I feel compelled to address four areas of illegitimate activity that, in my view, *do* threaten the independence of judges on which the rule of law depends: (1) violence, (2) intimidation, (3) disinformation, and (4) threats to defy lawfully entered judgments.

There is of course no place for violence directed at judges for doing their job. Yet, in recent years, there has been a significant uptick in identified threats at all levels of the judiciary. According to United States Marshals Service statistics, the volume of hostile threats and communications directed at judges has more than tripled over the past decade. In the past five years alone, the Marshals report that they have investigated more than 1,000 serious threats against federal judges. In several instances, these threats have required the assignment of full-time U.S. Marshals Service security details for federal judges, and approximately fifty individuals have been criminally charged. In extreme cases, judicial officers

have been issued bulletproof vests for public events.

Fortunately for our Nation's judges, the vigilance of law enforcement officers and investigators has stopped many threats of violence before they could be carried out. Indeed, from the founding of the Republic in 1789 until 1979, only one federal judicial officer, Chief Justice John Slough of the New Mexico Territorial Supreme Court, was killed in office. And the quarrel that led to Slough's shooting in the billiard room of a Santa Fe hotel in December 1867 did not stem from a judicial ruling, but rather from the judge's off-the-bench criticism of a territorial legislator.

In more recent decades, however, disgruntled litigants have perpetrated acts of violence against several judges and members of their families. Between 1979 and 1989, three federal judicial officers—two district judges and a circuit judge—were killed for doing their jobs. In 2005 and 2020, close relatives of federal judges were shot to death by assailants intent on harming the judges who had handled their cases. More recently, in 2022 and 2023, state judges in Wisconsin and Maryland were murdered, also at their homes. Each instance constituted a targeted attack following an adverse ruling issued by the judge exercising ordinary judicial duties.

These tragic events highlight the vulnerability of judges who sign their names to the decisions they render each day and return home each night to communities, where they remain involved as neighbors, volunteers, and concerned citizens. Judges cannot hide, nor should

---

[13] W. H. Rehnquist, 2004 Year End Report on the Federal Judiciary.

they. I am grateful to the many federal and state legislators who have stepped forward to sponsor bills shielding judges' personal identifying information from the public domain. I also thank Congress for providing additional funding to protect the physical security of judges and justices. And I commend the Marshals and other officers who work on the front lines day and night to keep judicial officers across the country as safe as possible. It is regrettable that law enforcement officers must now dedicate significant additional resources to protecting judges, tracking and investigating threats against them, and prosecuting those who cross the line between lawful criticism and unlawful threats or actions.

Of course, attempts to intimidate need not physically harm judges to threaten judicial independence. In earlier times, these provocations usually were directed at judges' homes. Perhaps the most egregious example involved U.S. District Judge Julius Waties Waring. As a judge in South Carolina from 1942 to 1952, Judge Waring issued numerous rulings opening voting and educational opportunities for Black Americans. Local residents outraged by these decisions burned a cross in the judge's lawn, fired gunshots at his home, and hurled a large lump of concrete through his front window. Elected officials called for his impeachment. But Judge Waring stood strong until taking senior status at age 71, secure in the knowledge that an equal protection challenge to racial segregation had made its way to the Supreme Court. By the time the landmark decision in *Brown* was issued in May 1954, Waring had moved to New York City, returning to South Carolina only in 1968 to be buried in Charleston, near the federal courthouse that now bears his name.

Today, in the computer era, intimidation can take different forms. Disappointed litigants rage at judicial decisions on the Internet, urging readers to send a message to the judge. They falsely claim that the judge had it in for them because of the judge's race, gender, or ethnicity—or the political party of the President who appointed the judge. Some of these messages promote violence—for example, setting fire to or blowing up the courthouse where the target works.

Occasionally, court critics deploy "doxing"—the practice of releasing otherwise private information such as addresses and phone numbers—which can lead to a flood of angry, profane phone calls to the judge's office or



*This cross was burned on the lawn of Chief Justice Warren's apartment building early in the morning on July 14, 1956.*

home. Doxing also can prompt visits to the judge's home, whether by a group of protestors or, worse, an unstable individual carrying a cache of weapons. Both types of activity have occurred in recent years in the vicinity of the Nation's capital. Activist groups intent on harassing judges have gone so far as to offer financial incentives for posting the location of certain judicial officers.

Public officials, too, regrettably have engaged in recent attempts to intimidate judges—for example, suggesting political bias in the judge's adverse rulings without a credible basis for such allegations. Within the past year we also have seen the need for state and federal bar associations to come to the defense of a federal district judge whose decisions in a high-profile case prompted an elected official to call for her impeachment. Attempts to intimidate judges for their rulings in cases are inappropriate and should be vigorously opposed. Public officials certainly have a right to criticize the work of the judiciary, but they should be mindful that intemperance in their statements when it comes to judges may prompt dangerous reactions by others.

Disinformation, even if disconnected from any direct attempt to intimidate, also threatens judicial independence. This can take several forms. At its most basic level, distortion of the factual or legal basis for a ruling can undermine confidence in the court system. Our branch is peculiarly ill-suited to combat this problem, because judges typically speak only through their decisions. We do not call press conferences or generally issue rebuttals.

To make matters worse, as I noted in my 2019 Year End Report, the modern disinformation problem is magnified by social media, which provides a ready channel to "instantly spread rumor and false information." At that time, I endorsed a renewed emphasis on civic education as the best antidote for combating the epidemic of misinformation. I am happy to report that the bench, bar, and academy have embraced this essential project—writing and speaking about the distinct role of courts in American government and explaining what they do and don't do.

But much more is needed—and on a coordinated, national scale—not only to counter traditional disinformation, but also to confront a new and growing concern from abroad. In recent years, hostile foreign state actors have accelerated their efforts to attack all branches of our government, including the judiciary. In some instances, these outside agents feed false information into the marketplace of ideas. For example, bots distort judicial decisions, using fake or exaggerated narratives to foment discord within our democracy. In other cases, hackers steal information—often confidential and highly sensitive—for nefarious purposes, sometimes for private benefit and other times for the use of state actors themselves. Either way, because these actors distort our judicial system in ways that compromise the public's confidence in our processes and outcomes, we must as a Nation publicize the risks and take all appropriate measures to stop them.

The final threat to judicial independence is defiance of judgments lawfully entered by courts of competent jurisdiction. As noted above, two of the major pillars of our Republic—separation of powers and judicial review—create an inevitable tension between the branches of our government. Hamilton foresaw, and Chief Justice Marshall confirmed, the

role of the judicial branch to say what the law is. But judicial independence is undermined unless the other branches are firm in their responsibility to enforce the court's decrees.

After *Brown v. Board of Education*, for example, multiple state governors sought to defy court orders to desegregate schools in the South. The courage of federal judges to uphold the law in the face of massive local opposition—and the willingness of the Eisenhower and Kennedy Administrations to stand behind those judges— are strong testaments to the relationship between judicial independence and the rule of law in our Nation's history.

It is not in the nature of judicial work to make everyone happy. Most cases have a winner and a loser. Every Administration suffers defeats in the court system—sometimes in cases with major ramifications for executive or legislative power or other consequential topics. Nevertheless, for the past several decades, the decisions of the courts, popular or not, have been followed, and the Nation has avoided the standoffs that plagued the 1950s and 1960s. Within the past few years, however, elected officials from across the political spectrum have raised the specter of open disregard for federal court rulings. These dangerous suggestions, however sporadic, must be soundly rejected.

Judicial independence is worth preserving. As my late colleague Justice Ruth Bader Ginsburg wrote, an independent judiciary is "essential to the rule of law in any land," yet it "is

vulnerable to assault; it can be shattered if the society law exists to serve does not take care to assure its preservation."[14] I urge all Americans to appreciate this inheritance from our founding generation and cherish its endurance. I also echo the words of Chief Justice Charles Evans Hughes, who remarked—in the aftermath of a significant prior threat to judicial independence—that our three branches of government "must work in successful cooperation" to "make possible the effective functioning of the department of government which is designed to safeguard with judicial impartiality and independence the interests of liberty."[15]

Our political system and economic strength depend on the rule of law. The rule of law depends, in turn, on Article III of the Constitution and judges and justices appointed and confirmed under it. Those men and women remain connected to the people they serve and do their work in the public eye. Chief Justice Taft is the only person to have served as head of the judicial and a political branch. As he put it, "Nothing tends more to render judges careful in their decisions and anxiously solicitous to do exact justice than the consciousness that every act of theirs is to be subject to the intelligent scrutiny of their fellow men, and to their candid criticism."[16] But violence, intimidation, and defiance directed at judges because of their work undermine our Republic, and are wholly unacceptable.

---

[14] R. B. Ginsburg, Remarks on Judicial Independence, Conference of American Judges Association, 2006.

[15] C. E. Hughes, Address of the Chief Justice of the United States to Joint Session of Congress, Mar. 4, 1939.

[16] W. H. Taft, Remarks at the Annual Meeting of the American Bar Association, American Law Register and Review 43(9) 577 (1895).

The federal courts must do their part to preserve the public's confidence in our institutions. We judges must stay in our assigned areas of responsibility and do our level best to handle those responsibilities fairly. We do so by confining ourselves to live "cases or controversies" and maintaining a healthy respect for the work of elected officials on behalf of the people they represent. I am confident that the judges in Article III and the corresponding officials in the other branches will faithfully discharge their duties with an eye toward achieving the "successful cooperation" essential to our Nation's continued success.

As always, I am privileged and honored to thank all the judges, court staff, and other judicial branch personnel throughout the Nation for their commitment to upholding judicial independence and the rule of law through their outstanding public service.

Best wishes to all in the New Year.

John G. Roberts, Jr.
Chief Justice of the United States
December 31, 2024

*Photo credits:  Page 1, Sallie Dixon, used by permission.*
         *Page 2, Engraving by J.F.E. Prud'homme after Archibald Robertson, Collection of the Supreme Court of the United States.*
         *Page 3, Photograph by Dane Penland, Smithsonian Institution, Courtesy of the Supreme Court of the United States.*
         *Page 6, Bettmann Archive/Getty Images, used by permission.*

# Appendix

# Workload of the Courts

In October Term 2023, the number of cases filed in the Supreme Court increased by two percent compared to the prior year.[1] For the 12-month period ending September 30, 2024, the number of cases filed in the U.S. courts of appeals remained relatively stable, decreasing by less than one percent. Civil cases filed in the U.S. district courts decreased 14 percent and cases filed in the U.S. bankruptcy courts increased 16 percent. Pretrial supervision cases increased two percent and post-conviction supervision case numbers decreased by one percent.

### *The Supreme Court of the United States*

The total number of cases filed in the Supreme Court increased two percent from 4,159 filings in the 2022 Term to 4,223 in the 2023 Term. The number of cases filed in the Court's *in forma pauperis* docket decreased two percent from 2,907 filings in the 2022 Term to 2,847 filings in the 2023 Term. The number of cases filed in the Court's paid docket increased 10 percent from 1,252 filings in the 2022 Term to 1,376 filings in the 2023 Term. During the 2023 Term, 69 cases were argued and 64 were disposed of in 55 signed opinions, compared to 68 cases argued and 66 disposed of in 55 signed opinions in the 2022 Term. The Court also issued four *per curiam* opinions in argued cases during the 2023 Term.



---

[1] The October Term 2023 workload statistics cover the period between the docketing of the first case with the 23-prefix on June 30, 2023 and the release of opinions and an orders list on July 2, 2024.

## *The Federal Courts of Appeals*

In the regional courts of appeals, filings remained fairly stable, falling less than one percent from 39,987 in fiscal year (FY) 2023 to 39,788 in FY 2024. This was an 18 percent drop from FY 2019, the last full fiscal year prior to the COVID-19 pandemic. Total civil appeals were down two percent from the prior year to 21,270. Criminal appeals increased four percent to 10,067. Appeals of administrative agency decisions went up eight percent to 4,992. All other appeals (bankruptcy appeals, original proceedings, and miscellaneous applications) decreased 12 percent to 3,459.



Appeals by pro se litigants, which amounted to 48 percent of filings, increased three percent to 19,101. Prisoner petitions accounted for 21 percent of appeals filings (a total of 8,388), and 87 percent of prisoner petitions were filed pro se, compared with 38 percent of other appeals filings.



### The Federal District Courts

The federal district courts docketed 290,896 civil cases in FY 2024, a decrease of 14 percent from the prior year. In the ongoing earplug products liability multidistrict litigation (MDL), 23,624 cases were filed in the Northern District of Florida in FY 2024, down 50 percent from the prior year. All other civil case filings fell nine percent to 267,272, less than one percent below the number filed in FY 2020.

Cases involving diversity of citizenship (*i.e.*, disputes between citizens of different states), which had climbed 47 percent from FY 2022 to FY 2023, fell 33 percent to 104,254 filings in FY 2024. These fluctuations are closely tied to the cases involving earplugs, as many MDL filings are in the category of diversity of citizenship.

Federal question cases (*i.e.*, actions under the Constitution, laws, or treaties of the United States in which the United States is not a party) increased two percent to 141,000 filings in FY 2024. Filings involving civil rights or prisoner petitions accounted for 58 percent of all federal question filings. These civil rights filings grew 10 percent from the prior year to 40,719, while these prisoner petition filings dropped less than one percent to 40,841.

Cases with the United States as a plaintiff decreased two percent to 3,069 in FY 2024, while cases with the United States as a defendant fell three percent to 42,567. Filings involving Social Security, civil immigration, and prisoner petitions accounted for 81 percent of all cases in which the United States was a defendant. Civil immigration filings increased 10 percent from the prior year to 12,183, prisoner petition filings decreased 12 percent to 8,341, and Social Security filings decreased eight percent to 13,845.

Civil immigration cases address topics such as petitions for naturalization and adjudication of immigration status. Criminal immigration cases, discussed below, deal with matters such as unlawful entry and reentry into the United States, alien smuggling, and fraud and misuse of visas or other permits.





The federal district courts docketed 69,673 criminal defendant filings (excluding transfers) in FY 2024, an increase of six percent from the prior year and a reduction of six percent from FY 2020. The largest categories were filings for defendants accused of immigration offenses, which increased 30 percent to 25,446, and filings for defendants charged with drug offenses, which fell eight percent to 16,735.

Ninety percent of total filings for defendants charged with immigration-related offenses were received by the five districts on the southwestern border: the District of Arizona, the Southern District of California, the District of New Mexico, the Southern District of Texas, and the Western District of Texas.

### The Bankruptcy Courts

The bankruptcy courts docketed 504,112 new filings in FY 2024, representing a 16 percent increase from the prior year, but 18 percent below the total for FY 2020.

Of the 90 bankruptcy courts, 87 courts received more petitions in FY 2024 than in the prior year. In FY 2023, 85 courts received more petitions than in the prior year, which suggests that some of the impacts of the COVID-19 pandemic on bankruptcy filings—including moratoriums on evictions and certain foreclosures, as well as reduced consumer spending—continued to subside.



Nonbusiness (*i.e.*, largely consumer) petitions, which amounted to 95 percent of bankruptcy petitions in FY 2024, increased 16 percent to 481,350. Business petitions rose 33 percent to 22,762. Petitions filed under Chapter 7 accounted for 59 percent of all bankruptcy filings, up 20 percent from the previous year. Petitions filed under Chapter 13 increased 10 percent, and those filed under Chapter 11 rose 39 percent.

## *Pretrial Services, Federal Probation, and Supervised Release System*

A total of 121,777 persons were under post-conviction supervision on September 30, 2024, a decrease of one percent from the prior year and a reduction of five percent from FY 2020. Of that number, 109,174 were serving terms of supervised release after leaving correctional institutions, a decrease of one percent from FY 2023.



Cases activated in the pretrial services system, including pretrial diversions, rose two percent to 72,899.[2]



---

[2] In the 2022 and 2023 Year End Reports, pretrial services case activations were reported *excluding* pretrial diversions.

# EXHIBIT F



← Not that guy ⊘    PageID 3746

RECENT

SUBSCRIPTION

SUBSCRIBED          $25 per month
Renews              Jun 15, 2022

Privacy  ·  Terms of Service  ·  Cookie Notice

11 likes

Not that guy ⊘                    Mar 30
@thatdaneshguy

Hello beautiful. I'm going to post a hot pic for you today. Look out for it 😎

12 likes

Not that guy ⊘                    Mar 28
@thatdaneshguy

That girth though 😎

Thinking of you

DF

Home

Notifications

Messages

Bookmarks

Lists

Subscriptions

My profile

More

NEW POST

RECENT

SUBSCRIPTION

SUBSCRIBED          $25 per month

Renews                      Jun 15, 2022.

Privacy  -  Terms of Service  -  Cookie Notice

← Not that guy ✓



♡  ○  $ SEND TIP                              🔖

8 likes

Not that guy ✓                                        Apr 27  ···
@thatdanesnguy

Taking a shower. Wish you were here. DM me to see more.



♡  ○  $ SEND TIP                              🔖

9 likes · 1 comment

Not that guy ✓                                        Apr 24  ···
@thatdanesnguy

10 years ago, I was part of a calendar shoot to raise money for charity. I was
October. Naturally, I went with something spooky. (This is a Halloween costume.
No real injuries.)





**Not that guy**
@thatdaneshguy

Heaven.

Don't forget to DM me requests for any custom content you'd like to see :)



If you share this, I'll find you

    SEND TIP  

**9** likes

# EXHIBIT G



Richard A. Luthmann
4199 Los Altos Court
Naples, FL 34109
Tel: (239) 631-5957
richard.luthmann@protonmail.com
Luthmann.Substack.com

December 20, 2024

**Via TRUTH SOCIAL (@devinnunes) and Direct Means**

Hon. Devin Nunes
CEO, Truth Social
Former Chairman, House Permanent Select Committee on Intelligence
Appointee, Chair the President's Intelligence Advisory Board

Dear Chairman Nunes,

As you know, I am a verified investigative journalist on the Truth Social platform. I am writing to bring to your attention significant evidence obtained through my investigative journalism that raises serious concerns about TikTok influencer Danesh Noshirvan (@ThatDaneshGuy) acting as an agent of the Chinese Communist Party (CCP). Based on the evidence, it is my belief that Mr. Noshirvan is carrying out subversion operations and active measures in connection with the enemies of the United States of America.

Given your extensive experience in national security and intelligence matters, I believe you are uniquely positioned to facilitate a thorough investigation into this matter.

Over the past several months, I have been documenting a pattern of behavior by Mr. Noshirvan that mirrors tactics historically employed by CCP influence operations, including those recently revealed by the Epoch Times as targeted against Falun Gong supporters and Chinese Democracy Advocates on United States soil. My findings, coupled with the operational platform he uses—TikTok, owned by the CCP-linked company ByteDance—warrant immediate scrutiny.

Below, I outline the evidence supporting these concerns:

1

## 1. Alignment of Methods with CCP PsyOps

Mr. Noshirvan's tactics include:

- **Doxxing and Harassment Campaigns:** He orchestrates targeted harassment against private citizens and public officials, including U.S. Supreme Court Justices, educators, law enforcement personnel, and small business owners.
- **Amplification Using Bots:** He employs AI-driven bots to simulate public outrage, a known CCP tactic to amplify disinformation and undermine trust in democratic institutions.
- **Targeting Polarizing Issues:** His campaigns often center on divisive issues such as abortion rights, law enforcement accountability, and governance, which are areas foreign adversaries exploit to destabilize American society.

## 2. TikTok as a Tool for Influence

As you are aware, TikTok has been scrutinized for its ties to the CCP and its potential to serve as a conduit for foreign influence. Mr. Noshirvan's extensive use of TikTok to spread disinformation and mobilize harassment raises questions about whether his actions are independently driven or part of a broader strategy supported by CCP interests.

## 3. Parallels with Documented CCP Operations

The CCP's international campaigns targeting dissident groups like Falun Gong and Hong Kong democracy advocates share striking similarities with Mr. Noshirvan's approach. These include:

- The use of online mobs and doxxing to intimidate opponents.
- Weaponizing platforms to create societal discord.
- Directly targeting public confidence in key institutions, such as the U.S. Supreme Court, law enforcement, and local governments.

## 4. Potential Violations of U.S. Law

If Mr. Noshirvan is acting on behalf of the CCP or is supported by foreign actors, it may constitute a violation of the Foreign Agents Registration Act (FARA) and other statutes related to foreign interference in domestic affairs.

2

**Request for Investigation**

Given the implications for national security, I urge you to facilitate a thorough intelligence investigation into Mr. Noshirvan's activities. Specifically, the following avenues warrant exploration:

- **Digital Forensics:** Tracing the origins of the bot networks used in his campaigns.
- **Financial Analysis:** Investigating any potential funding or indirect support from CCP-linked entities.
- **Platform Accountability:** Evaluating TikTok's role in enabling or amplifying these activities.

If a direct connection to the CCP is established, this would represent a dangerous precedent for unchecked foreign influence in the United States. The use of domestic wires and platforms to advance foreign subversion would necessitate urgent policy responses to safeguard American sovereignty and public trust.

I am prepared to provide additional documentation and findings to assist with this investigation. Please do not hesitate to contact me if I can be of further assistance.

Thank you for your attention to this critical matter. I trust your leadership and experience will help bring this issue to light and ensure accountability.

Regards,

Richard A. Luthmann
Investigative Journalist

CC:    File

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

--------------------------------------------------------

UNITED STATES OF AMERICA,                              2:22-cr-0021-SPC-NPM

      -against-

RICHARD LUTHMANN,

          Defendant.

--------------------------------------------------------

## MOTION FOR A HEARING AND DECLARATORY JUDGMENT ON THE IMPROPER, ILLEGAL, AND UNCONSTITUTIONAL ACTIONS OF THE UNITED STATES PROBATION OFFICE FOR THE MIDDLE DISTRICT OF FLORIDA; TEMPORARY AND PRELIMINARY RESTRAINTS REQUESTED

**PLEASE TAKE NOTICE** that RICHARD LUTHMANN, Defendant *Pro Se* herein, moves this Honorable Court at 2110 First Street, Fort Myers, Florida 33901, in the above-captioned matter as follows:

A) For a Preliminary Conference;

    a. To address whether the Law of the Judgment – the substantive law of the United States Court of Appeals for the Second Circuit - applies to this matter; and

    b. To address whether the U.S. District Court for the Middle District of Florida should be recused from the case and this matter should be transferred to the adjoining Southern District of Florida; and

    c. To issue temporary and preliminary restraints on the United States Probation Office for the Middle District of Florida; and

    d.  To obtain Court-ordered subpoenas and discovery related to the U.S. Probation Office, the Federal Bureau of Investigation, and the Government's interaction related to these persons, including but not limited to:

       i.  CHRISTOPHER AMBROSE, of Madison, Connecticut;

      ii.  KEVIN BARRY LOVE, of Staten Island, New York;

     iii.  KAMILLAH HANKS, of Staten Island, New York;

     iv.  RONALD CASTORINA, of Staten Island, New York;

      v.  ERIC NELSON, of Staten Island, New York;

     vi.  JOHN TOBACCO, of Staten Island, New York;

    vii.  MDFL USPO OFFICER HARMATY

   viii.  MDFL USPO OFFICER AMADORI

B) For a hearing on and issuance by the Court of a declaratory judgment whether and to what extent the U.S. Probation Office for the Middle District of Florida has violated Richard Luthmann's rights; or, in the alternative

C) For an Order Terminating Richard Luthmann's term of supervised release pursuant to 18 U.S.C. § 3583(e)(1);

D) For such other and further relief as this Honorable Court may deem just or equitable.

## BASIS OF MOTION

Please see the attached letter to the Administrative Office of the United States Courts dated July 28, 2023, the attached exhibits, and all the additional enclosed materials. They detail the factual basis for this application. Additionally, I include other relevant items, and I reserve the right to supplement my application with additional evidence, including notes and records I have made.

I request a Preliminary Conference. Critical legal issues must be decided before the hearing, temporary and preliminary restraints requested, subpoenas, and other discovery necessary for fundamental fairness.

After that, I would like a hearing and explicit permission from the Court to engage in activity protected by the Bill of Rights of our Constitutional Republic.

Correlatively, I would like a declaration that my rights have been violated.

At the outset, I do not want to sue the USPO or any individual officers or Government officials. I just want to be able to enjoy my constitutional rights.

I believe the USPO and others in the Government were called by "connected" individuals and lied to in violation of 18 U.S.C. § 1001. Kevin Barry Love admitted he called the FBI and US Probation, and I have it all on tape. See the attached article, and the audio is available here:

https://luthmann.substack.com/p/nyc-councilwomans-association-with

I believe these lies and the peddled misinformation caused the USPO to improperly react because they thought the misinformation peddled was genuine. Officer Harmaty told me I was "under investigation" because I was "harassing witnesses."

Christopher Ambrose is a "psychopath" and "pedophile," that I have learned through my work as an investigative journalist. See the attached article as an example. It is available at:

https://luthmann.substack.com/p/child-molester-and-psychopath

I have strong feelings about pedophiles and child predators. But I believe in the rule of law and have previously stated: "I want to see justice run its course. Child predators sicken me, and my opinion is that if it is proved that Christopher Ambrose is a pedophile after a speedy and fair trial, the justice system should put him down, hopefully permanently."

Neither Kevin Barry Love nor Kamillah Hanks were ever witnesses against me. In fact, they avoided subpoenas and complained about having to have paid a small fortune to do so. They are also deadbeats. They will do anything and say anything not to put their hands in their pockets, including lying to a federal officer and engaging in interstate menacing against attorneys, as reported to the FBI in New York and Providence Offices and noted in the letter to the Administrative Office of the US Courts. Kevin Barry Love's thug-like tactics caused collections lawyers who legally opined that I had a valid claim to drop me as a client and withdraw pending and filed lawsuits without notice to me, based on Officer Harmaty's (misinformed) directive. See the attached Almagno Law opinion letters from October 2022 concerning Kamillah Hanks, Kevin Barry Love, John Tobacco, and Ronald Castorina.

Officer Harmaty told Almagno Law to stop collecting, even though a deal in principle with John Tobacco was being negotiated without litigation. NEWSMAX personality John Tobacco stood ready, willing, and able to resolve the legal claims. Because of the "stop collections" order, nothing was collected. This money was being collected to benefit the United States and its taxpayers. Why was I told not to obtain cash for Mr. Tobacco's matters? Was my debt obligation waived? Why should I and the US Taxpayers have to suffer?

Ronald Castorina is now a New York State trial court judge. He perjured himself before a grand jury in a state case. See the attached from a national news outlet, available at:

https://frankreport.com/?s=castorina

He owes me money. I rendered services. He even said, "I need your expertise." Now, he can pull strings? I know they say: "There are two things that don't pay, crime and judges." But this is beyond the pale.

Eric Nelson was the crooked prosecutor who suborned his perjury. I want him as a fact witness to confirm Ronald Castorina's relationship with me and to discuss his communications with federal law enforcement. I also want to ask him about his trustworthiness and recent dishonest activity.

I wouldn't blame anyone in the MDFL USPO if they relied in good faith on the criminal conveyance of misinformation violating 18 U.S.C. § 1001. I respect the hard work and day-in-and-day-out risks faced by professional law enforcement.

Nonetheless, I have a right to a hearing, and the U.S. Courts are compelled to get to the bottom of the problematic institutional issues this case presents. I want to enjoy the full panoply of my available constitutional rights. Given my restitution, I also want to make the Government whole and engage in journalism to become a productive member of society.

The last thing I want to do is have my lawyers file an unnecessary § 1983 action and needlessly burden good cops and probation officers if there are clearly other intervening superseding tortfeasors. I hope Your Honor will obviate that need by issuing a declaration that if my constitutional rights were violated, they were broken by professional law enforcement relying in good faith on misinformation improperly or criminally conveyed. That would open the door for me to pursue my collections claims and any additional torts in the appropriate forums, unburdening this Court, the USPO, and the Government. It would also help me to make the Government whole.

## THE LAW OF THE JUDGMENT APPLIES

The jurisdiction of my federal case was transferred to the Middle District of Florida, where I now reside. See *U.S. v. Luthmann,* 2:22-CF-00021-SPC-NPM, Dkt. 1.

Once I started going to the courthouse, filing motions, and investigating, US Probation tried returning the case to the EDNY. I believe the EDNY still retains jurisdiction in this case. I

5

am a published journalist and a member of the National Writers Union. The US Courts Security Service sticks a body on me if I walk into the Fort Myers Courthouse and Federal Building. If I decided I wanted to spend my time reporting on the happenings in that courthouse, I would not be permitted.

I have a right to have the law of the Judgment in my case applied to my case, here, Second Circuit law. Just because my *supervision* was transferred under 18 U.S.C. § 3605, that does not mean that the legal jurisdiction of the underlying case was moved as well. I have told this to the USPO since last December. See the attached email dated 12-14-2022. I raised this issue in an earlier motion to Judge Polster Chappell, but the problem was never addressed.[1]

If this matter were a civil matter, when a case is transferred under 28 U.S.C. § 1404(a), it is well settled that courts routinely apply the choice of law rules of the jurisdiction from which the case was transferred. See, e.g., *Ferens v. John Deere Co.,* 494 U.S. 516, 523, 110 S. Ct. 1274, 1279, 108 L. Ed. 2d 443 [1990]; *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 243 n. 8, 102 S. Ct. 252, 259 n. 8, 70 L. Ed. 2d 419 [1981]; *Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S. Ct. 805, 821, 11 L. Ed. 2d 945 [1964]; *James Ventures, L.P. ex rel. Alpert v. Timco Aviation Servs, Inc.,* 315 F. App'x 885, 888 [11th Cir. Feb. 27, 2009]; *Roofing & Sheet Metal Serv., Inc. v. La Quinta Motor Inc.,* 689 F.2d 982, 991 [11th Cir. 1982].

Here, the Eastern District of New York Court is the transferer court, and the Middle District of Florida Court is the transferee court. Accordingly, the Middle District of Florida Court should apply the Eastern District of New York's substantive law, the law of the Second Circuit Court of Appeals, because it is the law that would have been applied if there had been no transfer of venue for supervision. See *Van Dusen,* 376 U.S. at 641, 84 S. Ct. at 821.

---

[1] Nor was any consideration given to the Law of the Case Doctrine.  See Dkt. # 18 and attachments.

6

The issue is essential factually as well. Concerning my changed circumstances, I have been trying to become an investigative journalist. I was recently admitted into the National Writers Union. While this is a matter of some significance, it would have great importance in the middle-class neighborhood where I grew up in the EDNY, Florida is a "right to work" state.

I would be prejudiced if the Court did not apply a body of law that took into account all of the facts and circumstances of my conditions and gave me the benefits that I would otherwise receive under the jurisdiction where the judgment was rendered.

## THE MDFL COURT SHOULD RECUSE AND TRANSFER THIS CASE TO AN ADJOINING FEDERAL DISTRICT, THE SDFL COURT, TO AVOID THE APPEARANCE OF IMPROPRIETY

My argument is that since the MDFL U.S. Probation Department is a legally constituted arm of and has a confidential relationship with the MDFL U.S. District Court, the Court should recuse itself from this case and send it to an adjoining district. The appropriate transferee venue is the SDFL because it does not oversee the MDFL U.S. Probation Department, and the several divisions are within 2 hours of the Naples/Fort Myers area, to where the Defendant and any U.S Probation Officers/witnesses may have to travel for a hearing. The NDFL or another district is exceptionally far and onerous, except for the EDNY, the originator district where the judgment was promulgated and always retains concurrent jurisdiction.

The MDFL U.S. Courts are heavily deferential to the U.S. Probation Office. In the instant case, an earlier motion to terminate supervised release went unopposed by the Government. See Dkt. #13. The District Court relied almost exclusively on the U.S. Probation Department's recommendation to continue probation and deny travel. The Court's reasoning excluded consideration of specific glaring legal issues, inter alia, the law of the judgment, the law of the case, and an evident and apparent sentencing disparity under 18 U.S.C. § 3553(a)(6).

Under federal law, judges may be disqualified where their "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Section 455(a) "sets out an objective standard for recusal, creating the so-called 'appearance of justice' rule." DeLuca v. Long Island Lighting Co., 862 F.2d 427, 428 (2d Cir. 1988). The federal test of impartiality "is what a reasonable person, knowing and understanding all the facts and circumstances, would believe." In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1309 (2d Cir. 1988).

Recusal is required if "an objective, disinterested observer fully informed of the underlying facts would entertain significant doubt that justice would be done absent recusal. The pertinent trigger for recusal is the 'appearance of partiality." Cox v. Onondaga County Sheriff's Dep't, 760 F.3d 139, 150 (2d Cir. 2014). The ultimate inquiry is "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain significant doubt about the judge's impartiality." United States v. Patti, 337 F.3d 1317, 1321 (11th Cir. 2003). Recusal is appropriate even though a judge's impartiality might not be reasonably questioned. Potashnick v. Port City Const. Co., 609 F.2d 1101 (5th Cir. 1980).

I do not believe the Court's integrity and impartiality are at issue. I personally think Your Honor is an outstanding judge and person. And, I don't believe the MDFL District Court's part in this "concert" is knowing, intentional, or willful.

However, the appearance of impropriety and partiality is the problem. The confidential relationship between the District Court and the USPO creates a *per se* presumption and a basis for disqualification. The public perception is that the MDFL District Court cannot be impartial when passing judgment on its own personnel. The United States Probation Office functions as a legally constituted arm of the judicial branch, with federal probation officers serving both as confidential advisors to and officers of the United States District Court. United States v. Reyes, 283 F.3d 446,

450 (2d Cir. 2002). The USPO is an independent professional organization, and the U.S. Probation Officer works "under the direction" of the District Court. 18 U.S.C. § 3602; <u>United States v. Berzon</u>, 16 Fla. L. Weekly Fed. D 605 (U.S. S.D. Fla. 2003).

There is also a factual question about the "Rules" of the MDFL USPO. These "Rules" have been cited by MDFL USPO Officers and are evidently known to the District Court. However, these "Rules" keep on changing. The USPO never provides a written copy of these "Rules." And any time there is a question about these "Rules," the USPO Officer tells me to "come in" to the Federal Building, where there are no recording devices, nothing is explained, and nothing is delivered in writing.

I request that the Court tell the MDFL USPO to produce a copy of these "Rules." I want to know who wrote them, who approved them, how long they had existed, when they were last reviewed or amended, etc. The more I ask about the "Rules," the more I feel Franz Kafka wrote them.

Congress has created within the judicial branch entities to assist the courts' administration. The Administrative Office of the United States Court, the Federal Judicial Center, the United States Probation Department, and the Judicial Conference of the United States are vested with administrative powers, including, in some instances, the ability to promulgate rules to further efficient administration. Such rulemaking delegations have been upheld as necessary "for the effective and expeditious administration of the business of the courts…" <u>Chandler v. Judicial Council of Tenth Circuit of United States</u>, 398 U.S. 74, 86 n.7, 26 L. Ed. 2d 100, 90 S. Ct. 1648 (1970).

However, the Florida Federal Courts have yet to recognize material examples of substantive rulemaking by these entities, including the USPO. <u>United States v. Bogle</u>, 689 F. Supp.

9

1121, 1145 (S.D. Fla. 1988). We have one of two situations: there are Rules, but they are not made available for some reason. Or there are no Rules, and the USPO and the District Court are making it up as they go along. The second option is the most alarming because the USPO has repeatedly claimed there are Rules.

  I asked about the Rules concerning travel. I had travel possibilities where there were work opportunities. The USPO characterized it as leisure travel. I wanted to know what the rules were so I could qualify for work travel. On March 2, 2023, MDFL USPO Officer Amadori said:

> As far as granting you permission to travel to Big Pine Key and elsewhere, you have not made any payment to the restitution payment, and probation's position is leisure travel cannot be granted if restitution payments have not been made. This was the reasoning as to why probation did not approve the request to travel to Chicago the first time you requested it.

Chicago and Big Pine Key were potential work travel. I had opportunities to make connections and work for others. I wanted to know the Rules, so I could properly qualify.[2] On March 2, 2023, I responded to MDFL USPO Officer Amadori:

> To clarify, the travel to Mr. Parlato is WORK TRAVEL. I am his unpaid intern right now.
>
> Mr. Parlato wants to HIRE me. If he hires me, I can begin to pay restitution immediately. I need to be able to travel to be hired. US Probation states that I cannot travel because I can't pay.
>
> Do you understand my perception of the circular nature of the argument? If I have a job offer where I need to be able to travel to make money, and I am not allowed to travel because I can't make money to pay restitution, what do I do?
>
> US Probation does not have an answer. US Probation has a policy, but I do not believe the policy is applicable. That is why I am going to the Court.

---

[2] I am now paying $25 per month towards restitution.

I am formally asking US Probation to reconsider the decision. You stated in your previous email that you view travel to Mr. Parlato as "leisure travel." His intention is to put me on the payroll. I would not make the trips otherwise. This is work travel.

Also, do you have a written copy of the US Probation policy so I can submit it to the Court to help in its determination?

Again, on March 7, 2023, I communicated with MDFL USPO Officer Amadori:

I renew my request to travel to Chicago, IL March 17 to 23. Today is ten days out.

My business itinerary and schedule are attached.

I have my interview with Swami Ishatmananda tentatively scheduled for 12:30 pm on Monday, March 20, pending approval.

Many people have spent money for tickets and other incidentals in the hope I will be permitted to travel.

Please let me know if I can receive approval, and either way, please send me a written copy of the MDFL Probation Office's Official Rules and Policy regarding travel for my reference.

Thank you in advance for your time.

And again on March 8, 2023, MDFL USPO Officer Amadori responded:

As previously told to you by probation regarding your request to travel to Chicago, leisure trips will not be permitted if restitution is owed and no payments have been made.

I swiftly replied:

I provided details to the Court. What additional details do you need so US Probation's decision can be reviewed by the Court, and a pretextual denial can be overruled if there is adequacy?

I am having business meetings with Indian journalists, and I am meeting with a well-respected Swami on an article about comparative monasticism, as stated below.

11

This trip has a business purpose. It is not a leisure trip. This trip would be deductible under the US tax code. And this trip passes business muster under US Probation rules.

Is the problem that I want to see shows or museums while in Chicago? Museums don't charge the indigent, and the show tickets are paid for. There are plenty of not-for-profits that also provide theater tickets for indigent people to see theater. Exposure to culture is a valid penological pursuit.[3]

The instant you can approve my travel to Chicago and the SDFL, I can get on the payroll and sign a payment agreement. I can't do that unless I know I can get on payroll and what I will get paid.
Is the US Probation Office's position that I cannot travel for business?

Can I get a copy of the US Probation Office's written policy?

Is the US Probation Office's position contrary to 18 USC sec. 3553(a)(7)? If I can travel, I have work, and I will get paid from the travel; what is the US Probation Office's problem with me earning money to make restitution payments?

Is the US Probation Office's position that I can only sit around, apply for, and collect federal disability where I have potential work that I am physically, mentally, and emotionally capable of doing, but US Probation says I am not legally able?

Will I have to be a legally disabled lie-about until August 4, 2024?

Am I being retaliated against because I filed for clarification with the Court and petitioned for relief within my rights?

I need to know all these things so I have the story straight for the press (copied), of which I am a member of the National Writers Union, unallowed to practice journalism.

To date, I have no written copy of the MDFL USPO Rules for leisure travel, business travel, or anything else. The objective, disinterested, lay observer fully informed of the facts would believe that no rules actually exist.  The MDFL USPO is a legally constituted arm of the MDFL

---

[3] And is also the LAW OF THE CASE, according to prior Order of the late Jack B. Weinstein, U.S.D.J.

District Court, with MDFL USPO federal probation officers serving both as confidential advisors to and officers of the District Court. Who could not conclude that the actions of the USPO and the existence and non-existence of specific "Rules" is not a glaring reflection of the laxity of the MDFL District Court and its oversight function? What is a Court if not an enforcer of the Rules? It is the most fundamental violation of procedural due process when the Rules are "we make it up as we go along." And sorry to say, that's what it looks like here.

There is an argument that the MDFL District Court should have a chance to "clean up its own mess." The problem is that Judge Polster Chappell already had an opportunity to do this. All these issues about the MDFL USPO's "unwritten Rules" and other serious concerns occurred before the Court made its March 15, 2023 Order. The problems having mushroomed since then, the Court had a chance to "nip it in the bud" five months ago. Instead, the MDFL Court "whistled past the graveyard" on these issues. And now, the appearance of impropriety and partiality is far too great for this matter not to be heard outside the MDFL district. It appears that laxity is not a mere mistake. Laxity may well be an institutional issue in the MDFL Courts. Akin to institutional racism or injustice, though not conscious, the laxity is exceedingly problematic.

I want a hearing to show that the MDFL USPO, an arm of the MDFL U.S. District Court, is continually moving the goalposts without any firm set of rules. What are the chances the MDFL U.S. District Court says it was wrong and punishes its own people?

Accordingly, the Court should recuse and refer this case to the SDFL or EDNY U.S. District Court.

## THE COURT SHOULD ISSUE TEMPORARY AND PRELIMINARY RESTRAINTS

As laid out below, temporary and preliminary restraints are necessary to protect my constitutional rights, which are ongoingly violated daily, and also ensure the MDFL USPO does

not retaliate. It's crass to think that anyone except mobsters would kill someone just so their claims don't make it to Court. Unless temporary and preliminary restraints issue, the MDFL USPO may effectively do just that. So long as I am under supervision, the MDFL USPO (an arm of the U.S. Courts) can take the position that the 13th Amendment allows me to be treated like a black slave before the Civil War. Preliminary and Temporary restraints must issue to protect my rights, personhood, and safety. Slaves are property and can be tortured and even killed with impunity.

For a preliminary injunction to issue, the movant must establish (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." Kelly v. Honeywell Int'l, Inc., 933 F.3d 173, 183-84 (2d Cir. 2019).

Alternatively, a party seeking a preliminary injunction must establish the following four factors: (1) a substantial likelihood of success on the merits; (2) a threat of irreparable injury, (3) that its own injury would outweigh the injury to the nonmovant, and (4) that the injunction would not disserve the public interest. Tefel v. Reno, 180 F.3d 1286, 1295 (11th Cir. 1999); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998).

"[T]he alleged violation of a constitutional right" generally results in a presumption of irreparable harm, Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996). Additionally, a prophylactic injunction to protect a violation of constitutional rights outweighs any injury to the Government perpetrating it and cannot disserve the public interest.

Under both standards and based on the factual record, the Court should grant the following restraints or explain why they are inappropriate.

14

## Violation of Fifth and Fourteenth Amendment Procedural Due Process Rights

As discussed extensively above, SCOTUS says the MDFL USPO has the power to make rules. Florida federal courts have recognized that the USPO has yet to engage in rulemaking. And yet, it has been represented in emails and verbally that there are "Rules" and official MDFL USPO policies that I do not comply with. These "Rules" and policies are the basis for decisions that limit my fundamental liberties and ability to engage in civil society.

As I understand it, the only applicable " Rules " are the Standard, Mandatory, and Additional Conditions of Supervised Release contained in the EDNY U.S. District Court's October 23, 2023, Judgment. See Dkt. #1. And it appears these provisions are ignorable from the Court's record. The EDNY U.S. Court's Judgment and Transfer of Jurisdiction documents did not appear on the docket until March 4, 2022. I have been under the Supervision of the MDFL USPO since August 5, 2021. For seven months, the USPO was "winging it" and not considering the applicable law of the Judgment or the case. Even after the Judgment was on the docket, I had to present the applicable Rules contained in the Judgment to the MDFL USPO for "consideration." See the attached 4-3-2023 Memorandum.

The Court should understand how dangerous it is to the Rule of Law and the appearance of justice when the goalposts can be moved on a whim.

Accordingly, I ask the Court to temporarily and preliminarily restrain the USPO from applying unwritten and non-existent "Rules" other than those contained in the October 23, 2023, Judgment and Orders of the Court.

## Violation of the First Amendment Right to Engage in Free Expression, Practice Journalism, and Associate with Journalists

I have the First Amendment right to free expression, the practice of journalism, and association with journalists. It is a fundamental right. I am a journalist. I am extensively published

and a member of the National Writers Union. The Government cannot use "appropriateness" of opinion or "third-party risk" to restrain my words, speech, and expression. And yet that is what they have done.

In <u>Procunier v. Martinez</u>, 416 U.S. 396, 408-09 (1974), the Supreme Court recognized that both prisoners and those with whom they correspond enjoy First Amendment rights. In certain circumstances, however, the right to free expression may be limited for reasons of prison security by activities such as opening prison mail and monitoring phone conversations. *See id.* at 413. But even in these cases, prison officials are constitutionally precluded from thwarting speech and retaliating against prisoners. And to my knowledge, the USPO does not open the mail or tap the phones of the individuals they supervise.

It is indisputable that prisoners (and therefore persons under supervision) are not completely outside the embrace of the Constitution. In particular, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." <u>Pell v. Procunier</u>, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804, 41 L. Ed. 2d 495 (1974). Among those First Amendment rights are the right to receive political publications, <u>Walker v. Blackwell</u>, 411 F.2d 23 (5th Cir. 1969); the right to engage in political writing without punishment, <u>Sostre v. McGinnis</u>, 442 F.2d 178 (2d Cir. 1971); the right to correspond with legitimate representatives of the press, <u>Guajardo v. Estelle</u>, 580 F.2d 748 (5th Cir. 1978); the right to correspond with attorneys and officers of the court, <u>Taylor v. Sterrett</u>, 532 F.2d 462 (5th Cir. 1976); the right to furnish legal assistance to other inmates where the state fails to provide an alternative source of assistance, <u>Johnson v. Avery</u>, 393 U.S. 483, 89 S. Ct. 747, 21 L. Ed. 2d 718 (1969); and the right to engage in political discussions with other inmates, <u>Diamond v. Thompson</u>, 364 F. Supp. 659 (M.D.Ala.1973).

Each of these facets of the First Amendment reflects a consistent principle: that Government authorities (including the U.S. Courts and their "legal arms") may not censor speech "simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements." Procunier v. Martinez, 416 U.S. 396, 413, 94 S. Ct. 1800, 1811, 40 L. Ed. 2d 224 (1974); Guajardo v. Estelle, 580 F.2d, at 761; The Luparar v. Stoneman, 382 F. Supp. 495 (D.Vt.1974).

Officer Harmaty has specifically directed me not to engage in journalism. She tried to tie my opinions, commentary, and practice of journalism to "mental illness." She told me the USPO could pick and choose which journalists I could associate with. In April, she said to me that Frank Parlato, an investigative journalist of 40 years, was "engaged in criminal activity," and I could not associate with him, hypothecating the judgment of an Article III judge.[4] I want the Court to rule on this critical issue. As a journalist, I believe the First Amendment rights of the free press, association, and free expression trump the authority of the Government (in this case, the USPO) to interpret the conditions of supervised release as to preclude *bonafide* journalism and newsgathering activity.

Based on my published articles, the FBI, MDFL USPO, Collier County Sheriff's Office, and others received complaints that I was "slandering" and "libeling" people. MDFL USPO told me I could not write or publish anymore based on the complaints. They told me not to affiliate with Frank Parlato, the publisher of the Frank Report (www.frankreport.com), a national outlet where I was regularly publishing because he was "engaged in criminal activity." The MDFL USPO told me I had no right to express my opinions. They presented me with a document where they

---

[4] Mr. Parlato was sentenced on July 31, 2023, to a non-carceral sentence for the failure to file a tax form in 2010. Nonetheless, the rights of the press and to associate with bonafide journalists are squarely at issue.

wanted me to agree to waive my rights to free speech. **See Exhibit "B" to the 7-28-2023 letter to the Administrative Offices of the U.S. Courts.**

I will repeat this. U.S. Probation, an arm of the U.S. Courts, wanted me to agree not to engage in any speech because select and favored people complained to the Government:

> "You must cease and desist making slanderous and libelous statements about other people, specifically Chris Ambrose, Kamillah Hanks, Kevin Love, and Ronald Castorina."

These were all the people I wrote about for the Frank Report. Castorina, Love, and Hanks owe me collectively over $150,000. I am owed over $500,000, and all proceeds will go to the U.S. Taxpayer (discussed in the Takings analysis below).

I want the chance to examine Officer Harmaty, procure her testimony, create a comprehensive factual record (above and beyond the attached emails), and ascertain which directives are the product of explicit USPO instruction and which are the result of institutional racism, injustice, and rot. I also want to establish which orders were based on Officer Harmaty and the USPO's good faith acceptance of false statements made to law enforcement, violating 18 U.S.C. § 1001. I reserve the right to introduce additional evidence, notes, and records on this point.

The USPO's attempt to silence my journalism in light of my articles critical of federal prisons, criminal justice, federal courts, and the Government smacks of impermissible viewpoint discrimination. In <u>Rosenberger v. Rectors and Visitors of the University of Virginia</u>, 515 U.S. 819 (1995), the Supreme Court declared:

> "When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."

18

I welcome the USPO's counterargument that there are valid concerns of appropriateness and third-party risk to be examined in the freedom of expression, right to association, and the practice of journalism of persons under supervision. That argument would necessarily mean that the whole of the United States is a prison plantation, and the millions of persons under supervision who wish to engage in free expression or association with *bonafide* journalists have the status of antebellum slaves. The US Courts are the plantation owners, and the USPO carries the bullwhip.



In light of the current trend of the weaponization of American Justice, if the Courts take the latter view, all the Government must do is criminalize those that engage in speech against the Government (for any reason). Then they will be precluded from future speech against the Government. This is not only viewpoint discrimination but an invitation to civil war. Our constitutional framers realized the wisdom of an instrumentalism reason for the First Amendment and its anti-censorship principle, particularly in the arena of political discourse. When words fly, bullets don't. When speech is suppressed, the discourse will likely boil over into violence. January 6, 2021, is an example and a warning. If free expression and political expression are systematically and institutionally stifled in America, violence becomes a more likely result. What happened at

the Capitol will look like a children's birthday party compared to what will come. And this view isn't controversial. It has been advanced in some form by multiple 2024 presidential candidates of both major political parties (e.g., Vivek Ramaswamy and Robert F. Kennedy, Jr.).

The Court should issue temporary and preliminary restraints against the USPO from interfering with my right to free expression, publication of reporting and opinions, practice of journalism, association with journalists, and related free speech, political expression, press, and association issues.

### Violation of My First Amendment Right to Petition the Court for the Redress of Grievances

Persons under federal supervision can petition authorities and the Courts to redress grievances. Even prisoners have this right. In Cruz v. Beto, 319 U.S., at 321, 92 S. Ct., at 1081, the Supreme Court stated:

> "[P]ersons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes "access of prisoners to the courts for the purpose of presenting their complaints.' " Clearly the term "Government" encompasses prison authorities. Moreover, if prisoners have a right to file a complaint with the courts, then *A fortiori* they must have a right to lodge complaints with the prison authorities as a matter of first resort. Cf. Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979).

The MDFL USPO, an arm of this Court, interfered with my right to petition this Court to redress constitutional violations. **See Exhibit "F" to the 7-28-2023 letter to the Administrative Offices of the U.S. Courts.** I had sought information about availability from AUSA Eth for a preliminary conference. Officer Harmaty responded: "Regarding the upcoming hearing, please refrain from contacting the government directly. I still need to notify the Court and seek its approval."

That was two months ago. I understand that I have a right to a hearing as a matter of right. Justice delayed is justice denied.

The Court should issue temporary and preliminary restraints such that the USPO shall not attempt to interfere with or stifle my access or opportunity to be heard by the U.S. Courts in any way.

**Violation of the Fifth Amendment's Takings Clause**

Castorina, Love, and Hanks owe me collectively over $150,000. I am owed over $500,000, and all proceeds will go to the U.S. Taxpayer The MDFL USPO told me Castorina, Hanks, and Love all called the FBI and the USPO to use the Government to stifle my protected speech and property rights. The Probation Department told me to stop my collections lawsuits. **See Exhibit "C" to the 7-28-2023 letter to the Administrative Offices of the U.S. Courts.** On May 9, 2023, I sent the MDFL USPO an email:

> I wanted to confirm that I have been directed by US Probation not to collect any past fees owed to me from 2017 when I was practicing law.
>
> The fees exceed $500,000.
>
> I owe @$600,000 in restitution, @$130,000 in forfeiture, @$200,000 in back US taxes, @$100,000 in back NYS taxes, and other miscellaneous debts.
>
> Time is of the essence because these claims must be commenced immediately because of the six (6) year statute of limitations, or they will be lost forever. Some claims begin to run next month in June.
>
> My contract with my former lawyers was interfered with by US Probation's directive. My collections lawyers dropped me after your emails to them directing them to stop work and discontinued prosecuting my valuable claims.
>
> You cited standard conditions of probation #13: "You must follow the instructions of the probation officer related to the conditions of

supervision." (A copy of the Judgment is attached herewith for your convenience).

I am confused for several reasons.

Obviously, I understand that the US Probation Office has directed me not to pursue the valuable claims/property rights.

And I will abide by US Probation's directive for fear of the pains of imprisonment.

The mandatory conditions of probation #4 states: "You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution." That box is not checked in the judgment.

Additional supervised release terms state: "The defendant shall comply with the forfeiture and restitution orders."

The Fifth Amendment says to the federal government that no one shall be "deprived of life, liberty or property without due process of law."

My questions are:

1. If I am precluded by US Probation from pressing valuable legal claims that would help pay back restitution, shouldn't the Federal Government credit me with their value under the fifth amendment's takings clause?

2. In the interim, can US Probation seek an official declaration as to my claims? Every day I am precluded from moving forward with my claims is a de facto taking.

3. Does US Probation's directive not to pursue valid property rights in order to satisfy restitution and forfeiture obligations operate as a *de facto* waiver of these provisions in the Judgment by the US Government? Does this mean the US Government has waived my requirement to comply with the forfeiture order and restitution order?

4. Has US Probation consulted with the US Attorney's Office or other counsel on these issues?

5. Can the US Probation office seek Federal Preemption from the US District Court (or join in my application for a declaratory

judgment) to toll the NY State statute of limitations on my claims based on the operation of federal law while these issues are being resolved?

6. US Probation granted permission for me to travel to New York for my pending 440 motion in my NY state case. Does the fact that I am indigent and US Probation expects me to spend thousands of dollars to travel to New York constitute a *de facto* waiver of my restitution obligations in order to pay for travel, lodging, and miscellaneous expenses related to that
directive?

7. Pursuant to Judge Polster-Chappell's recent Decision and Order, the Court was concerned I had not paid restitution and denied travel. Additionally, at our last meeting, you raised concerns about my health and my ability to travel to Chicago. Were these concerns considered when US Probation cleared me to travel to New York for the 440 motion appearance? I am concerned I might fall into a gutter in Brooklyn and die because of my serious health conditions and the fact I have no valid health insurance outside the State of Florida.

I would request a written response to these questions, just like the previous response to the Court's request to travel (see below), so that I am clear as to what is going on.

These are all good questions I would like the Court to address because its "arm," the MDFL

USPO, will not issue any written response or produce any "Rules."

On May 11, 2023, I again, under the good faith advice of counsel, requested details of what

Officer Harmaty stated was an "ongoing investigation":

My lawyer, Stephanie Jones, Esq. (copied), wants me to get a response in writing.

She says that I should be going to court to stop the clock on the statute of limitations running on the valuable claims that I have while the federal government continues its investigations that you said were going on.

The clock has to stop on these valuable claims so that I do not lose my rights to pursue them. You told me that the concern was witness tampering, witness intimidation, and harassment, but neither Kamillah Hanks, Kevin Barry Love, John Tabacco, nor several others were witnesses in my case. I have no list of "people to avoid"

like the government gives to organized crime figures. But then again, organized crime figures don't try to use the courts to collect debts.

I do not know how the investigation you referenced is being handled, who by, or when it will be complete, but I want to respect the process, so I need to protect the right to recovery. Anyone who doesn't want to pay their bills can say they are "harassed," and I suspect they are manipulating the federal system in order to end-run around the statute of limitations.

I had an attorney who had already filed cases. After you told them to stop work, they dropped me. Now, Stephanie Jones, Esq., is looking at the cases. She believes that they have merit, and there is a potential taking here. Her advice is that I must act to preserve my rights. The reason I have a lawyer helping me is that I cannot do this on my own.

Would it help if you spoke to her? Her phone number is 760-406-1657. I know you said you were not an email person. Is it better if she calls you, so these issues can be resolved?

I don't mind coming in to see you. But unless I am going to leave with the answers to the questions in writing to give to Attorney Jones, the exercise will be fruitless. Attorney Jones wants the information.

This is all an effort on my part to try to pay restitution. I want to get this sword of Damocles out from over my head.

Again, the MDFL USPO would not issue any written response or produce any "Rules." They had added to this a new and amorphous "Investigation" - though they wouldn't tell me any detail, like who was conducting it, what the issues were, or anything else substantive. Magically, they now decided it was OK for me to travel to New York, the ground zero of my addiction and charged criminality, and where all my enemies are. I would like to know what factors balance in favor of approved travel with those factual concerns.

MDFL USPO contacted my collections attorneys and told them that the MDFL USPO had to conduct an "appropriateness review" before I could seek redress in the state or federal courts to

24

collect debts. **See Exhibit "D" to the 7-28-2023 letter to the Administrative Offices of the U.S. Courts.** That email from Officer Haramaty states:

> I advised Mr. Luthmann that I wanted a list of all cases that you intended to pursue for outstanding attorney fees PRIOR TO SEEKING PAYMENT. Please provide the list at your earliest convenience, so that I may review them and see if they are appropriate for collection.

Officer Harmaty did not tell me that she went to law school or was qualified to opine on the "appropriateness" of the New York State-based debt collection. I thought that is what attorneys were for, and I have solid opinion letters from lawyers previously delivered to the MDFL USPO's possession.

The entire notion of the USPO, an arm of the U.S. Courts conducting "appropriateness review," smacks of something very authoritarian and very Soviet, something clearly in violation of the Bill of Rights, the Rule of Law, and the existence of an independent judiciary.



Then again, just let me know if my understanding is incorrect, and there is a separate system of justice for the remaining "American niggers" in incarceration and under supervision, which is

conducted with the modern-day bullwhip outside the plantation shed. I must be naïve to believe that there is equal justice under the law for all. I wonder where I saw that.



The collections lawyers dropped my pending cases without my consent and even a prior phone call or a letter for fear of "retribution" against them. The attached letters from October 2022 show that the collections lawyers opined that I had valid legal claims then. What changed? Tortious interference by Love, Hanks, Castorina, and others using the MDFL USPO as an unwitting accomplice.

Let's be clear that Kevin Barry Love is a brazen thug. He has lied to the MDFL USPO violating 18 U.S.C. § 1001. Additionally, in shades of Michael Avenatti's infamous extortion call to Nike, Kevin Barry Love made threatening phone calls to my former collections lawyers, smacking of interstate menacing. The New York and Providence FBI Offices have received complaints. **See Memo sent to Law Enforcement - Exhibit "E" to the 7-28-2023 letter to the Administrative Offices of the U.S. Courts.**

After everything that happened with Love and Officer Harmaty, one of the collections lawyers told me, "I don't want them doing to me what they do to Trump's lawyers," apologizing for dropping my case without telling me because of the "Government heat."

I have only recently discovered that statements made to coax law enforcement action were dishonest and violated 18 U.S.C. § 1001. Based on the false statements made, I am informed by my new attorney that US Probation Officers tortiously interfered with my collections contract to collect over $500,000 in debts.

The USPO's "stop-work" order to me and my collections attorneys constitutes a *de facto* taking under the Fifth Amendment. The U.S. Constitution itself affords persons deprived of constitutionally guaranteed rights a claim for damages. A property owner is entitled to compensation even for the temporary loss or abridgment of his property rights. Any Government action that works a taking of property rights necessarily implicates the constitutional obligation to pay just compensation. See <u>Knick v. Twp. of Scott</u>, 862 F. 3d 310 (1995).

Here, the USPO has frustrated my valuable property rights - my ability to collect on valid debts – and tortiously interfered with the attorney-client contract with former collections counsel. There are also issues of waiver, *de facto* taking, and destruction of valuable property rights, and other takings issues that must be litigated. I must be made whole so that my restitution can be paid and the U.S. Taxpayers can be made whole.

The Court should issue temporary and preliminary restraints such that the USPO shall not attempt to interfere with, impair, or stifle my property rights, my existing contracts, and my access or opportunity to validly pursue my property rights, including the collection of valid debts in the courts of the United States or the several states.

27

## THE COURT SHOULD ORDER DISCOVERY AND SUBPOENAS

To the extent that I am entitled to a hearing, I seek a preliminary conference to formally request discovery and inspection of the relevant files of the MDFL USPO and the FBI. These materials are necessary for a meaningful opportunity to be heard.

I also request the Court sign and Order the enclosed subpoenas to produce documents for the following persons:

     i.  CHRISTOPHER AMBROSE, of Madison, Connecticut;

    ii.  KEVIN BARRY LOVE, of Staten Island, New York;

   iii.  KAMILLAH HANKS, of Staten Island, New York;

   iv.  RONALD CASTORINA, of Staten Island, New York;

    v.  ERIC NELSON, of Staten Island, New York;

   vi.  JOHN TOBACCO, of Staten Island, New York;

These materials are necessary for a meaningful opportunity to be heard.

I want to establish a tentative witness list for the hearing at the Preliminary Conference, as well as deal with any reciprocal discovery requests by the Government.

## ALTERNATIVE RELIEF: TERMINATION OF THE TERM OF SUPERVISED RELEASE

Alternatively to the foregoing, I invite the Court to reconsider the Termination of my term of Supervised Release. I intend to invest my time and energy for the next year and beyond until August 5, 2024, litigating this case. Some issues are substantial to the constitutional republic and may be ripe for United States Supreme Court review. Even if the SCOTUS review is years away, these issues will never be moot because they are capable of repetition yet evading review. Roe v. Wade, 410 U.S. 113, 125, 93 S. Ct. 705, 713 (1973); Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515 (1911); see also Moore v. Ogilvie, 394 U.S. 814, 816 (1969); Carroll v. Princess

Anne, 393 U.S. 175, 178-179 (1968); United States v. W. T. Grant Co., 345 U.S. 629, 632-633 (1953).

I am geared up to be the champion of the forgotten men and women, the underclass of federal felons in this new American Era of Targeted and Weaponized Justice in service of elite and corrupt interests. I am a journalist and excited to tell the tale and create awareness of this significant threat to our constitutional republic, hopefully forestalling a subsequent Civil War.

However, I do invite the Court to reconsider its March ruling denying the request to terminate my term of supervised release in light of the reconsideration of specific legal issues, inter alia, the law of the judgment, the law of the case, and an evident and apparent sentencing disparity under 18 U.S.C. § 3553(a)(6). It may obviate my need to devote the next decade to this cause.

## NOTICE TO THE GOVERNMENT

The Government should have instant access to these papers. I make this submission through the MDFL US Courts website. Additionally, I have emailed AUSA Simon R. Eth, the Assistant United States Attorney listed on this case's docket, with a copy of all filed papers to: Simon.Eth@usdoj.gov.

## SUBMISSIONS TO THE ADMINISTRATIVE OFFICE OF THE U.S COURTS AND THE HOUSE JUDICIARY COMMITTEE

Because of the concerning and constitutional nature of the materials addressed in this submission, I have also noticed the Administrative Office of the U.S. Courts and the Judiciary Committee of the U.S. House of Representatives, who have oversight powers.

## **CONCLUSION**

For the reasons stated herein, I respectfully request that this Honorable Court grant the relief requested.

WHEREFORE, matter as follows:

A) For a Preliminary Conference;

    a. To address whether the Law of the Judgment – the substantive law of the United States Court of Appeals for the Second Circuit - applies to this matter; and

    b. To address whether the U.S. District Court for the Middle District of Florida should be recused from the case and this matter should be transferred to the adjoining Southern District of Florida; and

    c. To issue temporary and preliminary restraints on the United States Probation Office for the Middle District of Florida; and

    d. To obtain Court-ordered subpoenas and discovery related to the U.S. Probation Office, the Federal Bureau of Investigation, and the Government's interaction related to these persons, including but not limited to:

        i. CHRISTOPHER AMBROSE, of Madison, Connecticut;

        ii. KEVIN BARRY LOVE, of Staten Island, New York;

        iii. KAMILLAH HANKS, of Staten Island, New York;

        iv. RONALD CASTORINA, of Staten Island, New York;

        v. ERIC NELSON, of Staten Island, New York;

        vi. JOHN TOBACCO, of Staten Island, New York;

        vii. MDFL USPO OFFICER HARMATY

        viii. MDFL USPO OFFICER AMADORI

B) For a hearing on and issuance by the Court of a declaratory judgment whether and to what extent the U.S. Probation Office for the Middle District of Florida has violated Richard Luthmann's rights; or, in the alternative

C) For an Order Terminating Richard Luthmann's term of supervised release pursuant to 18 U.S.C. § 3583(e)(1);

D) For such other and further relief as this Honorable Court may deem just or equitable.


Dated:  Naples, Florida
        August 1, 2023,                                    Respectfully submitted,


                                                           _____
                                                           Richard Luthmann
                                                           Defendant *Pro Se*
                                                           338 Sugar Pine Lane
                                                           Naples, FL 34108
                                                           (239) 631-5957


TO:     Clerk of Court (electronic submission)
        U.S. Courthouse and Federal Building
        2110 First Street
        Fort Myers, Florida 33901

                U.S. Probation Office for the Middle District of Florida (electronic submission)
                US Courthouse and Federal Building
                2110 First Street
                Suite 4-182
                Ft. Myers, FL 33901-3011

        U.S. Attorney's Office (electronic submission)
        2110 First Street
        Suite 3-137
        Ft. Myers, FL 33901
        Attn: AUSA Simon R. Eth (Simon.Eth@usdoj.gov)



Richard A. Luthmann
338 Sugar Pine Lane
Naples, FL 34108
Tel: (239) 631-5957
richard.luthmann@gmail.com

<u>Via U.S. Mail</u>

July 28, 2023

Administrative Office of the
United States Courts
One Columbus Circle, NE
Washington, D.C. 20544

RE:  U.S. v. Luthmann, 2:22-cr-0021-SPC-NPM
Middle District of Florida
Violations by the U.S. Probation Office

Dear Sir or Madam:

My personal attorney Stephanie A. Jones, Esq., is copied hereto, as well as the U.S. Attorney for the Middle District of Florida.

I wanted to place on the record what I am now informed are disturbing violations by the U.S. Probation Office for the Middle District of Florida. I believe my constitutional rights have been harmed.

This letter is about my ability to practice journalism, engage in the free expression and dissemination of opinion and satire, enforce my valuable property rights, petition the courts for redress, and enjoy all my constitutional and other legal rights - without targeted tortious interference and civil rights violations by the U.S. Probation Office for the Middle District of Florida.

<u>Background</u>

I have serious physical, mental, emotional, and legal disabilities. I am trying to earn a living. I am trying to practice journalism, which I am informed the Constitution of our republic says anyone may do without interference from the Government. I am trying to collect valid debts. I am trying to repay certain monies owed to the United States and its taxpayers.  However, I have been improperly stifled by the U.S. Probation Office for the Middle District of Florida.

I tried to learn journalism from one of the best, Frank Parlato. I came to know him in the fall of 2022 and began working closely with him. I started working for him for the

1

Frank Report (www.frankreport.com) as an unpaid intern. He was showing me the ropes, and I was trying to learn the craft and trade of investigative journalism. I had recently left federal custody.

I started reporting about shady characters on the Frank Report. I wrote articles about perjurious Judge Ronald Castorina and Crooked Special Prosecutor Eric Nelson, who had a disbarred felon advising him to violate criminal defendants' rights.

I wrote about deadbeat NYC Councilwoman Kamillah Hanks and her "tough-guy" millionaire husband, Kevin Barry Love.

I wrote articles about CT Attorney Ed Nusbaum and CT "psychopath" Christopher Ambrose, and others.

I wrote about my time in prison and the people I met. I also covered courts and legal journalism related to the NXIVM case.

At all times, I reported true facts and gave my unabashed opinions.

But evidently, my free speech and practice of journalism are no longer protected in America. Particularly when you tell the truth about things the Government does not want to publicize, particularly their "protected people."

## Who is Richard Luthmann?

I was formerly an attorney and the Law Chair of the New York State Reform Party. We were on the fifth ballot line in NYS politics, upsetting the apple cart. A case in point was our line was the difference that ousted Queens Dem Party Boss Joe Crowley's niece from NYC Council in 2017.

I also pissed off Hillary Clinton with a "November Surprise" lawsuit filed against NBC Universal one week before the 2016 election. A client wore a shirt that said, "BILL CLINTON IS A RAPIST." He was manhandled and ousted from 30 Rock. I sued on his behalf, defending his right to hold his opinions – in this case, based on truth and fact – and be treated like a gentleman. **See the attached Exhibit "A."**

I was a nemesis of Former Congressman and Richmond County District Attorney Michael E. McMahon. I played dirty political tricks on him to get the truth out. He and his Judge wife were involved in steering cases and padding prosecution stats. I still have the tapes that prove it. Because of my allegations, she was forced to resign as the Administrative Justice for the 13th Judicial District. McMahon admitted that my indictment and arrest was the only thing that stopped my "reign of terror" against corrupt hacks. I don't think Mike McMahon is a bad guy, but his wife is a piece of work.

I pissed off a lot of political people, a lot of Democrats, and they got together and had a "contract" put in for me in the EDNY. I spent four years in federal prison. I filed a

2

Reservation of Rights and Declaration of Actual Innocence on the docket in my EDNY case. I am fighting that conviction because of substantial Government misconduct.

The local Staten Island, New York DA also arranged my prosecution for "Fake Facebook" pages targeting politicians. My activity was all protected political satire, and there was egregious conduct by the People in that case as well. I am fighting that case as well.

## The U.S. Probation Office Violates My Rights At the Direction of the "Elites"

Everything I worked for was taken away. I need a new craft and new trade. Because of my limitations, desk work is all I can do. Frank Parlato offered me a chance at a craft - he would teach me investigative journalism.

I joined the National Writers Union, and I began writing. Things were going well. Frank Parlato was about to put me on the payroll. And then the Government stepped in.

The US Probation Office for the Middle District of Florida received complaints that I was "slandering" and "libeling" people. They told me I could not write or publish anymore. They told me not to affiliate with Frank Parlato because he was a criminal.

They told me I didn't have a right to express my opinions. They presented me with a document where they wanted me to agree to waive my rights to free speech. **See Exhibit "B."**

I will repeat this. U.S. Probation, an arm of the U.S. Courts, wanted me to agree not to engage in any speech because select and favored people complained to the Government:

> "You must cease and desist making slanderous and libelous statements about other people, specifically Chris Ambrose, Kamillah Hanks, Kevin Love and Ronald Castorina."

These were all the people I wrote about for the Frank Report. Castorina, Love, and Hanks owe me collectively over $150,000. I am owed over $500,000, and all proceeds will go to the U.S. Taxpayer.

I was told Castorina, Hanks, and Love all called the FBI and U.S. Probation Department to use the Government to stifle my protected speech and property rights. The Probation Department told me to stop my collections lawsuits. **See Exhibit "C."**

U.S. Probation called my collections attorneys and told them that the U.S. Probation Office had to conduct an "appropriateness review" before I could seek redress in the state or federal courts to collect debts. **See Exhibit "D."** The collections lawyers dropped my pending cases without my consent and even a prior phone call or a letter for fear of "retribution" against them.

3

In shades of Michael Avenatti's infamous extortion call to Nike, Kevin Barry Love made threatening phone calls to my lawyers, smacking of interstate menacing. **See Memo sent to Law Enforcement - Exhibit "E."** One of the lawyers said, "I don't want them doing to me what they do to Trump's lawyers," apologizing for dropping my case without telling me because of the "Government heat."

I have recently discovered that statements made to coax law enforcement action were dishonest and in violation of 18 U.S.C. § 1001. Based on the false statements made, I am informed by my new attorney that US Probation Officers tortiously interfered with my collections contract to collect over $500,000 in debts.

The Probation Officers also violated my civil rights by causing a *de facto* taking. I emailed the US Attorney's Office to see about availability to schedule a hearing (to which I am entitled). I was promptly met with an email from US Probation directing me not to petition the District Court for the redress of grievances until I had their approval. **See Exhibit "F."** That was months ago.

Christopher Ambrose did one better. He called the cops to have me investigated for "libel," which is actually a crime on the books in Florida. When I went in to meet the Collier County Sheriff's Deputy, her jaw literally dropped once I showed her materials including some of the evidence attached hereto. Not only did Christopher Ambrose cause a huge waste of police time and resources, but he had no problem with improperly causing a chilling effect on the press. I'm not even sure the Florida criminal libel statute would withstand First Amendment scrutiny.

## Legal Opinion

I sought legal opinion from a trusted attorney, Stephanie A. Jones, Esq. In sum and substance, her opinion stated:

- The multitude of US Probation Office's (USPO) written and verbal directives have been patently illegal and unconstitutional, legal nullity, and can be flatly ignored.

- The USPO's attempt to silence Mr. Luthmann's journalism in light of his articles critical of federal prisons, criminal justice, and the government smacks of impermissible viewpoint discrimination. In <u>Rosenberger v. Rectors and Visitors of the University of Virginia</u>, 515 U.S. 819 (1995), the Supreme Court declared:

> "When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."

4

Case 2:22-cv-00211-BPS-HRO Document 22-20 Filed 08/01/2022 Page 5 of 6 PageID 564
Case 2:23-cv-00118-JES-HRO Document 22-20 Filed 08/01/2022 Page 5 of 6 PageID 564
PageID 3789

- Additionally, the USPO's directive to "stay away" from Mr. Parlato is problematic on several grounds. Mr. Parlato is facing charges and has yet to be sentenced by the Court in the Western District of New York. By assuming and hypothecating the result of a forthcoming federal sentencing, the USPO has usurped the independent judgment of Article III District Court Judge Richard J. Arcara.

- I am further informed that a likely result of Mr. Parlato's matter may very well be a misdemeanor sentence, if not an outright dismissal and vacatur. The point is that a government agency cannot usurp the Constitutional prerogative of an Article III Judge, which is exactly what the USPO has done here.

- In my opinion, these facts do not impede Mr. Luthmann's right to associate with Mr. Parlato, albeit subject to previously outlined reasonable geographical restrictions.

- The USPO's "stop-work" order to Mr. Luthmann and his collections attorneys constitutes a *de facto* taking under the Fifth Amendment.

- A property owner is entitled to compensation for the temporary loss of his property. Any Government action that works a taking of property rights necessarily implicates the constitutional obligation to pay just compensation. See Knick v. Twp. of Scott, 862 F. 3d 310 (1995). Here, the USPO has apparently frustrated Mr. Luthmann's valuable property rights - his ability to collect on valid debts - and tortiously interfered with the attorney-client agreement with his former collections counsel.

- The U.S. Constitution itself affords persons deprived of constitutionally guaranteed rights a claim for damages. It is abundantly clear that Mr. Luthmann has strong legal claims based on these facts.

Additionally, Attorney Jones intends to further explore the improper actions of Kevin Barry Love and Christopher Ambrose to see what part, if any, their statements to Government may have played in the USPO's directives.

I am filing papers in court in the Middle District of Florida this week, and I intend to subpoena everyone and get to the bottom of this. I intend to seek Court-Ordered subpoenas from:

- CHRISTOPHER AMBROSE, of Madison, Connecticut;

- KEVIN BARRY LOVE, of Staten Island, New York;

- KAMILLAH HANKS, of Staten Island, New York;

- RONALD CASTORINA, of Staten Island, New York;

- ERIC NELSON, of Staten Island, New York;

I am entitled to a hearing.

How can the Government so brazenly violate my Constitutional rights?

I request that you investigate the U.S. Probation Office for the Middle District of Florida. The weaponization of the United States Courts to protect the interest of favored Government elites cannot be tolerated.

If you have any questions or concerns, please do not hesitate to contact me.

Regards,

Richard A. Luthmann

CC:    File

Stephanie A. Jones, Esq.

United States Attorney
Middle District of Florida
2110 First Street, Suite 3-137
Fort Myers, FL 33901

Hon. Jim Jordan, Chairman of the House Judiciary Committee
Hon. Byron Donalds
Hon. Marjorie Taylor Greene
Hon. Nicole Malliotakis.

ENCL

# EXHIBIT A

FILED: Case 2:20-cv-02321-SPL Document 20-1 Filed 08/03/20 Page 8 of 20 Page ID 567
NYSCEF DOC. NO. 4
Page ID 3792
RECEIV



# EXHIBIT B

PROB 49
(04/15)

# United States District Court

Middle District of Florida

### Waiver of Hearing to Modify Conditions
### Of Probation/Supervised Release or Extended Term of Supervision

I have been advised and understand that I am entitled by law to a hearing and assistance of counsel before any unfavorable change may be made in my Conditions of Probation and Supervised Release or my period of supervision being extended. By "assistance of counsel," I understand that I have the right to be represented at the hearing by counsel of my own choosing if I am able to retain counsel. I also understand that I have the right to request the court to appoint counsel to represent me at such a hearing at no cost to myself if I am not able to retain counsel of my own choosing.

I hereby voluntarily waive my statutory right to a hearing and to assistance of counsel. I also agree to the following modification of my Conditions of Probation and Supervised Release or to the proposed extension of my term of supervision:

You must cease and desist making slanderous and libelous statements about other people, specifically Chris Ambrose, Kamillah Hanks, Kevin Love and Ronald Castorina.

You shall have no direct or indirect contact with Chris Ambrose, Kamillah Hanks, Kevin Love and Ronald Castorina without the written approval of the probation officer.

Witness: _____          Signed: _____
                Senior U.S. Probation Officer                        Supervised Releasee
                     Katrina Harmaty                                    Richard Luthmann

_____
Date

# EXHIBIT C

Richard L <richard.luthmann@gmail.com>

---

## Confirmation - Action Required

Richard L <richard.luthmann@gmail.com>                                          Tue, May 9, 2023 at 7:44 AM
To: "Katrina_Harmaty@flmp.uscourts.gov" <Katrina_Harmaty@flmp.uscourts.gov>
Cc: Claire Chesnoff <clairechesnoff@gmail.com>, sthea1914@gmail.com
Bcc: Richard Luthmann <richard.luthmann@protonmail.com>, mjcnyc159@aol.com

Officer Harmaty,

My mother and Attorney Stephanie Jones are coped hereto.

I wanted to confirm that I have been directed by US Probation not to collect any past fees owed to me from 2017 when I was practicing law.

The fees exceed $500,000.

I owe @$600,000 in restitution, @$130,000 in forfeiture, @$200,000 in back US taxes, @$100,000 in back NYS taxes, and other miscellaneous debts.

Time is of the essence because these claims must be commenced immediately because of the six (6) year statute of limitations, or they will be lost forever. Some claims begin to run next month in June.

My contract with my former lawyers was interfered with by US Probation's directive. My collections lawyers dropped me after your emails to them directing them to stop work and discontinued prosecuting my valuable claims.

You cited standard conditions of probation #13: "You must follow the instructions of the probation officer related to the conditions of supervision." (A copy of the Judgment is attached herewith for your convenience).

I am confused for several reasons.

Obviously, I understand that the US Probation Office has directed me not to pursue the valuable claims/property rights. And I will abide by US Probation's directive for fear of the pains of imprisonment.

The mandatory conditions of probation #4 states: "You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution." That box is not checked in the judgment.

Additional supervised release terms states: "The defendant shall comply with the forfeiture order and restitution order."

The Fifth Amendment says to the federal government that no one shall be "deprived of life, liberty or property without due process of law."

My questions are:

1. If I am precluded by US Probation from pressing valuable legal claims that would help pay back restitution, shouldn't the Federal Government credit me with their value under the fifth amendment's takings clause?

2. In the interim, can US Probation seek an official declaration as to my claims? Every day I am precluded from moving forward with my claims is a *de facto* taking.

3. Does US Probation's directive not to pursue valid property rights in order to satisfy restitution and forfeiture obligations operate as a *de facto* waiver of these provisions in the Judgment by the US Government? Does this mean the US Government has waived my requirement to comply with the forfeiture order and restitution order?

4. Has US Probation consulted with the US Attorney's Office or other counsel on these issues?

5. Can the US Probation office seek Federal Preemption from the US District Court (or join in my application for a declaratory judgment) to toll the NY State statute of limitations on my claims based on the operation of federal law while these issues are being resolved?

6. US Probation granted permission for me to travel to New York for my pending 440 motion in my NY state case. Does the fact that I am indigent and US Probation expects me to spend thousands of dollars to travel to New York constitute a *de facto* waiver of my restitution obligations in order to pay for travel, lodging, and miscellaneous expenses related to that directive?

7. Pursuant to Judge Polster-Chappell's recent Decision and Order, the Court was concerned I had not paid restitution and denied travel. Additionally, at our last meeting, you raised concerns about my health and my ability to travel to Chicago. Were these concerns considered when US Probation cleared me to travel to New York for the 440 motion appearance? I am concerned I might fall into a gutter in Brooklyn and die because of my serious health conditions and the fact I have no valid health insurance outside the State of Florida.

I would request a written response to these questions, just like the previous response to the Court's request to travel (see below), so that I am clear as to what is going on.

Thank you.

Richard Luthmann

–––––––– Forwarded message –––––––
From: **Katrina Harmaty** <Katrina_Harmaty@flmp.uscourts.gov>
Date: Mon, May 8, 2023 at 3:33 PM
Subject: FW: Richard Luthmann - request to travel
To: richard.luthmann@gmail.com <richard.luthmann@gmail.com>


Good afternoon Richard,


Based on the Court's request, you will be permitted to travel to NY for your upcoming court date on June 2, 2023. I will inform Ms. Wasserman of your permission to travel as well.


You may need to have your attorney file a petition with local court for excusal, reschedule or video option.


Please let me know as soon as you have your travel arrangements, thank you.

---

**From:** Richard L <richard.luthmann@gmail.com>
**Sent:** Wednesday, May 3, 2023 6:57 AM
**To:** Katrina Harmaty <Katrina_Harmaty@flmp.uscourts.gov>
**Cc:** jfink@finkkatzlaw.com
**Subject:** Fwd: Richard Luthmann - request to travel


**CAUTION - EXTERNAL:**


Officer Harmaty,


I will try to call you to follow up on this.

The Court in New York is requesting permission for me to appear on June 2. I do not think it is in my best interests to travel to New York right now. I have limited resources for travel and nowhere specific to stay. Also, I have doctors' appointments scheduled on and around that date which will be disrupted.

Additionally, I really only believe that I need to be in the courtroom if we have a hearing. The rest of the business can be handled by videoconferencing.

I have copied Jonathan Fink, Esq., who is my court-assigned co-counsel.

Regards,

Richard Luthmann

————— Forwarded message —————
From: **Sarah Wasserman** <SWASSERMAN@nycourts.gov>
Date: Tue, May 2, 2023 at 11:45 AM
Subject: Richard Luthmann - request to travel
To: Katrina_Harmaty@flmp.uscourts.gov <Katrina_Harmaty@flmp.uscourts.gov>
Cc: Leonard Cohen <lcohen@nycourts.gov>, richard.luthmann@gmail.com <richard.luthmann@gmail.com>, eric nelson <ericnelson@ericnelsonesq.com>, Jonathan Fink <jfink@finkkatz.com>, jfink@finkkatzlaw.com <jfink@finkkatzlaw.com>

Ms. Harmaty,

Please find attached a formal letter request for permission for Mr. Richard Luthmann to travel outside the district to Kings County Supreme Court for the next court date of June 1, 2023.

Sincerely,

*Sarah M. Wasserman (Kurtz) Esq.*

*Principal Court Attorney to Judge Donald Leo*

*Supreme Court, Kings County Criminal Term*

*320 Jay Street, 23rd Floor*

*Brooklyn, NY 11201*

*(T) 347.296.1121*

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

---

📄 **Federal Court Judgment_Redacted.pdf**
371K

Richard L <richard.luthmann@gmail.com>

---

## Confirmation - Action Required

---

**Richard L** <richard.luthmann@gmail.com>                                      Thu, May 11, 2023 at 3:20 PM
To: Katrina Harmaty <Katrina_Harmaty@flmp.uscourts.gov>
Cc: sthea1914@gmail.com, Claire Chesnoff <clairechesnoff@gmail.com>

Officer Harmaty,

My lawyer, Stephanie Jones, Esq., (copied) wants me to get a response in writing.

She says that I should be going to court to stop the clock on the statute of limitations running on the valuable claims that I have while the federal government continues its investigations that you said were going on.

The clock has to stop on these valuable claims so that I do not lose my rights to pursue them. You told me that the concern was witness tampering, witness intimidation, and harassment, but neither Kamillah Hanks, Kevin Barry Love, John Tabacco, nor several others were witnesses in my case. I have no list of "people to avoid" like the government gives to organized crime figures. But then again, organized crime figures don't try to use the courts to collect debts.

I do not know how the investigation you referenced is being handled, who by, or when it will be complete, but I want to respect the process, so I need to protect the right to recovery. Anyone who doesn't want to pay their bills can say they are "harassed," and I suspect they are manipulating the federal system in order to end-run around the statute of limitations.

I had an attorney who had already filed cases. After you told them to stop work, they dropped me. Now, Stephanie Jones, Esq., is looking at the cases. She believes that they have merit and there is a potential taking here. Her advice is that I must act to preserve my rights. The reason I have a lawyer helping me is that I cannot do this on my own.

Would it help if you spoke to her? Her phone number is 760-406-1657. I know you said you were not an email person. Is it better if she calls you, so these issues can be resolved?

I don't mind coming in to see you. But unless I am going to leave with the answers to the questions in writing to give to Attorney Jones, the exercise will be fruitless. Attorney Jones wants the information.

This is all an effort on my part to try to pay restitution. I want to get this sword of Damocles out from over my head.

Thank you,

Richard Luthmann

[Quoted text hidden]

Richard L <richard.luthmann@gmail.com>

---

## Confirmation - Action Required

---

**Katrina Harmaty** <Katrina_Harmaty@flmp.uscourts.gov>                    Thu, May 11, 2023 at 11:26 AM
To: Richard L <richard.luthmann@gmail.com>

We spoke about several of these matters when I met with you at your residence on May 2, 2023.

If you would like to discuss these matters further, you can report to the probation office on May 19, 2023 for an in person visit.

Kindly let me know what time works best and I will put it on my calendar – thank you!

[Quoted text hidden]

# EXHIBIT D

Richard L <luthmannrichard@gmail.com>

---

## Re: Potential Receivables

**Lawrence Almagno** <la@almagno-law.com>                           Tue, Apr 4, 2023 at 4:02 PM
To: Katrina Harmaty <Katrina_Harmaty@flmp.uscourts.gov>, Richard Luthmann <luthmannrichard@gmail.com>, Jesse Duarte <JD@almagno-law.com>

Mrs. Harmaty:

Thank you for your email. I am happy I clarified that point. I am confused with respect to your notion of "appropriate", and what details need to be reviewed by your office in order for you to make this "appropriateness" determination. (But maybe its just my lawyerly instincts prompting these questions, so I do apologize for that.)

That being said, Mr. Luthman has indicated that he's already disclosed two matters in the recent financial disclosure. In addition, he indicates that he is working on compiling the list of other potential collection claims, and he will convey same to you with due haste. I greatly appreciate the open dialog on this, as I am certainly concerned that we help Mr. Luthman solve his problems and not create new ones.

Thank you.

Very truly yours,

**Lawrence P. Almagno Jr.*** | Attorney at Law
Almagno Law, Inc.
10 Rangeley Road, Cranston, RI 02920
T (401) 946-4Law | F (401) 464-4Law
LA@Almagno-Law.com

New York Office
T |(212) 859-5074
43 W 43rd St. Ste 169
New York, NY 10036



*Licensed Attorney in Massachusetts, New York & Rhode Island, 1st Circuit Court of Appeals, Federal District Courts of MA, RI, & Eastern District of NY.
This transmittal may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, please do not read, copy or re-transmit this communication. If you have received this communication in error, please notify the sender by e-mail or by telephone and delete this message and any attachments. Thank you.

On Tue, Apr 4, 2023 at 2:41 PM Katrina Harmaty <Katrina_Harmaty@flmp.uscourts.gov> wrote:

Good afternoon,

I received your voicemail. I advised Mr. Luthmann that I wanted a list of all cases that you intended to pursue for outstanding attorney fees PRIOR TO SEEKING PAYMENT. Please provide the list at your earliest convenience, so that I may review them and see if they are appropriate for collection. If they are, the payment fee that Mr. Luthmann shared yesterday seems to be appropriate.

Thank you!



**Katrina Harmaty**

Senior United States Probation Officer

**United States Probation | Fort Myers Division**

**Address** 2110 First Street, Ste. 4-182, Fort Myers, FL 33901

**Phone** (239) 461-2071

**Cell** (239) 270-0590

# EXHIBIT E

# 18 U.S.C. § 875. Interstate communications

**(d)** Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C.S. § 875 (LexisNexis, Lexis Advance through Public Law 117-327, approved December 27, 2022)

On April 4, 2023, KEVIN BARRY LOVE ("Love") called ALMAGNO LAW, INC., the law office of Lawrence P. Almagno, Jr., Esq. ("Almagno"). Also present was Jesse Duarte, Esq. The law office is located in Cranston, Rhode Island. The law firm's telephone number is (401) 946-4529. Almagno returned the call to Love, who proceeded to threaten Almagno.

A recording is attached.

During the conversation, Love made specific threats using the telephone and knowingly did so across state lines.

Love admits he is in the State of New York while making the call.

The sole purpose of the call was a communication threatening to injure the property and reputation of Almagno and accuse Almagno of a crime.

Love states the FBI and DOJ have already been contacted and insinuates that he can cause these governmental agencies to act on his behalf.

Love threatens Almagno's law license and livelihood because he practiced his profession, by filing a collections action.

There was no attempt to settle or resolve the case. Love's entire purpose was to extort, threaten, and intimidate.

Love has a history of threats and intimidation.

Love's paramour (who he falsely claims is his wife), Kamillah Hanks, is an NYC Councilwoman. Love is her *de facto* agent and "enforcer."

Love has already engaged conduct that smacks of extortion on numerous occasions. One witness is Michael J. Cox, 718-880-0426. Cox worked on Hank's 2017 campaign and was owed $14,000. Cox suffered a heart attack. Days later, Love "took Cox for a ride" in Brooklyn and tried to force him to take $1,250 to "settle" the debt. Cox couldn't leave the car because of his health conditions. Because of Love's extortionate threats, Cox is fearful and has never been paid for his work.

Love's statements to Almagno, witnessed by Duarte, are clearly threatening and an attempt at extortion across state lines.

Focus in determining whether threat has been made is on whether defendant reasonably should have foreseen that statement he uttered would be taken as threat by those to whom it was made. United States v. Fulmer, 108 F.3d 1486, 46 Fed. R. Evid. Serv. (CBC) 411, 1997 U.S. App. LEXIS 5869 (1st Cir. 1997).

Defendant made at least two threats to operator of hotline dedicated to finding missing children, where during eight telephone calls over two-day period he told operator continuing saga of how he had abducted and sexually forced himself on his fourteen-year-old stepdaughter, though he was only playing elaborate prank. United States v. Freeman, 176 F.3d 575, 1999 U.S. App. LEXIS 9316 (1st Cir. 1999).

First Circuit saw no reason to depart from its prior law that objective test of defendant's intent was used from defendant's vantage point under this statute. United States v. Clemens, 738 F.3d 1, 2013 U.S. App. LEXIS 24488 (1st Cir. 2013).

Objective of party employing fear of economic loss or damage to reputation will have bearing on lawfulness of its use, and it is material whether defendant had claim of right to money demanded; where threat of harm to person's reputation seeks money or property to which threatener does not have, and cannot reasonably believe she has, claim of right, or where threat has no nexus to plausible claim of right, threat is inherently wrongful and its transmission in interstate commerce is prohibited by 18 USCS § 875(d). United States v. Jackson, 180 F.3d 55, 52 Fed. R. Evid. Serv. (CBC) 639, 1999 U.S. App. LEXIS 11906 (2d Cir.).

It is not whether means of communication chosen by defendant caused threat to reach "indefinite and unknown audience," but whether defendant intended to communicate threat to victim through chosen means. United States v. Kelner, 534 F.2d 1020, 1976 U.S. App. LEXIS 11878 (2d Cir.).

Although jury was erroneously instructed that communicating threat only required that reasonable person would regard communication as threat, error was harmless since evidence clearly showed that defendant had subjective intent to issue threat or knowledge that communication would be viewed as threat. United States v. Choudhry, 649 Fed. Appx. 60, 2016 U.S. App. LEXIS 9215 (2d Cir. 2016).

Providence Rhode Island FBI Office
10 Dorrance Street, 900
Providence, Rhode Island, 02903

New York City FBI Office
26 Federal Plaza, 23rd Floor
New York, NY 10278-0004

# EXHIBIT F

Richard L <luthmannrichard@gmail.com>

---

# Phone Numbers and Collections Cases

**Katrina Harmaty** <Katrina_Harmaty@flmp.uscourts.gov>                    Thu, Jun 15, 2023 at 2:28 PM
To: Richard L <luthmannrichard@gmail.com>

Thank you for the information provided below.

Regarding the upcoming hearing, please refrain from contacting the government directly. I still need to notify the Court and seek its approval.

---

**From:** Richard L <luthmannrichard@gmail.com>
**Sent:** Thursday, June 15, 2023 1:20 PM
**To:** Katrina Harmaty <Katrina_Harmaty@flmp.uscourts.gov>
**Cc:** clairechesnoff@gmail.com; Stephanie A. Jones Esq, LL.M, MPH <sthea1914@gmail.com>; Simon.Eth@usdoj.gov
**Subject:** Phone Numbers and Collections Cases

**CAUTION - EXTERNAL:**

[Quoted text hidden]

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

Richard L <luthmannrichard@gmail.com>

___

## Phone Numbers and Collections Cases

___

**Richard L** <luthmannrichard@gmail.com>                                    Thu, Jun 15, 2023 at 1:20 PM
To: Katrina Harmaty <Katrina_Harmaty@flmp.uscourts.gov>
Cc: "clairechesnoff@gmail.com" <clairechesnoff@gmail.com>, "Stephanie A. Jones Esq, LL.M, MPH"
<sthea1914@gmail.com>, "Simon.Eth@usdoj.gov" <Simon.Eth@usdoj.gov>
Bcc: mjcnyc159@aol.com, richard.luthmann@protonmail.com

Officer Harmaty,

As a follow up to our earlier meeting, here are the discussed phone numbers:

John Tabacco 19173456252

Michael Cox 17188800426

As the collections are time is of the essence and we agree that a hearing before Judge Poster Chappell is the way to
resolve this issue, I would suggest that we request a preliminary conference. There are legal and logistical issues the
court will need to address.

Is Mr. Eth representing the government here?

Regards,

Richard Luthmann

# "Child Molester" and "Psychopath"

Luthmann Submits Damning Evidence to CT Family Court About Christopher
Ambrose



**RICHARD LUTHMANN**
JUL 30, 2023

♥ 1    💬    🔄                                                    Share    •••

Richard Luthmann is a writer, investigative journalist, and member of the National
Writers Union. Recently, he penned a letter to the Connecticut Family Court in
Bridgeport, Connecticut, enclosing documents about disgraced Hollywood Writer
Christopher Ambrose and allegations of pedophilia obtained in a newsgathering
capacity.

# Child Molester and Psychopath?

Making an *amicus* (friend of the court) submission, Luthmann supplied daming
evidence for the Fairfield County Superior Court to consider.



The words "child molester" and "psychopath" are used in connection
with Christopher Ambrose, according to filed court documents.

"I believe Christopher Ambrose is a pedophile and not only allows but glorifies underage drinking, sex, and pedophilia in his home...I would ask the Court to consider the following documents, obtained by me in a newsgathering capacity," Luthmann wrote.

One document supplied is an email dated June 6, 2023, between Attorney Michael G. Curley of Murtha Cullina, LLP, and Nancy Stewart, Kelly Burke, and Michelle Peterson of the Connecticut Department of Children and Families (DCF). In this email, there is a reference to "a new allegation of penetration."



Luthmann asks the Family Court to get to the bottom of what appears not to be the first allegation of penetration related to Christopher Ambrose. "Attorney Curley is an officer of the Court, and DCF is also answerable to the Court," Luthmann writes.

Also included is a Report dated May 29, 2023, by New York City Private Investigator Manuel Gomez and addressed to Prosecutor Charles Kruly in the Western District of New York US Attorney Trini Ross's Office and Special Agent Brian Burns of the FBI Office-Buffalo. PI Gomez describes the video evidence he transmitted to the authorities detailing child molestation by Christopher Ambrose.



Richard Luthmann

Luthmann's letter also includes a report dated May 3, 2023, from Dr. Bandy Lee, MD, MDiv, warning of Christopher Ambrose's dangerousness where his children are involved.  Dr. Lee's medical opinion on Christopher Ambrose is "strongly suggestive that a diagnosis of psychopathy is present and justified—or, at the very least, that disturbing levels of psychopathic features are present."

# Mia Ambrose's Statement of Christopher Ambrose's Abuse

The *Amicus* submission also contains a signed statement from Mia Ambrose (16) detailing her adoptive father, Christopher Ambrose's cruel, racist, and abusive words and actions.

"My father, who is white, called me a beaner because of my Guatemalan heritage...He called me fat. He questioned my gender. He called me a bitch. He would say I'm dumb and a horrible sister to my brothers. One day, he told me to kill myself," Mia Ambrose's affidavit reads.



Mia Ambrose

Mia Ambrose recounts inappropriate sexual contact.

"[I]t got to the point where he would grab my butt or my breasts. When I objected, he said, 'Stop being a baby. It's just a prank.' I would walk to the bathroom. The next thing I knew, I was getting grabbed from behind. My father would grab my butt with his hand and squeeze it. I told my father I was uncomfortable with him touching me. He would say, 'it's just a joke. You're being a baby'," the statement says.

Mia Ambrose recounts that Christopher Ambrose would try to watch his daughter shower and change.

"My room was in the basement at my dad's house, which had no lock. My father started to come down when I was changing or taking a shower. It happened almost every day...It got to the point where I would change in a locked bathroom because he would otherwise come in just when I was changing," the statement says.

The statement also claims Christopher Ambrose incessantly allows underage drinking, drug use, and sex in his Madison, Connecticut, home. Ambrose is fully aware of the activities and does not stop them. He glorifies them.

"[Christopher Ambrose] knew there was alcohol. One day, he said he heard older male voices in the basement. Then he said, 'I found a condom under your bed. I just want to make sure you and your friends are being safe. I'm glad you guys are using protection.' He permitted this behavior, knowing the boys were over 18, some men were in their twenties, and the girls were as young as 14," the complaint says.

Luthmann included a previously-published article with pictures of the underage alcohol, drugs, and sex parties, corroborated by Mia Ambrose's statement.

Luthmann says the evidence shows Christopher Ambrose has allowed and encouraged his home to become a den of iniquity. Men aged 23 regularly have sex with children aged 14 and 15 after plying them with alcohol and drugs.



Social Media pictures show men in their 20s sleeping in beds at the Ambrose house, where they are allegedly having sex with girls as young as 14 years old.

# Will Chris Ambrose Get Busted?

Allowing an underage drinking party in your Connecticut home can get you busted under CS section 30-89a - Permitting a Minor to Illegally Possess Alcohol, a class A misdemeanor.

Section 53-21 makes it a felony for an adult to place a child in a situation where their health or morals are likely to be impaired.

These laws are often enforced. Connecticut parents were recently arrested for serving alcohol to minors at a house party where a 17-year-old was stabbed to death.

The allegations that Christopher Ambrose knowingly allowed underage drinking, sex, and drug use are more than serious. Mia Ambrose claims that her father supplies the alcohol and that girls as young as fourteen are having sex with men as old as twenty-three.

In Connecticut, consensual sexual intercourse over a 3-year age difference (where the minor is 13 to 15 years old) would subject the older party to a charge of Sexual Assault, 2nd Degree, in violation of *C.G.S. § 53a-71(a)(1)*. A guilty verdict would result in conviction of a Class B felony sex offense, with a mandatory minimum of 9 months and maximum 20 years imprisonment.

Ambrose may have some concerted action liability if knew statutory rape was happening in his home. But the greatest risk is to Ambrose's band of 20-something statutory rapists, none of whom, to the reporter's knowledge as of press time, have been questioned by Connecticut law enforcement to date.

# How is Luthmann Involved with Ambrose?

Christopher Ambrose, a well-known sleazoid, seems to blame everyone but himself for his troubles, including journalist Frank Parlato. The Hollywood plagiarist unsuccessfully petitioned the Connecticut Family Court to put a gag order on Parlato.

Ambrose's latest tact in his assault on reporters who tell the truth is shameful. When you don't like their opinions, you don't disagree, request a retraction, or even sue for libel. If you're Christopher Ambrose, you call the cops and try to get them arrested.

On March 17, 2023, Luthmann wrote an article entitled Christopher Ambrose Fails at Everything But One Special Talent.

The article detailed, by citing numerous examples in court filings and other evidence, Ambrose's tendency towards trickery.

Luthmann argues Ambrose makes various claims and continues assorted actions in different aspects of his life that are all tied together by a common thread: duplicity. These include his role as a father, his controversial career as a Hollywood screenwriter, and his legal disputes, including his federal court lawsuit against Frank Parlato.

In his article, Luthmann suggests Ambrose's claims are questionable.

Ambrose didn't like Luthmann's reporting, commentary, or opinions. But unhappy as Ambrose was, Luthmann written statements and opinions are shielded by the First Amendment. The US Supreme Court was clear in the 1990 case of Milkovich v. Lorain Journal Co. A statement of opinion relating to which is not provably false will receive complete constitutional protection where a media defendant is involved.

How did Ambrose, a lawyer, respond to the published article? Did Ambrose alert Luthmann or the Frank Report with an email or letter to false or objectionable

statements? Did he communicate with Luthmann, Parlato, or anyone else requesting a retraction? Not at all.



Madison, CT Police Chief Jack Drumm's department investigates reporters at Christopher Ambrose's behest?

Ambrose called the Madison, Connecticut, Police Department claiming Luthmann's published opinions were "libel" and "harassing." He lodged an official complaint calling for the Madison police to investigate the reporter and his article.

## Ambrose Tries To Get Luthmann Arrested For Practicing Investigative Journalism

Luthmann lives in Naples, Florida. In May, he was contacted by the Collier County Sheriff based on an "official complaint" against him in Connecticut.

The Madison police called the Florida authorities to chase down a reporter writing unflattering (but accurate) things about Ambrose.

The Collier County Sheriff's Office told Luthmann he was being investigated for libel under Florida law, a misdemeanor crime. Section 836.01 of the Florida Statutes says, "Any person convicted of the publication of a libel shall be guilty of a misdemeanor of the first degree."

Luthmann met with a deputy Collier County Sheriff.

"Her jaw literally dropped once I showed her what was going on," Luthmann said when called for comment. "Not only is this whole thing a waste of police time and resources, but it has a chilling effect on the press. I'm not even sure the Florida criminal libel statute would withstand First Amendment scrutiny with this Supreme Court," said Luthmann, a recovering attorney.

Luthmann filed his own criminal complaint against Ambrose.



Luthmann's complaint alleges, "CHRISTOPHER AMBROSE did violate F.S. § 837.05 by knowingly and maliciously making a false statement that was caused to be sent to Florida Law Enforcement."

## Were Ambrose's Actions Motivated By Actual Malice?

Because Ambrose is a lawyer, Luthmann alleges he knew or should have known better than to create a "waste of scarce FLORIDA LAW ENFORCEMENT RESOURCES."

He says Ambrose's actions are a "strategic complaint against PUBLIC PARTICIPATION."

Luthmann made allegations of child endangerment and underage sex at Ambrose's Madison, Connecticut, home:

> LUTHMANN believes AMBROSE has engaged in CHILD ENDANGERMENT in his home in Madison, CT, based upon the information available in the public record and other materials received from protected journalist sources.
>
> LUTHMANN believes AMBROSE's complaint against him is little more than retribution and an "ALIBI" against the rampant underage drinking, drug use, and sex that occurs in AMBROSE's home on Horsepond Road in Madison, CT, on a regular basis.
>
> LUTHMANN has seen evidence and spoken to witnesses that AMBROSE is aware that MEN as old as 23 years old are supplying drugs and alcohol to children as young as 14 and 15 and having sex with them.

"I want to see justice run its course. Child predators sicken me, and my opinion is that if it is proved that Christopher Ambrose is a pedophile after a speedy and fair trial, the justice system should put him down, hopefully permanently," Luthmann said.

Luthmann said Connecticut law enforcement already possesses the shocking evidence he has seen.

Luthmann's biggest concern wasn't Ambrose's use of law enforcement to attack free speech and the press. It was Ambrose's ability to manipulate the system and continue to abuse children.

"Maybe there's something to this Hollywood Pedophile Ring. Maybe there is one in Connecticut too."

Richard Luthmann is a writer, commentator, satirist, and investigative journalist with degrees from Columbia University and the University of Miami. Once a fixture in New York City and State politics, Luthmann is a recovering attorney who lives in Southwest Florida and a proud member of the National Writers Union.

"I am a journalist who writes about justice, the courts, government officials, prisons, and reform. You find some questionable players in all these places and often outright crooks. Exposing these bottom feeders from the outside is sometimes the only way to make them pay the price for their injustice and misdeeds."

"I use satire and opinion to make my point. I have already been told to 'stop writing about the Government' by the U.S. Government, so I must be doing something right."

"If you're a victim of the system, maybe the press is the right forum for you. If you have experienced injustice and are tired of dropping tens of thousands of dollars without results, maybe it's time to try the digital pen."

Contact Richard Luthmann at 239-631-5957 or richard.luthmann@protonmail.com.



*"Nihil est incertius vulgo, nihil obscurius voluntate hominum, nihil fallacius ratione tota comitiorum."* (Nothing is more unpredictable than the mob, more obscure than public

*opinion, and more deceptive than the whole political system.)*

*~ Marcus Tullius Cicero*

---

The news media is a critical check on the powerful, serving as a watchdog to hold elected officials and other public figures accountable for their actions. The media was first called the fourth estate in 1821 by Edmund Burke, who wanted to point out the power of the press. The press plays a crucial role in providing citizens with access to information about what is happening in government and by shining a light on corruption, abuse of power, and other forms of wrongdoing.

---

 1 Like

## Comments



Write a comment...

---

© 2023 Scrivener, LLC  · Privacy · Terms · Collection notice

Substack is the home for great writing

# NYC Councilwoman's Association with Kevin Barry Love Under Scrutiny

Love, "Husband" of NYC Councilmember Kamillah Hanks, Made Threatening Calls, May Lead to Federal Investigation

APR 20, 2023



Kevin Barry Love just can't behave.



Kevin Barry Love (center) flanked by Special Assistant to NYC Mayor Eric Adams, Diane Savino (right), and Richmond County Surrogate Matthew J. Titone (rear left).

Love, a millionaire real estate investor, is the "husband" of NYC Councilmember Kamillah Hanks.

Hanks, her political campaign, and Love are all being sued by former attorney Richard Luthmann for over $86,000 in unpaid legal fees from 2017.

In a stroke of "genius," Kevin Barry Love decided to take the matter into his own hands.

Recently, Love telephoned Luthmann's lawyers and had a conversation - over a cell phone and across state lines - smacking of extortion of the FEDERAL variety.

In what can only be described as "shades of Michael Avennati," Kevin Barry Love called Luthmann's lawyers. He threatened them with criminal charges and attorney grievances, using the largesse of his wife's elected office.





Is NYC Councilmember Kamillah Hanks' "husband," Kevin Barry Love,
under federal investigation for interstate menacing?

While Love may think he's the smartest person in any room, his actions show he
assuredly is not. His conduct may very well amount to federal criminal extortion
charges.

Kevin Barry Love was miffed that Luthmann made him look like a total idiot in
front of the entire NYC Council, the Mayor's Office, and the "Elections
Department" by showing the world that the Councilmember and her "husband"
were deadbeats.

Trying to outsmart Luthmann's lawyer, Love admitted that Luthmann did work for
Councilmember Hanks, her political campaign, and him and that they were, in fact,
deadbeats.



1×   0:00                                              -0:34   ▶

The "Elections Department," properly known as the NYC Campaign Finance Board, is tasked under the NYC Charter with policing shady political deals and is a named defendant in Luthmann's lawsuit.

Love admitted that Hanks' campaign paid a $1,650 partial retainer for over 100 hours worth of work. Millionaire Kevin Barry Love thinks lawyers should work for $1.65 an hour.

And Love has a pattern of labor-related abuses from his time as the chairman of the Downtown Staten Island Council, where at least one six-figure settlement was paid to a former employee.



NYC Councilmember Kamillah Hanks (center) with lobbyist Jon Del Giorno (left) and NYC Mayor Eric Adams (right). Hanks sits on the

NYC Council Land Use Committee, while her husband, Kevin Barry
Love, is a millionaire real estate investor.

Allegations of non-payment continue to mount against the Hanks campaign. Love pressed one worker to take $1,250 for over 100 hours of work, or $1.25 an hour.

A complaint was filed with the NYC Campaign Finance Board. Sources say the investigation is stalled due to pressure from City Hall. It is unclear whether it is from the Mayor's Office or the Speaker's Office.

Councilmember Hanks is the Chair of the Committee on Public Safety and serves as a member of the Committees on Civil Service and Labor, Education, Environmental Protection, Finance, Land Use, and the Subcommittee on Zoning and Franchises.

Love is apoplectic that Luthmann would have the audacity to call attention to apparent campaign finance violations, fraud, and other serious transgressions in his "wife," Council Member Kamillah Hank's campaign filings.



Kevin Barry Love is notorious in the truest sense of the word. The man appears to be a total buffoon, a cartoon character. Any credibility of his wife, the Staten Island Councilwoman, quickly dissipates when he enters the room.



NYC Mayor Eric Adams (seated) and Councilmember Kamillah Hanks (right).

Sources close to the NYC Mayor's Office have said that plans for Eric Adams to campaign with Kamillah Hanks this year have been put "on hold" based on recent controversies, including the Luthmann lawsuit.

In a profanity-laced tirade, Kevin Barry Love told Luthmann's lawyers to serve him and that they "better come big."

 1× 0:00 -0:18 

This is the second time Luthmann has made Kevin Barry Love look like a fool. The first time was when Love told the NY Post Luthmann had no proof. Within hours,

Luthmann published the evidence, including court documents and emails.

As comical as Love's actions may seem, they are very serious. This man is using the power of his wife's office to threaten people.

While attorneys can defend themselves, what is Kevin Barry Love doing to regular people?

Allegations have already been made that Love and Hanks were complicit in criminal activity related to Hanks' failed 2017 City Council Campaign against Debi Rose.

No one should be able to use a public office as part of a pattern of extortion or personal enrichment.



Is millionaire Kevin Barry Love using his wife, NYC Councilmember Kamillah Hanks' political office to extort the weak and enrich himself?

An Official Complaint was filed based on Kevin Barry Love's threats, which smack of federal crimes.

Apparently, Kevin Barry Love is right about one thing. The FBI and the DOJ are involved because the complete audio was sent to both of them.

Read the Official Complaint below:

## OFFICIAL COMPLAINT

18 U.S.C. § 875. Interstate communications

(d) Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

On April 4, 2023, KEVIN BARRY LOVE ("Love") called ALMAGNO LAW, INC., the law office of Lawrence P. Almagno, Jr., Esq. ("Almagno"). Also present was Jesse Duarte, Esq. The law office is located in Cranston, Rhode Island. The law firm's telephone number is (401) 946-4529. Almagno returned the call to Love, who proceeded to threaten Almagno.

A recording is attached.

During the conversation, Love made specific threats using the telephone and knowingly did so across state lines.

Love admits he is in the State of New York while making the call.

The sole purpose of the call was a communication threatening to injure the property and reputation of Almagno and accuse Almagno of a crime.

Love states the FBI and DOJ have already been contacted and insinuates that he can cause these governmental agencies to act on his behalf.

Love threatens Almagno's law license and livelihood because he practiced his profession, by filing a collections action.

There was no attempt to settle or resolve the case. Love's entire purpose was to extort, threaten, and intimidate.

Love has a history of threats and intimidation.

Love's paramour (who he falsely claims is his wife), Kamillah Hanks, is an NYC Councilwoman.

Love is her *de facto* agent and "enforcer."

Love has already engaged conduct that smacks of extortion on numerous occasions. One witness [NAME WITHHELD] worked on Hank's 2017 campaign and was owed $14,000. [NAME WITHHELD] suffered a heart attack. Days later, Love "took [NAME WITHHELD] for a ride" in Brooklyn and tried to force him to take $1,250 to "settle" the debt. [NAME WITHHELD] couldn't leave the car because of his health conditions.

Because of Love's extortionate threats, [NAME WITHHELD] is fearful and has never been paid for his work.

Love's statements to Almagno, witnessed by Duarte, are clearly threatening and an attempt at extortion across state lines.

Focus in determining whether threat has been made is on whether defendant reasonably should have foreseen that statement he uttered would be taken as threat by those to whom it was made. *United States v. Fulmer*, 108 F.3d 1486, 46 Fed. R. Evid. Serv. (CBC) 411, 1997 U.S. App. LEXIS 5869 (1st Cir. 1997).

Defendant made at least two threats to operator of hotline dedicated to finding missing children, where during eight telephone calls over two-day period he told operator continuing saga of how he had abducted and sexually forced himself on his fourteen-year-old stepdaughter, though he was only playing

elaborate prank. *United States v. Freeman*, 176 F.3d 575, 1999 U.S. App. LEXIS 9316 (1st Cir. 1999).

First Circuit saw no reason to depart from its prior law that objective test of defendant's intent was used from defendant's vantage point under this statute. *United States v. Clemens*, 738 F.3d 1, 2013 U.S. App. LEXIS 24488 (1st Cir. 2013).

Objective of party employing fear of economic loss or damage to reputation will have bearing on lawfulness of its use, and it is material whether defendant had claim of right to money demanded; where threat of harm to person's reputation seeks money or property to which threatener does not have, and cannot reasonably believe she has, claim of right, or where threat has no nexus to plausible claim of right, threat is inherently wrongful and its transmission in interstate commerce is prohibited by 18 USCS § 875(d). *United States v. Jackson*, 180 F.3d 55, 52 Fed. R. Evid. Serv. (CBC) 639, 1999 U.S. App. LEXIS 11906 (2d Cir.).

It is not whether means of communication chosen by defendant caused threat to reach "indefinite and unknown audience," but whether defendant intended to communicate threat to victim through chosen means. *United States v. Kelner*, 534 F.2d 1020, 1976 U.S. App. LEXIS 11878 (2d Cir.).

Although jury was erroneously instructed that communicating threat only required that reasonable person would regard communication as threat, error was harmless since evidence clearly showed that defendant had subjective intent to issue threat or knowledge that communication would be viewed as threat. *United States v. Choudhry*, 649 Fed. Appx. 60, 2016 U.S. App. LEXIS 9215 (2d Cir. 2016).

TO:

Providence Rhode Island FBI Office

10 Dorrance Street, 900

Providence, Rhode Island, 02903

New York City FBI Office

26 Federal Plaza, 23rd Floor

New York, NY 10278-0004

Richard Luthmann is a writer, commentator, satirist, and investigative journalist with degrees from Columbia University and the University of Miami. Once a fixture in New York City and State politics, Luthmann is a recovering attorney who lives in Southwest Florida and a proud member of the National Writers Union.



Drop me a line if you are a victim of the "Swamp" of corrupt politicians, lawyers, judges, or courts. I write about criminal justice, courts, prisons, and reform.

*"Nihil est incertius vulgo, nihil obscurius voluntate hominum, nihil fallacius ratione tota comitiorum." (Nothing is more unpredictable than the mob, nothing more obscure than public opinion, nothing more deceptive than the whole political system.)*

*~ Marcus Tullius Cicero*

---

For Article Ideas, Tips, or Help: [richard.luthmann@protonmail.com](mailto:richard.luthmann@protonmail.com) or call 239-287-6352.

The news media is a critical check on the powerful, serving as a watchdog to hold elected officials and other public figures accountable for their actions. The media was first called the fourth estate in 1821 by Edmund Burke, who wanted to point out the power of the press. The press plays a crucial role in providing citizens with access to information about what is happening in government, as well as shining a light on corruption, abuse of power, and other forms of wrongdoing.

---

 2 Likes

## Comments



---

© 2023 Scrivener, LLC  · Privacy · Terms · Collection notice
Substack is the home for great writing

# Judge Castorina Distinguishes 'Not Good Speech,' Kitchen Speech and Perjury

⏱ February 16, 2023





## Judge Castorina's Testimony vs Facebook Mesages

New York State Supreme Court Justice Ronald Castorina Jr is potentially on the hot seat.

His challenge is the stark contrast between his 2018 grand jury testimony as a witness in the People of NYS v Richard Luthmann and the Facebook Messenger message he exchanged with Luthmann two to three years earlier.

## Does It Rise to the Level of Perjury?

His calling his female opponent, Janine Materna, a "rotten cunt" or a "phony bitch" in Facebook Messenger messages to Luthmann is not the issue.



Attorney Janine Materna ran against Ronald Castorina in a 2016 N.Y.S. Assembly primary election.

What is an issue is that in the grand jury, Judge Castorina said Luthmann was the vulgar one, he found it offensive and certainly would not talk like Luthmann – at least not at the kitchen table.

Luthmann asked Judge Marina Cora Mundy to refer Castorina and attorney Eric Nelson, who acted as special prosecutor in the Luthmann case, to NYS Attorney General Letitia James for potential prosecution.

FR's purpose here is to compare Castorina as he speaks in Facebook Messenger conversations, and how he speaks in the grand jury, to make it easy for Judge Mundy, Letitia James and possibly federal prosecutors considering conspiracy charges to evaluate the matter.

The Facebook Messenger conversations are not newly discovered evidence. Nelson subpoenaed them in 2018, and it appears also suppressed them to enjoy what might be the subornation of perjury to get an indictment.

# Smiling Jack

## Castorina on Facebook September 11-12 2015:

In 2015, Luthmann created a fake Facebook page for Democratic District Attorney Candidate Michael McMahon.

Luthmann referred to McMahon as "Smiling Jack" and McMahon's advisor, former Judge Carmen Cognetta, as "Girl Get On Your Back."

The latter reference was sexual harassment allegations that forced Cognetta to resign from the Family Court bench in 1993.



**Castorina:** Lmfao- fucking hysterical ha ha ha. Your the best rich. I just got home and saw this and cracked up. It's spot on. Lol



*Luthmann sent another image from the fake Facebook page:*





**Castorina:** Wow- lmfao girl get on your back— holy shit – I'm fucking pissing my pants lmfao- wow ha ha ha

**Luthmann:** 😃

Fuck him.

Smiling Jack ain't too happy with me.

**Castorina:** what happened

**Luthmann:** I am responsible for all his problems apparently.

**Castorina:** i love the smiling jack reference and "girl get on your back" fuckin amazing



In extraordinary testimony, Judge Castorina in somber tones was shown and asked to describe the Grinch and McMahon photos.

Castorina neglected to state his first reaction was "Lmfao- fucking hysterical."

**CASTORINA [shown the Grinch and McMahon photos]:** He [Luthmann] compared D.A. McMahon to a Dr. Seuss character in a photograph. He put two photographs side by side. It shows D.A. McMahon looked like he was in a frowning — has a frowning face on, and then the Dr. Seuss character has a similar frowning face.

**NELSON:** Now does that fairly and accurately represent what you observed around the time period of September of 2015, which would be several months before the District Attorney's general election?

**CASTORINA:** And at least seven months before my first election, yes. It does accurately represent a — a message — I mean a message, if you will, because it's two photographs that was transmitted to me by Mr. Luthmann.

**NELSON:** And how about the next photograph, sir?

reference and "girl get on your back" fuckin amazing.





**CASTORINA:** The next one had — it says, Smiling Jack and Girl Get On Your Back. Meet Team McMahon. Is this who you want keeping Staten Island safe?

I don't know who he's referring to as well. I guess he's referring to D.A. McMahon as Smiling Jack, I guess. I don't know. I would be speculating to say.

But clearly there are two photographs, one of what appears to be D.A. McMahon and another which looks like former Judge Cognetta.

*[It "looks like" Judge Cognetta? He's not sure? But in 2015, Castorina was sure. He messaged Luthmann, "I love the smiling jack reference and "girl get on your back" fuckin amazing."*

# Fake Janine Page

## Castorina Messenger October 11, 2015:

Eleven months before the election, Castorina learned Janine Materna would run against him in a primary for the New York State Assembly.

Castorina reached out by Facebook Messenger to tell Luthmann and get his help.



**Castorina:** Janine Materna filed a committee **–** shes going to primary me for sure

she was roming around richmond town with that guy ron lauria yesterday too

**Luthmann:** Fuck them. Time for a fake Janine Materna site.

**Castorina:** that bitch has had a URL for assembly congress and senate for 5 years – she's fucking nuts

**Luthmann:** Facebook…

**Castorina:** "Yes."

*[Note that Castorina reportedly deletes the pro-pedophile Facebook after revealing that it would have of...*



**Castorina:** I need to talk to you about that race, and I'm going to need your expertise."



**Luthmann** *[advising him how to win in this heavily Republican district of Staten Island:]* Then turn it into RINO *[Republican In Name Only campaign]* Janine Materna. FLIP FLOP FLIPPITY FLOPPITY FLOOP



**Castorina:** shes a republican, but she took the working fam parties endorsement and worked for hillary [Clinton]



**Luthmann:** Republican today...Dem yesterday. Is there a picture of her with Hillary?



Castorina: yes, so much bullshit- shes a first year law student- its like legally blond im looking for one **[of Materna with Hillary Clinton]**, but theres a few with chucky schumer

## Castorina's Grand Jury Testimony

As their Facebook messages show, Castorina and Luthmann collaborated on a search for a picture of Materna with Hillary Clinton to be used on Facebook. Castorina called her a "bitch" and "legally blond." He knew Luthmann's intent was to smear Materna and he wanted to help him with a fake Facebook page.

Let's see what Judge Castorina said in the grand jury three years later, on August 1, 2018.



**SPECIAL PROSECUTOR NELSON:** At one point, if you recall, did he **[Luthmann]** say that it's time for a Janine Materna page?



**CASTORINA:** Yes. Yes, he did.



**NELSON:** And — and in your opinion, when you received that **[message]**, did you form any opinion in your mind as to what he meant from his words as to a Janine Materna page?



CASTORINA: Well, you know, you never know what to believe when this individual, Mr. Luthmann, says something.

So, frankly, I would assume at that point that he may have been talking about either a fake page or a page where he would — a satirical page where he would clearly be making fun of her to people and not in a way that was subterfuge, you know, either/or, or probably what he was talking about in that type of message.

***

*Castorina did not know what to believe? Then how come he did not testify that he sought Luthmann's expertise?*

# 'Not Good Speech'

## Castorina's Messages on October 11, 2015:

Luthmann shared links with Castorina from the Janine Materna fake Facebook page he created.



**Luthmann:** shared a link entitled "Poop Shoot Princess"



**Castorina:** Ha ha ha



**Luthmann:** We'll get her about 500 likes...

*Luthmann sent a link to this image*

*Castorina approved the link: SeeYouNextTuesdaySI. – which is also spelled C U N[ext] T [Tuesday]*



**Castorina**: I want to crush her – such a phony bitch
She's such a phony self serving bitch. Can't stand her

## Castorina's Statements August 30, 2016:

On August 30, 2016, two weeks before the Primary Election, Luthmann sent a message to Castorina.



**Luthmann:** I think we have to do a new video.
Janine Materna is not a democrat. Janine Materna is a cunt.



**Castorina:** She's a rotten one at that.



**Luthmann:** Janine Materna XXX?



*Castorina Materna XXX Pearl Necklace*

*Luthmann sends lewd photoshopped picture to Castorina*

She will jump in front of a bus.



**Castorina:** Lmfaooo omg. Her and wiener there's her pearl necklace she always wears...


**Luthmann:** "Carlos Danger and me."



**Castorina:** That's just terrible OMG lol

## Castorina's Grand Jury Testimony:



NELSON: And you're also aware of the fact that there's constitutional protections for free speech?



CASTORINA: That's correct.



NELSON: I'm not going to ask you to characterize this, but would it be accurate to say that the line political speech, free political speech and other actions in this case that there certainly could be a



**Castorina:** Well, certainly I — I don't believe that I can characterize the speech as either political or –or anything other than what it is. It's lewd. It's lascivious. It's outrageous at times.

It's not the type of conversation that I'd want to have at my kitchen table clearly.

So it's — it's not good speech. It's not the type of speech that I welcome or that I wish to participate in in any way, and certainly I would characterize it generally as unwelcome.

**\*\*\***

Castorina calls Luthmann's speech unwelcome, and to get away with this, he had to know that Nelson would suppress the equally offensive speech Castorina made in response to Luthmann.

Nelson only showed Luthmann's vulgarity and scrupulously avoided showing the grand jury Castorina's vulgarity.

Castorina and Nelson may be subject to felony indictment and prosecution. Luthmann filed an official complaint with New York State Attorney General Letitia James' Public Integrity Unit.

If ethical violations are found, Castorina and Nelson, both licensed attorneys, may be disbarred.

As a sitting New York State Supreme Court Justice, Castorina also faces sanctions from the New York State Commission on Judicial Conduct. A formal complaint was filed.

FR called Judge Castorina on his cell phone for a comment for this story. A man answered the phone, and when this writer identified himself, the call suddenly "dropped."

A immediate follow up went to voicemail. A message was left.

Calls to Eric Nelson, Perry Reich, Thomas Tormey, and Lucien Chalfen from the New York State Office of Court Administration were not returned.

A phone call to Janine Materna was answered by a man who identified himself as her fiance. He stated she was not inclined to comment on the matter.



Frank Parlato

About the author



**Frank Parlato**

## Please leave a comment: Your opinion is important to us! (Email & username are optional)

Enter your comment here...

### Castorina is a Bad Dude

February 18, 2023 at 8:35 am

Luthmann's no angel, and he went to jail. Castorina was right there with him, and now he's a Judge?

All you have to prove for perjury is a knowing and intentional lie. There are at least 10 counts of Ronald Castorina's perjury from what I have seen so far.

The sad part is about how disloyal Castorina is to Luthmann, who was his friend. Luthmann wrote all about this on his **Substack page**:

**Ronald Castorina – Disloyal**

If you want the back story on my dealings with Ron Castorina, it is out there. **Read Frank Parlato's ongoing exposé.**

I let Ron have it in a letter I wrote him dated October 27, 2022. The proof there is daming.

💬  f  🐦  📌  in

What triggered Ron as my prey (in the legal arena) is reading the transcript from the August 1, 2018, grand jury in the Kangaroo Court Case that was People v. Luthmann. The real story that no one knows is that Ron and I were colleagues and friends. Ron has even admitted this to political people saying, "You know politics as well as I do, I had to distance myself from Rich."

I had no problem with Ron doing that. In fact, the August 25, 2017, Facebook post that "cleared" Ron politically was something I did for my friend.

I closed that post like this:

> From Plato to Machiavelli to Hannah Arendt, the practice of politics has never been tied to truth. It is tied to distributive justice whereby there are great "noble lies" to borrow a Platonic term. And the Supreme Court of the United States agrees:
>
> http://time.com/.../on-your-mark-get-set-lie-supreme.../
>
> And finally, Ron Castorina has no knowledge of the contents of this email. Nor does any other elected official. This is all me – setting the record straight for my friend. If you're with me, I'm with you to the Gates of Hell.
>
> "We few, we happy few, we band of brothers;
>
> For he to-day that sheds his blood with me
>
> Shall be my brother"
>
> -Henry V, Act IV

In one paragraph, I said politics has nothing to do with truth, and quote a Time Magazine article: On Your Mark, Get Set, Lie: Supreme Court Weighs Truth in Politics.

In the next paragraph, I lied. Vintage Luthmann.

"Ron Castorina has no knowledge of the contents of this email." This statement is false, and demonstrably so.

I made the Facebook post from Lake Placid, New York. I was at the NYS Kiwanis Convention. I was sitting on the hockey arena floor where they played the Miracle on Ice. Ron was on the phone with me crying about how they were calling for him to resign the

Republican Party Chairmanship and that he needed "cover." I drafted the Facebook post on my smartphone. Attorney Sean O'Sullivan was sitting next to me helping. O'Sullivan –

In fact, Sean O'Sullivan is the lynchpin to much of what is going to happen. Sean has been around Republican Party politics for a long time. He's seen a lot of people come and go. He's lasted because he generally tells the truth. And in the case my lawyers are filing this week, Sean has already received a spoliation notice. Sean is Ron's "cut-out." Sean and Ron are business partners. And lawyers know, in many situations, the actions and knowledge of one partner can be imputed to the other.

I don't think Sean is going to lie for Ron. Sean isn't going to get his ticket pulled. In fact, I'm pretty sure Sean and Ron have already had a conversation about just how screwed Ron really is. Sean is getting subpoenaed right away – and you watch the legal maneuvering that will go on to try to block and/or delay his testimony. Once Sean goes on the record, Ron will lose his black robe, if he hasn't already.

Back to the Facebook post above. In the grand jury transcript, the Special Schmuck, Eric Nelson, goes through the entire August 25, 2017, Facebook post – co-authored by Luthmann, Castorina, and O'Sullivan on the record. Ron's sworn testimony is a lie. He denies involvement with the post, including its authorship or collaboration.

The problem is that Eric Nelson, an incompetent-by-design special prosecutor, had subpoenaed all of my Facebook and Verizon Phone records. We know this because Nelson billed and bilked NYC taxpayers out of hundreds of thousands of dollars claiming he read them.

If anyone looks at the phone records from August 25, 2017, they see numerous calls between Luthmann and Castorina that day. Castorina initiated the calls. Luthmann was at a convention. He wasn't calling Ron from Lake Placid because he was a "crazy person" that needed to talk to an Assemblyman. Anyone who knew me then knows I felt a greater need to talk to the bartender than an elected official, particularly on the weekend.

Ron wasn't "placating Luthmann" on the call Ron initiated. Ron was in tears they were calling for his resignation as Party Leader. For example, Ron had choice words about Letitia Remauro telling him it must have been a "dark time" for him to have consulted with Luthmann. I told Ron not to worry. I was a warrior. I would take the blows for my friend and my client. I grabbed Sean O'Sullivan, and we got to work.

But don't take Luthmann's word for it. Look at the phone records. They don't lie. The FBI gets warrant applications, arrests, and indictments on less "coordination." Nelson had the phone records. They contradicted Castorina's sworn testimony. Both sets of evidence were offered to the grand jury. One set is necessarily false.

And therein lies why I have to destroy Ronald Castorina legally and politically. Loyalty. Not to me, but to THE TRUTH.

---

indictment. The sitting Assemblyman and Judicial candidate would have defended Luthmann's actions as within the purview of the First Amendment because Luthmann's actions were also Castorina's.

Instead, the lawmaker and his accomplice, the incompetent-by-design Special Prosecutor, proceeded to bastardize the facts and the law.

Staten Island, New York. Where the Judges, the Lawmakers, and the Prosecutors tell you what speech is "not good speech." There are other places where they do that too. Beijing, Tehran, and Pyongyang.

But wait, there's more. What about grand jurors that might have questions about the First Amendment given Castorina's testimony? Eric Nelson, whose job as a prosecutor was to truthfully advise the grand jury, squarely told them he wasn't "going to give a lecture about Free Speech."

**NYS Supreme Court Justice Ronald Castorina, Jr.: Disloyal to the Facts; Disloyal to the Law; Disloyal to his Friends; Disloyal to the End.**

This is your Supreme Court Justice, Staten Island, New York. Don't worry. I intend to take out the trash. Maybe Tish James will get there first.

But because of the Castorina-Nelson-Smiling Jack "Fake Facebook" felony, I am a multiple felon. With a single felony, I could get a mortgage broker, real estate, insurance, or a multitude of other licenses to have a craft and/or a trade to focus on day in and day out. Because of the pile-on felony, the fake felony, the felony based on felonies and perjury, I can't even get a license to pilot a shrimp boat like Forrest Gump.

I have plenty of time and plenty of patience. I am a monster, and I am in control.

REPLY



### Joseph Pulitzer
February 18, 2023 at 8:31 am

---

‹                    💬    f    🐦    📌    in                    ›

muckraking.

REPLY



### WTF
February 17, 2023 at 3:57 pm

Yeah…it does seem like downplaying and distancing, but not lying. Unless I am missing something, it seems to me like there is nothing there regarding this judge.

REPLY



### ModernThomasNast
February 18, 2023 at 8:31 am

Downplaying????

It is flat out lying. Castorina lied about knowing about the fake facebook pages. Luthman told him "Facebook", and he replied "yeah" and "I need your expertise". He flat out lied about participating in the input for the fake facebook pages. He not only went looking for a photo with Hillary, but he sent Luthman the photo with Eric Holder.

Finally, Nelson as the Special Prosecutor had a duty to present "Truthful" evidence to the Grand Jurors. By very purposefully leaving out the Castorina end of the Facebook Messages, he is surborning Castorina's Lying. Nelson had an obligation to confront Castorina about those lies in front of the Garand Jury.

Furthermore, One of the jobs of the Prosecutor presenting to a grand jury is to explain the law and how it applies to the case. When one of the Grand Jurors asked him about the 2nd Amendment, instead of answering the question Neson replied "I'm not going to give a class on the 2nd Amendment." Where the hell did he go to law school "Whatsamatter U."

REPLY

### Anonymous
February 17, 2023 at 2:04 pm

What's the definition of perjury and does this really qualify ? He's just kind of Downplaying but not really lying

💬   f   t   p   in



### ModernThomasNast
February 17, 2023 at 4:36 pm

He's not downplaying. The Prosecutor is intentionally withholding half of the Conversations inorder to allow Castorina to lie!!

Last tike I checked the Prosecutor is duty bound to present true facts to the Grand Jury. Nelson knew Castorina was lying through his teeth, and he did nothing to present the truth or expose those lies.

I can't believe that Judge Mundy hasn't dragged both of them in to her courtroom and and held both I contempt.

REPLY



### Peaches
February 17, 2023 at 10:30 am

I'm sorry, this is ridiculous, imo of course. I'll try to read the next article. I can't get past the boring shmuck shit.

REPLY



### Woodward and Bernstein
February 18, 2023 at 9:08 am

Boring Shmuck Shit is what broke Watergate.

REPLY



### 🇺🇸 👑 Patriot God 👑 🇺🇸

February 16, 2023 at 11:24 pm

Dear stupid Ginzo!

Richard L <luthmannrichard@gmail.com>

---

## Update
5 messages

---

**Richard L** <luthmannrichard@gmail.com>                    Wed, Dec 14, 2022 at 11:22 AM
To: "megan_amadori@flmp.uscourts.gov" <Megan_Amadori@flmp.uscourts.gov>
Cc: Lawrence Almagno <la@almagno-law.com>, "mlepizzera@leplap.com" <mlepizzera@leplap.com>
Bcc: richard.luthmann@gmail.com, richard.luthmann@protonmail.com

Officer Amadori,

By way of update, I have attached the new scheduling notice for my disability hearing, which is now scheduled for February 14, 2023.

Additionally, Mr. Almagno (copied along with Attorney Lepizzera) contacted me earlier and said that you had concerns about my potential employment with him. I am including my Judgment ordered by Judge Weinstein in the EDNY. Please note on page 5 where it states in typewritten language: "The defendant is permitted to assist attorneys with legal work but not as an attorney."

It is my reading of the four corners of the Judgment that this language supercedes all other language because it was clearly the final amendment placed on the document. This would mean that Judge Weinstein never intended for US Probation's general powers to encroach upon important and specific policies concerning law firms, such as the attorney client privilege or the work product privilege.

In Judge Weinstein's wisdom, the inclusion of the language appears to allow me to work for lawyers AND allows lawyers to employ me without compromising core safeguards of the legal profession. There was a discussion on the record in the colloquy that addressed this point, that I have the ability to work in the law in some capacity so that my legal mind would not go to waste.

Unfortunately, we can't ask Judge Weinstein now, because he's dead. But if necessary, we can ask
United States District Judge Sheri Polster Chappell, who accepted jurisdiction of my supervision from Judge Dearie in the EDNY. Pursuant to

the transfer order, the MDFL has the authority to interpret the provisions of, modify, and terminate my Supervise Release sua sponte.

I still think there is a legal issue that is not addressed, whether Second Circuit or Eleventh Circuit law applies. It is my position that the law of the Second Circuit applies to the entire Judgment, and thus to determinations regarding supervision, based on conflicts of law principles.

What is the USPO's position in this issue and the others raised here? I do not want to put you in a bad spot. It may very well be best if I seek the District Court's direction on this irregular and complex issue.

Additionally, I can ask the court to address additional concerns about my activities as an aspiring journalist and the interplay between the terms of Supervision and the First Amendment's free press clause. This is squarely important to my ability to newsgather and assert the journalist's source privilege.

Finally, if trying to take actual employment is problematic, I do remind you that I am disabled under Florida law and I am seeking adjudication and benefits under Federal law. Under the Thirteenth Amendment, so long as I am under supervision, the choice is not mine. I understand that. Federal law explicitly provides that I cannot be compelled to work if I am disabled, even as part of supervision. But I want to work, if possible, at an appropriate job.

Though I would like to embrace ableism and get my life on track, if it is preferable for the USPO that I do nothing other than apply for and then collect federal disability benefits until my term of supervision expires on August 5, 2024, I understand that is your prerogative. There was no real work in prison during COVID-19, and given my limitations, I haven't been able to work for the past five years.

Please know that I do want to try to take appropriate part time work given my needs and limitations and work past my disabilities, physical, mental, emotional, and legal. I want the opportunity to contribute to society with

legitimate labor, grow as an individual, and meet all of my obligations, including restitution.

Please let me know if this is something that the USPO is considering because I believe due process and the ADA give me a right to ableism, a right to try and not just wait.

Please let me know if you have any further questions or concerns.

Regards,

Richard Luthmann
239-631-5957

---

**2 attachments**

📄 **Disability_Hearing_Scheduling_Letter.pdf**
3053K

📄 **Ex._A_-_Federal_Court_Judgment_Redacted.pdf**
371K

---

**Megan Amadori** <Megan_Amadori@flmp.uscourts.gov>          Wed, Dec 14, 2022 at 11:43 AM
To: Richard L <luthmannrichard@gmail.com>

Good Afternoon,

I can see from your previous email that it might be easier to have a face to face conversation regarding some of your concerns. I will be in the office on 12/21 as well as 12/22 from 9am – 2pm both days. Since I was not the one who originally instructed you, I think it might be helpful to review your conditions together, speak about my responsibilities as the probation officer, and to better understand what expectations are in place while on supervision.

Please let me know what date and time works best for you so that I can make sure that I am available to meet with you.

Thank you,



**Megan Amadori**

United States Probation Officer

2110
First
Street,
Suite 4-
182

Fort
Myers,
Florida
33901

**Phone**
(239)
461-2104

**Mobile**
(941)
899-
4038

---

**From:** Richard L <luthmannrichard@gmail.com>
**Sent:** Wednesday, December 14, 2022 11:23 AM
**To:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Cc:** Lawrence Almagno <la@almagno-law.com>; mlepizzera@leplap.com
**Subject:** Update

**CAUTION - EXTERNAL:**

[Quoted text hidden]

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

---

**Richard L** <luthmannrichard@gmail.com>                                    Wed, Dec 14, 2022 at 12:07 PM
To: Megan Amadori <Megan_Amadori@flmp.uscourts.gov>

Officer Amadori,

I am available any time on the 21st. Let me know what time is good for you.

Regards,

Richard Luthmann

Regards,

Richard Luthmann

---

**From:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Sent:** Wednesday, December 14, 2022 11:43:45 AM
**To:** Richard L <luthmannrichard@gmail.com>
**Subject:** RE: Update

[Quoted text hidden]

---

**Megan Amadori** <Megan_Amadori@flmp.uscourts.gov>                    Wed, Dec 14, 2022 at 12:34 PM
To: Richard L <luthmannrichard@gmail.com>

Does 10am work for you?

[Quoted text hidden]

---

**Richard L** <luthmannrichard@gmail.com>                                Wed, Dec 14, 2022 at 1:13 PM
To: Megan Amadori <Megan_Amadori@flmp.uscourts.gov>

Yes. I will see you then.

Regards,

Richard Luthmann

---

**From:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Sent:** Wednesday, December 14, 2022 12:34:45 PM
[Quoted text hidden]

[Quoted text hidden]

# Re: Request to travel to Chicago, IL March 17-23

| | |
|---|---|
| From | luthmannrichard@gmail.com <luthmannrichard@gmail.com> |
| To | Megan Amadori<Megan_Amadori@flmp.uscourts.gov> |
| CC | 'Arthur Aidala'<arthur@aidalalaw.com>, Lawrence Almagno<la@almagno-law.com>, Stephanie A. Jones Esq, LL.M, MPH <sthea1914@gmail.com>, Frank Parlato<frankparlato@gmail.com>, nwu@nwu.org |
| Date | Wednesday, March 8th, 2023 at 10:37 AM |

Officer Amadori,

I am looking for a second chance in life. All I am facing is legal obstacles to get work.

I am an unpaid intern learning journalism. I joined the National Writers Union. I am trying.

I have good and legitimate journalism work offered by 40 plus year investigative journalist Frank Parlato, and the only legal impediment is the US Probation Office. These impediments violate the press clause of the First Amendment to the US Constitution and applicable law. I have a right to work and work as a journalist.

Can you please reconsider the decision given this information and tell me what other information you need?

The apartment belongs to Joni Moscrop.

I really want and need this job. Why can't I work?

I provided details to the Court. What additional details do you need so US Probation's decision can be reviewed by the Court, and a pretextual denial can be overruled if there is adequacy?

I am having business meetings with Indian journalists and I am meeting with a well-respected Swami on an article about comparative monastacism as stated below.

This trip has business purpose. It is not a leisure trip. This trip would be deductible under the US tax code. And this trip passes business muster under US Probation rules.

Is the problem that I want to see shows or museums while in Chicago? Museums don't charge the indigent and the show tickets are paid for. There are plenty of not for profits that also provide theater tickets for indigent people to see theater. Exposure to culture is a valid penological pursuit.

The instant you can approve my travel to Chicago and to the SDFL, I can get on payroll and sign a payment agreement. I can't do that unless I know I can get on payroll and what I will get paid.

Is the US Probation Office's position that I cannot travel for business?

Can I get a copy of the US Probation Office's written policy?

Is the US Probation Office's position contrary to 18 USC sec. 3553(a)(7)? If I can travel, I have work and I will get paid from the travel, what is the US Probation Office's problem with me earning money to make restitution payments?

Is the US Probation Office's position that I can only sit around, apply for, and collect federal disability where I have potential work that I am physically, mentally, and emotionally capable of doing, but US Probation says I am not legally able?

Will I have to be a legally disabled lie about until August 4, 2024?

Am I being retaliated against because I filed for clarification with the Court and petitioned for relief within my rights?

I need to know all these things so I have the story straight for the press (copied), of which I am a member of the National Writers Union unallowed to practice journalism.

I need to hear from you by tomorrow morning, as I will be filing an emergency application with the District Court tomorrow afternoon if I do not. I would like an opportunity to be heard and the merits of my application properly evaluated.

Again, I have nothing personal against you. I know you have superiors and a book you have to go by.

Regards,


Richard Luthmann

**From:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Sent:** Wednesday, March 8, 2023, 9:43 AM
**To:** Richard L <luthmannrichard@gmail.com>
**Subject:** RE: Request to travel to Chicago, IL March 17-23

Good Morning,

As previously told to you by probation regarding your request to travel to Chicago, leisure trips will not be permitted if restitution is owed and no payments have been made. In addition to this, you have not provided me with a detailed itinerary of where and who you will be visiting during your trip. In your letter to the court you do not disclosure this either.

Due to this, your request will not be approved.

Thank you,

**Megan Amadori**

United States Probation Officer

2110 First Street, Suite 4-182

Fort Myers, Florida 33901

**Phone** (239) 461-2104

**Mobile** (941) 899-4038

---

**From:** Richard L <luthmannrichard@gmail.com>
**Sent:** Tuesday, March 7, 2023 11:32 AM
**To:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Cc:** Frank Parlato <frankparlato@gmail.com>; Arthur Aidala <arthur@aidalalaw.com>; Lawrence Almagno <la@almagno-law.com>
**Subject:** Request to travel to Chicago, IL March 17-23

<mark>CAUTION - EXTERNAL:</mark>

Officer Amadori,

I renew my request to travel to Chicago IL March 17 to 23. Today is ten days out.

My business itinerary and schedule is attached.

I have my interview with Swami Ishatmananda tentatively scheduled for 12:30pm on Monday, March 20, pending approval.

Many people have spent money for tickets and other incidentals on the hope I will be permitted to travel.

Please let me know if I can receive approval, and either way please send me a written copy of the MDFL Probation Office's Official Rules and Policy regarding travel for my reference.

Thank you in advance for your time.

Regards,

Richard Luthmann

**From:** Richard L <luthmannrichard@gmail.com>
**Sent:** Thursday, March 2, 2023, 5:57 PM
**To:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Cc:** Frank Parlato <frankparlato@gmail.com>; Arthur Aidala <arthur@aidalalaw.com>; Lawrence Almagno <la@almagno-law.com>
**Subject:** Re: Follow up from field visit

All parties are copied hereto.

---

**From:** Richard L <luthmannrichard@gmail.com>
**Sent:** Thursday, March 2, 2023, 5:55 PM
**To:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Subject:** Re: Follow up from field visit

Officer Amadori,

Please see the attached that was filed with the Court today.

To clarify, the travel to Mr. Parlato is WORK TRAVEL. I am his unpaid intern right now.

Mr. Parlato wants to HIRE me. If he hires me I can begin to pay restitution immediately. I need to be able to travel to be hired. US Probation states that I cannot travel because I can't pay.

Do you understand my perception of the circular nature of the argument? If I have a job offer where I need to be able to travel to make money, and I am not allowed to travel because I can't make money to pay restitution, what do I do?

US Probation does not have an answer. US Probation has policy, but I do not believe the policy is applicable. That is why I am going to the Court.

I am formally asking US Probation to reconsider the decision. You stated in your previous email that you view travel to Mr. Parlato as "leisure travel." His intention is to put me on payroll. I would not make the trips otherwise. This is work travel.

Also, do you have a written copy of the US Probation policy so I can submit it to the Court to help in it's determination?

My Federal Disability hearing is rescheduled for May. Should I just sit on my hands until then, and thereafter?

I am trying to work.

Also, as a matter of law, Mr. Parlato is not a convicted felon as a matter of law until the imposition of judgment by the Court. That has not occurred yet.

Does US Probation have the capacity to make a common sense ruling to help me make restitution to the victims in my case?

Again, if we can resolve these issues and I can go work, I would not have to go to the Court with them. Can we resolve any issues short of Court intervention?

Again, Mr. Parlato, Mr. Almagno, and Mr. Aidala are all copied hereto. They can provide and confirm additional facts, including their willingness to hire me so long as the traditional order of the practice of law and the practice of journalism are not upended by USPO "policy."

On a personal note, I appreciate your continued hard work on my case. In the attached letter, I mentioned to the Judge it was a pleasure dealing with you.

Please let me know:

1) if USPO has official, written policy and if so, please provide me with a copy of the same or ask the US Attorney to file a copy with the Court to aid it's resolution of the outstanding issues,

2) if USPO can reconsider it's denial of allowing me to travel for work with Mr. Parlato so I can get hired, make money, pay restitution, and repay the victims.

3) if the Chicago itinerary and description filed with the Court is sufficient to approve my trip.

Regards,

Richard Luthmann

---

**From:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Sent:** Thursday, March 2, 2023, 10:04 AM
**To:** Richard L <luthmannrichard@gmail.com>
**Subject:** RE: Follow up from field visit

Good Afternoon,

As far as granting you permission to travel to Big Pine Key, and elsewhere, you have not made any payment to the restitution payment and probation's position is leisure travel cannot be granted if restitution payments have not been made. This was the reasoning to why probation did not approve the request to travel to Chicago the first time you requested it. In addition to this, if Mr. Parlato is a convicted felon, it is your responsibility to notify me of such as to get permission from probation to have contact with him.

I do see that the government requested an extension of time due to be newly assigned to your case.

As it has been the conversation before, it appears you are wishing for the Court to address the questions regarding travel and employment so if that is what you prefer and are reverting back to during our conversations, then I think it is best that you have this clarification from the Court. As I have told you in the past, probation's policy is that you need to be detailed in your requests regarding travel out of district or out of the state. At this time blanket

permission will not be provided for travel by probation due to the fact that no restitution has been paid and details of
destination and names of those you will be seeing have not yet been provided.

Please let me know if any further clarification is needed regarding what probation requires for travel.

Thank you,



**Megan Amadori**
United States Probation Officer
2110 First Street, Suite 4-182
Fort Myers, Florida 33901
**Phone** (239) 461-2104
**Mobile** (941) 899-4038

---

**From:** Richard L <luthmannrichard@gmail.com>
**Sent:** Wednesday, March 1, 2023 3:31 PM
**To:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Cc:** Frank Parlato <frankparlato@gmail.com>; Lawrence Almagno <la@almagno-law.com>
**Subject:** Re: Follow up from field visit

<mark>CAUTION - EXTERNAL:</mark>

Officer Amadori,

Mr. Parlato's case is available on Pacer. It is in the Western District of New York. He has yet to be sentenced.

Here is his Wikipedia page:

https://en.m.wikipedia.org/wiki/Frank_Parlato_Jr.

One of the issues in the filed motion before the Court is the interplay between the First Amendment, the press clause,
my right to practice journalism, and the US Probation Rules and Regulations. I expect Judge Polster Chappell to rule
on this issue before Mr. Parlato is sentenced.

Mr. Parlato is copied hereto. His phone number is 305-783-7083.

Is it US Probation's position I cannot work with Mr. Parlato at his headquarters in Big Pine Key, Florida?
I would like clarification going into Tuesday's hearing. The US Attorney did not respond in the time

allotted by Court Order. I have no idea what the Government or US Probation's position is on these issues.

I will prepare the proposed Chicago itinerary. Permission was specifically requested for the trip in the motion to the Court. I do not know what the Government's position is on that or any other issue.

As always, let me know if there are any questions or concerns.

Regards,

Richard Luthmann

---

**From:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Sent:** Tuesday, February 28, 2023, 12:30 PM
**To:** Richard L <luthmannrichard@gmail.com>
**Subject:** RE: Follow up from field visit

Good Afternoon,

Please refer back to my pervious email requesting the current status of Mr. Parlato's case. From what I remember in our previous conversation, Mr. Parlato was being charged with a Federal offense. If he is convicted and results in him being convicted as a felon, it is your responsibility to notify me of this and I will need to provide you with permission to have contact with him.

In regards to the request for travel to Chicago please provide me a brief itinerary of the trip as well as the names of the friends that you will be staying with. Once I have that I can review your request.

Thank you,



**Megan Amadori**
United States Probation Officer
2110 First Street, Suite 4-182
Fort Myers, Florida 33901
**Phone** (239) 461-2104
**Mobile** (941) 899-4038

**From:** Richard L <luthmannrichard@gmail.com>
**Sent:** Monday, February 27, 2023 11:52 PM
**To:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Cc:** Lawrence Almagno <la@almagno-law.com>; Frank Parlato <frankparlato@gmail.com>
**Subject:** Re: Follow up from field visit

**CAUTION - EXTERNAL:**

Officer Amadori,

Thank you for trying Mr. Almagno. I alerted him you are trying to reach him and he is copied hereto.

I have also copied Mr. Parlato. I want to request permission to go down and stay with him for a few days so we can work together side by side. He operates out of Big Pine Key, Florida.

Mr. Parlato says that once I can travel to him and collaborate AND I can be assured my journalistic sources are protected, he can change my internship over from unpaid to paid, and then hopefully to part time work.

Mr. Parlato also has individuals he would like me to see in the Indian community in Chicago. I would like to renew that request for travel from March 17 to the 23rd. Let me know what information you will need. I will be doing interviews, newsgathering, and collecting information to write several articles for Mr. Parlato's media properties. I intend to stay with friends at 5555 N Sheridan Rd, Chicago, IL
https://maps.app.goo.gl/vhXWRBbJfvddUoKM9

If you would like to speak to Mr. Parlato, his phone number is 305-783-7083.

Let me know what information you will need to approve this.

I am still pursuing my federal disability claim because of my limitations and in case legal restrictions create further limiting impossibility of employment.

Regards,

Richard Luthmann

**From:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Sent:** Wednesday, February 22, 2023 1:30:21 PM
**To:** Richard L <luthmannrichard@gmail.com>
**Subject:** RE: Follow up from field visit

Good Afternoon,

I have reached out to Mr. Almagno twice now via email regarding the parameters of your work for his office and have not yet received a response. As we have previously discussed, I must investigate if there are any 3rd party risks

regarding any future employment as it applies to your instant offense. Until I receive a response from Mr. Almagno I cannot approve this employment.

In relation to you unpaid internship with Mr. Frank Parlato, as we discussed previously, writing on his website does not appear to have any 3rd party risk associated with it. As with any travel you will need to make a request to me a week prior via email with your departure date and return date. You will also need to provide me with the address of where you are planning on staying during your visit. Once I review I will notify you by email regarding my response to your request. From what I remember in our previous conversation, Mr. Parlato was being charged with a Federal offense. If he is convicted and results in him being convicted as a felon, it is your responsibility to notify me of this and I will need to provide you with permission to have contact with him. That would result in me speaking with Mr. Parlato regarding your function within the company and your responsibilities.

As it goes with your request to go to Miami and "knock on doors" as it relates to finding employment, again you will need to provide me a written request via email a week before you would wish to go. Again I would need to know where you are requesting to go and who you are planning to see during your visit. Permission to travel outside the district will not be approved without such information.

Please let me know if you have any further questions or need any further clarification of what is needed,

Thank you,



**Megan Amadori**
United States Probation Officer
2110 First Street, Suite 4-182
Fort Myers, Florida 33901
**Phone** (239) 461-2104
**Mobile** (941) 899-4038

---

**From:** Richard L <luthmannrichard@gmail.com>
**Sent:** Wednesday, February 22, 2023 1:07 PM
**To:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Cc:** Lawrence Almagno <la@almagno-law.com>; Frank Parlato <frankparlato@gmail.com>
**Subject:** Re: Follow up from field visit

<mark>CAUTION - EXTERNAL:</mark>

Officer Amadori,

I am trying to get myself on track, as you know, despite my limitations.

Judge Weinstein's EDNY Judgment says I can work for attorneys.

The attorney is Lawrence Almagno in Rhode Island. He wants to hire me, but he has concerns inherent to the practice of law, as outlined in the pending motion before the Court.

He is trying to get clearance from the state authorities as well. Because of Federalism and Tenth Amendment issues, the states also have the power to regulate attorney conduct and how legal services are rendered. I'm sure the Government and the Probation Office have a position on this.

Mr. Almagno is copied hereto. His number is 401-255-8201.

I also have joined organized labor by being accepted into the National Writers Union. I am establishing myself as a journalist and a writer.

Frank Parlato has been a journalist and publisher for 40 years. Presently, I am an unpaid intern for him. He is showing me the ropes of the trade so I can be of value one day. Mr. Parlato operates out of Big Pine Key in Florida. Mr. Parlato has told me that if I can travel regularly to Big Pine Key, he can put me on part time payroll. He has lodging for me.

I'm sure the Government and the Probation Office also have a position on the First Amendment and the journalist's privilege, as discussed in the pending court motion.

Mr. Parlato's number is 305-783-7083. He is copied hereto. He has no problem talking to you about the proposed setup if I can get permission to work.

I am also actively working towards Federal Disability if I can't get work, or am limited to part time work. My hearing was scheduled for February 14, but it was adjourned because I was exposed to Covid-19.

I used to live in Miami and have a substantial contact network there I haven't been able for work because I can't travel there. If I can knock on doors there, I believe I could pick something appropriate up given my limitations.

Let me know what other information you need.

Regards,

Richard Luthmann

---

**From:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Sent:** Thursday, February 16, 2023 10:03:53 AM
**To:** Richard L <luthmannrichard@gmail.com>
**Subject:** RE: Follow up from field visit

Good Morning,

From the conversation it was my understanding that you had an attorney in the Southern District of FL as well as in RI, however I only see one attorney given below. Does this attorney have two office locations that you are asking to work in both locations? Or are they two separate attorneys?

Thank you,



**Megan Amadori**
United States Probation Officer
2110 First Street, Suite 4-182
Fort Myers, Florida 33901
**Phone** (239) 461-2104
**Mobile** (941) 899-4038

---

**From:** Richard L <luthmannrichard@gmail.com>
**Sent:** Friday, February 10, 2023 1:13 PM
**To:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>; Richard Luthmann <richard.luthmann@gmail.com>
**Cc:** Lawrence Almagno <la@almagno-law.com>; Lawrence Almagno <la@almagno-law.com>; frankparlato@gmail.com
**Subject:** Re: Follow up from field visit

<mark>CAUTION - EXTERNAL:</mark>


The attorney is Lawrence Almagno - la@almagno-law.com

The Investigative Journalist is Frank Parlato - frankparlato@gmail.com

Both are copied hereto.

---

**From:** Megan Amadori <Megan_Amadori@flmp.uscourts.gov>
**Sent:** Friday, February 10, 2023 11:22:39 AM
**To:** Richard Luthmann <richard.luthmann@gmail.com>; luthmannrichard@gmail.com <luthmannrichard@gmail.com>
**Subject:** Follow up from field visit

Good Afternoon,

I just wanted to send a follow up email from our conversation yesterday. If you could please provide me the email addresses of both attorneys that you are asking to work with so I can prepare and send them an email to determine if

the position will be acceptable to probation. Once I receive both, I will reach out sometime next week.

Thank you,



**Megan Amadori**
United States Probation Officer
2110 First Street, Suite 4-182
Fort Myers, Florida 33901
**Phone** (239) 461-2104
**Mobile** (941) 899-4038

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

20.21 KB    1 embedded image

image001.jpg  20.21 KB

<u>**MEMORANDUM**</u>

<u>**By E-mail and Hand**</u>

TO:    US Probation Office, MDFL

FROM:      Richard Luthmann
             338 Sugar Pine Lane
             Naples, FL 34108
             Tel: (239) 631-5957
             E: Richard.luthmann@gmail.com
             E: LuthmannRichard@gmail.com

DATE:  April 3, 2023

Prepared for April 3, 2023, 11:00 a.m. meeting with US Probation Officer Katrina Harmaty, USPO MDFL, Katrina_Harmaty@flmp.uscourts.gov,

Through this memorandum, I am attempting to give an update and raise concerns about my particular challenges to further aid the US Probation Office in accomplishing the valid penological goals and congressional commands embodied in 18 U.S.C. § 3553(a) and elsewhere.

<u>**Part-Time Remote Writing Job Offers**</u>

I have two part-time remote job offers right now.

James Hufnagel, Managing Editor, Niagara Falls Reporter, 716-930-1043
- Part-time job offer as a writer for the newspaper
- Want to explore the transfer of supervision to WDNY, depending on whether I am capable of working there.

J. Gary DiLaura, FBI Special Agent (ret.), 716-628-9003
- Part-time job offer as a writer/editor/website manager for his column/newsletter

USPO Amadori previously sent me a few links to try with job leads through disability. A few of the links were broken, and the rest were not suitable because of transportation and/or disability limitations.

<u>**Journalism Union**</u>

I joined the National Writers Union as a writer and a journalist. I am trying to develop my skills so I can make more than $15 an hour. Much of my work to date has been as an unpaid income, just to get my name out there, establish a publication history, and get "free" training and education in the writing and journalism trade.

**New Medical Provider**

Dr. Yamilet Oliver – Psychiatric Intake Session 4/11/2023
Dr. Oliver wants to start from the beginning with me because I have not been able to see a mental health professional since last December. Jason (forgot the last name), my nurse practitioner, left David Lawrence Center. There was trouble finding a new provider for several reasons, one of which was my Primary Physician dropping Florida Blue coverage. I finally found a new Primary Care Physician, who referred me to Florida Personal Management, and Dr. Oliver, who wants to "begin again" from the baseline and reassess my medication and treatment plan.

I have been taking my proscribed medication, but I have had big issues with anxiety and mood swings since January. I have had no nurse practitioner to speak to, and until recently, I did not have a General Physician because of a change in coverage. I only have come to learn that David Lawrence Center and the Nurse Practitioners took me off of mood stabilizers, and I haven't been proscribed them for many months. This is not mental health best practices. I have been suffering because of it.

The US Government gave me a bipolar disorder diagnosis. See the Statement of Reasons in US v. Luthmann, 17-CR-664:

> Defendant has been an abuser of alcohol and cocaine. PSR ¶ 99; Def. Sent. Mem. 4-5. He reports drinking 1.75 liters of scotch each day throughout 2017 and spending "a couple of hundred [dollars]" on cocaine each week. PSR ¶ 99. The drug and alcohol use appears to have compounded Luthmann's existing mental health issues. He was diagnosed with anxiety and depression in 2012, and prescribed drugs which interact poorly with alcohol and drugs. PSR ¶ 96; Def. Sent. Mem. 4.
>
> His mental health problems persisted after his arrest for the instant offenses. While released on bail in April 2018, Defendant admitted himself to a hospital because he believed he has having a nervous breakdown resulting from his marital problems. PSR ¶ 97. He was diagnosed with Bipolar I Disorder and hospitalized for 11 days. Id. Following his return to detention, this court ordered Luthmann to undergo a forensic mental health evaluation for a determination of his competency to stand trial. PSR1198. The evaluator concluded that a more appropriate diagnosis for Defendant is Bipolar II Disorder. Id. He spent several months at a mental health treatment facility for purposes of this evaluation.

I have just come to learn that mood stabilizers and a bipolar diagnosis are not a good thing. Hopefully, this will all be rectified next week when I see Dr. Oliver.

Earlier in my supervision, I spoke regularly with Casey Portner about my issues, and he was a big help. I believe that if I was still able to speak with someone, this medical issue could have been caught months ago. USPO Officer Amber Jean discontinued my sessions with Casey Portner, after USPO Monica Holsteen left. It was Officer Holsteen who previously identified that I benefitted from the help that my sessions with Casey Portner afforded.

## Disability Case

Lawrence Almagno, Jr., Attorney, 401-946-4529

The hearing is now scheduled for May. However, it will likely be adjourned because Attorney Almagno is getting an updated report from a vocational expert to show my working limitations. The District Court's recent opinion confirms important and substantial legal limitations on my employment in addition to the existing medical, psychological, and emotional limitations. The vocational expert's report will cover all of this.

I have to help with this case. If I can get a disability award, I am entitled to $733 a month plus back-payment since my April 2021 application ($17,592 to date), less attorneys and expert fees and costs.

## Sick Grandmother  -Primary Caretaker

My grandmother is currently in and out of the hospital and is ill. She is 90 years old. She has masses in her colon that may be malignant. I am one of her primary caretakers, along with my mother and my stepfather.

## Knights of Columbus, Altar Service, and Catholic Faith

I joined the Knights of Columbus, and I have trained as an altar server at Saint Williams Roman Catholic Church in Naples, FL. See the attached. I regularly attend mass and church events.

## Sobriety

I have endeavored to live a sober lifestyle, and I attend AA meetings.

## Pending Motions on NYS Case

I have a videographic conference scheduled for tomorrow, April 4, 2023, in my New York case, People v. Luthmann. There is a pending motion to set aside the indictment based upon unprecedented prosecutorial misconduct and perjury by the Special Prosecutor, a sitting NYS Supreme Court Justice, and others. See the attached.

There may be several appearances in the case, including in-court hearings. I am seeking to represent myself, and I will need to be present in the New York State court to conduct the hearing, confront and question witnesses, offer evidence, etc.

If the indictment is dismissed, the case is over. If the conviction is overturned, I go back to pre-trial status, and I have to defend the case.

Because I am trying to clear my name and represent myself, this case is taking substantial time and energy every week, and I already have limitations.

There is also a pending NYS Appeal that I may have to perfect, and I am proceeding *Pro Se* in that case, which will also take substantial time and effort.

### Collections Cases

I owe the US Government over $600,000 in restitution and close to $1 million, all debts considered. I have over half a million dollars in uncollected legal billables that can be used to satisfy these debts. I file the first two of these cases – Luthmann et al v. Hanks and Luthmann et al. v. Castorina. The US Government gets the proceeds of these cases. See the attached.

Attorney Lawrence Almagno, Jr. – 401-946-4529 - is representing me on these cases.

The problem is, that substantial work needs to be done on these cases to get them ready to be put into suit. They all grow stale THIS YEAR, and I lose the right to sue because of the statute of limitations.

Attorney Almagno wanted me to work for him to get these cases together so I could put them into suit. USPO Amadori said that there were US Probation policies that said I couldn't work for him, even though Judge Weinstein's Judgement of Conviction specifically said I could work as an attorney but not for attorneys.

Judge Polster-Chappell's recent Decision didn't address these issues at all. I had hoped I would have been given an oral argument to explain all these nuances.
The best chance that the victims of my case and the US Federal Government and its taxpayers have in getting made whole is through these earned and uncollected billables. I need to work on them, or I lose the right to collect. This is a far better use of my time in paying the US Government and my victims back than working any $ 15-an-hour wage job, which will ultimately ensure that the US Government, its taxpayers, and my victims will never get paid back.

I would ask for permission to work for Mr. Almagno, solely on my own cases, so I can make the US Government, its taxpayers, and the victims in my case whole, consonant with 18 U.S.C. § 3553(a). If there are specific US Probation Policies and Procedures that are problematic, please give me written copies of them. I want to make this work, but Government action precluding me from collecting monies that would satisfy my debts when Judge Weinstein said that I could do this

work constitutes a taking under the Fifth and Fourteen Amendments. Talk to the US Attorney on this. They will tell you that I have an argument here.

Please allow me to help collect the debts that I am owed so that I can pay back restitution. At $15 an hour, it will take me 40,000 hours to pay back just the restitution, with no living expenses factored in. That would be approximately 770 weeks or almost 15 years. Assuming I had a 40 hour week at $15 an hour and was paid $600 weekly, the statutory formula excludes the first $225 from collection. Of the remaining $375, twenty (20) percent is subject to Government attachment according to the gross income level. That number becomes approximately $75.

With a $ 75-a-week amount going to the Government, it will take me approximately 8,000 weeks or 154 years to pay back the Government, looking only to wage-paying jobs, and not developing any education or craft to develop my skills to command a higher wage.

## Law of the Case and Sentencing Disparity

The docket from the US v. Luthmann EDNY case is fully included in the MDFL docket and is part of the case. The law of the case doctrine fully applies.

In addition to the Judgement of Conviction, where I am specifically allowed to work for attorneys, the following is squarely relevant:

| 05/21/2018 | 116 | Minute Entry for proceedings held before Magistrate Judge Ramon E. Reyes, Jr: Pleading as to Michael Beck held on 5/21/2018. Michael Beck (3) withdraws not guilty plea and enters a GUILTY PLEA to Counts 7, 8, 9, 10 and 11. Order of bond conditions continued for deft. Deft's counsel is directed to submit the requested bond modification by 5/22/2018. (Sentencing set for 9/13/2018 at 10:30 AM in Courtroom 10B South before Judge Jack B. Weinstein.) (FTR Log # 5:09:14-5:39:54.) (Barrett, C) (Entered: 05/23/2018) |

My co-defendant Michael Beck pleaded guilty to kidnapping charges enhanced by the use of a firearm in the commission of the crime. Beck was allowed the travel allowances in the orders contained herein, many AFTER his admission to his commission of a crime of violence using a firearm. He also received only two (2) years of supervision from the Court.

| 07/09/2021 | 295 | JUDGMENT as to George Padula, III (2), Count(s) 1, 10, 11, 2, 3, 3s, 4, 4s, 5s, 6s, 7, 8, 8s, 9, Dismissed on Motion of the United States; Count(s) 1s, 2s, 7s, Imprisonment: Count 1: 42 months; Count 7: 42 months, to run concurrently to the term imposed in Count 1; Count 2: 24 months, to run consecutively to the terms imposed in Counts 1 and 7; Supervised Release with Special Conditions: 2 years; Special Assessment: $300; Restitution: $559,911.26; Forfeiture Order. The Court recommends |

5

| | | designation to the MDC and placement in the CADRE Program. So Ordered by Judge Raymond J. Dearie on 6/28/2021. (Attachments: # 1 Forfeiture Order) (Lee, Tiffeny) (Entered: 07/09/2021) |
|---|---|---|

My other co-defendant, George Padula, III, also only received two (2) years of supervision from the Court, having been convicted of a crime of violence enhanced by the use of a firearm.

I never used a firearm and did not commit a crime of violence.

Judge Polster-Chappell clearly erred in her recent ruling in this and other important areas, because the Court does not mention or consider the law of the case doctrine, the application of the law of the jurisdiction of judgment (EDNY, Second Circuit), or sentencing disparity, and as such, I am considering a motion for reconsideration and, if warranted, an appeal to the Eleventh Circuit. See the attached.

## **Conclusion**

I look forward to continuing to work with US Probation to further the purposes of my supervision, including but not limited to the penological goals and congressional commands embodied in 18 U.S.C. § 3553(a).

The foregoing is all true to the best of my knowledge and belief.

Dated: Naples, Florida
      April 3, 2023                                       /S/ Richard Luthmann
                                                    Richard Luthmann

CC:     File
         Lawrence P. Almagno, Jr., Esq.
         Mario Romano, Esq.
         Stephanie Jones, Esq.
         USPO Supervisor Officer Scott Fanelli (scott_fanelli@flmp.uscourts.gov)



Case 2:23-cv-00012-SPC-NPM Document 22 Filed 05/01/23 Page 71 of 320 PageID 3656
Case 1:17-cr-00684-NJD Document 101 Filed 05/15/18 Page 1 of 1 PageID #: 841
PageID 3881

The Law Office of
Steve M. Preston
241 Fifth Avenue
New York, New York 10175
Tel 212.256.1911
Fax 212.280.0443

May 15, 2018

Hon. Jack B. Weinstein
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE:    United States v. Michael Beck
       Cr. Docket No. 17-684 (JBW).

Dear Judge Weinstein:

I represent Mr. Beck in the above-referenced matter. In early January 2018, Mr. Beck was released from custody of a fully compliant and the condition of, inter alia, home confinement over the past five months. He has twice been permitted to leave his residence for social events, specifically, a Broadway show and a family's wedding. He attended both events without incident.

Mr. Beck will turn 80 on Tuesday, May 15, 2018. His wife, Phyllis, a registered nurse at NYU Hospital, and a colleague in the home, would like to take him out to dinner at a restaurant on Staten Island where they live to celebrate his milestone. She wants to invite family members as well, including all of the remaining relatives in the area. In order to attend, Mr. Beck will need to leave the residence at 5:30 and he will return no later than 11:00 p.m.

Given that, yesterday, Mr. Beck's Pretrial Services Officer, Naomie Quiljie, opposes this request, but she did not provide an explanation. The government did not have a position but it has in the past objected to Pretrial Services.

Especially in light of the fact that Mr. Beck has been compliant with all terms of his release to date and considering this is a "big" day worth celebrating, I request that the condition of home confinement be relaxed for 6 hours on May 15, 2018, so that he can attend a birthday dinner out at a local restaurant.

Respectfully submitted,

/S/
James M. Branden

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 15 2018 ★

BROOKLYN OFFICE

Case 1:17-cr-00664-RJD Document 28 Filed 06/15/18 Page 1 of 1 PageID #: 1\7\7

The Law Office of
James M. Branden
551 Fifth Avenue
New York, New York 10176
Tel 212-286-0173
Fax 212-286-0495

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 15 2018 ★

BROOKLYN OFFICE

June 15, 2018

Hon. Jack B. Weinstein
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Michael Beck
Cr. Docket No. 17-664 (JBW)

Dear Judge Weinstein:

I represent Mr. Beck in the above-referenced matter. As part of the conditions of pretrial release Mr. Beck, who has pleaded guilty and is awaiting sentencing, has been confined to his residence with electronic monitoring.

On June 17, 2018, Mr. Beck's cousin, John Lipham, is hosting a Father's Day party, at the VFW post, 38 Square Place, Mahler, New Jersey. The party starts and and ends at 9 p.m. Mr. Beck would like to attend the party, which requires a temporary modification of the bail conditions so that he may leave his residence at 1:30 and return at 10:30 p.m. Mr. Beck's entire family will be present, including his parents, both in their 80s, and all of the co-signers on the release bond.

Mr. Beck was arrested in this matter in November 2017 and released in early January 2018. Since then, this Court has twice permitted him to attend social events (a wedding and a Broadway show). He attended those events without incident and he has been otherwise fully compliant with release conditions to date.

The government consents to this application. Though I emailed Pretrial Services about this application earlier today, I have not yet received a response to the email.

It is therefore requested that Mr. Beck be permitted to attend the Father's Day party and leave his residence this Sunday from 1:30 to 10:30 p.m.

Respectfully submitted,

James M. Branden

Case 1:17-cr-00664-CBA Document 140 Filed 09/13/18 Page 1 of 1 PageID #: 914

The Law Office of
Leon M. Brander
3½ Fifth Avenue
New York, New York 10178
Tel 212 280-0115
Fax 212 280-2495

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 1 3 2018 ★

BROOKLYN OFFICE

September 5, 2018

Hon. Jack B. Weinstein
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Michael Beck
Cr. Docket No. 17-660 (JBW)

Dear Judge Weinstein:

I represent Mr. Beck in the above-referenced matter. As part of the conditions of pretrial release, Mr. Beck, who has pleaded guilty and is awaiting sentencing, is confined to his residence and subject to electronic monitoring with certain exceptions, including permission to work Monday through Saturday and to attend church.

On Sunday, September 9, 2018, Mr. Beck has a work event. He is providing refreshments to a charity event at the Amazon distribution center in Robbinsville, New Jersey. We will drive a beverage truck to and from the event, which takes place from 2 to 7:00 p.m. As such, he will need to leave from church services and drive to the event and return to his residence by 10:30 p.m.

In addition, on September 27, 2018, Mr. Beck has a doctor visit in Staten Island at 4:00 p.m. We may not return to his residence until 8:30 that evening.

I have conferred with the government and pretrial services about both events. They have no objection to this Sunday's work event. As to the doctor visit, pretrial services only requests that Mr. Beck provide the particulars so that the visit can be confirmed. Mr. Beck will do so promptly.

For the foregoing reasons, Mr. Beck requests permission to attend the work event and run his duties as set forth herein.

Respectfully submitted,

Leon M. Brander

Case 2:23-cv-00012-JRS-MKD Document 22 Filed 07/01/21 Page 74 of 320 PageID 859
PageID 3884
Case 1:17-cr-00664-JBW Document 197 Filed 07/02/19 Page 1 of 1 PageID #: 1263
Case 1:17-cr-00664-JBW Document 196 Filed 06/24/19 Page 1 of 1 PageID #: 1267

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 02 2019 ★

**BROOKLYN OFFICE**

THE LAW OFFICES
JAMES M. BRANDEN
51½ 5th Avenue
New York, New York 10175
Tel. 212-980-9777
Fax 212-204-9494

June 24, 2019

[handwritten annotations in right margin, illegible]

Hon. Jack B. Weinstein
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Michael Beck
Cr. Docket No. 17-664 (JBW)

Dear Judge Weinstein:

I represent Mr. Beck in the above-referenced matter. Mr. Beck was arrested in December 2017 and released on early January 2018. He surrendered his passport upon arrest. When first released he was subject to home detention and travel within New York City only. Last fall, the home confinement condition was removed and he was granted permission to travel freely, in NY, NJ and PA.

Mr. Beck would like to travel with his wife, three kids, their spouses, and two grandchildren to the Bahamas from July 17 through 26, 2019. In order to do so, he will need Pretrial Services to give him his passport, which he will return promptly upon his return to the New York area.

Mr. Beck has advised by all condition of release to date. I make this request with the consent of USPO Celine Rosnacht and AUSA James McGovern. The pretrial, all family, also consent.

As such, on consent, it is requested that Mr. Beck be permitted to travel to Nassau, Bahamas with family from July 14-19, 2019 and that his passport be returned to him for that purpose. In the event this request is granted, Mr. Beck will forward his flight and lodging information immediately to USPO Rosnacht.

Respectfully submitted,

James M. Branden

RECEIVED
U.S.
✦ APR 17 2019 ★

BROOKLYN OFFICE

The Law Office of
James M. Branden
451 Fifth Avenue
New York, New York 10116
Tel: 212-286-0173
Fax 212-286-0495

April 5, 2019

Permission
granted to
~~~~~~~
~~~~~~~~
4/11/19

Hon. Jack B. Weinstein
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11701

Re: United States v. Michael Beck
Cr. Docket No. 17-684 (JBW)

Dear Judge Weinstein:

I represent Mr. Beck in the above-referenced matter. Mr. Beck was arrested in December 2017 and released in early January 2018. When first released he was subject to home detention and travel within New York City only. Last fall, the home confinement condition was removed and he was granted permission to travel freely in NY, NJ and PA.

Mr. Beck has parents in their 80s. They live in Staten Island but own a time share in Ft. Lauderdale, Florida. They visit Ft. Lauderdale a week or two a year, mostly to check up on the place. They have asked that Mr. Beck and his wife escort them on a trip later this month, from April 28 to May 6. USPO Celine Ferguson approves of the travel request. AUSA Moira Penza deferred to USPO Ferguson. The owners, all family, also consent.

As such, on consent, it is requested that Mr. Beck be permitted to travel to Florida, with his wife and parents from April 28 to May 6.

Respectfully submitted,

James M. Branden

Case 2:23-cr-00123-RJD-PK Document 22 Filed 08/01/23 Page 76 of 131 PageID 3886
Case 2:23-cr-00123-RJD-PK Document 22 Filed 08/01/23 Page 76 of 131 PageID 3886
PageID 3886
**Additional Orders as to USA v. Luthmann and Michael Beck**

| 04/15/2021 | ELECTRONIC ORDER as to Michael Beck re 275 Consent Letter from defense counsel requesting bond modification to permit defendant to travel to Florida April 22, 2021 to April 27, 2021. Application Granted. Conditions of release are temporarily modified, defendant is permitted to travel to Florida as requested. Defendant is directed to submit to his Pre Trial Officer a written detailed itinerary, not later than 3:00pm on April 19, 2021. So Ordered by Judge Raymond J. Dearie on 4/15/2021. (Mulqueen, Ellen) (Entered: 04/15/2021) |
|---|---|

| 05/06/2021 | ELECTRONIC ORDER as to Michael Beck re 286 Letter from defense counsel requesting permanent modification of bond to include travel to Florida. The Court confirmed with government counsel and Pre Trial Services that they have no objection to modifying the conditions of release to include travel to Florida. Accordingly, the bond is hereby modified to include travel to Florida. So Ordered by Judge Raymond J. Dearie on 5/6/2021. (Mulqueen, Ellen) (Entered: 05/06/2021) |
|---|---|



**Richard A. Luthmann**
338 Sugar Pine Lane
Naples, FL 34108
Tel: (239) 631-5957
richard.luthmann@gmail.com

<u>Via Certified U.S. Mail RRR with Certificate of Mailing</u>

Personal and Confidential to Addressee

October 27, 2022

Hon. Ronald Castorina, Jr.
Justice of the Supreme Court
26 Central Avenue
Staten Island, NY 10301

          RE:    Outstanding Account with Luthmann Law Firm, PLLC

Dear Ronald:

     I am winding up the affairs of the Luthmann Law Firm, PLLC ("LLF") on behalf of its assignees, successors in interests, and creditors, the largest of which is the United States Government. This communication is an attempt to collect on debts Ronald Castorina, Jr. owes to LLF. All the work performed and the related costs and expenditures were authorized by Ronald Castorina, Jr.

     In accordance with jurisdictional requirements, please see the enclosed notices under Part 137 of the Rules of the Chief Administrator. Further, please note that LLF and I are represented by counsel, and all communications should be had with Lawrence P. Almagno, Jr., Esq. of Almagno Law, Inc. His details are included in the enclosed package. I implore you to reach out to my lawyers before this gets messy. I further implore you not to try to contact me or have others contact me on your behalf. Please note that I am making a record of any and all conversations and communications related to this matter. Moreover, please do not engage in any further communications that may be construed as witness tampering. Upon information and belief, you have already been acting very poorly and dishonestly with potential witnesses. I have directed my attorneys that this tampering must be fully explored if this matter proceeds to litigation.

     You owe LLF substantial fees, costs, and expenses. If it were up to Luthmann alone, Luthmann would let sleeping dogs lie. Alas, it's not up to Luthmann but to the LLF and its successors, assigns, and creditors, particularly the United States Government. Thank the McMahons, the Clintons, the Vitalianos, and Chuck Schumer the next time you see them.

<div align="center">1</div>

## Crisis Management and Political "Fixing"

Luthmann spent many hours advising you and "fixing" things for you. When Luthmann went away, you thought you could skip out on your bill. But the law does not allow such conduct. Please see the letter from my attorneys, ALMAGNO LAW, INC., to that effect, attached as **EXHIBIT "A"** ("Lawyer Letter"). Ron, you're a judge. You should know better.

I don't want to get into it. Still, you are going to have much explaining to do both in this fee collection case and in *People v. Luthmann*, once I win my appeal pending in the Supreme Court Appellate Division: Second Department (unless, of course, you, the McMahons, or your other minions try to "fix" things.) To quote the unparalleled eloquence of Mr. Dennis Quirk:

- You F-ING LIED TO ME.
- You're A RAT.
- You're A LOWLIFE RAT.
- You're a LOWLIFE SCUMBAG.
- You're A SHITHEAD.

The Quirk-isms aside, you have big problems with perjury and lying under oath that will come out in this case. I don't know how you will be able to continue to be a New York Supreme Court Justice.

## Perjury and Lying Under Oath

You testified before a Grand Jury convened by Richmond County Special District Attorney Eric A. Nelson beginning on August 1, 2018. In that testimony, you perjured yourself innumerable times. A copy of the Transcript is attached as **"EXHIBIT "B"** (the "Transcript"). I have taken the liberty of highlighting some (for old times' sake) that you can give to your criminal attorneys so they can save your ass.

The statements that you made are demonstrably false. The Grand Jury subpoenaed my telephone records. I have enclosed the records between July 20, 2017, and September 10, 2017. A copy of the Phone Records is attached as **EXHIBIT "C"** (the "Phone Records"). On those thirty-six pages of records alone (spanning about a month and a half), you and I spoke over the phone **dozens of times**. And you called me on many occasions. You and I talked more than I did with my wife at the time.

In your Grand Jury Testimony, you said:



How do you have dozens of conversations in a 45-day period with "somebody that [you] would typically like to avoid"? If this were true, why would you call me? And why would you be on the phone with me for extended periods of time on numerous occasions? (8/1, 10:50AM - 15 minutes; 8/17, 3:28PM - 11 minutes; 8/21 7:27PM - 37 minutes). When you were in private practice, did you bill clients for phone calls?

Additionally, it won't take a Former FBI Agent from the Organized Crime Task Force to decipher what we were doing from the phone records. You notice that many of our calls come in short 1-minute or less communications, and many of them come in pairs. We were operating like members of La Cosa Nostra concerning what we said on the phone because when there was a call, it was part of a scheme to evade detection and records. The first call would set up a meeting place between you and me. Then, a little bit later, there would be a call saying I was at the meeting place. In between, I sometimes called my former driver, Larry Gilder, to come and pick me up and bring me to our meetings. You are a former prosecutor. This evidence would stand up in Federal Court as part of a warrant application for drug dealers or organized crime members:

- 8/1 10:50AM (set up) – 1:19PM (arrival)
- 8/4 12:07PM (set up) – 5:31PM (arrival)
- 8/7 6:06PM / 6:09PM (set up) – 6:58PM (arrival)
- 8/31 10:48AM / 12:18PM (set up) – 5:03PM (arrival)
- 9/1 12:19PM (set up) – 1:09PM (arrival)
- 9/10 1:13PM (set up) – 2:55PM (arrival)

Larry Gilder drove me to every one of these meetings. If you look at the records on 9/10, I called him at 2:09 PM to pull the car around so I could get to the meeting.

This evidence, which is part of the Grand Jury record, establishes, at the very least, that you and I had a business relationship that was much more than what you stated in your sworn testimony:

Case 2:22-cv-00021-JRG-MCD Document 22-2 Filed 08/04/23 Page 80 of 138 PageID 3665
Case 2:23-cv-00013-JRS-MCD Document 22-2 Filed 09/01/23 Page 214 of 358
PageID 3890



You were trying to "placate" me. I like that. Maybe I'll call Joe Tacopina and tell him to use the "placate" defense in his next Organized Crime trial in Federal Court when the US Attorneys introduce phone records. I wonder how that would go.

In reality, we had an attorney-client relationship, and I was your "fixer." The reality is squarely at odds with your sworn testimony:



I didn't create problems. I worked to "fix" your problems. And when the Democrat Party threw me to the FEDS, you ran away and threw me under the bus with them. You are a disloyal piece of shit. In your sworn testimony, you said:



But behind closed doors, in Facebook Messenger communications that are part of the Grand Jury record, attached as **EXHIBIT "D"** (the "Borelli conversation"), you and NYC Council Minority Leader Joe Borelli get a real kick out of my "juvenile, ridiculous stuff." Borelli says: "[w]e were talking about it…we all loved it."

Ron, you further testified about our Private Messenger conversations, attached as **EXHIBIT "E"** (the "Castornia Messenger conversations"). You stated under oath:

4



But in the Messenger Conversations, you appear to be enjoying my "side-show," particularly when I called Steve Richman a "Jew-rat":



However, I appear to have come close to the mark with the remainder, as Steve Richman has been proven to be a pervert and a "human cum-stain" on the NYC Board of Elections.

In your sworn Grand Jury testimony, you alleged that you had no attorney-client relationship with me, and I had no attorney-client relationship with you:

Case 2:23-cv-00012-PKC-MMD Document 22 Filed 07/01/23 Page 82 of 318 PageID 3567
Case 2:23-cv-00012-PKC-MMD Document 22 Filed 07/01/23 Page 82 of 318 PageID 3567
PageID 3892



So Ron, what were we doing at our meetings together if there was no attorney-client relationship?  Were we there to jerk off?  Or maybe we played a game to see who could "placate" the other one first?  The attached Phone Records don't lie; they get this matter past a motion to dismiss and into discovery.

Moreover, you know very well how much I loved to make "tapes."  I loved making tapes almost as much as Richard Nixon.  What do you think is going to get released when we get into discovery?  Everyone knows I have MCMAHON TAPES about how WARRANTS GOT SENT TO CERTAIN JUDGES.  Don't you think I have CASTORINA TAPES too?  And what I didn't get, I can assure you the FEDS have.  They have hours and hours of surveillance.  But it's not time for show-and-tell just yet.

The worst part of this whole thing is what a disloyal price of crap you are.  Eric Nelson is a corrupt prosecutor who has aided and abetted the unauthorized practice of law by getting bad advice from a disbarred attorney who went to Federal Prison on how to violate the Grand Jury Clause of the Sixth Amendment.  See the attached **EXHIBIT "F."** If what you said is true and I'm crazy, and there wasn't any business relationship between us, then all of my "offensive" social media activity was purely political activity protected by the First Amendment.  Eric Nelson failed to mention anything about the First Amendment to the Grand Jury in violation of my rights under the United States and New York State Constitutions, thus rendering the indictment fatally defective and a legal nullity.  Five years have passed, and the statute has run, so Eric Nelson can't return to the Grand Jury.

Suppose what Luthmann says is true, and there was a business relationship between us.  You are an unindicted co-conspirator in my "heinous" violations of the First Amendment.  The statute of limitations has run on the underlying crimes, but there is still plenty of time to indict you for your perjury before the Grand Jury.  So, when we get to the depositions, be prepared to be asked whether you got your current judgeship in exchange for throwing me to the wolves.  Or so that Eric Nelson didn't indict you?  Or so that Mike McMahon could clean up his witch of a wife's mess in systematically denying criminal defendants their constitutional rights to bolster her husband's prosecution stats?  You're a Public Official.  What do you say to the woman who gets mugged or the father whose son died of a fentanyl overdose because there was just not enough money in the budget for those extra cops or those extra doses of naloxone?  The Eric Nelson-Mike McMahon

6

vanity case against me has cost the NYC Taxpayers over $1 million and counting. And all they can prove is that I used "Cum-Shot Editor" to make a few dick pics with some politicians. Great job.

You know your involvement with me. And some real shit is about to get strewn across the public square. You testified:



Roger Stone. Dirty tricks. No morals or ethics. When you threw me under the bus, I knew immediately that you were an asshole. But it took me until very recently – when I read the attached transcripts - to realize that you and your political butt-buddy Joe Borelli are fucking RINOs. Remember the Grand Jury question about what I said:



Do you remember how you responded?:



Newsflash, Ron – you are not loyal or principled. In the words of DENNIS QUIRK: YOU'RE A SHITHEAD.

Ron, you're in the box.  And I wish you the best in finding someone willing to help you "fix" all these new problems.  Call my lawyer to resolve this.  Or not.  It's no skin off my ass either way.

Take care of yourself,

Richard A. Luthmann

CC:    File
       Lawrence P. Almagno, Jr., Esq.

ENCL: September 1, 2022, Letter from Lawrence P. Almagno, Jr., Esq.
       Transcript of Grand Jury Testimony
       Luthmann's Phone Records
       Miscellaneous Exhibits
       Part 137 Notices

# EXHIBIT A

# Almagno Law, Inc.

Lawrence P. Almagno Jr., Esq
Licensed in RI NY & MA

**<u>VIA U.S. Mail</u>**

**Advance copy sent to: <u>richard.luthmann@gmail.com</u>**

September 1, 2022

Luthmann Law Firm, PLLC
c/o Almagno Law, Inc.
42 W. 43rd Street, Ste. 169
New York, NY 10036

Richard Luthmann
338 Sugar Pine Lane
Naples, FL 34108

> **Re:** **Debt Collection – Luthmann Law Firm, PLLC ("LLF")**
> **Richard Luthmann as successor to LLF and for the benefit**
> **of the successors, assigns, and creditors of LLF**

Dear Mr. Luthmann:

You have engaged Almagno Law, Inc. (the "Law Firm") to prosecute collections matters against former clients of the now defunct Luthmann Law Firm, PLLC ("LLF") on behalf of the entity as a successor in interest. You have several creditors, the most significant of which is the United States Government.

This Law Firm has reviewed the underlying paperwork and we are of the opinion that you have several valid claims against former LLF clients.

**<u>Breach of Contract</u>**

Although not required in New York, it was standard practice of the LLF to have signed engagement letters on file for its clients. As such, given the billing records and other evidence, you have claims for breach of contract against former LLF clients with outstanding accounts. There was an agreement between LLF and the former client; LLF performed under the agreement; the former client failed to make payment; and LLF has suffered damages as a result. *See **Mandarin Trading Ltd. v. Wildenstein***, 16 N.Y.3d 173, 181-82 (2011); *Heijung Park v. Nam*

---

**Rhode Island Office**
10 Rangeley Road
Cranston, Rhode Island 02920

**New York Office**
43 W 43rd St. Ste 169
New York, NY 10036

Tel: (401) 946-4529 | Fax: (401) 464-4529
Email: LA@Almagno-Law.com

*Young Kim*, 205 A.D. 3d 429, 438 (1st Dep't 2022); *Core Dev. Grp. LLC v. Spaho*, 199 A.D. 3d 447, 449 (1st Dep't 2021); *Alloy Advisory, LLC v. 503 West 33rd Street Associates, Inc*., 195 A.D.3d 436, 144 N.Y.S.3d 854 (1st Dept. 2021); *Markov v. Katt*, 176 A.D. 3d 401, 401-02 (1st Dep't 2019).

Additionally, the contracts between the LLF and its former clients are all implied in fact. The case files as well as court filings and other materials show conduct by the parties consonant with the existence of a contract. A contract implied in fact rests upon the conduct of the parties and not their verbal or written words. *Parsa v. State*, 64 N.Y.2d 143, 148 (1984). An implied in fact contract requires: Mutual assent; Consideration; Legal capacity; and Legal subject matter. *See Maas v. Cornell Univ.*, 94 N.Y.2d 87, 94 (1999); *Jemzura v. Jemzura*, 36 N.Y.2d 496, 503-4 (1975); *Mirchel v. R.M.J. Sec. Corp.*, 205 A.D.2d 388, 390 (1st Dep't 1994). All of these elements are present here.

## Account Stated

"Under federal and New York law, an account stated refers to a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due." *See Nat'l Econ. Research Assocs. v. Purolite "C" Corp.*, No. 08 Civ. 7600(PGG), 2011 U.S. Dist. LEXIS 24458, at *6 (S.D.N.Y March 10, 2011); *see also Interman Indus. Prods.*, Ltd. v. R. S. M. Electron Power, Inc., 37 N.Y.2d 151, 153 (1975); *Ryan Graphics, Inc. v. Bailin*, 39 A.D.3d 249, 250 (1st Dep't 2007). LLF has valid claims for an account stated against all former LLF clients.

## Unjust Enrichment

Similarly, LLF has claims for Unjust Enrichment. The former LLF clients benefitted at LLF's expense, and equity and good conscience require restitution. *Columbia Mem'l Hosp. v. Hinds*, 2022 WL 1572408, *6 (2022); *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 455 (2018); *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012).

## Statute of Limitations

Under C.P.L.R. § 213(2), the statute of limitations of contracts, debt collection, and accounts stated is six (6) years. All of the former LLF client accounts were on the books as of December 15, 2017, so we are will within the applicable statutory period.

Additionally, under C.P.L.R. § 214(6), the statute of limitations for legal malpractice is three (3) years.  Richard Luthmann was legally disabled and unable to practice law on and after December 15, 2017.  The statutory time to interpose a legal malpractice claim or counterclaim has long passed.  Also, unlike other former LLF clients who made claims against Richard Luthmann and the LLF, none of these clients have had any issues with the services rendered.

**<u>Part 137 Notices</u>**

A legal precondition to the collection of legal fees earned in the State of New York is compliance with Part 137 of the Rules of the Chief Administrator.  The law requires that you must send a Notice of Client's Right to Arbitrate a Dispute Over Attorney's Fees to each and every client who has an outstanding account and from whom you wish to collect.

Accordingly, you must provide written notice to all former clients of LLF of their right to elect to resolve the dispute by arbitration under Part 137.  You must also provide said former LLF clients with a copy of the written instructions and procedures of the approved local bar association-sponsored fee dispute resolution program ("Local Program") having jurisdiction over your dispute.  Since the business address of the LLF for the winding up of its affairs in New York County, the Local Program is administered by the New York County Lawyers Association.
You must also provide former LLF clients with the "Request for Fee Arbitration" form and advise that said former LLF clients must file their Request for Fee Arbitration with the Local Program within 30 days of the receipt of the notice.  Thereafter, you will be free to bring a lawsuit in court to seek to obtain payment of the fee.

It is advisable that you send these notices by Registered U.S. Mail and U.S. Mail with a Certificate of Mailing.  In this way, you will be able to prove the delivery of the notice by the actual return of the Registered Mail and/or by the presumption of regularity of the delivery of the U.S. Mails.

Please refrain from any further contact with former LLF clients to whom you are sending Part 137 notices.  As you well know, any conversations with these parties may become relevant and discoverable in a court proceeding.  Additionally, please report to us any information that you may have about former LLF clients seeking to improperly coax potential witnesses.  Such information is clearly discoverable.

You may wish to disclose this letter to the former LLF clients so that they have this Law Firm's address if they seek to contact me so as to resolve any outstanding accounts prior to the initiation of a lawsuit in a court of competent jurisdiction.

Case 2:23-cv-00001-BJR-MCD Document 22 Filed 07/03/25 Page 89 of 123 Page ID 4674
Luthmann Law Firm, PLLC – Collections f/b/o creditors including the United States Government
Page ID 3899

However, this Law Firm is prepared to proceed with litigation as soon as the 30-day period under Part 137 is complete as per your request, given the interests of the United States Government as creditors. If former LLF clients wish to quickly and discreetly resolve their accounts, they may do so by calling this Law Firm. My direct line is 401-255-8201. Otherwise, you have directed us to proceed to judgment in these cases to satisfy the interests of the United States Government.

If you have any questions or concerns, please do not hesitate to contact me.


Regards,
ALMAGNO LAW, INC.

/s/ Lawrence P. Almagno Jr.
Lawrence P. Almagno Jr.

LPA/lc

CC:   File



### Richard A. Luthmann
338 Sugar Pine Lane
Naples, FL 34108
Tel: (239) 631-5957
richard.luthmann@gmail.com

<u>Via Certified U.S. Mail RRR with Certificate of Mailing</u>

Personal and Confidential to Addressee

October 12, 2022

Kamillah Hanks
37 Tappen Court
Staten Island, NY 10304

Kamillah Hanks 2017
c/o Kamillah Hanks
37 Tappen Court
Staten Island, NY 10304

Kevin Barry Love
37 Tappen Court
Staten Island, NY 10304

RE:    Outstanding Account with Luthmann Law Firm, PLLC

Dear Kamillah Hanks and Kevin Barry Love:

I am winding up the affairs of the Luthmann Law Firm, PLLC ("LLF") on behalf of its assignees, successors in interests, and creditors, the largest of which is the United States Government. This communication is an attempt to collect on debts Kamillah Hanks and the Kamillah Hanks Campaign Committee (the "Campaign Committee") owe to LLF. All the work performed and the related costs and expenditures were authorized by Kamillah Hanks and/or Kevin Barry Love, the *de facto* access agent for Kamillah Hanks and the Campaign Committee.

In accordance with jurisdictional requirements, please see the enclosed notices under Part 137 of the Rules of the Chief Administrator. Further, please note that LLF and I are represented by counsel and all communications should be had with Lawrence P. Almagno, Jr., Esq., of Almagno Law, Inc. His details are included in the enclosed package. I implore you to reach out to my lawyers before this gets messy. I further

1

implore you not to try to contact me or have others contact me on your behalf. Please take notice that I am making a record of any and all conversations and communications that I have related to this matter. Moreover, please do not engage in any further communications that may be construed as witness tampering. Upon information and belief, you have already been acting very poorly and dishonestly with potential witnesses and I have directed my attorneys that this tampering must be fully explored if this matter proceeds to litigation.

You owe LLF substantial fees, costs, and expenses. If it were up to Luthmann alone, Luthmann would let sleeping dogs lie. Alas, it's not up to Luthmann, but to the LLF and its successors, assigns, and creditors, particularly the United States Government. Thank the McMahons, the Clintons, the Vitalianos, and Chuck Schumer the next time you see them.

## 2017 Campaign: Partial Payment of LLF Fees, Costs, and Expenses

You only made a partial payment of LLF fees, costs, and expenses. Frankly, when Luthmann went away, you thought you can skip out on your bill. But neither the law nor the New York City Campaign Finance Board (CFB) allows such conduct. Please see the Campaign Committee's Expenditures from 2017 to the present as reported to and by the CFB, attached as **EXHIBIT "A"** ("CFB Report").

In 2017, you reported a payment of $1,650.00 to LLF/Luthmann for Petition Expenses/Petition Filing. See page 22. In 2021, you paid Howard Graubard, Esq., in excess of $10,000.00 for the same work. See page 19.

In addition, the record is clear that you agreed to all of the work to be performed in getting Phil Marius thrown off the ballot in 2017. See the attached **EXHIBIT "B."** Luthmann, along with other (unpaid to date) consultants (one a former State Committeeman), caused 747 of the 1,189 signatures on Phil Marius' Designating Petition to be invalidated. The Campaign Committee neither reported nor paid for any of this work.

## 2017 Campaign: Failure to Report to the Campaign Finance Board

Make any arguments that you would like, but agreements with lawyers and consultants must be reported and they must be paid under the CFB Rules. You have a big problem here, and maybe one of your current consultants, Scott Levenson (The Advance Group, CFB Report pages 38-41), is a seasoned veteran consultant in New York City Politics. He was fined and his candidate was fined for not properly reporting and being remunerated for work performed. See the attached **EXHIBIT "C",** available at: https://nypost.com/2016/01/06/melissa-mark-viverito-to-pay-7k-fine-for-campaign-finance-shenanigans/. Scott Levenson has also been engaged in serious battles with batshit crazy sore losers over his properly-earned consulting fees. See the attached **EXHIBIT "D."** Maybe you should talk to Scott Levenson about paying your people

2

because Scott Levenson is very good at getting paid. If this matter ends up in litigation, Scott Levenson will surely be a witness that needs to be deposed.

Also, Howard Graubard, Esq. and even the esteemed Jerry Goldfeder, Esq. (he literally wrote the book on New York Election Law), may be called as witnesses to establish the reasonableness of the fees, costs, and expenses involved in reviewing, "scrubbing," packaging and file Designating Petitions, as well as reviewing opposing candidates' Designating Petitions filed at the NYC Board of Elections, filing General and Specific Objections to Opponents' Designating Petitions, preparing and filing Election Law litigation in the New York Courts, serving the opposing candidates and proper parties, and all the appurtenant fees, costs, and expenses. And don't forget gas and tolls back and forth from the Board of Elections, and all the coffee, pizza, and donuts to keep everyone going. You know about all of this because you decided to report these expenditures in 2021 (I like Cafe Milano, Katz's Delicatessen, and Ruddy & Dean too). These expenditures should all have been reported and paid. And there is ample evidence that details the many hours upon hours spent in completing this process.

Additionally, the fact that you don't pay your loyal consultants but paid others who ran away from you in 2017 (e.g., JMT Media, LLC) further establishes a pattern of failure to report and failure to pay. If this matter goes to litigation, others who didn't get paid will be deposed and crystal clear facts will be established. Outgoing State Senator Diane Savino was witness to these occurrences on several instances, particularly by the Campaign Office on Bay Street in 2017, when she was worried that Tom McGinley alleged that she was homophobic.

### Kevin Barry Love is the *De Facto* Access Agent for Kamillah Hanks and the Campaign Committee; Nadia Hanks Graduation Case

There is no need to go into this unless there is full-blown litigation. I don't wish a Federal Prosecution on my worst enemies. But the factual record will establish that Kevin Barry Love was everywhere: coordinating, negotiating deals, "allowing" access, and "fixing" problems. Kevin Barry Love served as a *de jure* access agent for Kamillah Hanks and the Campaign Committee. It is a very grey area between a "gatekeeper" and public corruption. But I will note that Kevin Barry Love's name appears nowhere in the CFB Report. Also, what is the deal with KPH Consulting Inc. filed in New York State on February 25, 2019? See the attached **EXHIBIT "E."** Kamillah Payne-Hanks? Kevin Barry Love? This smells an awful lot like a place where Pay-to-Play and "access" money gets parked. I hope I'm wrong. The Feds can make a case out of a lot less.

Also, I don't want to drudge up Nadia's graduation case. I was happy to see her walk. But the conversations had with Kevin Barry Love and Kamillah Hanks were about the potential poor reflection on Kamillah that her daughter wasn't graduating high school, and it was suggested that the lawsuit would be paid from Campaign Committee funds. Obviously, if you are interested in a resolution, we can get his invoice covered as well in a package deal.

**CFB Fines for Failure to Report and Failure to Pay**

I would also point out that given the CFB's normal imposition or treble damages for violations, given the amounts involved in this matter and others related to non-payment and/or misuse of campaign funds for non-campaign purposes would effectively cripple any chances that you would have in a 2023 race. This is yet another reason to make good on all your outstanding obligations. You know this all too well. See the attached **EXHIBIT "F."** But knowing you, I don't think that you will. Your middle name is "crime," and crime never pays.

Finally, let it be known that I harbor no ill will towards you or anyone who ran away from me in my tough times. The last great New York City Party Boss, the Honorable Frank Seddio, once gave me a piece of advice that has stuck with me. He explained that the Wheel of Fortune was a big deal in Medieval Europe, particularly Italy. Life's ebbs and flows are dictated by the *Rota Fortunae*, and an important takeaway from that is an inherent sense of divine justice: how you treat people when you are on top is how you hope they treat you when you're on the bottom. Obviously, there is no such hope with you people, and the fault is mine. I got into bed with scorpions.

I look forward to your payment.

Hugs and kisses,

Richard A. Luthmann

CC: File
Lawrence P. Almagno, Jr., Esq.

ENCL: Part 137 Notices
September 1, 2022, Letter from Lawrence P. Almagno, Jr., Esq.

4

# EXHIBIT A

Case 22-2300, Document 22, 07/01/22, Page 95, PageID 3905

| Name | Address | Candidate/Office Date | Amount | Purpose/Explanation | Type |
|------|---------|----------------------|--------|---------------------|------|
| Butterfield, Kevin | Greenport, NY 11944 | Hanks, Kamillah M  9/10/2017 City Council (2017 ) | $414.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 12 ID: R0001963 |
| Butterfield, Kevin | Greenport, NY 11944 | Hanks, Kamillah M  9/1/2017 City Council (2017 ) | $222.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 12 ID: R0001901 |
| Butterfield, Kevin | Greenport, NY 11944 | Hanks, Kamillah M  9/12/2017 City Council (2017 ) | $144.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 12 ID: R0002087 |
| Butterfield, Kevin | Greenport, NY 11944 | Hanks, Kamillah M  9/11/2017 City Council (2017 ) | $135.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 12 ID: R0002020 |
| C Town | Staten Island, NY | Hanks, Kamillah M  11/2/2021 City Council (2021 ) | $2.50 | Other: explntion / Water? | Expenditure Payments St#: 14 ID: R0006614 |
| Cafe Milano | Staten Island, NY 10310 | Hanks, Kamillah M  6/20/2021 City Council (2021 ) | $26.96 | Other: explntion / Staff/Volunteer Meal | Expenditure Payments St#: 10 ID: R0005337 |
| Cafe Milano | Staten Island, NY 10310 | Hanks, Kamillah M  5/29/2021 City Council (2021 ) | $34.84 | Other: explntion / Volunteer Meals | Expenditure Payments St#: 9 ID: R0005050 |
| Camacho, Shaliayah | | Hanks, Kamillah M  5/10/2021 City Council (2021 ) | $75.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 8 ID: R0004880 |
| Carruthers, Russell | Staten Island, NY 10301 | Hanks, Kamillah M  8/10/2017 City Council (2017 ) | $24.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001685 |
| Casali Keller Consulting | Staten Island, NY 10303 | Hanks, Kamillah M  8/10/2021 City Council (2021 ) | $5,000.00 | Campgn Consuls. / Campaign Management | Expenditure Payments St#: 11 ID: R0005531 |
| Casali Keller Consulting | Staten Island, NY 10303 | Hanks, Kamillah M  10/20/2021 City Council (2021 ) | $2,500.00 | Campgn Consuls. / Campaign Management | Expenditure Payments St#: 14 ID: R0006401 |
| Casali Keller Consulting | Staten Island, NY 10303 | Hanks, Kamillah M  9/28/2021 City Council (2021 ) | $2,500.00 | Campgn Consuls. / Campaign Management | Expenditure Payments St#: 13 ID: R0006400 |
| Casali Keller Consulting | Staten Island, NY 10303 | Hanks, Kamillah M  5/15/2021 City Council (2021 ) | $4,000.00 | Campgn Consuls. / Campaign Management | Expenditure Payments St#: 9 ID: R0005031 |
| Casali Keller Consulting | Staten Island, NY 10303 | Hanks, Kamillah M  3/20/2021 City Council (2021 ) | $4,000.00 | Campgn Consuls. / Campaign Management | Expenditure Payments St#: 8 ID: R0004849 |
| Casali Keller Consulting | Staten Island, NY 10303 | Hanks, Kamillah M  4/15/2021 City Council (2021 ) | $4,000.00 | Campgn Consuls. / Campaign Management | Expenditure Payments St#: 8 ID: R0004851 |
| Casali Keller Consulting | Staten Island, NY 10303 | Hanks, Kamillah M  6/15/2021 City Council (2021 ) | $4,000.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 10 ID: R0005180 |
| Casali Keller Consulting | Staten Island, NY 10303 | Hanks, Kamillah M  11/15/2021 City Council (2021 ) | $5,000.00 | Campgn Consuls. / Campaign Management | Expenditure Payments St#: 15 ID: R0006708 |
| Casali Keller Consulting | Staten Island, NY 10303 | Hanks, Kamillah M  10/15/2021 City Council (2021 ) | $2,500.00 | Campgn Consuls. / Campaign Management | Expenditure Payments St#: 15 ID: R0006710 |
| Casali Keller Consulting | Staten Island, NY 10303 | Hanks, Kamillah M  1/21/2021 City Council (2021 ) | $4,000.00 | Campgn Consuls. / Campaign Management | Expenditure Payments St#: 7 ID: R0004317 |
| Casali Keller Consulting | Staten Island, NY 10303 | Hanks, Kamillah M  2/25/2021 City Council (2021 ) | $4,000.00 | Campgn Consuls. / Campaign Management | Expenditure Payments St#: 7 ID: R0004377 |

| Name | Address | Candidate/Office Date | Amount | Purpose/Explanation | Type |
|------|---------|----------------------|--------|---------------------|------|
| Herrera, Evelyn | Staten Island, NY 10304 | Hanks, Kamillah M  8/12/2017 City Council (2017 ) | $204.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001719 |
| Hewling, Nataki | Staten Island, NY 10301 | Hanks, Kamillah M  11/28/2020 | $350.00 | Other: explntion / Campaign Photoshoot | Expenditure Payments St#: 6 ID: R0003834 |
| Hicks, Kenyetta | Bronx, NY 10462 | Hanks, Kamillah M  9/13/2017 City Council (2017 ) | $144.00 | Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 12 ID: R0002167 |
| Hicks, Latoya | Staten Island, NY 10301 | Hanks, Kamillah M  9/13/2017 City Council (2017 ) | $144.00 | Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 12 ID: R0002170 |
| Hobrah | Staten Island, NY 10310 | Hanks, Kamillah M  9/15/2021 City Council (2021 ) | $93.64 | Other: explntion / Meet & Greet | Expenditure Payments St#: 12 ID: R0005969 |
| Hobrah | Staten Island, NY 10310 | Hanks, Kamillah M  12/10/2020 City Council (2021 ) | $32.12 | Other: explntion / Meet & Greet | Expenditure Payments St#: 6 ID: R0003827 |
| Home Depot | Staten Island, NY 10304 | Hanks, Kamillah M  1/28/2021 City Council (2021 ) | $45.70 | Other: explntion / Ties for Lawn Signs | Expenditure Payments St#: 7 ID: R0004277 |
| Home Depot | Staten Island, NY 10304 | Hanks, Kamillah M  2/12/2021 City Council (2021 ) | $32.56 | Office Expenses / Office Tools | Expenditure Payments St#: 7 ID: R0004518 |
| Honor, Lorraine | Staten Island, NY 10301 | Hanks, Kamillah M  2/1/2017 City Council (2017 ) | $106.49 | Fundraising / Entrance Fee | In Kind Contributions St#: 7 ID: R0000356 |
| Howard Graubard, Esq. | Brooklyn, NY 11217 | Hanks, Kamillah M  7/15/2021 City Council (2021 ) | $75.00 | Prof. Srvcs. / Legal Services | Expenditure Payments St#: 11 ID: R0005462 |
| Howard Graubard, Esq. | Brooklyn, NY 11217 | Hanks, Kamillah M  3/6/2021 City Council (2021 ) | $2,500.00 | Petition Expns. / Lawyer-Petition | Expenditure Payments St#: 7 ID: R0004449 |
| Howard Graubard, Esq. | Brooklyn, NY 11217 | Hanks, Kamillah M  10/12/2020 City Council (2021 ) | $1,000.00 | Prof. Srvcs. / Legal Fees/Retainer | Expenditure Payments St#: 6 ID: R0003778 |
| Howard Graubard, Esq. | Brooklyn, NY 11217 | Hanks, Kamillah M  3/19/2021 City Council (2021 ) | $2,500.00 | Petition Expns. / Petitions Legal | Expenditure Payments St#: 8 ID: R0004879 |
| Howard Graubard, Esq. | Brooklyn, NY 11217 | Hanks, Kamillah M  6/23/2021 City Council (2021 ) | $4,000.00 | Prof. Srvcs. / Legal Services | Expenditure Payments St#: 10 ID: R0005193 |
| Howard Graubard, Esq. | Brooklyn, NY 11217 | Hanks, Kamillah M  7/12/2021 City Council (2021 ) | ($1,608.50) | | Expenditure Refunds St#: 11 ID: R0005427 |
| Hunt, Lorline | Staten Island, NY 10314 | Hanks, Kamillah M  8/10/2017 City Council (2017 ) | $108.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001699 |
| Hunt, Lorline | Staten Island, NY 10314 | Hanks, Kamillah M  8/12/2017 City Council (2017 ) | $228.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001721 |
| Hunt, Lorline | Staten Island, NY 10314 | Hanks, Kamillah M  8/19/2017 City Council (2017 ) | $297.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001759 |
| Hunt, Lorline | Staten Island, NY 10314 | Hanks, Kamillah M  8/26/2017 City Council (2017 ) | $438.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001835 |
| Hunt, Lorline | Staten Island, NY 10314 | Hanks, Kamillah M  9/1/2017 City Council (2017 ) | $132.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 12 ID: R0001911 |

Case 2:23-cv-00012-JLS-KCD   Document 222   Filed 08/01/23   Page 97 of 333   PageID 5682
PageID 3907

| Name | Address | Candidate/Office Date | Amount | Purpose/Explanation | Type |
|---|---|---|---|---|---|
| Hyter, Wuan L | Staten Island, NY 10301 | Hanks, Kamillah M  9/13/2017 City Council (2017 ) | $144.00 | Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 12 ID: R0002172 |
| J&J Printing Company | Bayonne, NJ 07002 | Hanks, Kamillah M  10/5/2021 City Council (2021 ) | $320.27 | Campgn Lit. / Palm Cards | Expenditure Payments St#: 13 ID: R0006479 |
| J&J Printing Company | Bayonne, NJ 07002 | Hanks, Kamillah M  11/22/2021 City Council (2021 ) | $511.40 | Campgn Lit. / Palm Cards | Expenditure Payments St#: 14 ID: R0006683 |
| J&J Printing Company | Bayonne, NJ 07002 | Hanks, Kamillah M  6/9/2021 City Council (2021 ) | $495.90 | Campgn Mlngs / Palm Cards | Expenditure Payments St#: 10 ID: R0004987 |
| J&J Printing Company | Bayonne, NJ 07002 | Hanks, Kamillah M  1/21/2021 City Council (2021 ) | $2,455.69 | Campgn Lit. / Lawn Signs | Expenditure Payments St#: 7 ID: R0004299 |
| J&J Printing Company | Bayonne, NJ 07002 | Hanks, Kamillah M  1/19/2021 City Council (2021 ) | $2,400.00 | Campgn Lit. / Lawn Signs | Expenditure Payments St#: 7 ID: R0004118 |
| J&J Printing Company | Bayonne, NJ 07002 | Hanks, Kamillah M  2/10/2021 City Council (2021 ) | $511.40 | Campgn Lit. / Campaign Lit | Expenditure Payments St#: 7 ID: R0004516 |
| J&J Printing Company | Bayonne, NJ 07002 | Hanks, Kamillah M  5/12/2021 City Council (2021 ) | $578.55 | Campgn Lit. / Palm Cards | Expenditure Payments St#: 8 ID: R0004707 |
| J's On the Bay Luncheonette & | Staten Island, NY 10305 | Hanks, Kamillah M  1/5/2021 City Council (2021 ) | $66.47 | Other: explntion / Meet & Greet | Expenditure Payments St#: 6 ID: R0003863 |
| Jac Mao | Staten Island, NY 10305 | Hanks, Kamillah M  4/23/2021 City Council (2021 ) | $73.04 | Other: explntion / Meet & Greet | Expenditure Payments St#: 8 ID: R0004746 |
| Jameen, Petty | | Hanks, Kamillah M  5/7/2021 City Council (2021 ) | $150.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 8 ID: R0004867 |
| Jenkins, Latisha | Staten Island, NY 10301 | Hanks, Kamillah M  9/13/2017 City Council (2017 ) | $144.00 | Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 12 ID: R0002175 |
| Jenkins, Trestan A | Staten Island, NY 10301 | Hanks, Kamillah M  9/19/2017 City Council (2017 ) | $144.00 | Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 13 ID: R0002103 |
| JMT Media LLC | Staten Island, NY 10305 | Hanks, Kamillah M  11/6/2020 City Council (2021 ) | $2,500.00 | Office Expenses / Website, Logo | Expenditure Payments St#: 6 ID: R0003855 |
| JMT Media LLC | Staten Island, NY 10305 | Hanks, Kamillah M  12/19/2020 City Council (2021 ) | $5,000.00 | Office Expenses / Website, Logo | Expenditure Payments St#: 6 ID: R0003857 |
| JMT Media LLC | Staten Island, NY 10305 | Hanks, Kamillah M  1/25/2021 City Council (2021 ) | $1,500.00 | Office Expenses / Website, Logo | Expenditure Payments St#: 7 ID: R0004052 |
| Johnson, Lacey | Staten Island, NY 10304 | Hanks, Kamillah M  3/12/2021 City Council (2021 ) | $157.50 | Petition Expns. / Wages Petitioning | Expenditure Payments St#: 8 ID: R0004490 |
| Just Yard Signs | Azalea Park, FL 32807 | Hanks, Kamillah M  4/5/2021 City Council (2021 ) | $426.38 | Campgn Lit. / Lawn Signs | Expenditure Payments St#: 8 ID: R0004791 |
| Just Yard Signs | Azalea Park, FL 32807 | Hanks, Kamillah M  10/12/2021 City Council (2021 ) | $487.50 | Campgn Lit. / Yard Signs | Expenditure Payments St#: 13 ID: R0006502 |
| Just Yard Signs | Azalea Park, FL 32807 | Hanks, Kamillah M  10/2/2021 City Council (2021 ) | $464.00 | Campgn Lit. / Yard Signs | Expenditure Payments St#: 13 ID: R0006504 |

| Name | Address | Candidate/Office Date | Amount | Purpose/Explanation | Type |
|---|---|---|---|---|---|
| K Woods Foundation | Staten Island, NY 10304 | Hanks, Kamillah M  9/30/2021 City Council (2021 ) | $641.40 Other: explntion / Community Event Tix | Expenditure Payments St#: 13 ID: R0006510 |
| Kareem Moody Photography | | Hanks, Kamillah M  6/23/2020 City Council (2021 ) | $300.00 Prof. Srvcs. / Campaign Photos | Outstanding Liabilities St#: 16 ID: R0002940 |
| Katz's Delicatessen | New York, NY 10002 | Hanks, Kamillah M  8/17/2021 City Council (2021 ) | $83.62 Other: explntion / Staff Meals | Expenditure Payments St#: 11 ID: R0005523 |
| Key Food | Staten Island, NY 10301 | Hanks, Kamillah M  11/2/2021 City Council (2021 ) | $9.76 Other: explntion / Vol Refreshments | Expenditure Payments St#: 14 ID: R0006618 |
| Key Food | Staten Island, NY 10301 | Hanks, Kamillah M  11/1/2021 City Council (2021 ) | $21.12 Other: explntion / Refreshments | Expenditure Payments St#: 14 ID: R0006620 |
| Key Food | Staten Island, NY 10301 | Hanks, Kamillah M  4/21/2021 City Council (2021 ) | $26.01 Other: explntion / Staff Meals | Expenditure Payments St#: 8 ID: R0004757 |
| Key Food | Staten Island, NY 10301 | Hanks, Kamillah M  6/22/2021 City Council (2021 ) | $3.46 Other: explntion / Chafing Fuel-Meals | Expenditure Payments St#: 10 ID: R0005165 |
| Key Food | Staten Island, NY 10301 | Hanks, Kamillah M  6/22/2021 City Council (2021 ) | $8.70 Other: explntion / Volunteer Meals | Expenditure Payments St#: 10 ID: R0005166 |
| Key Food | Staten Island, NY 10301 | Hanks, Kamillah M  6/22/2021 City Council (2021 ) | $14.98 Other: explntion / Water/Volunteers | Expenditure Payments St#: 10 ID: R0005167 |
| Keyes, Brian | Staten Island, NY 10301 | Hanks, Kamillah M  9/12/2017 City Council (2017 ) | $144.00 Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 12 ID: R0002119 |
| Keyes, Brian | Staten Island, NY 10301 | Hanks, Kamillah M  9/11/2017 City Council (2017 ) | $72.00 Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 12 ID: R0002030 |
| Keyes, Brian | Staten Island, NY 10301 | Hanks, Kamillah M  9/10/2017 City Council (2017 ) | $126.00 Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 12 ID: R0001973 |
| Kings Arms Diner | Staten Island, NY 10310 | Hanks, Kamillah M  9/10/2021 City Council (2021 ) | $76.10 Other: explntion / Meet & Greet | Expenditure Payments St#: 12 ID: R0005956 |
| Kings Arms Diner | Staten Island, NY 10310 | Hanks, Kamillah M  8/29/2021 City Council (2021 ) | $49.42 Other: explntion / Meet & Greet | Expenditure Payments St#: 12 ID: R0005921 |
| Kingsale, Thelma | Stony Point, NY 10980 | Hanks, Kamillah M  3/31/2017 City Council (2017 ) | $100.00 Campgn Consuls. / Catering | Expenditure Payments St#: 8 ID: R0000981 |
| Lance J., Reha | Staten Island, NY 10303 | Hanks, Kamillah M  1/14/2021 City Council (2021 ) | $200.00 Other: explntion / Candidate Headshots | Outstanding Liabilities St#: 16 ID: R0004115 |
| Lewis-Clinton, Scherisce | Staten Island, NY 10305 | Hanks, Kamillah M  9/12/2017 City Council (2017 ) | $144.00 Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 12 ID: R0002121 |
| Liberty Tavern | Staten Island, NY 10301 | Hanks, Kamillah M  3/3/2017 City Council (2017 ) | $134.00 Fundraising / Food, Drinks | Expenditure Payments St#: 7 ID: R0000634 |
| Littman, Ronnie | Staten Island, NY 10302 | Hanks, Kamillah M  6/25/2021 City Council (2021 ) | $105.00 Campgn Wrkrs $$ / Canvassing | Expenditure Payments St#: 10 ID: R0005275 |
| Littman, Ronnie | Staten Island, NY 10302 | Hanks, Kamillah M  3/20/2021 City Council (2021 ) | $435.00 Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 8 ID: R0004873 |

Case 2:23-cv-00012-JLS-KCD   Document 222   Filed 08/21/02   Page 99 of 353   PageID 5684
PageID 3909

| Name | Address | Candidate/Office Date | Amount | Purpose/Explanation | Type |
|---|---|---|---|---|---|
| Lopez, Aaron | Staten Island, NY 10314 | Hanks, Kamillah M  6/22/2021 City Council (2021 ) | $105.00 | Campgn Wrkrs $$ / Canvassing | Expenditure Payments St#: 10 ID: R0005287 |
| Lopez, Dania | Bronx, NY 10455 | Hanks, Kamillah M  6/22/2021 City Council (2021 ) | $105.00 | Campgn Wrkrs $$ / Canvassing | Expenditure Payments St#: 10 ID: R0005285 |
| Love, Stephen | Sayreville, NJ 08872 | Hanks, Kamillah M  9/19/2017 City Council (2017 ) | $144.00 | Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 13 ID: R0002096 |
| Luthmann, Richard | Staten Island, NY 10301 | Hanks, Kamillah M  7/1/2017 City Council (2017 ) | $1,650.00 | Petition Expns. / Petition Filing | Expenditure Payments St#: 9 ID: R0001384 |
| Marco, Priscilla | Staten Island, NY 10304 | Hanks, Kamillah M  6/15/2021 City Council (2021 ) | $500.00 | Campgn Consuls. / Field Consultant | Expenditure Payments St#: 11 ID: R0005454 |
| Marco, Priscilla | Staten Island, NY 10304 | Hanks, Kamillah M  3/20/2021 City Council (2021 ) | $240.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 8 ID: R0004875 |
| Marco, Priscilla | Staten Island, NY 10304 | Hanks, Kamillah M  4/17/2021 City Council (2021 ) | $500.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 8 ID: R0004878 |
| Marco, Priscilla | Staten Island, NY 10304 | Hanks, Kamillah M  3/10/2021 City Council (2021 ) | $420.00 | Petition Expns. / Wages Petitioning | Expenditure Payments St#: 7 ID: R0004493 |
| Martin Hughes Funeral Home | Staten Island, NY 10304 | Hanks, Kamillah M  8/11/2021 City Council (2021 ) | $239.07 | Other: explntion / Funeral Florals | Expenditure Payments St#: 11 ID: R0005501 |
| Martin, Tara | NY | Hanks, Kamillah M  9/29/2021 City Council (2021 ) | $450.00 | Other: explntion / DJ Services | Expenditure Payments St#: 13 ID: R0006462 |
| McAfee | Santa Clara, CA 95054 | Hanks, Kamillah M  2/9/2017 City Council (2017 ) | $43.54 | Office Expenses / Anti Virus Software | Expenditure Payments St#: 7 ID: R0000376 |
| McDonald's | Staten Island, NY 10310 | Hanks, Kamillah M  11/2/2021 City Council (2021 ) | $38.65 | Other: explntion / Staff Meals | Expenditure Payments St#: 14 ID: R0006622 |
| McDonald's | Staten Island, NY 10310 | Hanks, Kamillah M  4/19/2021 City Council (2021 ) | $6.53 | Other: explntion / Staff Meals | Expenditure Payments St#: 8 ID: R0004763 |
| McFadden, Shavar | Far Rockaway, NY 11691 | Hanks, Kamillah M  8/19/2017 City Council (2017 ) | $84.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001761 |
| McFadden, Shavar | Far Rockaway, NY 11691 | Hanks, Kamillah M  8/12/2017 City Council (2017 ) | $36.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001723 |
| McFadden, Shavar | Far Rockaway, NY 11691 | Hanks, Kamillah M  9/10/2017 City Council (2017 ) | $120.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 12 ID: R0001975 |
| McFadden, Shavar | Far Rockaway, NY 11691 | Hanks, Kamillah M  9/1/2017 City Council (2017 ) | $60.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 12 ID: R0001913 |
| McFadden, Shavar | Far Rockaway, NY 11691 | Hanks, Kamillah M  8/26/2017 City Council (2017 ) | $132.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001837 |
| McFadden, Shavar | Far Rockaway, NY 11691 | Hanks, Kamillah M  8/10/2017 City Council (2017 ) | $78.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001693 |
| McFadden, Shavar | Far Rockaway, NY 11691 | Hanks, Kamillah M  9/11/2017 City Council (2017 ) | $30.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 12 ID: R0002032 |

Case 1:22-cv-00201-SRC-JBW Document 22-2 Filed 08/04/23 1:02:35 100 Page 234 of 358 PageID 3910

| Name | Address | Candidate/Office | Date | Amount | Purpose/Explanation | Type |
|------|---------|------------------|------|--------|---------------------|------|
| Rogers, Jamie | Staten Island, NY 10310 | Hanks, Kamillah M City Council (2017 ) | 9/13/2017 | $84.00 | Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 12 ID: R0002182 |
| Rose Sign Art | | Hanks, Kamillah M City Council (2021 ) | 2/24/2021 | $700.00 | Campgn Lit. / Window Vinyl Poster | Expenditure Payments St#: 7 ID: R0004453 |
| Ross, Charmiane | Staten Island, NY 10310 | Hanks, Kamillah M City Council (2017 ) | 9/13/2017 | $144.00 | Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 12 ID: R0002186 |
| Ruddy & Dean | Staten Island, NY 10301 | Hanks, Kamillah M City Council (2021 ) | 10/20/2021 | $257.56 | Other: explntion / Staff Meals/Meeting | Expenditure Payments St#: 14 ID: R0006281 |
| Sailors Snug Harbor Little Lea | Staten Island, NY 10310 | Hanks, Kamillah M City Council (2021 ) | 11/29/2021 | $60.00 | Other: explntion / Community Event | Expenditure Payments St#: 15 ID: R0006706 |
| Santinos Gourmet Deli | Staten Island, NY 10301 | Hanks, Kamillah M City Council (2021 ) | 6/22/2021 | $157.35 | Other: explntion / Staff/Vol Meals | Expenditure Payments St#: 10 ID: R0005173 |
| Santos, Samantha | Staten Island, NY 10305 | Hanks, Kamillah M City Council (2017 ) | 9/15/2017 | $144.00 | Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 12 ID: R0002231 |
| Santos, Samantha | Staten Island, NY 10305 | Hanks, Kamillah M City Council (2017 ) | 9/11/2017 | $54.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 12 ID: R0002046 |
| Santos, Samantha | Staten Island, NY 10305 | Hanks, Kamillah M City Council (2017 ) | 8/10/2017 | $360.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001681 |
| Santos, Samantha | Staten Island, NY 10305 | Hanks, Kamillah M City Council (2017 ) | 8/12/2017 | $135.00 | Campgn Wrkrs $$ / Canvasser | Expenditure Payments St#: 11 ID: R0001733 |
| Sawires, Antoun | Staten Island, NY | Hanks, Kamillah M City Council (2021 ) | 6/22/2021 | $2,250.00 | Campgn Consuls. / Field Consultant | Expenditure Payments St#: 10 ID: R0005196 |
| Sawires, Antoun | Staten Island, NY | Hanks, Kamillah M City Council (2021 ) | 5/20/2021 | $2,250.00 | Campgn Consuls. / Campaign Consultant | Expenditure Payments St#: 9 ID: R0005039 |
| Scale to Win | Santa Ana, CA 92703 | Hanks, Kamillah M City Council (2021 ) | 5/20/2021 | $585.14 | Other: explntion / Text Services | Expenditure Payments St#: 9 ID: R0005025 |
| Scale to Win | Santa Ana, CA 92703 | Hanks, Kamillah M City Council (2021 ) | 6/11/2021 | $4.10 | Other: explntion / Text Services | Expenditure Payments St#: 10 ID: R0005027 |
| Scale to Win | Santa Ana, CA 92703 | Hanks, Kamillah M City Council (2021 ) | 11/5/2021 | $16.66 | Other: explntion / Text Services | Expenditure Payments St#: 14 ID: R0006647 |
| Scale to Win | Santa Ana, CA 92703 | Hanks, Kamillah M City Council (2021 ) | 11/8/2021 | $332.24 | Other: explntion / Text Services | Expenditure Payments St#: 14 ID: R0006654 |
| Scale to Win | Santa Ana, CA 92703 | Hanks, Kamillah M City Council (2021 ) | 11/8/2021 | $1,661.46 | Other: explntion / Text Services | Expenditure Payments St#: 14 ID: R0006656 |
| Scale to Win | Santa Ana, CA 92703 | Hanks, Kamillah M City Council (2021 ) | 7/8/2021 | $323.57 | Other: explntion / Text Services | Expenditure Payments St#: 11 ID: R0005447 |
| Scale to Win | Santa Ana, CA 92703 | Hanks, Kamillah M City Council (2021 ) | 7/15/2021 | $472.04 | Other: explntion / Text Services | Expenditure Payments St#: 11 ID: R0005451 |
| Scale to Win | Santa Ana, CA 92703 | Hanks, Kamillah M City Council (2021 ) | 6/21/2021 | $91.92 | Other: explntion / Text Services | Expenditure Payments St#: 10 ID: R0005329 |

| Name | Address | Candidate/Office | Date | Amount | Purpose/Explanation | Type |
|---|---|---|---|---|---|---|
| thanks.io | Two Rivers, AK | Hanks, Kamillah M City Council (2021 ) | 4/6/2021 | $320.09 | Campgn Mlngs / Postcard Mailing | Expenditure Payments St#: 8 ID: R0004786 |
| thanks.io | Two Rivers, AK | Hanks, Kamillah M City Council (2021 ) | 4/13/2021 | $49.00 | Campgn Mlngs / Postcard | Expenditure Payments St#: 8 ID: R0004779 |
| thanks.io | Two Rivers, AK | Hanks, Kamillah M City Council (2021 ) | 4/23/2021 | $55.48 | Campgn Mlngs / Post Card Mailing | Expenditure Payments St#: 8 ID: R0004748 |
| thanks.io | Two Rivers, AK | Hanks, Kamillah M City Council (2021 ) | 11/23/2021 | $49.00 | Campgn Mlngs / Postcard Membership | Expenditure Payments St#: 14 ID: R0006662 |
| thanks.io | Two Rivers, AK | Hanks, Kamillah M City Council (2021 ) | 7/13/2021 | $49.00 | Campgn Mlngs / Postcard Service | Expenditure Payments St#: 11 ID: R0005436 |
| thanks.io | Two Rivers, AK | Hanks, Kamillah M City Council (2021 ) | 6/14/2021 | $49.00 | Campgn Mlngs / Postcard Membership | Expenditure Payments St#: 10 ID: R0005336 |
| thanks.io | Two Rivers, AK | Hanks, Kamillah M City Council (2021 ) | 8/13/2021 | $49.00 | Campgn Mlngs / Postcard Service | Expenditure Payments St#: 11 ID: R0005508 |
| thanks.io | Two Rivers, AK | Hanks, Kamillah M City Council (2021 ) | 9/13/2021 | $49.00 | Campgn Mlngs / Post Card Mail Svc | Expenditure Payments St#: 12 ID: R0005954 |
| thanks.io | Two Rivers, AK | Hanks, Kamillah M City Council (2021 ) | 9/30/2021 | $76.46 | Campgn Mlngs / Postcard Mailing | Expenditure Payments St#: 13 ID: R0006506 |
| thanks.io | Two Rivers, AK | Hanks, Kamillah M City Council (2021 ) | 10/13/2021 | $49.00 | Campgn Mlngs / Postcard Service | Expenditure Payments St#: 13 ID: R0006500 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 10/18/2021 | $2,900.00 | Campgn Mlngs / Pre Election Mailer | Expenditure Payments St#: 13 ID: R0006517 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 10/5/2021 | $1,000.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 13 ID: R0006507 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 10/12/2021 | $22,100.00 | Campgn Mlngs / General Mailing | Expenditure Payments St#: 13 ID: R0006498 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 11/9/2021 | $3,000.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 14 ID: R0006564 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 10/26/2021 | $9,018.10 | Campgn Mlngs / General Mailing | Expenditure Payments St#: 14 ID: R0006531 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 10/21/2021 | $8,460.21 | Campgn Mlngs / Pre Election Mailer | Expenditure Payments St#: 14 ID: R0006395 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 6/14/2021 | $5,878.40 | Campgn Mlngs / Campaign Mailer | Expenditure Payments St#: 10 ID: R0005324 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 6/15/2021 | $9,675.68 | Campgn Mlngs / Campaign Mailer | Expenditure Payments St#: 10 ID: R0005325 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 5/30/2017 | $754.50 | Campgn Lit. / Palm Cards | Expenditure Payments St#: 9 ID: R0001108 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 5/30/2017 | $646.72 | Campgn Lit. / Window Signs | Expenditure Payments St#: 9 ID: R0001110 |

| Name | Address | Candidate/Office | Date | Amount | Purpose/Explanation | Type |
|------|---------|------------------|------|--------|---------------------|------|
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 5/15/2017 | $2,500.00 | Campgn Consuls. / April Fees | Expenditure Payments St#: 9 ID: R0001078 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 5/15/2017 | $520.00 | Campgn Lit. / Palm cards | Expenditure Payments St#: 9 ID: R0001080 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 3/23/2017 | $2,500.00 | Campgn Consuls. / Consulting Fee | Expenditure Payments St#: 8 ID: R0000874 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 3/23/2017 | $2,500.00 | Campgn Consuls. / March Fees | Expenditure Payments St#: 8 ID: R0000875 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 1/19/2017 | $2,500.00 | Campgn Consuls. / Consulting Fee | Expenditure Payments St#: 7 ID: R0000218 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 2/22/2017 | $650.00 | Campgn Lit. / Palm cards | Expenditure Payments St#: 7 ID: R0000400 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 2/22/2017 | $200.00 | Campgn Lit. / Business Cards | Expenditure Payments St#: 7 ID: R0000402 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 12/16/2016 | $5,000.00 | Campgn Consuls. / Monthly Consulting | Expenditure Payments St#: 6 ID: R0000025 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 12/28/2016 | $10,000.00 | Campgn Consuls. / Consulting fees | Expenditure Payments St#: 6 ID: R0000066 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 1/5/2018 | $1,750.00 | Campgn Mlngs / Holiday Thank You's | Expenditure Payments St#: 16 ID: R0002310 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 9/12/2017 | $700.00 | Prof. Srvcs. / Printing Expense | Expenditure Payments St#: 12 ID: R0002012 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/28/2017 | $845.14 | Campgn Mlngs / Postage & Mailing | Expenditure Payments St#: 11 ID: R0001868 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/28/2017 | $5,490.10 | Campgn Mlngs / Postage & Printing | Expenditure Payments St#: 11 ID: R0001870 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/28/2017 | $7,306.06 | Campgn Mlngs / Postage & Prnting | Expenditure Payments St#: 11 ID: R0001872 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/28/2017 | $986.68 | Campgn Mlngs / Printing Exp | Expenditure Payments St#: 11 ID: R0001874 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 9/10/2017 | $583.36 | Prof. Srvcs. / Auto & Live calls | Expenditure Payments St#: 12 ID: R0001995 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 9/10/2017 | $1,260.00 | Prof. Srvcs. / GOTV Robo Call | Expenditure Payments St#: 12 ID: R0001997 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 7/18/2017 | $1,500.00 | Prof. Srvcs. / Campaign Mgt | Expenditure Payments St#: 10 ID: R0001525 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 7/25/2017 | $1,500.00 | Prof. Srvcs. / Campaign Mgt | Expenditure Payments St#: 10 ID: R0001526 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 7/25/2017 | $1,500.00 | Prof. Srvcs. / Campaign Mgt | Expenditure Payments St#: 10 ID: R0001527 |

Case 2:22-cv-00201-SRC-JBM Document 22-2 Filed 08/04/23 Page 33 of 53 Page ID 2688

Case 2:23-cv-00201-SRC-JBM Document 22-2 Filed 08/04/23 Page 33 of 53 PageID 3913

| Name | Address | Candidate/Office | Date | Amount | Purpose/Explanation | Type |
|------|---------|------------------|------|--------|---------------------|------|
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/4/2017 | $7,827.89 | Print Ads / Postage and Printing | Expenditure Payments St#: 10 ID: R0001547 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/11/2017 | $135.00 | Campgn Mlngs / Mail Flyers | Expenditure Payments St#: 11 ID: R0001608 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/11/2017 | $845.14 | Office Expenses / Palm Carda | Expenditure Payments St#: 11 ID: R0001610 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/11/2017 | $7,767.78 | Postage / Postage & Printing | Expenditure Payments St#: 11 ID: R0001612 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/8/2017 | $5,500.00 | Prof. Srvcs. / Consulting Service | Expenditure Payments St#: 11 ID: R0001581 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/8/2017 | $797.05 | Campgn Mlngs / Copies,Envelopes,Pos | Expenditure Payments St#: 11 ID: R0001583 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/8/2017 | $754.50 | Campgn Lit. / Palm Card | Expenditure Payments St#: 11 ID: R0001585 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/24/2017 | $335.38 | Campgn Mlngs / Mailing out flyer | Expenditure Payments St#: 11 ID: R0001792 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/24/2017 | $3,302.94 | Campgn Lit. / PBA Mailer | Expenditure Payments St#: 11 ID: R0001794 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/24/2017 | $760.00 | Campgn Lit. / Flyers | Expenditure Payments St#: 11 ID: R0001796 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/24/2017 | $2,597.81 | Campgn Lit. / Mailers | Expenditure Payments St#: 11 ID: R0001798 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2017 ) | 8/24/2017 | $2,500.00 | Prof. Srvcs. / Consulting Serv | Expenditure Payments St#: 11 ID: R0001800 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 11/4/2021 | $3,000.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 14 ID: R0006660 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 4/20/2021 | $1,000.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 8 ID: R0004775 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 4/14/2021 | $1,000.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 8 ID: R0004776 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 4/14/2021 | $1,000.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 8 ID: R0004777 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 5/18/2021 | $14,476.00 | Campgn Mlngs / Campaign Mailer | Expenditure Payments St#: 9 ID: R0004940 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 6/4/2021 | $9,994.51 | Campgn Mlngs / Campaign Mailer | Expenditure Payments St#: 9 ID: R0004946 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 6/9/2021 | $1,000.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 10 ID: R0004974 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 6/8/2021 | $7,622.07 | Campgn Mlngs / Campaign Mailer | Expenditure Payments St#: 10 ID: R0004977 |

| Name | Address | Candidate/Office | Date | Amount | Purpose/Explanation | Type |
|------|---------|------------------|------|--------|---------------------|------|
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 3/3/2021 | $15,227.14 | Campgn Mlngs / Campaign Mailer | Expenditure Payments St#: 7 ID: R0004423 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 12/16/2020 | $1,072.51 | Campgn Mlngs / Holiday Post Card | Expenditure Payments St#: 6 ID: R0003946 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 9/8/2021 | $2,500.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 6 ID: R0003967 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 11/13/2020 | $2,500.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 6 ID: R0003969 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 12/22/2020 | $2,500.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 6 ID: R0003971 |
| The Advance Group | New York, NY 10006 | Hanks, Kamillah M City Council (2021 ) | 12/22/2020 | $2,500.00 | Campgn Consuls. / Political Consultant | Expenditure Payments St#: 6 ID: R0003973 |
| The Kettle Black | Staten Island, NY 10310 | Hanks, Kamillah M City Council (2021 ) | 4/30/2021 | $56.09 | Other: explntion / Meet & Greet | Expenditure Payments St#: 8 ID: R0004725 |
| The Kettle Black | Staten Island, NY 10310 | Hanks, Kamillah M City Council (2021 ) | 5/10/2021 | $64.25 | Other: explntion / Meet & Greet | Expenditure Payments St#: 8 ID: R0004721 |
| The Kettle Black | Staten Island, NY 10310 | Hanks, Kamillah M City Council (2021 ) | 3/6/2021 | $105.19 | Other: explntion / Volunteer Meals | Expenditure Payments St#: 7 ID: R0004406 |
| The Kettle Black | Staten Island, NY 10310 | Hanks, Kamillah M City Council (2021 ) | 5/31/2021 | $143.03 | Other: explntion / Meet & Greet | Expenditure Payments St#: 9 ID: R0004950 |
| The Kettle Black | Staten Island, NY 10310 | Hanks, Kamillah M City Council (2021 ) | 4/21/2021 | $57.52 | Other: explntion / Meet & Greet | Expenditure Payments St#: 8 ID: R0004753 |
| The Kettle Black | Staten Island, NY 10310 | Hanks, Kamillah M City Council (2021 ) | 4/21/2021 | $33.96 | Other: explntion / Meet & Greet | Expenditure Payments St#: 8 ID: R0004755 |
| The Kettle Black | Staten Island, NY 10310 | Hanks, Kamillah M City Council (2021 ) | 4/13/2021 | $47.09 | Other: explntion / Meet & Greet | Expenditure Payments St#: 8 ID: R0004781 |
| The Kettle Black | Staten Island, NY 10310 | Hanks, Kamillah M City Council (2021 ) | 6/18/2021 | $38.76 | Other: explntion / Meet & Greet | Expenditure Payments St#: 10 ID: R0005323 |
| The Richmond | Staten Island, NY 10304 | Hanks, Kamillah M City Council (2021 ) | 9/25/2021 | $370.08 | Other: explntion / Meet & Greet | Expenditure Payments St#: 12 ID: R0005989 |
| The Richmond | Staten Island, NY 10304 | Hanks, Kamillah M City Council (2021 ) | 9/14/2021 | $20.84 | Fundraising / Catering/Bev. | Expenditure Payments St#: 12 ID: R0005963 |
| The Richmond | Staten Island, NY 10304 | Hanks, Kamillah M City Council (2021 ) | 9/14/2021 | $3,995.13 | Fundraising / Catering | Expenditure Payments St#: 12 ID: R0005965 |
| The Richmond | Staten Island, NY 10304 | Hanks, Kamillah M City Council (2021 ) | 11/2/2021 | $1,056.98 | Other: explntion / Election Celebration | Expenditure Payments St#: 14 ID: R0006634 |
| The Twisted Vine | Staten Island, NY 10301 | Hanks, Kamillah M City Council (2021 ) | 8/12/2021 | $24.90 | Other: explntion / Meet & Greet Meal | Expenditure Payments St#: 11 ID: R0005515 |
| Thomas, Crystal | Staten Island, NY 10312 | Hanks, Kamillah M City Council (2017 ) | 9/13/2017 | $144.00 | Campgn Wrkrs $$ / GOTV | Expenditure Payments St#: 12 ID: R0002198 |

# EXHIBIT B

Subscribe

News never stops. Neither do we. Support SILive.com

Advertisement

News

# Marius is off the ballot, North Shore primary between Rose, Hanks

Updated: Aug. 01, 2017, 7:10 p.m. | Published: Aug. 01, 2017, 6:10 p.m.

221
shares

NEW!

By Rachel Shapiro | rshapiro@siadvance.com

STATEN ISLAND, N.Y. -- Phil Marius, one of two Democratic primary challengers to Councilwoman Debi Rose, won't be on the September ballot because his campaign didn't collect enough valid signatures for his designating petition, the city Board of Elections found Tuesday.

A clerk's report issued Monday found that Marius had 442 valid signatures, falling eight short of the required 450 to get on the primary ballot.

Advertisement

He had collected 1,189 but 747 were invalid for illegible signatures, illegible addresses, no address or wrong address, signers living outside the district, witnesses to signatures in the wrong county and more.

Advertisement

More than 300 signatures were from people not registered as Democrats.

After Marius filed his petition with the Board of Elections, an objection was filed, as is typical in most races. Objections were filed to Hanks and Rose too.

Conservative Michael Penrose, who also has the Republican Party line in the November general election for the North Shore council seat, didn't have any objections filed against his petitions.

The objections against Marius' petitions had been filed in the name of Tammara Moore, the wife of Richard Luthmann.

Advertisement

Luthmann is Hanks' personal attorney and is law chairman for the Reform Party, a line that Hanks has in the general election.

He represented the objections to the Board of Elections Tuesday, which voted unanimously to invalidate Marius' petition.

The objections also included the allegation that 185 additional signatures were fraudulent, a matter that the Board of Elections didn't rule on because it doesn't have jurisdiction, they would have to be brought to court.

Advertisement

Marius argued he counted 510 valid signatures, but didn't have a line-by-line counter to the clerk's report that found 442 signatures. He said he didn't have time to look through the clerk's report released on Monday.

He could still opt to run as an independent if he collects valid signatures from registered voters in the district, a less burdensome process than collecting from registered Democrats only.

Marius would not say whether he's considering that option and offered no other comment on the board's ruling Tuesday.

Hanks, who has a better chance of winning in a one-on-one primary against Rose, said, "Running for elected office is not easy. It takes a lot of courage, hard-work, and dedication -- all values I have seen in Phil Marius. Phil has been a true role model for the young people of Staten Island and I hope he continues to inspire our communities. He is a natural leader and I look forward to the opportunity to work with him in the future."

Advertisement

Bob Olivari, a Rose campaign spokesman, said, "As the petitioning process winds down, the Debi Rose re-election campaign can now focus all our efforts on voter contact. Debi has a great record for Staten Island."

If you purchase a product or register for an account through one of the links on our site, we may receive compensation.



**Cookies Settings**

© 2022 Advance Local Media LLC. All rights reserved (About Us).

The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

Community Rules apply to all content you upload or otherwise submit to this site.

Ad Choices

Registration on or use of this site constitutes acceptance of our User Agreement, Privacy Policy and Cookie Statement, and Your California Privacy Rights (User Agreement updated 1/1/21. Privacy Policy and Cookie Statement updated 7/1/2022).

# EXHIBIT C



NEW YORK POST

LOG IN

**RECOMMENDED**

    

**METRO**

# Melissa Mark-Viverito to pay $7K fine for campaign-finance shenanigans

By Michael Gartland

January 6, 2016 | 12:46pm



Melissa Mark-Viverito

William Farrington

**MORE ON:**
**MELISSA MARK-VIVERITO**

'More like a political hiring hall':
Adams pays off 'political debt'

City Council Speaker Melissa Mark-Viverito has agreed to pay a $7,000 fine to settle charges that she violated the city's campaign finance law by accepting free consulting advice from a lobbyist to land her post in 2013.

As part of a settlement with the Conflicts-of-Interest Board, Mark-Viverito (D-Manhattan) also had to pay the consultant, The Advance Group, $3,796 for its



# NEW YORK POST

LOG IN

RECOMMENDED

**Blasio after mayor rips Michael Bloomberg**

**Melissa Mark-Viverito among protesters arrested at MoMA**

was acceptance of free consulting services."

Mark-Viverito told reporters she considers the outcome a "positive resolution."

"I'm happy it's resolved and I'm moving forward. I've got a lot of work to do," she said. "It's concluded, it's done, moving forward."

Scott Levenson, the Advance Group's president and a registered lobbyist, was fined $4,000 for his role.

Mark-Viverito took on Levenson to help with her campaign to come speaker in September 2013. Two other Advance Group honchos — vice president Joanthan Yedin and chief of staff Katie Franger — then "volunteered their efforts to further my speaker campaign," she said in the settlement.

For the next two months, they devoted two or three hours a week to her campaign. The Advance Group also shelled out $1,796 to have 3,000 fliers printed for use at the 2013 Somos El Futuro Conference in Puerto Rico promoting Mark-Viverito.

But the consultant — who has extensive dealings with city government –never invoiced Mark-Viverito's campaign.

The Advance Group was previously fined $15,000 by the city's Campaign finance Board and $10,800 by the state for other violations in the 2013 elections.

**FILED UNDER**  CAMPAIGN FINANCE , CITY COUNCIL , CITY HALL , MELISSA MARK-VIVERITO    1/6/16

**READ NEXT**  Jury will decide fate of cop who fatally shot unarmed man ...

## AROUND THE WEB





Case 2:23-cv-00201-SRC-JBC Document 22-1 Filed 07/01/25 Page 112 of 324 PageID 3697
Case 2:23-cv-00201-SRC-JBC Document 22-1 Filed 08/04/23 Page 11 Page 346 of 358
PageID 3922

# EXHIBIT D

ADVERTISEMENT

HOME

# Candidate and Consultant Feud, Police Called

Not so much post-election etiquette on the South Shore of Staten Island, reports Tom Wrobleski: Democrat Janine Materna's campaign is

By <u>Azi Paybarah</u> • 11/09/09 6:55pm





Not so much post-election etiquette on the South Shore of Staten Island, <u>reports Tom Wrobleski</u>:

Democrat <u>Janine Materna</u>'s campaign is considering suing its consulting firm, the Advance Group, for $1 million, and claimed that consultant Scott Levenson's position with the controversial ACORN group was among the reasons Ms. Materna lost the South Shore City Council race.

ADVERTISEMENT



She said the campaign did not know of Levenson's ACORN affiliation and if it had, "we never would have hired him."

[skip]

ADVERTISEMENT

Levenson said the campaign on Thursday paid him about $35,000, with $5,000 still owed. But Jodi Materna said Levenson is due nothing else and that some campaign costs are still "in dispute."

The two sides had a heated meeting in Levenson's Manhattan office on Thursday, with police eventually being called in. No arrests were made.

Said Levenson, "The lies and erratic behavior of the Materna family are nothing more than a scam to avoid paying their bills. It is an extreme case of sore loser."

ADVERTISEMENT

**Filed Under:** Home, Politics, Scott Levenson, Tom Wrobleski, Janin Materna

**SEE ALSO**: Inside LA's Star Garden Strike: Strippers Are Organizing Whether You Like It or Not

# EXHIBIT E

# Department of State
## Division of Corporations

### Entity Information

Return to Results     Return to Search

**Entity Details**                                                              ⌃

| | |
|---|---|
| **ENTITY NAME:** KPH CONSULTING INC. | **DOS ID:** 5500256 |
| **FOREIGN LEGAL NAME:** | **FICTITIOUS NAME:** |
| **ENTITY TYPE:** DOMESTIC BUSINESS CORPORATION | **DURATION DATE/LATEST DATE OF DISSOLUTION:** |
| **SECTION OF LAW:** 402 BCL - BUSINESS CORPORATION LAW | **ENTITY STATUS:** ACTIVE |
| **DATE OF INITIAL DOS FILING:** 02/25/2019 | **REASON FOR STATUS:** |
| **EFFECTIVE DATE INITIAL FILING:** 02/25/2019 | **INACTIVE DATE:** |
| **FOREIGN FORMATION DATE:** | **STATEMENT STATUS:** PAST DUE DATE |
| **COUNTY:** NEW YORK | **NEXT STATEMENT DUE DATE:** 02/28/2021 |
| **JURISDICTION:** NEW YORK, UNITED STATES | **NFP CATEGORY:** |

| | | | | |
|---|---|---|---|---|
| | ENTITY DISPLAY | NAME HISTORY | FILING HISTORY | MERGER HISTORY | ASSUMED NAME HISTORY |

**Service of Process Name and Address**

**Name:** KAMILLAH PAYNE-HANKS

**Address:** 37 TAPPEN COURT, STATEN ISLAND, NY, UNITED STATES, 10304

**Chief Executive Officer's Name and Address**

**Name:**

**Address:**

**Principal Executive Office Address**

**Address:**

**Registered Agent Name and Address**

**Name:**

**Address:**

**Entity Primary Location Name and Address**

**Name:**

**Address:**

**Farmcorpflag**

**Is The Entity A Farm Corporation:** NO

**Stock Information**

| Share Value | Number Of Shares | Value Per Share |
|---|---|---|
| NO PAR VALUE | 200 | $0.00 |

1/2

# EXHIBIT F



**New York City Campaign Finance Board**
100 Church Street, 12th Floor, New York, NY 10007
212.409.1800 | www.nyccfb.info

Frederick P. Schaffer
*Chair*

Gregory T. Camp
Richard J. Davis
Marianne Camille Spraggins
Naomi B. Zauderer
*Members*

Amy M. Loprest
*Executive Director*

November 26, 2019

**By First Class Mail and C-ACCESS**

Kamillah Payne-Hanks

Kamillah Hanks 2017

## FINAL BOARD DETERMINATION – EC2017 CAMPAIGN

The New York City Campaign Finance Board (the "Board"), at a meeting held on November 21, 2019, determined that the Kamillah Payne-Hanks 2017 Campaign (the "Campaign") violated the Act and Board rules and the Candidate, the Treasurer, and the Committee are jointly and severally liable for paying $1,329 in penalties as follows:

1.      A violation with no penalty for filing a late disclosure statement. *See* N.Y.C. Charter § 1052(a)(8); Admin. Code §§ 3-703(6), (12), 3-708(8); Board Rules 1-09, 3-02. The Campaign filed Disclosure Statement #14 on October 30, 2017, three days after the filing deadline of October 27, 2017. The Board assessed a violation with no penalty because the Campaign submitted only one statement untimely, no more than 10 days late.

2.      A penalty of $1,000 for accepting contributions from corporations. *See* N.Y.C. Charter § 1052(a)(13); Admin. Code §§ 3-702 (8), 3-703(1)(l); Board Rules 1-02, 1-04(c)(1), (e), (g)(4), (5), 1-05. The Campaign accepted in-kind contributions from Casa Belvedere and Cornerstone Realty, both of which are corporations. The Board assessed a penalty of $750 ($250 plus the amount of the contribution) for Casa Belvedere and $250 for Cornerstone Realty.

Candidate ID #: 1996-P

3. A penalty of $329 for failing to demonstrate that spending was in furtherance of the campaign. *See* Admin. Code §§ 3-702(21)(a), (b); 3-703(1)(d), (g), (6), (11); Board Rules 1-03(a), 1-08(p), 4-01(e). The Campaign paid $372 to a campaign worker, $72 in excess of the amount accounted for in the individual's timesheet provided by the Campaign. The Campaign also paid $2,145 to a consultant, $895 in excess of the amount provided for in the consultant's contract with the Campaign. The Campaign also made a $350 payment to Shore to Shore Realty, which was not accounted for in the Campaign's lease with Shore to Shore Realty. The Board assessed a penalty equal to 25% of the amount of the expenditures.

You must pay to the Board the full amount due of $1,329 no later than December 26, 2019. Checks should be made payable to the "New York City Election Campaign Finance Fund," and mailed to the attention of Jason Yee, Associate Counsel, New York City Campaign Finance Board, 100 Church Street, 12th Floor, New York, NY 10007 or delivered to the offices of the Board.

If the Board is not in receipt of the full $1,329 by December 26, 2019, the candidate's name and the unpaid amount will be posted on the Board's Website and the Board may initiate a civil action against the Committee, the Candidate, and the Treasurer to compel payment. In addition, you will be ineligible for public funds in any future election until this debt is paid in full.

**The Campaign will receive a Final Audit Report containing additional information regarding the matters listed herein, as well as any audit-only findings, which are not associated with any violation and are thus not included in this determination.**

You may challenge this final determination, within four months, in the New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules.

If you need additional time to pay this amount or if you have any questions concerning this Final Board Determination, please contact Jason Yee, Associate Counsel, at (212) 409-1765 or JYee@nyccfb.info.

Signature on original

Hillary Weisman
General Counsel

**NEW YORK CITY
CAMPAIGN FINANCE BOARD**

2

# Almagno Law, Inc.

Lawrence P. Almagno Jr., Esq
Licensed in RI NY & MA

**VIA U.S. Mail**

**Advance copy sent to: richard.luthmann@gmail.com**

September 1, 2022

Luthmann Law Firm, PLLC
c/o Almagno Law, Inc.
42 W. 43rd Street, Ste. 169
New York, NY 10036

Richard Luthmann
338 Sugar Pine Lane
Naples, FL 34108

**Re:** **Debt Collection – Luthmann Law Firm, PLLC ("LLF")**
**Richard Luthmann as successor to LLF and for the benefit**
**of the successors, assigns, and creditors of LLF**

Dear Mr. Luthmann:

You have engaged Almagno Law, Inc. (the "Law Firm") to prosecute collections matters against former clients of the now defunct Luthmann Law Firm, PLLC ("LLF") on behalf of the entity as a successor in interest. You have several creditors, the most significant of which is the United States Government.

This Law Firm has reviewed the underlying paperwork and we are of the opinion that you have several valid claims against former LLF clients.

**Breach of Contract**

Although not required in New York, it was standard practice of the LLF to have signed engagement letters on file for its clients. As such, given the billing records and other evidence, you have claims for breach of contract against former LLF clients with outstanding accounts. There was an agreement between LLF and the former client; LLF performed under the agreement; the former client failed to make payment; and LLF has suffered damages as a result. *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 181-82 (2011); *Heijung Park v. Nam*

---

**Rhode Island Office**
10 Rangeley Road
Cranston, Rhode Island 02920

**New York Office**
43 W 43rd St. Ste 169
New York, NY 10036

Tel: (401) 946-4529 | Fax: (401) 464-4529
Email: LA@Almagno-Law.com

Case 2:23-cv-00001-SRC-JBC Document 22-1 Filed 07/01/25 Page 12 of 14 PageID 858
Case 2:23-cv-00001-SRC-JBC Document 22-1 Filed 07/01/25 Page 12 of 14 PageID 706
PageID 3931

*Young Kim*, 205 A.D. 3d 429, 438 (1st Dep't 2022); *Core Dev. Grp. LLC v. Spaho*, 199 A.D. 3d 447, 449 (1st Dep't 2021); *Alloy Advisory, LLC v. 503 West 33rd Street Associates, Inc*., 195 A.D.3d 436, 144 N.Y.S.3d 854 (1st Dept. 2021); *Markov v. Katt*, 176 A.D. 3d 401, 401-02 (1st Dep't 2019).

Additionally, the contracts between the LLF and its former clients are all implied in fact. The case files as well as court filings and other materials show conduct by the parties consonant with the existence of a contract. A contract implied in fact rests upon the conduct of the parties and not their verbal or written words. *Parsa v. State*, 64 N.Y.2d 143, 148 (1984). An implied in fact contract requires: Mutual assent; Consideration; Legal capacity; and Legal subject matter. *See Maas v. Cornell Univ.*, 94 N.Y.2d 87, 94 (1999); *Jemzura v. Jemzura*, 36 N.Y.2d 496, 503-4 (1975); *Mirchel v. R.M.J. Sec. Corp.*, 205 A.D.2d 388, 390 (1st Dep't 1994). All of these elements are present here.


## Account Stated

"Under federal and New York law, an account stated refers to a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due." *See Nat'l Econ. Research Assocs. v. Purolite "C" Corp.*, No. 08 Civ. 7600(PGG), 2011 U.S. Dist. LEXIS 24458, at *6 (S.D.N.Y March 10, 2011); *see also Interman Indus. Prods.*, Ltd. v. R. S. M. Electron Power, Inc., 37 N.Y.2d 151, 153 (1975); *Ryan Graphics, Inc. v. Bailin*, 39 A.D.3d 249, 250 (1st Dep't 2007). LLF has valid claims for an account stated against all former LLF clients.


## Unjust Enrichment

Similarly, LLF has claims for Unjust Enrichment. The former LLF clients benefitted at LLF's expense, and equity and good conscience require restitution. *Columbia Mem'l Hosp. v. Hinds*, 2022 WL 1572408, *6 (2022); *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 455 (2018); *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012).


## Statute of Limitations

Under C.P.L.R. § 213(2), the statute of limitations of contracts, debt collection, and accounts stated is six (6) years. All of the former LLF client accounts were on the books as of December 15, 2017, so we are will within the applicable statutory period.

Additionally, under C.P.L.R. § 214(6), the statute of limitations for legal malpractice is three (3) years. Richard Luthmann was legally disabled and unable to practice law on and after December 15, 2017. The statutory time to interpose a legal malpractice claim or counterclaim has long passed. Also, unlike other former LLF clients who made claims against Richard Luthmann and the LLF, none of these clients have had any issues with the services rendered.

## Part 137 Notices

A legal precondition to the collection of legal fees earned in the State of New York is compliance with Part 137 of the Rules of the Chief Administrator. The law requires that you must send a Notice of Client's Right to Arbitrate a Dispute Over Attorney's Fees to each and every client who has an outstanding account and from whom you wish to collect.

Accordingly, you must provide written notice to all former clients of LLF of their right to elect to resolve the dispute by arbitration under Part 137. You must also provide said former LLF clients with a copy of the written instructions and procedures of the approved local bar association-sponsored fee dispute resolution program ("Local Program") having jurisdiction over your dispute. Since the business address of the LLF for the winding up of its affairs in New York County, the Local Program is administered by the New York County Lawyers Association. You must also provide former LLF clients with the "Request for Fee Arbitration" form and advise that said former LLF clients must file their Request for Fee Arbitration with the Local Program within 30 days of the receipt of the notice. Thereafter, you will be free to bring a lawsuit in court to seek to obtain payment of the fee.

It is advisable that you send these notices by Registered U.S. Mail and U.S. Mail with a Certificate of Mailing. In this way, you will be able to prove the delivery of the notice by the actual return of the Registered Mail and/or by the presumption of regularity of the delivery of the U.S. Mails.

Please refrain from any further contact with former LLF clients to whom you are sending Part 137 notices. As you well know, any conversations with these parties may become relevant and discoverable in a court proceeding. Additionally, please report to us any information that you may have about former LLF clients seeking to improperly coax potential witnesses. Such information is clearly discoverable.

You may wish to disclose this letter to the former LLF clients so that they have this Law Firm's address if they seek to contact me so as to resolve any outstanding accounts prior to the initiation of a lawsuit in a court of competent jurisdiction.

**Luthmann Law Firm, PLLC – Collections f/b/o creditors including the United States Government**

However, this Law Firm is prepared to proceed with litigation as soon as the 30-day period under Part 137 is complete as per your request, given the interests of the United States Government as creditors. If former LLF clients wish to quickly and discreetly resolve their accounts, they may do so by calling this Law Firm. My direct line is 401-255-8201. Otherwise, you have directed us to proceed to judgment in these cases to satisfy the interests of the United States Government.

  If you have any questions or concerns, please do not hesitate to contact me.


     Regards,
     ALMAGNO LAW, INC.

     <u>/s/ Lawrence P. Almagno Jr.</u>
     Lawrence P. Almagno Jr.

LPA/lc

CC: File

UCS 137-1 (11/01)

## NOTICE OF CLIENT'S RIGHT TO ARBITRATE

### A DISPUTE OVER ATTORNEYS FEES

The amount of $ _43,232.14_ is due and owing for the provision of legal services with

respect to:    General Legal Representation and the appurtenant fees, costs, expenses, and other expenditures including but not limited to:

_Representation related to NY Election Law and 2017 City Council Campaign Including advice, petition filings, and getting PHIL MARIUS knocked off the ballot._

If you dispute that you owe this amount, you have the right to elect to resolve this dispute by

arbitration under Part 137 of the Rules of the Chief Administrator of the Courts. To do so, you must

file the attached Request for Fee Arbitration within 30 days from the receipt of this Notice, as set

forth in the attached instructions.    If you do not file a Request for Fee Arbitration within 30 days

from the receipt of this Notice, you waive the right to resolve this dispute by arbitration under Part

137, and your attorney will be free to bring a lawsuit in court to seek payment of the fee.

Dated: _October 12, 2022_

_____

(Attorney's Signature)
[print Attorney's name, address and telephone number below]

Luthmann Law Firm, PLLC
By Richard Luthmann, successor in interest
c/o Almagno Law, Inc.
43 West 43rd Street, Ste. 169
New York, NY 10036

UCS 137-1 (11/01)

## NOTICE OF CLIENT'S RIGHT TO ARBITRATE

## A DISPUTE OVER ATTORNEYS FEES

The amount of $ _17,893.24_ is due and owing for the provision of legal services with

respect to: **General Legal Representation and the appurtenant fees, costs, expenses, and other expenditures including but not limited to:**

_Nadia Hunter v. The City of New York
151389/2017 (Sup. Ct. Rich Cty)_

If you dispute that you owe this amount, you have the right to elect to resolve this dispute by

arbitration under Part 137 of the Rules of the Chief Administrator of the Courts. To do so, you must

file the attached Request for Fee Arbitration within 30 days from the receipt of this Notice, as set

forth in the attached instructions.     If you do not file a Request for Fee Arbitration within 30 days

from the receipt of this Notice, you waive the right to resolve this dispute by arbitration under Part

137, and your attorney will be free to bring a lawsuit in court to seek payment of the fee.

Dated: _October 12, 2022_

_____
(Attorney's Signature)
[print Attorney's name, address and telephone number **below**]

Luthmann Law Firm, PLLC
By Richard Luthmann, successor in interest
c/o Almagno Law, Inc.
43 West 43rd Street, Ste. 169
New York, NY 10036



# Richard A. Luthmann
338 Sugar Pine Lane
Naples, FL 34108
Tel: (239) 631-5957
richard.luthmann@gmail.com

**Via Certified U.S. Mail RRR with Certificate of Mailing**

Personal and Confidential to Addressee

October 27, 2022

John Tabacco
120 Bayview Terrace
State Island, NY 10312-6327

<div align="center">

RE:    Outstanding Account with Luthmann Law Firm, PLLC

</div>

Dear John,

      I hope this letter finds you well.  I am winding up the affairs of the Luthmann Law Firm, PLLC ("LLF") on behalf of its assignees, successors in interests, and creditors, the largest of which is the United States Government.  I am obligated to send this letter to try to settle out your outstanding balances on the LLF's books. If it were up to me, I would let sleeping dogs lie.  But you know how the FEDS can be, particularly when an American Patriot like you is involved.

      In accordance with jurisdictional requirements, please see the enclosed notices under Part 137 of the Rules of the Chief Administrator.  Further, please note that LLF and I are represented by counsel and all communications should be had with Lawrence P. Almagno, Jr., Esq., of Almagno Law, Inc.  His details are included in the enclosed package.  Save yourself a headache and call Larry directly at 401-255-8201 and make an offer to resolve this whole thing before it blows up.  The Dirty Feds can try to piss on the Constitution all they want, but they can't impair the obligation of contracts - like a bona fide settlement agreement.  At least not yet anyway.

<div align="center">

1

</div>

Case 2:23-cr-00201-SRC Document 22-1 Filed 07/04/23 Page 12 of 36 PageID 853
Case 2:23-cr-00201-SRC Document 22-1 Filed 08/01/23 Page 12 of 36 PageID 712
PageID 3937

Give my best to your mom, your brothers, and Johnny Colt.  And keep up the great work on TV!  Great American Patriots need to know what is happening to their country before it's too late.

Regards,

Richard A. Luthmann

CC:     File
        Lawrence P. Almagno, Jr., Esq.

ENCL:   Part 137 Notices
        September 1, 2022, Letter from Lawrence P. Almagno, Jr., Esq.

P.S.-   Say hello to Roger for me the next time you see him.  The Dirty Feds asked me all about him and I kept my mouth shut!

*Johnny Tobacco*

UCS 137-1 (11/01)

## NOTICE OF CLIENT'S RIGHT TO ARBITRATE

## A DISPUTE OVER ATTORNEYS FEES

The amount of $ *48,232.47* is due and owing for the provision of legal services with

respect to:    General Legal Representation and the appurtenant fees, costs, expenses, and other expenditures including but not limited to:

- *Real Property and Foreclosures*
- *Political and Election Law*
- *Business Law*

If you dispute that you owe this amount, you have the right to elect to resolve this dispute by

arbitration under Part 137 of the Rules of the Chief Administrator of the Courts. To do so, you must

file the attached Request for Fee Arbitration within 30 days from the receipt of this Notice, as set

forth in the attached instructions.    If you do not file a Request for Fee Arbitration within 30 days

from the receipt of this Notice, you waive the right to resolve this dispute by arbitration under Part

137, and your attorney will be free to bring a lawsuit in court to seek payment of the fee.

Dated:  October 12, 2022

_____
(Attorney's Signature)
[print Attorney's name, address and telephone number below]

Luthmann Law Firm, PLLC
By Richard Luthmann, successor in interest
c/o Almagno Law, Inc.
43 West 43rd Street, Ste. 169
New York, NY 10036

# Almagno Law, Inc.

Lawrence P. Almagno Jr., Esq
Licensed in RI NY & MA

**VIA U.S. Mail**

**Advance copy sent to: richard.luthmann@gmail.com**

September 1, 2022

Luthmann Law Firm, PLLC
c/o Almagno Law, Inc.
42 W. 43rd Street, Ste. 169
New York, NY 10036

Richard Luthmann
338 Sugar Pine Lane
Naples, FL 34108

> **Re:** **Debt Collection – Luthmann Law Firm, PLLC ("LLF")**
> **Richard Luthmann as successor to LLF and for the benefit**
> **of the successors, assigns, and creditors of LLF**

Dear Mr. Luthmann:

You have engaged Almagno Law, Inc. (the "Law Firm") to prosecute collections matters against former clients of the now defunct Luthmann Law Firm, PLLC ("LLF") on behalf of the entity as a successor in interest. You have several creditors, the most significant of which is the United States Government.

This Law Firm has reviewed the underlying paperwork and we are of the opinion that you have several valid claims against former LLF clients.

**Breach of Contract**

Although not required in New York, it was standard practice of the LLF to have signed engagement letters on file for its clients. As such, given the billing records and other evidence, you have claims for breach of contract against former LLF clients with outstanding accounts. There was an agreement between LLF and the former client; LLF performed under the agreement; the former client failed to make payment; and LLF has suffered damages as a result. *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 181-82 (2011); *Heijung Park v. Nam*

---

**Rhode Island Office**
10 Rangeley Road
Cranston, Rhode Island 02920

**New York Office**
43 W 43rd St. Ste 169
New York, NY 10036

Tel: (401) 946-4529 | Fax: (401) 464-4529
Email: LA@Almagno-Law.com

**Luthmann Law Firm, PLLC – Collections f/b/o creditors including the United States Government**

*Young Kim*, 205 A.D. 3d 429, 438 (1st Dep't 2022); *Core Dev. Grp. LLC v. Spaho*, 199 A.D. 3d 447, 449 (1st Dep't 2021); *Alloy Advisory, LLC v. 503 West 33rd Street Associates, Inc*., 195 A.D.3d 436, 144 N.Y.S.3d 854 (1st Dept. 2021); *Markov v. Katt*, 176 A.D. 3d 401, 401-02 (1st Dep't 2019).

Additionally, the contracts between the LLF and its former clients are all implied in fact. The case files as well as court filings and other materials show conduct by the parties consonant with the existence of a contract. A contract implied in fact rests upon the conduct of the parties and not their verbal or written words. *Parsa v. State*, 64 N.Y.2d 143, 148 (1984). An implied in fact contract requires: Mutual assent; Consideration; Legal capacity; and Legal subject matter. *See Maas v. Cornell Univ.*, 94 N.Y.2d 87, 94 (1999); *Jemzura v. Jemzura*, 36 N.Y.2d 496, 503-4 (1975); *Mirchel v. R.M.J. Sec. Corp.*, 205 A.D.2d 388, 390 (1st Dep't 1994). All of these elements are present here.

## Account Stated

"Under federal and New York law, an account stated refers to a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due." *See Nat'l Econ. Research Assocs. v. Purolite "C" Corp.*, No. 08 Civ. 7600(PGG), 2011 U.S. Dist. LEXIS 24458, at *6 (S.D.N.Y March 10, 2011); *see also Interman Indus. Prods.*, Ltd. v. R. S. M. Electron Power, Inc., 37 N.Y.2d 151, 153 (1975); *Ryan Graphics, Inc. v. Bailin*, 39 A.D.3d 249, 250 (1st Dep't 2007). LLF has valid claims for an account stated against all former LLF clients.

## Unjust Enrichment

Similarly, LLF has claims for Unjust Enrichment. The former LLF clients benefitted at LLF's expense, and equity and good conscience require restitution. *Columbia Mem'l Hosp. v. Hinds*, 2022 WL 1572408, *6 (2022); *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 455 (2018); *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012).

## Statute of Limitations

Under C.P.L.R. § 213(2), the statute of limitations of contracts, debt collection, and accounts stated is six (6) years. All of the former LLF client accounts were on the books as of December 15, 2017, so we are will within the applicable statutory period.

Case 2:22-cr-00201-SRC-JBW Document 22-2 Filed 07/04/23 Page 13 of 36 PageID 716
Page 265 of 358
Luthmann Law Firm, PLLC – Collections f/b/o creditors including the United States Government

Additionally, under C.P.L.R. § 214(6), the statute of limitations for legal malpractice is three (3) years. Richard Luthmann was legally disabled and unable to practice law on and after December 15, 2017. The statutory time to interpose a legal malpractice claim or counterclaim has long passed. Also, unlike other former LLF clients who made claims against Richard Luthmann and the LLF, none of these clients have had any issues with the services rendered.

**Part 137 Notices**

A legal precondition to the collection of legal fees earned in the State of New York is compliance with Part 137 of the Rules of the Chief Administrator. The law requires that you must send a Notice of Client's Right to Arbitrate a Dispute Over Attorney's Fees to each and every client who has an outstanding account and from whom you wish to collect.

Accordingly, you must provide written notice to all former clients of LLF of their right to elect to resolve the dispute by arbitration under Part 137. You must also provide said former LLF clients with a copy of the written instructions and procedures of the approved local bar association-sponsored fee dispute resolution program ("Local Program") having jurisdiction over your dispute. Since the business address of the LLF for the winding up of its affairs in New York County, the Local Program is administered by the New York County Lawyers Association. You must also provide former LLF clients with the "Request for Fee Arbitration" form and advise that said former LLF clients must file their Request for Fee Arbitration with the Local Program within 30 days of the receipt of the notice. Thereafter, you will be free to bring a lawsuit in court to seek to obtain payment of the fee.

It is advisable that you send these notices by Registered U.S. Mail and U.S. Mail with a Certificate of Mailing. In this way, you will be able to prove the delivery of the notice by the actual return of the Registered Mail and/or by the presumption of regularity of the delivery of the U.S. Mails.

Please refrain from any further contact with former LLF clients to whom you are sending Part 137 notices. As you well know, any conversations with these parties may become relevant and discoverable in a court proceeding. Additionally, please report to us any information that you may have about former LLF clients seeking to improperly coax potential witnesses. Such information is clearly discoverable.

You may wish to disclose this letter to the former LLF clients so that they have this Law Firm's address if they seek to contact me so as to resolve any outstanding accounts prior to the initiation of a lawsuit in a court of competent jurisdiction.

**Luthmann Law Firm, PLLC – Collections f/b/o creditors including the United States Government**

However, this Law Firm is prepared to proceed with litigation as soon as the 30-day period under Part 137 is complete as per your request, given the interests of the United States Government as creditors.  If former LLF clients wish to quickly and discreetly resolve their accounts, they may do so by calling this Law Firm.  My direct line is 401-255-8201.  Otherwise, you have directed us to proceed to judgment in these cases to satisfy the interests of the United States Government.

If you have any questions or concerns, please do not hesitate to contact me.


Regards,
ALMAGNO LAW, INC.

/s/ Lawrence P. Almagno Jr.
Lawrence P. Almagno Jr.


LPA/lc

CC:   File

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

UNITED STATES OF AMERICA

*Plaintiff*

v.

RICHARD LUTHMANN

*Defendant*

Civil Action No. 2:22-cr-0021-SPC-NPM

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

CHRISTOPHER AMBROSE, OF MADISON, CONNECTICUT

To:

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: ALL MATERIALS, COMMUNCIATIONS, COMPLAINTS, AND/OR RECORDS WITHOUT LIMITATION RELATED TO RICHARD LUTHMANN FROM 10/1/2022 TO PRESENT INCLUDING ALL "WRITINGS," "RECORDINGS," AND/OR "PHOTOGRAPHS" AS DEFINED UNDER § 1001 OF THE FRE.

| Place: TO RICHARD LUTHMANN AT EMAIL ADDRESS: RICHARD.LUTHMANN@GMAIL.COM | Date and Time: 09/01/2023 5:00 pm |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:

*CLERK OF COURT*

OR

_____          _____
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
RICHARD LUTHMANN _____, who issues or requests this subpoena, are:
RICHARD LUTHMANN, PRO SE, 338 SUGAR PINE LANE, NAPLES, FL 34108; (239) 631-5957;
RICHARD.LUTHMANN@GMAIL.COM

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:22-cr-0021-SPC-NPM |
| RICHARD LUTHMANN | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

RONALD CASTORINA, STATEN ISLAND (RICHMOND COUNTY), NEW YORK

To:

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: ALL MATERIALS, COMMUNCIATIONS, COMPLAINTS, AND/OR RECORDS WITHOUT LIMITATION RELATED TO RICHARD LUTHMANN FROM 10/1/2022 TO PRESENT INCLUDING ALL "WRITINGS," " RECORDINGS," AND/OR "PHOTOGRAPHS" AS DEFINED UNDER § 1001 OF THE FRE.

| Place: TO RICHARD LUTHMANN AT EMAIL ADDRESS: RICHARD.LUTHMANN@GMAIL.COM | Date and Time: 09/01/2023 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

*CLERK OF COURT*

OR

_____     _____
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
RICHARD LUTHMANN_____, who issues or requests this subpoena, are:
RICHARD LUTHMANN, PRO SE, 338 SUGAR PINE LANE, NAPLES, FL 34108; (239) 631-5957;
RICHARD.LUTHMANN@GMAIL.COM

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida ▢▾

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:22-cr-0021-SPC-NPM |
| RICHARD LUTHMANN | ) |
| | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

KAMILLAH HANKS, STATEN ISLAND (RICHMOND COUNTY), NEW YORK

To:

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: ALL MATERIALS, COMMUNCIATIONS, COMPLAINTS, AND/OR RECORDS WITHOUT LIMITATION RELATED TO RICHARD LUTHMANN FROM 10/1/2022 TO PRESENT INCLUDING ALL "WRITINGS," " RECORDINGS," AND/OR "PHOTOGRAPHS" AS DEFINED UNDER § 1001 OF THE FRE.

| Place: TO RICHARD LUTHMANN AT EMAIL ADDRESS: RICHARD.LUTHMANN@GMAIL.COM | Date and Time: 09/01/2023 5:00 pm |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| CLERK OF COURT | |
|---|---|
| | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
RICHARD LUTHMANN _____, who issues or requests this subpoena, are:
RICHARD LUTHMANN, PRO SE, 338 SUGAR PINE LANE, NAPLES, FL 34108; (239) 631-5957;
RICHARD.LUTHMANN@GMAIL.COM

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:22-cr-0021-SPC-NPM |
| RICHARD LUTHMANN | ) |
| | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

KEVIN BARRY LOVE, STATEN ISLAND (RICHMOND COUNTY), NEW YORK

To:

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: ALL MATERIALS, COMMUNCIATIONS, COMPLAINTS, AND/OR RECORDS WITHOUT LIMITATION RELATED TO RICHARD LUTHMANN FROM 10/1/2022 TO PRESENT INCLUDING ALL "WRITINGS," " RECORDINGS," AND/OR "PHOTOGRAPHS" AS DEFINED UNDER § 1001 OF THE FRE.

| Place: TO RICHARD LUTHMANN AT EMAIL ADDRESS: RICHARD.LUTHMANN@GMAIL.COM | Date and Time: 09/01/2023 5:00 pm |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

*CLERK OF COURT*

OR

_____                    _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
RICHARD LUTHMANN _____, who issues or requests this subpoena, are:
RICHARD LUTHMANN, PRO SE, 338 SUGAR PINE LANE, NAPLES, FL 34108; (239) 631-5957;
RICHARD.LUTHMANN@GMAIL.COM

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Middle District of Florida

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 2:22-cr-0021-SPC-NPM |
| RICHARD LUTHMANN | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

### ERIC NELSON, STATEN ISLAND (RICHMOND COUNTY), NEW YORK

To:

_____

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: ALL MATERIALS, COMMUNCIATIONS, COMPLAINTS, AND/OR RECORDS WITHOUT LIMITATION RELATED TO RICHARD LUTHMANN FROM 10/1/2022 TO PRESENT INCLUDING ALL "WRITINGS," " RECORDINGS," AND/OR "PHOTOGRAPHS" AS DEFINED UNDER § 1001 OF THE FRE.

| Place: TO RICHARD LUTHMANN AT EMAIL ADDRESS: RICHARD.LUTHMANN@GMAIL.COM | Date and Time: 09/01/2023 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
RICHARD LUTHMANN _____, who issues or requests this subpoena, are:
RICHARD LUTHMANN, PRO SE, 338 SUGAR PINE LANE, NAPLES, FL 34108; (239) 631-5957;
RICHARD.LUTHMANN@GMAIL.COM

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:22-cr-0021-SPC-NPM |
| RICHARD LUTHMANN | ) |
| | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

JOHN TOBACCO, STATEN ISLAND (RICHMOND COUNTY), NEW YORK

To:

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: ALL MATERIALS, COMMUNCIATIONS, COMPLAINTS, AND/OR RECORDS WITHOUT LIMITATION RELATED TO RICHARD LUTHMANN FROM 10/1/2022 TO PRESENT INCLUDING ALL "WRITINGS," " RECORDINGS," AND/OR "PHOTOGRAPHS" AS DEFINED UNDER § 1001 OF THE FRE.

| Place: TO RICHARD LUTHMANN AT EMAIL ADDRESS: RICHARD.LUTHMANN@GMAIL.COM | Date and Time: 09/01/2023 5:00 pm |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

|  | |
|---|---|
| *CLERK OF COURT* | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
RICHARD LUTHMANN _____, who issues or requests this subpoena, are:
RICHARD LUTHMANN, PRO SE, 338 SUGAR PINE LANE, NAPLES, FL 34108; (239) 631-5957;
RICHARD.LUTHMANN@GMAIL.COM

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

# EXHIBIT I



  

✏️ **Edit your profile**



✏️ Change avatar

# Richard Luthmann  ✓ Verified

🏢 Writer, Editor, Journalist, Strategist and Commentator, Freelance
🏢 Journalist, This is For Real?
📍 Florida, New York
**As seen in:** This is For Real?, Substack, NewsBreak, Frank Report, Niagara Falls Reporter, Australian National Review, Survive the News, Sun Bay Paper, Florida Gulf News
**Covers:** I am an investigative reporter who writes about corruption, justice, the courts, government officials, corporate malfeasance, prisons, and reform. I also write commentary and satire.

US 🥭 🥑 👑 🍜 🖼️ 🏴‍☠️ AQ 🍊  #Writer #Thinker #Journalist #Consultant #ThisIsForReal #FLGulfNews #FrankReport
muckrack.com/richardluthmann Pronouns: 45/47

🔍 Search articles and posts on X
🔔 Create Alert
⬇️ Export ▾

‹ **Back to Richard Luthmann's profile**

## Richard Luthmann's Biography

Richard Luthmann is a writer, commentator, and investigative reporter with degrees from Columbia University and the University of Miami. Originally from the Northeast, Luthmann now lives in Southwest Florida. He is a member of the National Writers Union.

[Florida Gulf News] (http://www.FLGulfNews.com) brings a fresh perspective to the news scene in Southwest Florida. Richard Luthmann is the outlet's chief.

As the Editor-in-Chief of the Sun Bay Paper, Richard Luthmann also oversees the local news outlet's coverage, content development, production, and distribution of the print format periodical. He is committed to contributing to the recovery and growth of Fort Myers, Fort Myers Beach, and neighboring SWFL communities by providing helpful, informative, and engaging content and commentary.

Luthmann also contributes to numerous national publications, including [Art Voice] (https://artvoice.com/), [Newsbreak] (https://original.newsbreak.com/@richard-luthmann-1792610), [Substack] (https://luthmann.substack.com/), and [Frank Report] (https://frankreport.com/).

"I am a journalist who does deep-dive investigative reporting and covers legal issues. Exposing the bottom feeders and crooks is sometimes the only way to make them pay the price for their injustice and misdeeds. That's what I do well."

# EXHIBIT J

HOME    ABOUT    CHAPTERS    WRITERS' ISSUES WE CARE ABOUT    NEWS

WHY JOIN?    CONTACT US





Edit My Profile

Apply For A Press Pass

Change Password

Read National Meeting Minutes

Renew Membership

Find a Health Plan

Log out

Submit a News Item or Photo

You are here: Home / Find a Union Writer – Richard Luthmann

# Find a Union Writer – Richard Luthmann

First Name

Richard

Last Name

Luthmann

Country

United States

City

Naples

State

FL

Email

richard.luthmann@protonmail.com

Website

https://luthmann.substack.com/ ( Work )

Twitter
Handle

@rluthmann

About

Richard Luthmann is a writer, commentator,
satirist, and investigative journalist with
degrees from Columbia University and the
University of Miami. Once a fixture in New York
City and State politics, Luthmann is a
recovering attorney who lives in Southwest
Florida.

Image

8a4668b0_bf15_424a_9b26_82aa947ecb2b_586x782_webp.unknown

Image
Caption

Richard Luthmann

Work
Sample 1
Description

The Reunification Therapy Debate and
'Keyboard Tough' Divorce Lawyers
Linda Gottlieb's Turning Points For Families
harms children, exploits parents, court filing
claims

Work
Sample 1

https://luthmann.substack.com/p/the-
reunification-therapy-debate

Work
Sample 2
Description

Easter Egg Hunt in NY GOP Politics: Luthmann
Releases State Chair Ed Cox Bombshell On
Frank Morano's Radio Show
Trial By Combat Lawyer Turned Substack Scribe
Announces Exposé on NY GOP Chair Ed Cox's
Decade of Deception

Work
Sample 2

https://luthmann.substack.com/p/easter-egg-
hunt-in-ny-gop-politics

Work
Sample 3

Description

THE CHILDREN ARE COMING: Chicago Family Court's Dark World Exposed - A Sham 'BLM Scholarship,' Child Sexual Abuse, and Judicial Corruption

Cook County Judge William S. Boyd, Beerman LLP Law Firm Face Allegations of Corruption, Bribery, Silencing the Girard Children's Sexual Penetration Claims in Chicago Family Court

Work Sample 3

https://luthmann.substack.com/p/the-children-are-coming-chicago-family

Areas of Focus

Investigative Reporting, Politics and Government, Other

Services Needed/Offered

Blogging, Book Writing, Business Writing, Copywriting, Digital Formatting, Features Writing, Ghostwriting, Journalism, Legal Writing, Magazine Writing, Newspaper Writing, Op-Ed Writing, Proofreading, Proposal Writing, Public Speaking, Research (History, Science, Genealogy, Economics), Social Media Writing, Speechwriting, Web Writing

‹ Back to Listings

## LINKS

Our Mission

History and Achievements

Issues We Care About

Who We Represent

Leadership

Grievance and Contract Division

Governance/Committees

## WRITERS' ISSUES WE CARE ABOUT

Writers' Pay,  Copyright,  Freedom of Expression,  Writer Health and Safety,  Diversity,  Shield Bill

## RESOURCES

Contact Us

Contract and Grievance Assistance

FAQ

## SPANISH LANGUAGE DIVISION

Sindicato Nacional de Escritores

### IFJ PARTNERSHIP

 NWU is the sole provider of IFJ Press Passes to freelance journalists in the U.S. Apply for a Press Pass

### NWUSO

Meet the non-profit arm of the National Writers' Union.

© 2024 | *National Writers Union* | *All rights reserved* | *Twitter* | *Facebook* | *Log out*

# EXHIBIT K



Open in app or online

# The Troubling Case of Frank Parlato

Concealed "Mistakes" and Overreaching Prosecutors Highlight the Injustice of Federal Crimes in the Era of Weaponized Justice

RICHARD LUTHMANN AND CASSANDRA CYMERIAD

JUL 31

  

SHARE

Frank Parlato, the unyielding journalist, and proprietor of the Frank Report, faces his fate today, July 31, as he stands for sentencing in Buffalo Federal Court. His crime is a failure to file an IRS Form that most folks have likely never even laid eyes upon. Back in 2010, when he committed the act, Parlato was just as clueless about it as anyone else.



Frank R. Parlato, Jr.

Still, the relentless U.S. Attorney's Office, led by Trini Ross, has no intentions of going easy on the 67-year-old Parlato. They've urged Judge Richard J.

Arcara to ship him off to the cold confines of federal prison for a staggering two years or more.

It's worth noting that Parlato is no tax evader; the Government concedes that much. His felonious misstep lies in failing to submit the approved IRS paperwork – a bureaucratic maze he had no clue he had to navigate. Parlato, a man of many ventures, a businessman, journalist, and media tycoon, had a whole cadre of legal eagles, accountants, and savvy business experts on his payroll. But none of these wise folks bothered to enlighten him about this seemingly insignificant obligation.



Trini Ross, the United States Attorney for the Western District of New York

In the business world, when you find yourself handling hefty cash receipts exceeding the mark of $10,000, there's a duty bestowed upon you – filing the IRS Form 8300. It's a simple report, mind you, not a tax payment. Just a record of the transactions transpiring within your enterprise. This reporting responsibility stands alongside the obligatory bank reports for transactions crossing the same threshold of $10,000. It's a bureaucratic dance, no doubt, but one you can't avoid.

## What Happened Here?

Over the span of years, Frank Parlato took the reins as manager and CEO of the One Niagara Building, stationed in Niagara Falls, New York. With his hands at the helm, he wrought a remarkable metamorphosis upon this once-slumbering eyesore, birthing it anew as a thriving hub for tourists, just a stone's throw away from the grand attractions that draw them near. Even today, the One Niagara Building stands tall, a testament to his triumph.



**The Giant Hole** - Before Frank Parlato came to the rescue, the One Niagara property was an eyesore and a safety hazard. It continues to be a thriving tourist center creating economic activity for Niagara Falls.

A tale of enduring triumph, Parlato carved a path for average-joe vendors to bask in the spoils of tourism at One Niagara for a remarkable fifteen years and counting.

In 2010, nearly a dozen years ago, a food stand proprietor, in a bona fide transaction, forked over a sizable sum of $19,970.00 in cash for rent at One Niagara. This hard-earned money found its way into the safe embrace of a business bank account, and every penny due was dutifully handed over to settle income taxes.

And yet, the "crime" pinned on Parlato lies in a mere omission – he neglected to file the required IRS Form, a slip that sparked an unnecessary tumult.



The bustling food court at the One Niagara Building.

Parlato had no hidden agenda, no sly tricks up his sleeve. Truthfully, he wasn't even handling the rent payments at the One Niagara Building. Their approach to business was meticulous and conscientious. Back then, Parlato held the firm belief that the bank would dutifully report the cash transaction exceeding $10,000 – indeed, they did just that. His stewardship of One Niagara's affairs was guided by honesty and genuine goodwill.

## The Government's Lie: "Parlato is Guilty Because He's' a Deadbeat"

The Government's depiction of Parlato paints a grim portrait, as if he ought to be cast away, shackled, and forgotten. They claim he readily confesses to

owing a staggering $400,000 in income taxes, all while holding a "dangerously flippant" attitude towards tax and legal matters and overall branding him a contemptible character.

But amidst all this, the Government's foundation rests on a single false statement, as mentioned in their written submission to Judge Arcara. From this single thread of deception, they weave their entire tale for sentencing.



United States District Court Judge Richard J. Arcara

In the realm of federal courts, the U.S. Sentencing Guidelines act as guiding lights, pointing the way to appropriate sentences. The case of Bernie Madoff serves as an example; his life sentence was a consequence of the billions lost through his criminal actions.

Now, the Government aims to paint Parlato with a brush akin to a "mini-Madoff," accusing him of causing the IRS a "tax loss" of nearly $400,000.

Yet, this claim, to put it plainly, is pure poppycock.

We've grown accustomed to expecting "voodoo economics" from the corridors of power in Washington, D.C. But when these same whimsical practices target small business owners, it's a whole different matter.

How on earth can the failure to file a solitary tax reporting form, one they didn't even know about, while the Government acknowledges all taxes were indeed paid, lead to two-year imprisonment?

What is the Government's response? A murky evasion of a clear answer.

And that's probably because their prosecution of Frank Parlato is something that Congress never intended. And the U.S. Supreme Court said so in the 1991 case of Cheek v. United States.

> **"Congress does not intend that a person, by reason of a bona fide misunderstanding as to his liability for the tax, as to his duty to make a return, or as to the adequacy of the records he maintained, should become a criminal by his mere failure to measure up to the prescribed standard of conduct."**

The Western District of New York's U.S. Attorney's Office and U.S. Attorney Trini Ross are wading into very muddy waters in the Parlato case.

## The Truth: Parlato Actually Paid All His Taxes; Was the WDNY Indictment a Political Contact?

The Government and Parlato didn't arrive at the Form 8300 offense on the fly. There was a detailed Plea Agreement resolving allegations in an indictment that originated in 2015 when William J. Hochul was U.S. Attorney, and controversial retired AUSA Anthony M. Bruce was the lead prosecutor.



[Former Assistant United States Attorney Anthony M. Bruce](#)

In the original indictment, Clare Bronfman, the Seagrams' Heiress and NXIVM felon, threw around accusations about how Parlato had supposedly "stolen" a million dollars from her.

The truth, however, is quite different. In a real act of business and real estate "magic," Parlato managed to salvage a $26 million California property, which was on the brink of becoming a total loss due to Bronfman's negligence. This feat paralleled his previous shrewd dealings in the One Niagara venture.

Already in Bronfman's employ, Parlato received a monthly retainer, and when he saved the California property, she was more than happy to pay him a "success fee." Truth be told, Bronfman got a bargain. If she had engaged a law firm for the task, an $8 million fee would not have been out of the ordinary. But then, Tony Bruce wouldn't have had the audacity to twist those events into an FBI investigation and subsequent federal grand jury indictment.

Bronfman's allegations, it must be said, were nothing but lies, repeatedly debunked on multiple occasions, even during the NXIVM trial. Stephen Herbits, a respected American public servant and former Secretary General of the World Jewish Congress, who served as an advisor to Edgar M. Bronfman and an executive of the Seagram Company, discredited those false claims.

The real story lies in the shadows of a political scheme. Through his investigative reporting, Parlato had ruffled feathers among New York State politicians, exposing their shady deals.

By shedding light on the questionable $100 million "gift" from former Governor Andrew Cuomo to businessman James V. Glynn, disguised as "no-bid" contracts for the Maid of the Mist, Parlato disrupted the smooth flow of business and cut into the pool of "grease" available in the form of campaign contributions.



In the early stages of Parlato's pursuit of the Maid of the Mist tale, a scene reminiscent of a Brian DePalma film, The Untouchables, unfolded. Cuomo seemed to have dispatched a New York State Assemblyman to "pay a visit" to

Parlato. There were no bags of cash exchanged like in the movies, but a tempting offer loomed in the air – a lucrative "I LOVE NY" contract for Parlato and his media outlets, all contingent on him closing his lips. However, like Kevin Costner's character, Elliot Ness, Parlato sent this meddler packing without a second thought.

Delaware North, owned by billionaire Jeremy M. Jacobs, Sr., was another persistent target in Parlato's publications. This company held sway as the single most influential purchaser of politicians in the whole of New York State, towering over its peers.

With monopoly rights to concessions in Niagara Falls State Park, Delaware North raked in revenues through a "sweetheart deal" that far exceeded its payments to New York State – nearly tenfold, to be precise. Parlato's reporting shed light on the windfall distributed in Albany, all at the taxpayers' expense:

> "The lucrative arrangement Delaware North has with the Albany-based State Parks agency rivals that which previously existed for James Glynn's Maid of the Mist in the Niagara Falls State Park before investigative reporting by Publisher Frank Parlato blew the lid off that scam back in 2008. Maid leased the Observation Tower in the park as the base of its operations, and amazingly, by the terms of that contract, the taxpayers were paying James Glynn rent instead of the other way around."

For the likes of Glynn and Jacobs, it was crystal clear – Frank Parlato posed a threat to their high-powered dealings. And the politicians, well, they caught the message loud and clear as the flow of "grease" and "grift" in the New York State political machinery began to ebb.

An attempt to bribe Parlato had already fallen flat. Now, they sought a "trap door" to ensnare him. Could they find a prosecutor willing to take him down? Maybe one with a politician-wife, hungry for campaign contributions? Or

perhaps they could gather an "enemies list" of Parlato's adversaries and conjure up enough "witnesses" to spin a tale that might entice a grand jury?

Oh, how they wished for a seasoned prosecutor, on the cusp of retirement, who'd built a career going after "The Italians."



Former WDNY U.S. Attorney William J. Hochul with his wife, Kathy Hochul, Governor of the State of New York.

In the latter part of 2011, Clare Bronfman sauntered into the WDNY US Attorney's Office, finding herself face to face with Bill Hochul and Tony Bruce. But she hadn't limited her visits to just that office; she had also paid a call on other prosecutors, even journeying to the New Jersey Attorney General's Office. Her mission was clear – Frank Parlato posed an existential threat. He held damning knowledge of NXIVM's criminal machinations, ready to lay them

bare for all to see. Bronfman, like Glynn and Jacobs, yearned for Parlato's vanishing act.

Back in 2011 and 2012, Kathy Hochul occupied a seat as Congresswoman from Buffalo. Clare Bronfman's father chipped in as a generous contributor to Hochul's campaign.



Back in January 2012, the FBI sat down for their first conversation with Frank Parlato. From that moment onward, Tony Bruce delved into every aspect of Parlato's life – scrutinizing business dealings, tax returns, bank accounts, and even overdue library books – all with the aim of constructing a case to take him down.

In March 2015, Parlato warned Bruce about Clare and Sara Bronfman, labeling them as deceitful and revealing NXIVM's criminal nature. But Bruce turned a deaf ear. The consequence? Parlato found himself indicted, and Bruce swiftly retired thereafter.

With 19 years at the WDNY US Attorney's Office, <u>William J. Hochul walked away</u> in October 2016, just months shy of his pension vesting, to assume the role of General Counsel at Delaware North, a position he holds to this day.

By 2018, a new U.S. Attorney took charge of Parlato's Superseding Indictment, conveniently erasing all references to the Bronfmans. Now, the Government asserted that they were Parlato's "victims."

Throughout the time since the initial indictment and the subsequent shell game the Government played with the "victims," Parlato vehemently denied any wrongdoing.

And so, one wonders, what does the Government still seek to grasp here? Could it be related to the fact that the WDNY U.S. Attorney's Office has been under the *de facto* control of the Democrat Party since 2009?The FBI first interviewed Frank ParlatoWeaponized?

In the summer of 2022, Parlato geared up for a lengthy trial, facing Judge Arcara, ready to battle it out for weeks. The Government and Parlato's lawyers, Paul Cambria and Herb Greenman engaged in their own little dance as the trial date approached.



Buffalo Attorney Herbert L. Greenman

On August 5, 2022, a paper Plea Agreement was laid out in Judge Arcara's courtroom just before he took his seat on the bench. But Parlato refused to put pen to paper. The agreement demanded he admit to a laundry list of things he'd vehemently denied for over a decade of relentless investigation and indictment.

Within this deal, cooked up by the lawyers, they claimed Parlato owed a hefty sum of nearly $400,000 in taxes, with some amounts being nothing but estimates. But Parlato, standing firm, wasn't willing to give in so easily. He had paid $260,614 in income taxes beforebefore the 2015 indictment and wanted every ounce of credit for it.

Assistant U.S. Attorney Charles Kruly, who once served as Law Clerk for Judge Richard J. Arcara, played a significant role in this legal tango. He made his mark on the agreement, scribbling substantial handwritten amendments and striking out paragraphs until Parlato finally agreed to sign.



Assistant U.S. Attorney Charles Kruly

The Government's stance was clear – Parlato would only plead guilty to failing to file a form 8300 back in 2010. No admission of any other allegations from the original indictment, influenced by Bronfman or otherwise, or the subsequent "save-face" Superseding Indictment.

Politics may be afoot in the murky realm of the courtroom, and the US Attorney's Office in WDNY might just be wielding its power in ways that raise eyebrows. But in the midst of it all, Parlato stood his ground, fighting for his version of the truth.

In the papers and during the Judge's questioning, they wouldn't dare call Parlato's crime "intentional" or "willful," giving rise to uncertainty. The Feds

handed Judge Arcara a table displaying the taxes Parlato coughed up and the estimated amounts still due, revealing a big fat ZERO owed from 2006 to 2013.

### VII.   RESTITUTION AND PAYMENT OF TAX LIABILITY

21.   The defendant agrees to pay restitution to the Internal Revenue Service in the total amount of $181,934.51 pursuant to Title 18, United States Code, Section 3663 and 3. The defendant understands that defendant will not be entitled to withdraw the plea of guilty based upon any restitution amount ordered by the Court. The restitution amount has been calculated as follows:

| Tax Year | Amount |
|---|---|
| 2006 | $0 |
| 2007 | $0 |
| 2008 | $0 |
| 2009 | $0 |
| 2010 | $0 |
| 2011 | $0 |
| 2012 | $0 |
| 2013 | $0 |
| 2014 | $39,700 |
| 2015 | $71,623 |
| 2016 | $15,328 |
| 2017 | $14,990 |
| Interest and Penalties (2008-2009 & 2013) | $55,207.51 |
| TOTAL | $84,939.51 |

The Government clings to a falsehood, asserting that Frank Parlato owes them nearly $400,000 in "Tax Loss."

During proceedings before Judge Arcara, AUSA Kruly had to acknowledge that Parlato indeed made a payment, but a discrepancy remained, as the Government believed an estimated deficiency still lingered:

**AUSA KRULY: The tax loss for purposes of the guidelines calculation is $390,000, but the defendant paid approximately $260,000 of that tax amount, which is why the Restitution is lower.**

**THE COURT: Do you understand that, sir?**

**THE DEFENDANT: Yes, I do, Your Honor.**

However, the Government conveniently omitted a crucial detail – Parlato refrained from filing returns while under indictment (or facing imminent indictment), following the counsel of his then-lawyer, Former New York State Attorney General Dennis C. Vacco.



Former New York State Attorney General Dennis C. Vacco

Parlato argues that filing taxes during this time would have waived his Fifth Amendment Right against self-incrimination.



Importantly, Parlato firmly maintains that he owes nothing to the Government. The sum of $129,732 was merely an "estimated tax deficiency."

After he entered his plea for failing to file an obscure IRS form, Parlato promptly submitted his outstanding taxes for the years 2014-2017. Astonishingly, he owed none of the estimated $129,732.

The Government's inflated claim resulted from the IRS basing Parlato's income on tax years preceding the indictment – a critical miscalculation.

## Why is the Government Lying About Parlato's Taxes?

That's a valid question. The U.S. Attorney's Office prefers to keep their responses confined to court filings and statements made during hearings. We'll have to wait and see what they put forth at Parlato's sentencing, set for later today.

But it's likely that the Government will deny any wrongdoing or dishonesty in Parlato's case. This raises concerns about institutional problems. The stakes are high, and the very integrity of our system hangs in the balance.

In modern times, federal criminal laws have exploded in number, becoming impossibly vast and ambiguous. Prosecutors can accuse any of us of federal crimes, regardless of how innocuous our actions may seem. The sheer volume of federal crimes has surpassed the bounds of the statute books, diving deep into the murky waters of the Code of Federal Regulations. In this labyrinth, federal prosecutors discover a trove of intricate and technical prohibitions, ready to be wielded against unwitting victims.

Frank Parlato's inadvertent failure to file a Form 8300 serves as a poignant example.

This disconcerting state of affairs knows no limits. It shows no bias toward any social class or profession, jeopardizing the very core of our constitutional democracy. No one is exempt from this worrying form of overreach.

If the Government seeks to brand Frank Parlato a criminal due to taxes he has dutifully paid and tax forms he was unaware of, how long until the Department of Justice dispenses with the facade of "Justice"?

How long until we witness individuals brazenly convicted and sentenced under a justice system that clearly has no grounds for their guilt? If it hasn't begun already.



Upgrade to paid

Share

Leave a comment

Richard Luthmann is a writer, commentator, satirist, and investigative journalist with degrees from Columbia University and the University of Miami. Once a fixture in New York City and State politics, Luthmann is a recovering attorney who lives in Southwest Florida and a proud member of the National Writers Union.

"I am a journalist who writes about justice, the courts, government officials, prisons, and reform. You find some questionable players in all these places and often outright crooks. Exposing these bottom feeders from the outside is sometimes the only way to make them pay the price for their injustice and misdeeds."

"I use satire and opinion to make my point. I have already been told to 'stop writing about the Government' by the U.S. Government, so I must be doing something right."

"If you're a victim of the system, maybe the press is the right forum for you. If you have experienced injustice and are tired of dropping tens of thousands of dollars without results, maybe it's time to try the digital pen."

Contact Richard Luthmann at 239-631-5957 or richard.luthmann@protonmail.com.



*"Nihil est incertius vulgo, nihil obscurius voluntate hominum, nihil fallacius ratione tota comitiorum."* (Nothing is more unpredictable than the mob, more obscure than public opinion, and more deceptive than the whole political system.)

~ Marcus Tullius Cicero

The news media is a critical check on the powerful, serving as a watchdog to hold elected officials and other public figures accountable for their actions. The media was first called the fourth estate in 1821 by Edmund Burke, who wanted to point out the power of the press. The press plays a crucial role in providing citizens with access to information about what is happening in government and by shining a light on corruption, abuse of power, and other forms of wrongdoing.

---



A guest post by
**Cassandra Cymeriad**

♡ LIKE  💬 COMMENT  🔄 RESTACK

© 2023 Scrivener, LLC
c/o Substack, 548 Market Street PMB 72296, San Francisco, CA 94104
Unsubscribe



# EXHIBIT L

TRUTH.

← **Richard Luthmann**

Edit profile

**Richard Luthmann**
@rluthmann

**490** Followers **1.5k** Following

#writer #thinker #journalist #FMB #SunBayPaper #FLGulfNews #ThisIsForReal
Tips or stories: (239) 631-5957 richard.luthmann@protonmail.com

Joined July 2022

Fort Myers Beach, FL

https://luthmann.substack.com/

Truths | Replies | Media | Likes

Pinned Truth

**Richard Luthmann**
@rluthmann · Dec 20, 2024

'A danger to democracy.' Richard Luthmann urges Devin Nunes to probe TikTok influencer Danesh Noshirvan @ThatDaneshGuy for potential CCP-backed harassment campaigns. Doxxing, bots, and intimidation—where does it end? #NationalSecurityThreat #CancelCultureExposed @DevinNunes @JohnnyTabacco @CaraCastronuova

Richard A. Luthmann

Tel: (239) 631-5957
richard.luthmann@protonmail.com
Luthmann.Substack.com

December 20, 2024

**Via TRUTH SOCIAL (@devinnunes) and Direct Means**

Hon. Devin Nunes
CEO, Truth Social
Former Chairman, House Permanent Select Committee on Intelligence
Appointee, Chair the President's Intelligence Advisory Board

Dear Chairman Nunes,

As you know, I am a verified investigative journalist on the Truth Social platform. I am writing to bring to your attention significant evidence obtained through my investigative journalism that raises serious concerns about TikTok influencer Danesh Noshirvan (@ThatDaneshGuy) acting as an agent of the Chinese Communist Party (CCP). Based on the evidence, it is my belief that Mr. Noshirvan is carrying out subversion operations and active measures in connection with the enemies of the United States of America.

Given your extensive experience in national security and intelligence matters, I believe you

known CCP tactic to amplify disinformation and undermine trust in democratic institutions.

- **Targeting Polarizing Issues:** His campaigns often center on divisive issues such as abortion rights, law enforcement accountability, and governance, which are areas foreign adversaries exploit to destabilize American society.

**2. TikTok as a Tool for Influence**

As you are aware, TikTok has been scrutinized for its ties to the CCP and its potential to serve as a conduit for foreign influence. Mr. Noshirvan's extensive use of TikTok to spread disinformation and mobilize harassment raises questions about whether his actions are independently driven or part of a broader strategy supported by CCP interests.

**3. Parallels with Documented CCP Operations**

The CCP's international campaigns targeting dissident groups like Falun Gong and Hong Kong democracy advocates share striking similarities with Mr. Noshirvan's approach. These include:

- The use of online mobs and doxxing to intimidate opponents.
- Weaponizing platforms to create societal discord.
- Directly targeting public confidence in key institutions, such as the U.S. Supreme Court, law enforcement, and local governments.

**4. Potential Violations of U.S. Law**

If Mr. Noshirvan is acting on behalf of the CCP or is supported by foreign actors, it may

9+



# EXHIBIT M

## Re: Noshirvan v. Couture et al - Meet and Confer Requirement - Local Rule 3.01(g)

| | |
|---|---|
| From | Richard A Luthmann <richard.luthmann@protonmail.com> |
| To | Nick Chiappetta<nick@chiappettalegal.com> |
| CC | Frank Parlato<frankparlato@gmail.com>, Michael Volpe<mvolpe998@gmail.com>, RALafontaine<RALafontaine@protonmail.com>, Rick LaRivière<RickLaRiviere@proton.me>, frankiepressman@protonmail.com, mthomasnast@protonmail.com, julian-jackson-fannin-8837@ecf.pacerpro.com, AutoDocketMIA@duanemorris.com, JMagarin@duanemorris.com, ashaikh@duanemorris.com, bcastillo@duanemorris.com, cmackey@duanemorris.com, courtmail@duanemorris.com, hwgurland@duanemorris.com, jjfannin@duanemorris.com, ngounaris@duanemorris.com, pnmendoza@duanemorris.com, aalfano@rolfeshenry.com, kdeglman@rolfeshenry.com, pt@ptesq.com, vicki@chiappettalegal.com |
| Date | Wednesday, December 11th, 2024 at 4:20 PM |

With all due respect Nick, I don't have a client here. You're the one that has to worry about the crime fraud exception.

Is James McGibney your spiritual advisor as well?

And your clients, (and dare I say co-conspirators), are the ones with the history of DARVO tactics.  This is a page right out of the Bullyville.com playbook.

If you would like to hear from a real DARVO expert, I reserve the right to call Dr. Bandy X. Lee, MD as my expert witness if your client has the intestinal fortitude to bring me in on this rodeo.

In other news, I hear that the Vegas betting markets are putting a line on how long Danesh survives after January 20. The over-under is 30 days. I bet you can guess where my money's going.

Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
Muck Rack Profile
Substack: This is For Real?
Contributor: Frank Report
Editor-In-Chief: FLGulf.news
Contributor: Sun Bay Paper
Follow Me on TRUTH

Sent from Proton Mail Android

-------- Original Message --------
On 12/11/24 3:42 PM, Nick Chiappetta wrote:
Mr. Luthmann,

Please stop the DARVO tactics. We all know you are in cahoots with Camp, Garramone, and Couture. I saw you converse with Dr. Ralph Garramone before the hearing yesterday and that you left the hearing with Jennifer Couture.

By the way, this is the worst acting I have witnessed in a long time. Falsus in uno, falsus in omnibus.

Sincerely,

Nick Chiappetta | Founder
P. 561-768-4500
F. 561-768-4600
nick@chiappettalegal.com
2101 Vista Pkwy, Suite 258
West Palm Beach, Florida 33411

8401 Lake Worth Rd.,
Lake Worth, Florida 33467
*By Appointment Only*

⌗
Product Defect | Injury | Defamation | Insurance
        chiappettalegal.com

NOTICE: This e-mail message and any attachment to this e-mail message contains confidential information that may be legally privileged. If you are not the intended recipient, you must not review, re-transmit, convert to hard copy, copy, use or disseminate this e-mail or any attachments to it. If you have received this e-mail in error, please notify us immediately by return e-mail or by telephone at 561-768-4500 and delete this message. Please note that if this e-mail message contains a forwarded message or is a reply to a prior message, some or all of the contents of this message or any attachments may not have been produced by the sender.

From: Richard Luthmann <richard.luthmann@protonmail.com>
Sent: Wednesday, December 11, 2024 3:34 PM
To: Nick Chiappetta <nick@chiappettalegal.com>
Cc: Frank Parlato <frankparlato@gmail.com>; Michael Volpe <mvolpe998@gmail.com>; RALafontaine <RALafontaine@protonmail.com>; Rick LaRivière <RickLaRiviere@proton.me>; frankiepressman@protonmail.com <frankiepressman@protonmail.com>; mthomasnast@protonmail.com <mthomasnast@protonmail.com>; julian-jackson-fannin-8837@ecf.pacerpro.com <julian-jackson-fannin-8837@ecf.pacerpro.com>; AutoDocketMIA@duanemorris.com <AutoDocketMIA@duanemorris.com>; JMagarin@duanemorris.com <JMagarin@duanemorris.com>; ashaikh@duanemorris.com <ashaikh@duanemorris.com>; bcastillo@duanemorris.com <bcastillo@duanemorris.com>; cmackey@duanemorris.com <cmackey@duanemorris.com>; courtmail@duanemorris.com <courtmail@duanemorris.com>; hwgurland@duanemorris.com <hwgurland@duanemorris.com>; jjfannin@duanemorris.com <jjfannin@duanemorris.com>; ngounaris@duanemorris.com <ngounaris@duanemorris.com>; pnmendoza@duanemorris.com <pnmendoza@duanemorris.com>; aalfano@rolfeshenry.com <aalfano@rolfeshenry.com>; kdeglman@rolfeshenry.com <kdeglman@rolfeshenry.com>; pt@ptesq.com <pt@ptesq.com>
Subject: Re: Noshirvan v. Couture et al - Meet and Confer Requirement - Local Rule 3.01(g)

Mr. Chiappetta,

I have refrained from emailing your client because of a police complaint in Tioga County, PA.

Is he trying to frame me for "harassment" using a fake Joey Camp account?

Are you orchestrating this crime/fraud?

⌗

Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
Muck Rack Profile
Substack: This is For Real?
Contributor: Frank Report
Editor-In-Chief: FLGulf.news
Contributor: Sun Bay Paper
Follow Me on TRUTH

Sent with Proton Mail secure email.

On Wednesday, December 11th, 2024 at 10:51 AM, Richard Luthmann <richard.luthmann@protonmail.com> wrote:
I will stop emailing you, and report to the Court that you do not want to speak with me.

I guess your stance has rendered compliance with Local Rule 3.01(g) and "exercise in futility."

Regards,

Richard Luthmann

Writer, Journalist, and Commentator

Tips or Story Ideas:

(239) 631-5957

richard.luthmann@protonmail.com

Muck Rack Profile

Substack: This is For Real?

Contributor: Frank Report

Editor-In-Chief: FLGulf.news

Contributor: Sun Bay Paper

Follow Me on TRUTH

Sent with Proton Mail secure email.

On Wednesday, December 11th, 2024 at 10:48 AM, Nick Chiappetta <nick@chiappettalegal.com> wrote:

Provide an address for service of process or stop emailing me.

Good day.

Sincerely,

Nick Chiappetta | Founder

P. 561-768-4500

F. 561-768-4600

nick@chiappettalegal.com

2101 Vista Pkwy, Suite 258

West Palm Beach, Florida 33411


8401 Lake Worth Rd.,

Lake Worth, Florida 33467

*By Appointment Only*

⌗

Product Defect | Injury | Defamation | Insurance


https://url.avanan.click/v2/r01/___www.chiappettalegal.com___.YXAzOmNoaWFwcGV0dGFsZWdhbDphOm86MzI2Mjc2NzIyYjM0ZjJjYzAzNjM5YjhmM

NOTICE: This e-mail message and any attachment to this e-mail message contains confidential information that may be legally privileged. If you are not the intended recipient, you must not review, re-transmit, convert to hard copy, copy, use or disseminate this e-mail or any attachments to it. If you have received this e-mail in error, please notify us immediately by return e-mail or by telephone at 561-768-4500 and delete this message. Please note that if this e-mail message contains a forwarded message or is a reply to a prior message, some or all of the contents of this message or any attachments may not have been produced by the sender.

From: Richard Luthmann <richard.luthmann@protonmail.com>

Sent: Wednesday, December 11, 2024 10:46 AM

To: Nick Chiappetta <nick@chiappettalegal.com>

Cc: Danesh <daneshnoshirvan@gmail.com>; daneshnoshirvan@yahoo.com <daneshnoshirvan@yahoo.com>; thatdaneshguy@gmail.com <thatdaneshguy@gmail.com>; Frank Parlato <frankparlato@gmail.com>; Michael Volpe <mvolpe998@gmail.com>; RALafontaine <RALafontaine@protonmail.com>; Rick LaRivière <RickLaRiviere@proton.me>; frankiepressman@protonmail.com <frankiepressman@protonmail.com>; mthomasnast@protonmail.com <mthomasnast@protonmail.com>; julian-jackson-fannin-8837@ecf.pacerpro.com <julian-jackson-fannin-8837@ecf.pacerpro.com>; AutoDocketMIA@duanemorris.com <AutoDocketMIA@duanemorris.com>; JMagarin@duanemorris.com <JMagarin@duanemorris.com>; ashaikh@duanemorris.com <ashaikh@duanemorris.com>; bcastillo@duanemorris.com <bcastillo@duanemorris.com>; cmackey@duanemorris.com <cmackey@duanemorris.com>; courtmail@duanemorris.com <courtmail@duanemorris.com>; hwgurland@duanemorris.com <hwgurland@duanemorris.com>; jjfannin@duanemorris.com <jjfannin@duanemorris.com>; ngounaris@duanemorris.com <ngounaris@duanemorris.com>; pnmendoza@duanemorris.com <pnmendoza@duanemorris.com>; aalfano@rolfeshenry.com <aalfano@rolfeshenry.com>; kdeglman@rolfeshenry.com <kdeglman@rolfeshenry.com>; pt@ptesq.com <pt@ptesq.com>

Subject: Re: Noshirvan v. Couture et al - Meet and Confer Requirement - Local Rule 3.01(g)

I'm not accepting process. I'm considering it. It would save me $405. I'm thinking you guys might be sports!

Send the documents for me to take a look at. I make no promises.

Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
Muck Rack Profile
Substack: This is For Real?
Contributor: Frank Report
Editor-In-Chief: FLGulf.news
Contributor: Sun Bay Paper
Follow Me on TRUTH

Sent with Proton Mail secure email.

On Wednesday, December 11th, 2024 at 10:34 AM, Nick Chiappetta <nick@chiappettalegal.com> wrote:
Please provide your address where you will accept service of process.

Sincerely,

Nick Chiappetta | Founder
P. 561-768-4500
F. 561-768-4600
nick@chiappettalegal.com
2101 Vista Pkwy, Suite 258
West Palm Beach, Florida 33411

8401 Lake Worth Rd.,
Lake Worth, Florida 33467
*By Appointment Only*

⌗

Product Defect | Injury | Defamation | Insurance

https://url.avanan.click/v2/r01/___www.chiappettalegal.com___.YXAzOmNoaWFwcGV0dGFsZWdhbDPhOm86NTdjMml2MDYwMTFmMjg5NTk2Y2l5M

NOTICE: This e-mail message and any attachment to this e-mail message contains confidential information that may be legally privileged. If you are not the intended recipient, you must not review, re-transmit, convert to hard copy, copy, use or disseminate this e-mail or any attachments to it. If you have received this e-mail in error, please notify us immediately by return e-mail or by telephone at 561-768-4500 and delete this message. Please note that if this e-mail message contains a forwarded message or is a reply to a prior message, some or all of the contents of this message or any attachments may not have been produced by the sender.

From: Richard Luthmann <richard.luthmann@protonmail.com>
Sent: Wednesday, December 11, 2024 10:30 AM
To: Nick Chiappetta <nick@chiappettalegal.com>; Danesh <daneshnoshirvan@gmail.com>; daneshnoshirvan@yahoo.com <daneshnoshirvan@yahoo.com>; thatdaneshguy@gmail.com <thatdaneshguy@gmail.com>
Cc: Frank Parlato <frankparlato@gmail.com>; Michael Volpe <mvolpe998@gmail.com>; RALafontaine <RALafontaine@protonmail.com>; Rick LaRivière <RickLaRiviere@proton.me>; frankiepressman@protonmail.com <frankiepressman@protonmail.com>; mthomasnast@protonmail.com <mthomasnast@protonmail.com>; julian-jackson-fannin-8837@ecf.pacerpro.com <julian-jackson-fannin-8837@ecf.pacerpro.com>; AutoDocketMIA@duanemorris.com <AutoDocketMIA@duanemorris.com>; JMagarin@duanemorris.com <JMagarin@duanemorris.com>; ashaikh@duanemorris.com <ashaikh@duanemorris.com>; bcastillo@duanemorris.com <bcastillo@duanemorris.com>; cmackey@duanemorris.com <cmackey@duanemorris.com>; courtmail@duanemorris.com <courtmail@duanemorris.com>; hwgurland@duanemorris.com <hwgurland@duanemorris.com>; jjfannin@duanemorris.com <jjfannin@duanemorris.com>; ngounaris@duanemorris.com <ngounaris@duanemorris.com>; pnmendoza@duanemorris.com <pnmendoza@duanemorris.com>; aalfano@rolfeshenry.com <aalfano@rolfeshenry.com>; kdeglman@rolfeshenry.com <kdeglman@rolfeshenry.com>; pt@ptesq.com <pt@ptesq.com>
Subject: Re: Noshirvan v. Couture et al - Meet and Confer Requirement - Local Rule 3.01(g)

Dear Ethically Challenged Attorney Nick Chiapetta,

I live here! Did you sleep through law school? Pennoyer v. Neff; International Shoe v. Washington. Presence is a fundamental basis for jurisdiction. Christ Almighty give me strength. Were you folks always this dense or did the WOKENESS rot your brains?

If you're going to add me as a "co-conspirator" please let me know. I would consider accepting service. It will save me the filing fee for my anti-SLAPP lawsuit. That might be the only way Danesh can get the goods on his Man Crush Joey Camp. Now we know what he was thing about in the bathtub.

If you get me to sit for a depo and I am making an affirmative counterclaim, maybe you get a shot at all the goods. Maybe not. But beware, if Danesh brings me in, he goes first. And it ain't no fun when the Wabbit's got the gun. 18 U.S.C. §§ 2, 115, 951, 1343, 2257, and 2257A

⌷

Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
Muck Rack Profile
Substack: This is For Real?
Contributor: Frank Report
Editor-In-Chief: FLGulf.news
Contributor: Sun Bay Paper
Follow Me on TRUTH

Sent with Proton Mail secure email.

On Wednesday, December 11th, 2024 at 10:15 AM, Nick Chiappetta <nick@chiappettalegal.com> wrote:
By all means, please avail yourself you the court's jurisdiction.

Sincerely,

Nick Chiappetta | Founder
P. 561-768-4500
F. 561-768-4600
nick@chiappettalegal.com
2101 Vista Pkwy, Suite 258
West Palm Beach, Florida 33411

8401 Lake Worth Rd.,
Lake Worth, Florida 33467
*By Appointment Only*

⌷

Product Defect | Injury | Defamation | Insurance

https://url.avanan.click/v2/r01/___www.chiappettalegal.com___.YXAzOmNoaWFwcGV0dGFzZWdhbDphOm86YWNlM2QzNzU1ZTBjNjQ2OWJmOWJm

NOTICE: This e-mail message and any attachment to this e-mail message contains confidential information that may be legally privileged. If you are not the intended recipient, you must not review, re-transmit, convert to hard copy, copy, use or disseminate this e-mail or any attachments to it. If you have received this e-mail in error, please notify us immediately by return e-mail or by telephone at 561-768-4500 and delete this message. Please note that if this e-mail message contains a forwarded message or is a reply to a prior message, some or all of the contents of this message or any attachments may not have been produced by the sender.

From: Richard Luthmann <richard.luthmann@protonmail.com>
Sent: Wednesday, December 11, 2024 10:07 AM
To: Nick Chiappetta <nick@chiappettalegal.com>
Cc: Frank Parlato <frankparlato@gmail.com>; Michael Volpe <mvolpe998@gmail.com>; RALafontaine <RALafontaine@protonmail.com>; Rick

LaRivière <RickLaRiviere@proton.me>; frankiepressman@protonmail.com <frankiepressman@protonmail.com>; mthomasnast@protonmail.com <mthomasnast@protonmail.com>
Subject: Re: Noshirvan v. Couture et al - Meet and Confer Requirement - Local Rule 3.01(g)

Since you seek to re-serve, I am going ahead with my request for a Protective Order.

This communication serves to comply with the Local Rule 3.01(g) requirements.

Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
Muck Rack Profile
Substack: This is For Real?
Contributor: Frank Report
Editor-In-Chief: FLGulf.news
Contributor: Sun Bay Paper
Follow Me on TRUTH

Sent with Proton Mail secure email.

On Wednesday, December 11th, 2024 at 10:04 AM, Nick Chiappetta <nick@chiappettalegal.com> wrote:
Mr. Luthmann,

It appears that a clerical error occurred on the subpoena. The place of compliance is not correct. Therefore, my office is withdrawing this subpoena served on December 10, 2024, because the "place of compliance" does not comply with Rule 45's 100-mile rule. Therefore, you are relieved from complying with same. We will correct the clerical error and reserve you with a Rule 45 compliant subpoena.

Sincerely,

Nick Chiappetta | Founder
P. 561-768-4500
F. 561-768-4600
nick@chiappettalegal.com
2101 Vista Pkwy, Suite 258
West Palm Beach, Florida 33411

8401 Lake Worth Rd.,
Lake Worth, Florida 33467
*By Appointment Only*

▣

Product Defect | Injury | Defamation | Insurance

https://url.avanan.click/v2/r01/___www.chiappettalegal.com___.YXAzOmNoaWFwcGV0dGFsZWdhbDphOm86NDBhMTdhZTVlN2VmMmNhZGNkNDg!

NOTICE: This e-mail message and any attachment to this e-mail message contains confidential information that may be legally privileged. If you are not the intended recipient, you must not review, re-transmit, convert to hard copy, copy, use or disseminate this e-mail or any attachments to it. If you have received this e-mail in error, please notify us immediately by return e-mail or by telephone at 561-768-4500 and delete this message. Please note that if this e-mail message contains a forwarded message or is a reply to a prior message, some or all of the contents of this message or any attachments may not have been produced by the sender.

From: Richard Luthmann <richard.luthmann@protonmail.com>
Sent: Wednesday, December 11, 2024 9:24 AM
To: Nick Chiappetta <nick@chiappettalegal.com>
Cc: Danesh <daneshnoshirvan@gmail.com>; Frank Parlato <frankparlato@gmail.com>; Michael Volpe <mvolpe998@gmail.com>; RALafontaine <RALafontaine@protonmail.com>; Rick LaRivière <RickLaRiviere@proton.me>; frankiepressman@protonmail.com <frankiepressman@protonmail.com>; mthomasnast@protonmail.com <mthomasnast@protonmail.com>
Subject: Re: Noshirvan v. Couture et al - Meet and Confer Requirement - Local Rule 3.01(g)

Dear Ethically Challenged Attorney Nick Chiapetta,

The first volley of my response is contained in this piece published earlier today. Your WOKE ASSHOLE client's days of harassment with injury and death resulting are numbered. And so are yours as his enabler (Rule 4.4(a) ("A lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person.")).

https://luthmann.substack.com/p/brazen-scotus-doxxer-strikes-again

By this email, I view the obligations under Local Rule 3.01(g) satisfied.

Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
Muck Rack Profile
Substack: This is For Real?
Contributor: Frank Report
Editor-In-Chief: FLGulf.news
Contributor: Sun Bay Paper
Follow Me on TRUTH

Sent with Proton Mail secure email.

On Wednesday, December 11th, 2024 at 8:26 AM, Nick Chiappetta <nick@chiappettalegal.com> wrote:
Good morning Mr. Luthmann,

Thank you for your "interesting" email. Please be advised that my office will not be withdrawing the properly served non-party subpoena. You have two options. Email my office the requested documents or file your proposed motion incorporated into your email below.  If the latter do not forget to mention the conversation you had with Dr. Ralph Garramone before the hearing or that you left the hearing with Jennifer Couture. Further, there is no need for threats - physical, verbal, or otherwise. And yes, everyone on the courtroom eye witnessed your improper behavior yesterday. Physically threatening a female process server and myself in front of Federal Deputies in a Federal Courthouse. Kicking the subpoena on the floor. Throwing a tantrum.  Not appropriate to say the least. I strongly encourage you to seek help.

I am available to confer if you wish to file a motion and you may email me the requested documents. However, please refrain from contacting my client, office, or me personally ever again absent one of the two mentioned exceptions.

I look forward to receiving the requested documents. Please note, should you wish to file a motion, your email below will be "Exhibit A" to my response.

Sincerely,

Nick Chiappetta | Founder
P. 561-768-4500
F. 561-768-4600
nick@chiappettalegal.com
2101 Vista Pkwy, Suite 258
West Palm Beach, Florida 33411

8401 Lake Worth Rd.,
Lake Worth, Florida 33467
*By Appointment Only*

Product Defect | Injury | Defamation | Insurance

https://url.avanan.click/v2/r01/__www.chiappettalegal.com___.YXAzOmNoaWFwcGV0dGFsZWdhbDphOTU3MWFiZjExNjE1ZGE3MDM5ZWYyO\

NOTICE: This e-mail message and any attachment to this e-mail message contains confidential information that may be legally privileged. If you are not the intended recipient, you must not review, re-transmit, convert to hard copy, copy, use or disseminate this e-mail or any attachments to it. If

you have received this e-mail in error, please notify us immediately by return e-mail or by telephone at 561-768-4500 and delete this message. Please note that if this e-mail message contains a forwarded message or is a reply to a prior message, some or all of the contents of this message or any attachments may not have been produced by the sender.

From: Danesh <daneshnoshirvan@gmail.com>
Sent: Wednesday, December 11, 2024 7:45 AM
To: Richard Luthmann <richard.luthmann@protonmail.com>; Nick Chiappetta <nick@chiappettalegal.com>
Subject: Re: Noshirvan v. Couture et al - Meet and Confer Requirement - Local Rule 3.01(g)

Hello!
Oh hey look, it's one of Ralph's previous patients who *hasn't died* during operation. You're one of the lucky ones lmao.

I reported you to the justice department and FBI for sharing images online that you believed to be child porn. I currently have an onlyfans account that you're not aware you can't research for shit and because I have every right to be on the platform. Joey's account was removed because he shared revenge porn at Jennifer's direction (great friends you have). Since you and your co conspirators are constantly unaware of the law, it is illegal to share sexual images and present it as child porn, even if it's not. I have screenshots of you sharing sexual images and you claiming that you just shared child porn. There goes your entire life. You know how pedos are treated in prison, right? You deserve it, bud.

You're putting every effort into intimating me, but you can let your boss Ralph know it's not going to work. Threatening me, being hostile with me, harassing me, will never get me to stop and only hurt you guys in court. You're only helping my case as I'm suing for this exact behavior. Besides, I heard you cried in court when you were served so I'm not worried about you lol

One note: no amount of threats, harassment, or you throwing yourself on the sword for no reason will get me to stop seeking justice for my kids. All your efforts are simply reported to the FBI and courts. It's interesting that your co conspirators have no faith in their own case and have to hire you to try to scare me off hahahaha

Go tell your mom to heat you up a hot pocket and buy you a big box of tissues, because you will be held accountable along with your friends, numbnuts.

Moving forward, do not ever contact me ever again. Do not contact me with your alias either. Please only contact me through my lawyer. Any further communication will be considered harassment.

Danesh

On Tue, Dec 10, 2024, 11:02 PM Richard Luthmann <richard.luthmann@protonmail.com> wrote:
Dear Ethically-Challenged Attorney Nick Chiapetta,

Before you and your client, Mr. Noshirvan, have all of your malfeasance aired in the public square, I request a meet and confer to allow you and your client to withdraw -WITH PREJUDICE -  the attached defective, Frivolous and Bad Faith Subpoena, which you directed served on me in Magistrate Judge Dudek's courtroom seconds after he left the bench earlier today in the above-referenced Noshirvan v. Couture et al. matter.

I'll give you one shot so I don't have to file a motion to quash, ask for a protective order, ask for sanctions, sue you for abuse of process, etc. Or else I promise you and your client will be famous, and not in the way you dirtbag WOKE narcissist communists desire.

I already started drafting. Below is a taste. You won't get everything now, but this will be enough to get the press ready for when this thing is stamped.

BTW - will you admit that your client is a pedophile? OnlyFans Verified - then thrown off? The white dildo in the bathtub? Apparently, underaged girls? Why didn't he submit the documentation under 18 U.S.C. §§ 2257 and 2257A? You know that's a felony, right? Maybe to cover up the larger felony ... SEX WITH MINORS?

January 20 is coming.

Hugs and kisses,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
Muck Rack Profile
Substack: This is For Real?
Contributor: Frank Report

Editor-In-Chief: FLGulf.news
Contributor: Sun Bay Paper
Follow Me on TRUTH

Sent with Proton Mail secure email.

The Frivolous and Bad Faith Subpoena blatantly violates the rights of the Free Press in America. It serves to chill the practice of investigative journalism and First Amendment-protected activities.

The service of the subpoena in Magistrate Judge Dudek's courtroom immediately after the judge left the bench represents a flagrant affront to the principles of ordered justice and the dignity of the judiciary. Federal Court Officer Pena's sanctioning of this ambush tactic, directed by Noshirvan and his counsel, Attorney Nick Chiapetta, reflects a misuse of judicial resources and an abuse of process designed to harass and intimidate a journalist engaged in constitutionally protected activities. Such actions undermine the sanctity of the courtroom as a venue for fair and impartial proceedings, turning it instead into a stage for procedural ambushes. I do not blame Federal Court Officer Pena because he probably did not fully understand the gravity of a Federal Court Officer sanctioning such an abuse of the Court, the courtroom venue, the sanctity of the judiciary, and the Constitution of the United States. Sheppard v. Maxwell, 384 U.S. 333, 350, 86 S. Ct. 1507, 1515 (1966) (A responsible press has always been regarded as the handmaiden of effective judicial administration).

However, Noshirvan and Attorney Chiapetta's conduct not only disrespects the authority of the Court but also weaponizes its processes to chill investigative journalism, a cornerstone of democracy. The Court should admonish and sanction those responsible for knowingly orchestrating this bad-faith service of the Frivolous and Bad Faith Subpoena, including Noshirvan and Attorney Chiapetta, to preserve the integrity of the judicial system and deter similar abuses in the future.

The Frivolous and Bad Faith Subpoena issued to me should be dismissed under Rule 26 of the Federal Rules of Civil Procedure because it seeks information that is neither relevant to the claims or defenses in the underlying litigation nor proportional to the needs of the case. Rule 26(b)(1) limits discovery to nonprivileged matters necessary to resolve the issues at stake, yet the Frivolous and Bad Faith Subpoena requests journalistic work product and communications protected under the Qualified Journalist's Privilege.

Furthermore, Rule 26(c)(1) authorizes the issuance of a protective order to prevent undue burden, harassment, and intimidation. The overly broad and retaliatory nature of this subpoena—targeting a journalist for constitutionally protected investigative work—violates both procedural fairness and the public interest in safeguarding freedom of the press.

Accordingly, the Court should quash the subpoena under Rule 26 and issue a protective order barring further attempts to misuse the discovery process to harass or chill legitimate journalistic activities.

The Plaintiff, Mr. Danesh Noshirvan, is a bad actor. He and Attorney Chiapetta have repeatedly perjured themselves by swearing to the fact that Noshirvan is a journalist in court pleadings in this case. Noshirvan is not a journalist, and the insinuation that he is a journalist is an affront to the Fourth Estate.

Noshirvan regularly engages in the practice of "Doxxing," derived from the term "dropping documents," which refers to the malicious act of publicly revealing private or personal information about an individual, such as their home address, phone number, or workplace, without their consent. This act is typically carried out with the intent to harass, intimidate, or endanger the targeted individual. Doxxing is widely regarded as a severe invasion of privacy and violates federal and state laws, including anti-harassment statutes and laws protecting personal information.

Danesh Noshirvan, operating under the alias or social media handle @ThatDaneshGuy, has engaged in disturbing criminal activities centered around digital vigilantism. Most egregiously, he doxxed conservative Supreme Court Justices following the Dobbs v. Jackson Women's Health Organization decision by publicly disseminating their home addresses. This intentional and malicious act incited protests outside their residences, subjected the Justices to threats, and contributed to heightened security risks, violating 18 U.S.C. § 115, which criminalizes threats and harassment of federal officials.

Beyond this, Noshirvan has conducted campaigns of harassment against private citizens, including Jennifer Couture, Ralph Garramone, their family members, and their businesses by releasing their personal information online, inciting mob behavior that led to reputational and financial harm.

Noshirvan exploits minors through an OnlyFans page, reportedly without proper model releases to ensure participants were of legal age, raises significant concerns under 18 U.S.C. §§ 2257 and 2257A regarding the documentation required for adult content production. Noshirvan's page was previously listed as "Verified" on OnlyFans but was "dropped" for improper documentation, begging the question of whether the girls Furthermore, his campaigns targeting vulnerable groups, including healthcare workers, law enforcement, and educators, demonstrate a systematic disregard for ethical boundaries and legal protections, highlighting the dangers posed by his unchecked digital vigilantism.

Noshirvan's activities as a TikTok influencer align disturbingly with the objectives of the Chinese Communist Party (CCP), which wields TikTok and its parent company, ByteDance, as tools of psychological operations (psy-ops) and active measures designed to destabilize American society. TikTok's algorithmic amplification of divisive content, including Danesh's campaigns of WOKE cancel culture, serves to erode social cohesion and prime the United States for ideological fragmentation, governmental disarray, and potential foreign exploitation.

Whether as a knowing participant or as an unwitting "useful idiot," Noshirvan—an Iranian Farsi-speaking "anchor baby" whose rhetoric consistently demonizes Israel, Christianity, traditional values, white Americans, and Republicans—propagates narratives that align with CCP goals. These tactics, rooted in fostering resentment and outrage, are not benign; they constitute ideological warfare. Danesh's dangerous blend of malicious digital vigilantism and ideological extremism makes him a significant actor in advancing the destabilization of American values and institutions, rendering him not only a social menace but also a potential national security threat.

The undersigned fully anticipates that Danesh Noshirvan will face investigation and prosecution by the incoming Trump Justice Department for a litany of crimes, including but not limited to doxxing, harassment, incitement, violations of federal law under 18 U.S.C. §§ 115, 1343, 2257, and

2257A, and potential foreign collusion with adversarial entities like the Chinese Communist Party.

With Great Americans such as Pam Bondi and Kash Patel poised to restore integrity and accountability to the Justice Department after January 20, 2025, the tide of justice will once again prioritize the rule of law over politically motivated agendas. These proven patriots, renowned for their unwavering dedication to upholding justice, are uniquely positioned to confront the abuses of individuals like Danesh, who weaponize digital platforms to harm private citizens, undermine public institutions, and advance ideologically dangerous narratives. The restoration of law and order under their leadership will bring long-overdue accountability to figures like Noshirvan, who exploit societal divisions for personal and ideological gain.

In light of the extraordinary national significance of January 20, 2025, as the Presidential Inauguration of Donald J. Trump as the 47th President of the United States—a day of historic importance, national celebration, and unity—the undersigned respectfully requests that, should the Court decline to grant the broader relief sought herein, the Court at the very least amend the subpoena's compliance date to a later date. This adjustment would ensure that the undersigned and other parties potentially impacted by this historic day can appropriately honor and participate in this vital democratic tradition without undue burden or conflict. I would also appeal to the Eleventh Circuit.

BACKGROUND ON INVESTIGATIVE JOURNALIST RICHARD LUTHMANN

1.     I am a professional investigative journalist focusing on exposing corruption, misconduct, and systemic failures in government, the judiciary, and social institutions. My work has been widely published across multiple platforms, including Substack, Newsbreak, The Sun Bay Paper, FLGulfNews.com, and The Frank Report. My reporting has garnered attention for its depth, rigor, and focus on issues of public concern. Judge Polster Chappell knows very well that investigative journalism is "Act 2" in my life.

2.     I am a verified journalist listed on MuckRack, an internationally recognized platform for professional journalists. This verification underscores my commitment to ethical reporting and adherence to journalistic standards. My work is also supported by my membership in the National Writers Union (NWU), the only labor union representing freelance writers, ensuring my professional standing and advocacy for press freedom.

3.     My investigative reporting delves into critical issues:

Documenting personal and professional battles against systemic corruption and retaliatory tactics to suppress investigative journalism.

Providing an in-depth analysis of my involvement in landmark legal cases and their implications for First Amendment rights and the abuse of judicial processes.

Investigating judicial bias, failures to protect children, and systemic abuses within family court systems nationwide.

Exposing the widespread harm caused by parental alienation and institutional complicity in perpetuating these abuses.

Covering local interest stories, governance issues, and corruption in Southwest Florida, including malfeasance by public officials and policy failures.

4.     My journalistic work also extends to The Unknown Podcast, where I co-host discussions on underreported stories about court failures, social service negligence, and institutional corruption. This platform allows for a broader exploration of investigative findings and fosters public discourse on critical societal issues.

5.     Over my career, I have uncovered significant corruption, particularly within the judiciary, focusing on:

Judicial Conflicts of Interest: Exposing judges' failures to recuse themselves from cases involving financial or personal entanglements, undermining the integrity of the judicial process.

Family Court Failures: Highlighting cases where family courts overlooked abuse or failed to protect vulnerable parties, resulting in life-altering harm.

Cancel Culture and Digital Vigilantism: Investigating influencers like Danesh Noshirvan, who weaponize social media to harass and intimidate individuals for personal gain.

6.     My reporting on social media abuses has been pivotal in exposing the predatory practices of digital influencers such as Danesh Noshirvan, also known as @ThatDaneshGuy on TikTok. My investigative articles detail his tactics, including selective video editing, doxxing, and orchestrating harassment campaigns that cause real-world harm to private citizens, public figures, institutions, and American Society as a whole, as discussed in further detail below.

7.     My investigative journalism has consistently drawn attention to systemic government and court corruption. I have reported on public mismanagement and unethical practices by elected officials, bringing these issues to public attention and fostering calls for reform.

8.     In addition to my investigative writing, my work as a verified journalist on MuckRack has cemented my professional reputation, ensuring my reporting adheres to the highest ethical standards. My membership in the National Writers Union (NWU) further underscores my commitment to press freedom and the protection of journalistic integrity.

9.     My commitment to investigative journalism is rooted in the belief that a free and independent press is essential to democracy. My work has led to public debates, policy reviews, and calls for institutional accountability, ensuring that those in power are held responsible for their actions.

10.  As a journalist, I remain dedicated to uncovering the truth, advocating for transparency, and protecting the public interest. These principles guide my ongoing efforts to shed light on issues that matter most to the communities I serve.

INVESTIGATIVE JOURNALISM ON DANESH NOSHIRVAN

11.  My investigative journalism has documented the extensive harm caused by Plaintiff Danesh Noshirvan, a TikTok influencer operating under the handle @ThatDaneshGuy. With a platform of over 2 million followers, Noshirvan has engaged in systematic campaigns of digital vigilantism, targeting private citizens, public officials, healthcare professionals, educators, law enforcement officers, and even grieving families. His methods include selective video editing, doxxing, and orchestrated harassment campaigns designed to stoke outrage and monetize public anger, often with devastating consequences for his victims.

12.  These campaigns result in reputational harm, financial loss, personal threats, and severe emotional distress for his targets. A consistent hallmark

of Noshirvan's approach is his reliance on half-truths, misrepresentations, and omissions to create a narrative that incites mob behavior. My reporting has highlighted the breadth and depth of these campaigns, exposing the pervasive harm they inflict across diverse groups.

Key Incidents Documented in My Investigative Reporting

13.  The Jennifer Couture Incident: Noshirvan amplified a selectively edited video of Ms. Couture, portraying her as an aggressor in a Dunkin Donuts parking lot altercation. The video omitted critical context, including her efforts to de-escalate the situation and protect her young daughter. He subsequently doxxed Ms. Couture and her family, sharing their personal information online. This led to a torrent of harassment against Ms. Couture, her teenage daughter, and her husband's medical practice, Garramone Plastic Surgery. The financial toll included hundreds of thousands in lost business, tens of thousands of dollars spent on public relations and security, reputational loss, and loss in community standing, while the emotional toll continues to impact the family.

14.  The Aaron De La Torre Tragedy: In a case involving a high school football coach in Texas, Noshirvan disseminated unverified and defamatory allegations. This harassment campaign deeply impacted De La Torre's personal and professional life, leading to broader consequences, including his suicide. Noshirvan is currently under criminal investigation by Texas authorities, underscoring these WOKE Cancel Culture campaigns' dangerous and far-reaching effects.

15.  Doxxing U.S. Supreme Court Justices: Following the Supreme Court's decision in Dobbs v. Jackson Women's Health Organization, Noshirvan publicly disseminated the home addresses of conservative Justices, inciting protests and death threats. This action violated federal law, including 18 U.S.C. § 115, which prohibits threats and harassment of federal officials. Notably, Justice Brett Kavanaugh faced credible death threats following these disclosures, highlighting the real-world dangers of Noshirvan's actions.

16.  OnlyFans and Other Alleged Felonies: My investigation uncovered that Noshirvan reportedly operates an OnlyFans page containing sexually explicit material. Concerns have been raised regarding his apparent failure to file legally required model releases under 18 U.S.C. §§ 2257 and 2257A, which ensure participants in sexually explicit content are of legal age and consent. This failure constitutes a potential felony offense and raises grave concerns about the exploitation of minors and the possibility of child pornography being distributed on his platform. These allegations demand further scrutiny from law enforcement agencies.

17.  Agent of a Foreign Enemy: Noshirvan's actions align with Chinese Communist Party (CCP) objectives, leveraging platforms like TikTok, owned by Byte Dance and the CCP, to promote destabilizing "WOKE" Cancel Culture and undermine American societal cohesion.

18.  Beyond these high-profile incidents, my reporting has identified over 200 victims across various demographics and professions, including healthcare workers such as Dr. Edith Del Mar Behr (PA) and Dr. Ryne Paulson (WY); law enforcement officers like Nick Moore (GA); educators like Keshia Brinkerhoff (WY); and even small business owners like those affiliated with Countryside BBQ (SC) and Paparoni's Grill (SC). In many cases, family members and estates of deceased individuals have also been targeted, exacerbating the emotional and reputational harm.

19.  Here are some of the articles that I have published to date on this matter:

Jennifer Couture v. TikTok's Danesh Noshirvan: Can You Successfully Sue For Online 'Doxxing'? (attached as EXHIBIT "___")
https://luthmann.substack.com/p/jennifer-couture-v-tiktoks-danesh

License to Doxx: Did a Florida Federal Court Just Sanction Doxxing as a Litigation Strategy? (attached as EXHIBIT "___")
https://luthmann.substack.com/p/license-to-doxx-did-a-florida-federal

"The Unknown Podcast" Hosts Tackle Cancel Culture, Judicial Misconduct, and the Weaponization of the Legal System (attached as EXHIBIT "___")
https://luthmann.substack.com/p/the-unknown-podcast-hosts-tackle

Wicker Smith Ditches SCOTUS Doxxer Danesh Noshirvan's Case Over Discovery Doxxing  (attached as EXHIBIT "___")
 https://luthmann.substack.com/p/wicker-smith-ditches-scotus-doxxer

BREAKING: SCOTUS Doxxer Under Investigation in Texas Coach's Tragic Death (attached as EXHIBIT "___")
 https://luthmann.substack.com/p/breaking-scotus-doxxer-under-investigation

Cancel Culture Killer? SCOTUS Doxxer Investigated in Texas Coach's Death (attached as EXHIBIT "___") https://luthmann.substack.com/p/cancel-culture-killer-scotus-doxxer

The Unknown Podcast Episode 16: Cancel Culture's Reckoning, 'Reunification Therapy or Retraumatization?', Family Court Turkeys, and More (attached as EXHIBIT "___") https://luthmann.substack.com/p/the-unknown-podcast-episode-16-cancel

WOKE Mobs No Match for Beth Duttons in Trump's America: Florida Businesswoman and Mom Fights Back Against TikTok Harassment (attached as EXHIBIT "___") https://luthmann.substack.com/p/woke-mobs-no-match-for-beth-duttons

Cancel Culture Cracks: Florida Mom Fights Back Against WOKE Influencer (attached as EXHIBIT "___") https://luthmann.substack.com/p/cancel-culture-cracks-florida-mom


Patterns of Monetized Outrage and Exploitation

20.  Noshirvan has monetized his campaigns through platforms like TikTok and OnlyFans, profiting from the outrage he incites. TikTok's revenue-sharing model incentivizes creators to generate engagement through controversial content, creating a perverse system where greater harm yields greater profits. On OnlyFans, explicit content generates further revenue, raising serious ethical and legal questions about the legitimacy and oversight of his activities.

21.  Through my reporting, I have brought critical attention to the systemic failures of social media platforms to address such abuses. Despite

documented evidence of harm, platforms like TikTok have allowed Noshirvan to continue his campaigns, raising questions about their complicity, the broader implications for user safety, and the active measures currently employed by the CCP.

Retaliatory Frivolous and Bad Faith Subpoena and Legal Harassment

22.  The Frivolous and Bad Faith Subpoena issued by Noshirvan represents a clear act of retaliation against my investigative work. By targeting a journalist engaged in constitutionally protected activities, this Frivolous and Bad Faith Subpoena seeks to silence critical reporting and shield his misconduct from public scrutiny. This misuse of the legal process underscores the urgent need for judicial intervention to protect the integrity of investigative journalism and prevent further abuses.

23.  The breadth and depth of my reporting expose not only the individual harm caused by Noshirvan's campaigns but also the systemic failures that enable his continued misconduct. My work highlights the urgent need for accountability, reform, and protection for victims targeted by digital vigilantism. Judicial action to quash this retaliatory subpoena and impose sanctions against Noshirvan and his counsel will reinforce the principles of justice, fairness, and the vital role of a Free Press.

THE VICTIMS OF DANESH NOSHIRVAN

24.  The victims of Noshirvan's campaigns span diverse backgrounds, including private citizens, educators, healthcare workers, law enforcement officers, public figures, and elected officials. These victims have experienced doxxing, harassment, threats, reputational harm, and in some cases, tragic personal consequences.

Categorized Summary of Victims

25.  Below is a categorized summary of victims, illustrating the widespread impact of Noshirvan's campaigns of harassment and intimidation. These individuals, drawn from diverse backgrounds and professions, suffered reputational damage, financial loss, personal threats, and emotional distress.

26.  Private Citizens. Private individuals like Jennifer Couture (FL), Ralph Garramone (FL), and Gene Kelly (NJ) were falsely accused and subjected to widespread online harassment campaigns. In the case of Ms. Couture, Noshirvan's manipulated videos incited mob behavior that led to threats against her family and damage to her husband's medical practice. Similar campaigns targeted Michele Foley (FL), Shelly Schwarz (CA), Kent Steven Brown (IN), Max Bernegger (CT), and Gabrielle Xlander (NY). Each of these individuals suffered significant personal and professional fallout, including online harassment and reputational damage.

27.  Public Figures. Supreme Court Justices, including Justice Brett Kavanaugh, were subjected to doxxing following the Dobbs decision, with Noshirvan publicly disseminating their home addresses. This doxxing sparked protests and death threats, violating 18 U.S.C. § 115 and jeopardizing their safety. Public figures such as Isabella DeLuca (NY) and the late Robert LeMay (WA) also faced severe harassment campaigns. Other notable victims include political figures like Kyle Rittenhouse and Marjorie Taylor Greene and local officials like Burt Saunders, Amira Fox, and Sheriff Carmine Marceno (FL).

28.  Healthcare Workers. Healthcare professionals targeted by Noshirvan include Dr. Edith Del Mar Behr (PA), Dr. Ryne Paulson (WY), and Dr. Melissa Hieb (WY). Pharmacists Scott Wertz (PA) and Crystal Green (PA) were also subjected to coordinated harassment. Nurses such as Ambria Schebler (WY) and Dena L'Heureux (WY) faced reputational harm and threats, often tied to medical controversies or vaccine-related issues.

29.  Educational Professionals. Teachers and administrators such as Keshia Brinkerhoff (WY), Ryan Lewis (CA), and Heather Williams (CA) were subjected to public ridicule and professional jeopardy. Other victims include Dr. Stephanie Knarr, a mental health professional, and Cortney Kotzian, an educator accused of ideological bias. These individuals were targeted based on perceived stances on cultural and political issues, resulting in threats and reputational harm.

30.  Law Enforcement and Military Personnel. Law enforcement officers like Nick Moore (GA) and Arlington Police Department members (TX) were falsely accused of misconduct. The late Robert LeMay (WA), a retired officer, faced posthumous harassment. Military personnel, including active and retired service members such as Vincent Iorio (NY) and Michael Getz (AL), were similarly targeted, further evidencing Noshirvan's reckless disregard for institutional and individual integrity.

31.  Small Business Owners and Employees. Small business owners and employees targeted include those affiliated with Paparoni's Grill (SC), Countryside BBQ (SC), and Garramone Plastic Surgery (FL). Individuals such as Michael Brown (SC), Daryn Richardson (TX), and Dominic Parks (NY) experienced negative reviews, lost clientele, and financial harm due to Noshirvan's campaigns.

32.  Families of Victims. Family members of targeted individuals often became collateral damage. For example, the spouses, children, and extended family of Jennifer Couture and Ralph Garramone faced threats and online abuse. Families such as the Millers (CA) and the Turners (SC) experienced widespread harassment stemming from their association with Noshirvan's targets.

33.  Deceased Individuals and Their Estates. In one of the more egregious patterns, Noshirvan directed campaigns at deceased individuals, exacerbating the grief of surviving families. Victims include Robert LeMay (WA), Matthew Lee Rupert (IL), Hans Kristian Gaarder (NORWAY), and Mak Parhar (CANADA). These disturbing practices magnified the emotional toll on grieving families while sparking outrage against the estates of the deceased.

34.  Each category reflects the indiscriminate nature of Noshirvan's campaigns, with victims spanning professions, geographies, and socioeconomic statuses. This evidence underscores the systemic danger of Noshirvan's platform and the urgent need for judicial intervention.

IMPROPER SERVICE IN THE COURTHOUSE

1.     The Frivolous and Bad Faith Subpoena in question was served on me in a public courtroom while I was engaging in journalistic activities, an act

orchestrated by Attorney Nick Chiapetta. By arranging for the process server to ambush me in Judge Dudek's courtroom during the conclusion of a public proceeding, Chiapetta employed a calculated tactic intended to harass and intimidate me in the exercise of my First Amendment-protected activities as a journalist.

2.    On the morning of December 10, 2024, at about 9:00 AM, I saw Attorney Chiapetta in the hallway outside of Judge Dudek's courtroom in the Fort Myers U.S. Courthouse. He looked at me and said, "Oh, you're here." I had previously heard from a journalistic source that Noshirvan was looking to serve me with a subpoena. I had words with Attorney Chiapetta about the brazen issuance of a subpoena to a member of the press. I then handed him a document and directed him to give it to his client. See the attached EXHIBIT "__." I think I used the words, "Give this to your COCKSUCKER client, Danesh." The paper recounted President Trump conducting business with terrorists. It said: "President Trump, why are you showing me a picture of my house?" ... "Abdul, you're going to have to figure that out." The paper also had pictures of President Trump, Terrorists, and a shitty hovel that looks like it could belong to a terrorist, much like a shack or a cave.

3.    An examination of the documents contained in the Frivolous and Bad Faith Subpoena package show that Attorney Chiapetta ordered the process server AFTER I had arrived at the Ft. Myers Courthouse and had called his client, Danesh, a COCKSUCKER. See the attached EXHIBIT "A" at page 11.

4.    The witness fee check was created and issued on December 10, 2024. See the attached EXHIBIT "A" on page 10.

5.    Legal ethics and procedural norms prohibit serving process in a manner that is inherently harassing, disruptive, or designed to interfere with constitutionally protected activities.

6.    Attorney Chiapetta's deliberate choice of a courtroom—a place symbolizing the rule of law and impartial justice—as the venue for such a service magnifies the impropriety of this tactic. Courts have consistently condemned such behavior. See Hickman v. Taylor, 329 U.S. 495, 507 (1947) ("The discovery process is not to be used as a tool for harassment or oppression.").

7.    Attorney Chiapetta's lack of respect smacks of the same lack of brazenness Noshirvan showed in doxing the SCOTUS Justices he disagreed with. It makes me wonder whether this activity – the knowing formulation and service of the Frivolous and Bad Faith Subpoena on an investigative journalist - was coordinated and conspiratorial activity, outside of the proper bounds of the attorney-client relationship, and harassment well within the ambit of the crime-fraud exception to the attorney-client privilege.

8.    Serving a journalist in a courthouse, particularly while engaged in their professional capacity, constitutes a blatant abuse of the legal process. The Eleventh Circuit has made clear that courts possess the inherent authority to sanction attorneys who misuse litigation tools to achieve improper objectives. See Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998) ("Courts may sanction bad faith conduct to preserve the orderly administration of justice."). The subpoena is part of a deliberate pattern of harassment by Noshirvan and Attorney Chiapetta.

9.    This bad faith is evident (as analyzed in detail below) in:

The overly broad and duplicative nature of the requests, many of which seek publicly available information.

The targeting of a journalist to deter investigative reporting, violating the First Amendment.

The frivolous demand for irrelevant, unrelated materials, and unrelated legal matters, which have no bearing on the case.

10.   This tactical ambush, combined with the Frivolous and Bad Faith Subpoena's procedural flaws and geographic overreach, underscores a pattern of bad faith litigation tactics. The choice to serve me during a public court proceeding demonstrates an intent to chill my journalistic endeavors – and others who would have the temerity to cover Noshirvan's exploits - and hijack the judicial process for malfeasance and misconduct, rather than to secure relevant or necessary discovery.

11.   Such actions are contrary to the principles of fairness and professionalism expected in litigation. See ABA Model Rules of Professional Conduct Rule 4.4(a) ("A lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person."). Here, Attorney Chiapetta's conduct is precisely the type of oppressive behavior Rule 4.4(a) was designed to prevent.

12.   The improper service not only violated ethical standards but also disrupted my ability to attend and report on the public proceedings in question. By doing so, it interfered with my First Amendment rights to observe and report on matters of public concern, a cornerstone of Free Press protections enshrined in the Constitution.

13.   The deliberate orchestration of this service in a courtroom is HORNBOOK bad faith conduct that requires judicial intervention. Such actions undermine the integrity of the judicial process and cannot be allowed to stand unchallenged.

14.   Accordingly, I respectfully request that this Court act decisively to stem this malicious affront to investigative journalism and the Freedom of the Press. I ask the Court to grant all the relief herein requested. Specifically, I pray that this Court impose sanctions on Plaintiff's counsel, Nick Chiapetta, Esq., and the Defendant, Danesh Noshirvan in an amount sufficient to deter future misconduct. Because of Noshirvan's history in Doxxing the SCOTUS Justices, I request an amount no less than ONE HUNDRED THOUSAND ($100,000) DOLLARS, as authorized by the Court's inherent powers to regulate and sanction abusive litigation practices.

15.   This Court's swift intervention is necessary to reaffirm the principles of fairness, protect non-parties from oppressive discovery practices, and safeguard the vital role of investigative journalism and the Freedom of the Press in a democratic society.



# EXHIBIT N



# EXHIBIT O

**Request to Withdraw 'Time Travel' - Based BAD FAITH SUBPOENA - Noshirvan v. Couture et al - Meet and Confer Requirement - Local Rule 3.01(g)**

| | |
|---|---|
| From | Richard A Luthmann <richard.luthmann@protonmail.com> |
| To | Nick Chiappetta<nick@chiappettalegal.com> |
| CC | Michael Volpe<mvolpe998@gmail.com>, RALafontaine<RALafontaine@protonmail.com>, Rick LaRivière<RickLaRiviere@proton.me>, mthomasnast@protonmail.com, julian-jackson-fannin-8837@ecf.pacerpro.com, AutoDocketMIA@duanemorris.com, JMagarin@duanemorris.com, ashaikh@duanemorris.com, bcastillo@duanemorris.com, cmackey@duanemorris.com, courtmail@duanemorris.com, hwgurland@duanemorris.com, jjfannin@duanemorris.com, ngounaris@duanemorris.com, pnmendoza@duanemorris.com, aalfano@rolfeshenry.com, kdeglman@rolfeshenry.com, pt@ptesq.com, Frank Parlato<frankparlato@gmail.com>, frank.morano@wabcradio.com, frankiepressman@protonmail.com, tips@thefp.com, news.tips@abc.com, tips@cnn.com, tips@nypost.com, tips@nydailynews.com, chambers_flmd_dudek@flmd.uscourts.gov, chambers_flmd_steele@flmd.uscourts.gov, info@rcfp.org, NWU Membership<membership@nwu.org> |
| Date | Tuesday, December 17th, 2024 at 1:47 PM |

Mr. Chiappetta et al.,

This is an attempt to Meet and Confer pursuant to Local Rule 3.01(g) for you to withdraw your client, SCOTUS DOXXER Danesh Noshirvan's BAD FAITH SUBPOENA and agree to additional protections of the FREE PRESS. The request is cumulative of all others, including your violations of the advocate-witness rule.

My previous attempts to confer with you, Mr. Chiappetta, under Local Rule 3.01(g) have been an "exercise in futility." You make yourself unavailable and incapable of use for the accomplishment of the purposes of Local Rule 3.01(g). See Booth v. Churner, 532 U.S. 731, 738, 121 S. Ct. 1819, 1823 (2001).

This attempt to meet and confer is based upon newly-acquired evidence, hitherforeto unknown to the parties, and acquired by me in my capacity as a professional journalist from a confidential source. It is clear your client's FACTUAL THEORY and your LEGAL THEORY (and additionally Mr. Brad LaPorte's EXPERT METHODOLOGY) are predicated upon TIME TRAVEL evidence.

Based on this evidence I once again ask your client Danesh Noshirvan, the SCOTUS DOXXER, to withdraw the served BAD FAITH SUBPOENA and agree to a Protective Stipulation to be So-Ordered by the Court that you will not seek materials from any journalist or outlet prior to making a showing before the Court consonant with 11th Circuit Precedent.

Do all of you honestly believe that TIME TRAVEL exists? A review of the attached Subpoena and Operative Second Amended Complaint shows that Plaintiff Danesh Noshirvan relies upon TIME TRAVEL to make the allegations in the operative pleading AND the served BAD FAITH SUBPOENA.

Paragraph 50 of the operative pleading, the SECOND AMENDED COMPLAINT ("SAC)") refers to an incident at a Dunkin Donuts Parking lot on January 26, 2022. Paragraphs 63 to 81 are a diatribe about JOEY CAMP, who obviously rents - for free - the vast majority of the space in Noshirvan's head. CAMP and SCOTUS Doxxer Noshirvan have a long prior history. This litigation is yet another one of their "proxy wars."

CAMP has not been named, joined, or served in the case.

The attached invoice details how JOEY CAMP purchased thatdaneshguy.com  thatdaneshguy.org and thatdaneshguy.net (the "Danesh Domains") on September 16, 2021.

# Epik Holdings Inc

**1100 Bellevue Way NE, Ste 8A-601**
**Bellevue, WA**
**98004, USA**
**Phone: 206-826-2345**

# INVOICE (PAID)

Invoice #9439073
Date: September 16, 2021

TO:
**Joseph Camp**
**J - Square Presents**
**5514 Lewiston Street 5514 Lewiston Street**
**Denver CO 80239**
**Phone: +1.7204545240**
**Fax: +1**

| DESCRIPTION | AMOUNT |
|---|---|
| Create domain thatdaneshguy.com for 1 year(s) | 7.99 USD |
| Create domain thatdaneshguy.org for 1 year(s) | 6.99 USD |
| Create domain thatdaneshguy.net for 1 year(s) | 9.95 USD |
| Total : | 24.93 USD |

**Make Payment to Epik Holdings Inc**
**Bank Address:**
Chase Bank,
2950 Issaquah-Pine Lake Rd,
Sammamish, WA 98075

Thank you for your business!

Do you, Mr. Chiappetta, have any comment on how Joey Camp bought the Danesh domains BEFORE the Dunkin Donuts incident and BEFORE he knew of the Defendants?

Does this mean that the Plaintiff's theory of the case and the BAD FAITH SUBPOENA rests on the assertion that Joey Camp has magical or clairvoyant powers?

Mr. Noshirvan's claim is that Defendants directed Joey Camp to move against him. How did Joey Camp know what to do months before?

Paragraph 134 of the SAC is blatantly false, as a matter of physics and reality:

> 134. Defendants caused a defamatory website about Noshirvan to be built and published. The website's domain is www.thatdaneshguy.com. However, at some point, the domain was redirected to Court Listener (Couture v. Noshirvan (2:23-cv-00340).

Paragraphs 135 and 471 of the SAC are similarly facially false, putting broadsides into Noshirvan's claims and more importantly, the legal and factual theories underpinning them. Tracts of the SAC fall apart as it is clear that the CAMP-NOSHIRVAN "blood feud" predated these defendants' involvement and the operative facts and allegations in the SAC.

So, in order for the SAC and the BAD FAITH SUBPOENA to have any claim to reality - legal or factual - I must ask you:

- Does Joey Camp have a time machine? If so, do we have to alert the Department of Defense or Elon Musk in order to protect human civilization and the American Way of life?
- Is Joey Camp's time machine the same one that Internet Conspiracy Theorists claim Barron Trump used to help Donald Trump win the 2024 election? See https://culturacolectiva.com/en/history/barron-trump-time-traveler-theory/
- Mr. Chiappetta, do you support the use of TIME TRAVEL as a legal tool in litigation?
- Does the SCOTUS Doxxer, Mr. Noshirvan, support Expert Witness Brad LaPorte's use of TIME TRAVEL as part of his Expert Methodology in calculating damages?

I hope you see your client, the SCOTUS Doxxer's claims are ABSURD and FRIVILOUS as a matter of fact and law. They do not comport with reality.

If you do not withdraw this BAD FAITH SUBPOENA and stipulate that nothing else will issue against any journalist of journalist outlet unless and until a showing consonant with the law and 11th Circuit precedent is made, I will seek sanctions, costs, fees, and other relief. Your client and you have no right to frustrate investigative journalism as a litigation tactic and in violation of the First Amendment.

The SAC states at Paragraph 62:

> 62. Publication of Couture's public criminal activities are protected by the U.S. Constitution and Florida State Constitution.

What is good for the goose is good for the gander. At least several journalism outlets have reported that Noshirvan is under criminal investigation:

- https://frankreport.com/2024/11/19/tiktok-influencer-thatdaneshguys-accountability-videos-connected-to-suicide-police-investigate-2/
- https://luthmann.substack.com/p/breaking-scotus-doxxer-under-investigation
- https://www.newsbreak.com/richard-luthmann-1792610/3690067691331-cancel-culture-killer-scotus-doxxer-investigated-in-texas-coach-s-death
- https://www.newsbreak.com/richard-luthmann-1792610/3716192824729-tiktok-bully-danesh-noshirvan-s-victims-speak-out-legal-team-under-fire
- https://luthmann.substack.com/p/breaking-scotus-doxxer-busted-fbi

Mr. Chiappetta, I have asked you and your client time and time again. Please do not play dumb, even though it seems to be one of your greatest skills.

Here is the applicable law: The U.S. District Court for the Middle District of Florida stated (POLSTER CHAPPELL, J.) in Angiolillo v. Collier Cty., No. 2:08-cv-606-FtM-99SPC, 2009 U.S. Dist. LEXIS 105346, at *3-4 (M.D. Fla. June 18, 2009):

> Federal courts, including the Eleventh Circuit, have "overwhelmingly recognized a qualified privilege for journalists which allows them to resist compelled disclosure of their professional news gathering efforts and results, whether published or not." U.S. v. Diaz, 2004 U.S. Dist. LEXIS 11724, 2004 WL 1944851 *1 (S.D. Fla. April 27, 2004) (citing McCarty v. Bankers Insurance Co., 195 F.R.D. 39, 44 (N.D. Fla.1998)). This reporter's privilege stems from the adverse effect of forcing journalists to testify in judicial proceedings about the substance of their news reports. Diaz, 2004 U.S. Dist. LEXIS 11724, 2004 WL 1944851 at *1 (citing United States v. Caporale, 806 F.2d 1487, 1503-04 (11th Cir.1986) (reporters' subpoenas quashed where defendants failed to show alternative sources of information did not exist or that reporters had information relevant to the defense); Miller v. Transamerican Press, Inc., 621 F.2d 721, 725 (5th Cir.1980) (formally adopting reporter's privilege enunciated by other circuits). The privilege may be overcome only if the information sought is shown to be: (a) highly relevant; (b) necessary to the proper presentation of the case; and (c) unavailable from other sources. Diaz, 2004 U.S. Dist. LEXIS 11724, 2004 WL 1944851 at *1 (citing Caporale, 806 F.2d at 1504). The party seeking to compel a reporter's testimony must establish all three prongs by "clear and convincing evidence." McCarty, 195 F.R.D. at 47.

Please provide me with a response, consonant with Local Rule 3.01(g).

Thank you.

Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
**Muck Rack Profile**
**Substack: This is For Real?**
**Contributor: Frank Report**
**Editor-In-Chief: FLGulf.news**
**Contributor: Sun Bay Paper**
**Follow Me on TRUTH**

Sent with Proton Mail secure email.

# EXHIBIT P

**RE: Thanks for contacting the Reporters Committee.**

| | |
|---|---|
| From | info@rcfp.org <info@rcfp.org> |
| To | Richard A Luthmann<richard.luthmann@protonmail.com> |
| Date | Monday, December 16th, 2024 at 10:10 AM |

Hello Rich,

Thank you for contacting the Reporters Committee and making us aware of this issue.  It is helpful to know about instances when journalists are being subpoenaed, as this does present First Amendment concerns.

From your email, it seems as though you have legal representation, but if you have any specific questions about the subpoena process please feel free to reach out.  You can review our guide to the Reporters' Privilege, and of particular interest will be this section on the state of the law in the 11th Circuit (which includes the Middle District of Florida).

As you will see, the 11th Circuit recognizes a qualified privilege for journalists which allows them to resist compelled disclosure of their professional news gathering efforts in both criminal and civil proceedings.

If you are in need of general information about the Reporters Committee, please visit our website at www.rcfp.org.

The Reporters Committee is an unincorporated nonprofit association that does not engage in the practice of law. Neither the Reporters Committee nor any of its staff attorneys have been engaged by you, and they do not represent you in connection with this or any other matter. Accordingly, as there may be time limitations that apply to this or any other matters, should you need legal representation, you should contact an attorney licensed in your jurisdiction for representation without delay. This communication does not constitute an opinion as to the merits of your case(s), if any, and does not create an attorney-client relationship.

-------------- Original Message ---------------
From: Reporters Committee for Freedom of the Press [info@rcfp.org]
Sent: 12/13/2024 5:02 PM
To: richard.luthmann@protonmail.com
Subject: Thanks for contacting the Reporters Committee.

Thanks for contacting the Reporters Committee's hotline for journalists. We will respond to you soon.

Please remember that while Reporters Committee attorneys may provide general information and resources, they are not representing you and do not provide legal advice to hotline requesters.

# 11th Circuit

Reporter's Privilege
Compendium

I. Introduction: History &
Background

II. Authority for and source
of the right

   A. Shield law statute

   B. State constitutional
   provision

   C. Federal constitutional
   provision

   D. Other sources

III. Scope of protection

   A. Generally

   B. Absolute or qualified
   privilege

   C. Type of case

      1. Civil

      2. Criminal

      3. Grand jury

   D. Information and/or
   identity of source

   E. Confidential and/or
   nonconfidential information

   F. Published and/or non-
   published material

   G. Reporter's personal
   observations

   H. Media as a party

   I. Defamation actions

IV. Who is covered

   A. Statutory and case law
   definitions

1. Traditional news gatherers

a. Reporter

b. Editor

c. News

d. Photo journalist

e. News organization/medium

2. Others, including non-traditional news gatherers

B. Whose privilege is it?

V. Procedures for issuing and contesting subpoenas

A. What subpoena server must do

1. Service of subpoena, time

2. Deposit of security

3. Filing of affidavit

4. Judicial approval

5. Service of police or other administrative subpoenas

B. How to Quash

1. Contact other party first

2. Filing an objection or a notice of intent

3. File a motion to quash

a. Which court?

b. Motion to compel

c. Timing

d. Language

e. Additional material

4. In camera review

a. Necessity

b. Consequences of consent

c. Consequences of refusing

5. Briefing schedule

6. Amicus briefs

VI. Substantive law on contesting subpoenas

A. Burden, standard of proof

B. Elements

1. Relevance of material to case at bar

2. Material unavailable from other sources

a. How exhaustive must search be?

b. What proof of search does a subpoenaing party need to make?

c. Source is an eyewitness to a crime

3. Balancing of interests

4. Subpoena not overbroad or unduly burdensome

5. Threat to human life

6. Material is not cumulative

7. Civil/criminal rules of procedure

8. Other elements

C. Waiver or limits to testimony

1. Is the privilege waivable?

2. Elements of waiver

a. Disclosure of confidential source's name

b. Disclosure of non-confidential source's name

c. Partial disclosure of information

d. Other elements

3. Agreement to partially testify act as waiver?

VII. What constitutes compliance?

A. Newspaper articles

B. Broadcast materials

C. Testimony vs. affidavits

D. Non-compliance remedies

1. Civil contempt

a. Fines

b. Jail

2. Criminal contempt

3. Other remedies

VIII. Appealing

A. Timing

1. Interlocutory appeals

2. Expedited appeals

B. Procedure

1. To whom is the appeal made?

2. Stays pending appeal

3. Nature of appeal

4. Standard of review

5. Addressing mootness questions

6. Relief

IX. Other issues

A. Newsroom searches

B. Separation orders

C. Third-party subpoenas

D. The source's rights and interests

**11th Circuit**

# Reporter's Privilege Compendium

Jennifer A. Mansfield

Holland & Knight LLP

50 North Laura Street, Suite 3900

Jacksonville, FL 32202

T: 904.353.2000

*Special thanks to Sanford L. Bohrer and Scott D. Ponce, of Holland & Knight LLP, the previous authors of this chapter.*

Last updated June 2023

**COMPARE**

# I. Introduction: History & Background

The Eleventh Circuit follows Fifth Circuit precedent in *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 725 (5th Cir.) (*Miller I*), *modified on reh'g*, 628 F.2d 932 (5th Cir.1980) (per curiam) ("*Miller II*"), to recognize a First Amendment qualified reporter's privilege.  The Eleventh Circuit was formed on October 1, 1981 by splitting the former Fifth Circuit, and thus Fifth Circuit decisions prior to that date are binding precedent unless overruled *en banc*.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

A reporter's privilege exists where a subpoena seeks the identity of a journalist's confidential source in a civil case, including a defamation case in which the reporter or media organization is a party, and the party seeking the information must demonstrate with substantial evidence that the information is relevant, not available elsewhere, and the need for the information is compelling. *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726, *as modified*, 628 F.2d 932 (5th Cir. 1980).

The Eleventh Circuit has also recognized a qualified privilege for journalists in criminal cases.  *See United States v. Caporale*, 806 F.2d 1487 (11th Cir. 1986).  To obtain privileged materials, a party must establish by clear and convincing evidence that

the information is: (1) highly relevant, (2) necessary to the proper presentation of the case, and (3) unavailable from other sources. *Id.*

**COMPARE**

# II. Authority for and source of the right

Where federal jurisdiction is predicated upon the existence of a federal question, the federal law of privilege provides the rule of decision, even if the allegedly privileged material bears on a pendent state law claim. *Flynn v. Roanoke Companies Group, Inc.* 2007 WL 4564113 (N. D. Ga. Dec. 21, 2007),(citing *Hancock v. Hobbs*, 967 F.2d 462, 467 (11th Cir.1992)); *United States v. Fountain View Apartments, Inc.*, 2009 WL 1905046, *2 (M.D. Fla. July 1, 2009) (applying federal common law privilege in quashing subpoena seeking outtakes and reporter's notes).

The Supreme Court's plurality decision in *Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646 (1972), is the source of the law in the Fifth Circuit, and hence Eleventh Circuit on the existence of a First Amendment qualified reporter's privilege.

In *Miller v. Transamerican Press, Inc.*, a libel case, the Fifth Circuit construed *Branzburg* to hold that, where a reporter faces compulsory process issued by a grand jury, the First Amendment provides only a right to be free from process intended to harass. 621 F.2d 721, 725, *as modified*, 628 F.2d 932 (5th Cir. 1980). But, the Fifth Circuit distinguished the balance of interests in civil libel cases from that in grand jury proceedings. *Id.* at 725-26. Based on this distinction, *Miller* recognized a qualified First Amendment privilege for reporters in libel cases in which the plaintiff seeks to discover the reporter's confidential sources. *Id.* at 725.

The Eleventh Circuit has not recognized a common law reporter's privilege pursuant to Fed. R. Evid. 501, but some district courts have. In *Flynn v. Roanoke Companies Group, Inc.*, 2007 WL 4564113 (N. D. Ga. Dec. 21, 2007), the district court recognized a federal common law privilege, in part because of comity with Georgia's Reporter's Shield Law, which protects nonparty journalists from disclosing information obtained in preparation of news. O.C.G.A. § 24-9-30. "The decision to refer to state law is sensible in a case like this where the overwhelming majority of claims are based on diversity jurisdiction and state law claims." *Flynn*, 2007 WL 4564113 at *3.

**COMPARE**

# A. Shield law statute

Alabama has a shield statute that provides for an absolute reporter's privilege. Ala. Code § 12–21–142; *Price v. Time*, 416 F.3d 1327, 1335 (11th Cir. 2005).  The persons covered by the privilege, however, are limited to those engaged in, connected with or employed on any newspaper, radio broadcasting station or television station, while engaged in a news-gathering capacity.  The Eleventh Circuit has construed the Alabama shield law strictly, holding that it is "plain and apparent that in common usage 'newspaper' does not mean 'newspaper and magazine.'" *Price v. Time*, 416 F.3d 1327, 1336, 1339 (11th Cir. 2005).

Florida's evidence code contains a Reporter's privilege at Fla. Stat. § 90.5015.  Florida upheld a common law and First Amendment reporter's privilege in *State v. Davis*, 720 So. 2d 220, 222 (Fla. 1998). In *McCarty v. Bankers Ins. Co.*, the Northern District of Florida held that the test for piercing Florida's journalist's privilege was virtually identical to the federal

test adopted by the Eleventh Circuit. *See also United States v. Fountain View Apartments, Inc.*, 2009 WL 1905046, *2 n.5 (M.D. Fla. July 1, 2009).

Georgia's Reporter's Shield Law protects nonparty journalists from disclosing information obtained in preparation of news. O.C.G.A. § 24-5-508. *Flynn v. Roanoke Companies Group, Inc.*, Nos. 1:06-cv-1809, 1:07-MD-1804, 2007 WL 4564113 (N.D. Ga. Dec. 21, 2007), recognized a federal qualified common law reporter's privilege for non-confidential sources in civil cases, noting the standards for determining the limits of the privilege are virtually identical under the federal common law as they are under the Georgia statute.

COMPARE

# B. State constitutional provision

State privilege defenses have full force and effect in federal court in diversity jurisdiction cases by virtue of Fed.R.Evid. 501. *Price v. Time*, 416 F.3d 1327, 1336, 1339 (11th Cir. 2005).   Alabama, Florida, and Georgia are the states within the Eleventh Circuit.

COMPARE

# C. Federal constitutional provision

The First Amendment is the basis of the reporter's privilege doctrine as recognized by the Fifth Circuit's *Miller* decision, relying upon *Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646 (1972), and is still binding precedent within the Eleventh Circuit.  *Price v. Time, Inc.*, 416 F.3d 1327 (2005).

In *Branzburg*, five justices agreed that the First Amendment does not protect reporters from having to testify before grand juries. *Branzburg*, 408 U.S. at 690. In his concurring opinion in *Branzburg*, however, Justice Powell left open the possibility that journalistic privilege might be warranted in certain cases involving "legitimate First Amendment interests." *Id.* at 710 (Powell, J., concurring). Whether those interests exist, he wrote, depends on balancing the "freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Id.*

COMPARE

# D. Other sources

COMPARE

# III. Scope of protection

# A. Generally

In the Eleventh Circuit, the test for piercing the privilege requires the party seeking the reporter's confidential source to present: "substantial evidence[:][1] that the challenged statement was published and is both factually untrue and defamatory; [2] that reasonable efforts to discover the information from alternative sources have been made and that no other reasonable source is available; and [3] that knowledge of the identity of the informant is necessary to proper preparation and presentation of the case." *Price v. Time, Inc.*, 416 F.3d 1327 (2005) (quoting *Miller II*, 628 F.2d at 932); *accord United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986).

*Flynn v. Roanoke Companies Group, Inc.*, Nos. 1:06-cv-1809, 1:07-MD-1804, 2007 WL 4564113 (N.D. Ga. Dec. 21, 2007), recognized a qualified common law reporter's privilege for non-confidential sources in civil cases.

COMPARE

# B. Absolute or qualified privilege

State privilege defenses have full force and effect in federal court in diversity jurisdiction cases by virtue of Fed. R. Evid. 501. *Price v. Time*, 416 F.3d 1327, 1336, 1339 (11th Cir. 2005).  Thus, for diversity cases, state law governs whether the privilege is absolute or qualified.

The federal privilege as recognized by the Eleventh Circuit is a qualified one.  *Price*, 416 F. 3d at 1343.  It may be pierced if the party seeking the reporter's confidential source presents: "substantial evidence[:][1] that the challenged statement was published and is both factually untrue and defamatory; [2] that reasonable efforts to discover the information from alternative sources have been made and that no other reasonable source is available; and [3] that knowledge of the identity of the informant is necessary to proper preparation and presentation of the case." *Id*.

COMPARE

# C. Type of case

COMPARE

# 1. Civil

The Eleventh Circuit recognizes a qualified privilege for journalists which allows them to resist compelled disclosure of their professional news gathering efforts in both criminal and civil proceedings.  *Price v. Time, Inc.*, 416 F.3d 1327 (11th Cir. 2005) (applying privilege and finding that plaintiff had failed to exhaust alternative sources for information sought); *Miller I*, 621

F.2d 727 (recognizing the reporter's privilege in a defamation case; Fifth Circuit decisions prior to October 1, 1981 are binding precedent unless overruled *en banc*. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).)

**COMPARE**

# 2. Criminal

The Eleventh Circuit has "recognize[d] a qualified privilege for journalists," in criminal proceedings, "allowing them to resist compelled disclosure of their professional news gathering efforts." *United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013) (criminal drug possession trial). Information may only be compelled from a reporter claiming the privilege if the party requesting the information can show: (1) that it is highly relevant, (2) necessary to the proper presentation of the case, and (3) unavailable from other sources. *United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986) (applying privilege in criminal racketeering trial).

**COMPARE**

# 3. Grand jury

**COMPARE**

# D. Information and/or identity of source

**COMPARE**

# E. Confidential and/or nonconfidential information

Although the Eleventh Circuit has only expressly addressed protections for *confidential* information or sources, it has affirmed a district court's decision quashing a subpoena to a media company for non-confidential video footage. *United States v. Capers*, 708 F.3d 1286, 1302-03 (11th Cir. 2013). In addition, federal district courts throughout the Eleventh Circuit have held that the test for overcoming the privilege remains the same even if the information was not obtained from a confidential source. *See, e.g., Abrams v. Tuberville*, 2013 WL 12244457, *1 n.2 (M.D. Ala. Aug. 15, 2013) (applying *Caporale* test to information about a named source); *United States v. Fountain View Apartments, Inc.*, 2009 WL 1905046, *2 (M.D. Fla. July 1, 2009) ("[*Caporale*] standard applies even when the source of the information provided to the reporter is not confidential."); *Flynn v. Roanoke Companies Group, Inc.*, 2007 WL 4564113 (N. D. Ga. Dec. 21, 2007) (recognizing a federal common law reporter's privilege for non-confidential material); *United States v. Blanton*, 534 F. Supp. 295, 297 (S.D. Fla. 1982) ("Although no confidential source or information is involved, this distinction is irrelevant to the chilling effect enforcement of the subpoena would have on the flow of information to the press and public."); *Loadholtz v. Fields*, 389 F. Supp. 1299, 1301-02 (M.D. Fla. 1975) (recognizing that in a civil case the public's interest in the journalist's privilege often outweighs the private interest in compelled disclosure).

# F. Published and/or non-published material

In *United States v. Fountain View Apartments, Inc.*, 2009 WL 1905046, *2 (M.D. Fla. July 1, 2009), the court subdivided the non-published materials into outtakes and notes related and not related to the parties. It held that those materials that were not related to the parties were not relevant and that while outtakes of parties may be relevant, this factor alone was too speculative to justify compelled disclosure. Accordingly, the court quashed the subpoena.

However, in *United States v. Vasquez-Ortiz*, 2008 WL 11449045 (N.D. Ga. Jan. 23, 2008), a Georgia district court declined to reach the issue of whether the First Amendment reporter's privilege shields a television station's outtakes, because it found that the person seeking the outtakes had overcome any such privilege in any event. The court, however, noted that other jurisdictions have held that outtakes are not protected.

Sitting in diversity, the Southern District of Georgia applied Georgia's privilege to quash, in part, a subpoena for documents and unedited footage from the interview of a party, requiring the footage to be submitted for *in camera* inspection. *Woods v. Georgia Pacific Corp.*, 2008 WL 11350078 (S.D. Ga. Nov. 4, 2008).

**COMPARE**

# G. Reporter's personal observations

In *United States v. Fountain View Apartments, Inc.*, 2009 WL 1905046, *2 (M.D. Fla. July 1, 2009), the court held that the reporter's notes, drafts of scripts, and what the editor and reporter thought of interviewees' reactions were not relevant to the case, and therefore were protected.

**COMPARE**

# H. Media as a party

A reporter's privilege exists where a subpoena seeks the identity of a journalist's confidential source in a civil case, including a defamation case in which the reporter or media organization is a party. *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726, *as modified*, 628 F.2d 932 (5th Cir. 1980). The party seeking the information must demonstrate with substantial evidence that the information is relevant, not available elsewhere, and the need for the information is compelling. *Id.*

**COMPARE**

# I. Defamation actions

A reporter's privilege exists where a subpoena seeks the identity of a journalist's confidential source in a civil case, including a defamation case in which the reporter or media organization is a party. *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726, *as modified*, 628 F.2d 932 (5th Cir. 1980). The party seeking the information must demonstrate with substantial evidence that the information is relevant, not available elsewhere, and the need for the information is compelling. *Id*.

**COMPARE**

# IV. Who is covered

**COMPARE**

# A. Statutory and case law definitions

**COMPARE**

# 1. Traditional news gatherers

**COMPARE**

# a. Reporter

**COMPARE**

# b. Editor

**COMPARE**

# c. News

**COMPARE**

# d. Photo journalist

# e. News organization/medium

COMPARE

# 2. Others, including non-traditional news gatherers

COMPARE

# B. Whose privilege is it?

Under Florida's Reporter's Privilege, § 90.5015, Fla. Stat., Florida's Fourth District Court of Appeal held that a source, who was also a co-defendant to a defamation suit, would not be protected by the journalist privilege. *Cable News Network, Inc. v. Black*, 308 So. 3d 997 (Fla. 4th DCA 2020).

COMPARE

# V. Procedures for issuing and contesting subpoenas

Recognizing that the Eleventh Circuit has not definitively ruled on whether a Rule 45 subpoena must be personally served and, consequently, the district courts have reached different conclusions, the Middle District of Georgia held that personal service of a subpoena in a civil case did not require personal service. Personal service is not required by Rule 45 as long as the means of service are reasonably calculated to ensure receipt and actual notice by the witness. Although the subpoena was issued to a trade name used by a duopoly, and not either of the existing legal entities, the parent company of the duopoly waived an objection on that basis by responding to the subpoena. *Castleberry v. Camden County*, 331 F.R.D. 559 (M.D. Ga. 2019).

COMPARE

# A. What subpoena server must do

COMPARE

# 1. Service of subpoena, time

# 2. Deposit of security

**COMPARE**

# 3. Filing of affidavit

**COMPARE**

# 4. Judicial approval

**COMPARE**

# 5. Service of police or other administrative subpoenas

**COMPARE**

# B. How to Quash

**COMPARE**

# 1. Contact other party first

Federal Rule of Civil Procedure 45 requires that a non-party objecting to a subpoena for documents give notice in writing to the subpoenaing party within 14 days of receipt of the subpoena. Fed. R. Civ. P. 45(d)(2)(B). If the non-party objects to a subpoena on the grounds that the material requested is privileged, it must expressly state this in the objection and include a description of the privileged documents, which could be used by the subpoenaing party to contest the privilege. Once the non-party objects to a subpoena, the subpoenaed materials may only be obtained through a court order to compel production. *Id.* Although some non-parties choose to file a motion to quash, Rule 45 places no obligation on the non-party to do so.  In the absence of a motion to quash, it is incumbent on the subpoenaing party to move to enforce the subpoena.

Most local rules require a party moving to quash or to compel to submit a certificate of conference with the motion, indicating that the attorney for the moving party conferred with an attorney for each party affected by the requested relief to determine

whether the motion is opposed." S.D. Fla. Local Rule 7.1(a)(3); N.D. Ga. Local Rule 37.1(A)(1). Similarly, the Federal Rules require a party moving to compel to "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action." Fed. R. Civ. P. 37(1).  *See, e.g. Castleberry v. Camden County*, 331 F.R.D. 559 (M.D. Ga. 2019).

**COMPARE**

# 2. Filing an objection or a notice of intent

Rule 45 requires that a non-party objecting to a subpoena for documents give notice in writing to the subpoenaing party within 14 days of receipt of the subpoena. Fed. R. Civ. P. 45(d)(2)(B). If the non-party objects to a subpoena on the grounds that the material requested is privileged, it must expressly state this in the objection and include a description of the privileged documents, which could be used by the subpoenaing party to contest the privilege. Once the non-party objects to a subpoena, the subpoenaed materials may only be obtained through a court order to compel production. *Id.* Although some non-parties choose to file a motion to quash, Rule 45 places no obligation on the non-party to do so.  In the absence of a motion to quash, it is incumbent on the subpoenaing party to move to enforce the subpoena.

Although the subpoena was issued to a trade name used by a television duopoly, and not either of the existing legal entities, the parent company of the duopoly waived an objection on that basis by responding to the subpoena.  *Castleberry v. Camden County*, 331 F.R.D. 559 (M.D. Ga. 2019).

**COMPARE**

# 3. File a motion to quash

**COMPARE**

# a. Which court?

**COMPARE**

# b. Motion to compel

In *Castleberry v. Camden County*, 331 F.R.D. 559 (M.D. Ga. 2019), the district court denied as moot a motion to compel unused raw footage because, as explained in a declaration by the reporter, that to the extent that any raw footage ever existed it was destroyed under the station's retention policies before service of the subpoena.

**COMPARE**

## c. Timing

**COMPARE**

## d. Language

In a civil case for violation of patent rights where the plaintiff subpoenaed a non-party newspaper, the Middle District of Florida quashed the subpoena because the subpoena's requests broadly sought all "[d]ocuments and [c]ommunications," including internal communications that were "untethered to any particular custodian and regarding subject matters that appear to be of little relevance to this action." *EDST, LLC v. Iapartments, Inc.* 2022 WL 14022414, Case No. 8:22-cv-272-CEH-JSS (M.D. Fla. Oct. 24, 2022).

**COMPARE**

## e. Additional material

The Middle District of Georgia denied a civil defendant's motion to compel a transcript of an interview of the plaintiff, where a transcript did not already exist and a copy of the interview that aired was provided to the defendant. *Castleberry v. Camden County*, 331 F.R.D. 559 (M.D. Ga. 2019).

**COMPARE**

## 4. In camera review

In *Woods v. Georgia Pacific Corp.*, 2008 WL 11350078 (S.D. Ga. 2008), although the district court compelled disclosure of some materials, it required footage subject to the subpoena to be submitted for *in camera* review for the court to first determine if the materials should be provided to the subpoenaing party.

**COMPARE**

## a. Necessity

**COMPARE**

## b. Consequences of consent

# c. Consequences of refusing

**COMPARE**

# 5. Briefing schedule

**COMPARE**

# 6. Amicus briefs

**COMPARE**

# VI. Substantive law on contesting subpoenas

**COMPARE**

# A. Burden, standard of proof

In the Eleventh Circuit, information may only be compelled from a reporter claiming the privilege if the party requesting the information can show: (1) that it is highly relevant, (2) necessary to the proper presentation of the case, and (3) unavailable from other sources. *United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986) (applying privilege in criminal racketeering trial); *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726 (5th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981) (applying privilege in civil libel suit).

Overcoming the standard is a "heavy burden" and the standard must be met by clear and convincing evidence. *United States v. Thompson*, No. 20522–CIV–CR, 2015 WL 1608462 *1 (S.D. Fla. April 10, 2015) (citing *McCarty v. Bankers Ins. Co.*, 195 F.R.D. 39, 47 (N.D. Fla. 1998)).

**COMPARE**

# B. Elements

In the Eleventh Circuit, information may only be compelled from a reporter claiming the privilege if the party requesting the information can show: (1) that it is highly relevant, (2) necessary to the proper presentation of the case, and (3) unavailable

from other sources. *United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986).

**COMPARE**

# 1. Relevance of material to case at bar

In *United States v. Fountain View Apartments, Inc.*, 2009 WL 1905046, *2 (M.D. Fla. July 1, 2009), the court held that the reporter's notes, drafts of scripts, and what the editor and reporter thought of interviewees' reactions were not relevant to the case, and therefore were protected.

**COMPARE**

# 2. Material unavailable from other sources

In *United States v. Capers*, 708 F.3d 1286, 1302-03 (11th Cir. 2013), the appellate court affirmed the district court's quashing of a subpoena to a media company for footage of defendant's interview with police, because the defendant failed to establish why he could not obtain the footage from the police department.

In *Castleberry v. Camden County*, 331 F.R.D. 559 (M.D. Ga. 2019), the district court denied a motion to compel e-mails or documents the plaintiff sent to a reporter because the defendant could have sought the same documents directly from the plaintiff during the discovery period.

**COMPARE**

# a. How exhaustive must search be?

**COMPARE**

# b. What proof of search does a subpoenaing party need to make?

**COMPARE**

# c. Source is an eyewitness to a crime

**COMPARE**

## 3. Balancing of interests

In *Abrams v. Tuberville*, 2013 WL 12244457 (M.D. Ala. Aug. 15, 2013), the court explained that the Eleventh Circuit's *Caporale* test, described above, is designed to balance the competing interests of a free press and a fair trial.

**COMPARE**

## 4. Subpoena not overbroad or unduly burdensome

**COMPARE**

## 5. Threat to human life

**COMPARE**

## 6. Material is not cumulative

**COMPARE**

## 7. Civil/criminal rules of procedure

**COMPARE**

## 8. Other elements

The Southern District of Florida has interpreted the second *Caporale* prong (that the information must be necessary to the proper presentation of the case) to mean that the party seeking to overcome the privilege must have a compelling reason for seeking the information. *Gregory v. Miami-Dade County*, 2015 WL 3442008, *8 (S.D. Fla. 2015).

**COMPARE**

## C. Waiver or limits to testimony

**COMPARE**

# 1. Is the privilege waivable?

**COMPARE**

# 2. Elements of waiver

**COMPARE**

## a. Disclosure of confidential source's name

**COMPARE**

## b. Disclosure of non-confidential source's name

**COMPARE**

## c. Partial disclosure of information

**COMPARE**

## d. Other elements

**COMPARE**

# 3. Agreement to partially testify act as waiver?

**COMPARE**

# VII. What constitutes compliance?

**COMPARE**

# A. Newspaper articles

**COMPARE**

# B. Broadcast materials

**COMPARE**

# C. Testimony vs. affidavits

**COMPARE**

# D. Non-compliance remedies

**COMPARE**

# 1. Civil contempt

**COMPARE**

# a. Fines

**COMPARE**

# b. Jail

**COMPARE**

# 2. Criminal contempt

**COMPARE**

# 3. Other remedies

**COMPARE**

# VIII. Appealing

**COMPARE**

# A. Timing

**COMPARE**

# 1. Interlocutory appeals

A district court may certify an interlocutory issue for appeal pursuant to 28 U.S.C. § 1292(b).

**COMPARE**

# 2. Expedited appeals

**COMPARE**

# B. Procedure

**COMPARE**

# 1. To whom is the appeal made?

**COMPARE**

# 2. Stays pending appeal

# 3. Nature of appeal

**COMPARE**

# 4. Standard of review

The appellate court's review of a district court's determination of state law, including state privileges, is *de novo*, as is the appellate court's review of federal constitutional privilege issues. *Price v. Time, Inc.*, 416 F. 3d 1327, 1334 (11th Cir. 2005).

**COMPARE**

# 5. Addressing mootness questions

**COMPARE**

# 6. Relief

**COMPARE**

# IX. Other issues

**COMPARE**

# A. Newsroom searches

**COMPARE**

# B. Separation orders

**COMPARE**

# C. Third-party subpoenas

**COMPARE**

# D. The source's rights and interests

Under Florida's Reporter's Privilege, § 90.5015, Fla. Stat., Florida's Fourth District Court of Appeal held that a source, who was also a co-defendant to a defamation suit, would not be protected by the journalist privilege. *Cable News Network, Inc. v. Black*, 308 So. 3d 997 (Fla. 4th DCA 2020).

**COMPARE**

# EXHIBIT Q

## Re: Noshirvan v. Couture et al - Meet and Confer Requirement - Local Rule 3.01(g) - Request to Withdraw as Counsel

From    Richard A Luthmann <richard.luthmann@protonmail.com>

To    Nick Chiappetta<nick@chiappettalegal.com>

CC    Michael Volpe<mvolpe998@gmail.com>, RALafontaine<RALafontaine@protonmail.com>, Rick LaRivière<RickLaRiviere@proton.me>, mthomasnast@protonmail.com, julian-jackson-fannin-8837@ecf.pacerpro.com, AutoDocketMIA@duanemorris.com, JMagarin@duanemorris.com, ashaikh@duanemorris.com, bcastillo@duanemorris.com, cmackey@duanemorris.com, courtmail@duanemorris.com, hwgurland@duanemorris.com, jjfannin@duanemorris.com, ngounaris@duanemorris.com, pnmendoza@duanemorris.com, aalfano@rolfeshenry.com, kdeglman@rolfeshenry.com, pt@ptesq.com, Frank Parlato<frankparlato@gmail.com>, frank.morano@wabcradio.com, frankiepressman@protonmail.com, tips@thefp.com, news.tips@abc.com, tips@cnn.com, tips@nypost.com, tips@nydailynews.com, chambers_flmd_dudek@flmd.uscourts.gov, chambers_flmd_steele@flmd.uscourts.gov

Date    Monday, December 16th, 2024 at 9:36 AM

I just wanted everyone to be clear that my attempts to confer with Mr. Chiappetta under Local Rule 3.01(g) are an "exercise in futility."

Mr. Chiappetta wants me, a journalist he served with a subpoena to produce materials covered under the Reporter's Privilege in a brazen attempt to chill investigate journalism, to stop asking questions and contacting his office. Neither I nor the First Amendment shall obligate him absent a valid Order of a Court of competent jurisdiction.

I want a hearing and a full factual record. Mr. Chiappetta has run afoul of the advocate witness rule, the crime-fraud exception to the attorney-client privilege, and is a further witness and co-conspirator under FRE 801.

Happy Monday.

Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
Muck Rack Profile
Substack: This is For Real?
Contributor: Frank Report
Editor-In-Chief: FLGulf.news
Contributor: Sun Bay Paper
Follow Me on TRUTH

Sent from Proton Mail Android

-------- Original Message --------
On 12/16/24 8:44 AM, Richard Luthmann wrote:

> Chip,
>
> Like I said, it's an exercise in futility talking to you. You're worse than my ex-wife.
>
> I guess you and your client want to be on the express lane to sanctions. I'll see you in court.
>
> I'll explain this to the reasonable world in a way a six year old can understand:
>
> You brazenly served a subpoena on a journalist covering a case in a federal courtroom seconds after the judge left the bench.

You are seeking evidence covered by the Reporter's Privilege without making a showing you attempted to obtain these materials from other sources.

You failed to show the necessity or even the relevance of these materials. The first I ever heard of your asshole client was December 2023, when Professor Eugene Volokh wrote about him.

The facts you seek have zero, zilch, nada to do with the operative complaint, or any claims, defenses, or counterclaims at issue.

You have no good faith basis to say that the Reporter's Privilege does not apply other than YOUR fact witness statements as counsel.

Since you insist on the subpoena, I insist on a protective order to protect investigate journalism and the First Amendment.

I also insist on a hearing to create a record. Since you are the FACT WITNESS to facts that would plausibly make your client's case, I warn you to withdraw now, or else face sanctions for willfully violating the witness advocate rule.

You cannot continue as Danesh Noshirvan's counsel.

Any communications with the Court highlight a fundamental legal issue with the Local Rules and the ABA's Canon of Judicial Ethics, which shall become abundantly clear in due course.

And yes, I am a disbarred felon and have that status through LawFare and weaponized justice by the Left - based on my attacks on the New York Democrat Party and Hillary Clinton in 2015 and 2016, and my defense of Roger Stone and Donald J. Trump. The Feds were ready to give me a deal to "sing" on Stone and Trump. I told them to fuck off.

Now, Big Daddy is back.

Your client is an agent of TikTok, ByteDance, and the Chinese Communist Party. It is my hope that he ends up in Gitmo as an agent of a foreign enemy.

And given your behavior, you might be in the cell between him and James McGibney as a co-conspirator.

Ruff Ruff.

Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
Muck Rack Profile
Substack: This is For Real?
Contributor: Frank Report
Editor-In-Chief: FLGulf.news
Contributor: Sun Bay Paper
Follow Me on TRUTH

Sent from Proton Mail Android

-------- Original Message --------
On 12/16/24 8:10 AM, Nick Chiappetta wrote:
Mr. Luthmann,

You severely misunderstand your lack of standing in this case, the relevant facts and applicable law. You are a former attorney disbarred in two jurisdictions (NY and NJ) for crimes of dishonesty. I certainly hope that you are not attempting an unauthorized practice of law here.

Also, as a twice disbarred attorney, you should know that ex parte communications with the court are improper. As such, I request that you refrain from contacting my office and the court. Should you fail to comply with this final request, I will seek all available forms of relief including but not limited to sanctions.

Best regards,

Nick Chiappetta | Founder
P. 561-768-4500
F. 561-768-4600

nick@chiappettalegal.com
2101 Vista Pkwy, Suite 258
West Palm Beach, Florida 33411

8401 Lake Worth Rd.,
Lake Worth, Florida 33467
*By Appointment Only*

⌗
Product Defect | Injury | Defamation | Insurance
            www.chiappettalegal.com

NOTICE: This e-mail message and any attachment to this e-mail message contains confidential information that may be legally privileged. If you are not the intended recipient, you must not review, re-transmit, convert to hard copy, copy, use or disseminate this e-mail or any attachments to it. If you have received this e-mail in error, please notify us immediately by return e-mail or by telephone at 561-768-4500 and delete this message. Please note that if this e-mail message contains a forwarded message or is a reply to a prior message, some or all of the contents of this message or any attachments may not have been produced by the sender.

From: Richard Luthmann <richard.luthmann@protonmail.com>
Sent: Sunday, December 15, 2024 8:43 AM
To: Nick Chiappetta <nick@chiappettalegal.com>
Cc: Frank Parlato <frankparlato@gmail.com>; Michael Volpe <mvolpe998@gmail.com>; RALafontaine <RALafontaine@protonmail.com>; Rick LaRivière <RickLaRiviere@proton.me>; frankiepressman@protonmail.com <frankiepressman@protonmail.com>; mthomasnast@protonmail.com <mthomasnast@protonmail.com>; julian-jackson-fannin-8837@ecf.pacerpro.com <julian-jackson-fannin-8837@ecf.pacerpro.com>; AutoDocketMIA@duanemorris.com <AutoDocketMIA@duanemorris.com>; JMagarin@duanemorris.com <JMagarin@duanemorris.com>; ashaikh@duanemorris.com <ashaikh@duanemorris.com>; bcastillo@duanemorris.com <bcastillo@duanemorris.com>; cmackey@duanemorris.com <cmackey@duanemorris.com>; courtmail@duanemorris.com <courtmail@duanemorris.com>; hwgurland@duanemorris.com <hwgurland@duanemorris.com>; jjfannin@duanemorris.com <jjfannin@duanemorris.com>; ngounaris@duanemorris.com <ngounaris@duanemorris.com>; pnmendoza@duanemorris.com <pnmendoza@duanemorris.com>; aalfano@rolfeshenry.com <aalfano@rolfeshenry.com>; kdeglman@rolfeshenry.com <kdeglman@rolfeshenry.com>; pt@ptesq.com <pt@ptesq.com>; Vicki Modaffari <vicki@chiappettalegal.com>; frank.morano@wabcradio.com <frank.morano@wabcradio.com>
Subject: Noshirvan v. Couture et al - Meet and Confer Requirement - Local Rule 3.01(g) - Request to Withdraw as Counsel

Mr. Chiapetta,

This serves as a request under MDFL Local Rule 3.01(g). I seek to meet and confer on the relief of the withdrawal of Nick Chiapetta and Chiapetta Trial Lawyers as counsel of record for Danesh Noshirvan in the above-referenced matter pursuant to the advocate witness rule.

The advocate witness rule mandates "counsel should avoid appearing as both advocate and witness except under extraordinary circumstances." United States v. Hosford, 782 F.2d 936, 938 (11th Cir. 1986) (citing United States v. Crockett, 506 F.2d 759, 760 (5th Cir. 1975)). The rule most obviously addresses a situation where a party's attorney is called as a witness. See id. But violations of the rule may also arise where an attorney or prosecutor has inside knowledge about facts at issue in the trial if the prosecutor indirectly testifies by implying "special knowledge or insight" of the facts, or is selected as prosecutor despite being the "sole witness whose testimony is necessary to establish essential facts otherwise not ascertainable." Id. at 939 (footnote call number omitted).

On Wednesday, December 11th, 2024 at 8:26 AM, Nick Chiappetta <nick@chiappettalegal.com> stated [in pertinent part]:

"If the latter do not forget to mention the conversation you had with Dr. Ralph Garramone before the hearing or that you left the hearing with Jennifer Couture. Further, there is no need for threats - physical, verbal, or otherwise. And yes, everyone on the courtroom eye witnessed your improper behavior yesterday. Physically threatening a female process server and myself in front of Federal Deputies in a Federal Courthouse. Kicking the subpoena on the floor. Throwing a tantrum.  Not appropriate to say the least. I strongly encourage you to seek help."

Mr, Chiapetta, you have Hornbook "special knowledge or insight." You are a fact witness. It is improper for you to remain on this case.

Please withdraw as counsel for Mr. Noshirvan to save me the trouble of filing a motion, where I will ask for costs and sanctions.

Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:

(239) 631-5957
richard.luthmann@protonmail.com
Muck Rack Profile
Substack: This is For Real?
Contributor: Frank Report
Editor-In-Chief: FLGulf.news
Contributor: Sun Bay Paper
Follow Me on TRUTH

Sent with Proton Mail secure email.

---

**19.18 KB**  1 file attached

Outlook-piz3abmf.png  19.18 KB

# EXHIBIT R



"President Trump, why are you showing me a picture of my house?"

"Abdul, you're going to have to figure that out."

