Supreme Court of New Jersey
Disciplinary Review Board
Docket No. 20-115
District Docket No. XIV-2017-0724E

In the Matter of

Richard A. Luthmann

An Attorney at Law

:
:
:
:
:
:
:
:
:
:
:

Decision

Decided:  February 25, 2021

Ashley Kolata-Guzik, on behalf of the Office of Attorney Ethics, waived appearance for oral argument.

Respondent waived appearance for oral argument.

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter was before us on a motion for final discipline filed by the Office of Attorney Ethics (OAE), pursuant to <u>R.</u> 1:20-13(c)(2), following respondent's guilty pleas and convictions, in the United States District Court for the Eastern District of New York, to one count of conspiracy to commit wire fraud, contrary to 18 U.S.C. § 1343 and 18 U.S.C. § 1349, and one count



EXHIBIT #

of conspiracy to commit extortionate collection of credit, contrary to 18 U.S.C. § 894(a). The OAE asserted that respondent's convictions and associated misconduct constitute violations of RPC 4.1(a)(2) (failure to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client); RPC 8.4(b) (two instances – commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer); and RPC 8.4(d) (two instances – conduct prejudicial to the administration of justice).

For the reasons set forth below, we determine to grant the OAE's motion for final discipline and recommend to the Court that respondent be disbarred.

Respondent was admitted to the New Jersey bar in 2004 and to the New York bar in 2006. At the relevant times, he practiced law with The Luthmann Law Firm, PLLC, in Staten Island, New York. He also maintained a law office in Iselin, New Jersey.

Although respondent has no history of final discipline in New Jersey, on May 15, 2019, the Court temporarily suspended him based on the criminal misconduct underlying this matter. In re Luthmann, 237 N.J. 587 (2019). He remains suspended to date.

We now turn to the facts of this matter.

2

On November 30, 2017, a federal grand jury in the United States District Court for the Eastern District of New Jersey indicted respondent and his co-defendants. The indictment charged respondent with eleven crimes: wire fraud; two counts of aggravated identity theft; money laundering conspiracy; money laundering; access device fraud; kidnapping conspiracy; kidnapping; extortionate collection of credit conspiracy; extortionate collection of credit; and using, carrying, and possessing a firearm.

In December 2017, respondent was arrested and detained until March 2018, when he was released on a $1.5 million collateral bond. While released on bail, respondent sent his wife a threatening letter, because he believed that she was cooperating with the government's prosecution of him. In addition, contrary to the terms of a protective order, respondent provided a friend with three copies of wiretap interception transcripts for distribution to others. Consequently, in June 2018, the District Court revoked respondent's bail and he was sent to FMC Devens, an administrative security federal medical center.

On March 18, 2019, before the Honorable Ramon E. Reyes, Jr., U.S.M.J., respondent entered guilty pleas to counts one and nine of the indictment, conspiracy to commit wire fraud, contrary to 18 U.S.C. § 1343 and § 1349, and conspiracy to commit extortionate collection of credit, contrary to

18 U.S.C. § 894(a). Respondent allocuted to very few facts in support of his pleas.

In respect of the conspiracy to commit wire fraud charge, respondent stated that he represented "a company that was ripping off Chinese people and Chinese companies in the scrap metal business." Respondent further admitted that, in furtherance of the conspiracy, the companies exchanged e-mails "that traveled interstate."

As to the extortionate collection of credit charge, respondent allocuted that "one of the individuals that was in that company had a dispute with the other individuals and there was a situation and an encounter." Although respondent denied having been present, he stated that the encounter involved someone who brandished a firearm, and "the individual was threatened" in connection with an unpaid "business debt." Respondent acknowledged that he knew that the encounter would be taking place at his law office.

