1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF FLORIDA
2                        FORT MYERS DIVISION

3            EXCERPTED TRANSCRIPT OF MOTION HEARING
   _____
4
   DANESH NOSHIRVAN, an            )
5  Individual,                     )
                                   )
6            Plaintiff,            )
                                   )
7       vs.                        )   2:23-cv-1218-JES-KCD
                                   )
8                                  )
   JENNIFER COUTURE; RALPH         )
9  GARRAMONE, M.D.; RALPH          )
   GARRAMONE, M.D. P.A.; CENTRAL)
10 PARK OF SOUTHWEST FLORIDA,      )
   LLC; WRAITH, LLC; SULLIVAN      )
11 STREET INVESTMENTS, LLC;        )
   HAIRPIN TURN, LLC; OMG          )
12 REALTY, LLC; R G WEIGHT         )
   MANAGEMENT, LLC; CENTRAL PARK)
13 SOUTH, LLC; BRANTLEE, LLC;      )
   LEGACY OF MARIE GARRAMONE,      )
14 LLC; GARRAMONE MARKETING,       )
   INC.; 5681 DIVISION, LLC; THE)
15 LAW OFFICE OF PATRICK           )
   TRAINOR, ESQ., LLC; PATRICK     )
16 TRAINOR; and ANTI-DOXING        )
   LEAGUE, INC.,                   )
17                                 )
            Defendants.           )
18 _____

19

20

21

22          BEFORE THE HONORABLE KYLE C. DUDEK
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
23           FOR THE MIDDLE DISTRICT OF FLORIDA

24

25

1          2110 First Street North
           Fort Myers, Florida 33901
2          9:31 AM, January 24, 2025

3

4

5

6

7          Vonni R. Bray, RDR, CRR
           Federal Official Court Reporter
8          2110 First Street North
           Fort Myers, Florida 33901
9          vonni_bray@flmd.uscourts.gov
           (239) 461-2033
10

11

12

13       Proceedings recorded by machine shorthand
       Transcript produced by computer-assisted transcription
14

15

16

17

18

19

20

21

22

23

24

25

1                              APPEARANCES

2     FOR PLAINTIFF:

3     Mr. Nicholas A. Chiappetta
      Chiappetta Trial Lawyers
4     2101 Vista Parkway
      Suite 258
5     West Palm Beach, FL 33411

6

7     FOR DEFENDANT GARRAMONE PLASTIC SURGERY:

8     Mr. Julian Antony Jackson-Fannin
      Duane Morris LLP
9     201 S. Biscayne Boulevard
      Suite 3400
10    Miami, FL 33131

11

12    FOR DEFENDANTS CENTRAL PARK OF SOUTHWEST
                    FLORIDA, LLC, ET AL.:
13
      Mr. Patrick Trainor
14    Law Office of Patrick Trainor, Esq., LLC
      19 Union Avenue
15    Suite 201
      Rutherford, NJ 07070
16

17
      FOR DEFENDANTS COUTURE, GARRAMONE, OMG REALTY, AND
18                   WRAITH, LLC:

19    Mr. Aaron Alfano
      Rolfes Henry, Co., LPA
20    5415 87th Street East
      Bradenton, FL 34211
21

22

23

24

25

 1                    P R O C E E D I N G S

 2              (Court called to order at 2:08 PM)

 3         THE COURT:  All right.  I hope you all got

 4   something to eat.  Apologize; it took me a couple extra

 5   minutes to get off the phone.

 6         Okay.  All right.  Let me get my notes back

 7   in front of me as to where we are here.  I have it as

 8   we are on Request Number 64; is that correct,

 9   Mr. Trainor?

10         MR. TRAINOR:  That's what I have, sir.

11         THE COURT:  Mr. Chiappetta?

12         MR. CHIAPPETTA:  That's correct, Your Honor.

13         THE COURT:  All right.  We will turn, then,

14   to 64.

15         Is seeks, quote, "Receipts for all

16   redemptions for cash that you submitted through the

17   TikTok exchange from January 26, 2022, through the

18   present.  You can satisfy this request by downloading

19   your TikTok data directly from TikTok."

20         There are a host of objections that I won't

21   read for purposes of the record.

22         Then turn to you, Mr. Trainor.  I assume the

23   relevance of this is, again, it goes towards your issue

24   of the damages.  If he's claiming that your clients

25   harmed his business of his TikTok account and the

1    revenue he generates from it, then evidence of the

2    receipts that he is receiving, the cash that he is

3    receiving from that platform from January, 26, 2022, is

4    relevant to your case.

5              MR. TRAINOR:  That's correct, sir.

6              THE COURT:  All right.  Okay.

7              Mr. Chiappetta, I get the relevance.

8              MR. CHIAPPETTA:  I'm just trying to figure

9    out how it's not duplicative of 62, which requests

10   receipts of all payments received through TikTok.  So

11   now he's just asking for the redemption ticket for the

12   same payments?

13             THE COURT:  Okay.  Mr. Trainor, can you go

14   ahead and clarify that?  What do you see is the

15   difference between 64 and 62?

16             MR. TRAINOR:  Well, not much.  But received

17   is definitely not redeemed.  I don't -- you know, I

18   don't know if --

19             THE COURT:  I guess my point is, even if he

20   hasn't redeemed it off of TikTok, the fact that he's

21   received it on there, you would agree it means it's now

22   his; right?

23             MR. TRAINOR:  I would believe so, but I don't

24   know.  So I don't see it in front of me, but that's a

25   fair assumption.

1          THE COURT:  What do you mean you don't know?

2    If he's -- if he gets a million dollars and he takes a

3    hundred thousand dollars out of it, right, what you're

4    saying, redemption, you wouldn't now say that, "Oh,

5    he's only made a hundred thousand dollars," would you?

6          MR. TRAINOR:  No.  But I would say that

7    that's -- you know, he has a million dollars available

8    to him.  But I don't know if there's any sort of, you

9    know, withholds or anything along those lines on that

10   money, to be frank.

11         I mean, nobody can say that there's -- are

12   there holds or delays?  I don't know how they're --

13   without seeing how that actually filters down, I don't

14   know.  But in theory there, they are very similar, if

15   not the same.

16         THE COURT:  He got it through TikTok with the

17   data you are already getting; correct?

18         MR. TRAINOR:  Correct.

19         THE COURT:  All you want now is the

20   redemptions to show him pulling it out?

21         MR. TRAINOR:  Correct.

22         THE COURT:  Okay.  I'm going to deny 64.  I

23   think the information that's already been ordered

24   showing that he is in receipt of it is sufficient.  And

25   then this is not proportional, given what I've already

1    ordered.

2           I'm going to deny the motion to compel with

3    regard to Number 64.

4           Anything further, Mr. Chiappetta?

5           MR. CHIAPPETTA:  No, Your Honor.

6           THE COURT:  Turning next, then, to 65, which

7    is answered at Number 64.  It seeks, "Produce all

8    documents and information in your possession, custody,

9    or control that shows all followers of TikTok account

10   @thatdaneshguy, including each follower's creator name,

11   first and last name, account identification number,

12   email address, and phone number.  You can satisfy this

13   request by downloading your TikTok data directly from

14   TikTok."

15          There are a host of objections, which I won't

16   read into the record, but you can find in there.

17          So that leaves us with, essentially,

18   relevance and proportionality.

19          Okay.  So turning, first, to relevance,

20   Mr. Trainor; what is this?

21          MR. TRAINOR:  Again, also, it's a corollary

22   of damages because an increase or decrease in followers

23   seem to indicate that maybe people are turned off by

24   his content.  Maybe to say that we deplatformed him or

25   something like that would go into that.

```
 1            THE COURT:  Or it could show that more people
 2   followed him; right?
 3            MR. TRAINOR:  Exactly.  And also bear in
 4   mind, Your Honor, that followers also has a line of
 5   significance when it comes to earnings on the platform.
 6   Because if a creator has less than, I believe it's
 7   100,000 followers, he or she is not eligible to earn
 8   money on there.
 9            And, obviously, we believe Mr. Noshirvan has
10   far more than 100,000 followers.  But I don't know if
11   there's a second set of tier for a creator with 500,000
12   followers or more.  So having that information is very
13   important to calculating damages.
14            THE COURT:  Mr. Chiappetta, let me hear
15   from you.
16            MR. CHIAPPETTA:  Okay.  As it relates to this
17   case, this request does include the request for
18   information, and we believe it's an interrogatory.
19            Setting that aside, the request for all
20   followers is just overbroad in time and scope.  There's
21   no limitations.
22            Facially, defendants could go to my client's
23   TikTok account and see he has 2 million followers.  So
24   to figure out -- to identify each individual, it's just
25   not reasonably calculated.  It's not proportional to
```

1    the claims at issue.  I mean, it's --

2            THE COURT:  Let me stop you, because I want

3    to talk about the first issue you raised about the

4    temporal portion of it.

5            As I read your request, Mr. Trainor, you were

6    asking for his current followers; is that correct?

7            MR. TRAINOR:  I believe if you download the

8    followers, it will give you a list of followers;

9    correct.

10           THE COURT:  Okay.  But it's not historical.

11   It's not backward-looking.

12           MR. TRAINOR:  It tells you when that person

13   became your follower.

14           THE COURT:  Oh, okay.

15           MR. TRAINOR:  It's like an Excel spreadsheet.

16   You get a TXT file, sort of, so there's several columns

17   of information on there.  I believe when they followed

18   you -- a start date of following you is going to be

19   included in there.

20           THE COURT:  All right.

21           Mr. Chiappetta, is this in line with what

22   your client previously tried to download from TikTok?

23           MR. CHIAPPETTA:  I believe so.

24           THE COURT:  I know we asked before.  We

25   limited it.  As Mr. Jackson-Fannin mentioned, it was

1   limited to certain videos.  We had him download

2   comments related to those videos and, I think, all

3   followers; is that correct?

4           MR. CHIAPPETTA:  I believe so.

5           THE COURT:  Do you remember what the

6   result was?

7           MR. CHIAPPETTA:  I don't believe he was able

8   to download all of his followers, and that's why we

9   entered into the consent order, if memory serves.

10          THE COURT:  Okay.  What I'm going to do,

11  then, is I'm going to grant the motion to compel to the

12  extent that you -- first of all, I'm going to strike

13  the request for information for the reasons previously

14  stated, that this is not an interrogatory.

15          And then I am going to go ahead and grant it

16  to the extent that the information requested is to be

17  downloaded from TikTok by your client within 21 days.

18  If he can't download it, he's going to have to provide

19  information explaining that he's made all reasonable

20  efforts to do it.

21          Mr. Trainor, it may come, like in the last

22  case, where you have to subpoena TikTok.  I don't know.

23  But I'm going to take this first step and order him to

24  try to download it again and see what he gets.

25          All right.  So 64 [sic] is granted as

1    mentioned.

2            Any questions, Mr. Chiappetta?

3            MR. CHIAPPETTA:  No, Your Honor.

4            THE COURT:  Okay.  Moving on, then, to

5    Number 65.

6            MR. TRAINOR:  That was 65, sir.

7            THE COURT:  I'm sorry.  Thank you.

8            66, which is answered at 65.

9            Quote, "Produce all documents and information

10   in the possession, custody, or control that shows all

11   creators who tagged @thatdaneshguy from January 26,

12   2022, through the present, including each creator's

13   creator name, first and last time, account

14   identification number, email address, and phone number.

15   You can satisfy this request by downloading your TikTok

16   data directly from TikTok."

17           The response was, "See paragraph 64."

18           So I presume you're reasserting those same

19   objections, Mr. Chiappetta?

20           MR. CHIAPPETTA:  Yes, Your Honor.

21           THE COURT:  All right.

22           Okay.  Mr. Trainor, can you explain to me the

23   relevance of why you're looking for people who tagged

24   him?

25           MR. TRAINOR:  Again, it goes to the volume

1   and popularity of his content on social media -- on

2   TikTok, which, again, goes to potential for earnings.

3          And here, the tagged report is a very simple

4   report that when you download your TikTok data, it will

5   produce the people that have tagged the creator in

6   their videos.  And usually, when they tag somebody,

7   they are mentioning the video, something to that

8   effect.

9          So if a creator makes a video about Joe

10  Smith, and another creator tags him, they are tagging

11  him about that video about Joe Smith to backhand the

12  reference to each other.

13              THE COURT:  Okay.  All right.

14              Mr. Chiappetta.

15              MR. CHIAPPETTA:  We fail to see how tagged

16  creators are relevant to the claims asserted here

17  and/or defenses.  We don't believe it's proportional in

18  any way.  And I think that there's simply -- it's too

19  attenuated to try to label, I guess, tagged creators as

20  somehow an establishment of damages or, I guess,

21  quantitative of damages.

22              THE COURT:  All right.  I disagree with you,

23  Mr. Chiappetta.

24          I'm going to grant the motion to compel,

25  order 21 days for you to attempt to download this data

1   from TikTok.

2         And, again, as with the previous ones, it's

3   for you to download the data.  If it's too onerous, to

4   the extent that I would ask Mr. Noshirvan to calculate

5   this data by hand -- but to the extent that it's

6   available from TikTok, I want it downloaded.

7         Okay.

8         MR. CHIAPPETTA:  Yes, sir.

9         THE COURT:  Any questions, Mr. Chiappetta?

10        MR. CHIAPPETTA:  No, Your Honor.

11        THE COURT:  Moving on to Number 67, which is

12  answered at 66.

13        It seeks, quote, "All videos that stitched or

14  duetted the videos Noshirvan posted about Trainor from

15  January 26, 2022, through the present, including the

16  creator's creator name, first and last name, account

17  identification number, email address, and phone number.

18  You can satisfy this request by downloading your TikTok

19  data directly from TikTok."

20        The response are the same objections raised

21  to the other requests just discussed.

