UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

FORT MYERS DIVISION

-------------------------------------------------------------------X

DANESH NOSHIRVAN, an individual, Plaintiff

v.

JENNIFER COUTURE, et al., Defendants.

-------------------------------------------------------------------X

Case No. 2:23-cv-01218 (KCD/JES)

AFFIRMATION OF CHRISTOPHER MARLBOROUGH, ESQ.

I, Christopher Marlborough, an attorney duly admitted to practice law in the States of New York and Florida, affirm under penalty of perjury the following:

1. I submit this affirmation concerning my experience with Patrick Trainor, Esq., and Joseph A. Camp while representing defendant Christian Exoo in an action styled, *Daniel D'Ambly, et al. v. Christian Exoo, et al.*, 20—cv-12880 (District of New Jersey)(The *D'Ambly* Case). All claims against Mr. Exoo in that case were dismissed with prejudice on or before September 20, 2022.

2. In 2024, I also represented Mr. Exoo in connection with his successful motion to quash the Plaintiffs' subpoena in the *D'Ambly* case.

3. I do not know the precise date that Mr. Camp began assisting Mr. Trainor in the prosecution of his litigation cases by injecting himself into the cases, and harassing, intimidating, and threatening opposing parties, witnesses, and attorneys in those cases. However, I do know that the practice began no later than January 2021.

The *D'Ambly* Case

4. The *D'Ambly* Case was filed on September 21, 2020. All claims against my client, Mr. Exoo, were dismissed with prejudice on or before September 20, 2022. The case was terminated on May 1, 2025.

5. I first became acquainted with Mr. Trainor soon after I filed my appearance in the *D'Ambly* Case.

6. In that case, Mr. Trainor represented a group of Plaintiffs, including several alleged white supremacists, neo-Nazis, and members of the Proud Boys organization.[1]

7. Defendants in the *D'Ambly* Case included, but were not limited to, my client, the Twitter social media service, several Twitter executives,

---

[1] One of those Plaintiffs' Zachary Rehl convicted of seditious conspiracy and other charges and sentenced to fifteen years in federal prison in connection with the January 6, 2021, insurrection against the United States of America. *See* https://www.justice.gov/archives/opa/pr/two-leaders-proud-boys-sentenced-17-and-15-years-prison-seditious-conspiracy-and-other (last visited May 16, 2025).

and an alleged vast network of anti-fascist operatives named as John Doe Defendants.

8. Plaintiffs' claims against Mr. Exoo arose from their opposition to my clients' alleged activities on the Twitter social media platform, including linking Plaintiffs' identities to their extremist statements and practices. Plaintiffs' claims against my client included alleged violations of the Racketeer Influenced and Corrupt Organizations Act, common law claims, and several criminal statutes for which there exists no private right of action.

Joseph A. Camp

9. I know Mr. Camp began working to assist Mr. Trainor in the prosecution of his litigation cases no later than January 2021.

10. I first became acquainted with Mr. Camp in connection with his efforts to intimidate an individual associated with the *D'Ambly* Case in February 2021. I later learned that he was also harassing my client beginning in January 2021.

11. My client informed me that he received several harassing phone calls from Mr. Camp about the case beginning on January 24, 2021, at his place of work. On that day, Mr. Camp reportedly said, "Christian, you're a

punk and we're gonna hit you." My client reported to me that he received additional harassing phone calls at work from Mr. Camp on February 23, 2021 stating "I'm going to find you, your life is going to be very difficult" and "bitchass faggot."

12. At that time, I learned that Mr. Camp had been convicted of numerous cybercrimes and had been sentenced to at least three years in federal prison. I also learned that he had been convicted of stalking and attempting to influence a public official. *Camp v. Weber*, No. 18CA0337, 2019 Colo. App. LEXIS 2863, at *1 (App. July 3, 2019). I also became aware of numerous other harassment campaigns led by Mr. Camp.

13. Moreover, I learned of Mr. Camp's history of stalking and intimidating individuals, including attorneys and their families, to pressure them to withdraw from lawsuits and abandon their clients.

14. Based on the information that I learned about Mr. Camp, it was apparent to me that he applied common schemes, plans, and methods of intimidation to circumvent the judicial system to obtain litigation advantage for himself and others. Unfortunately, that common playbook was applied to me and my family.

15. Learning about Mr. Camp's extensive history of cybercrimes, stalking, and harassment, as well as his common scheme of harassing and

intimidating attorneys and their family members, had the effect of creating in my mind and the minds of my family members, including my elementary school age children, fear, trepidation and anxiety.

