UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DANESH NOSHIRVAN, an
individual,

      Plaintiff,

v.                                        Case No: 2:23-cv-1218-JES-KCD

JENNIFER COUTURE, an
individual, RALPH GARRAMONE
M.D., an individual, RALPH
GARRAMONE M.D. P.A., CENTRAL
PARK OF SOUTHWEST FLORIDA,
LLC, WRAITH, LLC, SULLIVAN
STREET INVESTMENTS, LLC,
HAIRPIN TURN, LLC, OMG
REALTY, LLC, R G WEIGHT
MANAGEMENT, LLC, CENTRAL
PARK SOUTH, LLC, BRANTLEE,
LLC, LEGACY OF MARIE
GARRAMONE, LLC, GARRAMONE
MARKETING, INC., 5681
DIVISION LLC, THE LAW OFFICE
OF PATRICK TRAINOR ESQ. LLC,
PATRICK TRAINOR, an
individual, and ANTI-DOXING
LEAGUE INC.,

      Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on review of three Motions to Dismiss from defendants (Docs. ##160, 161, 162) filed on October 21, 2024. Plaintiff filed Responses in Opposition with attached exhibits (Docs. ##168, 169, 170) on November 1, 2024. With permission from the Court (Docs. ##177, 183), some Defendants filed

Replies on November 5, 2024 (Doc. #182) and November 15, 2024. (Doc. #187.) For the reasons set forth below, the Motions are denied in part and granted in part.

I.

**A. Procedural Summary**

The original Complaint (Doc. #1) was filed by Danesh Noshirvan (Plaintiff or Noshirvan) on December 26, 2023. The Complaint was filed against seventeen defendants and described itself as "a civil conspiracy and agency action for defamation, tortious inference, misappropriation of likeness, and intentional infliction of emotional distress." (Id. ¶ 1.) It was dismissed sua sponte for failing to properly allege diversity jurisdiction. (Doc. #24.)

Plaintiff then filed the First Amended Complaint (FAC) against the same seventeen defendants. (Doc. #26.) The FAC survived a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction. (Doc. #65.) But later the Court granted a motion for judgment on the pleadings as to the first count (civil conspiracy to intentionally interfere with custodial rights) and the sixth count (agency), dismissing both counts without prejudice. (Doc. #130.)

Noshirvan subsequently filed a Second Amended Complaint (SAC) (Doc. #139), which is now the operative pleading. The SAC names the same seventeen defendants: (1) Jennifer Couture (Couture); (2) Ralph Garramone M.D. (Garramone); (3) Ralph Garramone M.D. P.A.

2

D/B/A Garramone Plastic Surgery (GPS); (4) Central Park of Southwest Florida, LLC (Central Park); (5) Wraith, LLC (Wraith); (6) Sullivan Street Investments, LLC (Sullivan Street); (7) Hairpin Turn, LLC (Hairpin Turn): (8) OMG Realty, LLC (OMG Realty); (9) R G Weight Management, LLC (R G Weight Management); (10) Central Park South, LLC (CPS); (11) Brantlee, LLC (Brantlee); (12) , Legacy of Marie Garramone, LLC (Legacy); (13) Garramone Marketing, Inc. (Garramone Marketing); (14) 5681 Division LLC (5681 Division); (15) The Law Office of Patrick Trainor Esq., LLC (Law Office); (16) Patrick Trainor (Trainor); and (17) Anti-Doxing League, Inc. (ADL). Trainor is a lawyer who owns the Law Office and the ADL. Garramone owns or controls all the other defendant entities.

The SAC omits the custodial interference claim previously dismissed by the Court (Doc. #139, p. 56), but asserts eighteen counts against various combinations of the seventeen Defendants. Four counts allege civil conspiracy claims against all Defendants for conspiracy to tortiously interfere with a business relationship (Count 2), conspiracy to commit defamation (Count 3), conspiracy to intentionally inflict emotional distress (IIED) (Count 4), and conspiracy to misappropriate Noshirvan's likeness (Count 5). The remaining counts seek to impose agency liability on various defendants for torts which were the object of the conspiracies.

## B. Factual Summary

In brief summary, the SAC makes the following pertinent factual allegations:

Noshirvan identifies himself variously as "an online entertainer and journalist," a "social media personality publicly known for his commentary and opinions on politics, civil rights, and current social issues," "a social media personality publicly known for his ability to find and identify 'bad actors' and his commentary on politics, civil rights, and current social issues," "a citizen journalist" who adds "commentary and satire" during news reports, and an "adult media personality and journalist" who uses social media platforms to report news which does not initially make the cut for major media outlets.

Noshirvan published a video on social media of a confrontation between Couture and a young woman in a parking lot. Couture and Garramone (Couture's boyfriend and employer) allegedly became enraged and, fueled by their need for vengeance or retribution, they "connected with" Camp, who in turn "connected" them with Trainor and the Trainor Law Firm. (Id. ¶ 103.) So began the alleged conspiracy to injure, harm, and destroy Noshirvan.

Camp is described as "a 'for-hire' social media troll, harasser, maligner, and defamer, who freelances his service to the highest bidder." (Id. ¶ 69.) Couture, GPS, Garramone, and Central Park each allegedly hired Camp to be their representative and

marketing, social media, and online reputation manager. Couture, Garramone, and GPS paid Camp bi-weekly, while Central Park paid Camp in-kind by housing him at a property it owns on Winkler Road in Fort Myers, Florida (the Winkler Road Property). While Camp is named in the <u>caption</u> of Counts 6-14 and 17 as if he is a defendant, he is not a named party or defendant in any of the causes of action in the case, and no summons was requested (Docs. ##2-18, 22) or issued for Camp. (Docs. ##21, 23.)

Trainor, ADL, or Camp created social media profile accounts on various platforms to contact other people who had been "publicly outed" by Noshirvan. (<u>Id.</u> ¶ 89.) Noshirvan views this as recruiting co-conspirators. (<u>Id.</u> ¶¶ 91, 104, 105.)

Couture and Garramone allowed Camp to live at the Winkler Road Property owned by Central Park. (<u>Id.</u> ¶ 108.) While living there, Camp published a video calling Noshirvan a "child predator" and directing viewers to report Noshirvan to Child Protective Services for child abuse and neglect. (<u>Id.</u> ¶ 112.) In another video from the Winkler Road Property, Camp falsely asserted he was in Noshirvan's hometown in Pennsylvania. Camp stated that he was working alongside others to impoverish Noshirvan and ruin his reputation by, among other things, circulating certain flyers, billboards, emails, television ads, and pennysaver ads about Noshirvan. (<u>Id.</u> ¶ 118.)

At about the same time, Couture and Garramone actually were in Pennsylvania. They took pictures of Noshirvan at his home and scattered flyers around Noshirvan's hometown, including in the bathroom of a local butcher shop they believed was owned by Noshirvan's in-laws. At least two distinct types of flyers were published, including one that contained a picture of Noshirvan's face and asked "Have you seen this predator?" A billboard and a pennysaver ad (depicted below) were also published in Noshirvan's hometown containing Noshirvan's face:





The ads were purchased by Trainor and his law firm using unidentified donor funds. Dialing the phone number on the ads directed callers to Trainor or his law firm. Camp claimed credit for the ads and flyers. (Id. ¶ 128.)

A string of other events allegedly occurred: a negative website about Noshirvan called "www.thatdaneshguy.com" was published; social media accounts named "victimsofthatdaneshguy"

were created on various platforms; a SWAT team was sent to Noshirvan's home based on false reports; Noshirvan's social media accounts were falsely reported to their respective platforms for misconduct; Noshirvan was reported to Child Protective Services three times; and a flyer for a fictious swingers party was published with the contact information of Noshirvan and his wife.

Couture posted the website and the flyer on her social media, and falsely asserted Noshirvan was publishing sexual images of her online. Among other things, Couture called Noshirvan a "revenge pornographer" who has "some sexual fantasy" about her. Couture shared her plans about getting revenge on Noshirvan and of publishing a billboard about Noshirvan with her co-workers at GPS.

Camp also began sending mass communications. He texted Noshirvan hundreds of times. He emailed Noshirvan's donors and subscribers, causing them to withdraw their support. He published hundreds of social media posts about Noshirvan. In these communications and others, Noshirvan was described variously as a child groomer, a sexual predator, a pedophile, a cyber bully, a stalker, a sextortionist, and a blackmailer. It was also stated that Noshirvan rapes his own child and caused a fourteen-year-old to commit suicide.

