UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DANESH     NOSHIRVAN,     an
individual,

      Plaintiff,

v.                                    Case No:  2:23-cv-1218-JES-KCD

JENNIFER COUTURE, an individual,
RALPH GARRAMONE M.D., an individual,
RALPH GARRAMONE, M.D., P.A. d/b/a
GARRAMONE PLASTIC SURGERY,
CENTRAL PARK OF SOUTHWEST
FLORIDA, LLC, OMG REALTY, LLC,
THE LAW OFFICE OF PATRICK TRAINOR
ESQ., LLC d/b/a THE LAW OFFICE OF
PATRICK TRAINOR, PATRICK TRAINOR,
an individual, and
ANTI-DOXING LEAGUE INC.

      Defendants.
_____/

RALPH GARRAMONE, M.D., P.A. d/b/a
GARRAMONE PLASTIC SURGERY,
JENNIFER COUTURE, an individual,
RALPH GARRAMONE, M.D., an individual,
PATRICK TRAINOR, an individual,

      Counter-Plaintiffs,

v.

DANESH NOSHIRVAN,

      Counter-Defendant.
_____/

## **OPINION AND ORDER**

This matter comes before the Court on review of three motions

for  sanctions  and  responses:  (1)  Defendant  Patrick  Trainor

(Trainor) filed a Motion for Rule 11 Sanctions Against Plaintiff's Counsel Nicholas Chiappetta, Esquire (Doc. #202) on December 10, 2024. Nicholas Chiappetta (Chiappetta) filed a Response in Opposition (Doc. #217) on December 20, 2024. With permission from the Court, Trainor filed a Reply (Doc. #227) on January 12, 2025. (2) Plaintiff Danesh Noshirvan (Plaintiff or Noshirvan) filed a Motion for Sanctions (Doc. #266) on March 13, 2025, to which various defendants filed Responses in Opposition. (Docs. ##276, 277, 278, 348.) (3) Defendant Ralph Garramone, M.D., P.A. d/b/a Garramone Plastic Surgery (GPS) filed a Motion for Sanctions (Doc. #334) on April 21, 2025, followed by a supplemental brief (Doc. #352), to which Plaintiff filed a Response in Opposition (Doc. #361) on May 7, 2025. The Court conducted an evidentiary hearing from May 19 to May 20, 2025. The motions are resolved as set forth below.

## I.

Noshirvan published a Tik-Tok video which depicted an altercation between Jennifer Couture (Couture) and another woman. At least two lawsuits have ensued. In this lawsuit, Noshirvan alleges that Defendants, enraged by his publication of the video, began a continuing course of harassment against him.[1] Litigation has not gone smoothly and three competing sanction motions are now

---

[1] A separate case alleges that Noshirvan is the harasser, not the other way around. See 23-cv-340-SPC-KCD (M.D. FL.).

pending before this Court. Defendant Trainor seeks sanctions against Chiappetta, Noshirvan's attorney, pursuant to Rule 11 for filing a third-party's declaration which Chiappetta allegedly knew or should have known was false. Noshirvan seeks sanctions against all Defendants pursuant to the Court's inherent powers for the use of "bad faith litigation tactics," including witness intimidation and harassment. And GPS seeks sanctions against Noshirvan and Chiappetta pursuant to 28 U.S.C. § 1927 and the Court's inherent powers for misconduct at a deposition and harassment of one of GPS's counsel, Julian Jackson-Fannin (Jackson-Fannin).

## II.

The Court first sets forth the relevant principles for each of the asserted sources of authority to sanction — Rule 11, the Court's inherent powers, and 28 U.S.C. § 1927.

### A. Rule 11

Rule 11(b) states that:

By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending,

-3-

> modifying, or reversing existing law or for
> establishing new law;
>
> (3)  the factual contentions have evidentiary
>       support or, if specifically so identified,
>       will likely have evidentiary support after a
>       reasonable opportunity for further
>       investigation or discovery; and
>
> (4)  the denials of factual contentions are
>       warranted on the evidence or, if specifically
>       so identified, are reasonably based on belief
>       or a lack of information.

Fed. R. Civ. P. 11(b). The Rule 11 standard for the imposition of

sanctions has been set forth by the Eleventh Circuit:

> Rule 11 sanctions are warranted when a party files a
> pleading or motion that "(1) has no reasonable factual
> basis; (2) is based on a legal theory that has no
> reasonable chance of success and that cannot be advanced
> as a reasonable argument to change existing law; and (3)
> is filed in bad faith for an improper purpose."
>
> Rule 11 imposes an affirmative duty on an attorney
> to conduct a reasonable inquiry into both the facts and
> the law before filing a pleading or motion. When deciding
> whether to impose sanctions under Rule 11, a district
> court must conduct a two-step inquiry, determining "(1)
> whether the party's claims are objectively frivolous;
> and (2) whether the person who signed the pleadings
> should have been aware that they were frivolous." A
> factual claim is frivolous when it has no reasonable
> factual basis. A legal claim is frivolous when it has no
> reasonable chance of succeeding. When the attorney's
> evidence is "merely weak," but supports a claim under
> existing law after a reasonable inquiry, sanctions are
> unwarranted. Sanctions are warranted, however, when the
> attorney exhibits "a deliberate indifference to obvious
> facts."
>
> If the attorney failed to make a reasonable
> inquiry, then "the court must impose sanctions despite
> the attorney's good faith belief that the claims were

sound." The reasonableness of the inquiry depends on the circumstances of the case.

In addition, an attorney's obligations with respect to the contents of pleadings or motions are not measured solely as of the time when the pleading or motion is initially filed with the court, but also at the time when the attorney, having learned the claims lack merit, reaffirms them to the court. "That the contentions contained in the complaint were not frivolous at the time it was filed does not prevent the district court from sanctioning [the attorney] for his continued advocacy of them after it should have been clear that those contentions were no longer tenable."

Gulisano v. Burlington, Inc., 34 F.4th 935, 941-43 (11th Cir. 2022)(internal citations omitted).

