## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

DANESH NOSHIRVAN
an individual,

     Plaintiff

vs.

JENNIFER COUTURE, et al,

     Defendants.

_____/

CASE NO: 2:23-cv-01218-JES-KCD

District Judge: Hon. John E. Steele

Magistrate Judge Douglas N. Frazier

### PLAINTIFF, DANESH NOSHIRVAN'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING LIABILITY

I.    **Introduction**

This is not a close case. The undisputed record shows a coordinated, multi-actor scheme—funded, housed, and directed by Dr. Ralph Garramone, ("**Garramone**"), Garramone Plastic Surgery ("**GPS**"), Central Park of Southwest Florida ("**Central Park**"), OMG Realty ("**OMG**") and Jennifer Couture ("**Couture**"), and operationalized by Patrick Trainor ("**Trainor**") his law firm, the Law Office of Patrick Trainor, LLC ("**Trainor Law Firm**") and the "Anti-Doxing League, Inc." (**ADL**) through Joseph "Joey" Camp ("**Camp**")—to publicly brand Danesh Noshirvan ("**Noshirvan**") a "pedophile," "predator," "stalker," and worse; to paper his hometown with defamatory flyers; to run a TV, billboard and local penny saver ads using Trainor's Law Firm number; to incite false CPS reports and "swatting"; to disseminate intimate images; to threaten death and sexual violence; and to mass-report him off platforms—for the stated purpose of "breaking" Noshirvan. No genuine dispute of material fact precludes summary judgment.

## II. Statement Of Undisputed Material Facts ("SUMF")

### A.    The making of a conspiracy

1.    From the outset, Couture – a close associate of Garramone – expressed a clear desire to harm Noshirvan and intent to retaliate. For example, Couture told Garramone: "*I want to take [Noshirvan] down.*" Dkt. 479, pp.23-27, Ex. 2-4. Likewise, Couture told Garramone that Noshirvan "***deserves a miserable death***" (on January 28, 2022) – a disturbingly hostile comment underscoring express malice toward Noshirvan. Dkt. 479, Ex. 2, p. 41. (JC: dated 01/28/22 "*I want to sue this guy*"… "*[w]e need to focus on making sure people don't come after your business*" … "*we need to find [Noshirvan] and s[u]e the living fuck out of him*"…"*I want to take to take [Noshirvan] down Ralph*"… "*this is really bad…[we have got to find a way to take this down someway somehow*"… "*It doesn't look like I'm the victim Ralph. It looks like I'm just an angry a\*\*hole and yes I've been angry because I cannot stand these f\*ing young entitled people*" … "***Ralph we have to stop this scumbag***" (*referring to Noshirvan*). ***RG: "It isn't going to just end baby. We have to end it."***); *Id.*, Ex. 4 (J***C: "I am meeting with Joey Camp."***)

2.    Couture's anger is tied to Noshirvan's publication of the January 26, 2022 Dunkin Donuts parking lot altercation. See Dkt. 478, Ex. 2-4. She complained to Garramone that "*this guy put my f\*ing name, my business, now your business, and my phone number…all over the internet. There has to be something we can do.*" *Id.* Garramone acknowledged this was "an accurate description" of what happened. *Id.*, p. 26, 14:22. Couture felt Noshirvan had publicly exposed her; she was determined to strike back. See Dkt. 478, Ex. 2-4. This exchange shows Couture's intent to harm Noshirvan's

reputation in retaliation, while actively discussing *"something <u>we</u> can do"* about him. These statements demonstrate the *mens rea* – a mindset bent on harming Noshirvan – which sets the stage for a conspiratorial effort to defame him.

3.    Couture wanted to clean up her own online reputation. Dkt. 479, Ex. 2. She lamented that *"if you Google my name, it's absolutely freaking horrible"* and discussed paying *"somebody $1,800 to clean this up." Id.*, Ex. 2-4. However, legitimate reputation repair was insufficient; Couture fixated on destroying Noshirvan's reputation as a form of vigilante justice. *Id.* Couture's words reflect a personal vendetta and intent to inflict reputational harm. *Id.*

4.    Garramone is the managing member of Central Park, OMG and GPS, Dkt. 479, P. 13:5-8, 16:3-18, 17:19-25, 18:1-25, 20:1-20. Garramone's actions and knowledge is imputed on Central Park, OMG and GPS.

**B.    May 05, 2022 – Hiring of a Third-Party "Hacker" (Joseph A. Camp)**

5.    Camp is a cyber-operative enlisted to target Noshirvan. Camp is not a formal employee of Defendants, but he was intentionally brought into the fold as a specialist unafraid of Noshirvan. Dkt. 479, Ex. 4, p.20-4 (JC: *"[Camp] <u>went after Danesh</u> that's how I found [him]…. I contacted [Camp]… [H]e isn't afraid of [Noshirvan]… I'm not gonna [sic] sit[] back and do[] nothing…."*); Dkt. 479, Ex. 46-8.

