## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

CASE NO. 2:23-CV-01218-JES-DNF

DANESH NOSHIRVAN
an individual,

       Plaintiff,

v.

JENNIFER COUTURE, an individual,
RALPH GARRAMONE M.D., an individual,
RALPH GARRAMONE, M.D., P.A. d/b/a
GARRAMONE PLASTIC SURGERY.,
CENTRAL PARK OF SOUTHWEST
FLORIDA, LLC, OMG REALTY, LLC,
THE LAW OFFICE OF PATRICK TRAINOR
ESQ., LLC d/b/a THE LAW OFFICE OF
PATRICK TRAINOR, PATRICK TRAINOR,
an individual, and
ANTI-DOXING LEAGUE INC.

       Defendants.

_____/

RALPH GARRAMONE, M.D., P.A. d/b/a
GARRAMONE PLASTIC SURGERY,
JENNIFER COUTURE, an individual,
RALPH GARRAMONE, M.D., an individual,

       Counter-Plaintiffs,

v.

DANESH NOSHIRVAN,

       Counter-Defendant.

_____/

## COUNTER-PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Counter-Plaintiffs RALPH GARRAMONE, M.D., P.A. d/b/a GARRAMONE PLASTIC SURGERY ("***GPS***"), JENNIFER COUTURE ("***Couture***"), and RALPH GARRAMONE, M.D. ("***Dr. Garramone***") (collectively referred to as "***Counter-Plaintiffs***"), file this Motion for Partial Summary Judgment and Incorporated Memorandum of Law, pursuant to Federal Rule of Civil Procedure 56, and in support respectfully state as follows:

### I.   INTRODUCTION

This is a defamation case to which Counter-Defendant, Danesh Noshirvan ("***Noshirvan***"), does not have any viable defense. It is undisputed that Noshirvan intentionally published the defamatory statements alleged by Counter-Plaintiffs. It is undisputed that the statements published by Noshirvan are patently false. It is also undisputed that the statements published by Noshirvan were designed to and did cause damage to Counter-Plaintiffs. There is no genuine issue of material fact as to Noshirvan's liability on Counter-Plaintiffs' claims for defamation. Accordingly, for the reasons stated herein, Counter-Plaintiffs respectfully submit that the Court should enter partial summary judgment as to liability in their favor and against Noshirvan.

### II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

#### A.   Relationship of the Parties

1.   GPS is a professional association organized under the laws of the State of Florida and has been in operation since 2000. *See* Declaration of Dr. Ralph

Garramone as Corporate Representative of GPS ("***GPS Decl.***"), attached as Exh. A at

¶ 2. *See also* Dr. Garramone's deposition in the 340 Case at 351:16-18[1].

      2.      Dr. Garramone has been recognized as a top plastic surgeon in Ft. Myers,

Florida. *See* GPS Decl., Exh. A, at ¶ 1; Declaration of Ralph Garramone, M.D.

("***Garramone Decl.***"), attached hereto as Exh. B at ¶¶ 2-3; and Dr. Garramone's

Deposition in the 1218 Case at 18:13-15.[2]

      3.      Couture is an employee of GPS and works as its office manager. *See*

Declaration of Jennifer Couture ("***Couture Decl.***"), attached hereto as Exh. C at ¶ 1;

GPS Decl., Exh. A at ¶ 3; Jennifer Couture's deposition at 13:11-15.[3]

      4.      GPS maintained exceptional goodwill and reputation in the community

through Dr. Garramone's work as a lauded plastic surgeon. [GPS Decl., Exh. A at ¶

4; Garramone Decl., Exh. B, ¶¶ 2-3].

      5.      GPS relies on its reputation and the good-will it has created with its

patients to maintain its standing in the community. [GPS Decl., Exh. A., at ¶ 4].

      6.      Noshirvan has been referred to as an online social media mega-influencer

---

[1] The complete transcript of GPS's deposition from the 340 Case has been previously filed under seal at D.E. 480 and will be referred to herein as the "GPS 340 Dep. (D.E. 480)." GPS was not deposed in the instant case.

[2] The complete transcript of Dr. Garramone's deposition from the 1218 Case has been previously filed under seal at D.E. 479 and will be referred to herein as Garramone 1218 Dep. (D.E. 479)."

[3] The complete transcript of Couture's deposition has been previously filed under seal at D.E. 476 and will be referred to herein as "Couture Dep. (D.E. 476)."

and he has approximately 2.5 million followers across all his social media accounts,

including, but not limited to, Instagram, Facebook, TikTok, and Substack. *See* Danesh

Noshirvan's April 25, 2025 deposition transcript at 21:15-22:6, 49:4-22, 115:20-116:6.[4]

7.      Noshirvan has 2 million followers on TikTok, approximately 500,000

followers on Instagram, and 3,000 subscribers to his Substack account. [Noshirvan1

Dep. (D.E. 473) at 115:20-21, 119:1-21, 120:18-21].

8.      Noshirvan initiated the instant litigation against Counter-Plaintiffs on

December 26, 2023. [D.E. 1].

