# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

DANESH NOSHIRVAN
an individual,

Plaintiff

vs.

JENNIFER COUTURE, et al,

Defendants.

_____/

RALPH GARRAMONE, M.D., P.A.
d/b/a GARRAMONE PLASTIC
SURGERY, JENNIFER COUTURE,
an individual, RALPH GARRAMONE,
M.D., an individual,

Counter-Plaintiffs,

v.

DANESH NOSHIRVAN,

Counter-Defendant.

_____/

CASE NO:   2:23-cv-01218-JES-DNF

District Judge: Hon. John E. Steele
Magistrate Judge Douglas N. Frazier


**PLAINTIFF DANESH NOSHIRVAN'S OPPOSITION TO DEFENDANTS JENNIFER COUTURE, RALPH GARRAMONE, M.D., AND OMG REALTY, LLC'S, MOTION FOR SUMMARY JUDGMENT AS TO COUNTS II, III, IV, AND IX OF THIRD AMENDED COMPLAINT (DKT. 540)**



## I.    Introduction

Jennifer Couture ("**Couture**"), Ralph Garramone, M.D. ("**Garramone**"), and

OMG Realty, LLC ("**OMG**")(collectively ("**Defendants**")) seek summary judgment

on Danesh Noshirvan's ("**Noshirvan**") claims for civil conspiracy to commit tortious

interference, defamation, and intentional infliction of emotional distress, by arguing

lack of evidence tying them to the egregious campaign of harassment and defamation

carried out by co-conspirator Joseph A. Camp ("**Camp**"). This attempt to isolate

themselves from Camp's conduct fails miserably. The record contains ample

evidence to the contrary. Couture, Garramone, and Ralph Garramone, MD PA d/b/a

Garramone Plastic Surgery ("**GPS**") hired and paid Camp as an "online reputation

manager" and provided him with resources, encouragement, and approval to "take

down" Noshirvan's online presence and reputation. They exchanged numerous

communications with Camp, received reports of his activities, and even explicitly

acknowledged his ongoing campaign against Noshirvan. Far from being unaware

bystanders, Defendants themselves took part in overt acts—including distributing

defamatory flyers and facilitating false reports—in furtherance of the conspiracy.

Defendants' assertions that Camp was a rogue volunteer with no agreement to harm

Noshirvan is flatly contradicted by record evidence.

Defendants conspired with Camp to injure Noshirvan through unlawful

means, and Couture personally participated in publishing false and malicious



statements about him. The record presents genuine issues of intent, agreement, and participation requiring jury resolution. Defendants' motion must be denied entirely.

II.     **Response to Statement of Undisputed Material Facts ("RSUMF")**

1.  (¶1 Denied in part). Defendants refer to Noshirvan as a Mega Influencer; Noshirvan does not refer to himself as an influencer. Dkt. 473,  21:15-22. Noshirvan currently has 2 Million followers on TikTok. *Id.* 115:20.

2.  (¶2 admitted). In 2022, Couture was GPS's operations manager. Dkt. 476, p. 13:11-3, 13:25-14:1-13. Couture's actions/knowledge can be  imputed on GPS.

3.  (¶¶3-5 admitted). Garramone, GPS, and OMG are sufficiently entangled or intertwined to be an extension of Garramone. Acts of planning, coordination, and agreement took place at 12998 S. Cleveland Ave. in Fort Myers, Florida with Garramone and Couture present.  Dkt. 477, pp. 34-5, 43-4(Q. "Were you required to agree [as part of your employment] that Couture was the victim of a January 26, 2022 incident. A. Yes), 67-77("I [often] saw [Camp] at GPS"…" I did have conversations with [Couture] in her office about who she had working for her and her plans for Noshirvan"…"She absolutely wanted revenge"), 92-3 (I knew Couture and Garramone were going to Mansfield, PA with Sydney Ratz and Alex Quattrone. *"I saw pictures after and heard a recap of the trip after they came back"… [Couture] asked Alex and Sydney to go. Garramone was [initially] unaware that they were Going...Garramone was upset that they were there"…"because that just incriminates them more"*), 98-9 (Photographs depicting the events relating to their trip to Mansfield between May

20, 2022 and May 22, 2022 were circulated throughout GPS's office) , 119("*I was
physically at [12998 S. Cleveland Ave.] (GPS/OMG Realty) when all of this was occurring
and these are things that I observed, not only with my eyes, but conversations I've had with
[Couture] herself in her office multiple times*").

