# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

CASE NO. 2:23-CV-01218-JES-KCD

DANESH NOSHIRVAN
an *individual*,

        Plaintiff,

v.

JENNIFER COUTURE, an individual,
RALPH GARRAMONE M.D., an individual,
RALPH GARRAMONE, M.D., P.A. d/b/a
GARRAMONE PLASTIC SURGERY,
CENTRAL PARK OF SOUTHWEST
FLORIDA, LLC, OMG REALTY, LLC,
THE LAW OFFICE OF PATRICK TRAINOR
ESQ., LLC d/b/a THE LAW OFFICE OF
PATRICK TRAINOR, PATRICK TRAINOR,
an individual, and
ANTI-DOXING LEAGUE INC.

        Defendants.

_____/

RALPH GARRAMONE, M.D., P.A. d/b/a
GARRAMONE PLASTIC SURGERY,
JENNIFER COUTURE, an individual,
RALPH GARRAMONE, M.D., an individual,

        Counter-Plaintiffs,

v.

DANESH NOSHIRVAN,

        Counter-Defendant.

_____/

1

## DECLARATION OF RICHARD A. LUTHMANN, JR.

RICHARD A. LUTHMANN, JR., declares pursuant to 28 U.S.C. §§ 1746 and under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

1. **Personal Background:** I am an adult resident of Collier County, Florida. I am a professional investigative journalist by trade. I publish news and commentary under the banner *This is For Real.* on Substack, and I contribute reporting to various media outlets, including *Florida Gulf News*, *The Sun Bay Paper*, *Newsbreak.com*, and occasionally *The Gateway Pundit* and other media outlets. I have personal knowledge of the facts set forth in this declaration.

2. **Coverage of Danesh Noshirvan:** Over the past two-plus years, I have closely followed and reported on Mega Influencer Danesh Noshirvan (the Plaintiff in this case), his online activities, his legal disputes, and related events related to weaponized justice, lawfare, and cancel culture. I have written and published numerous articles about Mr. Noshirvan's involvement in "cancel culture" incidents, allegations of doxxing and harassment, and the progress of his lawsuits against Jennifer Couture and others. **Exhibit D** to this declaration is a true and accurate survey manifest of the articles I have published concerning Danesh Noshirvan (and his associate, Nicholas Chiappetta) from 2022 to the present, listing each article's title, date, publication outlet, and (for completeness) a URL or citation. These articles include, for example, *"Woke TikToker's Gag Gambit Bombs"* (Feb. 28, 2026, on Substack & FL Gulf News) and *"Antifa TikTok Agitator Urges Armed Leftist Militias to 'Fight' ICE Agents"* (Jan. 13, 2026, on The Gateway Pundit). My reporting has been consistently critical of Mr. Noshirvan's tactics and claims, as I have sought to shed light on aspects of his conduct that I believe are newsworthy and in the public interest. In doing so, I have sometimes used a bit of a rhetorical edge or "flair"

in my writing – characterizing Mr. Noshirvan in strong terms based on the evidence (e.g.,
referring to him as a *"TikTok terrorist"* or describing his litigation as *"courtroom cosplay"* in
commentary) – but I stand by the factual substance of my reporting.

3. **Audience Reach:** My reporting on Mr. Noshirvan has garnered significant public attention.
   For instance, my Substack site (Luthmann.substack.com) averages over 1.1 million views per
   month on articles related to Mr. Noshirvan and associated topics. Attached to **Exhibit A** is a
   summary report of Substack traffic analytics for *This is For Real.*, demonstrating the volume
   of readership (page views) for my content in a recent 30-day period. Additionally, I disseminate
   my reporting through social media and cross-post articles on platforms like Newsbreak, which
   extends the reach to a broad audience in Southwest Florida and beyond. The public has shown
   considerable interest in the ongoing feud and litigation between Mr. Noshirvan and his critics,
   and my articles have spurred significant discussion and engagement online.

4. **Knowledge of This Lawsuit and Prior Involvement:** I have kept informed about this case
   (*Noshirvan v. Couture et al.*) through public court filings, attending hearings, and speaking
   with sources close to the litigation. I attended certain court hearings in 2025 as a member of
   the public (for example, a hearing in May 2025 before Judge Steele) and reported on those
   proceedings. Notably, in December 2024, after one such hearing, I was personally served by a
   process server, as directed by Plaintiff's counsel, with a trial subpoena at the federal courthouse
   in Fort Myers. This occurred in a rather confrontational manner – immediately after the
   hearing, in the courthouse hallway. In response, I retained counsel and promptly filed an
   emergency motion to quash that subpoena, on grounds including the reporters' privilege and
   procedural defects in the subpoena. Before the court could rule on my motion, Plaintiff's
   counsel withdrew the subpoena the very next day. The court then denied my motion as moot.

Thus, I did not end up testifying or producing documents at that time. I interpreted the subpoena

incident as an attempt to intimidate me or otherwise hinder my reporting, especially given the

timing and manner of service (literally chasing me down right after a hearing). It felt less about

obtaining necessary testimony and more about sending a message that my reporting was not

welcome. I have contacted the Presidential Administration and others about these issues.

5. **Prior Fifth Amendment Invocation (and Reasons):** In connection with 2025 testimony at

the May 2025 hearing (where no prior subpoena was issued), I did invoke my Fifth Amendment

privilege against self-incrimination. I wish to explain that I did so out of genuine concern for

my safety and to avoid becoming entangled in what I perceived could be a malicious

prosecution, retaliatory legal trap, a lawfare prosecution, or even an Antifa bounty for my

serious injury or death. Mr. Noshirvan and his associate, Mr. McGibney, had made public

statements that I found very threatening – including suggestions that I could or should be "dealt

with" or "taken out," and boasts about having connections to Antifa operatives and even

friendly contacts in federal law enforcement who could help them. Given Mr. Noshirvan's

known practice of inciting online mobs and the extreme animosity he and Mr. McGibney

displayed toward me (a journalist covering their activities), I had a well-founded fear that any

testimony I gave could be misused to target me. For instance, I worried they might twist my

words or contrive some accusation to push authorities to investigate or charge me falsely

(especially when they were publicly suggesting they had DOJ contacts). Indeed, ancillary

documents in Mr. Noshirvan's own lawsuit (but not any operative pleading) alleged I was part

of a conspiracy against him – an allegation Judge Steele later found to be baseless, but at the

time it created a cloud of possible legal jeopardy. In that environment, asserting the Fifth

Amendment was a protective measure. I want to be clear: I did not invoke the Fifth because I

have committed any crime – I have not – but because I did not trust what Mr. Noshirvan or those influenced by him might do with my testimony. My fears were not abstract; Mr. Noshirvan explicitly told me to "get ready for prison," and his associate, Mr. McGibney, is known for aggressive "anti-bullying" campaigns that often blur into harassment and requests for pictures of female genitalia, pretextually labeled as connected to "vaginal recognition techniques." I believed then that keeping silent was necessary to guard against being ensnared or harmed by these individuals.

6. **Change of Circumstances – No Further Fifth Amendment Concern:** On August 12, 2025, Judge Steele issued an order in this case that, among other things, dismantled Mr. Noshirvan's conspiracy theory involving me. The Court found no evidence that I had engaged in any wrongdoing aside from publishing the one expert report (which, from a journalist's perspective, is not wrongdoing at all, but regardless, that was the only conduct identified). This gave me a great deal of reassurance. It became apparent that Mr. Noshirvan's more outlandish accusations against me were not being credited in court. Therefore, the risk that my testimony could somehow incriminate me (or be used as a link in a chain toward some prosecution) vanished. After that order, I consulted with those knowledgeable and determined that I could withdraw my invocation of the Fifth Amendment. I did so formally on February 20, 2026, via email to Plaintiff's counsel, stating that I rescind any prior assertion of the Fifth Amendment and will not invoke it if called to testify at trial. See **Exhibit A**. In other words, I am now fully willing to testify (subject to the privilege and relevance limitations discussed) and will not refuse to answer on the grounds of self-incrimination. I affirm here and now: I have no intention of "pleading the Fifth" in this trial. Any statement to the contrary (such as the one on Plaintiff's witness list) is simply wrong, and Plaintiff's counsel is and was on notice of that fact. Nick

Chiappetta is either a big fat liar or the sloppiest lawyer in the history of the Florida federal courts. There is no third option in my mind.

7. **March 3, 2026 Witness List and My Reaction:** On March 3, 2026, I learned with certitude that Plaintiff Danesh Noshirvan had listed me as a witness on his trial witness list (filed with the Court that day). Specifically, I saw my name listed as Plaintiff's witness no. 18, with a parenthetical note stating I would "authenticate documents and plead the fifth again." I was frankly stunned and alarmed when I read this. I had heard about this from sources previously and had sent a Local Rule 3.01(g) notice to the counsel of record, hoping that Nickless would wake up, agree not to call me, and we wouldn't have to engage in motion practice. As of that date, I had not been served with any trial subpoena, nor had anyone reached out to ask if I'd be willing to testify or stipulate to anything. I had been following the docket, so I quickly accessed the witness list filing. Seeing the notation that I would "plead the fifth again" was especially disturbing – not only because it was false (as explained), but because it suggested to me that Plaintiff's counsel might be trying to create a false expectation in the Court's mind. I was concerned the Court might think I was planning to come in and stonewall, which could negatively color the Court's view of me and of any motion I might file. I have notified Plaintiff's counsel more than once that I would not be taking the Fifth. Thus, by the time I prepared this motion, Plaintiff and his counsel were unquestionably aware that their witness list description of my anticipated conduct was inaccurate. This sequence of events heightened my belief that listing me as a witness was a tactical move by Plaintiff to sideline me.

1. **Lack of Knowledge Relevant to the Case:** To reiterate and clarify, I have very limited firsthand knowledge about any facts that are actually in dispute between Mr. Noshirvan and the Defendants. I certainly have knowledge *about the case* – in the sense of knowing what the

allegations are, who the players are, etc. – but that knowledge is as an observer and reporter, not as a participant. I was not present for any alleged defamation. I did not witness any interactions between Mr. Noshirvan and Ms. Couture or Dr. Garramone, and I have no independent evidence of any damages or injuries. Essentially, anything I "know" about those things comes from things like reading court documents, interviewing sources, or watching Mr. Noshirvan's own content. If asked about such matters, I would either be repeating hearsay (which is obviously problematic and inadmissible) or perhaps offering commentary. That's not legitimate testimony. The only area where I *am* a direct witness is in authenticating my own work or communications – e.g., confirming "Yes, I wrote this article" or "Yes, I sent/received this email." I am perfectly willing to do that without objection. In fact, I hereby state under oath: I am the author of all the articles identified in **Exhibit D**, and I will stipulate to the authenticity of those articles and any other documents I have created (such as emails or social media posts, to the extent any are at issue).[5] There should be no need to drag me into court simply to have me say "Yes, that's my article," when I've already said it here. Beyond that, I don't have anything to contribute regarding the merits of Plaintiff's claims. I suspect that Plaintiff wants to ask me about things I've heard or people I've talked to (for example, whether I communicated with certain Defendants or third parties about Mr. Noshirvan). But those inquiries either aim at privileged newsgathering information or are of dubious relevance. I have never been part of any "conspiracy" against Mr. Noshirvan; my role has solely been that of a reporter covering and, admittedly, criticizing him. To the extent I've communicated with Defendants or others, it was for journalistic purposes – getting quotes, seeking information,

---

[5] I am concerned that certain conversations referred to by the Plaintiff's Exhibit List are incomplete. Particularly, there are specific referenced to Mr. Noshirvan, Mr. McGibney, Mr. Chiappetta, and homoerotic chats. See https://bullyville.gay/ (#COCKS, #CATURDAY, etc.). Thus, I will only swear to true and accurate representations to my memory.

etc. Plaintiff can ask those Defendants directly about any relevant communications; he doesn't need me as a conduit, and indeed, my knowledge of those communications is secondhand to theirs.

2. **Willingness to Testify (With Appropriate Protections):** If I am properly subpoenaed and the Court orders me to appear at trial, I will do so. I will testify truthfully to any relevant questions within my knowledge that do not intrude into protected areas. I want to make it clear: I am not trying to evade testifying out of convenience or fear of cross-examination. My only hesitations are protecting my sources and maintaining my privacy on irrelevant matters. So, for example, if asked, "Did you write this article on such-and-such date?", I will answer yes (if that's true) without any fuss. If asked, "How did you obtain this information in your article?" I would likely invoke the reporter's privilege if it was from a confidential source. If asked, "What is your opinion of Mr. Noshirvan's tactics?" I might answer based on what I've observed, though I'm not sure that's relevant testimony rather than opinion. If asked, "Who are your sources for X?" I will refuse unless compelled by the Court after a hearing (and appeal to the Eleventh Circuit and SCOTUS), because protecting sources is a fundamental ethical duty for me. Similarly, if asked something like, "Haven't you been treated for [medical condition]?" or anything about my health, I would object and refuse because it's not relevant and it's private. I raise these hypotheticals to show that I'm not categorically refusing to answer – I'm simply drawing boundaries that the law permits me to draw. I respectfully ask the Court to honor those boundaries by preemptively limiting such lines of inquiry. It would save everyone time and avoid me having to assert privilege before the jury.

3. **Impact on My Role as Press (Rule 615 Issue):** One of my biggest concerns is the prospect of being excluded from the courtroom during a trial that I have a professional duty and desire

to cover. If I remain on the witness list, I understand that Plaintiff can ask the Court to "sequester" witnesses under Rule 615, which would mean I'd have to sit outside until after I testify. If I'm called near the end of Plaintiff's case, that could mean missing days of testimony. As a journalist, I would be unable to witness the proceedings directly, which would severely hinder my reporting. I wouldn't be able to observe the demeanor of witnesses, the reactions of the judge and jury, or any number of nuances that are important in trial reporting. Moreover, given the volume of evidence likely to be presented, missing large chunks could lead to inaccuracies or gaps in my understanding. The last thing anyone wants is a reporter playing fast and loose with court proceedings, reporting based on secondhand or thirdhand knowledge. It's also personally distressing – I've followed this story for years, and the idea of being shut out at the climax, essentially because I did my job too well (to get myself on the witness list), is frustrating. I genuinely believe Plaintiff listed me to create this exact dilemma: either I comply with the subpoena and thereby sacrifice my ability to cover the trial, or I refuse to comply in order to do my job, and then face possible contempt. It's a lose-lose situation that I hope the Court will not allow to come to fruition. Public trials should not be about picking off journalists one by one to thin out critical coverage. I make this point not just for my sake, but as a matter of principle – if such a tactic succeeded, it could encourage others to try similar things (e.g., list an annoying reporter as a witness to get rid of them). I am confident this Court can find a solution that lets the trial proceed fairly without indulging that tactic.

4. **Attempts to Resolve Without Court Intervention:** I'm a pretty good journalist. After hearing from several sources that I would probably be on the witness list, I immediately tried to resolve these issues amicably. As noted, I reached out on Feb. 20, 2026, to make clear I wouldn't plead the Fifth. Again, on March 1, 2026, I personally emailed Plaintiff's counsel (Mr. Chiappetta)

and Defendants' counsel, reiterating my concerns in detail. In that email (**Exhibit F**), I proposed that Plaintiff agree to remove me from the witness list because I have nothing unique to offer and I will stipulate to authenticity anyway. Alternatively, I proposed that if they insist on my testimony, we could agree I'd testify first or that they'd take my deposition on video ahead of time – so that I wouldn't be excluded from the trial and could still do my reporting. Plaintiff's counsel never responded meaningfully to my Meet and Confer request. In other words, Danesh Noshirvan isn't interested in any compromise. Defendants' counsel, on the other hand, responded that they take no position and do not oppose this motion. Given Nickless's response, it became clear that motion practice was necessary. I have remained available to confer by phone or email, but Plaintiff's counsel did not show any inclination to negotiate further. In sum, I tried in good faith to nip this in the bud without burdening the Court, but Plaintiff's side would not budge. At least they haven't sent their bots after me… yet.

5.  **Conclusion – Why I'm Asking for Court Protection:** I want to emphasize that I do not seek to embroil the Court in ancillary issues lightly. My preference would have been to simply cover this trial from the gallery like any other reporter and avoid being part of the story. Unfortunately, Plaintiff's actions have forced me into the story. I have to protect my rights and the integrity of my work. If I did nothing, I might show up to trial only to be sidelined, or be compelled to answer improper questions without prior opportunity to object. That would not only harm me but deprive the public of a fully informed account of the trial (since I'm probably the journalist who knows the most background on this case). I firmly believe that granting the relief I seek will not prejudice any party – the trial will still have all the necessary evidence presented by those actually involved – but it will ensure that a precedent is not set where litigants can misuse court procedures to hamstring unfavorable press coverage. I am grateful

for the Court's time and consideration, and I swear that all factual statements in the motion above and in this declaration are true and accurate to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 4, 2026, in Naples, Florida.

_____
Richard A. Luthmann, Jr.

RICHARD A. LUTHMANN, JR.
Luthmann.Substack.com ● FLGulf.News ● https://linktr.ee/rluthmann

3/1/26, 9:18 PM                         (7) Sent | richard.luthmann@protonmail.com , .oton Mail

## Re: Local Rule 3.01(g) Conference Request – Witness Designation of Non-Party Journalist Richard Luthmann - Noshirvan v. Couture, 2:23-cv-1218-JES-DNF

From    Richard A Luthmann <richard.luthmann@protonmail.com>

To      Nick Chiappetta <nick@chiappettalegal.com>, Vicki Modaffari <vicki@chiappettalegal.com>,
        service@chiappettalegal.com, Aaron Alfano <aalfano@rolfeshenry.com>,
        Jackson-Fannin, Julian A. <jjfannin@duanemorris.com>,
        hwgurland@duanemorris.com <HWGurland@duanemorris.com>, pt@ptesq.com <pt@PTESQ.COM>



Date    Friday, February 20th, 2026 at 11:11 AM

Dear Counsel:

This communication is in furtherance of the above-referenced Local Rule 3.01(g) Conference Request. I plan on filing my motion to intervene forthwith. I would appreciate a response soonest.

I am informed that Mr. Noshirvan intends to call me as a witness: ("Mr. Luthmann will authenticate documents and plead the fifth again.")

This raises a multitude of issues. Mr. Luthmann's forthcoming motion will present a narrow but significant set of issues: whether a non-party investigative journalist may be designated as a trial witness in circumstances where (1) the proposed testimony is cumulative or available from alternative sources under the Eleventh Circuit's *Capers/Caporale* framework; (2) the practical effect of the designation is to trigger sequestration under Rule 615 and impair lawful press access to open proceedings; (3) compelled testimony would intrude upon qualified reporter's privilege and constitutionally protected newsgathering activity; (4) inquiry may improperly extend into protected physician–patient communications and healthcare information governed by Florida privilege law, HIPAA protections, and Article I, § 23 of the Florida Constitution; and (5) protective sequencing remedies under Rules 26(c), 45(d), and 611(a) can preserve any legitimate evidentiary interest without burdening a non-party journalist. The motion will further clarify that no Fifth Amendment privilege will be invoked, that authorship and publication will be stipulated, and that service of subpoena will be accepted, thereby eliminating any purported necessity for coercive or tactical witness designation.

**PLEASE TAKE NOTICE: Richard Luthmann plainly qualifies as a journalist under both Florida law and binding Eleventh Circuit precedent.**

Florida's journalist shield statute defines a "professional journalist" broadly to include any person "regularly engaged in collecting, photographing, recording, writing, editing, reporting, or publishing news" for gain or livelihood. Fla. Stat. § 90.5015(1)(a). Courts applying the statute focus on function, not corporate affiliation, and recognize independent and digital publishers within its scope. See id.; see also *Kidwell v. State*, 730 So. 2d 670, 671–72 (Fla. 1998).

The Eleventh Circuit likewise protects "professional news gathering efforts" without limiting the privilege to legacy media institutions. *United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013); *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 724–26 (5th Cir. 1980), adopted in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Mr. Luthmann operates a regularly published investigative news platform, "This Is For Real," through Substack and related media channels, with sustained and substantial readership. As reflected in the attached monthly analytics report, his publication received 1,170,434 views in the most recent 30-day reporting period alone, with consistent daily readership in the tens of thousands and traffic sourced from search engines, social platforms, direct subscribers, and external news sites. That scale of audience reach, combined with regular publication of investigative reporting on matters of public concern, places Mr. Luthmann squarely within the statutory definition of a professional journalist and within the Eleventh Circuit's functional understanding of protected news gatherers.

The privilege analysis turns on the act of journalism—not on institutional pedigree—and the record evidence confirms that Mr. Luthmann is engaged in sustained, professional news reporting activity entitled to protection under Fla. Stat. § 90.5015 and Eleventh Circuit law.

Further, I reiterate that I will not "plead the fifth again," for reasons best known to Mr. Noshirvan and to me, and as stated in Mr. Noshirvan's prior sworn testimony. https://www.youtube.com/watch?v=5BeKHfYZzFw

I received a response from Mr. Chiappetta, to wit: "Stop emailing."

I have not received any responses from other counsel as to their position(s).

Let me reiterate that I can't wait to authenticate ALL of my journalistic product for the evidentiary records and NOT TAKE THE FIFTH. Mr. Chiappetta has already introduced much of it in what Mr. Noshirvan deems the "related proceeding" of *Luthmann v. Noshirvan*, thereby effectively mooting the recently filed Motion *in Limine* addressing so-called "Inflammatory Political Statements."

Nickless - you should have stayed sober in law school, the day they taught that what is good for the goose is good for the gander.

Nicholas Anthony Chiappetta

3/1/26, 9:18 PM                                      (7) Sent | richard.luthmann@protonmail.com - ...oton Mail

Criminal Disposition: Poss Drug Parap. 12/02/1998 Illinois FINDING OF GUILTY
MISDEMEANOR CLASS A

Bankruptcy: Chapter 7 Closed 04/15/2008 0809195 Illinois Northern – Chicago

https://luthmann.substack.com/i/162514947/doxxing-for-justice-what-happens-next

Your client opened the door to the so-called "Inflammatory Political Statements" by including political
commentary on President Trump in his very first video about Jennifer Couture.  Your offer of my journalistic
coverage of the same and related matters into the evidentiary record cements their **probative value**, and as the
offering party, you can't claim **prejudice** under the doctrine of estoppel. You can argue about what the evidence
means and how much the jury should weigh it until you're blue in the face. But you can't preclude it, particularly
when you are the one who's opened the door.

<<Après moi, le déluge>>

Thank you for your attention to this matter!

Regards,

Richard A. Luthmann, Jr.

4199 Los Altos Court
Naples, Florida 34109
Pro Se
239-631-5957

richard.luthmann@protonmail.com
**LINKTREE**
**Muck Rack Profile**
**Substack:** **This is For Real.**
**Editor-In-Chief:** **FLGulf.news**
**Editor-In-Chief:** **NYNewsPress.com**
**Editor-In-Chief:** **TheFamilyCourtCircus.com**
**Contributor:** **Frank Report**
**Contributor:** **Sun Bay Paper**
**Follow Me on** **Facebook** **X** **Instagram** **LinkedIn** **TRUTH** **Rumble** **Newsbreak**

Sent with Proton Mail secure email.

https://luthmann.substack.com/i/175131556/free-speech-rape-muzzle-when-law-becomes-tyranny-what-is-the-
answer

# Free Speech Rape Muzzle: When Law Becomes Tyranny, What is the Answer?

The Founders' favorite philosopher, John Locke, warned that a government that violates natural rights loses legitimacy. Locke argued that when leaders exceed their authority and **violate the rights to life, liberty, or property**, individuals have the right to dissent and rebel.



**John Locke**

If a government fails to protect rights, reverting to a **state of nature** is preferable to living under a tyrant. Throughout history—during the American Revolution, the Indian

independence movement, and the civil-rights movement—<span style="color:red">dissent has checked
tyranny</span>.

Washington's antiharassment ruling raises a chilling question: when free speech is
throttled and abusers use the courts to silence victims, what recourse remains? If
courts treat unproven allegations as harassment and grant gag orders without
requiring proof, then the law itself becomes an instrument of abuse.

Victims facing doxxing, mob harassment, and false reporting might see the courthouse
as a rigged game.

That anger bubbles. When DARVO abusers seek to muzzle critics with "antiharassment
protection orders," some may have the mistaken belief that, in a legal system that
favors abusers, it's time to turn the courthouse steps into the OK Corral.



**Americans are still looking for answers to the cultural sickness that
precipitated Charlie Kirk's assassination.**

The rhetorical flourish aside, in the wake of the Charlie Kirk assassination, Americans
are looking for answers. No one is calling for violence, but many fear that silencing
speech breeds extremism. When lawful channels are closed, some people may feel
they have no choice but to resist by any means.

Professor Volokh's analysis, the psychological framework of DARVO, and the
documented behavior of Noshirvan and Hales all point to a crisis.



**thatdaneshguy** ✔ ⌖ 2d                                    

We don't need to honor his memory. School
shootings across the United States honor his
memory. We need to add a footnote to his
memory that he encouraged the violent culture
that led to his death and go the opposite way by
creating gun laws.



 **cagovernor** ✔ 4d

The best way to honor Charlie's memory is
to continue his work: engage with each
other, across ideology, through spirited
discourse. In a democracy, ideas are tested
through words and good-faith debate...    3/4

**Reprehensible posts about Charlie Kirk in the wake of his assassination, like the
one by Danesh Noshirvan, sparked national backlash. America agrees that
victims should speak and be heard. Free Speech is our American solution.**

Mega-influencers with armies of followers can DARVO their way into court, claim
they're being harassed, and obtain orders that gag their critics. Unless courts insist on
defamation trials and protect speech until statements are proven false, the First
Amendment is at risk.

In Locke's terms, a government that suppresses speech becomes illegitimate. Citizens
must decide whether to reclaim their rights through lawful dissent or face a future
where bullies rule with court orders and trolls.

3/1/26, 9:18 PM                                          (7) Sent | richard.luthmann@protonmail.com , ...oton Mail

The Bobick ruling feels like the deep state's latest assault on the First Amendment. It hands a judge the power to gag accusations without proving them false.

However, the federal system has a release valve in the form of dual state and federal oversight. Before we devolve into the war of all against all, the federal executive can act to protect the fundamental and inalienable rights of the sovereign people.

When a leader and First Amendment defender like President Trump sees what's happening in Orem, Utah, Bellevue, Washington, and across the country, he is justified in concluding that to protect the rule of law, we must defend free speech as the foundation of our constitutional republic.

If local, radical, blue-state courts trash free speech while armies of bullies and abusers roam free and enlist crooked local court systems as their *aides-de-camp*, why shouldn't the Commander-in-Chief send in troops to keep the peace?



**President Donald J. Trump**

President Trump promised to defend law and order. Now, Washington State's radical woke maniac judges are making his case. They are handing him the perfect excuse to roll up and say, "Enough."

On Wednesday, February 18th, 2026 at 9:46 PM, Richard Luthmann <richard.luthmann@protonmail.com> wrote:

> Counsel:
>
> *Pursuant to Local Rule 3.01(g), I write to request a good-faith conference regarding verified information this* reporter received concerning Plaintiff Danesh Noshirvan's designation of non-party journalist Richard Luthmann ("Mr. Luthmann") as a trial witness in *Noshirvan v. Couture*, 2:23-cv-1218-JES-DNF.
>
> Mr. Luthmann intends to file a limited-purpose motion to intervene under Federal Rule of Civil Procedure 24 if this issue cannot be resolved without motion practice. The purpose of that intervention would be narrow: to protect qualified reporters' privilege, prevent undue burden on a non-party, safeguard healthcare privacy rights, and ensure that sequestration mechanics are not used to frustrate lawful press coverage of open judicial proceedings.
>
> The Eleventh Circuit has long recognized that members of the press may intervene in federal proceedings to protect access and related legal interests. *In re Petition of Tribune Co.*, 784 F.2d 1518, 1521 (11th Cir. 1986); *Newman v. Graddick*, 696 F.2d 796, 800 (11th Cir. 1983). Rule 24(a)(2) permits intervention where a non-party claims a direct interest that may be impaired and is not adequately represented. That standard is met here. No party represents the interests of a non-party journalist whose professional newsgathering and courtroom access rights are directly affected by the witness designation.
>
> The Eleventh Circuit also recognizes a qualified reporter's privilege protecting professional newsgathering efforts. *United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013); *United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986); *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726 (5th Cir. 1980), adopted in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). Under that controlling framework, compelled testimony from a journalist requires a showing that the information sought is highly relevant, necessary, and unavailable from alternative sources.
>
> To eliminate any suggestion that testimony is "necessary" within the meaning of *Capers*, Mr. Luthmann will stipulate to the authenticity and authorship of all of his articles, publications, podcasts, social-media posts, and other media content on all platforms. There is no need for live testimony merely to establish authorship or publication. Those facts can be established by stipulation and documentary evidence.
>
> Further, Mr. Luthmann will accept service of any subpoena. There will be no dispute regarding service or appearance (provided Mr. Luthmann is in-state and available).
>
> Mr. Luthmann also formally represents that he does not intend to invoke the Fifth Amendment privilege in this matter. Any prior concern regarding the invocation of the Fifth Amendment arose directly from Plaintiff's threats, public accusations, and conduct suggesting an intent to manufacture or instigate criminal exposure. The Fifth Amendment protects testimony that could furnish a "link in the chain" of prosecution, not merely direct admissions. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). At the time those concerns arose, Plaintiff was actively advancing inflammatory allegations and suggesting law enforcement involvement.

Since then, however, the procedural and evidentiary landscape has materially changed. Judge Steele's August 12, 2025, Opinion and Order substantially narrowed and rejected Plaintiff's broader theories. In addition, Mr. Noshirvan has provided sworn testimony in subsequent proceedings, including in *Luthmann v. Noshirvan*, Case No. 2:25-cv-00337 (M.D. Fla.), and the developed record to date in that case, which further clarifies and limits the scope of his allegations. In light of those rulings and sworn representations, there is no objectively reasonable basis for concluding that Mr. Luthmann's testimony in this matter presents any realistic risk of criminal exposure. Accordingly, he does not intend to invoke the Fifth Amendment privilege.

What remains is a non-party journalist placed on a witness list in circumstances where the practical effect is to trigger sequestration under Federal Rule of Evidence 615 and thereby prevent him from observing and reporting on the remainder of the trial. Rule 615 exists to prevent witness tailoring, not to disable press coverage. The Court retains broad authority under Federal Rule of Evidence 611(a) to control the mode and order of proof to protect witnesses from harassment and to avoid unnecessary burdens, and under Federal Rules of Civil Procedure 26(c) and 45(d)(1) to protect non-parties from annoyance, embarrassment, oppression, or undue burden.

There is an independent and substantial healthcare-privacy concern that must be addressed. Mr. Luthmann maintains a doctor-patient relationship with defendants Garramone Plastic Surgery and Dr. Ralph Garramone, as well as with other licensed healthcare providers whose communications and records fall squarely within recognized medical privilege protections. Any attempt by Plaintiff to inquire into Mr. Luthmann's mental health, medical treatment, prescriptions, medications, diagnoses, or alleged psychological state would directly implicate privileged physician-patient communications and protected health information.

Under Florida law, confidential communications between patient and physician are protected. See Fla. Stat. § 90.503. In a diversity action, privilege questions are governed by state law pursuant to Federal Rule of Evidence 501. The Florida Constitution independently guarantees the right "to be let alone and free from governmental intrusion into the person's private life." Fla. Const. art. I, § 23. Florida courts have consistently recognized medical information as among the most sensitive categories of private information entitled to heightened protection.

Additionally, the HIPAA Privacy Rule establishes federal standards governing the use and disclosure of protected health information. While HIPAA does not itself create a testimonial privilege, it reinforces the strong policy against unrestricted disclosure of medical records and requires appropriate safeguards before any compelled production.

Because Mr. Luthmann has a direct treatment relationship with Dr. Garramone and Garramone Plastic Surgery—who are defendants in this very action—the risk of misuse or overreach is especially acute. The mere existence of litigation does not effect a blanket waiver of physician-patient privilege, nor does it open the door to broad character or psychological inquiry.

Any proposed questioning touching on medical or mental health matters would therefore require: (1) a written proffer identifying with specificity the precise subject matter sought; (2) a demonstration that the

information is highly relevant and necessary; (3) a showing that it is unavailable from alternative sources under *United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013); and (4) entry of a narrowly tailored protective order under Rules 26(c) and 45(d) restricting use and dissemination. In the absence of such a showing and safeguards, healthcare-related questioning would be improper, unduly intrusive, and violative of established privilege and constitutional protections.

If Plaintiff maintains that testimony is required, the scope must be strictly limited to non-privileged, non-medical matters not otherwise established by stipulation—such as objective facts concerning publication already reflected in the record. There can be no inquiry into confidential sources, editorial processes, mental impressions, newsgathering methods, or medical history.

Of course, the most straightforward resolution is available: Plaintiff may simply stipulate that he will not call Mr. Luthmann as a trial witness. That option eliminates any privilege dispute, avoids unnecessary intrusion into protected medical information, removes any sequestration concern, and conserves judicial resources. It is the cleanest and most efficient path forward. In lieu of that option, and to avoid motion practice, Mr. Luthmann proposes two practical alternatives.

First, if Plaintiff insists on calling him live, he may be called as Plaintiff's first witness. Examination would be limited to pre-identified, non-privileged subjects. Upon completion of testimony, Mr. Luthmann would not be treated as subject to sequestration for the remainder of the trial and would be permitted to observe proceedings as a member of the press.

Second, a narrowly scoped video deposition may be taken prior to trial. Topics would be identified in advance. Privilege objections would be preserved. The deposition could be used at Plaintiff's election pursuant to Rule 32. Following completion of that deposition, Mr. Luthmann would not be treated as a live trial witness and would not be subject to sequestration during trial proceedings.

Both approaches preserve Plaintiff's asserted evidentiary interests while eliminating any interference with open-court reporting. Federal courts possess broad authority to structure the mode and order of proof to protect witnesses and ensure the fair and efficient administration of the trial. Fed. R. Evid. 611(a). The Eleventh Circuit has repeatedly recognized the district court's "wide discretion" in controlling trial presentation and sequencing of witnesses. See *United States v. Stephens*, 365 F.3d 967, 974 (11th Cir. 2004). At the same time, the press has a well-established right of access to judicial proceedings, and courts must exercise their supervisory authority in a manner that does not unnecessarily burden that access. *In re Petition of Tribune Co.*, 784 F.2d 1518, 1521 (11th Cir. 1986); see also *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508–09 (1984) (recognizing the constitutional presumption of openness in judicial proceedings). Sequencing Mr. Luthmann's testimony first, or preserving it by narrowly scoped video deposition for later use, represents a measured and legally supported exercise of the Court's trial-management authority that protects Plaintiff's evidentiary rights while respecting the strong presumption of open-court access.

