```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                        FORT MYERS DIVISION
```

DANESH NOSHIRVAN, an individual,

    Plaintiff,

v.                                    Case No: 2:23-cv-01218-JES-DNF

JENNIFER COUTURE, an individual; RALPH GARRAMONE M.D., an individual; RALPH GARRAMONE M.D. P.A. d/b/a GARRAMONE PLASTIC SURGERY; CENTRAL PARK OF SOUTHWEST FLORIDA, LLC; OMG REALTY, LLC; THE LAW OFFICE OF PATRICK TRAINOR ESQ, LLC d/b/a THE LAW OFFICE OF PATRICK TRAINOR; PATRICK TRAINOR, an individual; and ANTI-DOXING LEAGUE INC.,

    Defendants.

---

## OPINION AND ORDER

This matter comes before the Court on four motions in limine relating to the testimony of Robert M. Gordon, Ph.D., ABPP:

- Garramone Plastic Surgery's ("GPS") Motion to Exclude Testimony of Robert M. Gordon, Ph.D., ABPP (Doc. #512) was filed on September 30, 2025. Danesh Noshirvan

("Noshirvan") filed his Response in Opposition (Doc. #534) on October 9, 2025.[1]

- Jennifer Couture ("Couture"), Ralph Garramone ("Garramone"), and OMG Realty, LLC's ("OMG") Motion to Exclude Testimony of Robert M. Gordon, Ph.D., ABPP (Doc. #520) was filed on September 30, 2025.[2] Noshirvan filed his Response in Opposition (Doc. #534) on October 9, 2025.

- GPS's Motion to Exclude Testimony of Robert M. Gordon, Ph.D., ABPP (Doc. #554) was filed on October 27, 2025. Noshirvan filed no substantive response to this filing; however, the Court will read Noshirvan's previous response (Doc. #534) alongside this motion since it is the unredacted version of GPS's motion.

- The Law Office of Patrick Trainor, Esq. ("Law Office"), Patrick Trainor ("Trainor"), Central Park of Southwest Florida, LLC ("Central Park"), and Anti-Doxing League, Inc.'s ("ADL") Motion to Exclude Testimony of Robert M. Gordon, Ph.D., ABPP (Doc. #579) was filed on November

---

[1] This motion was redacted.  After the Court granted Defendants permission to file under seal, the parties refiled the motion unredacted.  (Doc. #554.) Accordingly, the Court will deny this motion as moot.

[2] The unredacted version of the motion was filed as Document Number 527-1.

14, 2025.[3]  Noshirvan filed his Response in Opposition (Doc. #581) on November 17, 2025. The motions are resolved as set forth below.

## I.

On November 1, 2024, Robert M. Gordon, Ph.D., ABPP ("Gordon") completed a forensic psychological evaluation on Noshirvan via Zoom.  (Doc. #474-4.)  Prior to the evaluation, Gordon completed a document review of the following materials:

- Second Amended Complaint (Doc. #139);
- Four videos provided by Noshirvan;
- Pictures titled DN000010 to DN000041;
- Screenshots of alleged defamation;
- "United States of America v. Joseph A. Camp";
- A press release from the U.S. Attorney's Office, Western District of Missouri from June 19, 2013; and
- "A great deal of evidence of Joseph A. Camp's terroristic cyber bullying was also reviewed."

(Id. at pp. 1-3.)

During the evaluation, Gordon conducted an interview and administered the following tests: (1) The Brief Psychiatric Rating Scale; (2) Beck Depression Inventory II; (3) Beck Anxiety Inventory; (4) Clinician-Administered PTSD Scale for DSM-5; (5)

---

[3] The unredacted version of the motion was filed under Document Number 579-1.

International Trauma Questionnaire, and (6) Miller Forensic Assessment of Symptoms Test. (Id. at pp. 1-2.) These tests examine a variety of symptoms exhibited by the patient and are scored depending on the frequency and severity of such symptoms.[4] (Id. at pp. 5-8.)

After reviewing the documents, conducting his interview, and reviewing the results of the various tests, Gordon diagnosed Noshirvan with Complex Post-Traumatic Stress Disorder "due to the cyber bullying and damage to his reputation by Joey Camp." (Id. at p. 8.) Gordon further opined that Noshirvan would "need many years of intensive psychotherapy to help [] deal with his CPTSD." (Id. at p. 9.)

Gordon has not re-examined Noshirvan since his initial evaluation nor has Gordon served as a mental health provider for Noshirvan. Additionally, Noshirvan has not seen a mental health provider either before or after his examination by Gordon.

