**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

DANESH NOSHIRVAN, an individual,

Plaintiff/Counter-Defendant,

vs.

JENNIFER COUTURE, et al.,

Defendants.
____________________________________/

CASE NO:
2:23-cv-01218-KCD-KRH

District Judge:
Hon. Kyle C. Dudek

Magistrate Judge:
Hon. Kyle R. Hugelet

RALPH GARRAMONE, M.D., P.A. d/b/a GARRAMONE PLASTIC SURGERY, JENNIFER COUTURE, an individual, and RALPH GARRAMONE, M.D., an individual,

Counter-Plaintiffs,

vs.

DANESH NOSHIRVAN,

Counter-Defendant.
____________________________________/

**PLAINTIFF/COUNTER-DEFENDANT DANESH NOSHIRVAN'S MOTION FOR SUMMARY JUDGMENT ON THE COUNTERCLAIM OF GARRAMONE PLASTIC SURGERY, JENNIFER COUTURE, AND RALPH GARRAMONE (DOC. 448) AND MEMORANDUM OF LAW**

Plaintiff/Counter-Defendant Danesh Noshirvan ("Noshirvan"), pursuant to Fed. R. Civ. P. 56 and Local Rule 3.01, moves for summary judgment on all six counts of the Counterclaim (Doc. 448, pp. 37–71) filed by Defendants/Counter-Plaintiffs Ralph Garramone M.D. P.A. d/b/a Garramone Plastic Surgery ("GPS"), Jennifer Couture ("Couture"), and Ralph Garramone, M.D. ("Garramone") (collectively, "Counter-Plaintiffs").

## I. INTRODUCTION

The Counterclaim asks a jury to punish Noshirvan for saying, in January and February 2025, what he has said since May 2022: that Couture and Garramone traveled to his hometown, watched and photographed his home and his children, papered his neighborhood with flyers branding him a "pedophile," and paid Joseph Camp ("Camp") to do more of the same. Counter-Plaintiffs' own text messages, credit-card statements, and sworn testimony establish those facts. Everything else Noshirvan said about them—that they are "child stalkers," that they "cozy up with Nazis," that they are "racist and violent," that they are "gonna go to prison"—is the kind of charged characterization of disclosed facts that the First Amendment places beyond the reach of a defamation claim, as this Court held in granting Noshirvan summary judgment on Patrick Trainor's materially identical counterclaim. (Doc. 674.)

Summary judgment is warranted on six independent grounds. *First*, Counter-Plaintiffs cannot carry their burden of proving falsity; the gist of every factual statement is true. *Second*, the remaining statements are non-actionable opinion and rhetorical hyperbole. *Third*, Counter-Plaintiffs are limited-purpose public figures, and the record

contains no clear and convincing evidence that Noshirvan subjectively doubted the truth of anything he published. *Fourth*, there is no competent evidence of damages: presumed damages are unavailable, the per quod counts require special damages that were not timely or never produced, and Counter-Plaintiffs have disclaimed any claim for the identical statements Noshirvan published from 2022 through 2024. *Fifth*, Counter-Plaintiffs never served the pre-suit notice that section 770.01, Florida Statutes, requires. *Sixth*, the claims premised on unidentified Instagram posts (Doc. 448, ¶ 44) fail for want of any identified statement.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

### A. The public controversy

1. On January 26, 2022, Couture—then GPS's operations manager—was involved in an altercation in a Dunkin' Donuts parking lot. Noshirvan published video of the incident; it went viral and was covered by national news outlets. (Doc. 448, ¶¶ 27–29; Doc. 476, 13:11–14:13; Doc. 479, Ex. 2.) Couture was arrested and charged with burglary of an occupied conveyance, battery, and aggravated assault with a deadly weapon, resolved the charges by plea, and was placed on probation. (Doc. 493, p. 3; Doc. 479, Exs. 18, 20–21, 37.)

2. Within two days, Couture told Garramone that she wanted to "take [Noshirvan] down," that he "deserves a miserable death," and that "we have to stop this scumbag"; Garramone replied, "It isn't going to just end baby. We have to end it." (Doc. 479, Ex. 2, p. 41; *id.*, Exs. 2–4.)

3. Counter-Plaintiffs set out to shape public perception of the incident. Garramone discussed assembling a team to write a book in which Couture would "play the victim"; Couture drafted at least eight versions of a narrative and a 51-page account; and Garramone authored an "executive summary" and "talking points"—asserting, among other things, that Noshirvan works for the Chinese Communist Party and violated federal child-exploitation statutes—that were distributed nationally through Richard Luthmann ("Luthmann"). (Doc. 479, Exs. 3, 37, 49–53; Doc. 476, Exs. 59-61, 66–67; Doc. 477, pp. 43–46.)

4. Couture "paid for and funded the billboard (leased by Trainor), the TV ads, the newspaper (i.e., pennysaver) [and] the postcards" attacking Noshirvan, using GPS or Garramone funds. (Doc. 476, 33:12–24, Ex. 6; Doc. 478, Exs. 3–5.) GPS markets itself through billboards depicting Garramone and through social media, where it has roughly 28,200 Instagram followers. (Noshirvan Decl. ¶¶ 24, Exs. G (Instagram screenshots); *see* Doc. 493, p. 4 & n.1.)

5. In May 2023, Couture and GPS sued Noshirvan in this District. *Couture v. Noshirvan*, No. 2:23-cv-340-SPC-KCD (the "340 Case"). Both cases have been the subject of extensive public commentary, including podcasts promoted by Counter-Plaintiffs' then-counsel, Patrick Trainor ("Trainor"). (Doc. 493, pp. 7, 12–13, 17[1].) Couture also wrote to the Governor of Texas seeking criminal charges against a third party connected to Noshirvan's reporting and publicized her financial contributions to that family. (*Id.*)

[1] The Full Haus audio is record evidence. It was submitted to the Court on a jump drive along with two banker's boxes of paper documents and binders.

**B. Camp, the Mansfield trip, and the photographs of Noshirvan's children**

6. Couture located Camp because he "went after Danesh," met him in person on May 5, 2022, and told Garramone: "He's odd, Ralph, but he isn't afraid of Danesh. He has already given me more information than anyone about how all of this works and how to do [it]." (Doc. 479, Ex. 4, pp. 20–24.)

