UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DANESH NOSHIRVAN, an individual,

Plaintiff,

v. Case No: 2:23-cv-1218-KCD-KRH

JENNIFER COUTURE, an individual; RALPH GARRAMONE M.D., an individual; RALPH GARRAMONE M.D. P.A d/b/a GARRAMONE PLASTIC SURGERY; CENTRAL PARK OF SOUTHWEST FLORIDA, LLC; OMG REALTY, LLC; THE LAW OFFICE OF PATRICK TRAINOR ESQ, LLC d/b/a THE LAW OFFICE OF PATRICK TRAINOR; PATRICK TRAINOR, an individual; and ANTI-DOXING LEAGUE INC.,

Defendants.

---

**ORDER**

This case began with a viral video. Plaintiff Danesh Noshirvan is a citizen journalist who built a social media following by exposing bad behavior in public spaces. In January 2022, he posted a video of Defendant Jennifer

Couture that caught significant online attention. What followed was a retaliatory war of attrition that ultimately reached this Court. The parties have all filed cross-motions for summary judgment, which are resolved below.

## I. Background

To the extent material facts remain in dispute, the Court addresses them in the analysis below, viewing the record "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[1]

Back in January 2022, Anjalyke Reed recorded and posted her interpersonal dispute with Defendant Couture in a Dunkin Donuts parking lot. (Doc. 479-2.) The video went viral, and Plaintiff Noshirvan later posted the video to his TikTok account. He also identified Couture and shared her phone number. (*Id.*) A couple days later, Noshirvan posted another video identifying Defendants Ralph Garramone ("Garramone") and Garramone Plastic Surgery as Couture's employers. (Doc. 479-17.) Stranges called, texted, and left voicemails for Couture, Garramone, and Garramone Plastic Surgery about the Dunkin Donuts incident and even left negative reviews on Garramone Plastic Surgery's public business profiles. (Doc. 479-2; Doc. 479-3; Doc. 479-4.)

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

Couture's troubles did not stop with the bad press. She was arrested for her conduct during the parking lot altercation. (Doc. 479-17.) To avoid jail time, Couture pled out to three misdemeanor charges, receiving three consecutive twelve-month terms of probation in lieu of incarceration. (*Id.*)

To remove the negative publicity from the internet, Couture and Garramone first hired NetReputation, a company that offers reputation management services. (Doc. 479-4.) Those efforts, however, were unsuccessful. So Couture looked elsewhere and found Joseph A. Camp ("Camp"). The two met on May 5, 2022, where Camp pitched his own brand of "reputation management." (*Id.*) Camp said he would remove negative online postings about Couture, Garramone, and Garramone Plastic Surgery. Garramone Plastic Surgery footed the bill, paying Camp through its corporate credit cards. (*Id.*; Doc. 476-1; Doc. 476-2; Doc. 476-3; Doc. 476-4; Doc.468 at 401:7-18.)

Camp, however, did far more than remove negative postings. He texted Noshirvan with the first message beginning on the same day Garramone Plastic Surgery sent money. (Doc. 476-1; Doc. 476-2; Doc. 509-2.)[2] The messages threatened sexual violence against Noshirvan, Noshirvan's wife, and

[2] Defendants Patrick Trainor, the Law Office of Patrick Trainor, Anti-Doxing League, Inc., and Central Park insist that Camp never transmitted these, or any other offending messages, because a third party, James McGibney, hijacked Camp's accounts. (Doc. 539 at 4.) When analyzing their motion for summary judgment, the Court treats this as a disputed fact.

Noshirvan's children, called Noshirvan racial and homophobic slurs, discussed his "budget" to ruin Noshirvan, and utilized photographs of Noshirvan from Couture. (Doc. 509-2.) Camp also drafted language for a Change petition seeking Noshirvan's removal from TikTok, provided Couture and Garramone with information about Noshirvan on a Google sheet, and posted on Couture's social media accounts promoting a website titled "thatdaneshguy.com," which claimed that Noshirvan committed various crimes. (Doc. 479-43; Doc. 479-33; Doc. 479-33A; Doc. 479-48.) Camp even posted two videos asking people to report Noshirvan to Child Protective Services for child abuse and neglect and discussing vague plans "we ha[d]" for Noshirvan—including flyers and billboards. (Doc. 476-68; Doc. 476-69.) They parties offer starkly conflicting accounts of what Camp was actually hired to accomplish and what actions he took once brought on board—whether he was retained merely for lawful takedown requests or enlisted to orchestrate a scorched-earth campaign of digital intimidation and interstate harassment. These contested facts, to the extent relevant to resolving the pending motions, are addressed below.

Some of Camp's actions were done at a property owned by Defendant Central Park of Southwest Florida, LLC ("Central Park"). (Doc. 476-68; Doc. 476-69.) Camp stayed at the property for eleven weeks after initially receiving payment from Garramone, departing only after Couture asked him to leave.

