UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DANESH NOSHIRVAN, an individual,

Plaintiff,

v. Case No: 2:23-cv-1218-KCD-KRH

JENNIFER COUTURE, an individual; RALPH GARRAMONE M.D., an individual; RALPH GARRAMONE M.D. P.A d/b/a GARRAMONE PLASTIC SURGERY; CENTRAL PARK OF SOUTHWEST FLORIDA, LLC; OMG REALTY, LLC; THE LAW OFFICE OF PATRICK TRAINOR ESQ, LLC d/b/a THE LAW OFFICE OF PATRICK TRAINOR; PATRICK TRAINOR, an individual; and ANTI-DOXING LEAGUE INC.,

Defendants.

---

**ORDER**

The last batch of claims in this case center around Counter-Defendant Danesh Noshirvan's alleged defamatory statements about Jennifer Couture, Ralph Garramone, and Garramone Plastic Surgery. All parties have moved for summary judgment. (Docs. 538, 678.) Summary judgment, however, can only

be granted as to one statement. The rest pose jury questions. So, Counter-Plaintiffs' motion (Doc. 538) is **DENIED** and Counter-Defendant's motion (Doc. 678) is **GRANTED IN PART AND DENIED IN PART**.

## I. Background

This four-year-long dispute started in January 2022 after Noshirvan posted a video of Couture. It captured Couture confronting a young woman in a Dunkin' Donuts parking. After the video went viral, news networks broadcast it around the nation. The events between the initial video and the beginning of the counterclaims are hotly disputed, but the gist is that heated words were exchanged.

Relevant to these defamation counterclaims, Noshirvan posted articles and videos across his social media accounts. The posts began in January 2025 and concerned Counter-Plaintiffs. They make up roughly five categories: (1) Couture and Garramone are child stalkers; (2) Counter-Plaintiffs hired Joseph Camp, among others, to go after Noshirvan and his family; (3) Counter-Plaintiffs engaged in illegal/harmful activity; (4) Couture and Garramone are racist and violent; and (5) Couture is having a sexual affair with the Lee County Sheriff for favorable treatment. (*See* Appendix (hereinafter App.).)

Counter-Plaintiffs demanded that the publications be retracted or taken down by serving a Florida Statute § 770.01 notice on Nicholas Chiapetta—Noshirvan's attorney in this case. But the publications were neither retracted

nor taken down. So Counter-Plaintiffs now seek recovery for damage to their reputation, for money spent on security systems and security personnel, and for Couture's mental health treatment.

## II. Legal Standard

Summary judgment is not a substitute for trial. It is appropriate only "when a movant shows there is no genuine dispute as to any material fact and [he or she] is entitled to judgment as a matter of law." *Gonzalez v. Indep. Ord. of Foresters*, No. 24-10758, 2025 WL 337898, at *2 (11th Cir. Jan. 30, 2025). "When deciding a motion for summary judgment, a judge is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Las Brisas Condo. Homes Condo. Ass'n v. Empire Indem. Ins. Co.*, No. 2:21-cv-41-KCD, 2023 WL 8978168, at *1 (M.D. Fla. Dec. 28, 2023). "An issue is genuine if a reasonable jury could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019).

The principles governing summary judgment do not change when the parties file cross-motions for summary judgment. *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001). Cross-motions for summary judgment are treated separately, "view[ing] the facts in the light most favorable to the non-moving party on each motion." *Cowen v. Sec'y of Ga.*, 22 F.4th 1227, 1231 (11th Cir. 2022). Ultimately, "[w]hen parties jointly move

for summary judgment, the court has three options: granting summary judgment for the plaintiff under the defendant's best case, granting summary judgment for the defendant under the plaintiff's best case, or denying both motions for summary judgment and proceeding to trial." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir. 2023).

**III. Discussion**

As mentioned, both parties contend they are entitled to summary judgment. Counter-Plaintiffs argue there is only one conclusion: Noshirvan published 53 defamatory statements for which he has no viable defense. Noshirvan, however, suggests Counter-Plaintiffs are mistaken because there are six independent grounds that preclude liability. To slightly ease the Court's analysis, it first determines what statements are actionable. Then it considers the elements of the defamation claims.

**A. Actionable Statements**

Noshirvan's primary arguments are that his statements are not actionable because they are substantially true, rhetorical hyperbole, pure opinion, or privileged. The Court addresses each in turn.