At the September 5, 2019 sentencing proceeding before the Honorable Jack B. Weinstein, U.S.D.J., respondent affirmed his guilty plea. Judge Weinstein's Statement of Reasons Pursuant to 18 U.S.C. § 3553(c)(2), dated

October 15, 2019, set forth the facts underlying respondent's criminal conduct.[1]

Specifically, through his law practice, respondent met the clients who became his co-conspirators and co-defendants. For several years, respondent represented Co-Conspirator 1 in litigation relating to the scrap metal business, which involved exporting scrap metal from the United States, in large shipping containers, to foreign customers, who paid per unit of weight for scrap metal, separated and "charged for by value."

In 2015, following respondent's introduction of Co-Conspirator 1 to Co-Conspirator 2, who also was a client, the three individuals devised a scheme to defraud companies seeking to buy scrap metal. Co-Conspirator 1 identified potential victims, and respondent registered two companies to operate the fraud; facilitated the opening of bank accounts for the fraud; and corresponded with "customers." Respondent involved Co-Conspirator 2 in the scheme, because respondent believed that he had organized crime connections and could help settle potential disputes.

The names of the fraudulent companies were similar to the names of two legitimate scrap and recycling businesses and were used to defraud eight

---

[1] Judge Weinstein supported his findings with citations to the Pre-Sentence Investigation Report and the Government's Sentencing Memorandum.

companies. In early October 2015, one of the fraudulent companies contracted to sell scrap metal worth $31,500. The purchaser wired the funds to respondent's New York Interest on Lawyer Account Fund trust account. The monies were then wired to an account controlled by Co-Conspirator 1. Because no scrap metal delivery was made, the purchaser threatened criminal charges. The conspirators returned the money to the purchaser but used the lessons of this failure to develop a more sophisticated fraud scheme.

For each subsequent purchaser, the second fraudulent company arranged to sell and ship a container of scrap metal, which had been diluted with cheaper metal. The valuable scrap metal was placed on top of the filler metal and in close proximity to pre-drilled holes in the container, in order to convey the appearance that the entire container was filled with the valuable metal.

The conspirators also began using aliases when they interacted with customers, recruited a blind person under the care of a guardian ad litem to be the nominal president of one of the fraudulent companies, and laundered the proceeds of the transactions through various banks. Respondent suggested designating the blind person as the nominal president, asserting that his disability precluded him from being sued.

The conspirators operated quickly to complete as many sales as possible before it became known that they were shipping overvalued material. In just a

6

few weeks, they made more than $484,000 from fraudulent sales. Approximately $190,000 of this money was transferred to respondent, who also charged $15,000 to a debit card associated with the fraudulent company's bank account. In addition, respondent actively was involved in monitoring payments and replying to bank inquiries regarding monetary transfers.

While the scrap metal scheme was ongoing, respondent demanded legal fees and other money from Co-Conspirator 1, including money to pay an enforcer to meet with members of a Chinese organized crime enterprise hired by disgruntled customers. The story about the Chinese organized crime enterprise was false. In December 2016, respondent arranged for Co-Conspirator 2 and the enforcer, who had purportedly dealt with the Chinese organized crime enterprise, to hold Co-Conspirator 1 in a room at respondent's law office and to extort him. A loaded gun was pointed toward Co-Conspirator 1, who was directed not to call the police.

During the sentencing hearing, Adam Trusz, the procurement and operations manager for GDB International, testified that he purchased and organized the logistics for scrap metal product. Trusz stated that he received a telephone call from Arthur Sharpe, of Omni Metals, which was one of the fraudulent companies, inviting Trusz to visit a warehouse for the purpose of

evaluating and purchasing insulated copper wire, which would be loaded in a container and shipped to China for recycling.

Trusz met with a third party, who was not affiliated with Omni, at a warehouse, where Trusz examined boxes and bales of insulated copper wire. Neither Sharpe nor respondent were present.

On this particular occasion, the product that Trusz could examine was limited. He was permitted to examine "certain places and then approach the product only at the times that they would deem comfortable." If he tried to examine the container from a different vantage point, he was "pushed aside."