22        Mr. Trainor, can you explain to me what you

23  mean by "stitched or duetted"?

24        MR. TRAINOR:  When Mr. Noshirvan makes a

25  video about anything, another person can make a video

1  and then they can bring that video overlay onto the

2  video they're making.  So it's a way of bringing in the

3  previous video.

4           So if I make a video about puppies, let's

5  just say, and I post a video about puppies and they're

6  all little yellow puppies; and then you make a video

7  about little chocolate puppies, you could bring in --

8  start showing your chocolate video puppies and then

9  bring in my yellow lab puppies to show -- to merge them

10 together.  It's merging and cross-referencing one

11 another.

12          THE COURT:  When someone does that, though,

13 it's without the control of Noshirvan; right?  It would

14 be a third party who just decides to use the video he's

15 already posted; correct?

16          MR. TRAINOR:  Correct.  But it's a

17 downloadable dataset through his TikTok data.  That's

18 one of the things they can easily download through his

19 profile of his TikTok data.  It's available

20 preformatted, basically.  He just checks a box and

21 downloads that data.

22          What's important about that is, is that that

23 will -- that's also a way of communicating amongst

24 creators and people that follow the creator.  So if

25 this is a way that he's being hurt or this is -- or

 1   other information is being exchanged when they do these

 2   duets or stitches, that's relevant to the claims.

 3            His whole universe of TikTok data with the

 4   comings and goings, whether he's growing or decreasing

 5   in activity, is relevant to his claims of damages and

 6   hurting his business, which is primarily run through

 7   TikTok.

 8            THE COURT:  Okay.

 9            Mr. Chiappetta.

10            MR. CHIAPPETTA:  There has been absolutely no

11   showing that any of these duetted or stitched videos

12   are tracked by TikTok and/or downloadable by Noshirvan.

13   Essentially what Mr. Trainor is asking is for Noshirvan

14   to collect data on third-party posts --

15            THE COURT:  No, I'm not -- no, he's not.

16   He's saying, "You can satisfy this request by

17   downloading your TikTok data directly from TikTok."

18            MR. CHIAPPETTA:  I understand that

19   Mr. Trainor has said that.  There's no verifiable proof

20   that that is an accurate statement, Your Honor.

21            THE COURT:  All right.  Here's what I'm going

22   to do, then.  I'm going to grant the motion to compel

23   to the extent that Noshirvan is to download this data

24   from TikTok if it's available, just as with the other

25   ones.

1              If it's not available, I certainly am not

2     going to order Mr. Noshirvan to, by hand, view or try

3     to extrapolate every person who has cited or stitched

4     one of his videos.  But if TikTok has that data

5     available, I understand its relevance.

6              And I agree with Mr. Trainor that it goes

7     towards the popularity of his platform, which, in turn,

8     indicates the financial success of the platform.  If

9     he's markedly less popular after the result of the

10    defendant's actions, as you've alleged, I think it does

11    go to that issue.

12             And if Mr. Trainor is correct that it can be

13    downloaded, the burden on your client is minimal.  The

14    burden is then on Mr. Trainor to have to sort through

15    all of it to find any possible relevance or how he can

16    use it.

17             So I will give you 21 days to, again, respond

18    to that request by downloading that data from TikTok to

19    the extent it exists.

20             Do you have any questions about that,

21    Mr. Chiappetta?

22             MR. CHIAPPETTA:  No, Your Honor.

23             THE COURT:  Okay.

24             Moving on, then, to Number 68, which is

25    answered at 67.

1          Quote, "Produce all documents and information

2     in your possession, custody, or control for all Discord

3     server channels you subscribed to, posted comments to,

4     from January 26, 2022, through the present.  For each,

5     include the name of the Discord server channel, topic

6     of each Discord server channel, subject matter of each

7     comment posted, the Discord server channel moderator's

8     first and last name, username, whether it was a text or

9     voice channel, and identify the person who created the

10    Discord server channel."

11         All right.  There are a host of objections,

12    which I'm not going to read into the record but are

13    available.

14         I'm going to deny the motion to compel.  I

15    don't need to hear argument.  This, essentially, motion

16    to compel reads like an interrogatory.  You asked for

17    documents that have certain things on it and for him to

18    list or provide, which is not the proper focus of a

19    motion to compel -- I'm sorry, not the proper focus of

20    a request for documents.  So I'm denying the motion to

21    compel as to Number 68.

22         But I do have a question, Mr. Trainor.

23    What's the relevance of the Discord server so I can

24    know?

25         MR. TRAINOR:  A Discord server is basically

1    like a private chat room, like an invite-only chat

2    room, where you can, obviously, exchange messages and

3    pin videos and documents in there that you can print,

4    by the way.  You can print out that information, print

5    the Discord channel -- server channel.

6              THE COURT:  What's the relevance here?  I get

7    we're talking about TikTok.  What he does, Discord

8    channel, sounds like it's a private communication.

9              MR. TRAINOR:  Well, he discusses -- his

10   TikTok adventures or TikTok content is discussed within

11   these Discord server channels.  There's a Discord

12   channel dedicated to thatdaneshguy, which is his TikTok

13   username, creator name.

14             THE COURT:  Is that public?

15             MR. TRAINOR:  No.  They are private amongst

16   Mr. Noshirvan.  One of his moderators operates them.  A

17   person creates one -- say I created one.  Then I could

18   invite you, but I could also have a public one.  But

19   generally speaking, they are limited to invitee-type

20   people only.

21             So followers of thatdaneshguy can get invited

22   to that Discord channel and discuss whatever they are

23   up to.

24             THE COURT:  Okay.  As I mentioned, I've

25   given -- the way it's worded, I'm going to deny it.

 1              And turning, then, to Number 69, which is
 2    answered at 68.

 3              It says, quote, "Produce all documents and
 4    information in your possession, custody, or control
 5    that shows all enforcement actions.  Example,
 6    suspensions, bans, community guideline violations that
 7    TikTok has levied against @thatdaneshguy at any time
 8    since the account was created.  You can satisfy this
 9    request by downloading your TikTok data directly from
10    TikTok."

11              Noshirvan raises a host of objections that,
12    again, I won't read, given their length.  But they are
13    available in the record and they have been reviewed.

14              Okay.  Mr. Trainor, what's the relevance of
15    what we're doing here?

16              MR. TRAINOR:  Well, if he's -- first of all,
17    the data is very easily downloadable through a TikTok
18    profile, the creator profile.

19              THE COURT:  What data are you referring to?

20              MR. TRAINOR:  Number 69, the data related to
21    your enforcement actions.  Because the letters and
22    notices were populated in a folder within the creator
23    profile.  So it's a very easily downloadable dataset.

24              Secondly, it discusses the community
25    guideline violations that he's -- if he's causing any,

```
 1   when he's causing any.  So he's getting repeatedly

 2   warned and suspended and banned and reinstated due to

 3   conduct similar to -- for posting the content that he

 4   posts.

 5          You know, it goes to the fact that we're not

 6   the only -- I didn't get him deplatformed if he's

 7   getting deplatformed on a routine basis for similar

 8   things, for the content that he creates.  It mitigates

 9   our liability, if anything, showing how this is

10   something he's done repeatedly and habitually since

11   he's had this account.

12          THE COURT:  So to the extent, for example, he

13   argues that he was deplatformed because of your

14   clients, if you can get that enforcement material that

15   shows he was not, that it was something else, then that

16   would be relevant evidence to you?

17          MR. TRAINOR:  Correct.

18          THE COURT:  Okay.  I understand it from your

19   perspective.

20          Let me hear from you, Mr. Chiappetta.

21          MR. CHIAPPETTA:  Setting all the objections

22   aside here, one of the -- the very last sentence in the

23   first paragraph on page 55, "Noshirvan has already

24   produced documents responsive to this request as

25   limited by this Court."
```

 1    Statement in the 340 case; we've already

 2    pulled the documents directly from TikTok, and we've

 3    already produced them.

 4          THE COURT:  Okay.  Well, it's different --

 5    the scope of the 340 case is different than this one.

 6    Because the scope of the 340 case was focused on what

 7    the damage was to Mr. Garramone and Ms. Couture.  It

 8    was very much limited to the videos that were geared

 9    towards them.  So I can't recall the specifics of the

10    ruling and whether it would overlap directly entirely

11    with this.

12          Would it?

13          MR. CHIAPPETTA:  So I believe the ruling was

14    something similar to this, where the Court had said

15    that Noshirvan does not have to independently go out

16    and search for these, just simply go through TikTok and

17    find any of these bans or suspensions or community

18    violations that were provided through the TikTok

19    medium.

20          THE COURT:  Okay.  And you've already

21    done that?

22          MR. CHIAPPETTA:  We've done that.

23          THE COURT:  For all -- no temporal scope?

24          MR. CHIAPPETTA:  Well, we did object to

25    overbroad and --

 1          THE COURT:  No, no, no.  I'm saying from the

 2    prior production, was there any temporal scope put upon

 3    him?

 4          MR. CHIAPPETTA:  I don't recall.  But it

 5    would have went through -- it would have been

 6    January 26 of '22 through whatever date we produced it.

 7          THE COURT:  Okay.  What I'm going to do,

 8    then, is I'm going to grant the motion to compel to the

 9    extent that I'm going to direct Noshirvan to download

10    the data about all enforcement actions from TikTok.

11          If he's already done it, then you can just

12    respond and point them to where that material has

13    already been provided.  If not, then you're going to

14    have to download it and provide it again or whatever is

15    supplement since that time.

16          I think it's relevant to the issue about

17    maybe why Mr. Noshirvan was suspended or why his

18    account was bringing in less money.  If there's

19    enforcement actions for conduct outside of what he's

20    alleging the defendants did, then that's clearly

21    relevant to the damages question in this case.

22          Given that I am limiting it to just simply

23    downloading the TikTok data, I find that's

24    proportional.

25          21 days.  All right, Mr. Chiappetta?

```
 1            MR. CHIAPPETTA:  Yes, Your Honor.
 2            THE COURT:  Next we're on to -- I have it as
 3   71.  Is that the next one?
 4            MR. CHIAPPETTA:  70, Your Honor.
 5            THE COURT:  70.  All right.  70, which would
 6   be answered at 69; is that correct?
 7            MR. TRAINOR:  Correct.
 8            THE COURT:  Okay.  Number 70 seeks, "All
 9   documents concerning enforcement actions TikTok has
10   levied against @thatdaneshguy at any time since the
11   account was created.  You can satisfy this request by
12   downloading his TikTok data directly from TikTok."
13            How is that not covered by 69, Mr. Trainor?
14            MR. TRAINOR:  Appears that is, sir.
15            THE COURT:  All right.  We'll withdraw
16   that one.
17            Actually, for purposes -- I'll just deny it,
18   given it's duplicative.
19            The next one I have -- what do you have next
20   on your list, Mr. Trainor?
21            MR. TRAINOR:  Number 70, but it would be 71.
22   It's "All documents concerning the reinstatement of
23   @thatdaneshguy subsequent to enforcement actions, such
24   as suspensions, bans, community guidelines."
25            THE COURT:  But it's 71 in your request?
```

1          MR. TRAINOR:  I'm sorry.  It's 70 in my

2    requests, page 59.

3          THE COURT:  Okay.  All right.  You mean 69 in

4    his answer?

5          MR. TRAINOR:  No.  I have that as 70.  69 was

6    just a duplicate one we did; correct?

7          His answer is 69; I numbered that one 70.

8          THE DEPUTY CLERK:  We're on 71.

9          MR. TRAINOR:  Page 57, sir.  I had that

10   being 70 -- renumbered to 70.  Excuse me.  Answered

11   as 69.

12         THE COURT:  Okay.  So now we're at Number 70,

13   answered at 69.  I thought that was the one I just did.

14         MR. TRAINOR:  It was.  What we're on now is

15   71, answered as 70.

16         THE COURT:  Okay.  So we're at 71 answered as

17   70.  Okay.  Let me get to it.

18         71 is, quote, "All documents concerning the

19   reinstatement of @thatdaneshguy subsequent to

20   enforcement actions, such as suspensions, bans,

21   community guideline violations levied against

22   @thatdaneshguy.  You can satisfy this request by

23   downloading this data directly from TikTok."

24         All right.  The response is to the same

25   objection raised to the prior.  Okay.

1          Wouldn't this fall under the same data you're

2   having him download for the rest of it about --

3          MR. TRAINOR:  It's a separate notice or a

4   separate letter.  So I don't know if it would be

5   included in that suspension data.  But it is a separate

6   notice that you would receive when you're -- you'll be

7   first notified your suspension was for 12 hours, let's

8   just say, for example.

9          At the end of 12 hours, they will say your

10  suspension has been lifted.  So it's a separate notice.

11  If it's included with the suspensions, fine.  If not,

12  it should be produced.

13         THE COURT:  You just indicated that when you

14  get on TikTok, you get to a platform, and your

15  suspensions would be listed in a certain database with,

16  like, letters that he would get; correct?

17         MR. TRAINOR:  There's a tab in the creator

18  profile.

19         THE COURT:  And that tab, would that also

20  contain what you're referring to now as reinstatement

21  documents?