16. My state of mind contributed significantly to my decision about whether to continue to represent Mr. Exoo in the litigation or withdraw from the case to protect my family from continued harassment. I ultimately decided that it was important to show my children the importance of standing up for what is right, rather than backing down in the face of intimidation.

17. On August 30, 2021, Mr. Trainor submitted a letter to the Court falsely accusing my client of spoliation of evidence and using that as a basis to request expedited discovery. *See D'Ambly* Dkt. Doc. No. 92. Specifically, after demanding that my clients delete one of his social media posts, Mr. Trainor accused my client of deleting his Twitter account, when he temporarily deactivated the account.

18. On August 31, 2021, I submitted a letter to the Court in response to Mr. Trainor's letter. *See D'Ambly* Dkt. Doc. No. 93, annexed hereto as Exhibit 1. As outlined in the letter, my client did not delete his Twitter account, he temporarily deactivated the account, which was archived and available to my client at all times.

19. In the letter, I produced documents reflecting Mr. Trainor's conduct unbecoming an attorney during the meet and confer process, including his statement "you let your client delete his account, what a shitshow" and "allowing your client to delete his account is bush league douchery." *See* Exh. 1 at PDF page 5.

20. Mr. Camp's first contact with me and my family occurred on September 1, 2021, when he sent an e-mail directed to Mr. Exoo's counsel, Mr. Trainor, and United States Magistrate Judge Jessica S. Allen, but did not include counsel for the other defendants. A true and correct copy of the 9/1 and 9/3 2021 email chain from Mr. Camp is annexed hereto as Exhibit 2, PDF pages 2-3.

21. On the same day, Mr. Camp called me at my office for the purpose of harassing and intimidating me, and also left a voicemail message on my family's home telephone line to harass and intimidate my family members.

22. In the 9/1/21 email, Mr. Camp offered to collect affidavits indicating that I had made misrepresentations to the Court, which I did not do. *See* Exh. 2 at PDF page 2.

23. The 9/1/21 email came from the following email address: joey@joeycamp2020.com and listed the following phone number in the signature block (720) 454-5240. *See* Exh. 2 at PDF page 3.

24. On September 1, 2021, I received a telephone call from Mr. Camp on my office telephone line. I immediately recognized Mr. Camp's distinctive voice from many audio clips and video recordings posted by him and others online. I also recognized the phone number (720) 454-5240 as listed on my caller ID from signature block on his email to the Court that same day, and as one listed by Mr. Camp on various online sites.

25. During this telephone conversation, Mr. Camp made the following statements:

   a. He stated that he was recording the call.

   b. He stated that he really didn't mind publishing everything about me, my wife, and my children. "We will call your wife, we will call your neighbors, just about everyone … associates … family … your mom … colleagues. Someone is going to talk to us."

   c. "So what are you going to do about it, punk? You're a piece of shit. If someone throws a brick through your window, what are you going to do about it? Nothing."

   d. "If someone bashed your client's head in, I would not care."

 e. "Everything you do in life is being watched at this moment, and what are you going to do about it?"

 f. "Are you going to call the cops? I wish you would. That would really, really, really help."

 g. "How much of a racist rapist you are. We now believe that you raped little children. You are a rapist of children."

 h. "You are a rapist. You are a child molester. Racist and a pedophile."

 i. "If I need to destroy your reputation and your life. Well, it just has to happen."

 j. "You can't do shit. My audience is more effective in their work than your piece of shit clients."

 k. "So, pedophile Marlborough.  I have no comment for you."

26. On the same day, September 1, 2021, my wife received a voicemail message from Mr. Camp on our family's home telephone line. The message falsely stated that I was a pedophile and murderer. I later listened to the voicemail, and I immediately recognized Mr. Camp's distinctive voice from many audio clips and video recordings posted by him and others online. I also recognized the phone number (720) 454-5240 from the

signature block from his email to the Court that same day and as one listed by Mr. Camp on various online sites. *See* Exh. 2, at PDF page 3.

27. My family members, including my elementary school children, were terrified by Mr. Camp's threatening conduct. My family members' terror was exacerbated because we were aware that Mr. Camp had been criminally charged with crimes related to identity theft, harassment, and Mr. Camp made it a point to mention social security information several times during his harassing call to me.