Additionally, Camp allegedly: distributed sexually explicit images of Noshirvan after hacking his social media account; sent Noshirvan pictures of Noshirvan and his child in their yard;

threatened to publish the criminal history of Noshirvan's lawyer's wife, causing the lawyer to withdraw as Noshirvan's counsel; and claimed on social media to have placed cameras in Noshirvan's hometown to watch him.

## II.

Defendants now move to dismiss the SAC for multiple reasons, including failure to state a claim and failure to join an indispensable party (i.e. Camp). Before addressing those arguments, the Court addresses the threshold issues of whether the SAC improperly added new claims and whether Defendants forfeited their current arguments by not raising them in connection with the FAC.

### A.  SAC Improperly Adds Some New Claims

Defendants argue that Plaintiff improperly "expanded" the pleadings when he added new vicarious liability counts, implying this is a ground for dismissal. (Doc. #162, p. 2.)

The previous complaint, the FAC, was filed on January 4, 2024. (Doc. #26.) The FAC raised a single vicarious liability claim titled "Agency" alleging that some defendants were responsible <u>for Camp's actions</u>. (Doc. #26, ¶ 210) ("Garramone[] and [the] Garramone Entities are responsible under respondeat superior for Camp['s] acti[ons] . . . ."). No other principal, agent, or agency relationships were alleged.

The vicarious liability claim was dismissed without prejudice
because it failed to give defendants notice of what underlying
independent wrongs by Camp were being imputed to them. (See Doc.
#130.). The order instructed that "[i]n any forthcoming amended
complaint, Noshirvan should take care to separate each alleged
underlying independent wrong into a separate count and specify
which defendants are liable for what acts of Camp as to each."
(Doc. #130 at p. 10)(emphasis added). Noshirvan then filed the SAC
alleging a mix of defendants were liable for the acts of Camp,
Couture, Garramone, Trainor, and the Trainor Entities in counts
six, ten, twelve, thirteen, sixteen, eighteen, and nineteen. (Doc.
#139.)

Because the deadline to amend the pleadings had long passed
and the vicarious liability count was only dismissed without
prejudice so Plaintiff could identify the independent wrongs
committed by Camp, the addition of independent wrongs committed by
others without leave or good cause was improper and will not be
considered. See Abel v. Porsche Cars N. Am., Inc., No. 6:24-CV-
593-PGB-DCI, 2024 WL 4573268, at *1 (M.D. Fla. Oct. 24,
2024)(refusing to entertain new allegations filed after deadline
to amend pleadings that went beyond limited dismissal order). The
vicarious liability counts will only be considered to the extent
they allege vicarious liability against defendants for the actions
of Camp. As a result, Couture is stricken as an alleged agent from

counts six, ten, twelve, thirteen, and eighteen; Garramone is stricken as an alleged agent from counts twelve, thirteen, and eighteen; and counts sixteen and nineteen are dismissed without prejudice entirely as they attempt to attach vicarious liability solely for the actions of Couture and Trainor/Trainor Entities, respectively.

**B. SAC Dismissal Arguments Not Waived or Forfeited**

For his threshold issue, Noshirvan argues that Federal Rule of Civil Procedure "12(g)(2) bars Defendants from raising the issues in this second consecutive Rule 12 motion." (Doc. #168, p. 7.) Defendants disagree, as does the Court.

The pertinent portion of Rule 12 provides that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). The rule requires consolidation of all available pre-pleading defenses in a single motion, Leyse v. Bank of Am. Nat. Ass'n, 804 F.3d 316, 320 (3d Cir. 2015), and distinguishes between defenses that are forfeited if not raised in the first Rule 12 motion, Fed. R. Civ. P. 12(h)(1), the defense that is never forfeited (subject-matter jurisdiction), Fed. R. Civ. P. 12(h)(1), and defenses that survive up to trial. Fed. R. Civ. P. 12(h)(2).

The present motions to dismiss are the third round of Rule 12 motions. First, all the Defendants filed a Rule 12(b)(1) motion contesting subject-matter jurisdiction. (Doc. #46.) Then, GPS filed a Rule 12(c) motion for judgment on the pleadings. (Doc. #110.) And now, all Defendants move to dismiss the SAC under Rule 12(b)(6) and Rule 12(b)(7). Noshirvan correctly points out that "Defendants['] first motion to dismiss failed to raise the[] [present] issues." (Doc. #168, p. 6.) Nonetheless, Defendants are not precluded from raising the issues now because the issues were either previously unavailable or are exempted under Rule 12(h)(2).

When plaintiff files a superseding amended complaint that becomes the operative pleading, Roy v. Ivy, 53 F.4th 1338, 1352 (11th Cir. 2022), a defendant "will be allowed to plead anew in response to [the] amended complaint, as if it were the initial complaint, when the 'amended complaint . . . changes the theory or scope of the case.'" Krinsk v. SunTrust Banks, Inc., 654 F.3d 1194, 1202 (11th Cir. 2011)(citation omitted.) "It simply would be unfair to allow the plaintiff to change the scope of the case without granting the defendant an opportunity to respond anew." Id.

All of the SAC's agency counts (Count 6 through Count 19) are new. The new agency counts came about because the Court found the previous vicarious liability claim failed to give defendants proper notice of the claims against them. (See Doc. #130, pp. 9-10.) "A party is not precluded from making a second motion based

on a defense that he or she did not have reasonable notice of at the time that party first filed a motion to dismiss or on a defense that became available only after a motion had been made under Rule 12." Charles Alan Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1388 (3d ed.) Since Defendants' current arguments as to the new agency claims were previously unavailable, it would be unfair to preclude them pursuant to Rule 12(g)(2).

Moreover, Rule 12(h)(2) shields all of Defendants' current arguments from being forfeited.  As the case cited by Plaintiff states, "Rule 12(g)(2) carves out two exceptions to its consolidation requirement—those established in Rules 12(h)(2) and (3)." <u>Brooks v. Warden</u>, 706 F. App'x 965, 969 (11th Cir. 2017).[1] "Under Rule 12(h)(2), [failure to state a claim and to join an indispensable party defenses] endure[] up to, but not beyond, trial on the merits . . . ." <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 507 (2006).  Thus, even though omitted from the initial Rule 12 motion to dismiss, Defendants' current arguments that the SAC fails to state a claim and fails to join an indispensable party are preserved pursuant to Rule 12(h)(2).

---

[1] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." <u>Bonilla v. Baker Concrete Const., Inc.</u>, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007).

Defendants did not forfeit their current arguments under Rule 12(g)(2) and the Court will consider the arguments now.

### III.

A non-party like Camp is not a defendant of any type. <u>Wilson v. Hearos, LLC</u>, 128 F.4th 1254, 1259 (11th Cir. 2025). The absence of Camp as a party defendant prompts all defendants to move to dismiss under Rule 12(b)(7), arguing Camp is an indispensable party pursuant to Rule 19.

Rule 19 sets out a two-step process to determine whether a party must be joined in the action. <u>Molinos Valle Del Cibao, C. por A. v. Lama</u>, 633 F.3d 1330, 1344 (11th Cir. 2011); <u>Focus on the Fam. v. Pinellas Suncoast Transit Auth.</u>, 344 F.3d 1263, 1279 (11th Cir. 2003). "First, under Rule 19(a), the court determines whether the person in question is one who should be joined if feasible. Second, for all such necessary parties, a court determines whether the Rule 19(b) factors permit the litigation to continue if the party cannot be joined, or instead whether they are indispensable." <u>Winn-Dixie Stores, Inc. v. Dolgencorp, LLC</u>, 746 F.3d 1008, 1039 (11th Cir. 2014)(citations and internal punctuation omitted).

Applying these principles, the Court finds that Camp is not a required party who must be joined in this proceeding.

**A. Defendants Fail To Satisfy Rule 19(a)**

Rule 19(a) provides in pertinent part:

> (1) A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> > (i) as a practical matter impair or impede the person's ability to protect the interest; or
> >
> > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). Defendants fail to satisfy Rule 19(a) because they do not show the Camp is needed to give the existing parties complete relief or that Camp has claimed an interest relating to the subject of this action.

Defendants do not argue that Camp's presence as a defendant is needed for the existing parties to get complete relief. Indeed, joint tortfeasors normally need not all be joined in one lawsuit. Laker Airways, 182 F.3d at 847. While there are exceptions to this general rule, see id. at 847-48, none have been shown to apply here. Camp is not a required party under the first prong of Rule 19(a) because the Court can accord complete relief without Camp's presence.[2]

---

[2] While plaintiff has chosen not to sue Camp, a defendant has the ability to sue Camp as a third-party defendant. See Fed. R. Cv. P. 14.