Procedurally, "[u]nder Rule 11's 'safe harbor' provision, the party seeking sanctions must serve a copy of the motion on the opposing party 21 days before filing a motion for sanctions under Rule 11." Dudar v. State Farm Fire & Cas. Ins., No. 23-12788, 2024 WL 3580079, at *1 (11th Cir. July 30, 2024)(citing Fed. R. Civ. P. 11(c)(2)).

**B. Court's Inherent Powers**

"A court may impose sanctions for litigation misconduct under its inherent power[s]." Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1306 (11th Cir. 2009)(citations omitted). "These powers are necessarily vested in courts to manage their affairs to 'achieve the orderly and expeditious disposition of cases.'" In re Mroz, 65 F.3d 1567, 1575 (11th Cir. 1995)(quoting Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)).

To trigger the Court's inherent powers, "the party moving for sanctions must show <u>subjective</u> bad faith." <u>Hyde v. Irish</u>, 962 F.3d 1306, 1310 (11th Cir. 2020) That "mean[s]" showing "intentional and not just reckless behavior." <u>J.C. Penney Corp., Inc. v. Oxford Mall, LLC</u>, 100 F.4th 1340, 1346 (11th Cir. 2024)(citing <u>Purchasing Power, LLC v. Bluestem Brands, Inc.</u>, 851 F.3d 1218, 1224-25 (11th Cir. 2017)). This showing can be done with either (1) direct evidence of subjective bad faith or (2) evidence of conduct "so egregious that it could only be committed in bad faith." <u>Hyde</u>, 962 F.3d at 1310(quoting <u>Purchasing Power</u>, 851 F.3d at 1224-25).

Once a showing of subjective bad faith is made, the full force of the Court's inherent powers is unleashed, and the Court can utilize its discretion to impose wide-ranging sanctions against any offending party for a full range of litigation abuses. <u>Mingo v. Sugar Cane Growers Co-op. of Fla.</u>, 864 F.2d 101, 102 (11th Cir. 1989)("The sanctions imposed can range from a simple reprimand to an order dismissing the action with or without prejudice."); <u>In re Sunshine Jr. Stores, Inc.</u>, 456 F.3d 1291, 1304 (11th Cir. 2006)("Federal courts have the inherent power to impose sanctions on parties, lawyers, or both."); <u>Chambers</u>, 501 U.S. at 46 ("[T]he inherent power extends to a full range of litigation abuses."). "Because of their very potency, inherent powers must be exercised with restraint and discretion," and a "primary aspect of that discretion is the ability to fashion an appropriate sanction for

conduct which abuses the judicial process." <u>Chambers</u>, 501 U.S. at 44-45.

### C. 28 U.S.C. § 1927

Title 28, § 1927 provides that:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. "[T]he plain language of the statute imposes three essential requirements for an award of sanctions under § 1927:"

> First, the attorney must engage in "unreasonable and vexatious" conduct. Second, that "unreasonable and vexatious" conduct must be conduct that "multiplies the proceedings." Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, *i.e.,* the sanction may not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

<u>Amlong & Amlong, P.A. v. Denny's, Inc.</u>, 500 F.3d 1230, 1239 (11th Cir. 2007). To trigger § 1927, "the party moving for sanctions must show <u>objective</u> bad faith," which usually means showing the "attorney acted 'knowingly or recklessly.'" <u>Hyde</u>, 962 F.3d at 1310 (quoting <u>Schwartz v. Millon Air, Inc.</u>, 341 F.3d 1220, 1225 (11th Cir. 2003)).

**III.**

The Court next addresses the conduct alleged in each motion, the Court's relevant factual findings, and the imposition of sanctions, if any.

**A. Trainor's Rule 11 Motion For Sanctions Against Chiappetta**

**(1)    Allegations of Misconduct**

Trainor's Motion For Sanctions (Doc. #202) alleges that Chiappetta "committed a fraud upon this Court when he attached 'Declaration of James McGibney'" to his response against a motion to dismiss because Chiappetta knew or should have known that the Declaration "falsely states that Trainor conspired with Joseph Camp ('Camp') to use emails, telephones, and social media posts to threaten and harass a process serve[r] and her company, We Serve NJ, LLC." (Id. at p. 1.) Trainer continues that the McGibney Declaration "falsely states Trainor conspired to harass We Serve," which Chiappetta knew was false.  (Id. at p. 2.)  Trainor asserts Chiappetta filed the Declaration "argu[ing] that it is proof of a pattern of conduct, through which this Court can imply that Trainor participated in a civil conspiracy against Noshirvan."  (Id.) Trainor asserts that "[t]he McGibney Declaration's statements about Trainor are completely fabricated and are a component of Chiappetta's ongoing efforts to socially engineer a non-existent conspiracy against Noshirvan." (Id.)(footnote omitted.)

-8-

**(2)  Court's Factual Findings**

The McGibney Declaration was originally filed in Case No. 23-cv-340 and was later attached as an exhibit to Chiappetta's Response in Opposition to Defendants' Motion to Dismiss the operative pleading in the current case. (Doc. #170-10.) Chiappetta attached the Declaration to support his argument that a civil conspiracy was sufficiently pled because conspiracy could "be implied or inferred through a pattern of conduct." (Doc. #170 at p. 17.) Most of the McGibney Declaration addresses McGibney's own actions and the alleged actions of Camp. Only one paragraph mentions harassment of a process server:

> Lastly, I would like to bring to the court's attention an incident that occurred on February 6, 2024. Upon discovering that I served Mr. Trainor with a letter stating his misrepresentations to the court, Mr. Camp immediately began to harass the process server. I have attached the process server's affidavit to my affidavit.

(Doc. #170-10, ¶ 22.)[2] The supporting affidavits detail Camp's alleged harassment, but do not mention Trainor. (See Docs. #170-11,12.)