6.    Couture met with Camp in person on May 5, 2022. See Dkt. 479, Ex. 4. In deposition, Garramone was questioned: *"Did [Couture] travel to St. Pete and meet up with Joseph A. Camp on May 5th, 2022?"*Dkt. 479, 51:10-13. He claimed not to recall,

but a text from Couture tells the story. *Id.* Couture informed Garramone around that date, "*[t]his is who I'm meeting with, Joey Camp.*" *Id.,*  Ex. 4. (JC: "*I contacted him. He's odd, Ralph, but he isn't afraid of Danesh. He has already given me more information than anyone about how all of this works and how to do [it].*" *Id.* Couture's message  shows she sought out Camp for his knowledge — referring to internet harassment, doxing, or smear tactics – and valued Camp's lack of fear. *See id.* Camp was recruited as an expert operative against Noshirvan. *See id.* And Couture with Garramone's permission, allowed Camp to reside at Central Park's ranch to perform a covert online operations against Noshirvan's reputation. See Dkt. 479, Ex. 28, 30 (Couture attempting to kick Camp out in July 2022 — roughly 65 days later);  Dkt. 476, 37.

7.      The arrangement with Camp went beyond mere reputation management — it included payment for Camp's illicit undertakings. See Dkt. 476, Ex. 1-4; Dkt. 479, Ex. 36, 39, 45, 60.  On May 5, 2022 (the day Couture met with Camp), Garramone's business, GPS, paid Camp in two installments totaling $1,650. *Id.* An accounting document and credit card statements show payments of $1,100 and $550 to "Joey Camp (joeycamp2020/2024.com)" along with Camp's phone number: 720-454-5240, corresponding to charges on GPS's credit card. *Id.* Ex. 2-4. The documentation speaks for itself: money flowed to Camp. See Dkt. 476, 15:22-24, 16:4-5, Ex. 1-4. These payments by Couture strongly indicate that Camp was hired as a third-party agent — in the conspiracy, tasked with digital dirty work (e.g., spreading defamatory content online and harassing Noshirvan). See Dkt.479, Ex. 2-4. Camp's

harassment commenced immediately upon receiving payment from GPS, Couture, and Garramone on May 5, 2022. See Dkt. 479, Ex. 2; Dkt. 509, PL.'s Ex. 2 (text messages).

8.      There are signs of Camp's direct actions everywhere. Dkt. 479, Ex. 12-15, 19 -20; Dkt. 509, Pl.'s Ex. 2. One exhibit shows Camp's direct involvement in taking down Noshirvan. Dkt. 479, Ex. 43 (email to Couture while working for GPS regarding a change petition and use of "bots"). In the next exhibit, Couture shared Camp's "change petition" link with GPS's entire office staff. *Id.*, Ex. 44. This shows Camp was tasked to do more than reputation management. Camp also provided Garramone, Couture and GPS with  links to a Google spreadsheet containing Noshirvan's PII and social media information. Dkt. 479, Ex. 33-33A, 62; Dkt. 476, Ex. 9-10, 12, 34. The Google spreadsheet also contains 5 pages of alleged victims, analytics, addresses in Mansfield, PA, and pages for Anjalyke Reed, TikTok, Twitter, Facebook, and Instagram executives, former GPS employees, and Couture's ex-husband: Chris Couture, Gina Willaford, Theresa Barton, Aubrey Saffron, Dawn Spanie, Alycia Wolfe, and Annette Osorio. *Id.; Dkt. 476, Ex. 8(JC: "Joey [Camp] "has a lot of research and information gathered").* Two exhibits show Camp's direct actions. Dkt. 476, Ex. 68-9 (incitation of false reporting to CPS from Central Park).

9.      A photograph of Mansfield's town sign contained flyer targeting Noshirvan, featuring Joseph Camp's signature baseball cap. Dkt. 476, Ex. Ex. 13, p. 5, 16, 38. Either Camp joined Couture and Garramone in Mansfield, PA or they

borrowed Camp's hat to send a message. *Cf.* Dkt. 476, Ex. 70 (*"we are positive"* *"Camp
**never** went to Pennsylvania"*). Garramone later  stated, *"I think Joey Camp took that
picture and put his hat on the sign."* Dkt. 479, p. 115-16. This exchange shows
Garramone lied. Dkt. 476, Ex. 70 (*"we are positive"* *"Camp **never** went to Pennsylvania"*).
Video evidence confirms that that Camp was on Central park property that weekend.

10.    Further evidence of Camp's role comes from communications between
the conspirators. Dkt. 476, Ex. Ex. 8-10, 12, 14, 34. Ratz sent documents to Couture,
who then forwarded them to Camp – information and images about Noshirvan. Dkt.
476, Ex. 13, 15, 17-24; Dkt.479, Ex. 8-10 (JC: *"I wish we had …joey's phone[,] his phone
takes pictures like a spy camera."*  *"Ralph is excited."*). This chain suggests Camp was
acting as an online propagator: receiving material from the inner circle to disseminate
more broadly (posting on social media, through text message or websites). One
exhibit was a screenshot of Camp's Gab Social media profile that Couture shared
with    Garramone,    confirming    the    user    behind    Gab    account:
https://gab.com/JoeyCamp2020. After the Mansfield trip, Couture texted
Garramone referring to Camp as *"that hacker"* she hired, reinforcing that <u>they</u> saw
him as a hacker-for-hire. See, e.g., Dkt. 476, Ex. 40 (JC: *"[Camp] has a skill set that a lot
people don't have"*); *Id.* ¶¶32:12–25; 33:3–11., Ex. 6, ( JC: *"I paid for and funded the billboard
(leased by Trainor), the TV ads, the newspaper (i.e., pennysaver) [and] the postcards… **I
basically paid to get it started… Camp has done most of work … with … Trainor**. 
We desperately [a] victim from New Jersey."*).