9.      Starting on January 1, 2025, Noshirvan published a series of false and

defamatory statements on his social media accounts about the Counter-Plaintiffs as

detailed below. [GPS Decl., Exh. A, at ¶ 5; Garramone Decl., Exh. B, at ¶ 4; Couture

Decl., Exh. C, at ¶ 2].

**B.      Noshirvan's Defamatory Statements Concerning Counter-Plaintiffs**

10.      On January 1, 2025, Noshirvan made the following statements in a video

uploaded to his TikTok account, which is visible to his over 2 million followers[5,6]:

       a.      **"I am suing my children's stalkers, Jennifer Couture and Ralph
               Garramone of Fort Myers, Florida, and their company, Garramone
               Plastic Surgery, where they have their entire company. They literally
               had the, the employees of their company, work all day, stalking more,**

---

[4] The complete transcript of Danesh Noshirvan's April 25, 2025 deposition has been
previously filed under seal at D.E. 473 and will be referred to herein as "Noshirvan1
Dep. (D.E. 473)."

[5] https://www.tiktok.com/@thatdaneshguy/video/7455096982143520046?lang=en

[6] Mr. Noshirvan also reposted this TikTok video on his YouTube channel. *See*
https://www.youtube.com/watch?v=oaKLdMt8vlc

harassing me and coming after my children."

b. **"Hey, I'm not just, like, accusing them of this. Notice I don't say "allegedly." They admitted to *all* this in court."**

c. **"That's their *new* hire [Camp], that's their *new* for-hire troll. And this new for-hire troll, has been again, coming after my children, coming after my family, and, you know, targeting and harassing me."**

d. **"All these people are gonna go to prison."**

e. **"So Jennifer Couture, Ralph Garramone of Fort Meyers [*sic*], you two that want to cozy up with Nazis, white supremacists and child stalkers because you guys are ones yourselves."**

f. **"It's interesting to me that you've had to *admit* in court that you *are* in fact child stalkers. *You had to admit that* . . . Maybe you shouldn't have done those things."**

g. **"Perhaps your children will be taken from you, perhaps Family Services will take the rest of your children from you, when they see that you're actual child stalkers. I hope they never get wind of the fact that *you*, Jennifer Couture and Ralph Garramone of Fort Meyers [*sic*], are child stalkers, because that would be very bad for you."**

11.    On January 29, 2025, Noshirvan published a video on his YouTube channel containing the following false and defamatory statement:

a. **"Jennifer and Ralph are racist and violent extremely racist and extremely violent."**

12.    Noshirvan has made a number of Instagram posts, since January 2025, including the following which are false and defamatory:

a. **On January 28, 2025,[7] – "Jennifer Couture and Ralph Garramone of Garramone Plastic Surgery should have their actions and the actions of their violent goons like Joey Camp and Richard Luthmann attached to them."**

---

[7] https://www.instagram.com/p/DFZCLabNMAn/?igsh=MjB6bmRkemhjbGky&img_index=2

    b.   **"These sick \*\*\*\*s should be in jail, but it's alleged Jennifer Couture is raw dogging Lee County Sheriff Carmine Marceno in exchange for looking the other way when she clearly violated her probation."**

    c.   **On February 3, 2025[8] – "As you may know, I'm suing Jennifer Couture and Ralph Garramone, who employed goons like Joey Camp to harass myself and my family for the past 3 years."**

    d.   **"They've tried every nasty and illegal tactic to sabatoge [*sic*] this case including, but not limited to, intimidating witnesses, experts, and lawyers."**

13.    In addition to the Instagram posts noted above, Noshirvan has a "Child Stalker" highlight on his Instagram profile page that displays a thumbnail image of Jennifer Couture and contains links to a litany of posts made by Noshirvan that concern GPS, Dr. Garramone, and Ms. Couture.[9]

14.    On or about January 27, 2025 through February 6, 2025, Noshirvan made a series of blog posts/publications on his Substack account[10]. Each of the publications listed below contain patently false and defamatory titles and/or statements regarding Dr. Garramone, Ms. Couture, and GPS:

    a.   **January 27, 2025 – "Hey everyone great to be here! @legendofthesouth is the woman I'm suing for stalking my children. I didn't realize they allowed child stalkers on this platform."** [11]

    b.   **January 27, 2025 – "Jennifer Couture and her Plastic Surgeon husband stalk children. Part 1"** [12]

---

[8] https://www.instagram.com/p/DFoHoKsyOfu/?igsh=MWZkdXpwbHdqdTNpdw

[9] https://www.instagram.com/thatdaneshguy/?igsh=cDJlYmxwYm9xNXcz#

[10] https://substack.com/@thatdaneshguy

[11] https://substack.com/@thatdaneshguy/note/c-88988282

[12] https://substack.com/home/post/p-155838502

    i.  "Ralph Garramone and Jennifer Couture (@legendofthesouth) personally drove to my house to photograph my children without my knowledge to send to me accompanied with sexual threats against them."