    4.  (¶¶6-9 Denied). On May 05, 2022, Couture told Garramone: "*I found
someone I'm gonna work with … I have to take a thumb drive of all the information that we
have on [Noshirvan] and this girl*" (referring to Anjalyke Reed ("**Reed**")). Dkt. 479, Ex.
4, p. 20. "*I have everything I need on [Noshirvan] and [Reed]…,I think Sydney [Ratz] has
everything anyhow [Camp's] a computer hacker….*" *Id.* p.21. "*[Camp] went after
[Noshirvan] that's how I found [him].*" *Id.* "*I am meeting with .. Joey Camp.*" *Id.* p. 22.
"*[Sheriff Marceno] told me … this would be an issue if there was no [viral] video.*" Camp
began cyberharassing Noshirvan on the same day. Dkt. 509, P2. Couture paid Camp
on May 05, 2022 utilizing GPS's credit card. Dkt. 476, Ex. 1-4. On July 05, 2022, Camp
sent Couture a link to the infamous "***Google Spreadsheet***." Dkt. 476, Ex. 10. That link
was sent to GPS officers utilizing the domain: <u>Garramone.com</u> on July 10, 2022.  Dkt.
479, Ex. 33/33A. Within the July 5th  text message Camp requested payment via
"PayPal" link. Dkt. 479, Ex. 33. **Volunteers do not request money**. Dkt. 476, Ex. 27.
Camp did remove some internet publications related to Couture. Dkt. 476, Ex. 11.
However, removal of internet content was <u>not</u> Camp's only function. *Id.*, Ex. 14-24,
30, 32 (If Noshirvan lived here he'd be dead by now. JC: "*Same if he lives in this town.*"),
Dkt. 479, Ex. 43(Camp writes a false petition for Couture and sends its to GPS's

domain), 44 (Couture approves false petition and shares same with GPS employees),

Dkt. 476, 43 (GPS employment letter forwarded by Couture indicating approval).

     5. (¶¶10-11 Denied in part). On July 09, 2022, Couture sent a message to

Garramone (managing member of **Central Park** (Dkt. 479, 13:9-11)) stating *"[Camp],

I'm realistic … I've tried to pay you every week… I am not responsible for housing you or

giving you a place to live … **[it] has now turned into 11 weeks** … I have trusted you with

my life, my financial information, my heart, my soul, my feelings … even …[if] your past is

sketchy."* Couture also stated: *"I don't know how [to help you] **other than pay you for

the work you're doing…**." Dkt. 476, Ex. 35.* Camp is not a volunteer. He was resident

agent living on the Winkler Ranch for 11 weeks. *Id.* Ex. 6, p. 5 (JC: *"I moved [camp] into

one of my houses he is living [on the Winkler Ranch]"*, 36-8.

     6. (¶¶12-21 Denied). Defendants, GPS, and Central Park, had an

agreement to harm Noshirvan, which is evidenced by their concerted actions. Dkt.

476, Ex. 6, 8 (*"[Camp] has a lot of research and information gathered… [Camp] keeps

gathering … phone numbers for me…."*), 9-10, 13 (*"I did send the picture to …[Camp]"*),

14, 15 (*"the commercial on the radio and TV start airing tomorrow … the billboard went

up"*, *"If you scroll above you can see that it's me. I made my account different or my assistant

did."*), 16-24, 27, 30, 35-40 (*"I love [Camp]…, I just didn't want Bullyville legitimizing

[Noshirvan]"*), 41(IG user: *"I don't care what people say about me but f**k around with

[Noshirvan] now you're in my world." JC: "I told you I'm not gonna stop this mother f*cker

f*cked with the wrong person." IG User: I..got… very tough people behind me, all I do is tell*