Please advise within five business days whether Plaintiff will agree to (1) withdraw the witness designation, (2) adopt the call-first remedy with limited scope, or (3) proceed by preserved video deposition under the

3/1/26, 9:18 PM                          (7) Sent | richard.luthmann@protonmail.com ₋ ᵣₒton Mail

limitations described above.

Absent resolution, Mr. Luthmann will file a motion to intervene under Rule 24, together with a motion to strike the witness designation or, alternatively, for protective and sequencing relief under Rules 26(c), 45(d), and 611(a).

I am available to confer at your convenience, if everyone can behave.

Thank you for your attention to this matter!
Regards,


Richard A. Luthmann, Jr.

4199 Los Altos Court
Naples, Florida 34109
Pro Se
239-631-5957
richard.luthmann@protonmail.com
**LINKTREE**
**Muck Rack Profile**

**Substack: This is For Real.**
**Editor-In-Chief: FLGulf.news**
**Editor-In-Chief: NYNewsPress.com**
**Editor-In-Chief: TheFamilyCourtCircus.com**
**Contributor: Frank Report**
**Contributor: Sun Bay Paper**
**Follow Me on Facebook X Instagram LinkedIn TRUTH Rumble Newsbreak**


Sent with Proton Mail secure email.


**429.84 KB**   1 file attached

Substack Traffic Stats - This is For Real.pdf  429.84 KB

2/20/26, 10:52 AM                    Substack Home - This is For Re

## Stats

Network  Audience  Retention  Sharing  Referrals  Notes  Traffic  Email  Unsubscribes  Surveys  Earnin

30d views

# 1,170,434

↓ -197,873

## Total traffic

How many times your Substack was viewed over the selected period, including emails.



## Traffic by source

Where people who viewed your Substack came from, including emails.

2/20/26, 10:52 AM                              Substack Home - This is For Re...

## Stats



| | | | | |
|---|---|---|---|---|
| direct | Direct | 26,585 | 13,712 | 221 |
| email | Email | 22,652 | 20,545 | 12 |
| facebook.com | Social | 13,567 | 12,208 | 66 |
| google.com | Search | 6,006 | 4,307 | 20 |
| substack app | Substack | 5,151 | 2,702 | 40 |
| direct to app | Direct | 4,633 | 2,685 | 22 |
| open.substack.com | Substack | 3,566 | 3,104 | 0 |
| bing.com | Search | 1,205 | 915 | 6 |
| duckduckgo.com | Search | 1,005 | 793 | 2 |
| yahoo.com | Search | 427 | 323 | 2 |
| authordennisbrennan.com | Other External | 204 | 204 | 0 |
| thegatewaypundit.com | News | 181 | 131 | 1 |
| familycourtfraudwarrior.com | Other External | 168 | 115 | 4 |
| elenabelogolovsky.substack.com | Substack | 128 | 122 | 0 |
| twitter.com | Social | 123 | 100 | 0 |
| linkedin.com | Social | 117 | 110 | 0 |
| michaelvolpe.substack.com | Substack | 99 | 70 | 0 |
| instagram.com | Social | 97 | 84 | 0 |
| youtube.com | Social | 92 | 79 | 0 |

*Load more*

2/20/26, 10:52 AM

Substack Home - This is For Rea...

## Stats

 13 

# Antifa TikTok Agitator Urges Armed Leftist Militias to 'Fight' ICE Agents

By Guest Contributor Richard Luthmann  Jan. 13, 2026 7:45 am  923 Comments



*Ex. B*

Truth          Tweet          Share          Gettr          Gab

Listen to the article now 🌐 ≣
Audio by Carbonatix

↺   1.0x   ↻

🔊

*Guest post by Richard Luthmann*

Radical TikTok agitator Danesh Noshirvan has crossed a dangerous line.

The Antifa-aligned mega influencer is now openly calling for organized, armed left-wing militias to confront ICE agents and federal law enforcement in America's largest cities.

Framing ICE as "Trump's racist army," Noshirvan urges followers to physically block agents and force them out of communities. The rhetoric is not abstract. It is operational. It is coordinated.

And it comes from a figure already tied to dark-money networks, digital harassment mobs, perjury, and federal sanctions.

This is not protest. It is incitement—packaged as "accountability," powered by bots, and aimed at igniting street-level conflict.

Audio By Carbonatix

3/4/26, 2:19 PM                    Antifa TikTok Agitator Urges Armed Leftist Militias to 'Fight' ICE Agents | The Gateway Pundit | by Jim Hoft



Radical internet activist **Danesh Noshirvan** is no longer flirting with violent rhetoric. The Antifa-aligned mega influencer is now openly calling for organized, **armed left-wing militias** to confront U.S. Immigration and Customs Enforcement (ICE) agents and federal law enforcement in America's largest cities.

Behind the bombast lies a trail of extremist conduct, **dark-money ties**, and legal troubles that expose the truth about his "accountability" crusade.

### "Left-Wing Militias" to Confront ICE – Noshirvan's Shocking Call to Arms

Audio By Carbonatix

Danesh Noshirvan is openly urging organized, **armed resistance against federal agents**. In a recent video rant, the TikTok firebrand told followers "every major city" must start forming "left-wing militias" to "protect your communities."

ADVERTISEMENT **(HIDE THIS AD)**

He insisted a "well-regulated militia" should meet ICE agents whenever they appear, to "tell them to leave. Noshirvan even alleged that ICE agents "murdered" a civilian and later "assaulted" high schoolers, claiming "this wouldn't have happened if a militia would've kicked them out of town".

His solution: mobilize citizens to stand off with federal law enforcement. In Noshirvan's words, "Defend yourselves against Trump's personal petto, racist army, fight back against ICE.

He paints ICE as "extremists" – *"Trump's…racist army"* – and tells Americans it's their right to forcefully eject ICE from local communities.

ADVERTISEMENT **(HIDE THIS AD)**

## Around the Web

Audio By Carbonatix

3/4/26, 2:19 PM    Antifa TikTok Agitator Urges Armed Leftist Militias to 'Fight' ICE Agen...he Gateway Pundit | by Jim Hoft

**Dr. Mark Skousen: "The #1 Stock to Buy Before The SpaceX IPO." Get The Ticker**

The Oxford Club

**4 Foods Linked to Memory Loss**

Primal Health

**Lethargy or Type 3? If You Do This Daily, Check Your Sugar Immediately!**

HealthFrontline

The rhetoric crosses a dangerous line, effectively calling for armed confrontations with federal officers. Seasoned ICE agents now face an online agitator inciting mobs to "hold them accountable" at gunpoint. Federal authorities warn that such demonization of ICE has already led to a **400% surge in assaults** on immigration officers in recent years.

*Noshirvan's bombastic call to arms marks an escalation in anti-ICE extremism – one that observers fear could spark real-world violence.*

**Extremist Crusade: Doxxing Justices, Dancing on Trump's Grave, Harassment Turns Deadly**

ADVERTISEMENT (HIDE THIS AD)

# Around the Web

**Those Who Have Diabetes, Read It - Before They Delete It!**

Health Headlines

**Cardiologist: Do This Every Morning to Clear Your Arteries**

Wellness Gaze

**Do This Immediately if You Have Skin Tags or Moles (Its Genius)**

dermatology

Audio By Carbonatix

Noshirvan's militant rhetoric is nothing new – it fits a **pattern of extremist conduct**. The self-styled "accountability" activist has a history of targeting conservatives with alarming ferocity. He once posted a video of himself gleefully dancing on a mock-up of **President Trump's grave**, celebrating the idea of the former President's death.

Audio By Carbonatix

00:00                                                                00:17

his 3

**ut**: an

ral prison.

**exas**

Audio By Carbonatix

3/4/26, 2:19 PM                 Antifa TikTok Agitator Urges Armed Leftist Militias to 'Fight' ICE Agent, The Gateway Pundit | by Jim Hoft

00:00                                                          00:59

ny means.

es and

*ility,"* but

## Around the Web

Audio By Carbonatix

3/4/26, 2:19 PM                 Antifa TikTok Agitator Urges Armed Leftist Militias to 'Fight' ICE Agen... The Gateway Pundit | by Jim Hoft

**The 2lb Device That is Replacing Heavy Gas Blowers**

Seese Pro

**Why Your Rotator Cuff Isn't Healing (It's Not Just Age)**

RejuvaCare

**Sciatica is Not From a Slipped Disc. Meet The Real Enemy of Sciatica (Stop This)**

SmoothSpine

Often, he explicitly urges that a target be *"fired or even arrested"* for their views. The results are devastating: scores of people have **lost jobs or faced threats** after Noshirvan's viral videos sparked coordinated harassment campaigns.

In one case, a Texas high school coach named Aaron De La Torre **took his own life** just days after Noshirvan's relentless TikTok shaming videos went viral.

Noshirvan's toxic crusades have real blood on their hands. Even as he casts himself as a warrior against "hate," his **own tactics** – grave-dancing, doxxing, mob intimidation – mirror those of the very extremists he claims to oppose. This Mega-Influencer's "jihad" against conservatives isn't social justice; it's a personal vendetta with collateral damage fueled by foreign payments.

ADVERTISEMENT (HIDE THIS AD)

**Why Your Rotator Cuff Isn't Healing (It's Not Just Age)**

**Sciatica is Not From a Slipped Disc. Meet The Real Enemy of Sciatica (Stop This)**

**Billionaire Spends $1.7 Million on Motorhome With Its Own Garage**

### Dark Money, Lies, and Digital Terror – The Networks Behind Noshirvan

While Noshirvan preaches chaos on the streets, evidence shows powerful interests pulling the strings. Reports link him to a **secretive Democrat dark-money scheme** called the Chorus program,

Audio By Carbonatix

which offered select influencers up to $8,000 a month to push partisan content in strict secrecy. Noshirvan even indicated he applied to join this Sixteen Thirty Fund–backed operation, suggesting his "grassroots" outrage may have been **bankrolled from the shadows**.

He's also tied to prominent Democrat operatives. Scott Dworkin, founder of the Democratic Coalition, has hailed Noshirvan as "one of the hardest working investigators out there right now," a telling endorsement of Noshirvan's role in **the left's online war**.

ADVERTISEMENT (HIDE THIS AD)

# Around the Web

**Side Sleepers With Shoulder Pain: Do This Before Bed Tonight**

RejuvaCare

**The "Pocket Tornado" That Makes Brooms Obsolete**

Seese Pro

**Spine Specialists Says: Do This for 15min to Relieve Sciatica**

SmoothSpine

Audio By Carbonatix

3/4/26, 2:19 PM    Antifa TikTok Agitator Urges Armed Leftist Militias to 'Fight' ICE Age...  The Gateway Pundit | by Jim Hoft



Danesh Noshirvan is directly linked to Scott Dworkin, founder of the Democratic Coalition Against Donald Trump.

According to reports, **Dworkin and even foreign interests** bankroll Noshirvan's activities.

Noshirvan's entanglement with radical networks doesn't end there. In federal court, this Antifa-aligned agitator was caught in a web of lies and illegal conduct.

During a hearing last May, Noshirvan admitted under oath that he never obtained the legally required 2257 age verification or consent forms for the explicit **OnlyFans pornography** he filmed with his wife and another female participant.

ADVERTISEMENT **(HIDE THIS AD)**

## Around the Web

Audio By Carbonatix

3/4/26, 2:19 PM                    Antifa TikTok Agitator Urges Armed Leftist Militias to 'Fight' ICE Agent... The Gateway Pundit | by Jim Hoft

### Why Your Rotator Cuff Isn't Healing (It's Not Just Age)
Health Insights Magazine

### This Sciatica Discovery is Leaving Spine Specialists Speechless
SmoothSpine

### 10 Things I Wish People Knew About Lupus
GoodRx

This shocking admission means he **could not verify** that all performers were adults — a federal offense under **18 U.S.C. §2257** that carries up to five years in prison per violation.





Filed Court Document from Noshirvan v. Couture et. al., pending in Fort Myers federal court.

Audio By Carbonatix

3/4/26, 2:19 PM                    Antifa TikTok Agitator Urges Armed Leftist Militias to 'Fight' ICE Agent... The Gateway Pundit | by Jim Hoft

**Noshirvan's lawsuit** backfired spectacularly as these truths came out. A Florida federal judge slapped him with **$62,320 in sanctions** for "outrageous" bad-faith misconduct during the case.

In a profanity-laced deposition meltdown, Noshirvan tried to intimidate the opposition by baselessly accusing a Black attorney of being a "racist" and even spewing **fabricated claims** about "revenge porn" — tactics the court found were purely meant to harass.

Even after the gavel fell, Noshirvan took to social media with "**inflammatory but false**" posts **intended to incite his followers** to threaten his legal opponents. His behavior resembles lawfare by harassment — abusing courts and online mobs to bludgeon enemies.

Perhaps most insidious is Noshirvan's use of **technology and trickery** to amplify his attacks. Investigators uncovered **an army of AI-driven bot profiles** linked to his campaigns. Court insiders warn that Noshirvan operates an "AI-run cancel culture mob" — automated troll accounts unleashed to terrorize targets at scale.

Under oath, Noshirvan even conceded use of **social media sock puppets** and **fake personas** like "@JOEYSCRAMPS2020" and "Erica Sabonis" used to smear and stalk victims.

ADVERTISEMENT (HIDE THIS AD)

## Around the Web

**Why Your Rotator Cuff Isn't Healing (It's Not Just Age)**

RejuvaCare

**Lethargy or Type 3? If You Do This Daily, Check Your Sugar Immediately!**

HealthFrontline

**Replace Your Entire Roof in As Little As 1 Day!**

Metal Roofing Innovations

In short, this "Mega Influencer" relies on a whole machinery of deceit — dark money paymasters, extremist allies, and digital hit-squads — to execute his agendas.

Audio By Carbonatix

Now, with his militant call for armed militias against ICE and a growing record of lies and intimidation, Danesh Noshirvan has made himself the face of a dangerous new breed of activist. The question for authorities: Will this online terrorist **finally be held accountable**?

**Submit additional information.**



### Jim Hoft

Jim Hoft is the founder and editor of The Gateway Pundit, one of the top conservative news outlets in America. Jim was awarded the Reed Irvine Accuracy in Media Award in 2013 and is the proud recipient of the Breitbart Award for Excellence in Online Journalism from the Americans for Prosperity Foundation in May 2016.

You can **email Guest Contributor Richard Luthmann here**, and **read more of Guest Contributor Richard Luthmann's articles here**.

        

Audio By Carbonatix

1

**Ex. C**

1             UNITED STATES DISTRICT COURT

2             MIDDLE DISTRICT OF FLORIDA

3   - - - - - - - - - - - - - X     2:25-CR-337
    RICHARD LUTHMANN,

4            Plaintiff
        Vs.            Fort Myers, Florida

5    DANESH NOSHIRVAN,
         Defendant     September 10, 2025

6   - - - - - - - - - - - - - X

7           TRANSCRIPT OF EVIDENTIARY HEARING
       BEFORE THE HONORABLE NICHOLAS P. MIZELL

8          UNITED STATES MAGISTRATE JUDGE

9       RICHARD LUTHMANN
       4199 Los Altos Court

10      Naples, Florida 34109
       Appearing Pro Se

11

12      CHIAPPETTA TRIAL LAWYERS
       BY: NICHOLAS A. CHIAPPETTA, ESQ.

13      2101 Vista Parkway
       Suite 258

14      West Palm Beach, Florida 33411
       Appearing for the Defendant

15

16

17

18

19

20

21

22         COURT REPORTER:Brandi A. Wilkins

23            scalisba@gmail.com
            Fort Myers Federal Building

24            2110 First Street
            Fort Myers, Florida 33901

25

2

1          THE CLERK:  Calling case 2:25-CR-337,

2    Luthmann versus Noshirvan.

3          THE COURT:  Okay.  Good morning.  I'll I

4    guess entertain appearances, so who is here for the

5    plaintiff; right?

6          MR. LUTHMANN:  Richard Luthmann of 4199 Los

7    Altos Court, Naples, Florida, 34109.  Good morning,

8    Your Honor.

9          THE COURT:  Good morning.  All right.  For

10   the defense?

11         MR. CHIAPPETTA:  Good morning, Your Honor.

12   Nicholas Chiappetta on behalf of Danesh Norshirvan.

13         THE COURT:  All right, welcome.  Remind me

14   how to say Mr. -- is it Noshirvan?

15         THE WITNESS:  Norshirvan.

16         THE COURT:  Norshirvan, okay.

17         THE WITNESS:  Yeah, thank you.

18         THE COURT:  All right, thank you.  Okay.

19   Well, let's talk about what we're trying to do here

20   today.  First, I want to try to keep this very

21   focussed on a very limited issue.  Obviously we had

22   the Rule 16 Conference that was scheduled back in

23   July.  Mr. Norshirvan was not here.  I asked him to

24   show cause why he wasn't here.  I found the written

25   submission insufficient, non convincing standing

3

1    alone, so I wanted to give him an opportunity to come

2    in and explain himself here in the courtroom, and

3    that's really all we're here to do as far as that

4    goes.

5             I want to stay very focussed on just he

6    tells us in his show cause response that he received

7    the Notice of Hearing and simply didn't calendar it

8    and simply forgot to be here.  I think we should focus

9    on the credibility of that assertion.  And really

10   that's about it as far as, you know, any kind of

11   testimony or evidence that kind of thing.

12            After we get past that, I'd like to talk

13   about some of the things we talked about during the

14   Rule 16 Conference when the defense wasn't here and,

15   you know, keeping the case running along efficiently

16   and that kind of thing and see if I can -- you know,

17   my job principally in these cases as a magistrate

18   judge is to keep these cases running as smoothly as

19   possible.

20            I'm obviously aware of the other cases that

21   you are involved in here in the Middle District of

22   Florida, and I want to try to avoid some of the things

23   we've seen in those cases in this one, and also,

24   during any Rule 16 Conference, the rule provides that

25   I can explore with you your efforts to resolve the

4

1    matter.  So I might take that up too while you are

2    here and take maximum advantage of the fact that you

3    are here.  I understand Mr. Norshirvan travels here

4    from Pennsylvania?

5                THE WITNESS:  Yes, sir.

6                THE COURT:  Okay.

7                THE WITNESS:  Yes, Your Honor.

8                THE COURT:  So it's a commitment for you to

9    be here, and let's take full advantage of you being

10   here, and Mr. Chiappetta, you come from Orlando area.

11   Right?

12               MR. CHIAPPETTA:  West Palm Beach, Your

13   Honor.

14               THE COURT:  West Palm Beach.

15               MR. CHIAPPETTA:  Yes.

16               THE COURT:  All right.  Well, again,

17   everybody is -- I know you come up here from Naples or

18   thereabouts but everybody is taking a lot of time to

19   be here, and I want to take maximum advantage of the

20   fact that we are all here.  Okay.  Well, that's kind

21   of the sequence of things.

22               So on the issue about, again, the failure to

23   be here in July, I mean, I have the submission.  I

24   think what I envision doing on that is maybe give Mr.

25   Chiappetta an opportunity to offer any evidence you

5

1  might want to offer to try to I guess underscore the

2  credibility of what was offered from Mr. Norshirvan in

3  his show cause response Document 49, and I might have

4  some questions as well, and I might give Mr. Luthmann

5  an opportunity to ask a few questions and -- just to

6  make sure maybe Mr. Luthmann's thought of something I

7  haven't thought about about all of that, and then I'll

8  probably end up taking it under advisement.

9          And I mean, it's -- Mr. Norshirvan you

10 probably have maybe heard this but it's fairly

11 standard practice when a party doesn't show at a

12 hearing that if they're the plaintiff the case can be

13 dismissed, if they're the defendant they can be

14 defaulted right then and there, and that's not unusual

15 at all for a state or federal court to do that.

16         So I think that's in the range of

17 consequences for not being here.  Obviously there can

18 be something much less than that.  So -- and if you

19 are defaulted, it doesn't mean that there's any kind

20 of -- you know, there's still a lot of work to be

21 done.  It just means that the well pled allegations

22 are deemed admitted, and to the extent they don't

23 state a claim, the don't state a claim.  To the extent

24 they do, we'd have a damages trial.  So it's not -- it

25 wouldn't be the end of the case by no means but it

6

1    would be an adverse outcome for you if it were to go

2    that far, but obviously there's arrange of lesser

3    sanctions and I'll entertain argument on that as well.

4            Okay.  So with that, does anybody else have

5    any suggestions about other things we should take up

6    today or before exploring that issue?

7            MR. CHIAPPETTA:  Your Honor, there are two

8    things.  First, if I may, would a brief opening be

9    allowed?

10           THE COURT:  Okay, that's fine.

11           MR. CHIAPPETTA:  Just to state a few minor

12   points.

13           THE COURT:  That's fine.  Frame what we're

14   doing.  That's fine.

15           MR. CHIAPPETTA:  Okay.  And then the other

16   thing is it came to my attention last night that Mr.

17   Luthmann attempted to service my state court service

18   email address instead of my email address I have on

19   file for purposes of discovery and it's been

20   quarantined, so since we are in front of the Court, I

21   would ask that Mr. Luthmann reserve me those documents

22   so that I have them and that I have an additional 30

23   days to actually answer discovery because I just found

24   it last night, and I do have documentation to show

25   they were quarantined.

7

1              THE COURT:  Okay.

2              MR. LUTHMANN:  Yeah.  If he could submit

3      that, I'd like to take a look at it.  I'd love to see

4      that.

5              THE COURT:  It was something that was -- you

6      transmitted it last night?

7              MR. LUTHMANN:  Oh.  I transmitted a whole

8      bunch of things to him.  I sent him the courtesy copy

9      that the Court I copied as well so there's no question

10     that he received all of the exhibits, the witness --

11     or the exhibit list.  There's no witness list.  I'm

12     not calling any witnesses.  The issue with -- I have

13     the digital stuff in in accordance with the local

14     rules.

15             THE COURT:  Uh-huh.

16             MR. LUTHMANN:  So he has all of it.  I'm not

17     hiding the ball here.

18             THE COURT:  Okay.  Well, let's just --

19             MR. CHIAPPETTA:  May I clarify?

20             THE COURT:  Yeah.  Let's stay focussed on

21     one thing at a time.

22             MR. CHIAPPETTA:  All right.

23             THE COURT:  Talking about transmissions last

24     night.

25             MR. CHIAPPETTA:  Yes.  This was not -- this

8

1    was not a last night transmission.  We discovered this

2    last night.  This was served on I -- I'd have to look

3    at the document to see the exact date but there are

4    actual requests for discovery --

5              THE COURT:  Okay.

6              MR. CHIAPPETTA:  -- that got quarantined

7    that we didn't see.  So I don't want anything to be

8    deemed admitted or not answered or nonresponsive

9    because it went to quarantine and my office only

10   discovered this last night.

11             THE COURT:  I see.  All right.  So you're

12   saying --

13             MR. LUTHMANN:  Chiappetta legal and service

14   and Chiappetta legal are I guess representing to the

15   Court that those email addresses are not good email

16   addresses for him, but those are the ones that are

17   listed on the docket sheet.  Nick@Chiappettalegal.com

18   is actually on the ECF.  I have a copy of the civil

19   docket sheet there and that's what I go off of, Your,

20   Honor.  So where it says -- the only email on the

21   sheet is Nick@Chiappettalegal.com.  If that's the

22   case, I don't think I should bear the issue here.

23             THE COURT:  Yeah.  That's the email we have

24   too.  So --

25             MR. LUTHMANN:  I don't know what this is.  I

9

1  really -- I'm going to hand it back to him but I'm

2  going to reject it in total.

3          MR. CHIAPPETTA:  May I respond, Your Honor?

4  I have checked the Nick@Chiappettalegal.com and I have

5  not received a document or an email from Mr. Luthmann

6  as it relates to that email address.  The one that I'm

7  showing quarantine from is

8  Service@Chiappettalegal.com, and that is what I'm

9  showing here.

10          THE COURT:  Okay.  All right.

11          MR. CHIAPPETTA:  That is --

12          THE COURT:  Well, that's a discovery issue

13  we can get to later.  We're talking about scheduling

14  things and keeping cases running along efficiently,

15  that kind of thing.

16          MR. CHIAPPETTA:  Okay.

17          TH COURT:  I think you said there was two

18  things you wanted to --

19          MR. CHIAPPETTA:  It was just the brief

20  opening.

21          THE COURT:  Oh, the brief opening.  Okay.

22  All right.

23          MR. LUTHMANN:  On that point, I just want to

24  make clear on the record then.  Is this

25  Nick@Chiappettalegal.com address that's on the CM ECF,

10

1   is that a valid address?  I don't want there to be any

2   problems in communication.  We had -- I had terrible

3   problems with communication.  I explained this to the

4   Court on July 17 talking to Mr. Norshirvan, and I had

5   hoped that having an attorney would have resolved some

6   of the issues of communication, and now I'm hearing

7   the first thing we have is problems with

8   communication.  So I just want to be crystal clear of

9   what we're doing.

10          THE COURT:  Okay.  Well, what I heard was

11   Nick@Chiappettalegal.com is a good email address for

12   you?

13          MR. CHIAPPETTA:  It is, Your Honor.

14          THE COURT:  All right.

15          MR. CHIAPPETTA:  And Mr. Luthmann has had no

16   problem communicating through that email address to

17   me.  However, something in that attachment in that one

18   service got flagged and got blocked through the

19   service email address.

20          THE COURT:  Okay.  We can clean that up

21   later.  All right.  Just about today and the primary

22   issue for today, anything else before we get underway?

23          MR. LUTHMANN:  I have no problem with his

24   opening.  I would like to just bring to the Court's

25   attention I'm going to want to make objection -- I'm

11

1  going to want to try to admit request for judicial

2  notice, make an oral application for judicial notice

3  on two items and as well as make a blanket of

4  relevance.  I think the Court covered it already by

5  caveating the issue but a blanket relevance argument

6  under the Federal Rules of Evidence as related to the

7  Court's order as to the scope of this case, and his

8  exhibit list that he's already given in is already way

9  outside the bounds because the conduct is the July 17

10  in or around, on or about conduct.

11          THE COURT:  Right.

12          MR. LUTHMANN:  I think that's what that's

13  looking at.

14          THE COURT:  I think what we need to talk

15  about is our notice went out on June 17.  Mr.

16  Norshirvan tells us that he received it.  So what I'm

17  interested in hearing about is what happened between

18  June 17 and July 17.  That's what we're here to talk

19  about.

20          MR. LUTHMANN:  And so the exhibit list has

21  336 pages of internet posts that weren't by Mr.

22  Norshirvan, so I don't see the relevance.  I want to

23  make that relevance argument, but I also would want to

24  make the judicial notice arguments as well.  So maybe

25  that be -- and to the extent that he does have me on

12

1    his witness list, I'm not going to assert privilege.

2    Not the fifth amendment privilege because that was

3    resolved by Judge Steele in poo pooing their claims

4    that there was federal witness intimidation.  That was

5    basically laughed out of the court on -- in the order

6    on August 12.  That will be covered in the judicial

7    notice.

8            But there are other privileges related to

9    reporters' privilege, trade secrets and HIPAA and some

10   other issues that I would want to bring up so maybe

11   after Mr. Chiappetta gives his opening, I'd like to

12   give an opening to kind of outline that for the Court

13   to save us time.

14           THE COURT:  Yeah.  Let's just a couple --

15   just a few minutes to kind of frame things and I would

16   be somewhat surprised if Mr. Luthmann had any personal

17   knowledge that would be relevant to the issue about

18   why Mr. Norshirvan wasn't here on July 17, but we can

19   explore that later when you attempt to call him as a

20   witness.

21           MR. CHIAPPETTA:  Okay.

22           THE COURT:  All right.  Do you want to go

23   ahead and set the stage for a bit?

24           MR. CHIAPPETTA:  Yes, Your Honor.  Thank

25   you.

13

```
 1          THE COURT:  Okay.
 2          MR. CHIAPPETTA:  May is please the Court,
 3   Your Honor.  Just very briefly, Mr. Norshirvan is
 4   going to identify to the Court on the stand that he
 5   received notice, that there was a calendaring error in
 6   relation to his actual availability and that he didn't
 7   realize there was a conflict.  That will be addressed
 8   through direct testimony.
 9          He was in California on a family vacation
10   with his children.  That is undisputed.  The outside
11   of that, he is going to address issues with receiving
12   mail while he was gone.  He didn't receive several
13   envelopes until after he had returned in relation to
14   this case, and in addition to he does not actually
15   receive any emails from Mr. Luthmann because of an
16   ongoing pattern of harassment, and that's where the
17   Substacks come in, and that was also found in the 1218
18   case at Document 454 and 459 where Judge Steele had
19   found that Mr. Luthmann had disseminated information
20   that directly resulted in my client's expert witness
21   being harassed.
22          So we do have an issue here where before
23   this suit was filed stemming back from mid 2024, Mr.
24   Luthmann engaged in a pattern of conduct harassing
25   communications whether they be via Substack, email or
```

14

1    otherwise and that has essentially put off my client

2    and forced my client to block email communications

3    from Mr. Luthmann entirely well before this case was

4    even filed, and I'll let my client explain that in

5    further detail but I just wanted to provide a very

6    brief overview so the Court kind of understands where

7    my client is coming from.

8          THE COURT:  All right.  Well, let me offer

9    some thoughts about that.  Maybe we can streamline

10   what will be presented because we're not so much

11   interested in really communications between the

12   parties.  We're really interested in the communication

13   between the Court and the defendant and his, you know,

14   efforts to stay apprised of orders of notices from the

15   Court, and, you know, he admits that he received our

16   notice.

17         I imagine he received all sorts of notices

18   and orders from the Court, and we have been emailing

19   them to him, not snail mailing them to him, so I think

20   we just need to stay focussed on, you know, what -- I

21   think he tells us he receives all of our notices and

22   orders by email and we just need to figure out despite

23   this email of them why he wasn't here.

24         MR. CHIAPPETTA:  Okay.  I was just confused

25   because in your text order it says that he failed to

15

1    meet and confer about selecting a mediator, and that's
2    where that would be relevant --
3              THE COURT:  Okay.
4              MR. CHIAPPETTA:  -- as it relates because as
5    plaintiff Mr. Luthmann would have been required to
6    initiate that.
7              THE COURT:  True, but again also, our local
8    rules and the civil action order we docketed in the
9    case told everybody they need to do that.  So again,
10   that's another order and notice from the Court that
11   the parties would have received saying you need to do
12   this.  You need to work together to select a mediator.
13   So --
14             MR. CHIAPPETTA:  I understand.  I just
15   wanted to --
16             THE COURT:  Or also, you know, the efforts
17   to participate in the 26F Conference, to submit CMR, I
18   mean, all these kind of orders and notices are coming
19   from the Court, not Mr. Luthmann, and yet they're not
20   being followed.  They're not being given the attention
21   they're due.
22             MR. CHIAPPETTA:  I understand, and my client
23   will be apologizing to the Court for any oversights
24   that have occurred.
25             THE COURT:  Okay.

16

1          MR. CHIAPPETTA:  But in relation to actually

2    initiating and selecting a mediator, that is

3    plaintiff's burden, Your Honor, as far as I'm aware.

4          THE COURT:  Well, from our perspective, it's

5    joint.  It's a joint burden on both of them to work

6    together to select someone.  We want the case manager

7    report to be developed jointly and filed jointly, and

8    they need to work together to select a mediator

9    together.  So it's incumbent on both of them to make

10   that effort.

11         MR. CHIAPPETTA:  Understood, Your Honor.

12         THE COURT:  Okay.  All right.  Mr. Luthmann,

13   any other thing just to set the stage for today?

14         MR. LUTHMANN:  I'll just go into this very

15   briefly, the two points, the points on notice and the

16   points on relevance just so we have some case law put

17   on the record real quick so that I don't have to --

18   I'm referring back to it if I make the same objection

19   two, three, five, twenty times depending on what Mr.

20   Chiappetta decides to do.

21         I'm going to ask the Court to take judicial

22   notice of Judge Steele's August 12, 2025 opinion and

23   order in the 1218 case.  I'm going to do that and

24   because the Eleventh Circuit has been clear that

25   judicial notice may be taken of public records in

17

1    prior Court orders where their accuracy cannot

2    reasonably be questioned.

3         I would cite Horn V Potter, 392 Federal

4    Appendix 800-802 Eleventh Circuit 2010 as well as

5    Bryant V Avato Brands, 187 F3d 1271 at 1278 to 79.

6    That's the Eleventh Circuit in 1999.  And Shahar V

7    Bowers which is an on bock opinion 120 F3d 211-214

8    Eleventh Circuit 1997.  We are not asking this Court

9    to relitigate Judge Steele's case at all.  We're only

10   asking the Court to recognize adjudicate facts he

11   found after a full evidentiary hearing.

12        THE COURT:  Well, let me jump in there.  The

13   only thing I -- I think a lot of litigants lose track

14   of this.  You're right, and obviously I'm aware of

15   Judge Steele's order just because it's from this Court

16   and I'm aware of the other case here.  I think I need

17   to be aware of that in order to understand what's

18   going on with this one, so I have read Judge Steele's

19   order and -- but yes, obviously it's an order of the

20   Court, something I'm aware of, but for me to take

21   judicial notice of anything, it needs to be a fact

22   that I'm adjudicating here.  It needs to be -- it

23   needs to bear on it.

24        MR. LUTHMANN:  Yes.

25        THE COURT:  So the facts I'm adjudicating

18

1  today are, you know, the defendant received our

2  notice, says he forgot to calendar it and then for

3  whatever reason never thought about it ever again.

4           MR. LUTHMANN:  Yes.

5           THE COURT:  And I think that's what I'm

6  grappling with today, and I don't know what Steele

7  would have said that deals with Norshirvan's state of

8  mind between June 17 and July 17 about his need to be

9  here on July 17.

10          MR. LUTHMANN:  I will tell Your Honor.

11          THE COURT:  All right.

12          MR. LUTHMANN:  There are two words, good

13  faith.  That's the core of this hearing today.  And

14  the core of that order is bad faith.  It's about lack

15  of negligence.  It's about motus operandi, the way

16  that Mr. Norshirvan operates, it goes to common scheme

17  and plan.  It goes to intent.  It goes to malice.

18          These are issues that are throughout, and I

19  have seven points.  That's all I would like to put up

20  to the Court to offer the judicial notice for the

21  purpose of this hearing.  The first is that Document

22  454, that's the document in the 1218 case.

23          THE COURT:  That's Judge Steele's order?

24          MR. LUTHMANN:  Yeah, Judge Steele's order.

25          THE COURT:  Okay.

19

1          MR. LUTHMANN:  At Page 2106 that the Judge

2    took initial notice that Mr. Norshirvan is a mega

3    influencer with millions of followers on Tiktok,

4    Instagram and Youtube, and that's relevant here

5    because he said in his affidavit he knew about this

6    because it was on social media.  All right?  That's

7    squarely relevant.  He found out about the Court that

8    there was a hearing because of fervor on social media.