**II.**

Admission of expert opinion evidence is governed by Federal Rules of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

---

[4] For brevity, the Court will not lay out all the results.

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), and <u>Daubert v. Merrell Dow Pharms.</u>, 509 U.S. 579 (1993), the Supreme Court held that the trial court has a "gatekeeper" function designed to ensure that all expert testimony is both relevant and reliable. The importance of this gatekeeping function "cannot be overstated." <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004)(en banc).

In determining the admissibility of expert testimony under Rule 702, the Court applies a "rigorous" three-part inquiry. <u>Frazier</u>, 387 F.3d at 1260. A district court determines the admissibility of expert testimony by considering whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Knepfle v. J-Tech Corp.</u>, 48 F.4th 1282, 1294 (11th Cir. 2022) (quoting <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998)). In short, "the expert must be qualified; his methodology must be reliable; and his testimony must be helpful

to the trier of fact." Doe v. Rollins Coll., 77 F.4th 1340, 1347 (11th Cir. 2023). "[T]he party seeking to introduce the expert at trial bears the burden of establishing his qualifications, reliability, and helpfulness." Knepfle, 48 F.4th at 1294 (citing Frazier, 387 F.3d at 1260).

"Even expert testimony which satisfies these three requirements, however, may nonetheless be excluded under Rule 403 if the probative value of the expert testimony is substantially outweighed by its potential to confuse or mislead the jury, or if it is cumulative or needlessly time consuming." Frazier, 387 F.3d at 1263. In the final analysis, the admission of expert testimony is a matter within the discretion of the trial court. Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1103 (11th Cir. 2005); Frazier, 387 F.3d at 1258.

The gatekeeper function, however, does not provide the Court with an opportunity to substitute its judgment for that of a jury as to the persuasiveness of the expert evidence. United States v. Barton, 909 F.3d 1323, 1332 (11th Cir. 2018). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (citation omitted).

The expert testimony anticipated in this case is not scientific. Nonetheless, "[t]he principles set out in Daubert

apply to soft-science expert testimony. 'Social science testimony, like other expert testimony must be tested to be sure that the person possesses genuine expertise in a field and that her court testimony adheres to the same standards of intellectual rigor that are demanded in her professional work.'" Carrizosa v. Chiquita Brands Int'l, Inc., 47 F.4th 1278, 1317-18 (11th Cir. 2022)(citations omitted).

> That said, "social science research, theories, and opinions cannot have the exactness of hard science methodologies," and "peer review, publication, error rate, etc. are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert." [] Where "ideal experimental conditions and controls" are precluded, "other indicia of reliability are considered under Daubert, including professional experience, education, training, and observations." [] Where appropriate, social science expert testimony can give the jury a view of the evidence well beyond their everyday experience.

Id. at 1318 (internal citations omitted).

### III.

Defendants seek to exclude the opinions of Plaintiff's expert Robert M. Gordon ("Gordon"), arguing that he is unreliable and will not assist the trier of fact.

The first requirement is that the expert is qualified to testify on the subject matter. After reviewing Defendants' motions, there are no arguments challenging Gordon's qualifications. (Doc. #527-1, p. 2; Doc. #554, p. 2; Doc. #579-1, pp. 2-3.)  The Court will therefore proceed to the other

requirements and deem the first element met for the purposes of the instant motion.

### A. Reliability of Methodology

#### (1) Post-Traumatic Stress Disorder

Defendants argue that Gordon's use of the Clinician Administered PTSD Assessment Questionnaire for DSM-5 ("CAPS-5")[5] is unreliable. Specifically, Defendants point out that the DSM-5 requires "[e]xposure to actual or threatened death, serious injury, or sexual violence" and the "[p]resence of one (or more) of [certain] symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred." (Doc. #527-1, p. 6 (citing Brush v. Old Navy LLC, 687 F. Supp. 3d 452, 466-67 (D. Vt. 2023); Doc. #554, pp. 5-6; Doc. #579-1, p. 6.) Yet Gordon, according to Defendants, bases his diagnosis on the assertion of "cyberbullying and destruction of reputation." (Doc. #527-1, p. 6; Doc. #554, pp. 5-6; Doc. #579-1, p. 6.) Further, Defendants argue that the DSM-5 also "requires that the duration of the mental disturbance associated with an identifiable traumatic event exceed one month." (Doc. #527-1, p. 8; Doc. #554, p. 8; Doc. #579-1, pp, 8-9.) Since Gordon, according to Defendants, failed to strictly

---

[5] The Diagnostic and Statistical Manual of Mental Disorders, Edition 5 ("DSM-5") is a publication by the American Psychiatric Association. (Doc. #527-1, p. 6.) This publication is considered "the authoritative treatise on mental health disorders" in the United States. (Id.)

adhere to the diagnostic criteria in the DSM-5, Defendants contend Gordon's testimony must be unreliable.