7. That same day, GPS paid Camp $1,650 in two charges—$1,100 and $550—on GPS's American Express card. (Doc. 476, 15:22–16:5, Exs. 1–4.) Garramone admitted that the charges appear on GPS's statement, that "[i]t looks like they were made to Joseph Camp," and that he never contested them. (Doc. 479, 62:10–22, 66:21–68:5.) Camp is a convicted felon. (Doc. 624, Exs. 1–2; Noshirvan Decl. Ex. D (certified judgment, *United States v. Camp* (W.D. Mo.)).) Camp's harassment of Noshirvan and his family began that day, including the message: "I have a budget of 50K just to f*king destroy Hannah while you watch … Sand N*gg*r." (Doc. 476, Ex. 5; Doc. 509, Pl.'s Ex. 2.)

8. Couture moved Camp into the ranch house on Central Park of Southwest Florida property—an entity of which Garramone is the managing member—where, by Garramone's account, Camp was "couch surfing" "intermittently" for weeks and "did some work for reputation management while he was at the Winkler property"; Camp frequented GPS's office; and GPS wrote a letter to a foreign ministry confirming Camp's employment. (Doc. 476, Ex. 6; Doc. 477, pp. 66–67; Doc. 479, 12:19–13:11, 161:16–17, 194:3–7, 195:1–6, Exs. 28, 30–31, 35–36, 39.) Garramone admitted sending a June 29, 2022 email on GPS letterhead stating that "Joey Camp has been working diligently on our behalf, and we'd like him … to continue to do so"; agreed that GPS "hired Joseph

A. Camp"; and testified that Camp "got paid" "to manage the online harassment" and "was still doing it" in February 2023. (Doc. 479, 250:21–23, 255:18–256:16, 259:2–9, Ex. 45.) Before meeting Camp, Couture texted Garramone that she needed "everything I have on Danesh … on a flash drive" because "[h]e's a computer hacker, very interesting person, but he's going to help me," and later described Camp as "a computer hacker friend" who "can get all that information." (Doc. 479, 50:16–51:19, Exs. 3, 20.) Couture testified, "I hired Joey." (Doc. 476, 33:12–24; see id., Ex. 40 (Camp "has a skill set that a lot [of] people don't have").)

9. On May 20–21, 2022, Couture and Garramone traveled to Mansfield, Pennsylvania, where Noshirvan lives, and met two GPS employees, Sydney Ratz and Alex Quattrone. Garramone admitted that he and Couture flew to Philadelphia and drove to Mansfield, and that Ratz and Quattrone "were there" and "did join" them. (Doc. 476, pp. 138:11–147; Doc. 479, 89:15–96:15, 110:6–15, Exs. 8–9, 35.) Using the code names "Cindy" and "Bob," Garramone instructed the group to "use the cover of darkness to plant some flyers along that main street," to "be careful of the fuzz," and to "[p]ut [the] flyer in the flag of the mailbox … in the dark." (Doc. 479, Ex. 9.) Garramone offered the employees "$500 each for [their] participation," which he later characterized as covering "their travel expenses." (*Id.*, 103:2–105:18, 112:8–14, Ex. 11.)

10. Ratz drove past Noshirvan's home, reported that "the inside of [his] garage is so insanely trashed," and photographed Noshirvan in his front yard with his children. Couture replied: "Go get more photos. He isn't going to know who you are. You have Pennsylvania tags. #dadoftheyear … Go get pics of his nasty garage. I wish we had one

of Joey's phones. His phones take pictures like a spy camera. Now Ralph's excited." (Doc. 479, Ex. 8; Doc. 476, Ex. 13, p. 5.)

11. Couture sent the photographs of Noshirvan and his children to Camp and later admitted: "Ralph and I did not take [the] picture[s]. But I did send the picture[s] to … Camp … I know [the] picture[s] [were] being used." (Doc. 476, Ex. 13, p. 5; *id.*, Exs. 16–23, 39–40, 49; Doc. 479, Exs. 8–16, 24, 26, 58.)

12. The flyers distributed in Mansfield labeled Noshirvan a "predator," "pedophile," and "child-killer," and were found, among other places, in the restroom of the butcher shop owned by Noshirvan's in-laws, where Couture and Garramone were video-recorded. (Doc. 476, Exs. 17, 21–26; Doc. 479, 187:2–22, Ex. 27.) Garramone texted Couture: "He's posting this because we're in Danesh's town, and so it looks like we were doing something when all we did was go to a butcher shop … No one saw us put up a flyer." Couture replied: "Even if someone did see us put up a flyer, which they didn't … He can dish it, but he can't take it." (Doc. 479, 184:2–185:14, Ex. 26.) When she reported that the police were at Noshirvan's house, Garramone told her to "stop putting the flyers out" and "go back to the hotel." (*Id.*, Ex. 10.) Afterward she wrote: "Danesh will get his. We're on track for that. He knows it too. We were in his backyard he knows that." (*Id.*, Ex. 24.)

13. Garramone testified that he did not send the "Bob" text ("I assure you I didn't say that"), did not distribute flyers, could not say what "us" meant in his own text, and believed Camp—who Counter-Plaintiffs insist never went to Pennsylvania—"took that picture and put his hat on the sign" in Mansfield. (Doc. 479, 97:5–10, 116:5–21,

117:5–11, 128:4–24, 185:4–14; Doc. 476, Ex. 70.) Garramone also proposed to Couture that their "stance" would be that the materials "were manufactured by people on the internet … Those didn't come from us." (Doc. 479, 32:8–36:3, Ex. 2, pp. 31)

14. In 2024 and 2025, Couture and Garramone brought in Luthmann, a disbarred lawyer, and Frank Parlato to amplify their message, agreeing that "the retaliation has to be equally expansive." (Doc. 479, 285:10–286:15, 305:6–307:6, Exs. 54–57, 59; Doc. 476, Exs. 59–65.) This Court found that Noshirvan's expert witness was harassed after Luthmann published Noshirvan's expert disclosures online. (Doc. 459, p. 3 (citing Doc. 454, p. 15).) Trainor—then counsel for GPS and Couture, and the lessee of the billboard Couture funded—appeared as a guest on episode 130 of the "Full Haus" podcast, whose host openly describes himself as a "white supremacist," and on the "MurderTheMedia" program on March 15, 2022. (509, pp. 11:1-12-:18)(audio of Full Haus Episode 130, "Patrick Trainor and the ADL") Trainor also appeared pro hac vice on behalf of Zachary Rehl, a Proud Boys leader, in the District of Columbia's civil action against the Proud Boys arising from the January 6, 2021 attack on the Capitol. *District of Columbia v. Proud Boys Int'l, L.L.C.*, No. 1:21-cv-03267-APM (D.D.C.), Docs. 160–161 (Nov. 2022); Noshirvan Decl. ¶¶21-22. Camp's own statements and his use of Gab, GETTR, and similar platforms reflect the same ideology. (Doc. 509 pp. 130:8-130:25, Ex. 5; Doc. 493, p. 8; Doc. 509, Ex. 2.)