(Doc. 479-28; Doc. 479-30.) Camp was also seen at Garramone Plastic Surgery's office, a property owned by Defendant OMG Realty, LLC ("OMG Realty"), meeting with Couture and Garramone.[3] (Doc. 477 at 67, 69-71, 75-77, 119.)

Beyond Camp's own actions, Defendant Patrick Trainor ("Trainor"), an attorney in New Jersey who served as counsel for Couture and Garramone, rented a billboard that used Noshirvan's face alongside the words: "Doxxing is violent Have you been injured? Call for help 732-723-4007." (Doc. 476-15; Doc. 478-3.) Trainor acknowledged making the image. (Doc. 478 at 38:2-12, 48-50.)

The weekend after Trainor rented the billboard, Couture and Garramone traveled to Pennsylvania for Garramone's oldest son's college graduation. (Doc. 476 at 139:18-19.) Joining them were two employees from Garramone Plastic Surgery: Alex Quattrone ("Quattrone") and Sydney Ratz ("Ratz"). While in Pennsylvania, this group traveled to Mansfield—Noshirvan's hometown. (Doc. 479-8; Doc. 479-9.) After Quattrone and Ratz took a picture of Noshirvan at his house with his kids, Couture asked them to take a picture of Noshirvan's garage. (Doc. 479-8.) That same weekend, flyers appeared throughout Mansfield and inside a local business, Papa the Butcher. (Doc. 479-9.) The flyers invited people to a swinger's party with Noshirvan and his wife, showed

[3] Garramone is involved with both Central Park and OMG Realty, but the parties dispute his actual role with the entities.

the same image from the billboard, and asked "Have you seen this predator?" with Noshirvan's picture. (Doc. 476-16; Doc. 476-17; Doc. 476-21.)

At the end of the weekend, Couture and Garramone offered to cover Quattrone's and Ratz's travel expenses on top of placing an additional $500 in their paychecks. (Doc. 479-11.) This payment was to show their thanks, but both Ratz and Quattrone declined the offer. (*Id.*)

All of this led to Couture and Garramone Plastic Surgery, through their attorney Trainor, filing a federal lawsuit against Noshirvan. They alleged claims of cyberstalking, civil conspiracy, and interference with prospective economic advantage. *See Couture v. Noshirvan*, Case No 2:23-cv-340-SPC-KRH (hereinafter Case No. 340). Noshirvan was initially represented by attorney Robson Powers ("Powers"). (Case No. 340 at Doc. 21.) But within weeks of his appearance, Powers began receiving harassing emails from daneshfiles@yandex.com. (Doc. 546-3.) The emails threatened physical harm, vowed to broadcast Powers's personal information, and promised to drag him before bar authorities for ethics violations stemming from his representation of Noshirvan. (Doc. 546-3; Doc. 546-4; Doc. 546-5; Doc. 546-6; Doc. 546-7; Doc. 546-8; Doc. 546-9.)

Powers then filed a motion to withdraw as counsel on July 18, 2023, citing the emails as his reason. (Case No. 340 at Doc. 31 & Doc. 34.) Couture

and Garramone Plastic Surgery took no position on the merits, but requested the harassing emails be preserved and suggested Noshirvan was the source. (Case No. 340 at Doc. 35.) Powers was permitted to withdraw. (Case No. 340 at Doc. 36.)

After Powers withdrew, Noshirvan requested additional time to retain counsel because other attorneys were concerned about their safety. (Case No. 340 at Doc. 35 & Doc. 48.) Ultimately, Noshirvan was able to retain attorney Nicholas Chiapetta to represent him in that case. (Case No. 340 at Doc. 61.) Noshirvan later filed this lawsuit on December 26, 2023, based on all of the above actions. (Doc. 1.)

While both lawsuits were pending, Couture met with Richard Luthmann ("Luthmann") and Frank Parlato ("Parlato") to plan a media strategy for getting Couture's side of the story out. (Doc. 479-54; Doc. 479-55; Doc. 479-57; Doc. 479-59; Doc. 476-59; Doc. 476-60.) Shortly after meeting with Couture, Luthmann began posting on his Substack where he claimed to have been retained by a private party to investigate what happened with the events underlying this case.[4] (Doc. 476-61.)

---

[4] Couture denies being the private party.

## II. Legal Standard

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The principles governing summary judgment do not change when, as here, the parties file cross-motions for summary judgment. *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001). Cross-motions for summary judgment are to be treated separately, "view[ing] the facts in the light most favorable to the non-moving party on each motion." *Cowen v. Sec'y of State of Georgia*, 22 F.4th 1227, 1231 (11th Cir. 2022). Ultimately, "[w]hen parties jointly move for summary judgment, the court has three options: granting summary judgment for the plaintiff under the defendant's best case, granting summary judgment for the defendant under the plaintiff's best case, or denying both motions for summary judgment and proceeding to trial." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir. 2023).