There is nothing substantially true about Noshirvan's statements. "Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the gist or the sting of the statement is true." *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1234 (Fla. Dist. Ct. App. 2021). To determine if

the gist is true, the Court considers "whether the incorrectly reported material would have had a different effect on the mind of the viewer[.]" *Id.* at 1235.

The main problem with Noshirvan's argument is his myopic view of his statements. Take, for example, his claims about Counter-Plaintiffs paying Camp or their relationship with Camp.[1] It is technically true that Garramone Plastic Surgery paid Camp and that the Counter-Plaintiffs have acknowledged *some* relationship with Camp. (Doc. 476-3; Doc. 476-4; Doc. 479-42.) However, the statements do not limit themselves to such allegations. The statements continue on claiming the payments were for Camp to harass, defame, and stalk Noshirvan and his family. A very different sting than Noshirvan claims.

The same goes for Noshirvan's other statements. Though flyers were hung up around Noshirvan's hometown, they did not accuse him of being a "local pedophile" or "child murderer."[2] Rather the flyers called him a "predator" and "swinger." (Doc. 476-16; Doc. 476-17; Doc. 476-21; Doc. 479-9.) Admittedly, one is still a serious accusation, but nowhere near the same sting as Noshirvan's original statement. Similar issues arise for Noshirvan's statements about Couture and Garramone taking pictures of his children.[3] Couture and Garramone's motive in obtaining the picture of Noshirvan and his

[1] *See* app. statements 3, 5, 9, 11, 18, 20, 23–29, 31, 41, 46, 52.

[2] *See* app. statement 22.

[3] *See* app. statements 1, 16, 44.

kids is unclear. It could be the motive was simply to obtain a picture of Noshirvan. (Doc. 693-1 at ¶¶ 4–6, 9; Doc. 693-2 at ¶¶ 3–5, 8.) The remaining statement about Counter-Plaintiffs being racists, white supremacists, and Nazis rests on too many disputed facts.[4] So, none of the statements are protected as substantially true.

As for whether the statements are rhetorical hyperbole or pure opinion, the Court finds only one is not actionable. The First Amendment protects both rhetorical hyperbole and pure opinion as "statements that cannot reasonably [be] interpreted as stating actual facts' about an individual." *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990). Rhetorical hyperbole describes "loose, figurative, or hyperbolic language." *See Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006). Pure opinion, on the other hand, is a statement "based on facts which are otherwise known or available to the reader or listener." *See Razner v. Wellington Reg'l Med. Ctr., Inc.*, 837 So. 2d 437, 442 (Fla. Dist. Ct. App. 2002). Regardless of whether it is rhetorical hyperbole or pure opinion, the Court must "construe the statement in its totality." *See Flynn v. Wilson*, 398 So. 3d 1103, 1112 (Fla. Dist. Ct. App. 2024). This includes "all of the words used in the publication" and the publication's context—*i.e.*, the medium used and the audience. *Id.*

---

[4] *See* app. statement 5.

Noshirvan, again, cherry-picks words rather than looking to the whole context of his publications. Noshirvan's publications hold themselves out as if they are news stories. The titles include "BREAKING!," "TESTIMONY INSIDE," or even "Proof Inside." (Doc. 678-2 at 27, 32, 43, 58.) The posts even format themselves like a news publication with the location of the story at the beginning. (*Id.* at 4, 8, 10, 27, 33, 37, 45, 55, 60.) Further, Noshirvan commonly leaves out key pieces of information he claims to place in his articles. For example, in one article where he accuses Garramone of committing perjury, he fails to provide the testimony where he allegedly perjured himself. (*Id.* at 53.)

With this context in mind, it is hard to see how all the statements (except No. 32) are not actionable. Some accuse Counter-Plaintiffs of crimes. Others allege sexual affairs. And though some may appear benign, the publications' content attributes reprehensible conduct to the Counter-Plaintiffs. To be fair to Noshirvan, he has used "allegedly" or "alleged" in describing some actions, but this is the exception rather than the rule. (*Id.* at 3, 10.) Still, it is often not enough to just couch the statements in terms of opinion because it still implies some fact. *See Milkovich*, 497 U.S. at 18–19 ("[T]he statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'").