The limitations placed on Trusz's examination of the container did not raise any red flags. Trusz explained that "[t]he nature of the business is a lot of times, people get aggravated with the way that we approached them." The contents appeared "perfect." Thus, GDB entered into a contract with Omni for the purchase of one load of the insulated copper wire, for $140,000.

Trusz testified that, in the scrap metal industry, payment is made at the time a container is loaded with product. Thus, the funds were wired, and the container was loaded, sealed, and removed by truck for shipment to China.

When the container arrived in China, government x-rays revealed that the container was filled with concrete and covered with insulated copper wiring, which created the outward appearance that the container was full of

8

copper wiring. The Chinese government detained the container "for quite a bit of time in China," required GDB to pay storage and disposal fees, and accused the company of engaging in illegal activity. Trusz had worked in the industry since 2007 and had never experienced similar circumstances.

Although GDB had contracted for the shipment of three containers, only the first was shipped. During a telephone conversation, respondent told Trusz that he would talk to his clients about the situation and contact Trusz, but Trusz never heard from him again. GDB never received a refund for those containers.

Bradford Binkley, a special agent with the United States Department of Commerce (the Department), testified that the scheme came to the attention of the Department, which enforces United States' export regulations, because the scheme could affect the United States' international business relations.

Russell Junior Davenport, a blind man, testified about respondent's use of Davenport's signature and identity "for their own evil purpose." According to Davenport, as he was walking on a street, a man named Arthur offered him $3 and some cigarettes. Davenport told Arthur about a potential legal case against his legal guardian who had physically assaulted him. Arthur took him to meet respondent, who agreed to represent him.

At a meeting, respondent asked Davenport whether he would like to be the president of Omni Metal Corp. Davenport agreed but expressed concern about the impact that the position might have on his receipt of Social Security. Respondent told him not to worry about it.

Based on Davenport's testimony, someone named John Hecht provided him with a falsified birth certificate and a false identification card, which Davenport used as president of Omni. Respondent gave him a cane and business cards.

At respondent's direction, Davenport visited "different" financial institutions. He did not explain what he did during those visits, although Hecht had instructed him to dress appropriately. After three banks had "denied" Davenport, Hecht informed him that "we got a thing . . . called IDB" Bank.

Unbeknownst to Davenport, his name was being used to wire money. When someone named Jimmy took Davenport to IDB to sign checks, Davenport sensed that something was "not right" and asked Robert Myer, a bank officer, what was happening. When Myer answered that $221,000 was being paid to respondent, Davenport realized that he was "in a little too deep."

At some point, Davenport told respondent that he no longer wanted to participate. Respondent replied: "Do what you have to do." Davenport then closed the bank accounts.

The next day, respondent's secretary called Davenport and directed him to pick up his case file. According to Davenport, respondent did not provide any services in respect of Davenport's legal matter. Respondent also ignored Davenport's phone calls. Davenport conceded that respondent might have explained that he could not take the case, because Davenport had a guardian.

Davenport acknowledged that, for his work in the scheme, he had received a stipend on ten to fifteen occasions, although he was uncertain of the total amount.

Prior to his arrest, respondent had suffered from undiagnosed bipolar disorder. He, thus, thanked Judge Weinstein for sending him to FMC Devens, where he finally was diagnosed and treated for his condition, after having suffered for many years. Respondent described the difference that proper treatment had made in his life, apologized to the victims of his criminal conduct, and stated that he wanted to "[s]tart putting [his] life in order and . . . to be a productive member of society, law-abiding citizen, and . . . repay those that I've hurt as soon as possible."

During the sentencing hearing, respondent admitted that he created fake Facebook accounts and used them to disseminate information during local political campaigns, which resulted in a pending state court criminal matter. He also falsified Facebook and Twitter business records. The federal

11

prosecutor pointed out that, while respondent was on bail, he leaked wiretaps, contrary to the court's orders, because he believed it would be politically advantageous to him.