22         MR. TRAINOR:  I don't know if it's going to

23  be with the suspension letter, like if it piggybacks on

24  that, or if it's a separate entry.  But it's a separate

25  notice you receive when the suspension is lifted or

```
 1    banned or whatever the levy or the sanction is.
 2              THE COURT:  All right.
 3              Let me hear from you, Mr. Chiappetta.
 4              MR. CHIAPPETTA:  I'm failing to see how this
 5    isn't subsumed by the phrase "all enforcement actions."
 6              THE COURT:  That's what I'm trying to figure
 7    out.  "All enforcement actions"; I mean, that covers
 8    everything.
 9              MR. TRAINOR:  Well, it's very limited.
10    There's only going to be enforcement action for a
11    violation of community guidelines.  So if you're doing
12    something that goes against community guidelines --
13    like using your platform to harass people; there's
14    certain categories of publishing private information --
15    that's going to be a community guidelines violation.
16              And that's why they issue an enforcement
17    action against you.
18              THE COURT:  Okay.
19              MR. TRAINOR:  And depending upon the
20    severity, it could be a ban for a few hours; it could
21    be a suspension for a couple days or worse, depending
22    upon how they determine severity of your --
23              THE COURT:  Wouldn't a reinstatement always
24    follow an enforcement action?
25              MR. TRAINOR:  Typically, yeah, it would.  But
```

1    I'm -- my point is I don't know if it's the same notice

2    or if it's a whole set -- I believe it's a separate

3    notice that you're being reinstated.

4              THE COURT:  I guess what I'm trying to say is

5    you asked for all documents concerning enforcement

6    actions.

7              MR. TRAINOR:  Right.

8              THE COURT:  So wouldn't that encompass, if

9    there's an enforcement action, everything that involves

10   that, whether it's the suspension, then the

11   reinstatement letters --

12             MR. TRAINOR:  It could.  It very well could.

13   I read it that way, sir, and I believe that it could.

14   But it might not.

15             THE COURT:  You would agree with me that an

16   enforcement action always has to precede reinstatement;

17   right?

18             MR. TRAINOR:  I believe so, yes, sir.

19             THE COURT:  All right.

20             Mr. Chiappetta, is that how you read it as

21   well?

22             MR. CHIAPPETTA:  I do, Your Honor.

23             THE COURT:  That 71 is subsumed into 70?

24             MR. CHIAPPETTA:  That is correct.

25             THE COURT:  All right.  I'm going to deny the

1    motion to compel regarding 71.  I think it's subsumed
2    with the prior request.
3          All right.  Where does that put us at now?
4    The number next would be Request Number 72.
5              THE DEPUTY CLERK:  That's what I have, Judge.
6              MR. TRAINOR:  Answered as 71.
7              THE COURT:  Answered as 71.  All right.
8              And that is, quote, "The text of all
9    communications between Noshirvan and TikTok moderators
10   from January 26, 2022, through the present," end quote.
11             Noshirvan responds by indicating he's already
12   produced similar responsive documents, then raises a
13   host of objections.
14             All right.  I presume the relevance is to the
15   same issue about the suspensions and the impact on the
16   damages.
17             MR. TRAINOR:  Yes.  Everything goes to that.
18             THE COURT:  All right.
19             Mr. Chiappetta?
20             MR. CHIAPPETTA:  I mean, I believe we've went
21   through this already, and I don't believe there were
22   significant communications with the moderators.  So
23   whatever was produced was nominal at best.
24             I do believe that the request itself is not
25   really proportional, but we did produce documents

1   already.

2          THE COURT:  It's the text of communications

3   from a certain date through the present, and it's only

4   between your client and TikTok moderators.  So I do

5   think there's certain guardrails -- there's specific

6   guardrails on it.

7          I'm going to grant the motion to compel.

8   21 days to respond with this data to the extent it's

9   available from TikTok.

10          Do you understand that, Mr. Noshirvan -- I'm

11   sorry, Mr. Chiappetta?

12          MR. CHIAPPETTA:  Yes, Your Honor.

13          THE COURT:  All right.

14          Anything further on that one, Mr. Trainor?

15          MR. TRAINOR:  No, sir.

16          THE COURT:  Next up, then, we've got

17   Number 73.

18          And that is, quote, "The text of all

19   communications between Noshirvan and any non-moderator

20   TikTok employees of January 26, 2022, through the

21   present."

22          That response was "See response to

23   paragraph 71."

24          All right.  So I presume, Mr. Trainor, this,

25   again, goes towards the issue of suspensions and their

1    impact on his business?

2         MR. TRAINOR:  Correct.  Suspensions -- and

3    there's also other streams of income that he generates

4    through TikTok, various forms.  And this would go to

5    his eligibility or ineligibility for those certain

6    things or if and how his content may have impacted his

7    eligibility or ineligibility.

8         THE COURT:  All right.  Is this information

9    available on the TikTok platform?

10        MR. TRAINOR:  Should be available through

11   his creator profile.  That's where the communications

12   are sent.

13        THE COURT:  Mr. Chiappetta?

14        MR. CHIAPPETTA:  Again, I believe we fleshed

15   this out prior.  And I believe that to the extent that

16   these even existed, we've produced them.

17        THE COURT:  Okay.  I'm not confident that we

18   fleshed it out because the scope -- as I mentioned, the

19   scope of the other case is different than this one.

20        So I'm going to grant 21 days -- grant the

21   motion to compel.  21 days to produce this information

22   from the TikTok platform only.

23        Any questions about that, Mr. Chiappetta?

24        MR. CHIAPPETTA:  No, Your Honor.

25        THE COURT:  Anything further, Mr. Trainor?

1          MR. TRAINOR:  No, sir, that's it.

2          THE COURT:  Okay.  Moving on to Number 74,

3    which is answered at Number 73.

4          Quote, "Produce all documents and information

5    in your possession, custody, or control that shows all

6    devices you utilize or have utilized to post content to

7    TikTok, including such device's IP addresses, MAC

8    addresses, phone number, VOIP if applicable, and

9    operating system."

10          The response is several objections, which I

11    won't read in to the record.

12          Mr. Trainor, the trouble I'm having with this

13    is -- what you want to know in this is what has he used

14    to access TikTok, meaning what devices he's used to

15    access it; correct?

16          MR. TRAINOR:  Access it, produce videos he's

17    posted there, et cetera.

18          THE COURT:  The problem I have is I'm sure

19    all kinds of records are generated every time he uses a

20    device that accesses TikTok.  So how many records do

21    you think this could ultimately encompass?

22          MR. TRAINOR:  I don't know.  It's likely a

23    TikTok dataset that he can download.  It's very robust

24    what they allege.

25          THE COURT:  Do you know if he can download

1    this?

2            MR. TRAINOR:  When you look on their website,

3    there are checkboxes for that information.  They will

4    tell you where you signed on from, that kind of thing.

5    But -- you know, was it signed on maybe a geolocation?

6    Maybe it will tell you the Android device you signed on

7    with or desktop computer or laptop computer.  That's

8    the kind of information it will tell you.

9            Mr. Noshirvan has represented that he's only

10   used either his cell phone, and potentially there's a

11   video-editing laptop in play.

12           So it's not 25 or 30 different devices.  It's

13   one or two devices.

14           THE COURT:  That's not the problem.  I guess

15   what I'm -- the problem I have is that, theoretically,

16   every time he generates an email -- or let's just say

17   every TikTok message he sends, embedded in the metadata

18   is probably some indication of what device he's sending

19   it from; correct?

20           MR. TRAINOR:  Correct.

21           THE COURT:  So wouldn't that be a record of a

22   document that shows the device that he's utilizing to

23   access TikTok?

24           MR. TRAINOR:  A new document?

25           THE COURT:  Yeah.  It's a document; right?

 1              MR. TRAINOR:  But I don't believe that's the

 2    way it comes.  When you download from TikTok, it will

 3    be a TXT file.

 4              THE COURT:  I get that.  But you've asked for

 5    all documents in your possession that shows all devices

 6    you've utilized.  So if every time he uses TikTok and,

 7    let's say, sends a message; and embedded in that

 8    message is some data about the device he's using, isn't

 9    that responsive to Number 74?

10              MR. TRAINOR:  It could be the same device.  I

11    don't think he uses a different device every time he

12    signs on.

13              THE COURT:  But that's not what you asked

14    for.  You asked for every document that shows the

15    device.  So even if it's the same device every time,

16    that document, when it generates that record, is

17    responsive to your request.

18              What you're asking for is the data from

19    TikTok; right?

20              MR. TRAINOR:  That's probably the easiest way

21    to go about getting it.  But if he uses his cell phone

22    or whatever, a video at a computer, you could print out

23    the BIOS information of that computer, which shows you

24    all this information that we're asking for, the device

25    information.  It's a very simple document to print.

 1              THE COURT:  I understand that, but that's not
 2   what you've asked for.  You've asked for documents that
 3   show --
 4              MR. TRAINOR:  All devices --
 5              THE COURT:  -- all devices.
 6              MR. TRAINOR:  -- not every time he signs on.
 7   Just all devices.  There's likely one or two devices.
 8              THE COURT:  But he'd have to sift through
 9   every record to see, does it reflect a different device
10   than this record?  Does it reflect a different device
11   than that record?
12              MR. TRAINOR:  Why would he have to do that?
13              THE COURT:  Because the way you've asked the
14   question:  "Produce all documents."
15              MR. TRAINOR:  Yeah.
16              THE COURT:  "All documents."
17              MR. TRAINOR:  For all devices.  So if he has
18   three devices, there's a document that tells you all
19   that information that's encompassed there.  Every
20   computer, you can go on right there and pull it up, and
21   it will print that information out.
22              THE COURT:  You're asking for not only -- I
23   know that's what you're looking for now.  But the way
24   you've worded the request, if the document will in any
25   way reflect what device he was using when he accessed

1    TikTok, then it's responsive to this request.  Every

2    message he's composed, if it in any way indicates

3    through its text or the metadata the device that he was

4    using in this information, it's responsive to

5    Number 74.  That's how it's written.

6           So my problem is it's asking for a lot more

7    than what you are telling me that you're looking for

8    right now.  So can he download this data that you're

9    indicating to me directly from TikTok?

10           MR. TRAINOR:  I believe so.  I believe TikTok

11    will at least tell you the device type on their data,

12    maybe more, but I'm certain they will show you the

13    device type.

14           THE COURT:  Mr. Chiappetta?

15           MR. CHIAPPETTA:  As far as the device type

16    goes, I believe this would be better served as an

17    interrogatory.

18           With regards to IP addresses, I believe that

19    is sensitive information.  And given what is occurring

20    in this case and the sheer fact that --

21           THE COURT:  I don't want to hear about

22    sensitive information.  You've objected every time they

23    have tried to raise a protective order in here to

24    protect information that they've wanted to protect.

25    And now you're going to sit here and tell me that

 1  something like an IP address is protected information?

 2              MR. CHIAPPETTA:  Yeah.  Due to signal

 3  interception, yes.

 4              THE COURT:  All right.  You can raise that

 5  issue at a later time, then.

 6              I'm granting 74.  You've got 21 days, and its

 7  limited to the information that you can download from

 8  TikTok.  Nothing more.

 9              You're not searching through any other

10  records.  If TikTok has this information available for

11  download, you can download it.  Otherwise, it's denied.

12              Moving on to request Number 74, which is

13  answered at 73.

14              THE DEPUTY CLERK:  I believe we're at 75,

15  Your Honor.

16              THE COURT:  Sorry.  This misnumbering has

17  really not worked well.

18              Okay.  I just addressed Number 74.

19              So now we're at 75; is that correct,

20  Mr. Trainor?

21              MR. TRAINOR:  Yeah.  Answered as 74; correct,

22  sir.

23              THE COURT:  All right.  Thank you.

24              And it seeks, quote, "Produce all documents

25  and information in your possession, custody, or control

 1  that shows all devices utilized or have utilized to

 2  post content to all other social media platforms,

 3  including such device's IP addresses, MAC addresses,

 4  phone number, if applicable, and operating system."

 5          So now you want the information he's used to

 6  post content on every other social media platform.

 7  Where would this information come from?  What documents

 8  are you aware of that would have what you're looking

 9  for here?

10          MR. TRAINOR:  Each one of these social media

11  platforms that he cross-pollinates his consent, it

12  gives the user the ability to download their data.  He

13  could download their data from Instagram, Twitter,

14  these other platforms that he uses -- Instagram, these

15  other platforms that he utilizes can download user

16  data.

17          THE COURT:  Okay.  You're telling me that the

18  data that you want here, device IP address, MAC

19  address, phone number, and operating system, is

20  available on those platforms?

21          MR. TRAINOR:  I'm fairly certain, sir.  The

22  one thing I'm not fairly certain about is the phone

23  number.  But I know device types -- and varying ones

24  may have the MAC address or perhaps an IP address.

25          Because IP address is not fixed, whereas, the

 1   MAC address tends to be fixed.

 2          THE COURT:  Couldn't you -- I'm going on

 3   board with Number 74 because you're telling me that he

 4   can download it directly from TikTok.

 5          Now we're on to 75, and it's expanded to all

 6   social media platforms.  The problem I have is that

 7   you're not just saying, "Download the screen page that

 8   shows me all the devices that you've got on with

 9   Instagram."  That's not what you've asked for here.

10          Again, it's "Produce all documents in your

11   possession, custody, or control that shows all devices

12   you utilize or have utilized to post content to all

13   other social media platforms."

14          So let's go back to the scenario again.  If

15   he sends a message to someone on Instagram, and in the

16   message, whether it be in a text or the metadata, it

17   reflects the IP address of the device he's using, isn't

18   that responsive to Number 75?

19          MR. TRAINOR:  Potentially, yes, sir.

20          THE COURT:  As worded --

21          MR. TRAINOR:  When you download your data,

22   most times it's going to come to these people -- you're

23   going to get it as a text file.  So it might have a

24   thousand lines on it for every time you've logged in

25   with device type, IP address, the MAC address.  That's

1  a document.  Could be one document with a thousand

2  lines.

3         THE COURT:  I know it could be one document.

4  But you haven't just said, "Give me the one document

5  that has this."

6         You said, "Produce all documents."

7         So the fact that he can do that wouldn't stop

8  him from also having to produce that message in

9  Instagram that has the same data.  It's all documents.

10        MR. TRAINOR:  The messages don't have that

11 information.