28. On the afternoon of September 1, 2014, I brought my wife and young children to my local police station and attempted to file a police report. The officer stated that they would not file a report, but would instead take a statement for a "police blotter." I do not know what that is, but my wife and I provided a statement to the officer. We were told that law enforcement would take no action at this time. Even for a case of aggravated harassment, the crime was a misdemeanor, and they do not follow up on misdemeanors where the perpetrator is out of state. The officer asked us to keep them informed if the situation escalated significantly.

29. On September 2, 2021, I was informed that on the same day, Mr. Camp sent an intimidating threat to my client via text message. "What's up

bitch? Did you think I was going to go away and be scared? You're about to learn a lesson in why you should never have mentioned me. So is Josh, and your entire family". According to my client, the reference to Josh refers to my client's brother.

30. On September 3, 2021, Mr. Camp sent a second email to Mr. Trainor, Plaintiffs' counsel, and the Court, falsely claiming to have proof that I was lying to the Court and asking the Court to sanction me for my "blanket lies." *See* Exh. 2 at PDF, page 1.

31. Mr. Camp's signature block on this email included several other e-mail addresses, including: CampjosephA@gmail.com and JosephAcamp@yandex.com. The signature block also included the following telephone number (720) 454-5240. *See id.*

32. On September 5, 2021, I received additional evidence suggesting that Mr. Camp was receiving inside information about Mr. Trainor's litigation strategy and was eagerly anticipating receiving discovery materials in the case.

33. Specifically, Camp told his followers on Gab.com the following:

Stay tuned as something big is about to drop. Antifa is being named as a criminal and civil RICO Enterprise in a manner that is unusual and will not be able to be ignored. It will also put me in even more harm's way.
Names, certain accounts, etc. will be named specifically which means

that even the tech companies will no longer be able to ignore and platform these named violent extremist.

Attached as Exhibit 3 is a true and correct copy of a September 5, 2021, post on Mr. Camp's Gab.com page.

The Improper Purpose of the D'Ambly Litigation

34. After having been put through the wringer of Mssrs. Trainor and Camp's one-two-three punch combination of frivolous litigation claims, accompanied by false allegations of attorney misconduct, and an extrajudicial intimidation and harassment campaign, it is clear to me that the goal of the *D'Ambly* Case was not for a legitimate litigation purpose, but to abuse the discovery process to improperly obtain information about their perceived antifa conspiracy and to cause harm to people who did not share their views.

35. As a one Proud Boys leader, sentenced to three years in prison in connection with the January 6th insurrection against the United States, explained so eloquently, the Proud Boys:

> [N]eed to stop fighting Antifa in the streets where the cops are and start fighting them in bars and alleys, … We need to stomp them. We need to ruin their lives physically …. We need to rack

up hospital bills. We need to use special operations tactics and lightning strike them.[2]

36.    Indeed, identification and exposure of their perceived enemies if a top priority for Mr. Trainor's Proud Boy and neo-Nazi clients as well as Mr. Trainor's himself. As set forth below, Mr. Trainor formed the Anti-Doxing League through which he engages "researchers" to identify and expose his perceived enemies and anyone who funds those enemies all the way up to top levels of government.

37.    Mr. Camp refers to himself as "The Researcher" which seems to be a reference to his role in the Dominion voting machine lawsuits, although I have never gone far enough down that rabbit hole to find out. *See e.g.*, Docket: *US Dominion, Inc., et al. v. Herring Networks, Inc., et al.*, 21-cv-02130-CJN, Doc. No. 41-3 PDF Pages 10, 77- 78.

38.    Throughout the litigation, Mr. Trainor acted in furtherance of this objective of obtaining identifying information about his perceived antifa enemies on behalf of his Proud Boy and neo-Nazi clients.

39.    Mr. Trainor first issued premature requests for production of documents in February 2021, twenty months before the Rule 26 conference

---

[2] See https://www.nationalmemo.com/proud-boys-insurrection-police-ties-, last visited May 16, 2025.

in the *D'Ambly* Case. Around the same time, Mr. Camp first began harassing individuals associated with *D'Ambly* Case.

40. Mr. Trainor repeatedly demanded premature responses to his premature discovery requests at the pleading stage, despite being informed that the demands were premature. *See e.g.*, Exh. 1 at PDF page 4-6.

41. Mr. Trainor brought a failed motion for expedited discovery that was supported by Mr. Camp's, both before the Magistrate Allen and through an extrajudicial personal harassment campaign against me, my client, and my family.