Additionally, Defendants cannot satisfy Rule 19(a)'s second prong because Camp has not claimed an interest in this action. Defendants claim Camp has an interest in the subject matter of the case because he is an active participant in the alleged wrongdoings. But Rule 19(a)'s explicit language makes clear that the second prong is "contingent . . . upon an initial requirement that the absent party claim a legally protected interest relating to the subject matter of the action." Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1043 (9th Cir. 1983)(emphasis added); Hickerson v. Enter. Leasing Co. of Georgia, LLC, 818 F. App'x 880, 884 n.6 (11th Cir. 2020)(per curiam)(stating "the district court was not required by Rule 19 to allow [absent party]'s joinder," partly because that party did not claim an interest). The Eleventh Circuit has explained how an absent party can claim an interest, F.D.I.C. v. First Am. Title Ins. Co., 611 F. App'x 522, 530 (11th Cir. 2015), but Camp has not done so.

**B. Defendants Fail To Satisfy Rule 19(b)**

Even if Camp is a required party pursuant to Rule 19(a), Defendants fail to carry their burden of establishing the second part of the test – that the four nonexclusive factors in Rule 19(b) require dismissal in equity and good conscience. Rule 19(b) provides in pertinent part:

> If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed

among the existing parties or should be dismissed. The factors for the court to consider include:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
> > (A) protective provisions in the judgment;
> >
> > (B) shaping the relief; or
> >
> > (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b). These four nonexclusive factors "must be examined in each case to determine whether, in equity and good conscience, the court should proceed without a party whose absence from the litigation is compelled." Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 109 (1968).

> The distilled essence of these 'criteria' of subdivision (b) is the attempt to balance the rights of all concerned. The plaintiff has the right to 'control' his own litigation and to choose his own forum. This 'right' is, however, like all other rights, 'defined' by the rights of others. Thus the defendant has the right to be safe from needless multiple litigation and from incurring avoidable inconsistent obligations. Likewise the interests of the outsider who cannot be joined must be considered. Finally there is the public interest and the interest the court has in seeing that insofar as possible the litigation will be both effective and expeditious.

Schutten v. Shell Oil Co., 421 F.2d 869, 873 (5th Cir. 1970)(internal citation omitted).[3] "As the part[ies] invoking Rule 19, it is [the Defendants'] burden to demonstrate which Rule 19(b) factors require[] dismissal 'in equity and good conscience.'" Molinos Valle Del Cibao, 633 F.3d at 1347 (citation omitted).

Defendants do not satisfy their burden of establishing which Rule 19(b) factor(s) require dismissal. In fact, the Defendants fail to mention any factors at all. At most, Defendants make barebones conclusory assertions that Camp's absence "hinders the . . . ability to defend the lawsuit" (Doc. #160, p. 4); or "fundamentally undermines Plaintiff's case and impairs GPS's ability to raise all available defenses to Plaintiff's claims" (Doc. #161, p. 6); or "stymies his claims, and impairs Defendants' ability to raise all available defenses" (Doc. #162, p. 8.) This is insufficient under Rule 12(b)(7). See Molinos, 633 F.3d at 1347 (refusing to further consider a Rule 12(b)(7) motion after party failed to discuss the Rule 19(b) factors).

If anything, Rule 19(b) factors weigh against dismissal. Since Plaintiff asserts Camp's current whereabouts are unknown and

---

[3] The Eleventh Circuit "ha[s] adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by a Unit B panel of the former Fifth Circuit." In re Forrest, 47 F.4th 1229, 1235 n.3 (11th Cir. 2022)(citing Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982)).

Defendants do not contest this, the Court is not assured Plaintiff can seek relief in a better forum. <u>See</u> <u>Provident Tradesmens Bank & Tr. Co.</u>, 390 U.S. at 109 n.3 (explaining that "[t]he court should consider whether there is any assurance that the plaintiff, if dismissed, could sue effectively in another forum where better joinder would be possible.") Second, both the public and this Court have an interest in the complete resolution of the controversy given the expenditure of resources invested in the year or so it has been pending. <u>See</u> <u>Molinos</u>, 633 F.3d at 1345; <u>Provident</u>, 390 U.S. at 111. And third, as noted earlier, the interest of the Defendants may be protected by impleading Camp under Rule 14. <u>Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.</u>, 669 F.2d 667, 671 (11th Cir. 1982).

Because neither Rule 19(a) nor Rule 19(b) require Camp's joinder, Defendants' Rule 12(b)(7) motions to dismiss are denied.

**IV.**

Defendants argue that the SAC must be dismissed because each count fails to state a claim upon which relief may be granted under Rule 12(b)(6).[4] The Court sets forth the appropriate pleading

---

[4] The exhibits attached to Plaintiff's Responses (Docs. ##168-170) are not considered by the Court in resolving the motions. "Pursuant to Rule 12(d) of the Federal Rules of Civil Procedure, when ruling on a Rule 12(b)(6) or 12(c) motion, a court generally may not consider matters outside of the pleadings without treating the motion as a motion for summary judgment," unless one of two exceptions apply: "(1) the incorporation-by-reference doctrine [or] (2) judicial notice." <u>Johnson v. City of Atlanta</u>, 107 F.4th

standards and then begins with addressing the sufficiency of the four conspiracy claims.

### A. Rule 12(b)(6) Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted). To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level." Id. at 555. See also Edwards v. Prime Inc., 602 F.3d 1276, 1291 (11th Cir. 2010). This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. Erickson v. Pardus, 551 U.S. 89 (2007). "Legal conclusions without adequate factual support are entitled to no assumption of truth." Mamani v. Berzain,

---

1292, 1298 (11th Cir. 2024)(quoting Baker v. City of Madison, Alabama, 67 F.4th 1268, 1276 (11th Cir. 2023)). Plaintiff has not established that either exception applies to his exhibits.

654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012) (citations omitted). Thus, the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

### B. Conspiracy Counts

Plaintiff begins the SAC claims by setting out four civil conspiracy claims against all seventeen defendants: conspiracy to tortiously interfere with a business relationship (Count 2); conspiracy to commit defamation (Count 3); conspiracy to intentionally inflict emotional distress (IIED) (Count 4); and conspiracy to misappropriate Noshirvan's likeness (Count 5). All Defendants argue that the conspiracy counts must be dismissed because the SAC is a shotgun pleading which fails to sufficiently plead the elements of civil conspiracy and the conspiracy counts fail to meet the particularity requirements of Fed. R. Civ. P. 9(b).

### 1. The Conspiracy Counts are Shotgun Counts

All Defendants argue that the SAC should be dismissed as a shotgun pleading. The Court agrees that the conspiracy counts are part of a shotgun pleading.

Shotgun pleadings violate Rule 8(a)(2)'s "short and plain statement" requirement by "fail[ing] to one degree or another . . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1323 (11th Cir. 2015). See also Muscogee (Creek) Nation v. Rollin, 119 F.4th 881, 888 (11th Cir. 2024); Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1294-95 (11th Cir. 2018). At issue here is the fourth type of shotgun pleading, which is one that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." Weiland, 792 F.3d at 1323.

"The allegation that '[t]he Defendants' [engaged in certain conduct]" falls under the fourth type of shotgun pleading when there are multiple defendants but not all of them could have realistically participated in the complained of act. Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co., 953 F.3d 707, 732 (11th Cir. 2020). In contrast, a pleading with multiple defendants which alleges the defendants engaged in certain conduct does not fall under the fourth type of shotgun

21

pleading "when '[t]he complaint can be fairly read to aver that
all defendants are responsible for the alleged conduct," Id.
(alteration in original)(quoting Kyle K. v. Chapman, 208 F.3d 940,
944 (11th Cir. 2000)).

The SAC names seventeen defendants and repeatedly alleges
that "Defendants" engaged in certain conduct. For example, Count
3 alleges in part that "Defendants maliciously published or caused
to be published, [sic] false statements stating that Noshirvan
'rapes his own child' and 'caused a 14-year-old to commit
suicide.'" (Doc. #139, ¶ 166.) Count 4 alleges in part that
"Defendants . . . sent Noshirvan pictures of himself and [his]
child in his yard." (Id. ¶ 177.) Count 5 alleges in part that
"Defendants maliciously printed, published, and displayed at least
two distinct types of flyer advertisements . . . ." (Id. ¶ 186.)

But the SAC cannot be fairly read to allege that all the
seventeen defendants published statements that Noshirvan rapes his
own child, sent pictures to Noshirvan, and printed and displayed
at least two flyers. As to the rape statement, other parts of the
SAC allege it was Camp who made the statement. (Id. ¶¶ 215, 229,
244, 260, 275, 295, 490, 515.) No other instance of a publication
is alleged. This "provide[s] reason to doubt that each" Defendant
made the publication. Auto. Alignment, 953 F.3d at 733. The
incidents regarding the flyers and the pictures allegedly occurred
in Pennsylvania circa May 2022 (see Doc. #139 ¶¶ 120, 124, 145) by

Couture and Garramone. (Id. ¶ 124.) Temporal and geographic
realities, along with a fair reading of the SAC, negate the general
assertions that all seventeen defendants were in Pennsylvania
circa May 2022 engaging in that conduct.