The Court finds the McGibney Declaration pertinently asserts three facts: (1) that Trainor was served with a letter; (2) that Camp learned of the service; and (3) that "Camp immediately began to harass the process server." (Doc. #170-10, ¶ 22.) Four days

---

[2] Plaintiff labeled this exhibit as "Exhibit J." However, the exhibit appears on the Court's CM/ECF system as Exhibit 10. The Court will cite each exhibit herein by the numerical number assigned to it by the Court's CM/ECF system.

after the McGibney Declaration was filed in this case, "Trainor served Chiappetta a Rule 11 Safe Harbor letter," (Doc. #202, p. 7) in which Trainor demanded Chiappetta move to strike the McGibney Declaration or face a Rule 11 motion. (See Doc. #202-7.) Chiappetta never moved to strike the McGibney Declaration, and Trainor filed the Rule 11 Motion more than twenty-one days after serving the safe harbor letter.

**(3)  Appropriateness of Sanctions**

Trainor's Motion requests the Court "strike the falsely sworn McGibney Declaration, sanction Chiappetta and grant Defendant such other and further relief as the Court deems just." (Doc. #202, p. 22.) Because a letter does not satisfy Rule 11's safe harbor requirement and the pertinent factual claims made in the McGibney Declaration are not objectively frivolous, Trainor's Motion fails both procedurally and substantively and no relief is warranted.[3]

Trainor's motion for Rule 11 sanctions fails procedurally because the letter Trainor sent to Chiappetta does not satisfy

---

[3] Like Trainor's request for sanctions, his request to strike is not merited. A full three weeks before Trainor sought to strike the declaration, the Court denied another defendant's request for the same exact relief. (See Doc. #193.) The order explained that the Civil Action Order in effect "required discussion" of specific cases and their rational when a party moves to strike, and because that motion did not contain that required discussion, it was "unnecessary" and "without legal support". (Doc. #193, p. 3.) Trainor's motion commits the same error and merits the same result. Plus, because the motion to dismiss was decided without affording any weight to the declaration, (Doc. #420, p. 18 n. 4), Trainor's request to strike the declaration is moot.

Rule 11's safe harbor requirements. Rule 11 explicitly requires service of a sanction "motion" on the opposing party to start the twenty-one-day safe harbor clock. Fed. R. Civ. P. 11(c)(2). Trainor does not point to an Eleventh Circuit decision which permits a letter to start the twenty-one-day safe harbor clock, and the Court is not aware of such a case. With one exception, every circuit to address the question in a published opinion has held that a letter is insufficient to trigger Rule 11's safe-harbor period.[4]

The only exception is the Seventh Circuit. See Nisenbaum v. Milwaukee Cnty., 333 F.3d 804, 808 (7th Cir. 2003). In one sentence, the Nisenbaum court found a letter sufficient because it "complied substantially" with Rule 11's safe harbor provision. Id. Other circuit courts have "roundly criticize[d] the decision's cursory reasoning," Penn, 773 F.3d at 769, finding it "unpersuasive

---

[4] See Triantos v. Guaetta & Benson, LLC, 91 F.4th 556, 564 (1st Cir. 2024)(holding that a "letter could not have triggered the safe-harbor period"); Caranchini v. Nationstar Mortg., LLC, 97 F.4th 1099, 1102 (8th Cir. 2024)(holding that letters and other informal notices cannot "start the 21-day safe harbor period"); Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd., 682 F.3d 170, 175 (2d Cir. 2012)("An informal warning in the form of a letter without service of a separate Rule 11 motion is not sufficient to trigger the 21-day safe harbor period."); Penn, LLC v. Prosper Bus. Dev. Corp., 773 F.3d 764, 769 (6th Cir. 2014)(holding that a letter "fail[ed] to observe the mandatory procedures of Rule 11"); In re Pratt, 524 F.3d 580, 586 (5th Cir. 2008)(same); Roth v. Green, 466 F.3d 1179, 1192 (10th Cir. 2006)("[W]e conclude . . . that defendants' letters were not sufficient to satisfy the requirements of subsection (c)(1)(A), and thus the district court abused its discretion in granting defendants' motions for Rule 11 sanctions."); Barber v. Miller, 146 F.3d 707, 710 (9th Cir. 1998).

. . . because it contains no analysis . . . cites to no authority
. . . and indeed is the only published circuit decision reaching
such a conclusion." Roth, 466 F.3d at 1193. The Seventh Circuit
itself has acknowledged that "Nisenbaum stands alone and is
difficult to reconcile with the explicit requirements of the Rule
and the clear explanation from the Advisory Committee." N. Illinois
Telecom, Inc. v. PNC Bank, N.A., 850 F.3d 880, 887 (7th Cir. 2017).
The Advisory Committee's explanation is that:

> To stress the seriousness of a motion for sanctions
> and to define precisely the conduct claimed to violate
> the rule, the revision provides that the "safe harbor"
> period begins to run only upon service of the motion. In
> most cases, however, counsel should be expected to give
> informal notice to the other party, whether in person or
> by a telephone call or letter, of a potential violation
> before proceeding to prepare and serve a Rule 11 motion.

Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment
(emphasis added). "In other words, the Advisory Committee's Notes
clearly suggest that warning letters . . . are supplemental to,
and cannot be deemed an adequate substitute for, the service of
the motion itself." Penn, 773 F.3d at 767 (quoting Roth, 466 F.3d
at 1192). The Seventh Circuit conceded as much. See PNC Bank, 850
F.3d at 888.

    The Court finds the overwhelming circuit case law on this
issue persuasive. Trainor's letter failed to satisfy Rule 11's
safe harbor procedural requirements, thus precluding Trainer from
seeking or obtaining Rule 11 sanctions based on the McGibney
Declaration.

Trainor's Rule 11 Motion also fails substantively. Trainor's own assertions and the exhibits show the pertinent factual claims in the McGibney Declaration were reasonably grounded on facts and not objectively frivolous. The statement that Trainor was served with a letter had a reasonable factual basis because even Trainor asserts that Chiappetta possessed a video of Trainor being served with the letter. (Doc. #202 ¶ 12.) The statement that Camp harassed the process server had a reasonable factual basis because Trainor himself asserts that Chiappetta was copied on emails, (id. ¶ 13), where the process server company stated, among many other things, that Camp requested correspondence regarding Trainor's service and then kept "emailing and calling [them] and making threats." (Doc. #202-4, p. 7.) McGibney's supporting affidavits also lend support to the existence of harassment. Finally, the statement that Camp had learned Trainor was served with the letter had a reasonable basis because Camp was requesting information about that service, as the process server company asserted. Trainor has not established that the McGibney Declaration was false or that Chiappetta knew or should have known about a falsity.