11.    Camp's involvement demonstrates conspiracy leveraging a professional provocateur/hacker to amplify defamation efforts. See Dkt. 476, Ex. 5. (Camp: *"I have a __budget__ of 50K just to f\*king destroy Hannah while you watch … Sand N\*gg\*r"*). They paid Camp for his expertise, met with him on OMG/GPS/Central Park property to strategize, and had him disseminate defamatory content online. See Dkt. 508, Ex. 4, 8, 9.

12.    Former GPS employee, Jennifer Holliday's ("**Holliday**") testimony corroborates the aforementioned transactions. Dkt. 477, pp. 34-5, 43-4, 67-77, 92-3, 98-9, 119, 142-3. Hannah Noshirvan's testimony also strengthens all accounts. Dkt. 475, pp. 40-1, 52-3, 55, 57-8, 123:13-20.

**C.    May 20-1, 2022 — A weekend in Mansfield, Pennsylvania**

13.    Couture and Garramone moved from talk to action, engaging in coordinated planning. They communicated in code and strategized on how to target Noshirvan. Dkt. 479, Ex. 9. A pivotal set of text messages from May 21, 2022 captures the conspiracy in action. See Dkt. 479, Ex. 9  (Couture and Garramone attempt to disguise their identities adopt code names "Cindy" and "Bob"). For example, "*Hey, Bob here. You could use the cover of darkness to plant some flyers along that main street. Just be careful of the fuzz.*" *Id.* This is Garramone actively instructing on covert defamation tactics – namely, surreptitiously posting defamatory flyers about Noshirvan at night ("cover of darkness") and avoiding the police ("the fuzz"). *Id.* Garramone denied sending the message, but the text evidence shows he did. *See Id.*

14.    Couture and Garramone coordinated and directed GPS associates. In the same conversation, Couture wrote to two GPS employees: "*Hey, I — <u>we think</u> — if you guys aren't tired… you should go and put up flyers… I don't think they need to go near the house unless you want to. Just be quick. If you do [go near the house], wear a hat to hide your blonde hair. It's bright. In an hour, you could cover a lot of ground.*" Dkt. 479, Ex. 9. Couture explicitly said, "<u>*we*</u> *think,*" indicating a joint agreement with Garramone. *See id*. The detailed instructions show a thought-out, coordinated strategy to blanket Noshirvan's neighborhood with defamatory flyers while evading identification. See Dkt. 479, Ex. 8-9( RG: **"Jen <u>will</u> come in the morning and help but nighttime is best."**).

15.    Garramone was undeniably part of this plan. See Dkt. 479, Ex. 8-9. Not only is he <u>included</u> in the group text, but Couture's message frames it as a shared directive ("<u>we</u> think"). *Id.* Garramone himself ("Bob") suggested planting flyers at night, and later texts show him continuing to fine-tune the operation. *Id.* Garramone advised on the exact method of delivery: "*Put [the] flyer in the flag of the mailbox…[do it] in the dark. J*en will come in the morning and help, but nighttime is best. I will get her up or she'll be late.*" Id.* Garramone's instructions were given to avoid federal mailbox laws and emphasize stealth. *See id.* These communications illustrate an <u>explicit</u> agreement and coordinated effort to tarnish Noshirvan's reputation.

16.    The conspiracy pulled in two of GPS's employees: Sydney Ratz ("**Ratz**") and Alex Quattrone ("**Quattrone**"). See Dkt. 479, Ex. 8-9. Ratz (GPS medical assistant) Dkt. 479, 89:4-9,   and Quattrone (GPS IT employee) traveled to Mansfield,

Pennsylvania on May 20, 2022 – the town where Noshirvan resides – to help execute

the flyer operation. Dkt. 479, p. 90-1, Ex. 35. 17,  Dkt. 476, pgs. 138-47, Dkt. 477, 87:1-

13, 92-3. Ratz and Quattrone met up with Garramone and Couture. *Id.*

17.    While in Mansfield, Ratz and Quattrone acted as the "on the ground"

team. Dkt. 479, Ex. 8-9. Ratz surveilled Noshirvan's home and shared intel. *Id.* Ratz

texted that "*the inside of [Noshirvan's] garage is so insanely trashed,*" indicating she was

physically observing Noshirvan's property. Couture enthusiastically responded:

"*Oh my God. Go get more photos. He isn't going to know who you are. You have

Pennsylvania tags. #dadoftheyear. Sydney, you are amazing. Go get pics of his nasty garage.