c.  **January 27, 2025 – "Jennifer Couture and her Plastic Surgeon husband stalk children. Part 2"** [13]

    i.  "Jennifer Couture's misplaced rage begins to quickly spiral out of control after her manuscript was rejected as "misinformation." Later she recruits the assistance of a troll-for-hire, felon, white supremacist, extremist, and alleged pedophile, Joseph Anthony Camp to carry out her revenge against everyone."

    ii.  "Jennifer was outraged that Sheriff Carmine Marceno would apply the law to her as she expected special treatment due to their alleged sexual affair and because Jennifer claims that her and her husband Ralph Garramone donate to the Sheriff's Office."

    iii.  "Read her ramblings below and stay tuned for Part 3 where Jennifer Couture and Ralph Garramone hire white supremacist and serial stalker, Joey Camp . . . ."

d.  **January 28, 2025 – "BREAKING! Jennifer Couture and Ralph Garramone stalk children (TESTIMONY INSIDE)"** [14]

    i.  "Jennifer Couture and Ralph Garramone personally traveled Florida [*sic*] to Pennsylvania to flyer my hometown with posters doxxing me and defaming me by labeling me "a local pedophile" with a false story about me murdering a kid that doesn't exist in an effort to get my neighbors to murder me."

e.  **January 28, 2025 – "Breaking! Garramone Plastic Surgery PAID terrorist Joey Camp! (Proof Inside!)"** [15]

    i.  "After months of lying to the court and denying a relationship with Joey Camp, Ralph Garramone and Jennifer Couture were forced to admit their relationship with cyber stalker and pedophile Joseph Anthony Camp."

---

[13] https://substack.com/home/post/p-155843335
[14] https://substack.com/home/post/p-155979934
[15] https://substack.com/home/post/p-155979413

ii. "Ralph Garramone's company paid known troll4hire, white supremacist, and pedophile Joey Camp to harass and threaten Tiktoker @thatDaneshguy."

iii. "After months of denying a relationship with Joey Camp to the court, Ralph Garramone and Jennifer Couture provided discovery items showing that they had a VERY close relationship with the terrorist."

f. **January 28, 2025 – "RACIST & VIOLENT See what Jennifer Couture and Ralph Garramone paid Joey Camp to send me!"** [16]

i. "Jennifer Couture and Ralph Garramone of Garramone Plastic Surgery are an affluent couple who use their wealth and influence to terrorize anyone who wrongs them by employing violent felons and pedos."

ii. "Jennifer Couture and Ralph Garramone have recently admitted in court that their company Garramone Plastic Surgery paid Joey for his services."

iii. "Again, this is not even a portion of what they've done to terrorize us over the past 3 years, this isn't even the most illegal thing they did, but these disgusting tactics should always be associated with them."

iv. "An example of the 100s of text messages Jennifer Couture and Ralph Garramone paid Joey Camp to send me every day."

g. **January 28, 2025 – "For the first time, I'm going to post every single text message that Jennifer Couture directed Joey Camp to send me.** [17]

h. **January 29, 2025 – Hearing update! (Video)** [18]

i. "And now she's turned into, like, monstrous, demonic, like child stalking Karen. And this plastic surgeon, this guy is, the man with a doctorate, a man with a doctorate – what is he doing, skipping his son's graduation parties and, like, stalking my one and five year

---

[16] https://substack.com/home/post/p-155968917
[17] https://substack.com/@thatdaneshguy/note/c-89383005
[18] https://substack.com/home/post/p-156025438

old. What the hell?!? What the hell? A man with a doctorate gets his own company involved. Using company accounts to defame to me."

ii.  "You used your company, to try to, heh, to stalk children!"

iii.  "Ralph Garramone is a full grown man with a doctorate, blaming a TikToker that his customers are not interested, in a child stalker. What, am I not allowed to tell people that you stalk my children?"

iv.  "The one thing I actually did, that I admit to doing and I'll admit to doing right now, while I know they're screen recording as they stalk me, and I'm, the fact that this screen recording that they are gonna send the judge later exists, is proof, that they stalk me."

v.  "I'll say right now, for the past three years, nonstop, I've been referring to them as child stalkers."

vi.  "With, accusing me of everything under the sun, but they never accused me of defamation, for calling them child stalkers. For three years straight and I'm still saying it, 'cause they are."

vii.  "And now we know why, if you've seen the article that I posted the testimony. Now we know why, because they did it. Well, I knew the whole time. They did it. They are child stalkers."

viii.  "So, until then, I'm gonna post some things that I had already posted on other platforms, including, um – declarations from people, witness intimidation, the biggest crimes they committed."

ix.  "'Cause they did that. They, they literally paid 'em to do that."

i.  **January 29, 2025 – "Having read about what my stalker has done to me, can you believe this Newsweek reporter was allegedly paid off to slander me for Couture? Hack journalist."** [19]

j.  **January 30, 2025 – "BREAKING! Florida Doctor and CHILD STALKER Ralph Garramone and his wife goons CAUGHT engaging in WITNESS INTIMIDATION!"** [20]

---

[19] https://substack.com/@thatdaneshguy/note/c-89495252
[20] https://substack.com/home/post/p-156125684

    i. "Ralph Garramone owns Garramone Plastic Surgery in Fort Myers, Florida. This full grown man with a doctorate who took his employees to my town in another state to stalk a 1 year old infant and 5 year old. His lips could not be located for comment."

    ii. "The defendants threaten experts who testify against them. Ralph Garramone, Jennifer Couture, and Richard Luthmann could be looking at 5 - 15 years in prison for this behavior alone."