*them when they should do things and how to go about it. Taking a person down is easy if you
know how to apply pressure to the people around them." JC:* **"I like your strategy.**"*), 44-
5(*Camp admitting that Couture and Garramone and GPS approved creation of
**JenCoutureFl**; Garramone expressly approved Camp's illicit tactics, i.e., claims of
RICO, extortion, etc.*), 48-9 (acknowledging awareness and ratification of Camp's
actions), 50 (payment to Camp made around 2/16/2023), 51, 55 (wire transfer to
Trainor discussion 10 days before May 20th, 2022 ), 57 (Couture ratification of Camp's
actions in Sept, of 2022), 58; Dkt. 479, Ex. 2 (RG: *"No one knows who made those picture.
Our stance is that those pictures were manufactured …on the internet … as far as anyone is
concerned those didn't come from us." JC: "[Noshirvan] deserves a miserable death."*), 3 (RG
*"find the right team …* **play the victim** *… come out on top."*), 4-6, 8-16, 18 (JC: *"It has
been confirmed. A young girl committed suicide that was doxed by [Noshirvan]."*), 19 (JC:
sharing mass reporting post from GPS's IG account. *" I'm going to email it all over the
freaking town… good thing of having a computer hacker friend"* (Camp)), 21 (JC: *"I
connected him with Patrick … We are of the same mindset of what needs to be* **done to**
[Noshrivan]*", Patrick is on board … as well"*), 23 (JC: I won't rest until everybody
knows my side of the story), 24 (RG: *"[Noshirvan will get his. We're on track for that. He
knows it too. We were in his backyard. Set up a call with Patrick.),* 26 (RG: **No one saw us
put a flyer up**. *JC: "Even if someone did see us put a flyer… it's no different than …
posting on social media. "*), 33/33A, 34-5 (JC: *"[Camp is sending more stuff now[,] peoples
comments[,] etc." RG: Noshirvan is "trying to scare you because he knows he can't scare*

*Chiappetta*
TRIAL LAWYERS

*[Camp] there's no evidence as far as I'm concerned that you are stalking [Noshirvan]"),* 39-48, Dkts. 168-170.. Ex. B-D, G, Dkt. 546. Couture and GPS employees hand-posted the "swingers" flyer. Dkt. 479, 8-10. Couture allowed Camp to utilize her personal **@jencounterfl** social media accounts, which Camp with Couture's permission published claims of racketeering, money laundering, extortion, sextortion, and blackmail. Dkts. 476, 44-5, 57; 479, 48. Camp reported directly to Couture. Dkt. 470, 80:23-5, 81:2-21, 83:3-8, 85:13-24. Dkt. 516, pp.2-17. Each coconspirator "need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Donofrio v. Matassini*, 503 So.2d 1278, 1281 (Fla. 2d DCA 1987). Defendants stalked Noshirvan and children. See Dkt. 479, Ex. 8-15.

 7.  (¶¶22-23 Denied). Camp was not a volunteer. See Dkt.476, 1-4, 6, p. 5 (JC: "I moved [camp] into one of my houses he is living [on the Winkler Ranch]", 35-8., 43; Dkt. 479, Ex. 33. The conspiracy was formed in late 2021 between Trainor and Camp and later involved Defendants. Dkt.s 397, Ex. 1-5, 399, Ex. 1-3; 479, Ex. 4. Couture hired Trainor on May 06, 2022 one day after she hired Camp. Dkt. 499-2, 449-3, see also 478, Ex. 11-12.a.-j. Camp likely connected Couture to Trainor. 478, Ex. 5, 6 p. 113-5, 7, 10-4, and the conspiracy continued through 2024. Ex. 6a.-b., 9; 0340 Case, Dkt. 199-1. Defendants paid Ratz, Quattrone, Trainor, Trainor Entities, and Camp — all of which targeted Noshirvan at some point. See exhibits generally.

 8.  (¶24 admitted in part). Trainor utilized his representation of GPS and



Couture as a shield for their conspiracy to harm Noshirvan.

9.  (¶¶25-32 denied in part). There is ample evidence that Couture and Garramone agreed with Camp and Trainor to drive away Noshirvan's counsel in the 0340 Case. Dkts. 406-5, 406-10-11, Dkt. 478, Ex. 6, p. 1-26. In May of 2023, Trainor was attorney for Couture and GPS in that very case. Camp's harassment directly benefited Couture and GPS by crippling Noshirvan's ability to respond. See Dkt. 478, Ex. 6, p. 1-26. Trainor opposed Powers withdrawal and sought to preserve "evidence" of Camp's misconduct — as he has done throughout all the proceedings to get ahead of negative evidence. See 0340, Dkt. 35. Trainor vehemently denied the existence of Camp's harassment. Trainor as counsel for GPS and Couture was required to keep them apprised of the 0340 Case. Noshirvan was injured and suffered financial loss as a result of Powers' withdrawal. See Dkt. 546, Ex. 1-9.