9    That's a relevant fact.

10          He claims that -- and they opened the door

11    about the fifth amendment.  Well, I would ask that

12    Document 454, Judge Steele's order, Page 13 and 16 to

13    17, the Court found "none of the other evidence

14    establishes any of Mr. Norshirvan's allegations."

15    That's related to the witness intimidation.  That was

16    the basis for the fifth amendment assertion of

17    privilege.

18          I would not have Mr. Chiappetta or someone

19    who is not as learned as him and doesn't understand

20    the fifth amendment privilege try to cast aspersions

21    where the fifth amendment was used as a profilactin

22    measure fully within the rights and try to say that

23    there was some type of bad faith in the assertion of

24    an evidentiary privilege which obviously we know

25    there's not.

20

1          Third, the opposing party's disclosure in

2     that case the Court found was not in bad faith, and

3     that's at 17 to 18.  So the Court made distinctions

4     between bad faith conduct and good faith conduct or

5     not bad faith conduct but not quite good faith

6     conduct.

7          THE COURT:  Uh huh.

8          MR. LUTHMANN:  The fourth is Mr.

9     Norshirvan's self -- he engaged in bad faith there,

10    the egregiousness conduct.  Shouting, cursing at

11    opposing counsel ending with F you when Judge Steele

12    said "could only have been committed in bad faith."

13    That's page 29 to 30 of that opinion.  And then he --

14    the Court found that Mr. Norshirvan published false

15    claims online.  He found the he accused the opposing

16    counsel of racism and sexual harassment, and Judge

17    Steele found that they were made "intentionally to

18    incite his followers to engage in foreseeable

19    harassment and intimidation".

20         THE COURT:  All right.

21         MR. LUTHMANN:  And so that's relevant

22    because of what Mr. Chiappetta just said.  His claim

23    is that he says that people are intimidating him.  He

24    said that I'm intimidating him in the practice of

25    journalism.  And so this is a pattern, a common scheme

21

1   or plan, that goes to lack of mistake or negligence.

2   It goes to lack of good faith.  Two more points.

3           THE COURT:  I recall the subject or maybe

4   the principal subject of that hearing and that order

5   was that deposition of Mr. Norshirvan's wife.

6           MR. LUTHMANN:  Yes.

7           THE COURT:  And then he made some comments

8   while that was being undertaken.

9           MR. LUTHMANN:  Well, he wasn't even supposed

10  to be in the room.

11          THE COURT:  I understand.  So when did that

12  deposition take place roughly?

13          MR. LUTHMANN:  You'd have to ask Mr.

14  Chiappetta and Mr. Norshirvan.  They were there.

15          THE COURT:  Do you remember when that took

16  place?

17          MR. CHIAPPETTA:  Um.

18          THE COURT:  I mean, was it taking place

19  between June 17 and July 17 of 2025?

20          MR. CHIAPPETTA:  No, it was not.  Well

21  before, Your Honor.

22          THE COURT:  Right.  Right, right, right.  So

23  again, anyhow, I'm going to bear that in mind and

24  probably end up taking this request under advisement.

25          MR. LUTHMANN:  No problem, Your Honor.

22

 1          THE COURT:  But anything else on that?

 2          MR. LUTHMANN:  That's on the issue with the

 3    judicial notice on Judge Steele's order.

 4          THE COURT:  Right.

 5          MR. LUTHMANN:  The other item, item number

 6    two, is the Chief Justice's 2024 year end report on

 7    the Federal Judiciary issued by Chief Justice John

 8    Roberts of the United States Supreme Court.  It's

 9    proper here because it's an official government

10    publication whose authenticity cannot be reasonably

11    disputed or really I don't think questioned in the

12    Federal Courts.

13          Bryant V Avato Brands, 187 F3d 1271, that's

14    Eleventh Circuit 1999, and the other cases that I had

15    cited.  I'm not asking for judicial notice to be taken

16    or offering the report for the truth of the

17    allegations.  Instead I offer it to show that the

18    Chief Justice and the Federal Judiciary itself has

19    officially recognized the rising threats of doxing,

20    intimidation, disinformation and violence against

21    judges and judicial officials.

22          The recognition is an institutional fact,

23    and it's directly relevant to this Court's task of

24    protecting the integrity of these proceedings.  The

25    report is important because of what it represents.

23

1    Chief Justice Roberts warned that intimidation now

2    includes online attacks urging violence, doxing

3    judges, publishing private home addresses can prompt

4    harassment and armed visits.  We saw this with Justice

5    Cavanaugh who they picked up a man who --

6            THE COURT:  Okay.

7            MR. CHIAPPETTA:  Your Honor?

8            THE COURT:  None of that is at issue for

9    today.  I mean, we're here just to talk about he

10   received -- he acknowledged his receipt of the notice

11   and he failed to be here, and I'm not sure what

12   Justice Roberts had to say about any of that.

13           MR. LUTHMANN:  And I would argue that also

14   helps to --

15           MR. CHIAPPETTA:  Objection, Your Honor.

16           THE COURT:  Well, let him get his thought

17   in.  I'll let you be heard.

18           MR. LUTHMANN:  I would say that it reflects

19   a deliberate pattern of bad faith and the points that

20   I had said before, lack of good faith, lack of mistake

21   or negligence, intent and malice that are squarely

22   relevant to these proceedings.  And then we'll offer

23   other evidence and I'll have relevance objections.  I

24   don't think the Court wants to hear -- does the Court

25   want to hear that now or does the Court want to hear

24

1    that --

2              THE COURT:  Let's take it up as it happens.

3              MR. LUTHMANN:  Sounds good, thank you.

4              THE COURT:  All right.

5              MR. CHIAPPETTA:  Your Honor, we would just

6    object to the relevance of the document and also

7    that --

8              THE COURT:  About the Justice Roberts

9    report?

10             MR. CHIAPPETTA:  That is correct, Your

11   Honor, and Mr. Luthmann has not provided a certified

12   copy so it lacks foundation or predicate.  At the end

13   of the day, it's admissible for judicial notice in the

14   form that Mr. Luthmann tries to present it in.

15             THE COURT:  Okay.  And then anything else

16   about the Judge Steele order?  Do you want to say

17   anything about that right now?

18             MR. CHIAPPETTA:  As it relates to the Judge

19   Steele order, again, that too should be a certified

20   copy.  He's lacking foundation and predicate for the

21   Court to even consider it here today.  Outside of

22   that, should the Court want to take judicial notice of

23   it, it clearly finds that Luthmann disseminated

24   information that led to witness intimidation.  So we

25   would be okay with the Court taking judicial notice of

25

1     that.

2             THE COURT:  Well, like I said, I'm already

3     aware of -- I'm already aware of the order.

4             MR. CHIAPPETTA:  Yeah.

5             MR. LUTHMANN:  Okay.

6             THE COURT:  And to the extent it's helpful

7     at all for what I'm resolving today, I'm aware of it.

8     It is an order that we entered here in the Fort Myers

9     division.  All right.  So I'm aware of it.  Okay.  Mr.

10    Chiappetta, what do you want to present?  Again, in

11    response to the show cause order.

12            MR. CHIAPPETTA:  Your Honor, if I may call

13    Danesh Norshirvan to the stand.

14            THE COURT:  Yes, you may.

15            MR. CHIAPPETTA:  Thank you, Your Honor.

16            THE CLERK:  Please raise your right hand.

17            D A N E S H   N O S H I R V A N, after having

18    been duly called and sworn, testified as follows:

19            THE CLERK:  Thank you.  You may be seated.

20            THE WITNESS:  Thank you.

21            DIRECT EXAMINATION BY MR. CHIAPPETTA:

22    Q.   Good morning.

23    A.   Good morning.

24    Q.   Is there something that you wanted to say to the

25    Court?

26

1   A.    Yes.  Your Honor, I apologize, and I apologize to

2   you and to the Court.  I apologize for wasting your

3   time.  I apologize for not being here, not responding.

4   I promise that it was not intentional or malicious.

5   As you can see, I've hired a lawyer.  I do take this

6   very seriously.  I did have that trip planned a while

7   back, back in May.  I think it predates this lawsuit

8   possibly.

9         But I was not trying to avoid anything by

10  any means.  I was -- the only thing I was trying to

11  put out of my mind of course was any sort of

12  harassment my family and I have been enduring and try

13  to enjoy a family vacation with my widow mother in

14  California that we don't get to see very often.  So

15  again, I do apologize.

16        THE COURT:  All right.

17  Q.    All right.  Now, Mr. Norshirvan, you have

18  previously provided statements in your declaration

19  saying that you received --

20        THE COURT:  Mr. Chiappetta, bring that

21  microphone closer to you so we can pick that up.

22  Okay?

23        MR. CHIAPPETTA:  Apologies, Your Honor.

24        THE COURT:  Thank you.

25  Q.    Mr. Norshirvan, you had previously provided a

27

1    statement in your declaration saying you received

2    notice from the Court on or about June 17 of '25

3    regarding a Rule 16B Conference; is that accurate?

4    A.    Yes.

5    Q.    All right.  And what happened after you received

6    that notice?

7    A.    Well, this was coming about a month off of that

8    hearing, the evidentiary hearing that has been

9    referenced several times.  So in my mind, I have never

10   been pro se before and I don't -- I'm not as good at

11   the calendaring and all that, and so in my mind, I was

12   planning on responding to all of these things, but

13   also I was thinking that I don't know how long it's

14   going to be until there's probably some sort of

15   criminal recommendations for Mr. Luthmann.

16          In my mind I believed that that's where it

17   was going to go, not that anyone had told me that or

18   anything, but again, that's my own responsibility.  I

19   miscalendared that and I didn't put it on my calendar,

20   and I was just looking forward to the fun vacation.

21          I was really excited about going to Los

22   Angeles.  My brother was going to be there too.  I

23   haven't seen them in a very long time.  My kids

24   haven't seen their grandma in a very long time, and I

25   was just very focussed on this at the time.

28

1    Q.   All right.  And so because of the calendaring

2    error, were you able to see that there was a conflict

3    between the two dates?

4    A.   I didn't even look -- no, I didn't even consider

5    that.  No.

6    Q.   Okay.  And now what date did you actually leave

7    for the family vacation?

8    A.   On July 5.  We left on July 5 and we returned on

9    August 5.

10   Q.   All right.  And what was the purpose of the

11   family vacation?

12   A.   Again, it was to make sure that my children get

13   to spend time with their grandma.  They don't --

14   because we're on different sides of the U.S., she's in

15   California, I'm in Pennsylvania, she doesn't get to

16   see my kids so often as much as we'd like to, and

17   being she is all alone out there because my brother

18   lives in another state and I live in another state, I

19   just really wanted to make sure we spend a lot of

20   quality time out there.

21   Q.   Okay.  And now when you came back did you receive

22   letters?

23   A.   Well, the post office held all my mail of course,

24   but when I went to the post office to retrieve my

25   mail, yes.

29

1    Q.    Okay.  And do you happen to recall the dates of

2    those letters?

3    A.    They were throughout July, yeah.  It was not

4    exactly, but yeah, throughout July while I was gone.

5    Q.    All right.  And how did you find out you missed

6    the Rule 16 conference?

7    A.    I don't -- I don't remember exactly.  I was -- I

8    maybe saw something online or something, but it

9    immediately caused me to go check, and then of course

10   I was concerned and I reached out to you for help of

11   because I didn't know what to do really.

12   Q.    Okay.  All right.  Now, the Court had mentioned

13   that you have admitted receiving all email

14   notifications from the Court; correct?

15   A.    Yes.  I must have received them, yeah, but I get

16   a lot of -- I'm not making an excuse, I'm just telling

17   the truth.  I do get a lot of things coming into my

18   email in relation to Court but also like spam that

19   have been signed up for.  Not saying who did it, but

20   somebody had signed me up for a lot of spam.

21   Q.    Do you understand the emails that -- and letters

22   that you are receiving the communications from the

23   Court?  Do you understand what they're actually

24   meaning?

25   A.    Not as well as Mr. Luthmann because he has

30

1    experience with legal matters, but I mean, not really.

2    Q.    Okay.

3    A.    But I mean, I could understand simple things of

4    course, and I do understand that it was my mistake for

5    not calendaring that.

6    Q.    Okay.  And just so we're clear here, as it

7    relates to Mr. Luthmann, do you receive email

8    communications from him?

9    A.    No.  As you mentioned prior, I do have Mr.

10    Luthmann blocked.  He goes straight to my spam folder

11    because prior to this lawsuit he sends -- he's sent me

12    very vile messages accusing me and my family of

13    horrible, unspeakable things and also just racist

14    things that he sends.  It's just -- not just

15    unpleasant but it's disturbing to look at.  It's a lot

16    of what he posts publicly on his Substack as well.

17    But I do my best to avoid --

18            MR. LUTHMANN:  I'm going to object.  Is

19    there a foundation for this diatron?  Has he produced

20    anything besides his own statements that there are

21    emails sent to him that are racist or that are

22    threatening?

23            THE COURT:  Okay, I understand.  I think the

24    question was just -- again, we need to try to keep

25    your answers tighter to the question presented.

31

1          THE WITNESS:  Okay.

2          THE COURT:  Because the question was pretty

3   limited.

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  It was just, ou know, do you

6   receive emails from Mr. Luthmann, and yes or no on

7   that would be great.

8          THE WITNESS:  I understand.

9          MR. CHIAPPETTA:  And if I may let the record

10  reflect that Mr. Luthmann has CCed my client on

11  multiple emails where the Court was also CCed that

12  contained all of the communications in which my client

13  was referring to here today.

14         THE WITNESS:  Uh-huh.

15         THE COURT:  We'll talk about that later too.

16         MR. CHIAPPETTA:  Yeah.  Thank you.  All

17  right.

18  Q.   So you don't receive communications.  Now, for

19  identification purposes, I am going to mark this

20  document as Defendant's 1.  Oh, oops.

21  (The following exhibit was marked for identification:

22  EXH Number 1)

23         MR. CHIAPPETTA:  May I approach, Your Honor?

24         THE COURT:  Yes.

25  Q.   Have you ever seen this document?

32

1          MR. LUTHMANN:  Hold on a second.  I would

2    like to just get a clarification.  This was

3    substantially what was attached to Mr. Norshirvan's

4    affidavit?

5          MR. CHIAPPETTA:  That is correct.

6          MR. LUTHMANN:  Okay.  That's fine.  No

7    objection.

8          MR. CHIAPPETTA:  Okay.

9          THE WITNESS:  Okay.  I got it.

10   Q.   Do you recognize the document?

11   A.   Yes.

12   Q.   What is the document?

13   A.   This is my itinerary for July.  It says here the

14   date that this was forwarded to me from my wife.  It

15   was -- I'm sorry.  I believe that's the date she took

16   care of it for the receipt was May 2, 2025.

17   Q.   All right.  And does this appear to be a true and

18   correct copy of your receipt for your ticket?

19   A.   Yes.  This is my receipt for my ticket.

20   Q.   All right.  And where are the receipts for your

21   family members?

22   A.   That's not included.

23   Q.   Okay.  But they did go with you; correct?

24   A.   Yes.  I went with my wife, my children and my

25   mother-in-law.

33

1              MR. CHIAPPETTA:  Okay.  All right.  Then if

2      there's no objection, I would move Defendant's 1 into

3      evidence, Your Honor.

4              THE COURT:  All right.  There is no

5      objection?

6              MR. LUTHMANN:  I would object to the fact

7      that we have a redaction.  I'd just like him to state

8      for the record what was redacted and why.

9              MR. CHIAPPETTA:  The --

10             MR. LUTHMANN:  The redactions on the front,

11     I don't know why they are there.

12             THE COURT:  Okay.  Well, see if we can get

13     --

14             MR. CHIAPPETTA:  Your Honor, they are the

15     front portion of an email address, and for purposes of

16     pub filings, we've redacted it for PII.

17             THE COURT:  All right.

18             MR. LUTHMANN:  One of them is Danesh

19     Norshirvan's email so that one I think is inbounds.  I

20     would like to know what that email is.  That's part of

21     the service to the Court.  It looks like a gmail

22     address.  I would like to know if he's operating under

23     that email address for Court notices.

24             THE COURT:  I don't think it's germane for

25     what the exhibit is being offered for.  Any other

34

1     issues with it?

2                MR. CHIAPPETTA:  No.

3                THE COURT:  Okay.  Received.  Thank you.

4     (The following exhibit was received into evidence:

5     EXH Number 1)

6                MR. CHIAPPETTA:  All right.  May I approach

7     again?

8                THE COURT:  Feel free to approach your own

9     witness.

10               MR. CHIAPPETTA:  Thank you.

11               THE COURT:  You don't need to ask me each

12    time.

13    Q.   All right.  Now, you had previously testified

14    that you had blocked Mr. Luthmann's communications.

15    Do you recall the date you blocked Mr. Luthmann's

16    communications?

17    A.   That would have to have been -- I'm sorry.  That

18    would have to have been some time last -- oh, gosh.

19    Well, I remember specifically telling him to cease

20    communications with me.  I remember having the police

21    call him and tell him to cease communications with me.

22    I remember having you actually ask him.  During all

23    that time, I had had him blocked.  So I would say all

24    throughout this year at least.  Maybe mid 2024.

25    Q.   Okay.  All right.  Now, what I have here is a

35

1    composite exhibit marked as D2.  May I approach?

2              MR. LUTHMANN:  Is this on the witness list?

3              MR. CHIAPPETTA:  This is on the exhibit

4    list.

5              MR. LUTHMANN:  I object to this in total,

6    Your Honor.  Outside of the scope of this hearing, the

7    relevance inquiry that we have under Federal Rules of

8    Evidence 401-402, United States V Glasser 773 f2d

9    1553.

10             THE COURT:  All right.  Well, it hasn't been

11   offered to me yet.

12             MR. LUTHMANN:  Oh, sorry.

13             THE COURT:  Let's just see if you have any

14   issue with him at least presenting it to his witness.

15             MR. LUTHMANN:  Okay.

16   Q.   Have you ever seen this document before?

17   A.   Yes.

18   Q.   What is it?

19   A.   It is our -- this is an example of the Substack

20   articles that Luthmann -- defamatory articles that

21   Luthmann makes about me, and this one looks like in

22   relation to the 1218 case.

23   Q.   Okay.  And what date is that document?

24   A.   October 30.

25   Q.   Of what year?

36

1    A.    That would be last year.

2    Q.    All right.  And are you able to read the

3    highlighted portion?

4    A.    Yes.  It says "Now we have been retained by a

5    private party to investigate, news gather and publish

6    on the story with potential for a documentary on

7    social media and cancel culture."

8    Q.    Okay.  And that article was written by who?

9    A.    Richard Luthmann.

10   Q.    Okay.  Now, I'm just going to have you briefly

11   review these and confirm.

12        MR. LUTHMANN:  I'm going to object to all of

13   this outside the scope.  It's a waste of the Court's

14   time.  He's going to go through two years of Substack

15   selectively.  If he wants to have a record like this,

16   then he should take Florida Gulf News, New York News

17   Press, Family Court Circus.  Also my work on the

18   Gateway Pundant that I've had published there and

19   other places as well as the Frank Report.  So if you

20   want to have a survey of my journalistic materials, we

21   can do that and we'll do a full survey, or we can find

22   it's a waste of time because it far out exceeds the

23   cabin --

24        THE COURT:  All right.  Well, I'm just

25   finding a little bit of latitude, but where are we

37

1     going with these exhibits?

2             MR. CHIAPPETTA:  We're going to keep it very

3     brief.  We're just establishing Mr. Luthmann's ongoing

4     harassment prior to this case simply, and also,

5     because Mr. Luthmann had objected that my client's

6     statements weren't predicated on documents, the follow

7     up questions will be predicated on these documents.

8             THE COURT:  Well --

9             MR. LUTHMANN:  I'm going to --

10            MR. CHIAPPETTA:  As it relates to

11    establishing excusable neglect for purposes of this

12    particular hearing.

13            THE COURT:  Well, I mean, I've already heard

14    that I guess he attempted to block email

15    communications from Mr. Luthmann.

16            MR. CHIAPPETTA:  Yes.

17            THE COURT:  Sometime from mid 2024 I guess

18    to the present.

19            MR. CHIAPPETTA:  And this is why.  He's not

20    going to read any of these, Your Honor.

21            THE COURT:  I don't know if I necessarily

22    really need why.  So -- because really I'm just

23    focussed on he told me he got the notice.  He

24    nevertheless did not appear.  I am really, really just

25    focussed on despite receiving the notice why wasn't he

38

1    here a month later, and that's really about it.  So --

2            MR. CHIAPPETTA:  I mean, I'm not sure what

3    else my client --

4            THE COURT:  I guess this is really showing

5    that to the extent Luthmann was trying to, you know,

6    communicate with him that would have maybe prompted

7    him to focus more on the case and maybe be here, but

8    this is cutting against that grain.  This is going the

9    opposite direction.  This is saying you never --

10   you're basically saying here that he didn't get emails

11   from Mr. Luthmann.

12           MR. CHIAPPETTA:  Well, this is --

13           THE COURT:  The why, I don't know why that

14   matters to me.

15           MR. CHIAPPETTA:  Well, it matters because

16   there was a pattern that establish -- there was a

17   pattern of behavior as indicated in those documents

18   where Mr. Luthmann had called my client a member of

19   the China Communist Party.  They've called him a Jihad

20   terrorist.  He's went on and said a bunch of other

21   malicious things.  He's posted I guess simulated Only

22   Fans photographs in there and has made other

23   outrageous claims.

24           So I think the underlying basis for these

25   documents really is just to show the Court the

39

1    outrageousness of what Mr. Luthmann's statements is

2    what caused my client to essentially block him well

3    before this case was ever filed and that's what --

4    that's what we are simply establishing here.

5              THE COURT:  Okay.  Well, obviously I can

6    weigh in the balance that Mr. Norshirvan chose to

7    block all these communications sometime prior to this

8    suit being initiated.

9              MR. CHIAPPETTA:  Uh huh.

10             THE COURT:  And then maybe we should

11   explore -- well, okay.  I guess maybe you are

12   explaining maybe this is offering some context about

13   because it would be a question that I'm thinking about

14   asking is why didn't you unblock when you are involved

15   in a lawsuit with Mr. Luthmann.  Now you need to

16   communicate with him.

17             So I guess you're trying to maybe explain

18   why he did not unblock, but nevertheless, I don't know

19   if you can offer any rational for that because you

20   need to communicate with your party opponent.  So it's

21   a -- I know it's a tricky situation.

22             MR. CHIAPPETTA:  I would request just a

23   little bit of leeway to allow this and maybe one more

24   document to come in as it relates to the level of

25   harassment that he's received.

40

1          THE COURT:  All right.  So these are all

2    things written by Mr. Luthmann and published by Mr.

3    Luthmann?

4          MR. CHIAPPETTA:  Yes.  They're admissions by

5    a party opponent here.

6          THE COURT:  All right.  Well, let's -- I'm

7    going to give him a little bit of leeway to kind of

8    give some context, but it's a very limited reason why

9    we are going down this road.  I think really it's

10   going to go to why Mr. Norshirvan didn't unblock you

11   once he was in a lawsuit with you.

12         MR. LUTHMANN:  I have another objection,

13   just it's very technical.  It's that Mr. Norshirvan is

14   using and and Mr. Chiappetta is using terms of legal

15   art and I'd like to be clear that if terms are legal

16   art are terms of legal art or if they are how Mr.

17   Norshirvan feels.  Harassment is a crime but he might

18   feel harassed.  I have no problem with saying he feels

19   harassed.  That's his state of mind, but let's make

20   clear what's harassment as a state of mind, harassment

21   as a crime, defamatory.

22         THE COURT:  Understood.  No, I'm taking it

23   how you perceive things.

24         MR. LUTHMANN:  Okay.

25         THE COURT:  Not necessarily a settled fact

41

1    or anything like that.

2                MR. CHIAPPETTA:  Just a very brief rebuttal.

3    To the extent possible, we -- in addition to how Mr.

4    Norshirvan is feeling, we are potentially claiming

5    under the Florida Cyber Stalking Statute actual cyber

6    harassment.

7                THE COURT:  You're contemplating a potential

8    counterclaim?

9                MR. CHIAPPETTA:  Oh, there will be counter

10   claims if this suit survives, Your Honor.

11               THE COURT:  All right.  Well, we'll see if

12   we get that far.

13               MR. CHIAPPETTA:  All right.

14               THE COURT:  All right.  So again, let's

15   just -- I think we've kind of established that to the

16   extent this is helpful for me about what we're doing

17   today it really goes to why Mr. Norshirvan didn't

18   unblock Mr. Luthmann when this suit was initiated.

19               MR. CHIAPPETTA:  Yes, Your Honor.  Thank

20   you.

21               THE COURT:  I still have some questions

22   about that because I feel like I've seen in the things

23   filed with us some e-mails back and forth between

24   them, so I don't know if his effort to block has been

25   entirely successful.  It seems like they have engaged

42

1    in written communications with each other.  So you

2    might want to clarify that as well.

3            MR. CHIAPPETTA:  Okay.

4            THE WITNESS:  May I?

5            MR. CHIAPPETTA:  Well, one thing at a time.

6    Let me get through the documents and then we'll

7    address this question.

8    Q.    Okay.  So as it relates to the initial documents

9    I asked you to review, do you know what they are?

10   A.    Yes.  They are all about me and my family.

11   Q.    What are they?

12   A.    This is Richard's articles that he publishes and

13   emails that -- and physically mails in some cases that

14   is defamatory, harmful, upsetting material about me

15   and my family.

16   Q.    Okay.  And where does Richard Luthmann publish

17   those?

18   A.    He publishes online on Substack.

19   Q.    Okay.  And are you able to give just a very brief

20   few examples of statements made within those articles

21   by Mr. Luthmann?

22   A.    Yes.  Ones that stick out specifically --

23           MR. LUTHMANN:  I'm going to object to the

24   foundation.  Unless he's testifying from personal

25   knowledge, this is hearsay and there's no foundation

43

1    for his statements.

2         THE COURT:  No.  I overrule.  They are

3    admissions of a party opponent to the extent we're --

4    the documents themselves and now we're just talking

5    about their content.

6         MR. LUTHMANN:  I would object to that as

7    well because they have not differentiated within that

8    stack of documents things authored by Richard

9    Luthmann, coauthored by others or authored people who

10   are not Richard Luthmann.

11        So I would like a chance to voir dire those

12   documents to pick out those things and sort them into

13   the categories if they are going to say they're party

14   opponent admissions what are Richard Luthmann, what

15   are Richard Luthmann and others and what are non

16   Richard Luthmann.  Mr. Chiappetta has failed to do

17   that, and that's why this entire line is objectionable

18   based upon this evidentiary premise.

19        THE COURT:  Okay.  We'll take those up if

20   they're offered into evidence.

21        MR. CHIAPPETTA:  Okay.  We'll address that.

22   Q.   Do you know Mr. Luthmann's pen name?  Do you

23   recognize Mr. Luthmann's pen name, M. Thomas Nash?

24   A.   Yes.  Yes, that's him.

25   Q.   Okay.  Do you recognize the pen name Rick

44

1    LaRiviera?

2    A.    Yes.  They're all him.

3              MR. LUTHMANN:  Objection.  Basis.

4              THE COURT:  Well, okay.  Again, let's try to

5    stay -- this is a pretty narrow issue I'm grappling

6    with today, and maybe I want to caution Mr. Luthmann.

7    I said earlier I questioned whether or not any

8    examination of you today is even relevant to anything.

9              MR. LUTHMANN:  Okay.

10             THE COURT:  But an objection like that might

11   end up making you testify today relevant.

12             MR. LUTHMANN:  Okay.

13             THE COURT:  So let's be careful about the

14   positions we take.

15             MR. CHIAPPETTA:  I would just agree, Your

16   Honor, because I would like to have Mr. Luthmann

17   testify to one of his company names which is Rick

18   LaRiviera on Sun Biz.

19             THE COURT:  I'm sorry?

20             MR. CHIAPPETTA:  Mr. Luthmann owns a copy

21   Rick LaRiviera LLC on Sun Biz.

22             MR. LUTHMANN:  That's untrue.

23             THE COURT:  Okay.  Well, let's take that up

24   when we need to get to it.

25   Q.    Okay.  So Mr. Norshirvan, are you able to briefly

45

1    identify a few of the statements that Mr. Luthmann has

2    provided within those Substack articles?

3    A.    Throughout these statements, he consistently

4    refers to me as some sort of -- someone with some sort

5    of mental illness or mental disorder.  He calls me a

6    racist.  He refers to me as a pedophile.  He -- just

7    like every horrible thing that he could possibly

8    imagine, he -- it's very upsetting to look at.  He

9    makes horrible accusations about my wife who does not

10   even have an online presence.

11   Q.    Has he equated your wife to utilizing black face?

12   A.    Yes, he did.  He took a photo of my wife in

13   zombie makeup with like the eyes whited out, like

14   white out contacts, flesh hanging from the skin from

15   the production of Night of the Living Dead where the

16   character Judy canonically dies in a car explosion and

17   becomes a zombie.

18            She's covered in soot.  This was an on stage

19   play.  It's done every year.  It's a fan favorite.

20   It's a cult classic, Night of the Living Dead, Georgia

21   Baro.  The sad part is that Judy comes in at the end

22   with Tom who blew up in the truck explosion as zombies

23   with again flesh hanging from their skin, and he

24   compares this monster to black face.  He said this is

25   an image of someone doing black face which I find very

46

1    disturbing in many ways, one, to even make that

2    mistake, but two, like that's defamation of my wife.

3    Q.    Now, Mr. Norshirvan, just very carefully, have

4    you ever seen Mr. Luthmann publish any photographs

5    from your former Only Fans account?

6    A.    Yes.  He would publish simulated photos and claim

7    that it -- just making crazy claims about it, that

8    it's evidence of pedophilea, that it's evidence of

9    some sort of abuse or something, and then he

10   distributes that anywhere and everywhere he can with

11   these defamatory lies.

12   Q.    Did Mr. Luthmann ever accuse you of violating

13   federal law?

14   A.    Yes.  Yes.

15   Q.    Okay.

16   A.    He makes up randoms.

17          THE COURT:  Okay.  Can I ask a point of

18   clarification on that?  And Mr. Chiappetta, you can

19   follow up if you like.  Mr. Norshirvan, you said

20   simulated -- Luthmann made reference of simulated

21   photos of this Only Fans account.  So are you saying

22   you generated this simulated content and put it on

23   Only Fans or he created simulated content and

24   attributed it to your Only Fans?

25          THE WITNESS:  Oh.  The image that I posted

47

1    up was people simulating sexual acts, and he didn't --

2    I'm not saying he had anything to do with like

3    generating anything.  I'm not making a claim of AI or

4    something.

5              THE COURT:  Okay.  I see.  Okay.

6    Understood.

7              MR. CHIAPPETTA:  Your Honor, at this time, I

8    would move Defendant's 2 into evidence.

9              MR. LUTHMANN:  I'm going to object, outside

10   the scope, that the Court has already annunciated

11   relevance.  I've already stated for the record 401,

12   402, 403, Federal Rules of Evidence.

13             THE COURT:  All right.  And again, these are

14   a collection of what?  12, 15, 20 articles.

15             MR. CHIAPPETTA:  Somewhere -- I don't have

16   an exact number.  I mean, I can count if you want,

17   Your Honor, but yeah.  They're all articles posted on

18   Richard Luthmann's Substack authored by Richard

19   Luthmann and also some under pen names like M. Thomas

20   Nash or Rick LaRiviera all believed to be Mr.

21   Luthmann, and they all address my client in a very,

22   very false negative.

23             THE COURT:  All right.  They're just being

24   offered for going to Mr. Norshirvan's state of mind

25   about whether or not he wanted to block or unblock

48

1    communications with Luthmann?

2            MR. CHIAPPETTA:  Correct, Your Honor.

3            THE COURT:  All right.  For that limited

4    purpose, I'll take them in.

5            MR. CHIAPPETTA:  Thank you, Your Honor.

6            THE CLERK:  Thank you.

7    (The following exhibit was received into evidence:

8    EXH Number 1-2)

9    Q.    All right.  And so I guess my next question is

10   what the Court's question.  After having explained

11   what you have done so far, why did you not unblock Mr.

12   Luthmann when Mr. Luthmann filed a lawsuit against

13   you?

14   A.    Because Luthmann -- Mr. Luthmann continues to

15   within whatever Court things that he's sending me send

16   me horribly abusive even disguised in a lot of these

17   Court required emails, at the end he'll say that

18   because he doesn't believe I can speak English he's

19   going to translate it all into Farsi for me, and then

20   he'll repaste the whole thing in Farsi as if I cannot

21   speak English.  He knows full well I can speak

22   English, but all of it is just -- in my opinion, it is

23   a roose to force proximity to me when I'm trying to

24   get away from him.

25            Now, as far as Court things go, you're

49

1    right.  I did try to respond to some things that I

2    felt I had to meaning not really respond but like

3    things that the Court had to have me do whether it was

4    saying to Luthmann, okay, do you want to settle this?

5    Do you have a settlement offer?  And then seeing those

6    offers disingenuous or, you know, underhanded, I would

7    go, okay, I'm not going to waste time with this

8    anymore, stop contacting me, but any communication

9    I've had with Luthmann I only had because I felt that

10   I had to for this Court and I wanted to make sure I

11   was respecting this Court.

12            The miscalendaring, I would not have

13   purposely done that.  I made a mistake, I did, but

14   also when dealing with Luthmann it gets me very

15   uncomfortable.  This is all like -- this isn't just

16   the papers that you've got.  This is very upsetting

17   and it's very upsetting for me because it includes

18   people that I love and it says horrible, awful things

19   about them which hurts a lot more of course than what

20   it says about me.

21            Thinking about these things or even being

22   near this man is difficult for me.  Mentally,

23   emotionally.  I physically am like shaking looking at

24   those forms.  I don't understand the kind of cruelty.

25   I would never do that to anybody else.  No matter how

50

1    much I hate them, I could not obsess over people for

2    that long and that excessively.  It's hard.

3            It's really hard, and so I am doing my best,

4    and, you know, as you can imagine for me, it feels

5    very unfair being forced to have to answer to this

6    person from my position at least, and I do -- but I do

7    understand that it's not about answering to him, it's

8    about answering to you and I do want to do that

9    because I intend to show you, prove to you that this

10   man is the one being malicious and I'm just trying to

11   do my best here.