First, Defendants argue that Gordon lacks any evidence of exposure to actual or threatened death, serious injury, or sexual violence, because he conducted no independent investigation on Noshirvan's allegations in the Second Amended Complaint and interview. (Doc. #527-1, pp. 6-8; Doc. #554, pp. 5-8, Doc. #579-1, pp. 6-8.)  This argument, however, does not deal with the reliability or validity of the CAPS-5 test administered.  Further, it ignores the numerous other tests Gordon relied upon—including the Miller Forensic Assessment of Symptoms Test which showed no signs of malingering or feigning.  (Doc. #474-4, p. 8.)  Any quarrel with not independently verifying any of the allegations that Noshirvan presented to Gordon can be appropriately dealt with on cross-examination.

Defendants next argue that Gordon failed to follow DSM-5 diagnostic criteria because he did not observe at least one month's worth of PTSD symptoms before diagnosing a patient with PTSD and relied almost exclusively on Plaintiff's self-reporting.  (Doc. #527-1, pp. 8-9; Doc. #554, pp. 8-9; Doc. #579-1, pp. 8-10.)  This argument relies heavily on the fact that Gordon only met with Noshirvan once for an hour Zoom conference as well as the documents reviewed by Gordon, but fails to consider that Gordon obtained information about Noshirvan's symptoms dating back to 2022 and

administered a variety of tests. While Defendants contend the rationale for using these specific tests was not definitively explained, such concern can be considered through cross-examination and is not a reason to exclude Gordon's testimony. Accordingly, Gordon's analysis still comports with the DSM-5 diagnostic criteria.[6]

Further, Defendants also point the Court to the Georgetown Guidelines for Forensic Assessment of PTSD. (Doc. #527-1, pp. 10-12; Doc. #554, pp. 9-11; Doc. #579-1, pp. 10-12.) However, it too is not enough to show the methodology is unreliable since those guidelines were published before the DSM-5 and do not outline any specific examinations that must be given. Accordingly, the Defendants have not shown that Gordon's methodology was unreliable as it relates to his diagnosis of PTSD.

### (2) Complex Post-Traumatic Stress Disorder

Defendants also argue that Gordon's failure to adhere to the diagnostic criteria of Complex Post-Traumatic Stress Disorder ("CPTSD") in the ICD-11 as well as his diagnosis being made solely for the purpose of litigation renders his methodology unreliable.[7]

---

[6] The Court notes that in Bello v. DHL Express, Inc., the Defendants fail to point to the distinguishing facts that the plaintiff was diagnosed with PTSD even though there was only a record of thirteen days of symptoms. 2023 WL 11116945, at *2 (S.D. Fla. Nov. 10, 2023).

[7] The International Statistical Classification of Diseases and Related Health Problems, eleventh edition ("ICD-11"), is published by the World Health Organization. (Doc. #527-1, p. 12.) This publication recognizes the diagnosis of CPTSD, whereas the DSM-5 does not.

(Doc. #527-1, pp. 12-13; Doc. #554, pp. 12-13; Doc. #579-1, pp. 13-14.) Specifically, Defendants argue that Gordon "made no investigation into the veracity of Plaintiff's self-report, the allegations in the dismissed Second Amended Complaint, or whether Joey Camp was responsible for the traumatic events asserted by Plaintiff." (Doc. #527-1, p. 13; Doc. #554, p. 12; Doc. #579-1, p. 13.) Further, Defendants argue that Gordon failed to observe an extended period of Noshirvan's symptoms before diagnosing him with CPTSD and that Gordon failed to explain the results of the International Trauma Questionnaire ("ITQ"). (Doc. #527-1, p. 15-16; Doc. #554, pp. 14-15; Doc. #579-1, pp. 15-16.)