## C. The challenged statements

15. Every statement in the Counterclaim was published between January 1 and February 6, 2025, on Noshirvan's TikTok, YouTube, Instagram, or Substack accounts.

(Doc. 448, ¶¶ 41–45; Doc. 603, pp. 17–18.) The Substack posts carried titles such as "BREAKING! Jennifer Couture and Ralph Garramone stalk children (TESTIMONY INSIDE)" and "Breaking! Garramone Plastic Surgery PAID terrorist Joey Camp! (Proof Inside!)," and reproduced or linked the deposition testimony, text messages, and payment records described above. (Doc. 448, ¶ 45 & nn. 13–15; Noshirvan Decl. ¶¶ 12-20) Notably, Counter-plaintiffs did not timely produce the "at-issue" Substack posts.

16. Noshirvan has publicly called Counter-Plaintiffs "child stalkers" continuously since May or June 2022, when he created the "Child Stalker" highlight on his Instagram profile; the January 29, 2025 video states, "for the past three years, nonstop, I've been referring to them as child stalkers." (Doc. 448, ¶¶ 44–45; Doc. 493, pp. 7, 10. Doc. 479, Exs. 8-15) Counter-Plaintiffs expressly exclude from the Counterclaim "the actions taken by Noshirvan from January 2022 through December 2024." (Doc. 448, ¶¶ 36, 40.)

17. Noshirvan testified that he believed, and believes, that the statements are true, and identified the documents on which he relied. (Doc. 509, 150:1-152:16,155:12-155:13; Doc. 546-1, ¶¶ 5-10. Doc. 546-2) Counter-Plaintiffs have identified no evidence that Noshirvan doubted the truth of any statement before publishing it; their own motion for partial summary judgment cited none. (*See* Doc. 538, pp. 11–15, 25.)

**D. The section 770.01 letter and the absence of damages evidence**

18. On February 8, 2025, Counter-Plaintiffs' counsel emailed a letter styled as a section 770.01 notice to Noshirvan's litigation counsel in this case. (Doc. 448-1; Doc. 526-1.) The letter was never served on Noshirvan. Undersigned counsel had not agreed

to accept service of any pre-suit notice, does not represent Noshirvan in any capacity outside this case and the 340 Case, and had told Counter-Plaintiffs' counsel to "stop emailing [him]." (Doc. 526-1; Doc. 493, p. 16) The Counterclaim was filed on August 4, 2025. (Doc. 448.)

19. Counter-Plaintiffs' damages evidence consists of three declarations asserting that the statements were "immensely damaging," that they hired security and installed surveillance systems, that Couture sought mental-health treatment,[2] and that they retained counsel. (Doc. 538, ¶¶ 16–20 & Exs. A–C.) They produced no admissible invoices, receipts, medical records, patient records, financial statements, or other documents supporting any of those assertions, and identified no lost patient, lost revenue, or lost contract. (Doc. 569, pp. 4–5, 9–10)[3] GPS's Instagram following grew by more than 9,000 after it sued Noshirvan. (Noshirvan Decl. ¶ [__]; Doc. 493, p. 4 n.1.) Garramone agreed that Couture's 2022 statement that "[m]y reputation has been decimated because of this event" was "an accurate description of what happened," acknowledged her June 1, 2022 text that "[m]y reputation has died," and testified that Noshirvan had been "posting videos about us for three and a half years." (Doc. 479, 140:2–13, 176:14–177:16, Dos. 479, Ebs. 2, 18, pp. 11.)

[2] But Counter-plaintiffs do not have a qualified medical expert to discuss Couture's alleged treatment, diagnosis, permanency of alleged injury, to address causation, or distinguish between preexisting mental health issues (since January 2022).

[3] Counter-plaintiffs did produce home remodeling invoices (like pool timer installation), and an invoice for medical services allegedly provided to Couture. But those documents are inadmissible for a multitude of reasons, which will likely be addressed in reply.

## III. LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant who does not bear the burden of proof at trial discharges its initial burden by "pointing out … that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmovant must then produce admissible evidence showing a genuine issue for trial; "conclusory allegations without specific supporting facts have no probative value." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000). Where the plaintiff must prove an element by clear and convincing evidence, the question is whether a reasonable factfinder could find that the element has been shown with "convincing clarity." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–57 (1986). Summary judgment is the rule rather than the exception in defamation cases because "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

## IV. ARGUMENT

Counter-Plaintiffs must prove "(1) publication; (2) falsity; (3) [that the] actor … act[ed] with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) [that the] statement [is] defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). In denying Noshirvan's motion to dismiss, the Court accepted the Counterclaim's allegations as true and reserved truth, privilege, public-figure status,

and damages for a developed record. (Doc. 603, pp. 6–7, 14–18.) Noshirvan's Answer pleads each of the defenses raised below—absence of actual malice, truth and substantial truth, opinion and rhetorical hyperbole, failure to identify Counter-Plaintiffs, qualified privilege, absence of damages and special damages, and noncompliance with conditions precedent. (Doc. 617 (Answer), ¶ 52 & Aff. Defs. 1–14.) That record now forecloses every count.

**A. Counter-Plaintiffs cannot prove falsity: the factual statements are substantially true**

"A false statement of fact is the *sine qua non* for recovery in a defamation action." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983). Because the statements address a matter of public concern, the burden of proving falsity rests on Counter-Plaintiffs. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77 (1986). A statement is not false if its "gist" or "sting" is true; "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (quotation omitted); *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 706 (Fla. 3d DCA 1999); *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1234 (Fla. 3d DCA 2021).