## III. Discussion

Noshirvan's operative complaint (Doc. 434) has three remaining conspiracy claims and four substantive tort claims arising under Florida law. Before evaluating them individually, the Court outlines the foundational conspiracy principles governing the first three counts.

The gist of a civil conspiracy claim "is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." *Liappas v. Augoustis*, 47 So. 2d 582, 582 (Fla. 1950); *see also Loeb v. Geronemus*, 66 So. 2d 241, 243 (Fla. 1953). The plaintiff must identify and ultimately prove an actionable underlying tort or wrong because "[t]here is no freestanding cause of action in Florida for civil conspiracy." *Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 412 (Fla. Dist. Ct. App. 2022). This is because conspiracy "is a device to allow a plaintiff to spread liability to those involved in causing the underlying tort." *Tejera v. Lincoln Lending Servs., LLC*, 271 So. 3d 97, 103 (Fla. Dist. Ct. App. 2019). Thus, if the substantive claim fails, the conspiracy claim does too. *See Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1096 (Fla. Dist. Ct. App. 2009) ("Since the counts regarding the goals of the conspiracy—defamation and tortious interference—fail, so too the conspiracy count must fail."); *see also Fed. Ins. Co. v. Perlmutter*, 376 So. 3d 24, 36 (Fla. Dist. Ct. App. 2023).

In Florida, a civil conspiracy requires: "[1] an agreement between two or more parties, [2] to do an unlawful act or to do a lawful act by unlawful means, [3] the doing of some overt act in pursuance of the conspiracy, and [4] damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*,

702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997); *see also GE Real Est. Servs., Inc. v. Mandich Real Est. Advisors, Inc.*, 337 So. 3d 416, 420-21 (Fla. Dist. Ct. App. 2021). "An agreement between two or more parties occurs when there is an express or implied agreement of two or more persons to engage in a criminal or unlawful act." *Gilison v. Flagler Bank*, 303 So. 3d 999, 1004 (Fla. Dist. Ct. App. 2020).

A conspiracy can be proven by circumstantial evidence, although this is possible "only when the inference sought to be created by such circumstantial evidence outweighs all reasonable inferences to the contrary." *Raimi*, 702 So. 2d at 1284. And not every coconspirator needs to act in furtherance of the conspiracy. "A conspirator only needs to know of the scheme and assist in it in some way to be held responsible for all the acts of his conspirators." *Gilison*, 303 So. 3d at 1004. Merely passively accepting a benefit from a conspiracy, however, is insufficient to impose liability. *Eagletech Commc'ns, Inc. v. Bryn Mawr Inv. Grp., Inc.*, 79 So. 3d 855, 863 (Fla. Dist. Ct. App. 2012). "Where a complaint claims damages in two counts based on the same facts, only one cause of action is alleged despite the fact that the second count charges a civil conspiracy to commit the tortious acts, and only one recovery is permissible." *Osheroff v. Rauch Weaver Millsaps & Co.*, 882 So. 2d 503, 506-07 (Fla. Dist. Ct. App. 2004).

**a. Count II**

In Count II, Noshirvan alleges Defendants conspired to tortiously interfere with his business relationship with Powers, Noshirvan's former attorney. (Doc. 434 at ¶¶ 204-212.) Defendants seek summary judgment, arguing that: (1) Noshirvan failed to show intentional and unjustified interference; (2) Noshirvan suffered no damages; (3) an at-will contract cannot support a tortious interference claim; and (4) Noshirvan failed to show Defendants directing or encouraging Camp to message Powers. (Doc. 539 at 11-14; Doc. 540 at 16-18; Doc. 565 at 17-22.) Garramone Plastic Surgery also argues that the intracorporate conspiracy doctrine precludes its liability.[5] (Doc. 565 at 17-20.) Noshirvan's responses attempt to create a genuine dispute of material fact by citing an impressive number of documents. But the Court ultimately agrees that Defendants are entitled to summary judgment here. (Doc. 570 at 3-10, 13-14; Doc. 571 at 3-10, 13-14; Doc. 573 at 12-14.)

To succeed on a tortious interference with a business relationship claim, a plaintiff must prove: (1) the existence of a business relationship; (2) defendant's knowledge of the relationship; (3) defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff

[5] Since Noshirvan fails to prove an element of the tortious interference claim, the Court will not analyze intracorporate doctrine in this count.

as a result of the breach. *Glob. Marine Expl., Inc. v. Republic of France*, 151 F.4th 1296, 1312 (11th Cir. 2025); *see also Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994); *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985). "The general rule is that an action for tortious interference will not lie where a party interferes with an at will contract such as" an attorney-client relationship, which is "at will" and may be terminated at any time with or without cause. *Ferris v. S. Florida Stadium Corp.*, 926 So. 2d 399, 401-02 (Fla. 3d DCA 2006). "It is only where interference with an at-will relationship is direct and unjustified that such interference is actionable." *Id.* at 402. As noted earlier, if there is no actionable tortious interference with a business relationship, there can be no companion conspiracy claim. *Weisman v. S. Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 652 (Fla. Dist. Ct. App. 2020).