Noshirvan's argument is also belied by his own statements throughout his publications where he thanks the Counter-Plaintiffs for "proving [his] case

for [him]," (Doc. 678-2 at 2), and says he is "not just, like accusing them of this[.]" (*Id.* at 1.) Such statements are clearly not rhetorical hyperbole nor pure opinion.

There is one exception—the Court finds that statement No. 32 is not actionable. The post may mention some form of relationship between Camp and Couture, but it leaves too much to the imagination about the text messages. The other publications had images of Camp's text messages, providing a more objective statement of fact. As such, it is hard to see how this is actionable. So, Noshirvan's motion is granted as to statement No. 32.

Moving on to Florida's litigation privilege and good-faith privilege, neither protects Noshirvan. Florida's litigation privilege provides absolute immunity "to any act occurring during the course of a judicial proceeding . . . so long as the act has some relation to the proceeding." *See Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380, 383 (Fla. 2007). However, where a statement is made outside a formal proceeding, Florida extends a qualified privilege if it is "connected with, or ha[s] some relation to, an underlying lawsuit." *See DelMonico v. Traynor*, 116 So. 3d 1205, 1219 (Fla. 2013), *abrogated on other grounds by*, *Askew v. Fla. Dept. of Child. & Fams.*, 385 So. 3d 1034, 1036 n.2 (Fla. 2024).

As Noshirvan sees it, since most of the alleged statements "occurred during the lawsuit or describe allegations in the lawsuit" they are protected.

(Doc. 569 at 17–20.) There is just one problem. The statements were published on Noshirvan's social media accounts—*i.e.*, outside the courtroom. Noshirvan does not qualify for absolute immunity under Florida law because his statements did not occur during any formal proceeding. *See Cole*, 950 So. 2d at 383.

Nor will the qualified litigation privilege apply because Noshirvan made the statements to non-interested parties. While Noshirvan cites *DelMonico* to claim his audience was an interested party, his argument falls short. *See* 116 So. 3d at 1219–20. Unlike in *DelMonico*, Noshirvan was not conducting an informal investigation for potential witnesses or to pursue claims. *See id.* Instead, he was sharing the allegations with his followers—a key distinction that the Florida Supreme Court even noted in discussing why the qualified privilege existed. *See id.* at 1218–20. The mere fact that people wanted to hear about the case is not enough. *See id.* So, Noshirvan is not protected by the litigation privilege.

The same goes for Florida's good-faith qualified privilege. Florida provides a good-faith qualified privilege for statements that are otherwise actionable so long as they were made in good faith by someone having an interest or duty to a person having a corresponding interest or duty. *See Nodar v. Galbreath*, 562 So. 2d 803, 809 (Fla. 1984); s*ee also, Thomas v. Tampa Bay*

*Downs, Inc.*, 761 So. 2d 401, 404 (Fla. Dist. Ct. App. 2000) (providing the elements for the privilege).

As the Court just explained, Noshirvan did not make his statements to interested parties. Florida law has yet to articulate any precise measure for when an interest is mutual, but rather relies on intuition and the inquiry is flexible. *See e.g., Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1267 (S.D. Fla. 2004) (finding a mutual interest between a financial advisor and their clients in protecting "the stability of their investment") *Nodar*, 462 So. 2d at 809 (finding a mutuality between a parent and a teacher in a child's difficulties in class); *Thomas*, 761 So. 2d at 404 (finding a mutuality of interest between employees and their coworkers in their job duties). However, such mutuality of interest can be lost when the defendant fails to sufficiently tailor his audience to ensure that they all share the same particular "property, business, professional, or civic" interest. *See Falic*, 347 F. Supp. 2d at 1267.

Unlike the above examples, Noshirvan's audience only knows of him through social media. This parasocial relationship lacks any mutuality in business, employment, property, civic, or family interest. Instead, the audience has a mere "shared interest in [some] general subject matter"—this lawsuit—which is insufficient. *See Falic*, 347 F. Supp. 2d at 1267; *see also Teare v. Local Union No. 295*, 98 So. 2d 79, 83 (Fla. 1957) (finding no mutuality of interest between a union plumber and clients, where the clients were not interested in

whether a plumber was a union member); *Scholz v. RDV Sports, Inc.*, 710 So. 2d 618, 626 (Fla. Dist. Ct. App. 1998) (finding no mutuality between a basketball team unilaterally criticizing its former assistant coach and the news media, who was only interested in hearing the criticism). Though there is no bright-line rule for mutuality of interests, a mere parasocial relationship is insufficient for Noshirvan to obtain Florida's good-faith qualified privilege.