On September 9, 2019, in accordance with respondent's plea agreement, Judge Weinstein dismissed counts two through eight and counts ten and eleven of the indictment. In respect of counts one and nine, the judge sentenced respondent to two four-year terms of imprisonment, to be served concurrently, with credit for time served, followed by three years of supervised release. Judge Weinstein also imposed a $200 special assessment, ordered respondent to pay $559,911.26 in restitution, and ordered respondent's forfeiture of $130,000.

In Judge Weinstein's Statement of Reasons Pursuant to 18 U.S.C. § 3553(c)(2), he summarized respondent's scheme as follows:

> Defendant Richard Luthmann . . . abused his status as a lawyer and conspired to commit fraud and extortion. He, together with others, devised a scheme to defraud export companies purchasing scrap metal for shipment to foreign customers, and then organized a scheme to extort a coconspirator. While on pretrial release following his arrest, Luthmann engaged in witness tampering and provided evidence to third parties in violation of a court order.
>
>      . . . .
>
> Although he is remorseful for his conduct and in alcohol and drug abuse recovery, his crimes were

absurd, bizarre, and ruthless. The case illustrates the
danger in ignoring mental health problems of
practicing lawyers.

[OAEa,Ex.G,p.1.][2]

Judge Weinstein concluded:

Luthmann's crimes were bizarre and ruthless. He used
his status as a lawyer to give an air of legitimacy to a
serious fraudulent scrap metal scheme. His law license
was the recruitment tool that allowed him and his
coconspirators to take advantage of a disabled
individual to perpetrate the fraud. Unsatisfied by
traditional methods of debt collection, he used threats
of violence to collect a legal debt purportedly owed by
a coconspirator. The sentence imposed will
appropriately punish and deter Defendant from similar
conduct.

Luthmann's crimes damaged American commerce. It
is important that American scrap metal dealers are
able to ship their product abroad without suspicion
that they are committing fraud. Deterrence of others
who might engage in similar conduct was considered
by the court.

[OAEa,Ex.G,p.11.]

Judge Weinstein determined that respondent's substance abuse, mental

health issues, and the pressure he suffered as a lawyer did not warrant less than

a forty-eight-month prison term. Although the court acknowledged that

---

[2] "OAEa" refers to the appendix portion of the OAE's brief and appendix in support of
motion for final discipline, dated May 12, 2020.

13

respondent's behavior "may have been partly the result of medical and mental problems and medications," Judge Weinstein could not "attribute it to that in view of the report [he had] from the medical survey the Court ordered."

Based on the record, the OAE urged respondent's disbarment, contending that his guilty plea was evidence of a violation of RPC 8.4(b); that respondent violated RPC 4.1(a)(2) by failing to disclose material facts to three banks used to perpetuate the fraud, which would have avoided assisting a criminal or fraudulent act by his client; and that respondent violated RPC 8.4(d), as he admitted in his plea agreement that he obstructed justice by sending a threatening letter to his wife because he believed that she was cooperating with the government, and by disobeying a protective order that prohibited him from distributing discovery materials. The OAE further asserted that respondent failed to report his conviction, as R. 1:20-13(a)(1) requires.

In his May 12, 2020 brief to us, respondent contended that his prosecution was a ruse to conceal his role in a government plot; presented an obsession with geo-political conspiracy theories; and expressed his indignation that his incarceration has precluded him from running his "election interference machine."