12        THE COURT:  How do you know?  The metadata

13 has a lot of that information embedded in it.  That's

14 the problem, is how is he supposed to be able to

15 identify, of all the things that he does on social

16 media, when he creates a record, sends a message,

17 withdraws money -- when he does anything, there is some

18 record created indicating what IP address he is using

19 to do that function on the platform; correct?

20        MR. TRAINOR:  Correct, sir.

21        THE COURT:  Okay.  So in order to respond to

22 this request as you've drafted it, he would have to

23 compile every one of those, because you say "Produce

24 all documents that shows all devices you've utilized."

25        So it's not just the printout.  It's every

 1  document he's ever created that has that information

 2  on it.

 3          That's not what you want; right?

 4          MR. TRAINOR:  That's not what I was asking

 5  for here.  But that could be a second-level request.

 6          But there also could be the situation where a

 7  known or unknown type of device is being used, like a

 8  burner phone or something to that effect, that we're

 9  not aware of.  That could be other information.

10          We're trying to get to the nitty-gritty of

11  how we harmed his business, so to speak.  So in order

12  to get there, I have to know how his business was

13  working and functioning in order to be able to

14  determine any kind of damages, as would the Court have

15  to know that information.

16          So if I don't know what he's dealing with

17  before and after, I can't tell if he's been damaged

18  or not.

19          THE COURT:  Okay.  So how does the IP

20  address, MAC address, phone number of the devices he's

21  utilizing to access those platforms go towards that

22  issue?

23          MR. TRAINOR:  Because that will tell you

24  maybe it wasn't him that was going on, posting certain

25  things on his content.  Maybe there's another person

1   that does it for him.  Maybe it's a shared account with

2   somebody else and they have mutual passwords and they

3   share each other's content.  I don't know that

4   information.

5          THE COURT:  All right.  I'm denying the

6   request as worded because I don't see it as limited as

7   you do.  It says, "Produce all documents."  And the

8   way -- when you say, "Produce all documents that

9   reflect that situation," it means all documents.  It's

10  not just "I want the one that you can download from the

11  social media platform."  So it's denied.

12          Moving on to 76 answered at 75.

13          Number 76 says, "Produce all documents and

14  information in your possession, custody, or control

15  that shows all TikTok accounts that you created,

16  including each account's creator name, account

17  identification number, email address, and phone

18  number."

19          Response raises a host of objections that I

20  won't repeat in the record but is available.

21          All right.  And what is, again, the relevance

22  of this, Mr. Trainor?

23          MR. TRAINOR:  Multiple -- Mr. Noshirvan has

24  been known to use false accounts, fictitious accounts.

25  Used one account called Erica Sabonis, among others.

1    And those accounts will tell us who or what's being

2    posted to these other accounts.

3            Is some of those information being posted to

4    those accounts negative about Mr. Noshirvan that's

5    being attributed to other folks, like defendants in

6    this case?  Which is often the case, that's information

7    we should be privy to.

8            THE COURT:  Okay.  I'm denying the request as

9    written, as it seeks all documents.  As I read it,

10   that's all documents.  So if he creates a document with

11   a different creator's name -- let's say he has a burner

12   account and he gets on and he creates -- he comments

13   700 times.

14           Under that request, as it's written, he's got

15   to produce every single comment that he has ever

16   written, every message he's ever sent from that burner

17   account, no matter the subject matter.  It's not

18   proportional, given the --

19           MR. TRAINOR:  He can download the TikTok

20   data, sir.  He can download the data for that account,

21   which is a simple transaction for him to do right

22   through his profile.  Check two or three boxes, and he

23   has his data.

24           THE COURT:  Okay.  Have you asked him if he

25   has any other accounts?

```
1         MR. TRAINOR:  The things he's produced, I've
2  seen comments where he's telling other people, "I have
3  these sock puppet or fake accounts."
4         THE COURT:  Did you ask him what other --
5  because what would be -- a proportional discovery
6  request would be to send him an interrogatory and say,
7  "List me the TikTok accounts that you have used or
8  logged into over the past seven or whatever years."
9         He gives you a list.
10        Then come and say, "Give me documents for
11 one.  Give me documents for two."
12        But now I have all documents in your
13 possession, custody, or control that shows all TikTok
14 accounts that you created, including each account's
15 creator name, account identification number, and email
16 address and phone number.  So it's "Give me
17 everything."  Unbounded universe is --
18        MR. TRAINOR:  The creator profile could
19 address that.  That would be "all documents."
20        THE COURT:  No, it's not all documents.  You
21 could have just said, "Give me the creator profile,"
22 and that would have been a bounded request.  But it's
23 not.  So, no.  It's denied.  It's not proportional.
24        Moving on to Number 77, which is responded
25 as 76.
```

1          Quote, "Produce all documents and information

2  in your possession, custody, or control that shows all

3  TikTok accounts that you utilize or have utilized to

4  post content to TikTok, including each account creator

5  name, account identification number, email address, and

6  phone number."

7          Response:  "See response to paragraph 69

8  and 75, supra.  This request is also duplicative," end

9  response.

10         All right.  "Produce all documents and

11  information in your possession, custody, or control

12  that shows all TikTok accounts."

13         So, again, because you want all documents

14  that shows all TikTok accounts, that's not just the

15  creator profile page.  You would agree with me there;

16  right?

17         MR. TRAINOR:  As you're reading it, sir, I

18  agree with you there.  But as I wrote that, that --

19  that could have been sufficed by the creator profiles.

20         THE COURT:  I understand that you're saying

21  that's not what you mean.  But I've got your text in

22  front of me.  "Produce all documents in your possession

23  that shows all TikTok accounts that you utilized or

24  have utilized to post content."

25         TikTok sends email messages all the time;

 1  right?  Like any social media platform, you get random
 2  emails; "Hey, user kdudek1010, check this out.  Check
 3  that out."
 4           The way that's written, wouldn't you agree
 5  with me that every email he receives from TikTok for
 6  every account would then be responsive to that?
 7           MR. TRAINOR:  I think that's very broad, and
 8  I wouldn't agree with that.
 9           THE COURT:  Hold on.  It says, "All documents
10  and information in your possession, custody, or control
11  that shows all TikTok accounts."
12           Doesn't that show that he has that TikTok
13  account because he's received that email?
14           MR. TRAINOR:  Well, that he's utilized to
15  post content.
16           THE COURT:  No, no.  The first line says,
17  "Produce all documents and information in your
18  possession, custody, or control that shows all TikTok
19  accounts that you utilize or have utilized."
20           MR. TRAINOR:  "To post content."
21           THE COURT:  Okay.  "To post content."
22           So if he gets an email from TikTok, that's
23  responsive to that, is it not?  Because the evidence is
24  that he has that account; right?
25           MR. TRAINOR:  There's evidence that he posted

1  content.

2          THE COURT:  Okay.  I'm denying it.  I'm

3  denying it as worded.  It's not proportional, given the

4  relevance of it, to what it would vacuum up as it's

5  read.

6          Moving on, then, to Number 78, which is

7  written -- responded to as 77.

8          Quote, "Produce all documents and information

9  in your possession, custody, or control that shows all

10 accounts on all social media platforms other than

11 TikTok that you have created, including each account's

12 user name, account identification number, email

13 address, and phone number."

14         The response is that Noshirvan raises several

15 objections that I won't repeat here.  I had the same

16 problem with this one, Mr. Trainor.

17         "Produce all documents that shows all

18 accounts on all social media platforms, other than

19 TikTok, that you have created."

20         So if he gets an email from a Facebook

21 account to him as the creator of a Facebook account,

22 that's a document, would it not be, showing that he

23 controls that account; correct?

24         MR. TRAINOR:  Yes, sir.

25         THE COURT:  Okay.  What are you actually

1    looking for with 77?

2            MR. TRAINOR:  Well, I'm looking for these

3    other accounts, which are sometimes referred to as

4    sock puppet accounts.  Because the other accounts will

5    show his activity on these accounts, on these different

6    TikTok platforms -- or different social media

7    platforms.

8            And if he's on these platforms and these

9    other, sort of, unknown creator names that he has, if

10    those other creator names are also getting suspensions

11    and bans and, you know, sort of demerits on their

12    platform for the content, then it goes to show the

13    habits and the conduct of the user of --

14            THE COURT:  Yeah, and not what the defendants

15    did got him banned.

16            MR. TRAINOR:  Correct.

17            THE COURT:  I would agree with that

18    100 percent.

19            But I cannot have him respond to this

20    document request, which would vacuum up all those

21    promotional emails that I just mentioned, everything on

22    it that would evidence that he owns an account.  The

23    volume is vast.

24            MR. TRAINOR:  We can rewrite it, sir.  I

25    understand that completely.  I'm happy to rewrite them.

1  With those when I have the "all," we'll retailor and

2  we'll --

3          THE COURT:  Not only that.  If you've got

4  something -- like you said, like an account statement,

5  if you're specific, that's a lot easier and a lot

6  harder for him to defend.  If it's available right

7  there, print it out if that's what you're looking for.

8          But I can't -- Number 78 can't proceed as

9  written, so it's denied.  As I mentioned, it's not

10  proportional given the sheer volume of documents that

11  it's going to suck up.  Because everything that he

12  generates regarding that, the social media account, is,

13  arguably, evidence of his possession of it.

14          Moving on, then, to Number 79, which is

15  written -- or responded to as 78.  It's, quote,

16  "Produce all documents and information in your

17  possession, custody, or control that shows all accounts

18  on all social media platforms, other than TikTok, that

19  Noshirvan has used or uses to post content, including

20  each account's user name, account identification

21  number, email address, and phone number."

22          So is this the same thing?  You're trying to

23  find the dummy accounts?

24          MR. TRAINOR:  Correct, sir.

25          THE COURT:  I think the information about the

 1  dummy accounts is relevant, but I cannot enforce

 2  Number 79 as it's drafted.  So I'm going to deny it.

 3          More tailored requests about asking him to

 4  identify the accounts and information about those would

 5  be, I think, fair game.  But as its drafted, I can't --

 6  I cannot compel Mr. Noshirvan to comply with that.  So

 7  it's denied.

 8          Mr. Chiappetta, I haven't asked -- given I've

 9  been denying them, I haven't had you weigh in.  But is

10  there anything you'd like to add as to any of the last

11  three that I've gone over?

12          MR. CHIAPPETTA:  No, Your Honor.  Thank you.

13          THE COURT:  Next up is 80, which is answered

14  as 79.

15          Quote, "The text of all communications,

16  including but not limited to, email messages, chats,

17  text messages, phone conversations, encrypted messaging

18  applications, social media direct messages, and all

19  other forms of communication between Noshirvan and

20  James McGibney.  For each communication, include the

21  method of communication, for example, email address,

22  phone number, social media applications, messages, and

23  direct messages."

24          I'm striking that last portion that says,

25  "For each communication, include."  If the document

1    includes it, then you're entitled to it.  But he

2    doesn't have to write on the document or include any of

3    that information, so I'm striking that portion.

4            But as to the rest of it, Mr. Noshirvan

5    raises several objections, which I won't repeat in the

6    record, but I've read them.

7            Mr. Trainor, can you tell me what's the

8    relevance to Mr. McGibney to this case as opposed the

9    other one?

10           MR. TRAINOR:  It's the same thing, sir.  He's

11   interjecting himself.  He has posted, and continues to

12   post, information relevant to the case that exhibits

13   foreknowledge of things to come.  He's posting

14   disparaging and other sorts of content related to the

15   action that shows that he sort of is knowing things in

16   advance of other things.

17           Mr. McGibney himself is a known --

18           THE COURT:  Can't he -- I mean, right now

19   there's no protective order.  So the fact that he may

20   know things in advance, what -- how is that relevant to

21   the merits of the case?

22           MR. TRAINOR:  Well, he's listed in the

23   initial disclosures, number one.

24           THE COURT:  Okay.  He's listed in --

25           MR. TRAINOR:  Correct.

 1              THE COURT:  -- in Noshirvan's?

 2              MR. TRAINOR:  Correct.

 3              THE COURT:  Okay.

 4              MR. TRAINOR:  And he is a close associate,

 5    confidant of Mr. Noshirvan, at least according to the

 6    partial communications that we have.

 7              He also has -- is a computer hacker.  I guess

 8    you'd describe him that way.  So he's involved in the

 9    much similar conduct, as we say, that Noshirvan is

10    involved in.

11              And as he was disclosed on the initial

12    disclosures, I don't see how there's an objection to

13    producing your communications with him if he's making

14    certain assertions.

15              THE COURT:  Here's the problem I have with

16    it, though.  I certainly can understand why if there's

17    communications between them about your clients about

18    the facts of this case.  But you've asked for

19    everything.  It is all communications.  There's no

20    subject matter limit; right?

21              MR. TRAINOR:  Well, he's listed initially --

22    he's a person involved.  But he also is a person who

23    is routinely accusing Mr. Camp of everything under

24    the sun.

25              THE COURT:  I know the discord between the

1   two of them.  I've seen it.  But my point is you're

2   asking for -- if they had conversations about your

3   clients about the facts of this case, that might be

4   relevant.  If they have --

5              MR. TRAINOR:  The subject matter of the case,

6   and they also discuss other things and other platforms.

7              For instance, in one of the later requests I

8   have here, one of the few remaining, at one point,

9   Mr. Noshirvan shared information with Mr. McGibney

10  related to Meta corporation.

11             THE COURT:  Okay.

12             MR. TRAINOR:  And that was about

13  preserving -- or preventing a suspension.  So that's

14  information that we believe is relevant.

15             THE COURT:  Okay.  So I get that that would

16  be relevant.  But the way you've asked for it, it's

17  everything.  So if they play in a nightly poker

18  tournament, he's got to turn over those text messages.

19  If they are neighbors and they're going to the grocery

20  store and he picks something up for them, that's -- so

21  it's not just limited to the facts of this case.