42. In his September 5, 2021, Gab.com, Mr. Camp eagerly anticipated the receipt of the discovery to be used publicly against perceived members of antifa and their associates. *See* Exh. 3.

43. In 2022, Mr. Trainor appeared on several extremist far-right wing podcasts boasting about his goal to obtain the vast "treasure trove" of discovery concerning antifa.  On the Murder the Media Podcast, hosted by yet another Proud Boy sentenced to multiple years in prison for his participation in the January 6th insurrection, Mr. Trainor spoke of his desire to "blow the whole *thing* wide open". In this case, the "*thing*" refers to the tin-foil hat conspiracy theory that a perceived antifa network reaches the

highest levels of government. *See* 3/13/22 Murder the Media Podcast at 22:00-22:30, 53:48-55:05.[3]

44.    The Proud Boy host praised Mr. Trainor, stating, "You will be the first person in history to prove that antifa isn't just an idea, but an actual organization. Mr. Trainor responded, "In all of these cases against these guys, antifa and all that, no one has gotten to discovery, and discovery is when you will find all that information." *Id.* at 22:00-22:30. Mr. Trainor also promised that if the Defendants obtained discovery, the insurrectionist Proud Boy host would see all of the internal connections. *Id.* at 53:48-54:00.

---

[3] 3/13/22 Murder the Media Podcast, archived at
https://drive.google.com/file/d/1bsdfFKiLdqtMA6fU3NwLSoRAsbVZge9d/view?usp=sharing (The podcast was hosted by Nicholas DeCarlo, a member of the Proud Boys who was sentenced to four years in prison for his role in the January 6th insurrection and was later pardoned. During the insurrection, Mr. DeCarlo wrote "Murder the Media" on the Chestnut-Gibson Memorial Door of the Capitol Building and posed for pictures in front of the door to promote his podcast. This occurred before Mr. Trainor chose to appear on the podcast in 2022. Here is a quote from the podcast.
TRAINOR: "If we get into discovery, then that discovery information not by my doing, but eventually that discovery information in the case will proceed."
HOST: **Will blow the whole thing wide open**….
Trainor: **It would.** You'd see some real internal connections. Because you'd get down to the nitty gritty. Whatever they got. Who's your phone company? What kind of phone do you use?
HOST: You wonder why a Congressional probe of some kind hasn't already happened. That's right, they pay for all their salaries and everything of some kind. It's going to have to be the court system because it's not going to be your politicians.
TRAINOR: Plenty of campaign staffers that are not too far removed from these doxxes. Just leave it at that. If you're a campaign staffer, there's a very good chance you're going to become a Congressional staffer. To the very first question you asked me about who's connected to who, just keep that in mind. Guys running for office, campaign staffers, are not too far removed from these antifa people. Tim Kaine's son is obviously an antifa guy. What you've got to be worried about is who's influencing these influencers.



45. Mr. Trainor also boasted of his goals in his appearance on the white supremacist "unapologetically white" podcast, Full Haus. See Full Haus Podcast Episode 130: Support the ADL*. Anti-Doxing League (with a thumbnail photo mockingly depicting a member of the Anti-Defamation League).[4] Trainor stated that he formed his own ADL organization and that he has "researchers" creating evidentiary files and dossiers on people funding doxers with the goal of embarrassing and exposing them to the world.



Promotional page for Plaintiffs' Counsel's appearance on the "unapologetically pro-white" Full Haus Podcast

---

[4] https://www.full-haus.com/index.php/2022/05/27/latest-show-support-the-adl/ at 54:00-57:00 (last visited May 16, 2025).

46. Even after all claims against Mr. Exoo were dismissed with prejudice from the *D'Ambly* Case, Mr. Trainor sought improper third-party discovery from my client to obtain the precious secrets of his imagined antifa conspiracy. *See* D'Ambly Docket No. 205.

47. I represented Mr. Exoo in connection with a motion to quash the improper and overly broad third-party discovery. On June 17, 2024, the Court granted our motion to quash on procedural grounds and substantially narrowed the scope of any revised subpoena only to those issues relevant to the case. *See* D'Ambly Docket No. 207. Tellingly, after the Court denied Mr. Trainor the keys to his imagined chamber of antifa secrets, Mr. Trainor did not bother to serve another subpoena. It appears that he and his client had no interest in seeking discovery from Mr. Exoo about any relevant issue in the *D'Ambly* Case.

*[Signature: Christoph Marlbery]*

DATED:    Lynbrook, New York
          May 16, 2025