Defendants seek dismissal with prejudice since Plaintiff's
complaint has previously been dismissed as a shotgun pleading. But
the prior shotgun pleading dismissal dealt with the agency counts,
not the conspiracy counts. Since Plaintiff has not had an
opportunity to amend these shotgun pleading defects, this
dismissal will be without prejudice.

Although the conspiracy counts merit dismissal for this
reason alone, the Court will also analyze whether each otherwise
fails to state a claim.

### 2. Conspiracy Pleading Principles

"To state a cause of action for civil conspiracy, a plaintiff
must plead '(1) an agreement between two or more parties; (2) to
do an unlawful act or a lawful act by unlawful means; (3) the
execution of some overt act in pursuance of the conspiracy; and
(4) damage to the plaintiff as a result of said acts.'" Logan v.
Morgan, Lewis & Bockius LLP, 350 So. 3d 404, 412 (Fla. 2d DCA
2022)(citations omitted). The Logan court continued that:

> [i]n pleading conspiracy, the plaintiff must
> further identify an actionable underlying tort
> or wrong. This is because there is no
> freestanding cause of action in Florida for
> civil conspiracy. Rather, the conspiracy is

> merely the vehicle by which the underlying
> tort was committed, and the allegations of
> conspiracy permit the plaintiff to hold each
> conspirator jointly liable for the actions of
> the coconspirators. Significantly, a
> conspirator need not take part in the
> planning, inception, or successful conclusion
> of a conspiracy. The conspirator need only
> know of the scheme and assist in it in some
> way to be held responsible for all of the acts
> of his coconspirators.

Id. Some leeway, however, is usually allowed in pleading a civil

conspiracy claim:

> Although plaintiffs may be unable to
> allege specific facts proving actual acts of
> agreement or conspiracy, the pleadings are
> sufficient if they set forth facts from which
> an inference of unlawful agreement can be
> drawn. Actual agreements are seldom capable of
> proof by direct testimony and thus
> circumstantial evidence may be allowed to
> establish an alleged conspiracy. Plaintiffs
> cannot be required to plead with specificity
> the very facts which can only be proven by
> circumstantial evidence.

Brett v. First Fed. Sav. & Loan Ass'n, 461 F.2d 1155, 1158 (5th

Cir. 1972)(internal citations omitted).[5] Nonetheless, "a claim for

civil conspiracy must contain clear, positive and specific

allegations; general allegations of conspiracy are not

sufficient." Parisi v. Kingston, 314 So. 3d 656, 661 (Fla. 3d DCA

---

[5] An exception to conspiracy pleading leeway exists under Fed.
R. Civ. P. 9(a) when the object of the conspiracy is fraud. Am.
United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1065 (11th Cir.
2007). No such fraud conspiracy is asserted in the SAC.

2021) (citing World Class Yachts, Inc. v. Murphy, 731 So. 2d 798,
799 (Fla. 4th DCA 1999)).

### 3. Plausible Conspirators

The SAC only plausibly alleges five conspirators: Couture;
Garramone; Trainor; Trainor Law; ADL; and Central Park. Couture
and Garramone allegedly spread flyers of Noshirvan. Trainor,
Trainor Law, and the ADL allegedly published a billboard of
Noshirvan. Additionally, Trainor and the ADL allegedly created
social media profiles to recruit others to harass Noshirvan.
Central Park allegedly housed Garramone, Couture, Camp, and others
so they could harass Noshirvan. These are sufficiently pled facts
to plausibly infer that these defendants conspired to wrong
Noshirvan.[6]

Nothing in the conspiracy counts plausibly alleges that any
of the remaining defendants knew of a scheme and assisted in some
way. The remaining defendants (Ralph Garramone M.D. P.A. D/B/A
Garramone Plastic Surgery; Wraith, LLC; Sullivan Street
Investments, LLC; Hairpin Turn, LLC; OMG Realty, LLC; R G Weight

---

[6] Trainor, Trainor Law, the ADL, and Central Park also argue
that the civil conspiracy counts fail because they allege that
Camp is their agent. (See Doc. #162, pp. 12-13.) While it is true
that "neither an agent nor an employee can conspire with his or
her corporate principal or employer," Mancinelli v. Davis, 217 So.
3d 1034, 1036 (Fla. 4th DCA 2017)), Plaintiff can and has plead in
the alternative. (See Doc. #139, ¶ 110.) Additionally, a civil
conspiracy claim may be sufficiently pled with or without Camp.

Management, LLC; Central Park South, LLC; Brantlee, LLC; Legacy of Marie Garramone, LLC; Garramone Marketing, Inc.; and 5681 Division LLC) are dismissed without prejudice from the four conspiracy counts.

### 4. Count 2: Tortious Interference Conspiracy

Count 2 alleges that all Defendants (and unnamed others) conspired to tortiously interfere with Noshirvan's business relationships with his social media platforms, donors, and former lawyer. Count 2 asserts that Noshirvan had "monetized business relationships" with several social media platforms and that all Defendants (and unnamed others) agreed to participate in a campaign to "deplatform" Noshirvan to cause his financial ruin by unjustifiably interfering with these business relationships. Specifically, all Defendants allegedly made false reports of misconduct to the social media platforms of his accounts; Camp sent harassing and threatening emails to Noshirvan's donors, which caused the donors to withdraw their support and caused Noshirvan to lose lucrative business relationships and future income; and Camp harassed, threatened, extorted, and coerced Noshirvan's prior lawyer to withdraw as his counsel. Noshirvan seeks actual and punitive damages. (Doc. #139, ¶¶ 153-161.)

### (a)  Tortious Interference Elements

Under Florida law, "[t]he elements of tortious interference with a business relationship are (1) the existence of a business

relationship[;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1994). The alleged business relationship need not be evidenced by an enforceable contract, but it must be "a relationship with a particular party, and not just a relationship with the general business community." *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191 (11th Cir. 1999)(citing *Ethan Allen, Inc.*, 647 So.2d at 814). Each specified business relationship must be "evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc.*, 647 So.2d at 815. Accordingly, there is a cause of action for tortious interference "with existing or prospective customers but no cause of action . . . [with] the community at large." *Id.*

### (b)  Sufficiency of Count 2

Defendants argue that Count 2 fails to state a claim because the allegations do not plausibly show the existence of any business relationship. The Court agrees that Count 2 falls to sufficiently allege that Noshirvan had legal or contractual rights with his social media accounts, donors, or former attorney.

In Illoominate Media, Inc. v. CAIR Fla., Inc., 841 F. App'x
132, 137 (11th Cir. 2020), a self-proclaimed journalist alleged
that outsiders interfered with her social media account and her
followers/donors of that account. The Eleventh Circuit held that
the relationship with the followers/donors, "no matter how
economically beneficial that relationship might be," is a
relationship with "the general public" that Florida does not
recognize as constituting a tortious interference cause of action.
841 F. App'x at 137. As to the social media platforms themselves,
the Eleventh Circuit held that users tend to not have any "legal
or contractual rights in the continued use of [the] account[s]"
because the Terms of Service allow the social media platforms to
ban users for any reason at all. Id.

The Court finds this decision persuasive. The Court takes
judicial notice that all the social media platforms identified in
the SAC have Terms of Service in place which allow the platforms
to ban users like Noshirvan for any reason.[7]  The SAC fails to

---

[7] See https://x.com/en/tos ("To the extent permitted by law,
we may also terminate your account or cease providing you with all
or part of the Services for any other reason or no reason at our
convenience."); https://buymeacoffee.com/terms ("We may modify or
discontinue the Services at any time, in our sole discretion.");
https://www.tiktok.com/legal/page/us/terms-of-service/en    ("We
reserve the right to disable your user account at any time . . .
."); https://www.patreon.com/policy/legal#account-deletion ("We
can terminate or suspend your account at any time at our sole
discretion.").

plausibly plead the existence of a business relationship with these entities.

As to Noshirvan's former lawyer, "[t]here must be a relationship in existence at the time of any alleged interference." Bernstein v. True, 636 So. 2d 1364, 1366 (Fla. 4th DCA 1994). The SAC does not allege any specific agreement between the attorney and Noshirvan, or that any agreement was in existence at the time of the alleged interference. Quite the opposite, the SAC alleges that the lawyer was "Noshirvan's prior lawyer . . . ." (Doc. #139 at ¶ 159.). This is not sufficient to state a claim. E.g., Kassenoff v. Harvey, No. 3:23CV24085-TKW-ZCB, 2024 WL 562738, at *8 (N.D. Fla. Feb. 8, 2024)(holding complaint that only alleged plaintiff had "'represented' (past tense) many clients" did not suffice for a tortious interference with business relationships claim.).