Additionally, despite Trainor's assertions to the contrary, the Declaration does not say that Trainor conspired with Camp. Because the factual claims made in the contested portion of the McGibney Declaration did not accuse Trainor of a conspiracy and

-13-

were not objectively false or frivolous, Trainor's Rule 11 Motion fails substantively. Trainor's Motion is denied.

**B. Noshirvan's Motion For Sanctions**

    **(1)  Allegations of Misconduct**

Noshirvan's Motion For Sanctions (Doc. #266) alleges that all Defendants engaged in broad "bad faith litigation tactics" in this case and in the previously filed case.[5] At the evidentiary hearing, Chiappetta narrowed the alleged misconduct to two defendants, Trainor and Couture. (Doc. #451, pp. 18-20.) Chiappetta accused Trainor's Rule 11 Motion of baselessly asserting a hacking. (Id. at pp. 18-19.) And Chiappetta accused Couture of working in tandem with Luthmann and Camp to disseminate information and intimidate and harass expert witness Brad LaPorte. (Id. at pp. 19-20.)

    **(2)  Court's Factual Findings**

Chiappetta used the evidentiary hearing to move documents into evidence and elicit testimony. Except for evidence that establishes some relation between Couture and the harassment of expert witness Brad Laporte, none of the other evidence establishes any of the allegations.

The most incriminating evidence deals with Couture and the harassment of expert witness Brad LaPorte. Couture admitted on the

---

[5] The Court declines to consider allegations of impropriety in the separate case because the undersigned has no authority to consider or impose sanctions in another judge's case.

stand that she provided Luthmann with a copy of Noshirvan's expert
disclosures listing LaPorte as an expert witness. Couture
testified she provided these reports to Luthmann to obtain his
feedback, and obtained Luthmann's assurance he would not share the
expert disclosures with anyone. Not surprisingly, and contrary to
his assurance, Luthmann published the expert disclosures on the
internet, which led to the harassment of LaPorte and his eventual
withdrawal from the case. Couture testified that she never
instructed Camp or anyone else to intimidate or harass witnesses.
While a protective order currently prohibits any defendant,
including Couture, from disseminating such non-public expert
reports, (Doc. #251), at the time of this disclosure to Luthmann
there was no protective order which prohibited disclosure.

None of the other evidence presented at the evidentiary
hearing establishes any of Noshirvan's allegations. At most, the
remaining evidence shows communications between Couture and
Luthmann, and Trainor and Camp, and suggests that Camp was hired
by Garramone and Couture for "reputation management." The
communications between Couture and Luthmann included Couture
sending Luthmann tweets, articles, and YouTube clips about
Noshirvan. (See Doc. #406-3.) The communications between Trainor
and Camp consist mostly of unilateral messages from Camp to
Trainor, except for one exchange where Camp offers to get a
document notarized and Trainor replies there is no need to do so.

-15-

(See Docs. #406-8, 9, 10, 11.) The communications between Couture
and Garramone reference a "Joey", presumably Joseph Camp. (Doc.
#406-5, p. 1.) In another communication, Garramone stated "we never
asked or paid Joey to do anything other than reputation management
after Noshirvan attacked us . . . ." (Doc. #406-1, p. 3.) The
communications certainly suggest some relationship between Couture
and Luthmann, Trainor and Camp, and Garramone, Couture, and Camp.
But not more.

### (3)  Appropriateness of Sanctions

Noshirvan's Motion requests "that the Court grant [h]is
Motion and default the Defendants on liability only or enter an
order extending the CMSO deadline by 60-days for Noshirvan's expert
report, by 30-days for Noshirvan's expert rebuttal, award monetary
sanctions, allow Noshirvan to supplement this motion with a fee
and cost affidavit, and any other relief this Court deems just and
proper." (Doc. #266, p. 22.) Apart from a deadline extension, the
Court finds no other relief is warranted.

Relief is not warranted as to Noshirvan's allegation that
Trainor is knowingly and falsely asserting that Camp's internet
accounts were hacked because some evidence on the record does
suggest a hacking occurred. (See Doc. #406-15, 17.) Furthermore,
no evidence established that any expert witnesses are being
harassed at the behest of any Defendants.

The evidence does establish, however, that Couture recklessly disclosed to Luthmann the expert disclosures identifying LaPorte as an expert witness for Noshirvan. It was reckless because Couture testified that she reads Luthmann's internet publications, and anybody who reads those publications would know at least two things: (1) Luthmann publishes things and (2) Luthmann hates Noshirvan. It was predictable that Luthmann would publish the expert disclosure and that the disclosure would be used against Noshirvan.

Nonetheless, Couture's behavior is not sanctionable under the Court's inherent powers because it does not rise to the level of subjective bad faith. For Couture to be sanctioned for LaPorte's harassment under the Court's inherent powers, Plaintiff had the burden of showing either direct evidence establishing that Couture intended for LaPorte to be harassed or evidence that Couture's conduct was so egregious that it could only have been committed in bad faith. J.C. Penney Corp., 100 F.4th 1340 at 1346; Hyde, 962 F.3d at 1310. Plaintiff failed to do either. No direct evidence establishes that Couture gave the expert disclosures to Luthmann with the intention that LaPorte be harassed. To the contrary, Couture expressly stated under oath that she gave the expert disclosures to Luthmann for the purpose of receiving his feedback, not so witnesses would be intimidated or harassed. (Doc. #450, p. 80, 83.) Her testimony is credible given that Luthmann is a former

-17-

attorney. And the act of giving the expert disclosures to Luthmann was not so egregious that it only could have been committed in bad faith. Since Couture's behavior does not rise to the level of subjective bad faith, she cannot be subjected to a sanction under the Court's inherent powers.