I wish we had one of Joey's phones. His phones take pictures like a spy camera. Now Ralph's

excited.*" *Id.*, Ex. 8. Couture directed Ratz to continue spying and photographing

Noshirvan's home, while reassuring her that with local license plates Noshirvan

won't recognize her. *See id.* Couture even hashtags "#dadoftheyear" sarcastically,

mocks Noshirvan's parenting — a hint at the disparaging narrative they intend to

spread. Crucially, Couture notes "*Now [Garramone's] excited,*" explicitly indicating

Garramone's active approval of Ratz's clandestine actions. *Id.* These statements

underscore Garramone's, Couture's, and GPS's active involvement. Couture's

statement that "*[y]ou can use the pictures I'll send you what I have (referring to photograph

taken of Noshirvan and children) but one of '**my employees isn't'** driving the car so you

can't have him  (referring to Quattrone) in there,*"  clearly underscores Couture's and

GPS's knowledge and involvement. Dkt. 476, Ex. 15 (Billboard, discussing TV advertisement, and discuss false defamatory claims); Dkt. 479, Ex. 58.

18.    Ratz and Quattrone carried out the physical distribution of defamatory flyers with Couture, as orchestrated. Dkt. 479, Ex. 8-9, 27.  Couture (speaking for herself, Garramone, and GPS) instructed Ratz and Quattrone to canvass the area with flyers. Dkt. 479, Ex. 8-9. Additional communications show follow-ups during the mission. *Id.* On May 21st, 2022, Couture told Garramone: "*the police are at [Noshirvan's] house.*" Couture's statement shows that she was physically present at Noshirvan's home to observe the police arrive. Dkt. 479, Ex. 10;Dkt. 476, Ex. 18-20. Garramone cautioned Couture to "*stop putting the flyers out*" and directed Couture to "*go back to the hotel*" so she does not get caught. *Id.* This statement reinforces the prior inference and suggests continuous supervision of mission progress and concern for avoiding law enforcement detection. They knew their conduct was tortious.

19.    Garramone offered financial rewards to the GPS employees for their participation. Dkt. 479, Ex. 11 ("*$500 each for [their] participation on May 20, 2022*"). Garramone's offer evidences Garramone/GPS intent to provide logistical/financial support; enabling the defamatory campaign. *Id. (Quattrone: I will sit out the "**next secret 007 mission.**").*

20.    Couture's, Garramone's, Ratz's and Quattrone's involvement (on behalf of GPS) —traveling across state lines, spying on Noshirvan, photographing private property and children, and blanketing his town with slanderous flyers – was

not a rogue act, but done at the behest and direction of Couture and Garramone.
They acted as co-conspirators or agents carrying out the overt acts of defamation on
the ground; Garramone and Couture managed the operation from behind the scenes.

21.     The defamatory statements included calling Noshirvan a *"swinger,"* a
flyer containing the billboard image of Noshirvan's face, implying that Noshirvan is
violent doxer, and *"Have you seen this predator,"* *" pedophile,"* or *"child-killer."*  Dkt. 476,
Ex. 17, 21-2, 23. Stalking is depicted. *Id.* Ex. 18-20; compare with Dkt. 509, Pl.'s Ex.1-
13(Exhibit 9 is a flyer depicting the pennysaver with a handwritten *"who's your daddy
dinesh"*); Dkt. 509, 156:7-14.

22.     Couture and Garramone were video recorded in Papa the Butcher's
shop Dkt. 479, Ex. 27; Dkt. 476, Ex. 25-6. Flyers were found in the women's restroom
and Camp published images of the flyers online. *Id.*, Ex. 23; 473, 134:7, pp. 148-151.

**D. The Role of the Law Firm and the Billboard Scheme**

23.     Trainor, the sole incorporator of ADL and sole member of Trainor Law,
used both entities as public-facing fronts against Noshirvan. Dkt. 478,  17:8–19:25; Ex.
1-2; Dkt. 508, ¶145.

24.     Unusually, the conspiracy roped in a lawyer and law firm — Trainor,
Trainor Law Firm, and the ADL. Dkt. 478, Ex. 1-2. Trainor was ostensibly hired by
Couture and GPS for legal services, but evidence suggests his involvement went
beyond traditional counsel into the territory of reputational attacks. Dkt. 478, 36:11-
17, 37:6-25, 38:1-25, pp. 44-5, 49 ("PT: *"That appears to be a billboard similar to what __we__* -

*- I -- I published"*); Dkt. 477,  177:11-14, 199:3-7, 210:2-9, 213:13-19, 214:4–215:11; Dkt. 508, 113:24-25, 217.

25.    One major overt act was Trainor leasing a billboard to defame Noshirvan. *Id.* Trainor admitted on the record, *"I purchased a billboard." Id.,* p. 164. Trainor insistence was an attempt to shield his clients. *Id.*, p. 49.