**k. January 30, 2025 – "Dr. Garramone of Fort Myers is soliciting violent felons to threaten my family. I'm suing his ass for $5 million"** [21]

    i. "Ralph Garramone, owner of Garramone Plastic Surgery in Fortt [sic] thinks he's some sort of mob boss, but mob bosses don't stalk and threaten infants."

    ii. "Dr. Ralph Garramone has committed perjury in Federal court countless times during this case, but his more serious crimes include every effort he and his co-conspirators made to prevent a fair trial."

    iii. "Read how this full grown man with a doctorate targeted the family of Hannah Noshirvan, an innocent woman with no online presence who has never engaged in any of this."

    iv. "Why are Ralph Garramone and Jennifer Couture still engaging in their terrorism while they're being sued for the exact behavior?"

**l. February 6, 2025 – "BREAKING Tiktoker filed protective order for his kids against Jennifer Couture and Dr. Ralph Garramone of Fort Myers"** [22]

    i. "Tiktoker Danesh Noshirvan @thatdaneshguy had to file a protective order against plastic surgeon Dr. Ralph Garramone and his wife Jennifer Couture to protect his young children. Their unhinged and illegal tactics and employment of felons like Joseph Camp and Richard Luthmann to carry out their abuse."

    ii. "Dr. Ralph Garramone of Garramone Plastic Surgery admitted in court that he and Jennifer Couture stalked Tiktoker

[21] https://substack.com/home/post/p-156128149
[22] https://substack.com/home/post/p-156628111

@thatdaneshguy"

15.    The Court has taken and can take judicial notice of Noshirvan's TikTok, Instagram, and YouTube accounts such that it can independently confirm such statements were, in fact, published on Noshirvan's social media accounts. (D.E. 454 at 21 n. 6).

16.    These kinds of statements are immensely damaging in the context of a medical practice, where trust and credibility are of utmost importance. [GPS Decl., Exh. A, at ¶ 17].

17.    Moreover, Dr. Garramone and Couture faced and continue to face harassment and threats as a result of Noshirvan's posts, requiring them to hire personal security for protection and to pay for enhanced security features to their residence following the influx of false and defamatory social media posts by Noshirvan that started in January 2025. [Garramone Decl., Exh. B., at ¶ 16; Couture Decl., Exh. C., at ¶ 15].

18.    GPS has had to hire security personnel and had to pay for enhanced security surveillance systems to be installed at its office location in Ft. Myers, Florida, as a result of the threats and harassment stemming from Noshirvan's posts starting in January 2025. [GPS Decl., Exh. A, at ¶ 18].

19.    Couture suffered and continues to suffer emotional distress as a result of Noshirvan's false and defamatory posts, requiring her to seek and pay for medical treatment by a licensed mental health professional. [Couture Decl., Exh. C, at ¶ 16].

20.    The Counter-Plaintiffs collectively also had to retain and pay the

undersigned counsel to issue a cease and desist letter to Noshirvan and to bring suit against him, if necessary. On February 8, 2025, counsel for the Counter-Plaintiffs issued a pre-suit notice pursuant to Fla. Stat. § 770.01 (the "***Notice***"), on Noshirvan through his counsel. [D.E. 448-1; 526-1; GPS Decl., Exh. A, at ¶ 19; Garramone Decl., Exh. B, at ¶ 17; Couture Decl., Exh. C, at ¶ 17].

21.    The Notice contains the direct quotes of Noshirvan's defamatory statements made in January and February 2025, provides notice of Counter-Plaintiffs' intent to assert defamation claims if Noshirvan fails to retract or correct the defamatory statements, and demands that he cease and desist from making further defamatory statements regarding Counter-Plaintiffs. [D.E. 448-1; 526-1].

22.    Despite this Notice, Noshirvan's defamatory statements continued, forcing the Counter-Plaintiffs to retain the undersigned counsel in pursuit of the instant counterclaims. [GPS Decl., Exh. A, at ¶ 19; Garramone Decl., Exh. B, at ¶ 17; Couture Decl., Exh. C, at ¶ 17].

### C.    Noshirvan's Statements Are False

23.    At no point did the Counter-Plaintiffs, or anyone acting on their behalf, ask Camp, or have an agreement with Camp, or any other defendant or third-party, to harass, sexually cyber-harass, cyberstalk, deplatform, defame, or inflict emotional distress on Noshirvan, or to interfere with Noshirvan's personal and/or business relationships. [GPS 340 Dep. (D.E. 480) at 342:11-343:13; Couture Dep. (D.E. 476) at 410:16-411:4, 420:17-421:4; GPS Decl., Exh. A, at ¶ 6; Garramone Decl., Exh. B, at ¶ 5; Couture Decl., Exh. C, at ¶ 3].