10. (¶¶33-6 denied). Defendants were "aware" of their general agreement to harm Noshirvan. Dkts. 479, Ex. 2-62, 476, Ex. 1-70, Dkt. 470, 80:23-5, 81:2-21, 83:3-8, 85:13-24, Dkt. 476, Ex. 44-5(Camp admitting that Couture and Garramone and GPS approved creation of JenCoutureFl; Garramone expressly approved Camp's illicit tactics, i.e., claims of RICO, extortion, see "conclusion"), 46, 48-9 (acknowledging awareness and ratification of Camp's actions after receipt of report). Camp reported and incited his followers to mass report Noshirvan to CPS from



Central Park property – Winkler Ranch, while residing there with Garramone's permission. Dkts. 168-170. Ex. B-D, G, Dkt. 476,  Ex. 6, p. 5, Ex. 35.

11. (¶¶37-8 denied in part). Unrebutted testimony conclusively shows that Noshirvan and wife were diagnosed with CPTSD as a result of Defendants' campaign. See Dkt. 474, Ex. 25-6.

12. (¶¶39-47 denied in part). Defendants',  GPS, and Central Park, paid Camp and Trainor, offered to pay Ratz and Quattrone, and contracted with Richard A. Luthmann and Frank Parlato to disseminate defamatory statements.   Dkt. 476, Ex. 1-4, 6, 35.50 (check to Camp 2/16/2023), 51, 55 (wire transfer to Trainor), Dkt. 479. 8-11 (JC: "*[Garramone] is going to put $500 in each of your __next checks__ … I will cover all … travel expenses*"), Dkt. 476, Ex. 59-65, Dkt. 479, Ex. 54-5, 57, 59 ("*the retaliation has to be equally expansive*"; Couture agreeing to haggle with Parlato to reduce **$75,000 fee**); 2:25-cv-337, Dkt. 78-1; Dkt. 508, Ex. 8, pp. 30-43, 48-53;  Dkt. 474, pp.120-22; Dkt. 476, Ex. 59-65. Couture authorized Camp to utilize her @JenCoutureFl social media accounts to actively promote: the penny saver, Camp's website: www.thatdaneshguy.com,  and falsely claim that Noshirvan committed "racketeering, money laundering, stalking, extortion, sextortion, and Blackmail." Dkt. 479, Ex. 48; Dkt. 476, Ex. 58 ("No [one] knew anything about [Camp]"). Trainor admitted leasing the billboard and taking out the pennysaver advertisement. But Couture paid Trainor to do so. Dkt. 476,  Ex. 6, ( JC: "*I paid for and funded the billboard*



*(leased by Trainor), the TV ads, the newspaper (i.e., pennysaver) [and] the postcards… **I basically paid to get it started… Camp has done most of work … with … Trainor**. We desperately [a] victim from New Jersey.").* Camp removed truthful online content about Couture regarding the January 26, 2022 Dunkin Donuts altercation. Dkt. 476, Ex. 47-9. Camp was paid. Ex. 50. They had knowledge because Camp directly reported to Couture and Trainor.  Dkt. 470, 80:23-5, 81:2-21, 83:3-8,  85:13-24,  478, Ex. 6, Dkt. 479, Ex. 33/33A. Camp is a cyber-operative enlisted to target Noshirvan; he was intentionally brought into the fold as a specialist unafraid of Noshirvan. Dkt. 479, Ex. 4, p.20-4. IT and content removal individuals need not be unafraid of anyone. Quattrone was Defendants' IT department before Camp. 470, 90:5-14. Couture paid Camp weekly from personal and business accounts and allowed him to live on Central Park's Winkler Ranch. Couture stated **"I've tried to pay you <u>every week</u>**… I *am not responsible for housing you or giving you a place to live … [it] has now turned into* **<u>11 weeks</u>** *… I don't know how [to help you] other than pay you for the work you're doing…."* Dkt. 476, Ex. 35. Camp was on Defendants' payroll and under their control.