12           I mean, my lawyer, he's also my lawyer in my

13   other cases as well.  We're both spread thin, and I

14   believe that's the purpose of this.  I believe that's

15   why he filed this lawsuit.  This is a man who has

16   called me a pedophile over and over -- not my lawyer

17   but Luthmann has called me pedophile over and over

18   again, and when we were at the evidentiary hearing, he

19   rushed me --

20           THE COURT:  I think you might be getting too

21   far off the question.

22           THE WITNESS:  I'm sorry.

23           THE COURT:  So let's go back to more of a Q

24   and A.

25           THE WITNESS:  I'm sorry, Your Honor.

51

1          MR. CHIAPPETTA:  I apologize, Your Honor.

2          THE COURT:  Uh-huh.

3   Q.   Okay.  Now, just as it relates to ongoing

4   harassment, can you tell me about the letter your YMCA

5   received on August 30, 2025?

6          MR. LUTHMANN:  Objection.  How does he have

7   personal knowledge of what the YMCA did?  It's going

8   to be a hearsay response.

9          MR. CHIAPPETTA:  Okay.  I'll rephrase the

10  question.

11         *THE COURT:*  All right.

12  Q.   Are you aware of a letter your YMCA received?

13  A.   Yes.

14  Q.   How?

15  A.   They brought it to my wife's attention because it

16  was an envelope that included photos of myself and my

17  wife claiming that we're pedophiles and having our

18  name and address and our faces printed on it, and it

19  was sent to several businesses around my town and it

20  matches the exact type of harassing and defamatory

21  language that Luthmann uses in the Substack articles

22  and the kind of harassment I've been facing.

23         MR. LUTHMANN:  Objection.  He has not made

24  the connection to why the YMCA sent it to him.

25         MR. CHIAPPETTA:  Okay.  So we'll go back.

52

1    Q.    What happened after the YMCA received the letter?

2    A.    After they received the letter, they immediately

3    notified my wife, and my wife came and spoke to her

4    boss about it because we have -- unfortunately have to

5    become accustom to this type of harassment and how to

6    address it as soon as it happens.  So that's how we

7    became aware of it.

8    Q.    And has --

9              MR. LUTHMANN:  I'm going to object.  It's a

10   fact out of evidence here.  Does he work at the YMCA?

11   Is there some connection?  I'm not getting that.  He

12   hasn't put that into evidence.  I want to hear the

13   connection with the YMCA and why a third-party would

14   hand him the letter unless he has some knowledge of

15   the person.  I don't understand what's going on here.

16   Q.    What is the size of your town?

17             THE COURT:  I think this is just going again

18   kind of that state of mind thing we were talking about

19   a minute ago, and I don't think I want to belabor the

20   point too much more.

21             MR. CHIAPPETTA:  Okay.

22             THE COURT:  But is there anything much more

23   different from that event to what we already talked

24   about with these Luthmann articles?

25             MR. CHIAPPETTA:  Yes.  This event is

53

1    significantly more severe because there was multiple

2    letters --

3              THE COURT:  When was it?  Just so I can

4    maybe get an idea about --

5              MR. CHIAPPETTA:  This was August 30.  This

6    was a couple weeks ago, ten days ago.

7              THE COURT:  Oh.

8              MR. CHIAPPETTA:  11 days ago maybe.

9              THE COURT:  Okay.  Let's not -- I don't

10   think that would be helpful for what we are talking

11   about today.

12             MR. CHIAPPETTA:  Understood, Your Honor.

13             THE COURT:  Okay.

14             MR. CHIAPPETTA:  Then are you -- Your Honor,

15   if I may request, are you able to refresh my memory of

16   that other question that the Court had?

17             THE COURT:  No.  Well, yeah.  When you are

18   done, I'll probably ask a few and you can follow up

19   and Mr. Luthmann can follow up as well.

20             MR. CHIAPPETTA:  Okay.

21             THE COURT:  But yeah, I think we're

22   primarily concerned again with --

23             MR. CHIAPPETTA:  Okay.  So I think I have

24   it.

25             THE COURT:  He had the notice and he

54

1  nevertheless wasn't here and I'm trying to understand

2  why in that four week interim despite any other

3  notices and orders he might have received from us and

4  other communications from Mr. Luthmann, in that entire

5  one month span nothing caused him to circle back and

6  actually see the conflict on his calendar or apprise

7  us about the conflict.

8          MR. CHIAPPETTA:  Okay.

9  Q.   So just to be clear that it was not -- that you

10  never calendared the Rule 16 Conference date; correct?

11  A.   I did not do that.

12  Q.   Okay.  So you couldn't go back and see it on your

13  calendar or a conflict; correct?

14  A.   Correct.  I -- yes.

15  Q.   Okay.  Now, setting that aside, I believe the

16  Court had mentioned seeing you respond to Luthmann's

17  emails at some point in time.

18  A.   Uh huh.

19  Q.   Are you able to explain how that occurred?

20  A.   Yes.  As I actually touched on it earlier, I

21  wasn't responding to his specific emails.  I was just

22  sending him an email, and if I did, it was just go to

23  my Spam, grab the most recent one I see and respond to

24  it because I saw on the docket and I was trying to do

25  my best on my own here that there was certain things I

55

1    needed to do.

2         I believe I had to meet and confer or

3    something.  I had to see if there was a chance for

4    a -- what is it calls -- a settlement -- not

5    settlement but a resolution.  So I asked him if he has

6    a genuine offer because I felt that I was supposed to

7    do that, but that's what that was.  I was responding

8    because I was making an effort to respect the Court's

9    deadlines and I just made a mistake of course.  I was

10   negligent about the --

11   Q.   Okay.

12   A.   -- the hearing.

13   Q.   So just to be clear, your testimony here today is

14   that when you want to respond to Mr. Luthmann or feel

15   the need that you have to respond to Mr. Luthmann, you

16   go to your Spam email account and you pull up an email

17   and then you write a -- write something and send it

18   directly to Mr. Luthmann?

19   A.   Yes.  Yes.

20   Q.   Okay.  Okay.

21        MR. CHIAPPETTA:  Your Honor, I don't think I

22   have any further questions for Mr. Norshirvan.

23        THE COURT:  All right.  Well, let me ask --

24   let me kind of ask some points of clarification along

25   these lines.

56

1          Mr. Norshirvan, you said the vacation was

2    from July 5 to August 5?

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  And during that time you still

5    had access to your email?

6          THE WITNESS:  I would still have access to

7    my email during that time, yes.

8          THE COURT:  All right.  I take it at least

9    some time during that one month span you were probably

10   corresponding with folks by email?

11         THE WITNESS:  I don't actually use email too

12   often, but I do have access to my email during that

13   time.

14         THE COURT:  Okay.  All right.  So I think

15   you've already told us that obviously the Court has

16   been emailing you.  Until Mr. Chiappetta appeared, all

17   of our orders and notices have gone to you directly

18   here.

19         THE WITNESS:  The Court will send me mail,

20   physical mail.  As far as mail through email, I

21   believe you had -- you had said that you had been

22   emailing me and I agreed with you.  But again, I

23   don't -- my email is -- like it's just full of Spam

24   and stuff, and I don't -- I don't recall receiving the

25   actual notice through email.  I just recall the

57

1    physical one which, yeah, I did receive.

2              THE COURT:  All right.  And because we sent

3    this notice out June 17 and that notice refers to

4    things that were previously referred to in the order

5    we docketed back in April, our civil action order

6    where we tell the parties that they need to get

7    together, they need to talk about discovery in the

8    case and put together a case management report for the

9    case, those kinds of things.

10             THE WITNESS:  Your Honor?

11             THE COURT:  And then we continue to refer to

12   that civil action order and a couple more orders after

13   June 17.  So I'm trying to understand why given that

14   civil action order from April that you would have

15   received before June that would have put you on notice

16   about the need that, you know, there's going to be a

17   conference here about a schedule.

18             You're going to have to talk to Mr. Luthmann

19   about discovery in the case, and then we sent you two

20   more orders after June 17 that remind you of that

21   initial order from April.  Why that wouldn't have

22   jogged your memory about the June email or -- yeah,

23   the June email that gave you notice of the hearing.

24   Why wouldn't that have caused you to recall, oh, I

25   have to be in Court in July.

58

```
 1              THE WITNESS:  Again, Your Honor, once I
 2    had -- I need to put it on my calendar immediately and
 3    I failed to do so which I will not do again.  Again, I
 4    hired a lawyer to make sure I don't make these kind of
 5    mistakes again, but I will say that I -- I was not --
 6    I believe during that time there was also a omit where
 7    Mr. Luthmann had to rewrite or his claim or something.
 8    If I'm not mistaken, he had to rewrite it or redo
 9    something, and so I think that probably added to my
10    confusion of whether or not this is something that is
11    happening because, again, it's not like it was in the
12    back of my mind.  I failed to calendar that, and I
13    apologize for that, Your Honor, but I -- there's a lot
14    of different elements with that and then also the
15    evidentiary hearing the month before and me just kind
16    of hoping, you know, that this is -- you know, you
17    hope for the best when you are in Court.  It doesn't
18    always work out the way you want but you do hope for
19    the best, and I did hope that after he pled the fifth
20    to witness intimidation that hopefully I would not
21    have to --
22              MR. LUTHMANN:  Objection.  This is a
23    narrative.  You want to tell a story, you go into
24    (inaudible).
25              THE COURT:  Yeah.  Let's stay focussed on
```

59

1  the question I asked you.

2         THE WITNESS:  Sorry.  From my perspective, I

3  thought this would not be someone I would have to

4  worry about any longer.  I understand now that that's

5  not how that works, and so there was just other

6  factors in there that was while you make the argument,

7  yes, that there's things that should have reminded me,

8  yes, it should have.  There were also things that were

9  making me think that, hey, I'll finally be free of

10 this guy.

11         *THE COURT:  Hmm.*

12         THE WITNESS:  Which is what I hold onto.

13         THE COURT:  You are involved in the two

14 other cases here in Fort Myers.

15         THE WITNESS:  Uh-huh.

16         THE COURT:  And are you involved in any

17 other lawsuits currently?

18         THE WITNESS:  No, Your Honor.

19         THE COURT:  Okay.

20         THE WITNESS:  No.

21         THE COURT:  And then prior to being involved

22 in these three lawsuits that we have in Fort Myers,

23 had you been involved in other litigation?

24         THE WITNESS:  Nothing more than like it was

25 like a car accident, a minor fender bender one back

60

1    like ten years ago, or like something about getting my

2    deposit back or something with real estate, but again,

3    small -- no, nothing like this.  Nothing -- no civil

4    action to this degree.  I have no criminal record.  I

5    don't -- yeah.

6              THE COURT:  Okay.  The prior matters that

7    you mentioned like sounds like a real estate deposit

8    and what was the other thing again?

9              THE WITNESS:  Yeah.  Another one was a

10   fender bender.

11             THE COURT:  Oh, yeah.  Okay.

12             THE WITNESS:  Yeah.

13             THE COURT:  So were you always represented

14   by counsel in those matters or did you handle them pro

15   se?

16             THE WITNESS:  For that, there was insurance

17   to deal with whatever happens with the -- I don't

18   remember or recall what had happened but I believe I

19   was 18 or 20 at the time.  The other time -- or no, in

20   my 20s, and the other time, the real estate thing,

21   that was not for me.  I worked for a company and they

22   would send their -- their real -- their lawyers but my

23   name was only on it because the -- say if like the

24   tenant put my name on it because I was the one they

25   were giving rent to but I had no part of it, so no.

61

1          THE COURT:  Okay.  All right.  Just trying
2    to get a feel for your litigation experience.
3          THE WITNESS:  Yeah.  I understand, Your
4    Honor.
5          THE COURT:  And well, and also after we sent
6    this notice out in June and before you were
7    represented by counsel, you filed a few things between
8    June 17 and July 17, and again, I'm curious why if you
9    are filing things in the case, you are attending to
10   the case, why that didn't cause you to think about the
11   notices from the Court in mid June that you needed to
12   be here in mid July.
13         THE WITNESS:  Yes fair question, Your Honor.
14   I did what I believe -- I was filing and responding to
15   everything I believed that I was supposed to be filing
16   or responding to.  That only shows that I was ignorant
17   of that and didn't -- wasn't considering it because I
18   didn't think it was a matter.
19         I possibly thought because he had to rewrite
20   his that maybe something like that would have gotten
21   pushed, I can only speculate, but it -- it is likely
22   because I didn't think that there was anything for me
23   to do in that regard because I miscalendared.
24         THE COURT:  If you see it from our
25   perspective, that's a bit confusing that if you keep

62

1    filing things with us, why isn't that reminding you

2    about a notice that you received from us?

3              THE WITNESS:  Of course, Your Honor, and I'm

4    grateful that you allowed me the opportunity to try to

5    explain myself the best I can.

6              THE COURT:  All right.  I think those are

7    the questions that were generated when I read your

8    show case response, and -- oh, and then all right.  So

9    when this litigation gets initiated and now you know

10   you are a party, you were obviously representing

11   yourself for a while.  You know when the lawsuit

12   starts that you have blocked communications with

13   someone who now you're engaged in litigation with, and

14   yet I understand what you've offered as far as your

15   state of mind about why you don't -- again, some of

16   your thoughts about why you don't want to review

17   emails from Mr. Luthmann, but I want to see if you

18   have any explanation about why you didn't apprise the

19   Court about that predicament.  You know, why not tell

20   us I'm involved in this lawsuit with someone with whom

21   I've blocked communications and here's why and is

22   there any other way we can come up with a way for the

23   parties to, you know, communicate.  I never got

24   anything like that from you.  So why not?

25              THE WITNESS:  I didn't know I could do that.

63

1    I would have sent that to you right away, Your Honor.

2    There's a lot I have to say, but I don't want to, you

3    know, bombard you.  I want to do it the right way.  I

4    apologize.

5                THE COURT:  All right.  Mr. Chiappetta, did

6    anything I ask cause you to want to follow up in any

7    way?

8                MR. CHIAPPETTA:  No, Your Honor.

9                THE COURT:  All right.  Mr. Luthmann, do you

10   want to ask -- do you have any questions that we

11   haven't already explored about this?

12               MR. LUTHMANN:  I do.  I do.

13               THE COURT:  Again, this very limited issue.

14               MR. LUTHMANN:  I'll go very briefly.  Yes,

15   Your Honor.  Okay.

16               CROSS EXAMINATION BY MR. LUTHMANN:

17   Q.   Okay.  Just to confirm, your name is Danesh

18   Norshirvan?

19   A.   Yes.

20   Q.   Okay, and do you go by any other names?

21   A.   No.

22   Q.   Is your middle name John?

23   A.   That's not a real name, no.

24   Q.   Have you ever gone by Danesh John Norshirvan?

25   A.   I have written that down before, yeah.

64

1    Q.    Oh, so you do go by other names besides Danesh

2    Norshirvan?

3    A.    No.    John is a term of endearment in Farsi.    It

4    means dear.

5    Q.    Okay.

6    A.    So -- and we commonly use it.    So Danesh John is

7    something my mother calls me, but that's not my middle

8    name.

9    Q.    But you've been referred to that by others, so

10   others --

11   A.    Other Persian people may call me that or I may

12   refer to myself as that because that is a term of

13   endearment.    It's not a name.

14   Q.    Okay.    So you've never used the name Danesh John

15   Norshirvan.    Others just used it about you?

16   A.    Are you still confused about this?

17               MR. CHIAPPETTA:    Objection.    Misstating

18   facts.

19               THE WITNESS:    Are you still confused about

20   this, sir?    John is not a name.

21               MR. LUTHMANN:    So Danesh John Norshirvan --

22               THE COURT:    Hold on.    Just a second.

23               MR. LUTHMANN:    John is not a middle name?

24               THE COURT:    I have an objection.    I got to

25   at least say something about it.    I'm going to

65

1    overrule it for now, but let's not spend too much more

2    time about this name issue.

3              MR. LUTHMANN:  Okay.  I'll move on.

4              THE COURT:  And maybe slow down a little bit

5    so the Court Reporter can catch everything.

6              MR. LUTHMANN:  Sorry.

7              THE COURT:  And if there's an objection, I

8    can say something about it before you ask any other

9    questions.

10   Q.    Who is Erica Sabonis?

11             MR. CHIAPPETTA:  Objection, relevance.

12             THE COURT:  Okay.  Where is this going?

13             MR. LUTHMANN:  That's a name that I believe

14   that he's used before as a sock puppet or catfish.  So

15   he just said on the record he doesn't use any other

16   names besides Danesh Norshirvan, and there's evidence

17   in the 1218 case that Mr. Chiappetta knows all about

18   that Erika Sabonis was a sock puppet name that was

19   used by Danesh John Noshirvan, and he admitted that in

20   his depositions.

21             THE COURT:  All right.  All right.  Mr.

22   Chiappetta, anything else?

23             MR. CHIAPPETTA:  Your Honor, Mr. Luthmann is

24   attempting to litigate on behalf of Jennifer Couture

25   and Ralph Garramone, issues in the 340 case and the

66

1    1218 case that have zero relevance to the June 17 Rule

2    16 discovery conference.  Absolutely irrelevant.

3              THE COURT:  All right.  Well, I'll allow a

4    little bit of latitude about some basic biographical

5    about Mr. Noshirvan including his name and any other

6    names he goes by.

7              MR. LUTHMANN:  I'm asking that now only,

8    Your Honor, because I just asked him do you go by

9    other names, he said no, and then I asked Erica

10   Sabonis, the name that he goes by --

11             THE COURT:  Understood.

12             MR. LUTHMANN:  -- and he lied.

13             MR. CHIAPPETTA:  Objection.

14             THE COURT:  Well, hold on.

15             MR. LUTHMANN:  In my opinion.

16             THE COURT:  Hold on.  I don't think we have

17   an answer yet.  So I'll let you ask the question.

18             MR. CHIAPPETTA:  Objection to the extent Mr.

19   Luthmann is testifying.

20             THE COURT:  Understood.  Understood.

21   Q.    Who is Erika Sabonis?

22   A.    I don't know.  I've used an account with that

23   name.  I've never gone by Erica Sabonis.

24   Q.    Okay.  So you make a distinction then between

25   using an account with a name and going by a name; is

67

1    that correct?  Is that fair?

2    A.    So Erica Sabonis does not exist.

3    Q.    Does Danesh Norshirvan exist?

4    A.    I'm standing in front of you, sir.

5    Q.    Okay.  Do you have accounts that you use that go

6    by Danesh Norshirvan?

7    A.    The accounts that I have are all public.

8    Q.    Do they go by Danesh Norshirvan?

9    A.    They go by that Danesh guy.

10   Q.    That's good.  We're getting somewhere.  I have a

11   couple of questions to just see that you're oriented

12   to time, place and reality.  The first question is do

13   you know what today's date is?

14   A.    Yeah.  We're -- it's September 10, I believe.

15   Q.    Okay.  Great.  And who is the current president

16   of the United States?

17   A.    I don't see the relevance.  Donald Trump is the

18   current president.

19   Q.    Okay.  Great.  And you do understand you are

20   testifying under oath and expected to answer

21   truthfully; right?

22   A.    Yes.

23   Q.    Okay.  And you're the defendant in this case;

24   correct?

25   A.    Yes.

68

1   Q.   Okay.  And how old are you?

2   A.   I'm 38 years old.

3   Q.   Okay.  And you just said that you commonly go by

4   the online handle @thatDaneshguy; right?

5   A.   Yes.

6   Q.   And under that handle, you have a large online

7   following, over 2.5 million followers across all

8   platforms; is that correct?

9   A.   Yes.

10   Q.   Okay.  Are you a mega influencer?

11            MR. CHIAPPETTA:  Objection.  How is this

12   relevant, Your Honor?

13            THE COURT:  Yeah.  Now we're getting a

14   little too far off field from what we need to talk

15   about today.

16            MR. LUTHMANN:  Okay.

17            THE COURT:  This is a very limited purpose

18   hearing.

19            MR. LUTHMANN:  Okay.

20   Q.   Do you live in Mansfield, Pennsylvania?

21   A.   I do.

22   Q.   Okay.  And you admitted that in the sworn

23   declaration you gave to the Court related to this

24   matter; correct?

25   A.   Okay.

69

 1          MR. CHIAPPETTA:  Objection.  Is there a

 2   question?

 3          MR. LUTHMANN:  I said correct.  I answered

 4   with a question at the end.

 5          THE COURT:  Well, it was duplicative, but

 6   all right.  Go ahead.

 7   Q.   I'll restate it for the record.  In fact, you

 8   admitted in a sworn declaration that you reside in

 9   Mansfield, Pennsylvania; correct?

10   A.   Yes.

11   Q.   Okay.  Do you also reside in California?

12   A.   No.

13   Q.   Do you conduct business in California?

14   A.   No.

15   Q.   Okay.  You flew here today for the hearing;

16   correct?

17   A.   Yes.

18   Q.   Where did you fly from?

19   A.   Pennsylvania.

20   Q.   Okay.  And in the past 30 days, have you been in

21   the State of California?

22   A.   In the past 30 days, no.

23   Q.   Okay.  And so to be clear, you have children;

24   correct?

25   A.   Yes.

70

1    Q.   I've seen them on social media; right?

2    A.   No.

3    Q.   So your children --

4    A.   You posted them once.  You posted a picture of my

5    child once.  You posted a photo --

6    Q.   Your children are not --

7          THE COURT:  Whoa, whoa, whoa.  Hey.

8    Question, pause, answer.

9          MR. LUTHMANN:  Okay.

10          THE COURT:  Okay.  So I think we have I

11   don't know the fact whether he does or does not have

12   children was really relevant.

13          MR. LUTHMANN:  It's going to get -- well,

14   I'm going to get there for the California excursion

15   when he was supposed to be in the Court.  It's

16   relevant to this.

17          THE COURT:  Well, I don't think there's any

18   dispute he was in California when he was supposed to

19   be here.

20          MR. LUTHMANN:  Excuse me?

21          THE COURT:  There is no dispute he was in

22   California when he was supposed to be here.

23          MR. LUTHMANN:  Okay, but I'm going to show

24   the full pattern of the bad faith of his

25   communications and to his three million users and his

71

1    disregard for this Court.  So just give me a little

2    bit of leeway, Judge.  I'm going to stay in caveat

3    with what you want.

4    Q.    So Mr. Norshirvan, you were notified on June 17

5    of the Rule 16 scheduling conference set for July 17

6    at 11 a.m.; that's correct?

7    A.    Yes.

8    Q.    Okay.  And you received that email notice?

9    A.    I don't recall receiving an email.

10   Q.    Okay.  So you don't acknowledge receiving the

11   emails from the Court?

12   A.    I don't recall an email.

13            MR. CHIAPPETTA:  Objection.  Well, I'll

14   withdraw the objection.

15            THE COURT:  Okay.  I think he answered

16   already.

17   Q.    Okay.  And you admit in your affidavit you

18   "mistakenly forgot to add the hearing to your

19   calendar"; correct?

20   A.    Correct.

21   Q.    Okay.  And the hearing ended up conflicting with

22   a family vacation; correct?

23   A.    Yes.

24   Q.    Okay.  And you claim that the vacation in the

25   affidavit "had been planned well before this lawsuit

72

1    was filed"; is that right?

2    A.    Yes.

3    Q.    Okay.  But you actually purchased your airline

4    tickets for that trip on May 2, 2025; didn't you?

5    A.    That's not relevant to when we had planned it.

6    Q.    The Judge figures out relevance.  Please answer

7    the question.

8    A.    Excuse me?

9    Q.    The Judge figures out relevance --

10   A.    I answered your question, sir.

11          MR. CHIAPPETTA:  Objection.  Argumentative.

12          THE COURT:  All right.  That I will sustain.

13   Okay.  We know when you bought the airline ticket.

14          MR. LUTHMANN:  Was May 2, 2024.

15          THE COURT:  Right, and I know when the case

16   started was in April.

17          MR. LUTHMANN:  The lawsuit was filed in late

18   April.  Correct?

19          THE COURT:  Okay.

20          THE WITNESS:  We planned it back in January.

21   My wife and I have been talking about it for a long

22   time not that it's your business, sir.

23   Q.    But didn't you just submit evidence to the Court

24   that the proof of purchase --

25   A.    Are you confused?

73

1    Q.    Excuse me.  Can I ask my question?

2    A.    Are you confused?  That's been answered, sir.

3          THE COURT:  Let him finish his question.

4    And then it's question, objection, answer.  So --

5    Q.    Didn't you just submit evidence to the Court

6    today as well as evidence connected to your affidavit

7    that you purchased on May 2, 2025 the airline tickets?

8    A.    I submitted evidence showing the email that this

9    was planned far before June, but no, my wife and I had

10   planned it, yeah, back in January or February.  We

11   talked about it for a long time.

12   Q.    So booking flights on May 2 was not "well before

13   you knew the lawsuit"; wasn't it?

14   A.    It was well before this hearing was scheduled.

15   Q.    So regardless, you never alerted the Court that

16   you had a conflict on July 17; did you?

17   A.    Okay.

18         THE COURT:  I'm sorry.  What was the answer?

19         THE WITNESS:  I said okay.  Yes.

20         THE COURT:  Right.

21   Q.    Okay.  You did not file any motion to reschedule

22   or continue the July 17 conference; correct?

23   A.    Correct.  I should have.

24   Q.    Yeah.  And you didn't notify opposing counsel,

25   me, or the Court at all before failing to show up;

74

1    right?

2    A.    Correct, sir.

3    Q.    Okay.  And on July 17, 2025, at 11 a.m. when you

4    were supposed to be in Federal Court, you were not

5    present either in person or remotely; that's correct?

6    A.    Correct.

7    Q.    Okay.  And in fact, the Magistrate Judge Mizell

8    noticed your absence on the record and issued an order

9    to show cause before you failed to appear; right?

10   A.    Please repeat that.  I didn't hear you clearly.

11            MR. CHIAPPETTA:  Objection.  Your Honor,

12   can -- are you able to instruct Mr. Luthmann to slow

13   down?  I can barely keep up with what he's saying.

14            MR. LUTHMANN:  Sorry.  I'll slow down.  I'll

15   reask that.

16            THE COURT:  Thank you.

17   Q.    And in fact, Magistrate Judge Mizell noted your

18   absence on the record and issued an order to show

19   cause because you failed to appear; right?

20   A.    Yes.

21   Q.    Okay.

22            MR. LUTHMANN:  Your Honor, may I approach

23   the witness?

24            THE COURT:  Yes.

25            MR. LUTHMANN:  Okay.  I can get this in

75

1    either as a judicial notice or as based on his

2    testimony, but it is the Court's Rule 14 -- 16B

3    Conference notes that were filed as Document 40 in the

4    case.

5              THE COURT:  All right.

6              MR. LUTHMANN:  I would like that offered.

7    I'll go through my basis.

8              THE COURT:  This is -- I am sorry, what

9    document?

10             MR. LUTHMANN:  This is Document 40 in this

11   case filed on 7/17/25, the Court's notes.

12             THE COURT:  Our minutes, yes.

13             MR. LUTHMANN:  Okay.

14             THE WITNESS:  Your Honor, I received a

15   different thing in the mail.  It actually had

16   different names on it.  I believe I gave it to you.

17   This is another thing that led me to a lot of

18   confusion.  I received something from the Court but it

19   wasn't meant for me.  It was meant for another case.

20   Can my attorney show you that?

21             THE COURT:  Well, let's -- you'll have a

22   chance on rebuttal to ask you some follow up

23   questions.

24             THE WITNESS:  Sure, sure.

25             THE COURT:  Unless he wants to ask you about

76

1    this for now.

2            THE WITNESS:  Sure, sure.

3    Q.   So looking at that document, these minutes were

4    by the Clerk of the Court for the Middle District of

5    Florida; correct?

6    A.   It looks like that's what this is, yes.

7    Q.   And according to these minutes, you did not

8    appear at the Rule 16B Conference; correct?

9    A.   Correct.

10   Q.   Okay.

11           MR. LUTHMANN:  Your Honor, plaintiff moves

12   this exhibit into evidence as a record showing

13   defendant's non appearance on July 17.  It's a public

14   record under 803BA, and it's self authenticating under

15   9021 based on this statement.

16           THE COURT:  Okay.  Well, I don't think I

17   need to take it into evidence.

18           MR. CHIAPPETTA:  Your Honor, there's no

19   objection.

20           THE COURT:  It's already on our docket.

21   It's our minutes.

22           MR. LUTHMANN:  All right.

23           THE COURT:  There's also no dispute he

24   wasn't here.

25   Q.   Now, Mr. Norshirvan, isn't it true that on the

77

1    very date, July 17, 2025, you were actually at

2    Universal Studios Hollywood in Los Angeles enjoying a

3    theme park?

4    A.    I don't know exactly what date we went to

5    Universal Studios.  It's disturbing that you have that

6    knowledge of when I went there with my children.

7              THE COURT:  Just answer the question.

8              THE WITNESS:  I'm sorry.  At some point

9    during this vacation, yes.  We went to Universal

10   Studios.

11   Q.    Let me remind you we have video and photographic

12   evidence of you queueing for the Mario Kart ride --

13   A.    I said yes.

14   Q.    -- at the exact hour you were supposed to be in

15   the court.

16   A.    That's so --

17   Q.    Does that refresh your recollection, sir?

18             MR. CHIAPPETTA:  Objection.

19   A.    No.

20             MR. CHIAPPETTA:  Improper recollection --

21   improper attempt to refresh recollection without a

22   document.

23             MR. LUTHMANN:  Okay.  Your Honor, may I

24   approach the witness?

25             THE COURT:  All right.

78

1          THE WITNESS:  Sorry.  Mr. Luthmann, if I can
2    answer your question?
3          THE COURT:  There's no question now.  He's
4    rephrasing his question.
5          THE WITNESS:  Okay.  So this is inaccurate,
6    sir.
7          THE COURT:  Hold on.
8          THE WITNESS:  Okay.  I apologize, Your
9    Honor.
10   Q.   I'm handing the witness what has been marked as
11   Plaintiff Exhibit 2.  Mr. Noshirvan, do you recognize
12   the person in this image?
13   A.   That is King Koopa, and next to him, you'll see
14   me.
15   Q.   Okay.
16   A.   Bowser sometimes he's referred to.
17   Q.   Okay.  And this is a screen shot of your own
18   social media post; isn't it?
19   A.   It is.
20   Q.   And the post shows you at Universal Studios
21   Hollywood; correct?
22   A.   Not on that date.
23   Q.   So what date was this?
24   A.   Because of you, I never post anything the same
25   day.

79

```
 1          MR. CHIAPPETTA:  Objection, asked and
 2   answered.
 3          THE COURT:  I don't think we have an answer
 4   yet.
 5          THE WITNESS:  I would never reveal that I'm
 6   at a theme park on the internet where you have access
 7   to where I am.  I posted this days after.  As I've
 8   said many times in the comment section of all these
 9   photos when people get concerned and say don't post
10   your location, I say don't worry.  I would never post
11   something the day of.  So no, I wasn't at Universal
12   Studios the day of.
13   Q.   So thank you for your diatron.  It's a simple
14   question.  Were you at Universal Studios in California
15   on or about July 17, 2025?
16          MR. CHIAPPETTA:  Asked and answered.
17          THE COURT:  Well, pretty much, but okay.
18   That's my understanding.  Mr. Norshirvan, do you want
19   to say anything more about that?
20          THE WITNESS:  I mean, we made sure to do a
21   lot of fun stuff with the kids if that's what you are
22   trying to get at.  Yes.  We had a great time in Los
23   Angeles.  Universal Studios is one of the things we
24   did.
25          MR. LUTHMANN:  I'm going to ask the Court to
```

80

1    treat Mr. Norshirvan --

2           THE COURT:  Mr. Noshirvan, let's just answer

3    the question point blank.  I mean, you can obviously

4    be at Universal Studios for multiple days.  You have

5    one picture from one day being there.  So on that day

6    on July 17 you were supposed to be here, were you at

7    Universal Studios?

8           THE WITNESS:  No.

9           THE COURT:  All right.

10           MR. LUTHMANN:  Well, I'm going to move this

11    Exhibit 2 into evidence to establish his whereabouts

12    on or about July 17, 2025, during the missed Rule 16B

13    Conference in or around Universal Studios in

14    California.

15           THE COURT:  All right.  We've covered a lot

16    of ground.  Have we -- has he previously testified

17    where he was that day?

18           MR. CHIAPPETTA:  He has not, Your Honor.

19           THE COURT:  Okay.  Why don't we just ask

20    that question point blank?  Where was he when he was

21    supposed to be here?

22    Q.   Where were you -- on the date at 11 a.m. on July

23    17, 2025, where were you, Mr. Norshirvan?

24    A.   My kids and I were at the swimming pool.

25    Q.   Excuse me?

81

1   A.    Swimming pool.  I took my kids to the swimming

2   pool because it's warm in California.  We don't get a

3   lot of that weather, so we made sure to go to the

4   beach or the pool whenever we could.

5   Q.    Okay.  And where was the swimming pool located?

6   A.    That's -- I don't feel comfortable telling you.

7            MR. CHIAPPETTA:  Objection.  Relevance, Your

8   Honor.

9            MR. LUTHMANN:  Is there a city or state that

10  it was located in?  That's what I would like to know.

11           THE WITNESS:  Okay.  In -- I'm sorry, Your

12  Honor.  I don't feel comfortable giving him locations.

13           THE COURT:  Well, it was a long time ago.

14           THE WITNESS:  But I -- because I could

15  return to these locations, but I would like to say

16  that it's in California if that's sufficient to you.

17  Q.    Is there a local in California?  California is

18  very big state.  It's probably one of the largest in

19  the --

20           MR. CHIAPPETTA:  Objection, relevance.

21           THE COURT:  I don't think we need to go any

22  further.

23           MR. CHIAPPETTA:  Badgering.

24           THE COURT:  He's in California and he's

25  swimming on the date and time he's supposed to be

82

1    here.

2         MR. LUTHMANN:  All right.

3    Q.   So you won't give up -- give that information but

4    I'm going to ask you about Snow the Product -- Snow

5    That Product.  Who is Snow That Product?

6    A.   I'm sorry?

7    Q.   Snow That Product Podcast?

8    A.   Huh?  Oh.  Oh, you mean Snow the Product, yes.

9    She's a rapper.

10   Q.   Okay.  How do you know that rapper?

11   A.   We follow each other online.

12   Q.   Okay.  And on or about July 17 when you were

13   ordered to attend the conference, you actually sat

14   down with her for a podcast in Los Angeles; is that

15   correct?

16   A.   At some point I did a podcast with her while I

17   was in Los Angeles, yes.

18   Q.   Okay.  And I'm going to show you two things in

19   tandem Exhibits 3A and 3B.  This is 3A that has been

20   marked.  And this is 3B that has been marked.

21         Now, Mr. Norshirvan, please look at Exhibit

22   3A, and do you recognize the people in that

23   photograph?