As discussed above, any concern with making no investigation into the veracity of the allegations presented by Noshirvan are better suited for cross-examination. Defendants arguments do not challenge the validity of the tests utilized by Gordon nor are the cases cited by Defendants particularly persuasive. See, e.g., First Premium Servs., Inc. v. Best Western Int'l Inc., 2004 WL 7203535, at *3 (S.D. Fla. Jan. 8, 2004)(concerning tax returns not a psychological evaluation); PODS Enters., Inc. v. U-Haul Int'l, Inc., 2014 WL 12628664, at *4 (M.D. Fla. June 27, 2014)(concerning linguistic analysis regarding the words "pod" and "pods," where the expert conducted no rigorous linguistic analysis of context and usage, but relied on a definition given by counsel). Unlike the cases Defendants cite, Gordon relied on more than mere

-11-

allegations presented by Plaintiff.  Gordon utilized an array of psychological assessments to determine the presence and severity before making any diagnosis.  (Doc. #474-4.)  To the extent Defendants disagree with the diagnosis, they can challenge Gordon on cross-examination.

Further, as discussed above, the argument concerning the extended period of time that Gordon should have reviewed Noshirvan's symptoms ignores the record of symptoms dating back to 2022.  Since, Gordon did not evaluate Noshirvan until November 2024, this provides at least a year's worth of symptoms for Gordon to consider.  Such consideration is still within the ICD-11 diagnostic criteria.

Defendants next argue that Gordon failed to explain the results of the ITQ or how he reached the diagnosis of CPTSD.  (Doc. #527-1, p. 16; Doc. #554, pp. 15-16; Doc. #579-1, pp. 16-17.)  While true Gordon does not explicitly identify the scores he provided to Noshirvan, such consideration can again be brought up in cross-examination.  Defendants fail to show how the ITQ itself is unreliable, and though how Gordon exactly utilized the ITQ is unknown, it is clear that he still relied upon the underlying PTSD diagnosis in reaching his conclusion.  (Doc. #474-4, pp. 6-7.)

Finally, Defendants argue that Gordon's CPTSD diagnosis was made solely for purposes of this litigation.  (Doc. #527-1, p. 17; Doc. #554, pp. 16-17; Doc. #579-4, pp.17-18.)  Defendants contend

that while not dispositive, it "further weighs against the reliability of Gordon's testimony" since Noshirvan only met with Gordon for about an hour via Zoom and was not re-examined in the future. (Doc. #527-1, pp. 17-18; Doc. #554, pp. 16-17; Doc. #579-1, pp. 17-18.)  While true Gordon only met with Noshirvan for about an hour, this argument goes more to the credibility of Gordon rather than the reliability of his methodology.  Such consideration is better suited for the jury.

### B. Helpfulness

The third prong of the Daubert inquiry asks, "whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 593.  Commonly referred to as the "helpfulness" inquiry, expert testimony can properly be applied and is helpful if it relates to any issue in the case and if it concerns matters that are beyond the understanding of an average lay person.  Prosper v. Martin, 989 F.3d 1242, 1249 (11th Cir. 2021).

It is undisputed that Gordon utilized the CAPS-5, ITQ, Brief Psychiatric Rating Scale, Beck Depression Inventory-II, Beck Anxiety Inventory, and Miller Forensic Assessment of Symptoms Test.  Although Defendants take issue with the conclusions reached by Gordon as well as the methods utilized, the conclusions go to a crucial issue in this case—whether Noshirvan suffered emotional distress.  Further, Defendants acknowledge the diagnostic criteria

of PTSD and CPTSD is beyond the understanding of the average lay person. (Doc. #527-1, pp. 18-19; Doc. #554, pp. 17-18, Doc. #579-1, pp. 18-19.) Defendants are able to cross-examine Gordon regarding why he utilized the specific tests in lieu of other examinations they contend are better suited for such diagnosis. These quarrels, however, are not sufficient to exclude the evidence.

Ultimately, the Court finds that Gordon satisfies all three prongs of Daubert, and the Court finds no undue prejudice from the anticipated testimony. The weight of the testimony is an issue for the jury.

Accordingly, it is now

**ORDERED:**

(1) Defendant Garramone Plastic Surgery's Motion to Exclude Testimony of Robert M. Gordon, Ph.D., ABPP (Doc. #512) is **DENIED as moot.**

(2) Jennifer Couture, Ralph Garramone, and OMG Realty, LLC's Motion to Exclude Testimony of Robert M. Gordon, Ph.D., ABPP (Doc. #520) is **DENIED.**

(3) Garramone Plastic Surgery's Motion to Exclude Testimony of Robert M. Gordon, Ph.D., ABPP (Doc. #554) is **DENIED.**

(4) The Law Office of Patrick Trainor, Esq., Patrick Trainor, Central Park of Southwest Florida, LLC, and

Anti-Doxing League, Inc.'s Motion to Exclude Testimony of Robert M. Gordon, Ph.D., ABPP (Doc. #579) is **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, this __13th__ day of March 2026.

*[signature: John E. Steele]*
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Parties of record