The factual assertions in the Counterclaim reduce to five propositions, each established by Counter-Plaintiffs' own documents and testimony.

*(i) That Couture and Garramone traveled to Pennsylvania to "flyer [Noshirvan's] hometown with posters … labeling [him] 'a local pedophile.'"* (Doc. 448, ¶ 45.) Undisputed. SUMF ¶¶ 9, 12.

*(ii) That they "drove to [his] house to photograph [his] children" and "stalk" them.* (*Id.* ¶¶ 41, 45.) Couture and Garramone directed GPS employees, in Couture's words, to "[g]o get more photos" of Noshirvan's home while he was in the yard with his children, and Couture sent the photographs to Camp knowing they were "being used." SUMF ¶¶ 10–11. Whether the person behind the wheel was Couture, Garramone, or an employee acting on their instruction is precisely the kind of detail that does not alter the sting. *Masson*, 501 U.S. at 517.

*(iii) That GPS "PAID … Joey Camp," that Counter-Plaintiffs "employed goons like Joey Camp," and that they "hire[d]" him.* (Doc. 448, ¶¶ 43, 45.) GPS's credit card paid Camp $1,650 the day Couture recruited him; Garramone wrote that Camp "has been working diligently on our behalf"; GPS confirmed his "employment" in writing; Couture testified, "I hired Joey." SUMF ¶¶ 7–8. Counter-Plaintiffs' insistence that the payments were a "thank you" and that Camp was a "volunteer" (Doc. 538, ¶¶ 35–37) is a quibble over labels, not a dispute of gist. *Readon*, 317 So. 3d at 1234.

*(iv) That Counter-Plaintiffs "admitted … in court" that GPS paid Camp and that they had a relationship with him.* (Doc. 448, ¶¶ 41, 45.) The admissions came in sworn testimony and document production in this case. SUMF ¶¶ 7–8, 11, 13. Whether an admission occurs in a courtroom or in discovery does not change its substance, and the posts themselves told readers that the source was "TESTIMONY" and "discovery items." SUMF ¶ 15.

*(v) That Counter-Plaintiffs associate with, and employed, persons who are felons, white supremacists, and stalkers.* (Doc. 448, ¶¶ 43, 45, 57(b), 101(c), 130(d).) Camp's criminal

history, his "Sand Nggr" message, and his threats are in the record; Luthmann was disbarred for conspiracy to extort with a firearm; Trainor—the lawyer Counter-Plaintiffs retained and paid to lease the billboard—appeared on a podcast whose host proclaims himself a "white supremacist" and represented a Proud Boys leader in the January 6 litigation; and Counter-Plaintiffs paid and housed Camp, paid Trainor, and coordinated with Luthmann. SUMF ¶¶ 4, 7–8, 14.

Against this, Counter-Plaintiffs offer declarations reciting that the statements are "false" and that they never stalked anyone or hired Camp. (Doc. 538, Exs. A–C.) A party cannot manufacture a dispute of fact by contradicting its own contemporaneous writings with conclusory denials. *Leigh*, 212 F.3d at 1217; *Scott v. Harris*, 550 U.S. 372, 380 (2007) (where a party's account "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts"). No reasonable jury could find that the gist of statements (i) through (v) is false.

**B. The remaining statements are protected opinion and rhetorical hyperbole**

Whether a statement is one of fact or of protected opinion is a question of law, decided by examining the statement "in its totality" and "in the context in which it was published." *Turner v. Wells*, 879 F.3d 1254, 1262–63 (11th Cir. 2018); *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 715 (11th Cir. 1985). Two categories of speech are immune. First, "pure opinion"—commentary "based upon facts which are set forth in the [publication] or which are otherwise known or available to the reader or listener"—is not actionable, because the audience can judge the facts for itself. *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981); *Turner*, 879 F.3d at 1262–63.

Second, "rhetorical hyperbole"—"loose, figurative" language that "cannot reasonably be interpreted as stating actual facts"—is protected however harsh it is. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20–21 (1990); *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) ("blackmail"); *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 284–86 (1974) ("traitor"); *Horsley v. Rivera*, 292 F.3d 695, 701–02 (11th Cir. 2002) ("accomplice to homicide"). This Court applied those principles in granting Noshirvan summary judgment on Trainor's counterclaim, holding that Noshirvan's statements about Trainor were non-actionable opinion and rhetorical hyperbole in the context of a heated, public dispute over this litigation. (Doc. 674, pp. 9-11.) The same conclusion follows here.

*1. "Child stalkers," "stalk children," "my children's stalkers."* These are Noshirvan's characterization of the conduct in SUMF ¶¶ 9–12—conduct the posts themselves documented ("TESTIMONY INSIDE"; "Proof Inside"). Labeling that conduct "stalking" is pure opinion based on disclosed facts. See *From*, 400 So. 2d at 57. It is also substantially true. Florida and Pennsylvania define stalking to include repeatedly following or surveilling a person with intent to harass, § 784.048, Fla. Stat.; 18 Pa.C.S. § 2709.1, and federal law criminalizes interstate travel with intent to harass or intimidate that places a person in fear or causes substantial emotional distress, 18 U.S.C. § 2261A. Noshirvan need not prove a conviction to describe conduct by its ordinary name. *See Smith*, 731 So. 2d at 706–07.

*2. "Nazis," "white supremacists," "racist and violent," "terrorist," "goons," "mob boss," "sick **s."* No reasonable viewer of a TikTok tirade or a Substack "BREAKING!" post understands "you two that want to cozy up with Nazis, white supremacists and child

stalkers because you guys are ones yourselves" as a factual report that Couture and Garramone belong to a fascist party. It is invective—"the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining" a verifiable fact. *Milkovich*, 497 U.S. at 21. Courts uniformly hold that calling someone a "racist" is an unverifiable expression of opinion. *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988); *Ozyesilpinar v. Reach PLC*, 365 So. 3d 453, 457, n.5 (Fla. 3d DCA 2023) (characterization of plaintiff's remarks as a "racist tirade" was pure opinion based on disclosed facts); *see Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379–80 (S.D. Fla. 2006) (comparing plaintiff to notorious criminals and calling him a "thug" was rhetorical hyperbole). The January 29 statement that "Jennifer and Ralph are racist and violent" was, moreover, made while Noshirvan was discussing the "Sand N*gg*r" message Camp sent the day GPS paid him, Trainor's appearance on a self-described white-supremacist podcast, and Couture's January 2022 altercation—disclosed facts from which the viewer could draw his own conclusion. SUMF ¶¶ 1, 7; Doc. 493, p. 8.