As an initial matter, no tortious interference can exist until there is a business relationship. Here, the business relationship formed after Noshirvan retained Powers when he was served with process on June 2, 2023. (Case No. 340 Doc. 16; Case No. 340 Doc. 21). As such, this claim will only lie for behavior occurring after June 2, 2023, at the earliest.

A reasonably jury could conclude the content of the emails constituted a direct and unjustified interference with Noshirvan and Powers's relationship.

The emails were sent to Powers's work email address, and they often referenced this very dispute. A reasonably jury could also conclude the content of the emails—threatening violence, threatening to dox Powers, and threatening to report Powers for ethical violations—constitute fraud, coercion, or other wrongdoing. *See, e.g.*, *Ferris*, 926 So. 2d at 402 (stating interference is unjustified where those who encouraged or caused a rupture in the attorney-client relationship used means of fraud, coercion, or other wrongdoing). Since these emails were the basis for Powers's motion to withdraw, a reasonable jury could also conclude the interference was direct and unjustified.

Further, a reasonable jury could conclude that Camp sent the emails to Powers. The emails contain similar language to Camp's text messages sent to Noshirvan. Specifically, the messages use statements and slurs directed at Noshirvan (and Powers at times) such as, "sand n*****," "f***** n*****," "n*****," "f*****," and "Daddy." (*Compare* Doc. 509-2 at 1, 3, 5-6, 8-16, 17, *with*, Doc. 546-3; Doc. 546-4; Doc. 546-5; Doc. 546-6; Doc. 546-7; Doc. 546-8; Doc. 546-9.)

The question then becomes who, if anyone, conspired with Camp to intentionally interfere with Noshirvan's business relationship with Powers. This is where Noshirvan's claim fails. The cited evidence directs the Court's attention to documents from 2022 and 2023 *before* any business relationship

between Noshirvan and Powers existed. (Doc. 476-2; Doc. 476-3; Doc. 476-4; Doc. 476-5; Doc. 476-10; Doc. 476-10-11; Doc. 476-46; Doc. 476-48; Doc. 476-49; Doc. 476-50; Doc. 476-51; Doc. 479-44.) Further, some of the cited documents do not even relate to Powers at all. (Doc. 406-5, Doc. 406-10.) These documents cannot support any reasonable inference that Defendants agreed to interfere with Noshirvan's business relationship because it simply did not exist at that time. Therefore, Defendants' motions for summary judgment are granted as to Count II.

**b. Count III**

Count III alleges that Defendants conspired with Camp to defame Noshirvan by calling him a "pedophile," "child groomer," and "stalker." (Doc. 434 at ¶¶ 213-30.) Defendants contend: (1) they never agreed with Camp to defame Noshirvan, and (2) Noshirvan failed to prove the statements are false. (Doc. 539 at 14-20; Doc. 540 at 14-16, 22-24; Doc. 565 at 16-19.) Garramone Plastic Surgery also argues the intracorporate immunity doctrine precludes liability. (Doc. 565 at 17-20.) Viewing the evidence in light most favorable to Noshirvan, the Court finds only OMG Realty is entitled to summary judgment.

In addition to the conspiracy principles discussed above, the following defamation principles are relevant. To succeed on a defamation claim, a plaintiff must show: (1) a publication; (2) of a false statement; (3) made with

knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory. *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008); *see also Black v. Cable News Network, Inc.*, 423 So. 3d 2, 8 (Fla. Dist. Ct. App. 2025). Defamation per se occurs when the statement imputes to another a felony offense or an infectious disease, or tends to subject one to hatred, distrust, ridicule, contempt, or disgrace, or injures one in their trade or profession. *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. Dist. Ct. App. 2016).

Statements that are not false can support defamation-by-implication claims when they create a false impression. *Black*, 423 So. 3d at 9. *Jews for Jesus* recognized a cause of action for "defamation by implication" where "literally true statements are conveyed in such a way as to create a false impression." 997 So. 2d at 1106-08. "Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, such that he may be held responsible for the defamatory implication." *Jews for Jesus*, 997 So. 2d at 1106. "The tort requires that the implied fact be defamatory." *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1237 (Fla. Dist. Ct. App. 2021). "True statements, statements

that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions[.]" *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018).

**(1) Scope of Agreement is Disputed**

All parties argue the evidence concerning the agreement required for a civil conspiracy favors them. (Doc. 516 at 18-20; Doc. 539 at 14-20; Doc. 540 at 14-16; Doc. 565 at 16-19.) The Court, however, cannot answer this question, with the exception of OMG Realty, because the parties hotly dispute the scope of Camp's "reputation management" work.