**B. Florida Statute § 770.01**

Noshirvan's next argument—*i.e.*, the counterclaims fail since Counter-Plaintiffs served Chiapetta with a retraction demand rather than Noshirvan—is frivolous. Florida Statute § 770.01 requires a plaintiff to serve written notice on a media defendant, specifying the allegedly false statements, at least five days before filing suit. Assuming without deciding that Noshirvan is a media defendant, his argument fails. It ignores the agency relationship between Chiapetta and Noshirvan—the attorney-client relationship. *See Hoch v. Loren*, 273 So. 3d 56, 58–59 (Fla. Dist. Ct. App. 2019). So Noshirvan was properly served notice.[5]

[5] Additionally, it is likely that Counter-Plaintiffs' counsel was ethically required to communicate with Chiapetta rather than Noshirvan. *See* Fla. Rules Regulating the Fla. Bar 4-4.2(a) (2026). So Noshirvan's argument cannot prevail when it would require attorneys to violate their ethical responsibilities.

**C. Limited Public Figures**

Only one argument remains before moving to the defamation elements. Noshirvan contends Counter-Plaintiffs are limited public figures. Not so.

Limited public figures are individuals "who have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *See Young v. Kopchak*, 368 So. 3d 1001, 1005 (Fla. Dist. Ct. App. 2023); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). In other words, there must be a public controversy that Counter-Plaintiffs play some sufficient central role in. *See id.* at 1006. A public controversy is "any topic upon which sizeable segments of society have different, strongly held views." *See Della-Donna v. Gore Newspapers Co.*, 489 So. 2d 72, 76 (Fla. Dist. Ct. App. 1986). Simply "[a]ttracting the public's interest is not enough." *Id.* Instead, a reasonable person should "have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." *Id.* at 77.

This case is a far cry from a public controversy. Though national news outlets reported on the Dunkin' Donuts incident, this reporting is more like the tabloids and clickbait news. No reasonable person would expect for anyone beyond the immediate parties to be impacted by the lawsuit's resolution. After all, this case centers around parties effectively throwing mud at each other.

Nothing more. So Counter-Plaintiffs are not limited public figures and need not prove actual malice.

**D. Defamation**

At last, the Court turns to the claims at issue. To establish liability for defamation under Florida law, a party must prove: (1) the defendant published a statement; (2) such statement was false; (3) the defendant acted at least negligently on a matter concerning a private person; (4) actual damages; and (5) such statements are defamatory. *See Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).

The Court need not go any further than analyzing falsity to deny Counter-Plaintiffs' motion. For simplicity, the Court again relies on categories: (1) Couture and Garramone are child stalkers; (2) Counter-Plaintiffs hired Joseph Camp, among others, to go after Noshirvan and his family; (3) Counter-Plaintiffs engaged in illegal/harmful activity; (4) Couture and Garramone are racist and violent; and (5) Couture is having a sexual affair with the Lee County Sheriff for favorable treatment.

Starting with the child stalker statements, Noshirvan points to the picture of him and his kids at his home. (Doc. 479-8.) The picture was taken by friends of Couture and Garramone and shared with Camp. (Doc. 476-14 at 5.) Since Camp later used that picture to send Noshirvan vulgar texts about the children, a jury could conclude that Couture and Garramone stalked

Noshirvan's kids. The second, third, and fourth categories are likewise replete with disputed facts. The crux of this case is the extent of Counter-Plaintiffs' relationship with Camp, and a jury could go either way. The fifth category about an alleged sexual affair could also be true. True, there is no evidence of a sexual affair in the record. But there is evidence that Couture did expect at least some modicum of preferential treatment due to her relationship with the Lee County Sheriff. (Doc. 479-3 at 28, 34–35.) A reasonable jury could then make a reasonable inference that it is due to some affair. So Counter-Plaintiffs' motion is denied as a jury question remains at least as to falsity.