Following a review of the record, we determine to grant the OAE's motion for final discipline. Final discipline proceedings in New Jersey are governed by R. 1:20-13(c). Under that Rule, a criminal conviction is conclusive evidence of guilt in a disciplinary proceeding. R. 1:20-13(c)(1); In re Magid, 139 N.J. 449, 451 (1995); In re Principato, 139 N.J. 456, 460 (1995). Respondent's convictions of conspiracy to commit wire fraud and conspiracy to commit extortionate collection of credit, thus, establish violations of RPC 8.4(b). Pursuant to that Rule, it is professional misconduct for an attorney to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer." Respondent's conduct further violated RPC 4.1(a)(2) and RPC 8.4(d). Specifically, respondent violated RPC 4.1(a)(2) by failing to disclose material facts to the three banks used to perpetuate the fraud. Respondent's disclosure would have prevented his clients from engaging in criminal or fraudulent acts. Moreover, respondent's failure to disclose to his client that he was being lured to respondent's law office for the purpose of being extorted constituted a further violation of RPC 4.1(a)(2), because respondent could have prevented that criminal act of extortion.

Respondent also engaged in conduct prejudicial to the administration of justice when he obstructed justice by sending a threatening letter to his wife, whom he believed was cooperating with the government, and by disobeying

15

the protective order prohibiting him from distributing copies of discovery materials, violations of RPC 8.4(d).

Hence, the sole issue is the extent of discipline to be imposed. R. 1:20-13(c)(2); In re Magid, 139 N.J. at 451-52; and In re Principato, 139 N.J. at 460.

In determining the appropriate measure of discipline, we must consider the interests of the public, the bar, and the respondent. "The primary purpose of discipline is not to punish the attorney but to preserve the confidence of the public in the bar." Ibid. (citations omitted). Fashioning the appropriate penalty involves a consideration of many factors, including the "nature and severity of the crime, whether the crime is related to the practice of law, and any mitigating factors such as respondent's reputation, his prior trustworthy conduct, and general good conduct." In re Lunetta, 118 N.J. 443, 445-46 (1989).

The Court has noted that, although it does not conduct "an independent examination of the underlying facts to ascertain guilt," it will "consider them relevant to the nature and extent of discipline to be imposed." Magid, 139 N.J. at 452. In motions for final discipline, it is acceptable to "examine the totality of the circumstances" including the "details of the offense, the background of respondent, and the pre-sentence report" before "reaching a decision as to [the]

sanction to be imposed." <u>In re Spina</u>, 121 N.J. 378, 389 (1990). The "appropriate decision" should provide "due consideration to the interests of the attorney involved and to the protection of the public." <u>Ibid.</u>

That an attorney's conduct did not involve the practice of law or arise from a client relationship will not excuse the ethics transgression or lessen the degree of sanction. <u>In re Musto</u>, 152 N.J. 165, 173 (1997). Offenses that evidence ethics shortcomings, although not committed in the attorney's professional capacity, may, nevertheless, warrant discipline. <u>In re Hasbrouck</u>, 140 N.J. 162, 167 (1995). The obligation of an attorney to maintain the high standard of conduct required by a member of the bar applies even to activities that may not directly involve the practice of law or affect his or her clients. <u>In re Schaffer</u>, 140 N.J. 148, 156 (1995).

In this case, respondent's conduct involved the practice of law. Although the scheme itself did not require the use of respondent's skills as an attorney, he used his professional position to carry out the crime. He recruited two clients to conspire with him to create fraudulent companies for the purpose of defrauding legitimate businesses and, to use his words, "ripping off" Chinese companies. Respondent expressly recruited the second client on the belief that he was involved with organized crime and, thus, could settle disputes. Respondent then recruited a third client, who was disabled, to be the president

17

of the sham corporations, and sent him on a criminal errand to four different banks, where he presented false identification documents for the purpose of opening bank accounts for respondent to carry out his fraudulent activities. Moreover, respondent directed the proceeds of his illegal activities to his attorney trust account.

As Judge Weinstein observed, respondent "used his status as a lawyer to give an air of legitimacy to a serious fraudulent scrap metal scheme. His law license was the recruitment tool that allowed him and his coconspirators to take advantage of a disabled individual to perpetrate the fraud."