22             You'd agree with that; right?  So why should

23  I order you to essentially pry into everything they've

24  talked about unrelated to the subject matter of this

25  case and make him turn that over to you?

 1            MR. TRAINOR:  Because they are much more

 2    involved than what may seem here.  At one time they

 3    will be saying that I've accessed this account, like

 4    Mr. McGibney has said in his communications that have

 5    been produced with Mr. Noshirvan, where he's saying

 6    that he's accessing the account of this person, in this

 7    case Mr. Camp.  And then subsequent to that, other

 8    information comes out.

 9            We're looking to get to the real conduct

10    that's been happening by Mr. Noshirvan and if that

11    conduct is what's getting him deplatformed, as they

12    say, versus what we're accused of.

13            THE COURT:  And I think you can do that.  But

14    the corollary of that is Mr. Noshirvan's filed a

15    lawsuit, but that doesn't mean that now his entire life

16    or his entire communications with third parties is now

17    open to discovery.

18            There's obviously limits to it, and you

19    want -- with Mr. McGibney, you want everything, every

20    text message he's ever exchanged about any topic, for

21    an unlimited period of time.

22            MR. TRAINOR:  Not unlimited, sir.  Because

23    Mr. McGibney has --

24            THE COURT:  Where is the limit in here?

25            MR. TRAINOR:  Mr. McGibney himself has

 1  limited it.  He said his first communication with

 2  Mr. Noshirvan was on or about September 7, 2022.

 3              THE COURT:  You're assuming that's true.

 4              MR. TRAINOR:  I have no choice but to assume

 5  that's true.  They put that in the declaration.

 6              THE COURT:  But you did not put that in

 7  yours -- again, it's unbounded, and there's no temporal

 8  scope to it, no subject matter scope to it.  So every

 9  private message they have, I'm going to turn over to

10  you in discovery?

11              MR. TRAINOR:  They are not discussing current

12  events, sir.

13              THE COURT:  How do you know?  They may be

14  discussing direct evidence; and I think in that

15  circumstance, you'd be entitled to it.  But here,

16  you're asking for that and everything else.

17              Wouldn't you agree?

18              MR. TRAINOR:  It's relevant because I've

19  seen --

20              THE COURT:  Okay.

21              MR. TRAINOR:  I've seen their Instagram

22  communications or direct messages.  And they talk about

23  other things that they do that are related to the

24  subject matter of this case.  So it isn't as if, you

25  know, I'm asking for their discussion on sharing each

1    other's mother's brownie recipe.

2          THE COURT:  Yes, you are.

3          MR. TRAINOR:  Well, they'll be doing that in

4    the same token they say, "Okay, well, here's

5    so-and-so's information."

6          THE COURT:  I know.  But what he could do is

7    then go through and say, "Okay.  This is responsive.

8    This covers the subject matter of this dispute or, you

9    know, the subject matter of doxing or the subject

10   matter of X, Y, or X," and produce that and not have to

11   produce his mother's -- as you indicated, his

12   grandmother's brownie recipe.

13         MR. TRAINOR:  Fine.

14         THE COURT:  I know "fine," but that's not

15   what you wrote in your request.

16         MR. TRAINOR:  I'll rewrite it.  I'll

17   redraft it.

18         THE COURT:  I'm denying the motion to compel.

19   Given the scope of it, I don't find it proportional.

20         Moving on next to 81, which was answered as

21   80, which we have, quote, "The text of all

22   communications, including but not limited to, email

23   messages, chats, text messages, phone conversations,

24   encrypted messaging applications, social media direct

25   messages between Noshirvan and Instagram account

1    @bullyville."

2             Response was:  "See paragraph 79."

3             Again, so here I am.  I have no temporal

4    limit, no subject matter limit.

5             MR. TRAINOR:  We'll draft -- we'll correct

6    them, sir.

7             THE COURT:  Deny the motion to compel as

8    to -- that was 81.

9             Moving on, then, to 82, which was answered

10   as 81.

11            Quote, "The text of all communications,

12   including but not limited to, email messages, chats,

13   text messages, phone conversations, encrypted messaging

14   applications, social media direct messages, and all

15   other forms of communication between Noshirvan and the

16   website jamesmcgibney.com."

17            That response is:  "See response to

18   paragraph 79, supra."  So raising the same objections

19   as before.

20            All right, Mr. Trainor.  I have the same

21   problem as I did with the last ones.  But is there any

22   reason why conversations -- first of all, how do you --

23   conversation with a website.

24            MR. TRAINOR:  Through, like, the form.  You

25   fill the form out, comments.  I don't know if the

1    website has an email address that they communicate
2    with.
3              THE COURT:  Okay.  So you want just -- you
4    don't want communications...
5              MR. TRAINOR:  Relevant information is
6    repeatedly and continually posted on all Mr. McGibney's
7    platforms, his social media as well as his website,
8    about the parties and about the subject matter of this
9    case.  That is information that is relevant, and there
10   isn't any way we should have access to that.
11             Because there might be other things going on
12   behind the scenes discussing when to place things --
13   based on the Instagram messages we have seen so far,
14   there are discussions of the two of them sharing
15   information to be posted and that kind of thing.
16             THE COURT:  Okay.  And I think I get it, and
17   I understand the relevance of it.
18             Unlike your prior request, where he was
19   communicating with an individual, you're now asking
20   about a website, so it is in some way more limited.
21             But I'm struggling to understand how you can
22   have a chat or text message or a phone conversation
23   with a website.
24             MR. TRAINOR:  If you can't have a phone
25   conversation with it, then just provide the forms that

1   you fill out.  And you send an email or a text -- or a
2   message through the actual website itself when they
3   have those --
4           THE COURT:  So you want messages sent through
5   the website?
6           MR. TRAINOR:  Through the website, however
7   you want to phrase that.
8           THE COURT:  All right.
9           Let me hear from you on that one,
10  Mr. Chiappetta.  It's not like before, where he's
11  saying, "Give me every communication with an
12  individual."  It's now saying, "Give me communications
13  with a particular website."
14          MR. CHIAPPETTA:  Your Honor, I understand.
15  But this is Mr. Trainor's sixth request as it relates
16  to Mr. McGibney and/or his websites or his companies.
17  We have 34, 35, 36.  We have 79, 80, 81, and now 82.
18          THE COURT:  Well, you haven't answered --
19          MR. CHIAPPETTA:  At the end of the day, where
20  this really comes in, it's all text communications,
21  emails, chats, text messages, phone conversations,
22  encrypted messages.
23          And I do agree, with regards to a website,
24  whether or not even a chat box exists.  But that goes
25  beyond -- as described by Mr. Trainor, that goes beyond

1   a website as to other emails or communications directly

2   with McGibney, not just the website, which would have

3   been encompassed in 34, 35, and 36.

4           THE COURT:  Well, okay.  Let me see 34, 35,

5   and 36.

6           34, 35, and 36 are limited to X account and

7   an Instagram account.

8           MR. CHIAPPETTA:  But it includes the

9   production of communications with persons who controls

10  or publishes the account and outside messages and

11  emails and so forth.

12          THE COURT:  No, it doesn't.  It doesn't say

13  who controls the account.  It says to the website and

14  the website.

15          MR. CHIAPPETTA:  No, but what I'm saying is

16  that that would essentially be encompassed within the

17  response to 34, which requests the person who controls

18  or publishes and that have occurred outside those

19  handles or Instagram accounts or X accounts, because

20  they ultimately would be the same person.

21          THE COURT:  All right.  Well, then it won't

22  be any problem because you'll have produced them.

23          So I'm going to grant Number 82 to the extent

24  that you have to provide all communications with that

25  website.

1          I'm not sure -- I've not visited the website,

2     so I'm not sure how you communicate with it.  But to

3     the extent there's posts or messages sent to the

4     website, I'm going to order them to produce them, given

5     the relevance of Mr. McGibney to the allegations in

6     this case.  21 days.

7          Any questions, Mr. Chiappetta?

8          MR. CHIAPPETTA:  No, Your Honor.

9          THE COURT:  Moving on, then, to Request

10    Number 83, which is responded to at Number 82.

11         Quote, "Produce all documents and information

12    in your possession, custody, or control that shows all

13    persons who donated to GoFundMe accounts that you

14    control beginning May 25, 2023, through the present,

15    including each donor's first and last name, username,

16    email address, phone number, amount of each donation,

17    date of donation, reason for donation, and whether such

18    donation was a single donation or recurring."

19         Response:  Noshirvan raises a host of

20    objections that I won't repeat given their length.

21         First, I'm striking the latter portion of

22    that which says to include things.  This isn't an

23    interrogatory to the extent that the documents he has

24    that are responsive include that information.  It's

25    there.  He's not obligated to write or supplement

```
 1   whatever it is that he has.

 2              So striking the line beginning with

 3   "including each."

 4              It says -- it will now stand as, quote,

 5   "Produce all documents and information in your

 6   possession, custody, or control that shows all persons

 7   who donated to GoFundMe accounts that you control

 8   beginning May 5, 2023, through the present."

 9              All right.  Mr. Chiappetta, can you explain

10   to me the relevance we've got here?

11              MR. TRAINOR:  "Trainor."  Sorry.

12              THE COURT:  Oh, Mr. Trainor.  I'm sorry.

13              MR. TRAINOR:  Well, it's limited in time.

14   During that time, this would be -- again, his Linktree

15   accounts and his TikTok accounts say, Support my

16   content on these -- on my GoFundMe.  Support my content

17   by contributing to my GoFundMe.

18              That would be earnings.  That would be --

19   goes to the amount of his financial earnings that he's

20   made from his content.  His content is TikTok.  That's

21   the business he's allegedly damaged.

22              This information would tell us more -- give

23   us a better understanding of his apparent earnings.

24              THE COURT:  Okay.

25              Mr. Chiappetta.
```

1          MR. CHIAPPETTA:  This request is not narrowly

2     tailored.  Mr. Noshirvan runs a host of GoFundMe

3     fundraisers for different -- to raise money for people

4     who have been injured one way or another.

5          And, again, this would just swallow all that

6     whole and encompass well beyond anything related to

7     Mr. Noshirvan's business or any money that would be --

8     could ever be deemed income.

9          THE COURT:  So are we -- yeah, how do I

10    separate that out, Mr. Trainor, the ones that aren't

11    related to his TikTok data versus what -- I don't

12    know -- charitable organizations he's going towards?

13         MR. TRAINOR:  I don't know anyone he's done a

14    charitable GoFundMe for.  But I do know that on his --

15    he's made -- his content, his GoFundMe for his support

16    content is continually there.

17         So it's almost as if the content is -- the

18    GoFundMe is purposely built for supporting his content.

19    That's what it says on it.  It doesn't say, "Support

20    Hurricane victims of western North Carolina."

21         It says, "Support my content."

22         THE COURT:  I'm going to deny it.  If you

23    issue more targeted ones that can identify the GoFundMe

24    pages that you believe are supportive of his content as

25    opposed to something else, you can issue that.  Ask for

1  information.

2          I would, again, caution you against "all

3  documents," because "all documents" encompasses, in a

4  GoFundMe situation, if he gets an email from GoFundMe

5  saying, "John Smith has given you $50," he's got to

6  produce that email.

7          MR. TRAINOR:  Well, he doesn't have any other

8  GoFundMes.  That's the thing.

9          THE COURT:  Okay.  That's not what he just

10 represented.  He represented he's got other GoFundMes.

11 If you want to do a more targeted request --

12         MR. TRAINOR:  Yes, sir.

13         THE COURT:  All right.  Number 84, quote,

14 "Produce all documents and information in your

15 possession, custody, or control that shows of -- all

16 information provided to you by former employees of

17 Garramone Plastic Surgery, including the former

18 employee's first and last name, date the information

19 was provided, subject matter of information provided,

20 the former employee's email address, phone number,

21 TikTok creator name, social media username, the manner

22 in which such information was provided, and the date of

23 last communication between Noshirvan and any such

24 former employee."

25         Response is a host of objections, which I

1    won't read into the record.

2            Mr. Trainor, what you're looking for here is

3    documents he's received from prior employees of

4    Garramone Plastic Surgery?

5            MR. TRAINOR:  Correct.

6            THE COURT:  About what subject matter?

7            MR. TRAINOR:  The subject matter of the

8    litigation.  At least one of these employees has

9    submitted a statement where this person has accused me

10   of doing certain things in her statement which did not

11   happen.

12           So I don't know how she would know certain

13   things she said that I did when her and I wouldn't know

14   each other from a hole in the wall.  And somehow she

15   knows that I was doing certain things, which I never

16   did.

17           So those communications are relevant because

18   it goes to us functioning as a conspiratorial group.

19           THE COURT:  I would agree with that.

20           First, I'm going to strike the portion of the

21   request that starts with "including," because he

22   doesn't have to include certain information.  He

23   doesn't have to write on a document to supplement it.

24   He has to produce what he has.

25           So -- and, again, I'm going to strike

1    information for the reasons stated.  So it's "Produce

2    all documents in your possession, custody, or control

3    that shows of all information provided to you by former

4    employees of Garramone Plastic Surgery."

5              Mr. Chiappetta.

6              MR. CHIAPPETTA:  I would still argue that

7    "Produce all documents of all information" isn't

8    necessarily limited to relevant issues within this

9    case.

10             THE COURT:  How many employees -- former

11   employees of Garramone Plastic Surgery is your client

12   communicating with?

13             MR. CHIAPPETTA:  That he's aware of?

14             THE COURT:  Yep.  Obviously, it's -- it can

15   only be to the extent he's aware of it.

16             MR. CHIAPPETTA:  Well, not necessarily.

17   There could be an ex-employee that just has never

18   identified themself as an ex-employee.

19             THE COURT:  I know.  But in that

20   circumstance, how can he respond?  He doesn't have

21   supernatural powers.  The rules of discovery don't -- I

22   can't presume something that's outside his personal

23   knowledge.  That's why it's built in -- it's inherently

24   built into their obligations to do a reasonable

25   inquiry.