Count 2 is dismissed without prejudice as to all defendants as it relates to Noshirvan's alleged business relationship with the former lawyer, since Noshirvan might be able to state a claim and has not had a previous opportunity to amend this aspect of the claim. Count 2 is otherwise dismissed with prejudice as to all defendants because amendment would be futile.

### 5. Count 3: Defamation Conspiracy

Count 3 alleges that all Defendants conspired to defame Noshirvan by maliciously publishing or causing to be published:

29

flyers with Noshirvan's face and the words "Have you seen this
predator?"; false statements describing Noshirvan as a
"pedophile," "child groomer," "stalker," "sextortionist," and
"blackmailer"; false statements that Noshirvan "rapes his own
child" and "caused a 14-year-old to commit suicide"; a billboard
depicting Noshirvan's face and the words "doxing is violent"; fake
flyers with pictures of Noshirvan and his wife and their personal
contact information for a "swingers party"; and calling
Noshirvan's wife a "wh**e" on social media.  Count 3 also alleges
that Defendants intentionally reported false child abuse to Child
Protective Services on three occasions, and then published
statements regarding the false reports on social media to harm
Noshirvan's reputation.  Noshirvan seeks actual and punitive
damages.  (Doc. #139, ¶¶ 162-73.)

### (a)  Defamation Elements

"To prevail on a defamation claim, a public-figure plaintiff
must prove (1) publication by the defendant, (2) of a false
statement, (3) with knowledge or reckless disregard as to the
falsity (i.e., "actual malice"), (4) which causes actual damages,
and (5) is defamatory."  Flynn v. Wilson, 398 So. 3d 1103, 1110-
11 (Fla. 2d DCA 2024). Thus, "a public figure bringing a defamation
suit must plausibly plead actual malice in accordance with the
requirements set forth in Iqbal and Twombly." Michel v. NYP
Holdings, Inc., 816 F.3d 686, 702 (11th Cir. 2016). Whether

Plaintiff is a public figure is a question of law.  Mishiyev v.
Davis, No. 2D2023-1242, 2025 WL 352652, at *5 (Fla. 2d DCA Jan.
31, 2025).

"[T]o survive a motion to dismiss, [plaintiff] had to
plausibly allege in its amended complaint 'facts sufficient to
give rise to a reasonable inference that the false statement was
made with knowledge that it was false or with reckless disregard
of whether it was false or not.'" Veritas v. Cable News Network,
Inc., 121 F.4th 1267, 1283 (11th Cir. 2024)(quoting Michel, 816
F.3d at 702). See also Turner v. Wells, 879 F.3d 1254, 1273 (11th
Cir. 2018). "An intention to portray a public figure in a negative
light, even when motivated by ill will or evil intent, is not
sufficient to show actual malice unless the publisher intended to
inflict harm through knowing or reckless falsehood." Don King
Prods., Inc. v. Walt Disney Co., 40 So. 3d 40, 45 (Fla. 4th DCA
2010).

### (b)  Sufficiency of Count 3

A defamation claim must allege actual malice when plaintiff
is a public figure. New York Times Co. v. Sullivan, 376 U.S. 254
(1964). All Defendants argue that Count 3 fails to state a
defamation claim because it fails to sufficiently allege actual
malice even though Plaintiff is clearly a public figure based on
his own description of himself in the SAC.

31

"Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "But 'generally' is a relative term" which excuses a party from pleading malice under an elevated pleading standard but does not allow him to evade the "short and plain statement of the claim" requirement in Rule 8(a). Iqbal, 556 U.S. at 686–87. While "legal conclusions can provide the framework of a complaint" they "must be supported by factual allegations." Id. at 679.

Count 3 alleges that Defendants "maliciously" published or caused to be published the various false statements. (Doc. #139, ¶¶ 164-66, 169-70.) It further alleges that Defendants knew these statements were not true but acted with reckless disregard of the truth. (Id. ¶ 167.) Additionally, Noshirvan seeks punitive damages because Defendants "acted maliciously, wantonly, or with a recklessness suggestive of an improper motive or vindictiveness, . . .." (Id. ¶ 173.) These allegations provide the framework for the claim, and the remainder of the SAC adds sufficient facts to satisfy the plausibility standard. At the pleading stage, this is sufficient for actual malice. The motions to dismiss Count 3 for failure to sufficiently allege actual malice are denied.

### 6. Count 4: IIED Conspiracy

In Count 4, the SAC alleges that all Defendants "swatted" Noshirvan; sent Noshirvan pictures of Noshirvan and his child in their yard; mentioned in social media posts that cameras were

placed illegally in public areas to watch Noshirvan; and made false reports made to Child Protective Services. This conduct is alleged to have caused Noshirvan's wife and child to temporarily move out of their home and to have inflicted severe emotional distress on Noshirvan.

Defendants argue that this claim must be dismissed because its factual overlap with the defamation conspiracy claim violates Florida's single action/single publication rule. Defendants also argue that the conduct alleged is not sufficiently outrageous to qualify as an IIED claim.

### (a)   Florida Single Publication Rule

As a Florida court has recently summarized:

> In Florida, a single publication gives rise to a single cause of action. The single publication/single action rule does not permit multiple actions when they arise from the same publication upon which a failed defamation claim is based. The rule is designed to prevent plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm. The rule precludes the recasting of defamation claims as additional, distinct causes of action in tort if all of the claims arise from same defamatory publication.

Mishiyev v. Davis, 402 So. 3d 443, 453 (Fla. 2d DCA 2025)(internal punctuation and citations omitted). The rule does not apply, however, if separate causes of action "are properly pled upon the

existence of independent facts." <u>Fridovich v. Fridovich</u>, 598 So. 2d 65, 70 (Fla. 1992).

The only overlapping fact between the defamation conspiracy count and the IIED conspiracy count is the alleged false reports to Child Protective Services. Plaintiff asserts that this portion of the claim is "based upon independent fact[s]" because "public solicitation to report child abuse can be defamatory while actual reporting and undergoing an abuse investigation can be emotionally stressful." (Doc. #168, p. 20.) But the SAC's own clear language refutes Plaintiff's arguments since it shows that both the defamation conspiracy claim and the IIED conspiracy claim are at least partly based on the allegedly false reporting to Child Protective Services, not on solicitation to report. (<u>Compare</u> Doc. #139, ¶ 168 ("Defendants intentionally reported false child abuse to Child Protective Services . . . .", <u>with</u> Doc. #139, ¶ 178 "As a result of Defendants['] . . . false reports to Child Protective Services . . . .")). The IIED claim and the defamation claim are therefore both partly based on the same publication.

The IIED claim is not saved from the single publication rule simply because the defamation claim has survived. <u>See</u> <u>Emergency Recovery, Inc. v. Gov't Emps. Ins. Co.</u>, No. 8:23-CV-957-KKM-AEP, 2025 WL 938682 at *11 (M.D. Fla. Mar. 28, 2025)(J., Mizelle)(explaining that while the single publication rule generally requires a defamation claim to have failed to bar other

torts, this does not apply to the tort of intentional infliction of emotional distress). Plainly, "a plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous.'" Fridovich, 598 So. 2d at 70. The portion of paragraph 178 alleging "false reports to Child Protective Services" is stricken and that portion of the claim is dismissed with prejudice. The defamation conspiracy and IIED conspiracy claims otherwise rely on distinct facts, so the remainder of the IIED conspiracy claim in Count 4 is unaffected by the single publication rule.

### (b)  Not Sufficiently Outrageous Conduct

All defendants also argue that Count 4 must be dismissed because the alleged conduct does not rise to the level of outrageousness necessary to support a claim of IIED conspiracy. The Court agrees.

Florida recognizes the tort of IIED. Metro. Life Ins. Co. v. McCarson, 467 So. 2d 277, 278 (Fla. 1985). To establish a claim for IIED, plaintiff must allege and ultimately prove:

> (1) the wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result;
>
> (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community;

(3) the conduct caused emotional distress; and

(4) the emotional distress was severe.

Glegg v. Van Den Hurk, 379 So. 3d 1171, 1174 (Fla. 4th DCA 2024).