Though Noshirvan is not entitled to sanctions based on subjective bad faith, he is entitled to his alternative request for an extension of deadlines because he has established good cause. As discussed above, Couture recklessly shared Noshirvan's expert disclosures, leading to the harassment and eventual withdrawal of expert witness LaPorte. The Court finds good cause and justification to extend deadlines as follows: The Court will recognize Noshirvan's rebuttal expert report of Chris Silver Smith, provided to Defendants on June 4, 2025, (Doc. #410, ¶ 5), as timely. With no trial date certain set in this case, the Court will also reopen discovery until September 13, 2025, for the sole limited purpose of allowing discovery on the expert disclosure. See Bodden v. Cole, 2012 WL 33051, at *2 (M.D. Fla. Jan. 6, 2012) (finding that an untimely expert disclosure would be harmless where there was plenty of time before trial and the court reopened discovery for this limited purpose). Other deadlines are necessarily impacted, so a new Case Management and Scheduling Order will be issued separately by the assigned magistrate judge. Otherwise, Noshirvan's Motion is denied.

### C. GPS's Motion For Sanctions

#### (1)  Allegations of Misconduct

GPS's Motion For Sanctions (Doc. #334) and supplemental brief (Doc. #352) allege that Noshirvan made a series of communications "designed to improperly influence this proceeding through extrajudicial means, and incite targeted harassment of GPS's counsel by Plaintiff's massive online following, which harassment has now occurred and continues to metastasize." (Doc. #334, pp. 1-2.) GPS asserts that Noshirvan's media posts are defamatory (Id. at 7-9) and merit sanctions. It is also alleged that Chiappetta is subject to sanctions because he has condoned Noshirvan's misconduct. (Doc. #352, pp. 3, 12-13.)

#### (2)  Court's Factual Findings

Noshirvan's wife Hannah (Mrs. Noshirvan) was identified as a witness in plaintiff's Second Amended Initial Disclosures served on September 26, 2024. On April 15, 2025, Jackson-Fannin, counsel for GPS, took the deposition of Mrs. Noshirvan remotely by Zoom. At the outset, Jackson-Fannin went "over a couple of ground rules" with Mrs. Noshirvan, including the "need to make sure that there's no external influences." (H. Noshirvan Dep. 8:14, 10:7-8.) Jackson-Fannin asked, "Is there anyone in the room with you right now?" (Id. at 10:8-9.)  Mrs. Noshirvan responded "No." (Id. at 10:10.)

-19-

Once underway, Jackson-Fannin delved into two areas of questioning which resulted in the conduct at issue in the motion. First, Jackson-Fannin presented Mrs. Noshirvan with a picture of a woman with the words "[Mrs.] Noshirvan in 'Black Face'" written underneath it. (See Doc. #406-31, p. 255.) The woman in the picture is smiling widely with light neon eyes while wearing what appears to be black makeup. (Id.) Jackson-Fannin asked Mrs. Noshirvan if she was the person in the photo, and Mrs. Noshirvan responded yes. (H. Noshirvan Dep. 35:11-15.) Jackson-Fannin asked Mrs. Noshirvan when the picture was taken, and she explained that the picture was taken somewhere between 2008 to 2013 when she played a character in a play who got blown up and became "a burnt charcoal-covered zombie." (Id. at 36:5-22.) Jackson-Fannin then asked:

> Q. And your costume was the same?
>
> A. It was the costume before me, it was the costume after me. It was the costume for that character.
>
> Q. And your makeup, your costume makeup was the same?
>
> A. Yes, the makeup was the same.
>
> Q. So you don't harbor any animosity towards African-Americans or black people?
>
> A. No, I do not, and I also take offense at that picture as labeled, "Blackface picture." That is not blackface.
>
> Q. Okay.
>
> A. It's been taken out of context.

Q. Okay.

A. You can see I have zombie contact lenses on.

Id. at 36:23-37:12. Jackson-Fannin then moved on to another subject.

Second, Jackson-Fannin inquired about an explicit picture uploaded to an OnlyFans account with the handle "@thatdaneshguy"—the same social media handle Noshirvan uses on TikTok, Instagram, YouTube, and other platforms.[6] The operative pleading at that time alleged Noshirvan was harmed by defendants' false statements that Plaintiff and his wife are "swingers." Jackson-Fannin asked Mrs. Noshirvan if she was aware Noshirvan had an OnlyFans account, if she knew who was in the picture, if she and her husband had an open marriage, and other similar questions. During this line of questioning, Noshirvan interrupted:

> MR. JACKSON-FANNIN: Mrs. Noshirvan, please. Mr. Chiappetta, please advise your client that she needs to answer my question.
>
> MR. DANESH NOSHIRVAN: Whoa, I'll remember this at settlement. I'll remember this shit at settlement.

---

[6] The Court takes judicial notice of some of Noshirvan's social media accounts. Noshirvan's TikTok account has about two million followers. See TikTok, https://www.tiktok.com/@thatdaneshguy (last visited July 18, 2025). Noshirvan's Instagram account has about five hundred thousand followers. See Instagram, https://www.instagram.com/thatdaneshguy/ (last visited July 18, 2025). Noshirvan's YouTube account has about one hundred sixty thousand subscribers. See Youtube, https://www.youtube.com/@ThatDaneshGuy (last visited July 18, 2025).

BY MR. JACKSON-FANNIN: Q. And now we understand, is Mr. Noshirvan in the room with you, Mrs. Noshirvan?

A. No. No. He's not. He was in the hallway.

Q. Was he there just a moment ago in the room with you?

A. No, no, he was not.

Q. Well, then what was the voice that we just heard, Mrs. Noshirvan?

A. He's in the hallway. He's in the hallway.

Q. Is the door open and is he visible from you right now?

A. No. The door was cracked.

MR. JACKSON-FANNIN: Okay. So then, Mr. Chiappetta, please advise your client to answer my question.

THE WITNESS: Stop, Danesh, stop.

MR. DANESH NOSHIRVAN: Act with decency, motherfucker, and maybe I will. What are you asking her about, you dumb shit? You're asking her about photos –

MR. CHIAPPETTA: Danesh, stop.