26.    On May 10, 2022, shortly before the flyer campaign (May 20, 2022), Couture told Garramone she wanted to wire money to "Trainor" because *"he's already done a lot of work."* Dkt. 479, p. 86-88 (RG: *"I don't know how it was paid"*). The reference to Trainor's work and a payment that needed to be wired on the weekend strongly correlates with the billboard's timing. Garramone asked:  was this wire transfer "for purposes of paying for the billboard?". Trainor immediately objected and invoked privilege, effectively stonewalling a direct answer. Nonetheless, the inference is clear: Couture intended to send Trainor money as compensation for his extralegal efforts. Couture admitted in her own deposition that she paid Trainor money to lease the billboard. Dkt. 476, Ex. 6 ( JC: *"I paid for and funded the billboard (leased by Trainor), the TV ads, the newspaper (i.e., pennysaver) [and] the postcards… I basically paid to get it started"*); *Id.* p. 33:12-24( JC: *"I hired Joey. I have two other attorneys working on this and helping me as well."*). The unrebutted evidence shows that Garramone and GPS authorized Couture to use joint resources, which Couture then used to pay Trainor for a billboard and penny saver. *Id., Ex.* 6 (JC: *"I moved [Camp] into …my ranch house (Central Park property) … [Camp] works closely with Patrick"*).

27.    Trainor attempted to cloak his participation in attorney-client privilege. When asked pointedly if purchasing a billboard was part of his "legal services," Trainor denied it – effectively separating the billboard as a "non-legal" act he did on the client's behalf. Dkt. 478, 51:22-25, 52-55 (PT: claiming billboard and penny saver were "*public service announcements*"); Dkt. 479, Ex. 61. Trainor's maneuver suggests knowledge of tortious conduct. Still, he helped facilitate it. Trainor also admitted to creating the image utilized on the billboard and pennysaver — another over act. Dkt. 478, 38:2-12, 48-50.

28.    The content of the billboard is especially relevant to defamation: it contained Noshirvan's image — alongside a disparaging message — "*Doxing is violent. Have you been injured?*". By placing a billboard in public, the conspirators aimed to broadcast their defamatory claims to the entire community. Dkt. 479, Ex. 48; Dkt. 478, Ex. 4-5. This complements the flyers distributed locally, ensuring anyone in Noshirvan's hometown would the harmful messages at eye-level (flyers) and literally looming overhead (billboard). Trainor and Trainor Law Firm were directly involved in this publication. The ADL's ironic name suggests it was meant to appear as an anti-harassment cause, to lend legitimacy to their campaign. But it too committed acts furtherance of the conspiracy. Dkt. 478, Ex. 14, ¶52.

29.    Trainor's role shows that the conspiracy to defame co-opted legal channels and entities to advance its goals. There was a television commercial. See

Dkt. 478, Ex. 4-5. Couture admitted paying for the television commercial with Garramone's or GPS's money. Dkt. 476, Ex. 6; compare Dkt. 478, Ex. 3.

30.    Trainor, Trainor Law Firm, and the ADL communicated with Camp and Rikki Cornelisse with the goal of recruiting additional co-conspirators. Dkt. 478, Ex. 6, 6a.-b., 11-3; *Cf.* Ex. 14. This comports with Camp's Google Spreadsheet shared with GPS, Garramone, and Couture. Dkt. 479, Ex. 33, 33A (Cornelisse is on the list in green highlight as a potential partner).

**E. Internal Admissions and Attempts to Cover Up**

31.    The communications among the conspirators not only show planning but also after-the-fact admissions and cover-up strategies. See Dkt. 476, Ex. 1-70, Dkt. 478, Ex. 1-14, Dkt. 479, Ex. 1-62. Defendants' acknowledged what they had done — with a tone of glee or justification — and plotted how to avoid accountability. *Id.*

32.    After the Mansfield operation, Couture wrote to Garramone about their success and exposure risk. See Dkt. 476, Ex. 13, 39 (JC: "*I verified his address*"); Dkt. 479, Ex. 26. Couture reassured Garramone  that "*No one saw us put up a flyer. All they did was see us in the store… It's no different than him posting on social media. He can dish it, but he can't take it..*" Dkt. 479, EX. 26. This text is crucial: Couture uses "<u>us</u>" – directly implicating Garramone as part of the team that put up the flyers. She admits the joint action ("us put up a flyer") while rationalizing it as fair retaliation for Noshirvan's online conduct ("*he can dish it but can't take it*"). Dkt. 479, EX. 22-4. Garramone tried to claim he "*didn't distribute any flyers,*" but Couture's internal

message flatly contradicts that, treating him as a full participant. *Id.*, Ex. 26. When confronted with Couture's use of "us," Garramone had no credible explanation. Dkt. 479, 184:2-21, 185:1-14. This is an insider confession that the conspiracy executed its plan.

33.     The conspirators also discussed cover stories and denial tactics. A telling excerpt: Garramone suggested their "stance" would be that the defamatory pictures/flyers were "manufactured by people on the internet" and "didn't come from us." Garramone said: *"No one knows who made those pictures…Our stance on that is those pictures were manufactured by people on the internet…Those didn't come from us."* This is a direct attempt to fabricate plausible deniability for the origin of the defamatory materials. In context, they were concerned that some of the images or flyers used in their campaign could be traced back to them. The fact that Garramone articulates this "stance" to Couture indicates an agreement to lie in unison – a classic cover-up strategy within a conspiracy. See also, Dkt. 476, Ex. 6, 13, 43, 38-9; Dkt. 479, Ex. 48.