24.     Indeed, neither the Counter-Plaintiffs nor anyone acting on their behalf stalked Noshirvan's children or had an agreement with Camp to stalk Noshirvan's children. [GPS Decl., Exh. A, at ¶ 7; Garramone Decl., Exh. B, at ¶ 6; Couture Decl., Exh. C, at ¶ 4; Couture Dep. (D.E. 476), 188:4-6, 414:8-15.

25.     Further, neither Dr. Garramone nor Couture have asked any employee of GPS to "work all day stalking [Noshirvan], harassing [Noshirvan] and coming after [Noshirvan's] children."  GPS Decl., Exh. A, at ¶ 8; Garramone Decl., Exh. B, at ¶ 7; Couture Decl., Exh. C, at ¶ 5].

26.     Nowhere in the course of the legal proceedings referenced by Noshirvan did GPS admit to dedicating its business efforts to stalking or harassing Noshirvan or to "come after" Noshirvan's children. [GPS Decl., Exh. A, at ¶ 9].

27.     Likewise, at no point did Counter-Plaintiffs direct any of their employees to stalk or harass Noshirvan or to "come after" Noshirvan's children. [GPS Decl., Exh. A, at ¶ 10; Garramone Decl., Exh. B, at ¶ 9; Couture Decl., Exh. C, at ¶ 6].

28.     Richard Luthmann is not an employee of any of the Counter-Plaintiffs and none of the Counter-Plaintiffs hired him to "come after" Noshirvan's children and family or to otherwise target or harass Noshirvan. [Couture Dep. (D.E. 476), 419:9-20;  GPS Decl., Exh. A, at ¶ 11; Garramone Decl., Exh. B, at ¶ 8; Couture Decl., Exh. C, at ¶ 7].

29.     Counter-Plaintiffs have not been convicted of any felonies. GPS Decl., Exh. A, at ¶ 12; Garramone Decl., Exh. B, at ¶ 11; Couture Decl., Exh. C, at ¶ 8].

30.     At no time during the pendency of this litigation did Counter-Plaintiffs

admit or have to admit that they are child stalkers. The exact opposite is true. [Couture
Dep. (D.E. 476), 188:4-6, 414:8-15]. To be sure, neither Dr. Garramone, Couture, nor
GPS are child stalkers. [GPS Decl., Exh. A, at ¶ 13; Garramone Decl., Exh. B, at ¶
12; Couture Decl., Exh. C, at ¶ 9].

31.    Neither Dr. Garramone nor Couture drove to Noshirvan's house to
photograph his children to send him said photographs accompanied with sexual
threats against his children. [Garramone Decl., Exh. B, at ¶ 10; Couture Decl., Exh.
C, at ¶ 10].

32.    Couture did not and has not engaged in or had a sexual affair with Sheriff
Carmine Marceno as stated by Noshirvan. [Couture Decl., Exh. C, at ¶ 12].

33.    When asked if he had any proof that Couture and Dr. Garramone were,
in fact, racists, Noshirvan did not come forward with any proof. [Noshirvan1 Dep.
(D.E. 473) at 296:1-300:8]. The reason he has no proof is that they are not racists,
white supremacists, or Nazis. [Garramone Decl., Exh. B, at ¶ 13; Couture Decl., Exh.
C, at ¶ 11

34.    Further, Noshirvan has no proof that Counter-Plaintiffs are violent—let
alone extremely violent.

35.    Camp was not an employee of GPS. [GPS 340 Dep. (D.E. 480) at 219:20-
219:24; 225:5-225:15; Couture Dep. (D.E. 476) at 409:24-410:7; GPS Decl., Exh. A,
at ¶ 14]. He was not on GPS's payroll nor did GPS issue Camp a W-2 or Form 1099
at any time. [GPS 340 Dep. (D.E. 480) at 341:3-11; GPS Decl., Exh. A, at ¶ 14].

36.    Couture and Dr. Garramone did not employ Camp to harass Noshirvan

or his family. [Garramone Decl., Exh. B, at ¶ 14; Couture Decl., Exh. C, at ¶ 13]. Camp volunteered to help GPS, Dr. Garramone, and Couture to mitigate the reputational harm caused by Noshirvan and Camp received some funds for his help. [D.E. 448, ¶¶ 245, 286, 287, 289; GPS 340 Dep. (D.E. 480) at 224:6-224:16, 341:12-342:7; Garramone Decl., Exh. B, at ¶ 14; Couture Decl., Exh. C, at ¶ 13]. Payments made from GPS to Camp between May and July 2022 were as a "thank you" for his help and nothing more. [GPS 340 Dep. (D.E. 480) at 344:12-17; GPS Decl., Exh. A, at ¶¶ 15].

37.    Camp's assistance to GPS, Dr. Garramone, and Couture was strictly limited to reputation management. [GPS 340 Dep. (D.E. 480) at 224:6-224:16; GPS Decl., Exh. A, at ¶ 16; Garramone Decl., Exh. B, at ¶ 15; Couture Decl., Exh. C, at ¶ 14].

38.    The Court found in its Opinion and Order that "no evidence established that any expert witnesses are being harassed at the behest of any Defendants." [D.E. 454, pg. 16].