### III.    Summary Judgment Standard

Summary judgment is appropriate only where the movant shows that "there is no genuine dispute as to any material fact" and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must consider all evidence in the light most favorable to the non-moving party  and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If reasonable

minds could differ, or if the movant's evidence is challenged by contradictory evidence, summary judgment must be denied. *Id.* at 248-50.

**IV.    Defendants rely on sham affidavits to contradict record evidence**

Unsupported affidavits based on nothing more than "recollection,"  cannot defeat summary judgment. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005); *see Kiernan v. ReviveMD305, LLC,* 412 So. 3d 156, 159 (Fla. 3d DCA 2025).

Defendants' affidavits are contradicted by record evidence. Their motion ignores the summary judgment standard by effectively asking the Court to credit their version of events and disregard Noshirvan's evidence. Defendants rely solely on their own self-serving denials in their declarations. But a jury is not required to accept those generic denials, when contrary evidence shows Defendants' narrative is implausible. Noshirvan has marshaled significant evidence – documents, deposition testimony, and reasonable inferences from undisputed facts – that directly contradicts Defendants' generic denials, and raise serious questions of credibility.

**V.    Genuine Issues of Material Fact Preclude Summary Judgment**

Noshirvan need only show that a reasonable jury could find each element of his claims satisfied. A civil conspiracy under Florida law requires: (a) an agreement between two or more parties, (b) to do an unlawful act or a lawful act by unlawful means, (c) the doing of an overt act in furtherance of the conspiracy, and (d) resulting damage to the plaintiff. *Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 fn.9. (Fla.



2015). Here, the underlying wrongs are (1) tortious interference, (2) defamation, and
(3) intentional infliction of emotional distress.

### A. Ample Evidence Supports the Existence of an Agreement Among Defendants and Camp to Harm Plaintiff

Defendants baldly assert that "no evidence" shows any agreement except
"reputation management." Dkt. 540, p.15. The record tells a different story. RSUMF
¶¶ 2-12. While conspirators rarely reduce their schemes to writing, Noshirvan has
pieced together a mosaic of direct and circumstantial evidence that, viewed
collectively, permits a strong inference of an agreement. *See Charles v. Florida
Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008)(agreement
may be express or implied); *Nicholson v. Kellin*, 481 So.2d 931, 935 (Fla. 5th DCA 1985)
(conspiracy is concerted action to accomplish an unlawful purpose or to accomplish
some purpose by unlawful means); *Donofrio v. Matassini*, 503 So.2d 1278, 1281 (Fla.
2d DCA 1987) ("[t]he existence of a conspiracy and an individual's participation in it
may be inferred from circumstantial evidence"). "The fact-finder may infer the
agreement from the circumstances; direct proof is not necessary." *Moran v. State*, 278
So. 3d 905, 909 (Fla. 1st DCA 2019). The elements have been met. *see Weisman v. S.
Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 652 (Fla. 4th DCA 2020)(explaining
corporate liability); *Regions Bank v. Kaplan*, 2014 WL 5088889, at *6 (M.D. Fla. Sept. 30,
2014)(same).



Noshirvan's mosaic of evidence includes (1) communications/admissions by Defendants indicating coordination, (2) the timing and sequence of events which align too neatly with Defendants' interests to be coincidental, and (3) Defendants' own conduct facilitating Camp's attacks. RSUMF ¶¶2-12; Dkt. 516. Most telling are Couture's and Garramone's own words in private messages. RSUMF ¶¶2-12. They effectively admit to participating in, and encouraging, the campaign against Noshirvan. See Dkt. 476, Ex. 13, 39-41; Dkt. 479, EX. 19 (JC: *"Joey has a list of [Noshirvan's] victims."*); *Id.*, Ex. 33/33A, 34 (Google Spreadsheet); Dkt. 476, p. 33:12-24( JC: *"I hired Joey. I have two other attorneys"*).  RSUMF ¶¶2-12.