24   A.   It looks like myself and Snow.

25   Q.   Okay.  And where were you in that picture?

83

1    A.    At her studio.

2    Q.    And that's you seated next to her taping the

3    podcast; is that correct?

4    A.    Yes.

5    Q.    And this was recorded on or about July 17?

6    A.    Possibly, I don't know.  Whatever the date says

7    here.  July 15.

8    Q.    Okay.  And turning to Exhibit 3B is this a

9    promotional image distributed publicly on social media

10   to advertise that podcast appearance?

11   A.    Yes.

12   Q.    Okay.  And it features your name and likeness

13   along Snow the Product?

14   A.    Uh-huh.

15   Q.    With the scheduled date and time of the podcast;

16   correct?

17   A.    Yes.  July 15, 6 p.m.

18   Q.    Okay.  Exhibits 3A and B show you not only

19   appeared on the podcast with Snow The Product but you

20   also publicly promoted as a featured guest prior to

21   that event?

22   A.    Please repeat your question.  I didn't hear you.

23   Q.    Exhibits 3A and 3B together show that you not

24   only appeared on the podcast with Snow The Product,

25   but you were also publicly promoted as a featured

84

1    guest tied to the event; correct?

2    A.    She publicly promoted me, yes.

3    Q.    And these events coincided with the exact period

4    when you failed to appear in Federal Court as ordered;

5    correct?

6    A.    No, not correct.

7              MR. CHIAPPETTA:    Objection.    Form -- excuse

8    me, not form.    Objection misstates testimony,

9    misstates facts.

10             THE COURT:    I'll -- I'm not confused by the

11   question, so let's have the answer.

12             THE WITNESS:    No.    I was not scheduled to be

13   in Court July 15 at 6 p.m.

14   Q.    Okay.    But you were in California at that point;

15   correct?

16   A.    Yes.    I was in California when I should have been

17   here.

18   Q.    Did you buy a plane ticket to come back to Fort

19   Myers?

20   A.    Is this --

21             MR. CHIAPPETTA:    Objection.

22             THE WITNESS:    -- a real question?

23   Q.    It's a simple question.

24   A.    No.    I didn't -- I was very clear that I was

25   there from the fifth to the fifth.

85

1    Q.    Okay.

2              MR. LUTHMANN:  Your Honor, I'd move Exhibits

3    3A and 3B into evidence as a consolidated packet

4    relevant under 401.  They establish his activity and

5    public appearances on or about the day he missed his

6    mandatory Rule 16B Conference.  The authentication has

7    been established through the defendant's own testimony

8    under Rule 901.

9              MR. CHIAPPETTA:  Your Honor, objection.

10   This is completely irrelevant to whether or not Mr.

11   Norshirvan proved excusable neglect.  These documents

12   lack predicate, foundation and they contain hearsay

13   statements, and Mr. Luthmann has not met those as

14   requirements in order to move these documents into

15   evidence.

16             MR. LUTHMANN:  They are not offered for the

17   truth of the matter asserted but rather to show the

18   defendant's presence and conduct in and around the

19   missed hearing, and they are therefore not hearsay,

20   sir.  The circumstantial evidence of the location and

21   activity including the fact that he was not on a

22   vacation.

23             THE COURT:  I didn't hear a hearsay

24   objection.

25             MR. CHIAPPETTA:  I did have a hearsay

86

1    objection.

2              THE COURT:  Okay.

3              MR. CHIAPPETTA:  But setting aside the

4    hearsay objection, to the extent that after Mr.

5    Luthmann's clarification, then Mr. Luthmann has now

6    clarified they are absolutely irrelevant because there

7    is no dispute that my client was in California on a

8    family vacation whether he made an appearance or not,

9    and again, this is two days before the actual hearing

10   date.  So there's --

11             THE COURT:  I understand.

12             MR. CHIAPPETTA:  -- no relevance here.

13             THE COURT:  All right.  I think we do have

14   at least some relevance.  We may be getting to the

15   point of we're running afoul of being cumulative, but

16   I'll take this.  I don't intend to belabor this much

17   longer.

18             MR. LUTHMANN:  Okay.

19             THE COURT:  So we'll accept these.

20   (The following exhibit was received into evidence:

21   EXH Number 3A and 3B)

22   Q.   So Mr. Norshirvan, you had time to participate in

23   a podcast and go on rides at Universal all during the

24   period you forgot the Court hearing was scheduled;

25   correct?

87

1    A.    I don't understand the question at all.

2    Q.    I'll repeat it.  So you had time to participate

3    in a podcast and go on rides, the Super Mario Bowser

4    ride at Universal all during the period you forgot a

5    Court hearing was scheduled; is that correct?

6    A.    I didn't do those things when I was supposed to

7    be here, but I did while I was in California do fun

8    things with my children.  I already admitted that.

9    The whole point was a summer vacation.  The intention

10   was fun.

11   Q.    Okay.  Let's go on that point.  You did not

12   realize that you had missed the hearing until after

13   the fact, and according to you, you say you found out

14   by saying people talking about it on social media;

15   correct?

16   A.    No.  I said it could be from that, but I don't

17   actually recall.  In fact, it's more likely that it

18   was when I got back that I had learned about it, but

19   again, I don't recall.  I'm not at all saying as soon

20   as it ended someone on social media told me.  I don't

21   get information like that.

22   Q.    So you are retracting the testimony in your sworn

23   affidavit?

24   A.    I don't know what you're talking about.  I said

25   -- what I said was that it could be that someone

88

1   online had said something as you had said before

2   because you said that earlier, but I wasn't verifying

3   anything or authenticating anything as any fact.

4   Q.   Then let's go back --

5   A.   Well, I'm telling you right now.

6        THE COURT:  Hold on.  There's not a

7   question.

8        THE WITNESS:  I'm sorry, Your Honor.

9        MR. LUTHMANN:  Give me a moment.

10       THE COURT:  I am not so sure it was a sworn

11  affidavit, but I think you are referring to Document

12  49, his show cause response?

13       MR. LUTHMANN:  Document 49, yes.

14       THE COURT:  Okay.

15       MR. LUTHMANN:  Where are we?

16  Q.   You say in this in the second paragraph, and I'll

17  read it.  On June 17, 2025, I received an email notice

18  about a Rule 16 scheduling conference set for July 17,

19  2025.  While I did receive the notice, I mistakenly

20  forgot to add the hearing to my calendar.  If I had, I

21  would have seen it conflicted with a family vacation,

22  family vacation that had been planned well before this

23  lawsuit was filed.  I did not realize I had missed the

24  hearing until I saw people on social media talking

25  about it.  As soon as I saw that, I began working on

89

1   this response to explain what happened.

2   A.   Okay.

3   Q.   Is that -- do you recall making that statement?

4   A.   Fair enough, yes.

5   Q.   Is that statement true?

6   A.   Yea.

7   Q.   Is it true now or is it true when you wrote this?

8   A.   Yes.  Absolutely, yes.

9   Q.   So what happened?

10  A.   What you just read happened, sir.

11  Q.   So what you said before, you were lying when you

12  said that before?

13          MR. CHIAPPETTA:  Objection.  Vague,

14  ambiguous, misstates facts.

15          THE COURT:  I think he's --

16          MR. LUTHMANN:  Okay.

17          THE COURT:  I think he's clarified.

18          MR. LUTHMANN:  Okay, thank you.  You've

19  clarified.  Okay.

20          THE WITNESS:  I apologize for that

21  misunderstanding.

22          MR. LUTHMANN:  Okay.

23  Q.   Okay.  And so who did you see talking about it

24  online?  Was it Mr. Luthmann, myself's posts that

25  alerted you?

90

1    A.    God no.  No. Excuse me.  I meant to say no, not

2    that.  I don't recall exactly what it was.  My

3    priority would have been to respond to the Court at

4    that point, not to figure out who reminded me.

5    Q.    But again, you say you don't recall, but in your

6    affidavit you said you saw people on social media

7    talking about it?

8    A.    Correct.

9    Q.    Who were those people?

10            THE COURT:  Just for clarity, I don't think

11   this is an affidavit.

12            MR. LUTHMANN:  Well, in your submission.

13   Sorry.

14            THE COURT:  The show cause response, yes.

15   Okay.

16            MR. CHIAPPETTA:  Okay.  I'm going to object

17   to that last question entirely.

18            THE COURT:  What, we're still asking about

19   whether or not he recalls the social media post that

20   reminded him of not being here.

21            MR. CHIAPPETTA:  I mean, this is a distinct

22   without a difference.  You know, what Mr. Norshirvan

23   had said in a previous statement to the Court versus

24   not being able to recall at today's present date are

25   apples and oranges.

91

1          THE COURT:  Mr. Luthmann, what are we
2    getting at here?
3          MR. LUTHMANN:  I'll move along.
4          THE COURT:  Okay.  That's fine.
5          MR. LUTHMANN:  I think the point is clear
6    that there's some ambiguity today with respect to the
7    submission.  Submission seems a little more ironclad
8    than his testimony.  Okay.
9    Q.   So as soon as you realized you missed the Federal
10   Court hearing, you did not immediately call the Court
11   or try to remedy it at that date; did you?
12   A.   I did.
13   Q.   Well, what --
14   A.   You're wrong.
15   Q.   Okay.  So instead of promptly notifying the judge
16   or opposing counsel on July 17 or 18, you waited and
17   prepared a written explanation; is that right?
18   A.   So the first thing I did was called the Court.
19   That's the first thing I did.  I immediately called
20   the Court.  I remember that now, and they told me this
21   is not how you do it.  I'm not supposed to just call
22   the Court.  I'm supposed to answer and respond, and so
23   that's why I prepared a response, yes.
24   Q.   So in fact, you filed your response to the show
25   cause order on July 29, 2025, nearly 12 days after you

92

1    missed the hearing; is that correct?

2           MR. CHIAPPETTA:  Objection, Your Honor.  I

3    believe the show cause order provided a timeframe for

4    Mr. Norshirvan to respond and try -- Mr. Luthmann is

5    trying to use that timeframe against him here in this

6    question.

7           THE COURT:  All right.  That's overruled.  I

8    mean, he could have submitted it before we even got

9    it, so you can ask that question about when he sent it

10   to us.

11   Q.    Okay.  So Mr. Norshirvan, during those 12 days,

12   you were still on your west coast trip; weren't you?

13   A.    Yes, I was.

14   Q.    And you continued to vacation after July 17;

15   correct?

16   A.    Of course.  Why wouldn't I?

17   Q.    And you said before that you received the notice

18   when you got back home in the mail?

19   A.    I did receive the notice when I got back home.

20   When I went to the mailbox, they gave me all my missed

21   mail.  Yeah, I did get it then too.

22   Q.    Okay.  So you didn't receive -- that notice that

23   you received in the mail wasn't the only notice you

24   received?

25   A.    No.  As I've been answering you directly, I told

93

1    you as soon as I found out from, you know, whatever

2    that source, whoever it was online who said it, I

3    don't even recall who said it, but as soon as I found

4    out, I immediately called the Court, but there was

5    nothing I could do when I called to the Court.  So I

6    had to respond simply, and yeah, I took time to make

7    sure that my response was good, sufficient, and I did

8    everything right because clearly I don't have

9    knowledge of all of this legal stuff as well as you

10   do, sir.

11   Q.    So you went to Las Vegas after California;

12   correct?

13   A.    Again, while I was in California, I did a lot of

14   fun.  So fun was the point of the trip.

15   Q.    And so after California, you went to Las Vegas;

16   correct, Mr. Noshirvan?

17   A.    This was part of the trip.  No.  I didn't have a

18   separate trip.  It was part of the trip.  We went to

19   Las Vegas too.

20   Q.    It's a very simple question.

21   A.    I answered it.

22            THE COURT:  Whoa, whoa.

23   Q.    After California, you went to Las Vegas; correct?

24   Yes or no?

25            THE COURT:  Whoa, whoa.  You can't talk over

94

1    each other.  So again, just slow it down, and again,

2    we've got microphones in here so you don't need to

3    elevate your voice either.  Let's just keep it at an

4    even pace and even tone.

5                MR. LUTHMANN:  Okay.

6                THE COURT:  All right.  So what was the

7    question?

8    Q.    I said you went onto Las Vegas after California;

9    correct?

10   A.    No, during.

11   Q.    Walk me through that.  How can you --

12   A.    So after happens when something ends.  During

13   happens in the middle of something.

14   Q.    During your vacation --

15   A.    During the vacation we went to Vegas, yes, and

16   then we came back to California.  So we were on a

17   trip.

18   Q.    Okay.  Hold on, hold on.  Hold on, hold on.

19   A.    Excuse me.  I'm answering you.

20   Q.    Okay, please.

21   A.    We were on a trip and we did fun things.  That

22   included stuff like Universal Studios.  It included a

23   couple of things you don't know about that were very

24   fun.  The point is I did not know about the hearing

25   and I apologize for missing it and I will not be

95

1  making those mistakes moving forward.

2  Q.   That's not what we are asking.  I'm just trying

3  to get a timeline of you said you went to California

4  and then you went to Las Vegas and then you went back

5  to California; is that what the timeline we're talking

6  about is?

7  A.   Do you need all of the details of my family trip

8  because I --

9  Q.   I just want the general details of it, sir.

10  A.   Sir, I'm answering you.  I'm answering you.

11  Because when --

12  Q.   You're obfuscating, sir.

13         THE COURT:  Whoa, whoa.  Again, you're doing

14  it again.  All right.  So the question is, yes, can

15  you give a rough outline of went to California, went

16  to Nevada, went back to California?

17         THE WITNESS:  Went to California.  At some

18  point during that, we went to Universal Studios, and

19  at some point during that, we went to Vegas for a

20  weekend, and I don't recall exactly which weekend it

21  was but it was one of the four weekends.  We went to

22  the beach.  We went to the pool.  We went to the

23  botanical garden.  We -- I mean, if you want me to

24  list it all out, we went to different restaurants that

25  we enjoyed.

96

```
 1              THE COURT:  Okay.  So there you go.
 2              THE WITNESS:  Went to the Santa Monica Pier
 3    also.
 4              THE COURT:  During his month long trip in
 5    California, he spent a weekend in Las Vegas.  All
 6    right.
 7    Q.   And when you were in Vegas, you stayed at the
 8    Elara Hilton Grand Vacations Club; correct?
 9    A.   Why do you have this information?
10              MR. CHIAPPETTA:  Objection.  How is any of
11    this relevant, Your Honor?
12              THE COURT:  I can see the relevance for a
13    bit.  Let's answer the question and see where this
14    goes.
15    A.   Yes.  The only reason we went was because a
16    friend of ours and a group of friends who were going
17    that we haven't seen in years had a free place for us
18    to stay, and so we stayed with them because it was --
19    it didn't cost us anything.
20    Q.   And you were filming social media content at that
21    hotel around the pool?
22    A.   I don't recall doing such a thing.  You mean
23    making my videos?  No.  If I went -- if I made a
24    story, like I left a story on something or used social
25    media in any average way, possibly, but no.  I wasn't
```

97

1    doing my job.  I don't remember doing anything like

2    that.

3    Q.    So it's your testimony you didn't film any social

4    media content at that hotel?

5    A.    So I'm sorry.  The testimony I just gave you?

6    Q.    Yeah.

7    A.    I just said I don't recall.

8    Q.    Okay.  So do you recall if you filmed around the

9    pool?

10   A.    I -- no, I don't recall if I did.

11   Q.    Did you go to the pool?

12   A.    Likely.

13   Q.    Okay.  Are you a member of the Hilton Grand

14   Vacations Club?

15   A.    No.

16   Q.    Okay.  Is anyone in your family a member of the

17   Hilton Grand Vacations Club?

18   A.    I don't know why you need to know that.

19   Q.    I'm asking.

20   A.    Possibly.  I don't recall.

21   Q.    Okay.

22            MR. LUTHMANN:  Your Honor, may I approach?

23   I'm showing --

24            THE COURT:  Okay.

25            MR. LUTHMANN:  -- Mr. Norshirvan a group

98

1    of -- this is Exhibit 4A.

2            THE WITNESS:  This is why I have him blocked

3    by the way.  This is --

4            MR. LUTHMANN:  This is Exhibit 4B.  This is

5    exhibit 4C.  And this is exhibit 4D.

6            THE COURT:  All right.  So just so I am

7    following you, you have 4A, B, C, D?

8            MR. LUTHMANN:  I have 4A, B, C, D.

9            THE COURT:  Okay.

10   Q.   And I'm showing the witness a group of exhibits

11   that have been premarked for those purposes, 4A

12   through D.  Now, Mr. Norshirvan, please look at

13   Exhibit 4A.  Do you recognize that building depicted?

14   A.   So there's a PH on it.  It looks like Planet

15   Hollywood.

16   Q.   Is that the Hilton Grand Vacations Elara Hotel in

17   Las Vegas?  I'm looking at this, the A I handed you.

18   A.   I'm sorry.  Are you talking about this image?

19   I'm sorry.  My mistake.

20   Q.   This one is A, this one is B and that's C and

21   that's D.

22   A.   Okay.  This seems to be the Hilton Grand

23   Vacation.

24   Q.   That's the Elara Hotel.

25   A.   Okay.

99

1    Q.    And you stayed there?

2    A.    Yeah.

3    Q.    Okay.  And then Exhibit B, that's the pool area?

4          MR. CHIAPPETTA:  Objection.

5    Q.    Is that the pool area of the Elara hotel?

6    A.    Possibly.  I didn't memorize it.  I was there for

7    a weekend.

8          THE COURT:  Hold on.  Mr. Chiappetta has an

9    objection.

10         MR. CHIAPPETTA:  Well, there were two

11   questions wrapped in there or a statement and then a

12   question wrapped into whatever was just asked.

13         THE COURT:  I think the question was and

14   that's the pool area of the hotel is what I picked up

15   on.

16         MR. LUTHMANN:  Correct.  Is that the pool

17   area of the hotel; correct?

18         THE WITNESS:  I would be speculating but I

19   think that may be what it was.  I don't remember

20   exactly.

21   Q.    You spent time at the pool during your trip?

22   A.    I spent a short time there, yeah.

23   Q.    Okay.  And Exhibit C is another image of the same

24   Elara pool from a wider angle showing the deck and the

25   signage.  Does that refresh your recollection?

100

1    A.    Not really, but I mean, if it's what you say it

2    is, I'll take your word for it.  I didn't take these

3    pictures.

4    Q.    And finally, Exhibit 4D is a screen shot showing

5    you filming live content at the pool.  That's you in

6    the image; is that correct?

7    A.    That could be anywhere.  That could be anything.

8    What makes you -- what makes you determine this is me

9    doing a live at the Elara pool?

10   Q.    Take 4B and 4D and put them together and look at

11   the backdrop of the building.  Do those look the same?

12   A.    This is not enough to go from.  How could you say

13   what date and time this?  I can't --

14   Q.    I'm trying to show you the proximity at the --

15   you've admitted that you've been at the Elara hotel;

16   correct?

17   A.    I admitted it at some point, yeah.

18   Q.    And you admitted you were at the pool?

19   A.    I admitted I was at the pool, yes.

20   Q.    And you said that you were filming at the pool?

21   A.    I said I may have.

22   Q.    Okay.  Well, I'm showing you your filming, a

23   screen shot, and the building behind it in your shot

24   and then I'm showing you 4D which appears to be the

25   same building.  Do you agree?

101

1 A. I see a dead palm tree leaf on the left and on

2 the right a like unidentifiable shape like a building,

3 but no. I can't agree with you on anything about

4 this. I'm wearing a T-shirt. People don't wear

5 T-shirts to the pool. This is --- I can't confirm

6 this, no.

7 Q. So you are saying that you don't keep track of

8 the social media you produce?

9   MR. CHIAPPETTA: Objection. Misstates

10 facts.

11   *THE COURT:* *Well, yeah. I'll sustain that,*

12 and I really don't see -- I think we passed the point

13 of admission of returns.

14   MR. LUTHMANN: Okay. Gotcha.

15   THE COURT: All right.

16   MR. LUTHMANN: I'll go to the next one.

17 Q. These Exhibits A through D correctly show your

18 presence at the Hilton Elara pool and facilities in

19 Las Vegas in mid July 2025 immediately following that

20 you failed to appear for the Rule 16 Conference in

21 Fort Myers; correct, Mr. Noshirvan?

22 A. No. I didn't take --

23   MR. CHIAPPETTA: Objection.

24   THE COURT: All right.

25   MR. CHIAPPETTA: I'm going to need Mr.

102

1    Luthmann to show down and repeat that.  I did not

2    catch his question.

3           THE COURT:  Okay.

4    Q.    Question, these Exhibits 4A through 4D

5    collectively show your presence at the Hilton Elara

6    hotel and its pool facilities in Las Vegas in mid July

7    2025 immediately following the date you failed to

8    appear for the Rule 16B Conference in Fort Myers;

9    correct?

10           MR. CHIAPPETTA:  Objection.  Misstates

11    facts.  The witness has already testified he does not

12    recognize those photographs.

13           THE COURT:  Well, 4D, yes, but let's see

14    what Mr. Norshirvan has to say about that.

15           THE WITNESS:  Yeah.  So these three photos I

16    did not take.  I don't know -- I understand these are

17    photos of this hotel that I confirmed I was at.  I did

18    not make any videos about my content in this hotel or

19    at the pool.  What you are showing here is a live, but

20    again, this could be anything and anywhere, and

21    assuming you are correct, even assuming you are

22    correct, that's not my content.

23           I don't do -- lives are just a little hello

24    to people.  That's not -- that's not what my content

25    is.  So no.  To answer your question accurately, no.

103

1    I wasn't making content by the pool or in Vegas.  I

2    admit that I was on vacation in Vegas during the month

3    that at some point I was supposed to be here, and I

4    miscalendared that, and I apologize.

5    Q.    So you would admit that if a video were to be

6    produced of you doing a live at the Elara pool, then

7    your previous statements about it would not be

8    entirely correct?

9            MR. CHIAPPETTA:  Objection.  Calls for

10   speculation.  If a video would be produced, then this

11   would be that.

12           MR. LUTHMANN:  Strike that.  I have a video

13   of you at the pool.  When I produce that, can I call

14   you a liar?

15           MR. CHIAPPETTA:  Objection.

16           THE COURT:  Okay.  All right.  I'll sustain

17   the objection.  We'll see if we have to deal with the

18   video later, but I don't think we're going to.

19           MR. LUTHMANN:  All right.  Your Honor, I

20   move Exhibits 4A through D into evidence as a

21   consolidated packet.  Again, they are relevant under

22   Rule 401.  They establish the defendant's whereabouts

23   and conduct during the time of his missed Federal

24   Court appearance.  They are properly authenticated

25   through the witness' testimony under Rule 901.

104

1    Exhibit 4D further shows defendant actively creating

2    and broadcasting live content from the Elara pool.

3            MR. CHIAPPETTA:  Lack of authentication,

4    foundation.

5            THE COURT:  Okay.  As to all four?  I mean,

6    do we have a differentiation between A, B, C versus D?

7    I mean, it seems like D was quite different from A, B

8    and C.

9            MR. LUTHMANN:  I would say --

10           THE COURT:  I'm asking Mr. Chiappetta the

11   nature of the objection.

12           MR. CHIAPPETTA:  Well, I don't believe that

13   that -- I would argue that it lacks relevance.  It

14   does not establish a timeframe.  It's just literally a

15   photograph of my client's face.  It does not -- it

16   lacks relevance essentially.

17           THE COURT:  Okay.

18           MR. CHIAPPETTA:  As it relates to D.

19           THE COURT:  As to D, all right.  And then

20   did you have any problem with A, B and C?

21           MR. CHIAPPETTA:  Yes.  Authentication,

22   foundation.  My client said he didn't take those

23   photographs.  He took those photographs at face value

24   for what Mr. Luthmann represented them to be.  Setting

25   that aside, I think Mr. Luthmann has failed to lay

105

1      down that proper authentication and predicate to admit

2      those photographs into evidence as it stands here

3      today.

4                  THE COURT:  Okay.

5                  MR. CHIAPPETTA:  That's not my client's

6      testimony.

7                  MR. LUTHMANN:  They're demonstrative,

8      exhibits circumstantial evidence of locations and

9      conduct and admitted by the client that he was there

10     in other testimony verifying other testimony,

11     corroborating other testimony and validly admissible

12     as evidence.

13                 THE COURT:  All right.  I'm not going to

14     accept D for now.  As far as A, B and C, if they were

15     demonstrative, they wouldn't be admitted into

16     evidence, and but again, my recollection is Mr.

17     Norshirvan said that they matched his recollection of

18     being at the hotel.  So they just depict where he was.

19                 MR. LUTHMANN:  Gotcha.

20                 THE COURT:  I don't see any problem with

21     that.  So for that purpose, we'll take A, B and C.

22                 MR. LUTHMANN:  You'll take A, B and C?

23     (The following exhibit was received into evidence:

24     EXH Number 4A-D)

25                 THE COURT:  All right.  So just in the

106

1     interest of time, Mr. Luthmann, what other areas of

2     inquiry do you have left?

3                MR. LUTHMANN:  I'll try to get done.  I'm

4     going to -- I'm scraping -- the other stuff that was

5     outside the purview before, I'm scrapping that.  I'm

6     going to get through some other questions here.

7                THE COURT:  Yeah.

8                MR. LUTHMANN:  About the time period, the

9     vacation the 17th to the 17th and thereafter, that

10    cushion.

11               THE COURT:  We are focussing on that.  So

12    where are we going next?

13               MR. LUTHMANN:  Despite all this activity --

14               THE COURT:  No, no.  I'm asking what are

15    your next intended inquiries about this?

16               MR. LUTHMANN:  I'm going to ask about the

17    trip and who else was there on the trip.  Okay?  I'm

18    going to ask about his relationships and motivations

19    for being on the trip a couple things in that area,

20    and I should be done pretty quickly.  Let me see.  I

21    have -- I'm going to talk about the improv troop for a

22    little bit.

23               THE COURT:  I'm sorry.  The what?

24               MR. LUTHMANN:  The improv troop that he was

25    in Las Vegas for, and then talk about some other

107

1    things that show lack of mistake, lack of intent, lack

2    of negligence, those type of things, and then I'll

3    close.

4              THE COURT:  All right.  Well, I've heard

5    plenty of testimony about all the family that went and

6    there were.  I don't want to explore that anymore.

7              MR. LUTHMANN:  Okay.

8              THE COURT:  To the extent you would have any

9    questions about any other commercial type meetings he

10   might have been engaged in.

11             MR. LUTHMANN:  Yes.

12             THE COURT:  We can explore that a little bit

13   more and then maybe this improv thing.

14             MR. LUTHMANN:  All right.  Let me move

15   along.

16             THE COURT:  Yes, Mr. Chiappetta?

17             MR. CHIAPPETTA:  Your Honor, I apologize.  I

18   just want to preemptively object because I can see Mr.

19   Luthmann has an exhibit with my client's wife face on

20   it.

21             THE COURT:  Yeah.  I just mentioned --

22             MR. CHIAPPETTA:  She's been harassed enough,

23   and I'm just going to preemptively object.

24             MR. LUTHMANN:  No, no.  That's fine.  I'll

25   scrap that.

108

1          THE COURT:  I said we're not going to

2    explore the family anymore.  I've heard plenty of

3    testimony about the family that went and the family

4    that were there, but to the extent there were non

5    family that might have been, you know, associated with

6    Norshirvan's social media endeavors, I'll let you

7    explore that.

8          MR. LUTHMANN:  Well --

9          THE COURT:  We've already done the podcast

10   with the rap artist.

11         MR. LUTHMANN:  Yeah.  Well, I do have the

12   fact that the wife and child are in the social media,

13   but I'm going to put that to the side.

14         MR. CHIAPPETTA:  All right.

15         MR. LUTHMANN:  That's not where the Court

16   wants to go, so I'll put that to the side.

17         MR. CHIAPPETTA:  One more objection, Your

18   Honor.  Mr. Luthmann is going to attempt to introduce

19   the Only Fans photograph that has been the subject of

20   the 340 case and the 1218 case.  That is absolutely

21   irrelevant here.

22         THE COURT:  I didn't hear anything about

23   that.

24         MR. LUTHMANN:  He opened the door.  He

25   talked all about the Only Fans and you accepted into

109

1    evidence all of my terrible things that he alleges

2    about these -- about putting "stolen Only Fans."  I

3    have every right to question him because he did it in

4    direct and he's opened it and you've accepted

5    evidence.

6           MR. CHIAPPETTA:  Your Honor, I would remind

7    Mr. Luthmann that dissemination of this type of

8    content is actually a felony in Florida, and he is not

9    protected just because he's in this litigation from

10    dissemination of those documents.

11           *THE COURT:*  Uh-huh.

12           MR. LUTHMANN:  I vehemently disagree because

13    I've been to the Federal Bureau of Investigation with

14    these documents.  They took the documents and they're

15    investigating I believe as well as other people in the

16    Federal Government.

17           THE COURT:  Okay.

18           MR. LUTHMANN:  I don't know how pornography

19    --

20           THE COURT:  Let's take it one at a time.  Do

21    you have any other -- you already asked about the

22    podcast with the rap artist.  Do you have any other

23    events like that you are going to explore?

24           MR. LUTHMANN:  Yeah, I have a couple.  He is

25    an improv troop.  I'm going to bring that in and then

110

1    I'm going to ask just a couple questions about

2    California.  Let me just ask this one.  It's a simple

3    question.

4    Q.    So you said you have family in California.  How

5    long has your family been in California?

6    A.    All my life.

7    Q.    Okay.  And is your family originally from

8    California or did they come from some place else?

9    A.    This is why I have him blocked.  My family

10   immigrated here.

11   Q.    Where did they come from?

12   A.    They came from Iran.

13   Q.    Oh, okay.  And you said your mother lives here.

14   Is she an American citizen?

15   A.    Yes.  She's an American citizen, Richard.

16   Q.    Is she a naturalized American citizen?

17   A.    Why do you care?  Yes, she is.

18   Q.    Okay.  And you are an American citizen?

19   A.    Yes.  I was born here, Richard.

20   Q.    Okay.  Does your mother still hold any allegiance

21   to the Islamic Republic of Iran?

22   A.    This kind of racist stuff is why I have him

23   blocked.  And I shouldn't have to --

24          THE COURT:  I don't have an objection.  Mr.

25   Chiappetta?

111

1        MR. CHIAPPETTA:  I'll object to it being
2   argumentative.
3        THE COURT:  Yeah.  401 or 403, I don't see
4   why we need to go down these lines.
5        MR. LUTHMANN:  I've made several --
6        THE COURT:  I'll sustain the objection.
7        MR. LUTHMANN:  Okay.  I'll stop that line.
8        THE COURT:  Okay.
9   Q.   So were you filming at the Elara pool for your
10  content creation business?
11  A.   No.
12       MR. CHIAPPETTA:  Objection, asked and
13  answered.
14       THE COURT:  That's sustained.  He's already
15  answered plenty of questions about that.
16  Q.   And isn't it true some of the comment you film or
17  have filmed is commercial pornography?
18       MR. CHIAPPETTA:  Objection.  Way outside the
19  scope of this hearing, Your Honor.
20       MR. LUTHMANN:  I have a right to know what
21  he's doing at the Elara where he was filming.  In that
22  period I ask him, during the period relevant to this
23  hearing, did you film any commercial pornography?
24       THE WITNESS:  No.
25       MR. CHIAPPETTA:  Objection, Your Honor.

112

1                MR. LUTHMANN:  Okay.  That's all I need.

2                THE COURT:  Okay.  All right.  We have a no.

3    It didn't happen.  It didn't happen during this

4    timeframe.

5                MR. LUTHMANN:  Okay.

6    Q.   And you said before you had an Only Fans page;

7    that's correct?

8                THE COURT:  Given that answer, I don't see

9    any need to explore that any further.

10               MR. LUTHMANN:  I'm going to say though does

11   he still maintain the page?  I asked if he filmed.

12               THE COURT:  For what we're doing today --

13               MR. LUTHMANN:  Okay.

14               THE COURT:  -- I don't see any need to go

15   down that road.

16               MR. LUTHMANN:  Okay.

17   Q.   What's the Mom's Basement Theater?

18               THE COURT:  I'm sorry.

19   Q.   What is the Mom's Basement Theater?

20   A.   It's a theater in Las Vegas.  It's kind of a hole

21   in the wall small community -- not even community,

22   smaller than that, just a hole in the wall theater,

23   black box kind of theater.

24   Q.   What is Improv Shimprov?

25   A.   Improv Shimprov is a group that I used to do

113

1    improv with about 10 or 13 years ago.  How long has it

2    been?  Not 10.  Since 2017 or 2016.  It's been quite a

3    while since I've performed with them, but while I was

4    in Vegas, they were -- my friends were there doing a

5    show, and I did get to sit in on one after not doing

6    it for like a very long time and it was a great, fun

7    experience.

8    Q.    So you performed the improv?

9    A.    Yeah, I did.

10    Q.    Okay.  May I approach?

11         THE COURT:  Yeah.

12    Q.    I am going to show Mr. Norshirvan exhibits that

13    I've premarked as Exhibits 7A through 7D and I will

14    give Mr. Chiappetta copies as well.

15         THE WITNESS:  Again, photos of my wife.

16    He's keeping track of every photo of my wife.

17         THE COURT:  All right.  So what collection

18    is this again?

19         MR. LUTHMANN:  7A through D.  I'll say this

20    again.  Showing the witness a group of exhibits that

21    have been premarked for identification as Plaintiff's

22    Exhibit 7A through 7D.

23    Q.    Mr. Norshirvan, could you please look at Exhibit

24    7A?  It's the first one I gave you.  That's the flyer.

25    A.    Yup.

114

1    Q.    Do you recognize that flyer?

2    A.    Nope.

3    Q.    Okay.

4    A.    I don't.  I had nothing to do with the creation

5    or planning of anything on this.  They added me last

6    minute because I was in Vegas.

7    Q.    Is that a flyer from Mom's Basement?

8    A.    I don't know.

9    Q.    Can you read?

10         MR. CHIAPPETTA:  Objection.  Eliciting

11   hearsay.

12         THE COURT:  I'm sorry?

13         MR. CHIAPPETTA:  It's eliciting hearsay.

14   He's asking the witness to read the flyer.  That flyer

15   --

16         MR. LUTHMANN:  I asked if he could read.

17         THE COURT:  Yes.  That was the question.

18         MR. CHIAPPETTA:  It's also argumentative.

19         THE COURT:  That's sustained.  Let's keep

20   this above board.

21   Q.    Okay.  So you don't recognize the flyer at all?

22   A.    No.  I had nothing to do with this creation of or

23   planning of.  I hopped in last minute.

24   Q.    Okay, but you recognize Improv Shimprov?

25   A.    Yes.  I told you I was part of this improv group.

115

1    Q.    Okay.

2    A.    In the past, but I haven't been for over eight

3    years now.