*3. "All these people are gonna go to prison," "should be in jail," "could be looking at 5–15 years in prison," "Family Services will take the rest of your children."* These are predictions and expressions of outrage, not assertions that any conviction has occurred; they are the paradigm of hyperbole. *Horsley*, 292 F.3d at 702. And they were made in the same breath as Noshirvan's explanation of why—that he "is suing" Counter-Plaintiffs for the conduct described. A statement that discloses itself as the speaker's inference from stated facts is not actionable. *Turner*, 879 F.3d at 1263.

*4. "Perjury," "witness intimidation," "every nasty and illegal tactic to sabotage this case."* Garramone denied under oath knowing Camp (Doc. 480, 118:7-118-12, 129:77-131:2, 131:14 – 131:18, 131:20-132:2) sending the "Bob" text, and distributing flyers; the documents contradict each denial. SUMF ¶ 13. Noshirvan's characterization of that testimony as "perjury" is opinion based on disclosed facts—the posts reproduced the testimony. *From*, 400 So. 2d at 57. As to witness intimidation, this Court found that Noshirvan's expert was harassed after Luthmann—with whom Couture and Garramone had coordinated so that "the retaliation [would be] equally expansive"—published the expert disclosures. SUMF ¶ 14. Noshirvan's attribution of that conduct to Luthmann's principals is commentary on a pending judicial proceeding, grounded in facts of record, and is not actionable.

*5. "It's alleged Jennifer Couture is raw dogging Lee County Sheriff Carmine Marceno in exchange for looking the other way when she clearly violated her probation."* Count IV pleads this statement as defamation per quod (Doc. 448, ¶ 101; Doc. 603, p. 24), and it fails for the independent reasons in Part D below. On the merits, the statement is expressly framed as an allegation and draws on Couture's own recorded statements that she expected favorable treatment from the Sheriff's Office, that she had "email addresses of every employee in the sheriff's department," and that charges were brought only because the Sheriff's Office "believe[d] Danesh over [her]." (Doc. 479, Exs. 2, 18, 20–21, 37; Doc. 493, pp. 3, 9.) Crude as it is, the gist—that Couture sought and expected preferential treatment from the Sheriff—comes from her own words.

### C. Counter-Plaintiffs are limited-purpose public figures, and there is no clear and convincing evidence of actual malice

Whether a plaintiff is a public figure is a question of law. *Michel*, 816 F.3d at 702. A limited-purpose public figure is one who has "thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). The Court isolates the public controversy, examines the plaintiff's role in it, and asks whether the challenged statements were germane to that role. *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1494–96 (11th Cir. 1988); *Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 845–46 (Fla. 4th DCA 2002) (corporation that injected itself into public debate was a limited-purpose public figure). A controversy is public when "persons beyond the immediate participants" would "feel the impact of its resolution." *Della-Donna v. Gore Newspapers Co.*, 489 So. 2d 72, 77 (Fla. 4th DCA 1986).

Both elements are established. The controversy—whether an online commentator's exposure of a recorded public altercation is legitimate accountability or "doxing," and whether the subjects of that reporting may retaliate through hired operatives, flyers, billboards, and litigation—has been debated on national television, in two federal lawsuits, on podcasts, and across social media reaching millions. SUMF ¶¶ 1, 4–5, 15. Counter-Plaintiffs did not merely attract attention. They bought a billboard, television advertisements, and newspaper space; recruited Camp, Trainor, and Luthmann to make "the retaliation … equally expansive"; authored competing narratives and "talking points" for national distribution; wrote to a governor; and filed the 340 Case. SUMF ¶¶ 3–6, 14. Those are the acts of parties seeking to "influence the

resolution" of a public dispute. *Gertz*, 418 U.S. at 345; *Turner*, 879 F.3d at 1272–73; *Silvester*, 839 F.2d at 1496. GPS—whose principal and public face is Garramone and whose funds and employees were used throughout—stands in the same position. *Mile Marker*, 811 So. 2d at 845–46.

Counter-Plaintiffs must therefore prove, by clear and convincing evidence, that Noshirvan published each statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). The test is subjective: there must be "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020). Ill will, a profit motive, and even an extreme departure from professional standards are not enough. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666–67 (1989).

The record contains no evidence—let alone clear and convincing evidence—that Noshirvan doubted anything he said. He spoke about events he personally experienced and about documents Counter-Plaintiffs themselves produced: the credit-card payments, the "cover of darkness" texts, the "go get more photos" texts, Couture's admission that she sent the photographs to Camp, Garramone's own text that "[n]o one saw us put up a flyer," and Garramone's sworn admissions that GPS hired and paid Camp. SUMF ¶¶ 7–13, 17. A speaker who accurately reports his adversaries' own admissions and then characterizes them cannot be found to have harbored serious doubts about their truth. *See Berisha*, 973 F.3d at 1312–13. Counter-Plaintiffs' own summary-judgment motion

identified no evidence of Noshirvan's state of mind; it rested on the assertion that the statements are false and that Noshirvan "did not come forward with any proof" of racism when asked at deposition. (Doc. 538, ¶ 33, p. 25.) Falsity is not malice, *Michel*, 816 F.3d at 703, and the absence of "proof" for a statement of opinion is not evidence of doubt about it. The Counterclaim's own theory—that Noshirvan publishes "to increase his popularity … and to make money" (Doc. 448, ¶ 3)—describes motive, which "cannot provide a sufficient basis for finding actual malice." *Harte-Hanks*, 491 U.S. at 667. Summary judgment is therefore required on every count. *Anderson*, 477 U.S. at 254–57.