Regardless of the disputed scope of Camp's work, a reasonable jury can only conclude that OMG Realty never agreed with anyone to defame Noshirvan. Noshirvan's only cited evidence showing an agreement between OMG Realty and Camp is Camp's presence at OMG Realty's property, *i.e.*, Garramone Plastic Surgery's office building. (Doc. 477-4 at 69-70.) This fails to permit any reasonable inference of an agreement between Camp and OMG Realty when looking to Noshirvan's other cited evidence.

For starters, Garramone Plastic Surgery made bi-weekly payments to Camp for his "reputation management" work on behalf of Couture, Garramone, and Garramone Plastic Surgery. (Doc. 476-2; Doc. 476-3; Doc. 476-4; Doc. 476-5.) These payments, in tandem with the drafted letter from Garramone Plastic

Surgery claiming Camp was its employee, preclude any reasonable inference that OMG Realty agreed to defame Noshirvan. (Doc. 479-40.) Simply because Garramone is related to OMG Realty, and OMG Realty owns Garramone Plastic Surgery's office building, is not enough to raise a reasonable inference that an agreement existed between Camp and OMG Realty. Especially where the cited evidence only shows Camp's presence at Garramone Plastic Surgery and no further involvement from OMG Realty. Accordingly, OMG Realty's motion for summary judgment as to Count III is granted.

**(2) Falsity**

While Defendants argue the alleged defamatory statements made were true, Noshirvan has already denied the truthfulness of the statements, thus creating a disputed fact issue. Even where Defendants point to Noshirvan's testimony that "Doxxing can be violent" to show some statements were true, such testimony is not the smoking gun they believe it to be. (Doc. 473 at 31:9-13.) A reasonable jury could conclude Noshirvan's testimony does not prove "Doxxing is violent" is a true statement when considering the context. Noshirvan's image was placed behind those words, which could reasonably suggest that Noshirvan's actions themselves were violent. Accordingly, a reasonable jury could conclude the statement was false. Since this ultimately

poses a jury question, the Court cannot grant summary judgment based on falsity.

**(3)Intracorporate Conspiracy Doctrine**

Garramone Plastic Surgery also argues that the intracorporate conspiracy doctrine bars the conspiracy claims. (Doc. 565 at 17-19.) The Court disagrees for one simple reason: there are others in the alleged conspiracy beyond agents of Garramone Plastic Surgery. *See Mancinelli v. Davis*, 217 So. 3d 1034, 1036-37 (Fla. Dist. Ct. App. 2017) (collecting cases) ("Thus, the intra-corporate conspiracy doctrine, as a general proposition, precludes the claim of conspiracy against individuals and their corporation for wholly internal agreements to commit wrongful or actionable conduct.").

Accordingly, the Court grants OMG Realty's motion for summary judgment as to Count III and denies the rest.

**c. Count IV**

In Count IV, Noshirvan alleges that Defendants conspired with Camp to intentionally inflict emotional distress by utilizing a campaign of death threats against Noshirvan and his family. (Doc. 434 at ¶¶ 231-242.) Noshirvan's motion for summary judgment generally argues all elements have been proven as to each Defendant. (Doc. 516 at 18-20, 22-24.) Defendants argue: (1) they never agreed with Camp to intentionally inflict emotional distress against

Noshirvan; (2) the conduct at issue is not sufficiently outrageous to support an IIED claim; and (3) Noshirvan has not suffered severe emotional distress. (Doc. 539 at 20-24[6]; Doc. 540 at 19-24; Doc. 565 at 23-26.) Garramone Plastic Surgery again argues that the intracorporate conspiracy doctrine precludes liability. (Doc. 565 at 17-20.) Viewing the evidence in light most favorable to the nonmovant, the Court finds only OMG Realty is entitled to summary judgment.

**(1) Scope of Agreement & Intracorporate Doctrine**

The Court applies the same analysis concerning agreement and the intracorporate doctrine as outlined above to Count III. *See* supra Section III.b.(1), (3).

**(2) Outrageous**

The question of whether conduct is sufficiently outrageous to support an IIED claim is a question of law. See *Glegg v. Van Den Hurk*, 379 So. 3d 1171, 1174 (Fla. Dist. Ct. App. 2024). Florida has adopted Section 46 of the Restatement (Second) of Torts (1965) as the definition of the required conduct:

> d. Extreme and outrageous conduct . . . It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or

[6] Trainor, Law Office, Anti-Doxxing League, and Central Park's motion appears to more dispute the facts rather than bring forward any meaningful argument. (Doc. 539 at 20-24.) As such, the Court will deny their motion.

> even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 279 (Fla. 1985). Thus, liability "does not extend to mere insults, indignities, threats, or false accusations." *Williams v. Worldwide Flight SVCS., Inc.*, 877 So. 2d 869, 870 (Fla. Dist. Ct. App. 2004).