Noshirvan's arguments about damages or who the statements are "of and concerning" are easily discarded. For starters, there are sufficient damages in the record for the jury to conclude that Counter-Plaintiffs' were harmed. Even ignoring the alleged reputational damage, Counter-Plaintiffs hired security personnel, installed an enhanced security system, and Couture sought mental health treatment. (Doc. 538-1 ¶ 18, Doc. 538-2 ¶ 16, Doc. 538-3 ¶¶ 15–16.) Whether a jury buys it or not is not for the Court to decide. *See Daniels v. HSN, Inc.*, No. 8:18-cv-3088-T-24 JSS, 2020 WL 533927, at *6–7 (M.D. Fla. Feb. 3, 2020) (collecting cases). Further, there are at least five statements that specifically identify Garramone Plastic Surgery. (*See* app. statements 1, 9, 23, 25, 29.) A reasonable jury could also conclude other

statements are about Garramone Plastic Surgery even if not explicitly named. (*See id.* at statements 3, 34.) So Noshirvan's arguments fail.

## IV. Conclusion

Out of the 53 alleged defamatory statements, only one is not actionable. The rest are left for the jury to decide. There are simply too many issues of material fact that the Court cannot resolve at this stage of the proceedings. Accordingly, it is **ORDERED:**

(1) Counter-Plaintiffs' Motion for Summary Judgment (Doc. 538) is **DENIED.**

(2) Counter-Defendant's Motion for Summary Judgment (Doc. 678) is **DENIED IN PART AND GRANTED IN PART** as follows:

a. Judgment shall be entered in favor of Counter-Defendant Danesh Noshirvan as to Statement 32 in Counts III and IV and against Counter-Plaintiff Jennifer Couture who shall take nothing as to these Counts. Judgment shall be withheld until the conclusion of trial.

b. Danesh Noshirvan's motion is otherwise **DENIED.**

**ENTERED** in Fort Myers, Florida on October 20, 2026.

Kyle C. Dudek
United States District Judge

## Appendix

| Statement Number: | Content of the Statement |
|---|---|
| 1[1] | "I am suing my children's stalkers, Jennifer Couture and Ralph Garramone of Fort Myers, Florida, and their company, Garramone Plastic Surgery, where they have their entire company. They literally had the, the employees of their company, work all day, stalking more, harassing me and coming after my children." |
| 2 | "Hey, I'm not just, like, accusing them of this. Notice I don't say 'allegedly.' They admitted to *all* this in court." |
| 3 | "That's their *new* hire [Camp], that's their *new* for-hire troll. And this new for-hire troll, has been again, coming after my children, coming after my family, and, you know, targeting and harassing me." |
| 4 | "All these people are gonna go to prison." |
| 5 | "So Jennifer Couture, Ralph Garramone of Fort Meyers [sic], you two that want to cozy up with Nazis, white supremacists and child stalkers because you guys are ones yourselves." |
| 6 | "It's interesting to me that you've had to *admit* in court that you *are* in fact child stalkers. You had to admit that . . . Maybe you shouldn't have done those things." |
| 7 | "Perhaps your children will be taken from you, perhaps Family Services will take the rest of your children from you, when they see that you're actual child stalkers. I hope they never get wind of the fact that *you*, Jennifer Couture and Ralph Garramone of Fort Meyers [sic], are child stalkers, because that would be very bad for you." |
| 8[2] | "Jennifer and Ralph are racist and violent extremely racist and extremely violent." |
| 9[3] | "Jennifer Couture and Ralph Garramone of Garramone Plastic Surgery should have their actions and the actions of their violent goons like Joey Camp and Richard Luthmann attached to them." |
| 10 | "These sick ****s should be in jail, but it's alleged Jennifer Couture is raw dogging Lee County Sheriff |

[1] Statements 1–7 are from a TikTok and YouTube video. (Doc. 678-2 at 1–2.)
[2] The parties failed to provide the necessary authentication for this publication. So, the Court will not consider it for the cross-motions.
[3] Statements 9–10 are from an Instagram post. (Doc. 678-2 at 3.)