Respondent also arranged for one of the conspirators to threaten another, who had been either unwilling or unable to meet respondent's demand for the payment of his legal fees. Respondent arranged for the confrontation to take place at his law office and, even though he was not present for the encounter, he knew exactly what would happen. Thus, at a minimum, aspects of his law practice were intertwined with his criminal conspiracy.

In addition to the crimes themselves, respondent demonstrated a distaste for, or refusal to lead, a law-abiding life. Even after his release on bail, respondent engaged in criminal conduct, in matters unrelated to the scrap metal scheme. His criminal acts included witness tampering and releasing wiretap transcripts, contrary to a court order prohibiting that very conduct.

18

Indeed, he has complained to us that his incarceration precluded him from running his "election interference machine."

Case law supports disbarment on both counts to which respondent pleaded guilty. In respect of the wire fraud, attorneys who commit serious crimes or crimes that demonstrate a total lack of moral fiber must be disbarred in order to protect the public, the integrity of the bar, and the confidence of the public in the legal profession. See, e.g., In re Quatrella, 237 N.J. 402 (2019) (attorney convicted of conspiracy to commit wire fraud after taking part in a scheme to defraud life insurance providers via three stranger-originated life insurance policies; the victims affected by the crimes lost $2.7 million and the intended loss to the insurance providers would have been more than $14 million); In re Klein, 231 N.J. 123 (2017) (attorney convicted of wire fraud for engaging in an "advanced fee" scheme that lasted eight years and defrauded twenty-one victims of more than $819,000; the attorney leveraged his status as an attorney to provide a "veneer of respectability and legality" to the criminal scheme, including the use of his attorney escrow account); In re Ellis, 208 N.J. 350 (2011) (attorney convicted of one count of bank fraud and one count of conspiracy to commit bank fraud; in mitigation, the attorney was a mere cog in the criminal enterprise, he cooperated with the government, and he suffered from depression; in aggravation, the lenders lost more than $12 million, the

attorney had an extensive disciplinary history, and he engaged in the criminal activity for his own benefit); In re Meiterman, 202 N.J. 31 (2010) (attorney pleaded guilty to using the United States mail to promote and facilitate a racketeering enterprise; the attorney admitted that he bribed public officials to expedite sewer connection approvals for land developments and coached a witness to lie to law enforcement authorities and a federal grand jury); In re Seltzer, 169 N.J. 590 (2001) (attorney working as a public adjuster committed insurance fraud by taking bribes for submitting falsely inflated claims to insurance companies and failed to report the payments as income on his tax returns; the attorney was guilty of conspiracy to commit mail fraud, mail fraud, and conspiracy to defraud the Internal Revenue Service); In re Lurie, 163 N.J. 83 (2000) (attorney convicted of eight counts of scheming to commit fraud, nine counts of intentional real estate securities fraud, six counts of grand larceny, and one count of offering a false statement for filing); In re Chucas, 156 N.J. 542 (1999) (attorney convicted of wire fraud, unlawful monetary transactions, and conspiracy to commit wire fraud; attorney and co-defendant used, for their own purposes, $238,000 collected from numerous victims for the false purpose of buying stock); In re Goldberg, 142 N.J. 557 (1995) (two separate convictions for mail fraud and conspiracy to defraud the United States); In re Messinger, 133 N.J. 173 (1993) (attorney convicted of conspiracy

20

to defraud the United States by engaging in fraudulent securities transactions to generate tax losses, aiding in the filing of false tax returns for various partnerships, and filing a false personal tax return; the attorney was involved in the conspiracy for three years, directly benefited from the false tax deductions, and was motivated by personal gain); and In re Mallon, 118 N.J. 663 (1990) (attorney convicted of conspiracy to defraud the United States and aiding and abetting the submission of false tax returns; attorney directly participated in the laundering of funds to fabricate two transactions reported on two tax returns in 1983 and 1984).