1        MR. CHIAPPETTA:  As far as that have been

2  affirmatively identified as former employees, there is

3  at least one individual.

4        THE COURT:  Are there anymore?

5        MR. CHIAPPETTA:  There is a possibility of a

6  second or third, but I have not confirmed 100 percent

7  that they were actually ex-employees or just a friend

8  of an ex-employee.

9        THE COURT:  All right.  I'm going to grant

10  the motion to compel to Number 83 [sic] as I've limited

11  it.  21 days.

12        All right.  Document -- finally, we're on

13  to -- is this our last one?

14        THE DEPUTY CLERK:  Last one I saw,

15  Your Honor.

16        THE COURT:  85.

17        MR. TRAINOR:  Answered as 84?

18        THE COURT:  Yep.  That's what I have.

19        MR. TRAINOR:  Yes.

20        THE COURT:  All right.  Here we go.

21        Quote, "Produce all documents and information

22  in your possession, custody, or control that shows your

23  communications with your Meta contact, whose contact

24  information that you shared with James McGibney.  You

25  referred McGibney to your Meta contact in your files

1  labeled 'screenshot'" -- I won't repeat the numbers,

2  but there's two JPEG files referenced.

3          Noshirvan responds that, "This information

4  isn't relevant, and it's not narrowly tailored," among

5  other objections.

6          Mr. Trainor, can you explain the relevance of

7  this information you're seeking?

8          MR. TRAINOR:  Yes.  It's very relevant.  In

9  their discussions in those two JPEGs that I've included

10 there, they are discussing a way for McGibney and

11 Noshirvan to avoid a suspension of their Instagram

12 social media accounts.

13          And in there, Noshirvan says that, "I spoke

14 to my Meta contact," and then he shares with McGibney

15 the Meta contact information.

16          And then -- because McGibney first asked him,

17 "Hey, can you help me?  I'm about to be suspended based

18 on my last Instagram post."

19          And then Noshirvan says, "Well, I have my

20 Meta contact."  He goes, "Actually, I have two Meta

21 contacts."  And then they share that information.  And

22 then there's no evidence of being suspended.

23          And that's also -- Instagram is also part of

24 his alleged social media business.

25          THE COURT:  Okay.  So this is relevant to

1  establish the issue of damages and about his suspension

2  versus non-suspension based on the conduct of your

3  clients.

4        MR. TRAINOR:  Correct, or if he has the

5  ability to avoid being suspended based upon an apparent

6  connection to the platform.

7        THE COURT:  All right.

8        Mr. Chiappetta, let me hear from you.

9        MR. CHIAPPETTA:  We obviously do not believe

10 that this is relevant or proportional.  Mr. Noshirvan

11 has previously testified in the other case, as it

12 relates to this, that this Meta contact is no more than

13 a customer service representative.

14        And at the end of the day, there's no special

15 communications as it relates.  He simply forwarded

16 information of this contact, who then forwards it to

17 whatever supervisor.  She doesn't make any decisions

18 one way or the other.  It's absolutely irrelevant.

19 There's absolutely nothing to gain from this inquiry.

20        THE COURT:  That's up for them to decide how

21 much they gain from it.  I understand the relevance

22 Mr. Trainor is indicating.  So if there's relevance to

23 it, then my question becomes:  How burdensome is it to

24 produce in the proportionality question.

25        So how many communications are there?  It's

1   limited, because they have identified the Meta contact

2   from these specific screenshots.  So how many

3   communications are we talking about?

4           MR. CHIAPPETTA:  The problem here is in 85,

5   it requests all documents showing communications.  So

6   there's -- it's not limited in context as it relates to

7   a certain subject matter of any kind.  There's no date

8   or time limitation on this.

9           And so when you look at how the request is

10  shaped --

11          THE COURT:  I don't want to limit it to just

12  the facts of this case.  Because one of the things they

13  argue is that your client has been removed from these

14  platforms for other conduct that's not theirs.  It's

15  not what they've done.

16          So to the extent your client is communicating

17  with this Meta person about being suspended for other

18  reasons, then that's highly relevant to their claim for

19  damages.  So I don't think a subject matter limitation

20  on this particular communication would be appropriate

21  here.

22          MR. CHIAPPETTA:  Perhaps --

23          THE COURT:  Go ahead.

24          MR. CHIAPPETTA:  Perhaps a temporal

25  limitation of some kind.  I mean, this could go back

```
 1   5 years, 10 years, 20 years.  I mean, where do we draw
 2   the line?
 3          THE COURT:  That's what I'm asking you.
 4   You're the one who has to prove it's disproportionate.
 5   So I need to know -- there's 20,000 messages?  There's
 6   10?  There's 5?  There's 1?  There's 10?
 7          MR. CHIAPPETTA:  There's no way for me to
 8   answer that because there's no time frame in here for
 9   me to even assess.
10          THE COURT:  You should have went to your
11   client and said, "Hey this is what they are asking for.
12   I'm going to have to go to the Court and argue that it
13   is not proportional.  What's the universe effects here?
14   How long would it take for you to gather them?"
15          That's what I need to know.  And do you have
16   any of that information for me?
17          MR. CHIAPPETTA:  But where we sit here, the
18   request itself doesn't have any time limitation.  As
19   such, the -- it would be not only addressing the volume
20   of potential communications, you're looking at, you
21   know, having to go back and dig through potentially
22   decades of, I guess, absent communications to figure
23   out if they even exist at this point.
24          THE COURT:  All right.  I am overruling the
25   objections, granting the motion to compel as to
```

1    Number 85.  21 days to provide those communications.

2            I'm striking the term "information" from the

3    request for the reasons I've already stated repeatedly

4    on the record.

5            That completes all of them that we have

6    covered with that today.  We are now going to take a

7    brief bathroom break because I have to go to an initial

8    appearance in a criminal case.  It should take just a

9    few minutes.

10           The last issue is the request for fees and

11   costs.  When a motion to compel is granted in part and

12   denied in part, as here, whether to award costs for a

13   sanction is in the Court's discretion.  I'm not going

14   to -- some of the requests were overbroad and

15   defensible; others were not.

16           So I find neither party was in favor of fees.

17   The case citation is Wyndham Vacation Ownership, 2019

18   Westlaw 5394057.

19           When we come back -- which we can take a

20   10-minute break for everyone to use the restroom.  When

21   we come, we'll discuss the protective order.  And we

22   will get through whatever we can with regard to the

23   other pending motion and then set a time to address the

24   remainder of it.

25           Any questions before we conclude,

```
 1    Mr. Trainor?

 2              MR. TRAINOR:  No, sir.

 3              THE COURT:  Any on your end, Mr. Chiappetta?

 4              MR. CHIAPPETTA:  No, Your Honor.

 5              THE COURT:  All right.  We'll see you back

 6    here in 15 minutes.

 7                   (Court recessed at 3:29 PM)

 8                   (Court called to order at 3:49 PM)

 9              THE COURT:  Okay.  So I thought I had copies

10    of the protective order up on the bench.  Give me one

11    second to go get them.  But I guess before we do that,

12    I know we've got the other motion to compel that is

13    pending at Docket 199.

14              How would the parties like to address what to

15    do?  Because as I see it, we've got two issues left,

16    which is, first, the motion which we have to get

17    through, and also the issue of the protective order.  I

18    don't know if we'll get through the whole motion today.

19              So what would you like to do first?  The

20    protective order or the motion?  If we do the motion,

21    we won't get through the protective order.

22              I'll turn, first, to Mr. Chiappetta.

23              MR. CHIAPPETTA:  I'm okay with doing the

24    protective order first, Your Honor.  I don't want to

25    delay the defendants' production responses.
```

 1              THE COURT:  Okay.

 2              Mr. Trainor, is that okay with you?

 3              MR. JACKSON-FANNIN:  The protective order,

 4  yes.

 5              THE COURT:  So what we're going to do --

 6  because we're going to run out of time today -- we're

 7  going to reschedule this.  But we're going to do it by

 8  Zoom as opposed to making everyone come back.

 9              Because I know, Mr. Trainor, you traveled for

10  this; correct?

11              MR. TRAINOR:  Correct.

12              THE COURT:  Okay.  So whatever we don't get

13  through with regard to Docket 199, we will finish up by

14  Zoom and make a date for that at the conclusion of this

15  hearing.

16              So turning next, then, to the protective

17  order.  I have copies, one presented by

18  Mr. Jackson-Fannin; one provided by you,

19  Mr. Chiappetta.

20              MR. CHIAPPETTA:  Yes, Your Honor.

21              THE COURT:  Yours, I noticed, had some bolded

22  language.  Is that the language I'm supposed to

23  understand is the difference between what they are

24  proposing and what you are?

25              MR. CHIAPPETTA:  There are a few other subtle

1    differences that haven't been addressed.  But the main

2    points of contention are the bolded language.

3            THE COURT:  All right.  So let's take the

4    bolded language first, and then we can identify

5    whatever you said are the other smaller issues of

6    contention.

7            So going to Chiappetta's proposed, it has the

8    bolded language.  I see under paragraph 1, there's

9    some -- under subsection (e) -- there's some additional

10   language that says, "Joseph A. Camp and Richard

11   Luthmann are expressly excluded from the definition of

12   a 'party employee,' and no party may designate as

13   confidential any information referencing or pertaining

14   to Camp or Luthmann."

15           Mr. Chiappetta, I presume you wanted this

16   added in; correct?

17           MR. CHIAPPETTA:  That is correct.

18           THE COURT:  Okay.  Why?

19           MR. CHIAPPETTA:  We believe that both

20   individuals are relevant in playing a role in the

21   ongoing issues that are the basis of my client's claim.

22   And a lot of -- what we're seeking to protect,

23   essentially, are, essentially, identifying information

24   as it pertains to Camp himself.

25           So we don't necessarily believe that it would

1    be appropriate to protect these individuals.

2            THE COURT:  I guess my question is:  This

3    confidentiality order doesn't prevent them from

4    disclosing the information to you; correct?

5            MR. CHIAPPETTA:  No.

6            THE COURT:  What I'm trying to say is it

7    doesn't prevent you from discovering the information

8    you may want about Camp or Luthmann; correct?

9            MR. CHIAPPETTA:  It does not.

10            THE COURT:  So the question is just whether

11    they should be able to designate as confidential, which

12    essentially preserves that information from being

13    disseminated by either party; correct?

14            MR. CHIAPPETTA:  No.  It -- essentially, it

15    would allow for redactions as it relates to these

16    individuals.

17            THE COURT:  Where is the portion in here that

18    talks about redactions?  I don't see anything about

19    redactions.  It's just designating something

20    confidential, and that prevents how it's going to be

21    disseminated amongst the parties and to people outside

22    of the lawsuit.

23            MR. CHIAPPETTA:  As it relates here, I think

24    the bigger issue here isn't necessarily that.  The

25    problem that I have here is the way this is written is

1    that if Camp or Luthmann were designated as an employee

2    to a party, then, essentially, a party could

3    disseminate information to them under the exceptions.

4              THE COURT:  Okay.  That's not subsection (1).

5    Subsection (1), as you've written it, would prevent

6    either party from designating confidential any

7    information that falls under the categories but as

8    directed or comes from Camp or Luthmann.

9              So it would prevent them from designating

10   confidential materials referencing -- pertaining to

11   Camp or Luthmann.

12             MR. CHIAPPETTA:  I believe it's both.  I

13   believe that the first prong, which prevents the

14   designation, is applicable under what I have labeled as

15   section 6, what they have labeled as section 7, and

16   which prevents that designation there.

17             But I do agree with the second prong.  I do

18   agree with what the Court is stating.

19             THE COURT:  Is that?

20             MR. CHIAPPETTA:  Is that the second prong,

21   essentially, prevents Camp and Luthmann's information

22   to be designated as confidential as it's defined in

23   paragraph 1.

24             THE COURT:  Without that language, they could

25   designate information confidential, but you would still

 1   receive it in discovery; correct?

 2           MR. CHIAPPETTA:  I would receive it in

 3   discovery.

 4           THE COURT:  So all it would do is prevent you

 5   from disclosing that information to anyone outside this

 6   case without a court order.

 7           MR. CHIAPPETTA:  I respectfully disagree with

 8   that.  My purpose in writing this was not to prevent my

 9   client's disclosures here.  It was to prevent witness

10   intimidation.  And my client has essentially listed

11   38 additional witnesses who are individuals, human

12   beings, that we do not want their information

13   disseminated to these people.

14           THE COURT:  Okay.  But that's -- I get that

15   may be a later portion.  But I'm talking about the

16   language you've included under subsection (1), which

17   you are saying that material involving Camp or Luthmann

18   cannot be designated confidential.  That's what that

19   says.

20           They are expressly excluded from the

21   definition of a party employee, which is addressed

22   later.  And no party may designate as confidential any

23   information referencing or pertaining to Camp or

24   Luthmann.

25           So what you're saying is if they've got a

1   document, and it's otherwise confidential under one of

2   these subsections, if it pertains to Camp, they cannot

3   designate it confidential.  That's what that says;

4   correct?

5            MR. CHIAPPETTA:  Okay.  Yeah, I see your

6   point, Your Honor.  That's not what the intent was.  I

7   think the intent was more to designate -- or not

8   designate Camp's information as confidential or

9   Luthmann's.  Perhaps I didn't express it as well as I

10  intended.

11           THE COURT:  I'm not getting there.  So what

12  did you want with that language to mean?  What were you

13  trying to convey with it?

14           MR. CHIAPPETTA:  Essentially, I wanted to

15  exclude, from confidentiality, information that

16  pertains to Camp and Luthmann, which I guess I'm --

17           THE COURT:  No.  That's what it says.

18           MR. CHIAPPETTA:  Yeah.  I don't want to

19  protect Luthmann and Camp's information as it's defined

20  in paragraph 1.