The question of whether conduct is sufficiently outrageous to support an IIED claim is a question of law. Id. Florida has adopted Section 46, Restatement (Second) of Torts (1965) as the appropriate definition of the required conduct:

> d. Extreme and outrageous conduct . . . . It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Metro. Life Ins. Co. v. McCarson, 467 So. 2d 277, 279 (Fla. 1985). Thus, "[l]iability . . . does not extend to mere insults, indignities, threats, or false accusations." Williams v. Worldwide Flight SVCS., Inc., 877 So. 2d 869, 870 (Fla. 3d DCA 2004).

The remaining allegations in Count 4 are that Defendants "swatted" Noshirvan; sent Noshirvan pictures of Noshirvan and his child in their yard; and mentioned in social media posts that cameras were placed illegally in public areas to watch Noshirvan.

As a matter of law, none of these allegations set forth conduct
which is sufficiently outrageous to qualify for an IIED claim.
For this reason, Count 4 is dismissed without prejudice.

### 7. Count 5: Appropriation of Likeness Conspiracy

Count 5 asserts a claim against all Defendants for conspiracy
to appropriate likeness for commercial purposes. Defendants are
alleged to have participated in an advertising campaign for the
purpose of ruining Noshirvan's reputation and destroying him
financially. All Defendants are alleged to have maliciously
printed, published, displayed, and/or disseminated three types of
commercial advertisements: (1) at least two distinct flyers, (2)
a billboard, and (3) "commercials" (apparently a reference to
pennysaver ads), all containing Noshirvan's face and
ThatDaneshGuy's likeness without Noshirvan's consent. (Doc. #139,
¶¶ 184-193.)

### (a) Appropriation of Likeness Elements

In addition to common law rights and remedies for invasion of
privacy, Florida has a statutory cause of action for commercial
appropriation of likeness. Jews For Jesus, Inc. v. Rapp, 997 so.
2d 1098, 1103 n.6 (Fla. 2008)(citing Fla. Stat. § 540.08). The
statute provides in relevant part: "No person shall publish, print,
display or otherwise publicly use for purposes of trade or for any
commercial or advertising purpose the name, portrait, photograph,
or other likeness of any natural person without the express written

or oral consent to such use given by" certain designated persons. Fla. Stat. § 540.08(1). "[T]he term 'commercial purpose' as used in section 540.08(1) does not apply to publications . . . which do not directly promote a product or service." Tyne v. Time Warner Entm't Co., L.P., 901 So. 2d 802, 810 (Fla. 2005).

>    **(b)  Lawful Commercial Purpose**

All Defendants argue that Count 5 fails to state a claim because it fails to allege the publications were for a commercial purpose. The Court agrees. Count 5 explicitly states the publications were done "for the purpose of ruining [Noshirvan's] reputation and destroying him financially." (Doc. #139, ¶ 185.) That does not allege the purpose of the publications was to directly promote a product or service. Stating some singular unspecified "advertisement" was published for a "commercial purpose" elsewhere in the SAC does not suffice, despite Plaintiff's argument to the contrary. It is conclusory and does sufficiently give any Defendant notice of the claim against them. Count 5 is dismissed without prejudice because the count does not allege a commercial or advertising purpose.

>    **C. The "Agency" Counts**

The SAC self-identifies the remaining counts, Counts 6 through 15 and 17 through 18, as "agency" claims for the same underlying torts discussed above—i.e., tortious interference with a business relationship, defamation, IIED, and misappropriation of

likeness. (Doc. #139, p. 2.) The "agency" counts for tortious interference with a business relationship, IIED, and misappropriation of likeness suffer from the same defects as their civil conspiracy counterparts. The "agency" counts for IIED (Counts 12 and 13) are therefore dismissed without prejudice, except as to the allegation of false reports to Child Protective Services, which is dismissed with prejudice. The "agency" count for tortious interference with a business relationship (Count 14) is dismissed with prejudice as to Noshirvan's social media accounts and subscribers/donors but without prejudice as to Noshirvan's prior lawyer. The "agency" count for misappropriation of likeness (Count 16) is dismissed without prejudice. That leaves only the "agency" defamation Counts, (Counts 6 through 11 and 17 through 18), all seeking to attribute liability to varying defendants for the alleged defamatory actions of Camp.

Those defendants all argue that these remaining Counts must be dismissed because they fail to plausibly plead agency. Among other things, they argue that control, scope of employment, and reliance are insufficiently plead. Noshirvan devotes an insubstantial paragraph in response. Liberally construed, Noshirvan counters in conclusory fashion that these counts plausibly plead actual agency, ratification, and/or aiding and abetting. The Court sets out the standard for each before addressing the sufficiency of the allegations.

### 1. Actual Agency

"Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." Goldschmidt v. Holman, 571 So.2d 422, 424 n.5 (Fla. 1990). See also Moore v. Toub, 398 So. 3d 1151, 1154 (Fla. 5th DCA 2024); Font v. Stanley Steemer Int'l, Inc., 849 So. 2d 1214, 1216 (Fla. 5th DCA 2003). "The key element in establishing actual agency is the control by the principal over the actions of the agent. And it is the right of control, not actual control or descriptive labels employed by the parties, that determines an agency relationship." Hickman v. Barclay's Intern. Realty, Inc., 5 So. 3d 804, 806 (Fla. 4th DCA 2009)(citations omitted). If the purported principal's right to control extends to the manner and means by which a task is to be performed, the person is an agent and not an independent contractor, and vicarious liability may attach. Font, 849 So. 2d at 1216. Florida considers the following non-exhaustive factors to determine whether a purported principal had the right to control an agent:

> (a) the extent of control which, by the parties' agreement, the employer exercises over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the

direction of the employer or by a specialist
without supervision; (d) the skills required
in the particular occupation; (e) whether the
employer or the workman supplies the
instrumentalities, tools, and the place of
work; (f) the length of time for which the
person is employed; (g) the method of payment,
whether by the time or by the job; (h) whether
or not the work is part of the regular business
of the employer; (i) whether or not the
parties believe that they are creating the
relation of master and servant; and (j)
whether the principal is or is not a business.

Carlson v. FedEx Ground Package Sys., Inc., 787 F.3d 1313, 1319

(11th Cir. 2015). See also Ware v. Money-Plan Int'l, Inc., 467 So.

2d 1072, 1074 (Fla. 2d DCA 1985).  Additionally,

[g]eneral principles of vicarious liability
establish that a principal is responsible for
the wrongful acts of its agent if the agent
was either acting (1) within the scope of [its
authority], or (2) during the course of [the
agency] and to further a purpose or interest
of the [principal].

An [agent's] conduct is within the scope of
his employment, for purposes of determining [a
principal's] vicarious liability to third
persons injured by the [agent], if the
conduct: (1) is of the kind the [agent] is
hired to perform, (2) occurs substantially
within the time and space limits authorized or
required by the work to be performed, and (3)
is activated at least in part by a purpose to
serve the [principal].

A principal may also be liable for the acts of
its agent which were outside the scope of the
agent's authority if the principal
subsequently ratifies the actions.

K Co. Realty LLC v. Pierre, 376 So. 3d 730, 734 (Fla. 4th DCA

2023)(internal citations and punctuation omitted).

41

### 2. Ratification

"[A] principal may be still be liable for the acts of its agent which were outside the scope of the agent's authority if the principal subsequently ratifies the actions." <u>Trevarthen v. Wilson</u>, 219 So. 3d 69, 72 (Fla. 4th DCA 2017). "It is a fundamental proposition of the law of agency that a principal may subsequently ratify its agent's act, even if originally unauthorized, and such ratification relates back and supplies the original authority." <u>Kumar Corp. v. Nopal Lines, Ltd.</u>, 462 So. 2d 1178, 1185 (Fla. 3d DCA 1985). "Ratification, as applied to the law of agency, is the adoption or affirmance by a principal of the acts of his agent, either expressly, as by a written act, or impliedly, as by acceptance of the benefits of the" the agent's actions. <u>Spurrier v. United Bank</u>, 359 So. 2d 908, 910 (Fla. 1st DCA 1978). <u>See</u> <u>also</u> <u>K Co. Realty LLC</u>, 376 So. 3d at 734.

"Ratification cannot occur unless the principal has 'full knowledge of all material facts and circumstances relating to the unauthorized act or transaction at the time of the ratification.'" <u>ABC Salvage, Inc. v. Bank of Am., N.A.</u>, 305 So. 3d 725, 729 (Fla. 3d DCA 2020)(citations omitted). "Ratification of an agent's prior unauthorized actions occurs when the principal is *fully informed* of the agent's act and *affirmatively* manifests an intent to approve that act." <u>Stalley v. Transitional Hosps. Corp. of Tampa</u>, 44 So. 3d 627, 631 (Fla. 2d DCA 2010). Constructive knowledge does not

satisfy the fully informed requirement, <u>Bach v. Fla. State Bd. of Dentistry</u>, 378 So. 2d 34, 36 (Fla. 1st DCA 1979), and the failure to act does not satisfy the affirmative action requirement. <u>Stalley</u>, 44 So. 3d at 631. Whether an agent's act has been ratified by the principal is a question of fact. <u>Deutsche Credit Corp. v. Peninger</u>, 603 So. 2d 57, 58–59 (Fla. 5th DCA 1992).