MR. DANESH NOSHIRVAN: What the fuck is wrong with you?

MR. CHIAPPETTA: Danesh, stop. Walk away.

MR. DANESH NOSHIRVAN: I'm sorry, I hear him from the hallway and I had to come and tell him he's a fucking misogynistic piece of shit. Fuck you.

MR. JACKSON-FANNIN: Mr. Chiappetta, would you like to advise your client?

THE WITNESS: I closed the door.

MR. CHIAPPETTA: No, I think your entire line of questioning is inappropriate. This is not a conversation between -- that involves the deponent in any which way whatsoever. It's between two other individuals, and you are just trying to get some type of impression or create a reaction, which you just did, which is fantastic. So

> I hope that Ms. Couture and Doctor Garramone who are on this deposition as well, see just how great of a job you're doing, because, oh, you definitely inspired my client to take this all the way. So good job, Julian, let's move on.

Id. at 118:16-120:14. Jackson-Fannin concluded his deposition without further interruptions from Noshirvan.

Noshirvan then published a series of internet communications starting the next day. An April 16, 2025 Substack post with the headline "Breaking! Lawyer Julian A. Jackson allegedly stated he cannot tell the difference between BLACK PEOPLE and MONSTERS! Shares Revenge Porn in court!," described Jackson-Fannin as a "low-class racist" who "went on a hyper-racist tangent" when he "held up a photo of [Noshirvan's wife] and thought it would be funny to say that it was a person doing blackface." (Doc. #352-1, pp. 2-3.) "Do you hate black people, Julian?" the post asks. (Id. at p. 3.) The post also described Jackson-Fannin as a "pervert" for questioning Mrs. Noshirvan about the OnlyFans picture. (Id.) Noshirvan wrote that Jackson-Fannin "cried in deposition that he was going to tell the judge I threatened him after I may or may not have interrupted the deposition when I heard Julian's perverted questions and may or may not have called him a 'fucking pig' and a 'misogynist' because that's what you call people who share revengeporn [sic] and men need to stand up to men." (Id.) The post ends with a sarcastic line: "Since he's a lawyer, this is all 'allegedly' and so are all my posts LOL." (Id. at p. 4.)

-23-

Noshirvan soon deleted the April 16 post, explaining to his followers that he was going to seek relief in court instead. (See Doc. #352-9, p. 2.) But after later posting that "[m]y lawyer says I can restore it now," (id.), Noshirvan proceeded to publish two similar Substack posts on April 17, 2025. (See Docs. #352-2, 3.) In the April 17, 2025 Substack posts, Noshirvan again described Jackson-Fannin as a "low-class racist" but added that he is also a "misogynist" and a "pig". (Id.) Both posts asserted that Jackson-Fannin "sa[id] that he thinks black people look like monsters . . . ." (Id.) The second April 17 Substack asks, "Does Julian A. Jackson-Fannin always sexually harass people in deposition?" (Doc. #352-3, p. 3.)

Noshirvan then began making posts on social media. On a picture of Jackson-Fannin uploaded to the Instagram account of professional organization with which Jackson-Fannin is associated, Noshirvan commented "This man sexually harassed my wife." (Doc. #352-4, p. 2.) Noshirvan published a story on his Instagram of that comment, while tagging another professional organization with which Jackson-Fannin is associated. (See Doc. #352-4, p. 3.) In another two Instagram posts, Noshirvan similarly tags the organizations while stating Jackson Fannin "sexually harassed my wife." (See Doc. #352-4, pp. 4-5.) Noshirvan then made two posts with the link to the Substack posts. (See Doc. #352-4, pp. 7-8.) In the first, Noshirvan wrote: "Share this everywhere. Thank you."

-24-

(Id. at p. 7.) In the second, Noshirvan wrote: "This man is Julian A Jackson-Fannin of Duane Morris LLP and this man sexually harassed my wife during deposition." (Id. at p. 8.)

Noshirvan followed up his social media posts with an email to Jackson-Fannin on April 19, 2025, on which Chiappetta and others at Duane Morris were copied. (See Doc. #352-6, pp. 4-5.) In the email, Noshirvan again referred to Jackson-Fannin as a "pig", and asked Jackson-Fannin "Do you hate brown people just like you hate women, Julian?" (Id. at p. 5.)

Noshirvan published two more Substack posts on April 21 and April 23, 2025. (Doc. #352-7, 8.) In the April 21 Substack, Noshirvan wrote "[y]ou should apologize to my wife, sexist pigs." (Doc. #352-7, p. 4.) In the April 23 Substack, after GPS filed the present Motion, Noshirvan wrote: "I never directed any harassment towards [Jackson-Fannin] and have absolutely no issue saying what I've said many times on my platform[,] which is: I do not support harassment, bullying, or threatening anyone." (Doc. #352-8, p. 3.)

Predictably, Noshirvan's communications led to harassment. At least one of Noshirvan's Instagram posts about Jackson-Fannin received about five thousand "likes" (Doc. #352-5, p. 5) with people reacting with pictures and comments which read "I'm gonna kill him. Want to come?", "GET HIM !!!!!!!", "[o]h, he's meat," "[s]ounds like street justice time," "[t]ime to bring back Real Justice," "[f]ind him and his wife[,] make the score even," among

-25-

others. (Doc. #406-29.) Duane Morris was inundated with disparaging messages on Instagram. (See Doc. #352-4, p. 6.) People called and left Jackson-Fannin threatening voicemails, sometimes employing the same language Noshirvan used in his communications:

> Hey Julian, we gotcha. We know where you live, we know who your mother is, we know who your sisters are, we know who your . . . any female relative you have, we are going to sexually harass them . . . I think. We're thinking about it. We're figuring out who we need to call, what we need to do. But you're a dirty fucking disgusting pig. You're a disgrace to all men everywhere. You're a disgrace to lawyers everywhere. . . . Fuck you, you piece of fucking shit.

(Doc. #406-30.) Jackson-Fannin testified that he had never received these types of messages until Noshirvan's communications.