### F.  False narratives

34.     Couture and Garramone unjustifiably wrote a false narrative to defame Noshirvan. Dkt. 479, Ex. 37, 49 (8 versions), 50 (51-page diatribe), 51 (AI generated story); Dkt.476, Ex. 66, 67 Garramone created negative talking points to further destroy Noshirvan's reputation. *Id.*, Ex. 52 (falsely claiming Noshirvan works for the CCP and violated federal child exploitation laws (§2257 and §2257A)), 53 (falsely

claiming Noshirvan weaponized social media, utilized mass email/call campaigns

and is an anti-Israel anchor baby with adversarial ideologies).

35.    Richard A. Luthmann ("**Luthmann**") and Frank Parlato ("**Parlato**")

were brought in to help Camp amplify the message. See Dkt. 479, Ex. 54-5, 57, 59 ("*the*

*retaliation has to be equally expansive*"; Couture agreeing to haggle with Parlato to

reduce $75,000 fee); 2:25-cv-337, Dkt. 78-1; Dkt. 508, Ex. 8, pp. 30-43, 48-53;  Dkt. 474,

pp.120-22; Dkt. 476, Ex. 59-65.

**G. Online defamation, harassment, and IIED**

36.    Couture authorized Camp to utilize her @JenCoutureFl account to

actively promoted: the penny saver, Camp's website: www.thatdaneshguy.com, and

falsely claim that Noshirvan committed "*racketeering, money laundering, stalking,*

*extortion, sextortion, and Blackmail.*" Dkt. 479, Ex. 48; Dkt. 476, Ex. 58 ("*No [one] knew*

*anything about [Camp]*").

37.    Camp recorded and published a call-to-action urging followers to report

Noshirvan to CPS as a "*child predator.*" Dkt. 508,  ¶124; Dkt. 476, Ex. 68-9;  False CPS

calls were made and publicized by Camp; one call was initiated from Camp while

living on Central Park property. *Dkt. 509,  40:23–25; 41:1–7; Dkt. 508, ¶¶234–241.* These

actions reinforce the coordinated efforts between OMG, GPS, Central Park, Couture,

and Garramone: Camp was housed and worked from the Central Park's property,

he appeared in-person for several closed-door meetings on OMG property in GPS's

office with Couture and Garramone to plan the campaign. Dkt. 508, ¶¶101, 193–196;
Dkt. 477. 69:1–76:25; Dkt. 479, Ex. 38 Dkt. 477, 69:2-22, 70:2-4.

38.     Camp at Couture's, Garramone's, and GPS's behest maliciously
published false statements: "*Noshirvan rapes his own child*" and "*caused a 14-year-old
to commit suicide.*" Dkt. 509, 151:19-23. Couture started the latter statement.

39.     Camp stole sexually explicit photographs of Noshirvan, distributed (to
Defendants), and disseminated them publicly in violation of Fla. Stat. §784.049, made
rape threats to Noshirvan's family, and urged Noshirvan to commit suicide. Dkt. 474,
pp.209:1-14, 249:9 -252:25; Dkt. 474-5. Camp swatted Noshirvan. Dkt. 474-4.

40.     Camp's identity and pattern of conduct has been confirmed. Dkts. 380-
1, 380-8, 380-13, 397, Ex. 1-4, 399, Ex. 1-3, Dkt. 472, p. 19-24, 37-9, 42-5. Attorney
Marlborough's testimony indicates preplanned coordination of efforts between
Trainor and Camp by January of 2021. Dkts. 397 ¶¶10–22; 399 ¶¶3–8.

41.     Noshirvan provided statutory defamation notice; no notice is required
for "nonmedia defendants." Dkt. 476, 338:10-25.

### III.    Legal Standard

### A. Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to
any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). A fact is material if it could affect the case's outcome, and a dispute is
genuine only if a reasonable jury could return a verdict for the nonmovant. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The movant bears the initial burden of showing the absence of a genuine issue of material fact by citing the record. C*elotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once met, the burden shifts to the nonmovant to present specific facts showing a genuine issue for trial. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002). If no reasonable jury could find for the nonmovant, summary judgment must be granted. *Lima v. Fla. Dep't of Child. & Fam.*, 627 F. App'x 782, 785–86 (11th Cir. 2015). Other materials in the record may be considered. Fed. R. Civ. P. 56(c)(3).

## IV.  Civil Conspiracy

"A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or  to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So.2d 1273, 1284 (Fla. 3d DCA 1997); *see Witmer v. Dep't of Bus. & Prof'l Regulation, Div. of Pari–Mutuel Wagering*, 631 So.2d 338, 342 (Fla. 4th DCA 1994) (an agreement may be  express or implied between  two or more persons); *Nicholson v. Kellin*, 481 So.2d 931, 935 (Fla. 5th DCA 1985) ("[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose by unlawful means"). Each coconspirator need not act to further a conspiracy; each "need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Donofrio v. Matassini*, 503 So.2d 1278, 1281

(Fla. 2d DCA 1987) ("[t]he existence of a conspiracy and an individual's participation in it may be inferred from circumstantial evidence"); *see also Nicholson*, 481 So.2d at 935 (an act done in pursuit of a conspiracy by one conspirator is an act for which each other conspirator is jointly and severally liable).