39.    The evidence in this case shows that it was *Noshirvan*—not Counter-Plaintiffs—who tried to intimidate the lawyers in this case. As the Court found, "Noshirvan's communications are sanctionable under the Court's inherent powers because they served no purpose other than to improperly influence the litigation by disrupting the court proceedings and harassing and intimidating opposing counsel." [D.E. 454, pgs. 30-31].

## III.    MEMORANDUM OF LAW

### A.    Applicable Legal Standard

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant is entitled to judgment as a matter of law." *Id.* In reviewing a motion for summary judgment, the Court is "required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1143 (11th Cir. 2007)). Notably, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter," but only "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

As the Eleventh Circuit has recognized, summary judgment of defamation cases is particularly appropriate because "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings*, 816 F. 3d 686, 702 (11th Cir. 2016). In other words, "because of the importance of free speech, summary judgment is the 'rule,' and not the exception, in defamation cases." *Guitar v. Westinghouse Elec. Corp.*, 396 F. Supp. 1042, 1053 (S.D.N.Y. 1975) (internal citation omitted).

15

**B.      Counter-Plaintiffs are Entitled to Judgment as Matter of Law on their Defamation *Per Se* Claims (Counts I, III, V)**

To establish a cause of action for defamation, Counter-Plaintiffs must allege "(1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) the plaintiff suffered damages as a result of the publication." *Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1328 (S.D. Fla. 2012). A defamatory statement rises to the level of libel *per se* if it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953) (citing Restatement, Torts, Section 570). When determining whether a published statement constitutes defamation *per se*, the Court may consider only the "four corners" of the publication and construe the publication as the "common mind would naturally understand it." *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1339 (S.D. Fla. 1998).

To bring a claim for defamation *per se*, a party need not show any special damages considering *per se* defamatory statements are "so obviously defamatory and damaging to [one's] reputation that they give rise to an absolute presumption both of malice and damage." *Id.* (alternation in original). In other words, if a statement is *per se* defamatory, it is presumed the statement caused damage. *See Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015).

As detailed herein, the Counter-Plaintiffs have shown that Noshirvan made defamatory *per se* statements such that Counter-Plaintiffs are entitled to judgment as a matter of law.

## 1. Defamation *Per Se* By Noshirvan Directed at GPS

GPS is entitled to summary judgment on its cross-claim for defamation *per se* related to Noshirvan's publication of false statements about GPS's business. A business entity "may recover for [defamation] just as an individual, where a publication prejudices it in the conduct of its trade or business, deters third persons from dealing with it, assails its management, impugns its methods of doing business or inflicts injury on its credit or business." *Stone v. Shafran*, 641 F. Supp. 3d 1344, 1362 n. 11 (S.D. Fla. 2022) (quoting *McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. 1st DCA 1986)).

Here, Noshirvan authored and made false and defamatory statements about GPS, including assertions that (i) GPS engaged in a criminal conspiracy to harm Noshirvan and his family; and (ii) GPS maintains professional relationships with individuals Noshirvan claims are terrorists, racists, pedophiles, and stalkers. (SOF ¶¶ 10-14). These statements are false, (SOF ¶¶ 10-14, 23-39), and it is undisputed that such defamatory statements were published on Noshirvan's social media accounts. (SOF ¶¶ 10-14). Moreover, the Court has taken judicial notice of Noshirvan's TikTok, Instagram, and YouTube accounts such that it can independently confirm such statements were published. (SOF ¶ 15).

Noshirvan's statements directly undermine GPS's trade and profession, striking

at the foundation of its business operations. As a medical provider, GPS's ability to attract and retain patients depends heavily on its good name and standing in the Fort Myers community and beyond. Its reputation for integrity and professionalism is a critical asset that drives client trust, referrals, and growth. (SOF ¶¶ 2, 4-5). By falsely stating that GPS has engaged in criminal conduct and maintains professional relationship with felons and terrorists, Noshirvan has cast doubt on GPS's ethical standards and has introduced doubt into the minds of current and prospective patients. These kinds of statements are immensely damaging in the context of a medical practice, where trust and credibility are of utmost importance. (SOF ¶ 16).

Because such statements affect GPS in its trade and profession, the statements amount to *per se* defamation such that malice and damages are presumed. *Daniels v. HSN, Inc.*, 2020 WL 533927, at *3 (M.D. Fla. Feb. 3, 2020). Therefore, there exists no dispute of material fact as to Count I and Counter-Plaintiffs' motion for summary judgment as to liability should be granted as to this cause of action.

## 2. Defamation *Per Se* By Noshirvan Directed at Couture and Dr. Garramone

Relatedly, Noshirvan made a series of false statements accusing Dr. Garramone and Couture of having committed numerous felonies and participating in a in criminal conspiracy with Camp to harm Noshirvan and his family. (SOF ¶¶ 10-14). Specifically, Noshirvan repeatedly states that Couture and Dr. Garramone are "child stalkers," a serious defamatory assertion that carries criminal implications. *Id.*

Under Florida law, stalking requires: (1) willful conduct, (2) malicious conduct,

(3) repeated following, harassment, or cyberstalking, and (4) conduct directed at another person. Fla. Stat. § 784.048. The record contains no evidence whatsoever to suggest Dr. Garramone or Couture engaged in any such behavior. To the contrary, the undisputed evidence affirmatively shows these allegations are categorically false. (SOF ¶¶ 23-31).