### B.    Tortious Interference  (Count 2)

Tortious interference requires (1) a business relationship, (2) defendants' knowledge of it, (3) intentional and unjustified interference causing breach or termination, and (4) resulting damage. *Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994). Substantial evidence shows that Couture, Garramone, and Trainor  knew of Camp's efforts directed at Noshirvan's counsel. RSUMF ¶¶1-12. The evidence supports an inference that Trainor kept his clients informed—or that they directed Camp's actions. In September 2022, Couture acknowledged and reported Camp's actions to Garramone, evidencing continuity of agreement. Payments followed in February of 2023. *Id.* Camp's campaign of threats and intimidation forced Powers to withdraw in June/July of 2023; an overt act. Defendants knew of Powers' attorney-client relationship, approved Camp's tactics,

and benefited from disruption. Intent to interfere is clear: they gained by depriving Noshirvan. Camp's targeting of Powers immediately after engagement shows premeditation. The resulting damages: loss of counsel, delay, added expense, and mental anguish. Interference severing an attorney-client relationship is actionable.

## II.    Civil Conspiracy to Defame (Count 3)

Defamation requires: (1) a false statement; (2) about the plaintiff; (3) communicated to a third party; (4) malice; and (5) damages, unless the statement is defamatory per se or by implication. *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). Each conspiratorial participant can be held liable for defamatory publications made by any co-conspirator in furtherance of the scheme. *See Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 412 (Fla. 2d DCA 2022).

Defendants shared a unity of purpose with Camp to injure Noshirvan's reputation. The evidence details a broad *"defamatory campaign"* orchestrated by Defendants to ruin Noshirvan's reputation and destroy him financially. RSUMF ¶¶1-12. The existence of such an agreement is borne out by Defendants' conduct. *Id.* Camp was engaged as a "reputation manager." In context, "reputation management" referred to harming Noshirvan. *See Id.* Interests were aligned to silence or discredit Noshirvan online. Removing <u>truthful</u> but negative internet content about Couture inevitably involved targeting Noshirvan – who was outspoken about the January 2022 altercation. One of Camp's undertakings was to deplatform Noshirvan and portray him as a dangerous person; Garramone and

Chiappetta
TRIAL LAWYERS

Couture *expressly approved these actions*. RSUMF ¶¶1-12. They provided a false narrative and Noshirvan's personal data. Dkt. 476, Ex. 51, 66-70(showing Camp still in cahoots with Defendants on Sept. 24, 2023). Camp shared stolen Only Fans photographs with Defendants and weaponized those stolen photographs in false narratives disseminated online. *Id.* They also coordinated with others to amplify defamatory messages across various platforms throughout 2024. RSUMF ¶¶1-12. This concert of action supports a reasonable inference of an underlying agreement. Camp did not independently dream up and executed a complex defamation campaign (spanning flyers, websites, petitions, social media, billboards, and more) in perfect alignment with Defendants' interests without their active cooperation. Defendants *wanted* Noshirvan to be universally vilified and pursued that "objective."

Defendants' own communications illuminate their agreement. *See id.* Camp sought permission in August 2022 to spread a Change.org petition falsely maligning Noshirvan, Defendants did not object – they green-lit it. *Id.* When Camp bragged about removing Noshirvan's content from YouTube, Google, and other platforms (by providing false reports), Garramone praised his work as "diligent" and wanted it continued. *Id.* Couture likewise authorized Camp's ongoing efforts in email chains. *Id.* This is direct evidence that Defendants agreed with Camp's defamatory actions. Couture's Sept. 2022 text acknowledges Camp used her social media account to



attack Noshirvan. *Id.* If she had *not* agreed, she would have stopped it. She did not.

She told Garramone, while paying Camp. *Id.* Acquiescence implies agreement.

On May 20, 2022, Couture, Garramone, and two GPS employees physically distributed defamatory flyers around Noshrivan's neighborhood. These flyers portrayed Noshirvan  and his wife with lurid false accusations (e.g., "swingers party" implying sexual misconduct).  The campaign of social media defamation – posting that Noshirvan is a *"pedophile," "child rapist," "child groomer," "blackmailer," "sextortionist,"* etc. – carried out by Camp with Defendants' knowledge and tacit approval. *See Hoch v. Rissman*, 742 So. 2d 451, 457 (Fla. 5th DCA 1999) (term "pedophile" is defamatory per se). Couching a accusation as an opinion does not immunize it if it implies undisclosed defamatory facts. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1999).  By late 2022, Couture knew precisely what vile content Camp was spewing (using her account, no less) and she alerted Garramone about it. RSUMF ¶¶1-12. Their arrangement continued. It was joint plan.