4    Q.    So the second exhibit, Exhibit 7B, shows the

5    inside of Mom's Basement Theater during a performance.

6    Do you recognize that venue?  It's the larger picture

7    with the panoramic view right there.

8    A.    It looks like it.

9    Q.    Okay.  So that's the inside of Mom's Basement?

10   A.    It looks like it is.

11   Q.    Okay.  And it's -- Exhibit 7C is a social media

12   photo showing you on stage performing an Improv

13   Shimprov show.  Is that correct?  Were you are on

14   stage?

15   A.    This is another photo of my wife that you are

16   keeping for some reason, but yes.  I didn't deny this,

17   so I don't know why you need to keep those photos.

18   Q.    Wait a second.  The woman standing next to you,

19   that's your wife?

20   A.    I don't recall.

21   Q.    Do you know who the woman standing next to you

22   is?

23   A.    I can't authenticate this photo.  I don't know

24   where you got it.

25   Q.    You just said a second ago that's another picture

116

1    of your wife.  I had no idea that that was your wife

2    and you volunteered that information, so --

3    A.   If you are going to lie to the Court, that's

4    fine.  Yes.  This is my wife.  That's my wife.

5    Q.   Okay.

6    A.   And you do know that.

7    Q.   No.  Now I know.

8    A.   You are lying to the Court.

9            THE COURT:  Again, again, don't talk over

10   each other.  I need it -- again, the way this goes,

11   question, pause, answer.

12           THE WITNESS:  I'm sorry, Your Honor.  It's

13   the photos of my wife in his possession again is

14   upsetting to me.

15           THE COURT:  Okay.  7C is Mr. Norshirvan on

16   stage.

17           MR. LUTHMANN:  With his wife, yes.

18           THE COURT:  At the venue that you are

19   talking about.

20   Q.   And then Exhibit D shows you and your wife Hannah

21   dining with other members of the Improv Shimprov

22   troop; correct?

23   A.   This looks like a photo of people getting dinner.

24   It does not look like a stage performance.  It looks

25   like a bunch of people getting dinner.  And you can

117

1    keep my wife's name out of your mouth respectfully.

2    Q.    Okay, Mr. Smith, excuse me, but in that picture,

3    are you in that picture?

4    A.    That's what it looks like but I can't

5    authenticate these photos that you've provided.    I

6    don't know.

7    Q.    But you say it looks like you?

8    A.    Yeah.

9    Q.    And the person next to you looks like your wife?

10   A.    Okay.  Is that a question?

11   Q.    Yes.  Does the person next to you look like your

12   wife?

13   A.    You said the person next to you looks like your

14   wife.

15   Q.    Yeah.  And the person next to you looks like your

16   wife; is that correct?

17   A.    Yes.

18   Q.    Okay.  And do you recall that dinner?

19   A.    Not exactly, but I did have dinner with my

20   friends while I was there, yeah.

21   Q.    In Las Vegas?

22   A.    Yes.

23   Q.    Okay.  So Exhibit 7A through D together show you

24   were not only present at Mom's Basement Theater in Las

25   Vegas but you were actively performing with the improv

118

1    troop and socializing with them afterwards; correct?

2    A.    I'm allowed to socialize with friends, yes.  I

3    admitted to all of this.  None of this is --

4    Q.    Okay.  And these activities coincided the same

5    period of time that you failed to appear at the Rule

6    16B Conference in Fort Myers; correct?

7              MR. CHIAPPETTA:  Objection.  Misstates

8    facts.  There's been no testimony that any of this

9    occurred within the timeframe of July 17.

10             THE COURT:  Okay.  Why don't we explore that

11   first and sustain the objection.  Go ahead.

12   Q.    So on or about July 17, you were on your

13   vacation?

14   A.    Around -- in that month, yeah, I was on my

15   vacation.

16   Q.    You said before that pictures don't get onto to

17   the internet or onto social media immediately, and so

18   there's a lag or a difference in days; is that a

19   correct characterization of what you said?

20   A.    When I post photos, I never post my -- I'll

21   accurately tell you what I said.  I never post my

22   exact location the day of because of people like you.

23   That's my honest answer.

24   Q.    Okay.

25   A.    And there's dates that show written here, and no,

119

1    it's not on the same date I was supposed to be here.

2    Q.    What was the date of the show?

3    A.    It looks -- right here it says Saturday, July 19

4    at 9:30 p.m.

5              THE COURT:    So just so the record is clear,

6    it looks like the witness is pointing at 7A.

7              MR. LUTHMANN:    7A.

8              THE COURT:    Okay.    The flyer.

9              THE WITNESS:    Uh-huh.

10             THE COURT:    Okay.

11   Q.    And so how long before the July 19 event with

12   Improv Shimprov was it -- did you find out about it?

13   When did you first hear about this event?

14   A.    The comedy show?

15   Q.    Yeah.

16   A.    I believe it was the day before or a couple days

17   before.  I was talking to my friends who happened to

18   be going to Vegas, and they said do you want to jump

19   in on a show, and I said I would love to.  I said I

20   just got to warn you if we post about it online,

21   you're going to get unfortunately people who are going

22   to come harass you.  I was talking about you.  And

23   they were very sweet.  They said, you know, we've been

24   thinking about it.  We've seen the stuff you've been

25   dealing with and we don't care.  You deserve to live

120

 1   your life and we want to see our friend so I don't

 2   care, and that really moved me.  So I --

 3   Q.   Mr. Norshirvan?

 4   A.   Excuse me.  I'm answering you.  Sir.  Sir.

 5            MR. CHIAPPETTA:  Objection.

 6            THE COURT:  Mr. Noshirvan, I was waiting for

 7   Mr. Luthmann to ask about -- yeah.  I think you've

 8   already answered the question.

 9   Q.   Yes.  You've answered the question.  Thank you.

10   Okay.

11            THE COURT:  Just so I'm clear, Mr.

12   Noshirvan, so to the best of your recollection, the

13   flyer matches the date that you were engaged with this

14   troop on stage?

15            THE WITNESS:  Yes.  The flyer looks like --

16   the flyer looks like date is the date that I -- around

17   the date that I was there.

18            THE COURT:  Okay.  All right.  Very good.

19            MR. LUTHMANN:  Your Honor, I move Exhibit 7A

20   through 7D into evidence as a consolidated packet.

21   They are relevant under 401 because they demonstrate

22   this defendant's voluntary participation in

23   entertainment and social activities during the very

24   timeframe he failed to comply with the Federal Court

25   order.  Authentication has been established to the

121

 1    defendant's own testimony under Rule 901.  These are

 2    not hearsay but circumstantial evidence of the

 3    defendant's whereabouts and conduct, corroborates his

 4    presence in Las Vegas and deliberate choice to engage

 5    in pleasure rather than to fulfill his Court's

 6    obligations.

 7         THE COURT:  Uh-huh.

 8         MR. CHIAPPETTA:  Your Honor, we don't object

 9    to the documents.  We do object to Mr. Luthmann's

10    characterization because we believe they're clearly

11    irrelevant being that this occurrence occurred on July

12    19 and the subject of this Court's order in this

13    hearing is July 17.  So I would just like the record

14    to reflect such.

15         THE COURT:  Okay.  Well, based on that, I

16    would find they still remain relevant, close enough in

17    time.  So we'll go ahead and receive them.

18         MR. LUTHMANN:  Okay.

19    (The following exhibit was received into evidence:

20    EXH Number 7A-D)

21    Q.   So how long have you been doing improv?

22    A.   I have not been doing it for -- since 2016.

23    Q.   Okay.  When did you start doing improv?

24    A.   Way before this case, like 20 years ago.

25    Q.   Okay.  And it's a type of comedy; correct,

122

 1  improv?
 2  A.   It could be a type of comedy, yes.
 3  Q.   So you are a comedian?
 4  A.   No.  I'm a content creator.
 5  Q.   But you do improv, and it's a type of comedy?
 6  A.   When did I do it?
 7  Q.   Is it fair to say you are a comedian?
 8  A.   No.  When did I do that?  2016, so I'm not
 9  currently --
10  Q.   You said you did --
11           MR. CHIAPPETTA:  Objection.
12           THE COURT:  Wait.  You're doing it again.
13           MR. LUTHMANN:  Okay.
14           THE COURT:  Slow down.  And again, I'm
15  questioning why we are doing this here.
16           MR. LUTHMANN:  Okay.  I'll move along.
17           THE COURT:  Okay.
18  Q.   So before earlier today, you were -- yes or no,
19  you apologized to the Court for your failure to appear
20  on the 17th; is that correct?
21  A.   I mean, I'm doing it right now as well, and I
22  don't mind doing it again.
23  Q.   Okay.  But in that written response you filed
24  with the Court on July 29, you offered explanations
25  and justifications?

123

1    A.    Uh-huh.

2    Q.    But you didn't actually apologize anywhere; did

3    you?

4    A.    I don't know.  I don't remember but I'm

5    apologizing right now.

6    Q.    Okay.  So after you engaged counsel, Mr.

7    Chiappetta, is the first time that you apologized?

8    A.    Okay.  I don't --

9          MR. CHIAPPETTA:  Objection to the extent

10   that this response elicits privileged information.

11         THE WITNESS:  I believe, no.  Actually I

12   apologized to the Court when I called in when I called

13   that day because I remember calling the day.  I said

14   I'm sorry, I didn't know, and they said this is the

15   wrong way to do it.  But I am sorry.  I mean, I've

16   made that clear.

17         THE COURT:  All right.  So I didn't see that

18   that got afoul of privilege, so overruled for now.

19   Q.    I'm looking at your document, Mr. Norshirvan,

20   number 49.  I don't see anywhere where it appears you

21   apologized.  Do you recall apologizing in that

22   Document 49 that you filed?

23         MR. CHIAPPETTA:  Asked and answered.

24         THE COURT:  All right.  Yeah, asked and

25   answered, and again, interest of time.  I mean, the

124

 1    document says what the document says.

 2                MR. LUTHMANN:  Okay.

 3    Q.    So you apologized today because you said you were

 4    wrong.  When was the last time before today that you

 5    apologized?

 6                MR. CHIAPPETTA:  Objection.  Asked and

 7    answered.  If not, it's still answered.

 8                MR. LUTHMANN:  No, about anything.  I'm

 9    asking about anything.

10                THE COURT:  Um --

11                MR. CHIAPPETTA:  Then vague and irrelevant.

12                THE COURT:  Yeah.  All right.  Sustained.

13    Q.    Okay.  So let's talk about your social media

14    activity around the time of our missed hearing.  You

15    are quite active online; aren't you?

16    A.    If I'm not active, I don't make money.  So yes.

17    Q.    So while on this California and Las Vegas

18    vacation, you were regularly using your phone and

19    posting content; correct?

20                MR. CHIAPPETTA:  Objection.  Asked and

21    answered.

22                THE COURT:  Overruled.  Let's see.

23                THE WITNESS:  If you notice during that

24    month instead of posting regular content I was posting

25    a lot of photos and collages of photos because I

125

1   didn't have really the time on family vacation to make

2   content, but I did try to make content whenever I

3   possibly could.  Otherwise I won't get paid.  That's

4   my job.

5   Q.   So we established that on July 15 you co-hosted a

6   podcast remotely and you also posted photos and videos

7   from Universal Studios on July 17 to your followers;

8   did you not?

9   A.   To be clear, I did not co-host.  I was a guest on

10  somebody else's podcast.  I did not make money from

11  it.  It's not my content.  I don't own it.  So I was a

12  guest, and yes, I did take Universal Studios and took

13  my kids to as you've described the Mario area.

14  Q.   And you don't deny that you were documenting your

15  trip on social media at least at times during that

16  period?

17  A.   I was documenting it, but I was also -- because

18  as always I would take pictures during my family trip

19  but I was also misleading you specifically so that you

20  wouldn't harass us during this trip.  So I would post

21  things at the wrong times.

22  Q.   So you had the presence of mind to engage with

23  your online audience but not to check in on a

24  scheduled Federal Court hearing; is that correct?

25           MR. CHIAPPETTA:  Objection.  Argumentative.

126

1                THE COURT:  Sustained.

2    Q.    Later on when the people on the internet were

3    talking about you skipping Court, you certainly saw

4    those posts pretty quickly; didn't you?

5    A.    I don't recall.

6    Q.    You are very in tune to social media chatter

7    about you so you saw that news and that's what

8    prompted you to act by writing your response; correct?

9    A.    No.  I don't look what people are saying about

10   me.  Every now and then when there's a development in

11   the case, a couple suspicious profiles with no name

12   and were created yesterday suddenly show up trying to

13   taunt me or tease me or try to provoke me into saying

14   something.  It's possible one of those accounts said

15   something.

16   Q.    Okay.  So to be clear, it wasn't your conscience

17   or proactive case management that alerted you.  It was

18   a public embarrassment on social media that tipped you

19   off; right?

20                MR. CHIAPPETTA:  Objection.  Misstates

21   facts.  This is confusing and it misstates testimony.

22   Mr. Norshirvan has previously testified that he was

23   notified by some third-party on social media.  So how

24   would conscience even be irrelevant or become even an

25   issue here?

127

1          THE COURT:  Okay.  Yeah.  I'll sustain it

2   because I think I've heard plenty about what apprised

3   him of his -- at least his recollection about what

4   apprised him about his failure to appear.

5   Q.   Okay.

6          THE COURT:  Okay.  Well, any other lines

7   that you --

8          MR. LUTHMANN:  I'd like to get into his --

9   and ask just a couple of questions about why we should

10  believe that it was an innocent mistake given his

11  history with Judge Steele's findings in his order and

12  his previous doxing of the Supreme Court Justices.  I

13  want to get into that, but I think the Court wants --

14  I think the Court has enough?

15         THE COURT:  Yeah.  I think in the interest

16  of time.

17         MR. LUTHMANN:  All right.

18         THE COURT:  I don't see -- I think 403 is

19  going to prevent us from going down those roads.

20         MR. LUTHMANN:  I have nothing further on

21  cross.

22         THE COURT:  All right.

23         MR. CHIAPPETTA:  Your Honor, if I may just a

24  very brief close?

25         THE COURT:  Yeah.  Any redirect questioning?

128

1              MR. CHIAPPETTA:  Yes.  I do want to bring up

2    one issue that was addressed if I may.

3              THE COURT:  Sure.

4              REDIRECT EXAMINATION BY MR. CHIAPPETTA:

5    Q.   All right.  Do you recall receiving this letter?

6    Or envelope, excuse me.

7    A.   Yes.

8    Q.   And what date is it post marked?

9    A.   June 18, 2025.

10   Q.   All right.  And are these documents the documents

11   that were in that envelope?

12   A.   Yes.  Yes.  This is -- yes.

13   Q.   Okay.  And intermingled in there on the first

14   page, what is the caption?

15   A.   On this page here?

16   Q.   Yes.

17   A.   I'm sorry.  What do you mean caption?

18   Q.   The parties names.

19   A.   Parties names say Lana Patrick plaintiff versus

20   Mike Visano Tax Collector Pasco County Florida

21   defendant.

22   Q.   And what is the case number?

23   A.   Case number is 3:25-CV-627/MMH/LLL.

24   Q.   Okay.

25              MR. LUTHMANN:  Can I see those?  Can I

1    examine and voir dire these?

2             MR. CHIAPPETTA:  Yes, of course you can

3    because we are going to go to Page 2 where it actually

4    addresses this case where they are commingled.

5             MR. LUTHMANN:  Lana Patrick.

6    Q.    So Mr. Noshirvan, you've previously testified

7    that you received a show cause order for case number

8    3:25-CV-00627; is that correct?

9    A.    Yes.

10   Q.    And that's the Jacksonville division?

11   A.    That's what I received.

12   Q.    Okay.  And now there's a second page that was

13   part of this envelope too; correct?

14   A.    Yes.

15   Q.    And are you able to explain what this document

16   says?

17   A.    Yes.  This document -- this one looks relevant to

18   the case and this one says text order Local Rule 3.03

19   requires that with first appearance each party must

20   file a disclosure statement using standard form from

21   the Clerk or the Court's website but defendant has

22   failed to do so.  Furthermore, while plaintiff filed

23   his disclosure forms, he used an incorrect form as

24   such paper is deemed stricken and the Clerk is

25   directed to delete the pdf file from the CMECF docket

130

1    by July 2.  Parties must file a disclosure statement

2    using standard form filed here signed Judge Magistrate

3    Judge Nicholas Mizell.  Did I say that correctly, Your

4    Honor?

5              THE COURT:  It's Mizell.

6              THE WITNESS:  Mizell, I apologize.

7              THE COURT:  All right.

8    Q.   Okay.  And now the other two documents, what did

9    they contain on them?

10   A.   So this is for somebody else, and this one had an

11   order for Lana Patrick saying that order directing

12   plaintiff to show cause by written response filed on

13   or before July 2 why this case should remain pending

14   in the Jacksonville division and not be transferred to

15   Tampa division pursuant to Local Rule 1.04B.  See

16   order details signed by Judge Marcia Morales Howard on

17   6/18.

18   Q.   Okay, and --

19             MR. LUTHMANN:  I'm going to object to all of

20   this.  This is outside the scope of redirect.  He's

21   offering new evidence at this point, and I would ask

22   this entire line be stricken.

23             THE COURT:  No, I recall we had some Q and A

24   on this before.  So we'll let him clean this up.

25   Q.   Okay, and what is the address on that document?

131

1    A.    It says here Richard Luthmann, 4199 Los Altos

2    Court, Naples, Florida 34109.

3              MR. CHIAPPETTA:  Thank you.  And does this

4    packet that I've just handed you that we've discussed

5    here today reflect a true and accurate copy of the

6    letter sent to you by the United States District Court

7    of the Middle District of Florida.

8              THE WITNESS:  Yes.  That's exactly what I

9    received.

10   Q.    Then at this time to show that an error did occur

11   in mailing, we would like to move this -- these

12   documents in as Defendant's Composite 3.

13             THE COURT:  Let me -- well, all right.

14   Apparently this is an envelope that was received and

15   addressed from the Court addressed to Mr. Norshirvan

16   and was sent on June 18.  Yes?  These are all the

17   contents of that envelope.

18             MR. CHIAPPETTA:  Yes.

19             MR. LUTHMANN:  I'm not going to object, but

20   I do want to recross on this.

21             THE COURT:  Well, let me see them.

22             MR. CHIAPPETTA:  May I approach, Your Honor?

23             THE COURT:  Yeah.  We're going to take them

24   in.  Let me see what we have here.

25   (There was a pause in the proceeding.)

132

1            THE COURT:  Mr. Luthmann, are you -- I'm

2    trying to maybe clarify this for everybody.  Are you a

3    party to this Patrick versus Visano matter?

4            MR. LUTHMANN:  No.  No, Your Honor.

5            THE COURT:  Okay.  I take it Mr. Norshirvan

6    is not a party to that either?

7            THE WITNESS:  No.

8            THE COURT:  All right.

9            THE WITNESS:  Your Honor, no.

10   (There was a pause in the proceeding.)

11           THE COURT:  All right.  Well, it appears

12   that what happened here is -- just for everyone's

13   benefit about how things work around here, so this is

14   an attempt by the Clerk to send Document 20, the text

15   order that we docketed about the 303 disclosure form

16   and to send it to Danesh which has his address here in

17   Pennsylvania and looks like it may have also been an

18   attempt to send that very same order to Mr. Luthmann.

19           But then we have obviously an order from the

20   Jacksonville matter that's addressed to Ms. Patrick,

21   and somehow this ended up in the same envelope, but

22   the way the clerk's office works throughout the

23   district, it's kind of a unified clerk's office.  So

24   folks downstairs could be mailing things to parties

25   and cases from Tampa, Orlando, Jacksonville, and vice

133

1    versa, folks out in Jacksonville or Tampa could be

2    mailing you things in our case.  So we've kind of got

3    this unified distribution of labor in the clerk's

4    office.  So it appears that what was intended to go to

5    Ms. Patrick happened to get into this envelope, but

6    nevertheless, the order that we docketed 20 made its

7    way to Mr. Norshirvan.  All right.

8           MR. CHIAPPETTA:  All right.

9           THE COURT:  That's what we have here.

10          MR. CHIAPPETTA:  Then I have no further

11   questions.

12          THE COURT:  Okay.  And I don't think this

13   related -- apparently this didn't relate to the Notice

14   of Hearing.  That's a separate event.

15          MR. CHIAPPETTA:  Not necessarily the Notice

16   of Hearing but the confusion that ensued after as it

17   relates to the communication because obviously Mr.

18   Norshirvan was pro se at the time and that would be

19   confusing for someone who lacked experience.

20          THE COURT:  About why this Ms. Patrick's

21   order is in here?

22          MR. CHIAPPETTA:  Exactly, Your Honor.

23          THE COURT:  Okay.  Well, again, you can

24   always call the clerk's office and get some

25   clarification on that, but you got a copy of document

134

1    20 which that's what the purpose of this mailing was.

2    Okay.

3                MR. LUTHMANN:  I just have two recross

4    questions.

5                THE COURT:  About?

6                MR. LUTHMANN:  About --

7                THE COURT:  Oh, did you have anything else

8    about redirect wise?

9                MR. CHIAPPETTA:  No.

10               THE COURT:  All right.  What --

11               MR. LUTHMANN:  Recross is just about his

12   actions after he received that to show the pattern of

13   what he did.  Did he call the clerk, did he not call

14   the clerk?

15               THE COURT:  I'll allow a question or two.

16               RECROSS EXAMINATION BY MR. LUTHMANN:

17   Q.   So Mr. Norshirvan, after you received this

18   package, did you believe it was sent in error?

19   A.   Yes.  I believed it was sent in error.

20   Q.   Did you call anybody to inquire about it?

21   A.   No.  No, I did not.

22   Q.   So you didn't call the clerk?

23   A.   No.  I just assumed it was a mistake.

24   Q.   Did you talk to any attorneys about it?

25   A.   Nope.

135

1    Q.    Did you talk to Mr. Chiappetta?

2              MR. CHIAPPETTA:  Objection.  It would elicit

3    attorney client privilege.

4              THE COURT:  Yeah, that would.

5              MR. CHIAPPETTA:  And/or work product.

6              THE COURT:  Okay.  We'll sustain that.

7              THE WITNESS:  I assumed it was a mistake.

8              THE COURT:  Well, there's no question.

9              THE WITNESS:  Oh, I'm sorry.

10   Q.    You didn't think it was that important?

11             MR. CHIAPPETTA:  Objection.  Misstates

12   facts.

13             THE COURT:  Well.

14   Q.    Did you believe that it wasn't important enough

15   to make a phone call about it?

16   A.    I now see that I should have, but at the time, I

17   thought it might be a mistake.

18   Q.    Okay, that's fine.

19   A.    But everything to do with the Court is important.

20             THE COURT:  All right.  Okay.  Mr.

21   Norshirvan, I think you are done.

22             THE WITNESS:  Thank you.

23             THE COURT:  You can step down.

24             THE WITNESS:  Thank you, Your Honor.

25             THE COURT:  Mr. Chiappetta, did you have

136

1    anybody else you wanted to call?

2            MR. CHIAPPETTA:  No, Your Honor.

3            THE COURT:  Okay.  And did you want to offer

4    a couple quick points?  Or maybe we'll take a break

5    for lunch and resume after.

6            MR. CHIAPPETTA:  I can --

7            THE COURT:  Or do you want to resume after

8    lunch?

9            MR. CHIAPPETTA:  Is there any way we can

10   just go through this quickly?  I can -- maybe ten

11   minutes rather than take an hour break.

12           THE COURT:  Well, we don't need to take an

13   hour but I do want to give everyone here a break, and

14   so if you want to -- I remember you wanted to offer

15   something in the way of closing type statements.  Do

16   you want to make them now or after?

17           MR. CHIAPPETTA:  I can be very brief and

18   I'll make them now if Your Honor will allow if Your

19   Honor --

20           THE COURT:  Because either way we are going

21   to resume.  We're going to resume after lunch and I

22   want to get your final remarks about this issue and

23   then maybe talk about typical Rule 16 issues and

24   things like that.

25           MR. CHIAPPETTA:  Understood, Your Honor.  If

137

1    you would like, I can wait until after lunch.

2             THE COURT:  Yeah.  Maybe you have an idea to

3    kind of -- you know, have an opportunity to kind of

4    think about it.

5             MR. CHIAPPETTA:  Okay.

6             THE COURT:  All right.  Well, I'm going to

7    take a break.  Well, hold on.  Before we do that, Mr.

8    Luthmann, did you have anything?

9             MR. LUTHMANN:  I was just going to suggest

10   --

11            THE COURT:  Did you want to offer anything

12   into evidence before we take any kind of argument from

13   you all?

14            MR. LUTHMANN:  Well, yeah.  I wanted to -- I

15   thought I offered all that stuff into evidence.

16            THE COURT:  The things I've already

17   received?

18            MR. LUTHMANN:  Yeah.

19            THE COURT:  Okay.  We've already done that,

20   but outside of that, anything else to offer?

21            MR. LUTHMANN:  No.  I have nothing else to

22   say.  I'm not calling any witnesses.  I'm going to

23   rest on everything that's been done.

24            THE COURT:  Okay.  Then I'll offer -- I'll

25   let you all offer some argument about the show cause

138

1   issue when we get back, and then we'll talk about

2   typical Rule 16 type matters and hopefully send you on

3   your way.

4            MR. CHIAPPETTA:  And Your Honor, if we can

5   discuss the discovery issue as well.

6            THE COURT:  Yeah.  We can talk about all

7   that stuff under the ruberic of Rule 16 and keeping

8   things running smoothly.  Okay.  Why don't we get

9   together say -- Wendy, do we have anything else this

10  afternoon?

11           THE CLERK:  We have two new arrests at 2:30.

12           THE COURT:  All right.  We're going to try

13  to be wrapped up before 2:30.  I've got some new

14  arrests, and there's a variety of other things going

15  on in the Courthouse as you can imagine.  We even have

16  a high profile murder trial going on right down the

17  hall.  So all sorts of things going on.  And okay.

18  How about just go grab something quick, maybe get back

19  here by 1:15.

20           MR. LUTHMANN:  Yes, sir.

21           THE COURT:  And then we'll maybe spend an

22  hour together before I have to do my 2:30 events.

23           MR. LUTHMANN:  All right.

24           THE COURT:  There's plenty of things out

25  there.  You've all been here before, and you are

139

1    probably familiar with the dining scene out there but

2    there's plenty of places to get something very quick.

3              MR. CHIAPPETTA:  Yes, Your Honor.  Thank

4    you.

5              THE COURT:  All right.  See you then.

6              THE WITNESS:  Thank you, Your Honor.

7    (The proceeding recessed at 12:25 p.m.)

8    (The proceeding reconvened at 1:20 p.m.; appearances

9    as before noted.)

10             THE COURT:  Okay.  Welcome back.  Hope

11   everybody got refreshed a little bit, grab a bite,

12   grab a drink, that kind of thing.  While I was

13   reflecting on everything we talked about so far, I did

14   have one more question and I guess I'll allow the

15   lawyers to follow up if they want, but it's

16   Norshirvan?

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  Okay.  I'm trying to remember

19   how to pronounce it correctly.

20             THE WITNESS:  I appreciate it.

21             THE COURT:  So obviously I did check the

22   docket and just so we are all on the same page

23   everything we've been sending to you has been through

24   the postal mail.

25             THE WITNESS:  Okay.

140

1              THE COURT:  So all of our notices have been

2      I call it snail mail.  S we have snail mailed to you

3      paper copies of everything and never emailed you, and

4      I think part of the confusion I think at some point

5      you filed something with us that might have suggested

6      that you might have missed the notice because again

7      you weren't -- you had a lot of email issues and you

8      had a lot of email issues with Mr. Luthmann and I

9      remember thinking at that time, wait a minute, that's

10     not a problem because we're not emailing you.  We're

11     mailing you.

12             So anyway, I did check that.  Just like

13     this, everything else has come to you this way.  So

14     that's what the docket reflects, and but in addition

15     to that, have you ever done any other ways of just

16     checking the docket?  Do you ever use like Pacer or

17     things like that to just check how the docket is

18     looking and what's going on?

19             THE WITNESS:  I have, yes.  I have used it

20     before.  Although it's difficult to navigate, I've

21     tried to use it, yeah.

22             THE COURT:  Okay.  So have you used it while

23     this case is pending since April?

24             THE WITNESS:  I don't believe I have.  I've

25     used it on the 1218 case.

141

1          THE COURT:  Okay.

2          THE WITNESS:  Yeah.

3          THE COURT:  That's common.  I mean, you are

4    involved in multiple cases and it's a good way to just

5    keep tabs on things.

6          THE WITNESS:  Yeah.

7          THE COURT:  Okay.  And then all right.

8    Well, anyway, we clarified how we were sending

9    everything and what the record reflects from our end,

10   and then just wanted to make sure if you had any other

11   means of kind of keeping yourself apprised.  Okay.  Do

12   you want to give me any other kind of thoughts about

13   the show cause issue and then we'll move on to some

14   other things?

15         MR. CHIAPPETTA:  Brief closing, Your Honor.

16         THE COURT:  Sure.

17         MR. CHIAPPETTA:  May I approach?

18         THE COURT:  Please.

19         MR. CHIAPPETTA:  Your Honor, just very

20   briefly, I just want to point out that Mr. Norshirvan

21   does not contest that he received the letter

22   essentially requiring him to appear for the -- in June

23   for the July Rule 16 Conference.  That's not at issue

24   here just to clarify that.  I do think that Mr.

25   Norshirvan's testimony here today has unequivocally

142

1    established excusable neglect.  I believe Mr. Luthmann

2    himself had kind of expressly stated negligence which

3    in and of itself is a form of neglect.

4         So when we look at that at the time Mr.

5    Norshirvan was pro se, he should be -- we would

6    request that he's afforded that leniency at this

7    hearing here just simply because the events and acts

8    that were occurring was when he was pro se, and we

9    also would like to address the issue that there is

10   zero record evidence of any willful intent of any kind

11   whatsoever isolated as it relates to the July 17

12   conference.

13        It just -- there's just nothing on the

14   record what -- via oral testimony or documents

15   admitted into evidence.  In fact, I think all of the

16   evidence goes the other way, and so I would

17   respectfully request that this Court not impose a

18   sanction at all, but if this Court was inclined to

19   impose a sanction, I would ask for a reduced

20   sanction -- a reduced monetary sanction at most simply

21   because of the circumstances here, and I would also

22   posit that default is an extreme remedy, and based

23   upon what the testimony here today supports, the

24   causal factors have not been met.  There is no

25   willfulness.  There's no chance of repetition because

143

1    Mr. Norshirvan is represented, and given that, we

2    would just request some leniency from Your Honor.

3            THE COURT:  Very well.  All right.  Thank

4    you.

5            MR. CHIAPPETTA:  Thank you very much.

6            THE COURT:  Mr. Luthmann, would you want to

7    make a few remarks?

8            MR. LUTHMANN:  Default is not an extreme

9    remedy.  Your Honor admitted default happens all the

10   time in this Courthouse when people fail to do what

11   they are supposed to do, and what are they supposed to

12   do after they catch themselves, come to this Court and

13   establish reasonable cause, good cause and good faith,

14   a good faith reason why they messed up if they messed

15   up.  But when they thumb their nose at the Court,

16   that's a total different story, and I think we have

17   here a pattern of an individual thumbing his nose at

18   the Court, and I'll point to two things the Court

19   should take a look at.

20           Take a look at the docket sheet and take a

21   look at specifically Document 25.  That was Mr.

22   Norshirvan's opposition or his motion to dismiss to

23   the original complaint in this matter, and if we're

24   going to take him at face value, then we should give

25   him a chair at the Levin School of Law at the

144

1   University of Florida in Gainesville because he's a

2   learned individual.  He's no Polly Anna.  Take him --

3   he signed this document.  Take him at face value.  The

4   man could probably recite the civil procedure from

5   Pennoyer v Neff and International Shoe and Berner

6   versus Inferior Court onward if you read this

7   document.  He wrote it by himself, all by himself.  He

8   didn't say to anyone that he had any help.  He didn't

9   say he had a ghost writer.  He didn't say anything

10  else.  So let's take him at --

11            MR. CHIAPPETTA:  I'm going to object to

12  this.

13            MR. LUTHMANN:  Let's take him at face value

14  at what the Court record says.  Thank you, Your Honor.

15            MR. CHIAPPETTA:  Your Honor.

16            THE COURT:  Okay.

17            MR. CHIAPPETTA:  I object to Mr. Luthmann's

18  entire closing as none of this was elicited in the

19  actual testimony whatsoever, and it's completely

20  outside of the scope of this proceeding and improper

21  to close on something that was not even addressed for

22  purposes of this hearing.

23            MR. LUTHMANN:  The record is always

24  addressable, Your Honor.

25            THE COURT:  Yeah.  I mean, obviously the

145

1    motion is on file and it is what it is and it appears

2    what it appears, but we certainly did not explore

3    anything about how it was prepared and we're not going

4    to now, but I understand the basis for Mr. Luthmann's

5    suspicions, but we can leave it at that.

6            All right.  Well, I think I have everything

7    I need, and I'll again take it under advisement about

8    what we are going to do on that, and I am somewhat

9    mindful also about the point that the motion to

10   dismiss that's pending does raise some jurisdictional

11   issues I think both subject matter and personal, so we

12   may want to see how those play out before I'm, you

13   know, assessing a sanction and then having to maybe

14   unwind a sanction for lack of jurisdiction.  So I'm

15   going to maybe keep that on the shelf for a bit.

16           Let's see.  Couple other things.  I saw

17   references to a variety of motions that I think maybe

18   have been drafted and exchanged with each other but

19   not necessarily filed with us, and so hopefully you

20   can continue to discuss and hopefully work it out

21   amongst yourselves.  I will -- on that score, let me

22   say that I think there's a pending motion about the

23   communication issues in the case.  I think that was

24   filed before Mr. Chiappetta joined us, and I think

25   that really changes the landscape on that.