Even if Counter-Plaintiffs were private figures, the result would not change as to falsity or damages. Because the speech addresses a matter of public concern, they bear the burden of proving falsity, *Hepps*, 475 U.S. at 776–77, and may not recover presumed or punitive damages without proof of actual malice, *Gertz*, 418 U.S. at 349–50.

**D. There is no competent evidence of damages**

*1. Presumed damages are unavailable on the per se counts (I, III, V).* Counter-Plaintiffs' per se theory rests entirely on presumed damages. (Doc. 538, pp. 16–17.) But the Florida Supreme Court has held that, absent actual malice, the per se presumption of damages does not apply against media defendants; the plaintiff must prove actual injury. *Mid-Fla. Television Corp. v. Boyles*, 467 So. 2d 282, 283 (Fla. 1985). Noshirvan disseminates news and commentary to millions of subscribers through channels Florida courts treat as media, *Comins v. Vanvoorhis*, 135 So. 3d 545, 559–60 (Fla. 5th DCA 2014), and at a scale the Legislature itself defines as a "journalistic enterprise," § 501.2041(1)(d), Fla. Stat.; *see* Part E, *infra*; Doc. 603, pp. 8–9 (analyzing Counter-Plaintiffs' compliance with § 770.01

as to Noshirvan). Independently, presumed damages are constitutionally unavailable absent actual malice where the speech concerns a matter of public concern. *Gertz*, 418 U.S. at 349–50; *see also CNN, Inc. v. Black*, 374 So. 3d 811, 816 (Fla. 4th DCA 2023). Counter-Plaintiffs must therefore prove actual damages caused by the January–February 2025 statements. They cannot.

*2. No evidence of actual injury caused by the 2025 statements.* Counter-Plaintiffs have disclaimed any claim arising from Noshirvan's statements between January 2022 and December 2024. (Doc. 448, ¶¶ 36, 40.) Yet the "child stalker" label, the Instagram "Child Stalker" highlight, and the account of the Mansfield trip have been continuously published since 2022. SUMF ¶ 16. Garramone himself testified that Couture's reputation had been "decimated" by June 2022 and that Noshirvan had been "posting videos about us for three and a half years." SUMF ¶ 19. Counter-Plaintiffs must isolate injury caused by the 2025 repetitions from the three years of identical, unchallenged publication that preceded them. They offer nothing that does so: no witness who first learned of the accusations in 2025, no patient who left, no revenue decline, no document of any kind. SUMF ¶ 19. Declarations that the statements were "immensely damaging" are conclusory and carry no weight. *Leigh*, 212 F.3d at 1217. The claimed security expenditures are attributed to "harassment and threats" by unidentified third parties, not to any reader's belief that a false statement of fact was true; the emotional-distress claim was never supported by a single record, and Couture refused to produce any; and attorney's fees incurred to send a demand letter and prosecute this very Counterclaim are not damages. *See Price v. Tyler*, 890 So. 2d 246, 250–51 (Fla. 2004) (American Rule).

Evidence never produced in discovery may not be used to defeat summary judgment. Fed. R. Civ. P. 37(c)(1).

*3. The per quod counts (II, IV, VI) fail for want of special damages.* Defamation per quod requires proof of special damages—actual, out of pocket losses which must be proven by specific evidence as to the time, cause and amount. *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004) (Ryskamp, J.); *Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 457 (Fla. 5th DCA 1999); *Frey v. Minter*, 829 F. App'x 432, 434 (11th Cir. 2020) (affirming summary judgment where per quod plaintiff did not present evidence of special damages (such as lost profits), which he was required to do). None was produced. SUMF ¶ 19. The per quod counts fail for a further reason: Counter-Plaintiffs' per quod theory is that the statements are "not inherently injurious" and become so only through extrinsic facts (Doc. 538, p. 20)—a concession that the statements, read as written, are opinion.

## E. Counter-Plaintiffs did not comply with section 770.01

"Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory." § 770.01, Fla. Stat. The statute applies to online publishers who disseminate news and commentary to the public. *See Techtronic Indus. Co. v. Bonilla*, No. 8:23-cv-1734-CEH-AEP, 2025 U.S. Dist. LEXIS 184050, at *16 (M.D. Fla. Sep. 19, 2025)(Florida courts have interpreted the difference between a non-media and a media defendant as separating

"third parties who are not engaged in the dissemination of news and information through the news and broadcast media from those who are so engaged."); *Comins*, 135 So. 3d at 559–60. The Legislature has since confirmed that online publishers of Noshirvan's scale are media: section 501.2041(1)(d), Florida Statutes, defines a "journalistic enterprise" to include one that "[p]ublishes 100 hours of audio or video available online with at least 100 million viewers annually" or "in excess of 100,000 words available online with at least … 100,000 monthly active users," and section 501.2041(2)(j) forbids any social media platform from acting "to censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast." Noshirvan's TikTok, YouTube, Instagram, and Substack channels—with more than two million followers and hundreds of hours of video viewed  millions times annually—exceed those benchmarks. (Noshirvan Decl. ¶¶ 1-5.) A publisher the Legislature protects from deplatforming as a journalistic enterprise is, *a fortiori*, an "other medium" entitled to section 770.01's pre-suit notice. Compliance is a condition precedent, and "[f]ailure to comply with the notice provision of section 770.01 requires dismissal." *Mancini v. Personalized Air Conditioning & Heating, Inc.*, 702 So. 2d 1376, 1377–78 (Fla. 4th DCA 1997); *Canonico v. Callaway*, 26 So. 3d 53, 55 (Fla. 2d DCA 2010) (affirming dismissal with prejudice of action filed before the notice period ran); *Intihar v. Citizens Info. Assocs., LLC*, No. 2:13-cv-720-FTM-29CM, 2014 WL 842464, at *3 (M.D. Fla. Mar. 4, 2014) (Steele, J.) (website was an "other medium"; dismissing for noncompliance). Because "notice must be given prior to the filing of the suit," post-suit notice cannot cure the defect. *Tobinick v. Novella, 2015 U.S.*

*Dist. LEXIS 31884, at *24 and 30 (S.D. Fla. Mar. 16, 2015)*. The requirement is strictly construed. *Jews for Jesus*, 997 So. 2d at 1112.