Here, the evidence points to a variety of misconduct. Focusing on Camp's actions, the evidence shows texts to Noshirvan with threats of death, rape, and coercion to commit suicide and texts with racial slurs and a homophobic slur. (Doc. 509-2; Doc. 476-5.) Such threats and messages are sufficien to qualify for an IIED claim. *See Nims v. Harrison*, 768 So. 2d 1198, 1201 (Fla. Dist. Ct. App. 2000) (finding a single publication with racial slurs, a homophobic slur, and threats of murder and rape against the defendant and their family was outrageous).

Camp also disseminated sexually explicit images of Noshirvan without Noshirvan's consent and sent pictures of Noshirvan's deceased father to him, alongside false statements about the father's death. While this Court has

previously held that the images—standing alone—cannot support an IIED claim, it can in totality be considered outrageous when paired with Camp's other conduct above as well as: (1) Camp swatting Noshirvan; (2) Camp sending a picture of Noshirvan and his kids in their yard to Noshirvan; and (3) Camp posting on social media that cameras were placed illegally in public areas to watch Noshirvan. (Doc. 420.)

**(3) Severe Emotional Distress**

Finally, a reasonable jury could conclude both that Noshirvan suffered and did not suffer severe emotional distress. Though not robustly developed, Florida law defines severe emotional distress as "emotional distress of such a substantial quality or enduring quality[] that no reasonable person in a civilized society should be expected to endure it." *See Kraeer Funeral Homes, Inc. v. Noble*, 521 So. 2d 324, 325 (Fla. Dist. Ct. App. 1988). When considered alongside causation, a factfinder must answer two questions: (1) whether the plaintiff in fact suffered emotional distress as a consequence of whatever the defendant did; and (2) whether the emotional distress the plaintiff suffered was so intense or so long-lasting that no reasonable person should be expected to endure it. *See Alderwoods Grp., Inc. v. Garcia*, 119 So. 3d 497, 506 (Fla. Dist. Ct. App. 2013); *Kim v. Jung Hyun Chang*, 249 So. 3d 1300, 1306 (Fla. Dist. Ct. App. 2018).

On the one hand, a reasonable jury can find Noshirvan suffered severe emotional distress because of Camp's actions. Noshirvan has suffered from panic attacks, depression, hyper-vigilance, and disruption of his ability to work and engage in normal family life that started in 2022. (Doc. 474-3.) These symptoms led to his Complex Post-Traumatic Stress Disorder diagnosis. (*Id.* at 8.) Such evidence taken together could permit a jury to find that Noshirvan's emotional distress was so intense that no reasonable person should be expected to endure it. *See Kim*, 249 So. 3d at 1306-07.

On the other hand, a reasonable jury could also find Noshirvan did not suffer severe emotional distress. Noshirvan's own testimony shows he has not seen a mental health professional since 2022—except for Dr. Gordon for this lawsuit—and currently is not taking medication to treat his claimed emotional distress. (Doc. 509-1 at 167:19-168:2.) Such cited evidence permits a reasonable jury to conclude, regardless of Dr. Gordon's Complex Post-Traumatic Stress Disorder diagnosis, that Noshirvan did not subjectively experience severe emotional distress. *See Kim*, 249 So. 3d at 1305-06.

**d. Count VI**

Count VI has competing cross-motions for summary judgment. (Doc. 516; Doc. 565.) Noshirvan alleges Garramone Plastic Surgery, acting through its employee and agent Camp, defamed Noshirvan. (Doc. 434 at ¶¶ 243-56.)

Noshirvan again generally argues he satisfies all the elements to succeed on his defamation claim. (Doc. 516 at 20-22.) Garramone Plastic Surgery argues Noshirvan cannot prove falsity[7] or that Garramone Plastic Surgery, or anyone authorized to act on its behalf, published any of the defamatory statements. (Doc. 565 at 22-23.)

Whether Garramone Plastic Surgery published the offending statements starts with a discussion of agency principles. To establish actual agency, a plaintiff must show: "(1) acknowledgement by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990); *see also Moore v. Toub*, 398 So. 3d 1151, 1154 (Fla. Dist. Ct. App. 2024). Control by the principal is the key element, and the focus is "the right of control, not actual control or descriptive labels employment by the parties, that determines an agency relationship." *Hickman v. Barclay's Int'l Realty, Inc.*, 5 So. 3d 804, 806 (Fla. Dist. Ct. App. 2009). A reasonable jury could attribute three various actions to Garramone Plastic Surgery utilizing agency principles.

[7] The Court incorporates its above discussion on falsity as if fully stated here. *See* supra Section III.b.(2).