| | |
|---|---|
| | Carmine Marceno in exchange for looking the other way when she clearly violated her probation.” |
| 11[4] | “As you may know, I’m suing Jennifer Couture and Ralph Garramone, who employed goons like Joey Camp to harass myself and my family for the past 3 years.” |
| 12 | “They’ve tried every nasty and illegal tactic to sabatoge [sic] this case including, but not limited to , intimidating witnesses, experts, and lawyers. |
| 13[5] | Thumbnail image of Jennifer Couture with the label “Child Stalker” |
| 14[6] | “Hey everyone great to be here! @legendofthesouth is the woman I’m suing for stalking my children. I didn’t realize they allowed child stalkers on this platform.” |
| 15[7] | “Jennifer Couture and her Plastic Surgeon husband stalk children. Part 1” |
| 16 | “Ralph Garramone and Jennifer Couture (@legendofthesouth) personally drove to my house to photograph my children without my knowledge to send to me accompanied with sexual threats against them.” |
| 17[8] | “Jennifer Couture and her Plastic Surgeon husband stalk children. Part 2” |
| 18 | “Jennifer Couture’s misplaced rage begins to quickly spiral out of control after her manuscript was rejected as ‘misinformation.’ Later she recruits the assistance of a troll-for-hire, felon, white supremacist, extremist, and alleged pedophile, Joseph Anthony Camp to carry out her revenge against everyone.” |
| 19 | “Jennifer was outraged that Sheriff Carmine Marceno would apply the law to her as she expected special treatment due to their alleged sexual affair and because Jennifer claims that her and her husband Ralph Garramone donate to the Sheriff’s Office.” |
| 20 | “Read her ramblings below and stay tuned for Part 3 where Jennifer Couture and Ralph Garramone hire white supremacists and serial stalker, Joey Camp . . . .” |

[4] Statements 11–12 are from an Instagram post. (Doc. 678-2 at 4.)
[5] The highlight can still be found on Noshirvan’s Instagram page. (Doc. 678-2 at 5.)
[6] Statement 14 is from a Substack post. (Doc. 678-2 at 7.)
[7] Statements 15–16 are from a Substack article. (Doc. 678-2 at 8–9.)
[8] Statements 17–20 are from a Substack article. (Doc. 678-2 at 10–26.)

| | |
|---|---|
| 21[9] | "BREAKING! Jennifer Couture and Ralph Garramone stalk children (TESTIMONY INSIDE)" |
| 22 | "Jennifer Couture and Ralph Garramone personally travelled Florida [sic] to Pennsylvania to flyer my hometown with posters doxxing me and defaming me by labeling me 'a local pedophile' with a false story about me murdering a kid that doesn't exist in an effort to get my neighbors to murder me." |
| 23[10] | "Breaking! Garramone Plastic Surgery PAID terrorist Joey Camp! (Proof Inside!)" |
| 24 | "After months of lying to the court and denying a relationship with Joey Camp, Ralph Garramone and Jennifer Couture were forced to admit their relationship with cyber stalker and pedophile Joseph Anthony Camp." |
| 25 | "Ralph Garramone's company paid known troll4hire, white supremacist, and pedophile Joey Camp to harass and threaten Tiktoker @thatDaneshguy." |
| 26 | "After months of denying a relationship with Joey Camp to the court, Ralph Garramone and Jennifer Couture provided discovery items showing that they had a VERY close relationship with the terrorist." |
| 27[11] | "RACIST & VIOLENT See what Jennifer Couture and Ralph Garramone paid Joey Camp to send me!" |
| 28 | "Jennifer Couture and Ralph Garramone of Garramone Plastic Surgery are an affluent couple who use their wealth and influence to terrorize anyone who wrongs them by employing violent felons and pedos." |
| 29 | "Jennifer Couture and Ralph Garramone have recently admitted in court that their company Garramone Plastic Surgery paid Joey for his services." |
| 30 | "Again, this is not even a portion of what they've done to terrorize us over the past 3 years, this isn't even the most illegal thing they did, but these disgusting tactics should always be associated with them." |

[9] Statements 21–22 are from a Substack article. (Doc. 678-2 at 27–31.)
[10] Statements 23–26 are from a Substack article. (Doc. 678-2 at 32–35.)
[11] Statements 27–31 are from a Substack article. (Doc. 678-2 at 36–39.)