Like the attorney in Klein, respondent used his status as an attorney to recruit co-conspirators and directed the proceeds of a criminal enterprise to his attorney trust account. Finally, he had one of his clients threatened and intimidated in an attempt to recoup outstanding legal fees. With his approval, that violent extortion took place at his law office.

Respondent's misconduct is akin to that of the attorneys the Court has disbarred for their extensive involvement in crime, which involved the use of their attorney skills in furtherance of the criminal enterprise, for their pecuniary gain. Respondent's criminal acts spanned two years. He used his law firm and its accounts to commit the fraudulent activity. Moreover, his

fraudulent scheme was so serious that it had the potential of damaging international business relations between the United States and China.

Respondent involved his clients in his criminal enterprise. One client was chosen because respondent believed that he was connected to organized crime, which would assist respondent in "settling" disputes. He targeted another client for selection because he was disabled. Although respondent's criminal activity did not generate the sums of money that the attorneys in the above cases produced, his behavior had the effect of potentially causing an international incident. At a minimum, it had the effect of potentially jeopardizing the economic stability of U.S. participants in the scrap metal recycling trade. That conduct alone warrants disbarment.

Respondent's conviction of conspiracy to commit extortion independently warrants disbarment. See, e.g., In re Ross, 194 N.J. 513 (2008) (reciprocal discipline imposed on attorney who was disbarred in Pennsylvania and who pleaded guilty to wire fraud, mail fraud, and conspiracy to commit extortion); In re Yim, 188 N.J. 257 (2006) (reciprocal discipline for attorney whose Virginia license was revoked after he pleaded guilty to collection of extensions of credit by extortionate means; the attorney discussed with another whether he could arrange for a debtor to be either seriously injured or killed in an apparent accident); and In re Krakauer, 99 N.J. 476 (1985) (attorney

convicted of extortion in connection with a scheme to extort $12,500 from a municipal contractor in connection with a senior high-rise project).

In respect of extortion, in 2014, the Court announced, "[g]oing forward, any attorney who is convicted of official bribery or extortion should expect to lose his license to practice law in New Jersey." In re Cammarano, 219 N.J. 415, 423 (2014) (disbarment for attorney convicted of conspiracy to obstruct interstate commerce by extortion under color of office right; while in his capacity as the Mayor of Hoboken, he accepted $25,000 in bribes from a developer in exchange for the assurance of expedited zoning approvals).

Subsequent to the pronouncement in Cammarano, the Court disbarred an attorney who pleaded guilty to two counts of conspiracy to obstruct and affect interstate commerce by extortion and wire fraud conspiracy. The attorney also practiced law while suspended. In re Frey, 226 N.J. 545 (2016). Frey engaged in a scheme with a mortgage broker and another attorney to victimize his own clients by extorting money from them for his own financial benefit. In the Matters of Thomas G. Frey, DRB 15-281 and DRB 15-396 (May 3, 2016). Specifically, he misrepresented to his clients, who owned and rented properties to tenants, that the Internal Revenue Service was investigating the legitimacy of their real estate holdings and that, unless they retained him to represent them, they would be criminally prosecuted. Id. at 26-27. The purpose of the

23

scheme was to collect legal fees from the clients and to entice them to sell certain properties as to which he would have a financial interest in the purchase. Ibid.

Here, respondent's conduct is similar to that of the attorney in Yim. In that case, in a Virginia federal court, the attorney pleaded guilty to collection of extensions of credit by extortionate means, contrary to 18 U.S.C. § 894(a)(1) and (2). In the Matter of Eric Yim, DRB 06-078 (June 6, 2006) (slip op. at 1-2). He was sentenced to twenty-eight months' imprisonment, followed by three years of supervised release, and fined $5,000. Id. at 2-3.