21           THE COURT:  Okay.  Why?  Why would -- let's,

22  for example, say, during this disclosure, Luthmann, I

23  understand, was a patient of Dr. Garramone, based on

24  some of the material I've seen exchanged.

25           Under the way you have it drafted, if his

 1   medical information fell within the ambit of your

 2   discovery request, although it's HIPAA-protected, which

 3   under what you've drafted would normally be

 4   confidential, it would not be now because it pertains

 5   to Luthmann.  So move him out.

 6            Why?

 7            MR. CHIAPPETTA:  Okay.  In the context of

 8   that one scenario, that makes sense.

 9            But the real issue here is, is that a lot of

10   this goes back to tracing phone numbers, email

11   addresses back to individuals.  And --

12            THE COURT:  You get the information.  You --

13   designating something confidential doesn't prevent you

14   from getting it.  It just prevents you from disclosing

15   it to a third party.

16            So if you got -- if you struck that language,

17   you would still get all of the discovery to the extent

18   it pertains to Camp or Luthmann.  You would still get

19   all of the stuff pertaining to them that doesn't fall

20   in those buckets of A, B, C, D, and E as

21   nonconfidential.

22            But to the extent that one of them -- let's

23   say it had Joseph Camp's phone number, mailing address,

24   or email address, they could designate that

25   confidential.  Why couldn't they be able to do it just

1    as they have with any other witness that you have that

2    you want to designate confidential?  Unless there's

3    something you want to do with that information.

4             MR. CHIAPPETTA:  I have nothing I want to do

5    with that information, Your Honor.  I'm not really

6    certain as to why it's being referenced that way.

7             THE COURT:  You wrote that bolded language,

8    didn't you?

9             MR. CHIAPPETTA:  Yeah.  I am of the opinion

10   that, given what has occurred, he should not be

11   afforded any confidential protection as it relates to

12   this.  What he did should be open to the public.

13            THE COURT:  Okay.  But what he did is open to

14   the public.  The only thing that would be protected is

15   those categories for A, B, C, D, and E.

16            So, for example, if Joseph Camp sent an email

17   to Garramone and it didn't contain the financial data,

18   didn't contain his name, telephone number, just had his

19   email address, didn't have HIPAA-protected information,

20   didn't have other personal identifying information

21   which could be redacted, you still get that email and

22   you can still use the email.

23            So you're saying you want to use Joseph

24   Camp's and Luthmann's financial data, personal

25   identifying information, HIPAA, personal phone number,

1   mailing address, and email address all should be

2   public, notwithstanding that you want to protect that

3   for every other witness in this case?

4           MR. CHIAPPETTA:  Well, that's not exactly

5   what I'm saying.  Maybe that's how it comes across in

6   reading.

7           As far as HIPAA-protected information, I have

8   no issue with that.  But Joseph Camp publicly makes his

9   email, phone number, and all that stuff readily

10  available.  And it's already all over the internet to

11  begin with.  So there is no real privacy concern there.

12          THE COURT:  Okay.  So what does that -- then

13  if they designate something confidential that falls

14  into one of these categories touching upon Camp or

15  Luthmann, if that information is already public, then

16  what does it matter?

17          All right.  We'll move on to the next bolded

18  language, which is under paragraph 3 of yours.

19          Quote, "The term 'good cause' is utilized

20  herein and requires a factual showing in the form of

21  admissible testimony explaining the basis for the

22  designation from a person with personal knowledge."

23          So you're just adding that to provide heft to

24  what constitutes good cause?

25          MR. CHIAPPETTA:  Absolutely.

1      THE COURT:  What's objectionable with that

2  language, Mr. Jackson-Fannin?

3      MR. JACKSON-FANNIN:  Your Honor, we believe

4  the good cause standard, of course, is in the province

5  of the Court and that to engraft an additional

6  evidentiary burden on the parties, because we each

7  would be bound by it, is unnecessary.  The Court is

8  perfectly capable of determining whether or not the

9  parties have set forth good cause for their

10  confidential designation.

11      THE COURT:  Okay.  All right.  Moving on to

12  the next bolded language, which is at the bottom of

13  that same paragraph.

14      "A party who provides confidential

15  information to a third party, including those stated in

16  paragraph 7, is responsible for, subject to,

17  court-ordered sanctions for the dissemination of that

18  confidential information by that third party."

19      So what you're trying to do is create some

20  liability to the extent a party disseminates the

21  information -- well, but they are already subject to

22  sanctions for disclosing that to a third party.

23      MR. CHIAPPETTA:  Not necessarily, Your Honor.

24  It's an enforcement mechanism.  So under

25  subsection (6), there's exceptions --

 1              THE COURT:  Yes.

 2              MR. CHIAPPETTA:  -- where a party can send to

 3     people.

 4              Now, what happens if one of those exceptions

 5     disseminates?  Who holds that exception responsible?

 6              So the party who disseminated to the

 7     exception party should be held responsible if that

 8     party --

 9              THE COURT:  So you want to create some sort

10     of, borrowing from the tort terminology, vicarious

11     liability for anyone who -- that's what it is; right?

12              MR. CHIAPPETTA:  Essentially.  We have to

13     have an enforcement mechanism.

14              THE COURT:  Yeah.  It's called contempt

15     proceedings.  If they violate it, despite knowing what

16     their obligations are, then you hold them in contempt

17     like you do anyone else.  But you want -- okay.

18              Let's use your example.  Your client gets

19     some confidential information.  McGibney gets ahold of

20     it.  And you've -- he's disclosed it.  Your client has

21     disclosed it to someone on that list.  And then it --

22     someone on that list accidentally gives it to McGibney

23     or Joseph Camp or whoever.  So I should hold your

24     client liable for the failure of his expert or whoever?

25              MR. CHIAPPETTA:  Well, I understand the

1  point.  I do believe that it would be a stronger

2  incentive not to disseminate.

3            THE COURT:  Mr. Jackson-Fannin.

4            MR. JACKSON-FANNIN:  Your Honor, as the Court

5  has already intimated, the parties themselves would be

6  subject to contempt of court violating the court order.

7            In addition to that, to the extent that we're

8  concerned about the dissemination of confidential

9  information to third parties as written, the bolded

10  language here is just simply not workable.  The example

11  that we utilized during the conferral was such:  If we

12  have confidential information that we're then obligated

13  or need to share with our third-party e-vendor, and

14  then that e-vendor gets hacked --

15            THE COURT:  That's right.

16            MR. JACKSON-FANNIN:  -- which is completely

17  out of our control, under the sentence here that

18  counsel would like to include, the dissemination by our

19  e-vendor being hacked would suddenly -- the burden and

20  liability would fall to the party when we have not

21  really been in violation of the Court's order.  So we

22  just believe that it's just completely unworkable.

23            And due to the fact we have contempt

24  proceedings, the parties are covered.  This also goes

25  to the fact that counsel did oppose our inclusion of

1    what's in our version as Exhibit A, which is the

2    acknowledgment and agreement to be bound when you are

3    disseminating confidential information to third

4    parties, such as e-discovery vendors and such.

5              He didn't feel that that was necessary and

6    didn't want that, or that could not force people to

7    necessarily agree to it.  And so, therefore, you know,

8    people would not necessarily be bound to sign it and so

9    forth.

10             But that was a mechanism that we thought --

11   and in my few years of doing this and in dealing with

12   protective orders, it's never really been an issue to

13   have that as an attachment and to have witnesses and

14   third-party vendors sign it so that they too have

15   acknowledged it and they are bound by it.  So if there

16   is some dissemination there, they're subject to

17   contempt by the Court, too.

18             THE COURT:  That's the whole idea.

19             MR. JACKSON-FANNIN:  Yes, sir, and that's our

20   position.

21             THE COURT:  You rejected that?

22             MR. CHIAPPETTA:  There's a reason for that.

23             THE COURT:  Why?

24             MR. CHIAPPETTA:  Because at the beginning

25   of -- let's say that we would have entered into

 1   something similar to this at the beginning of the case.

 2   It would have made sense with regard to certain

 3   individuals like vendors and experts, and I don't

 4   necessarily oppose it.

 5          But the problem now is, is my client has

 6   already retained experts.  They've already done the

 7   work.  To have them go back and force them to sign

 8   something after the fact, it puts it in an offset

 9   position.

10          THE COURT:  I can't put the genie back in the

11   bottle, so to speak, in that respect.  Obviously, if I

12   executed this, it can only pertain to information that

13   is forthcoming; correct?  If he's -- essentially, what

14   he's saying is if he's already disclosed the

15   information to someone, that's water under the bridge;

16   right?

17          MR. JACKSON-FANNIN:  Correct, Your Honor.  We

18   do have a clawback provision in the agreement, in our

19   version -- that's paragraph 4 -- that would allow the

20   parties to go back and redesignate documents that have

21   already been exchanged in discovery as confidential.

22          We would then ask if he has disclosed those

23   documents to his experts that he's already disclosed to

24   us, that they then will only be in possession of the

25   documents that have been designated as confidential,

1   destroy any other copies.

2           We also understand that to the extent he

3   could go back and ask if they want to sign it.  But

4   certainly you can't force them to sign the

5   acknowledgement and agreement to be bound.

6           Granted, you know, you have a little bit more

7   control over your expert witnesses since, you know,

8   they are at the behest of your check that they are

9   receiving.  So we think that the encouragement for them

10  to sign it should not be problematic.

11          But I get the Court's concern.  And I also

12  take Counsel's point very well in terms of he's already

13  made the designation and it was prior to the protective

14  order being entered.  So we're just at a little awkward

15  impasse in terms of the timing.

16          THE COURT:  Then let's jump to the next

17  language that's in dispute, which I think is maybe more

18  to the heart of the matter of what Mr. Chiappetta is

19  talking about.  And that's under paragraph 7.

20          Quote, "Confidential information may not be

21  disclosed to Camp or Luthmann, regardless of whether

22  they may fit into one of the enumerated categories

23  listed in section 6(i) through (viii)."

24          I presume this is what you were referring to,

25  Mr. Chiappetta, where you were concerned that they are

 1   going to get confidential information; is that correct?

 2          MR. CHIAPPETTA:  That is a portion of it,

 3   but, yes.

 4          THE COURT:  Mr. Jackson-Fannin, can you fill

 5   me in on what's objectionable about that portion?

 6          MR. JACKSON-FANNIN:  Well, Your Honor, I

 7   mean, opposing counsel has listed Mr. Camp as a witness

 8   in this case with knowledge of the facts.  His name is

 9   listed throughout the allegations.  There have been

10   multiple pleadings and so forth.

11          We have even asserted that Mr. Camp is an

12   indispensable party to this litigation, based on his

13   intimate involvement here.

14          THE COURT:  He's not a party, though, is he?

15          MR. JACKSON-FANNIN:  Not a party yet.

16          But to the extent that if we are to depose

17   him on these issues in this case, we would have to have

18   the ability to share information that may or may not

19   have been designated as confidential.

20          And Mr. Luthmann isn't a party and is not

21   listed on anybody's witness list, so far as I know at

22   this juncture, and is simply a journalist who has been

23   reporting on this case.  And so I'm not really seeing

24   the point of necessarily singling them out; well,

25   Mr. Luthmann in particular, because he seems rather

```
 1   inconsequential to these proceedings.

 2           But Mr. Camp is an intimate witness and has

 3   been involved, an integral part of the allegations and

 4   issues that are in this case.

 5           So to exclude our ability to be able to share

 6   confidential information --

 7           THE COURT:  I want to know which one of the

 8   bullet points here -- because he's not a party.  Which

 9   one of the bullet points, (1) through (8), do you think

10   Camp would eventually fall under?

11           MR. JACKSON-FANNIN:  I think it would

12   probably be Romanette vi, Your Honor.  Because if

13   he is --

14           THE COURT:  If he's deposed, you want to be

15   able to present him with information that's been

16   designated --

17           MR. TRAINOR:  Correct.  Absolutely.

18           THE COURT:  So, Mr. Chiappetta --

19           MR. CHIAPPETTA:  Your Honor, I do not oppose

20   an exception subject to (vi), that Joseph A. Camp sits

21   for an in-person deposition.  No problem.  But

22   dissemination outside of that is the issue.

23           THE COURT:  Do you think he'd fall under any

24   of the other categories?

25           MR. JACKSON-FANNIN:  Well, Your Honor, I
```

1    hadn't really looked at it.  I don't think that we

2    intend to designate him as an expert.

3              THE COURT:  What about his mediator?  That

4    was a joke.  Sorry.

5              MR. JACKSON-FANNIN:  Let's see.  Yes.  He

6    certainly would qualify under (vii).

7              THE COURT:  As the author of a document.

8              MR. JACKSON-FANNIN:  Correct.

9              And we have exchanged documents that he is

10   involved with in discovery already.

11             Also, to the extent that Mr. Chiappetta has

12   already placed in the public record my clients'

13   financial records that indicate the payments that were

14   made to Mr. Camp, those will have to be designated as

15   confidential information.  And, undoubtedly, that

16   involves and pertains to Mr. Camp.  And so that

17   information should be shareable.

18             So definitely (vi), (vii).  And to the extent

19   that Mr. Camp was an external vendor to the practice

20   for a period of time when he was hired to sort of do

21   the reputational cleanup for the surgery center, I

22   think that he would also fall within Romanette (iii) in

23   that limited space.  So that's why I just don't see --

24   it's not practicable for Mr. Camp.

25             And, again, as I said, Mr. Luthmann is just

 1   inconsequential.

 2            THE COURT:  All right.  So this document that

 3   you have provided me, Mr. Jackson-Fannin, is that the

 4   final version of the protective order that you would

 5   propose that the Court enter in this case?