### 3. Aiding and Abetting

"To state a claim for aiding and abetting a tort in Florida, a plaintiff must allege: '(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abetter; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." <u>Taubenfeld v. Lasko</u>, 324 So. 3d 529, 543–44 (Fla. 4th DCA 2021)(quoting <u>Lawrence v. Bank of Am., N.A.</u>, 455 Fed. Appx. 904, 906 (11th Cir. 2012)). The second element requires "that a defendant have actual 'knowledge of the underlying [wrongdoings],' not merely that certain 'red flags' indicate a defendant 'should have known' of the [wrongdoings]." <u>Honig v. Kornfeld</u>, 339 F. Supp. 3d 1323, 1343 (S.D. Fla. 2018). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal[,] or fails to act when required to do so, thereby enabling the breach to occur." <u>Logan</u>, 350 So. 3d at 411 (citations omitted). But substantial assistance for aiding and abetting purposes "has never been boundless." <u>Twitter, Inc. v. Taamneh</u>, 598 U.S. 471,

488-89 (2023).  "That is because, if it were, aiding-and-abetting liability could sweep in innocent bystanders as well as those who gave only tangential assistance. . . . Moreover, both criminal and tort law typically sanction only 'wrongful conduct,' bad acts, and misfeasance. . . . Some level of blameworthiness is therefore ordinarily required."  Id.  "For these reasons, courts have long recognized the need to cabin aiding-and-abetting liability to cases of truly culpable conduct."  Id. at 489.

### 4. Sufficiency of Aiding and Abetting Allegations

Of the "agency" claims left in the SAC, only Count 11 explicitly mentions aiding and abetting. Embedded deep in Count 11, two of the last three paragraphs state that "OMG Realty, Central Park, [and] Garramone were aware of Camp's tortious activity through Camp's communications -on and off – [sic] Garramone Surgery Ctr. and Winkler Property, and knowingly provided substantial assistance. As a result, Garramone's, OMG Realty's, and Central Park's, aiding and abetting of Garramone's employee or agent Camp, Noshirvan suffered [damages]." (Doc. #139, ¶¶ 305-06.)  Counts 7 through 10 simply assert that some defendant(s) was/were "aware" of Camp's allegedly tortious conduct and "provided substantial assistance." (Doc. #139, ¶¶ 231, 247, 262, 282.) These are the apparent bases upon which Noshirvan argues aiding and abetting "was plead." (Doc. #160, p.  16.)

The Court finds otherwise. First, these counts fail to plausibly plead aiding and abetting. The mere recitals of the aiding and abetting elements in Counts 7, 8, 9, and 10 are not enough. See Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Count 11 alleges a little more, explaining that "OMG Realty provided substantial assistance by allowing Garramone and Camp to utilize Garramone Surgery Ctr. to carry out those acts," and that "Central Park provided substantial assistance by allowing Garramone and Camp to utilize the Winkler Property to carry out those acts." (Doc. #139, ¶¶ 302-03.) But the mere "provision of . . . infrastructure which provides material support to [tortfeasors]" is not an affirmative act sufficient to allege substantial assistance under aiding and abetting. See Twitter, 598 U.S. at 499. More must be alleged, such as an "act of encouraging, soliciting, or advising the commission of [a specific wrongful act]." Id. at 500. The SAC does not make such allegations. It simply attempts to attach aiding and abetting liability on defendants because Camp stayed and acted from a property owned by some of those defendants. But that in and of itself does not allege an affirmative act by those defendants towards specific wrongful conduct. The SAC therefore fails to sufficiently plead aiding and abetting.

Second, Noshirvan's attempt to plead aiding and abetting within the "agency" counts results in a shotgun pleading. Noshirvan cannot simultaneously raise a claim for aiding and abetting a tort in the same counts in which he raises an agency claim for that tort. Aiding and abetting and agency are two different vicarious liability actions. By combining them, Noshirvan "commit[ted] the sin of not separating into a different count each cause of action or claim for relief." Weiland, 792 F.3d at 1323. These aiding and abetting claims are dismissed without prejudice.

### 5. Sufficiency of Ratification Allegations

The Court finds that ratification is insufficiently pled. Counts 6 through 11 each contain a sentence asserting that varying defendants were "aware" of and "ratified" Camp's actions. (Doc. #139, ¶¶ 211, 228, 243, 259, 274, 294.) These sentences are conclusory and fail to sufficiently allege ratification. See Iqbal, 556 U.S. at 678. It is also problematic that the sentences assert varying defendants ratified Camp's "actions." Attributing ratification to broad, undefined "actions" is insufficient because "[r]atifying one transaction or act does not encompass multiple independent transactions undertaken at approximately the same time or during the same general course of conduct." Restatement (Third) Of Agency § 4.07 cmt. c (2006). Instead, as to each "act in question," G & M Restaurants Corp. v. Tropical Music Serv., Inc., 161 So. 2d 556, 558 (Fla. 2d DCA 1964), it must be sufficiently

pled that the ratifier was fully informed of the act and that he affirmatively "approve[d] that act." Stalley, 44 So. 3d 627 at 631. The SAC simply fails to comply with this requirement.  Any ratification theory Plaintiff has attempted to plead in these counts is dismissed without prejudice.

### 6. Sufficiency of Actual Agency Allegations

The first two elements of actual agency are sufficiently pled when a complaint alleges that the purported agent was "employed by" the purported principal, was "its employee[] or agent[]", "acting within the scope" of employment, was directly compensated by the purported principal, worked at a location "created, owned, and operated by" the purported principal, wore uniforms provided by the purported principal, and the purported principal represented to others that the purported agent was an employee. Franza v. Royal Caribbean Cruises, Ltd., 772 F.3d 1225, 1236 (11th Cir. 2014).

Here, the SAC alleges that GPS, Central Park, Garramone, and Couture employed Camp; that Camp is their employee or agent, and that Camp was acting within the scope of employment for each. (Doc. #139, ¶¶ 196, 207, 209, 220, 225-26, 235, 240-41.) It is alleged that Couture, GPS, and Garramone paid Camp to act as their "representative, marketing, social media, and online reputation manager." (Id. at ¶¶ 197, 236, 252.) The SAC states Couture

financially compensated Camp, but specifies that GPS and Garramone paid Camp bi-weekly. Camp's job title was allegedly just a guise by which Defendants could pay Camp to terrorize Noshirvan. (Id. at p. 3.) Meanwhile, Central Park is alleged to have paid Camp in kind by letting him live in the Winkler Property "for his services [to] Garramone . . . ." (Id. at ¶ 221.) It is alleged that Camp also worked out of 12998 S. Cleveland Ave, where GPS is located and where all the Garramone entities except for Wraith and GPS maintain their principal place of business. (Id. at ¶¶ 149-50, 276.) Additionally, it is alleged that GPS and Garramone acknowledged in writing that Camp was authorized to act on their behalf. (Id. at ¶ 396.)

The allegations sufficiently plead the first two elements of actual agency only as to Couture, Garramone, GPS, and Central Park. Camp allegedly was their employee, acting within the scope of his employment, and receiving compensation. At the pleading stage, this suffices to plausibly allege that Couture, Garramone, GPS, and Central Park acknowledged Camp would act for them and Camp accepted. See Franza, 772 F.3d at 1236. The reasonable inference is further supported by the allegation that GPS and Garramone acknowledged in writing that Camp was authorized to act on their behalf. See Belik v. Carlson Travel Grp., Inc., 864 F. Supp. 2d 1302, 1311 (S.D. Fla. 2011)(holding actual agency was sufficiently

plead partly based on allegation that principal acknowledged in writing that agent acted on its behalf).