Chiappetta made negligible attempts to restrain his client Noshirvan. At the deposition, Chiappetta initially instructed Noshirvan to "stop", but then answered "No," when Jackson-Fannin asked him in other words to restrain Noshirvan. (See H. Noshirvan Dep. 120:3.) Jackson-Fannin alerted Chiappetta via email of Noshirvan's April 16 Substack post the same day it was published. (Doc. #406-19, p. 3.) Chiappetta responded that the post had been deleted but added: "Your actions in yesterday's deposition reflect poorly not only on yourself, but on Duane Morris too. Take responsibility for your actions." (Id. at pp. 1-2.) Beginning the next day, Noshirvan began publishing more communications after posting "[m]y lawyer says I can restore it now." (Doc. #352-9, p.

-26-

2.) Noshirvan's assertion that Chiappetta greenlit his publication was not persuasively rebutted by any evidence.

After being alerted of Noshirvan's email, Chiappetta responded that he would "advise [Noshirvan] to stop emailing you." (Doc. #352-6, pp. 3-4.) But Chiappetta defiantly added: "To the extent, [sic] you claim to bring my client's email to the court, what are you going to say? Nothing my client said is actionable and there is a factual basis to support certain statements." (Id. at p. 3.) Furthermore, Chiappetta told GPS's counsel: "Please stop emailing me on the weekend. This is clearly not an emergency." (Id.) After GPS filed the present Motion, Chiappetta sent GPS's counsel an email:

> Very cute filing. Way to destroy your own reputation by filing frivolous motions, falsely claiming defamation, and falsely certifying conferrals that did not occur in violation of the local rules. Don't worry, we will correct all of your false statements.

(Doc. #352-6, p. 2.)

### (3)  Appropriateness of Sanctions

GPS requests the following relief:

1. Order Plaintiff to appear in person for a hearing on this Motion to answer for his conduct;

2. Direct Plaintiff to immediately remove all social media posts targeting Mr. Jackson-Fannin and prohibit further public commentary that could prejudice this litigation or endanger its participants, including other counsel for GPS as well as other attorneys in this case;

   3. Compel Plaintiff to issue a formal, public retraction and to request his followers to cease all harassment and threats directed at Mr. Jackson-Fannin;

   4. Formally reprimand Mr. Chiappetta and issue an order directing him to control his client's conduct, as required by Rule 4-8.4(d) of the Florida Rules of Professional Conduct;

   5. Award GPS all attorneys' fees and costs incurred in connection with preparing and filing this Motion;

   6. Order that any violation of the Court's order would result in dismissal of Plaintiff's case; and

   7. Any additional relief that the Court believes is just and proper to address the issues raised herein.

(Doc. #334 at p. 2-3.)

  The Court has no authority to issue sanctions against Noshirvan under § 1927 because Section "1927 only applies to attorneys or persons admitted to conduct cases in a court of law." Smith v. Grand Bank & Tr. of Fla., No. 04-80343, 2005 WL 6106148, at *7 (S.D. Fla. Apr. 28, 2005)(collecting cases). See also Roadway Exp., Inc. v. Piper, 447 U.S. 752, 757 (1980)(stating that "§ 1927 deals only with attorney conduct . . . ."). Nor can the Court sanction Chiappetta under § 1927 because, even though he is an attorney subject to § 1927, his conduct here is not sufficient to warrant such sanctions. See Peer, 606 F.3d at 1314 (holding that even though attorney acted in bad faith, sanctions under § 1927 were inappropriate because the bad faith conduct was not dilatory nor did it multiply the proceedings). Even if Chiappetta acted with objective bad faith, GPS failed to substantively argue or

much less show that the conduct was dilatory or that it multiplied the proceedings.

Sanctions are appropriate against Noshirvan, however, under the Court's inherent powers. First, Noshirvan interrupted a deposition in which he was not a participant, telling Jackson-Fannin he'd "remember this shit at settlement." (H. Noshirvan Dep. 118:20-21.) When Jackson-Fanning attempted to continue with the deposition, Noshirvan interrupted for a second time and called Jackson-Fannin a "motherfucker", a "dumb shit", and a "misogynistic piece of shit." (Id. at 119:10-12, 14-16, 24.) Noshirvan crudely asked Jackson-Fannin "what the fuck" was wrong with him. (Id. at 119:19-20.) "Fuck you" were Noshirvan's parting words. (Id. at 119:24.)

Noshirvan's interruption and language at the deposition show subjective bad faith and merits sanctions. E.g. Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1320 (11th Cir. 2002)("A party also demonstrates bad faith by delaying or disrupting the litigation . . . ."). Noshirvan repeatedly hurled expletives at Jackson-Fannin, even after being told to stop, which establishes that his behavior was intentional and was so egregious that it could only have been committed in bad faith. Such misbehavior at a deposition justifies sanctions.

Additionally, and more importantly, Noshirvan's conduct after the deposition merits sanctions under the Court's inherent powers.

-29-

If Noshirvan's wife was being improperly questioned by Jackson-Fannin, the appropriate reaction was to present a motion and seek relief from the Court. See Fed. R. Civ. P. 30(c)(2). Noshirvan knew court intervention was the appropriate remedy by April 16, 2025, at the latest. (See Doc. #352-9, p. 2)(Noshirvan's April 16th social media post explaining the April 16 Substack post was deleted because Chiappetta would "be addressing the behavior displayed by" Jackson-Fannin with the Court). Yet no motion ever came and Noshirvan instead resorted to publishing more inflammatory communications against Jackson-Fannin. This shows intentional and not just reckless behavior.

Noshirvan's post-deposition communications were not only inflammatory but false and intentionally made to incite followers to engage in foreseeable harassment and intimidation. Noshirvan asserted that Jackson-Fannin "sa[id] that he thinks black people look like monsters . . . ." (Docs. #352-2, 3.) The deposition transcript establishes Jackson-Fannin did not say that or anything remotely close. Nor did Jackson-Fannin sexually assault Mrs. Noshirvan, as Noshirvan asserted. Noshirvan baselessly called Jackson-Fannin a "low-class racist", a "pig", and a "misogynist". Noshirvan's communications are sanctionable under the Court's inherent powers because they served no purpose other than to improperly influence the litigation by disrupting the court

-30-

proceedings and harassing and intimidating opposing counsel.
Thomas, 293 F.3d at 1324 n.28.