Here, the elements of civil conspiracy have been met by all Defendants. See SUMF ¶¶1-19, 22-32, 39; see *Weisman v. S. Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 652 (Fla. 4th DCA 2020)(a corporation can be held liable where its "agent has a personal stake in the activities that are separate and distinct from the corporation's interest."); *Regions Bank v. Kaplan*, 2014 WL 5088889, at *6 (M.D. Fla. Sept. 30, 2014)(same).

<u>Agreement</u>: The record conclusively establishes that Defendants reached a meeting of the minds to accomplish an unlawful objective – namely, an aggressive defamation and harassment campaign. SUMF 1-29. An agreement may be express or implied; here it was both. Communications reveal an express plan hatched and approved at the highest levels: Couture told Garramone *"we have to stop this scumbag"* and discussed meeting with co-conspirator Camp to coordinate efforts, to which Garramone responded, *"It isn't going to just end… We have to end it."* See SUMF ¶1. Garramone (the principal of GPS, Central Park, and OMG) funded and encouraged the scheme, and housed participants, while Couture, Camp, and others actively plotted execution – showing a shared intent and agreement to target Noshirvan.

<u>Unlawful Objective</u>: The object of the agreement was unequivocally unlawful and tortious: Defendants agreed to defame and inflict emotional distress upon Noshirvan

(through threats, stalking, and other outrageous conduct). SUMF ¶¶1-2, 4-7, 9-21, 22-29, 31-9. By conspiring to brand Noshirvan a criminal and orchestrating harassment against him, Defendants pursued an illicit objective.

Overt Acts in Furtherance: It is undisputed that each Defendant (or their agents) committed numerous overt acts to carry out the conspiracy. SUMF ¶¶1-39. The conspirators turned their agreement into action through a series of coordinated steps, all documented in the record. *Id*. There is no genuine issue of fact that these overt acts occurred; they are extensively documented and, in many instances, admitted by Defendants. Accordingly, the overt-act element of the conspiracy is met.

Damages: Noshirvan suffered clear damage as a result of the conspiracy's actions. SUMF¶¶19-20, 33-39. The coordinated defamation per se campaign gravely injured Noshirvan personal and professional reputation. Additionally, extreme harassment caused severe emotional distress. See SUMF ¶38. Noshirvan was diagnosed with significant psychological harm (Complex PTSD), forced to temporarily relocate his family, and alter his daily life to avoid continued harassment.

## V.    Defamation

Defamation is "the unprivileged publication of false statements which naturally and proximately result in injury to another." *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973). Under Florida law, then, "[d]efamation has the following five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least

negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098 (Fla. 2008).

Here, the elements of defamation and civil conspiracy have been met by all Defendants. See SUMF 1-37, 39. *See Logan v. Morgan, Lewis & Bockius* LLP, 350 So. 3d 404, 412 (Fla. 2d DCA 2022)(requiring underlying tort for conspiracy). The record conclusively shows that they disseminated defamatory messages to the public – all identifying and disparaging Noshirvan. See SUMF ¶¶20, 24-7, 33-7. These publications, made through public mass and social media satisfy this element.

<u>Publication</u>: The statements branding Noshirvan a "pedophile," "predator," "stalker," and accused him of crimes like extortion, child abuse, and murder – are false. Defendants cannot prove these heinous accusations. The undisputed evidence shows the accusations were **<u>invented</u>** as part of Defendants' campaign to "take down" Noshirvan. See SUMF ¶¶1-10, 12, 23, 25-8, 33-8. Defendants' own communications confirm they knew these statements were contrived for retaliatory purposes.

<u>Fault</u>: The undisputed facts show far more than reckless disregard for the truth. Defendants acted with <u>intentional</u> malice. They set out expressly intending to harm Noshirvan's reputation ("*I want to take [him] down…he deserves a miserable death*") and coordinated a barrage of outrageous falsehoods without any regard for the truth. See SUMF ¶¶20, 27, 31, 33-8. Defendants' knew the accusations were false (***indeed, <u>fabricated</u> them***) yet spread them widely to maximize damage.

Defamatory: There is no dispute that the statements were defamatory. They unquestionably tended to injure Noshirvan's reputation. See SUMF ¶¶20, 27, 31, 33-9. Accusations of being a child predator or engaging in heinous crimes is defamatory *per se*. The defamatory meaning of Defendants' statements is plain and confirmed by context – the flyers, billboard, and posts were designed to vilify Noshirvan and ignite public outrage against him (e.g., urging people to report him as a danger).

Damages: Florida law presumes general damages to the victim's reputation. Thus, Plaintiff need not prove special harm, as the false accusations of egregious crimes are so inherently injurious. *See Hoch v. Rissman*, 742 So. 2d 451, 457 (Fla. 5th DCA 1999) (recognizing statements that one is a pedophile as defamatory per se).

In any event, the undisputed evidence shows Noshirvan suffered actual harm from Defendants' defamation. The false campaign caused severe damage: Noshirvan has been publicly shamed and ostracized, required police protection for false reports, and endured emotional trauma diagnosed as Complex PTSD. See SUMF ¶ 39.

## VI.    Intentional infliction of emotional distress

In order to prove  intentional infliction of emotional distress in Florida, it must be shown that: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. *Williams v. Worldwide Flight SVCS.*, Inc., 877 So. 2d 869, 870 (Fla. 3d DCA 2004); *cf. Nims v. Harrison*, 768 So.2d 1198, 1199 (Fla. 1st DCA 2000)(allowing IIED claim where the allegations involved death threats, and threats

to rape the plaintiff's children and other family relatives); *Alcantara v. Denny's Inc.*, 2006 WL 8439596, at *4 (M.D. Fla. Jan. 19, 2006); *Thomas v. Hosp. Bd. of Dir. of Lee Cty.*, 41 So. 3d 246, 256 (Fla. 2d DCA 2010) (reversing dismissal of IIED claim when hospital made false statements about decedent's cause of death). IIED claims are fact dependent, and those facts are viewed in totality. *Cooper v. Empower U, Inc.*, 603 F. Supp. 3d 1317, 1322 (S.D. Fla. 2022)(a court must view defendants' conduct in light of their alleged knowledge of plaintiff's susceptibility to emotional distress).

Here, when viewed in totality the elements of IIED and civil conspiracy have been met by all Defendants. See SUMF 1-12, 39.

Intentional Conduct: The undisputed evidence shows Defendants acted intentionally in orchestrating a campaign to cause severe distress. See SUMF 1-12, 39. This was no accident. Defendants openly declared their aim to make Noshirvan "suffer," to "break" him,– evincing a deliberate desire to inflict harm. See SUMF 1-8, 12, 39. They recruited a known internet provocateur (Camp) specifically to attack Noshirvan, funded and directed Camp to terrorize Noshirvan online and in his hometown, for many months. See SUMF 1-12, 39. These actions were taken with express malice and knowing that extreme emotional harm was not only likely but the intended result. *Id.*

Outrageous Conduct: Defendants' conduct was extreme, outrageous, and utterly beyond the bounds of decency. Defendants engaged in a ruthless vendetta involving vile threats of death, rape, and coercion to commit suicide; a menacing behavior that

cannot be tolerated. See SUMF 39. They disseminated sexually explicit images of Noshirvan without consent, to maximize   humiliation and anguish. Camp sent Noshirvan pictures of his deceased father, knowingly making horrific false statements, about a loved one's death. This was done in a coordinated effort, over an extended period, and with knowledge. It is hard to imagine conduct more outrageous in a modern society.

Causation: The undisputed evidence establishes Defendants' outrageous acts caused Noshirvan's emotional distress. SUMF ¶39 The timing and circumstances leave no room for doubt: Noshirvan began experiencing severe psychological and emotional effects in direct response to the harassment and defamation campaign. *Id.* He was forced to live in a state of fear and anxiety, alter his daily routines, and even temporarily relocate his family for their safety. Mental health professionals diagnosed him with Complex Post-Traumatic Stress Disorder. See SUMF ¶39.

Severity: Finally, Noshirvan's emotional distress was — and continues to be — severe. *Id.* Noshirvan has endured profound psychological injury manifesting in symptoms such as panic attacks, depression, hyper-vigilance, and disruption of his ability to work or engage in normal family life. *Id.* The severity of distress is evidenced by measures Noshirvan had to take: involving law enforcement, obtaining counseling, and seeking psychiatric care to cope with the extreme fear and anguish Defendants imposed. There is no evidence to the contrary.

## VII.   Defendants Cannot Prove A Genuine Issue of Material Fact

The burden has shifted. *See Bailey*, 284 F.3d at 1243. Now Defendants must

"come forward with specific facts showing a genuine issue for trial." *Id.* They cannot.

Summary judgment is appropriate on Defendants' affirmative defenses. Dkts.

443, p. 67-71, 444, p.69-72,  445, p. 75-8, 446, p. 75-8,  447, p. 43-7, and 448, p. 34-7.

## VIII.  Conclusion

Noshirvan respectfully requests entry of partial summary judgment on

liability for Counts 3–4, 6-7, 9, and 12 with a separate trial on damages, and such

further relief as is just.

DATED: September 30, 2025.

Respectfully submitted,

Nicholas A. Chiappetta, Esq.
**Chiappetta Trial Lawyers**
Attorneys for Mr. Noshirvan
2101 Vista Parkway, Suite 258
West Palm Beach, Florida 33411
Direct: (561) 768-4500
Fax:    (561) 768-4600
service@chiappettalegal.com
nick@chiappettalegal.com
www.chiappettalegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2025, I electronically filed the foregoing
with the Clerk of Court by using the CM/ECF system, which will send notice of
electronic filing to: all counsel of record.

*/s/Nicholas A. Chiappetta*
Nicholas A. Chiappetta