Moreover, Noshirvan made additional statements publicly accusing Dr. Garramone of engaging in criminal conduct and fraudulent activity, including witness intimidation and perjury. (SOF ¶ 14). Noshirvan did not remove or retract these statements even after the Court ruled that "no evidence established that any expert witnesses are being harassed at the behest of any Defendants." [D.E. 454, pg. 16; SOF ¶¶ 21-22].

These statements constitute defamation *per se* under Florida law because they "accuse a person of a felony." *Klayman*, 22 F. Supp. 3d at 1247. "[A] statement tending to injure one in his trade or profession is a falsehood directed at a person's professional competence or fitness to engage in a given profession." *Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1342 (M.D. Fla. 2003). Under Florida law, "even though the full impact of an alleged defamatory communication must be shown by allegations of inducement, colloquium and innuendo, it is nonetheless actionable per se . . . if [it impugns a person's professional competence or fitness to engage in a given profession]." *Id.* (quoting *Campbell v. Jacksonville Kennel Club*, 66 So. 2d 495, 498 (Fla. 1953) (alteration in original). Because the elements of defamation *per se* are plainly met, and because such statements are presumed to be both malicious and damaging, there exists no

genuine issue of material fact as to Noshirvan's liability. Accordingly, summary
judgment as to liability should be granted in favor of both Dr. Garramone and Couture
on this claim.

### C.    Counter-Plaintiffs are Entitled to Judgment as Matter of Law on their Claims for Defamation *Per Quod* (Counts II, IV, VI)

Defamation *per quod* similarly requires a showing that: "(1) the defendant
published a false statement; (2) about the plaintiff; (3) to a third party; and (4) that the
falsity of the statement caused injury to another." *Daniels v. HSN, Inc.*, 2020 WL
533927, at *3 (M.D. Fla. Feb. 3, 2020) (cleaned up). However, defamation *per quod*
"requires the statement to be put in context so as to demonstrate its defamatory
meaning or that the plaintiff is the subject of the statement." *Id.* (internal quotations
omitted). With defamation *per quod* claims, "the words used, given their natural and
common meaning, are not inherently injurious, but rather are injurious only as a
consequence of extrinsic facts, such as innuendo." *Scobie v. Taylor*, 2013 WL 3776270,
at *2 (S.D. Fla. July 17, 2013). Stated otherwise, if the statement "requires explanation
of context" to be defamatory, it may qualify as defamation *per quod*. *Daniels*, 2020 WL
533927, at *4 (cleaned up).

Because "defamation *per quod* 'requires additional explanation of the words
used to show that they have a defamatory meaning, . . . the plaintiff must allege and
prove special damages.'" *Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 457 (Fla.
5th DCA 1999). Special damages are "actual, out of pocket losses; that is, realized or
liquidated loss." *Grayson v. No Labels, Inc.*, 2022 WL 1316227, *3 (M.D. Fla. April 28,

2022).

### 1.  Defamation *Per Quod* By Noshirvan Directed at GPS

GPS has maintained an outstanding reputation and significant goodwill within the community, cultivated over years of trusted service in the medical profession. (SOF ¶¶ 4-5). That reputation was severely and unjustly damaged by Noshirvan's false and defamatory statements made in January and February 2025. Specifically, Noshirvan authored and published statements asserting that GPS knowingly employed violent individuals at its place of business, thereby suggesting that GPS's medical practice posed a threat to the safety and wellbeing of its patients and staff. (SOF ¶¶ 10-14).

These defamatory statements were not facially obvious in their harmful meaning. Rather, they required Noshirvan's followers and the general public to understand their defamatory implication. As such, the statements constitute defamation *per quod*.

As a direct result of Plaintiff's defamatory statements, GPS suffered measurable financial harm due to having to hire security personnel at its office location in Ft. Myers, Florida, having to purchase and install enhanced security surveillance systems. (SOF ¶ 18). These losses are directly tied to the harassment and threats directed at GPS as well as GPS's reputational damage caused by Plaintiff's false statements. Moreover, Counter-Plaintiffs were left with no choice but to incur additional expense by retaining the undersigned counsel to serve Noshirvan with a Notice pursuant to Fla. Stat. § 770.01 and pursue the counterclaims at bar. (SOF ¶ 20).

Accordingly, because GPS has established both the falsity and the harm

resulting from Noshirvan's statements, and because the record contains no genuine
dispute as to these material facts, summary judgment should be entered in GPS's favor
on this claim.

### 2. Defamation *Per Quod* By Noshirvan Directed at Couture and Dr. Garramone

Similarly, Noshirvan authored and widely disseminated a series of false and
highly inflammatory statements about Couture and Dr. Garramone, labeling them as
"stalkers," "Nazis," "racists," and "white supremacists," and further claimed they
have a history of engaging in fraudulent behavior. (SOF ¶¶ 10-14). Noshirvan also
stated that Dr. Garramone and Couture maintained personal and professional
relationships with individuals Noshirvan claims are terrorists, pedophiles, and
stalkers. *Id.* Most egregiously, Plaintiff accuses Dr. Garramone and Couture of
participating in a criminal conspiracy to harm Noshirvan and his family and that they
will be going to prison. *Id.*

These statements are not only false but are deeply damaging. While their
defamatory impact is severe, the nature of the injury is not necessarily apparent on the
face of the statements and instead require extrinsic facts and context to fully grasp the
reputational harm. As such, these statements constitute defamation *per quod* under
Florida law.

These statements impute serious criminal behavior punishable by incarceration,
questionable morals, and association with extremist and violent individuals. These
assertions strike at the core of Dr. Garramone and Couture's integrity, both

professionally and personally. In their respective roles within the community and in professional spheres, such defamatory claims have a direct and harmful impact on their reputation and standing.

Noshirvan's social media posts led to growing harassment and threats directed at Dr. Garramone and Couture in 2025. As a result, Dr. Garramone and Couture were forced to hire personal security and obtain enhanced security surveillance at their residence for their safety and well-being. (SOF ¶ 17). Relatedly, Couture suffered emotional distress due to Noshirvan's defamatory statements such that she sought continues to receive medical treatment by a mental health professional. (SOF ¶ 19). Moreover, Dr. Garramone and Couture, with GPS, were left with no choice but to incur additional economic harm through retaining the undersigned counsel to pursue the relevant counterclaims. (SOF ¶ 20). Indeed, Dr. Garramone and Couture suffered direct economic harm as a result of Noshirvan's actions.

Because these statements are demonstrably false and their defamatory nature is clear when understood with context, Dr. Garramone and Couture satisfy the elements of defamation *per quod*. Dr. Garramone and Couture have suffered concrete reputational harm, and no genuine issue of material fact remains on this claim. Accordingly, summary judgment should be granted in their favor.

### D.    Counter-Plaintiffs Are Entitled to Judgment as They Are Not Limited Public Figures

The Court should grant summary judgment as to Counter-Plaintiffs' defamation claims given the fact that they are not limited public figures and are not subject to the

actual malice analysis. Limited public figures are individuals "who have thrust
themselves to the forefront of particular public controversies in order to influence the
resolution of the issues involved." *Young v. Kopchak*, 368 So. 3d 1001, 1006 (Fla. 4th
DCA 2023). "Determining whether a plaintiff is a public figure, who is subject to the
actual malice analysis, 'is a question of law for the court to decide.'" *Jacoby v. Cable
News Network, Inc.*, 2021 WL 5858569, at *3 (11th Cir. Dec. 10, 2021) (quoting *Michel
v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016)). To determine whether a
legal person is a limited public figure, courts must "determine whether there is a 'public
controversy'" and "then determine whether the plaintiff played a sufficiently central
role in the instant controversy to be considered a public figure for purposes of that
controversy." *Id.*

A public controversy is "any topic upon which sizeable segments of society have
different, strongly held views." *Della-Donna v. Gore Newspapers Co.*, 489 So. 2d 72, 76
(Fla. 4th DCA 1986) (quoting *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 138 (2d Cir.
1984)). However, "[a]ttracting the public's interest is not enough." *Id.* In determining
whether a controversy is public, a court "should ask whether a reasonable person
would have *expected persons beyond the immediate participants in the dispute to feel the impact
of its resolution. If the issue was being debated publicly and if it had foreseeable and
substantial ramifications for non-participants*, it was a public controversy." *Id.* at
77 (emphases added).

Counter-Plaintiffs have not "thrust themselves to the forefront" of any

24

particular public controversy. To the extent they have come under public scrutiny, that is due to Noshirvan's repeated and continued defamatory publications about Counter-Plaintiffs—*not* by any independent act by Counter-Plaintiffs. Moreover, Counter-Plaintiffs are not at the center of any public controversy, nor have they attempted to influence the outcome of any public controversy. Thus, Counter-Plaintiffs are not general or limited public figures and their defamation claims are not subject to an actual malice analysis. Moreover, even if Counter-Plaintiffs could be considered general or limited public figures (which they are not), the undisputed facts demonstrate that Noshirvan acted with actual malice toward them. Accordingly, Counter-Plaintiffs are entitled to summary judgment as to liability on their defamation claims.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant summary judgment as to liability on all of Counter-Plaintiffs' claims.

Respectfully submitted this 15th day of October, 2025,

*/s/ Julian A. Jackson-Fannin*
Harvey W. Gurland, Jr., Esq.
Florida Bar No. 284033
Julian A. Jackson-Fannin, Esq.
Florida Bar No. 93220
DUANE MORRIS LLP
201 South Biscayne Blvd., Suite 3400
Miami, FL 33131
Tel:  561.962.2108
HWGurland@duanemorris.com
JJFannin@duanemorris.com
*Counsel for Counter-Plaintiffs*

DM1\20085703.6