The conspirators expanded their defamation campaign by publishing a large billboard displaying Noshirvan's face alongside the phrase *"doxing is violent"*, implying Noshirvan engages in violent harassment. RSUMF ¶¶1-12. Trainor and the Trainor Law Firm leased the billboard, with the coordination and funding from Couture, Garramone, and GPS. *Id.* Defendants knew of and encouraged this effort – it aligned perfectly with their goal of painting Noshirvan as a public menace. *See id.*



A false "PennySaver" and a FOX News TV spot ran with defamatory content about Noshirvan. *Id.* Defendants set in motion this sustained operation. *Id.*

Camp filed and incited mass reporting o CPS falsely accusing Noshirvan of child abuse. RSUF 1-12. Several acts occurred the Winkler Ranch with Couture's, Garramone's, and Central Park's knowledge, consent, and agreement. Central Park's premises were used to make multiple videos in furtherance. Defendants cannot plausibly deny involvement; they housed Camp and allowed use of their facilities. Their blanket denials and self-serving declarations that "*no one on their behalf*" published statements are contradicted by emails, texts, payments, and witness accounts. The record contains ample evidence of an agreement to defame.

Defendants never challenged falsity and malice. The statements—branding Noshirvan a "*terrorist," "pedophile," and "cybercriminal" inter alia*—were patently false; made with reckless disregard for the truth. Defendants fabricated the statements to maximize harm. RSUMF ¶¶1-12. At best, their denials raise credibility disputes.

### III. Civil Conspiracy to Inflict Emotional Distress (Count 4)

Defendants argue that (1) there is no evidence they intended to cause Noshirvan distress or agreed to any outrageous conduct, and (2) the alleged acts are not sufficiently "outrageous" to sustain an IIED claim. The record squarely contradicts both assertions. RSUMF ¶¶1-12. Record evidence shows that Defendants orchestrated and funded a deliberate campaign of harassment designed to terrorize him, and that he suffered severe CPTSD as a result. *Id.*



Florida law defines "outrageous" conduct as behavior "so extreme in degree as to go beyond all possible bounds of decency." *Moore v. Pederson*, 806 F.3d 1036, 1053 (11th Cir. 2015). Defendants and co-conspirators coordinated actions easily meet this standard. Noshirvan endured death threats, threats to rape and mutilate his children, racial slurs, repeated stalking, and false child abuse reports—all intended to cause emotional distress. *Id.*; see §784.049, (1)(c)-(e), Fla. Stat.; §847.001(19) and (22), Fla. Stat.;  Dkt. 509, 151:19-23. 39. Camp stole sexually explicit photographs  of Noshirvan, distributed (to Defendants), and disseminated them publicly in violation of Fla. Stat. §784.049, made rape threats to Noshirvan's family, and urged Noshirvan to commit suicide. Dkt. 474, pp.209:1-14, 249:9 -252:25; Dkt. 474-5. Camp swatted Noshirvan. Dkt. 474-4.  A white-powder "terrorist" hoax was staged. Repeated, extreme threats and harassment can satisfy the IIED threshold. *See Nims v. Harrison*, 768 So.2d 1198 (Fla. 1st DCA 2000) (allowing IIED for threats of rape and death); *Alcantara v. Denny's Inc.*, 2006 WL 8439596, at *4 (M.D. Fla. Jan. 19, 2006); *Thomas v. Hosp. Bd. of Dir. of Lee Cty.*, 41 So. 3d 246, 256 (Fla. 2d DCA 2010) (allowing IIED for false statements about a relative's death).

Defendants' argument that "*Camp did it, not us*" is unavailing. Each conspirator is liable for the acts of others committed in furtherance of the common plan. *Donofrio*, 503 So.2d at 1281. Couture desired to "*make [Noshirvanf] suffer,*" and Camp described their joint effort as a "*sustained operation*" to destroy Noshirvan's life. RSUMF ¶¶1-



12. Defendants funded, directed, and endorsed Camp's conduct, demonstrating reckless disregard. *Id.* Continuity of payment after witnessing Camp's extreme behavior constitute ratification, not disapproval. *Id.* In Sept. 2022, Couture and Garramone explicitly acknowledged Camp's campaign of harassment. *Id.* Even after brief hesitation, they continued supporting Camp financially. *Id.* Defendants personally created spread false narratives, permitted Camp to incite false mass CPS reporting from their Winkler Ranch (Central Park). Defendants direct facilitation transforms them from passive bystanders into active participants.

Defendants' claim that Noshirvan's distress was not "severe" because he lacked extensive medical treatment is meritless. Severity is measured by the intensity and duration of suffering, not by therapy records. Noshirvan lived in constant fear, lost sleep, and relocated his family for safety. Dkt. 474, Ex. 25-6. An expert diagnosed him with PTSD/CPTSD, corroborating depth trauma. *Id.* The distress was continuous, debilitating, and directly caused by Defendants' coordinated campaign. *Id.* This was not a single rude comment or minor threat; this was **sustained, years-long psychological warfare** involving threats of murder and rape against a man and his children. Dkt. 509, 151:19-23; Dkt. 474, pp.209:1-14, 249:9-252:25; Dkt. 474-5. Extreme coordinated harassment can qualify as IIED. *See, e.g., Nims*, 768 So.2d 1198. The context – a group of people deliberately targeted someone with the most



depraved threats imaginable – distinguishes this case from run-of-the-mill workplace or neighborhood spats that fail the IIED test.

### IV.    Defendant Couture Is Not Entitled to Summary Judgment Count 9

Count 9 is a defamation against Couture individually. There is substantial record evidence that Couture personally published false and defamatory statements about Noshirvan. Apart from the conspiracy, Couture bears direct responsibility for publishing defamatory statements. By hiring Camp to speak and act for her online, Couture effectively made him her agent in disseminating defamatory content. Florida law recognizes that one who requests or authorizes another to publish a defamatory statement can be held liable as if she published it herself. *See Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1121 (S.D. Fla. 2021) (one is liable for defamation if acting through an agent or procuring its publication). Couture authorized Camp's publications and actively participated in dissemination. A false story circulated that Noshirvan had sent Couture and Garramone a letter containing a white powder (suggesting a terroristic act). This story was traced back to Couture's communications – a false accusation that Noshirvan committed a felony. Couture personally distributed the defamatory flyers. RSUMF ¶¶1-12. Couture and Garramone expressly admitted to same. Couture's social media account was used to post defamatory content about Noshirvan. Even if Camp typed the words, it was Couture's account – and she admittedly allowed Camp to control it as her agent. *Id.* Couture acted with express and actual malice. *Id.* Couture was aware that the horrific

Chiappetta
TRIAL LAWYERS

accusations were fabricated because she made them up. She paid to broadcast/publish fabricated accusations. Statements like *"stalker"*, *"sextortionist"*, *"extortionist "and claiming "Noshirvan caused a child to commit suicide"* are defamation per se. No record evidence suggests truth; the statements are categorically false.

When Couture and Garramone handed out flyers in person, that is direct defamation. The defamatory content appearing on Couture's social media accounts must be treated as Couture's publication because she granted access. Couture has provided no contrary evidence. She offers only self-serving statements that she *"never owned any website"* and that she *"did not pay anyone to publish defamatory statements."* These statements are squarely contradicted, e.g., Couture's social posts, the Belize letter, and payment evidence. *Id.* Couture's own text messages show her awareness and tacit approval of the online content and promotion of Camp's website. Id.  Couture defamed Noshirvan. *Id*. She must answer for her actions.

## IV.    Conclusion

Noshirvan has come forward with mosaic evidence connecting each Defendant to the conspiracy to injure him through unlawful means. Defendants' motion asks the Court to weigh Defendants' denials against Noshirvan's evidence. That is not the Court's role. Defendants also failed to seek leave of court before filing a second motion for summary judgment. See Dkts. 46, 65, 497, and 507. Therefore, Noshirvan respectfully requests that the Court **DENY** Defendants' Motion (DE 540) in its entirety and **GRANT his motion (DE 516).**



DATED: November 03, 2025.

Respectfully submitted,

Nicholas A. Chiappetta, Esq.
**Chiappetta Trial Lawyers**
Attorneys for Mr. Noshirvan
2101 Vista Parkway, Suite 258
West Palm Beach, Florida 33411
Direct: (561) 768-4500
Fax:    (561) 768-4600
service@chiappettalegal.com
nick@chiappettalegal.com
www.chiappettalegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 03, 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to: all counsel of record.

*/s/Nicholas A. Chiappetta*
Nicholas A. Chiappetta