146

```
 1              So I don't really think that motion -- I
 2      think basically it's moot now that we have counsel
 3      here, and then as far as communication goes, I did see
 4      the -- well, two notes.  I saw the email that I think
 5      Mr. Luthmann sent around around 2:30 something this
 6      morning.  Encourage you to maybe revisit your sleep
 7      hygiene on that, but --
 8              MR. LUTHMANN:  I wanted to make sure
 9      everybody had everything they need.
10              THE COURT:  I understood.  I hear the same
11      thing about mine.  So -- that email the 2:30 email
12      that I saw, that is what emails between you all should
13      look like.  All right?  That was business like.  It
14      was to the point.  There was no name calling,
15      hyperbole, invective, drama.  It was just, you know,
16      very business like, and that is how these
17      communications should be going back and forth.
18              So please keep it like that and don't --
19      don't swim any other waters, and also don't loop us
20      in.  We don't want to be looped in on your emails back
21      and forth.  I imagine a lot of these people don't want
22      to be looped in.  I don't think Governor DeSantis or
23      the Attorney General of Florida, they probably have a
24      lot bigger fish to fry than what's going on in this
25      case.
```

147

```
1          So I would keep it to you all and keep it

2     business like, and let's just stay focussed on trying

3     to keep this thing running along efficiently.  I mean,

4     Rule 1 of civil procedure, right, is it's all about

5     efficiency, and everything we're supposed to do here

6     is all about trying to get to a fair and efficient

7     resolution.  Inexpensive, efficient and fair.  So we

8     need to keep the other two in mind about being

9     efficient and inexpensive.  Okay.  And then what was

10    the other one that I think was still with us?

11          MR. LUTHMANN:  Your Honor, if I may.

12          THE COURT:  It's currently pending; right?

13    I'm trying to --

14          MR. LUTHMANN:  If I may, Your Honor.

15          THE COURT:  I talked about 59.  Just a

16    second.  I want to talk about what's pending with us.

17    Amended motion to dismiss.  That's not with me.

18    That's with Judge Badalamenti.  You probably -- not

19    for long.  I don't know if you all were watching the

20    Senate last night, but we are about to have a new

21    District Judge here.  Judge Dudek just got confirmed,

22    so he's probably going to be your District Judge here

23    in the next day or two, any minute now really.  Okay.

24    And I know you are both familiar with Judge Dudek.  So

25    --
```

148

1          MR. CHIAPPETTA:  Yes, Your Honor.

2          THE COURT:  He's going to get one or both

3     the other cases and he's familiar with you.  All

4     right.  And then -- yeah.  Again, let's try to avoid

5     -- we really need to focus on the issue here of, you

6     know, stay focussed on the merits of the case.  I

7     would encourage you all to not to go down other roads

8     of -- a lot of folks can get these things all wrapped

9     up in other angles.  You want to be mindful about, you

10    know, I can remember back when I was in the trenches.

11    I would never threaten anybody with anything criminal.

12    I would never threaten anybody with anything about

13    disciplinary proceedings or anything like that because

14    it's not helpful, and it's much better to just stay

15    focussed on the merits of the case.

16          I guess Rule 16 wise since the defense

17    wasn't here before, I mean, we already put a schedule

18    in place and I looked at it this morning.  It looks

19    like discovery doesn't even close until I think May or

20    June of next year; is that right?  So I think -- does

21    that still remain plenty of time for you all?

22          MR. CHIAPPETTA:  Yes.  I believe that the

23    current schedule as written is more than enough time.

24    The only thing that we would request is an ESI

25    protocol which we did provide in our written discovery

149

1   to Mr. Luthmann because this case is all ESI, Your

2   Honor.

3          THE COURT:  Sure.  Okay.

4          MR. LUTHMANN:  Yeah.

5          THE COURT:  Try to --

6          MR. LUTHMANN:  I have no problem with that.

7   I'm all about it.  I put it in mine too.

8          THE COURT:  Okay.

9          MR. LUTHMANN:  The one point of housekeeping

10  I had was that after the Rule 16 that we had we talked

11  about mediation.

12         THE COURT:  Yes.  Do you have to agree to

13  one still?

14         MR. LUTHMANN:  And he hasn't like talked to

15  me about that.  I put it on the docket.  I'm good with

16  Mr. Burkett.  I know that Mr. Burkett has a history of

17  being a very good mediator here.  I'll take him.  I

18  know he's worked with Mr. Chiappetta before, and I

19  would even say that mediation might help this case

20  sooner rather than later.

21         THE COURT:  Yeah.

22         MR. LUTHMANN:  If we put everybody down in a

23  room, I think I can resolve this.  I'm not looking for

24  a lot here.  I'm just -- this is more --

25         THE COURT:  Mr. Luthmann, just sit up in

150

1    your chair.  I can hear you better.

2              MR. LUTHMANN:  This is not something that

3    I'm not looking for a lot.

4              THE COURT:  Okay.

5              MR. LUTHMANN:  You know, that's just it.

6              THE COURT:  You've worked with Mr. Burkett

7    before, but he sounds -- this matter seems a bit too

8    simple for someone like that.  Mr. Burkett handles

9    very complex matters.  We're talking a lot of arcane

10   theorys and multiple defendants and millions or

11   billions of dollars at stake.  That's the kind of

12   thing he usually handles.

13             MR. CHIAPPETTA:  Yeah.  Mr. Burkett mediated

14   the 340 case and the 1218 case.

15             THE COURT:  Oh, okay.  So he's already

16   familiar with at least this side.

17             MR. CHIAPPETTA:  Yes.

18             THE COURT:  Okay.  Wow, interesting.

19             MR. CHIAPPETTA:  But given this case not

20   necessarily at least in its current posture being his

21   --

22             THE COURT:  What's his rate?

23             MR. CHIAPPETTA:  He's expensive, and until

24   counterclaims come in and more parties come in, he may

25   be above this case's pay grade.

151

1              THE COURT:  That's what I'm thinking.  I

2     mean, isn't -- I wouldn't be surprised if he didn't

3     charge 6 or $700 an hour or something like that.

4              MR. CHIAPPETTA:  $750.

5              THE COURT:  $750 an hour, you might not want

6     to foot that bill, Mr. Luthmann.

7              MR. LUTHMANN:  Well, no.  I think three,

8     four, five hours with a guy like that, we know if this

9     thing can get resolved or not.

10             THE COURT:  Okay.

11             MR. LUTHMANN:  That's the way I look at it.

12    I'm a big believer that you try to sit down and talk

13    early.  You know, if you don't talk early, if you

14    don't ask, you're not going to get it.  So you might

15    as well ask.  You might as well put somebody in the

16    middle that is the best at doing this.  So that's how

17    I feel.

18             THE COURT:  You're preaching to the choir on

19    that one.  The Court always encourages you all to

20    always talk about resolution while this is pending.

21    We can walk and chew gum, right?  We can litigate and

22    try to resolve all at the same time.  We can have two

23    lines of communication going on.  I know they're

24    opposite in ways.  They kind of cut against the grain

25    of each other.  Right?  Having this zealous litigation

152

1    against each other, but also trying to resolve it on

2    the other side, but you've got to do both at the same

3    time, and, you know, we do encourage you to do that,

4    and yes, I always tell folks you can mediate as often

5    as you like.

6            You can mediate more than once.  You can

7    mediate early.  If it doesn't work, you can mediate

8    later.  If you need more litigation therapy before you

9    can resolve, that's your prerogative.  So yeah.  So we

10   always encourage that, but apparently you have not

11   agreed to one, but how about we set a deadline for you

12   to at least agree to one?  Maybe two weeks from today.

13           MR. LUTHMANN:  I feel I put it out there.

14   If he wants to come back with some other changes and

15   other people.

16           THE COURT:  Yeah, okay.  Mr. Chiappetta can

17   give you some names.

18           MR. LUTHMANN:  I've been putting out the

19   offer, so I feel I should get one back.

20           THE COURT:  Yup.  That's fine.

21           MR. LUTHMANN:  Or a counter offer.

22           THE COURT:  Give you a couple weeks to work

23   it out.

24           MR. CHIAPPETTA:  Your Honor, when is the

25   deadline for mediation to occur?

153

1          THE COURT:  Well, regardless, we always want

2     at least the identity of the mediator upfront.

3          MR. CHIAPPETTA:  I'm trying to determine

4     based on the deadline date if whether or not I can

5     agree to Mr. Burkett here today based on potential

6     counterclaims coming in.

7          THE COURT:  Well, your mediation deadline is

8     -- let me get it in front of me.

9          MR. LUTHMANN:  You gave us four weeks from

10    the July 17 date.  So the mediation deadline has

11    passed from that order.

12          THE COURT:  Hold on.

13          THE CLERK:  7/10.

14          THE COURT:  July 10 is your mediation

15    deadline.

16          THE CLERK:  2026.

17          MR. CHIAPPETTA:  Of '26?

18          THE COURT:  Yeah.

19          MR. CHIAPPETTA:  Oh, yeah.  Then we can

20    agree to Mr. Burkett.

21          THE COURT:  Okay.

22          MR. CHIAPPETTA:  Mediation will occur before

23    July of '26.

24          MR. LUTHMANN:  I like that.

25          THE COURT:  Okay.  So yeah.  There you go,

154

1    making progress.  You've got a mediator agreed to.  Of

2    course, you've got plenty of time to revisit that too.

3    So for now, we'll expect mediation with Burkett.  If

4    that changes and you choose to mediate with someone

5    else, just file a joint notice that you've changed the

6    mediator.  Again, something I always say at Rule 16

7    Conferences, we -- and I think you know we have a

8    certified list of mediators here on our website.  We

9    prefer you use those individuals, but if someone who

10   is not on our list is well suited to get the job done,

11   we're certainly not going to balk at that.  So you can

12   use somebody off our list.  Just explain why you are

13   departing from the list and you'll be good to go file

14   the joint notice.

15            MR. CHIAPPETTA:  Thank you, Your Honor.

16            THE COURT:  Okay.  So that's good that's

17   done.  So schedule mediation, and again, I just want

18   to -- I think everybody is going to be well served if

19   you try not to get bogged down in collateral issues.

20   I know Mr. Luthmann has made some references before

21   about potentially trying to disqualify Mr. Chiappetta.

22            Again, I think you are all well served if

23   you just -- unless you absolutely cannot put that

24   aside, but if you can find your way of putting it

25   aside, maybe it's just better to stay focussed on the

155

1    merits.  So I just put that out there.

2         MR. LUTHMANN:  Your Honor, I hear you, and

3    you set the goose gander rule last time and I'll bring

4    it up again.  I will tone down my rhetoric if they

5    tone down theirs.  I was just told that I was

6    committing crimes in the State of Florida, you know,

7    and I've gone to law enforcement.  Believe me I've

8    gone to law enforcement.  So we don't need it either

9    way.  You know, and frankly, I will be the one that

10   says today on the record I won't go extra judicial.  I

11   will keep it tight on this.  I just want -- they know

12   what I want.  I want an apology.

13        THE COURT:  Right.

14        MR. LUTHMANN:  That's the basic and carnal

15   thing that I want.

16        THE COURT:  Right.

17        MR. LUTHMANN:  They lumped me in with a

18   pedophile.  They lump me in calling me the most

19   heinous thing that there can be given my religion,

20   given my background, given my beliefs and given the

21   laws of the State of Florida.  They put it on the

22   books in 2022.  You have -- if you violate a child

23   under the age of 12, you get put to death in this

24   state, and I don't know if Mr. Norshirvan has that --

25   that they put that on the books, but DeSantis did.

156

1           THE COURT:  There is a curious -- there's a

2      lot of curiosities in the Florida Constitution and in

3      the Florida statute books, and I remember Florida was

4      my third bar, and I remember when studying for the

5      Florida Bar thinking how crazy they were down here

6      with their constitution because it's like that seems

7      like that should be a statute everything under the sun

8      is in the constitution down here.  They even talk

9      about -- they even regulate hog farming in the

10     Constitution of Florida so anyway.

11          So anyway, that's my long way of getting to

12     the fact that, yes, I understand on the statutes they

13     define certain crimes as capital crimes, but that

14     doesn't necessarily mean capital punishment.  So

15     anyway, just wanted to offer you some thoughts on

16     that.  Okay.  What about that?  You're probably

17     familiar, and I don't know if you interchange any

18     settlement discussions with -- or a settlement

19     conference with the magistrate judge in the two other

20     matters that you have.  You've all done just private

21     mediations so far?

22          MR. CHIAPPETTA:  Private mediations so far.

23          THE COURT:  But you are probably familiar

24     that the magistrate judges here hold settlement

25     conferences commonly in these cases.

157

1            MR. CHIAPPETTA:  Yes, Your Honor.  We are

2      familiar with that.  Given the current posture, I

3      don't necessarily know if it would be I guess a good

4      idea at this point given the posture of the case with

5      the other individuals.

6            THE COURT:  Are there other folks you think

7      might need to be parties here at some point?

8            MR. CHIAPPETTA:  Absolutely.

9            MR. LUTHMANN:  Okay.

10           THE COURT:  So who are they thinking

11     about -- well, we have a deadline for motions to amend

12     and joint parties that might have already expired.

13           MR. LUTHMANN:  I think it's the 13th.  I

14     think it's in a couple days.

15           THE COURT:  Um.

16           MR. LUTHMANN:  If we want to extend, I would

17     ask, but I might have to (inaudible) --

18           THE CLERK:  9/12/2025.

19           MR. LUTHMANN:  Mr. McGivney --

20           THE COURT:  Just a second.

21           THE CLERK:  So three days.

22           THE COURT:  Oh, three days away is our

23     deadline for those kinds of motions.

24           MR. CHIAPPETTA:  Well, I won't be bringing a

25     motion, Your Honor.  I'll wait until I answer and file

158

1    a counterclaim.

2            THE COURT:  Okay.

3            MR. CHIAPPETTA:  In which case I'll be able

4    to bypass that.

5            THE COURT:  Understood.  So you are thinking

6    the counterclaim might potentially bring in other

7    parties?

8            MR. CHIAPPETTA:  It will.  It will address

9    the people who we believe paid for those Substack

10    articles.

11           THE COURT:  I see.

12           MR. CHIAPPETTA:  Yeah.

13           THE COURT:  Wouldn't that be duplicative of

14    what's already going on in the other cases?

15           MR. CHIAPPETTA:  No, not necessarily.

16           THE COURT:  Okay.

17           MR. CHIAPPETTA:  Technically, it would

18    intertwine components, but it could be broken down by

19    time frames, and so we would pick up here with a

20    counterclaim essentially starting at a certain time

21    whether it's June of '24 or October of '24 and moving

22    forward, and it would actually lead to a different set

23    of counter defendants and would include -- well, Mr.

24    Luthmann would be included in that.

25           THE COURT:  Understood.

159

1          MR. CHIAPPETTA:  But there would be at least

2     three or four other individuals as well.

3          THE COURT:  I see.  Understood.  Well, yeah.

4     A lot of times people lose sight of the fact that in a

5     counterclaim you can join additional parties, and it's

6     still -- it's a counterclaim, not a third-party claim,

7     and anyway, just nomenclature wise.  But well, before

8     it gets -- I mean, you are already embroiled in

9     litigation with the folks I imagine would be the other

10    defendants counterclaim.

11         MR. CHIAPPETTA:  That would be correct.

12         THE COURT:  Okay.

13         MR. CHIAPPETTA:  Well, most of them anyway.

14         THE COURT:  All right.  And I wonder if

15    maybe -- well, my thought was you're here.  Mr.

16    Norshirvan has come all the way from Pennsylvania.

17    You are here all the way from the east coast of

18    Florida, and I mean, if you would like, I don't have

19    anything else going on today.  If you want to try to

20    take a run at some settlement discussions with me as

21    your free moderator, I would offer my services and

22    maybe we could have some -- trade some offers back and

23    forth and see if we could at least put this one to

24    rest.

25         MR. LUTHMANN:  They had made an offer

160

1    before.  I made an offer just before you took the

2    bench about a retraction.

3            THE COURT:  All right.  Well, don't -- okay.

4    Maybe don't give me the content yet of any offers.

5            MR. LUTHMANN:  Okay.

6            MR. CHIAPPETTA:  I appreciate Your Honor's

7    offer, but I was appeared here today on the schedule,

8    and I have two little league teams to coach this

9    evening, and I really do not want to miss that.

10           THE COURT:  Understood.  Well, but Mr.

11   Norshirvan might want you to think otherwise.  You're

12   here on his dime, and maybe if we could get this case

13   resolved today, he might want you to potentially make

14   other arrangements.

15           MR. CHIAPPETTA:  I understand that, but

16   given Mr. Luthmann's position that was provided this

17   morning and our position that was provided at lunch or

18   right after lunch, I don't -- I think we are far

19   enough apart that it -- we won't get there today, and

20   I'll just end up missing two little league baseball

21   practices for I guess without having a good result or

22   an outcome.

23           THE COURT:  Okay.

24           MR. LUTHMANN:  I'm going to say you never

25   know unless you try.  The president says that a lot.

161

1    You never know unless you ask.  He sat down with

2    Putin.  Maybe we get peace, maybe we don't, but you

3    never know unless you try.  Right?

4           THE COURT:  It can be shocking sometimes.

5    I've had many cases where we try to have a settlement

6    discussion and both sides come in here and tell me,

7    Your Honor, this is a total waste of time.  We're

8    never going to resolve, and we do.  So -- but I

9    understand.  I'm kind of springing this on you, and

10   you probably had other plans.  Do you want to confer

11   about it at all about maybe taking advantage of this

12   opportunity?

13          MR. CHIAPPETTA:  One moment, Your Honor.

14   Thank you.

15          THE COURT:  Okay.

16   (There was a discussion off the record.)

17          THE COURT:  Maybe we could even do it for

18   just a bit.  I'm not saying we have to do it until 4

19   or 5:00.  Maybe we just take a run at it for maybe 30,

20   40, 60 minutes.

21          MR. CHIAPPETTA:  I have a two hour drive

22   back into town.

23          THE COURT:  Right.

24          MR. LUTHMANN:  Give us a half-hour in

25   earnest.

162

1          MR. CHIAPPETTA:  Um.

2          MR. LUTHMANN:  I feel --

3          THE COURT:  Again, I want you all to agree,

4    and I don't mean to pressure you or anything.

5          MR. CHIAPPETTA:  Yeah.

6          THE COURT:  I want you all to agree it's

7    worth while.

8          MR. CHIAPPETTA:  So here's the thing.  My

9    client would agree to 30 minutes from right now that

10   would put it at like 2:15 to go forward, but he has

11   one condition and I would also need a restroom break

12   before we began.

13         THE COURT:  No problem.

14         MR. CHIAPPETTA:  Our only condition to even

15   agree to this is that one of the terms would be that

16   you have to take down all of your Substacks that

17   mention my client's name.

18         MR. LUTHMANN:  Is he going to take down

19   everything that mentions my name?

20         MR. CHIAPPETTA:  That can be a discussion

21   point.  You have to agree to that term before we'll

22   agree to negotiate.

23         MR. LUTHMANN:  I'll agree to that term if

24   he's going to do it.  I mean, I'm not going to give it

25   up for nothing.  You ain't giving up something for

163

1    nothing.  Right?  So why would I do that?

2          THE COURT:  He's willing to put it on the

3    table maybe subject to a goose gander rule.

4          MR. CHIAPPETTA:  Okay.  My client said that

5    that's agreeable as far as both sides remove all

6    content of the other.  I would just ask for a brief

7    two minute break to use the restroom.  Then we can

8    come back.

9          THE COURT:  No problem.  That's fine.

10          MR. LUTHMANN:  That's the first step, yeah.

11          MR. CHIAPPETTA:  Then I would also ask that

12    this settlement conference be private.

13          THE COURT:  Yes.

14          MR. CHIAPPETTA:  I know there's other

15    individuals that are here.  That should not be --

16          THE COURT:  It would be just like you would

17    a mediator.  It would be confidential.  Anything you

18    say, Mr. Norshirvan, you've been in some mediations

19    with Mr. Burkett?

20          MR. CHIAPPETTA:  Yes, Your Honor.

21          THE COURT:  You've heard the spiel from a

22    mediator before about it's all confidential.  Anything

23    you say is not going to be shared outside of the

24    context of the settlement discussions.

25          THE WITNESS:  I understand, Your Honor.

164

 1          THE COURT:  Nobody could ever, you know, use

 2     it against each other and I would never tell anybody

 3     what you said or anything like that, and yeah, it's

 4     all confidential, and we just try to hand write a

 5     resolution.  And even if we don't get it done, maybe

 6     we make significant progress and you're that close and

 7     you can wrap it up before the next days or weeks

 8     without me.  Maybe we could -- I think it would be

 9     worthwhile to at least spend some time on it.

10          MR. CHIAPPETTA:  Okay.

11          THE COURT:  Okay.  Sounds good.  So why

12     don't we do this logistically.  We'll adjourn this

13     hearing.  We're done with this, and then Mr. Luthmann,

14     I'll keep you in this room, and I'll put defense in

15     the jury room behind that wall, and I can just go back

16     and forth.

17          MR. CHIAPPETTA:  Okay.

18          THE COURT:  I take it you don't need to make

19     any kind of mediation statements to each other.

20          MR. CHIAPPETTA:  No, nothing like that, Your

21     Honor.  Before we --

22          THE COURT:  You've already -- I've seen some

23     of the emails back and forth about Mr. Luthmann's

24     offers, so I kind of get the gist of it.

25          MR. CHIAPPETTA:  Before we adjourn this

165

1    particular hearing, I just wanted to discuss that

2    discovery issue.

3              THE COURT:  Okay.

4              MR. CHIAPPETTA:  Is that something that's

5    going to require a motion or is that something that

6    Your Honor can extend here today?

7              THE COURT:  You -- you have pending

8    discovery requests that you haven't responded to yet;

9    right?

10             MR. CHIAPPETTA:  I --

11             THE COURT:  That's the issue?

12             MR. CHIAPPETTA:  I believe Mr. Luthmann has

13   sent something but it was -- it was sent -- from what

14   I have here, it was sent to my service email address

15   and it was quarantined.  So I would need Mr. Luthmann

16   to reserve me, and then I --

17             THE COURT:  Well, you have them.

18             MR. CHIAPPETTA:  Well, no.  They're in

19   quarantine, and whether or not I can actually pull

20   them from a third-party quarantine --

21             THE COURT:  Oh.

22             MR. CHIAPPETTA:  -- I can't guaranty --

23             THE COURT:  I see.

24             MR. CHIAPPETTA:  -- based upon how my office

25   is set-up, so I would ask Mr. Luthmann to provide

166

1   those documents to me again, and then for a fresh
2   clock to start so I actually have a fair opportunity
3   to review those documents.
4           THE COURT:  What are you talking about?  The
5   interrogatories?
6           MR. LUTHMANN:  What I did was before he was
7   on and we have to discuss that first.
8           THE COURT:  I'm sorry?
9           MR. LUTHMANN:  Before he came on, I put in
10  the notices request for admit and I put in
11  interrogatories that Mr. Norshirvan actually copied
12  the Court.  So sorry that I did and I won't do it
13  moving forward.
14          THE COURT:  Okay.
15          MR. LUTHMANN:  There's a record that was
16  sent over 30 days ago.  It's my position that the
17  request for admit are now as an operation of Federal
18  Rules of Civil Procedure deemed admitted, and I was
19  going to compel and file a motion and I wanted to meet
20  and confer with Mr. Chiappetta and file a motion to
21  have those deemed admitted and have the
22  interrogatories compel answers to those
23  interrogatories.
24          THE COURT:  So we have interrogatories,
25  request for admission.  Do you have requests for

167

1    documents?

2              MR. LUTHMANN:  Then the second trench that I

3    just sent a few days ago was a second set of notices

4    to admit based on new evidence and a request for

5    production, a robust request for production with ESI

6    and all the metadata stuff and mine as well.

7              THE COURT:  Do you have the second set?

8              MR. LUTHMANN:  I sent that to the Court.

9              MR. CHIAPPETTA:  I think that's all that I

10   was referring to.  I was not aware that a first was

11   even sent, and based on my client's testimony, I think

12   it's pretty clear he did not receive any e-mails from

13   Mr. Luthmann as it relates to that discovery.

14             MR. LUTHMANN:  And I'm going to -- I'm

15   willing to take this to a motion though because I

16   believe the 30 days are there and this has been

17   pending and he has knowledge of it and I don't want

18   them to play possum to try to get an additional 30

19   days for something that I put in in due diligence.

20   But I have right here, and I'll tell the Court I have

21   this prepped as part of the exhibits from before, but

22   this is -- I have the transmission email and I'm going

23   to hand it to Mr. Chiappetta and I have the request

24   for admissions.

25             THE COURT:  Okay.  Well --

168

 1          MR. LUTHMANN:  And I'll hand them to him

 2   right now in open court so the Court knows that I'm

 3   handing the request for admissions that was signed and

 4   dated and served on August 9 to Mr. Norshirvan at all

 5   of his email addresses.

 6          THE COURT:  Okay.

 7          MR. LUTHMANN:  Okay?

 8          THE COURT:  Got it.  When was that again?

 9          MR. LUTHMANN:  And mailed to his home.

10          THE COURT:  Okay.  When was that again?

11          MR. LUTHMANN:  Excuse me?

12          THE COURT:  The date?

13          MR. LUTHMANN:  That was -- this was August

14   9.  It was --

15          THE COURT:  All right.  Let me offer two

16   notes on this.  One, as our discovery handbook talks

17   about, you know, some extensions to discovery response

18   times are routine, and we certainly expect you all to

19   pretty much grant that to each other liberally.  So it

20   would not be unusual at all for one side to say hey, I

21   need another 30 or 60 or 90 days to -- 30 or 60 days

22   to respond in addition to the 30 that I already get.

23          MR. LUTHMANN:  Okay.

24          THE COURT:  And then also the request for

25   admission point.  Yes, the rule does read the way it

169

1    reads, but unfortunately, when you look at some --

2    unfortunately, I think from Mr. Luthmann's

3    perspective, the case law just doesn't bear that out,

4    especially, look, there's plenty of published circuit

5    law out there saying it's not like a default situation

6    where you don't answer the complaint. It's a failure

7    to respond to request for admissions and not

8    necessarily binding as in the way -- you know, despite

9    the way the rule reads.

10           So given that case law, I think we're better

11   served just allowing them time to just go ahead and

12   respond, and also, you know, those things -- another

13   thing in the case law is those things need to be

14   really tailored to very narrow things, not broad based

15   merit type questions. Your typical RFA request for

16   admission would be something like some of the things

17   you asked Mr. Norshirvan today on the stand. You

18   know, just do you go by any other names, where do you

19   live, all of those kinds of things, very pinpoint type

20   facts. So those are the things the RFA should be

21   going to and not much else. So anyway, let me offer

22   all that and let you confer about it and let me know

23   if you can't figure it out.

24           MR. LUTHMANN: All right. So I want just a

25   clearing house then and we can all have our discovery

170

1  and be clear that we're all putting discovery in and

2  this is the date.  I'd love for us to have a schedule

3  whereby maybe we could get it so ordered by the Court

4  that says we are all going to have everything by a

5  certain date.  Then we're going to have X amount of

6  days where we --

7           THE COURT:  Have they served discovery

8  requests on you yet?

9           MR. LUTHMANN:  I don't even know.  I haven't

10 seen them.  I don't know what he sent me.  I don't

11 know what he did.  So --

12          MR. CHIAPPETTA:  Okay.

13          THE COURT:  Well.

14          MR. CHIAPPETTA:  Discovery was served by my

15 paralegal close to almost a month ago now, but the

16 issue I have with setting a date is I was only given a

17 request for admissions, the first set.  I was not

18 given these documents here nor was I given the first

19 set of interrogatories.

20          THE COURT:  No, I'm not going to set it

21 right now.  I'm going to let you confer about it all

22 informed by what I just said, that we think it's

23 customary for folks to as a courtesy give each other

24 30, 60 additional days.  That's routine and also the

25 request for admission point, just given the case law

171

1    that does -- the failure to respond within 30 days

2    doesn't really have the impact that the rule would

3    suggest.

4              MR. LUTHMANN:  If he wants to restart the

5    clock, I'll restart the clock for him, he restarts the

6    clock for me, and we can agree on a schedule.

7              THE COURT:  All right.

8              MR. LUTHMANN:  If that's the least we get

9    done today on mediation.

10              MR. CHIAPPETTA:  Your Honor?

11              THE COURT:  There we go, making progress on

12    that too.

13              MR. CHIAPPETTA:  The final point that I

14    would just bring up which is that I'm sure that this

15    Court has been CCed on as well is Mr. Luthmann's

16    absolute refusal to comply with Local Rule 3.01G and

17    communicate telephonically.

18              THE COURT:  Yeah.  Well, I think that goes

19    both ways.  I mean, obviously Norshirvan is blocking

20    Luthmann this whole time until you came on the case

21    really wasn't compliant with 3.01G either.  So -- and

22    we often struggle with how to handle that when we have

23    pro se parties.

24              MR. CHIAPPETTA:  Your Honor, what I'm

25    getting at is that Mr. Luthmann is refusing to

172

1    communicate with my office now via telephone and
2    requesting an in person meeting which is impossible
3    because I'm not going to drive two hours.
4              THE COURT:  Sure.
5              MR. CHIAPPETTA:  It's unreasonable really to
6    drive two hours to meet with him face-to-face at this
7    courthouse.
8              THE COURT:  Yeah.
9              MR. CHIAPPETTA:  And he's refusing any other
10   form of communication.  So in order to comply with the
11   local rule, I would request that the Court advise him
12   that telephonic means are generally accepted and that
13   he should be following that --
14             THE COURT:  Well, you should.  I mean --
15             MR. CHIAPPETTA:  -- local rule.
16             THE COURT:  -- Mr. Chiappetta and Mr.
17   Luthmann should be able to speak on a phone in a civil
18   and courteous matter, business like matter about
19   things like, hey, I need a few more days or I need a
20   few more pages, that kind of thing.  I mean, you
21   should be able to do that, and about maybe the
22   substantive motions I was thinking what I could do as
23   a substitute is require you all to serve motions on
24   each other three or four days before you file them,
25   and that way the other side has it.  They can offer

173

1    thoughts about, hey, I don't have a problem with that,

2    or if you just change this, I'm good, that kind of

3    thing, and if because if you can't confer, I got to

4    come up with a substitute.

5              MR. LUTHMANN:  I have no problem with that,

6    that's fine.  I'll tell the issue that I have is this.

7    And I put it in the papers is, you know, fool me once,

8    shame on you, fool me twice, shame on me.  I feel as

9    if the things that we say are what is reflected in the

10   certification.  So it might have been a mistake in

11   time with two days September 11 versus September 15.

12             THE COURT:  Oh, yeah.  I remember that.

13             MR. LUTHMANN:  But you know, I said 30 days

14   and the 30 days was the 30 days, but then it happened

15   again where he mischaracterized the fact that I wanted

16   to speak and have a record.  So I either wanted to do

17   it in person or I wanted to do it in writing or I

18   wanted to do it through the mail or email or whatever.

19   These are all formal ways in 3.01G it can happen.  It

20   doesn't necessarily contemplate a telephone call, and

21   in the State of Florida where it's a two party consent

22   state, it makes almost email even better because you

23   have a full record of going back and forth.

24             THE COURT:  Well, on that score, you both

25   traded e-mails on that extension of time, and you

174

1    still get on the same page with each other.  So I

2    don't know if it's necessarily a cure all, and

3    obviously, you can video conference each other, but

4    anyway, and then again, like I said, the email that

5    came across at 2:30 in the morning is much more the

6    form that e-mails should be taking from here on out.

7         MR. CHIAPPETTA:  Yes, Your Honor.

8         THE COURT:  If you keep it that way, I think

9    we'll be good, and I would encourage you to try to

10   either talk orally on the phone or maybe engage each

11   other on the video conference about other things to

12   satisfy 3.01G, and if you can't, if you can't bring

13   yourselves to do it, then at least serve a motion on

14   each other three days before you -- 72 hours before

15   you file it with us, so that way each side at least

16   has an opportunity to say I don't oppose that and you

17   can tell the Court.  All right?  All right.

18        MR. LUTHMANN:  Given the Court's words and

19   kind words, I will give Mr. Chiappetta another chance

20   and I will earnestly act and try to act with him in

21   good faith and believe that he's acting the same way.

22        THE COURT:  Well, I think both sides want

23   that.  All right.  Do you want to take a quick

24   bathroom break and maybe we can have a discussion for

25   about 20 minutes?

175

1          MR. CHIAPPETTA:  Yes, Your Honor.  Thank

2     you.

3          THE COURT:  Okay.  Very good.  Let's adjourn

4     this hearing.  Thank you.

5              (Proceeding concluded at 1:58 p.m.)

6

7          CERTIFICATE OF COURT REPORTER

8          I certify that this is a true and accurate

9     record of proceedings in the United States Magistrate

10    Court for the Middle District of Florida before the

11    Honorable Nicholas P. Mizell on September 10, 2025.

12

13    S/ Brandi A. Wilkins

14    Brandi A. Wilkins

15    Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**Survey Manifest of Richard Luthmann's published reporting on Danesh Noshirvan (and Nicholas Chiappetta), listing article titles, dates, publication outlets, and citations/URLs for identification.**



*(Articles by R. Luthmann unless otherwise noted.)*

- **Feb. 28, 2026:** *"Woke TikToker's Gag Gambit Bombs."* (Published on *This is For Real?* Substack & Florida Gulf News). – Report on Noshirvan's failed attempt to gag critical evidence, with commentary on his "cancel culture" tactics backfiring.
  **https://luthmann.substack.com/p/woke-tiktokers-gag-gambit**

- **Feb. 3, 2026:** *"Feds Tag Antifa Influencer as Domestic Threat."* (Published on *Florida Gulf News*; also on Substack). – Report detailing a DHS source labeling Danesh Noshirvan as an Antifa-linked domestic threat after inciting violence (e.g., calls to "fight ICE"), and the widening federal probe into his activities.
  **https://luthmann.substack.com/p/feds-tag-antifa-influencer**

- **Jan. 13, 2026:** *"Antifa TikTok Agitator Urges Armed Leftist Militias to 'Fight' ICE Agents."* (Published in *The Gateway Pundit* by Jim Hoft and Richard Luthmann). – Article covering Noshirvan's extremist rhetoric encouraging armed resistance against federal agents (cited in Motion at p. 2).
  **https://www.thegatewaypundit.com/2026/01/antifa-tiktok-agitator-urges-armed-leftist-militias-fight/**

- **Dec. 5, 2025:** *"Trolls In Trouble: Danesh Noshirvan and James McGibney."* (Published on *Florida Gulf News* and Substack). – Co-authored exposé (with Dick LaFontaine) based on leaked chats, showing Noshirvan and McGibney conspiring in harassment, perjury, and schemes involving Antifa links.
  **https://luthmann.substack.com/p/trolls-in-trouble-2**

- **Nov. 24, 2025:** *"Snake Oil Star Danesh Noshirvan: Trust Fund TikToker Begs on GoFundMe to Pay $62K Court Sanction."* (Published on *Florida Gulf News* and Substack). – Co-authored with Dick LaFontaine, reporting on Judge Steele's $62,320 sanctions order against Noshirvan and Noshirvan's subsequent GoFundMe campaign, raising questions of potential fraud and highlighting his deposition outburst that led to sanctions.
  **https://luthmann.substack.com/p/snake-oil-star-danesh-noshirvan**

- **Oct. 22, 2025:** *"Paid to Lie: Antifa Lawyer Nick Chiappetta?"* (Published on Substack & FL Gulf News). – Investigative piece (with M. Thomas Nast) profiling Noshirvan's attorney Niccholas Chiappetta, documenting his role in advancing Noshirvan's false narratives and his own alleged misconduct (false police reports, frivolous filings), earning the moniker "Antifa lawyer." Reveals Chiappetta's involvement in smear campaigns and notes Judge Steele's public reprimand of Chiappetta in Aug. 2025.
  **https://luthmann.substack.com/p/paid-to-lie**

- **Jul. 15, 2025:** *"Delusional Danesh Sinking Fast: Nuisance Lawsuit Is Going Down."*
  (Published on *Florida Gulf News* and Substack). – Report analyzing Noshirvan's Third
  Amended Complaint (TAC) in this case, describing it as a "slander manifesto" full of
  conspiratorial allegations (e.g., linking Defendants to white supremacists without
  evidence)[14]. Highlights how the TAC collapsed under its own weight and foreshadows the
  case's weakness.
  **https://luthmann.substack.com/p/delusional-danesh-sinking-fast-nuisance**

- **Nov. 25, 2024:** *"Cancel Culture Killer? SCOTUS Doxxer Investigated in Texas Coach's
  Death."* (Published on Substack; also appeared on Michael Volpe's Substack)[65][66]. – Co-
  authored with Michael Volpe, this article connects Noshirvan's doxxing of a Texas high school
  coach (Aaron De La Torre) to the coach's suicide, and notes law enforcement interest in
  Noshirvan's role. Provides broader context of the real-world harm caused by Noshirvan's
  campaigns.
  **https://luthmann.substack.com/p/cancel-culture-killer-scotus-doxxer**

- **Oct. 31, 2024:** *"License to Doxx: Did a Florida Federal Court Just Sanction Doxxing as a
  Litigation Strategy?"* (Published; on Substack) – Article discussing an early stage of the
  Noshirvan litigation, questioning whether the court's handling of certain filings tacitly allowed
  Noshirvan to use doxxing and false allegations in his lawsuit. Explores the tension between
  Noshirvan's litigation tactics and the principles of justice, and was one of the first pieces to
  label Noshirvan a "professional cyberbully."
  **https://luthmann.substack.com/p/license-to-doxx-did-a-florida-federal**

# THE
# FRANK REPORT

*The truth is always fair*

CRIMINAL JUSTICE  |  FAMILY COURT  |  INVESTIGATIONS  |  SANDUSKY  |  ONETASTE  |  NXIVM

BERNHARD FRITSCH  |  HEALTH  |  ABOUT

**CANCEL CULTURE**

# Cyberbullying, Bots, and Cancel Culture Chaos: Inside the Danesh-Luthmann Conflict

January 6, 2025 · by (FR) Frank Parlato

*Ex. E*

**142**



3/4/26, 11:02 AM    Cyberbullying, Bots, and Cancel Culture Chaos: Inside the Danesh-Luthmann Conflict - Frank Report





A client has hired me to investigate and report on "cancel culture" and related issues. The goal is to clarify this subject for a potential documentary series.

See: Fear, Algorithms, Anonymity and AI: Why 'Accountability Culture' Thrives

Today's topic is the conflict between Richard Luthmann and Danesh Noshirvan.

Richard Albert Luthmann, 45, has written for this publication and has a
Substack, which, according to Substack, has over 59,000 followers.



**This is For Real?**

Subscribe without fear of Big Brother ever
knowing: corrupt politicians, government officials,
and courts; guest commentators; exciting
news; and investigative reporting. Comments
or tips: richard.luthmann@protonmail.com
or (239) 631-5957.

Over 59,000 subscribers

According to TikTok, Danesh Noshirvan, 38, has more than 2 million followers.
Danesh's TikTok handle is @thatdaneshguy.



# Cancel Culture Meets Cyber Feud

Danesh, whose content niche involves "cancel culture," creates videos
targeting individuals for perceived wrongdoing, often by doxxing them
(sharing personal information like legal names, addresses, employers, and
contact details) and encouraging his followers to contact them or leave
comments on their social media accounts.

142

Luthmann initiated the now-escalating conflict by writing on Substack, accusing Danesh of being a professional cyberbully.

Danesh, who describes himself as an "online entertainer," "journalist," and "shock jock," admits his "work often depicts bad actors behaving badly on camera...which unfortunately in some cases, results in public cancellation."

# Claims and Counterclaims

Danesh alleges Luthmann is being paid to attack him, claiming Jennifer Couture and her employer, Dr. Ralph Garramone—a prominent Florida plastic surgeon and adversary in Danesh's federal lawsuits—are funding Luthmann's efforts.

Luthmann denies these accusations, asserting he is an investigative journalist covering the lawsuits between Couture, Garramone, and Danesh. These lawsuits, rife with allegations and counter-allegations, include claims of defamation, tortious interference, and conspiracy.

Danesh featured Couture and Garramone in more than a dozen videos, targeting them for their alleged actions and encouraging his followers to hold them accountable. His videos reportedly led to harassment, including phone calls, negative online reviews, and even threats, affecting Garramone's business operations and Couture's personal life.

142



## Building a Platform for 'Accountability'

Couture and Garramone's alleged experiences are far from unique.

Danesh's TikTok videos often feature him playing cellphone footage of people in arguments or displaying regrettable and sometimes criminal behavior.

Danesh is skillful at identifying these often unknown people using software programs and online sleuthing skills. His signature move involves appearing superimposed on a previously posted video (called a "stitch" on TikTok), greeting the alleged wrongdoer with a chilling "hello" before revealing their identity.



**142**



Danesh, who started making videos on TikTok in 2020, invites his followers to engage in campaigns to expose the now-identified individual in the video. He dismisses the term "cancel culture" in favor of "accountability culture."

# The Mechanics of a Digital Mob

The campaigns involve him and his followers contacting individuals in the videos, their employers, the police, and anyone who could hold the individual accountable.

Campaigns frequently lead to thousands of texts, phone calls, and emails. If the individual owns a business, they may also experience "review bombing," where people who have never used the business's products or services appear to leave negative reviews on platforms like Yelp, Google, and Amazon. This can significantly lower the business's ranking on these platforms.

Repeated phone calls and text messages target an individual's phone, often containing urgent and sometimes profanity-laden content. Employers receive calls asking them to terminate the individual's employment. If Danesh believes the person in question committed an illegal act, law enforcement is bombarded with hundreds of messages and calls requesting the individual's arrest.

## Personal and Professional Fallout

Danesh's record on TikTok clearly demonstrates the effectiveness of the campaigns. Many individuals have lost their careers, while others have experienced significant or total destruction of their businesses. Some have been arrested, others have relocated, and at least one person took his own life.

Luthmann argues Danesh's campaigns and his TikTok account, with its 2 million followers, are deceptive.

## Are AI Bots Driving the Outrage?

Luthmann writes, "Despite claiming a massive online following, evidence suggests much of [Danesh's] engagement is artificially inflated through AI bots and fabricated interactions."

Luthmann further contends that the numerous calls and texts that appear to overwhelm the targeted individual, employers, and even the police are not genuine outpourings of public outrage but are primarily generated by AI-driven attacks.

142

He suggests it's possible that "Mr. Noshirvan is lying about his 2 million followers and it's just him, … a half-dozen others, and a bunch of AI and AI-generated bots" behind the cancel campaigns.

# Danesh Responds: Subpoenas and Sharp Allegations



Danesh appearing in video naming
Luthmann as a paid troll for Jennifer
Couture and Ralph Garramone pictured
below in the video with Danesh in the
forefront



On January 1, 2025, Danesh struck back, releasing a TikTok video alleging Couture and Garramone, his adversaries in his federal civil litigation, hired Luthmann to attack him.

Danesh also revealed he served Luthmann with a subpoena in the litigation.

In the video, Danesh claims:

> "They (Couture and Garramone) just hired another gigantic loser. His name is Richard Luthmann. He's a man who has also been a felon. He has been involved in a crime where he lured someone to a private room so that that person could be held at gunpoint so that he could have money taken from him. This guy is insane.

> "When we served (the subpoena), he started screaming and crying in court and threatening the process server. That's their new hire. That's their new-for-hire troll, and this new-for-hire troll has been again coming after my children, coming after my family, and, you know, targeting and harassing me…"

In his video, Danesh concludes, "Richard, get ready for prison, buddy."

# Allegations of Harassment Spark Legal Threats

Danesh, his wife, and his children reside in Mansfield, Pennsylvania. Luthmann, who lives in Naples, Florida, stated he has never visited Mansfield.

Danesh has reported to local police that Luthmann harasses him through repeated phone calls and emails.

In response to Danesh's accusation, Luthmann emailed the judges in the federal lawsuit, multiple journalists, and copied Danesh. He wrote:

"Any claim that Mr. (Danesh) Noshirvan or his family is being 'harassed' is disingenuous at best and patently absurd. Any 'police claim' to that effect would be a knowing abuse of process and the filing of a false claim with authorities. Any local police department or prosecutorial office that would take up such a claim on Mr. Noshirvan's behalf would open themselves up to a monumental civil suit."

## Danesh Fires Back

Danesh responded to Luthmann's email with a strongly worded message:

"I've asked you to stop contacting me several times. I'm going to call the police again. Stop contacting me you psychopath you've been sending nasty emails to my family you sick fuck. Leave us all alone and rot in prison, and stop harassing my children and wife. I will not read your email and I will not respond to anything you send me because it is illegitimate and harassment. Fuck off loser."

## Luthmann Dismisses Cancellation Threats

A disbarred lawyer, Luthmann spent four years in federal prison after the U.S. Attorney for the Eastern District of New York charged him with participating in an allegedly mob-based scrap metal scam in New York City and New Jersey. Luthmann's probation ended in 2024.

Luthmann shrugged off Danesh's ability to use his platform to cancel him, stating:

142   "Danesh Noshivan ... made a fatal miscalculation. I can't be canceled. The
      )-Biden Justice Department already did that to me," Luthmann said. "I
      don't give a flying f—- about Cheese Danesh and his WOKE band of blue-
      haired Garbage Pail Kids and Internet groupies."

## Formal Action Against Danesh

As a former attorney who has represented high-profile clients, including alleged Mafia members and New York City politicians, Luthmann has a deep understanding of the legal system. He currently represents himself in several lawsuits against individuals he claims are part of the Justice Department's "railroading" of him based on false charges.

On January 2, Luthmann issued Danesh a formal demand letter, calling for a retraction, an apology, and $100,000 in liquidated damages for the allegedly defamatory content in his video.

Luthmann maintains Danesh's allegations are "unequivocally false," including claims he held someone at gunpoint, and Couture and Garramone hired him to engage in stalking and harassment.

Luthmann stated he would sue Danesh for defamation if he ignored the demands in the letter.

## Allegations of Harassment-Related Suicide

Luthmann also alleges Danesh could face prison.

Luthmann claims Danesh is "under investigation related to the harassment-related suicide of Denton, Texas, football coach Aaron De La Torre, who Noshirvan previously targeted." The legal issue centers on whether Danesh's alleged use of AI to generate calls, texts, and posts requesting De La Torre's arrest and dismissal crossed the line from free speech to cyberstalking.

## Investigations and Controversial Claims

Luthmann further alleged, without revealing specifics, that Danesh's actions have triggered several state and federal investigations. He also claims—without evidence—that Danesh might receive financial support from the Chinese Communist Party (CCP) to sow discord in American institutions through divisive rhetoric and misinformation.

# Danesh Addresses TikTok Ban Concerns

In a recent video, Danesh acknowledged the possibility of a U.S. ban on TikTok due to its ties to the CCP. He asked his followers to support him on YouTube and Instagram, where he also has accounts, stating, "I'll continue to post content until this app no longer allows me to."



### Frank Parlato

Frank Parlato is an investigative journalist, media strategist, publisher, and legal consultant.





### Frank Parlato

Frank Parlato is an investigative journalist, media strategist, publisher, and legal consultant. See Full Bio ›

142



4.2

3/4/26, 8:49 AM                          (7) Sent | richard.luthmann@protonmail.co;    roton Mail

## Re: Danesh (ThatDaneshGuy) Noshirvan Ayatollah Down — Your Family Escaped Iran - Were You Wrong About Trump, and Who's Really Funding Your Digital Jihad?

**Ex. F**

From    Richard A Luthmann <richard.luthmann@protonmail.com>

To      Joey@YourDaddyJoey.news <joey@yourdaddyjoey.news>

CC      ThatDanesh Guy <thatdaneshguy@gmail.com>, thatdaneshguy@yahoo.com,
        Danesh <daneshnoshirvan@gmail.com>, daneshnoshirvan@yahoo.com,
        Nick Chiappetta <nick@chiappettalegal.com>, nickchiappetta@gmail.com, service@chiappettalegal.com,
        Vicki Modaffari <vicki@chiappettalegal.com>, services@chiappettalegal.com,
        nchiappetta@chiappettalegal.com, Troy@slingshot.news,
        Frankie Pressman <frankiepressman@protonmail.com>, Frank Parlato <frankparlato@gmail.com>,
        Michael Volpe <mvolpe998@gmail.com>, mediacontacts@infowars.com, showtips_nfocom@infowars.com,
        whistleblowers@infowars.com, Jim Hoft <jimhoft@gmail.com>,
        Dick LaFontaine <RALafontaine@protonmail.com>, Rick LaRivière <RickLaRiviere@proton.me>,
        Modern Thomas Nast <mthomasnast@protonmail.com>, Tom Lemons <tom@rnews.news>,
        Joseph A. Camp <joey@joeycamp2020.com>, Cortney Kotzian <theomahaoracle@gmail.com>,
        cinf-ir@cinfin.com, steve_spray@cinfin.com, media_inquiries@cinfin.com, news@floridaweekly.com,
        Cara Castronuova <caracastronuova@yahoo.com>, jt@liquidlunchtv.com,
        Richard Luthmann <rluthmann@flgulfnews.com>, richard@nynewspress.com,
        Greg Maresca <greg_m@newsitem.com>, investigates@cbsnews.com, news.tips@abc.com,
        tips@candaceowens.com, tips@lawandcrime.com, tips@lawnewz.com, tips@nypost.com, tips@thefp.com,
        CHAMBERS FLMD STEELE <chambers_flmd_steele@flmd.uscourts.gov>,
        CHAMBERS FLMD DUDEK <chambers_flmd_dudek@flmd.uscourts.gov>,
        chambers_flmd_frazier@flmd.uscourts.gov, chambers_flmd_chappell@flmd.uscourts.gov,
        Sweeney_Chambers@cod.uscourts.gov <sweeney_chambers@cod.uscourts.gov>,
        o'hara_chambers@cod.uscourts.gov, ptesq1@yahoo.com

Date    Sunday, March 1st, 2026 at 11:55 AM

Danesh,

Are you really Persian? Or is that just part of your Mega Influencer Shtick?

(7) Sent | richard.luthmann@protonmail.com, Proton Mail









I see many of the Persian people showing GRATITUDE today.

3/4/26, 8:49 AM                              (7) Sent | richard.luthmann@protonmail.com | Proton Mail

I would love a response before we publish.

Thank you for your attention to this matter!



Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
**LINKTREE**
**Muck Rack Profile**
**Substack: This is For Real.**
**Editor-In-Chief: FLGulf.news**
**Editor-In-Chief: NYNewsPress.com**
**Editor-In-Chief: TheFamilyCourtCircus.com**
**Contributor: Frank Report**
**Contributor: Sun Bay Paper**
**Follow Me on Facebook X Instagram LinkedIn TRUTH Rumble Newsbreak SPOTIFY**

Sent from Proton Mail for Android.

-------- Original Message --------
On Saturday, 02/28/26 at 21:09 Joseph Camp <joey@yourdaddyjoey.news> wrote:

Mr. Noshirvan and Mr. Chiappetta,

Our newsroom (YourDaddyJoey News) is preparing coverage concerning the pending federal matter Noshirvan v. Couture et al., No. 2:23-cv-01218-JES (M.D. Fla.), along with broader issues (see Lutthman email within this thread) that have become matters of public discussion due to extensive online publication, litigation filings, and commentary circulating across multiple platforms.

Because both of you are public participants in an ongoing legal controversy — and because significant claims, counterclaims, and public accusations are being widely disseminated — we believe it is essential that your perspectives be included fully and accurately. This outreach is therefore intended to ensure fairness and provide an opportunity for clarification before publication.

To be clear:

Our reporting will distinguish between verified facts, court filings, public statements, and disputed allegations.

Any assertions referenced in prior correspondence will be treated as claims attributed to sources unless independently verified.

Your responses will be published in full or summarized faithfully, depending on length and editorial format.

We recognize that the matters at issue involve strong opinions, political speech, and ongoing litigation. For that reason, your direct comment is particularly important. Silence or refusal to respond will also be noted, but we would prefer to include substantive answers so readers may evaluate competing narratives themselves.

Specifically, we invite you to address:

Whether you dispute the characterization of your public statements and online conduct currently being circulated in media and litigation contexts;

Whether you believe public commentary about your activities has been inaccurate or misleading, and if so, what corrections you request;

Any context you believe has been omitted from public discussion regarding your roles in the referenced litigation;

Any additional statement you wish readers to consider concerning your professional conduct, motivations, or positions.

We are working under publication deadlines but remain willing to accommodate a reasonable response window. If you prefer to provide a written statement through counsel, we will accept that format.

Our objective is straightforward: to document a matter of clear public interest with accuracy, balance, and transparency. This correspondence is part of that process.

Please indicate whether you intend to respond.


On Sat, Feb 28, 2026, 8:41 PM Richard Luthmann <richard.luthmann@protonmail.com> wrote:

3/4/26, 8:49 AM                                     (7) Sent | richard.luthmann@protonmail.co..., Proton Mail

Dear Danesh ("ThatDaneshGuy") Noshirvan and Antifa-Linked Lawyer Nicholas Chiappetta:

We are journalists seeking a response to a journalistic inquiry on newsworthy topics related to the pending
Fort Myers federal court matter *Noshirvan v. Couture et al*, No. 2:23-cv-01218-JES (U.S. Dist. Ct., M.D.
Fla.) and related legal and non-legal matters.

Today, the world has turned upside down for the Iranian regime you've flirted with. Breaking news out of
the Middle East: Iran's Supreme Leader, Ayatollah Ali Khamenei, is dead – taken out in joint U.S.-Israeli
strikes. President Donald Trump himself confirmed that Khamenei "was killed" thanks to U.S. intelligence
and our "working closely with Israel." https://www.theepochtimes.com/world/irans-leader-khamenei-killed-
israeli-security-sources-say-5992226

In other words, Trump and Prime Minister Netanyahu just dealt a death blow to the tyrants in Tehran. This
marks the Iranian people's greatest chance at liberation since 1979, after 46 years under the mullahs'
oppressive rule.

Why does this involve you? Because for years, you, Danesh, built your fame on attacking Trump and
swearing he'd "never" help the Iranian people.

https://www.youtube.com/shorts/Tb5yvDicqP4

You even addressed Iranians in Farsi to sneer that President Trump would do nothing for them, while you've
danced on Trump's grave (literally) in ghoulish celebration.

Now the man you mocked has helped slay the very Ayatollah you effectively cheered (and that your family
escaped). The irony is rich, and it demands answers. As a journalist, I'm writing to ask those tough
questions – and I intend to publish your responses (or non-responses) in full for the world to see. There is
no malice here, only an opportunity for truth and accountability. It's time to put up or shut up.

## Background: Danesh Noshirvan's Track Record of Extremism

Before we get to the questions, let's recap *why* these questions are more than justified. Danesh, your public
record speaks for itself – and it isn't pretty:

- **Privileged "Anchor Baby," Fake Oppressed Persona:** You are a self-proclaimed "Iranian Anchor
  Baby" born to Persian parents who fled Iran, yet you've hardly lived the life of an underdog. In fact,
  you don't even work – you live off a trust fund from your late father's real-estate fortune, plus your
  *schoolteacher wife's income, while you sit home making attack videos. Oppressed? Hardly. Yet you*
  constantly play the "oppressed brown man" card for sympathy and to deflect criticism. The absurdity
  is that Iranians like you are actually categorized as white – Iran literally means "Land of the
  Aryans," and your culture has proudly touted its Aryan heritage for decades.
  https://frankreport.com/2026/01/19/the-danesh-chronicles-2-the-trust-fund-aryan-who-plays-brown-
  for-profit/
  In other words, your "brown victim" act is a calculated con to get woke cred and donations, instead
  of admitting you're an unemployed Persian heir living in luxury.

3/4/26, 8:49 AM                                    (7) Sent | richard.luthmann@protonmail.co..., Proton Mail

- **Allegiance to the Ayatollah & Hatred of Trump:** You have openly professed hatred for President
  Trump and even declared allegiance to Iran's Islamist regime. On video, you boasted, "The
  Ayatollah is paying me… we have an agenda to turn America into Sharia law." Yes, you effectively
  claimed loyalty to Iran's dictator – the very regime of Ayatollahs now crumbling.
  https://www.youtube.com/shorts/MAl4yUfB_So
  Meanwhile, you trashed our own leaders: in one infamous stunt, you gleefully posted a video of
  yourself dancing on a mock grave of President Trump. That's right – while on the Ayatollah's payroll
  (by your own admission), you literally danced on Trump's "grave," reveling in what you *hoped* was
  his demise.
  https://youtube.com/shorts/2V7BwY4Y8pM?feature=share
  You even took your vitriol further: when conservative activist Charlie Kirk was assassinated, you
  "danced on Charlie Kirk's grave" too, mocking the murder victim by sneering that "we don't need to
  honor his memory…he encouraged the violent culture that led to his death."

 **thatdaneshguy**  ⊚ 2d                           

We don't need to honor his memory. School
shootings across the United States honor his
memory. We need to add a footnote to his
memory that he encouraged the violent culture
that led to his death and go the opposite way by
creating gun laws.

 **cagovernor**  4d

The best way to honor Charlie's memory is
to continue his work: engage with each
*other, across ideology, through spirited*
discourse. In a democracy, ideas are tested
through words and good-faith debate...    3/4

https://youtube.com/shorts/Ee4OnfC0ULA
Even Americans who disliked Kirk were aghast at your ghoulish glee. You earned the national
backlash and the moniker "grave dancer" – a line even I never thought an "anti-hate" activist like
you would cross.

- **Inciting Violence & Targeting Law Enforcement:** Your rhetoric hasn't just been offensive; it has
  crossed into outright incitement. You urged your followers to form "armed left-wing militias" in
  every city to "fight back" against U.S. immigration officers, painting ICE agents as "Trump's
  personal ... army" to be violently confronted.

3/4/26, 8:49 AM                                    (7) Sent | richard.luthmann@protonmail.co..., Proton Mail

https://www.youtube.com/shorts/qjidXfvlFG4

You didn't stop at generic calls to arms – you threatened specific federal agents and their families. In one post, you vowed to expose "the entire list of everyone who ever worked for ICE" and suggested their families "should be given the EXACT same care" they gave others.

https://www.youtube.com/shorts/Nvn8dDVzx5Y

You then cynically added "This is not a threat... just logical advice" as if that fools anyone. Let's be clear: you essentially promised to doxx and terrorize law enforcement officers' kids at school. Such antics blur the line between trolling and terrorism. It's no surprise that Homeland Security now has an active file on you, labeling you "Antifa-linked" and a potential foreign-funded domestic threat. In fact, DHS and federal investigators have you on their radar, much like any extremist agitator, and rightly so. Free speech does not mean free rein to threaten violence.

- **Cancel Culture "Hitman" for Dark Money Masters:** You've built a brand as a TikTok "accountability" crusader, but in reality, you behave more like a paid political hitman. Investigations by journalists have exposed that your "grassroots" cancel-culture jihad is likely bankrolled by powerful dark-money networks. A recent exposé revealed a secret Democratic Party influence program *("Chorus," run by the Sixteen Thirty Fund) paying select influencers up to $8,000 a month* to push partisan talking points in secret. You were among those approached, and you even signaled on social media that you applied to join this covert pay-to-post scheme. In other words, your relentless attacks on conservatives look exactly like something a dark-money donor would pay for – because it likely was. Federal lawsuits allege that you are on the payroll of Democratic operatives and even that your whole TikTok shtick was a "foreign active measure" cooked up by regimes in Beijing and Tehran to undermine America. (It sure would explain your slavish defense of the Iranian mullahs and even Chinese Communist Party narratives.) Seasoned investigators have "followed the money," and all trails lead to you: a purported "digital hitman" running a "cyberstalking-for-profit" operation. We've uncovered AI-driven bot swarms and fake cancel-mobs amplifying your campaigns, hallmarks of a coordinated effort funded by shadowy donors. Simply put, you present yourself as a lone do-gooder, but the evidence suggests you're really a well-paid attack dog for interests that hate Trump, hate Israel, and hate the American values you pretend to defend.

With that record established – in your own words and via documented facts – you can understand why the events of today shine a blinding spotlight on your actions. The Iranian people are closer to freedom now than they've been in decades, thanks in large part to the very leaders you disparaged. So, Danesh, here are my questions:

## Questions for Danesh Noshirvan

1. **Do you now admit that President Trump and Prime Minister Netanyahu have proven you wrong about helping the Iranian people?** You told the world Trump would "never" aid Iranians – yet Trump *partnered with Israel to eliminate Khamenei* and strike at the heart of the oppressive regime. This is the Iranian people's best shot at liberty in nearly half a century. Will you apologize to Donald Trump and Bibi Netanyahu for smearing them, now that they delivered exactly what you

said they wouldn't? Will you finally side with the liberation of the Persian people over the theocrats who oppressed them? Or do you still refuse to acknowledge the truth that everyone sees?

2. **Will you use your platform to help rebuild a free Iran, or will you continue using it to tear down America and Israel from within?** Your homeland stands at the dawn of a new era – an era you claimed would never come. A *true* Iranian patriot would seize this moment to support his people's freedom. Are you capable of doing that? Or will you stick to being a "Digital Jihadi Joe" who serves his masters' agendas and sows chaos in the West? In short: now that Iran's terror regime is falling, will you *pivot* to something constructive, or keep doubling down on the destructive cancel-culture antics that made you infamous?

3. **Who is funding you, Danesh, and will you finally come clean about it?** For years, you've dodged this question, but we now know a lot more. Reports show that operatives like you were offered big bucks through dark-money funds to pump out woke propaganda. You even applied to such a program (the Sixteen Thirty Fund's secret influencer scheme). Our investigations – and federal court filings – allege that your entire operation has been bankrolled by Democrat dark money and possibly even foreign regimes in Iran and China. So I ask directly: will you disclose your income sources and backers? Will you admit if organizations like the Democratic Coalition (Scott Dworkin & friends), the Sixteen Thirty Fund, or even agents of Tehran paid you to attack conservatives? Or do we have to wait for subpoenaed bank records to expose the truth? (Remember, deleting Tweets is easy; deleting wire transfers, not so much.)

4. **Will you retract your anti-Semitic conspiracy theories now that reality has intervened?** When TikTok finally banned your account last month for your pattern of violent content, you bizarrely blamed "the Jews and the IDF" – as if the Israeli Defense Force secretly runs TikTok. (For the record, TikTok banned you because of *your own* outrageous conduct, such as posting a fake video depicting the murder of Charlie Kirk and inciting abuse with bots, not because of some Zionist plot.) Now consider the irony: those same "Jews and the IDF" you scapegoated just helped decapitate the *Iranian regime that you supported. Israel did exactly what you said would never happen – they* materially helped free your people. Will you apologize for that disgusting "blame the Jews" lie? Or are you so deep in hate and delusion that you'll continue to spew baseless garbage about Jewish conspiracies rather than face the facts?

5. **Are you prepared to face the legal consequences of your threats and lies?** You have **doxxed Supreme Court Justices** (right when a man was plotting to assassinate Justice Kavanaugh), and you've essentially called for violent confrontation with federal agents.
   https://youtube.com/shorts/nxHx6LD_OWE
   You've threatened law enforcement families, all under the thin veil of "activism." Here's a reality check: in the United States, true threats and incitement are not protected speech – and you're already under federal investigation for exactly this behavior. Overseas, where there's no First Amendment, your words could get you jailed (or worse) if any of your victims or their governments decide to come after you. Does this concern you at all? You built an online persona thinking you were

untouchable, but now DHS is knocking at the door,      and even Big Tech found you too toxic to
tolerate. Do you really believe you can laugh this off as "logical advice" and not end up in an orange
jumpsuit? In short: what's your endgame, Danesh? The law (and karma) are catching up. Are you
ready for that?

*Consider these questions an opportunity, Danesh – a chance to reclaim whatever shred of integrity might be*
*left. If you truly stand for "accountability," you should have no problem answering for your own actions.*

**Will you answer, or will you hide** (as you did when you skipped court dates and had public meltdowns
under basic questioning)?

https://www.youtube.com/watch?v=5BeKHfYZzFw

The world is watching, especially now.

## Questions for Nicholas Chiappetta

Mr. Chiappetta, don't get comfortable – we need to talk about your role in all of this. You have been
described as Danesh's personal "Antifa-connected lawyer," a legal enabler for his harassment campaigns. In
fact, federal sources say Danesh's whole network – including you – is under investigation for a coordinated
harassment-for-hire operation.

As an officer of the court, sworn to uphold the Constitution and law, you have some explaining to do as
well:

1. **How do you reconcile your oath to uphold the Constitution with aiding and abetting Danesh's
   anti-constitutional antics?** You earned a reputation as the go-to lawyer for Danesh's smear
   operations – filing frivolous lawsuits and coaching false "harassment" claims to silence his targets.
   Meanwhile, your client doxxed Supreme Court justices and urged armed militias to confront federal
   agents. You of all people should know that's not "free speech" but intimidation and incitement. So I
   ask: why are you complicit in this? Do you believe in anything beyond winning for Team Antifa?
   Where do your loyalties lie – with the rule of law, or with your client's lawless agenda? You can't
   have it both ways, counselor.

2. **What possessed you to impersonate an opposing attorney via a fake email account – and do
   you comprehend how unethical that was?**

   '

3/4/26, 8:49 AM                              (7) Sent | richard.luthmann@protonmail.co... Proton Mail

and electronically stored information related to Plaintiff's counsel's im

Trainor's email address and internet domain.  [D.E. 427 at 12].   As se

*inserted on page twelve (12) of Plaintiff's motion is an image of Mr. C*

computer screen which shows him impersonating Trainor's email add

domain (ptesq.com) by using "ptesq1" to send and receive correspond



During one case, you were caught creating a fake email to pose as an opposing lawyer, a deception a
federal judge blasted as "*egregious*" misconduct. This isn't a minor slip; it's a flashing neon sign of
bad faith. Why should anyone trust a word you say in court after you pulled a stunt like that? Have
you reported your own behavior to the bar (somehow, I doubt it)? Or are ethical rules just pesky
details to be ignored in your pursuit of victory at any cost? In short, are you going to act like a real
attorney or a two-bit con artist? The courts – and the public – deserve an answer.

3. **Are you a lawyer, or a member of Danesh's harassment cabal (or both)?** Evidence suggests
   you've been an active participant in Danesh's coordinated "cancel culture" conspiracy. Investigators
   uncovered a "dark alliance" or cyber cabal linking Danesh, you (his lawyer), and fellow provocateur
   James McGibney working in concert. Private communications show you all conspiring in these hit
   jobs.
   https://bullyville.news/
   This goes way beyond traditional attorney-client representation. So which is it, Mr. Chiappetta: are
   you acting as legal counsel, or as a partner in crime? Because from where I sit, it looks like you've
   crossed the line into being a co-conspirator. Are you prepared to be held accountable for that?
   (Remember, being a lawyer doesn't immunize you from being charged if you further a criminal
   scheme.)

4. **Why have you not withdrawn as counsel for Danesh Noshirvan?** This is a man who brags about
   taking money from an enemy regime to impose *Sharia law* in America, who incites violence and
   sows chaos. If you were *faithful* to your oath to the Constitution, you would have walked away the

moment your client started threatening federal agents' families and undermining the rule of law.
Instead, you've stuck by him, validating his delusions and enabling his abuses. Is it just the
paycheck? Or have you so embraced the Antifa-woke ideology that *nothing* is off-limits? At this
point, the question has to be asked: what won't you do in the name of "winning"? Creating fake
emails, weaponizing the courts with sham filings, running to the police with trumped-up claims to
gag hero journalist Joey Camp, who exposed Danesh and his Antifa buddies – you've done all that.
https://flgulfnews.com/federal-court-boogeyman-backfire/
When does it end? Frankly, if you had any ethical compass left, you'd realize *that the train left the
station long ago*. So again: why are you still representing this digital terrorist? Do you have an
answer that doesn't involve selling out your duty as an attorney?

These questions aren't hypothetical. They strike at the heart of your professional integrity (or what's left of
it). The public can judge whether your actions befit an officer of the court or a henchman for hire. I'm
giving you a chance here to present your side, if you have one.

In closing, let me be crystal clear: I seek the truth, not spin. If any factual point I've cited above is incorrect,
you're welcome to correct it – but note, every allegation is backed up by *receipts* (video, court records,
affidavits, your own statements) from credible sources, many of which *you* supplied through your behavior.

**This is your opportunity to respond in good faith. The Iranian people are on the brink of freedom;
the American people are awakening to the games played by paid agitators and their enablers. It's
time for both of you to choose a side: Will it be truth and freedom, or lies and tyranny?**

I look forward to your prompt reply – or to your silence, which may ultimately say more than you ever
could. We think we already know what President Trump thinks.

https://www.youtube.com/watch?v=7m-IX4hSLZo

Oh, and do you know when you'll pay your $62,500 owed in sanctions? We think we already know what
President Trump thinks about that, too.

https://www.youtube.com/shorts/UTz5vJSZqfY

Thank you for your attention to this matter!

Regards,

Richard Luthmann
Writer, Journalist, and Commentator
Tips or Story Ideas:
(239) 631-5957
richard.luthmann@protonmail.com
**LINKTREE**

3/4/26, 8:49 AM                                        (7) Sent | richard.luthmann@protonmail.com - Proton Mail

**Muck Rack Profile**
**Substack: This is For Real.**
**Editor-In-Chief: FLGulf.news**
**Editor-In-Chief: NYNewsPress.com**
**Editor-In-Chief: TheFamilyCourtCircus.com**
**Contributor: Frank Report**
**Contributor: Sun Bay Paper**
**Follow Me on Facebook X Instagram LinkedIn TRUTH Rumble Newsbreak SPOTIFY**

Sent with Proton Mail secure email.

**1.05 MB**      7 embedded images

image.png 199.42 KB      image.png 369.08 KB      1000037609.jpg 137.20 KB      1000037608.jpg 87.70 KB

1000037607.jpg 134.92 KB      1000037606.jpg 100.72 KB      1000037596.jpg 46.35 KB