The Court previously held only that the Counterclaim adequately *pleaded* compliance and that the allegation had to be accepted as true on a motion to dismiss. (Doc. 603, pp. 8–9.) Noshirvan identified the precise defect—service on his litigation counsel rather than on him—by motion before answering (Doc. 493, pp. 14–16), the Court addressed it (Doc. 603, pp. 8–9), and Noshirvan then denied compliance in direct response to the paragraph of the Counterclaim alleging the notice (Doc. 617 (Answer), ¶ 52). Counter-Plaintiffs have therefore had particularized notice of the defect since September 2025, which is all Rule 9(c) requires. *See* Fed. R. Civ. P. 9(c); *Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1224 (11th Cir. 2010). The undisputed facts now show non-compliance. The statute requires service "on the defendant." Counter-Plaintiffs instead emailed a letter to Noshirvan's litigation counsel, who had no authority to accept it, did not represent Noshirvan outside two pending cases, and had told them to stop emailing him. SUMF ¶ 18. Nothing in section 770.01 authorizes substituted service on a lawyer; the statute's purpose is to ensure that the defendant himself "know[s] that [he] is being sued, and for what," so that he may retract, *Tobinick*, at 24, and Counter-Plaintiffs—who knew Noshirvan's home address well enough to send employees to photograph it—cannot claim that service on him was impracticable. Because no notice was served on Noshirvan before the Counterclaim was filed, Counts I through VI must be dismissed. *Mancini*, 702 So. 2d at 1377–78; *Canonico*, 26 So. 3d at 55.

Independently, the statute requires that the notice "specify[] … the statements" alleged to be defamatory. To the extent any count rests on the unspecified "litany of posts" under the Instagram "Child Stalker" highlight (Doc. 448, ¶ 44), no notice identified them, the Counterclaim does not identify them, and Counter-Plaintiffs never identified them in discovery or in their own summary-judgment motion. A defamation plaintiff cannot reach a jury on statements it has never identified. *See* Fed. R. Civ. P. 56(c)(1). And because the highlight has existed since mid-2022, any claim based on it accrued then, § 770.07, Fla. Stat.; *Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So. 2d 113, 115 (Fla. 1993), is time-barred, § 95.11(5)(h), Fla. Stat., and is in any event disclaimed by paragraphs 36 and 40 of the Counterclaim.

### F. GPS's counts fail for the additional reason that the statements are true as to GPS or are not about GPS

Count I attributes to Noshirvan the assertions that GPS "engaged in a criminal conspiracy" and "maintains professional relationships with individuals identified as terrorists, racists, pedophiles, and stalkers." (Doc. 448, ¶ 57.) GPS's own credit card paid Camp; GPS employees Ratz and Quattrone carried out the Mansfield operation at Garramone's direction and for Garramone's money; and GPS confirmed Camp's employment in writing. SUMF ¶¶ 7–9. The "professional relationship" is undisputed. Count II's theory—that GPS "knowingly employed violent individuals" (Doc. 448, ¶ 72)—is likewise established by GPS's payments to Camp on the day he sent the "50K … destroy Hannah" message. SUMF ¶ 7. And the "Nazis" and "white supremacists" statement was addressed to "Jennifer Couture, Ralph Garramone of Fort Myers, you two"—not to GPS, which the Counterclaim concedes is implicated only "by

implication." (Doc. 448, ¶ 41.) A defamation plaintiff must show that the statement was "of and concerning" it, and a corporation cannot recover for invective directed at individuals. *See Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 804–05 (Fla. 1st DCA 1997).

## V. CONCLUSION

For the foregoing reasons, Noshirvan respectfully requests that the Court grant summary judgment in his favor on Counts I through VI of the Counterclaim (Doc. 448), order that Counter-Plaintiffs GPS, Couture, and Garramone take nothing on the Counterclaim, and grant such further relief as the Court deems just.

DATED: September 16, 2026.

Respectfully submitted,

Nicholas A. Chiappetta, Esq.
Florida Bar No. 1006407
**Chiappetta Trial Lawyers**
Attorneys for Mr. Noshirvan
2101 Vista Parkway, Suite 258
West Palm Beach, Florida 33411
Direct: (561) 768-4500
Fax: (561) 768-4600
service@chiappettalegal.com
nick@chiappettalegal.com
www.chiappettalegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record and pro se parties.

/s/ Nicholas A. Chiappetta
Nicholas A. Chiappetta

## EXHIBIT INDEX

### I. Exhibits Filed With the Motion

| Exhibit | Description | Cited At |
|---|---|---|
| 1 | Declaration of Danesh Noshirvan in Support of Motion for Summary Judgment on the Counterclaim (Doc. 448), executed September 15, 2026 ("Noshirvan Decl."), with Exhibits B through H attached thereto. | SUMF ¶¶ 4, 7, 14, 15, 19; Part E |
| A | True and correct copies of the publications quoted in paragraphs 41–45 of the Counterclaim: the January 1, 2025 TikTok video (also posted to YouTube); the January 29, 2025 YouTube video ("Hearing update"); the January 28 and February 3, 2025 Instagram posts; and the Substack posts and notes published January 27 through February 6, 2025, together with transcripts of the video items and copies of the underlying documents reproduced in or linked from each Substack post (deposition excerpts, GPS payment records, and Camp text messages). | SUMF ¶¶ 15–16; Noshirvan Decl. ¶¶ 6–9 |
| B | Screenshots of the "Child Stalker" highlight on Noshirvan's Instagram profile as it appears today, and of its earliest posts with their original dates (posted 241 weeks ago). | SUMF ¶ 16; Noshirvan Decl. ¶ 10 |
| C | Flyers distributed in Mansfield, Pennsylvania on May 20–21, 2022, collected by Noshirvan, and photographs taken by Noshirvan at the time. | SUMF ¶ 12; Noshirvan Decl. ¶ 13 |
| D | Certified copy of the Judgment and certified copy of the docket sheet in *United States v. Joseph A. Camp*, No. 10-00318-01-CR-W-BCW (W.D. Mo.), obtained from the Clerk of that Court. | SUMF ¶ 7; Noshirvan Decl. ¶ 23 |
| E | Certified Wheat Ridge Police Department records and Jefferson County, Colorado protective-order records concerning Joseph A. Camp (previously filed as Exhibits 1 and 2 to Doc. 624). | SUMF ¶ 7; Noshirvan Decl. ¶ 23 |
| F | Decision of the Disciplinary Review Board of the Supreme Court of New Jersey in *In the Matter of Richard A. Luthmann, an Attorney at Law*, Docket No. DRB 20-115 (Feb. 25, 2021), and the Supreme Court of New Jersey's Order of disbarment (June 16, 2021), obtained from the Office of Attorney Ethics. | SUMF ¶ 14; Noshirvan Decl. ¶ 23 |

| Exhibit | Description | Cited At |
|---|---|---|
| G | Screenshots of GPS's public Instagram account (@garramoneplasticsurgery) showing approximately 28,200 followers as of September 13, 2026; approximately 19,900 followers as of September 2025; and approximately 10,900 followers as of September 2023, before GPS filed suit against Noshirvan. | SUMF ¶¶ 4, 19; Noshirvan Decl. ¶ 24 |

## II. Record Materials Cited by Docket Number

| Docket No. | Description | Cited At |
|---|---|---|
| **Doc. 448** | Counter-Plaintiffs' Counterclaim against Noshirvan, filed August 4, 2025 (Counts I–VI). | Passim |
| **Doc. 448-1** | February 8, 2025 letter from Counter-Plaintiffs' counsel styled as a notice under section 770.01, Florida Statutes, attached to the Counterclaim. | SUMF ¶ 18; Part E |
| **Doc. 454** | Order of the Court (cited by Doc. 459 at p. 15). | SUMF ¶ 14 |
| **Doc. 459** | Order of the Court finding that Noshirvan's expert witness was harassed after Richard Luthmann published Noshirvan's expert disclosures online. | SUMF ¶ 14 |
| **Doc. 476** | Transcript of the June 10, 2025 deposition of Jennifer Couture, with Exhibits 1–70 (including Exs. 1–4 (GPS American Express statements and accounting entries reflecting the May 5, 2022 payments to Camp); Ex. 5 (Camp text messages); Ex. 6; Ex. 13; Exs. 16–26; Exs. 39–40; Ex. 49; Exs. 59–67; Ex. 70). | SUMF ¶¶ 1, 3, 4, 7–14 |
| **Doc. 477** | Transcript of the April 22, 2025 deposition of Jennifer Holliday (former GPS employee). | SUMF ¶¶ 3, 8 |
| **Doc. 478** | Transcript of the April 11, 2025 deposition of Patrick Trainor, with exhibits (including Exs. 3–5 (billboard, television advertisement, and related materials)). | SUMF ¶ 4 |

| Docket No. | Description | Cited At |
| --- | --- | --- |
| **Doc. 479** | Transcript of the July 25, 2025 deposition of Ralph Garramone, M.D., with Exhibits 1–62 (including Exs. 2–4 (Couture–Garramone text messages, Jan.–May 2022); Exs. 8–16 (May 20–21, 2022 Mansfield text messages, including the "Cindy"/"Bob" messages and Couture's instruction to Ratz to "go get more photos"); Exs. 18, 20–21, 37 (Couture arrest and plea materials); Exs. 24, 26–27; Exs. 28, 30–31, 35–36, 38, 45 (Camp's residence and work for GPS); Exs. 49–57, 59 (false narratives; Luthmann and Parlato); Ex. 58). | SUMF ¶¶ 1–3, 6–13, 16, 19; Part B |
| **Doc. 493** | Noshirvan's Motion to Dismiss the Counterclaim (Doc. 448), including the Statement of Relevant Facts. | SUMF ¶¶ 1, 4, 5, 14, 16, 18, 19; Parts B, E |
| **Doc. 509** | Transcript of the deposition of Danesh Noshirvan, with Plaintiff's Exhibits (including Pl.'s Ex. 2 (Camp text messages) and Ex. 5). | SUMF ¶¶ 7, 14, 17 |
| **Doc. 526-1** | Email correspondence between undersigned counsel and Counter-Plaintiffs' counsel concerning the February 8, 2025 letter, including counsel's instruction to "stop emailing [him]" (Exhibit 1 to Doc. 526). | SUMF ¶ 18; Part E |
| **Doc. 538** | Counter-Plaintiffs' Motion for Partial Summary Judgment on the Counterclaim, with Exhibits A–C (Declarations of Ralph Garramone, M.D., Jennifer Couture, and Garramone Plastic Surgery). | SUMF ¶¶ 17, 19; Parts A, C, D |
| **Doc. 546-1** | Declaration of Danesh Noshirvan dated October 24, 2025, filed in opposition to Defendants' motions for summary judgment (¶¶ 5–10). | SUMF ¶ 17; Noshirvan Decl. ¶ 17 |
| **Doc. 546-2** | Exhibit 2 to Noshirvan's October 2025 summary-judgment opposition. | SUMF ¶ 17 |
| **Doc. 569** | Noshirvan's Memorandum of Law in Opposition to Counter-Plaintiffs' Motion for Partial Summary Judgment (Doc. 538), filed November 3, 2025. | SUMF ¶ 19 |
| **Doc. 603** | Order on Noshirvan's Motion to Dismiss the Counterclaim. | SUMF ¶ 15; Parts A, B, D, E |

| Docket No. | Description | Cited At |
|---|---|---|
| **Doc. 624** | Noshirvan's Notice of Filing Camp criminal records, with Exhibits 1–2 (certified Wheat Ridge Police Department and Jefferson County, Colorado protective-order records) (also attached as Noshirvan Decl. Ex. F). | SUMF ¶ 7 |
| **Doc. 674** | Order granting Noshirvan summary judgment on Patrick Trainor's counterclaim. | Introduction; Part B |
| **Answer** | Noshirvan's Answer and Affirmative Defenses to the Counterclaim (Doc. 448), filed March 4, 2026. | Part A; Part E |

Materials previously lodged with the Court on the jump drive and in the two banker's boxes submitted with Noshirvan's Motion for Partial Summary Judgment—including the audio recording of Episode 130 of the "Full Haus" podcast (also marked as Defendant's Exhibit 2 at the deposition of Brad LaPorte)—are cited in the Motion by reference to that submission and are not re-filed here. See Noshirvan Decl. ¶ 22.