First, a reasonable jury could conclude Camp was either an employee or an agent of Garramone Plastic Surgery. Starting on May 5, 2022, Garramone Plastic Surgery began making bi-weekly payments to Camp. (Doc. 476-2; Doc. 476-3; Doc. 476-4; Doc. 476-5.) During that time, Camp attended meetings with Couture at Garramone Plastic Surgery—though there is no evidence concerning the topics discussed in those meetings. (Doc. 477-1 at 69-70.) Other evidence shows Couture asking Garramone to stop Camp from instigating Noshirvan even more, and Camp livestreaming where he refers to a "we" in discussing billboards, flyers, and other "rounds" of action against Noshirvan. (Doc. 479-46; Doc. 476-68; Doc. 479-69.) Such facts permit, although do not require, a jury to conclude that Camp was hired by Garramone Plastic Surgery for more than simply removing negative internet posts. (Doc. 476-50; Doc. 476-70.) Such inference is strengthened by Camp's own social media publications in which he claimed to be visiting his "boss's estate," as well as Couture's and Garramone's statement that they "hired Joey." (Doc. 476-7; Doc. 476-38; Doc. 476-43.)

Second, a reasonable jury could conclude that Couture, Quattrone, and Ratz acted as agents of Garramone Plastic Surgery in Mansfield when posting various flyers. The evidence shows Couture, Quattrone, and Ratz were all present in Mansfield the weekend of May 20, 2022—the same weekend flyers

appeared around town and in Papa the Butcher. (Doc. 476-18; Doc. 476-22; Doc. 479-10; Doc. 479-11.) What's more, there is evidence showing text messages among the three employees and Garramone discussing placing flyers out, and between Couture and Garramone wanting to thank Quattrone and Ratz for their assistance by placing an additional $500 in their next paychecks. (Doc. 479-11.) Such evidence permits a reasonable inference that Couture, Quattrone, and Ratz were acting as agents of Garramone Plastic Surgery.

Finally, a reasonable jury could conclude Couture acted on behalf of Garramone Plastic Surgery when she purchased the billboard, postcards, tv advertisements, and newspaper advertisements. Couture acknowledges getting these advertisements started and making some payments to Trainor around May 10, 2022, before the billboard at issue was put up from May 22, 2022, through June 19, 2022. (Doc. 476-6; Doc. 476-56.)

On the other hand, a reasonable jury could conclude none of the above actions were done by or on behalf of Garramone Plastic Surgery. When looking to Camp, there are texts where Camp stated Noshirvan should have kept Camp's name out of his mouth, as well as messages by Couture to Garramone asking Camp to stop instigating Noshirvan. (Doc. 476-6; Doc. 476-50.) Couture even disputes that Camp's posts were made on behalf of Garramone Plastic Surgery. (Doc. 536-2.) These messages and testimony permit a reasonable

inference that Camp was acting alone on a personal vendetta beyond any scope of his "reputation management" work.

As to Couture, no documents cited by the parties definitively show which account Couture used to pay for the advertisements. Given Couture's own personal vendetta against Noshirvan, a reasonable jury could conclude Couture was not acting on behalf of Garramone Plastic Surgery.

Finally, Quattrone and Ratz could have been present in Pennsylvania in their personal capacity given the graduation occurring that same weekend, as well as their refusal of any payment from Couture and Garramone, because "[they're] both just happy to help [Couture and Garramone] in any way we can." (Doc. 479-11.) Accordingly, both Noshirvan and Garramone Plastic Surgery's motions for summary judgment as to Count VI are denied.

**e. Count VII**

Count VII also has competing cross-motions for summary judgment. (Doc. 516; Doc. 539). Here, Noshirvan alleges that Central Park, through its agent Camp, published defamatory statements about him, *e.g.*, "child predator," "rapist," etc. (Doc. 434 at ¶¶ 257-69.) Noshirvan generally argues he satisfies all the elements to succeed on his defamation claim. (Doc. 516 at 20-22.) Central Park, however, argues that Noshirvan has failed to show Camp

was its agent.[8] (Doc. 539 at 19-20.) Viewing the evidence in light most favorable to both parties, neither is entitled to summary judgment.

On the one hand, a reasonable jury could conclude Camp was either an employee or an agent of Central Park. Couture and Garramone gave Camp permission to stay at Central Park's property for approximately eleven weeks. (Doc. 479-28; Doc. 479-30.) The messages suggest that this permission was given because they were grateful for the work Camp was doing for them—some of which occurred on Central Park's property. (Doc. 479-30.) Though admittedly limited evidence, the Court must make all reasonable inferences in favor of the non-movant. As such, Central Park's motion is denied as to Count VII.

On the other hand, a reasonable jury could also conclude Camp was not an employee or an agent of Central Park. Even considering the above evidence, the messages came from Couture—not Garramone, the Principal of Central Park—who called it "my house." (Doc. 479-28; Doc. 476-7 at 5.) And the work Camp completed at the property reflected, among other things, removing negative posts about Couture, Garramone, and Garramone Plastic Surgery.

[8] Central Park also argues that Noshirvan cannot prove Camp was the speaker since his accounts were hacked by James McGibney, however, this fact is disputed and thus improper for granting summary judgment.

These alone could raise a reasonable inference that Camp was not an employee or agent of Central Park, but rather Garramone Plastic Surgery. What's more, Noshirvan cites a letter signed by Garramone stating Camp was an employee of Garramone Plastic Surgery during this time frame. (Doc. 476-43.) As such, a reasonable jury could conclude that Camp was not an agent or employee of Central Oark. So Noshirvan's motion as to Count VII is likewise denied.

**f. Count IX**

Couture is charged with defamation in Count IX, and both parties seek summary judgment. (Doc. 434 at ¶¶ 270-84.) Noshirvan argues he proved all the elements (Doc. 516 at 20-22), and Couture argues Noshirvan has failed to prove falsity or that Camp is an agent or employee of Couture. (Doc. 540 at 18-19, 22-24.)

The Court adopts without repeating its reasoning as to falsity in the above section. *See* supra section III.b.(2). Further, a reasonable jury could conclude that Camp is an agent acting on behalf of Couture since she has stated she hired Camp. (Doc. 476-7 at 3.) What's more, the scope of Camp's "reputation management" work is disputed, providing additional grounds to deny both Couture's and Noshirvan's motion. Given a fact question remains for the jury, Couture and Noshirvan's respective motions for summary judgment as to Count IX are denied.

**g. Count XII**

In his final count, Noshirvan alleges that Garramone Plastic Surgery, through Camp, Couture, and Garramone, intentionally inflicted emotional distress against him. (Doc. 434 at ¶¶ 285-319.) Garramone Plastic Surgery contends Noshirvan has failed to show any intentional conduct by it or anyone on its behalf, any tortious conduct that was outrageous and beyond all bounds of decency, and any evidence that he suffered emotional distress. (Doc. 565 at 22-25.) As was discussed in Count IV, there remains jury questions as to the scope of Camp's "reputation management" work and whether Noshirvan suffered severe emotional distress. Accordingly, Noshirvan's and Garramone Plastic Surgery's motions will be denied as to Count XII.

## IV. Conclusion

At bottom, this record presents a thicket of irreconcilable testimony and factual disputes that this Court cannot decide at summary judgment. Sorting out who agreed to what, which communications crossed the line into actionable misconduct, and what motivated the parties' escalating actions are questions for the jury. Accordingly, it is **ORDERED:**

(1) Plaintiff Danesh Noshirvan's Motion for Partial Summary Judgment (Doc. 516) is **DENIED.**

(2) Garramone Plastic Surgery's Motion for Summary Judgment on Plaintiff's Third Amended Complaint (Doc. 536) is **DENIED AS MOOT**.

(3) Garramone Plastic Surgery's Motion for Summary Judgment on Plaintiff's Third Amended Complaint (Doc. 565) is **GRANTED IN PART AND DENIED IN PART** as follows:

a. Judgment shall be entered in favor Defendant Garramone Plastic Surgery as to Count II and against Plaintiff Danesh Noshirvan who shall take nothing as to this Count. Judgment shall be withheld until the conclusion of trial.

b. Garramone Plastic Surgery's motion is **DENIED** as to Counts III, IV, VI, and XII.

(4) Anti-Doxing League Inc., Central Park of Southwest Florida, LLC, Patrick Trainor, and The Law Office of Patrick Trainor Esq., LLC's Joint Motion for Summary Judgment (Doc. 539) is **GRANTED IN PART AND DENIED IN PART** as follows:

a. Judgment shall be entered in favor Defendants Anti-Doxing League Inc., Central Park of Southwest Florida, LLC, Patrick Trainor, and The Law Office of Patrick Trainor Esq., LLC as to Count II and against Plaintiff Danesh Noshirvan who shall

take nothing as to this Count. Judgment shall be withheld until the conclusion of trial.

b. Anti-Doxing League, Inc., Patrick Trainor, Central Park of Southwest Florida, LLC, and The Law Office of Patrick Trainor Esq., LLC's motion is **DENIED** as to Counts III, IV, and VII.

(5) Jennifer Couture, Ralph Garramone, and OMG Realty LLC's Motion for Summary Judgment (Doc. 540) is **GRANTED IN PART AND DENIED IN PART** as follows:

a. Judgment shall be entered in favor Defendants Jennifer Couture, Ralph Garramone, and OMG Realty, LLC as to Count II and against Plaintiff Danesh Noshirvan who shall take nothing as to this Count. Judgment shall be withheld until the conclusion of trial.

b. Judgment shall be entered in favor Defendant OMG Realty, LLC as to Counts III and IV and against Plaintiff Danesh Noshirvan who shall take nothing as to these Counts. Judgment shall be withheld until the conclusion of trial.

c. Jennifer Couture and Ralph Garramone's motion is **DENIED** as to Counts III and IV.

d. Jennifer Couture's motion is **DENIED** as to count IX.

**ENTERED** in Fort Myers, Florida on October 20, 2026.

Kyle C. Dudek
United States District Judge