| | |
|---|---|
| 31 | "An example of the 100s of text messages Jennifer Couture and Ralph Garramone paid Joey Camp to send me every day." |
| 32[12] | "For the first time, I'm going to post every single text message that Jennifer Couture directed Joey Camp to send me." |
| 33[13] | "And now she's turned into, like, monstrous, demonic, like child stalking Karen. And this plastic surgeon, this guy is, the man with a doctorate, a man with a doctorate—what is he doing, skipping his son's graduation parties and, like, stalking my one- and five-year old. What the hell?!? What the hell? A man with a doctorate gets his own company involved. Using company accounts to defame me." |
| 34 | "You used your company, to try to, heh, to stalk children!" |
| 35 | "Ralph Garramone is a full grown man with a doctorate, blaming a TikToker that his customers are not interested, in a child stalker. What, am I not allowed to tell people that you stalk my children?" |
| 36 | "The one thing I actually did, that I admit to doing and I'll admit to doing right now, while I know they're screen recording as they stalk me, and I'm, the fact that this screen recording that they are gonna send the judge later exists, is proof, that they stalk me." |
| 37 | "I'll say right now, for the past three years, nonstop, I've been referring to them as child stalkers." |
| 38 | "With, accusing me of everything under the sun, but they never accused me of defamation, for calling them child stalkers. For three years straight and I'm still saying it, 'cause they are." |
| 39 | "And now we know why, if you've seen the article that I posted the testimony. Now we know why, because they did it. Well, I knew the whole time. They did it. They are child stalkers. |
| 40 | "So, until then, I'm gonna post some things that I had already posted on other platforms, including, um— |

[12] Statement 32 is from a Substack post. (Doc. 678-2 at 40.)
[13] Statements 33–41 are from a video on Substack. (Doc. 678-2 at 41.)

| | |
|---|---|
| | declarations from people, witness intimidation, the biggest crimes they committed." |
| 41 | "Cause they did that. They, they literally paid 'em to do that." |
| 42[14] | "Having read about what my stalker has done to me, can you believe this Newsweek reporter was allegedly paid off to slander me for Couture? Hack journalist." |
| 43[15] | "BREAKING! Florida Doctor and CHILD STALKER Ralph Garramone and his wife goons CAUGHT engaging in WITNESS INTIMIDATION!" |
| 44 | "Ralph Garramone owns Garramone Plastic Surgery in Fort Myers, Florida. This full grown man with a doctorate who took his employees to my town in another state to stalk a 1 year old infant and 5 year old. His lips could not be located for comment." |
| 45 | "The defendants threaten experts who testify against them. Ralph Garramone, Jennifer Couture, and Richard Luthmann could be looking at 5-15 years in prison for this behavior alone." |
| 46[16] | "Dr. Garramone of Fort Myers is soliciting violent felons to threaten my family. I'm suing his ass for $5 million" |
| 47 | "Ralph Garramone, owner of Garramone Plastic Surgery in Fortt [sic] thinks he's some sort of mob boss, but mob bosses don't stalk and threaten infants." |
| 48 | "Dr. Ralph Garramone has committed perjury in Federal court countless times during this case, but his more serious crimes include every effort he and his co-conspirators made to prevent a fair trial." |
| 49 | "Read how this full grown man with a doctorate targeted the family of Hannah Noshirvan, an innocent woman with no online presence who has never engaged in any of this." |
| 50 | "Why are Ralph Garramone and Jennifer Couture still engaging in their terrorism while they're being sued for the exact behavior?" |

[14] Statement 42 is from a Substack post. (Doc. 678-2 at 42.)
[15] Statements 43–45 are from a Substack article. (Doc. 678-2 at 43–52.)
[16] Statements 46–50 are from a Substack article. (Doc. 678-2 at 53–57.)

| | |
|---|---|
| 51[17] | "BREAKING Tiktoker filed protective order for his kids against Jennifer Couture and Dr. Ralph Garramone of Fort Myers" |
| 52 | "Tiktoker Danesh Noshirvan @thatdanesh guy had to file a protective order against plastic surgeon Dr. Ralph Garramone and his wife Jennifer Couture to protect his young children. Their unhinged and illegal tactics and employment of felons like Joseph Camp and Richard Luthmann to carry out their abuse." |
| 53 | "Dr. Ralph Garramone of Garramone Plastic Surgery admitted in court that he and Jennifer Couture stalked Tiktoker @thatdaneshguy" |

[17] Statements 51–53 are from a Substack article. (Doc. 678-2 at 58–66.)