Specifically, Yim conspired with a private investigator, who had performed some services for him, to threaten an individual who owed him $4,000 as the result of having failed to repay a $2,000 loan. Id. at 3-4. The debtor, who was "almost penniless and judgment-proof," had been avoiding Yim's attempts to collect on the loan. Id. at 4.

Yim stated to the investigator that, although he did not want the investigator to harm the debtor, he did want the debtor threatened. Ibid. After the investigator told Yim that threats might not result in repayment of the loan, Yim agreed to the investigator's suggestion that the debtor "get broken up and dumped somewhere, possibly in D.C." Id. at 5. He paid the investigator $1,000

to carry out the scheme. <u>Ibid.</u> The investigator turned out to be a government informant. <u>Id.</u> at 6.

In recommending Yim's disbarment, we observed that Yim's conduct was "utterly incompatible with the standard of honesty and integrity that we require of attorneys." <u>Id.</u> at 17. The Court agreed.

Here, when one of respondent's clients refused or was unable to pay respondent's outstanding legal fees, he arranged for the client, whom he believed to be connected to organized crime, to intimidate and shake down the client who owed him fees. The incident occurred in respondent's own office. Given the similarity between respondent's and Yim's conduct, and the Court's pronouncement in <u>Cammarano</u>, respondent's conviction of conspiracy to commit extortionate collection of credit mandates disbarment.

Indeed, respondent's criminal conduct warrants disbarment. As the <u>Goldberg</u> Court observed:

> Criminal convictions for conspiracy to commit a variety of crimes, such as bribery and official misconduct, as well as an assortment of crimes related to theft by deception and fraud, ordinarily result in disbarment. We have emphasized that when a criminal conspiracy evidences 'continuing and prolonged rather than episodic, involvement in crime,' is 'motivated by personal greed,' and involved the use of the lawyer's skills 'to assist in the engineering of the criminal scheme,' the offense merits disbarment.

[In re Goldberg, 142 N.J. at 567 (citations omitted).]

Finally, respondent is a clear danger to the public. During his short-term release on bail, respondent continued to pursue criminal activity. First, he engaged in witness tampering. Second, he provided evidence to third parties in violation of a court order.

In mitigation, respondent has no history of final discipline; expressed remorse at the sentencing hearing; and suffered from addiction as the result of an undiagnosed psychiatric condition. As Judge Weinstein noted, however, the record lacked any indication that respondent's addiction and psychiatric disorder played any role in his criminal conduct, which demonstrates a moral disconnect of great proportion.

As the Court has recognized, "[s]ome criminal conduct is so utterly incompatible with the standard of honesty and integrity that we require of attorneys that the most severe discipline is justified by the seriousness of the offense alone." In re Hasbrouck, 152 N.J. 366, 371-72 (1998). Such is the case here.

For the above reasons, we recommend respondent's disbarment in order to protect the public and preserve confidence in the bar.

We further determine to require respondent to reimburse the Disciplinary

Oversight Committee for administrative costs and actual expenses incurred in

the prosecution of this matter, as provided in <u>R.</u> 1:20-17.

Disciplinary Review Board
Bruce W. Clark, Chair


By:   **/s/ Timothy M. Ellis**
      Timothy M. Ellis
      Acting Chief Counsel

SUPREME COURT OF NEW JERSEY
DISCIPLINARY REVIEW BOARD
VOTING RECORD

In the Matter of Richard A. Luthmann
Docket No. DRB 20-115

Decided: February 25, 2021

Disposition: Disbar

| *Members* | Disbar | Recused | Did Not Participate |
|-----------|--------|---------|---------------------|
| Clark | X | | |
| Boyer | X | | |
| Gallipoli | X | | |
| Hoberman | X | | |
| Joseph | X | | |
| Petrou | X | | |
| Rivera | X | | |
| Singer | X | | |
| Zmirich | X | | |
| Total: | 9 | 0 | 0 |

/s/ Timothy M. Ellis
Timothy M. Ellis
Acting Chief Counsel