 6            MR. JACKSON-FANNIN:  Yes, Your Honor, it is.

 7            THE COURT:  Are there any other additions or

 8   anything else?

 9            MR. JACKSON-FANNIN:  There was -- and I think

10   that we discussed -- because the parties had continued

11   to negotiate some finer points last evening.

12   Particularly, with respect to paragraph 4, Counsel has

13   graciously agreed to our proposed changes there, so

14   there's no issue regarding that.

15            THE COURT:  The time for negotiations

16   is done.

17            MR. JACKSON-FANNIN:  Correct, Your Honor.

18            THE COURT:  This needs to be settled so the

19   parties can exchange their information.

20            MR. JACKSON-FANNIN:  This is the one that

21   we're proposing that the Court enter.  The only issues

22   that the parties -- the sticking points came, actually,

23   still in paragraph -- in our paragraph 6.

24            Excuse me, it is 7.

25            Paragraph 7, Romanette (i) --

 1              THE COURT:  Okay.

 2              MR. JACKSON-FANNIN:  -- where we wanted to be

 3   able to share confidential information with the surgery

 4   center auditors.

 5              Counsel wanted to exclude that, in addition

 6   to -- and in Romanette (ii), Counsel wanted the

 7   language in this proceeding rather than just saying

 8   "legal counsel for the parties."

 9              THE COURT:  All right.

10              MR. JACKSON-FANNIN:  And my client has

11   multiple counsel that handle all range and manner of

12   legal issues for them.

13              THE COURT:  What I want you to do is -- the

14   problem I have with your prior requests for a

15   confidential -- sorry, confidentiality order, as I

16   expressed in the order, was the breadth of the scope of

17   what could be borne as confidential is essentially

18   unlimited.  It was whatever either side decided was

19   personal to them, they could designate, which is

20   outside the rules as to what, as I view it, is allowed.

21              There's a right to public access, so it's not

22   a cart blanche this is -- I don't want -- this is

23   embarrassing.  I don't want it out.  But embarrassment

24   is not the test for a protective order.

25              I agree the information that you've provided

 1    in paragraph 1 under A, B, C, D, and E all constitute
 2    things that I think are appropriate for a protective
 3    order.
 4            So what I'm going to do is, following the
 5    hearing today, Mr. Jackson-Fannin, file the final
 6    version of what you want as the protective order.
 7            Mr. Chiappetta, I'll then give you 7 days to
 8    file a response brief with any additional language you
 9    want included and the reason why you want to include
10    it.  All right?
11            MR. CHIAPPETTA:  Okay.
12            THE COURT:  So what I'm working off of here,
13    Mr. Chiappetta, is you've added some language to their
14    proposal in bold that we've gone over.  To the extent
15    you want that added in, you can file the response
16    brief, identifying what you want added in and where,
17    and argument as to why it should be in there.
18            So I'll give you the opportunity to make the
19    argument for those specific sections because I know I
20    kind of -- there's no set motion for this in front of
21    me here today.  So I'm going to give you that option
22    for a written brief.  All right?
23            MR. CHIAPPETTA:  Thank you.
24            THE COURT:  So that will be -- going to do
25    that today, right, Mr. Jackson-Fannin?

```
 1              MR. JACKSON-FANNIN:  I will do it by Monday,
 2    Your Honor.  I do have to drive back to Miami, so I
 3    will try and get it done most certainly by Monday.
 4              THE COURT:  So 7 days from whenever they file
 5    that.
 6              All right, Mr. Chiappetta?
 7              MR. CHIAPPETTA:  Yes, Your Honor.  But that's
 8    going to conflict with my obligations under the Court's
 9    prior ruling with Mr. Trainor's discovery responses due
10    by the 31st, which are, I believe, 7 days as well.
11              THE COURT:  No.  31st is --
12              MR. CHIAPPETTA:  Today is the 24th.
13              THE COURT:  Okay.  So I'll give you until
14    next Wednesday, which will be February 5.
15              MR. CHIAPPETTA:  Thank you.
16              THE COURT:  All right?  So February 5 is your
17    response deadline for that protective order.  I will
18    turn that around, hopefully, as quickly as I can so
19    that way you can move on with the pending discovery
20    requests and extensions.
21              I will -- when is the current discovery due?
22              MR. JACKSON-FANNIN:  Your Honor, actually,
23    our discovery for the practice, and I believe
24    Mr. Alfano's clients, was due today, pursuant to the
25    Court's last order that we had at the December hearing.
```

```
 1   And our motion for extension was at Docket Entry 231.
 2             Aaron, I don't know when your motion came
 3   through.
 4             THE COURT:  Do you have a pending motion for
 5   an extension of time as well, or did I grant that just
 6   yesterday?
 7             MR. CHIAPPETTA:  You granted it the
 8   other day.
 9             THE COURT:  All right.  I'm granting your
10   extensions of time until I can address the protective
11   order.  When I address the protective order, is
12   everything else ready to go?
13             MR. JACKSON-FANNIN:  Yes, Your Honor.
14             THE COURT:  You've got it all ready?
15             MR. JACKSON-FANNIN:  We're pretty much ready
16   to go.  I'd have to go back and check with my staff on
17   that, but my understanding is that it won't take us
18   very long to get it together.  At most, it may take us
19   a couple of days to get everything lockstepped,
20   including the second amended privilege log that we were
21   required to produce.
22             THE COURT:  Mr. Chiappetta, is there any
23   reason -- any argument that I should not grant them the
24   extension of time until after I've addressed that
25   request for the protective order on which you're filing
```

1    a brief on on the 5th?

2         MR. CHIAPPETTA:  I mean, at this particular

3    juncture, I do believe a protective order is

4    appropriate.  But, I mean, this has been ongoing for

5    quite some time.  These discovery obligations have been

6    going back since April.

7         THE COURT:  That goes both ways, doesn't it?

8         MR. CHIAPPETTA:  It does.

9         THE COURT:  Okay.  So anything beyond that as

10   the objection as to why I shouldn't continue their

11   discovery responses until after I've addressed the

12   protective order?

13        MR. CHIAPPETTA:  No, Your Honor.

14        THE COURT:  All right.

15        MR. JACKSON-FANNIN:  And, Your Honor, just to

16   be clear, we've got -- presently, Counsel's responses

17   are due on February 10.  According to the Court's

18   rulings today, the supplemental documents that Counsel

19   would have to produce within the 21 days would now put

20   the final document delivery deadline at the 14th --

21        THE COURT:  14th.

22        MR. JACKSON-FANNIN:  -- of February.  And we

23   had initially sought, at least, I think 10 days after

24   the Court had entered in the protective order to make

25   the final production, along with all the other docs.

1           So -- if assuming that the briefing schedule
2    holds and Mr. Chiappetta has it and the Court gives a
3    day or two to enter it in, then it's quite feasible
4    that the parties could have a simultaneous exchange on
5    the 14th.
6           THE COURT:  I'll address that in the
7    protective order -- or the order addressing the
8    protective order of when that's going to be due.
9           MR. JACKSON-FANNIN:  Okay.
10          THE COURT:  I will -- I find, given the
11   outstanding issue of the protective order -- given both
12   sides agree that a protective order is appropriate in
13   this case, as you just indicated -- right;
14   Mr. Chiappetta?
15          MR. CHIAPPETTA:  That is correct.
16          THE COURT:  All right.  And given the
17   documents that are being held by the defendants in this
18   case, Garramone MD, PA, in particular, that are
19   currently due -- tomorrow or today?
20          MR. JACKSON-FANNIN:  Today, Your Honor.
21          THE COURT:  -- today without a protective
22   order, and everyone agreeing that it's appropriate to
23   have one for certain information, I'm going to extend
24   the deadline and stay those discovery responses until I
25   issue a ruling on the protective order.

 1          Mr. Chiappetta's protective order brief is

 2   due on the 5th.  I will get an order entered on the

 3   6th, and I will set a deadline.

 4          Mr. Jackson-Fannin, I would proceed --

 5   there's not much difference between what Mr. Chiappetta

 6   is indicating to you.  There's just a few obvious

 7   differences about what you can designate confidential,

 8   specifically regarding Luthmann and Camp.

 9          So as I read it, you can proceed that there's

10   going to be a confidentiality order entered something

11   similar to what you're proposing.

12          So please move forward with getting

13   everything ready to go, so that way it can be a short

14   turnaround.  Whether that be the 14th or a day prior, I

15   will decide in the order on the protective order.

16          MR. JACKSON-FANNIN:  Okay.  Thank you,

17   Your Honor.

18          THE COURT:  Any questions about that,

19   Mr. Chiappetta?

20          MR. CHIAPPETTA:  No, Your Honor.

21          THE COURT:  That brings us to our last matter

22   of business.  We have a pending motion to compel at

23   Docket Entry 199.

24          It's now 4:20.  I'm happy to reschedule this

25   hearing for Zoom at a later time to avoid everyone's

```
 1   travel, given we've been here all day; or we can press
 2   on and get through whatever we can with regard to this
 3   motion.
 4           Mr. Chiappetta, what would you prefer?
 5           MR. CHIAPPETTA:  It would depend on how soon
 6   there is availability for rescheduling.
 7           THE COURT:  It will be soon.  We're going to
 8   talk about that shortly.  But just all things
 9   considered, how would you like to proceed?
10           MR. CHIAPPETTA:  It's hard to tell because
11   this has already rolled over from the 7th.  I've
12   already accommodated Mr. Trainor's schedule from
13   January 7 to the 24th.  And depending on how long the
14   delay is going to be, I may just choose to proceed to
15   have the matter heard.
16           THE COURT:  We can't hear it all today is
17   what I just said.  So my question is:  Do you want to
18   hear what we can until 5:00?  Or do you want to kick it
19   all until we reconvene on Zoom, whenever that be?
20           MR. CHIAPPETTA:  We can reconvene on Zoom.
21           THE COURT:  All right.
22           Mr. Trainor, what would you prefer to do?  Do
23   you want to move forward and address what we can now or
24   reconvene on Zoom and address it all?
25           MR. TRAINOR:  I'd rather address it all in
```

```
 1    one shot on Zoom.
 2              THE COURT:  Okay.  Everyone, pull up your
 3    calendar, please.  Since this will be by Zoom,
 4    obviously, travel is not an issue.
 5              Okay.  Who has availability on the 28th?
 6              MR. TRAINOR:  Tuesday?
 7              THE COURT:  That would be Tuesday, yep.
 8              Mr. Chiappetta?
 9              MR. CHIAPPETTA:  One second, Your Honor.
10              THE COURT:  Yep.
11              MR. ALFANO:  Your Honor, I'm not available on
12    Tuesday.  I have an all-day mediation then.
13              THE COURT:  Okay.  Is it your motion?
14              MR. ALFANO:  No, it's not.
15              THE COURT:  Okay.  Would your attendance --
16    could you send someone as a substitute if needed?
17              MR. ALFANO:  I could.
18              THE COURT:  Okay.
19              MR. CHIAPPETTA:  I'm sorry.  What day,
20    Your Honor?
21              THE COURT:  Sure.  It would be Tuesday, the
22    28th.  This coming Tuesday.
23              MR. CHIAPPETTA:  I believe that would work
24    for me, Your Honor.
25              THE COURT:  Mr. Trainor?
```

```
 1              MR. TRAINOR:  I'm available.
 2              THE COURT:  Okay.  So one second.  All right.
 3   We'll set it, then, for 10:30.  I'll circulate the
 4   Zoom, file a notice on the docket.
 5              Okay.  Mr. Chiappetta, is there anything
 6   outside of the Docket Entry 199, the motion to compel,
 7   which we will address at 10:30 on Tuesday, that remains
 8   outstanding, according to your records?
 9              MR. CHIAPPETTA:  Outstanding in what sense,
10   Your Honor?
11              THE COURT:  Of what was set to be heard
12   today?
13              MR. CHIAPPETTA:  I believe that's it.
14              THE COURT:  Okay.
15              Mr. Trainor, is there anything outstanding
16   outside of Docket Entry 199 that was not addressed
17   today that was set according to your records?
18              MR. TRAINOR:  No, sir.
19              THE COURT:  All right.  Just want to make
20   sure I didn't miss anything that maybe either party
21   filed that I was not aware of.
22              Does either counsel that did not have a
23   motion here today have anything else that the Court
24   should be advised of?
25              MR. JACKSON-FANNIN:  Nothing from Garramone
```

1    Plastic Surgery, Your Honor.

2              MR. ALFANO:  Nothing for Ms. Couture,

3    Dr. Garramone, Wraith, LLC, or OMG Realty.

4              THE COURT:  Okay.

5              Counsel, thank you for your time today.  I

6    know that was a long motion.

7              We will reconvene at 10:30 on Tuesday to

8    address the other outstanding motion to compel, and we

9    will get you an order on that protective order issue as

10   quickly as possible once I get briefing.

11             Thank you.  We are adjourned.

12               (Proceedings adjourned at 4:26 PM)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      REPORTER'S CERTIFICATE

 2              I, Vonni R. Bray, a Certified Diplomate and

 3   Realtime Reporter, certify that the foregoing transcript,

 4   consisting of 102 pages, is a true and correct record of

 5   the proceedings given at the time and place hereinbefore

 6   mentioned; that the proceedings were reported by me in

 7   machine shorthand and thereafter reduced to typewriting

 8   using computer-assisted transcription; that after being

 9   reduced to typewriting, a certified copy of this

10   transcript will be filed electronically with the Court.

11              I further certify that I am not attorney for,

12   nor employed by, nor related to any of the parties or

13   attorneys to this action, nor financially interested in

14   this action.

15              IN WITNESS WHEREOF, I have set my hand at Fort

16   Myers, Florida, this 12th day of February, 2025.

17

18

19                         s/ Vonni R. Bray, RDR, CRR
                           Vonni R. Bray, RDR, CRR
20                         United States Court Reporter

21

22

23

24

25
```