But the SAC does not sufficiently plead the first two elements of actual agency as to any other Defendant. Apart from Couture, Garramone, GPS, and Central Park, no other entity is alleged to have employed or compensated Camp. Nothing in the SAC alleges or suggests that any other entity acknowledged Camp could act on their behalf or that Camp accepted acting on their behalf. Instead, the SAC attempts to attach liability to the other Garramone Entities simply because they share a common managing agent (Garramone) and principal place of business (Cleveland Ave.). But the Garramone Entities cannot be held vicariously liable under actual agency for such mere commonalities since legal entities are separate and distinct "even if they share the same ownership and management." ZAGG Inc. v. Ichilevici, No. 23-CV-20304, 2024 WL 5186468, at *4 n.2 (S.D. Fla. Dec. 20, 2024); United Techs. Corp. v. Mazer, 556 F.3d 1260, 1271 (11th Cir. 2009)(stating that actual agency/respondeat superior "does not necessarily impute to the corporation any and all conduct by one who at times also acts on a corporation's behalf."); see also Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158 (2001)(holding that an individual and an entity solely owned by that individual can each be considered distinct for liability reasons if it is properly alleged that the owner was acting within his scope of employment). This is

especially true here, where the SAC alleges that Garramone hired Camp "to perform services on *his* behalf" and that Camp was "his *personal*" employee. (Doc. #139, ¶¶ 235-236.) The SAC fails to allege the first two elements of actual agency as to anyone except Couture, Garramone, GPS, and Central Park.

The final element—control—is the most important to establish actual agency. Hickman, 5 So. 3d at 806. The SAC fails to plausibly allege anyone controlled Camp. Plaintiff only offers one fact to allege control: compensation. (Doc. #139, ¶¶ 205, 239, 255)(pleading that Couture, Garramone, and GPS "maintained control over Camp by virtue of the monetary compensation" paid to Camp); (Doc. #139, ¶ 224)(pleading that Central Park "maintained control over Camp by virtue of the in kind (living accommodations) compensation it provided to Camp"). Compensation fails to plausibly allege control because it only "evince[s] control over the ends of the job, not the means of it," and therefore it is irrelevant as courts must "ignore 'mere economic control'" when analyzing this element. Garcia-Celestino v. Ruiz Harvesting, Inc., 898 F.3d 1110, 1122 (11th Cir. 2018)(quoting Crew One Prods., Inc. v. N.L.R.B., 811 F.3d 1305, 1311 (11th Cir. 2016)). Fatally, no other fact or argument for control is advanced by the Plaintiff. See id. at 1126 (rejecting control assertion partly because party "d[id] not identify any such control rights [principal] purportedly had.").

Instead of alleging Camp was sufficiently controlled, the SAC actually does the opposite. Unlike mere compensation, the *method* of compensation is relevant to this analysis. See Carlson, 787 F.3d at 1319 (listing "the method of payment, whether by the time or by the job," as a factor to determine control). This is because "an hourly-pay arrangement usually suggests workers are employees, while a by-the-job arrangement tends to indicate they are independent contractors." Garcia-Celestino, 898 F.3d at 1128. The distinction is important because employers can be vicariously liable for the actions of their employees but not for the actions of their independent contractors. Lenox v. Sound Ent., Inc., 470 So. 2d 77, 78 (Fla. 2d DCA 1985); Hunt v. Liberty Lobby, 720 F.2d 631, 649 (11th Cir. 1983).

Here, the SAC itself alleges Camp does "freelance work" to harass "the 'paid-for' target" in exchange for payment. (Doc. #139, ¶¶ 69-70.) A freelancer is essentially synonymous with an independent contractor. See Freelance, Cambridge Dictionary ("working independently usually for various organizations rather than as an employee of a particular one"); Freelance, Collins Dictionary ("Someone who does freelance work . . . is not employed by one organization, but is paid for each piece of work they do by

the organization they do it for.").[8] While it is true that the
descriptive label used by the parties is not determinative of their
actual legal relationship, <u>Nazworth</u>, 486 So. 2d at 638, the factual
allegation that Camp was compensated for the job of harassing
Noshirvan shows an independent contractor relationship, not that
of an employee. <u>Garcia-Celestino</u>, 898 F.3d at 1128.

In sum, the SAC only sufficiently pleads the first two
elements of actual agency as to Couture, Garramone, GPS, and
Central Park. The last and most important element is not
sufficiently pled as to any defendant because the lone fact offered
to show control—that Camp was compensated—fails to do so. If
anything, the SAC alleges that Camp is an independent contractor
hired by multiple parties to harass Noshirvan. Since that fails to
allege the element of control necessary for actual agency
liability, the "agency" defamation claims fail, and are dismissed
without prejudice.

**D. Miscellaneous Arguments**

Since all of the counts merit dismissal for the reasons
stated, any additional arguments need not be reached. But three
miscellaneous arguments do merit discussion. First, Trainor and
Trainor Law argue they are immune from the defamation and

---

[8] Courts may look at popular and legal dictionaries to
determine the ordinary meaning of a word. <u>Spencer v. Specialty
Foundry Prod. Inc.</u>, 953 F.3d 735, 740 (11th Cir. 2020).

misappropriation of likeness claims under Florida's litigation privilege. (Doc. #162, p. 20.) They are wrong. Florida's litigation privilege comes in two forms: absolute and qualified. Grippa v. Rubin, 133 F.4th 1186 (11th Cir. 2025). Absolute litigation privilege applies "when the relevant statements were made 'either in front of a judicial officer or in pleadings or documents filed with the court or quasi-judicial body,'" Id. at 1194. (quoting DelMonico v. Traynor, 116 So. 3d 1205, 1217 (Fla. 2013), abrogated on other grounds by Askew v. Fla. Dep't of Child. & Fams., 385 So. 3d 1034, 1036 n.2 (Fla. 2024)). Qualified litigation privilege applies when "'ex-parte, out-of-court statements' that are related to the underlying lawsuit a[re] made without express malice." Id. at 1198 (quoting DelMonico, 116 So. 3d at 1208, 1218-19). Neither applies here because the alleged acts did not occur before a judicial officer, in filed documents/pleadings, or in the course of an underlying lawsuit.

Next, all Defendants argue that the SAC fails to properly plead punitive damages under Florida Statute § 768.72. But, as Noshirvan correctly argues, the Eleventh Circuit has "held that section 768.72['s] . . . pleading requirements are inapplicable to federal diversity cases." SE Prop. Holdings, LLC v. Welch, 65 F.4th 1335, 1348 (11th Cir. 2023)(citing Cohen v. Office Depot, Inc., 184 F.3d 1292, 1295-99 (11th Cir. 1999), vacated in part on other

grounds, 204 F.3d 1069 (11th Cir. 2000)). Defendants' § 768.72
argument is rejected.

Lastly, Defendants argue that the SAC is replete with
duplicative counts. Plaintiff offers no rebuttal argument. But a
reading of the SAC does suggest that multiple counts are
duplicative. For example, Counts 8 and 10 both allege that
Garramone is vicariously liable for Camp's alleged defamation of
Noshirvan. The same goes for Counts 6, 17, and 18 since they all
allege that GPS is vicariously liable for Camp's alleged defamation
of Noshirvan. Similarly, Central Park is alleged to be vicariously
liable for Camp's alleged defamation of Noshirvan in Counts 7, 10,
and 11. Duplicative counts are dismissed without prejudice and any
forthcoming amended complaint should be devoid of duplicative
counts.

**V.**

Plaintiff may file a final amended complaint for the limited
purpose of addressing the deficiencies addressed in the counts
dismissed without prejudice. Any forthcoming complaint would be
Plaintiff's fourth. If deficiencies persist, the Court will
consider dismissal with prejudice given Plaintiff's repeated
failure to cure and the futility of allowing further amendments.
(See Doc. #168, p. 12)(Plaintiff opining that "[i]f the SAC fails
to put Defendants on notice-no pleading ever will.").

Accordingly, it is now

**ORDERED:**

1. Defendants' Motions to Dismiss (Docs. ##160, 161, 162) are **GRANTED IN PART AND DENIED IN PART** as set forth below.

2. The following counts or portions of counts are **dismissed without prejudice:**

   a. Count 2, except as to Noshirvan's social media accounts and subscribers/donors, which is **dismissed with prejudice.**

   b. Count 3

   c. Count 4, except as to the allegation of false reports to Child Protective Services, which is **dismissed with prejudice.**

   d. Count 5

   e. Count 6

   f. Count 7

   g. Count 8

   h. Count 9

   i. Count 10

   j. Count 11

   k. Count 12, except as to the allegation of false reports to Child Protective Services, which is **dismissed with prejudice.**

l. Count 13, except as to the allegation of false reports to Child Protective Services, which is **dismissed with prejudice.**

m. Count 14, except as to Noshirvan's social media accounts and subscribers/donors, which is **dismissed with prejudice.**

n. Count 15

o. Count 16

p. Count 17

q. Count 18

r. Count 19

3. Plaintiff may file a Third Amended Complaint within **FOURTEEN (14) DAYS** of this Opinion and Order.

**DONE AND ORDERED** at Fort Myers, Florida, this ____26th____ day of June 2025.


_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE


Copies:
Parties of record