Chiappetta also acted in bad faith and is subject to sanctions
under the Court's inherent powers. "Because depositions typically
occur extra-judicially, the participants in a deposition—
particularly the relevant attorneys—are entrusted with the
responsibility of conducting depositions efficiently, orderly, and
courteously." Mitnor Corp. v. Club Condominiums, 339 F.R.D. 312,
316 (N.D. Fla. 2021). Chiappetta violated this professional
responsibility when he declined to restrain Noshirvan at the
deposition. See H. Noshirvan Dep. 120:3. Noshirvan's conduct at
the deposition was patently improper. While Chiappetta initially
instructed Noshirvan to stop the behavior, H. Noshirvan Dep.
119:18, 21, he expressly declined to subsequently refrain
Noshirvan. Additionally, Chiappetta initially advised Noshirvan to
delete the April 16 Substack post in favor of seeking relief from
the Court instead. (See Doc. #361, p. 19)(Chiappetta stating that
he "asked Noshirvan to take the post down, which Noshirvan
did.");(see also Doc. #352-9, p. 2)(Noshirvan stating the April 16
Substack post was deleted because Chiappetta would "be addressing
the behavior displayed by" Jackson-Fannin with the Court). But
Chiappetta then greenlit Noshirvan to resume posting. (See
id.)(Noshirvan stating that "[Chiappetta] says I can restore [the
April 16 Substack post] now."). The need to sanction Chiappetta

is underscored by Chiappetta's lingering belief that Noshirvan's conduct was justified. (See Doc. #361, p. 4)(Chiappetta stating underneath the "factual background" section that "[w]hile Noshirvan's statements [at the deposition] were not the nicest, they certainly were understandable given the circumstances.").

None of Chiappetta's arguments lead to a contrary conclusion. Chiappetta's brief does not mention sanctions under the court's inherent powers. Chiappetta devotes the first two sections of his argument to defamation and defamation privileges law, without any analysis or application. (Id. at pp. 12-14.) In his third section, Chiappetta discusses preliminary injunction law and mentions in passing that GPS's requested sanctions "suffocate the speech right of Noshirvan's mouth." (Id. at p. 15.)  The Eleventh Circuit has already held a free speech argument in this context is without merit. Thomas, 293 F.3d at 1329 n.33. In his fourth and fifth argument sections, Chiappetta argues no admissible evidence shows any wrongdoing by himself or Noshirvan. (Doc. #361, pp. 17-19.) But the Court dealt with all evidentiary objections at the evidentiary hearing and the admitted evidence shows sanctionable conduct by both.

For his conduct, Noshirvan will be sanctioned with the imposition of GPS's attorney's fees and costs in connection with bringing the matter to the Court's attention, and a warning against future conduct. The attorney's fees and taxable costs include but

are limited to those incurred in connection with GPS's preparation,
filing, and hearing concerning its present Motion For Sanctions.
Noshirvan and GPS must confer in good faith as to what amount that
constitutes. Within twenty-one days of this Order, GPS may either
file a notice with the agreed-upon sum or a motion to calculate
the appropriate fees. The motion must conform with the requirements
set by Local Rule 7.01(c)(1)-(4).

Noshirvan is warned that if he engages in similar conduct in
the future, namely conduct that disrupts the litigation (including
depositions) or that incites the harassment of opposing counsel,
he will be subject to more severe sanctions, which may include
dismissal of his case.

Chiappetta will be sanctioned with the following public
reprimand: Nicholas Chiappetta has failed to meet the professional
standards expected from officers of the court in connection with
the deposition and its aftermath. Chiappetta must adhere to all
the Rules Regulating the Florida Bar, including not to:

> engage in conduct in connection with the practice of law
> that is prejudicial to the administration of justice,
> including to knowingly, or through callous indifference,
> disparage, humiliate, or discriminate against litigants,
> jurors, witnesses, court personnel, or other lawyers on
> any basis, including, but not limited to, on account of
> race, ethnicity, gender, religion, national origin,
> disability, marital status, sexual orientation, age,
> socioeconomic status, employment, or physical
> characteristic.

R. Regulating the Fla. Bar 4-8.4(d).

-33-

Accordingly, it is now

**ORDERED:**

1.  Trainor's Motion For Sanctions (Doc. #202) is **DENIED.**

2.  Noshirvan's Motion For Sanctions (Doc. #266) is **GRANTED
    IN PART AND DENIED IN PART.** Noshirvan's request for
    sanctions is **DENIED** but his request for an extension of
    deadlines is **GRANTED IN PART.** The Court recognizes
    Noshirvan's rebuttal expert report of Chris Silver Smith,
    provided to Defendants on June 4, 2025, as timely. The
    Court will also reopen discovery until **September 13,
    2025,** for the sole limited purpose of allowing discovery
    on the expert disclosure. Other deadlines are necessarily
    impacted, so a new Case Management and Scheduling Order
    will be issued separately by the assigned magistrate
    judge. Otherwise, Noshirvan's Motion is **DENIED.**

3.  GPS's Motion For Sanctions (Doc. #334) is **GRANTED IN PART
    AND DENIED IN PART** as set forth below:

    a. Noshirvan is warned that if he engages in similar
       conduct in the future, namely conduct that disrupts
       the litigation (including depositions) or that
       incites the harassment of opposing counsel, he will
       be subject to more severe sanctions, which may include
       dismissal of his case.

-34-

b. Noshirvan and GPS must confer in good faith as to appropriate attorney's fees. Within **TWENTY-ONE (21)** days of this Order, GPS may either file a notice with the agreed-upon sum or a motion to calculate the appropriate fees.

c. Chiappetta is publicly reprimanded as detailed above.

**DONE AND ORDERED** at Fort Myers, Florida, this __12th__ day of August 2025.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE